UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ATLANTIC HOUSING PARTNERS
L.L.L.P., A FLORIDA LIMITED
LIABILITY PARTNERSHIP;
CANTON CONSTRUCTION, LLC, A
FLORIDA LIMITED LIABILITY
CORPORATION; CONCORD
MANAGEMENT, LTD., A FLORIDA
LIMITED PARTNERSHIP; and THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD.,

     Plaintiffs,

v.                                Case No: 6:23-cv-2473-JSS-DCI

BREVARD COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
FLORIDA,

     Defendant.

_____/

### ORDER

    Defendant, Brevard County, moves to dismiss Plaintiffs' Amended Complaint (Dkt. 17) asserting that Plaintiffs lack standing, under the Fair Housing Act and Florida Fair Housing Act, violate Federal Rules of Civil Procedure 8, and fail to state plausible claims for relief under the Fair Housing Act and Florida Fair Housing Act. (Motion, Dkt. 19.)  Plaintiffs oppose the Motion.  (Dkt. 28.)  For the reasons set forth below, the Motion is granted in part and denied in part.

## BACKGROUND[1]

This case stems from Brevard County's (County) alleged violations of the Federal Fair Housing Act (FHA) and the Florida Fair Housing Act (Florida FHA). (Dkt. 17 ¶¶ 29–43.)  Plaintiffs are four businesses that possessed an economic interest in the development of an affordable housing complex in the County.  (*Id.* ¶¶ 9–14.) Specifically, The Venue at Heritage Oaks Partners, Ltd. (VHO) is the contract purchaser of the land where the complex was to be built.  (*Id.* ¶¶ 9–10.)  Atlantic Housing Partners L.L.L.P. (AHP) is the developer hired to manage the development of the complex.  (*Id.* ¶ 10.)  Canton Construction, LLC (Canton) is the construction company that contracted to build the complex. (*Id.* ¶ 11.)  Concord Management, Ltd. (Concord) is the management company that contracted to manage the complex.  (*Id.* ¶ 13).  The project never came to fruition because the Brevard County Board of County Commissioners (BCBCC) rejected AHP's bond financing application.  (*Id.* ¶ 22.)

VHO and AHP planned to develop an affordable housing complex containing 105 multi-family dwelling units (the Development) under Florida's Live Local Act.[2] (*Id.* ¶ 10.)  They planned to fund a substantial portion of the Development with federal

---

[1] The court accepts the well-pleaded, non-conclusory factual allegations in Plaintiffs' Amended Complaint (Dkt. 17) as true and construes them in the light most favorable to Plaintiffs when considering the motion to dismiss.  *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1291 (11th Cir. 2007).

[2] The Live Local Act requires municipality authorization of multifamily affordable housing. *See* Fla. Stat. § 166.04151(7)(a) ("A municipality must authorize multifamily and mixed-use residential as allowable uses in any area zoned for commercial, industrial, or mixed use if at least 40 percent of the residential units in a proposed multifamily development are rental units that, for a period of at least 30 years, are affordable.")

tax-exempt bonds and tax-credit resources they received through allocation from the Brevard County Housing Finance Authority (BCHFA) and the Florida Housing Finance Corporation pursuant to the Tax Equity and Fiscal Responsibility Act (TEFRA), 26 U.S.C. §§ 141–50. [3]  (*Id.* ¶ 14.)

TEFRA requires local government approval of the bond financing plan.  *See* 26 U.S.C. § 147(f)(2)(A)(i). [4]   On July 31, 2023, AHP submitted an application for approval of its tax-exempt bond financing plan for the Development to BCHFA.  (*Id.* ¶ 15.)  On October 25, 2023, BCHFA held a meeting to receive input from the public regarding the application.  (*Id.* ¶ 16.)  On December 5, 2023, BCBCC held a meeting on the application as required by 26 U.S.C. § 147(f)(2)(A)(i).  (*Id.* ¶ 18).  At both meetings, members of the public spoke in opposition to the Development being built. (*Id.* ¶ 20.)  At the BCBCC hearing, a representative of AHP was allowed three minutes to speak about the Development but was not allowed an opportunity to respond to members of the public who spoke in opposition to the Development.  (*Id.* ¶ 21.) Following the hearing, BCBCCs staff published a report stating that:

---

[3] TEFRA imposes requirements on the issuers of state and local government bonds. 26 U.S.C. §§ 141–50.  Under the private business use test, a bond is a "private activity bond" if "more than 10 percent of the proceeds of the issue are to be used for any private business use." 26 U.S.C. § 141(b)(1).  According to Plaintiffs' Amended Complaint, 100 percent of the proceeds of the bonds AHP applied for were intended for private business use, as the bonds were to fund the Development, a private business venture.  *See* (Dkt. 17 ¶ 14.)

[4] Private activity bonds require public approval by the governmental unit issuing the bond or the "governmental unit . . . on behalf of which such bond was issued." 26 U.S.C. § 147(f)(2)(A)(i).  There are two methods of obtaining public approval of a private activity bond: "(i) by the applicable elected representative of such governmental unit after a public hearing following reasonable public notice, or (ii) by voter referendum of such governmental unit."  26 U.S.C. § 147(f)(2)(B)(i)–(ii).  The Brevard County Commissioners chose the first method.  *See* (Dkt. 17 ¶ 18.)

> There is no fiscal impact to [BCBCC or BCHFA]. The County is only authorizing the [BCHFA] to issue the bonds under the IRS requirements for tax-exempt bonds[,] and the County shall be indemnified from the issuance of bonds and the [p]roject.

(*Id.* ¶ 19) (emphasis omitted).  Despite this report, BCBCC denied AHP's bond financing application following the hearing.  (*Id.* ¶¶ 19, 22.)

On December 27, 2023, Plaintiffs filed their initial Complaint.  (Dkt. 1.)  On January 19, 2024, the County filed a motion to dismiss.  (Dkt. 13.)  In response to the motion, on February 9, 2024, Plaintiffs filed their Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).  (Dkt. 17.)  Plaintiffs' Amended Complaint asserts two causes of action: (1) violation of the FHA, 42 U.S.C. §§ 3604 and 3613 and (2) violation of the Florida FHA, Fla. Stat. §§ 760.23, 760.26, and 760.35.  (*Id.* ¶¶ 29–43.)  Plaintiffs allege that BCBCC did not deny the bond financing application for a legitimate, nondiscriminatory reason.  (*Id.* ¶ 23.)  Further, Plaintiffs allege that the denial of the application has frustrated Plaintiffs' efforts to build the Development and that Plaintiffs have "not received the benefits of the various agreements they entered into with respect to the proposed development." (*Id.* ¶¶ 24, 27.)

On February 23, 2024, the County filed the instant Motion.  (Dkt 19.)  The County moves to dismiss Plaintiffs' Amended Complaint on three grounds.  (*Id.* at 6–14.)  First, the County argues that Plaintiffs lack statutory standing to bring their claims under the FHA and Florida FHA.  (*Id.* at 13–14.)  Second, the County argues that Plaintiffs fail to state a segregative effect or disparate impact claim under the FHA and

Florida FHA upon which relief can be granted. (*Id.* at 8–13.)  Third, the County asserts that Plaintiffs' Amended Complaint is an impermissible shotgun pleading because it lumps the Plaintiffs together and combines Plaintiffs' segregative effect and disparate impact claims together. (*Id.* at 6–7.)  Plaintiffs respond that they have standing because they are "aggrieved" persons under the broad definition of "aggrieved" in the FHA. (Dkt. 28 at 15–18.)   Second, Plaintiffs argue that they plausibly plead a claim for housing discrimination under the FHA and Florida FHA because the facts alleged permit the reasonable inference that the County's application of 26 U.S.C. § 147(f), "to the bond [f]inancing application was 'artificial, arbitrary, and unnecessary.'" (*Id.* at 10).  Third, Plaintiffs argue that the Amended Complaint is not a shotgun pleading because it identifies each of the Plaintiffs and their corresponding economic interest in the Development. (*Id.* at 7.)  The court will address each argument in turn.

## APPLICABLE STANDARDS

### A. Standing

"The party invoking federal jurisdiction bears the burden of establishing standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  At the pleading stage, a plaintiff must plead sufficient facts to establish each element of standing; that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *accord Lujan*, 504 U.S. at 560–61.  If a plaintiff's injury is one which is "stigmatic" in nature, or generally "suffered by all

members of a racial group" when the alleged discrimination is racial, the plaintiff must assert a "judicially cognizable injury" to survive dismissal. *Allen v. Wright*, 468 U.S. 737, 754 (1984). A judicially cognizable injury cannot be an "abstract stigmatic injury." *Id.* at 756. Rather, a stigmatic injury is judicially cognizable if there is "some concrete interest with respect to which [the injured parties] are personally subject to discriminatory treatment," and that interest "satisf[ies] the causation requirement of [the] standing doctrine." *Id.* at 757 n.22. Absent standing, a claim is due to be dismissed. *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005). A dismissal for lack of standing "has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (citing *Cone Corp. v. Fla. Dep't of Transp.,* 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)).

### B. Shotgun Pleading

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to "contain . . . a short and plain statement of [a] claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). Federal Rule of Civil Procedure 10(b) requires the plaintiff to "state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). To "promote clarity," Rule 10(b) also requires the plaintiff to state "each claim founded on a separate transaction or occurrence . . . in a separate count." *Id.* "Complaints that violate either Rule 8(a)(2) or Rule 10(b), or both, are often disparagingly referred to

as 'shotgun pleadings.'" *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015).  Shotgun pleadings "fail . . . to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id*. at 1323.  A court may dismiss a complaint as a shotgun pleading "where 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Id.* at 1325 (quoting *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.,* 77 F.3d 364, 366 (11th Cir. 1996)).

### C. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all well-pleaded factual allegations as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Lotierzo v. A Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir. 2002).  To survive a motion to dismiss, a pleading must allege facts that reasonably demonstrate that evidence exists to support the plaintiff's claims. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007).  A plaintiff cannot put forth solely "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Iqbal*, 556 U.S. at 678.  "To avoid dismissal, the 'complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face.'"  *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  "A complaint is plausible on its face when it contains sufficient facts to support a reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  The plausibility standard requires "more than a sheer possibility that a defendant

has acted unlawfully." *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

## ANALYSIS

### A.    Standing

The County contends that Plaintiffs lack statutory standing to bring their claims because they "are entities pursuing a commercial venture for their own benefit—not individuals of a protected class who are trying to vindicate their rights." (Dkt. 19 at 14.)  Plaintiffs counter that they have statutory standing under the FHA because their alleged financial injury falls within the zone of interests the FHA protects and that they have alleged sufficient facts to satisfy the Article III standing requirements. (Dkt. 28 at 15–20.)

Under 42 U.S.C. § 3613, "[a]n aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A).  An "aggrieved person" "includes any person who claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i).  A statutory cause of action is presumed to extend only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014).  Statutory standing is very broad under the FHA and Florida FHA.  *See Bank of Am. Corp. v. City of Miami*,

*Fla.*, 581 U.S. 189, 198 (2017) ("This Court has repeatedly written that the FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing . . . as broadly as is permitted by Article III of the Constitution."); *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1408–09 (11th Cir. 1989) ("Here, [the plaintiff developer] alleges its injury results from racial animus. Thus, [the plaintiff developer's] allegation of injury was sufficient to establish standing under the [FHA]. Standing under the [Florida FHA] . . . should be treated similarly because [the Florida FHA's] identical in substance to [FHA]."); *River Cross Land Co., LLC v. Seminole Cnty.*, No. 6:18-cv-01646-Orl-22KRS, 2019 WL 12518729, at *3 (M.D. Fla. Feb. 13, 2019) ("[I]t is well-established that developers . . . can bring suit under the FHA so long as they can establish [Article III] standing.")

Here, Plaintiffs have alleged sufficient facts to confer standing under the FHA and the Florida FHA based on a financial injury because they allege that they have "not received the benefits of the various agreements they entered into with respect to the proposed development," due to BCBCC's arbitrary denial of the bond financing application. (Dkt. 17 ¶¶ 22–28.) *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015) (noting that private developers can bring FHA claims "to vindicate the FHA's objectives and to protect their property rights by stopping municipalities from enforcing arbitrary and, in practice, discriminatory ordinances barring the construction of certain types of housing units.") Further, Plaintiffs have also alleged sufficient facts to confer standing under the FHA and the Florida FHA because they allege the County's arbitrary denial of the bond financing

application frustrated Plaintiffs' AHP, Canton, and Concord's efforts to develop, construct, and manage the Development since the funds expired December 31, 2023, without the County's approval.  (Dkt. 17 ¶¶ 24–27.)

As the court finds that Plaintiffs have alleged sufficient facts to support standing under the FHA and the Florida FHA, the court now turns to Plaintiffs' Article III requirements.  To establish Article III standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc.*, 578 U.S. at 338.  Here, taking all of Plaintiffs' factual allegations to be true, the court concludes that Plaintiffs have properly asserted Article III standing.  First, Plaintiffs allege an injury-in-fact by alleging that denial of the bond financing application altogether frustrated the plans for the Development to be built, developed, and managed and that Plaintiffs have not "received the benefits of the various agreements they entered."  (Dkt. 17. ¶¶ 24–27.) Second, Plaintiffs plausibly allege that their injuries are fairly traceable to the County's alleged conduct because "[t]he County's utilization of [TEFRA's approval requirements] to arbitrarily deny the requested [b]ond [f]inancing has altogether frustrated Plaintiffs' efforts to develop the [housing] [p]roject." (Dkt. 17 ¶ 24.) *See Village of Arlington Heights,* 429 U.S. at 261 (holding that developer that contracted to purchase a tract of land to build racially integrated low and moderate income housing had Article III standing when the government defendant's denial of rezoning land from single-family to multiple-family classification stood "as an absolute barrier to constructing the housing [for which the developer] had

- 10 -

contracted [to build].")  Last, Plaintiffs' injury would be redressed by a favorable decision because Plaintiffs are seeking monetary damages, which if granted as authorized by 42 U.S.C. § 3613(c)(1), would remedy Plaintiffs' injuries resulting from the County's alleged arbitrary denial of the bond financing application in violation of the FHA and Florida FHA.  (*Id.* ¶¶ 35, 43.)  *See also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."); *Harding v. Orlando Apts., LLC*, No. 6:11-cv-85-Orl-19DAB, 2011 WL 1457164, at *4 (M.D. Fla. Apr. 15, 2011) ("'[T]he fundamental distinction between arguing no cause of action and arguing no Article III redressability, . . . [is] that the former argument is not squarely directed at jurisdiction itself, but rather at the existence of a remedy for the alleged violation of federal rights[.]'") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 96 (1998)).  Accordingly, Plaintiffs have established Article III standing to maintain their claims.

### B.    Shotgun Pleading

Shotgun pleadings generally present in the following ways: (1) a complaint "containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) a complaint "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that fails to separate "into a different count each cause of action or claim for relief"; and (4) complaints containing "multiple claims against

multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland*, 792 F.3d at 1321–23.

The County contends that the Amended Complaint constitutes the third type of shotgun pleading "because it lumps the Plaintiffs together, as well as their purported claims against [the] County." (Dkt. 19 at 6.)  While the Amended Complaint could be clearer, it puts the County on sufficient notice of the claims against it and the grounds upon which they rest because all of Plaintiffs' claims stem from the County's denial of the bond financing application.  Specifically, Plaintiffs sufficiently allege that but for BCBCC's arbitrary denial of the bond financing application, VHO and AHP would have been able to develop an affordable housing community with the funds it sought approval for, Canton would have been able to construct the Development as contracted, and Concord would have been able to manage it as contracted.  (Dkt. 17 ¶¶ 9–28.)  Further, a court's shotgun pleading analysis is focused on a plaintiff lumping multiple claims against different defendants together, creating a notice problem as to which defendant committed what harm—not lumping multiple plaintiffs together that have alleged injuries that all flow from one defendant's singular decision.  *Weiland*, 792 F.3d at 1325 (explaining that a court may dismiss a complaint as a shotgun pleading "whe[n] 'it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief'") (quoting *Anderson,* 77 F.3d 364, 366).

However, the court does find it problematic that Plaintiffs lump their segregative effect and disparate impact claims together into one count under each statute since both claims require different elements.  (Dkt. 17 ¶¶ 29–43.)  *See Weiland*, 792 F.3d at 1322–23; *Novak v. Cobb Cnty. Kennestone Hosp. Auth.*, 74 F.3d 1173, 1175 & n.5 (11th Cir. 1996) (referring to a complaint that pleaded multiple causes of action in a single count as "a quintessential 'shotgun pleading'")  If Plaintiffs choose to file a second amended complaint, the court instructs Plaintiffs to separate their segregative effect and disparate impact claims into different counts.

## C.    Rule 12(b)(6)

As a threshold matter, the court will apply the same analysis to Plaintiffs' FHA and Florida FHA claims.  *See Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc.*, 347 F. App'x 464, 467 (11th Cir. 2009) ("'The Florida [FHA] contains statutory provisions that are substantively identical to the [FHA].' Accordingly, we apply the same analysis to [the plaintiff's] claims under these two statutes.") (quoting *Loren v. Sasser*, 309 F.3d 1296, 1299 n.9 (11th Cir. 2002)); *see also Alley v. Les Chateaux Condo. Ass'n, Inc.*, No. 8:10-cv-760-T-33TGW, 2010 WL 4739508, at *3 n.2 (M.D. Fla. Nov. 16, 2010) (applying the same analysis to claims for violations of the FHA and Florida FHA).

The FHA protects certain classes of people from discrimination in the sale, rental, and financing of housing.  *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 540 ("[T]he FHA aims to ensure that [government] priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.").  In an FHA case, the

plaintiff "has the burden of proving that a challenged practice caused or predictably will cause a discriminatory effect." *Id.* at 527 (citing 24 C.F.R. § 100.500(c)(1)).  A plaintiff can demonstrate a discriminatory effect in two ways.  *Hallmark Devs., Inc. v. Fulton County., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006).  First, "it can demonstrate that the decision [at issue] has a segregative effect." *Id.* (internal citation and quotation omitted).  Second, the plaintiff can show that the decision "makes housing options significantly more restrictive for members of a protected group than for persons outside that group." *Id.* (quotation omitted).  The second method is commonly called as a "disparate impact" claim.  *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 833 (11th Cir. 2018).

Plaintiffs allege that the County's actions have a segregative effect on diverse persons seeking housing in an area that already has segregated housing patterns.  (Dkt. 17 ¶ 27.)  Plaintiffs further allege that the County's actions have a disparate impact on racial minorities "based on statistical housing patterns, demographic statistics for the market area, and racial population disparities within the market area."  (Dkt. ¶ 28.)  The County argues that Plaintiffs fail to plead sufficient facts under either a segregative effect and disparate impact theory because Plaintiffs' allegations as to both theories are conclusory in nature and therefore should not be accepted as true.  (Dkt. 19 at 8–13.)

### i.   Segregative Effect

To state a segregative effect claim, a complaint must plead facts plausibly showing that the government's actions perpetuated segregation.  *See Dept' of Hous. & Urban Dev.'s Implementation of the Fair Hous. Act Discriminatory Effects Standard*, 78 Fed. Reg. 11,460 (Feb. 15, 2013) (codified at 24 C.F.R. § 100.500(a)) (prohibiting a practice that "creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin"); *see also Hallmark Devs., Inc.*, 466 F.3d at 1286 (explaining that a plaintiff can demonstrate discriminatory effect by showing the government defendant's decision "makes housing options significantly more restrictive for members of a protected group than for persons outside that group") (quotation omitted).

Here, the only fact that Plaintiffs allege to support their segregative effect claims is that "[t]he County's arbitrary denial of the requested [b]ond [f]inancing has served to perpetuate segregated housing patterns in and around Brevard County by preventing the development of affordable multi-family rental housing on appropriately zoned property, which housing would be utilized by diverse persons and groups of persons." (Dkt. 17 ¶ 27.)   Plaintiffs conclusorily assert that the denial of the bond financing application perpetuates segregated housing patterns in the County without providing any facts to plausibly support the contention that existing housing patterns in Brevard County are segregated.  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts[,] will not prevent dismissal.").   Further,

Plaintiffs do not plead any facts to support the contention that a class protected under the FHA is being segregated against as "diverse persons" are not a protected class under the FHA. (Dkt. 17 ¶ 27.) To the extent Plaintiffs seek to bring their claims based on a protected race class, Plaintiffs do not plead any facts supporting that a specific racial minority or minorities are affected by purported segregated housing patterns in and around the County. (*See id.*)

To survive a 12(b)(6) motion to dismiss, segregative effect FHA claims often require publicly available statistical evidence plausibly establishing that a particular community has segregated housing patterns that negatively affect a class protected under the FHA. *Compare Jackson v. Okaloosa County., Fla.*, 21 F.3d 1531, 1543 (11th Cir. 1994) (reversing 12(b)(6) dismissal of an FHA claim where plaintiffs pleaded that "[t]he exclusion of public housing from the unincorporated five-mile area allegedly ha[d] a harsher impact on African Americans than whites because 86% of the persons on the wait-list for public housing [we]re African American[] and the neighborhood where the new public housing project will probably be built (absent court action) [wa]s racially impacted"), *with Boykin v. Fenty*, 650 F. App'x 42, 44–45 (D.C. Cir. 2016) (affirming 12(b)(6) dismissal of an FHA claim where African American and Hispanic plaintiffs, who were former residents of a homeless shelter closed by the government defendant, alleged that the defendant closed the homeless shelter in order to move predominately minority homeless persons from majority-white neighborhoods into minority neighborhoods, reasoning that the plaintiffs allegations did not "support an inference that homeless persons were targeted for exclusion because of their race

[because although the plaintiffs attached] exhibits containing statistics about the racial and ethnic composition of various neighborhoods in the [d]istrict where shelters and placements were located, [they did not attach] any statistics about the racial makeup of the homeless population")  Plaintiffs contend that the "exact statistical information necessary to support [their claims] will be revealed through discovery," (Dkt. 28 at 13), but to plausibly allege claims, conclusory statements will not suffice.  *Iqbal*, 556 U.S. at 678.  Further, publicly available data may well be available even at this early stage in the litigation.  *See* Robert G. Schwemm, *Segregative-Effect Claims Under the Fair Housing Act*, 20 N.Y.U. J. Legis. & Pub. Pol'y 709, 738 (2017) ("[S]egregative-effect precedents suggest a fairly straightforward approach that relies exclusively on local census data.").  Therefore, Defendant's Motion is granted in part and Counts One and Two are dismissed without prejudice for failure to state a segregative effect claim under the FHA and Florida FHA.

### ii.   Disparate Impact

Disparate impact claims require a plaintiff to plead facts that plausibly support the application of a facially neutral policy "had a harsher impact" on a protected group of individuals, such as a racial minority, even if the effect was unintended.  *Hallmark Devs., Inc.*, 466 F.3d at 1286.  To plead a disparate impact claim, a complaint must assert facts that plausibly:

> (1) show statistically-imbalanced . . . patterns which adversely impact a minority group; (2) identify a facially-neutral policy used by [d]efendants; (3) allege that such policy was "artificial, arbitrary, and unnecessary;" and (4) provide factual allegations that meet the "robust causality requirement" linking the

- 17 -

> challenged neutral policy to a specific adverse racial or ethnic
> disparity.

*City of Miami v. Bank of Am. Corp.*, 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016) (quoting

*Inclusive Cmtys. Project, Inc.*, 576 U.S. at 540–43). The Amended Complaint does not

show statistically imbalanced patterns that meet the robust causality requirement.

Plaintiffs do not provide any statistical evidence in their Amended Complaint.

(*See* Dkt. 17.)  Accordingly, they do not allege facts establishing that the County applies

its policy of conducting public hearings to approve private bond financing applications

as authorized by 26 U.S.C. § 147(f)(2)(A)(i) in a manner that adversely impacts a

minority group in a statistically unbalanced way.  (*See* Dkt. 19 at 12); *Inclusive Cmtys.*

*Project, Inc.*, 576 U.S at 543 ("A plaintiff who fails to allege facts at the pleading stage

or produce statistical evidence demonstrating a causal connection cannot make out a

prima facie case of disparate impact.").  Rather, Plaintiffs make a conclusory statement

about the existence of statistical evidence without any support. *See* (Dkt. 17 ¶ 28)

(stating, "Moreover, based on statistical housing patterns, demographic statistics for

the market area, and racial population disparities within the market area, denial of the

requested Bond Financing has a clear and negative disparate impact on racial

minorities, denying them rights to housing.")  Further, as mentioned previously,

Plaintiffs' general reference to an unidentified minority group is not enough to survive

the Motion.  *See Jackson*, 21 F.3d at 1543.  Therefore, the court finds that Plaintiffs'

have not pleaded sufficient facts to show a statistically imbalanced pattern.  *Compare*

*River Cross Land Co., LLC*, 2019 WL 12518729, at *7 (granting a motion to dismiss

when plaintiff presented "no comparative [statistical] data at all"), *with Fulton County., Ga. v. Wells Fargo & Co.*, No. 1:21-cv-1800-MLB, 2022 WL 846903, at *16–18 (N.D. Ga. Mar. 22, 2022) (denying 12(b)(6) motion to dismiss where plaintiffs provided detailed statistical data supporting mortgage loan issuer defendants issued "a disproportionate number of high-cost, subprime, or other nonprime loans to minority borrowers" as compared to non-minorities).

The Amended Complaint also does not satisfy the robust causality requirement because it does not contain any facts linking the challenged neutral policy to a specific adverse racial or ethnic disparity. (*See* Dkt. 17, 19 at 11–12.) *See also River Cross Land Co., LLC*, 2019 WL 12518729, at *7 (explaining that to meet the robust causality requirement when faced with a 12(b)(6) motion, "a plaintiff must allege facts demonstrating a casual connection' between the challenged policy and the alleged statistical disparity") (cleaned up) (quoting *City of Miami*, 171 F. Supp. 3d at 1320). The Amended Complaint does not identify a specific minority group that was adversely impacted by the County's application and does not provide statistical evidence as support. Rather, Plaintiffs make the conclusory statement that minorities were adversely impacted by the County's denial of their application. (*See* Dkt. 17 ¶ 28.) ("Moreover, based on statistical housing patterns, demographic statistics for the market area, and racial population disparities within the market area, denial of the requested Bond Financing has a clear and negative disparate impact on racial minorities, denying them rights to housing.")

The court rejects the County's argument that Plaintiffs did not sufficiently identify a facially neutral policy that was artificially, arbitrarily, and unnecessarily used by the County. (Dkt. 19 at 11.) Specifically, the court finds that Plaintiffs plausibly identify the County's and BCBCC's policy to conduct public hearings to approve the bond financing application as authorized by 26 U.S.C. § 147(f)(2)(A)(i) is a facially neutral policy that was used arbitrarily to deny approval of the bond financing application. (Dkt. 17 ¶¶ 18–25.) In support of this contention, Plaintiffs allege that BCHFA, the authority in charge of the issuance of the tax-exempt bonds that Plaintiffs applied for, recommended approval of the bond financing application. (Dkt. 28 at 10.) Plaintiffs further allege that BCBCC's own published report suggests BCBCC's approval of the application.[5] (Dkt. 17 ¶ 19.) Last, Plaintiffs allege that an AHP representative was limited to three minutes to speak and could not provide a response in rebuttal to members of the public who opposed approval of the application. (*Id.* ¶ 21.)

Therefore, Defendant's Motion is granted in part, and Counts One and Two are dismissed without prejudice for failure to state a disparate impact claim under the FHA and Florida FHA.

---

[5] In its response to the Motion, Plaintiffs represent that the "BCHFA . . . recommended approval of the [b]ond [f]inancing application." (Dkt. 28 at 3) (citing Dkt. 17 ¶ 16.) However, the court notes a review of the Amended Complaint shows that paragraph 16 does not state that. (*See* Dkt. 17 ¶ 16.) ("On October 25, 2023, the BCHFA held a public meeting for the purpose of receiving public input on the bond financing application (the "Community Meeting").")

## <u>CONCLUSION</u>

Accordingly, it is **ORDERED** that:

1. Brevard County's Motion to Dismiss the Amended Complaint (Dkt. 19) is **GRANTED IN PART and DENIED IN PART**.

2. The Motion is **GRANTED** to the extent that:

   a. Count One is **DISMISSED without prejudice** for failure to state a segregative effect or disparate impact claim under the Fair Housing Act.

   b. Count Two is **DISMISSED without prejudice** for failure to state a segregative effect or disparate impact claim under the Florida Fair Housing Act.

3. Otherwise, the Motion is **DENIED**.

4. On or before **October 19, 2024**, Plaintiffs may file a second amended complaint that addresses the deficiencies described herein.

**ORDERED** in Orlando, Florida, on September 19, 2024.

JULIE S. SNEED<br>
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record

- 21 -