# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

Case No. 6:23-cv-2473-JSS-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited liability
partnership; CANTON CONSTRUCTION,
LLC, a Florida limited liability corporation;
CONCORD MANAGEMENT, LTD., a
Florida limited partnership; and THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD., a Florida limited
partnership,

       Plaintiffs,

v.

BREVARD COUNTY, a political
subdivision of the State of Florida,

       Defendant.

_____/

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, Atlantic Housing Partners L.L.L.P. ("AHP"), Canton Construction,

LLC, Concord Management, Ltd., and The Venue at Heritage Oaks Partners, Ltd.

("VHOP"), by and through their undersigned attorneys, and pursuant to Federal Rule

of Civil Procedure 56 and Local Rule 3.01, file their *Motion for Partial Summary*

*Judgment and Incorporated Memorandum of Law* (this "Motion"). In support of this

Motion, Plaintiffs state as follows:

1

# I. INTRODUCTION

Plaintiffs are moving for partial summary judgment on the issues of whether Plaintiffs have established *prima facie* cases for their segregative-effect and disparate-impact claims under the Fair Housing Act (the "FHA") against Defendant. The record evidence does not raise genuine issues of material fact on any elements of Plaintiffs' *prima facie* cases, and the record evidence demonstrates each element of Plaintiffs' *prima facie* cases. Should this Court grant this Motion in its entirety, then this case will still proceed to trial on the second and, potentially, third parts of the three-part burden-shifting test on FHA claims, *see* 24 C.F.R. § 100.500(c), and Plaintiffs' damages caused by Defendant's violation of the FHA.

## II. UNDISPUTED BACKGROUND

**A.    Undisputed Material Facts of this Case:**

VHOP was the contract purchaser of that certain real property located in the City of West Melbourne, Florida ("West Melbourne") and Brevard County, Florida ("Brevard County"), which had a parcel identification number of 28-37-07-00-253 (the "Property").[1]

Plaintiffs intended to develop the Property into a multi-family apartment complex with 105 affordable-housing units known as "The Venue at Heritage Oaks"

---

[1] *See* Doc. Bates Stamped RRTPBC000009 – RRTPBC000024

(the "Development").[2] The Development was intended to satisfy the occupant requirements of the Housing for Older Persons Act.[3] That is, the Development was intended to be operated for persons who were fifty-five years of age or older, and at least eighty percent of the occupied units would be occupied by at least one person who was fifty-five years of age or older.[4]

On July 31, 2023, AHP submitted its application for tax-exempt bond financing to finance the Development (the "Bond Application").[5] The tax-exempt bond financing was necessary for Plaintiffs to move forward with the Development because without such financing, the Development would not have been financially feasible for Plaintiffs to pursue.[6] The aggregate principal amount of the bond for which Plaintiffs applied via the Bond Application was $16,750,000.00.[7]

On October 25, 2023, the Brevard County Housing Financing Authority (the "BCHFA") held a public meeting for the purpose of receiving public input on the Bond Application.[8] After that meeting, the BCHFA recommended approval of the Bond Application.[9]

---

[2] *See* Doc. Bates Stamped RRTPBC000009 – RRTPBC000024; *see also* AHP Corporate Rep. Depo. Tr., 77:1-9
[3] S. Culp Depo. Tr., Vol. II, 235:22-236:6
[4] S. Culp Depo. Tr., Vol. II, 266:8-18; *see also* 42 U.S.C.A. § 3607(2)(C)(i)
[5] *Compare* Dkt. 37, para. 18 with Dkt. 41, para. 18
[6] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[7] *See* Doc. Bates Stamped RRTPBC000009 – RRTPBC000024
[8] *See* Doc. Bates Stamped RRTPBC000009 – RRTPBC000024
[9] *See* Doc. Bates Stamped RRTPBC000009 – RRTPBC000024

On December 5, 2023, Defendant's Board of County Commissioners (the "BOCC") held a public hearing to decide the Bond Application.[10] The BOCC voted to deny the Bond Application.

**B.    Pertinent Procedural History:**

On October 18, 2024, Plaintiffs filed their *Second Amended Complaint* (Dkt. 37) (the "Complaint"). Thereby, Plaintiffs have brought the following four claims against Defendant for its denial of the Bond Application and resulting discriminatory effect on black households in West Melbourne: Count I – action for Defendant's violation of the federal FHA based upon segregative effect[11]; Count II – action for Defendant's violation of the federal FHA based upon disparate impact[12]; Count III – action for Defendant's violation of the Florida FHA based upon segregative effect[13]; and Count IV – action for Defendant's violation of the Florida FHA based upon disparate impact[14].

On November 1, 2024, Defendant filed its *Answer, Affirmative Defenses and Demand for Jury Trial to Plaintiffs' Second Amended Complaint* (Dkt. 41) (the "Answer"). Thereby, Defendant admitted or denied Plaintiffs' allegations in the

---

[10] *Compare* Dkt. 37, para. 22 *with* Dkt. 41, para. 22
[11] Dkt. 37, paras. 44-58
[12] Dkt. 37, paras. 59-73
[13] Dkt. 37, paras. 74-88
[14] Dkt. 37, paras. 89-103

Complaint, and raised certain affirmative defenses to Plaintiffs' claims set forth in the Complaint.[15]

This Court extended the end of this case's discovery period from February 3, 2025, to March 1, 2025.[16] During and after this case's discovery period, Plaintiffs and Defendant have engaged in discovery by propounding and responding to written discovery requests, disclosing and exchanging reports of Plaintiffs' and Defendant's respective expert witnesses, and taking depositions of witnesses.

Regarding expert discovery pertinent to this Motion, Plaintiffs have retained Dr. Hank Fishkind as Plaintiffs' expert witness in this case to opine on, among other things, whether Defendant's actions resulted in illegal discrimination against racial minorities protected under the FHA.[17] In rendering his opinions in this case, Dr. Fishkind published his initial *Expert Report* dated September 12, 2024 ("Dr. Fishkind's Initial Report") and his *Expert Rebuttal Report* dated January 21, 2025 ("Dr. Fishkind's Rebuttal Report"). Defendant has retained Dr. Sean T. Malone as Defendant's expert witness in this case to review Dr. Fishkind's Initial Report. In rendering his opinions in this case, Dr. Malone published his *Rebuttal Report* dated November 29, 2024 ("Dr. Malone's Rebuttal Report") and his *Supplemental Expert Report* dated March 11, 2025 ("Dr. Malone's Supplemental Report").

---

[15] Dkt. 41, *passim*.
[16] *See* Dkt. 47.
[17] *See* Dr. Fishkind's Initial Report, para. 1

On January 16, 2025, this Court extended this case's dispositive-motion deadline to April 1, 2025.[18] Thus, this Motion is timely filed.

**C.    Record Evidence in Support of this Motion:**

Plaintiffs rely upon the following record evidence in support of this Motion:

1.    The Complaint (Ex. 1);

2.    The Answer (Ex. 2);

3.    Dr. Fishkind's Initial Report (Ex. 3);

4.    Dr. Fishkind's' Rebuttal Report (Ex. 4);

5.    Dr. Malone's Rebuttal Report (Ex. 5);

6.    Dr. Malone's Supplemental Report (Ex. 6);

7.    The deposition transcript of Dr. Malone (Ex. 7);

8.    The deposition transcript of the Corporate Representative of Atlantic Housing Partners, L.L.L.P. (Ex. 8);

9.    The deposition transcript of Scott Culp, Volume II (Ex. 9); and

10.    Documents bates stamped RRTPBC000009 - RRTPBC000024 (Ex. 10).

### III. ARGUMENT

"A party may move for summary judgment, identifying each claim or defense – **or the <u>part</u> of each claim or defense** – on which summary judgment is sought."

---

[18] *See* Dkt. 47

Fed. R. Civ. P. 56 (emphasis added). "[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The movant must satisfy this initial burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In response, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986) (citation omitted).

A.      **Based upon the Undisputed Material Facts of this Case and as a Matter of Law, Plaintiffs Have Established a *Prima Facie* Case that Defendant's Denial of the Bond Application Actually or Predictably Perpetuated the Segregated-Housing Pattern Based upon Race in West Melbourne.**

1.      **Legal Standard for Evaluating whether Plaintiffs Established a *Prima Facie* Case on Their Segregative-Effect Claims:**

In Counts I and III of the Complaint, Plaintiffs have brought claims against Defendant for violating the federal FHA, 42 U.S.C. §§ 3604 and 3613, and the

Florida FHA, Florida Statutes §§ 760.23, 760.26, and 760.35, respectively based upon Defendant's denial of the Bond Application actually or predictably perpetuating a segregated-housing pattern in West Melbourne.

The fact that Counts I and III of the Complaint proceed under federal law and Florida law is immaterial because the same legal analysis applies to FHA claims under federal law and Florida law.[19]

The legal framework of FHA claims is a three-part, burden-shifting analysis. *See* 24 C.F.R. § 100.500(c). Courts must first evaluate whether a plaintiff has established a *prima facie* case of discriminatory effect by demonstrating that "a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). "A practice has a discriminatory effect where it actually or predictably … perpetuates segregated housing patterns because of race…." 24 C.F.R. § 100.500(a).

## 2.    A Segregated-Housing Pattern Based upon Race Exists in West Melbourne.

Dr. Fishkind (i.e., Plaintiffs' expert) performed an analysis of whether a segregated-housing pattern based upon race existed in West Melbourne.[20] The relevance of West Melbourne to Dr. Fishkind's analysis of a segregated-housing

---

[19] *See* Dkt. 34, p. 13 ("As a threshold matter, [this] [C]ourt will apply the same analysis to Plaintiffs' FHA and Florida FHA claims.")

[20] Dr. Fishkind's Initial Report, paras. 70-76; *see also* Dr. Fishkind's Rebuttal Report, paras. 89-104

pattern is that the Development was planned to be developed at the Property in West Melbourne.[21] Dr. Fishkind's analysis of the segregated-housing pattern is that Brevard County's percentage of black households is nine percent; whereas West Melbourne's percentage of black households is only four percent (i.e., more than fifty percent less than Brevard County's percentage of black households).[22] The housing pattern is segregated because white households represent eighty percent of households in Brevard County and seventy-nine percent of households in West Melbourne.[23]

Dr. Malone (i.e., Defendant's expert) has not rendered any opinion on Dr. Fishkind's opinion that a segregated-housing pattern based upon race exists in West Melbourne.[24] In his Rebuttal Report, Dr. Malone opines that Dr. Fishkind's finding of a segregative effect is unreliable.[25] In arriving at his opinion, Dr. Malone takes issue with Dr. Fishkind's analysis of the racial composition of the Development's projected racial composition.[26] However, Dr. Malone does not render any opinion on Dr. Fishkind's opinion that a segregated-housing pattern based upon race exists in West Melbourne.[27]

---

[21] Dr. Fishkind's Initial Report, paras. 27-31
[22] Dr. Fishkind's Rebuttal Report, paras. 26-29; *see also* Dr. Fishkind's Initial Report, para. 24
[23] Dr. Fishkind's Rebuttal Report, paras. 26-29; see also Dr. Fishkind's Initial Report, para. 24
[24] Dr. Malone's Depo. Tr., 34:15-35:5; *see also* Dr. Malone's Rebuttal Report, *passim*; Dr. Malone's Supplemental Report, *passim*
[25] Dr. Malone's Rebuttal Report, paras. 54-64
[26] Dr. Malone's Rebuttal Report, paras. 54-59
[27] Dr. Malone's Depo. Tr., 34:15-35:5

Accordingly, Dr. Fishkind's opinion that a segregated-housing pattern based upon race exists in West Melbourne is unrebutted by any record evidence. Thus, no genuine issue of material fact exists as to whether a segregated-housing pattern exists in West Melbourne.

Additionally, this case's record evidence, i.e., Dr. Fishkind's statistical analysis, demonstrates that a segregated-housing pattern exists in West Melbourne in that West Melbourne has more than fifty percent less black households than Brevard County, and the black households pale in comparison to white households, which represent eighty percent of households in Brevard County and seventy-nine percent of households in West Melbourne.[28]

### 3. Defendant's Denial of the Bond Application Actually or Predictably Perpetuated the Segregated-Housing Pattern in West Melbourne.

Defendant's denial of the bond application perpetuated the segregated-housing pattern in West Melbourne because the Development's projected racial composition of the occupants would have been comprised of thirty-five percent black households and forty-five percent white households, which was significantly higher than the white-to-black household ratio in both Brevard County (eighty percent white households to nine percent black households) and West Melbourne (eighty-five percent white households to five percent black households).[29]

---

[28] Dr. Fishkind's Rebuttal Report, paras. 26-29; *see also* Dr. Fishkind's Initial Report, para. 24
[29] Dr. Fishkind's Rebuttal Report, paras. 26-29; see also Dr. Fishkind's Initial Report, para. 24

According to Dr. Fishkind's statistical analysis, "there is definitive evidence that the denial of the Project had a segregative impact limiting the opportunities for households headed by black [people] 55 and older from living in Melbourne/West Melbourne."[30]

Dr. Fishkind's foregoing conclusion is buttressed by his analysis on robust causation.[31] Courts have taken issue with FHA claims that provide evidence that a facially-neutral policy or practice simply applies more to a certain population because more of that population existed in a certain area. *See Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 834-36 (11th Cir. 2018). In the *Oviedo* case, the court took issue with the plaintiff's statistical analysis because it, according to the court, merely showed that more members of a racial minority lived in a certain area of Oviedo as opposed to the City of Oviedo as a whole. *See id.* at 835. The court recommended a comparison between (1) the percentage of racial minorities occupying properties that were affected by the subject policy throughout the Oviedo compared to (2) the percentage of non-minorities living in such properties throughout Oviedo. *See id.*

Here, Dr. Fishkind has demonstrated the causality between Defendant's denial of the Bond Application and the perpetuation of the segregated-housing pattern by

---

[30] Dr. Fishkind's Rebuttal Report, paras. 29, 70
[31] Dr. Fishkind's Rebuttal Report, paras. 95-108

analyzing the percentage of black households to white households needing affordable housing in the specific zip code where Plaintiffs were projected to draw their tenants from for the Development.[32] The analysis showed that twenty-nine percent of black and white households combined needed affordable housing in the relevant market.[33] Only twenty-seven percent of white households needed affordable housing in the relevant market; whereas, forty-three percent of black households in the relevant market needed affordable housing.[34] Thus, a facially-neutral policy or practice that restricts affordable housing in the relevant market perpetuates the segregated-housing pattern in West Melbourne because it diminishes housing opportunities for black households in West Melbourne disproportionately more than white households.[35]

Furthermore, Defendant's denial of the Bond Application directly prevented Plaintiffs from moving forward with the Development. Without the tax-exempt bond financing for which Plaintiffs applied and Defendant denied, it was not economically viable for Plaintiffs to undertake the Development because Plaintiffs would have incurred losses had they moved forward with the Development without the tax-exempt bond financing.[36] Also, once Defendant denied the Bond Application, the

---

[32] Dr. Fishkind's Initial Report, paras. 26-30
[33] Dr. Fishkind's Rebuttal Report, paras. 95-104
[34] Dr. Fishkind's Rebuttal Report, paras. 95-104
[35] Dr. Fishkind's Rebuttal Report, paras. 95-104
[36] AHP Corporate Rep. Depo. Tr., 199:13-201:9

allocation for Plaintiffs' bond for the Development did not carry forward to 2024, and there were no new bond allocations in 2024 available to Brevard County for multi-family properties.[37] Thus, Defendant's denial of the Bond Application prevented Plaintiffs from moving forward with the Development on the Property.[38]

Accordingly, Defendant's denial of the Bond Application actually or predictably perpetuated the segregated-housing pattern in West Melbourne because Defendant's denial of the Bond Application prevented Plaintiffs from moving forward with the Development on the Property, and Dr. Fishkind's unrebutted statistical analysis demonstrates that Defendant's prevention of the Development perpetuated the segregated-housing pattern in West Melbourne by limiting the opportunities for households headed by black people who were 55 years or older from living in West Melbourne.

**4.     Dr. Malone's Opinions on Segregative Effect Do Not Raise a Genuine Issue of Material Fact because Dr. Malone Lacks any Opinion on the Statistical Analysis Performed by Dr. Fishkind in His Rebuttal Report.**

Dr. Malone's opinions in his Rebuttal Report were limited to critiquing Dr. Fishkind's statistical analysis in his Initial Report.[39] Dr. Malone has not performed

---

[37] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[38] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[39] Dr. Malone Depo. Tr., 34:5-14

any independent analysis of whether Defendant's denial of the Bond application resulted in a segregative effect.[40]

Significantly, Dr. Fishkind authored his Rebuttal Report to address and rebut Dr. Malone's critiques of Dr. Fishkind's statistical analysis in his Initial Report.[41] In doing so, Dr. Fishkind rebutted Dr. Malone's conclusion that Dr. Fishkind's conclusion concerning segregative impact is unreliable.[42] First, Dr. Fishkind addressed the basis for why his reliance on the survey data was reliable.[43] Second, Dr. Fishkind addressed the reliability of his conclusion that the racial composition of the Development's occupants would be thirty-five percent.[44] And finally, and most importantly, in his Rebuttal Report, Dr. Malone contended that Dr. Fishkind should have used a certain methodology in evaluating segregative effect and disparate impact that was more reliable than the methodology that Dr. Fishkind used in his Initial Report.[45] In his Rebuttal Report, Dr. Fishkind used the methodology prescribed by Dr. Malone, and that methodology still demonstrated that Defendant's denial of the Bond Application had a segregative impact in limiting the opportunities

---

[40] Dr. Malone Depo. Tr., 34:15-35:5
[41] Dr. Fishkind's Rebuttal Report, paras. 1-4
[42] Dr. Fishkind's Rebuttal Report, para. 86
[43] Dr. Fishkind's Rebuttal Report, paras. 90-91
[44] Dr. Fishkind's Rebuttal Report, paras. 92-100
[45] Dr. Malone's Rebuttal Report, paras. 54-64

for households headed by black people 55 years of age and older from living in West Melbourne.[46]

Dr. Fishkind's analysis in his Rebuttal Report is unrebutted. Dr. Malone's Rebuttal Report was authored and published prior to Dr. Fishkind's Rebuttal Report[47]; thus, Dr. Malone's Rebuttal Report does not contain any opinions on Dr. Fishkind's analysis in his Rebuttal Report.[48] After Dr. Fishkind's publication of his Rebuttal Report, Dr. Malone authored and published his Supplemental Report.[49] However, Defendant's attorney instructed Dr. Malone not to form any opinions as to Dr. Fishkind's Rebuttal Report.[50] Moreover, Dr. Malone has never performed any independent analysis of segregative effect in this case[51]; the only topic on which Dr. Malone opined is on the unreliability of Dr. Fishkind's statistical analysis in his Initial Report. But, again, Dr. Malone has not formed any opinions on Dr. Fishkind's statistical analysis, opinions, and conclusions in Dr. Fishkind's Rebuttal Report.[52] Those remain completely unrebutted by the record evidence in this case.

Accordingly, there is no record evidence that raises a genuine issue of material fact as to Dr. Fishkind's statistical analysis, opinions, and conclusions set forth in

---

[46] Dr. Fishkind's Rebuttal Report, 101-104
[47] *Compare* Dr. Malone's Rebuttal Report, pg. 1 *with* Dr. Fishkind's Rebuttal Report, pg. 1
[48] *Compare* Dr. Malone's Rebuttal Report, pg. 1 *with* Dr. Fishkind's Rebuttal Report, pg. 1
[49] Dr. Malone Depo. Tr., 17:14-18:10
[50] Dr. Malone Depo. Tr., 17:14-18:10
[51] Dr. Malone Depo. Tr., 34:15-35:5
[52] Dr. Malone Depo. Tr., 17:14-18:10, 36:19-37:13, 40:6-22

Dr. Fishkind's Rebuttal Report, all of which support Dr. Fishkind's ultimate conclusion that Defendant's denial of the Bond Application had a segregative impact in limiting the opportunities for households headed by black people 55 years of age and older from living in West Melbourne.

**B.    Based upon the Undisputed Material Facts of this Case and as a Matter of Law, Plaintiffs Have Established a *Prima Facie* Case that Defendant's Denial of the Bond Application Has Actually or Predictably Resulted in a Disparate Impact on Black Households in the Relevant Market.**

**1.    Legal Standard for Evaluating whether Plaintiffs Set Forth a *Prima Facie* Case on Their Disparate-Impact Claims:**

In Counts II and IV of the Complaint, Plaintiffs have brought claims against Defendant for violating the federal FHA, 42 U.S.C. §§ 3604 and 3613, and the Florida FHA, Florida Statutes §§ 760.23, 760.26, and 760.35, respectively based upon Defendant's denial of the Bond Application actually or predictably resulting in a disparate impact on black households in the relevant market.

Similar to Counts I and III of the Complaint, the fact that Counts II and IV of the Complaint proceed under federal law and Florida law is immaterial because the same legal analysis applies to the FHA claims under federal law and Florida law.[53]

Again, the legal framework of FHA claims is a three-part, burden-shifting analysis. *See* 24 C.F.R. § 100.500(c). Courts must first evaluate whether a plaintiff

---

[53] *See* Dkt. 34, p. 13 ("As a threshold matter, [this] [C]ourt will apply the same analysis to Plaintiffs' FHA and Florida FHA claims.")

has established a *prima facie* case of discriminatory effect by demonstrating that "a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). "A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons … because of race…." 24 C.F.R. § 100.500(a).

"Disparate-impact liability under the Fair Housing Act requires proof that a policy or practice of the defendant has a disproportionately adverse effect on minorities, for which a *prima facie* case has three distinct elements. First, a *prima facie* case requires the identification of a specific, facially-neutral ... practice or policy. Second, the plaintiff must establish the existence of a significant statistical disparity between the effects of the challenged policy or practice on minorities and non-minorities. Third, in the light of the serious constitutional questions that might arise ... if such liability were imposed based solely on a showing of statistical disparity, a plaintiff proceeding on a disparate-impact theory must also establish a 'robust causality' connecting the challenged policy and the statistical disparity. A plaintiff who fails to ... produce statistical evidence demonstrating a causal connection cannot make out a *prima facie* case of disparate impact." *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1296 (11th Cir. 2019) (internal citations and quotation marks omitted).

**2.    Defendant's Denial the Bond Application Was a Facially-Neutral Practice or Procedure.**

Defendant denied the Bond Application by Defendant's BOCC vote to deny the Bond Application at the December 5, 2023, public hearing. The BOCC's decision was facially-neutral in that it did not expressly treat members of protected classes disparately. Rather, Defendant's denial of the Bond Application had a discriminatory effect.

**3.    Defendant's Denial of the Bond Application Had a Significant Statistical Disparity between the Effects of the Denial on Black Households versus White Households in the Relevant Market.**

Again, Courts have taken issue with FHA claims that provide evidence that a facially-neutral policy or practice simply applies more to a certain population because more of that population existed in a certain area. *See Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Fla.*, 759 F. App'x 828, 834-36 (11th Cir. 2018).

Here, Dr. Fishkind addressed the foregoing concern and correctly opined that in order to prove the existence of a disparate impact on a protected group, statistical proof was needed to prove that although all members of an affected group (in this case, the total population of households who need affordable housing in the relevant market) are impacted by the Defendant's denial of the Bond Application, a protected group within the affected group (in this case, black households who need affordable

housing in the relevant market) had to be more negatively impacted based upon a reasonable degree of statistical certainty,[54]

To that end, Dr. Fishkind analyzed the percentage of black households to white households needing affordable housing in the specific zip code where Plaintiffs were projected to draw their tenants from for the Development, i.e., the "relevant market".[55] In doing so, Dr. Fishkind demonstrated the disparate impact that Defendant's denial of the Bond Application had on black households compared to white households and, in turn, demonstrated the causal connection between the denial of the Bond Application and the disparate impact on black households compared to white households.

Indeed, Dr. Fishkind's statistical analysis showed that twenty-nine percent of black and white households combined needed affordable housing in the relevant market.[56] Only twenty-seven percent of white households needed affordable housing in the relevant market; whereas, forty-three percent of black households in the relevant market needed affordable housing.[57] Thus, a facially-neutral policy or practice that restricts affordable housing in the relevant market disparately impacts black households compared to white households by diminishing affordable housing

---

[54] Dr. Fishkind's Initial Report, para. 39
[55] Dr. Fishkind's Initial Report, paras. 27-31
[56] Dr. Fishkind's Rebuttal Report, paras. 95-104
[57] Dr. Fishkind's Rebuttal Report, paras. 95-104

options, which are needed disproportionately more by black households than white households in the relevant market.[58]

### 4.    Defendant's Denial of the Bond Application Caused the Statistical Disparity between the Effects of the Denial on Black Households versus White Households in the Relevant Market.

Dr. Fishkind's statistical analysis of the disparate impact on black households needing affordable housing in the relevant market compared to white households needing affordable housing in the relevant market quantitatively demonstrates the causal connection between Defendant's denial of the Bond Application and the disparate impact on black households.

Dr. Fishkind also opined on qualitative reasons leading to his conclusion that the Bond Application caused a disparate impact on black households. Dr. Fishkind opined that the relevant market has a significant shortage of affordable housing. Therefore, the Development would have contributed to reducing the substantial deficit of affordable housing in the Relevant Market.[59] Relatedly, the Bond application denial added to the shortage of affordable housing by further limiting the supply of affordable housing in the Relevant Market.[60]

Dr. Fishkind's opinions are supported by AHP's Corporate Representative's testimony, who testified that without the tax-exempt bond financing for which

---

[58] Dr. Fishkind's Rebuttal Report, paras. 95-104
[59] Dr. Fishkind's Initial Report, paras. 25, 33-35
[60] Dr. Fishkind's Initial Report, paras. 25, 82

Plaintiffs applied and Defendant denied, it was not economically viable for Plaintiffs to undertake the Development because Plaintiffs would have incurred losses had they moved forward with the Development without the tax-exempt bond financing.[61] Also, once Defendant denied the Bond Application, the allocation for Plaintiffs' bond for the Development did not carry forward to 2024, and there were no new bond allocations in 2024 available to Brevard County for multi-family properties.[62] Thus, Defendant's denial of the Bond Application prevented Plaintiffs from moving forward with the Development on the Property.[63]

### 5.    Dr. Malone's Opinions on Disparate Impact Do Not Raise a Genuine Issue of Material Fact because Dr. Malone Lacks any Opinion on the Statistical Analysis Performed by Dr. Fishkind in His Rebuttal Report.

Dr. Malone's opinions in his Rebuttal Report were limited to critiquing Dr. Fishkind's statistical analysis in his Initial Report.[64] Dr. Malone has not performed any independent analysis of whether or not Defendant's denial of the Bond application caused a disparate impact on racial minorities.[65]

Significantly, Dr. Fishkind authored his Rebuttal Report to address and rebut Dr. Malone's critiques of Dr. Fishkind's statistical analysis in his Initial Report.[66] In

---

[61] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[62] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[63] AHP Corporate Rep. Depo. Tr., 199:13-201:9
[64] Dr. Malone Depo. Tr., 34:5-14
[65] Dr. Malone Depo. Tr., 34:5-14
[66] Dr. Fishkind's Rebuttal Report, paras. 1-4

doing so, Dr. Fishkind rebutted Dr. Malone's conclusion that Dr. Fishkind's conclusion concerning disparate impact is unreliable.[67] First, Dr. Fishkind addressed the basis for why the relevant market he used is correct.[68] Second, Dr. Fishkind defended the rental rates that he used in his statistical analysis.[69] And finally, and most importantly, in his Rebuttal Report, Dr. Malone contended that Dr. Fishkind should have used a certain methodology in evaluating disparate impact that was more reliable than the methodology that Dr. Fishkind used in his Initial Report.[70] In his Rebuttal Report, Dr. Fishkind used the methodology prescribed by Dr. Malone, and that methodology still demonstrated that Defendant's denial of the Bond Application had a disparate impact on black households compared to white households.[71]

Dr. Fishkind's analysis in his Rebuttal Report is unrebutted. Dr. Malone's Rebuttal Report was authored and published prior to Dr. Fishkind's Rebuttal Report[72]; thus, Dr. Malone's Rebuttal Report does not contain any opinions on Dr. Fishkind's analysis in his Rebuttal Report.[73] After Dr. Fishkind's publication of his Rebuttal Report, Dr. Malone authored and published his Supplemental Report.[74]

---

[67] Dr. Fishkind's Rebuttal Report, paras. 5-25.
[68] Dr. Fishkind's Rebuttal Report, paras. 74-77
[69] Dr. Fishkind's Rebuttal Report, paras. 78-80
[70] Dr. Malone's Rebuttal Report, paras. 23-39, 46-53
[71] Dr. Fishkind's Rebuttal Report, paras. 22-25, 48-66, 81-88
[72] *Compare* Dr. Malone's Rebuttal Report, pg. 1 *with* Dr. Fishkind's Rebuttal Report, pg. 1
[73] *Compare* Dr. Malone's Rebuttal Report, pg. 1 *with* Dr. Fishkind's Rebuttal Report, pg. 1
[74] Dr. Malone Depo. Tr., 17:14-18:10

However, Defendant's attorney instructed Dr. Malone not to form any opinions as to Dr. Fishkind's Rebuttal Report.[75] Moreover, Dr. Malone has never performed any independent analysis of disparate impact in this case[76]; the only topic on which Dr. Malone opined is on the unreliability of Dr. Fishkind's statistical analysis in his Initial Report. But, again, Dr. Malone has not formed any opinions on Dr. Fishkind's statistical analysis, opinions, and conclusions in Dr. Fishkind's Rebuttal Report.[77] Those remain completely unrebutted by the record evidence in this case.

Accordingly, there is no record evidence that raises a genuine issue of material fact as to Dr. Fishkind's statistical analysis, opinions, and conclusions set forth in Dr. Fishkind's Rebuttal Report, all of which support Dr. Fishkind's ultimate conclusion that Defendant's denial of the Bond Application disparately impacted households headed by black people 55 years of age and older as they needed affordable housing more than white households in the same relevant market.[78]

## IV. CONCLUSION

WHEREFORE, Plaintiffs, Atlantic Housing Partners L.L.L.P., Canton Construction, LLC, Concord Management, Ltd., and The Venue at Heritage Oaks Partners, Ltd., request this Court to enter an order that grants summary judgment on

---

[75] Dr. Malone Depo. Tr., 17:14-18:10
[76] Dr. Malone Depo. Tr., 34:5-14
[77] Dr. Malone Depo. Tr., 17:14-18:10, 36:19-37:13, 40:6-22
[78] Dr. Fishkind's Rebuttal Report, paras. 30-38, 71-88, 105-108

the following issues, and that awards Plaintiffs any other relief that this Court deems just or proper:

1.      No genuine issue of material fact exists on whether a segregated-housing pattern based upon race exists in West Melbourne and, based upon this case's record evidence, a segregated-housing pattern based upon race exists in West Melbourne;

2.      No genuine issue of material fact exists on whether Defendant's denial of the Bond Application actually or predicably perpetuated the segregated-housing pattern based upon race in West Melbourne, and based upon this case's record evidence, Defendant's denial of the Bond Application actually or predicably perpetuated that segregated-housing pattern;

3.      Based upon this case's Record Evidence and as a matter of law, Plaintiffs have established a *prima facie* case on Counts I and III of the Complaint as there are no genuine issues of material fact and the record evidence supports that a segregated-housing pattern based upon race exists in West Melbourne and Defendant's denial of the Bond Application actually or predicably perpetuated that segregated-housing pattern;

4.      No genuine issue of material fact exists on whether Defendant's denial of the Bond Application was a facially-neutral practice or procedure, and based upon

this case's record evidence, Defendant's denial of the Bond Application was a facially-neutral practice or procedure;

5. No genuine issue of material fact exists on whether Defendant's denial of the Bond Application had a significant statistical disparity between the effects of the denial on black households versus white households in the relevant market, and based upon this case's record evidence, Defendant's denial of the Bond Application had a significant statistical disparity between the effects of the denial on black households versus white households in the relevant market;

6. No genuine issue of material fact exists on whether Defendant's denial of the Bond Application caused the statistical disparity between the effects of the denial on black households versus white households in the relevant market, and based upon this case's record evidence, Defendant's denial of the Bond Application caused the statistical disparity between the effects of the denial on black households versus white households in the relevant market; and

7. Based upon this case's Record Evidence and as a matter of law, Plaintiffs have established a *prima facie* case on Counts II and IV of the Complaint as there are no genuine issues of material fact and the record evidence supports that Defendant's denial of the Bond Application has actually or predictably resulted in a disparate impact on black households in the relevant market.

Filed this 1st day of April 2025.

/s/ Michael D. Piccolo
**Rebecca E. Rhoden**
Florida Bar No. 0019148
**Michael D. Piccolo**
Florida Bar No. 1003505
**Lowndes, Drosdick, Doster, Kantor & Reed, P.A.**
215 North Eola Drive
Orlando, Florida 32802-2809
Telephone: (407) 843-4600
rebecca.rhoden@lowndes-law.com
michael.piccolo@lowndes-law.com
courtnay.holt@lowndes-law.com
litcontrol@lowndes-law.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April 2025, a true and correct copy of the foregoing was served by filing the foregoing with the Clerk of Court via CM/ECF, which will send notice of such filing to all counsel of record.

/s/ Michael D. Piccolo
**Michael D. Piccolo**