## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Case No. 6:23-cv-2473-JSS-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., A FLORIDA LIMITED
LIABILITY    PARTNERSHIP;
CANTON CONSTRUCTION, LLC,
A FLORIDA LIMITED LIABILITY
CORPORATION; CONCORD
MANAGEMENT, LTD., A FLORIDA LIMITED
PARTNERSHIP; THE VENUE AT HERITAGE OAKS PARTNERS, LTD.,

Plaintiffs,

v.

BREVARD COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
FLORIDA,

          Defendant.

_____/

## PLAINTIFFS' NOTICE OF FILING EXHIBITS IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

Plaintiffs, Atlantic Housing Partners, L.L.L.P. ("AHP"), Canton Construction, LLC

("Canton"), Concord Management, Ltd. ("Concord"), and The Venue at Heritage Oaks Partners,

Ltd. ("VHO"), by and through its undersigned counsel, hereby gives notice of the filing of the

exhibits in support of their Motion for Summary Judgment.

DATED on April 1, 2025.

/s/ Rebecca E. Rhoden
**Rebecca E. Rhoden**
Florida Bar No. 0019148
**Michael D. Piccolo**
Florida Bar No. 1003505
**Lowndes, Drosdick, Doster, Kantor & Reed, P.A.**
215 North Eola Drive
Orlando, Florida 32802-2809
Telephone: (407) 843-4600
rebecca.rhoden@lowndes-law.com
michael.piccolo@lowndes-law.com
courtnay.holt@lowndes-law.com
litcontrol@lowndes-law.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April, 20254, a true and correct copy of the foregoing was electronically filed with this Court and served on all attorneys of record.

/s/ Rebecca E. Rhoden
**Rebecca E. Rhoden, Esquire**

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

Case No. 6:23-cv-2473-JSS-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., A FLORIDA LIMITED
LIABILITY          PARTNERSHIP;
CANTON CONSTRUCTION, LLC,
A FLORIDA LIMITED LIABILITY
CORPORATION;          CONCORD
MANAGEMENT, LTD., A FLORIDA
LIMITED   PARTNERSHIP;   THE
VENUE   AT   HERITAGE   OAKS
PARTNERS, LTD.,

       Plaintiffs,

v.

BREVARD COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
FLORIDA,

       Defendant.

_____/

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs, Atlantic Housing Partners, L.L.L.P. ("AHP"), Canton Construction,

LLC ("Canton"), Concord Management, Ltd. ("Concord"), and The Venue at

Heritage Oaks Partners, Ltd ("VHO"), by and through their undersigned attorneys,

and pursuant to Federal Rules of Civil Procedure 7, 8, 10, and 15, and this Court's

1

*Order* (Dkt. 34) entered on September 19, 2024, file their *Second Amended Complaint* against Defendant, Brevard County (the "County"), and allege as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      AHP is a Florida limited liability partnership that conducts business in Florida.

2.      Canton is a Florida limited liability company that conducts business in Florida.

3.      Concord is a Florida limited partnership that conducts business in Florida.

4.      VHO is a Florida limited partnership that conducts business in Florida.

5.      Nonparty, Southern Affordable Service, Inc. ("SAS"), is a Florida not-for-profit corporation that conducts business in Florida.

6.      The County is a political subdivision of the State of Florida, is organized under the laws of the State of Florida, and is located in this District and this Division.

7.      This Court has subject-matter jurisdiction to adjudicate this action pursuant to 28 U.S.C. §§ 1331 and 1343. Also, this Court has supplemental jurisdiction over Plaintiffs' state-law claims set forth herein pursuant to 28 U.S.C. § 1367 because said claims are so related to Plaintiffs' federal-law claims set forth herein that they form part of the same case or controversy.

8.     Venue is proper in this District as all acts giving rise to this action occurred in this District.

9.     All conditions precedent to this action (if any) have occurred or have been performed.

## GENERAL ALLEGATIONS

**A.     The Planned Development of the Property:**

10.     VHO was the contract purchaser of certain real property located within the City of West Melbourne and the County (Parcel ID 28-37-07-00-253) (the "Property").

11.     SAS is the general partner of the owner of the Property.

12.     VHO and AHP intended to develop the Property as "The Venue at Heritage Oaks", which was planned to be an affordable-housing development comprised of 105 multifamily dwelling units for rental (the "Development").

13.     The Property was appropriately-zoned for affordable, multifamily rental housing thereon.

14.     VHO and AHP intended to develop the Property under the Live Local Act, as codified by Florida Statutes § 166.04151(7).

15.     Canton was to construct the Development.

16.     Once the Development was completed, Concord was to manage the Development.

3

17. VHO and AHP planned to fund a substantial portion of the Development with federal tax-exempt bond and tax credit resources allocated through the Brevard County Housing Finance Authority ("BCHFA") and Florida Housing Finance Corporation ("FHFC"), the use of which places restrictions on the eligibility requirements for the tenants in the Development.

**B.     The County's Arbitrary Denial of the Bond Financing for the Development Based upon the County's Application of the Policy:**

18. On July 31, 2023, AHP submitted its application for tax-exempt bond financing for the Development to the BCHFA (the "Bond Financing").

19. The Bond Financing was necessary for the planned Development on the Property.

20. On October 25, 2023, the BCHFA held a public meeting for the purpose of receiving public input on the Bond Financing application (the "Community Meeting"). After the meeting, BCHFA recommended approval of the Bond Financing application.

21. As a condition of the Bond Financing, a Land Use Restriction Agreement encumbering the Property would have required that a minimum of 20% of the apartment units be set aside and available only to households earning less than 50% of area median income or 40% of the units set aside and available only to households earning less than 60% of the area median income with the remaining 80% available to households earning less than 120% of area median income, for as

4

long as the financing is outstanding, or for a term of 15 years, or as long as a real estate tax exemption is available to the Development, whichever is longer. Additionally, the Live Local Act requires 40% of the apartment units be set aside and available to households earning less than 120% of area median income for a term of 30 years. Finally, the Low Income Housing Tax Credits awarded by FHFC will provide that 100% of the units be available only to households earning less than 60% of the area median income when using Private Activity Multi-Family Mortgage Revenue Bonds Issued by the Local HFA, which is the BCHFA in this case.

22. On December 5, 2023, the Brevard County Commission ("BCC") held a hearing on the Bond Financing application (the "BCC Hearing") as required by 26 U.S.C. §147(f) (the "Policy").

23. The report published by the County's staff in advance of the BCC Hearing provided as follows:

> a. This issue will provide funds to finance the acquisition, construction, equipping and development of 105 rental housing units which will be available to Brevard County families of lower and moderate income. There is **no fiscal impact to the Board of County Commissioners or the Authority**. The County is **only authorizing the Housing Finance Authority to issue the bonds under the IRS requirements for tax exempt bonds and the County shall be indemnified** from the issuance of bonds and the Project. (emphasis added).

5

       b.    The County's outside bond counsel has reviewed the project and provided the following statement: "The resolution proposed to be adopted by the BOCC satisfies the pertinent federal and state law requirements and provides that neither the County nor any of the elected officials or staff of the County will have any obligation or liability, financial or otherwise, with respect to the Project or the Bonds.

24.    At both the Community Meeting and the BCC Hearing, members of the public spoke in opposition to affordable multifamily rental housing.

25.    A representative of AHP spoke during the hearing, but was limited to three minutes and not allowed to provide a response to those opposing the Bond Financing application.

26.    Following the BCC Hearing, utilizing the Policy, the BCC voted to deny the Bond Financing application (the "Bond Denial").

27.    The BCC did not base the Bond Denial on any legitimate nondiscriminatory reason.

**C.    Plaintiffs' Harm Caused by the County's Arbitrary Denial of the Bond Financing for the Development Based upon the County's Application of the Policy:**

28.    The County's application of the Policy to arbitrarily deny the requested Bond Financing has altogether frustrated VHO's and AHP's efforts to develop the Development as the Bond Financing, which was necessary for the Property to be

developed as a qualified affordable-housing development, expired on December 31, 2023.

29.     Canton was unable to construct the Development because of the County's application of the Policy to arbitrarily deny the requested Bond Financing.

30.     Concord was unable to manage the Development because of the County's application of the Policy to arbitrarily deny the requested Bond Financing.

31.     As a result of VHO's and AHP's inability to develop the Property, Canton, Concord, and SAS have not received the benefits of the various agreements that they entered into with respect to the proposed Development.

**D.     Affordable-Housing Shortage in the County, and Demographics in the County and West Melbourne:**

32.     In the County, there is a more-than 9,000-unit shortage of affordable housing according to the Federal Reserve Bank of Atlanta.

33.     Such a shortage is substantial and statistically significant.

34.     Black households comprise only 9% of the population in the County and 4% of the population in West Melbourne.

35.     While black households comprise approximately 9% of the County's population, 43% of those black households are in need of affordable housing.

36.     Conversely, white households comprise 80% of the population in the County and 79% of the population in West Melbourne.

37.    While White households comprise approximately 80% of the County's population, only 27% of white households are in need of affordable housing.

**E.    The Development's Projected Demographics:**

38.    Based upon an analysis of the racial composition of other communities owned by Plaintiffs or affiliated companies thereof in the County, Black households would have accounted for approximately 35% of the households in the Development.

39.    Thus, the Development's projected population of Black households would have been nearly four times higher than the County's population of Black households.

40.    Also, the Development's projected population of Black households would have been nearly nine times higher than West Melbourne's population of Black households.

41.    Based upon an analysis of the racial composition of other communities owned by Plaintiffs or affiliated companies thereof in the County, White households would have accounted for approximately 45% of the households in the Development.

42.    Thus, the Development's projected population of White households would have been over 45% less than the County's population of White households.

8

43.     Also, the Development's projected population of White households would have been nearly 45% less than West Melbourne's population of White Households.

## COUNT I: ACTION FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT, 42 U.S.C. §§ 3604 AND 3613
### (Segregative Effect)

44.     This is an action by Plaintiffs against the County for violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3604 and 3613.

45.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 43 hereof.

46.     A segregated housing pattern exists in West Melbourne in that while black households comprise 9% of the population in the County, they only comprise 4% of the population in West Melbourne.

47.     Black people, a class protected under the FHA, are adversely affected by said segregated housing pattern.

48.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has created, increased, reinforced, or perpetuated said segregated housing pattern by preventing the Development, which would have brought affordable, multifamily rental housing on the appropriately-zoned Property and decreased said segregated housing pattern

based upon the Development's projected demographics of Black and White households.

49.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy, as applied, has created, increased, reinforced, or perpetuated said segregated housing pattern.

50.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County made unavailable or denied dwellings to Black people.

51.     Accordingly, the County's arbitrary denial of the Bond Financing for the Development based upon the County's application of the Policy has caused a segregative effect in the County.

52.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County unlawfully obstructed VHO's and AHP's right and ability to develop and market the proposed Development, a multifamily affordable housing community.

53.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton was unable to construct the Development.

54.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Concord was unable to manage the Development.

55.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton, Concord, and SAS have not received the benefits of the various agreements that they entered into with respect to the proposed Development.

56.     As a result of the actions taken by the County, Plaintiffs have been injured.

57.     Plaintiffs are obligated to pay their undersigned attorneys a reasonable fee for their services rendered in this action, together with all costs associated therewith.

58.     Under 42 U.S.C. §3613, Plaintiffs have a cause of action against the County for violation of the Federal Fair Housing Act, for which Plaintiffs are entitled to actual damages, plus reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs, Atlantic Housing Partners, L.L.L.P., Canton Construction, LLC, Concord Management, Ltd., and The Venue at Heritage Oaks Partners, Ltd, request that this Court enter a Final Judgment in Plaintiffs' favor and against Defendant, Brevard County, for actual damages, reasonable attorneys' fees,

taxable costs, and any other relief, including equitable relief, that this Court deems just and proper.

## COUNT II: ACTION FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT, 42 U.S.C. §§ 3604 AND 3613
### (Disparate Impact)

59.    This is an action by Plaintiffs against the County for violation of the Federal Fair Housing Act, 42 U.S.C. §§ 3604 and 3613.

60.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 43 hereof.

61.    The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has disproportionately adversely impacted Black people within the market area of the Development who were qualified to rent affordable multifamily housing in a statistically imbalanced way by preventing the Development, which would have brought affordable, multifamily rental housing on the appropriately-zoned Property and increased housing opportunities for Black people based upon the Development's projected demographics of Black and White households.

62.    Consequently, the County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has made unavailable or denied housing options to Black people.

12

63.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has made housing options significantly more restrictive for Black people than for White people.

64.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has adversely impacted Black people in a statistically imbalanced proportion to their White counterparts, which has made housing options significantly more restrictive for Black people than White people.

65.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy was unwarranted and, as applied, has the discriminatory effect of making housing options significantly more restrictive for Black people than White people.

66.     Accordingly, the County's arbitrary denial of the Bond Financing for the Development based upon the County's application of the Policy has caused a disparate impact on Black people.

67.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County unlawfully obstructed VHO's and AHP's right and ability to develop and market the proposed Development, a multifamily affordable housing community.

13

68.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton was unable to construct the Development.

69.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Concord was unable to manage the Development.

70.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton, Concord, and SAS have not received the benefits of the various agreements that they entered into with respect to the proposed Development.

71.     As a result of the actions taken by the County, Plaintiffs have been injured.

72.     Plaintiffs are obligated to pay their undersigned attorneys a reasonable fee for their services rendered in this action, together with all costs associated therewith.

73.     Under 42 U.S.C. §3613, Plaintiffs have a cause of action against the County for violation of the Federal Fair Housing Act, for which Plaintiffs are entitled to actual damages, plus reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs, Atlantic Housing Partners, L.L.L.P., Canton Construction, LLC, Concord Management, Ltd., and The Venue at Heritage Oaks

14

Partners, Ltd, request that this Court enter a Final Judgment in Plaintiffs' favor and against Defendant, Brevard County, for actual damages, reasonable attorneys' fees, taxable costs, and any other relief, including equitable relief, that this Court deems just and proper.

### COUNT III: ACTION FOR VIOLATION OF THE FLORIDA FAIR HOUSING ACT, FLORIDA STATUTES §§ 760.23, 760.26, AND 760.35 (Segregative Effect)

74.     This is an action by Plaintiffs against the County for violation of the Florida Fair Housing Act, Florida Statutes §§ 760.23, 760.26, and 760.35.

75.     Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 43 hereof.

76.     A segregated housing pattern exists in West Melbourne in that while black households comprise 9% of the population in the County, they only comprise 4% of the population in West Melbourne.

77.     Black people, a class protected under the FHA, are adversely affected by said segregated housing pattern.

78.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has created, increased, reinforced, or perpetuated said segregated housing pattern by preventing the Development, which would have brought affordable, multifamily rental housing on the appropriately-zoned Property and decreased said segregated housing pattern

based upon the Development's projected demographics of Black and White households.

79.     The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy, as applied, has created, increased, reinforced, or perpetuated said segregated housing pattern.

80.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County made unavailable or denied dwellings to Black people.

81.     Accordingly, the County's arbitrary denial of the Bond Financing for the Development based upon the County's application of the Policy has caused a segregative effect in the County.

82.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County unlawfully obstructed VHO's and AHP's right and ability to develop and market the proposed Development, a multifamily affordable housing community.

83.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton was unable to construct the Development.

84.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Concord was unable to manage the Development.

85.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton, Concord, and SAS have not received the benefits of the various agreements that they entered into with respect to the proposed Development.

86.     As a result of the actions taken by the County, Plaintiffs have been injured.

87.     Plaintiffs are obligated to pay their undersigned attorneys a reasonable fee for their services rendered in this action, together with all costs associated therewith.

88.     Under Florida Statutes § 760.35, Plaintiffs have a cause of action against the County for violation of the Florida Fair Housing Act, for which Plaintiffs are entitled to actual damages, plus reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs, Atlantic Housing Partners, L.L.L.P., Canton Construction, LLC, Concord Management, Ltd., and The Venue at Heritage Oaks Partners, Ltd, request that this Court enter a Final Judgment in Plaintiffs' favor and against Defendant, Brevard County, for actual damages, reasonable attorneys' fees,

taxable costs, and any other relief, including equitable relief, that this Court deems just and proper.

## COUNT IV: ACTION FOR VIOLATION OF THE FLORIDA FAIR HOUSING ACT, FLORIDA STATUTES §§ 760.23, 760.26, AND 760.35
### (Disparate Impact)

89.    This is an action by Plaintiffs against the County for violation of the Florida Fair Housing Act, Florida Statutes §§ 760.23, 760.26, and 760.35.

90.    Plaintiffs reallege and incorporate herein by reference Paragraphs 1 through 43 hereof.

91.    The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has disproportionately adversely impacted Black people within the market area of the Development who were qualified to rent affordable multifamily housing in a statistically imbalanced way by preventing the Development, which would have brought affordable, multifamily rental housing on the appropriately-zoned Property and increased housing opportunities for Black people based upon the Development's projected demographics of Black and White households.

92.    Consequently, the County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has made unavailable or denied housing options to Black people.

93.    The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has made housing options significantly more restrictive for Black people than for White people.

94.    The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy has adversely impacted Black people in a statistically imbalanced proportion to their White counterparts, which has made housing options significantly more restrictive for Black people than White people.

95.    The County's arbitrary and unwarranted denial of the Bond Financing for the Development based upon the County's application of the Policy was unwarranted and, as applied, has the discriminatory effect of making housing options significantly more restrictive for Black people than White people.

96.    Accordingly, the County's arbitrary denial of the Bond Financing for the Development based upon the County's application of the Policy has caused a disparate impact on Black people.

97.    By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, the County unlawfully obstructed VHO's and AHP's right and ability to develop and market the proposed Development, a multifamily affordable housing community.

98.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton was unable to construct the Development.

99.     By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Concord was unable to manage the Development.

100.    By applying the Policy to deny the approval of the Bond Financing and, consequently, preventing the Development, Canton, Concord, and SAS have not received the benefits of the various agreements that they entered into with respect to the proposed Development.

101.    As a result of the actions taken by the County, Plaintiffs have been injured.

102.    Plaintiffs are obligated to pay their undersigned attorneys a reasonable fee for their services rendered in this action, together with all costs associated therewith.

103.    Under Florida Statutes § 760.35, Plaintiffs have a cause of action against the County for violation of the Florida Fair Housing Act, for which Plaintiffs are entitled to actual damages, plus reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs, Atlantic Housing Partners, L.L.L.P., Canton Construction, LLC, Concord Management, Ltd., and The Venue at Heritage Oaks

Partners, Ltd, request that this Court enter a Final Judgment in Plaintiffs' favor and against Defendant, Brevard County, for actual damages, reasonable attorneys' fees, taxable costs, and any other relief, including equitable relief, that this Court deems just and proper.

<div align="center">

**PLAINTIFFS' DEMAND FOR JURY TRIAL**

</div>

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

Filed this 18th day of October 2024.

*/s/ Rebecca E. Rhoden*
**Rebecca E. Rhoden**
Florida Bar No. 0019148
**LOWNDES, DROSDICK, DOSTER,
KANTOR & REED, P.A.**
215 North Eola Drive
Post Office Box 2809
Orlando, Florida 32802-2809
Telephone: (407) 843-4600
rebecca.rhoden@lowndes-law.com
courtnay.holt@lowndes-law.com
litcontrol@lowndes-law.com

*Counsel for Plaintiffs*

<div align="center">

**CERTIFICATE OF SERVICE**

</div>

I HEREBY CERTIFY that on the 18th day of October 2024, a true and correct copy of the foregoing was electronically filed with this Court and served on all attorneys of record.

*/s/ Rebecca E. Rhoden*
**Rebecca E. Rhoden**

<div align="center">

21

</div>

# EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-cv-02473-CEM-DCI

ATLANTIC HOUSING
PARTNERS L.L.L.P., CANTON
CONSTRUCTION LLC, CONCORD
MANAGEMENT, LTD
and THE VENUE AT HERITAGE OAKS
PARTNERS, LTD,

      Plaintiffs,

vs.

BREVARD COUNTY,

      Defendant.

_____/

## DEFENDANT BREVARD COUNTY'S ANSWER, AFFIRMATIVE DEFENSES AND DEMAND FOR JURY TRIAL TO PLAINTIFFS' SECOND AMENDED COMPLAINT

COMES NOW Defendant, BREVARD COUNTY (hereinafter referred to as "Defendant" or "The County"), by and through the undersigned counsel hereby files its Answer, Affirmative Defenses and Demand for Jury Trial to Plaintiffs' Second Amended Complaint, and states as follows:

### PARTIES, JURSIDICTION AND VENUE

1. Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

2. Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

3.  Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

4.  Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

5.  Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

6.  Admitted.

7.  Admitted for jurisdictional and venue purposes only, otherwise denied. Defendant specifically denies both the factual and legal basis for Plaintiffs' claims.

8.  Admitted.

9.  Denied and strict proof is demanded thereof.

## GENERAL ALLEGATIONS

**A. The Planned Development of the Property:**

10.  Denied and strict proof is demanded thereof.

11.  Denied and strict proof is demanded thereof.

12.  Denied and strict proof is demanded thereof.

13.  Denied and strict proof is demanded thereof.

14.  Denied and strict proof is demanded thereof.

15.  Denied and strict proof is demanded thereof.

16.  Denied and strict proof is demanded thereof.

17.  Denied and strict proof is demanded thereof.

**B. The County's Arbitrary Denial of the Bond Financing for the Development Based upon the County's Application of the Policy:**

18.  Admitted.

19. Denied and strict proof is demanded thereof.

20. Denied as framed.

21. Denied and strict proof is demanded thereof.

22. Admitted.

23. Denied as framed.

24. Denied as framed.

25. Denied as framed.

26. Denied as framed.

27. Denied and strict proof is demanded thereof.

**C. Plaintiffs' Harm Caused by the County's Arbitrary Denial of the Bond Financing for the Development Based upon the County's Application of the Policy:**

28. Denied and strict proof is demanded thereof.

29. Denied and strict proof is demanded thereof.

30. Denied and strict proof is demanded thereof.

31. Denied and strict proof is demanded thereof.

**D. Affordable-Housing Shortage in the County, and Demographics in the County and West Melbourne:**

32. Denied and strict proof is demanded thereof.

33. Denied and strict proof is demanded thereof.

34. Denied and strict proof is demanded thereof.

35. Denied and strict proof is demanded thereof.

36. Denied and strict proof is demanded thereof.

37. Denied and strict proof is demanded thereof.

E. **The Development's Projected Demographics:**

38.   Denied and strict proof is demanded thereof.

39.   Denied and strict proof is demanded thereof.

40.   Denied and strict proof is demanded thereof.

41.   Denied and strict proof is demanded thereof.

42.   Denied and strict proof is demanded thereof.

43.   Denied and strict proof is demanded thereof.

**COUNT I: ACTION FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT, 42
U.S.C. §§ 3604 AND 3613
(Segregative Effect)**

44.   Admitted.

45.   Defendant realleges and incorporates herein by reference its answers to Paragraphs 1
through 43 as if fully set forth herein.

46.   Denied and strict proof is demanded thereof.

47.   Denied and strict proof is demanded thereof.

48.   Denied and strict proof is demanded thereof.

49.   Denied and strict proof is demanded thereof.

50.   Denied and strict proof is demanded thereof.

51.   Denied and strict proof is demanded thereof.

52.   Denied and strict proof is demanded thereof.

53.   Denied and strict proof is demanded thereof.

54.   Denied and strict proof is demanded thereof.

55.   Denied and strict proof is demanded thereof.

56.   Denied and strict proof is demanded thereof.

57. Denied and strict proof is demanded thereof.

58. Denied and strict proof is demanded thereof.

WHEREFORE, Defendant, Brevard County, requests Plaintiffs take nothing by way of their

Second Amended Complaint and any other relief that this Court deems just and proper.

## COUNT II: ACTION FOR VIOLATION OF THE FEDERAL FAIR HOUSING ACT, 42 U.S.C. §§ 3604 AND 3613
### (Disparate Impact)

59. Admitted.

60. Defendant realleges and incorporates herein by reference its answers to Paragraphs 1

through 43 as if fully set forth herein.

61. Denied and strict proof is demanded thereof.

62. Denied and strict proof is demanded thereof.

63. Denied and strict proof is demanded thereof.

64. Denied and strict proof is demanded thereof.

65. Denied and strict proof is demanded thereof.

66. Denied and strict proof is demanded thereof.

67. Denied and strict proof is demanded thereof.

68. Denied and strict proof is demanded thereof.

69. Denied and strict proof is demanded thereof.

70. Denied and strict proof is demanded thereof.

71. Denied and strict proof is demanded thereof.

72. Denied and strict proof is demanded thereof.

73. Denied and strict proof is demanded thereof.

WHEREFORE, Defendant, Brevard County, requests Plaintiffs take nothing by way of their Second Amended Complaint and any other relief that this Court deems just and proper.

## COUNT III: ACTION FOR VIOLATION OF THE FLORIDA FAIR HOUSING ACT, FLORIDA STATUTES §§ 760.23, 760.26, AND 760.35
### (Segregative Effect)

74. Admitted.

75. Defendant realleges and incorporates herein by reference its answers to Paragraphs 1 through 43 as if fully set forth herein.

76. Denied and strict proof is demanded thereof.

77. Denied and strict proof is demanded thereof.

78. Denied and strict proof is demanded thereof.

79. Denied and strict proof is demanded thereof.

80. Denied and strict proof is demanded thereof.

81. Denied and strict proof is demanded thereof.

82. Denied and strict proof is demanded thereof.

83. Denied and strict proof is demanded thereof.

84. Denied and strict proof is demanded thereof.

85. Denied and strict proof is demanded thereof.

86. Denied and strict proof is demanded thereof.

87. Denied and strict proof is demanded thereof.

88. Denied and strict proof is demanded thereof.

WHEREFORE, Defendant, Brevard County, requests Plaintiffs take nothing by way of their Second Amended Complaint and any other relief that this Court deems just and proper.

## COUNT IV: ACTION FOR VIOLATION OF THE FLORIDA FAIR HOUSING ACT,
## FLORIDA STATUTES §§ 760.23, 760.26, AND 760.35
### (Disparate Impact)

89. Admitted.

90. Defendant realleges and incorporates herein by reference its answers to Paragraphs 1 through 43 as if fully set forth herein.

91. Denied and strict proof is demanded thereof.

92. Denied and strict proof is demanded thereof.

93. Denied and strict proof is demanded thereof.

94. Denied and strict proof is demanded thereof.

95. Denied and strict proof is demanded thereof.

96. Denied and strict proof is demanded thereof.

97. Denied and strict proof is demanded thereof.

98. Denied and strict proof is demanded thereof.

99. Denied and strict proof is demanded thereof.

100. Denied and strict proof is demanded thereof.

101. Denied and strict proof is demanded thereof.

102. Denied and strict proof is demanded thereof.

103. Denied and strict proof is demanded thereof.

WHEREFORE, Defendant, Brevard County, requests Plaintiffs take nothing by way of their Second Amended Complaint and any other relief that this Court deems just and proper.

* Any allegation that was not expressly admitted is deemed denied.

** Defendant denies the Second Amended Complaint's prayers for relief.

## **AFFIRMATIVE DEFENSES**

1. For a First Affirmative Defense, Defendant affirmatively alleges that Plaintiffs' Second Amended Complaint fails to state claims or causes of action upon which relief may be granted. Even assuming that Plaintiffs are entitled to relief, which is denied, Plaintiffs are not entitled to any or all remedies requested in the Second Amended Complaint and/or its prayers for relief.

2. For a Second Affirmative Defense, Defendant affirmatively alleges that assuming the Defendant's actions caused a disparate impact to African Americans, which Defendant denies, the impact was not significant to support Plaintiffs' allegations.

3. For a Third Affirmative Defense, Defendant affirmatively alleges that assuming the Defendant's actions caused a disparate impact to African Americans, which the Defendant denies, the Defendant had a legitimate, non-pretextual and non-discriminatory public interest reason to rebut the disparate impact. Defendant affirmatively alleges that its legitimate, non-pretextual, and non-discriminatory interests in the challenged decision could not have been served by the implementation of another practice, within its authority, that might have had a less discriminatory effect.

4. For a Fourth Affirmative Defense, Defendant affirmatively alleges that Plaintiffs lack standing to bring this action.

5. For a Fifth Affirmative Defense, Defendant affirmatively alleges that this action is not ripe for consideration by this Court.

6. For a Sixth Affirmative Defense, Defendant affirmatively alleges that Plaintiffs cannot demonstrate the requirements for injunctive relief, and therefore any such requested relief should be denied.

7.   For a Seventh Affirmative Defense, Defendant affirmatively alleges that Plaintiffs must mitigate their damages and have failed to do so. Therefore, Plaintiffs' claims should either be barred, or in the alternative, comparatively reduced in accordance with Plaintiffs' failure to mitigate damages.

8.   For an Eighth Affirmative Defense, Defendant affirmatively alleges that Plaintiffs caused the loss complained of by failing to adequately address the requirements of city, county, state and/or federal policies and procedures.

9.   For a Ninth Affirmative Defense, Defendant affirmatively alleges that the County has not denied an opportunity for fair housing because there are ample affordable opportunities in the relevant market. Therefore, the denial of Plaintiffs' proposed project has not resulted in a denial of fair housing cognizable under federal and state law.

10. For a Tenth Affirmative Defense, Defendant affirmatively alleges that the County acted in good faith and the County's actions and/or policies were facially neutral which furthered important governmental, public and economic interests of the County.  Defendant did not formulate, or engage in, any unconstitutional action or policy and Defendant did not violate any federal or state civil rights laws.

11. For a Eleventh Affirmative Defense, Defendant affirmatively alleges that no state or federally protected rights of Plaintiffs have been infringed on or violated, thus barring Plaintiffs' recovery under any theory.

12. For a Twelfth Affirmative Defense, Defendant affirmatively alleges that Plaintiffs' damages, if any, were proximately caused by factors other than Defendant's actions, including but not limited to Plaintiffs' own actions. Accordingly, the Plaintiffs' recovery, if any, should be reduced by the ratio in which Plaintiffs own actions caused or contributed to the alleged damages.

13. For a Thirteenth Affirmative Defense, Defendant affirmatively alleges that Plaintiffs' damages, if any, were not proximately caused by Defendant's actions. Defendant further affirmatively alleges that there is no robust causality connection between Defendant's actions and Plaintiffs' alleged disparate or segregative impact claims.

14. For a Fourteenth Affirmative Defense, Defendant affirmatively alleges it is entitled to legislative immunity and Defendant is entitled to enjoy the immunities, privileges, limitations and defenses set forth in §768.28 Fla. Stat.

15. For a Fifteenth Affirmative Defense, Defendant affirmatively alleges that the Plaintiff has failed to take advantage of available administrative remedies.

16. For a Sixteenth Affirmative Defense, Defendant affirmatively alleges that it is entitled to a setoff for any prior adjudicated unpaid claims to it, or to another Florida State agency, or to an Officer or Political Subdivision thereof, pursuant to Sect. 768.28(6), Fla. Stat.

17. For a Seventeenth Affirmative Defense, Defendant affirmatively alleges that it is entitled to a setoff or deduction for payments to any third persons, firms or corporations in settlement of any claims of Plaintiffs as a result of the incident alleged in Plaintiffs' Complaint, and therefore Defendant is entitled to a setoff or deduction equal to the value of all benefits received by, were paid or payable to, Plaintiffs from any such source(s), including a setoff or deduction for any monies paid by a collateral sources(s).

*Defendant hereby gives notice that he intends to rely upon such other defenses as may become available during further proceedings in this case and hereby reserves the right to amend its Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint in order to assert any such defenses.

**Defendant affirmatively alleges that it is entitled to an award of attorney's fees, expenses, and costs pursuant to 42 U.S.C. § 1988, 28 U.S.C. § 1927, Fed. R. Civ. P. 54(d), Fed. R. Civ. P. 11, and/or the Court's inherent powers. Plaintiffs' Complaint is facially frivolous and without any legitimate legal basis to assert a claim based on race discrimination under state or federal law, thereby justifying taxation of reasonable defense attorney fees and taxable costs in favor of Defendant, and against Plaintiff.

WHEREFORE, Defendant most respectfully requests from this Honorable Court to deny Plaintiffs' requests and award Defendant with reasonable attorney's fees and costs expended in the defense of this action, in addition to any additional determination that this Honorable Court deems just and proper.

## DEMAND FOR JURY TRIAL

Defendant hereby demands trial by a jury for all issues and questions so triable.

Respectfully submitted,

*/s/ Susan G. Gainey*
Susan G. Gainey, Esquire

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of November, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a true and correct copy of the foregoing trough a notice of electronic filing to:  Rebecca E. Rhoden, Esq., LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A., 215 N. Eola Dr., Orlando, FL 32801;          Rebecca.rhoden@lowndes-law.com;          Tina.althoff@lowndes-law.com; litcontrol@lowndes-law.com .

*/s/ Susan G. Gainey*

Susan G. Gainey, Esquire
Florida Bar No.: 1016477
Roper, Townsend, Sutphen, P.A.
255 S. Orange Ave., Suite 750
Orlando, FL  32801
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Attorneys for Defendant, Brevard County
Primary e-mail: sgainey@roperpa.com
Secondary e-mail: lramirez@roperpa.com

# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No: 6:23-cv-2473-JSS-DCI**

ATLANTIC HOUSING PARTNERS L.L.L.P.,
CANTON CONSTRUCTION LLC,
CONCORD MANAGEMENT, LTD and
THE VENUE AT HERITAGE OAKS PARTNERS, LTD,

Plaintiffs,

v.

BREVARD COUNTY,
Defendant.
_____/

**<u>EXPERT REPORT</u>**

September 12, 2024

------------------------------------------------------------
Hank Fishkind, Ph.D., President
Fishkind Litigation Services, Inc.
3504 Lake Lynda Dr, Suite 107
Orlando, Florida 32817
(407) 382-3256
www.fishkindls.com

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No: 6:23-cv-2473-JSS-DCI**

**I.0    Introduction**

1.0    Fishkind Litigation Services ("FLS") was retained by counsel for the Plaintiffs to: (a) determine if the Defendant's actions resulted in illegal discrimination against racial minorities protected under the Federal Fair Housing Act, 42 U.S.C.; (b) calculate Plaintiffs' economic damages if the court finds for the Plaintiffs; (c) draft this expert report; (d) provide litigation support; and (e) testify at deposition and/or trial if required.

2.0    I conducted the research in this engagement along with Mr. Edghill in my firm; I drafted this opinion and will offer the testimony.  Other members of my firm provided clerical support.  My resume is attached as Exhibit #1, and my court experience as an expert is provided in Exhibit #2.  The materials reviewed and relied upon in rendering this opinion are presented in Exhibit #3.  A list of all publications I have authored is provided in Exhibit #4.

3.0    My standard hourly fees apply in this engagement.  These are as follows:

Dr. Fishkind        $600/hour for research, and
                    $1,200/hour for testimony at trial or deposition

Mr. Edghill         $500/hour for research

**II.0    Qualifications to Provide Expert Opinion in this Matter**

4.0    I am qualified to provide the Court with this expert opinion because of my education and my experience.  I am an economist and President of Fishkind Litigation Services ("FLS").  FLS was formed in 2019 after Dr. Hank Fishkind sold the non-litigation practices of Fishkind & Associates, Inc. to PFM.  Dr. Fishkind leads the FLS team.  He has over 40-years of litigation experience and has testified as an expert in federal and state courts and acted as a Special Master to the U.S. Tax Court.  My clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, as well as both Plaintiff and defendants in litigation.

5.0    My resume is included as Exhibit #1 which documents my qualifications.  I have a Ph.D. in economics with specialties in Urban and Regional Economics and in Econometrics.

6.0     For many years, I was a Research Economist with the Bureau of Economic and Business Research at the University of Florida, and from time-to-time I served as its Acting Director and its Associate Director. During the course of my work at the Bureau, I conducted numerous economic studies mostly concerning Florida's economy. I designed, launched, and administered the Bureau's monthly economic confidence index which involved sample surveys of Floridians. I also designed and executed the Bureau's economic forecasting program.

7.0     I have served on the State of Florida's Governor's Council of Economic Advisors under two different administrations.

8.0     While I was employed at the Bureau, I was also a faculty member in the Department of Economics at the University of Florida. I achieved the rank of Associate Professor and obtained tenure before I decided to leave the University and work as an economic consultant and financial advisor in the private sector.

9.0     I was a founding board member of Engle Homes, a publicly traded (NASDAQ) homebuilding company until it was sold to TOUSA. I was also a founding board member of Summit Properties, which was a large, national apartment Real Estate Investment Trust (REIT) traded on the NYSE until the company was sold to Camden Properties. As a board member of these real estate development companies, I served on their asset allocation and audit committees among other assignments.

10.0    I have published expert reports concerning the disparate impact on racial minorities and other groups protected under the FHA on numerous occasions. I have provided expert opinions on these matters in front of city and county commissions.

11.0    I have been qualified as an expert witness to provide economic testimony on more than 50 occasions by both the federal and state courts in Florida and in federal courts in Tennessee and Washington, D.C., and in the U.S. Court of Federal Claims. I have also served as a court-appointed expert to provide valuation reports to the U.S. Tax Court. Exhibit #2 lists my court experience.

### III.0    Background

12.0    This case arises from Brevard County's decision on December 5, 2023 ("Decision") denying Plaintiffs' request for approval of tax exempt bonds to fund The Venue at Heritage Oaks  ("Project").[1]  The Project was to be a 105-unit, rental apartment community, with apartments offered at below market rates: (a) 21 units affordable to households earning 30% of the area median income ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.[2]  HUD calculates the AMI for all markets each year.[3]

13.0    By denying bond approval, the Project lost its favorable financing which expired December 31, 2023.  As a result, the Project became economically unfeasible as an affordable apartment project and was terminated by the Plaintiffs.[4]

14.0    Plaintiffs claim that the Decision violated the Federal Fair Housing Act, 42 U.S.C. §3604(a) ("FHA") and the Florida Fair Housing Act §§ 760.23, 760.26, and 760.35 ("FFHA"), by denying the approval necessary for the Project to be developed as an affordable apartment community.  Plaintiffs argue that the denial: (a) had a disparate impact on racial minorities; (b) caused a discriminatory effect by having a greater adverse impact on racial minorities than on other groups; and (c) perpetuated segregated housing patterns.[5]

15.0    Defendant asserts that the denial was based on public opposition to the Project expressed at its public hearing on the matter on December 5, 2023.[6]

### IV.    Summary of Expert Opinions

16.0    HUD's Final Rule for its discriminatory effects standard (24 CFR 100.500) states that a discriminatory effect is a practice that "has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin".

17.0    Assuming the court finds that the Decision denying approval of the bonds was not for a legitimate non-discriminatory reason, the Decision had a disparate impact on a protected class, and perpetuated racial segregation in housing markets.

---

[1] Complaint, Document #1.
[2] Plaintiffs' project plan.
[3] https://www.huduser.gov/portal/datasets/il.html
[4] Complaint, Document #1, ¶ 24.
[5] Complaint, Document #1, ¶ 25-41.
[6] Complaint, Document #1, ¶ 20-23.

18.0    The first step in the analysis is to identify the relevant market for the analysis.[7]   The Plaintiffs have successfully developed four, affordable apartment communities in Brevard County.  Analysis of their renters shows that more than 73% of their tenants moved in from the local market, roughly from Titusville to Palm Bay and west of the intracoastal.  Since the Project was located centrally among the Plaintiffs' four existing projects, the Relevant Market would be similar to the historical market for the Plaintiffs' Brevard County projects including Titusville, Cocoa, Melbourne, West Melbourne, and Palm Bay and west of the intracoastal.

19.0    The second step is to determine the Affected Group.[8]  The Affected Group comprises all households in the Relevant Market with incomes of: (a) 30% or less of AMI; (b) 60% or less of AMI, and (c) 80% or less of AMI.  The Decision by the Defendant limited their opportunity to obtain affordable housing in the relevant market.

20.0    Third, three conditions precedent must be satisfied to support a finding of discriminatory impact.

    a.  First, there cannot be a surplus of available housing in the relevant market that could satisfy the housing needs of the Affected Group.[9] Analysis of the Relevant Market demonstrates that there is no surplus available that could satisfy the housing needs of the Affected Group.

    b.  Second, is evidence that the units in the Project would be rented by members of the Affected Group.[10]   The Project was designed to address the housing needs of the Affected Group in the Relevant Market.  In addition, the Plaintiffs' other four apartment projects in the Relevant Market are rented by members of the Affected Group.

    c.  Third, courts recognize that racial imbalance is endemic to affordable housing, because the housing typically caters to a disproportionately higher percentage of racial minorities.  To satisfy the "robust causality requirement," the statistical analysis must demonstrate that the Decision resulted in the racial imbalance. Here the statistical analysis clearly points to the Decision as the cause of the discrimination as courts have specified.[11]

---

[7] Schwemm (2016), Pages 700-702.
[8] Schwemm (2016), page 698.
[9] Hallmark Developers, 466 F.3d 1276 (2006).
[10] IBID.
[11] Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Case No. 6:16-cv-1005-Orl-37GJK 08-23-2017

21.0   Disparate Impact is measured by comparing the impact of the disputed policy on members of the Affected Group.[12]  Statistical proof is needed to demonstrate that members of a protected class (as defined in the FHA) within the Group are more impacted than other members of the Group.  In other words, while all members of the Group may be negatively affected by the disputed policy, protected members must incur greater harm that can be measured to a reasonable degree of statistical certainty.

22.0   Table 1 shows that the Decision had a disparate impact on blacks, a protected class under the FHA.  As noted above, the Project planned to offer 1, 2, and 3 bedroom apartments priced to be affordable to households earning 30% AMI, 60% AMI, and 80% AMI.  In all cases, there is a statistically significant difference in the impact of the Decision on white households and black households as measured by the Chi-square statistic ($X^2$).  However, in three cases the sampling variation (margin of error) in the data are large, causing the significance to deteriorate to 52% or 76%.  In the remaining six cases the differences are statistically significant at 87% or more based on the sampling variation in the underlying data.

**Table 1. Analysis of Disparate Impact Measured by the Percentage of Households who can Afford the Rental Rate by AMI**

| AMI and Bedrooms | White | Black | Difference | Significance |
|---|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% | 52% |
| 30% AMI 2 Bedroom | 90% | 83% | -7% | 52% |
| 30% AMI 3 Bedroom | 85% | 76% | -9% | 76% |
| 60% AMI 1 Bedroom | 77% | 61% | -16% | 91% |
| 60% AMI 2 Bedroom | 77% | 61% | -16% | 91% |
| 60% AMI 3 Bedroom | 69% | 31% | -38% | 99% |
| 80% AMI 1 Bedroom | 65% | 51% | -14% | 87% |
| 80% AMI 2 Bedroom | 57% | 42% | -15% | 87% |
| 80% AMI 3 Bedroom | 46% | 31% | -15% | 94% |

23.0   The Decision also perpetuates racial segregation in the Relevant Market.  Segregative-effects claims differ from disparate impact claims.  Segregative impacts focus on the harm done to the community, whereas disparate impact claims analyze the harm done to a protected class under the FHA.[13]

---

[12] Schwemm (2016), pages 698-699.
[13] Schwemm (2017), page 713.

24.0    As Table 2 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located.  The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households.  The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability.  Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market.  In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households.  The data shows that the Decision perpetuates racially segregated housing patterns in West Melbourne.

**Table 2. Analysis of Segregative Impact Based on Racial Characteristics of Households Impacted by the Decision**

| Category | White | Black |
|---|---|---|
| Project | 45% | 35% |
| Brevard County | 80% | 9% |
| West Melbourne | 79% | 4% |

25.0    The final issue relates to the robust causality requirement.  The statistical analysis must demonstrate that the Decision resulted in the racial imbalance.  The Relevant Market has a significant shortage of affordable housing.  The Decision exacerbated the shortage by limiting the supply of affordable housing in the Relevant Market.  The shortage affects all households in the Relevant Market who need affordable housing.  However, as the data in Table 3 demonstrate, black households are harmed more than white households.

26.0    Table 3 presents the statistical data addressing the issue of robust causality showing that the Decision caused the discrimination.  The analysis compares the total percentage of white households needing affordable housing (27%) to the percentage of black households needing affordable housing (43%).  Affordable housing is defined for Table 3 using HUD's small area fair market rent reports for a 2-bedroom unit in zip code 32922[14], the predominate area from which the Plaintiffs' projects draw their tenants.  Based on the data in Table 3, the Decision had a discriminatory impact on black households in the Relevant Market.

---

[14]https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2024_code/2024zip_code_calc.odn?zcta=32922&metro_code=METRO37340M37340&year=2024&hypo=

**Table 3. Demonstration of Robust Causality – The Decision Resulted in the Discrimination**

| Category | White | Black |
|---|---|---|
| Total Households | 91,861 | 13,095 |
| Needing Affordable Housing | 24,725 | 5,580 |
| Percent Affordable Housing | 27% | 43% |

## V.0   Determining the Relevant Market

27.0   The first step in the analysis is to determine the Relevant Market for the Project.   The Project was to be a 105-unit, rental apartment community located at 2395 Minton Road (northeast corner of Minton Road and Heritage Oaks Boulevard) in West Melbourne. The Plaintiffs planned to develop apartments offered at below market rates: (a) 21 units affordable to households earning 30% AMI; (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.

28.0   The Plaintiffs have developed, and currently own and manage, four other affordable apartment projects in Brevard County: Wickham Club, Hammock Harbor, Malabar Cove, and Venue at Viera.  Figure 1 shows their locations along with the Project.  As Figure 1 shows, the Project would have been north of Malabar Cove and south of Wickham Club, Hammock Harbor, and the Venue at Viera.

29.0   The Project's location and product offerings would have positioned it to serve the same market as the Plaintiffs' other apartment communities.

[The balance of this page left intentionally blank.]

**Figure 1. Map of Plaintiffs' Apartment Communities in Brevard County**



30.0    The Plaintiffs survey their residents on a regular basis in the normal course of their business. Among other things, their survey provides information about the racial and ethnic composition of their tenants and where the tenants previously lived. This data shows that 71% of the tenants moved from 16 zip codes in Melbourne, West Melbourne, Rockledge, Palm Bay, Cocoa, Viera, and Titusville.

31.0    Therefore, the Relevant Market for the Project is from Titusville on the north to Palm Bay on the south, west of the intracoastal, and including Cocoa, Rockledge, Viera, Melbourne, and West Melbourne.

## VI.0   Identifying the Affected Group

32.0    As noted previously, the Project was designed to provide affordable apartments to those in the Relevant Market earning 30%, 60% and 80% of AMI.   All households in the Relevant Market with these income characteristics are in the Affected Group, because the Decision limited their housing opportunities in the Relevant Market.

## VII.0  Demonstration of Market Need for the Project – No Surplus

33.0    The Relevant Market has a shortage of affordable housing.  Brevard County recognized the need for affordable housing dating back to March 15, 1979, when it created the Brevard County Housing Finance Authority ("BCHFA"). Its mission is to "alleviate the shortage of affordable residential housing facilities, and to provide capital for investment in such facilities, for low, moderate or middle income families, by issuing its revenue bonds to acquire home mortgages, by purchasing the same and by pledging such home mortgages as security for the payment of the principal and interest on any such revenue bonds and by entering into any agreements in connection therewith."[15]

34.0    BCHFA reports that since its inception it has issued almost $200 million in bonds making 4,791 rental units available to the families of lower and moderate income.[16]   BCHFA provided bond funding for the Plaintiffs' Malabar Cove, Wickham Club, and Venue at Viera communities.[17]

35.0    However, there remains a significant shortage of affordable housing in Brevard County.  The Federal Reserve Bank of Atlanta reports that there is a deficit of 9,181 affordable and available rental units in the market.[18] Therefore, there is no surplus of available housing in the Relevant Market that could satisfy the housing needs of the Affected Group.  As a result, the Project would have contributed to reducing the substantial deficit of affordable housing in the Relevant Market.

---

[15] BCHFA Website emphasis added. https://brevardhfa.org/programs/#/
[16] IBID.
[17] IBID.
[18] https://www.atlantafed.org/community-development/data-and-tools/southeastern-rental-affordability-tracker

**VIII.0  Demonstration that the Project would Serve the Affected Group**

36.0   First, the Project was specifically designed by the Plaintiffs to serve the needs of the Affected Group.  The Project would have provided housing affordable to households earning 30% AMI to 80% AMI.

37.0   Second, as noted above, there is a substantial shortfall of affordable rental housing in the Relevant Market exceeding 9,000 units according to the Federal Reserve Bank of Atlanta.

38.0   Third, the Plaintiffs other four apartment communities in the Relevant Market provide affordable housing to members of the Affected Group. Plaintiffs planned for the Project to continue serving this market niche.

**IX.0  Analysis of Disparate Impact**

39.0   Disparate Impact is measured by comparing the impact of the Decision on members of the Affected Group in the Relevant Market.[19]  Statistical proof is needed to demonstrate that members of a protected class (as defined in the FHA) within the Group are more impacted than other members of the Group in the Relevant Market.  In other words, while all members of the Group in the Relevant Market will be negatively affected by the Decision, protected members must incur greater harm that can be measured to a reasonable degree of statistical certainty.

40.0   The methodology for the analysis includes the following procedures.

    a.  Adjust the rental rates proposed by the Plaintiffs for the units in the Project as of 2023 to their equivalent amounts as of 2022 to match the available income data.

    b.  Gather data on household income by race and ethnicity for households in the Relevant Market.  These data are available from the U.S. Census, American Community Surveys, for 2022, using data set ACSDT5Y2022.

    c.  Calculate the volumes and percentage of White, Latino, Black, and Asian households who could afford to rent the Project's apartments at each AMI threshold (30%, 60%, and 80%).

    d.  Compare the percentages of white households to black households who could afford the Project's apartments at each AMI threshold.

---

[19] Schwemm (2016), pages 698-699.

e. Test the statistical significance of the differences in percentages of white households and black households who could rent the apartments at each AMI threshold.

## IX.1    Adjust the Rental Rates

41.0    The Plaintiffs' plan for the Project utilized the appropriate market and income data for the Palm Bay-Melbourne-Titusville MSA, which includes all of Brevard County, to set their expected rental rates for the apartments in the Project at each AMI threshold.  These data are vintage 2023.

42.0    However, the latest available income data from the U.S. Census, American Community Surveys ("ACS") is as of 2022.  Therefore, it is necessary to adjust the rental rates to 2022.  Fortunately, this can be readily accomplished by using the HUD data for income limits and rent limits for 2022 instead of the 2023 information used by the Plaintiffs.

43.0    Table 4 presents the adjusted rental rates using the 2022 HUD data for income and rent limits by apartment size.  The income thresholds are calculated at 30% of income for rent as per professional practice and HUD standards.[20]   FLS also reviewed and examined the HUD income tables provided here for Brevard County as part of the Palm Bay-Melbourne-Titusville, FL MSA[21].

[The balance of this left blank intentionally.]

---

[20] https://www.huduser.gov/portal/datasets/home-datasets/files/HOME_IncomeLmts_State_FL_2023.pdf and Herbert (2018).
[21]https://www.huduser.gov/portal/datasets/il/il2024/select_Geography.odn?STATES=12.0&statelist=12.0&stname=&wherefrom=%24wherefrom%24&statefp=00&year=&ne_flag=0&selection_type=&incpath=%24incpath%24&data=2024

**Table 4. Apartment Rents and Income Thresholds for the Project
Adjusted to 2022 HUD Data**

| 30% AMI | Plaintiff's Proposed Rents | Income Threshold @ 30% |
|---|---|---|
| One Bedroom | $457 | $18,280 |
| Two Bedroom | $548 | $21,920 |
| Three Bedroom | $633 | $25,320 |
| | | |
| **60% AMI** | Plaintiff's Proposed Rents | Income Threshold @ 30% |
| One Bedroom | $853 | $34,120 |
| Two Bedroom | $914 | $36,560 |
| Three Bedroom | $1,096 | $43,840 |
| | | |
| **80% AMI** | Plaintiff's Proposed Rents | Income Threshold @ 30% |
| One Bedroom | $1,219 | $48,760 |
| Two Bedroom | $1,462 | $58,480 |
| Three Bedroom | $1,689 | $67,560 |

### IX.2    Gather the Income Data

44.0    The next step is to gather the data for household incomes, by racial and ethnic group, for the Relevant Market.  These data are available by census tract from ACS.  Since the Relevant Market includes most, but not all, of Brevard County, the database had to be assembled from the census tracts.

45.0    There are 66 census tracts in the Relevant Market.  The following tracts comprise the Relevant Market: 621.15;  623.01;  623.02;  624.01;  624.02; 625;  626;  628;  629;  630;  631.02;  631.04;  631.05;  631.06;  631.08; 631.09;  641.02;  641.24;  641.23;  641.26;  641.27;  641.29;  641.28; 641.30;  642.01;  642.02;  643.01;  643.02;  644;  645;  646.01;  646.02; 647.01;  647.02;  648;  649.01;  649.02;  650.01;  650.22;  650.23; 650.24;  650.25;  651.23;  651.24;  651.26;  651.27;  651.28;  651.29; 651.30;  651.31;  652.01;  652.02;  652.31;  652.36;  652.37;  652.38; 652.39;  652.40;  712.01;  712.02;  712.04;  712.05;  713.35;  713.37; 713.39;  713.41.

### IX.3 Calculate the Percentages of Households who can Afford the Apartments in the Project

46.0 The ACS provides detailed data on the income distribution of households in each census tract by race and ethnicity. For this analysis data were obtained for households with a householder who is: (a) White alone, not Hispanic or Latino I Table B19001H; (b) Hispanic or Latino I Table B19001I; (c) Black or African American alone I Table B19001B; and (d) Asian alone I Table B19001D.

47.0 The income data for each group is provided in ranges as shown in Table 5 here illustrated for White only households in the Relevant Market. The ACS provides the data for the income range, the estimated number of households with incomes in the range, and the margin of error in measuring the estimates (to be discussed later below). I added the midpoint for each income range for use in quantifying the number of households in each income range who could afford the apartments on offer in the Project at the rental rates and their equivalent income levels required as shown in Table 4 for the Project.

**Table 5. ACS Data for Household Incomes in the Relevant Market Illustration for White Only Households Table B19001H**

| Range | Midpoint of Range | Estimate | Margin of Error |
|---|---|---|---|
| Total: | | 91,861 | 16,119 |
| Less than $10,000 | $9,999 | 3,644 | 3,644 |
| $10,000 to $14,999 | $12,500 | 2,408 | 2,674 |
| $15,000 to $19,999 | $17,500 | 3,559 | 3,475 |
| $20,000 to $24,999 | $22,500 | 4,189 | 3,701 |
| $25,000 to $29,999 | $27,500 | 4,025 | 3,819 |
| $30,000 to $34,999 | $32,500 | 3,326 | 3,270 |
| $35,000 to $39,999 | $37,500 | 3,574 | 3,401 |
| $40,000 to $44,999 | $42,500 | 3,393 | 3,159 |
| $45,000 to $49,999 | $47,500 | 4,086 | 4,018 |
| $50,000 to $59,999 | $55,000 | 7,183 | 5,091 |
| $60,000 to $74,999 | $67,500 | 10,002 | 6,889 |
| $75,000 to $99,999 | $87,500 | 12,050 | 6,516 |
| $100,000 to $124,999 | $112,500 | 8,851 | 5,538 |
| $125,000 to $149,999 | $137,500 | 6,993 | 4,978 |
| $150,000 to $199,999 | $175,000 | 7,545 | 4,954 |
| $200,000 or more | $200,000 | 7,033 | 4,653 |

48.0    With this data I can calculate the number of households who can afford to rent the apartments in the Project at each AMI level and for each category of apartments (1, 2, or 3 bedroom). For example, using the data in Table 4, the 1-bedroom apartment at 30% AMI had proposed rent of $457 per month. The tenant would have to have household income of $18,280 or more to be able to afford to rent the apartment using no more than 30% of their annual income. This income threshold translates to households earning more than the midpoint income level of $17,500 since $18,280 is at the top end of the income range of $15,000-$19,999. As Table 5 shows, for White only households 9,611 or 10% of all White only households cannot afford to rent this apartment, because their income is too low, falling below the $17,500 level.

49.0    These calculations were repeated for each apartment category shown in Table 4 for each of the four racial/ethnic household groupings. In this way, the percentage of each group that can afford each apartment type can be determined. The detailed calculations are provided in Exhibit #5.

**IX.4    Compare the Percentages to Determine if there is Disparate Impact**

50.0    To determine if there are any differences in the percentage of each racial/ethnic group that can afford each apartment type, the percentages are compared.

51.0    For example, the 3-bedroom apartment at 80% of AMI is rented at $1,689 as shown in Table 4. To rent this apartment the tenant must have an income of $67,560 or more. The income analysis shows that 69% of Black households cannot afford this apartment compared to 54% of White households in the Relevant Market.

52.0    Table 6 summarizes the analysis of the disparate impact of the Decision on Black households, a protected class under the FHA. As the data in Table 6 show, in every case for each type of apartment at each AMI level, the percentage of Black households that can afford the apartment is less than the percentage of White households who can afford the apartment. The detailed calculations are shown in Exhibit #6.

53.0    The Decision restricted the volume of affordable housing in the Relevant Market. The Relevant Market has a shortage of over 9,000 affordable rental units. The Decision reduced the opportunity for all households in the Affected Group to obtain affordable housing. However, considerably more Black households were adversely affected compared to White households. Therefore, the Decision had a disparate impact on the FHA protected group of Black households.

**Table 6. Analysis of Disparate Impact of the Decision**
**Percent of Households who can Afford the Apartment**

| AMI and Bedrooms | White | Black | Difference |
|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% |
| 30% AMI 2 Bedroom | 90% | 83% | -7% |
| 30% AMI 3 Bedroom | 85% | 76% | -9% |
| 60% AMI 1 Bedroom | 77% | 61% | -16% |
| 60% AMI 2 Bedroom | 77% | 61% | -16% |
| 60% AMI 3 Bedroom | 69% | 31% | -38% |
| 80% AMI 1 Bedroom | 65% | 51% | -14% |
| 80% AMI 2 Bedroom | 57% | 42% | -15% |
| 80% AMI 3 Bedroom | 46% | 31% | -15% |

54.0   The next question is whether these differences are statistically significant. This issue is addressed next.

**IX.5   Measure the Statistical Significance of the Disparate Impact Measures**

55.0   There are two basic approaches to assess the statistical significance of the differences calculated in Table 6: (1) $X^2$ test and (2) margin of error analysis. In this application the $X^2$ test is used to compare the observed percentage of households who can afford the apartments in the Project to the expected percentages if there was no disparate impact from the Decision. The margin of error ("MOE") method compares the differences in percentages of households after accounting for sampling error in measuring the number of households earning each range of income.

56.0   $X^2$ is widely used in science, medicine, social sciences, engineering, and most any other endeavor to check the differences between an expected outcome and an observed or measured outcome.[22]  In this application if there is no disparate impact from the Decision, the actual percentages of affordability for White households and Black households would be the same, or at least very similar.   The $X^2$ test measures the squared differences between the actual percentages and the expected (no disparate impact) percentages.  The larger the $X^2$ statistic the more likely there is disparate impact from the Decision.

---

[22] Witcov (2019), McHugh (2013), and Turhan (2020).

57.0   The results are summarized in Table 7 for the $X^2$ test. Exhibit #6 contains detailed calculations. In every case, the $X^2$ statistic is very large and significant at the 95% confidence level. On this basis, the Decision had a statistically significant disparate impact on Black households.

**Table 7. Statistical Test for Disparate Impact using the $X^2$ Test**

| AMI and Bedrooms | White | Black | Difference | $X^2$ |
|---|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% | 449 |
| 30% AMI 2 Bedroom | 90% | 83% | -7% | 449 |
| 30% AMI 3 Bedroom | 85% | 76% | -9% | 506 |
| 60% AMI 1 Bedroom | 77% | 61% | -16% | 739 |
| 60% AMI 2 Bedroom | 77% | 61% | -16% | 739 |
| 60% AMI 3 Bedroom | 69% | 31% | -38% | 3,685 |
| 80% AMI 1 Bedroom | 65% | 51% | -14% | 585 |
| 80% AMI 2 Bedroom | 57% | 42% | -15% | 548 |
| 80% AMI 3 Bedroom | 46% | 31% | -15% | 398 |

58.0   The results from the $X^2$ tests are very strong. However, the $X^2$ statistic does not consider sampling error in the actual measurement of the number of households in each income range as measured by the ACS.

59.0   The ACS is an annual, nation-wide, survey designed to provide communities with reliable and timely social, economic, housing, and demographic data. The ACS has an annual sample size of about 3.5 million.[23]

60.0   The ACS is, as its name implies, a survey based on sampling the population, it is not a complete 100% count of the data. As a result, like any other sample-based system, the ACS estimates have a degree of uncertainty associated with them. This is called sampling error. Generally, the larger the sample size the smaller the degree of sampling error. The Census Bureau publishes a margin of error ("MOE") along with every ACS estimate to allow users to understand the MOE and the reliability of the estimates.[24]

---

[23] U.S. Census Bureau (September 2020), page 1.
[24] IBID.

61.0  The ACS' documentation also provides detailed instructions for calculating the statistical significance of differences between ACS data, such as the income differences between white and black households of interest in this report, using MOE.  The calculations begin with measuring the standard error ("SE") of the ACS estimate.  The SE quantifies the variability of an estimate due to sampling.  It is calculated by dividing the MOE by 1.65.[25]

62.0  The calculations for testing the statistical significance of any difference between two ACS estimates are as follows.[26]

   a.  Calculate the SEs for the two ACS estimates.
   b.  Square the resulting SE for each estimate.
   c.  Sum the squared SEs.
   d.  Calculate the square root of the sum of the squared SEs.
   e.  Divide the difference between the two ACS estimates by the square root of the sum of the squared SEs.
   f.  Compare the absolute value of the result from Step e with the critical value for the desired level of confidence – 1.65 for 90%.
   g.  If the absolute value of the result from Step e is greater than the critical value, then the difference between the two estimates can be considered statistically significant, at the level of confidence corresponding to the critical value selected in Step f.

63.0  Algebraically, the test for statistical significance from the ACS is shown below.  $X_1$ and $X_2$ are the two ACS estimates being compared.  SE refers to the standard errors of $X_1$ and $X_2$.  Finally, Z is the critical level for the confidence interval (1.65 for 90%).[27]

$$\text{If} \quad \left| \frac{\widehat{X}_1 - \widehat{X}_2}{\sqrt{\left[SE(\widehat{X}_1)\right]^2 + \left[SE(\widehat{X}_2)\right]^2}} \right| > Z_{CL}$$

---

[25] U.S. Census Bureau, Op Cit., page 45.
[26] U.S. Census Bureau, Op Cit., page 47.
[27] IBID.

64.0   These calculations are straight forward in situations where the MOE is available.  However, in this application the income thresholds for each type of apartment at the Project encompass more than one income range measured by ACS.  For instance, a 1-bedroom apartment at 80% AMI has an income threshold of $48,760 as shown in Table 4.  This apartment is affordable for white households with incomes above $48,760, which includes households starting with the income range of $50,000 and including those earning over $200,000 as shown in the red box on Table 8.

**Table 8. Household Income for White Only Households in the Relevant Market**

| Income Range | Midpoint | Estimate | % of Total | MOE |
|---|---|---|---|---|
| Total: | | 91,861 | 100% | 16,119 |
| Less than $10,000 | $9,999 | 3,644 | 4% | 3,644 |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | 2,674 |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | 3,475 |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | 3,701 |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | 3,819 |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | 3,270 |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | 3,401 |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | 3,159 |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | 4,018 |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | 5,091 |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | 6,889 |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | 6,516 |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | 5,538 |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | 4,978 |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | 4,954 |
| $200,000 or more | $200,000 | 7,033 | 8% | 4,653 |

65.0   As Table 8 shows, there are seven income ranges included in the group of households who can afford the 1-bedroom apartment at 80% AMI.  Each range has its own specific MOE.  As ACS notes, the MOE declines as a percentage of the estimate, as the sample size increases.  For example, in Table 8 the MOE for the total sample is 16,119 or 18%.  The percentage MOE for the income range of $10,000 to $14,999 is over 100%, because the MOE is greater than the estimated number of households estimated in this group.  The other ratios of MOE to their estimates range from 54% to over 100%.

66.0    Continuing with the example of the seven income ranges where households can afford to rent the 1-bedroom apartment at 80% AMI, this group has 59,657 households. Since the relative MOE (MOE divided by the estimate) declines sharply as the sample size increases, the MOE for this group of seven households will be far lower than the MOE for any one of the individual estimates.

67.0    To estimate the percent MOE by sample size, I estimated an equation for the relationship using ordinary least squares regression. Figure 2 displays the relationship and provides the equation for the percent MOE by sample size. The relationship is highly nonlinear with the percent MOE dropping sharply as sample size increases. As shown in Figure 2, the best fitting equation ($y=15.184X^{0.567}$) is a power function with an $R^2$ (goodness of fit) of 0.915 meaning that the equation explains 91.5% of the variation between percent MOE and sample size.

**Figure 2. Relationship between Sample Size and the Percent MOE**



68.0    I used the equation to estimate the MOE for each income range that could afford each of the apartments for each racial/ethnic group. Using the MOE, I could then calculate the SE for each group. With the SE, I could then determine whether the differences between white and black households who could afford each apartment to be offered at the Project was statistically significant. Table 9 summarizes the results. The detailed calculations are provided in Exhibit #7.

69.0   As the data in Table 9 document shows the differences between white and black households are statistically significant in 6 of the 9 cases with 87% or more confidence.   For the 30% AMI group, the differences for the 1-bedroom and 2-bedroom apartments are not statistically significant. Although the differences are 7% for the 1 and 2-bedroom apartments, their relatively smaller sample sizes result in larger MOE and less precision in estimating the underlying income data.  The 3-bedroom apartments at 30% AMI have a difference of 9% between whites and blacks which is statistically significant at the 76% level of confidence.

### Table 9. Margin of Error Analysis of Statistical Significance

| Disparate Impact Analysis @ 30% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 10% | 10% | 15% |
| % Black Cannot Afford | 17% | 17% | 24% |
| SE White | 0.035 | 0.035 | 0.029 |
| SE Black | 0.087 | 0.087 | 0.073 |
| | | | |
| Test Score | 0.71 | 0.71 | 1.17 |
| Z Score | 52% | 52% | 76% |
| | | | |
| Disparate Impact Analysis @ 60% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
| % White Cannot Afford | 23% | 23% | 31% |
| % Black Cannot Afford | 39% | 39% | 69% |
| SE White | 0.022 | 0.022 | 0.019 |
| SE Black | 0.058 | 0.058 | 0.050 |
| | | | |
| Test Score | 1.67 | 1.67 | 4.83 |
| Z Score | 91% | 91% | 99% |
| | | | |
| Disparate Impact Analysis @ 80% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
| % White Cannot Afford | 35% | 43% | 54% |
| % Black Cannot Afford | 49% | 58% | 69% |
| SE White | 0.017 | 0.016 | 0.014 |
| SE Black | 0.048 | 0.044 | 0.040 |
| | | | |
| Test Score | 1.51 | 1.64 | 1.89 |
| Z Score | 87% | 90% | 94% |

**X.0    Analysis of Segregative Impact**

70.0    The analysis of Segregative impact differs from the disparate impact examination conducted above.  Segregative impact focuses on the harm done to the community, whereas disparate impact claims analyze the harm done to a protected class under the FHA.[28]

71.0    Schwemm notes that most claims for segregative impact are made against municipalities that are accused of using their land-use powers to block integrated housing developments in predominantly white areas. Furthermore, he notes that unlike disparate impact claims, segregative effect claims may challenge a particular action or decision as well as an across-the-board policy.[29]

72.0    In this case the Defendant defends its Decision claiming it was made for in response to public opposition to the Project.  While the Decision was not associated with a land use decision, it prevented development of an integrated housing development similar to those the Plaintiffs had previously developed in the Relevant Market.  Also, as noted previously, three of the Plaintiffs' four other communities in the Relevant Market were approved for bond financing by the Defendant.

73.0    The major difference in this instance was the proposed location for the Project in West Melbourne.  There was substantial public opposition to the Project at the December 5, 2023, public hearing held by the Defendant.

74.0    Some of the opposition was organized by residents of Woodfield at Heritage Oaks, a self-described "private subdivision of Heritage Oaks located in West Melbourne, Florida. It is comprised of waterfront and wooded custom homes within a gated community, developed by some of Brevard's finest builders including Lifestyle Homes, Belmont Homes, and Schwab Custom Homes. These prestigious houses range in size from 1,800 to over 6,000 total square feet. Woodfield at Heritage Oaks is located just south of Hwy 192 (New Haven Avenue) off Minton Road."[30]  The Project was to be located at the northeast corner of Minton Road and Heritage Oaks adjacent to Woodfield.  The organization encourage its members "Let's pack the room."[31]

---

[28] Schwemm (2017), page 713.
[29] Schwemm (2017), page 713.
[30] https://www.woodfieldatheritageoaks.org/hud-project-on-minton
[31] https://www.woodfieldatheritageoaks.org/hud-project-on-minton

75.0    The video record of the December 5, 2023, meeting included many residents of West Melbourne arguing against the Project, often complaining about development of apartments at the site allowed under Florida's Live Local Act, SB102.  Interestingly, the Chairman of the County Commission acknowledged the pressing need for more affordable housing and voted in favor of issuing the bonds.  Nevertheless, the majority of the Commission voted against approving the bond issue without any explanation for their votes.[32]

76.0    Regardless of their ultimate motivation, the Defendant decided not to approve the bond issue dooming the Project.  As Table 10 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located.  The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households.  The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability.  Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market.  In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households.  The data show that the Decision perpetuates racially segregated housing patterns in West Melbourne.

**Table 10. Analysis of Segregative Impact Based on Racial Characteristics of Households Impacted by the Decision**

| Category | White | Black |
|---|---|---|
| Plaintiffs other Projects | 45% | 35% |
| Brevard County | 80% | 9% |
| West Melbourne | 79% | 4% |

## XI.0    Analysis of Robust Causality

77.0    The final issue to address is the requirement for a demonstration of what is termed "robust causality". The robust causality requirement requires a showing that links the challenged neutral policy to a specific adverse racial or ethnic disparity.[33]

---

[32] https://spacecoastdaily.com/2023/12/watch-live-brevard-county-commission-holds-meeting-in-viera-on-tuesday-17/
[33] City of Miami v. Bank of Am. Corp., 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016).

78.0 Schwemm explains the requirement for robust causality springs from the Supreme Court's decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.[34]  Therein, the court stated that in order "to protect potential defendants against abusive disparate-impact claims…. [an impact claim] that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement ensures that [r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create."

79.0 Schwemm goes on to explain that "Impact-based challenges based solely on racial imbalances, according to Inclusive Communities, "would almost inexorably lead . . . to . . . numerical quotas," presumably because potential defendants would seek racial balance to avoid liability, a situation that would raise "serious constitutional questions."[35]

80.0 More recently and closer to the Project, in Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo the court explained that "racial imbalance is endemic to affordable housing, as such housing caters to a disproportionately higher percentage of racial minorities. Regrettably, these vestiges of racial inequality remain today; but this fact does not establish the crucial element of causation. To hold otherwise ignores the FHA's unequivocal "robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create."[36]

81.0 The Oviedo court also provided a formula to demonstrate robust causation. The court prescribed comparing the % of racial minorities occupying multifamily properties in the City to the % of non-minorities occupying multifamily properties in the City.

82.0 The statistical analysis presented below, following the Oviedo court's recommendation, demonstrates that the Decision resulted in the racial imbalance.  The Relevant Market has a significant shortage of affordable housing.  The Decision exacerbated the shortage by limiting the supply of affordable housing in the Relevant Market.  The shortage affects all households in the Relevant Market who need affordable housing.  However, as the data in Table 11 demonstrate, black households are harmed more than white households.

---

[34] 135 S. Ct. 2507 (2015).
[35] Schwemm (2017), page 728.
[36] Case No. 6:16-cv-1005-Orl-37GJK

83.0   Table 11 presents the statistical data addressing the issue of robust
causality showing that the Decision caused the discrimination.  The analysis
compares the total percentage of white households needing affordable
housing (27%) to the percentage of black households needing affordable
housing (43%).  Affordable housing is defined for Table 11 using HUD's
small area fair market rent reports for a 2-bedroom unit in zip code 32922[37],
the predominate area from which the Plaintiffs' projects draw their tenants.
Based on the data in Table 11, the Decision had a discriminatory impact on
black households in the Relevant Market.

**Table 11. Demonstration of Robust Causality – The Decision Resulted in the Discrimination**

| Category | White | Black |
|---|---|---|
| Total Households | 91,861 | 13,095 |
| Needing Affordable Housing | 24,725 | 5,580 |
| Percent Affordable Housing | 27% | 43% |

## XII.0   Economic Damages

84.0   The Plaintiffs estimate that their economic damages are on the order of $10
million.

85.0   The Plaintiffs have asked me to defer analysis of the damages at this time.

## XIII.0   Discovery Still Open

86.0   I am informed that discovery remains open in this matter.

87.0   In the future, I plan to update this report to incorporate the analysis of
economic damages and to reflect any additional material evidence
provided.

---

[37]https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2024_code/2024zip_code_calc.odn?zcta=32922&metro_code=METRO37340M37340&year=2024&hypo=

**Exhibit #1 – Resume**



**SELECT CLIENT LIST**

Akerman
Bell Roper
Boatman Ricci
Burr Forman
Coleman Yovanovich
Conrad Scherer
de la Parte & Gilbert
Fulmer Leroy Albee
Fisher Rushmer
Foley Lardner
Gunster
Hill Ward Henderson
Holland & Knight
Morgan & Morgan
Nabors Giblin
Pendas Law
Smolker Bartlett
Tobin Reyes
Weiss Hatdler Cerawell
AEGON
Baron Collier
BP
Cemex/CSR/Rinker
City of Miami
Colonial Properties Trust
Colber Enterprises
Falcone Group
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
FPL
King Ranch
Kitson & Partners
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Parry Capital
Rayonier
Starwood Land Ventures
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.

# Henry H. Fishkind, Ph.D.

## President

hankf@fishkindls.com

**PROFESSIONAL SYNOPSIS**

With over 40 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980, Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988, Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm. In 2019, Dr. Fishkind sold the financial advisory, consulting, and real estate advisory portions of his business while keeping the expert witness portion, Fishkind Litigation Services, Inc.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and served on the board of directors of Engle Homes, Summit Properties, and ABT Funds until the companies were sold. Today, Dr. Fishkind is President of Fishkind Litigation Services.

**AREAS OF EXPERTISE**

Expert Witness
Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Privacy & Intellectual Property
Fiscal Impact Analysis
Real Estate Economics

**PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| President, Fishkind & Associates, Inc./Fishkind Litigation Services, Inc. | 1988 - Present |
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, Bureau of Economics & Business Research, University of Florida | 1980 - 1983 |
| Economist/Associate Professor, University of Florida | 1975 - 1983 |

**EDUCATION**

Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, B.A., Economics, 1971

Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107, Orlando, FL 32817
407.382.3256



## Exhibit #2 – Court Experience

| | DEPOSITIONS AND TESTIMONY | 2019-2020-2021-2022-2024 | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | HENRY H. FISHKIND, PH.D. | FISHKIND LITIGATION SERVICES, INC. | | | | | | |
| 3 | CASE NAME | Court | Case Number | Represented | Opinion | Deposition | Testified | Affidavit |
| 4 | B&B Bowling, LLC d/b/a Strikes @ Boca v. CRVII Boca TC, L.P. et al. | In the Circuit Court of the 15th Judicial Circuit In and For Palm Beach County, Florida | 50-2020-CA-007031-XXXX-MB | Defendant | yes | yes | | |
| 5 | Benoit v. Benoit | Twentieth Judicial Circuit In and For Collier County | 19-DR-1569 | Respondent | | yes | | no |
| 6 | Blaine et al. v. North Brevard County Hospital District | United States District Court Middle District of Florida Orlando Division | 6:18-cv-487-ORL-22DCI | Plaintiff | yes | yes | | |
| 7 | Blume v. Blume | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Action | 16-DR-823 | Respondent | yes | no | yes | |
| 8 | Angelika Bovi et al. v. Daniel Shepherd et al. | In the Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida | 502017CP000747XXXXMB | Plaintiff | yes | yes | | yes |
| 9 | Buffalo Rock Company, Inc. v. Pepsico, Inc., et al. | In the Circuit Court of Jefferson County, Alabama | 01-CV-2019-900217.00 | Plaintiff | yes | yes | | |
| 10 | Cafifa Media Group, LLC v. Star Over Orlando, Inc. et al. | American Arbitration Association | 01-18-0003-2715 | Respondent | yes | no | yes | |
| 11 | Celebrate Virginia South Holding Company, LLC, et al. v. CVAS Property Management, LLC, et al. | In The United States District Court Eastern District of Virginia Richond Division | 3:21-CV-00261 | Plaintiff | yes | yes | | yes |
| 12 | CSX Transportation, Inc. v. National Railroad Passenger Corporation | National Arbitration Panel, Washington, D.C. | | Claimant | yes | no | yes | no |
| 13 | DaVita, Inc., et al. v. Associates in Nephrology, et al. | In the Circuit Court of the Twentieth Judicial Circuit In and For Lee County, Florida | 21-CA-01844 | Defendant | yes | yes | | |
| 14 | Citrosuco North America, Inc. v. Brown International Corporation, LLC | | | Claimant | yes | no | yes | |
| 15 | DeLuna Oyster Company, Inc. v. Skanska USA Civil Southeast, Inc. | In the Circuit Court In and For Escambia County, Florida | 2020-CA-001679 | Defendant | yes | yes | | |
| 16 | Dynamic Motion Rides GMBH, et al. v. Universal City Development Partners Ltd., et al. | United States District Court Middle District of Florida Orlando Division | 6:21-cv-752-RBDLRH | Plaintiff | yes | yes | | no |
| 17 | Estate of Hugh Corrigan, IV et al. v. Sebastian River Improvement District | In the Circuit Court of the Nineteenth Judicial Circuit of the State of Florida In and For Indian River County | 31-2019-CA-000811 | Plaintiff | yes | yes | | |
| 18 | ETNA Holding, LLP v. Magic Companies Group, LLC et al. | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida, Civil Division | 2022-CA-000588-O | Defendant | yes | yes | | |
| 19 | Eveleigh et al. v. Eveleigh et al. | In the Circuit Court, Fourth Judicial Circuit, In and For Duval County, Florida | 2014-CP91607 | Defendant | yes | no | yes | |
| 20 | F&L Fiduciary Services, LLC et al. v. Ed Crapo as Property Tax Appraiser, et al. | In the Circuit Court of the Eighth Judicial Circuit In and For Alachua County, Florida, Civil Division | 2020-CA-001916 | Plaintiff | yes | yes | | |
| 21 | Fickling and Company, Inc. et al. v. West Shore Legacy, LLC | In the Circuit Court For the Eighth Judicial Circuit In and For Alachua County, Florida | 2022-CA-002682 | Plaintiff | yes | yes | | |

| # | Case | Court | Case Number | Role | | | | |
|---|------|-------|-------------|------|---|---|---|---|
| 22 | Matthew Finn v. Waterman Broadcasting Corporation | In the Circuit Court of the Twentieth Judicial Circuit In and For Lee County, Florida | 2020-CA-005712 | Plaintiff | yes | yes | | no |
| 23 | Flagstone Island Gardens, LLC et al. v. City of Miami | In the Circuit Court of the 11th Judicial Circuit in and For Miami-Dade County, Florida, Complex Business Litigation | 2017-013829-CA-01 (44) | Defendant | yes | yes | | |
| 24 | Florida Gas Transmission Company, LLC v. State of Florida Department of Transportation | United States District Court, Southern District of Florida, Fort Pierce Division | 2:22-cv-14071-DMM | Plaintiff | yes | yes | | |
| 25 | Garvey Farm, LP et al. v. City of Elsmere, Kentucky et al. | United States District Court Eastern District of Kentucky Northern Division at Covington | 2:23-cv-00015-DCR | Defendant | yes | yes | | |
| 26 | Grand Venezia COA, Inc. v. Clearwater Cay Community Development District et al | In the Sixth Judicial Circuit In And For Pinellas County, Florida | 16-001584-CI | Defendant | no | no | yes | no |
| 27 | Hobe Sound Ranch, Ltd. V. Martin County | In the Circuit Court of the Nineteenth Judicial Circuit In and For Martin County, Florida Civil Division | 2018-CA-000710 | Plaintiff | yes | yes | | yes |
| 28 | Home Builders Association of West Florida, Inc. et al. v. The Board of County Commissioners, Santa Rosa County, Florida et al. | In The Circuit Court of the First Judicial Circuit In and For Santa Rosa County, Florida | 2020-CA-0201 | Defendant | | | yes | |
| 29 | Home Point Financial Corporation v. Donald Mark Lane, et al. | In the United States District Court For the Middle District of Florida, Orlando Division | 6:20-cv-01819-CEM-EJK | Defendant | yes | yes | | |
| 30 | Jake H. Hunter, et al. v. A. Jefferey Tomassetti, PLC, et al. | In the Circuit Court of the Fourth Judicial Circuit, In and For Nassau County, Florida | 2014-CA-000427 | Plaintiff | yes | yes | | |
| 31 | Island Estate Group, LLC et al. v. Michael J. Carroll, Sr. et al. | American Arbitration Association | 01-20-0001-6804 | Respondent | yes | yes | | |
| 32 | John J. Jerue v. Drummond Company, Inc. | United States District Court For the Middle District of Florida Tampa Division | 8:17-cv-00587-EAK-AEP | Defendant | yes | yes | | |
| 33 | Lawrence G. Kass, MD v. St. Anthony's Physicians Surgery Center, LLC | In the Circuit Court of the Sixth Judicial Circuit In and For Pinellas County, Florida | 20-002495-CI | Defendant | yes | yes | | |
| 34 | Kimberly ReGenesis, LLC et al. v. Lee County | United States District Court Middle District of Florida, Fort Myers Division | 2:19-cv-00538-FtM-38NPM | Plaintiff | yes | yes | | |
| 35 | Las Olas Company, Inc. et al. v. Florida Power & Light Company | In the Circuit Court of the Seventeenth Judicial Circuit in and For Broward County, Florida | CACE 19-019911 (18) | Defendant | yes | yes | yes | |
| 36 | Lemon Bay Cove, LLC v. United States of America | In the United States Court of Claims | 1:17-cv-00436-MCW | Plaintiff | yes | yes | yes | yes |
| 37 | Lincoln Rock, LLC v. City of Tampa | United States District Court Middle District of Florida Tampa Division | 8:15-CV-01374-JSM-JSS | Plaintiff | yes | yes | | |
| 38 | Richard John Lucibella v. Town of Ocean Ridge et al. | United States District Court Southern Florida | 20-82156-CIV-Cannon/Brannon | Plaintiff | yes | yes | | |

| # | Case | Court | Case Number | Party | | | | |
|---|------|-------|-------------|-------|---|---|---|---|
| 39 | Luke Miller v.Gregg Uliano, et al. | In the Circuit Court for the Eighteenth Judicial Circuit In and for Seminole County, Florida | 2020-CA-000339-08-L | Defendant | yes | yes | | |
| 40 | Omni Interlocken Co., LLC. v. Broomfield County Board of Equalization | Board of Assessment Appeals, State of Colorado | 2021BAA2041 | Petitioner | yes | | yes | |
| 41 | River Cross Land Company, LLC v. Seminole County | United States District Court Middle District of Florida Orlando Division | 6:18-cv-1646-ORL-22KRS | Defendant | yes | yes | | |
| 42 | Mark Savage et al. v. Estate Homes by Stock, LLC | In the Circuit Court of the Twentieth Judicial Circuit In and for Collier County, Florida, Civil Division | 2023-CA-2348 | Defendant | yes | no | yes | no |
| 43 | Sensor Systems, LLC et al. v. Blue Barn Holdings, Inc. et al. | United States District Court Middle District of Florida Tampa Division | 8:19-CV-02581-SCB-AAS | Plaintiff | yes | yes | | |
| 44 | Wayne Sforza v. Custom Homes by Kaye, Inc. d/b/a Kaye Lifestyle Homes | In the Circuit Court of the Twentieth Judicial Circuit In and for Collier County, Florida, Civil Action | 18-CA-2626 | Defendant | yes | yes | yes | no |
| 45 | SRQ Taxi Management, LLC v. Sarasota Manatee Airport Authority | United States Bankruptcy Court Middle District of Florida Tampa Division | 8:17-bk-07782-MGW | Defendant | yes | yes | yes | no |
| 46 | David W. Steffee v. Kerry C. Dustin | In the Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida | 502017CP002145XXXXMB Probate Division | Defendant | yes | yes | yes | no |
| 47 | Summit Construction Management Group, LLC v. City of Oviedo | In the Circuit Court of the Eighteenth Judicial Circuit In and For Seminole County, Florida | 2017-CA-001062 | Defendant | yes | yes | yes | yes |
| 48 | Town Center at Doral LLC, et al | United States Bankruptcy Court, Southern District of Florida, Miami Division | 2018 CA 000360 NC | Debtors | yes | yes | yes | |
| 49 | Town of Indian River Shores v. City of Vero Beach, et al. | United States District Court for the Southern District of Florida, Fort Pierce Division | 2:21-cv-14354 | Defendant | yes | yes | | |
| 50 | Unicorp Colony Units, LLC v. Colony Beach & Tennis Club Association, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida | 2018-CA-000360-NC | Plaintiff | yes | | | |
| 51 | Universal Health Care Group, Inc., et al. v. Warburg Pincus, LLC et al. | United States Bankruptcy Court Middle District of Florida Tampa Division | 8:13-bk-05952-KRM | Defendant | yes | | | yes |
| 52 | John Van Horn v. Richard Koon et al. | In the Circuit Court of the Ninth Judicial Circuit In and For Orange County, Florida | 2015-CA-010999-O | Plaintiff | yes | | | yes |
| 53 | Walt Disney Parks and Resorts US, Inc. v. Rick Singh et al. | In the Circuit Court of the Ninth Judicial Circuit of Florida In and For Orange County Civil Division | 2016-CA-005297-O | Plaintiff | yes | yes | yes | yes |
| 54 | Waters Mark Development Enterprises, LC v. Brevard County, Florida | In the Circuit Court of the 18th Judicial Circuit, in and For Brevard County, Florida | 05-2014-CA-41947 | Defendant | no | yes | | yes |
| 55 | Wayne's Aggregate & Materials, LLC v. Roy Wayne Yates et al. | In the Circuit Court of the Eighteenth Judicial Circuit In and For Brevard County, Florida | 05-2019-CA-18868 | Defendant/Counter-Claimants | yes | yes | yes | |
| 56 | Wellen Park, LLP et al. v. West Villages for Responsible Government, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida, Civil Division | 2020-CA-003838 | Plaintiff | yes | no | yes | yes |

**Exhibit #3 – Materials Reviewed or Relied Upon**


**Documents Filed with the Court:**

Complaint, 12.27.2023

Plaintiffs' Opposition to Defendant, City of New Smyrna Beach's Motion for
Summary Judgment, 02.20.2014

Case Management and Scheduling Order, 03.26.2024

Notice of Electronic Filing, New Case Assigned (Judge Mendoza), 12.27.2023

Notice of Electronic Filing, Order, 01.02.2024

Return of Service, 01.03.2024

Summons in A Civil Action, 02.08.2023

Standing Order on Discovery Motions, 01.04.2024

Disclosure Statement Pursuant to Federal Rule of Civil Procedure 7.1 and Local
Rule 3.03, 01.10.2024

Notice of Pendency of Other Actions, 01.10.2024

Notice of Electronic Filing, 01.11.2024

Notice of Lead Counsel Designation, 01.11.2024

Defendant, Brevard County's, Motion to Dismiss and Incorporated Memorandum
of Law, 01.19.2024


**Production:**

HUD 2023 Income & Rent Limits – Brevard County, 05.15.2023

Rent Limits – Heritage Oaks 105 – MMRB – 4% HC, 12.04.2023

Demographic Information – Age and Race Ethnicity – Brevard

**References/Cases/Citations:**

Costar:
  Hammock Harbor
  Malabar Cove
  Melbourne, FL USA Multifamily Market, 05.06.2024
Venue at Viera
Wickham Club

Comprehensive Plans:
  Cocoa
  Melbourne
  Palm Bay
  Titusville
  West Melbourne

Robert G. Schwemm & Calvin Bradford, Proving Disparate Impact in Fair Housing Cases After Inclusive Communities, 19 N.Y.U. J. Legis. & Pub. Pol'y 685 (2016).

Robert G. Schwemm, Segregative-Effect Claims Under the Fair Housing Act, 20 N.Y.U. J. Legis. & Pub. Pol'y 709 (2017).

Christopher Herbert, Alexander Herman, and Daniel McCue, (2018), Measuring Housing Affordability: Assessing the 30-Percent of Income Standard, Joint Center for Housing Studies, Harvard University

Carey Witkov and Keith Zengel (2019), Chi-Squared Data Analysis and Model Testing
for Beginners, Oxford, Oxford, UK.

Comprehensive Annual Financial Report, Brevard County, Florida, Year Ending September 30, 2019, 2020, 2021, 2022

Housing Finance Authority Public Hearing Agenda, 10.15.2023

Brevard County Housing Finance Authority Meeting Minutes, 08.23.2023, 10-25-2023

Advisory Board Annual Reports, 2023

Debt Service: Financial Management

Calculation Summary of Small Area Fair Market Rents

McHugh, Mary L., "The Chi-Square Test of Independence," Department of Nursing, School of Health and Human Services, National University, Biochemia Medica 2013; 23(2):143-9

Turham, Nihan Solpuk, "Karl Pearson's Chi-Square Tests," Department of Educational Sciences, Faculty of Education, Faith Sultan Mehmet Foundation University, Academic Journals, Vol. 15(9), p.p. 575-580, September 2020

Affordable Housing v. City of Fresno, Nos. 04-15625, 04-15644, 04-15650, 04-15683, 04-15693, 04-15753, 04-15780, 04-17130, 05-15104, Argued and Submitted November 16, 2005, Filed January 11, 2006

Avenue 6E Investments., LLC v. City of Yuma Arizona, No. 13-16159, Decided March 25, 2016

City of Miami v. Bank of America Corporation., Case No. 13-24506-CIV-DIMITROULEAS

Hallmark Developers, Inc. v. Fulton County, Georgia, United States Court of Appeals, Eleventh Circuit, No. 05-15633, October 12, 2006

Oviedo Town Center. II, L.L.L.P. v. City of Oviedo, Case No. 6:16-cv-1005-Orl-37GJK, 08-23-2017

River Cross Land Company, LLC. v. Seminole County, 6:18-cv-1646-ACC-LRH, 06-04-2021

Texas Department of Housing and Community Affairs, et al. v. The Inclusive Communities Project, Inc., et al., On Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit, No. 13-1371, June 25, 2015

24 CFR 100 HUD Rule on FHA

42 USC FHA

Department of Housing and Urban Development, 24 CFR Part 100, Docket No. FR-6251-F-02,  Reinstatement of HUD's Discriminatory Effects Standard, Final Rule, 03.17.2023

American Community Survey, 5-Year Estimates: ACS and Margin of Error Values, Sage Data

Understanding Error and Determining Statistical Significance, U.S. Census Bureau, 2018, 2020

Section VII Proving Discrimination Disparate Impact, Title VI Legal Manual, United State Department of Justice

Department of Housing and Urban Development, Implementation of the Fair Housing Act's Disparate Impact Standard, 24 CFR Part 100, Docket No. FR-6111-F-03

Fair Housing and Related Laws, U.S. Department of Housing and Urban Development, 42 U.S.C. Section 3601-19, Title VIII of the Civil Rights Act of 1968

Housing Discrimination Under the Fair Housing Act, U.S. Department of Housing and Urban Development

Implementation of the Fair Housing Act's Discriminatory Effects Standard, A Rule by the Housing and Urban Development Department, 02.15.2013, Federal Register

Schwemm, Robert G., "Fair Housing Litigation After Inclusive Communities What's New and What's Not," Columbia Law Review Sidebar, Vol. 115, September 18, 2015,Pages 106-126

## Exhibit #4 Publications

REFEREED PROFESSIONAL ARTICLES

(With Byron Walden) "Correctly Calculating the Present Value ofFuture Medical Costs in Personal Injury Cases," *The Value ExaminerJ.* February 2015.

(With Stanley K. Smith) "Elderly Migration into Rapidly Growing Areas:  A Time Series Approach," *Review of Regional Studies,* Spring 1985, pp. 11-27.

(With Blaine Roberts)  "An Empirical Note on Employment Forecasts," *Monthly  Labor Review,* March 1978, pp. 105-108.

(With Blaine Roberts) "The Role of Monetary Forces in Regional Economic Activity: An Econometric Simulation Analysis," *Journal of Regional Science,* April 1979, pp. 15-29.

(With Jerome Milliman and Richard Ellson) "A Pragmatic Econometric Approach to Assessing Economic Impacts of Growth or Decline in Urban Areas," *Land Economics,* February 1978, pp. 442-460.

The Regional Impact of Monetary Policy: An Econometric  Simulation  Study of Indiana 1958-1973," *Journal of Regional Science,* April 1977, pp. 77-88.

"Manitoba Interlake Area – A Review," *Journal of Regional Sciences,* April 1977, pp. 151-153.

BOOKS AND MONOGRAPHS

(With Jerome Milliman) "An Econometric Approach to Regional Stagnation," in *Planning Under Regional Stagnation,* 1982.

(With Neil Sipe)  *A Primer on Impact Fees in Florida,* 1981.

"The Impacts of Growth Management Policies on New Home Prices," in *Urban Land Markets: Price Indices, Supply Measurers and Public Policy Effects,* 1980.

"The Geographic Incidence of Monetary Policy:  An Econometric Analysis," *Geographic Aspects of Inflationary Processes, Volume* 2, 1976.

(With Ernst Stromsdorder and Kamran Moayed-Dadkhan) *Cost Analysis of Manpower Programs: An Analysis of the Art,* 1973.

"The Big Green – The Fishkind Study," *Responses to an Aging Florida,* Florida  Council on Aging, October 1998.

Topic: Light Rail System for Orlando, *The Orlando Sentinel,* Letter Writer's Forum, 1999

"Outlook 2000, A Leveling Off," *Florida Realtor,* January 2000.

## NONREFERRED  JOURNALS  AND  NEWSLETTERS

*Econocast,* published quarterly November, 1984 – 1994.

*The Florida Outlook,* published quarterly 1977-1994.

*Economic Indicators,* published monthly, 1979-1982.

*Quarterly Forecasts for Florida and its counties,* published quarterly at Fishkind.com since 1998.

Fund Newsletters for 27 Florida Counties, published monthly 2006-2009.

*Econocast Weekly,* published weekly.

## GRANT  SPONSORED  RESEARCH  ACTIVITY

(With Jerome Milliman and Neil Sipe) *Modeling Financing Alternatives for Capital Improvements,* Gainesville, Florida: Bureau of Economic and Business Research, April 1983.
(For the Department of Community Affairs.)


(With Jerome Milliman and Neil Sipe) *A Regional Fiscal Impact Model,* Gainesville, Florida: Bureau of Economic and Business Research, June 1982.
(For the Department of Veterans and Community Affairs.)


(With Ron Dodson, Charles McDonald, and Scott Hargrave} *A Cost-Benefit Analysis of Consultants in the Florida Department of Transportation,* Gainesville, Florida: Bureau of Economic and Business Research, February 1981.
(For the Department of Transportation.)


*The Outlook for Residential Construction in Florida,* Gainesville, Florida: Bureau of Economic and Business Research, October 1979.
(For the Florida Home Builders Association.)


*The Outlook for Residential Construction,* Gainesville, Florida: Bureau of Economic and Business Research, March 1979.
(For the Florida Homebuilders Association.)


(With John Alexander and Carl Feiss} *Largo Prototype Assessment Model,* Gainesville, Florida, April 1979.
(For the Plan Board.)


(With Jerome Milliman) *An Economic Analysis of Growth Management in Sarasota County,* Sarasota, Florida: Contractors Association, November 1978.


(With Jerome Milliman) *Methodology for Assessing the Physical, Economic and Social Tradeoffs Between Increased Economic Development and Enhanced Environmental Quality,* Gainesville, Florida: Bureau of Economic and Business Research, July 1978.
(For the Department of Administration.)

(With Blaine Roberts) *A Comparative Regional Housing Market Analysis of Florida and California,* Gainesville, Florida: Bureau of Economic and Business Research, June 1978.
(For California Federal Savings.)

(With Blaine Roberts)

*A Short-Run Manpower Forecasting Model, Gainesville, Florida:* Bureau of Economic and Business Research,1977

(For the Department of Community Affairs, State of Florida.)

(With Blaine Roberts, Jerome Milliman, and Juan Gonzalez) *Florida Econometric Manpower Simulation Study,* Gainesville, Florida: Bureauof Economic and Business Research, 1976.
(For the Division of State Planning, State of Florida.)

(With Jerome Milliman and Richard Ellson) *Alachua County Econometric Study.* Gainesville, Florida: Bureau of Economic and Business Research, 1976.
(For the Gainesville-Alachua County Regional Utilities Board.)

(With Jerome Milliman and Richard Ellson) *Development of a Methodology for Determining the Need for Vocational and Technical Education in Urban Areas of Florida,* Gainesville, Florida: Bureau of Economic andBusiness Research, 1976.
(For the Florida State Advisory Council on Vocational and Technical Education.)

*The Economic Impacts of the Orlando International Airport,* 1992.(For the Greater Orlando Aviation Authority.)

*Tourism:  How Does It Affect Our Economy?  Fiscal Impacts of Tourism onCentral Florida,* 1996.
(For  the  Convention and  Visitors Bureaus of  Orlando/Orange County,Kissimmee/St. Cloud, and Seminole County.)

*The Economic Impact of the Bert Harris, Jr., Private Property Rights Protection Act and the Proposed Property Rights Amendment,* 1998.
(For the Florida Chapter of the American Planning Association.)

*South Carolina Private Property Rights Study:  Economic Impact of H.3591,*1998.
(For the South Carolina Coastal Conservation League, Association ofCounties, and Municipal Association.)


*Proposed 2 AM Liquor Ban Will Damage Miami Beach Economy for Years to Come*, 2021 (For the Miami Herald)

**Exhibit # 5 Analysis of the Number of Households who can Afford Apartments at the Project
By Household Incomes by Race/Ethnicity**

**Disparate Impact Analysis @ 30% AMI**          **Households with a householder who is White alone, not Hispanic or Latino**

| Total: | Midpoint | Estimate | % of Total | $18,280 One Bedroom | $21,920 Two Bedroom | $25,320 Three Bedroom |
|---|---|---|---|---|---|---|
| | | 91,861 | 100% | | | |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | 90% | 90% | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | | | 85% |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | | | |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | | | |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | | | |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | | | |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | | | |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | | | |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | | | |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | | | |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | | | |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | | | |
| $200,000 or more | $200,000 | 7,033 | 8% | | | |

## Disparate Impact Analysis @ 30% AMI

**Households with a householder who is Black or African American alone**

| Total: | Midpoint | Estimate | % of Total | $18,280 One Bedroom | $21,920 Two Bedroom | $25,320 Three Bedroom |
|---|---|---|---|---|---|---|
| | | 13,095 | 100% | | | |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | 83% | 83% | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% | | | 76% |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% | | | |
| $35,000 to $39,999 | $37,500 | 532 | 4% | | | |
| $40,000 to $44,999 | $42,500 | 370 | 3% | | | |
| $45,000 to $49,999 | $47,500 | 485 | 4% | | | |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% | | | |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% | | | |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% | | | |
| $100,000 to $124,999 | $112,500 | 871 | 7% | | | |
| $125,000 to $149,999 | $137,500 | 511 | 4% | | | |
| $150,000 to $199,999 | $175,000 | 852 | 7% | | | |
| $200,000 or more | $200,000 | 276 | 2% | | | |

**Disparate Impact Analysis @ 60% AMI**  **Households with a householder who is White alone, not Hispanic or Latino**

| Total: | Midpoint | Estimate | % of Total | $34,120 One Bedroom | $36,560.00 Two Bedroom | $43,840.00 Three Bedroom |
|---|---|---|---|---|---|---|
| | | 91,861 | 100% | | | |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | 77% | 77% | N/A |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | | | N/A |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | | | 69% |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | | | |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | | | |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | | | |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | | | |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | | | |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | | | |
| $200,000 or more | $200,000 | 7,033 | 8% | | | |

**Disparate Impact Analysis @ 60% AMI**                    Households with a householder who is Black or African American alone

|  |  |  |  | $34,120 | $36,560 | $43,840 |
| --- | --- | --- | --- | --- | --- | --- |
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | Three Bedroom |
|  |  | 13,095 | 100% |  |  |  |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 532 | 4% | 61% | 61% | N/A |
| $40,000 to $44,999 | $42,500 | 370 | 3% |  |  | N/A |
| $45,000 to $49,999 | $47,500 | 485 | 4% |  |  | 55% |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% |  |  |  |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% |  |  |  |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% |  |  |  |
| $100,000 to $124,999 | $112,500 | 871 | 7% |  |  |  |
| $125,000 to $149,999 | $137,500 | 511 | 4% |  |  |  |
| $150,000 to $199,999 | $175,000 | 852 | 7% |  |  |  |
| $200,000 or more | $200,000 | 276 | 2% |  |  |  |

**Disparate Impact Analysis @ 80% AMI**        **Households with a householder who is White alone, not Hispanic or Latino**

|  |  |  |  | $48,760 | $58,480 | $67,560 |
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | Three Bedroom |
|  |  | 91,861 | 100% |  |  |  |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | N/A | N/A | N/A |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | N/A | N/A | N/A |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | N/A | N/A | N/A |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | 65% | N/A | N/A |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% |  | 57% | N/A |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% |  |  | 46% |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% |  |  |  |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% |  |  |  |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% |  |  |  |
| $200,000 or more | $200,000 | 7,033 | 8% |  |  |  |

**Disparate Impact Analysis @ 80% AMI**                    Households with a householder who is Black or African American alone

| | | | | $48,760 | $58,480 | $67,560 |
|---|---|---|---|---|---|---|
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | Three Bedroom |
| | | 13,095 | 100% | | | |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 532 | 4% | N/A | N/A | N/A |
| $40,000 to $44,999 | $42,500 | 370 | 3% | N/A | N/A | N/A |
| $45,000 to $49,999 | $47,500 | 485 | 4% | N/A | N/A | N/A |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% | 51% | N/A | N/A |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% | | 42% | N/A |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% | | | 31% |
| $100,000 to $124,999 | $112,500 | 871 | 7% | | | |
| $125,000 to $149,999 | $137,500 | 511 | 4% | | | |
| $150,000 to $199,999 | $175,000 | 852 | 7% | | | |
| $200,000 or more | $200,000 | 276 | 2% | | | |

**Exhibit #6 Analysis of Disparate Impact**

| Disparate Impact Analysis @ 30% AMI | | 1 Bedroom | |
|---|---|---|---|

| 1 Bedroom Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 82,250 | 9,611 | 91,861 |
| Black | 10,859 | 2,236 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 90% | 10% | 100% |
| Black | 83% | 17% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 86% | 14% | 100% |
| Black | 86% | 14% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 79,213 | 12,648 | 91,861 |
| Black | 11,292 | 1,803 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 9,611 | 2,236 |
| Expected | 12,648 | 1,803 |

| Chi-square (Observed value) | 448.986 |
|---|---|
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 30% AMI**              **2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 82,250 | 9,611 | 91,861 |
| Black | 10,859 | 2,236 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 90% | 10% | 100% |
| Black | 83% | 17% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 86% | 14% | 100% |
| Black | 86% | 14% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 79,213 | 12,648 | 91,861 |
| Black | 11,292 | 1,803 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 9,611 | 2,236 |
| Expected | 12,648 | 1,803 |

| | |
|---|---|
| Chi-square (Observed value) | 448.986 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 30% AMI**                    **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 78,061 | 13,800 | 91,861 |
| Black | 9,926 | 3,169 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 85% | 15% | 100% |
| Black | 76% | 24% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 80% | 20% | 100% |
| Black | 80% | 20% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 73,846 | 18,015 | 91,861 |
| Black | 10,527 | 2,568 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 13,800 | 3,169 |
| Expected | 18,015 | 2,568 |

| | |
|---|---|
| Chi-square (Observed value) | 505.655 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 60% AMI**

**1 Bedroom**

1 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 70,710 | 21,151 | 91,861 |
| Black | 8,047 | 5,048 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 77% | 23% | 100% |
| Black | 61% | 39% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 69% | 31% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,580 | 28,281 | 91,861 |
| Black | 9,063 | 4,032 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 21,151 | 5,048 |
| Expected | 28,281 | 4,032 |

| | |
|---|---|
| Chi-square (Observed value) | 738.957 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 60% AMI**              **2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 70,710 | 21,151 | 91,861 |
| Black | 8,047 | 5,048 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 77% | 23% | 100% |
| Black | 61% | 39% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 69% | 31% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,580 | 28,281 | 91,861 |
| Black | 9,063 | 4,032 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 21,151 | 5,048 |
| Expected | 28,281 | 4,032 |

| | |
|---|---|
| Chi-square (Observed value) | 738.957 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 60% AMI**                    **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,743 | 28,118 | 91,861 |
| Black | 4,107 | 8,988 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 31% | 69% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 50% | 50% | 100% |
| Black | 50% | 50% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 46,277 | 45,584 | 91,861 |
| Black | 6,597 | 6,498 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 28,118 | 8,988 |
| Expected | 45,584 | 6,498 |

| | |
|---|---|
| Chi-square (Observed value) | 3684.697 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**

**1 Bedroom**

1 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 59,657 | 32,204 | 91,861 |
| Black | 6,660 | 6,435 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 65% | 35% | 100% |
| Black | 51% | 49% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 58% | 42% | 100% |
| Black | 58% | 42% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 53,188 | 38,673 | 91,861 |
| Black | 7,582 | 5,513 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 32,204 | 6,435 |
| Expected | 38,673 | 5,513 |

| | |
|---|---|
| Chi-square (Observed value) | 585.373 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**          **2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 52,474 | 39,387 | 91,861 |
| Black | 5,476 | 7,619 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 57% | 43% | 100% |
| Black | 42% | 58% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 49% | 51% | 100% |
| Black | 49% | 51% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 45,444 | 46,417 | 91,861 |
| Black | 6,478 | 6,617 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 39,387 | 7,619 |
| Expected | 46,417 | 6,617 |

| | |
|---|---|
| Chi-square (Observed value) | 547.870 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**                    **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 42,472 | 49,389 | 91,861 |
| Black | 4,107 | 8,988 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 46% | 54% | 100% |
| Black | 31% | 69% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 39% | 61% | 100% |
| Black | 39% | 61% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 35,641 | 56,220 | 91,861 |
| Black | 5,081 | 8,014 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 49,389 | 8,988 |
| Expected | 56,220 | 8,014 |

| Chi-square (Observed value) | 398.376 |
|---|---|
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Exhibit #7 Analysis of Margin of Error**

## Margin of Error Analysis

| Disparate Impact Analysis @ 30% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 10% | 10% | 15% |
| % Black Cannot Afford | 17% | 17% | 24% |
| SE White | 0.035 | 0.035 | 0.029 |
| SE Black | 0.087 | 0.087 | 0.073 |
| | | | |
| Test Score | 0.71 | 0.71 | 1.17 |
| Z Score | 52% | 52% | 76% |

| Disparate Impact Analysis @ 60% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 23% | 23% | 31% |
| % Black Cannot Afford | 39% | 39% | 69% |
| SE White | 0.022 | 0.022 | 0.019 |
| SE Black | 0.058 | 0.058 | 0.050 |
| | | | |
| Test Score | 1.67 | 1.67 | 4.83 |
| Z Score | 91% | 91% | 99% |

| Disparate Impact Analysis @ 80% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 35% | 43% | 54% |
| % Black Cannot Afford | 49% | 58% | 69% |
| SE White | 0.017 | 0.016 | 0.014 |
| SE Black | 0.048 | 0.044 | 0.040 |
| | | | |
| Test Score | 1.51 | 1.64 | 1.89 |
| Z Score | 87% | 90% | 94% |

**Exhibit #7 Analysis of the Statistical Significance of Differences in Affordability for White and Black Households
in the Relevant Market**

### White Only Households

| 30% AMI | Midpoint of Range | % Cannot Afford | Count | % MOE | Standard Error |
|---|---|---|---|---|---|
| 1 BR | $18,280 | 10% | 9,611 | 0.0837831 | 0.050778 |
| 2 BR | $21,920 | 10% | 9,611 | 0.0837831 | 0.050778 |
| 3 BR | $25,320 | 15% | 13,800 | 0.0682456 | 0.041361 |
| | | | | | |
| 60% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $34,120 | 23% | 21,151 | 0.0535702 | 0.032467 |
| 2 BR | $36,560 | 23% | 21,151 | 0.0535702 | 0.032467 |
| 3 BR | $43,840 | 31% | 28,118 | 0.0455840 | 0.027627 |
| | | | | | |
| 80% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $48,760 | 35% | 32,204 | 0.0422086 | 0.025581 |
| 2 BR | $58,480 | 43% | 39,387 | 0.0376549 | 0.022821 |
| 3 BR | $67,560 | 54% | 49,389 | 0.0331206 | 0.020073 |

**Black Households**

| 30% AMI | Midpoint of Range | % Cannot Afford | Count | % MOE | Standard Error |
|---|---|---|---|---|---|
| 1 BR | $18,280 | 17% | 2,236 | 0.1915295 | 0.116078 |
| 2 BR | $21,920 | 17% | 2,236 | 0.1915295 | 0.116078 |
| 3 BR | $25,320 | 24% | 3,169 | 0.1571677 | 0.095253 |
| | | | | | |
| 60% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $34,120 | 39% | 5,048 | 0.1207029 | 0.073153 |
| 2 BR | $36,560 | 39% | 5,048 | 0.1207029 | 0.073153 |
| 3 BR | $43,840 | 45% | 5,950 | 0.1099601 | 0.066642 |
| | | | | | |
| 80% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $48,760 | 49% | 6,435 | 0.1051815 | 0.063746 |
| 2 BR | $58,480 | 58% | 7,619 | 0.0955763 | 0.057925 |
| 3 BR | $67,560 | 69% | 8,988 | 0.0870280 | 0.052744 |

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No: 6:23-cv-2473-JSS-DCI**

ATLANTIC HOUSING PARTNERS L.L.L.P.,
CANTON CONSTRUCTION LLC,
CONCORD MANAGEMENT, LTD and
THE VENUE AT HERITAGE OAKS PARTNERS, LTD,

Plaintiffs,

v.

BREVARD COUNTY,
Defendant.
_____/

**EXPERT REBUTTAL REPORT**

January 21, 2025

------------------------------------------------------------
Hank Fishkind, Ph.D., President
Fishkind Litigation Services, Inc.
3504 Lake Lynda Dr, Suite 107
Orlando, Florida 32817
(407) 382-3256
www.fishkindls.com

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
Case No: 6:23-cv-2473-JSS-DCI**

**I.0     Introduction**

1.0     Since the publication of my expert report on September 12, 2024: (a) Dr. Malone produced his rebuttal report on behalf of the Defendant on November 29, 2024; and (b) Mr. Culp had his deposition taken November 21, 2024 and December 18, 2024.  This report responds to Dr. Malone's rebuttal and incorporates information from Mr. Culp's depositions.

2.0     Since I have already provided my qualifications, billing rate, publications, and court experience, I will not repeat that here.

**II.0     Summary of Expert Opinions**

**II.1     Dr. Malone's Critiques of My Expert Report**

3.0     Dr. Malone makes the following criticisms of my report.

    3.1     I failed to analyze the correct relevant market which Dr. Malone opines is households where at least one member is 55 or older and all members are 18 or older in conformance with the Housing for Older Persons Act.[1]

    3.2     I used the wrong rental rates for The Venue at Heritage Oaks (the "Project" at issue).[2]

    3.3     The Chi-Square test methodology I used is improper.[3]

    3.4     I failed to use the standard methodology to estimate the standard errors in the sampled data.[4]

    3.5     My analysis of segregative impact is flawed.[5]

    3.6     My analysis of robust causation is incorrect.[6]

---

[1] Malone (11-29-2024), page 6.
[2] Malone, Op. Cit., page 7.
[3] Malone, Op. Cit., page 9,
[4] Malone, Op. Cit., page 11.
[55] Malone, Op. Cit., page 21.
[6] Malone, Op. Cit., page 23.

4.0    I disagree with all of Dr. Malone's critiques, except that I did not use the standard methodology to estimate standard errors. Herein I agree with this criticism, and I have adopted the standard methodology as per Dr. Malone's opinion, which as shown below did not alter my conclusions. Below, I provide a full discussion of the issues.

**II.2    Analysis of Disparate Impact Using Dr. Malone's Prescribed Methodology**

5.0    Before turning to the detailed rebuttal of Dr. Malone's issues, I will focus on the effect of restricting the analysis of disparate impact and segregative impact only to households headed by someone 55 or older, which is the group Dr. Malone instructed should have been analyzed. Dr. Malone presented such a methodology prescribing use of the Public Use Microdata Sample ("PUMS") files.[7]    However, he never pursued or produced an analysis based on his methodology. Below I have produced the results of Dr. Malone's methodology.

6.0    PUMS provides data on household incomes by race at detailed levels of geography. Following Dr. Malone's methodology, I developed an analysis of disparate impact and segregative impact using the PUMS data for the relevant geographic market as described in my report to which Dr. Malone had no criticism. Also, responding to Dr. Malone's concerns over my application of the Chi-Square test and my estimates for standard errors, I adopted the standard Z-test in lieu of the Chi-Square test and I calculated the standard errors using the standard census methodology prescribed by Dr. Malone.

7.0    Dr. Malone complains that I used the wrong rental rates for the Project. The rental rates presented to the Brevard County Housing Finance Authority ("BCHFA") were different from those subsequently provided to the Florida Housing Financing Corporation ("FHFC"). The Plaintiffs explained that this is the typical process and in order to obtain financing from FHFC, more restrictive (i.e. lower) rental rates are required. These FHFC rates were controlling for the Project as they were for the other four projects built in Brevard County by the Plaintiffs, all of which were supported by BCHFA. Therefore, in my analysis shown below I used the FHFC rates. However, to mitigate any controversy over this issue, I also analyzed disparate impact using the rental rates presented to BCHFA that Dr. Malone asserts should be used.

---

[7] Malone, Op. Cit., page 9.

8.0   Table 1 presents the results of the test for disparate impact using Dr. Malone's prescribed methodology.  The analysis is provided for the three income categories for the Project for rentals with income levels at or below: 30% of average metropolitan area income ("AMI"), 60% of AMI, and 80% of AMI.  The percentages are the percentage of the households headed by someone 55 or older who cannot afford the rents planned at the Project.

9.0   For example, for households headed by someone 55 or older, with incomes at or below 30% AMI, 8.4% of white households and 12.8% of black households cannot afford the rental rate set for the one-bedroom apartments reserved for those with 30% AMI.

**Table 1. Analysis of Disparate Impact Using the PUMS Data and Dr. Malone's Methodology - % Who Cannot Afford the Rent**

| 30% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 8.4% | 11.5% | 13.5% |
| Black | 12.8% | 12.8% | 14.5% |
| Difference | 4.4% | 1.3% | 1.1% |
| **Z-Test** | **1.48** | **0.42** | **0.32** |
| **Significance Level** | **0.93** | **0.66** | **0.62** |

| 60% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.2% | 29.4% | 35.1% |
| Black | 25.6% | 35.9% | 42.7% |
| Difference | 2.4% | 6.5% | 7.6% |
| **Z-Test** | **0.59** | **1.43** | **1.62** |
| **Significance Level** | **0.72** | **0.92** | **0.95** |

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 33.6% | 41.9% | 49.3% |
| Black | 42.7% | 49.6% | 56.4% |
| Difference | 9.1% | 7.7% | 7.1% |
| **Z-Test** | **1.95** | **1.60** | **1.49** |
| **Significance Level** | **0.97** | **0.95** | **0.93** |

10.0    To determine whether denial of the Project results in a disparate impact on households headed by someone age 55 or older in the relevant marketplace, one compares the percentages of white households to black households for each number of bedrooms at each AMI level.  As the results in Table 1 show, in every category a larger percentage of black households cannot afford the rental rates.  The differences range from 1.1% to 9.1%. The question then is: are these differences statistically significant?

11.0    To test for significance, I applied the standard Z-Test.[8]  I used the standard Z-Test for evaluating the statistical significance of the percentage difference between black and white households who cannot afford the various apartment offerings at each AMI level, because the standard approach recommended by the Census Bureau is not applicable.[9]   The Census Bureau method assumes that the percentages under examination each have their own margin of errors, but that is not the situation here.  I had to calculate the percentages with the result that they do not have their own unique margins of error.   Therefore, I calculated the Z-Tests for the percentage for black and white households and then compared the differences in affordability to the margins of error for each component for black and white households as described below.

12.0    The Z-Test scores measure how many standard deviations the test score is from the mean of the normal distribution.  For example, at the 30% AMI level, 8.4% of white households could not afford a one-bedroom apartment compared to 12.8% of the black households for a difference of 4.4%.  The Z-Test score is 1.48 meaning that the difference is 1.48 standard deviations from the mean of zero (i.e. no difference in the percentages who can afford the  apartment).  This difference is significant at the 93% level of confidence.

13.0    The differences between black and white households that range from 1.1% to 9.1% are statistically significant ranging from 62% to 97%.  These results strongly point to a disparate impact from the denial of the Project.

14.0    However, there is one additional test needed for verification of disparate impact.  We have to analyze the sampling or measurement error associated with the data on household incomes for households headed by someone 55 or older in the relevant market using the PUMS database.  To calculate the standard error ("SE") in the PUMS data, I used the following methodology prescribed by Dr. Malone as per the PUMS instructions.[10]

---

[8] Frost, Jim (2020), Introduction to Statistics, Statistics by Jim: State College, PA., pages 131-135, and See for example https://www.statisticshowto.com/probability-and-statistics/hypothesis-testing/z-test/
[9] U.S. Census Bureau, *Understanding and Using American Community Survey Data: What All Data Users Need to Know*, U.S. Government Publishing Office, Washington, DC, 2020, pages 55-56.
[10] U.S. Census Bureau (2022), "Public Use Microdata Sample (PUMS) Accuracy of the Data 2022, pages 14-15.

15.0    Using the generalized variance function ("GVF") method using design factors,[11] I calculated the confidence intervals for the percentages of the households in each income grouping from the PUMS data. I measured the confidence intervals at the 70% level reflecting the fact that the PUMS data has a higher level of sampling error than the American Community Survey ("ACS") database from which PUMS is generated.[12] Table 2 provides the results.

**Table 2. Analysis of Disparate Impact Using the PUMS Data and Dr. Malone's Methodology - % Who Cannot Afford the Rent Considering Sample Errors and Confidence Levels**

| 30% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 8.4 | 11.5 | 13.5 |
| Black | 12.8 | 12.8 | 14.5 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.23 | 1.41 | 1.51 |
| Black +/- @ 70% Confidence | 4.46 | 4.46 | 4.70 |
| | | | |
| Difference Black v White | 4.40 | 1.33 | 1.06 |
| | | | |
| Z-Test | 1.48 | 0.42 | 0.32 |
| Significance Level | 0.93 | 0.66 | 0.62 |

| 60% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.2 | 29.4 | 35.1 |
| Black | 25.6 | 35.9 | 42.7 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.87 | 2.02 | 2.11 |
| Black +/- @ 70% Confidence | 5.82 | 6.40 | 6.60 |
| | | | |
| Difference Black v White | 2.43 | 6.47 | 7.60 |
| | | | |
| Z-Test | 0.59 | 1.43 | 1.62 |
| Significance Level | 0.72 | 0.92 | 0.95 |

---

[11] Census, Op. Cit., page 11.
[12] Census, Op. Cit., page 1.

---

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 33.6 | 41.9 | 49.3 |
| Black | 42.7 | 49.6 | 56.4 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 2.09 | 2.18 | 2.21 |
| Black +/- @ 70% Confidence | 6.60 | 6.67 | 6.61 |
| Difference Black v White | 9.13 | 7.70 | 7.14 |
| Z-Test | 1.95 | 1.60 | 1.49 |
| Significance Level | 0.97 | 0.95 | 0.93 |

16.0    As noted previously, in every case a higher proportion of black households headed by someone 55 or older in the relevant marketplace cannot afford the apartments compared to white households headed by someone 55 or older in the relevant marketplace.  From Table 1 we learned that these differences were statistically significant at levels ranging from 62% to 97%. This information is included in Table 2 for reference.

17.0    The PUMS data in Tables 1 and 2, like all sampled data, has some sample error associated with its data.  I calculated the standard errors associated with the data estimates from PUMS at the 70% confidence level.

18.0    For example, at 80% AMI, 42.7% of black households cannot afford the one-bedroom apartment compared to 33.6% of white households for a difference of 9.13 percentage points.  With a Z-Test of 1.95 we can be 97% confident that the difference of 9.13 percentage points is statistically significant.  In addition, the measurement of 42.7% for black households that cannot afford the apartment is measured in PUMS with sampling error. At the 70% confidence level the data measure this 42.7% within a range of +/- 6.60%.  In other words, the measurement of 42.7% lies between 49.33% and 36.14% with 70% confidence.

19.0    Continuing with the example of the one-bedroom apartment at 80% AMI, even taking the measurement error of +/- 6.60% into account, the difference between the white and black households that cannot afford the rent of 9.13% is greater than the lower level of the confidence band of the observed percentage of black households.   Stated differently, the statistically significant differential between white and black households of 9.13% exceeds the measurement error of 4.27%.

20.0   The boxes in Table 2 highlight the five comparisons where the differences
between the white and black households are not only statistically significant,
but also, they are larger than the measurement errors in the PUMS data.
Therefore, in 5 of the 9 cases constituting 56% of the data there is definitive
evidence that the denial of the Project had a disparate impact on black
households headed by someone 55 or over in the relevant marketplace.

21.0   Finally, Dr. Malone asserts that the rental rates to be used in the analysis
of disparate impact should be based on the submission to the BCHFA.
Table 3 displays the BCHFA rental rates.   The income threshold is a
constant 50% of AMI for the apartments.  The rental rates range from $806
to $1,181 per month.   I calculated the required income needed for each
rental level using the standard metric that 30% of income can be devoted
to rent without creating a hardship.

### Table 3. Rental Rates Proposed to BCHFA for the Project

| Income Level of 50% of AMI | Plaintiff's Proposed Rents | Income Threshold @ 50% AMI |
|---|---|---|
| One Bedroom | $806 | $32,240 |
| Two Bedroom | $968 | $38,720 |
| Three Bedroom | $1,181 | $47,240 |

Sources: rental rates from the July 31, 2023 application by the Plaintiffs to
BCHFA, page 7

22.0   Using Dr. Malone's methodology as described previously, the results of the
analysis for the rental rates shown in Table 3 are presented in Table 4.  As
before, these data definitively demonstrate disparate impact from the denial
of the Project.  In every case, black households headed by someone 55 or
over, were less able to afford the apartments compared to white
households.   The differences range from 2.66 percentage points to 9.49
percentage points.   The differences are highly significant based on the F-
Test and are at or above the measurement error confidence range in one
of three observations.

**Table 4. Analysis of Disparate Impact Using the PUMS Data and Dr. Malone's Methodology - % Who Cannot Afford the Rent Considering Sample Errors and Confidence Levels Based on Rental Rates Submitted to BCHFA**

| 50% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 18.01 | 23.21 | 30.16 |
| Black | 21.55 | 25.86 | 39.66 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.70 | 1.87 | 2.03 |
| Black +/- @ 70% Confidence | 5.48 | 5.84 | 6.52 |
| | | | |
| Difference Black v White | 3.54 | 2.66 | 9.49 |
| Z-Test | 0.92 | 0.64 | 2.07 |
| Significance Level | 0.82 | 0.74 | 0.98 |

23.0    Dr. Malone also criticized me for not using the standard Census methodology to calculate standard errors and confidence intervals in my analysis of disparate impact using all households with the ACS database. Table 5 presents the updated analysis of disparate impact using the ACS[13] database for all households in the relevant market area and applying the ACS standard methodology[14] to calculate the standard errors used for the confidence intervals as per Dr. Malone's recommendation.

**Table 5. Analysis of Disparate Impact Examining all Households in the Relevant Market Area with the ACS Database and Standard Calculations for the Standard Errors of the Estimates**

| 30% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 10.46% | 10.46% | 15.02% |
| Black | 17.08% | 17.08% | 24.20% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 3.35% | 3.35% | 4.01% |
| Black +/- @ 90% Confidence | 8.48% | 8.48% | 7.48% |
| Difference Black v White | 6.61% | 6.61% | 9.18% |
| Z-Test | **20.55** | **20.55** | **24.74** |
| Significance Level | **1.00** | **1.00** | **1.00** |

---

[13] Census, Op. Cit.
[14] Census, Op. Cit., pages 59-60.

| 60% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.03% | 23.03% | 30.61% |
| Black | 38.55% | 38.55% | 68.64% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 2.25% | 2.25% | 2.38% |
| Black +/- @ 90% Confidence | 6.05% | 6.05% | 5.51% |
| Difference Black v White | 15.52% | 15.52% | 38.03% |
| Z-Test | 36.00 | 36.00 | 81.42 |
| Significance Level | 1.00 | 1.00 | 1.00 |

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 35.06% | 42.88% | 53.76% |
| Black | 49.14% | 58.18% | 68.64% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 1.66% | 1.49% | 1.31% |
| Black +/- @ 90% Confidence | 5.10% | 4.44% | 4.01% |
| Difference Black v White | 14.08% | 15.31% | 14.87% |
| Z-Test | 30.54 | 32.77 | 32.67 |
| Significance Level | 1.00 | 1.00 | 1.00 |
| Avg | 0.42 | 0.51 | 0.61 |

24.0    The analysis in Table 5 proves that the denial of the Project had a significant disparate impact on black households in the relevant market area. For all nine cases, the percentage of black households who could not afford the apartment rents was significantly larger than for white households. These differences are not only statistically significant, but they are larger than the sampling error as measured by the confidence intervals.

25.0    For example, in the case of one-bedroom apartments with the 80% AMI limitation, 49% of black households could not afford these units compared to 35% of white households. The differential of 14.08% was much larger than the lower confidence level of 5.10% meaning that the differential was not only statistically significant, but also reliably measured because the differential was greater than the measurement error.

## II.3 Analysis of Segregative Impact Using Dr. Malone's Prescribed Methodology

26.0 This section of the report analyzes whether the denial of the Project had a segregative impact using the methodology prescribed by Dr. Malone as discussed above. As before, the analysis of segregative impact uses the PUMS data, the Z-Test, and the GVF method with the design factors to calculate the standard errors associated with the PUMS data.

27.0 Table 6 shows the data for households headed by someone 55 or older in Brevard County and in the Melbourne/West Melbourne areas from the PUMS data. This data shows 9% of the households headed by someone 55 or older in the County are black compared to 5% in the Melbourne/West Melbourne area (the smallest geography available that includes PUMS data for West Melbourne).

**Table 6. PUMS Data for Households Headed by Someone 55 or Older**

| Area | Area Total | White 55+ | Black 55+ |
|------|-----------|-----------|-----------|
| County Total | 153,220 | 122,077 | 13,442 |
| Percent of Total | 100% | 80% | 9% |
| Melbourne/West Melbourne | 53,168 | 45,278 | 2,690 |
| Percent of Total | 100% | 85% | 5% |

28.0 Table 7 presents the segregative impact analysis. In households headed by someone 55 or older, 8.8% were headed by blacks in the County compared to 5.1% in Melbourne/West Melbourne. This is a difference of 3.7 percentage points. The Z-Test score is 16.1 indicating that this difference of 3.7 percentage points is statistically significant with 100% confidence. The 70% confidence interval around the measurement of households in the County and in Melbourne/West Melbourne is far below the 3.7 percentage point difference in their shares of black households headed by someone 55 or older.

29.0 Therefore, there is definitive evidence that the denial of the Project had a segregative impact limiting the opportunities for households headed by blacks 55 and older from living in Melbourne/West Melbourne.

**Table 7. Segregative Analysis Using the PUMS Data and the Methodology Prescribed by Dr. Malone**

| Category | Amounts |
|---|---|
| County % Black | 8.77 |
| Melbourne/West Melbourne % Black | 5.06 |
| 70% Confidence Interval | |
| County | 1.34 |
| Melbourne/West Melbourne | 1.76 |
| | |
| Difference Black v White | 3.71 |
| | |
| Z-Test | 16.11 |
| Significance Level | 1.00 |

## II.4    Conclusions

30.0    The denial of the Project resulted in a disparate and segregative impact on households headed by someone black in the relevant market.  Regardless of whether the analysis included all households using the ACS database or only households headed by someone 55 or older using the PUMS database, and no matter which rental rates are examined: disparate impact is demonstrated by the fact that for every income grouping and for every apartment size the percentage of black households that cannot afford the apartments is far higher than the percentage of white households that cannot afford the apartments.  These racial differences are statistically significant in all cases at confidence levels from 62% to 97%.

31.0    However, both the ACS and PUMS databases are based on survey data that is subject to sampling (measurement) error.  My analysis of disparate impact takes sampling error into account by comparing the statistically significant differences in affordability between white and black households to the measurement errors associated with the data.  In the vast majority of the cases examined, the differences in affordability were far greater than the sampling errors and their associated confidence intervals.  This is true uniformly for the analysis of all households using the ACS database and for most cases using the PUMS database for households 55 and over.

32.0    There were four cases out of the nine examined in Table 2 using the PUMS data where the affordability differences were statistically significant with confidence ranging from 62% to 93% but the margin of errors and resulting confidence intervals measuring the black households was greater than the affordability differential.

33.0    In most cases, when sampling error exceeds the differences in the samples at interest, the conclusion is that the precision of the data is too low to support definitive conclusions concerning any differences between the samples.  In this case the samples being evaluated are the percentages of black and white households who cannot afford to rent the various apartment offerings at the differing income limits using the PUMS data in Table 2. These data demonstrate statistically significant differences between the white and black households, but these differences are smaller than their sampling errors.

34.0    Thus, for these four observations (out of the nine in total) there is tension between: (a) the statistically significant differences in households by race that cannot afford the apartment offering and (b) the measurement error associated with the underlying data available for the analysis.

35.0    There is every reason to believe that the sampling errors in the PUMS and ACS are random, and that the sampling procedures themselves are not the sources of any bias in the measurements.  In this case the small sample sizes drawn from the PUMS data come with substantial sampling error and measurement imprecision.

36.0    Therefore, the sampling errors are highly unlikely to have caused any bias in the data, it is just that the measurements are imprecise but not biased in any particular direction.  Since this is the case here, the sampling errors are not a reasonable basis to reject the statistically significant differentials in the affordability of the apartments in the four observations from Table 2.

37.0    Considering all of these circumstances, the uniformly consistent and statistically significant differences between white and black households reliably demonstrate that the denial of the Project had a disparate impact on black households in the relevant market.

38.0    Finally, the demonstrations of segregative impact using PUMS as shown here and using the census data as in my report, are not only statistically significant, but the racial differences are far in excess of sampling error. Therefore, denial of the project undeniably perpetuated segregation in West Melbourne.

## IV.0    Introduction

39.0    There are two main sections to this report.  The first provides analyses of disparate impact and segregative impact utilizing the methodology Dr. Malone prescribed but failed to produce.  The purpose is to demonstrate that even using the restrictive assumptions promoted by Dr. Malone, the data and analyses demonstrate that the denial of the Project resulted in a disparate and segregative impact on households headed by blacks.

40.0    The second section addresses the critiques of my report published by Dr. Malone.  His criticisms are mostly incorrect and they often suffer from Dr. Malone's misunderstanding of the economics and parameters of affordable housing projects in Florida.  The two most important are discussed next.

41.0    First, Dr. Malone failed to properly understand the Project's plan, as housing restricted to seniors in accordance with the Housing for Older Persons Act.[15]  The requirements are that at least 80% of the units must have at least one occupant who is 55 years of age or older along with other reporting requirements.  The regulations do not require that the household head must be 55 or over, only that 80% of the units have at least one occupant over 55.  Thus, 20% of the units can be occupied by households headed by someone of any age.  Furthermore, for the remaining 80% of the units, all that is required is that one occupant, not necessarily the head of the household or the lessee, be 55 or over.  Therefore, the most appropriate dataset is the one I used which encompasses all households not just households headed by someone 55 or older.

42.0    While Dr. Malone correctly references the general requirements of the Older Persons Act, he states that I "must analyze the incomes of households where at least one member of the household is 55 or older and all members of the household are 18 or older."[16] However, as noted above, the Act does not require that all members of the household are 18 or older.  Dr. Malone supports his contention referring to Volume 1 of Mr. Culp's deposition.[17]

43.0    However, in Mr. Culp's subsequent deposition he corrected this misstatement noting that his intention and the Act only requires that at least 80 percent of the units must have at least one occupant who is 55 years of age or older without any requirement that all members of the household are 18 or older.[18]

44.0    Nevertheless, to do the analysis Dr. Malone instructs that I should have used the PUMS dataset which provides details on household income by age and race of the household head.[19]  As noted later, I conducted the analysis using the PUMS data as Dr. Malone directed for households headed by someone 55 or older.  This is the dataset that most closely aligns with Dr. Malone's methodology.

---

[15] U.S. Department of Housing and Urban Development, "Fair Housing Act: Housing for Older Persons", accessed 1/17/2025
https://www.hud.gov/program_offices/fair_housing_equal_opp/fair_housing_act_housing_older_persons
[16] Malone, Op. Cit., page 6.
[17] Deposition of Scott Culp (11/21/2024), pages 162-163
[18]  Deposition of Scott Culp (12/18/2024), pages 235-236
[19] Malone, Op. Cit., page 9.

45.0    However, the PUMS data do not include any information for households where at least one member of the household is 55 or older, regardless of the age of the head of the household, and all members of the household are 18 or older.  Furthermore, relying on PUMS for households headed by someone 55 or older excludes the 20% of the households eligible for the Project that are not age restricted.  This is why I decided to use the ACS dataset for all households in the relevant market.

46.0    Second, Dr. Malone asserts that I should have used the rent schedule presented to BCHFA instead of the schedule that the Plaintiffs planned to actually use for the Project.  As Mr. Culp explained in his deposition, the Project planned to be a low-income, housing tax credit community, using the four percent low income housing tax credits as part of its financing.  To use this facility the rent schedule for the Project would be different from the one previously submitted to BCHFA.  That is why I used the rent schedule the Plaintiffs provided to me reflecting their intention to access the low-income, four percent, housing tax credit feature.

47.0    Ultimately, it will be up to the court to determine which rent schedule is applicable.  However, as reported below, I conducted analysis of disparate impact using both rent schedules.  In each case there is strong evidence of disparate impact.  So, the point is moot.

**V.0    Analysis of Disparate Impact and Segregative Impact Using the Methodology Prescribed by Dr. Malone**

48.0    As noted above, Dr. Malone instructs that the proper data set for the analysis in this case is PUMS.[20]  PUMS are samples drawn from the data collected from the American Community Survey ("ACS").  The ACS is a nationwide survey providing communities with reliable and timely social, economic, housing, and demographic data every year.[21]  I used the ACS data in my report.

49.0    PUMS can be used to provide more detailed data on household incomes by race at detailed levels of geography not available in ACS.  However, unlike the ACS data, PUMS is much more difficult to work with.  The PUMS data are not tabulated and require processing with statistical software or in Excel, which is what I did.  I generated PUMS data for households headed by someone age 55 or older in the relevant geographic market as described in my report to which Dr. Malone had no criticism.

---

[20] U.S. Census Bureau (February 2021), Understanding and Using the American Community Survey Public Use Microdata Sample Files: What Data Users Need to Know, U.S. Government Printing Office, Washington, DC, 2021
[21] Ibid.

---

50.0    Also, responding to Dr. Malone's concerns over my application of the Chi-Square test and my estimates for standard errors, I adopted the standard Z-test in lieu of the Chi-Square test and I calculated the standard errors using the census methodology prescribed by Dr. Malone and described in the PUMS literature published by Census.[22]

51.0    Table 8 presents the results of the test for disparate impact using Dr. Malone's prescribed methodology.  The analysis is provided for the three income categories for the Project for rentals with income levels at or below: 30% of average metropolitan area income ("AMI"), 60% of AMI, and 80% of AMI.  The percentages are the percentage of the households headed by someone 55 or older in the relevant market who cannot afford the rents planned at the Project.

52.0    For example, for households headed by someone 55 or older, with incomes at or below 30% AMI, 8.4% of white households and 12.8% of black households cannot afford the rental rate set for the one-bedroom apartments reserved for those with 30% AMI.

**Table 8. Analysis of Disparate Impact Using the PUMS Data and Dr. Malone's Methodology - % Who Cannot Afford the Rent**

| **30% AMI** | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 8.4% | 11.5% | 13.5% |
| Black | 12.8% | 12.8% | 14.5% |
| Difference | 4.4% | 1.3% | 1.1% |
| Z-Test | 1.48 | 0.42 | 0.32 |
| Significance Level | 0.93 | 0.66 | 0.62 |

| **60% AMI** | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.2% | 29.4% | 35.1% |
| Black | 25.6% | 35.9% | 42.7% |
| Difference | 2.4% | 6.5% | 7.6% |
| Z-Test | 0.59 | 1.43 | 1.62 |
| Significance Level | 0.72 | 0.92 | 0.95 |

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 33.6% | 41.9% | 49.3% |
| Black | 42.7% | 49.6% | 56.4% |
| Difference | 9.1% | 7.7% | 7.1% |
| Z-Test | 1.95 | 1.60 | 1.49 |
| Significance Level | 0.97 | 0.95 | 0.93 |

---

[22] U.S. Census, Op. Cit., page 17.

53.0    To determine whether denial of the Project results in a disparate impact on
        households headed by someone age 55 or older in the relevant
        marketplace, one compares the percentages of white households to black
        households for each number of bedrooms at each AMI level.  As the results
        in Table 8 show, in every category a larger percentage of black households
        cannot afford the rental rates.  The differences range from 1.1% to 9.1%.
        The question then is: are these differences statistically significant?

54.0    To test for significance, I applied the standard Z-Test.[23]  The Z-Test scores
        measure how many standard deviations the test score is from the mean of
        the normal distribution.  For example, at the 30% AMI level, 8.4% of white
        households could not afford a one-bedroom apartment compared to 12.8%
        of the black households for a difference of 4.4 percentage points.  The Z-
        Test score is 1.48 meaning that the difference is1.48 standard deviations
        from the mean of zero (i.e. no difference in the percentages who can afford
        the apartment).  This difference is significant at the 93% level of confidence.

55.0    The differences between black and white households that range from 1.1%
        to 9.1% are statistically significant ranging from 62% to 97%.  These results
        strongly point to a disparate impact from the denial of the Project.

56.0    However, there is one additional test needed for verification of disparate
        impact.  We have to analyze the sampling or measurement error associated
        with the data on household incomes for households headed by someone
        55 or older in the relevant market using the PUMS database.

57.0    To calculate the standard error ("SE") in the PUMS data, I used the following
        methodology prescribed by Dr. Malone as per the PUMS instructions.[24]
        Using the generalized variance function ("GVF") method using design
        factors,[25] I calculated the confidence intervals for the percentages of the
        households in each income grouping from the PUMS data.  I measured the
        confidence intervals at the 70% level reflecting the fact that the PUMS data
        has a higher level of sampling error than the American Community Survey
        ("ACS") database from which PUMS is generated.[26]  Table 9 provides the
        results.

---

[23] Frost, Jim (2020), <u>Hypothesis Testing</u>, Statistics by Jim: State College, PA. and See for example
https://www.statisticshowto.com/probability-and-statistics/hypothesis-testing/z-test/
[24] U.S. Census Bureau (2022), "Public Use Microdata Sample (PUMS) Accuracy of the Data 2022, pages
14-15.
[25] Census, Op. Cit., page 11.
[26] Census, Op. Cit., page 1.

**Table 9. Analysis of Disparate Impact Using the PUMS Data and Dr.
Malone's Methodology - % Who Cannot Afford the Rent
Considering Sample Errors and Confidence Levels**

| 30% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 8.4 | 11.5 | 13.5 |
| Black | 12.8 | 12.8 | 14.5 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.23 | 1.41 | 1.51 |
| Black +/- @ 70% Confidence | 4.46 | 4.46 | 4.70 |
| Difference Black v White | 4.40 | 1.33 | 1.06 |
| Z-Test | 1.48 | 0.42 | 0.32 |
| Significance Level | 0.93 | 0.66 | 0.62 |

| 60% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.2 | 29.4 | 35.1 |
| Black | 25.6 | 35.9 | 42.7 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.87 | 2.02 | 2.11 |
| Black +/- @ 70% Confidence | 5.82 | 6.40 | 6.60 |
| Difference Black v White | 2.43 | 6.47 | 7.60 |
| Z-Test | 0.59 | 1.43 | 1.62 |
| Significance Level | 0.72 | 0.92 | 0.95 |

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 33.6 | 41.9 | 49.3 |
| Black | 42.7 | 49.6 | 56.4 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 2.09 | 2.18 | 2.21 |
| Black +/- @ 70% Confidence | 6.60 | 6.67 | 6.61 |
| Difference Black v White | 9.13 | 7.70 | 7.14 |
| Z-Test | 1.95 | 1.60 | 1.49 |
| Significance Level | 0.97 | 0.95 | 0.93 |

58.0    As noted previously, in every case a higher proportion of black households headed by someone 55 or older in the relevant marketplace cannot afford the apartments compared to white households headed by someone 55 or older in the relevant marketplace. From Table 8 we learned that these differences were statistically significant at levels ranging from 62% to 97%. This information is included in Table 9 for reference.

59.0    The PUMS data in Tables 8 and 9, like all sampled data, has some sample error associated with its data. I calculated the standard errors associated with the data estimates from PUMS at the 70% confidence level.

60.0    For example, at 80% AMI, 42.7% of black households cannot afford the one-bedroom apartment compared to 33.6% of white households for a difference of 9.13 percentage points. With a Z-Test of 1.95 we can be 97% confident that the difference of 9.13 percentage points is statistically significant. In addition, the measurement of 42.7% for black households that cannot afford the apartment is measured in PUMS with sampling error. At the 70% confidence level the data measure this 42.7% within a range of +/- 6.60%. In other words, the measurement of 42.7% lies between 49.33% and 36.14% with 70% confidence.

61.0    Continuing with the example of the one-bedroom apartment at 80% AMI, even taking the measurement error of +/- 6.60% into account, the difference between the white and black households that cannot afford the rent of 9.13% is greater than the lower level of the confidence band of the observed percentage of black households. Stated differently, the statistically significant differential between white and black households of 9.13% exceeds the measurement error of 6.60%.

62.0    The boxes in Table 8 highlight the five comparisons where the differences between the white and black households are not only statistically significant, but also, they are larger than the measurement errors in the PUMS data. Therefore, in 5 of the 9 cases constituting 56% of the data, there is definitive evidence that the denial of the Project had a disparate impact on black households headed by someone 55 or over in the relevant marketplace.

63.0    As previously discussed in paragraphs 35 and 36, simply because: (a) the confidence interval is greater than (b) the statistically significant affordability differential; this does not necessarily mean that the results are unreliable. The sampling errors giving rise to the confidence intervals create imprecision in the measurements, but they do not introduce any bias. So, despite the imprecision in measurement, the differentials showing disparate impact remain valid.

64.0    Finally, Dr. Malone asserts that the rental rates to be used in the analysis of disparate impact should be based on the submission to the BCHFA. Table 10 displays the BCHFA rental rates.  The income threshold is a constant 50% of AMI for the apartments.  The rental rates range from $806 to $1,181 per month.  I calculated the required income needed for each rental level using the standard metric that 30% of income can be devoted to rent without creating a hardship.

**Table 10. Rental Rates Proposed to BCHFA for the Project**

| Income Level of 50% of AMI | Plaintiff's Proposed Rents | Income Threshold @ 50% AMI |
|---|---|---|
| One Bedroom | $806 | $32,240 |
| Two Bedroom | $968 | $38,720 |
| Three Bedroom | $1,181 | $47,240 |

Sources: rental rates from the July 31, 2023 application by the Plaintiffs to BCHFA, page 7

65.0    Using Dr. Malone's methodology as described previously, the results of the analysis for the rental rates shown in Table 10 are presented in Table 11. As before, these data definitively demonstrate disparate impact from the denial of the Project.  In every case, black households headed by someone 55 or over were less able to afford the apartments compared to white households.  The differences range from 2.66 percentage points to 9.49 percentage points.  The differences are highly significant based on the F-Test and are at or above the measurement error confidence range in one of three observations.

66.0    Again, as previously discussed in paragraphs 35 and 36, simply because the confidence interval is greater that the statistically significant affordability differential does not necessarily mean that the results are not reliable.  The sampling errors giving rise to the confidence intervals create imprecision in the measurements, but they do not introduce any bias.  So, despite the imprecision in measurement, the differentials showing disparate impact remain valid.

**Table 11. Analysis of Disparate Impact Using the PUMS Data and Dr. Malone's Methodology - % Who Cannot Afford the Rent Considering Sample Errors and Confidence Levels Based on Rental Rates Submitted to BCHFA**

| 50% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 18.01 | 23.21 | 30.16 |
| Black | 21.55 | 25.86 | 39.66 |
| 70% Confidence Interval | | | |
| White +/- @ 70% Confidence | 1.70 | 1.87 | 2.03 |
| Black +/- @ 70% Confidence | 5.48 | 5.84 | 6.52 |
| Difference Black v White | 3.54 | 2.66 | 9.49 |
| Z-Test | 0.92 | 0.64 | 2.07 |
| Significance Level | 0.82 | 0.74 | 0.98 |

67.0    Next, I turn to an analysis of whether the denial of the Project had a segregative impact using the methodology prescribed by Dr. Malone as discussed above.  As before, the analysis of segregative impact uses the PUMS data, the Z-Test, and the GVF method with the design factors to calculate the standard errors associated with the PUMS data.

68.0    Table 12 shows the data for households headed by someone 55 or older in Brevard County and in the Melbourne/West Melbourne areas from the PUMS data.  This data shows 9% of the households headed by someone 55 or older in the County are black compared to 5% in the Melbourne/West Melbourne area (the smallest geography available that includes PUMS data for West Melbourne).

**Table 12. PUMS Data for Households Headed by Someone 55 or Older**

| Area | Area Total | White 55+ | Black 55+ |
|---|---|---|---|
| County Total | 153,220 | 122,077 | 13,442 |
| Percent of Total | 100% | 80% | 9% |
| Melbourne/West Melbourne | 53,168 | 45,278 | 2,690 |
| Percent of Total | 100% | 85% | 5% |

69.0    Table 13 presents the segregative impact analysis.  In households headed
by someone 55 or older, 8.77% were headed by blacks in the County
compared to 5.06% in Melbourne/West Melbourne.  This is a difference of
3.71 percentage points.  The Z-Test score is 16.11 indicating that this
difference of 3.71 percentage points is statistically significant with 100%
confidence.  The 70% confidence interval around the measurement of
households in the County and in Melbourne/West Melbourne is far below
the 3.7 percentage point difference in their shares of black households
headed by someone 55 or older.

70.0    Therefore, there is definitive evidence that the denial of the Project had a
segregative impact limiting the opportunities for households headed by
blacks 55 and older from living in Melbourne/West Melbourne.

**Table 13. Segregative Analysis Using the PUMS Data and the Methodology
Prescribed by Dr. Malone**

| Category | Amounts |
| --- | --- |
| County % Black | 8.77 |
| Melbourne/West Melbourne % Black | 5.06 |
| 70% Confidence Interval | |
| County | 1.34 |
| Melbourne/West Melbourne | 1.76 |
| | |
| Difference Black v White | 3.71 |
| | |
| Z-Test | 16.11 |
| Significance Level | 1.00 |

**VI.0    Rebuttal of Dr. Malone's Critique of my Report**

**VI.1    Introduction**

71.0    Dr. Malone makes the following criticisms of my report.

71.1    I failed to analyze the correct relevant market which Dr. Malone
opines is households where at least one member is 55 or older and
all members are 18 or older in conformance with the Housing for
Older Persons Act.[27]

71.2    I used the wrong rental rates for The Venue at Heritage Oaks (the
"Project" at issue).[28]

---

[27] Malone (11-29-2024), page 6.
[28] Malone, Op. Cit., page 7.

71.3    The Chi-Square test methodology I used is improper.[29]

71.4    I failed to use the standard methodology to estimate the standard errors in the sampled data.[30]

71.5    My analysis of segregative impact is flawed.[31]

71.6    My analysis of robust causation is incorrect.[32]

72.0    All of these claims are incorrect with the exception that I did not use the standard methodology to estimate standard errors.  Herein I agree with this criticism, and I have adopted the standard methodology as per Dr. Malone's opinion, which as shown below did not alter my conclusions.

73.0    It is instructive to note that the only affirmative opinion contained in Dr. Malone's report is his finding that "the proposed affordable units would be expected to increase the number of Black Households in West Melbourne by fewer than 3."[33]   Otherwise, Dr. Malone's opinions are limited to criticizing my opinions while adding none of his own beyond his fewer than 3 estimate.

## VI.2    Incorrect Relevant Market

74.0    Dr. Malone concluded that the only relevant market is households where at least one member is 55 or older and all members are 18 or older and not all households in the relevant market.  However, as discussed above, there is no data available for households in the relevant market where at least one member is 55 or older and all members are 18 or older.

75.0    Dr. Malone writes: "He [meaning me] failed to conduct his analysis within households that would qualify for the age-restricted community proposed in this matter.  An analysis with respect to age in addition to geographic race/ethnicity characteristics is not possible with the published ACS tables.  However, the ACS provides alternative datasets tailored to address research questions that are not tractable in the published ACS tables.  These datasets are referred to as Public Use Microdata Sample (PUMS) files."[34]

---

[29] Malone, Op. Cit., page 9,
[30] Malone, Op. Cit., page 11.
[31][31] Malone, Op. Cit., page 21.
[32] Malone, Op. Cit., page 23.
[33] Malone, Op. Cit., page 4.
[34] Malone, Op. Cit., page 8-9/

76.0    Dr. Malone is wrong.  The PUMS files do not contain any information for households where at least one member is 55 or older and all members are 18 or older.  PUMS does contain data for households in the relevant market by age of household head, by income and race.  With these, I analyzed the data for these  households as discussed above.

77.0    Dr. Malone is also wrong because he ignored the fact that 20% of the eligible households have no age restrictions.  So, his prescribed methodology using the PUMS data, which would require focus on households headed by someone 55 or older is overly restrictive. Nevertheless, as shown above, even following Dr. Malone's methodology I found clear evidence of disparate impact and segregative effect.

**VI.3    Wrong Rental Rates**

78.0    Dr. Malone opines that I used the wrong rental rates in my analysis.  Dr. Malone asserts that I should have used the rent schedule presented to BCHFA instead of the schedule that the Plaintiffs planned to actually use for the Project.

79.0    However, as Mr. Culp explained at his deposition, the Project planned to be a low-income, housing tax credit community, using the four percent low-income housing tax credits as part of its financing.[35]  To use this facility, the rent schedule for the Project would be different from the one previously submitted to BCHFA.  That is why I used the rent schedule the Plaintiffs provided to me reflecting their intention to access the low-income, four percent, housing tax credit feature.

80.0    Nevertheless, even using the rental rates submitted to BCHFA there is evidence of disparate impact as shown in Table 11 and discussed in paragraphs 65 and 66.

**VI.4    Improper Chi-Square Analysis**

81.0    Dr. Malone claims that I misapplied the Chi-Square test because I conducted the test on an extrapolation of the sample to the population instead of relying solely on the sample.[36]    Regrettably, Dr. Malone misunderstood my analysis.

82.0    Fundamentally, the Chi-Square test compares: (a) the data distribution that is observed compared to (b) the data distribution that is expected if there is no relationship between the two data sets being compared.[37]  That is the analysis in my report.

---

[35] Deposition of Scott Culp (December 18, 2024), page 327, lines 1-7.
[36] Malone, Op. Cit., page 11.
[37] Frost, Op. Cit, pages 311-330.

83.0   I operated only on the sample data from the ACS, not on the population data. I compared the observed percentages of households who could not afford the apartment offerings for black and white households to the expected percentages if there was no disparate impact. The expected percentages without disparate impact would be the same for black and white households. I then translated the percentages back to the sample counts. The analysis then was conducted strictly on the samples and not on the population data.

84.0   Regardless of whether Dr. Malone or I am correct about my use of the Chi-Square test, I have updated my analyses using the Z-test instead. In this way there is no need to further debate the Chi-Square issue. The Z-test method fully serves the purpose for testing statistical significance of the differences in the affordability statistics for white and black households.

**VI.5    Calculation of Standard Errors**

85.0   Dr. Malone correctly noted that I did not follow the standard methodology for calculating the standard errors and their associated confidence intervals using the ACS data in my report. While I maintain, and demonstrate below, that the innovative methodology I used in my report is reliable, the disagreement between Dr. Malone and me can be resolved by my simply utilizing the standard methodology which I have done.

86.0   Table 14 compares the estimated standard errors, expressed here for comparative purposes in the form of coefficients of variation ("CV"). CV is simply the standard error of the measurement divided by the sample size. As Table 14 shows, there is very little difference between my innovative method and the standard method. In all cases, my method overstated the CV calculated in the standard fashion by small amount.

### Table 14. Comparison of Estimated Standard Errors Expressed as Coefficients of Variation

| 30% AMI | Fishkind | ACS | Difference |
|---------|----------|-----|------------|
| 1 BR | 5% | 3% | 2% |
| 2 BR | 5% | 3% | 2% |
| 3 BR | 4% | 4% | 0% |

87.0   I have updated my prior analysis of disparate impact for all households in the relevant market area using the standard method for calculating standard errors and CVs and employing the Z-test. Table 15 presents the results. In all cases black households are significantly less able to afford the apartments than white households, and in seven of the nine cases, the differences exceed the margin of error for black households.

---

**Table 15. Analysis of Disparate Impact for All Households using the ACS
Database and Standard Methodology to Calculate Standard Errors**

| 30% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 10.46% | 10.46% | 15.02% |
| Black | 17.08% | 17.08% | 24.20% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 3.35% | 3.35% | 4.01% |
| Black +/- @ 90% Confidence | 8.48% | 8.48% | 7.48% |
| Difference Black v White | 6.61% | 6.61% | 9.18% |
| Z-Test | 20.55 | 20.55 | 24.74 |
| Significance Level | 1.00 | 1.00 | 1.00 |

| 60% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 23.03% | 23.03% | 30.61% |
| Black | 38.55% | 38.55% | 68.64% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 2.25% | 2.25% | 2.38% |
| Black +/- @ 90% Confidence | 6.05% | 6.05% | 5.51% |
| Difference Black v White | 15.52% | 15.52% | 38.03% |
| Z-Test | 36.00 | 36.00 | 81.42 |
| Significance Level | 1.00 | 1.00 | 1.00 |

| 80% AMI | One Bedroom | Two Bedroom | Three Bedroom |
|---|---|---|---|
| White | 35.06% | 42.88% | 53.76% |
| Black | 49.14% | 58.18% | 68.64% |
| 90% Confidence Interval | | | |
| White +/- @ 90% Confidence | 1.66% | 1.49% | 1.31% |
| Black +/- @ 90% Confidence | 5.10% | 4.44% | 4.01% |
| Difference Black v White | 14.08% | 15.31% | 14.87% |
| Z-Test | 30.54 | 32.77 | 32.67 |
| Significance Level | 1.00 | 1.00 | 1.00 |

88.0    The coding error Dr. Malone pointed out was actually the result of my
printing an incorrect source page.  This does not impact the results shown
in Table 15.

## VI.6    Segregative Impact

89.0    Dr. Malone claims that my conclusion concerning segregative impact is
unreliable.  He attacks the survey data from the Plaintiffs other affordable
housing projects in the relevant market and asserts that I should have only
relied on data for age restricted households like the Plaintiffs' Venue at
Viera.  Dr. Malone is wrong on both assertions.

90.0    First, concerning the Plaintiffs' survey data, the Plaintiffs collect data from
their residents on a routine basis in the normal course of their business.  Mr.
Culp explained as follows:

```
                         William Scott Culp
                         November 21, 2024

 1       Q.  -- as --
 2           So what I'm trying to figure out is do you
 3    know how many -- in a specific property do you know
 4    how many tenants are minority or how many tenants are
 5    white?
 6       A.  I don't know them off the top of my head.  In
 7    our portfolio we do maintain data.  Some of that data
 8    can be collected, some of it can't under Fair Housing
 9    Laws.  So we maintain the data that can be collected
10    and maintained with regard to the makeup of the
11    tenants in our communities.
```

91.0    The Plaintiffs collect data from their renters when they apply for an
apartment.  The data include name, address and zip code at the time of
application, age, race, and ethnicity.  Applicants are not required to provide
race and ethnicity data, but 61% did provide this information.  The fact that
applicants self-report their race and ethnicity, or choose not to do so, does
not invalidate the survey data.  The challenges associated with the self-
reporting of race and ethnicity are well known and continue to be debated.[38]
These same challenges impact the Census data, but nevertheless Census
is considered reliable.

---

[38] Ghirardelli, Alyss, et al. (March 2024), "Advancing Equity in Race and Ethnicity Data in Population
Surveys: Findings from Expert Interviews", NORC at the University of Chicago, Health Care Programs
accessed 1/20/2025
file:///F:/XFER/Client%20Active%20Work%20Directory/Atlantic%20Housing%20Partners%20v.%20Bre
vard%20County/References/norc-equitybrief1-advancingequity.pdf

92.0   Table 16 provides the results for the 921 renters who did provide race and ethnicity data.  Results are provided for all four of the Plaintiffs affordable apartment projects in Brevard County, all of which were financed by BCHFA bonds.  The 319 Apartments rented by blacks accounted for 35% of the total.  The share of apartments rented by blacks is statistically significant because the standard deviation in the data is 67 and two standard deviations (the 95% confidence level) is 135 which is far below the observation of 319.  In other words, the variation in the underlying data is low, so the observation of 319 is reliable.

**Table 16. Race and Ethnic Composition of the Plaintiffs Affordable Apartment Communities in Brevard County**

| Community | White | Black | Hispanic | Other | Total Respondents |
|---|---|---|---|---|---|
| Wickham Club | 42% | 36% | 22% | 1% | 100% |
| Hammock Harbor | 35% | 51% | 15% | 0% | 100% |
| Malabar Cove I | 39% | 33% | 28% | 0% | 100% |
| Malabar Cove II | 47% | 30% | 22% | 0% | 100% |
| Venue at Viera Senior Living | 73% | 9% | 17% | 1% | 100% |
| | ======= | ======= | ======= | ======= | ======= |
| Total | 45% | 35% | 20% | 0% | 100% |

93.0   The lowest black share was 9% at the Venue at Viera Senior Living, which is the only one that is restricted to residents 65 and over.  The Viera project is not comparable to the Project which was intended to be limited to having 80% of its units rented to a household with someone (not necessarily even the head of the household or even the lessor) 55 or older in compliance with the Housing for Older Persons Act.

94.0   Mr. Culp explained that the Plaintiffs Hammock Harbor community is comparable to the Project because the age restrictions in the Housing for Older Persons Act does not make the Project different from Hammock Harbor that has no age restrictions.  At Hammock Harbor 51% of the renters are black.

[The balance of this page left intentionally blank.]

```
24        Q.  So would you agree that as far as comparing the

25   race compensation of renters for Hammock Harbor that it's
```

```
                        Scott Culp Volume II
                        December 18, 2024

1    not comparable to compare it to Venue at Heritage Oaks?

2            MS. RHODEN:  Object to form.

3            THE WITNESS:  No.

4    BY MS. GAINEY:

5        Q.  You don't agree?

6        A.  No, I do not.

7        Q.  Okay.  Tell me why.
```

```
8        A.  Venue at Heritage Oaks was proposed to be

9    seniors with one person in the household 55 years or

10   older.  Other members of the household can be younger or

11   older and be unrestricted, and 20 percent of the units

12   would have -- be totally unrestricted.  So the comparison

13   would be very similar.  The household differentiation

14   between unrestricted community with regard to age and a

15   seniors restricted community in accordance with the

16   Housing for Older Persons Act would be negligible other

17   than you'll have one person in 80 percent of the units

18   that is over the age of 55.
```

95.0    In my report I provided data on the racial makeup of Brevard County and West Melbourne using the 2022 ACS database. The expected racial mix for the Project was expected to be similar to the Plaintiffs' other four affordable apartment communities in Brevard County. For convenience I have reproduced that information in Table 17.

**Table 17. Racial Composition of Brevard County, West Melbourne and the Project**

| Category | White | Black |
|---|---|---|
| Project | 45% | 35% |
| Brevard County | 80% | 9% |
| West Melbourne | 79% | 4% |

96.0    The denial of the Project prevented a significant number of blacks from renting apartments in West Melbourne.  The denial had the effect of perpetuating the racial imbalance in West Melbourne having a segregative effect on blacks.

97.0    Dr. Malone takes issue with the analysis in Table 17.  He claims that data from by report shown in Table 11 contradict the estimated racial composition expected at the Project. Dr. Malone is mistaken.

98.0    On this issue in my report, I noted the following.  Table 11, which is now Table 18 below, presents the statistical data addressing the issue of robust causality showing that the Decision caused the discrimination.  The analysis compares the total percentage of white households needing affordable housing (27%) to the percentage of black households needing affordable housing (43%).  Affordable housing is defined for Table 18 using HUD's small area fair market rent reports for a 2-bedroom unit in zip code 32922[39], the predominate area from which the Plaintiffs' projects draw their tenants. Based on the data in Table 18, the Decision had a discriminatory impact on black households in the Relevant Market.

**Table 18. Demonstration of Robust Causality – The Decision Resulted in the Discrimination**

| Category | White | Black |
|---|---|---|
| Total Households | 91,861 | 13,095 |
| Needing Affordable Housing | 24,725 | 5,580 |
| Percent Affordable Housing | 27% | 43% |

---

[39]https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2024_code/2024zip_code_calc.odn?zcta=32922&metro_code=METRO37340M37340&year=2024&hypo=

99.0    Dr. Malone argues that Table 18 conflicts with Table 17. He comes to this erroneous conclusion as shown in Table 19. The purpose of Table 18 was to demonstrate robust causality following the Oviedo court's decision.[40] The court provided a formula to demonstrate robust causation. The court prescribed comparing: (a) the % of racial minorities occupying multifamily properties in the City to (b) the % of non-minorities occupying multifamily properties in the City. That is why in Table 18 and again in Table 19, I compared the percent of black households to white households needing affordable housing in the specific zip code where the Plaintiffs draw their tenants. This is not the whole County.

100.0    Furthermore, what Dr. Malone does is to compare the share of black households to the total of all households needing affordable housing in coming to his 18%. Although this calculation is arithmetically correct, it conflicts with the purpose of the analysis. As noted above, the purpose is to follow the robust causation test outlined by the Oviedo court which compares: (a) the percent of white households needing affordable housing to the total of white households in the market to (b) the percentage of black household needing affordable housing to the total of black households. If there is a difference, this may satisfy the robust causation requirement.

**Table 19. Dr. Malone's Erroneous Analysis**

| Category | White | Black | Total | Black % Total |
|---|---|---|---|---|
| Total Households | 91,861 | 13,095 | 104,956 | 12% |
| Needing Affordable Housing | 24,725 | 5,580 | 30,305 | 18% |
| Percent Affordable Housing | 27% | 43% | 29% | |

101.0    Next, I turn to an analysis of whether the denial of the Project had a segregative impact using the methodology prescribed by Dr. Malone as discussed above focusing only on households headed by someone 55 or older. As before, the analysis of segregative impact uses the PUMS data, the Z-Test, and the GVF method with the design factors to calculate the standard errors associated with the PUMS data.

102.0    Table 19 shows the data for households headed by someone 55 or older in Brevard County and in the Melbourne/West Melbourne areas from the PUMS data. This data shows 9% of the households headed by someone 55 or older in the County are black compared to 5% in the Melbourne/West Melbourne area (the smallest geography available that includes PUMS data for West Melbourne).

---

[40] Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Case No. 6:16-cv-1005-Orl-37GJK

**Table 19. PUMS Data for Households Headed by Someone 55 or Older**

| Area | Area Total | White 55+ | Black 55+ |
|---|---|---|---|
| County Total | 153,220 | 122,077 | 13,442 |
| Percent of Total | 100% | 80% | 9% |
| Melbourne/West Melbourne | 53,168 | 45,278 | 2,690 |
| Percent of Total | 100% | 85% | 5% |

103.0  Table 20 presents the segregative impact analysis.  In households headed by someone 55 or older, 8.77% were headed by blacks in the County compared to 5.06% in Melbourne/West Melbourne.  This is a difference of 3.71 percentage points.  The Z-Test score is 16.11 indicating that this difference of 3.71 percentage points is statistically significant with 100% confidence.  The 70% confidence interval around the measurement of households in the County and in Melbourne/West Melbourne is far below the 3.7 percentage point difference in their shares of black households headed by someone 55 or older.

104.0  Therefore, there is definitive evidence that the denial of the Project had a segregative impact limiting the opportunities for households headed by blacks 55 and older from living in Melbourne/West Melbourne.

**Table 20. Segregative Analysis Using the PUMS Data and the Methodology Prescribed by Dr. Malone**

| Category | Amounts |
|---|---|
| County % Black | 8.77 |
| Melbourne/West Melbourne % Black | 5.06 |
| 70% Confidence Interval | |
| County | 1.34 |
| Melbourne/West Melbourne | 1.76 |
| | |
| Difference Black v White | 3.71 |
| | |
| Z-Test | 16.11 |
| Significance Level | 1.00 |

### VI.7    Robust Causation

105.0   In my report I utilized the data shown in Table 18 to demonstrate that the
        denial of the Project caused a disparate impact that satisfied the robust
        causation requirements.   While both black and white households need
        affordable housing in the relevant market, denial to the Project had a greater
        impact on black households compared to white households.

106.0   Dr. Malone's only criticism of my proof of robust causation was his mistaken
        conclusion that the Project was age restricted.  As discussed previously, the
        Project was intended to satisfy the Housing for Older Persons act which
        only requires that 80% of the rental units have someone in the household
        who is 55 or older.

107.0   Nevertheless, as reported in Table 9 above, in households headed by
        someone age 55 or older, black households have a significantly higher
        needs for affordable housing than white households.   Compared to
        households headed by whites, black households' needs for affordable
        housing are between 1% and 9% above the needs for white households.
        These differences are statistically significant at confidence levels ranging
        from 62% to 97%.  Also as noted previously, in many cases the sampling
        errors (measurement errors) exceed the differences in needs.  However,
        the sampling errors only impact the precision of the estimates and do not
        introduce any bias.  Therefore, in this fact situation, the findings of excess
        need for black compared to white households headed by someone 55 or
        over are reliable.

108.0   More importantly, the restriction of analyzing only households headed by
        someone 55 or older arises from Dr. Malone's misunderstanding of the
        effect of the Housing for Older Persons Act, which does not require that all
        the apartments be restricted for renters 55 or over.  As Table 15 showed
        when the data for all households is examined not only are the differences
        between the needs for affordable housing between black and white
        households statistically significant, but in seven of the nine cases the
        differences exceed the margins of error arising from sampling
        (measurement) error.  Therefore, the results for all households strongly
        support the conclusion that the disparate and segregative impacts
        demonstrated here satisfy the robust causality requirement.

# EXHIBIT 5

1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| ATLANTIC HOUSING PARTNERS L.L.L.P., A FLORIDA LIMITED LIABILITY PARTNERSHIP; CANTON CONSTRUCTION, LLC, A FLORIDA LIMITED LIABILITY CORPORATION; CONCORD MANAGEMENT, LTD., A FLORIDA LIMITED PARTNERSHIP; THE VENUE AT HERITAGE OAKS PARTNERS, LTD., | Case No.: 6:23-CV-02473 <br><br> Hon. Julie Sneed <br><br> Hon. Daniel Irick |
| Plaintiffs, | |
| v. | |
| BREVARD COUNTY, A POLITICAL SUBDIVIDION OF THE STATE OF FLORIDA, | |
| Defendant. | |

**<u>REBUTTAL REPORT OF SEAN T. MALONE, PH.D.</u>**

November 29, 2024

Table of Contents

Summary of Engagement and Conclusions..................................................................................3

Professional Qualifications and Compensation.........................................................................4

Dr. Fishkind Relied on Insufficient Facts While Ignoring Relevant Information.....................5

Datasets Exist that Can Test Income by Race/Ethnicity and Age...........................................8

Dr. Fishkind's Application of Statistical Methodology is Fatally Flawed ................................9

    Dr. Fishkind Abuses the Chi-Square Test Methodology....................................................9

    Dr. Fishkind Analysis Calculation of Standard Errors Ignores the Standard Accepted Methodology ...................................................................................................................... 11

    Dr. Fishkind Failed to Disclose the Data He Relied on to Produce His Regression Estimates.... 15

    Dr. Fishkind's Regression Methodology Is Most Likely Unreliable ................................ 18

    Dr. Fishkind's Standard Errors Do Not Match His Own Calculations.............................. 20

    Dr. Fishkind Most Statistically Significant Result is Due to Human Error....................... 21

Dr. Fishkind's Opinion on Segregative Effect is Unreliable .................................................. 21

    The 35% Assumption is Unfounded................................................................................ 22

    The 35% Assumption is Not Reliable.............................................................................. 22

Dr. Fishkind's Misrepresented His Methodology as the Same Used by the Court in Oviedo ........ 23

    Dr. Fishkind Failed to Consider the Practical Significance related to his Segregative Effects Opinion ........................................................................................................................... 24

Conclusion ........................................................................................................................... 25

## Summary of Engagement and Conclusions

1.      I have been retained by Roper Townsend & Sutphen, P.A., counsel for the Defendant in this action.

2.      I was asked to review the Expert Report of Hank Fishkind which was issued on September 12, 2024, (the "Fishkind Report").

3.      In preparing this report, I also relied on additional resources. A list of these is provided in Exhibit 1.

4.      In his report, Dr. Fishkind conducts analysis related to three general opinions. The first is that the decision made by the Brevard County Commission to deny the approval of tax-exempt bonds (the "Decision") for The Venue at Heritage Oaks (the "Proposed Community") had a disparate impact on a protected class. The second is that the Decision perpetuates racial segregation in West Melbourne. The third is the Decision resulted in racial imbalance, satisfying the requirement for robust causation.

5.      I have drawn several conclusions from my review of the Fishkind Report. Below is a summary of my conclusions.

- Dr. Fishkind's opinion finding disparate impact is based on insufficient facts for this case. His analysis based on percentages that can or cannot afford rent is based on the wrong income data and evaluated at the wrong rents.

- Dr. Fishkind's application of statistical methodology is fatally flawed. He conducts two types of tests to determine the statistical significance: chi-square tests and Z-tests. Both methods were applied incorrectly.

  o He applies a commonly accepted statistical test, the chi-square test, in an unacceptable way, severely inflating the statistical significance of his results.

  o His method for calculating standard errors he claims to use in the Z-tests is based on data he has not disclosed, then he swaps in a different set of smaller standard errors without any explanation, inflating the statistical significance of his results.

  o He used an incorrect value to wrongly arrive at his most statistically significant test results.

- Dr. Fishkind's opinion that the Decision perpetuated racial segregative effects relies on an unsupported and unreliable assumption that 35% of the Proposed Community will be occupied by Black households.

- Dr. Fishkind's opinion regarding "robust causation" is misleading: he states his methodology is prescribed by the court in *Oviedo,* but then provides an opinion resulting from an alternative analysis that is a retread of his flawed disparate impact analysis.

- Dr. Fishkind failed to consider the practical significance of the potential change in racial segregative patterns due to the proposed community.

- I estimate the proposed affordable units would be expected to increase the number of Black Households in West Melbourne by fewer than 3.

6.      This report describes my work, opinions, and conclusions. I reserve the right to amend this report should additional documents or information become available to me.

## Professional Qualifications and Compensation

7.      I am an Associate Director of Analytics at IMS Legal Strategies | Analytic Focus[1] ("IMS"), which provides consulting services for numerous public and private entities on a wide range of topics. My role includes statistical, financial, and economic analysis to support expert testimony in litigation.

8.      As part of my responsibilities at IMS I regularly conduct statistical and financial analysis. I have consulted on a number of matters in litigation related to real estate including: MBS credit rating methodologies, real estate valuation, discriminatory mortgage lending, and housing violations.

9.      Prior to joining IMS, I taught undergraduate courses in business finance; investments; money and banking; and financial case studies at the University of Texas at San Antonio. I also currently teach undergraduate finance and statistics courses at Trinity University in the Department of Finance and Decision Sciences.

---

[1] Formerly Analytic Focus LLC

10.     I received my Bachelor of Arts degree in Financial Economics from Capital University, my Master of Science degree in Finance from the University of Texas at San Antonio, and my doctorate in Finance from the University of Texas at San Antonio.

11.     My professional and academic experience, a list of my publications, and a list of previous testimony I have given, are included in my resume, a true and correct copy of which is attached as Exhibit 2.

12.     My firm is being compensated for my work on this engagement at the rate of $450 per hour for my time. The payment of these fees is not contingent on the opinions I express in connection with this engagement.

## Dr. Fishkind Relied on Insufficient Facts While Ignoring Relevant Information

13.     Dr. Fishkind's methodology for disparate impact may be summarized as comparing proportions of people who, based on their income, can afford a specific amount of rent. This analysis requires information about both income and rents. Importantly, Dr. Fishkind ignored facts relevant to this matter and chose to evaluate income data for irrelevant populations for affordability of rents that were irrelevant to the Proposed Community.

14.     The Proposed Community, "Venue at Heritage Oaks[, was] also intended to be restricted to occupancy by Seniors in accordance with the Housing for Older Persons Act".[2] The Proposed Community was planned as a senior community at the time of the application on July 31, 2023. And the plan for a senior community was current on the date the Decision was made. At the December 5, 2023 meeting, Mr. Scott Culp, principal of Plaintiff Atlantic Housing Partners, stated:

- "[T]he venue at Heritage Oaks is a community that we're proposing to be a senior's affordable housing community[.]"[3]

---

[2] Email from Scott Culp regarding presentation to community residents. Available at https://www.woodfieldatheritageoaks.org/hud-project-on-minton.

[3] See page 2 of Verbatim transcript of 12/05/23 Brevard County Commission Meeting. "Verbatim 12-05-2023 H.1. Heritage Oaks project.pdf".

- "We're proposing to restrict the occupancy of this community for seniors in accordance with Housing for Older Persons Act[.]"[4]

15.    I reasonably assume Dr. Fishkind was aware of this information. He clearly reviewed the video where the two statements above were made by Mr. Culp.[5] Yet, Dr. Fishkind chose to ignore this fact and forgo an analysis of affordability for those eligible for senior communities in favor of an analysis based on a population of people who would be restricted from living there. As household income is related to age, an opinion on racial income disparities within a particular age group that is based on income data for all age groups is unreliable because it is based on an irrelevant dataset. Households analyzed by Dr. Fishkind that do not meet the age requirements to live at the proposed community may bias the results of any analysis.[6] To evaluate disparate impact claims, Dr. Fishkind must analyze the incomes of households where at least one member of the household is 55 or older and all members of the household are 18 or older.[7]

16.    Further, Dr. Fishkind evaluated the affordability of rents that were not the same rents planned for the Proposed Community. He considered that the Proposed Community would include "(a) 21 units affordable to households earning 30% AMI; (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI."[8] However, this is not representative of the plans for the Proposed Community. According to the comments made by Mr. Culp, "20 percent of the units will be at 50 percent of the median income and the balance will have a maximum of 120 percent of median income."[9] At this same meeting, Mr. Culp submitted a table showing the mix of units and rents for the proposed community. This table shows that 14 1-bedroom units, 6 2-bedroom

---

[4] See page 3 of Verbatim transcript of 12/05/23 Brevard County Commission Meeting. "Verbatim 12-05-2023 H.1. Heritage Oaks project.pdf".

[5] ¶75 of Fishkind Report discusses the video record of the December 5, 2023 meeting. He also provides a footnote containing a link to the video which contains the statements by Mr. Culp about the plan for an age-restricted senior community.

[6] I also note that Dr. Fishkind uses 2022 5-Year ACS estimates. 1-Year data should be used when currency of estimates is important as the 5-Year estimates are a combination of 2018, 2019, 2020, 2021, and 2022. To the extent that estimates have changed over that time period, 5-Year estimates may bias the results.

[7] Deposition Transcript of William Scott Culp, November 21, 2024 at pages 162-163. "Under the Housing for Older Persons Act, which this was proposed for, you would have to have at least one member of the household 55 or older. All residents would have to be 18 or older."

[8] Fishkind Report at ¶127.

[9] See page 2 of Verbatim transcript of 12/05/23 Brevard County Commission Meeting. "Verbatim 12-05-2023 H.1. Heritage Oaks project.pdf". This statement is also captured in the video viewed by Dr. Fishkind.

units, and 1 3-bedroom unit would be priced based on 50% AMI while the balance were "Mkt" or at the market rates.[10]

**Figure 1**



### VENUE AT HERITAGE OAKS
#### APARTMENT HOMES
#### UNIT MIX AND RENTS

| Bed Rooms | Bath Rooms | Units | Square Feet | AMI% | Low HOME Rents | High HOME Rents | Gross HC Rent | Utility Allow. | Net Restricted Rents | PBRA Contr Rents | Applicant Rents | Appraiser Rents | CU Rents |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1.0 | 14 | 703 | 50% | | | $806 | $118 | $688 | | $688 | $688 | $688 |
| 1 | 1.0 | 57 | 703 | Mkt | | | $1,491 | | $1,491 | | $1,491 | $1,650 | $1,491 |
| 2 | 2.0 | 6 | 1,018 | 50% | | | $967 | $144 | $823 | | $823 | $823 | $823 |
| 2 | 2.0 | 24 | 1,018 | Mkt | | | $1,708 | | $1,708 | | $1,708 | $1,850 | $1,708 |
| 3 | 2.0 | 1 | 1,153 | 50% | | | $1,118 | $163 | $955 | | $955 | $955 | $955 |
| 3 | 2.0 | 3 | 1,153 | Mkt | | | $1,958 | | $1,958 | | $1,958 | $2,175 | $1,958 |
| | | 105 | 85,065 | | | | | | | | | | |

Credit Underwriting Report Prepare for Brevard County HFA 12/04/23



17.     Again, I reasonably assume Dr. Fishkind was aware of this information since he reviewed the video of this meeting.[11] Dr. Fishkind also states he reviewed the Brevard County Housing Finance Authority Meeting Minutes for 8/23/2023. This contains the same information he chose to ignore: "The low income set aside will be 20% at 50% of AMI."[12]

18.     I am aware the incomplete deposition testimony of Mr. Culp may contradict the information in the previous paragraphs. For example, Mr. Culp states the intent was that 100 percent would be affordable at or below 80% AMI. However, Plaintiffs presented 20 percent at 50 percent AMI in order to meet the restrictions for the tax-exempt bond program. They did not

---

[10] "Culp Presentation Minutes Commissioner Meeting Dec.pdf" at page 35.

[11] Fishkind Report at ¶75 and fn. 32.

[12] Brevard County Housing Finance Authority Minutes for August 23, 2023 at page 3. Available at https://www.brevardfl.gov/docs/default-source/publicmeetingdocuments/2023-08-23-brevard-county-housing-finance-authority-meeting-minutes.pdf

present the affordability mix that would have qualified the Proposed Community for the 4 percent low-income housing tax credits.[13]

19.    To evaluate the effects of the decision, one should consider what was presented to the decision makers. The Brevard County Commission voted to not approve funding for the Proposed Development with 20% of the units set aside for those with incomes up to 50% AMI and the balance were to be at the market rate. This was conveyed in the application and in the meeting where the vote was held. Any analyses should evaluate the affordability of rents at 50% of AMI. The remaining units were proposed to be at market rates and as such, should not have any disparate impact on racial and ethnic groups via the mechanism of affordable housing.[14]

20.    Dr. Fishkind's opinions on disparate impact are based on his analysis of percentages of groups that could afford units in the Proposed Community. He relied on income data for White and Black households in the "Relevant Community" and evaluated it according to rents that were more affordable than those presented in the application. His analysis is unable to conclude anything about affordability for Black and White households who are likely to live in the Proposed Community because it uses the wrong incomes and the wrong rents.

## Datasets Exist that Can Test Income by Race/Ethnicity and Age

21.    Dr. Fishkind relied on American Community Survey tables published the U.S. Census Bureau to estimate proportions of households that could afford different amounts of rent in 2022. He did this analysis between two groups: Black households and White households. He also did this analysis within a specified geographic area. He failed to conduct his analysis within households that would qualify for the age-restricted community proposed in this matter. An analysis with respect to age in addition to geographic and race/ethnicity characteristics is not possible with the *published* ACS tables. However, the ACS provides alternative datasets tailored to

---

[13] See Deposition Transcript of William Scott Culp, November 21, 2024 at pages 114-117.
[14] The market rents in PLAINTIFFS 02928 all exceed the definition of "affordable housing" provided by Dr. Fishkind in ¶83 in the Fishkind Report.

address research questions that are not tractable using the *published* ACS tables.[15] These data sets are referred to as Public Use Microdata Sample (PUMS) files.

22.    Later in this report, I demonstrate several errors Dr. Fishkind made when estimating standard errors for his statistical tests. Another benefit that Dr. Fishkind would have realized by using PUMS files is that they include replicate weights which are used in the successive difference replicate (SDR) method to approximate standard errors.[16] This is the methodology ACS uses to calculate standard errors for their published tabulations and would be superior to the flawed approximations Dr. Fishkind improvised.

## Dr. Fishkind's Application of Statistical Methodology is Fatally Flawed

*Dr. Fishkind Abuses the Chi-Square Test Methodology*

23.    A chi-square test uses a contingency table of counts observed in sample data to test if there is a difference in the population proportions. Dr. Fishkind neglects to use the counts from the sample data in favor of using the population estimates. This practice grossly inflates the chi-square statistic and the statistical significance its value. To demonstrate this fatal flaw, consider the example in the following paragraphs.

24.    Suppose we have two buckets, each containing 1,000 marbles that can be red or blue. We draw two samples of 100, one from each bucket. We observe the sample frequencies and can test the null hypothesis that the proportion of red marbles in each bucket are the same using a chi-square test. The observed frequency and chi-square test results for these hypothetical samples are shown below in Figure 2.

---

[15] "The U.S. Census Bureau produces a large number of data profiles, tables, maps, and other products based on American Community Survey (ACS) data. Even this abundance of pretabulated estimates and data products cannot meet the needs of every data user. The Census Bureau's ACS Public Use Microdata Sample (PUMS) files enable data users to create custom estimates and tables, free of charge, that are not available through pretabulated ACS data products." https://www.census.gov/programs-surveys/acs/library/handbooks/pums.html

[16] Public Use Microdata Sample (PUMS) Accuracy of the Data (2022) at page 12. Available at https://www2.census.gov/programs-surveys/acs/tech_docs/pums/accuracy/2022AccuracyPUMS.pdf

**Figure 2**

| Sampled Frequencies | | |
|---|---|---|
| | **Red** | **Blue** |
| **Bucket A** | 90 | 10 |
| **Bucket B** | 83 | 17 |
| | | |
| **Test Statistic** | 2.10 | |
| **p-value** | 0.15 | |
| **Critical Value** | 3.84145882 | |
| **alpha** | 0.05 | |

25.     While the sample proportion in Bucket A is 90% and the sample proportion in Bucket B is 83%. The p-value of 0.15 indicates that we cannot reject the null hypothesis that the proportions in both buckets are the same.

26.     Now, to extend the example to demonstrate Dr. Fishkind's methodology. The sample frequencies are the same as above, 90 red marbles were sampled from Bucket A and 83 red marbles were sampled from Bucket B. Since we drew 90 red marbles from Bucket A and we know each marble in Bucket A represents 100 marbles in Bucket A, we expect there are 900 red marbles in Bucket A. Similarly, since we drew 83 red marbles in Bucket B and we know each marble in Bucket B represents 100 marbles in Bucket B, we expect there are 830 red marbles in Bucket B. Dr. Fishkind applies the chi-square test not to the sampled frequencies but to the expected frequencies in the population which were estimated from the sample. The estimated population frequencies and the chi-square test results are shown below in Figure 3.

**Figure 3**

| Estimated Population Frequencies | | |
|---|---|---|
| | **Red** | **Blue** |
| **Bucket A** | 9,000 | 1,000 |
| **Bucket B** | 8,300 | 1,700 |
| | | |
| **Test Statistic** | 209.81 | |
| **p-value** | 0.00 | |
| **Critical Value** | 3.84145882 | |
| **alpha** | 0.05 | |

27.     Again, the proportion in Bucket A is 90% and the proportion in Bucket B is 83%. But, now the p-value is very close to 0 because the test statistic has become very large. The conclusion of

this hypothesis test would be to reject the null hypothesis that the proportions in both buckets are the same. However, this would be an incorrect conclusion because it is based on a test where the observed frequencies must come from the sample, not an extrapolation of the sample to the population. In this example, the test statistic was inflated by a factor of 100x.[17]

28.     The degree of inflation in the test statistic is directly related to the difference between the estimated population size and the sample size. If both groups are represented equally in the sample, the degree inflation is equal to N/n, where N = N1 + N2 and n = n1 + n2. This represents the minimum degree of statistic inflation as many samples may not equally reflect both groups in the sample. In other words, one group may be over or under sampled. In the context of Dr. Fishkind's analysis, the American Community Survey samples approximately 1% of the U.S. population each year. Since Dr. Fishkind's analysis relied on 5-year ACS estimates, the lower bound of his test statistic inflation is approximately 20x as his N/n was equal to 20 (N/n= 100%/5% = 20).


*Dr. Fishkind Analysis Calculation of Standard Errors Ignores the Standard Accepted Methodology*

29.     Dr. Fishkind presents the steps to calculate the significance of any difference between two ACS estimates in paragraph 62 of his report. While the steps themselves are not incorrect, Dr. Fishkind fails apply the methodology provided by the creators of the dataset he relies on for the second step: the calculation of standard errors for the two ACS estimates. He makes two significant deviations from accepted methods.

30.     First, Dr. Fishkind converts estimates of the number of households that can (or cannot) afford apartments into proportions. This means that he must calculate the standard error for a proportion estimate. He incorrectly assumes that the margin of error for a proportion is the margin of error of the count estimate divided by the estimate, or in his report, the "percent MOE". Equivalently, the formula Dr. Fishkind uses to calculate the standard error of his proportion is: $SE(P) = \frac{SE(X)}{X}$. This is incorrect. The standard method to calculate the standard error of a

---

[17] 209.81/2.0981 = 100. This is equal to the population of all marbles (20,000 = 10,000 + 10,000) divided by the total sample observations (200 = 100 + 100).

proportion is: $SE(P) = \frac{1}{Y}\sqrt{[SE(X)]^2 - \frac{X^2}{Y^2}[SE(Y)]^2}$, where $P = X/Y$, and $X$ is the numerator and $Y$ is the denominator in the proportion.[18]

31.     Second, in paragraph 65 of his report, Dr. Fishkind points out that households that "can afford to rent the 1-bedroom apartment at 80% AMI [...] has 59,657 households [across seven income ranges]. Since the relative MOE (MOE divided by the estimate) declines sharply as the sample size increases, the MOE for this group of seven households [*sic*] will be far lower than the MOE for any of the individual estimates." Completely ignoring ACS documentation for this exact situation, he forges forward with an alternative methodology to estimate the MOE for the combined estimates. However, this methodology has unknown error rates, because the data used in the regression is not cited anywhere in his report and cannot be replicated from the single image of a graph he provided. There was no need for this improvised effort on the part of Dr. Fishkind.

32.     The U.S. Census Bureau provides a document that "provides how to approximate standard errors and margins of error when aggregating American Community Survey (ACS) estimates[.][19] Beyond providing formulas, this documentation goes step-by-step through examples of how to calculate standard errors of sums of estimates. Dr. Fishkind failed to use the methodology recommended by the creators of the dataset he relies on without any explanation.

33.     While the ACS tables present margins of error for individual estimates, there is a standard method to approximate the standard error of the sum of estimates.[20] The approximation for the standard error, SE, for the sum of two estimates, $X_1$ and $X_2$ is:

---

[18] See page 6 of American Community Survey: Worked Examples for Approximating Standard Errors Using American Community Survey Data. U.S. Census Bureau (2023). Available at https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/2022_ACS_Accuracy_Document_Worked_Examples.pdf.

[19] See page 1 of American Community Survey: Worked Examples for Approximating Standard Errors Using American Community Survey Data. U.S. Census Bureau (2023). Available at https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/2022_ACS_Accuracy_Document_Worked_Examples.pdf.

[20] The standard error is simply the margin of error divided by 1.65. See page 2 of American Community Survey: Worked Examples for Approximating Standard Errors Using American Community Survey Data. U.S. Census Bureau (2023). Available at https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/2022_ACS_Accuracy_Document_Worked_Examples.pdf.

$$\text{SE}(X_1 + X_2) = \sqrt{[SE(X_1)]^2 + [SE(X_2)]^2}$$

34.     This formula can be expanded to the sum of more than two estimates by adding the additional standard errors squared under the radical.[21]

35.     Below, I walk through an example comparing Dr. Fishkind's chosen methodology compared to the standard accepted methodology to calculate the standard error for proportion based on a combined estimate.

36.     The steps to calculate the standard error for a proportion of White households that can't afford a three-bedroom apartment at 80% AMI would be to:

1) Calculate the standard error of the estimates in each income range that can't afford a three-bedroom apartment at 80% AMI

2) Calculate the standard error of the estimated number of White households that can't afford a three-bedroom apartment at 80% AMI

3) Calculate the standard error of the proportion of White households that can't afford a three-bedroom apartment at 80% AMI

According to Dr. Fishkind, households that can't afford are those in the 11 income ranges that earn less than $75,000. Table 5 in the Fishkind report provides the estimate (number of households in the income range) as well as the margin of error for the individual estimates. To calculate the

---

[21] See page 5 of American Community Survey: Worked Examples for Approximating Standard Errors Using American Community Survey Data. U.S. Census Bureau (2023). Available at https://www2.census.gov/programs-surveys/acs/tech_docs/accuracy/2022_ACS_Accuracy_Document_Worked_Examples.pdf.

individual standard errors, I simply divide the Margin of Error by 1.645. An excerpt of Table 5 with the standard of errors is shown below.

**Table 1: Excerpt of Table 5 from Fishkind Report with Standard Error Added**

| Range | Estimate | Margin of Error | Standard Error |
|---|---|---|---|
| Total (All income ranges) | 91,861 | 16,119 | 9,799 |
| Less than $10,000 | 3,644 | 3,644 | 2,215 |
| $10,000 to $14,999 | 2,408 | 2,674 | 1,626 |
| $15,000 to $19,999 | 3,559 | 3,475 | 2,112 |
| $20,000 to $24,999 | 4,189 | 3,701 | 2,250 |
| $25,000 to $29,999 | 4,025 | 3,819 | 2,322 |
| $30,000 to $34,999 | 3,326 | 3,270 | 1,988 |
| $35,000 to $39,999 | 3,574 | 3,401 | 2,067 |
| $40,000 to $44,999 | 3,393 | 3,159 | 1,920 |
| $45,000 to $49,999 | 4,086 | 4,018 | 2,443 |
| $50,000 to $59,999 | 7,183 | 5,091 | 3,095 |
| $60,000 to $74,999 | 10,002 | 6,889 | 4,188 |
| Less than $75,000 | 49,389 | | 8,213 |

37.     The table above contains everything we need to continue to step three. Below the individual estimates, I show my calculation of the estimate of the number of households earning less than $75,000 and its standard error using the formula to approximate standard errors for combined estimates provided by the Census Bureau. The table below shows the calculation of the proportion of White households that can't afford a three-bedroom apartment at 80% AMI and its standard error.

**Table 2: Proportion and Standard Error Calculation**

| | Estimate | Standard Error |
|---|---|---|
| X (Under 74,999) | 49,389 | 8,213 |
| Y (Total) | 91,861 | 9,799 |
| P = X/Y | 0.5376 | 0.0686 |

38.     The proportion of 0.54 (54%) agrees with Dr. Fishkind's calculation, however, the standard error calculated using the ACS documentation is 0.0686, more than 3x the standard error Dr. Fishkind presented (0.020073).[22] In this example, if Dr. Fishkind had used the standard

---

[22] Fishkind Report at page 54 reports the standard error for the proportion of white households that cannot afford a 3-bedroom apartment at 80% AMI in the final row in the rightmost column.

methodology in the ACS documentation, he would have had larger standard errors and even less
statistical significance.

39.      I do recognize that the approximation formula may overestimate or underestimate
standard errors in some situations. The ACS documentation recommends using the PUMS files to
avoid these issues.[23] This is yet another reason Dr. Fishkind analyzed the wrong dataset. Not only
would using the PUMS data have provided the information necessary to analyze households that
were eligible for the age-restricted Proposed Community, but it has additional information that
allows for a more accurate estimation of standard errors.


*Dr. Fishkind Failed to Disclose the Data He Relied on to Produce His Regression Estimates*

40.      In the section above, I described how Dr. Fishkind passed over the ACS recommended
methodology to calculate standard errors in favor of a regression methodology. He describes his
method and the equation he arrived at using his method only in paragraph 67 of his report. He
also provided a figure plotting the supposed data he used to estimate his equation.

41.      In that paragraph it is unclear what dataset he is using to estimate his regression. One
might speculate in would be the same data presented in Table 5 of his report (Household Income)
as he introduces the earlier paragraph with an example from Table 5.[24] However, the figure
provided clearly cannot be related to the data in Table 5. For example, see the two data points
circled in the figure excerpted below.

---

[23] See page 16 of American Community Survey: Worked Examples for Approximating Standard Errors Using
American       Community       Survey       Data.       U.S.       Census       Bureau       (2023).       Available       at
https://www2.census.gov/programs-
surveys/acs/tech_docs/accuracy/2022_ACS_Accuracy_Document_Worked_Examples.pdf.
[24] Table 5 contains the same data as Table 8 in the Fishkind Report.

**Figure 4**



42.     Examining Point #1 on the annotated figure reveals the data point in the dataset used to estimate the relationship between Sample Size and % MOE with the highest % MOE has a margin of error that is somewhere between 35% and 40%. I've included a table below excerpting the data from Table 5 of the Fishkind Report in addition to a column with the percentage MOE.

**Table 3: Excerpt of Table 5 from Fishkind Report with Added % MOE**

| Range | Estimate | Margin of Error | % MOE |
|---|---|---|---|
| Total (All income ranges) | 91,861 | 16,119 | 9,799 |
| Less than $10,000 | 3,644 | 3,644 | 100% |
| $10,000 to $14,999 | 2,408 | 2,674 | 111% |
| $15,000 to $19,999 | 3,559 | 3,475 | 98% |
| $20,000 to $24,999 | 4,189 | 3,701 | 88% |
| $25,000 to $29,999 | 4,025 | 3,819 | 95% |
| $30,000 to $34,999 | 3,326 | 3,270 | 98% |
| $35,000 to $39,999 | 3,574 | 3,401 | 95% |
| $40,000 to $44,999 | 3,393 | 3,159 | 93% |
| $45,000 to $49,999 | 4,086 | 4,018 | 98% |
| $50,000 to $59,999 | 7,183 | 5,091 | 71% |
| $60,000 to $74,999 | 10,002 | 6,889 | 69% |
| $75,000 to $99,999 | 12,050 | 6,516 | 54% |
| $100,000 to $124,999 | 8,851 | 5,538 | 63% |
| $125,000 to $149,999 | 6,993 | 4,978 | 71% |
| $150,000 to $199,999 | 7,545 | 4,954 | 66% |
| $200,000 or more | 7,033 | 4,653 | 66% |

43.     While the highest % MOE (Point #1) on Figure 8 of the Fishkind Report is between 35% and 40%, there is not a single data point in Table 5 with a percentage MOE below 54%.

44.     Point #2 in the annotated figure above is the point in Dr. Fishkind's dataset with the largest sample size.[25] This point has a sample size somewhere between 175,000 and 200,000. This is larger than the largest estimate in Table 5 (91,861). Further, the largest estimate in the table with Black

---

[25] I presume Dr. Fishkind has confused the term "sample size" with "estimate". Recall that the ACS 5-year data is based on a sample approximately 5% the size of the population being estimated. So, an estimate of 91,861 that means the sample size was *approximately* 4,600. The maximum "sample size" of just under 200,000 would relate to an estimate of approximately 1,000,000. This would be an impossibility for any estimate of number of households in Brevard County as the population (not households) in Brevard County was 606,612 in 2020 (according to 2020 Census). Further, in Exhibit #7, it is apparent that "Count" (estimate) is being used as the "sample size" because the resulting % MOE is equivalent to the one if the formula provided in Figure 2 is applied to the "Count" values. For example, row 1 of the table on page 2 of Exhibit #2 has a % MOE of 0.1915295 with an estimate of 2,236. The formula in Figure 2 is $y = 15.184x^{-0.567}$, where $y$ is the % MOE and $x$ is the "sample size". $0.1915295 = 15.184(2,236)^{-0.567}$

household estimates is 13,095. Thus, a value between 175,000 and 200,000 cannot be reconciled by adding the two largest estimates together.

45.      My conclusion from the two points above is that Dr. Fishkind has not disclosed the data he relied on to fit his model to estimate the percentage MOE which he uses to calculate the standard errors for each group of income ranges.[26] Without this data, I am unable to completely review Dr. Fishkind's work for its reliability. Further, the model Dr. Fishkind proposes will have errors, the uncertainty created by these errors would be measurable. By concealing the data he used, he has also concealed the error rate implicit in his analysis.

*Dr. Fishkind's Regression Methodology Is Most Likely Unreliable*

46.      Even without having the opportunity to review the data Dr. Fishkind used to estimate his regression model, I have found evidence that demonstrates his methodology is subject to high unreliability.

47.      I used the data in Table 5 of the Fishkind Report and applied the exact methodology used by Dr. Fishkind in Figure 8 of his report: I estimated a power function to explain the relationship between estimate size ("sample size") and the percent MOE. I present the results in the figure below.

---

[26] ¶68 of the Fishkind Report.

**Figure 5**



48.    Dr. Fishkind's estimated formula using the undisclosed dataset was $y = 15.184x^{-0.567}$ with an $R^2 = 0.915$. My estimated formula using data in Table 5 of the Fishkind Report was $y = 61.762x^{-0.507}$ with an $R^2 = 0.964$. While these two formulas certainly appear different, to demonstrate exactly how different they are, I apply them both to a count (sample size) of 9,611. Dr. Fishkind's model estimates a percentage MOE of .0837831 and a standard error of 0.050778. My replication of his method using Table 5 data would estimate a percentage MOE of 0.59082 and a standard error of 0.35916. If Dr. Fishkind's methodology were reliable, it should be able to estimate percentage MOE for White households when fit on the data in Table 5. However, the resulting percentage MOE is wildly different than the results from Dr. Fishkind's method; they are more than 7 times as large.

49.    Even worse for the prospect of reliable estimates from Dr. Fishkind, in Table 5, there is a row with an estimate of 10,002, which is extremely close to my example of 9,611. My replication based on Table 5 data would estimate a MOE of 5,678 while Dr. Fishkind's would estimate 805. The actual MOE in Table 5 is 6,889. This difference not only further demonstrates massive discrepancies between the model Dr. Fishkind estimated and the data he claims to have used to conduct his analyses, but it demonstrates how sensitive the model for standard errors is to the data underlying it. I simply changed the dataset to a reasonable one from his own report and found extremely different results.

19

*Dr. Fishkind's Standard Errors Do Not Match His Own Calculations*

50.     Further above, I described how Dr. Fishkind's regression methodology is untested and has an error rate that cannot be determined without his disclosure of the data he used to fit the model. In paragraph 68 of his report, Dr. Fishkind states that "[he] used the equation[, from his regression model, ]to estimate the MOE for each income range that could afford each of the apartments for each racial/ethnic group. Using the MOE [he] could then calculate the SE for each group. With the SE, [he] could then determine whether the differences between White and Black households who could afford each apartment to be offered at the Project was statistically significant. Table 9 summarizes the results. The detailed calculations are provided in Exhibit #7."

51.     Table 9 and the first page of Exhibit #7 present the standard errors used in his calculations. Yet, the second and third pages of Exhibit #7 show the calculation of completely different standard errors using his regression methodology. These alternative sets of standard errors are shown in the table below.

**Table 4**

| Affordability Type | Unit Type | Race/Ethnicity Group | Standard Error Used in Statistical Significance Calculations (Page 53) | Standard Error Calculated Using Regression Methodology (Pages 54-55) | Difference in SE Estimates | % Difference |
|---|---|---|---|---|---|---|
| 30% AMI | 1 BR | White | 0.035 | 0.051 | -0.016 | -31% |
| 30% AMI | 1 BR | Black | 0.087 | 0.116 | -0.029 | -25% |
| 30% AMI | 2 BR | White | 0.035 | 0.051 | -0.016 | -31% |
| 30% AMI | 2 BR | Black | 0.087 | 0.116 | -0.029 | -25% |
| 30% AMI | 3 BR | White | 0.029 | 0.041 | -0.012 | -30% |
| 30% AMI | 3 BR | Black | 0.073 | 0.095 | -0.022 | -23% |
| 60% AMI | 1 BR | White | 0.022 | 0.032 | -0.010 | -32% |
| 60% AMI | 1 BR | Black | 0.058 | 0.073 | -0.015 | -21% |
| 60% AMI | 2 BR | White | 0.022 | 0.032 | -0.010 | -32% |
| 60% AMI | 2 BR | Black | 0.058 | 0.073 | -0.015 | -21% |
| 60% AMI | 3 BR | White | 0.019 | 0.028 | -0.009 | -31% |
| 60% AMI | 3 BR | Black | 0.050 | 0.067 | -0.017 | -25% |
| 80% AMI | 1 BR | White | 0.017 | 0.026 | -0.009 | -34% |
| 80% AMI | 1 BR | Black | 0.048 | 0.064 | -0.016 | -25% |
| 80% AMI | 2 BR | White | 0.016 | 0.023 | -0.007 | -30% |
| 80% AMI | 2 BR | Black | 0.044 | 0.058 | -0.014 | -24% |
| 80% AMI | 3 BR | White | 0.014 | 0.020 | -0.006 | -30% |
| 80% AMI | 3 BR | Black | 0.040 | 0.053 | -0.013 | -24% |

52.     The table above demonstrates the undisclosed methodology and/or dataset Dr. Fishkind used after he abandoned the one he proffered reduced his standard errors by 21% to 34%. Lower standard errors produce higher levels of statistical significance which would favor Plaintiffs. It's

unacceptable that Dr. Fishkind has described the methods to calculate one set of standard errors yet uses a completely different set of estimates from an undisclosed methodology and/or dataset.

*Dr. Fishkind Most Statistically Significant Result is Due to Human Error*

53.    Dr. Fishkind uses two kinds of tests to calculate the statistical significance of differences in Table 6 and Table 7. In both tables, one test sticks out: 60% AMI for 3 Bedrooms. Table 6 reports a chi-square statistic of 3,685 (5 times the next largest value) and Table 7 reports a Z-score of 4.83 (2.5 times the next largest value). What could cause such high test statistics in a disparate impact analysis? Evidence of disparate impact? No. Dr. Fishkind just used the wrong value in his calculations. In both of these tests, Dr. Fishkind's calculations were based on 31% of White households not being able to afford versus 69% of Black households not being able to afford. However, the 69% appears out of thin air. On page 41 of his report, Dr. Fishkind calculates the percentage of Black households that can afford a 3-bedroom apartment at 60% AMI to be 55%. Which means the complement of 55% or 45% cannot afford a 3-bedroom apartment at 60% AMI. Dr. Fishkind's error inflated the difference between the White and Black non-affordable rate to 2.7 times the size of his own estimate. The most statistically significant results Dr. Fishkind presented are not actually statistical results at all, just the result of human error.[27]

## Dr. Fishkind's Opinion on Segregative Effect is Unreliable

54.    Dr. Fishkind's stated "the Decision perpetuates segregation in West Melbourne where the Project was to be located." His opinion relies on his assumption that the Proposed Community will have a racial composition of 35% Black households.[28] I do not accept his assumption at face value.

---

[27] This was not the only careless error, the calculation of Dr. Fishkind's chi-squared statistics suffered from an apparent coding error that would have been recognizable if he checked his work with chi-square calculators readily available online.

[28] "The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households. The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability. Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market." Fishkind Report at ¶76.

*The 35% Assumption is Unfounded*

55.    Dr. Fishkind provided no data that he relied upon to make that assumption. He has only stated the source of the data is a survey conducted by Plaintiffs.[29] Estimates from surveys are susceptible to a number of issues that could create a bias or high levels of uncertainty. For example, race and ethnicity information is typically self-reported and respondents may have chosen not to report their race or ethnicity, or even have misreported it. I cannot simply accept that the survey indicated 35% of the households are Black, simply because Dr. Fishkind has said so.

56.    When Mr. Culp testified about the data Dr. Fishkind may have relied on, he was uncertain as to how complete it was or how it was collected.[30] To assess the reliability of Dr. Fishkind's 35% I would need to review the survey data as well as the questions and methods used to collect it.

57.    Just as there are methods to calculate the margin of error around the ACS estimates, there are methods to calculate the margin of error around the 35% estimate derived from a survey. However, Dr. Fishkind has not provided an opinion on the uncertainty of his assumption or an error rate related to his conclusion.

*The 35% Assumption is Not Reliable*

58.    Assuming the 35% is an accurate estimate from the survey data, the sample is not representative of the Proposed Community at issue. The community is age-restricted which rules out three of the four subsamples as the Venue at Vierra is the only age-restricted community. The racial/ethnicity composition in unrestricted-age communities may be different than age-restricted communities. The same is true for communities with larger low-income set asides. This makes

---

[29] Fishkind Report  at ¶30.
[30] "Some of that data can be collected, some of it can't under Fair Housing Laws. So we maintain the data that can be collected and maintained with regard to the makeup of tenants in our communities. [...] I don't know [if is collected by] anything other than applications. I know there is recertifications on a regular basis, and that – that may also provide input to the data. [... The database] allows us to pull information with regard to what has been reported. [...] There is some restrictions on what you can require someone to put down on an application versus what you can, you know, request. So we can pull the data that's been provided to us by the applicants."

Venue at Vierra a poor representation of the Proposed Community as Venue at Vierra has 100% of its units affordable at or below 80% AMI, in contrast to the Proposed Community.[31] This would cause a bias if the survey data were extrapolated to the Proposed Community. The existence of this bias cannot be evaluated until I have had the opportunity to review the survey data, questions, and its methodology.

59.    Other claims by Dr. Fishkind can be used to calculate a reasonable check on the reliability of his assumption that 35% of the units would be occupied by Black households. In Table 11 Dr. Fishkind represents that 27% of White households need affordable housing and 43% of Black households need affordable housing. In Table 10, Dr. Fishkind represents that 80% of the households are White in Brevard County where 9% are Black. It would follow that of White and Black Households that need affordable housing, only 15.19% would be Black.[32] This estimate is less than half the estimate provided by Dr. Fishkind.

## Dr. Fishkind's Misrepresented His Methodology as the Same Used by the Court in Oviedo

60.    Once again, Dr. Fishkind describes his methodology as doing one thing and then he actually does something else. In paragraphs 81 and 82 of his report he states: "The Oviedo court also provided a formula to demonstrate robust causation. The court prescribed comparing the % of racial minorities occupying multifamily properties in the City to the % of non-minorities occupying multifamily properties in the City. The statistical analysis presented below, following

---

[31] Memo dated July 1, 2020 Re: Venue at Viera Senior Living to BCHFA from Public Resources Advisory Group at page 1. Available at https://brevardhfa.org/wp-content/uploads/2020/07/PRAG-Report-Venue.pdf

[32] 9% × 43% = 3.87% of Brevard County households are Black and need affordable housing. 80% × 27% = 21.60% of Brevard County households are White and need affordable housing. 15.19% = $\frac{3.87\%}{3.87\%+21.60\%}$ of the households that need affordable housing would be Black. This number is likely an overestimate because it assumes 0% of households that need affordable housing are in other racial/ethnic groups. This methodology is similar to one reached by the court in *Arlington Heights*, where the court "simply assum[ed] that the development's racial make-up would reflect the income-eligible population in the overall metropolitan area[.]" See Schwemm, Robert G. "Segregative-Effect Claims Under the Fair Housing Act." *NYUJ Legis. & Pub. Pol'y* 20 (2017): 709 at page 740.

the Oviedo court's recommendation, demonstrates that the Decision resulted in the racial imbalance."

61.     Reading Dr. Fishkind's methodology, one might mistakenly assume that he will compare the percentage of Black households occupying multifamily properties in the West Melbourne or Brevard County to the percentage of White households occupying multifamily properties, however he is regurgitating the same flawed disparate impact analysis as before, except this time he does not even attempt to demonstrate statistical significance. Again, he is using the same ACS data to estimate what proportion of households cannot afford a specific amount of rent. This data and analysis is irrelevant to the facts of this matter because the Proposed Community was age-restricted where the data he uses includes all age groups.

## Dr. Fishkind Failed to Consider the Practical Significance related to his Segregative Effects Opinion

62.     The application indicated that only 21 units in the 105-unit Proposed Community would be affordable. While I contend the 35% assumption made by Dr. Fishkind is unreliable, if it were true, the 21 affordable units would be expected to increase the number of Black Households in West Melbourne by fewer than 7.[33]

63.     If a 15% assumption is more appropriate, the 21 affordable units would be expected to increase the number of Black Households in West Melbourne by fewer than 3.[34] Further, based on the 15% assumption, I estimate that there is an approximately 8% probability that the number of Black households will not even increase by even one household above the current baseline with the addition of 21 affordable units.[35]

---

[33] $21 \times (35\% - 4\%) = 6.51$. This is the number of Black Households in addition to the Black Households that would already be expected given the 9% rate of Black Households in West Melbourne.
[34] $21 \times (15.19\% - 4\%) = 5.46$
[35] Using the 35% assumption proffered by Dr. Fishkind, there is still an approximately 7% probability that the Proposed Community would have increased the number of Black Households in West Melbourne by a maximum of 3 beyond the baseline expectation. These probabilities are calculated using a binomial distribution where the probability of success is equal to the difference between the assumption of Black households in the affordable units of the Proposed Community and the current 4% rate in West Melbourne.

## Conclusion

64.     I have reviewed the Expert Report of Hank Fishkind dated September 12, 2024, it is my opinion that the Fishkind Report presents no reliable statistical evidence that the Decision had a disparate impact on a protected class. Dr. Fishkind's analysis was undermined with flawed methodology, errors, and ignorant to the facts of the matter.

65.     Further, Dr. Fishkind's opinion on the Decision perpetuating racial segregation hinges on an undocumented and unreliable estimate. Even if true, the practical impact of the decision on racial segregation is minimal.

66.     I understand a request for the survey Dr. Fishkind relied on has been made to Plaintiffs and that the deposition of Mr. Culp is incomplete at the time of this report. I reserve the right to amend this report should this, or any other information/documents become available to me.


*Sean T. Malone*

Sean T. Malone, Ph.D.


November 29, 2024

San Antonio, TX

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| ATLANTIC HOUSING PARTNERS L.L.L.P., A FLORIDA LIMITED LIABILITY PARTNERSHIP; CANTON CONSTRUCTION, LLC, A FLORIDA LIMITED LIABILITY CORPORATION; CONCORD MANAGEMENT, LTD., A FLORIDA LIMITED PARTNERSHIP; THE VENUE AT HERITAGE OAKS PARTNERS, LTD., <br><br> Plaintiffs, <br><br> v. <br><br> BREVARD COUNTY, A POLITICAL SUBDIVIDION OF THE STATE OF FLORIDA, <br><br> Defendant. | Case No.: 6:23-CV-02473 <br><br> Hon. Julie Sneed <br><br> Hon. Daniel Irick |

**SUPPLEMENTAL EXPERT REPORT OF SEAN T. MALONE, PH.D.**

March 11, 2025

**Table of Contents**

Summary of Engagement and Conclusions..................................................................................1

Professional Qualifications and Compensation........................................................................2

Demographic Information Reports Support My Opinions that Dr. Fishkind's Opinion on
Segregative Effect is Unreliable and the Practical Impact of the Decision is Minimal........................2

Demographic Information Reports Support My Opinions that Dr. Fishkind's Opinion on
Disparate Impact is Based on Insufficient Facts ....................................................................7

Conclusion ........................................................................................................................9

## Summary of Engagement and Conclusions

1.      I have been retained by Roper Townsend & Sutphen, P.A. ("Counsel"), counsel for the Defendant in this action.

2.      On March 5, 2025, I received six Microsoft Excel files from Counsel that contained reports on the demographic information for tenants as of 2/14/2020, 2/14/2021, 2/14/2022, 2/14/2023, 2/14/2024, and 2/14/2025. Each workbook contained information for five different properties: Wickham Club, Hammock Harbor, Malabar Cove I, Malabar Cove II, and Venue at Viera Senior Living.[1] I refer to these files as "Demographic Information Reports" throughout this report. I also received transcripts from the deposition of Jonathan Thomas from Counsel.[2]

3.      I was asked to review the Demographic Information Reports and supplement or update my opinions based on that review.

4.      I have drawn several conclusions from my review of the Demographic Information Reports. Below is a summary of my conclusions.

- Dr. Fishkind's assumption that 35% of households would be Black households is biased because it mostly considers properties without age restrictions when the proposed community was intended to be occupied by seniors.
  - The proportion of Black leaseholders in the data is correlated with whether the property is age-restricted.
  - The only comparable community in Brevard County, in terms of age restrictions, is Venue at Viera. The estimated proportion of Black tenants at Venue at Viera is 9.36%.
- Using an estimate of 9.36% for the proportion of Black households that could have occupied the affordable units at the proposed community, I've supplemented two of my opinions:

---

[1] Malabar Cove is described as two properties, though it may be better described as a single community developed in two phases. See Thomas Deposition Day 2 at 25:10-14.
[2] Thomas 2/4/2025 Deposition Transcript and Thomas 2/19/25 Deposition Transcript.

- o Adding 21 affordable units would be expected to increase the number of Black Households in West Melbourne by approximately 1.
- o I estimate a 31% probability that the number of Black households will not even increase by even one household above the current baseline with the addition of 21 affordable units.
- Approximately 98% of the units at Venue at Viera Senior Living have occupants who are 55 and older. This reinforces my opinion that a helpful disparate impact analysis must consider households with at least one occupant who is 55 or older and would qualify to live at the proposed community.

5.      This report describes my work, opinions, and conclusions. I reserve the right to supplement or amend this report should additional documents or information become available to me.

## Professional Qualifications and Compensation

6.      In the Malone Report, I described my qualifications and compensation related to this engagement. I also included a copy of my resume. I incorporate those in this report by reference.

## Demographic Information Reports Support My Opinions that Dr. Fishkind's Opinion on Segregative Effect is Unreliable and the Practical Impact of the Decision is Minimal

7.      In Dr. Fishkind's initial report[3] (the "Fishkind Report"), he states "[t]he racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% Black households. The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability. Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market."[4]

---

[3] The Expert Report of Hank Fishkind issued on September 12, 2024.
[4] Fishkind Report at ¶76.

8.      In my initial report[5] (the "Malone Report"), I took issue with the fact that Dr. Fishkind failed to provide the facts he relied on to arrive at his conclusion that Black households would make up approximately 35% of the proposed project.[6] I raised that I would need to review the data to further assess its reliability.[7]

9.      On March 5, 2025, I received the Demographic Information Reports described above. Using these reports, I estimated the proportion of Black tenants at each of the communities at each point in time such a report was provided. I considered a tenant to be Black if they reported their race to be "Black or African American" without regard to their response to the ethnicity (Hispanic or Non-Hispanic) question.

10.      I understand that tenants are asked about their race and ethnicity on the Tenant Income Certification form near the date they move into a community.[8] I also understand that tenants are not required to disclose their race or ethnicity.[9] Therefore, some tenants are missing race and/or ethnicity information.

11.      Therefore, I produced three estimates of the proportion of Black tenants. The first considers all tenants, without regard to whether they identified their race; the second considers only tenants who provided race or ethnicity data; and the third considers only tenants who provided race data. The extent that these estimates differ depends on the how many tenants who chose to not disclose their race and/or ethnicity on the Tenant Income Verification form. More than 94% of tenants at Venue at Viera reported race or ethnicity data while only 63% of tenants provided it at the other properties.[10]

12.      In Figure 1 below, I present the results for second measure that considers only tenants who provided race or ethnicity data. Figures for the other two definitions are provided in Exhibit 1.

---

[5] The Rebuttal Report of Sean T. Malone, Ph.D., issued on November 29, 2024.
[6] Malone Report at ¶55.
[7] Malone Report at ¶56.
[8] Thomas 2/4/2025 Deposition Transcript at 30:25-31:15 and Thomas 2/19/25 Deposition Transcript at 10:1-4.
[9] Thomas 2/4/2025 Deposition Transcript at 31:16-32:2.
[10] These rates are from the Demographic Information Report dated 2/14/2024.

**Figure 1**



13.     There is a glaring difference between the proportion of Black tenants at Venue at Viera Senior Living and the other four communities. This difference reflects the exact bias forewarned about in the Malone Report. I stated that the Proposed Community "is age-restricted which rules out three of the four subsamples as the Venue at Vierra is the only age-restricted community. The racial/ethnicity composition in unrestricted-age communities may be different than age-restricted communities."[11]

14.     The testimony of Jonathan Thomas confirms Venue at Viera is the only age-restricted community in Brevard County where Demographic Information Reports were produced.[12]

---

[11] Malone Report at ¶58.
[12] Thomas 2/19/25 Deposition Transcript at 24:12-25:9.

15.    Not only is this marked difference present in the 2/14/2024 report (the date closest to the filing of this litigation), it is nearly constant for the five reports that include data for Venue at Viera Senior Living.

16.    I separate the communities into two categories to examine if the proportion of Black tenants is related to whether a community is age restricted. The tabulation is shown below in Table 1.

**Table 1**

| As of 2/14/2024 | Black | Not Black | Tenants who Provided Race or Ethnicity |
|---|---|---|---|
| **Community is Not Age-Restricted** | 336<br>40.88% | 486<br>59.12% | 822<br>100% |
| **Community is Age-Restricted** | 16<br>9.36% | 155<br>90.64% | 171<br>100% |

17.    40.88% of tenants who provided race or ethnicity data were Black in communities that did not have age restrictions. This is more than 4x the estimate in the age-restricted community where 9.36% of the tenants who provided race or ethnicity identified as Black.[13] I use a Pearson's chi-squared test to examine the statistical significance of the difference between the proportions. The resulting Pearson's chi-squared statistic was 61.4563 and has an associated probability well below 1%, indicating a high level of statistical significance. In other words, if the proportion of Black tenants was the same between communities where there were and were not age-restrictions, it would be *extremely* unlikely to observe such a large difference due to random chance.

18.    When Dr. Fishkind assumes that the Black household percentage will be similar to the average proportion across all five properties, he is creating an inflated estimate. The five properties are not representative of the proposed community. The proposed community, Venue at Heritage

---

[13] Since the race is provided for 94.5% of residents, a 95% confidence interval for the proportion of Black tenants at Venue at Viera Senior Living is from 8.33% to 10.39%. The 95% confidence interval for a larger population (age-restricted communities in general) would be 4.99% to 13.72%. See https://online.stat.psu.edu/stat415/lesson/6/6.3.

Oaks, is age-restricted and the only property representative of age-restricted communities is Venue at Viera.[14]

19.    The analysis above has demonstrated that Dr. Fishkind's assumption that 35% of the households in the Proposed Community is extremely biased. Based on the 9.36% estimate for age-restricted communities calculated in Table 1, Dr. Fishkind has likely overstated his estimate by more than 3.5x.

20.    In my report, I used numbers provided by Dr. Fishkind to derive an alternative estimate for the proportion of Black households in the Proposed Community at 15.19%. I used this alternative estimate to demonstrate the unreasonableness of Dr. Fishkind's 35% assumption. I also used the 15.19% estimate to make two additional opinions:

- "If a 15% assumption is more appropriate, the 21 affordable units would be expected to increase the number of Black Households in West Melbourne by fewer than 3."[15]

- "[B]ased on the 15% assumption, I estimate that there is an approximately 8% probability that the number of Black households will not even increase by even one household above the current baseline with the addition of 21 affordable units."[16]

21.    Due to the new information I've received and the analysis shown in Table 1, I am supplementing my opinions to include the following:

- A 9.36% assumption for the proportion of Black households in the affordable units in the proposed community is appropriate because it is based on the demographic information of the only similar property developed by Plaintiffs in Brevard County.

- Based on the 9.36% assumption, the 21 affordable units would be expected to increase the number of Black Households in West Melbourne by approximately 1.[17]

---

[14] Thomas 2/19/25 Deposition Transcript at 25:15-26:3.
[15] Malone Report at ¶16.
[16] Malone Report at ¶16.
[17] $21 \times (9.36\% - 4\%) = 1.113$

- Based on the 9.36% assumption, I estimate that there is an approximately 31% probability that the number of Black households will not even increase by even one household above the current baseline with the addition of 21 affordable units.[18]

## Demographic Information Reports Support My Opinions that Dr. Fishkind's Opinion on Disparate Impact is Based on Insufficient Facts

22.    In the Malone Report, I opined Dr. Fishkind examined the wrong dataset to evaluate disparate impact claims because he analyzed households that did not meet the age requirements to live at the proposed community.[19] The testimony of Mr. Thomas confirmed that the minimum age requirement for Venue at Viera was 55, similar to the proposed community.[20] While Mr. Culp testified, that the restrictions and expectations for proportion of the units with occupants 55+ are different between Venue at Viera and the proposed restrictions for Venue at Heritage Oaks[21], I do understand that at some point before the completion of  Venue at Viera, there were similar expectations between the two communities. Particularly, 80% of units were expected to serve seniors at Venue at Viera according to a document written for Brevard County Housing Finance Authority, as shown in Figure 2 below.[22]

---

[18] This probability is calculated using a binomial distribution where the probability of success is equal to the difference between the 9.36% assumption of Black households in the affordable units of the Proposed Community and the current 4% rate in West Melbourne.
[19] Malone Report at ¶13-15.
[20] Thomas 2/4/2025 Deposition Transcript at 40:9-11.
[21] Culp 12/18/24 Deposition Transcript at 248:19-249:13.
[22] Available at https://brevardhfa.org/wp-content/uploads/2020/07/PRAG-Report-Venue.pdf. Also attached as Exhibit 2.

Figure 2



| | SECOND AVENUE NORTH, SUITE 400 ST. PETERSBURG, FLORIDA 33701 TEL: (727) 822-3339 \| FAX: (727) 822-3502 |
|---|---|

**PUBLIC RESOURCES ADVISORY GROUP**

TO:      BREVARD COUNTY HOUSING FINANCE AUTHORITY

FROM:    PUBLIC RESOURCES ADVISORY GROUP

RE:      VENUE AT VIERA SENIOR LIVING

DATE:    JULY 1, 2020

The Credit Underwriting Report ("CUR") was prepared by First Housing Development Corporation of Florida.   We expect to provide additional information at the Authority meeting concerning the demographic commitment, the rate on the Tranche 2 Bonds and the definition of net available cash flow, together with items that may be clarified prior to the meeting.

**The Development**

The development will have 145 units in a four story mid-rise located at the southeast corner of the interesection of N. Wickham Road and Wyndham Drive in Melbourne, FL. This building is part of a larger multiphase project.  Unit amenities will include a balcony or patio, carpeting, dishwashers and garbage disposal and in unit washer and dryer.  The common space will include a community room, exercise facility and a picnic area.

The borrower expects that 80% of the units will serve residents age 55+/62+.  There will be 37 one-bedroom units, seven on these units will serve households at or below 40% of AMI, 23 will serve

23.     Even when Venue at Viera was expected to have 80% of its units serving those 55 and older, the Demographic Information Report shows only 2 of 145 Venue at Viera units didn't have at least one occupant who was aged 55 years or older.[23] In other words, while expected to only have 80% of units serving those 55 and older before completion, more than 98% of the units had occupants 55 or older after the project was completed. In contrast, only 26% of occupied units had at least one occupant who was 55 or older in communities without age restrictions. This analysis reinforces my opinion that Dr. Fishkind's disparate impact analysis must reflect households that meet the age requirements of the proposed community. In other words, he must analyze affordability in households where there is at least one person 55 or older. He has failed to do such an analysis.

---

[23] Demographic Information Report dated 2/24/2024.

## Conclusion

24.    I have reviewed the Demographic Information Reports provided to me and conducted additional analyses based on that information to supplement my opinions.

25.    The information in the Demographic Information Reports show that an age-restricted community, like the proposed development, would have an expected proportion of Black households near 10%. This allowed me to supplement my opinions related to the minimal practical impact of the decision. The impact is even smaller than described in my initial report.

26.    Further, the apparent differences in demographics between communities that are intended for seniors and those that aren't demonstrates why it is so important disparate impact analyses rely on data for households that actually would qualify to live there based on age restrictions. Analyses based on households without regard to the age of their occupants, like Dr. Fishkind's, is unable to conclude anything about affordability for Black and White households who are likely to live in the proposed community.

27.    I reserve the right to amend or supplement this report if any other information/documents become available to me.


*Sean T. Malone*

Sean T. Malone, Ph.D.


March 11, 2025

San Antonio, TX

# EXHIBIT 1





# EXHIBIT 2



SECOND AVENUE NORTH, SUITE 400
ST. PETERSBURG, FLORIDA 33701
TEL: (727) 822-3339 | FAX: (727) 822-3502

**PUBLIC RESOURCES ADVISORY GROUP**

**TO:**      BREVARD COUNTY HOUSING FINANCE AUTHORITY

**FROM:**   PUBLIC RESOURCES ADVISORY GROUP

**RE:**      VENUE AT VIERA SENIOR LIVING

**DATE:**    JULY 1, 2020

The Credit Underwriting Report ("CUR") was prepared by First Housing Development Corporation of Florida. We expect to provide additional information at the Authority meeting concerning the demographic commitment, the rate on the Tranche 2 Bonds and the definition of net available cash flow, together with items that may be clarified prior to the meeting.

## The Development

The development will have 145 units in a four story mid-rise located at the southeast corner of the interesection of N. Wickham Road and Wyndham Drive in Melbourne, FL. This building is part of a larger multiphase project. Unit amenities will include a balcony or patio, carpeting, dishwashers and garbage disposal and in unit washer and dryer. The common space will include a community room, exercise facility and a picnic area.

The borrower expects that 80% of the units will serve residents age 55+/62+. There will be 37 one-bedroom units, seven on these units will serve households at or below 40% of AMI, 23 will serve households at or below 60% of AMI and seven at or below 80% of AMI. The 46 two-bedroom units will be allocated as follows: nine to serve households at or below 40% of AMI, 28 units to serve households at or below 60% of AMI, and nine for households at or below 80% of AMI. Of the 62 three-bedroom units, 13 will serve 40% and below, 36 will serve 60% and below and 13 will serve 80% and below.

## Financing Structure

The development is being funded from the following sources:

| Source | Lender | Construction | Permanent |
|---|---|---|---|
| **Tax Exempt Bonds** | Authority Tax Exempt Bonds/Bank United/Fairview | $16,755,000 | 15,079,500 |
| **Tax Exempt Bonds** | Authority Tax Exempt Bonds/Fairview | | 1,675,500 |
| **Bridge Loan** | Fl Tax Holdings | 1,092,086 | |
| **Tax Credit Equity** | Fl Tax Holdings | 9,891,398 | 10,983,484 |
| **Deferred Developer Fee** | Atlantic Housing | 4,566,837 | 4,566,837 |
| **Total** | | **$32,305,321** | **$32,305,321** |

**Tranche 1 and Tranch 2 Bonds-Bank United and Fairview Bond Holdings, Inc.**
Bank United will purchase tax-exempt bonds in an amount not exceeding $16,755,000 (the "Tranche 1 Bonds"). The Tranche 1 Bonds will be interest only for 36 months during construction. The interest rate will be locked at closing, but is expected to be 2.85% for the first 12 months and 2.25% for the following nine years. First Housing added an 25 basis point cushion for underwriting together with annual trustee fees and the issuer fee of 12.5 basis points.

**PRAG**

No later than January 15, 2022,  Fairview Bond Holdings, Inc. ("Fairview") will purchase the greater of the amount of bonds over 70% of the loan to value at completion or 10% of the bonds held by Bank United. Beginning January 15, 2023, Fairview will purchase a minimum of 10% of the original issuance amount through and including 2030.

Bonds purchased by Fairview shall be deemed the "Tranche 2 Bonds" and will be subordinate to the bonds held by Bank United.  The Tranche 2 Bonds will pay interest monthly at a floating rate equal to weekly LIBOR plus a spread.  The Tranche 2 Bonds will be interest-only for 36 months.

Amortization of the the Tranche 1 and Tranche 2 Bonds will be based on a 42 year amortization period. All payments on the Tranche 2 Bonds are to be made from available cash flow.

**Bridge Loan**
FL Tax Holdings will make an equity bridge loan of $6,505,029.  The bridge loan will bear interest at 8% with a 12 month term .  It is anticipated that the bridge loan will be repaid from the last installment of tax credit equity.

**Tax Credit Equity-FL Tax Holdings**
The applicant will apply to  FHFC to receive 4% Housing Credits.  Pursuant to a letter of interest dated April 23, 2020, the Housing Credit Equity will be purchased by FL Tax Holdings or an affiliate at a syndication rate of  $0.916 per housing credit for a net total equity investment of up to $10,983,484. $9,891,398 of the tax credit equity will be available during the construction period.

| Installment | Amount | % | Due Upon |
|---|---|---|---|
| 1 | $3,386,369 | 30.83% | Closing |
| 2 | $6,505029 | 59.23% | Prior to completion of construction check LPA |
| 3 | 1,092,086 | 9.94% | Later of final low-income housing credit certification or receipt of 8609 |
| **Total** | **$10,983,484** | **100.00%** | |

**Deferred Developer Fee**
In order to balance the sources and uses of funds, the Developer must defer $4,566,837 or 99.84% of the developer fee.

**Guaranties/Guarantors**

**Construction Completion Guaranty** The Applicant, Venue at Brevard Partners, Ltd.; Southern Affordable Services, Inc.; and FL Tax Holdings will each provide  construction completion guaranty. P&P Bonds will be provided by   all subcontracts for site work and infrastructure, concrete, mechanical, plumbing, electrical,roofing, and retaining walls.The HFA will be named as a co-obligee on these bonds.

**Operating Deficit Guaranty** The Applicant, Venue at Brevard Partners, Ltd.; Southern Affordable Services, Inc.; and FL Tax Holdings will each provide an operating deficit guaranty.  These guaranties will remain in place for a minimum of three years following issuance of certificates of occupancy.

PRAG

**The Standard Environmental Indemnity Guaranty and the Guaranty of Resource Obligations**
These guaranties will be provided by The Applicant, Venue at Brevard Partners, Ltd.; Southern Affordable Services, Inc.; and FL Tax Holdings.

**Credit Underwriting Report ("CUR")**

The CUR provided recommends the issuance of tax-exempt multifamily mortgage revenue bonds in the abount of $16,755,000 (subject to changes based on the underwriting criteria set forth in the CUR) be awarded to the subject development. PRAG recommends approval of the financing plan subject to all the assumptions in the Special and General Conditions outlined in the draft CUR and any revisions to such CUR., including the following:

1. The Land Use Restriction Agreement will prohibit a foreclosure by any entity related to the Borrower, specifically Fairview.

2. The HFA will be named as a co-obligee on subcontractor payment and performance bonds.

3. The tax credit equity investor, and one of the guarantors, FL Tax Holdings, is related to the Applicant, Developer, General Contractor, Management Company and Co-Management Company. All equity must be funded before any bond in excess of the original draw of $50,500 are issued.

4. The ownership of Fairview Bond Holdings, Inc. is confirmed as required by the CUR.

Attachment:

Credit Underwriting Report dated July 1,2020

# Ownership Structure



# Developer Structure



# EXHIBIT 7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited liability
partnership; CANTON CONSTRUCTION, LLC,
A Florida limited liability corporation;
CONCORD MANAGEMENT, LTD., a Florida
limited partnership; THE VENUE AT
HERITAGE OAKS PARTNERS, LTD.,

     Plaintiffs,
v.

BREVARD COUNTY, a political
subdivision of the state of Florida,

     Defendant.

_____/

DEPOSITION OF SEAN MALONE, PH.D.

Pages 1 through 45

Via Remote Video Conference

Taken on behalf of the Plaintiffs

DATE TAKEN:        MARCH 19, 2025

TIME:              1:03 P.M. – 2:05 P.M.

PLACE:             REMOTE VIDEO CONFERENCE

Stenographically reported by:

JENNIFER B. SANDERS, RPR, FPR-C
Notary Public, State of Florida

Page 2

```
1   APPEARANCES:
2   APPEARING ON BEHALF OF PLAINTIFFS:
3   MICHAEL PICCOLO, ESQUIRE (Video Conference)
    LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.
4   215 N. Eola Drive
    Orlando, FL  32802
5   michael.piccolo@lowndes-law.com
6
7   APPEARING ON BEHALF OF DEFENDANT:
8   SUSAN GAINEY, ESQUIRE (Video Conference)
    ROPER, P.A.
9   255 S. Orange Avenue, Suite 750
    Orlando, FL  32801
10  sgainey@roperpa.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1                    I N D E X
2   MARCH 19, 2025
3   DEPOSITION OF SEAN MALONE, PH.D.
4       Direct Examination by Mr. Piccolo        4
5   CERTIFICATE OF REPORTER                      42
6   CERTIFICATE OF OATH                          43
7   ERRATA SHEET                                 44
8   NOTIFICATION LETTER                          45
9
10
11                   * * * * *
12              E X H I B I T S
13  Plaintiffs' Exhibit 1 (Referenced)           11
14  (Subpoena)
15  Plaintiffs' Exhibit 2 (Referenced)           12
16  (Fishkind report 9/12/24)
17  Plaintiffs' Exhibit 3 (Referenced)           13
18  (Malone rebuttal report 11/29/24)
19  Plaintiffs' Exhibit 4 (Referenced)           13
20  (Fishkind rebuttal report 1/21/25)
21  Plaintiffs' Exhibit 5 (Referenced)           14
22  (Malone supplemental report 3/11/25)
23
24
25
```

Page 4

```
1              P R O C E E D I N G S
2                  * * * * * * *
3          SEAN TIMOTHY MALONE, PH.D.,
4      Having been first duly sworn to tell the
5   truth, was examined and testified upon his oath as
6   follows:
7          THE WITNESS:  I do.
8              DIRECT EXAMINATION
9   BY MR. PICCOLO:
10     Q    Good afternoon, sir.  My name is Michael
11  Piccolo, and I represent the plaintiffs in this case.
12         Will you please state your full name for the
13  record.
14     A    My full name is Sean Timothy Malone.
15     Q    I'm going to refer to you as Dr. Malone during
16  the course of this deposition; is that okay?
17     A    That's okay.
18     Q    Dr. Malone, where do you reside?
19     A    I live in San Antonio, Texas.
20     Q    Okay.  Are you under the influence of any
21  substance or medication that would affect the testimony
22  that you're about to give?
23     A    No.
24     Q    All right.  We're conducting this deposition
25  via Zoom.  Are there any persons with you, physically
```

Page 5

```
1   present, in the room that you're in?
2      A    No.  There's nobody in the room with me.
3      Q    And where are you currently located?
4      A    I'm in the offices of IMS Legal Strategies.
5      Q    And where is that located?
6      A    It's also in San Antonio, Texas.
7      Q    And did you bring any papers, whether that's
8   -- or documents, whether a hard copy or electronic
9   copies to refer to during the course of your deposition?
10     A    Yes.
11     Q    Okay.  What did you bring with you to refer to
12  during the course of your deposition?
13     A    So I did bring a digital copy of my file that
14  was provided to you.  I've also printed a few hard
15  copies of some of those documents, mainly, the expert
16  reports.
17     Q    All right.  Do you have any other documents or
18  communications with you that you're going to refer to
19  during the course of your deposition other than the
20  digital copy of your file and the hard copies that you
21  just referred to?
22     A    I don't believe so.
23     Q    Okay.  And can you just tell me the titles or
24  identify the hard copies that you have with you?
25     A    Sure.  I have the rebuttal report of Sean T.
```

Page 6

1   Malone from November 29, 2024.
2        I have the expert report of Hank Fishkind,
3   September 12, 2024.
4        I have the supplemental expert report of Sean
5   T. Malone, March 11, 2025.
6        I have the expert rebuttal report of Hank
7   Fishkind, January 21, 2025.
8        I also have a copy of "Proving Disparate
9   Impact in Fair Housing Cases After Inclusive
10  Communities" by Robert Schwenn, and a copy of a document
11  titled "Public Use Microdata Sample, Accuracy of the
12  Data 2023."
13       Q    Those last two documents, are those included
14  as electronic files in your file?
15       A    Yes.
16       Q    Have you taken any handwritten notes on any of
17  the hard copies of the documents?
18       A    No.  I printed them clean for today.
19       Q    Okay.  And, currently, you're looking at a
20  laptop, a phone, or a desktop monitor?
21       A    A laptop monitor.
22       Q    Is there just one monitor in front of you?
23       A    Yes.
24       Q    All right.  Do you have any other tabs or
25  anything else open other than the Zoom?

Page 7

1        A    I have one tab where I just downloaded my file
2   but it's closed.
3        Q    Okay.  Other than the laptop screen, you don't
4   have any other screens or phones in your line of sight,
5   correct?
6        A    No.
7        Q    Is that correct?
8        A    I do not have any other devices in my line of
9   sight.
10       Q    Have you been deposed before?
11       A    Yes.
12       Q    When's the last time you were deposed?
13       A    I need to refer to the date in my resume which
14  is attached to my first report.
15            In June 2023.
16       Q    How many times have you been deposed in the
17  last five years?
18       A    I've been deposed in two cases in the last
19  five years.
20       Q    Are those the only depositions that you've
21  ever given?
22       A    Yes.
23       Q    So this is your third deposition?
24       A    Yes.
25       Q    All right.  I'll go over some baseline

Page 8

1   instructions.  You're under oath this afternoon, and
2   Madam Court Reporter is here transcribing everything
3   that's said; do you understand that?
4        A    Yes.
5        Q    For the benefit of a clean record, I would
6   request that you allow me to answer the question -- or
7   excuse me -- you allow me to finish asking the question
8   before you start answering the question, and I'll try to
9   do the same, not to ask a follow-up question until
10  you're done answering a question; does that make sense?
11       A    Yes.
12       Q    If you need to take a break at any time, just
13  let us know.  The only rule regarding that will be that
14  you have to answer the question pending before we go on
15  break; does that make sense?
16       A    Yes, it does.  Thanks.
17       Q    And if you don't understand a question that I
18  ask through the course of your deposition, please let me
19  know, and if you answer a question, I'll assume that you
20  understood it; is that fair?
21       A    Yes, that's fair.
22       Q    All right.  What did you do in preparation for
23  your deposition today?
24       A    I had one phone call with Ms. Gainey prior to
25  this -- not today, but last week -- to just make sure I

Page 9

1   was prepared.  I've also reviewed the -- some of the
2   documents in my file, including the expert reports.
3        Q    Other than the expert reports, what other
4   documents did you review in your file in preparation for
5   today's deposition?
6        A    I did a quick review of the invoices that
7   were sent to our clients.  I looked at the Schwemn
8   article that we reviewed -- that I listed earlier --
9   sorry -- and I looked at some of the supporting
10  materials for my reports.
11       Q    Which supporting material?
12       A    I would have to reference my -- the list of
13  final names for that, but they were the spreadsheets
14  that had some of the calculations for the most recent
15  supplemental report I filed.
16       Q    Did you review any of the supporting materials
17  for your initial report?
18       A    No.  I just reviewed my report.
19       Q    You just reviewed your supplemental expert
20  report?
21       A    No.  I've reviewed both -- both reports I
22  authored.
23       Q    You're right.  That was a -- I phrased that
24  inaccurately.
25            You just reviewed supporting materials for

Sean Malone, Ph.D.
March 19, 2025

Page 10

1  your supplemental report in preparation for today's
2  deposition, correct?
3      A   Yes.  But, you know, over the course of time,
4  I have reviewed my supplemental documents at some point,
5  but I wouldn't be able to recall exactly which files and
6  when.
7      Q   No problem.  And in preparation for your
8  deposition today, did you review both of Dr. Fishkind's
9  reports filed in this case?
10     A   I did.
11     Q   And then you said you had one phone call with
12 Ms. Gainey last week.  Have you corresponded
13 electronically with Ms. Gainey -- or when was the last
14 time you corresponded electronically with Ms. Gainey or
15 her office?
16     A   I just received an email communicating the
17 link for today's call.
18     Q   And you haven't received any communications
19 regarding facts or assumptions for you to rely upon
20 with respect to your expert opinion for Ms. Gainey,
21 recently, correct?
22     A   I have not received any of that is a correct
23 statement.
24     Q   Aside from Ms. Gainey, did you speak with
25 anyone in preparation for your deposition today?

Page 11

1      A   No.
2      Q   All right.  Let's go to Exhibit 1 of your
3  deposition.  So this will be marked as Exhibit 1 to your
4  deposition.  It reputes to be the subpoena duces tecum
5  and notice of taking video deposition of Dr. Sean
6  Malone.  It's four pages long -- well, the last page is
7  blank -- have you seen this document before?
8      A   Yes.
9      Q   All right.  And have you seen Exhibit A to
10 Exhibit 1 to your deposition before?
11     A   I have.
12     Q   And have you produced all the documents
13 requested in Exhibit A to Exhibit 1 to your deposition?
14     A   Yes.
15     Q   When did you perform the search compilation
16 and production of the documents requested in Exhibit A
17 to Exhibit 1 to your deposition?
18     A   It was a few weeks ago.
19     Q   Was it in early March, or late February?
20     A   I believe that was early March.
21     Q   All right.  So since performing the search
22 compilation and production of the documents responsive
23 to Exhibit A to Exhibit 1 to your deposition, have you
24 done any other searches since then to ensure that there
25 have been no other documents created or sent that are

Page 12

1  responsive to this Exhibit A?
2      A   I did one additional search when I issued my
3  supplemental report and sent along, with my supplemental
4  report, those additional files.
5      Q   And when was that?
6      A   March 11.
7      Q   Okay.  So for between March 11, 2025, and
8  today -- which is March 19, 2025 -- there's been no
9  creation or sending or receiving of documents or
10 communications that are responsive to Exhibit A to
11 Exhibit 1 to your deposition, correct?
12     A   That's correct.  I'm not aware of any other
13 documents that are responsive to this.
14     Q   Okay.  All right.  So I'm going to mark what
15 reputes to be the expert report of Hank Fishkind, dated
16 September 12, 2024, as Exhibit 2 to your deposition.
17         Have you seen this report before?
18     A   I have.
19     Q   Okay.  Now, during the course of this
20 deposition, I'm going to refer to this report, which is
21 Exhibit 2 to your deposition, as Dr. Fishkind's initial
22 report; is that okay?
23     A   That's okay.
24     Q   And I'll next mark as Exhibit 3 to your
25 deposition, what reputes to be the rebuttal report of

Page 13

1  Sean T. Malone, Ph.D., dated November 29, 2024; have you
2  ever seen this document before?
3      A   Yes.
4      Q   And did you author this document?
5      A   I did author this document.
6      Q   And during the course of your deposition, I'm
7  going to refer to Exhibit 3 to your deposition as your
8  initial report; is that okay?
9      A   Yes.
10     Q   I'm going to mark as Exhibit 4 to your
11 deposition what reputes to be the expert rebuttal report
12 of Dr. Fishkind, dated January 21, 2025; have you seen
13 this document before?
14     A   I have seen this document, yes.
15     Q   And I'm going to refer to this document as
16 Dr. Fishkind's either supplemental or rebuttal report
17 during the course of your deposition; is that okay?
18     A   Yes.
19     Q   All right.  And during the course of your
20 deposition, I may refer to both of Dr. Fishkind's
21 reports, Dr. Fishkind's initial report and
22 Dr. Fishkind's rebuttal report, collectively, as
23 Dr. Fishkind's reports; does that make sense?
24     A   Yes.
25     Q   All right.  And, finally, what I'm going to

Page 14

1  mark as Exhibit 5 to your deposition is the supplemental
2  report -- excuse me -- supplemental expert report of
3  Sean T. Malone, Ph.D., dated March 11, 2025; have you
4  ever seen this document before?
5       A    Yes, I have.
6       Q    And you authored this document.
7       A    Yes, I did author it.
8       Q    And I'm going to refer to this report during
9  the course of your deposition, which is Exhibit 5 to
10  your deposition, as your supplemental report; does that
11  make sense?
12      A    Yes.
13      Q    And during the course of your deposition, I
14  may refer to your initial report, which is Exhibit 3 to
15  the deposition, and your supplemental report, which is
16  Exhibit 5 to your deposition, as your reports; does that
17  make sense?
18      A    Yes.
19      Q    So are your expert reports a complete
20  statement of all of your opinions that you will express
21  in this case?
22      A    No.  They are a statement of my opinions at
23  this point in time.
24      Q    Do you hold any other opinions at this point
25  in time, other than the opinions reflected in your

Page 15

1  expert reports?
2       A    I haven't completed forming all of my opinions
3  for the second or the supplemental report from
4  Dr. Fishkind, and so while I've reviewed that report and
5  I may have some preliminary opinions on it, I haven't
6  formalized those into another report yet.
7       Q    Are you intending on preparing and publishing
8  another expert report in this case?
9       A    Only if I'm asked to.
10      Q    Have you been asked to?
11      A    No.
12      Q    So as you sit here today, do the expert
13  reports, your expert reports, contain a complete
14  statement of all of your opinions that you will express
15  in this case?
16           MS. GAINEY:  Object to form.
17      Q    You can answer.
18      A    No.  They're only a listing of the opinions
19  that I've made up to this point in time.
20      Q    Okay.  So you don't have -- you don't know
21  what your opinions are going to be in the future, right?
22      A    No, I don't.
23      Q    Okay.  So as you sit here today, are your
24  expert reports a complete statement of all of your
25  current opinions that you will express in this case?

Page 16

1       A    Yes.  They're current as of now, yes.
2       Q    And as you sit here today, you have no other
3  expert opinions that you'll express in this case that
4  have not been reflected in the reports -- in your
5  reports, correct?
6           MS. GAINEY:  Object to form.
7       A    I do have some opinions related to
8  Dr. Fishkind's second report that I haven't formalized
9  in an expert report, because I wasn't asked to.  So
10  those would not be included in my initial or
11  supplemental report.
12      Q    The opinions that you just referenced, those
13  are not included in either your initial or supplemental
14  report, correct?
15      A    That would be correct.
16      Q    Have you ever authored an expert report in a
17  case previously?
18      A    Yes.
19      Q    Do you understand what the requirements are
20  for what needs to be provided in expert reports?
21      A    Generally, I do understand the requirements.
22      Q    What's your general understanding of the
23  requirements?
24      A    That they contain my opinions and bases and
25  facts that I've relied upon to arrive at those opinions.

Page 17

1       Q    And your expert reports in this case, they --
2  they meet your general understanding of the requirements
3  as of today, correct?
4       A    They -- both reports meet those requirements
5  as of the dates they were authored.  When I received the
6  supplemental report from Dr. Fishkind, I understood,
7  from counsel, that it was filed at an untimely manner
8  and, as such, I was not asked to disclose any further
9  opinions in the form of a report at that time.
10           And so the information had changed, but the
11  untimely nature of it, I was not asked to formalize any
12  opinions on it.  So that would be where I may have
13  additional opinions.
14      Q    So you don't have any formal opinions on
15  Dr. Fishkind's supplemental report reflected in your
16  supplemental report, correct?
17           MS. GAINEY:  Object to form.
18      A    That's correct.
19      Q    And because -- I've looked through your
20  supplemental report.  There's no reference to
21  Dr. Fishkind's supplemental report reflected in your
22  supplemental report, correct?
23      A    Correct.
24      Q    And you've been instructed by your counsel not
25  to form -- not to put opinions as to your -- as to

Page 18

1  Dr. Fishkind's supplemental report in your supplemental
2  report, correct?
3      MS. GAINEY:  Object to form.
4      A   Yes.  I understood, from counsel, not to form
5  additional opinions based on Dr. Fishkind's supplemental
6  report, so those are not reflected in mine.
7      Q   And they're not reflected in your initial
8  report because that was prepared and served prior to
9  Dr. Fishkind's supplemental report, correct?
10     A   Yes.
11     Q   So with respect to the opinions that are
12 actually reflected in your expert reports, do your
13 expert reports contain all bases and reasons for those
14 opinions?
15     A   Yes, they do.
16     Q   With respect to the opinions reflected in your
17 initial report and your supplemental report, do those
18 reports contain all the facts and data that you
19 considered when forming those opinions?
20     A   Could you please repeat that question?
21     MR. PICCOLO:  Madam Court Reporter, can you
22 read it back, please.
23     (The pending question was read back by the
24 court reporter.)
25     MS. GAINEY:  Did that break up for anybody

Page 19

1  else?
2      MR. PICCOLO:  A little bit, yeah.
3      Do you mind repeating that, Madam Court
4  Reporter.
5      (The pending question was reread by the court
6  reporter.)
7      A   Within the reports and the file that I
8  provided, it does contain the facts and data that I
9  would have considered to form those opinions.
10 BY MR. PICCOLO:
11     Q   Okay.  Fair enough.
12     Does your expert reports contain all the
13 exhibits that you will use to summarize or support the
14 opinions reflected in your expert reports?
15     A   I'm sorry.  Could you repeat that question?
16     MR. PICCOLO:  Madam Court Reporter, can you
17 read that back.
18     (The pending question was read back by the
19 court reporter.)
20     A   It contains all exhibits I would have created,
21 up to this point, to summarize the opinions in my
22 reports, yes.
23     Q   Does your expert report contain your
24 qualifications to testify as an expert in this case?
25     A   It does.

Page 20

1      Q   Does your expert report have a list of all
2  other cases in which, during the previous four years,
3  you testified as an expert at trial or by deposition?
4      A   It does.
5      Q   Does your expert reports provide a statement
6  of the compensation to be paid for the study and
7  testimony that you're going to give in this case?
8      A   Yes.
9      Q   All right.  Let's look at your supplemental
10 report, which is on the screen, and I'm going to look at
11 paragraph 25.
12     And for the benefit of the record, paragraph
13 25 provides that the information in the demographic
14 information reports show that an age-restricted
15 community, like the proposed development, would have an
16 expected proportion of Black households near 10 percent;
17 do you see that?
18     A   Yes.
19     Q   Is that your opinion?
20     A   Yes.
21     Q   Is that accurate?
22     A   It is.  It's -- 10 percent is rounded, of
23 course.
24     Q   What is it rounded from?
25     A   The estimate under report is 9.36 percent.

Page 21

1      Q   How did you arrive at that, quote, near
2  10 percent, end quote, number?
3      A   I analyzed the demographic information reports
4  to find the proportion of tenants with race and
5  ethnicity data that identified as Black at Venue at
6  Viera.
7      Q   So is that near 10-percent number reflective
8  of your analysis of the Venue at Viera only, or with
9  respect to your analysis of any other communities of the
10 plaintiff?
11     A   It is reflective of only my analysis of Venue
12 at Viera because the rest of my analysis shows that
13 Venue at Viera is statistically different from the other
14 communities because it's age restricted.
15     Q   How is it age restricted?
16     A   Venue at Viera is -- actually, the correct
17 name for it is Venue at Viera Senior Living.  It is a
18 community for seniors, and so there are age
19 restrictions, basically either 55 or 62-plus, in order
20 to live at Venue at Viera.
21     Q   So is it your understanding that only 55 and
22 older residents reside at Venue at Viera?
23     A   No.  It's -- no, that's not my understanding.
24     Q   All right.  What's your understanding?
25     A   It has to be -- a member of the household has

Sean Malone, Ph.D.
March 19, 2025

Page 22

1  to meet the age requirements.  It doesn't exclude
2  residents from below those age requirements.
3      Q    So give me -- what's your -- what's your
4  opinion or understanding of what the age restriction at
5  Venue at Viera is?
6      A    That there are requirements as to age being
7  either 55-plus or 62-plus, and one member of the
8  household must be that age or older in order to qualify.
9          So you can have residents that are under that
10 age, but you must have at least one qualifying household
11 member.
12     Q    Where do you get that from?
13     A    I've gotten it from several sources, one was
14 the deposition of Scott Culp.  There was a website for
15 Venue at Viera Senior Living that has various age
16 restrictions on it.
17     Q    And the website provides age restrictions that
18 comport with your understanding of what the age
19 restrictions are at Venue at Viera, correct?
20     A    I don't have the website in front of me, but I
21 believe so.
22     Q    Did the plaintiffs provide you with
23 demographic reports for other communities other than the
24 Venue at Viera?
25     A    Yes.

Page 23

1      Q    And so, if I understand your testimony
2  correctly, you -- well, actually, I don't think you got
3  there.
4          Why did you just solely analyze Venue at Viera
5  as opposed to the other communities that plaintiffs
6  provided you demographic information for?
7      A    Well, I chose to exclude the other communities
8  because they're not similar to the proposed community
9  which was Venue at Heritage Oaks, because Venue at
10 Heritage Oaks was also going to be age restricted
11 because it was intended to be housing for seniors, and
12 the other communities didn't have such restrictions on
13 age and were not intended for senior living.
14          And so when looking to estimate the proportion
15 of Black households in the proposed community, I want to
16 look at data that is representative of that proposed
17 community, and Venue at Viera was the only one that meet
18 that criteria.
19     Q    What was the proposed age restrictions for The
20 Venue at Heritage Oaks?
21     A    The minimum age for at least one of the
22 household members would have been 55-plus.
23     Q    So is it your understanding and is your
24 opinion based upon the assumption that the age
25 restrictions at The Venue at Heritage Oaks had the same

Page 24

1  age restrictions that the Venue at Viera had?
2      A    It's not that they're exactly the same but
3  both are intended for seniors.
4      Q    What are the differences in the age
5  restrictions between The Venue at Heritage -- Venue at
6  Viera versus The Venue at Heritage Oaks, if any?
7      A    Well, the exact age cutoffs and requirements
8  may be different by a few years depending on which
9  property you're looking at, but both are intended for
10 seniors.
11     Q    Yeah.  But when you keep saying that they're
12 intended for seniors, there's more to age restrictions
13 than just intended for seniors; you understand that
14 correct?
15     MS. GAINEY:  Object to form.
16     A    I understand that Venue at Viera is for --
17 intended for 55-plus.  Venue at -- I'm sorry.  I mixed
18 that up.
19          Venue at Heritage Oaks, the proposed
20 community, was intended for seniors 55 or older.  Venue
21 at Viera had -- was also intended for older people, and
22 its age restrictions were slightly different, but
23 they're much closer than the other properties which have
24 no age restrictions at all.
25     Q    Sure.  And so when you say that the minimum

Page 25

1  age for the household at Venue at Heritage Oaks was
2  55 and older, are you saying that only 55-and-older
3  residents could have resided at The Venue at Heritage
4  Oaks, or are you saying something else?
5      A    I'm saying that at least one of the household
6  members would need to be 55 or older.  Now, I understand
7  that it was intended to be -- intended for seniors under
8  the Housing for Older Persons Act, so it is possible
9  that there are households that have -- that are
10 exclusively people under 55, but those are, at a
11 maximum, 20 percent of the units.
12     Q    And what was the act that you just referred
13 to?
14     A    Housing for Older Persons Act.
15     Q    Do you know whether or not the Venue at Viera
16 was supposed to comply or was governed by the Housing
17 for Elderly Persons Act?
18     A    I don't know that.
19     Q    You go on, in paragraph 26 of your
20 supplemental report, to state, quote, further, the
21 apparent differences in demographics between communities
22 that are intended for seniors and those that aren't,
23 demonstrates why it's so important disparate impact
24 analyses rely on data for households that actually would
25 qualify to live there based on age restrictions.

Sean Malone, Ph.D.
March 19, 2025

Page 26

1      Do you see that?
2  A   I do.
3  Q   Is that your opinion?
4  A   Yes, that's my opinion.
5  Q   Is that accurate?
6  A   Based on my analyses, it's accurate.
7  Q   And so would you agree with me if someone
8  performs statistical analyses comparing households or
9  comparing communities where the households demographics
10 or ages were different, then that would not be
11 appropriate statistical analyses, right?
12 A   Please repeat the question.
13 Q   Sure.
14     So would it be -- let me ask it this way:  You
15 would agree with me that it would be unreliable if
16 someone performs statistical analyses on demographics of
17 communities if those communities didn't have the same
18 age restrictions, right?
19 A   Not necessarily.
20 Q   Let me ask you this:  Would you agree with me
21 that analyses based on households without regard to the
22 age of their occupants, you're unable to conclude
23 anything about affordability for Black or White
24 households; do you agree with me on that?
25 A   I'm sorry.  Could you repeat that?

Page 27

1  Q   Sure.
2      Would you agree with me that analyses based on
3  households, without regard to their age of their
4  occupants, is unreliable to conclude anything about
5  affordability for Black and White households who are
6  likely to live in those proposed communities?
7  A   I believe that they need to be similar enough,
8  otherwise, you're looking at two different data sets
9  which may have different rates of affordability.  So you
10 want to find the best controlled, if you will, for the
11 most similar age groups.
12 Q   Sure.  And I'm just asking a yes-or-no
13 question here.  Do you agree with me that analyses based
14 upon households, without regard to the age of their
15 occupants, is unable to conclude anything about
16 affordability for Black and White households who are
17 likely to live in those proposed communities?
18     MS. GAINEY:  Object to form.
19 A   Not necessarily.  If those ages and those
20 groups ended up being similar, it doesn't -- it doesn't
21 mean that the results wouldn't be unreliable.
22 Q   But you don't think what I just said is an
23 accurate statement?
24 A   Not completely.
25 Q   Okay.  So I'm going to look at -- we'll read

Page 28

1  paragraph 26, and I'll read verbatim from your report
2  which provides, quote, analyses based on households
3  without regard to the age of their occupants, like
4  Dr. Fishkind's, is unable to conclude anything about
5  affordability for Black and White households who are
6  likely to live in the proposed community.
7      Did you see that?
8  A   I do.
9  Q   Is that your opinion?
10 A   It is.
11 Q   Is that accurate?
12 A   Yes.
13 Q   Because I think what you're getting at here is
14 that in order to have a reliable statistical analysis,
15 you have to be comparing apples to apples or, at least,
16 as closely as possible, right?
17 A   That's correct.  And that's -- one difference
18 is adding that statement of, like, Dr. Fishkind's
19 because he was looking at all the communities, and those
20 other communities are complete -- they're not intended
21 for seniors.  We have very large differences in ages
22 between those and so that is not reliable.
23 Q   Right.  Because -- it's not reliable because
24 when he's comparing the -- when he's comparing
25 communities to the proposed communities, your position

Page 29

1  is that the age restrictions of both comparators need to
2  be identical in order to have some type of reliability,
3  right?
4      MS. GAINEY:  Sorry.  I didn't mean to
5      interrupt you.
6      Object to form.
7  A   No.  I never opined about the restrictions
8  need to be identical.
9  Q   Well, what do they need to be, then?
10 A   They need to be similar.  As in this case,
11 they're both intended for seniors.
12 Q   So do you think that if a comparison was done
13 between communities that had different age restrictions,
14 do you think that that would be less reliable compared
15 to a comparison of communities that had identical age
16 restrictions?
17 A   I would be speculating because I don't know
18 what that data would actually look like.  It really
19 depends on how different the age distributions of the
20 people living there.
21 Q   When you're trying to find comparators -- do
22 you know what I mean when I say comparators?
23 A   I believe I do.
24 Q   Okay.  When you're trying to find a
25 comparative community to compare to the proposed

Page 30

1  community in this case, wouldn't it be -- wouldn't
2  you -- are you looking for a community that is as
3  similar as possible to the proposed community in terms
4  of age restrictions?
5      A   Yes.  I would look for a community as similar
6  as possible.
7      Q   So would you prefer to have a community that
8  is identical in terms of age restrictions as opposed to
9  one that is not?
10     A   I'd prefer to.  That would be the ideal
11 control, but it doesn't necessarily mean that one that
12 is very similar is going to be unreliable.
13     Q   So when we look at paragraph four of your
14 supplemental report, you say, quote, I've drawn several
15 conclusions from review of the demographic information
16 reports.
17         Do you see that?
18     A   Yes.
19     Q   And when you're referring to the demographic
20 information reports, are you referring to the
21 demographic information reports provided by the
22 plaintiffs or tenants of certain properties?
23     A   Yes.
24     Q   I believe that's reflected in paragraph two.
25 I'm not trying to hide the ball.  I just saw that.

Page 31

1      Q   So -- but in preparing and rendering your
2  opinions reflected in this supplemental report, you only
3  relied upon the demographic information report for the
4  Venue at Viera Senior Living, correct?
5      A   I wouldn't agree that that's entirely correct.
6      Q   Did you not testify earlier that you
7  disregarded the other four properties because they
8  didn't have age restrictions?
9          MS. GAINEY:  Object to form.
10     A   My analysis considered two stages of analysis.
11 The first did consider all of the communities, and my
12 conclusion was that the age-restricted community was
13 statistically different from the non-age restricted
14 communities.
15         So when you say that I didn't consider those
16 other data, I disagree with that.  It's from that
17 analysis that I concluded I should be excluding those
18 communities, and then I only create the estimate from
19 Venue at Viera.
20     Q   And when you say you create the estimate from
21 Venue at Viera, what do you mean?
22     A   I used the data to calculate the proportion of
23 Black tenants at Venue at Viera.
24     Q   And you did not use any other properties or
25 communities or any other data other than the Venue at

Page 32

1  Viera Senior Living to calculate the estimated Black
2  residents at the proposed Venue at Heritage Oaks,
3  correct?
4          MS. GAINEY:  Object to form.
5      A   The rates from the other communities are not
6  in the calculation for that nine to 10 percent figure,
7  but I did consider those rates in arriving -- to only
8  look at the rate at Venue at Viera.
9      Q   All right.  I mean, I guess I get what you're
10 saying, but I need to be more clear, right?
11         You, in this report, in your supplemental
12 report, you gave an opinion about what you estimate the
13 Black demographic of tenants at the proposed Venue at
14 Heritage Oaks would be; is that right?
15     A   Yes.  It includes that opinion.
16     Q   Okay.  And in terms of that opinion, did you
17 rely upon anything other than the Venue at Viera Senior
18 Living to estimate what the Black applicants would be --
19 excuse me -- the Black tenants would be for the proposed
20 Venue at Heritage Oaks?
21     A   That proportion is based only on the
22 demographics at Venue at Viera.  But I wouldn't go as
23 far as to say I didn't rely on the other rates.  Again,
24 I decided to only rely -- I'm sorry -- I decided to only
25 include the data from Venue at Viera because of my

Page 33

1  analysis of the other communities.
2      Q   Okay.  And you say here, at paragraph four,
3  the only comparable community in Brevard County in terms
4  of age restrictions is Venue at Viera; is that your
5  opinion?
6      A   I would add that that's specific to properties
7  that are either developed or managed by plaintiffs.  Of
8  those properties, the only one in Brevard County is
9  Venue at Viera.
10     Q   Did you consider any other communities or
11 properties in any of your analyses that were not managed
12 by plaintiffs?
13     A   I did not.
14     Q   And you say, quote, the estimated proportion
15 of Black tenants at Venue at Viera is 9.36 percent,
16 correct?
17     A   Correct.
18     Q   And then you go on to say, using an estimate
19 of 9.3 percent of the proportion of Black households
20 that could have occupied the affordable housing -- the
21 affordable units at the proposed community, I've
22 supplemented two of my opinions; do you see that?
23     A   I do.
24     Q   And that 9.36 percent that we just referred
25 to, that's taken from Venue at Viera, right?

Sean Malone, Ph.D.
March 19, 2025

Page 34

1    A    Yes.
2    Q    And when you say here, the proposed community,
3    you're referring to The Venue at Heritage Oaks, right?
4    A    Yes.
5    Q    Within your expert reports, do you have any
6    opinion on whether Brevard County's denial of
7    plaintiffs' bond application caused a disparate impact
8    on racial minorities?
9    A    No.  My opinions more relate to the
10   unreliability of the results that Dr. Fishkind has put
11   forward for disparate impact, and that he hasn't
12   presented any reliable statistical evidence.
13        I haven't done any -- produced an opinion
14   about whether or not there was disparate impact.
15   Q    Do you have any opinion on whether Brevard
16   County's denial of the plaintiffs' bond application
17   resulted in a segregated effect?
18   A    (No response.)
19   Q    Within your expert reports.
20   A    The only related opinions have to do with,
21   basically, the criticisms of Dr. Fishkind's showing that
22   his -- his opinions about segregative effects are
23   unreliable and that there's no reliable statistical
24   evidence presented.
25   Q    Right.  But did you do a statistical analysis

Page 35

1    of whether or not Brevard County's denial of the
2    plaintiffs' bond application resulted in a segregative
3    effect reflected in either of your expert reports?
4    A    I didn't do any separate independent analysis
5    of that.
6    Q    So I'm going to go to your initial report, and
7    I'm going to go to paragraph 64, and it provides, quote,
8    I have reviewed the expert report of Hank Fishkind,
9    September 12, 2024.  It's my opinion that the Fishkind
10   report presents no reliable statistical evidence that
11   the decision had a disparate impact on a protected
12   class.
13        Do you see that?
14   A    I do.
15   Q    When you have decision capitalized, what is
16   the -- what are you referring to by the quote, capital D
17   decision?
18   A    The capital D decision refers to the denial
19   on -- in the December 5, 2023, meeting at the county
20   commissioners.
21   Q    And that's -- and I think, colloquially, we
22   say that is when Brevard County denied plaintiffs' bond
23   application; is that your understanding?
24   A    Yes.
25   Q    And is this your opinion, what I just read to

Page 36

1    you?
2    A    It is.
3    Q    And is it accurate?
4    A    I believe it is.
5    Q    And is it still true?
6    A    Yes.
7    Q    And you have here:  Dr. Fishkind's analysis
8    was undermined with flawed methodology errors and
9    ignorant to the facts of this matter.
10        Do you see that?
11   A    I do.
12   Q    Okay.  Is that your opinion?
13   A    Yes.
14   Q    Is that accurate?
15   A    It is.
16   Q    Okay.  And have you -- I know you've reviewed
17   Dr. Fishkind's supplemental report, right?
18   A    I've reviewed it, yes.
19   Q    Right.  But you have not rendered any opinion
20   in your supplemental report as to whether or not
21   Dr. Fishkind's analysis in his supplemental report was
22   undermined with flawed methodology, errors, and ignorant
23   of the facts of the matter -- of this matter, correct?
24   A    Not in my report.
25   Q    That's correct, right?

Page 37

1    A    That's correct.
2    Q    And in your supplemental report, you have not
3    rendered any opinion as to whether or not Dr. Fishkind's
4    analysis in his supplemental report is -- presents no
5    reliable evidence that the decision had a disparate
6    impact on a protected class, correct?
7    A    Would you repeat that one more time?
8         MR. PICCOLO:  Madam Court Reporter?
9         (The pending question was read back by the
10   court reporter.)
11   A    My supplemental report does -- does not
12   address his supplemental report, so that would be
13   correct.
14   BY MR. PICCOLO:
15   Q    Your supplemental report contains no opinion
16   on whether the analysis in Dr. Fishkind's supplemental
17   report hinges on undocumented and unreliable estimates
18   with respect to the -- (inaudible) -- racial
19   segregation, correct?
20        THE COURT REPORTER:  I need you to repeat
21   that.
22        (Clarification by the Court Reporter.)
23        MR. PICCOLO:  No problem.
24   BY MR. PICCOLO:
25   Q    Dr. Malone, your supplemental report does not

Page 38

1  contain any expert opinion on whether or not
2  Dr. Fishkind's opinion on the decision perpetrating
3  racial segregation hinges on an undocumented and
4  unreliable estimate, correct?
5          MS. GAINEY:  Object to form.
6      A    Well, it does to the extent that he uses the
7  same bases for his opinion.  So if he's still relying on
8  the -- a 35 percent estimate that considers all of the
9  properties, it is -- it is the -- same opinion in
10 both reports would apply to a supplemental report, but
11 it doesn't directly fall out his supplemental report.
12     Q    Your supplemental report states nowhere that
13 Dr. Fishkind's opinion in his initial report is the same
14 as the opinion in the supplemental report, correct, sir?
15     A    No.  It doesn't say that.
16     Q    That's correct, right?
17     A    That's correct.
18     Q    In your supplemental report, you have no
19 expert opinions provided for as to the reliability of
20 the statistical analysis performed by Dr. Fishkind in
21 his supplemental report with respect to disparate impact
22 and segregated effect, correct?
23         MS. GAINEY:  Object to form.
24     A    I wouldn't say that's entirely true.  Again,
25 these opinions relating to reliability are true if he

Page 39

1  didn't correct for them in his supplemental analysis.
2      Q    I'm not talking about what's outside of the
3  report.  You authored your supplemental report, correct?
4      A    I did.
5      Q    Okay.  You know what's in your supplemental
6  report, correct?
7      A    Yes.
8      Q    And we've established earlier that there's no
9  reference, whatsoever, to Dr. Fishkind's supplemental
10 report in your supplemental report, correct?
11         MS. GAINEY:  Object to form.
12     A    That's correct.
13     Q    Okay.  And so, therefore, there's no opinion
14 of you, in your supplemental report, about the liability
15 or the validity of Dr. Fishkind's analysis in his
16 supplemental report, correct?
17         MS. GAINEY:  Object to form.
18     A    Again, I don't wholly agree with that
19 statement, because if he's still looking at communities
20 that are not age restricted in his other report, it
21 still means his analysis would be unreliable.  So the
22 opinions are about why the analysis is unreliable.
23     Q    So you're saying that the only way that your
24 expert report provides any -- shreds any light on
25 Dr. Fishkind's supplemental report is if he basically

Page 40

1  did the same exact thing he performed the same
2  analysis in his original report that he performed in his
3  supplemental report; is that what I'm hearing?
4      A    You'd be mishearing.  It's not that he'd do
5  the exact same thing, but he may make the same mistakes.
6      Q    But you have no opinion in your expert report
7  that he made any mistakes in his supplemental report,
8  correct?
9          MS. GAINEY:  Object to form.
10     A    My supplemental report doesn't describe what
11 he did in his supplemental report.  It doesn't mean that
12 he didn't make the same mistakes, and so I don't --
13 you're right -- I do not have an opinion that says he
14 made the same mistakes.
15     Q    You don't have an opinion in your supplemental
16 report about any mistakes that Dr. Fishkind made or
17 didn't make in his supplemental report, correct?
18     A    That's correct.
19     Q    In fact, in your supplemental report, you have
20 no analysis of Dr. Fishkind's statistical analysis
21 performed in his supplemental report, correct?
22     A    Yes.
23     Q    Okay.
24         MR. PICCOLO:  No further questions.
25         MS. GAINEY:  Nothing.

Page 41

1          MR. PICCOLO:  All right, Madam Court Reporter,
2  I will email you the exhibits.
3          And, Susan, I will get you -- I will email
4  Scott after this and see if he's available on
5  Monday.
6          MS. GAINEY:  That sound good.
7          THE COURT REPORTER:  Do you want me to
8  transcribe this?
9          MR. PICCOLO:  Yes, please.
10         MS. GAINEY:  We'll take a copy, and we'll read
11 and sign.  You can send to me and I'll forward it
12 to Dr. Malone.
13         (The reading and signing of this deposition
14 were reserved.)
15         (The deposition concluded at 2:05 p.m.)
16         (Plaintiffs' Exhibits 1 through 5 were marked
17 for identification.)
18
19
20
21
22
23
24
25

Page 42

1              CERTIFICATE OF REPORTER

2  STATE OF FLORIDA)

   COUNTY OF ORANGE)

3

4         I, JENNIFER B. SANDERS, Registered

5  Professional Reporter, Florida Professional Reporter, do

6  hereby certify that I was authorized to and did,

7  remotely, stenographically report the foregoing video

8  conference deposition of SEAN MALONE, PH.D.; that a

9  review of the transcript was requested; and that the

10 foregoing transcript, pages 4 through 41, is a true

11 record of my stenographic notes.

12        I FURTHER CERTIFY that I am not a relative,

13 employee, attorney or counsel of any of the parties, nor

14 am I a relative or employee of any of the parties'

15 attorneys or counsel connected with the action, nor am I

16 financially interested in the action.

17

18        Signed this 24th day of March 2025, Orange

19 County, Florida.

20

21

22         Jennifer B. Sanders, RPR, FPR-C

23

24

25

Page 43

1              CERTIFICATE OF OATH

2  STATE OF FLORIDA)

   COUNTY OF ORANGE)

3

4         I, Jennifer B. Sanders, Registered

5  Professional Reporter, Florida Professional Reporter, a

6  Notary Public for the State of Florida, certify that the

7  witness, SEAN MALONE, PH.D., remotely appeared before

8  me, via video conference, on this 19th day of March

9  2025, and was sworn remotely.

10        WITNESS my hand and official seal this 24th

11 day of March 2025.

12

13 Identification:  Texas Driver's License

14

15

16

17

18 Jennifer B. Sanders, RPR, FPR-C

   Notary Public - State of Florida

19 Commission #HH 582377

20 My Commission Expires: 9/16/2028

21

22

23

24

25

Page 44

1              ERRATA SHEET

2  DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

3   IN RE:  ATLANTIC HOUSING PARTNERS L.L.L.P., a Florida
    limited liability partnership, et al. v. BREVARD COUNTY,

4     a  political subdivision of the state of Florida

5            SEAN MALONE, PH.D.

6            March 19, 2025

7         U.S. Legal Job No. 6831134-001

8  _____

9  PAGE    LINE        CHANGE              REASON

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 Under penalties of perjury, I declare that I have read

   the foregoing document and that the facts stated in it

23 are true.

24 DATE:_____    _____

25                     Sean Malone, PH.D.

Page 45

1              WITNESS NOTIFICATION LETTER

2  March 24, 2025

3  Sean Malone, Ph.D.
   c/o Susan Gainey, Esquire

4  Roper P.A.
   255 S. Orange Avenue, Suite 750

5  Orlando, FL  32801

6  IN RE:  ATLANTIC HOUSING PARTNERS L.L.L.P v. BREVARD
   COUNTY

7         DEPOSITION TAKEN ON MARCH 19, 2025

8         U.S. LEGAL SUPPORT JOB NO.:  6831134-001

9

10 The transcript of the above-referenced proceeding has
   been prepared and is being provided to your office for

11 review by the witness.

12 We respectfully request that the witness complete their
   review within a reasonable amount of time and return the

13 errata sheet to our office at the below address or via
   email to:  Southeastproduction@uslegalsupport.com.

14

15 Sincerely,
   Jennifer B. Sanders, RPR, FPR-C

16 U.S. Legal Support, Inc.
   16825 Northchase Drive

17 Suite 800
   Houston, Texas  77060

18 (407) 649-9193

19

20 CC via transcript:  Michael Piccolo, Esquire

21

22

23

24

25

_____

**Exhibits**
_____

**EX 0001 Sean Malone, Ph.D.**
 **PLTF 031925**
 3:13 11:2,3,
 10,13,17,23
 12:11
**EX 0002 Sean Malone, Ph.D.**
 **PLTF 031925**
 3:15 12:16,
 21
**EX 0003 Sean Malone, Ph.D.**
 **PLTF 031925**
 3:17 12:24
 13:7 14:14
**EX 0004 Sean Malone, Ph.D.**
 **PLTF 031925**
 3:19 13:10
**EX 0005 Sean Malone, Ph.D.**
 **PLTF 031925**
 3:21 14:1,9,
 16
_____

_____
           **1**
_____

**1**
 11:2,3,10,
 13,17,23
 12:11 41:16
**10**
 20:16,22
 21:2 32:6
**10-percent**
 21:7
**11**
 6:5 12:6,7
 14:3
**12**
 6:3 12:16
 35:9

**19**
 12:8
_____

_____
           **2**
_____

**2**
 12:16,21
**20**
 25:11
**2023**
 6:12 7:15
 35:19
**2024**
 6:1,3 12:16
 13:1 35:9
**2025**
 6:5,7 12:7,8
 13:12 14:3
**21**
 6:7 13:12
**25**
 20:11,13
**26**
 25:19 28:1
**29**
 6:1 13:1
**2:05**
 41:15
_____

_____
           **3**
_____

**3**
 12:24 13:7
 14:14
**35**
 38:8
_____

_____
           **4**
_____

**4**
 13:10
_____

_____
           **5**
_____

**5**
 14:1,9,16

 35:19 41:16
**55**
 21:19,21
 24:20 25:2,
 6,10
**55-and-older**
 25:2
**55-plus**
 22:7 23:22
 24:17
_____

_____
           **6**
_____

**62-plus**
 21:19 22:7
**64**
 35:7
_____

_____
           **9**
_____

**9.3**
 33:19
**9.36**
 20:25 33:15,
 24
_____

_____
           **A**
_____

**able**
 10:5
**Accuracy**
 6:11
**accurate**
 20:21 26:5,6
 27:23 28:11
 36:3,14
**act**
 25:8,12,14,
 17
**add**
 33:6
**adding**
 28:18
**additional**
 12:2,4 17:13
 18:5

**address**
 37:12
**affect**
 4:21
**affordability**
 26:23 27:5,
 9,16 28:5
**affordable**
 33:20,21
**afternoon**
 4:10 8:1
**age**
 21:14,15,18
 22:1,2,4,6,
 8,10,15,17,
 18 23:10,13,
 19,21,24
 24:1,4,7,12,
 22,24 25:1,
 25 26:18,22
 27:3,11,14
 28:3 29:1,
 13,15,19
 30:4,8 31:8
 33:4 39:20
**age-restricted**
 20:14 31:12
**ages**
 26:10 27:19
 28:21
**ago**
 11:18
**agree**
 26:7,15,20,
 24 27:2,13
 31:5 39:18
**allow**
 8:6,7
**analyses**
 25:24 26:6,
 8,11,16,21
 27:2,13 28:2
 33:11
**analysis**
 21:8,9,11,12
 28:14 31:10,

17 33:1
34:25 35:4
36:7,21
37:4,16
38:20 39:1,
15,21,22
40:2,20

**analyze**
23:4

**analyzed**
21:3

**answer**
8:6,14,19
15:17

**answering**
8:8,10

**Antonio**
4:19 5:6

**anybody**
18:25

**anyone**
10:25

**apparent**
25:21

**apples**
28:15

**applicants**
32:18

**application**
34:7,16
35:2,23

**apply**
38:10

**appropriate**
26:11

**arrive**
16:25 21:1

**arriving**
32:7

**article**
9:8

**asked**
15:9,10 16:9
17:8,11

**asking**
8:7 27:12

**assume**
8:19

**assumption**
23:24

**assumptions**
10:19

**attached**
7:14

**author**
13:4,5 14:7

**authored**
9:22 14:6
16:16 17:5
39:3

**available**
41:4

**aware**
12:12

———————

**B**

**back**
18:22,23
19:17,18
37:9

**ball**
30:25

**based**
18:5 23:24
25:25 26:6,
21 27:2,13
28:2 32:21

**baseline**
7:25

**bases**
16:24 18:13
38:7

**basically**
21:19 34:21
39:25

**believe**
5:22 11:20
22:21 27:7
29:23 30:24
36:4

**below**
22:2

**benefit**
8:5 20:12

**best**
27:10

**bit**
19:2

**Black**
20:16 21:5
23:15 26:23
27:5,16 28:5
31:23 32:1,
13,18,19
33:15,19

**blank**
11:7

**bond**
34:7,16
35:2,22

**break**
8:12,15
18:25

**Brevard**
33:3,8 34:6,
15 35:1,22

**bring**
5:7,11,13

———————

**C**

**calculate**
31:22 32:1

**calculation**
32:6

**calculations**
9:14

**call**
8:24 10:11,
17

**capital**
35:16,18

**capitalized**
35:15

**case**
4:11 10:9
14:21 15:8,
15,25 16:3,
17 17:1

19:24 20:7
29:10 30:1

**cases**
6:9 7:18
20:2

**caused**
34:7

**certain**
30:22

**changed**
17:10

**chose**
23:7

**clarification**
37:22

**class**
35:12 37:6

**clean**
6:18 8:5

**clear**
32:10

**clients**
9:7

**closed**
7:2

**closely**
28:16

**closer**
24:23

**collectively**
13:22

**colloquially**
35:21

**commissioners**
35:20

**communicating**
10:16

**communications**
5:18 10:18
12:10

**communities**
6:10 21:9,14
22:23 23:5,
7,12 25:21
26:9,17
27:6,17

28:19,20,25
29:13,15
31:11,14,18,
25 32:5
33:1,10
39:19
**community**
20:15 21:18
23:8,15,17
24:20 28:6
29:25 30:1,
2,3,5,7
31:12 33:3,
21 34:2
**comparable**
33:3
**comparative**
29:25
**comparators**
29:1,21,22
**compare**
29:25
**compared**
29:14
**comparing**
26:8,9
28:15,24
**comparison**
29:12,15
**compensation**
20:6
**compilation**
11:15,22
**complete**
14:19 15:13,
24 28:20
**completed**
15:2
**completely**
27:24
**comply**
25:16
**comport**
22:18
**conclude**
26:22 27:4,
15 28:4

**concluded**
31:17 41:15
**conclusion**
31:12
**conclusions**
30:15
**conducting**
4:24
**consider**
31:11,15
32:7 33:10
**considered**
18:19 19:9
31:10
**considers**
38:8
**contains**
19:20 37:15
**control**
30:11
**controlled**
27:10
**copies**
5:9,15,20,24
6:17
**copy**
5:8,13,20
6:8,10 41:10
**correct**
7:5,7 10:2,
21,22 12:11,
12 16:5,14,
15 17:3,16,
18,22,23
18:2,9 21:16
22:19 24:14
28:17 31:4,5
32:3 33:16,
17 36:23,25
37:1,6,13,19
38:4,14,16,
17,22 39:1,
3,6,10,12,16
40:8,17,18,
21
**correctly**
23:2

**corresponded**
10:12,14
**counsel**
17:7,24 18:4
**county**
33:3,8
35:19,22
**County's**
34:6,16 35:1
**course**
4:16 5:9,12,
19 8:18 10:3
12:19 13:6,
17,19 14:9,
13 20:23
**court**
8:2 18:21,24
19:3,5,16,19
37:8,10,20,
22 41:1,7
**create**
31:18,20
**created**
11:25 19:20
**creation**
12:9
**criteria**
23:18
**criticisms**
34:21
**Culp**
22:14
**current**
15:25 16:1
**cutoffs**
24:7

---

**D**

---

**data**
6:12 18:18
19:8 21:5
23:16 25:24
27:8 29:18
31:16,22,25
32:25

**date**
7:13
**dated**
12:15 13:1,
12 14:3
**dates**
17:5
**December**
35:19
**decided**
32:24
**decision**
35:11,15,17,
18 37:5 38:2
**demographic**
20:13 21:3
22:23 23:6
30:15,19,21
31:3 32:13
**demographics**
25:21 26:9,
16 32:22
**demonstrates**
25:23
**denial**
34:6,16
35:1,18
**denied**
35:22
**depending**
24:8
**depends**
29:19
**deposed**
7:10,12,16,
18
**deposition**
4:16,24 5:9,
12,19 7:23
8:18,23 9:5
10:2,8,25
11:3,4,5,10,
13,17,23
12:11,16,20,
21,25 13:6,
7,11,17,20
14:1,9,10,

Sean Malone, Ph.D.
March 19, 2025

13,15,16
20:3 22:14
41:13,15

**depositions**
7:20

**describe**
40:10

**desktop**
6:20

**developed**
33:7

**development**
20:15

**devices**
7:8

**difference**
28:17

**differences**
24:4 25:21
28:21

**different**
21:13 24:8,
22 26:10
27:8,9
29:13,19
31:13

**digital**
5:13,20

**DIRECT**
4:8

**directly**
38:11

**disagree**
31:16

**disclose**
17:8

**disparate**
6:8 25:23
34:7,11,14
35:11 37:5
38:21

**disregarded**
31:7

**distributions**
29:19

**document**
6:10 11:7

13:2,4,5,13,
14,15 14:4,6

**documents**
5:8,15,17
6:13,17 9:2,
4 10:4
11:12,16,22,
25 12:9,13

**downloaded**
7:1

**drawn**
30:14

**duces**
11:4

**duly**
4:4

_____

**E**

_____

**earlier**
9:8 31:6
39:8

**early**
11:19,20

**effect**
34:17 35:3
38:22

**effects**
34:22

**either**
13:16 16:13
21:19 22:7
33:7 35:3

**Elderly**
25:17

**electronic**
5:8 6:14

**electronicall
y**
10:13,14

**email**
10:16 41:2,3

**end**
21:2

**ended**
27:20

**ensure**
11:24

**entirely**
31:5 38:24

**errors**
36:8,22

**established**
39:8

**estimate**
20:25 23:14
31:18,20
32:12,18
33:18 38:4,8

**estimated**
32:1 33:14

**estimates**
37:17

**ethnicity**
21:5

**evidence**
34:12,24
35:10 37:5

**exact**
24:7 40:1,5

**exactly**
10:5 24:2

**EXAMINATION**
4:8

**examined**
4:5

**exclude**
22:1 23:7

**excluding**
31:17

**exclusively**
25:10

**excuse**
8:7 14:2
32:19

**Exhibit**
11:2,3,9,10,
13,16,17,23
12:1,10,11,
16,21,24
13:7,10
14:1,9,14,16

**exhibits**
19:13,20
41:2,16

**expected**
20:16

**expert**
5:15 6:2,4,6
9:2,3,19
10:20 12:15
13:11 14:2,
19 15:1,8,
12,13,24
16:3,9,16,20
17:1 18:12,
13 19:12,14,
23,24 20:1,
3,5 34:5,19
35:3,8 38:1,
19 39:24
40:6

**express**
14:20 15:14,
25 16:3

**extent**
38:6

_____

**F**

_____

**fact**
40:19

**facts**
10:19 16:25
18:18 19:8
36:9,23

**fair**
6:9 8:20,21
19:11

**fall**
38:11

**far**
32:23

**February**
11:19

**figure**
32:6

**file**
5:13,20 6:14

Sean Malone, Ph.D.
March 19, 2025

7:1 9:2,4
19:7
**filed**
9:15 10:9
17:7
**files**
6:14 10:5
12:4
**final**
9:13
**finally**
13:25
**find**
21:4 27:10
29:21,24
**finish**
8:7
**first**
4:4 7:14
31:11
**Fishkind**
6:2,7 12:15
13:12 15:4
17:6 34:10
35:8,9 38:20
40:16
**Fishkind's**
10:8 12:21
13:16,20,21,
22,23 16:8
17:15,21
18:1,5,9
28:4,18
34:21 36:7,
17,21 37:3,
16 38:2,13
39:9,15,25
40:20
**five**
7:17,19
**flawed**
36:8,22
**follow-up**
8:9
**follows**
4:6

**form**
15:16 16:6
17:9,17,25
18:3,4 19:9
24:15 27:18
29:6 31:9
32:4 38:5,23
39:11,17
40:9
**formal**
17:14
**formalize**
17:11
**formalized**
15:6 16:8
**forming**
15:2 18:19
**forward**
34:11 41:11
**four**
11:6 20:2
30:13 31:7
33:2
**front**
6:22 22:20
**full**
4:12,14
**future**
15:21

---

**G**

**Gainey**
8:24 10:12,
13,14,20,24
15:16 16:6
17:17 18:3,
25 24:15
27:18 29:4
31:9 32:4
38:5,23
39:11,17
40:9,25
41:6,10
**gave**
32:12

**general**
16:22 17:2
**Generally**
16:21
**getting**
28:13
**give**
4:22 20:7
22:3
**given**
7:21
**going**
4:15 5:18
12:14,20
13:7,10,15,
25 14:8
15:21 20:7,
10 23:10
27:25 30:12
35:6,7
**good**
4:10 41:6
**governed**
25:16
**groups**
27:11,20
**guess**
32:9

---

**H**

**handwritten**
6:16
**Hank**
6:2,6 12:15
35:8
**hard**
5:8,14,20,24
6:17
**hearing**
40:3
**Heritage**
23:9,10,20,
25 24:5,6,19
25:1,3 32:2,
14,20 34:3

**hide**
30:25
**hinges**
37:17 38:3
**hold**
14:24
**household**
21:25 22:8,
10 23:22
25:1,5
**households**
20:16 23:15
25:9,24
26:8,9,21,24
27:3,5,14,16
28:2,5 33:19
**housing**
6:9 23:11
25:8,14,16
33:20

---

**I**

**ideal**
30:10
**identical**
29:2,8,15
30:8
**identificatio
n**
41:17
**identified**
21:5
**identify**
5:24
**ignorant**
36:9,22
**impact**
6:9 25:23
34:7,11,14
35:11 37:6
38:21
**important**
25:23
**IMS**
5:4

Sean Malone, Ph.D.
March 19, 2025

inaccurately
  9:24
inaudible
  37:18
include
  32:25
included
  6:13 16:10,
  13
includes
  32:15
including
  9:2
Inclusive
  6:9
independent
  35:4
influence
  4:20
information
  17:10 20:13,
  14 21:3 23:6
  30:15,20,21
  31:3
initial
  9:17 12:21
  13:8,21
  14:14 16:10,
  13 18:7,17
  35:6 38:13
instructed
  17:24
instructions
  8:1
intended
  23:11,13
  24:3,9,12,
  13,17,20,21
  25:7,22
  28:20 29:11
intending
  15:7
interrupt
  29:5
invoices
  9:6

issued
  12:2

**J**

January
  6:7 13:12
June
  7:15

**K**

keep
  24:11
know
  8:13,19 10:3
  15:20 25:15,
  18 29:17,22
  36:16 39:5

**L**

laptop
  6:20,21 7:3
large
  28:21
late
  11:19
Legal
  5:4
liability
  39:14
light
  39:24
line
  7:4,8
link
  10:17
list
  9:12 20:1
listed
  9:8
listing
  15:18
little
  19:2

live
  4:19 21:20
  25:25 27:6,
  17 28:6
living
  21:17 22:15
  23:13 29:20
  31:4 32:1,18
located
  5:3,5
long
  11:6
look
  20:9,10
  23:16 27:25
  29:18 30:5,
  13 32:8
looked
  9:7,9 17:19
looking
  6:19 23:14
  24:9 27:8
  28:19 30:2
  39:19

**M**

Madam
  8:2 18:21
  19:3,16 37:8
  41:1
made
  15:19 40:7,
  14,16
make
  8:10,15,25
  13:23 14:11,
  17 40:5,12,
  17
Malone
  4:3,14,15,18
  6:1,5 11:6
  13:1 14:3
  37:25 41:12
managed
  33:7,11

manner
  17:7
March
  6:5 11:19,20
  12:6,7,8
  14:3
mark
  12:14,24
  13:10 14:1
marked
  11:3 41:16
material
  9:11
materials
  9:10,16,25
matter
  36:9,23
maximum
  25:11
mean
  27:21 29:4,
  22 30:11
  31:21 32:9
  40:11
means
  39:21
medication
  4:21
meet
  17:2,4 22:1
  23:17
meeting
  35:19
member
  21:25 22:7,
  11
members
  23:22 25:6
methodology
  36:8,22
Michael
  4:10
Microdata
  6:11
mind
  19:3

Sean Malone, Ph.D.
March 19, 2025

mine
  18:6
minimum
  23:21 24:25
minorities
  34:8
mishearing
  40:4
mistakes
  40:5,7,12,
  14,16
mixed
  24:17
Monday
  41:5
monitor
  6:20,21,22

**N**

name
  4:10,12,14
  21:17
names
  9:13
nature
  17:11
necessarily
  26:19 27:19
  30:11
need
  7:13 8:12
  25:6 27:7
  29:1,8,9,10
  32:10 37:20
needs
  16:20
never
  29:7
nine
  32:6
non-age
  31:13
notes
  6:16
notice

  11:5
November
  6:1 13:1
number
  21:2,7

**O**

Oaks
  23:9,10,20,
  25 24:6,19
  25:1,4 32:2,
  14,20 34:3
oath
  4:5 8:1
Object
  15:16 16:6
  17:17 18:3
  24:15 27:18
  29:6 31:9
  32:4 38:5,23
  39:11,17
  40:9
occupants
  26:22 27:4,
  15 28:3
occupied
  33:20
office
  10:15
offices
  5:4
okay
  4:16,17,20
  5:11,23 6:19
  7:3 12:7,14,
  19,22,23
  13:8,17
  15:20,23
  19:11 27:25
  29:24 32:16
  33:2 36:12,
  16 39:5,13
  40:23
older
  21:22 22:8
  24:20,21

  25:2,6,8,14
one
  6:22 7:1
  8:24 10:11
  12:2 22:7,
  10,13 23:17,
  21 25:5
  28:17 30:9,
  11 33:8 37:7
open
  6:25
opined
  29:7
opinion
  10:20 20:19
  22:4 23:24
  26:3,4 28:9
  32:12,15,16
  33:5 34:6,
  13,15 35:9,
  25 36:12,19
  37:3,15
  38:1,2,7,9,
  13,14 39:13
  40:6,13,15
opinions
  14:20,22,24,
  25 15:2,5,
  14,18,21,25
  16:3,7,12,
  24,25 17:9,
  12,13,14,25
  18:5,11,14,
  16,19 19:9,
  14,21 31:2
  33:22 34:9,
  20,22 38:19,
  25 39:22
opposed
  23:5 30:8
order
  21:19 22:8
  28:14 29:2
original
  40:2
outside
  39:2

**P**

p.m.
  41:15
page
  11:6
pages
  11:6
paid
  20:6
papers
  5:7
paragraph
  20:11,12
  25:19 28:1
  30:13,24
  33:2 35:7
pending
  8:14 18:23
  19:5,18 37:9
people
  24:21 25:10
  29:20
percent
  20:16,22,25
  21:2 25:11
  32:6 33:15,
  19,24 38:8
perform
  11:15
performed
  38:20 40:1,
  2,21
performing
  11:21
performs
  26:8,16
perpetrating
  38:2
persons
  4:25 25:8,
  14,17
Ph.d.
  4:3 13:1
  14:3

phone
  6:20 8:24
  10:11
phones
  7:4
phrased
  9:23
physically
  4:25
Piccolo
  4:9,11 18:21
  19:2,10,16
  37:8,14,23,
  24 40:24
  41:1,9
plaintiff
  21:10
plaintiffs
  4:11 22:22
  23:5 30:22
  33:7,12
plaintiffs'
  34:7,16
  35:2,22
  41:16
please
  4:12 8:18
  18:20,22
  26:12 41:9
point
  10:4 14:23,
  24 15:19
  19:21
position
  28:25
possible
  25:8 28:16
  30:3,6
prefer
  30:7,10
preliminary
  15:5
preparation
  8:22 9:4
  10:1,7,25
prepared
  9:1 18:8

preparing
  15:7 31:1
present
  5:1
presented
  34:12,24
presents
  35:10 37:4
previous
  20:2
previously
  16:17
printed
  5:14 6:18
prior
  8:24 18:8
problem
  10:7 37:23
produced
  11:12 34:13
production
  11:16,22
properties
  24:23 30:22
  31:7,24
  33:6,8,11
  38:9
property
  24:9
proportion
  20:16 21:4
  23:14 31:22
  32:21 33:14,
  19
proposed
  20:15 23:8,
  15,16,19
  24:19 27:6,
  17 28:6,25
  29:25 30:3
  32:2,13,19
  33:21 34:2
protected
  35:11 37:6
provide
  20:5 22:22

provided
  5:14 16:20
  19:8 23:6
  30:21 38:19
provides
  20:13 22:17
  28:2 35:7
  39:24
Proving
  6:8
Public
  6:11
publishing
  15:7
put
  17:25 34:10

─────────────
         Q
─────────────

qualifications
  19:24
qualify
  22:8 25:25
qualifying
  22:10
question
  8:6,7,8,9,
  10,14,17,19
  18:20,23
  19:5,15,18
  26:12 27:13
  37:9
questions
  40:24
quick
  9:6
quote
  21:1,2 25:20
  28:2 30:14
  33:14 35:7,
  16

─────────────
         R
─────────────

race
  21:4

racial
  34:8 37:18
  38:3
rate
  32:8
rates
  27:9 32:5,7,
  23
read
  18:22,23
  19:17,18
  27:25 28:1
  35:25 37:9
  41:10
reading
  41:13
reasons
  18:13
rebuttal
  5:25 6:6
  12:25 13:11,
  16,22
recall
  10:5
received
  10:16,18,22
  17:5
receiving
  12:9
recent
  9:14
recently
  10:21
record
  4:13 8:5
  20:12
refer
  4:15 5:9,11,
  18 7:13
  12:20 13:7,
  15,20 14:8,
  14
reference
  9:12 17:20
  39:9
referenced
  16:12

**referred**
  5:21 25:12
  33:24
**referring**
  30:19,20
  34:3 35:16
**refers**
  35:18
**reflected**
  14:25 16:4
  17:15,21
  18:6,7,12,16
  19:14 30:24
  31:2 35:3
**reflective**
  21:7,11
**regard**
  26:21 27:3,
  14 28:3
**regarding**
  8:13 10:19
**relate**
  34:9
**related**
  16:7 34:20
**relating**
  38:25
**reliability**
  29:2 38:19,
  25
**reliable**
  28:14,22,23
  29:14 34:12,
  23 35:10
  37:5
**relied**
  16:25 31:3
**rely**
  10:19 25:24
  32:17,23,24
**relying**
  38:7
**rendered**
  36:19 37:3
**rendering**
  31:1

**repeat**
  18:20 19:15
  26:12,25
  37:7,20
**repeating**
  19:3
**report**
  5:25 6:2,4,6
  7:14 9:15,
  17,18,20
  10:1 12:3,4,
  15,17,20,22,
  25 13:8,11,
  16,21,22
  14:2,8,10,
  14,15 15:3,
  4,6,8 16:8,
  9,11,14,16
  17:6,9,15,
  16,20,21,22
  18:1,2,6,8,
  9,17 19:23
  20:1,10,25
  25:20 28:1
  30:14 31:2,3
  32:11,12
  35:6,8,10
  36:17,20,21,
  24 37:2,4,
  11,12,15,17,
  25 38:10,11,
  12,13,14,18,
  21 39:3,6,
  10,14,16,20,
  24,25 40:2,
  3,6,7,10,11,
  16,17,19,21
**reporter**
  8:2 18:21,24
  19:4,6,16,19
  37:8,10,20,
  22 41:1,7
**reports**
  5:16 9:2,3,
  10,21 10:9
  13:21,23
  14:16,19
  15:1,13,24

  16:4,5,20
  17:1,4
  18:12,13,18
  19:7,12,14,
  22 20:5,14
  21:3 22:23
  30:16,20,21
  34:5,19 35:3
  38:10
**represent**
  4:11
**representativ
e**
  23:16
**reputes**
  11:4 12:15,
  25 13:11
**request**
  8:6
**requested**
  11:13,16
**requirements**
  16:19,21,23
  17:2,4 22:1,
  2,6 24:7
**reread**
  19:5
**reserved**
  41:14
**reside**
  4:18 21:22
**resided**
  25:3
**residents**
  21:22 22:2,9
  25:3 32:2
**respect**
  10:20 18:11,
  16 21:9
  37:18 38:21
**response**
  34:18
**responsive**
  11:22 12:1,
  10,13
**rest**
  21:12

**restricted**
  21:14,15
  23:10 31:13
  39:20
**restriction**
  22:4
**restrictions**
  21:19 22:16,
  17,19 23:12,
  19,25 24:1,
  5,12,22,24
  25:25 26:18
  29:1,7,13,16
  30:4,8 31:8
  33:4
**resulted**
  34:17 35:2
**results**
  27:21 34:10
**resume**
  7:13
**review**
  9:4,6,16
  10:8 30:15
**reviewed**
  9:1,8,18,19,
  21,25 10:4
  15:4 35:8
  36:16,18
**right**
  4:24 5:17
  6:24 7:25
  8:22 9:23
  11:2,9,21
  12:14 13:19,
  25 15:21
  20:9 21:24
  26:11,18
  28:16,23
  29:3 32:9,
  10,14 33:25
  34:3,25
  36:17,19,25
  38:16 40:13
  41:1
**Robert**
  6:10

room
    5:1,2
rounded
    20:22,24
rule
    8:13

—————————

S

—————————

Sample
    6:11
San
    4:19 5:6
saying
    24:11 25:2,
    4,5 32:10
    39:23
says
    40:13
Schwemm
    9:7
Schwenn
    6:10
Scott
    22:14 41:4
screen
    7:3 20:10
screens
    7:4
Sean
    4:3,14 5:25
    6:4 11:5
    13:1 14:3
search
    11:15,21
    12:2
searches
    11:24
second
    15:3 16:8
see
    20:17 26:1
    28:7 30:17
    33:22 35:13
    36:10 41:4
segregated
    34:17 38:22

segregation
    37:19 38:3
segregative
    34:22 35:2
send
    41:11
sending
    12:9
senior
    21:17 22:15
    23:13 31:4
    32:1,17
seniors
    21:18 23:11
    24:3,10,12,
    13,20 25:7,
    22 28:21
    29:11
sense
    8:10,15
    13:23 14:11,
    17
separate
    35:4
September
    6:3 12:16
    35:9
served
    18:8
sets
    27:8
several
    22:13 30:14
show
    20:14
showing
    34:21
shows
    21:12
shreds
    39:24
sight
    7:4,9
sign
    41:11
signing
    41:13

similar
    23:8 27:7,
    11,20 29:10
    30:3,5,12
sir
    4:10 38:14
sit
    15:12,23
    16:2
slightly
    24:22
solely
    23:4
sound
    41:6
sources
    22:13
speak
    10:24
specific
    33:6
speculating
    29:17
spreadsheets
    9:13
stages
    31:10
start
    8:8
state
    4:12 25:20
statement
    10:23 14:20,
    22 15:14,24
    20:5 27:23
    28:18 39:19
states
    38:12
statistical
    26:8,11,16
    28:14 34:12,
    23,25 35:10
    38:20 40:20
statistically
    21:13 31:13
Strategies
    5:4

study
    20:6
subpoena
    11:4
substance
    4:21
summarize
    19:13,21
supplemental
    6:4 9:15,19
    10:1,4 12:3
    13:16 14:1,
    2,10,15 15:3
    16:11,13
    17:6,15,16,
    20,21,22
    18:1,5,9,17
    20:9 25:20
    30:14 31:2
    32:11 36:17,
    20,21 37:2,
    4,11,12,15,
    16,25 38:10,
    11,12,14,18,
    21 39:1,3,5,
    9,10,14,16,
    25 40:3,7,
    10,11,15,17,
    19,21
supplemented
    33:22
support
    19:13
supporting
    9:9,11,16,25
supposed
    25:16
sure
    5:25 8:25
    24:25 26:13
    27:1,12
Susan
    41:3
sworn
    4:4

Sean Malone, Ph.D.
March 19, 2025

**T**

tab
  7:1
tabs
  6:24
take
  8:12 41:10
taken
  6:16 33:25
taking
  11:5
talking
  39:2
tecum
  11:4
tell
  4:4 5:23
tenants
  21:4 30:22
  31:23 32:13,
  19 33:15
terms
  30:3,8 32:16
  33:3
testified
  4:5 20:3
testify
  19:24 31:6
testimony
  4:21 20:7
  23:1
Texas
  4:19 5:6
Thanks
  8:16
thing
  40:1,5
think
  23:2 27:22
  28:13 29:12,
  14 35:21
third
  7:23
time

  7:12 8:12
  10:3,14
  14:23,25
  15:19 17:9
  37:7
times
  7:16
Timothy
  4:3,14
titled
  6:11
titles
  5:23
today
  6:18 8:23,25
  10:8,25 12:8
  15:12,23
  16:2 17:3
today's
  9:5 10:1,17
transcribe
  41:8
transcribing
  8:2
trial
  20:3
true
  36:5 38:24,
  25
truth
  4:5
try
  8:8
trying
  29:21,24
  30:25
two
  6:13 7:18
  27:8 30:24
  31:10 33:22
type
  29:2

**U**

unable
  26:22 27:15

  28:4
undermined
  36:8,22
understand
  8:3,17
  16:19,21
  23:1 24:13,
  16 25:6
understanding
  16:22 17:2
  21:21,23,24
  22:4,18
  23:23 35:23
understood
  8:20 17:6
  18:4
undocumented
  37:17 38:3
units
  25:11 33:21
unreliability
  34:10
unreliable
  26:15 27:4,
  21 30:12
  34:23 37:17
  38:4 39:21,
  22
untimely
  17:7,11

**V**

validity
  39:15
various
  22:15
Venue
  21:5,8,11,
  13,16,17,20,
  22 22:5,15,
  19,24 23:4,
  9,17,20,25
  24:1,5,6,16,
  17,19,20
  25:1,3,15
  31:4,19,21,

  23,25 32:2,
  8,13,17,20,
  22,25 33:4,
  9,15,25 34:3
verbatim
  28:1
versus
  24:6
video
  11:5
Viera
  21:6,8,12,
  13,16,17,20,
  22 22:5,15,
  19,24 23:4,
  17 24:1,6,
  16,21 25:15
  31:4,19,21,
  23 32:1,8,
  17,22,25
  33:4,9,15,25

**W**

want
  23:15 27:10
  41:7
way
  26:14 39:23
website
  22:14,17,20
week
  8:25 10:12
weeks
  11:18
whatsoever
  39:9
When's
  7:12
White
  26:23 27:5,
  16 28:5
wholly
  39:18
WITNESS
  4:7

Sean Malone, Ph.D.
March 19, 2025

---

**Y**

---

**yeah**
  19:2 24:11
**years**
  7:17,19 20:2
  24:8
**yes-or-no**
  27:12

---

**Z**

---

**Zoom**
  4:25 6:25

# EXHIBIT 8

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS,
L.L.L.P., a Florida limited
liability partnership;
CANTON CONSTRUCTION, LLC, a
Florida limited liability
corporation; CONCORD
MANAGEMENT, LTD., a Florida
limited partnership; THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD.,

        Plaintiffs,

vs.

BREVARD COUNTY, a political
subdivision of the state of
Florida,

        Defendant.

_____/


VIDEO-RECORDED DEPOSITION OF THE CORPORATE
REPRESENTATIVE FOR ATLANTIC HOUSING PARTNERS, L.L.L.P.,
PURSUANT TO FLORIDA RULE OF CIVIL PROCEDURE 30(B)(6)


DEPONENT:   W. SCOTT CULP

DATE:      Tuesday, March 18, 2025

TIME:      9:34 a.m. to 4:30 p.m.

PLACE:     Lowndes, Drosdick, Doster,
             Kantor & Reed, P.A.
             215 North Eola Drive
             Orlando, Florida 32801


Stenographically Reported By: Andrea C. Rivera
Professional Court Reporter, Notary Public

W. Scott Culp
March 18, 2025

Page 2

                    APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
     BY:  MICHAEL D. PICCOLO, ESQUIRE
     LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.
     215 North Eola Drive
     Orlando, Florida 32801
     407-843-4600
     michael.piccolo@lowndes-law.com

ON BEHALF OF THE DEFENDANT:
     BY:  SUSAN G. GAINEY, ESQUIRE
     ROPER, TOWNSEND & SUTPHEN, P.A.
     2707 East Jefferson Street
     Orlando, Florida 32803
     407-897-5150
     sgainey@roperpa.com

ALSO PRESENT:  DESTINEY OTALVARO (Legal videographer)

Page 3

                 INDEX OF PROCEEDINGS

DEPOSITION OF W. SCOTT CULP

Direct Examination by Ms. Gainey              5

Certificate of Oath                         242

Certificate of Reporter                     243

Witness Review Letter                       244

Errata Sheet                                245

                    -----

                DEFENDANT'S EXHIBITS

Number        Description                   Page

Exhibit 1     Subpoena duces tecum            6
Exhibit 2     Mr. Missignan's report         11
Exhibit 3     Fifteen-year pro formas        73
Exhibit 4     Sources and uses statements    83
Exhibit 5     Estimated 2024 incoming rents  88
Exhibit 6     Rent calculations              88
Exhibit 7     Table of rents                 92
Exhibit 8     Interrogatories               134
Exhibit 9     Large stack of documents      135
Exhibit 10    Plaintiffs' responses         138
Exhibit 11    Venue at Viera Senior Living  150
Exhibit 12    Dr. Fishkind's production file 151
Exhibit 13    E-mail dated 12/3/2023        178
Exhibit 14    E-mails dated 12/4/2023       192
Exhibit 15    E-mails dated 11/14/2023      193
Exhibit 16    Memo to Scott Culp            213
Exhibit 17    E-mail 11/29/2023 w/attachments 213
Exhibit 18    E-mails dated 10/2/2023       218
Exhibit 19    Letter dated 7/28/2023        219
Exhibit 20    Land use and comprehensive    222
Exhibit 21    Credit underwriting report    224
Exhibit 22    AHP's organizational chart    226
Exhibit 23    E-mails dated 12/7/2023       227
Exhibit 24    Letter dated 12/6/2023        228

Page 4

          Proceedings taken before Andrea C. Rivera,
Professional Court Reporter and Notary Public, in and
for the State of Florida at Large in the above cause.
          - - - - - - -
THEREUPON:
          The following proceedings occurred:
          THE VIDEOGRAPHER:  Good morning.  We are now
on the record on March 18th, 2025 at 9:34 a.m.
Audio and video recording will continue to take
place until all parties agree to go off the record.
Please note that microphones are sensitive and may
pick up whispering and private conversations.
          This is the video-recorded proceeding of
witness Scott Culp, corporate representative of
Atlantic Housing Partners, L.L.L.P., taken by
counsel for defendant in the matter of Atlantic
Housing Partners, L.L.L.P. versus Brevard County,
filed in the United States District Court, Middle
District of Florida, Orlando Division.  This
proceeding is being held at 215 North Eola Drive,
Orlando, Florida 32802.
          My name is Destiney Otalvaro.  I'm the
videographer on behalf of U.S. Legal Support.  The
court reporter is Andrea Rivera on behalf of U.S.
Legal Support.  Counsel will state their

Page 5

appearances for the record, after which the court
reporter will swear in the witness.
          MR. PICCOLO:  Michael Piccolo here on behalf
of the plaintiffs.
          MS. GAINEY:  Susan Gainey for the defendant.
          THE COURT REPORTER:  Please raise your right
hand.
                    W. SCOTT CULP,
having been first duly sworn or affirmed to tell
the truth, was examined and testified as follows:
          THE WITNESS:  I do.
                 DIRECT EXAMINATION
BY MS. GAINEY:
     Q    Please state your name for the record.
     A    Scott Culp.
     Q    Mr. Culp, nice to meet you again.  You know
I'm Susan Gainey.  I represent the defendant in this
lawsuit, and I'm going to be asking you various
questions today.  I understand that you have been
designated the corporate representative for actually all
four plaintiffs in this case; is that correct?
     A    That's correct.
     Q    For purposes of this first deposition, I'd
like to just have you be designated as the
representative of Atlantic Housing Partners, L.L.L.P.

W. Scott Culp
March 18, 2025

Page 6

1    And if there is anything I ask you about during the
2    course of this deposition that is more appropriately
3    asked of another party, then just let me know.  But I
4    did send you a subpoena with regard to Atlantic Housing
5    L.L. -- Atlantic Housing Partners, L.L.L.P.  And you
6    received that subpoena?
7        A    Yes, I have.
8        Q    And I have showed you what we are going to
9    mark as Defendant's Exhibit 1, and ask you if that's the
10   subpoena you received pursuant to Federal Civil
11   Procedure 30(b)(6)?
12       A    Yes, it's a copy.
13            (Defendant's Exhibit 1 was marked for
14       identification.)
15   BY MS. GAINEY:
16       Q    And attached to that subpoena are various
17   items of inquiry under exhibit A.  Have you reviewed
18   exhibit A prior to your deposition here today?
19       A    Yes.
20       Q    And in your capacity as the 30(b)(6)
21   representative of Atlantic Partners -- Atlantic Housing
22   Partners, L.L.L.P., what is your designation, officer,
23   director, managing agent?
24       A    I am a manager of the general partner of
25   Atlantic Housing Partners, L.L.L.P.

Page 7

1        Q    All right.  And for purposes of today, I'll
2    either say Atlantic Housing or AHP or maybe some
3    variation of that.  You understand that we're all asking
4    you about Atlantic Housing Partners, L.L.L.P., correct?
5        A    Yes.
6        Q    And you are the person who is most
7    knowledgeable and, as so, designated regarding the
8    matters of inquiry under exhibit A?
9        A    I believe so.
10       Q    Are there any areas of inquiry as identified
11   in exhibit A that you are not the most knowledgeable
12   person for Atlantic Housing Partners, L.L.L.P.?
13       A    The only question in that regard is with
14   regard to expert opinions with regard to damages.  I am
15   knowledgeable and probably most knowledgeable with
16   regard to the facts concerning the damages.  I don't
17   know how to answer the question with regard to most
18   knowledgeable compared to an expert preparing damages.
19   Does that make sense?
20       Q    Well, which specific number are you referring
21   to?
22       A    Two.
23       Q    And number two asks for all documents and
24   communications relied on to support plaintiffs' claim
25   for damages including, but not limited to, estimated

Page 8

1    rent or rent calculations for Venue at Heritage Oaks,
2    operating pro formas for Venue at Heritage Oaks, voucher
3    income and other income, annual rent variance and
4    sources and uses statement for Venue at Heritage Oaks,
5    close quote.  Is that what number two says?
6        A    It does.
7        Q    All right.  And so you don't believe that you
8    are the most knowledgeable person at Atlantic Housing
9    Partners, L.L.L.P. in response to number two?
10       A    I didn't say that.  My question was with
11   regard -- and I think reading now number two, you're
12   talking about documents and communication relied on.
13   And I have as much knowledge as anyone with regard to
14   the documents and communication relied on.
15       Q    Yea, I think that's probably a fair
16   assessment.  I understand that the plaintiffs have hired
17   an expert in this case by the name of Dr. Hank Fishkind,
18   correct?
19       A    Dr. Fishkind is not an expert provided by us
20   with regard to damages.
21       Q    And also Paul Missigman who's been designated
22   at your trial Rule 26 damages witness?
23       A    That is my understanding.
24       Q    So just a point of clarification, I know you
25   were talking about experts.  Do you have a hired or

Page 9

1    retained expert as it relates to damages?
2        A    Not at this time.
3        Q    So now that you have reviewed number two, are
4    you the most knowledgeable person as it relates to
5    number two?
6        A    With regard to my understanding of number two,
7    yes.
8        Q    And just to refresh your recollection on some
9    of the ground rules in giving a deposition, if there's
10   any of my questions that you do not understand, please
11   ask me to clarify.  Is that fair?
12       A    Yes.
13       Q    If you answer my question I'm going to assume
14   that you understood what I was asking you.  Is that
15   fair?
16       A    Yes.
17       Q    And, of course, if you need a break during any
18   point in this deposition, please don't hesitate to ask
19   for one.
20       A    Okay.
21       Q    Did you review any documents in preparation
22   for today's deposition?
23       A    I reviewed Paul Missigman's damage
24   calculations.
25       Q    And can you be more specific as to what you

W. Scott Culp
March 18, 2025

Page 10

1  reviewed?
2      A    He had a report that he provided to our
3  counsel with regard to our damages, and it's my
4  understanding that's been produced; and I reviewed that
5  report in a pdf format.
6      Q    All right.  And just for clarification, I
7  haven't seen an actual report from Paul.  Are you
8  talking about an outline or some type of written report
9  from Paul or are you talking about his model?
10     A    What I reviewed you would probably consider to
11 be his model, multiple pages, and that I reviewed in pdf
12 format.  And the reason I clarified that, I think you
13 may have received that also in a spreadsheet format.
14 I'm not sure though.
15     Q    Were the pages that you reviewed Bates-Stamped
16 on the lower right-hand corner?
17     A    I don't believe so.
18     Q    And other than Paul's documents, did you
19 review anything else in preparation for today's
20 deposition?
21     A    No.
22     Q    Other than your attorneys, did you talk to
23 anyone in preparation for today's deposition?
24     A    No.  Although, I did talk to my wife.  I told
25 her you would keep me here way too long.  That was in

Page 11

1  preparation though for this deposition, because she
2  needs to know.
3          MS. GAINEY:  I'm going to show you what we'll
4      mark as Defendant's Exhibit 2, a report to you that
5      you'll see an exhibit marker at the top, exhibit 4,
6      which was exhibit 4 from Paul Missigman's
7      deposition.
8          (Defendant's Exhibit 2 was marked for
9      identification.)
10 BY MS. GAINEY:
11     Q    Were those the documents that you reviewed in
12 preparation for today's deposition?
13     A    No.
14     Q    And can you further identify the documents you
15 reviewed in preparation for today's deposition?
16     A    Did you say can I further identify them?
17     Q    Uh-huh.
18     A    The first page is an e-mail from me to --
19     Q    No, sir.  I'm sorry, let me clarify my
20 question.
21     A    All right.
22     Q    You said those were not the -- what I've
23 handed you as Defendant's Exhibit 2 were not the
24 documents you reviewed in preparation for today's
25 deposition?

Page 12

1      A    Correct.
2      Q    So I'm asking you aside from what I've just
3  handed you, further identify what you did review in
4  preparation for today's deposition, because --
5      A    A pdf format of Paul Missigman's financial
6  model calculating the damages.
7      Q    Very good.  So what I've handed you is
8  exhibit 4, which -- or actually portions of exhibit 4,
9  and I'm going to purport to you that Mr. Missigman
10 produced those in response to a subpoena duces tecum
11 before his deposition.  The reason why I've pulled out
12 those portions of exhibit 4 is because Mr. Missigman
13 testified that you were the one that provided documents
14 to him in order to do his model for damages in this
15 case; is that accurate?
16     A    Partially.  As noted in the exhibit you've
17 handed me, there is information that I provided to Paul
18 Missigman that he could utilize in referencing as he
19 creates his model for damages.  In addition, you have
20 other documents in exhibit 4 that didn't come from me
21 that he utilized in prepping his damages calculation.
22 I've seen some of those.  Some of them I have not.  Some
23 of this exhibit 4 I provided, some I did not.  None of
24 this exhibit is the exhibit that you asked me about
25 previously if I had reviewed anything prior to this

Page 13

1  deposition.
2      Q    So I'm understanding you to say that you only
3  reviewed his model and not necessarily the other
4  documents that you've relied on in order to produce his
5  model.  Did I understand you correctly?
6      A    In preparation for this deposition, that is
7  correct.  None of this exhibit 4 are the items that I
8  reviewed in preparation for this deposition.
9      Q    Prior to today's deposition had you ever seen
10 the documents in exhibit 4 between the time they were
11 created until --
12     A    Obviously --
13     Q    -- this deposition?
14     A    Obviously the e-mail from me --
15     Q    Correct.
16     A    -- with the attachments, and provided by me
17 I've seen and --
18     Q    That's why I asked from the time they were
19 created until --
20     A    Right.  You also have some information in here
21 that's not from me.  And you have information from
22 William Griese to Paul Missigman.
23     Q    Who's William Griese?
24     A    He is an employee, and I'm not exactly sure
25 which entity he's employed by.

W. Scott Culp
March 18, 2025

Page 14

1    Q    By one of the plaintiffs?
2    A    By an affiliate of one of the plaintiffs. We
3  have a number of employees, and their employer may be
4  Westmore Capital Holdings or -- so as far as he is
5  employed by an affiliate of one of the plaintiffs. He
6  does tax returns and tax documents and he's provided
7  some information to Paul Missigman, and you noted that
8  in the exhibit. It's e-mails from him to Paul
9  Missigman. Those items I have never reviewed.
10   Q    There's also some items what I believe to be
11 items provided by Mr. Thomas?
12   A    Yes, and I believe the items provided by Mr.
13 Thomas I have seen but haven't reviewed them recently.
14 And the only other ones I don't recognize, because I
15 haven't reviewed them, don't recall ever seeing them
16 before, are the attachments to Mr. Griese's e-mails.
17 And then later on you have additional attachments that
18 are from me.
19   Q    So as it relates to Mr. Griese, who would be
20 the most knowledgeable person as to who Mr. Griese works
21 for?
22   A    I would probably be the most knowledgeable,
23 but I would need to look at our payroll records to see
24 exactly which entity he works for.
25   Q    And as the designated representative of

Page 15

1  Atlantic Housing, you're saying that you have never seen
2  the document provided by Mr. Griese to Mr. Missigman?
3    A    That's correct.
4    Q    And -- but the other documents as they relate
5  to e-mails between you and Mr. Thomas, you have seen
6  those?
7    A    Yes.
8    Q    Any other documents in there other than the
9  documents from Mr. Griese and potentially attachments
10 provided by Mr. Griese that you have not seen before?
11   A    No.
12   Q    So when I took your deposition in your
13 personal capacity, you deferred the damages opinion to
14 Mr. Missigman; is that correct?
15   A    That's correct.
16   Q    And when I took Mr. Missigman's deposition, he
17 indicated that it was, in fact, you who provided the
18 underlying documents and Mr. Griese and Mr. Thomas that
19 he relied on in order to do his damages model; is that
20 correct?
21        MR. PICCOLO: Object to form.
22        THE WITNESS: You made a statement, and if you
23 have his deposition transcript and you want to ask
24 me if what you said and what he said is correct, I
25 can read that; but I can't tell you what he said in

Page 16

1  his deposition and what you said. So that's the
2  question you asked and I can't answer that question
3  without you presenting the transcript of the
4  deposition.
5  BY MS. GAINEY:
6    Q    All right. So let me back up and ask a --
7    A    Okay.
8    Q    -- different question.
9    A    Okay.
10   Q    Did you provide the underlying documents to
11 Mr. Missigman in order for him to provide his damages
12 model --
13        MR. PICCOLO: Object to form.
14 BY MS. GAINEY:
15   Q    -- and damages in this case?
16        MR. PICCOLO: Same objection.
17        THE WITNESS: I provided the documents that
18 you have provided to me just now within exhibit 4
19 for him to utilize in his preparation of his
20 damages. I don't know that those are all of the
21 underlying data and documents that he used to
22 develop his damages. I do know what I provided him
23 and what you have provided me a copy of in this
24 exhibit 4.
25 BY MS. GAINEY:

Page 17

1    Q    So is the answer to my question yes?
2    A    No, it's not.
3        MR. PICCOLO: Object to form.
4  BY MS. GAINEY:
5    Q    All right.
6    A    No, it's not.
7    Q    So yes or no, did you --
8    A    It's not a --
9    Q    Let me --
10   A    -- yes-or-no answer.
11   Q    Let me -- let me finish my question, please.
12   A    All right.
13   Q    The court reporter is going to be very upset
14 with --
15   A    You do the --
16   Q    -- us if we talk --
17   A    -- same for me, let me finish my answer and
18 I'll let you finish your question.
19   Q    Did you or did you not, at least in part,
20 provide the -- some of the documents Mr. Missigman used
21 in order to do his damages model in this case?
22   A    I provided Mr. Missigman the information you
23 have identified in exhibit 4.
24   Q    And as the representative of Atlantic Housing
25 Partners, did other people provide documents in order

W. Scott Culp
March 18, 2025

Page 18

1  for Mr. Missigman to do his damages model in this case?
2      A    Yes.
3      Q    And who are those other people.
4      A    Jonathan Thomas and William Griese.
5      Q    And have you spoken to Mr. Thomas regarding
6  the documents he provided to Mr. Missigman that underlie
7  the damages model in this case?
8      A    No.
9      Q    Have you spoken to Mr. Griese regarding the
10 documents he provided to Mr. Missigman that underlies
11 the damages model in this case?
12     A    No.
13     Q    Have you spoken to Mr. Missigman specifically
14 regarding his damages model?
15     A    Yes.
16     Q    And tell me about that conversation.
17     A    It's been quite some time.  There was a
18 question about had he provided the damages calculations
19 to our counsel.  There was a question about in general
20 the extent of the damages in total dollars.  Not much
21 more than that.
22     Q    When you say sometime, can you give me an
23 estimate of how long ago?
24     A    I really don't recall.  Sometime around the
25 time of producing the damages calculations, because I

Page 19

1  was asking had he produced them for our attorneys; and I
2  don't recall when that was.
3      Q    I'm going to purport to you that Mr. Missigman
4  testified that he did not produce any of the damages
5  calculations until mid January 2025.  Does that sound
6  accurate to you?
7      A    I don't recall.
8      Q    Who at Atlantic Housing Partners would know
9  and speak on behalf of the company as to when Mr.
10 Missigman produced his damages model?
11     A    I could speak to that.  I have to look at the
12 records of what I produced to our counsel, or what was
13 produced to our counsel by other people; and that would
14 be the date.
15     Q    So if that were Mr. Missigman's testimony, you
16 have no reason to dispute that it wasn't until mid
17 January 2025 that he produced documents related to the
18 litigation?
19     A    I don't know that to be inaccurate.
20     Q    I'm going to purport to you that Mr. Missigman
21 testified that prior to January 2025 he was not asked to
22 produce any documents related to the damages in this
23 litigation.  Would you agree with that or would you not
24 agree as the representative of Atlantic Housing
25 Partners?

Page 20

1      A    What am I agreeing or not agreeing to?
2      Q    I'm going to purport to you that Mr. Missigman
3  testified that he was not asked to produce any damages
4  documents until January of 2025, this year.  Would you
5  agree with that or would you disagree with that?
6      A    I would agree that you're reporting that to
7  me.
8      Q    Sir, listen, this might be --
9      A    I don't know the question.
10     Q    -- a very long deposition.
11     A    It could be if you don't get different kind of
12 questions.
13     Q    Let's be clear about this.  You are here as a
14 representative of Atlantic Housing Partners, L.L.L.P. --
15     A    I think --
16     Q    -- so not --
17     A    -- I agreed to that when we started.
18     Q    -- not in your personal capacity.
19     A    Right.
20     Q    So I am asking you questions pursuant to
21 Federal Civil Procedure 30(b)(6).  So you're the company
22 today.
23     A    I agree.
24     Q    So Mr. Missigman is testi -- has testified
25 that he was not asked by anyone from Atlantic Housing

Page 21

1  Partners or any of the plaintiffs to produce any damages
2  documents prior to mid January 2025.  As the
3  representative of Atlantic Housing Partners, is that a
4  true statement or is that a -- not a true statement?
5          MR. PICCOLO:  Object to form.
6          If you know.
7          THE WITNESS:  I know that I had asked Mr.
8      Missigman to prepare damages prior to that date.  I
9      don't know whether or not he was asked to produce
10     that damages calculation prior to that date.
11 BY MS. GAINEY:
12     Q    When did you ask Mr. Missigman to prepare
13 damages calculations?
14     A    I see the e-mail you provided me on March 1st
15 where I told him he can use anything to prove
16 statistically with historical data from our portfolio
17 with regard to his question.  And February 24th, in the
18 same e-mail trail, I'm giving him my financial model to
19 use for input in his damages calculation.  That was
20 February 24th of 2024.  None of that answers your
21 question about when he was asked to produce the damages
22 calculation.  I believe we've produced all e-mails and
23 correspondence.  I don't have any recollection of a date
24 and time that Paul Missigman was asked to produce his
25 damages calculation, but I do have some documents that

W. Scott Culp
March 18, 2025

Page 22

1  you've provided me to refresh my recollection of when I
2  asked Paul Missigman to begin preparation of his damages
3  calculation.
4      Q    Mr. Missigman testified that he doesn't
5  believe that he ever sent you the model.
6      A    That is correct.
7      MR. PICCOLO:  Object to form.
8  BY MS. GAINEY:
9      Q    My question was going to be is that accurate,
10  but you anticipated my question, so...
11      A    Well, let me complete that answer, because you
12  asked me if I prepared anything -- if I'd read anything
13  in preparation for this deposition.  And the first time
14  I had ever seen his model or he had ever given me any
15  copies of the pdf format of his model was yesterday.  So
16  as of the time of his deposition, that was accurate.  He
17  had not -- I had never looked at, nor had he presented
18  to me his model.
19      Q    And for purposes of the record, his deposition
20  was on February 21st, 2025.  So I'm understanding your
21  testimony to say that from the time he completed his
22  damages model up until yesterday, he had not provided a
23  copy of the damages model to you?
24      A    That is correct.  Now, the only -- because you
25  are deposing me as the corporate rep, the corporation

Page 23

1  produced those damages to our attorney.
2      Q    When was that?
3      A    You asked that question before and I don't
4  have a recollection of that.
5      Q    Was it this year?
6      A    You asked that question before and I don't
7  have a recollection of that.
8      Q    You have no recollection whether it was this
9  year, last year?
10      A    I told you in the answer earlier that I don't
11  know when Paul Missigman, without looking at the records
12  of correspondence with our attorney, produced those
13  financial damages calculations.
14      Q    As the representative from AHP you have no
15  reason to dispute Mr. Missigman's testimony that it was
16  -- he did not produce those damages records to the
17  attorneys until January of 2025; is that correct?
18      MR. PICCOLO:  Object to form.
19      THE WITNESS:  I have no knowledge that would
20      be contrary to that that I recollect.
21  BY MS. GAINEY:
22      Q    Mr. Missigman also testified that the records
23  that he -- that you, Mr. Culp individually, provided to
24  him which he relied on in order to do his damages models
25  are Bates-Stamped 68 through 80.  Can you please take a

Page 24

1  look at Exhibit 2 to see if those are the documents that
2  you, in fact, provided to Mr. Missigman in order to do
3  his damages model?
4      MR. PICCOLO:  Object to form.
5      THE WITNESS:  These are documents that I
6      provided to Mr. Missigman for his use in inputting
7      for his damages calculation.
8  BY MS. GAINEY:
9      Q    And where did you get the information that you
10  used in order to produce those documents to Mr.
11  Missigman?
12      A    This information comes primarily from the
13  application to the Brevard County Housing Finance
14  Authority, any revisions we may have been making in
15  process with the credit underwriter during that process
16  of underwriting for the closing on the taxes and bonds,
17  although it's hard to read.
18      Q    Any -- sorry, that's how they were produced to
19  us.
20      A    Yeah.  I know it's my sunglasses, but they're
21  also prescription, so it helps.  There is some input
22  here that relates to revisions being made in
23  anticipation of the four percent Low-Income Housing Tax
24  Credits, and it was included in the financial model that
25  was provided to Paul Missigman.

Page 25

1      Q    Did some of that information come from Venue
2  at Viera?
3      A    No -- well, let me take that -- let me make
4  sure of it.  When you say come from Venue at Viera, you
5  mean the entity, or was it related to cost information
6  pertaining to Venue at Viera?
7      Q    Well, I'm just trying to get an idea of where
8  the numbers that underlie the damages model in this came
9  from.  And if you look at 0078 --
10      A    78.
11      Q    -- it says Viera FHFC approved at the top.
12      A    Yes.  That is the utility allowances that were
13  approved by Florida Housing Finance Corporation for
14  Venue at Viera, because utility allowances are
15  engineered and approved by the corporation for use.  And
16  the best data that would provide the most realistic
17  projection of utility allowance would be the closest
18  identical product in geography and in construction to
19  Venue at Heritage Oaks, which was Venue at Viera.  So I
20  had utilized Viera to approve utility allowances to
21  provide this schedule of rents.
22      Q    Also if you look at 68 --
23      A    68, yeah, that's my cover e-mail.
24      Q    -- it also references Venue at Viera --
25      A    Let's see.

W. Scott Culp
March 18, 2025

1    Q    -- in the second to the last paragraph.

2    A    Yeah.  None of the data behind there -- I
3  indicated to Paul that he could add in the fair market
4  rents and the Section 8 vouchers, and could modify
5  expenses from historical data for Venue at Viera because
6  my information that I was providing did not include any
7  historical data with regard to fair market rents,
8  Section 8 vouchers or expenses related to Venue at
9  Viera.

10    Q    On document marked 0069 there's numbers there.
11  Where did those numbers come from?

12    A    I created this.  And with regard to each of
13  the numbers, let's see, the unit mix comes from the
14  plans.  I determined from the plans that we had
15  developed there were seventy-one one-bedroom units and
16  thirty two-bedroom units and four three-bedroom units.
17  That's where those numbers came from.  I determined that
18  in a four percent low-income housing tax rate
19  application utilizing income averaging we would restrict
20  the units based upon the affordability that's in the
21  columns to the right of that at thirty percent, sixty
22  percent and eighty percent AMI.  I provided that input.

23    Q    Those are not the numbers that were provided
24  to the Brevard County Commissioners on December 5th,
25  2023, were they?

1    A    No, they were not.

2    Q    Okay.  Go ahead.  Where did you get the rest
3  of the numbers?

4    A    The -- of course the total is just math.  The
5  income averaging percentage is just math.

6    Q    Can you tell me -- and excuse me to interrupt
7  you, but there's some very small numbers underneath the
8  totals.  What are those numbers?

9    A    They're math that's utilized to determine the
10  income average under sixty percent.  You'll see out to
11  the right 59.9048.  Those grayed-out numbers, actually
12  you see that in the model, they're grayed out
13  intentionally because it's just math.  And I look at
14  those when I'm looking at my models to make sure I'm
15  using the right math.

16    So if you look at the spreadsheet you'll see
17  that's just math.  And it helps to generate the
18  59.9048 percentage.  It has to be below sixty percent in
19  income averaging.  The hard construction costs,
20  two-bedroom, two-bath of one ninety-seven six fifty-six,
21  that's a number that I input based upon my estimation
22  based upon our historical data for our construction
23  costs.

24    Q    Let me be very specific about -- where did you
25  get the historical data where you came up with this

1  estimate?

2    A    Yeah, I maintain primarily in my head.  But
3  I've done, what, close to a hundred and fifty
4  communities now.  And each year I keep an update as to
5  what our costs are.  We do cost certifications.  We do
6  budgeting.

7    And so I'm aware of what our costs are, and I
8  try and keep abreast of the costs by product type.  So
9  I'm fairly aware of those.  So I create conceptual
10  estimates.  And I created the estimate for the Housing
11  Finance Authority on the construction cost for this
12  community.  So I had in my mind what I thought those
13  were.  That doesn't mean this number will specifically
14  match that.

15    When I'm developing a model, this number here,
16  one ninety-six six fifty-six is a reference number.
17  It's not actually used anywhere else in the model, but
18  it's a reference number for me so I know that what I'm
19  working on has some basis for reality.  I don't want to
20  see that I have nineteen thousand dollars in
21  construction costs per unit.  So it just helps me with a
22  reference to make sure I have some basis for the -- in
23  reality to what I'm doing.

24    Q    So are there any actual documents or data that
25  you can point to as to where you came up with that

1  number?

2    A    No.  Literally it comes out of my head.  I do
3  have historical data on every job we've ever built, but
4  I don't go back to that when I'm creating this.  I
5  literally come up with it out of my head because I'm
6  very familiar.  I'm bidding projects constantly,
7  developing several projects every year.  So I have some
8  idea in my mind of what our construction cost is.  So
9  that's what I put in there.  It doesn't really tie back
10  to the rest of the financial model, as you would see if
11  you tied them together and if you tried to look from
12  each one.  But it helps me in referencing that I have a
13  real estate model.

14    Q    Underneath that it says mid-rise four?

15    A    Yes.

16    Q    What does that mean?

17    A    All of our product types are categorized in
18  the Florida Housing Finance Corporation construction
19  types.  Mid-rise four is one of the Florida Housing
20  Finance Corporation construction types.  And I need to
21  make sure that I'm thinking about the correct product
22  type.  I have, you know, one-story villas, three-story
23  garden, mid-rise four, high-rise seven.  And those are
24  all Florida Housing Finance construction types, and I
25  just want to make sure that I'm thinking about the

W. Scott Culp
March 18, 2025

Page 30

1  correct type.
2      Q   So does that mean mid-rise building, four
3  stories?
4      A   Correct.
5      Q   The next number, eighteen million seven six
6  seven four three seven.
7      A   Yeah, that's a calculation based upon the
8  conceptual per unit estimate in my mind at one
9  ninety-seven six fifty-six, and I make some adjustments.
10  It's the math there based upon unit type, one-bedroom,
11  two-bedroom, three-bedroom, and adjust the total
12  construction cost; and that's how you get to eighteen
13  million seven sixty-seven four thirty-seven.
14     Q   Are there any records or data where you're
15  doing those calculations?
16     A   No.
17     Q   Or is that -- that's in your head again?
18     A   Yeah.  No.
19     Q   The next number, is that math, one seven eight
20  seven three seven average per unit hard costs?
21     A   It should be.  Eighteen million seven
22  sixty-seven four thirty-seven divided by the one oh
23  five.  I haven't checked that; but if you want me to,
24  I'll do that right now.  Eighteen seven six seven four
25  three seven divided by one oh five.  It looks like one

Page 31

1  seventy-eight seven thirty-seven.  Sounds right.
2      Q   Underneath that it says CK against concept
3  budget.  What does that mean?
4      A   I want to make sure that this number is
5  consistent with the conceptual budget.  The conceptual
6  budget is required to provide to the Housing Finance
7  Authority in our applications.  So I want to make sure
8  my model is consistent with, even though it may be
9  slightly different than, the conceptual budgets that
10  we're using.  So I'm just -- I'm checking that.  It's a
11  reminder to myself to check.
12     Q   All right.  And did you, in fact, check it
13  against the conceptual budget?
14     A   I don't remember.
15     Q   So that is more or less just a note to
16  yourself?
17     A   It's a note to myself.  And I do these
18  numerous times throughout the process, maybe weekly,
19  monthly.  So I may be checking -- so I don't remember.
20  I probably at one point looked at that, because I do
21  this a lot for each individual project.  I'm always
22  checking, you know, to see where we are.
23     Q   And is there any separate document that
24  reflects that you checked it against the conceptual
25  budget?

Page 32

1      A   No, I don't -- wouldn't have a separate
2  document.  The other thing that would be helpful is in
3  the number just below it, and the question you're going
4  to ask me next from the HFA credit underwriting report;
5  that tells me what the HFA had for that number.  And so
6  the HFA had a number of seventeen million eight
7  fifty-seven three oh five.  And I'm checking to make
8  sure my numbers and my conceptual idea of what the
9  construction costs should be are in range with what has
10  been provided.
11     Q   And is it, in fact, in range with what had
12  been provided?
13     A   Yes.
14     Q   The interest rate at sixty point five percent,
15  how did you determine that?
16     A   That's a plug by me.  And, again, I have some
17  historical knowledge of interest rates on tax exempt
18  bonds that changes every month.  But when I'm preparing
19  models I try and make sure I have something that's
20  consistent with the historical trends.
21     Q   What is the current interest rate?
22     A   Don't know.
23     Q   I'm sorry, I thought you said --
24     A   I don't know.
25     Q   Do you check it every month or --

Page 33

1      A   I do, but I don't know what it is today.
2      Q   When you last checked it what was it?
3      A   I don't remember.
4      Q   Land cost per unit --
5      A   Yes.
6      Q   -- twenty-four thousand seven sixty-two.  What
7  is that number?
8      A   It's the land cost divided by the number of
9  units.  Let's see.  If we calculate twenty-four seven
10  sixty-two times one oh five, it gives you two million
11  six.
12     Q   And --
13     A   Then we see to the right two million eight
14  fifty is our land purchase price.  We had allocated a
15  value of two hundred and fifty thousand to the office
16  pad to reach a net land purchase price for the
17  multi-family affordable housing of two million six.
18     Q   How did you come up with the office pad value?
19     A   Just created it out of our head.
20     Q   You also have one million eight hundred
21  thousand ninety-five zero three one as the net land
22  purchase price from HFA credit underwriting report,
23  correct?
24     A   Correct, yes.
25     Q   And why does that number differ?

W. Scott Culp
March 18, 2025

1    A    You see the note to the right of that that you
2    can't barely read there assumes soils remediation is in
3    the construction costs.  There was a soils remediation
4    on this site because the soils were required to be
5    remediated.  And instead of -- that would not be land
6    under the Florida Housing Finance Corporation
7    categorization of costs, so we would have moved that to
8    construction costs, and the net would be the one million
9    eight ninety-five oh thirty-one.
10    Q    The next page on 71 --
11    A    70 or 71?
12    Q    Sorry.  This is --
13    A    My next page is 70.
14    Q    I'm missing a page.  Are you missing a page?
15    A    No, I have 70.
16    Q    Okay.  So tell me about 70.
17    A    That's the summary of the sources and uses.
18    Provides all the sources by categories and the uses by
19    categories.
20    Q    And where did you get those numbers?
21    A    They are math generated from the numbers that
22    are presented on page 72 and 73, with the exception of
23    there's a block that has some information with regard to
24    the total development cost limitations based upon
25    Florida Housing Finance Corporation rules.  And there's

1    some information at the bottom right that's checking the
2    fifty percent test for the bond issue.  But the sources
3    and uses and numbers within those are math coming from
4    pages 72 and 73, which is the detailed costs.
5    Q    Page 71, where did you get those numbers?
6    A    There again, that's math, and it comes from
7    the input parameters you saw on 69.  And then in the
8    table below, the costs per unit limitations, those were
9    the -- by category the cost lim -- total cost -- total
10    development cost limitations provided from Florida
11    Housing Finance Corporation for each development type.
12    And then the math to determine the total development
13    cost limitation.
14    Q    Why does the top row -- or why are there two
15    different rows, top row at sixty percent, forty percent,
16    and the bottom row eighty percent, one twenty percent,
17    thirty percent?
18    A    Not two different rows, they're all different
19    blocks.  And depending on what your set-asides are,
20    you'll see that we have a number of units, a total
21    number of units in the first block, project total, that
22    equals a hundred and five units.  You'll see the second
23    block we have units that are set aside at sixty percent
24    AMI.  That's fifty-three units.  You'll see that's
25    consistent with -- it should be, unless I made a

1    mistake, let's see -- consistent with page 69, sixty
2    percent units, there's fifty-three of them.
3        The second set of columns, the eighty percent
4    AMI, you'll see thirty-one units at eighty percent, that
5    comes from page 69, the thirty-one units.  Then the
6    thirty percent AMI with twenty-one units, that also
7    comes from page 69.  That's all just math coming from
8    the input parameters on Bates-Stamped 69.
9    Q    We established in your first -- your first
10    deposition, first two depositions that what was
11    presented to the Brevard County Commissioners was -- and
12    also in the application, was twenty percent at fifty
13    percent AMI, eighty percent up to a hundred and twenty
14    percent AMI, correct?
15    A    We established in that deposition what we
16    presented the correct restrictions for the bond
17    allocation.  The Low-Income Housing Tax Credit
18    restrictions include the restrictions that were in the
19    bond allocation, but further restricted to comply with
20    the four percent Low-Income Housing Tax Credits.
21    Q    Yes, sir, I understand you have an explanation
22    for it, but I just want to talk about the numbers
23    themselves as they represented to the Brevard County --
24    A    I think we just did.
25    Q    Can you please let me finish my question

1    before you --
2    A    Sure.
3    Q    -- cut me off?  Thank you.
4        What we established and what I think is very
5    clear in this case what was actually presented as far as
6    the numbers to the Brevard County Commissioners was
7    twenty percent of the units would be up to fifty percent
8    AMI, and the remainder of the units would be up to a
9    hundred and twenty percent AMI; is that correct or is
10    that not correct?
11        MR. PICCOLO:  Object to form.
12        THE WITNESS:  Could you repeat the question?
13        MS. GAINEY:  Sure.  Actually, I will have her
14    read it back to you so that we're very clear about
15    this.
16        (The court reporter complied.)
17        MR. PICCOLO:  Same objection.
18        THE WITNESS:  I don't recall if that is
19    correct.
20    BY MS. GAINEY:
21    Q    All right.  Let's look at the application so
22    that we can refresh your recollection.
23    A    Are we going to look at the application or are
24    we going to look at what is presented to the
25    commissioners?

W. Scott Culp
March 18, 2025

Page 38

1    Q    We're going to look at both.

2    A    Okay.

3    Q    So on the application, I will show you what is

4    marked as plaintiffs 02419, and ask you what the

5    set-asides were in the application that was submitted to

6    the Brevard Housing authority on or about July 31st,

7    2023.

8    A    I'm seeing in Bates-Stamped 2419, item D, that

9    we have twenty percent set-aside units, which is

10   twenty-one units. I'm seeing a table of the rents

11   would be by unit type in item F for that twenty percent

12   set-aside units. I'm seeing in item G, the selection,

13   which is the required to be chosen in the application of

14   twenty percent at fifty percent or forty percent at

15   sixty percent, and we chose twenty percent at fifty

16   percent. That was in the application.

17   Q    And then it's twenty percent was at fifty

18   percent. What was the remainder of the eighty percent,

19   is it a hundred and twenty percent AMI?

20   A    I don't recall if there was anything in the

21   application that had any restriction on the balance of

22   the units. The taxes and bonds do not require any

23   further restrictions other than the twenty percent at

24   fifty percent or forty percent at sixty percent, and

25   this selection was twenty percent of fifty percent.

Page 39

1    Q    Sir, did you review the application in

2    preparation for today's deposition?

3    A    No.

4    Q    So when we asked for the person at Atlantic

5    Housing Partners with the most knowledge with respect to

6    the application that was submitted to the Brevard County

7    Housing Finance Authority, is that you?

8    A    Yes, it is.

9    Q    And you don't recall the application?

10   A    I do recall the application.

11   Q    So --

12   A    I don't recall every specific note and detail

13   and word in the application; but if you have the

14   application in front of you, you could probably present

15   it to me and I could look and see whether there are

16   other restrictions other than the twenty percent at

17   fifty percent.

18   Q    Absolutely. I'm happy to do that for you,

19   because I certainly want to refresh your recollection.

20   A    The application on the coverage page says that

21   eighty percent of the units will be unrestricted by the

22   bond covenants. I'll look through, if you'd like, the

23   rest of the application to see if there's any other

24   reference to any further restriction.

25   Q    So per the application, just to make sure I

Page 40

1    understand your testimony, only twenty percent of the

2    units as proposed for Venue at Heritage Oaks would be

3    restricted to up to fifty percent of AMI; is that

4    correct or is that not correct?

5    A    I'm looking at the application. I don't

6    recall a restriction under the bonds or the bond

7    application beyond the twenty percent at fifty percent.

8    I could be incorrect, but I don't think I am; but I'm

9    looking through the application to see if we had any

10   other set-asides within the application. It shouldn't

11   be too hard to determine.

12       Now, the application development cost pro

13   forma Bates-Stamped 2474 had the twenty percent at fifty

14   percent and the balance at market rate. I'll look to

15   see if there's any other items within the application

16   that might have provided anything different, but I don't

17   believe there are. And, again, this is the application

18   for the taxes and bonds. It doesn't represent what the

19   ultimate set-asides would be, but it would be with the

20   set-asides that would be restricted under the bond

21   allocation. And I'm not seeing anything other than the

22   twenty percent at fifty percent in the bond application.

23   Q    I'll take that back for now. Thank you.

24   A    Do you want this page also that you had handed

25   me, 2419? It was the twenty percent of fifty percent.

Page 41

1    Q    Thanks.

2        Based on that, what set-aside amounts were

3    presented to the county commissioners in December of

4    2023?

5    A    I don't recall what was in my presentation,

6    and I don't recall what was in the information provided

7    to the commissioners by the Housing Finance Authority.

8    I didn't provide that information. I believe I reviewed

9    it and looked at it at one point. I don't remember on

10   the top of my head right now, but that documentation

11   that was provided from the HFA to the county

12   commissioners would be what was presented to them. And

13   other than that it would only be my presentation to the

14   commissioners at the county commission meeting.

15   Q    Did you review your presentation in

16   preparation for today's deposition?

17   A    I did not. Thanks.

18   Q    I'm going to show you what I believe is a copy

19   of a presentation to see if that refreshes your

20   recollection as to what set-asides were presented to the

21   Brevard County Commissioners in December of 2023.

22   A    Was this my presentation to the commission or

23   was this my presentation to the community?

24   Q    It's a document produced by your attorneys,

25   so --

W. Scott Culp
March 18, 2025

Page 42

1    A    Right --
2    Q    -- it's Bates-Stamped.
3    A    -- but we -- there was a document that was the
4  presentation to the community and there was a document
5  that was a presentation to the commissioners, that's why
6  I was asking.  They're very similar.
7    Q    I was just going to say, I think they're very
8  similar, are they not?
9    A    Yes, they are very similar.  On Bates-Stamped
10 2818 there was a table that identified the maximum
11 allowable incomes for a hundred and twenty-eight -- a
12 hundred and twenty percent income limits.  And on 2819
13 there was identification of the rents that would be at
14 the fifty percent AMI.  And there was a note the
15 anticipated market rate rents, those are not a hundred
16 and twenty percent AMI rents because they are
17 anticipated at market.  A hundred and twenty percent of
18 AMI would be above market.  So we were indicating there
19 that those were at market.
20    Q    So after reviewing those documents, what
21 set-asides was presented to the Brevard County
22 Commissioners in December of 2023?
23    A    Twenty percent, fifty percent.  The reference,
24 again, to the other, the balance of those were shown
25 here as market rate rents.

Page 43

1    Q    Any other set-asides that were presented to
2  the Brevard County Commissioners in December of 2023?
3    A    Not from this document.  I don't know what the
4  Brevard County HFA presented to the commission without
5  seeing the report that they provided.
6    Q    Do you have any evidence or information that
7  what the Brevard County Housing Authority presented was
8  different than what you presented in the application and
9  in your presentation?
10       MR. PICCOLO:  Object to form.
11       THE WITNESS:  It was different.  It was
12    something else.
13 BY MS. GAINEY:
14    Q    As far as set-asides.
15    A    I don't know.  I can't -- I really can't
16 recall what they presented to the HF -- I mean, to the
17 commission in their HFA report.
18    Q    Back to the documents that we were talking
19 about, Paul Missigman, 0071.  So various set-asides
20 that Mr. Missigman used in order to do his damages
21 calculation, correct?
22    A    Yes.
23    Q    And --
24    A    Well --
25    Q    Go ahead.

Page 44

1    A    Note set-asides that I prepared and provided
2  to Mr. Missigman that he could utilize in his input for
3  preparing his damages calculation.
4    Q    And after reviewing both the application and
5  the community -- or the presentation that you prepared
6  at some point in this case, do you agree that those
7  set-asides are not consistent with what was presented to
8  the Brevard County Commissioners on or about December
9  5th, 2023?
10    A    No, I do not.
11    Q    You don't agree with that?
12    A    No, I do not.
13    Q    Okay.  Tell me why you don't agree with that.
14    A    The restrictions that were presented to the
15 commissioners were consistent with the bond application,
16 and these restrictions are consistent with what was
17 presented to them when --
18    Q    Yes.
19    A    You want me to finish or you want to ask
20 another question?
21    Q    I said -- I was just saying yes.
22    A    Okay.  If your maximum restriction is twenty
23 percent at fifty percent and all others are
24 restricted -- are unrestricted, I can restrict those
25 further for the four percent low-income housing credits,

Page 45

1  which is what this does.
2    Q    Sir, I understand you have an explanation as
3  to why the set-asides are different, and I get that.  I
4  understand that.  What I am trying to get to, as the
5  representative for Atlantic Housing Partners is what was
6  actually presented to the Brevard County Commissioners
7  on December 5th, 2023 as far as set-asides?
8    A    And you presented to me the presentation that
9  I made to the county commission.  I read from that
10 presentation, told you what page on that presentation.
11 I presented information with regard to the rents.  You
12 did not present to me what the HFA presented to the
13 commission, and I told you without reading that I don't
14 know what the HFA presented to the commission.
15    Q    And based on what you have reviewed, is there
16 any indication that the set-asides, as you have noted in
17 Missigman's 0071, were ever presented to the Brevard
18 County Commissioners?
19    A    I'm not aware whether the Brevard County
20 Commissioners had any information with regard to the
21 four percent Low-Income Housing Tax Credit set-asides.
22    Q    Was units at sixty percent AMI ever presented
23 to the Brevard County Commissioners?
24    A    Again, I would need to see what the HFA
25 presented; but I don't recall any presentation to the

W. Scott Culp
March 18, 2025

Page 46

1   commissioners with regard to sixty percent set-asides?
2        Q    Well, was there any presentation made to the
3   commissioners regarding forty percent set-asides?
4        A    Not that I recall.
5        Q    Was there any presentation to the
6   commissioners regarding thirty percent set-asides?
7        A    Not that I recall.
8        Q    Is there a document that will refresh your
9   recollection other than the presentation that you did to
10  the commissioners?
11       A    As I answered previously, the HFA presented a
12  document to the commission.  And you've asked me about
13  what was presented to the commission, and I said I don't
14  recall what was in the HFA's document.  But whatever was
15  in the HFA's document was also presented to the
16  commission.
17       Q    Aside from what the HFA may have presented to
18  the commissioners, did the plaintiffs or Atlantic
19  Housing Partners present any other set-asides other than
20  what you have testified here with respect to twenty
21  percent of AMI --
22       A    No.
23       Q    -- to the commissioners?
24       A    No.
25       Q    Referring you back to the document marked

Page 47

1   Missignan 0071, at the bottom it has TDC costs per unit
2   limitation.  What does that mean?
3        A    Yeah, we reviewed that a minute ago; but
4   that's total development costs provided by Florida
5   Housing Finance Corporation by construction type,
6   multiplied by the number of units and utilizing the
7   factors provided by the Florida Housing Finance
8   Corporation to adjust those total development cost
9   limitations.
10       Q    And the plus six percent, what is that?
11       A    A factor provided by Florida Housing Finance
12  Corporation to adjust the total development cost
13  limitations.
14       Q    What's MMRB add-on?
15       A    Multi-family mortgage revenue bonds.  Those
16  total development cost limitations have a factor when
17  you're utilizing multi-family mortgage revenue bonds
18  determined by Florida Housing Finance Corporation to be
19  as indicated in the table.
20       Q    Going to the next page, 72.  The numbers that
21  are in this document, where do those numbers come from?
22       A    I apologize for having to put my sunglasses
23  back on for the video, but these numbers were all
24  created or input by me into my financial model.  The new
25  rental units is my estimate of construction cost,

Page 48

1   excluding the ineligible basis items which are
2   identified; and those are my estimates of the ineligible
3   basis items.  The numbers to the right are my
4   calculations for the ineligible basis items.  The
5   general contractor fees is my calculation of the fees.
6        And I'm verifying that with the Housing
7   Finance Authority credit underwriting report.  You'll
8   see to the right that note.  And then the total actual
9   construction cost, including the fees.  And then all of
10  the financial costs have been revised to be consistent
11  with the Housing Finance Authority's credit underwriting
12  report.
13       Q    Did you prepare a separate financial model?
14       A    Other than this?
15       Q    (Nods head.)
16       A    I probably did.  I prepare a number of them
17  throughout the process.  I could have prepared one for
18  the application.  This one's obviously prepared after
19  the HFA credit underwriting report because this is
20  revised for the HFA credit underwriting report.  I don't
21  typically save all of my models.  I update them as we
22  get new information.
23       Q    Is that an Excel workbook?
24       A    Yes.
25       Q    So in the documents that have been produced

Page 49

1   because of this lawsuit, I have not seen a separate
2   model prepared by you.  That doesn't mean -- there's
3   been thousands of pages, and I mean Excel workbook
4   model.
5        A    Well, Excel workbook model would be a digital
6   file.  This is an Excel workbook model, this document
7   we're looking at today.  This is not a Word document.
8   This is not a PowerPoint document.  This is --
9        Q    Let me --
10       A    -- a print-off of my Excel Word document -- my
11  Excel spreadsheet document.
12       Q    Let me just ask it differently.  What is
13  marked as Missignan 68 through 80, is that what you
14  consider your financial model that you referred to in
15  your testimony?
16       A    69.  68's an e-mail.
17       Q    Excuse me, 69.  Thank you.
18       A    69, let me see if we're going to 80.  Yes.
19       Q    Other than those documents, are there any
20  other financial documents that you used in order to
21  assist Mr. Missignan in calculating the damages in this
22  case?
23       A    Other than information I would have used to
24  create this model, no.
25       Q    Referring you back to 0072, the new rental

W. Scott Culp
March 18, 2025

1    unit, seventeen million five seventy-six two zero three,
2    where's that number from?
3        A    My construction estimate.
4        Q    Your head?
5        A    No.  There was actually a construction
6    schedule of values provided to the underwriter, and that
7    number comes from that construction schedule of values.
8        Q    What's the underlying basis for that number,
9    is --
10       A    My determination of construction cost, my
11   estimate.
12       Q    And do you rely on any data or documents in
13   order to come up with that estimate?
14       A    As I referenced earlier, when we talked
15   about -- I believe it's page 69, I have the historical
16   knowledge of our construction cost and the information
17   with regard to our current construction cost; and that
18   helps me to come up with a conceptual budget.  And I
19   create a schedule of values that's provided to the
20   underwriter.
21       Q    So if we want to look at the underlying
22   numbers for that particular seventeen-million-dollar
23   number, you look at the schedule of value which was
24   provided to the underwriter?
25       A    That's correct.

1        Q    Any other documents that form the basis of
2    that seventeen-million-dollar new rental units number?
3        A    No.
4        Q    Why is this categorized as eligible versus
5    ineligible?
6        A    The cost in an affordable housing community
7    financed to a four percent Low-Income Housing Tax Credit
8    equity are categorized as eligible and ineligible.
9    There are certain items that are not in -- not eligible
10   for tax credits, and we've identified those items in
11   this model.
12       Q    The ineligible items in the next several lines
13   there, what form the basis of those numbers, where did
14   you --
15       A    My --
16       Q    -- get those?
17       A    My estimate.
18       Q    So would all the numbers in this document come
19   from your construction cost estimate?
20       A    In the top part with regard to construction
21   cost, yes.
22       Q    Excuse me, yes.  That's what I meant.
23       A    Yes.
24       Q    And as it relates to washers and dryers, what
25   forms the basis of sixty-five thousand oh fifty

1    estimate?
2        A    That is a mathematical calculation you'll see
3    to the right, washer and dryers.  You'll see a
4    percentage that we anticipate will be purchased by the
5    owner/applicant, which is, I believe, seventy percent,
6    which relate to the number seventy-four.  You'll see a
7    unit price of eight hundred and seventy-nine dollars and
8    six cents, which is our cost at that time I prepared
9    this for washer and dryers.  You multiply that
10   seventy-four times eight seventy-nine oh six and you
11   should get sixty-five thousand oh fifty.
12       Q    And these are estimates, correct?
13       A    Correct.
14       Q    And are you basing them on other developments
15   or is it just your experience in the industry?
16       A    That's yes and yes.
17       Q    Okay.  Tell me what you mean.
18       A    Other developments is my experience.  All of
19   our developments is my experience.  And I use the most
20   current information we have with regard to our cost to
21   develop these estimates.  It's a conceptual estimate.
22   It's my belief on what would be our cost based upon what
23   we're currently experiencing and what we believe to be
24   the cost when this development is contracted for.
25       Q    And are there any ways that you can go -- that

1    a person can go back and check how you came up with
2    these numbers, other than --
3        A    How I came up with the numbers?  I come up
4    with the numbers out of my head based upon our
5    historical data.  If you're trying to check on that
6    historical data, all of our cost certifications are
7    public record for every job we've ever built; and they
8    have detail with regard to every line item, including
9    the ineligible line items.
10       Q    So in this case you didn't actually do that,
11   you just used your experience in the industry in
12   order --
13       A    That's correct.
14       Q    -- to come up with the numbers?
15       A    That's correct.
16       Q    And I would assume that that would be the case
17   for the numbers that you have with respect to parking?
18       A    That's correct.
19       Q    And those are -- parking is the fees that
20   people pay to park at the development?
21       A    No.  This is the cost for those parking
22   spaces.
23       Q    Got it.
24       A    Because that's ineligible cost.  But these
25   they pay are in the pro forma under the revenues.

W. Scott Culp
March 18, 2025

Page 54

1    Q    Why are there no fees -- or costs related to
2  fitness club or community club?
3    A    'Cause those are not optional items charged to
4  the residents and, therefore, are not ineligible.
5    Q    The general contractor fee?
6    A    Yes.
7    Q    Where did you come up with that number?
8    A    That's based upon the maximum percentage
9  allowable by Florida Housing Finance Corporation for the
10 general contractor fees.  And because I was matching to
11 the Housing Finance Authority credit underwriting
12 report, it comes in just below the maximum.  The maximum
13 is fourteen percent.  I was matching to the dollar
14 amount in the credit underwriting report which gets you
15 to that thirteen point three three percent.
16   Q    And is that thirteen point three three percent
17 of the total cost?
18   A    That is thirteen point three three percent of
19 the total hard construction cost, correct.
20   Q    And the last line there, is that math?
21   A    Yes, that's just the totals.
22   Q    Regarding the financial cost, the next set of
23 numbers, the construction loan interest?
24   A    All those items are taken from the Housing
25 Finance Authority credit underwriting report.  And the

Page 55

1  credit underwriting takes our application and our
2  information and creates their own estimate of the
3  financial cost, and I use the credit underwriter's
4  estimate of the financial cost.
5    Q    So am I hearing you to say the credit
6  underwriting reports comes up with the numbers and then
7  you pull those numbers back into your model?
8    A    That's correct.
9    Q    You have there, off to the side, need Paul M's
10 estimate.  I'm assuming that's another note to yourself?
11   A    Yes.  And that would be a note in my model
12 that I'm using.  But to the right of that you see the
13 note throughout where I've revised all of these to be
14 what the HFA credit underwriting report included.  So I
15 no longer need Paul's estimate because I have the HFA's
16 credit underwriting report.
17   Q    So one could essentially disregard that note?
18   A    Yes.
19   Q    You didn't need it anymore?
20   A    Yeah.  I could have deleted that note.  I
21 don't.  I just added a further note to say what my
22 numbers are based upon.
23   Q    So would you have had an earlier model that
24 you then revised and updated per the credit underwriting
25 report?

Page 56

1    A    Yes.
2    Q    In this case I understand that there was a
3  draft credit underwriting report dated early December of
4  2023.  Is that where you're pulling these numbers from?
5    A    Yes.
6    Q    And I believe you said in your prior
7  deposition that that was the -- although it was marked
8  draft, that was the last credit report done in this
9  case, correct?
10   A    Yeah.  And I don't recall whether there was
11 actually ever -- I think we had this discussion in my
12 prior deposition, where the draft was turned into a
13 final or the draft was the final.  I think we had that
14 question before, but the one that we reviewed in my
15 deposition that was published in December.
16   Q    The writing is very small but I think it says
17 updated with Ammon's, does it say e-mail, estimate?
18   A    Ammon's.
19   Q    Ammon?
20   A    Ammon is an employee that works with us, and
21 he will oftentimes provide me with information.  But, of
22 course in this instance I've revised those per the
23 underwriter's report.
24   Q    So that can also be disregarded?
25   A    Yes.

Page 57

1    Q    What does it say after Ammon?  Can you see it?
2    A    E-S-T-I.  It would have said -- would have
3  finished out as estimated if it could fit in the block.
4    Q    0073, these numbers -- let me actually just
5  back up.  On 0072 it has Brevard County, City of Sanford
6  up in the left-hand corner.
7    A    Yes, it does.
8    Q    Is that an error?
9    A    That is an error.
10   Q    On 0073 it has the same, Brevard County, City
11 of Sanford.  Is that an error?
12   A    Yes.  That's probably pulling from some of the
13 other pages, which is why the error is there; but I
14 don't see it.  Anyway, yes, it's an error.
15   Q    It should read City of West Melbourne?
16   A    That's correct.
17   Q    Where did these numbers come from on 0073?
18   A    You'll note to the far right all these numbers
19 came from the HFA credit underwriting report with the
20 exception of a few that -- in the middle having to do
21 with the Florida Housing Finance Corporation fees.  And
22 down under contingencies there seems to be a note there,
23 and I can't really read it.
24   Q    Updated with does that say Marc's budget?  And
25 this is how they were produced to us.

W. Scott Culp
March 18, 2025

1    A    And that's fine.  I know.
2    Q    So I apologize.
3    A    Yeah, those columns in the center are just
4    like on the prior page.  Those are my notes that I would
5    update those.  But then to the right is where I got my
6    final numbers.  So I would have updated originally with
7    Marc's budget.  Marc is my development manager, works
8    for me.
9    Q    What's his last name?
10   A    Gauthier, G-A-U-T-H-I-E-R.  But I update with
11   his budgets.  And then when the underwriter updates with
12   their final estimate, I update the model with what the
13   underwriter has agreed to.
14   Q    It appears there is also a note that says
15   updated with Cindy's budget?
16   A    That probably had to do with impact and
17   connection fees, because Cindy prepares an impact fee
18   estimate for me, which is the next page you're going to
19   see, I think.  And she drafts those for my approval, and
20   I use those again until the underwriter tells me they're
21   using something different.
22   Q    What's Cindy's last name?
23   A    The reason I pause, 'cause it was Bell at one
24   point and it was Piurkowski at one point.  I don't
25   remember which she is now.  Either Bell or Piurkowski.

1    Q    And I understand you to say that you do an
2    initial estimate, I'll call it, and you make notes to
3    yourself that those estimates may need to be updated.
4    But then when you get the HFA credit underwriting report
5    you just use the numbers from the credit underwriting
6    report to update your original estimates.
7    A    Yes.
8    Q    Am I understanding that correctly?  Sorry.
9    A    Yes, the process is that we submit our
10   information to the credit underwriter.  They verify.
11   They may go to the local government for fees.  They may
12   go to their own records for Florida housing fees.  They
13   may have other data information.  They provide a final
14   report that that bond allocation is then going to be
15   based upon.  So I update my model based upon the credit
16   underwriter's report and their final numbers.
17   Q    When was this model prepared?
18   A    Oh, gosh.  I don't recall the first time it
19   was prepared.  It would have been before we submitted an
20   application to the Florida -- to the HFA.  But then this
21   model was updated after the credit underwriter report,
22   because we updated for the anticipation of four percent
23   Low-Income Housing Tax Credits.  So sometime after the
24   credit underwriting report.
25   Q    So sometime after early December 2023; is that

1    fair?
2    A    Correct, yeah.
3    Q    There is a note over to the side that says,
4    about halfway down, revised per HFA CUR, dash, plan and
5    cost review added.  What does plan and cost review added
6    mean?
7    A    The credit underwriter engages a plan and cost
8    review from a third-party professional, and they pay
9    fees that we pay.  And I believe that means that the
10   fees I had listed for the credit underwriting fee were
11   not inclusive at one point of the plan and cost review,
12   and the credit underwriter had me add the plan and cost
13   review fees.  So the number under total for FHFC credit
14   underwriting fee at one point was probably not
15   conclusive of the plan and cost review, and the credit
16   underwriting report came back with adding the plan and
17   cost review fee.
18   Q    I'm hearing you to testify that you relied
19   pretty extensively on the numbers from the credit
20   underwriting report.  Is that a fair assessment of what
21   you're saying?
22   A    When you say relied pretty extensively, we
23   provide information to the credit underwriter; and we
24   work together with the credit underwriter to get to a
25   final set of numbers that we agree upon.  And I want to

1    be consistent because we're closing on that set of
2    numbers.  So I update my models to be consistent with
3    the credit underwriter's report.
4    Q    When you say "we," who provides the original
5    numbers to the credit underwriters?
6    A    It is we.  It's me.  It's whoever in our
7    organization, you know, who sends the e-mail, who
8    prepares the application, who, you know, drafts the
9    model.  It is a group.  It is we.
10   Q    That would probably include Marc and Cindy
11   and --
12   A    They're all providing numbers typically to me.
13   I'm typically providing numbers and these models to
14   people in organizations that are actually preparing the
15   application, putting it into binders, sending it to the
16   HFA.  And I'm not meaning to be vague, but it is we that
17   provides the information to the HFA.
18   Q    A little bit further down it says HFA CUR,
19   credit underwriting report, added increase over GC
20   contract that includes contingency, I think is what it
21   says.  It's very small.
22   A    Yeah.  I can't really read that, but what that
23   has to do with is the contingency.
24   Q    Explain what you mean.
25   A    Let me see.  I can't really read all that

W. Scott Culp
March 18, 2025

Page 62

1  detail there, but the HFA credit underwriting report
2  would have provided for a five percent hard cost
3  contingency, and that number doesn't look like five
4  percent hard cost contingency.  So there might have been
5  a note as to why that would be different than five
6  percent, but I can't see it.
7      Q   Is there an Excel workbook or Excel document
8  that still exists that has these numbers on it that can
9  be more readily viewed?
10     A   Probably.
11     Q   Have you produced that document to your
12 attorneys?
13     A   I think so.
14     Q   So I also can't read what that says.
15     A   Yeah.
16     Q   But you're saying that the hard contingency
17 number that's under eligible is not the -- is not five
18 percent?
19     A   It doesn't look like it, 'cause forty-two
20 thousand dollars is not five percent of the hard cost of
21 construction, which is the typical hard cost
22 contingency.  Now, that doesn't mean that the
23 underwriter, for one reason or another, didn't make a
24 determination that the hard cost contingency didn't need
25 to be five percent.  And I can't read that note to

Page 63

1  determine why we got to forty-two thousand.  I could go
2  back.  Let me see.  That wouldn't be right.  It'd be a
3  lot more than that.  Sorry.  I can't read that and it
4  doesn't come to five percent, so I'm not exactly sure
5  what the reason was that that was different.
6      Q   A little bit further down it says developer
7  fee only on HC eligible cost.  Is that hard cost?
8      A   Yes.
9      Q   And what does that mean?
10     A   As we looked at earlier on the prior page,
11 there's eligible construction -- eligible cost and
12 ineligible cost.  And that number represented a
13 developer fee only on the eligible cost, although I
14 don't think at the end of the day this number is
15 accurate.  This was my estimation.  It was not
16 consistent with the credit underwriting report.  The
17 percentage of the fee is not accurate.  And what the
18 developer fee is calculated on is not accurate.
19     Q   Is there anything else that's not accurate in
20 0073?
21     A   I think we just touched on, just to make sure
22 I'm answering the question, the hard cost contingency.
23 And, again, that's the maximum limit, the five percent.
24 So to say it's not accurate, it is less than the
25 maximum.  So it's accurate.  It's not what would be

Page 64

1  consistent with what you would normally see.
2      Again, with the developer fee there's a
3  maximum, I believe it's eighteen percent; and all the
4  items that the developer fee can be charged on are not
5  necessarily just the ineli -- eligible items I've
6  listed here.  So it meets and is accurate, but could be
7  different in the cost certification.  So it does meet
8  the maximum, below the maximum, but there could be
9  different -- a different number in the final cost cert.
10     Q   Do -- you are -- the company, if you know,
11 still have the original documents so that we can -- so
12 this is more legible?
13     A   Yeah, you asked that and I'm going to check.
14     Q   I actually asked if you provided it to your
15 attorney --
16     A   Oh.
17     Q   -- if you or the com -- maybe Marc or Cindy
18 or --
19     A   Yeah.
20     Q   -- someone else that assists you still have
21 it.
22     A   Yeah.  I wouldn't have deleted it since the
23 beginning of the litigation.  So if it existed at the
24 time we started this litigation, I still have it.  I
25 believe I produced all those files to our attorney, but

Page 65

1  I'll review again to see if it was something that I
2  might have missed.  I'm going to make a note --
3      Q   Yeah.
4      A   -- if you don't mind for just a second.
5      Q   It's a good thing you brought your notebook,
6  because I think it would certainly be helpful to have
7  the --
8      A   Yeah, I agree.
9      Q   -- the original document.  Going on to --
10     A   And I'm going to reference your Bates Stamps
11 so that I make sure I'm looking for the right thing.
12     Q   We'll take a break here.
13     A   Is it 62 to 80, that number; or 68 to 80?  Let
14 me look back here.
15     Q   I think it was 69.  You noted --
16     A   Yeah, 69 to 80.  69 to 80.  Okay.  I'll look
17 for that.
18     Q   We'll take a break here in just one moment.
19 Let me just get through a few more of these documents.
20 0074, where did those numbers come from?
21     A   Typically Cindy.  Ah, looks up there CLB.  She
22 must be Bell at that time instead of Piurkowski.  I
23 can't remember when the divorce was and when the name
24 was.  But anyway, it came from Cindy initially.  I would
25 then review them, and oftentimes I'll make some

W. Scott Culp
March 18, 2025

Page 66

1 adjustments to them in my final model.
2     Q    So 6-5-23 is the date that Cindy, an employee
3 with the organization, provided these numbers?
4     A    That's correct.
5     Q    Do you know if they were ever updated or
6 changed maybe after the credit underwriting report or
7 anything?
8     A    I would have reviewed them at the time of the
9 final draft, final credit underwriting report.  I don't
10 know whether or not they were changed from June 23rd to
11 the credit underwriting report.
12     Q    The last column there has payment due and it
13 has three numbers underneath it.  What are those
14 numbers?
15     A    I don't know.
16     Q    Going on -- going on to 75, this may be a
17 continuation of impact fees; or does this reflect
18 something different?
19     A    Oh, it's a continuation, yeah.  What you've
20 got here is -- by the way, this printed -- it normally
21 would all be on one page, but you have some three pages
22 now and it's supposed to all be on one.  But to see if
23 this is in the right order, what you have here is city
24 impact fees, county impact fees and connection fees.
25 And if they're in the right order, the second set --

Page 67

1 page, page 75 is the city impact fees.  And the first
2 page is the county impact fees.  So that's what it's
3 showing.
4     Q    And what's page 76?
5     A    And 76 is the connection fees, water and sewer
6 connections, which are the city's.  And then you'll see
7 at the bottom of that page the total fees is combined
8 for all three pages.  And then you'll see notes with
9 regard to where Cindy got the information for the fee
10 schedule.  That's to help me determine if I'm
11 comfortable with the information we have.
12     Q    Where are the notes that -- the bottom of --
13     A    Page 76 --
14     Q    -- 76?
15     A    -- where it says notes.
16     Q    And it appears that there is, on Bates-Stamped
17 0074, right above it, page six of twelve, on 0075
18 there's -- it says page seven of twelve, and 0076 it
19 says page eight of twelve.
20     A    It is.
21     Q    Where's the rest of the pages?
22     A    The other pages that we've been referencing,
23 all the other pages, they just didn't have the footer
24 note because this is all in my model.  So this is
25 probably the sixth, seventh and eighth.  They shouldn't

Page 68

1 be though because these are printed -- oh, it's when
2 they're printed.  When you print a pdf and you put a
3 custom footer at the bottom, it puts a custom footer on
4 the printed page, 'cause these three pages, 74, 75 and
5 76 are one page in my model.  But when they're printed
6 and split up, the pdf will put a footer at the bottom of
7 them.
8     Q    Page 0077, up in the left it says Brevard
9 County, City of Sanford.  That's an error, correct?
10     A    Yes, it's carrying over from the other pages.
11     Q    The -- well, what are these numbers?
12     A    It's a calculation of the qualified basis for
13 the tax credits and a qualification of the annual tax
14 credit allocation that would be available to apply for
15 and a calculation of a reasonable estimate of the tax
16 credit equity that might be able to be achieved through
17 the sale of those tax credits.
18     Q    And where did you get these numbers?
19     A    All of the A and B come from the documents we
20 just looked at, total development cost and total
21 eligible basis.  I think if you were to look back at
22 page -- yeah, page -- yeah, I think that's right, page
23 73, the numbers tie to page 77 for total development
24 cost, land cost, other ineligible cost.  And then we get
25 into a calculation for qualified basis.

Page 69

1     Q    And where did you get the -- is that math, the
2 calculations, the --
3     A    The qualified basis.
4     Q    -- qualified basis?
5     A    Yeah, you'll note the hundred percent is the
6 affordable units, 'cause all of them are being
7 restricted under the four percent Low-Income Housing Tax
8 Credit program.  We discussed before, in my previous
9 deposition, basis boost, which is what that hundred and
10 thirty percent is for either being in a DDA or a QCT.
11 And the math generates the qualified basis you can use
12 for your tax credit allocation.
13     Q    Off to the right in the line applicable
14 fraction one hundred percent it says check --
15     A    Yes.
16     Q    -- and it has a number.
17     A    Yeah.
18     Q    What does that mean?
19     A    That's a calculation coming from our unit
20 distribution.  And you can see that it's consistent with
21 the total eligible basis above.  It says twenty-six in
22 B, total eligible basis, and the unit in -- the number
23 in gray is identical.  So we're checking to make sure
24 that these numbers carry forward correctly, they match.
25     Q    A little bit further down it says update.

W. Scott Culp
March 18, 2025

1    What does that mean?
2        A    It's just a reminder to update the tax credit
3    allocation, if there are any changes to that.
4        Q    And was it ever updated?
5        A    This would be the updated.  I mean, I'm
6    constantly up -- it's just a reminder to me to make sure
7    I'm updating it when I look at my model.
8        Q    Another note to yourself?
9        A    Yes.
10       Q    The next page, 0078, where did you get these
11   numbers?
12       A    The rents come from the Florida Housing
13   Finance Corporation website where they publish the
14   HUD-established rents, gross rents for each unit type in
15   each metropolitan statistical area; and that's where the
16   monthly gross rent comes from.  And we spoke earlier
17   about the utility allowances and where they came from.
18       Q    And the sixty percent AMI, thirty percent AMI
19   and eighty percent AMI, those were not the set-asides
20   that were presented to the Brevard County Commissioners
21   in December 2023, correct?
22       A    Not that I'm aware of.
23       Q    And the Viera FHFC, Florida Housing Finance
24   Commission, why is Viera referenced there?
25       A    Because as we mentioned, when you asked the

1    question earlier, is the closest in geography and the
2    closest with regard to construction type with this
3    community.  Therefore, an engineered utility allowance
4    would be most accurately estimated to be similar to the
5    closest development in the geography with the closest
6    construction type.
7        Q    Right.  I guess what I was trying to clarify
8    is is I thought you said that the numbers came from the
9    Florida Housing Finance Commission website, or is that
10   related to the rents?
11       A    I've said that with relation to the gross
12   rent.
13       Q    Got it.  So --
14       A    And then we talked about the utility
15   allowances coming from the engineered utility allowances
16   that were approved for Viera.
17       Q    Just to clarify, the rent amount is from the
18   FHFC website, the less utility allowances from Viera; is
19   that correct or not?
20       A    That is correct.
21       Q    0079, what are these numbers?
22       A    It's our estimate of expenses.
23       Q    Where did you get those numbers?
24       A    From my head.
25       Q    080, the pro forma, where did you get these

1    numbers?
2        A    From all the pages before.  Essentially all of
3    this is a calculation that pulls from everything we just
4    looked at.  It pulls the expenses, the revenues based
5    upon the unit mix and the set-asides.  And the only
6    thing it really doesn't pull is I have to manually input
7    the first mortgage at stabilization to generate the one
8    oh debt service coverage in the first year.  It's
9    identified in the lower right column, which goes back to
10   our sources and uses and determines what our first
11   mortgage is going to be at the balance.
12       MS. GAINEY:  I think it's probably a good time
13   to take a break.
14       THE WITNESS:  Sounds like it.
15       MS. GAINEY:  So let's go off the record.
16       THE VIDEOGRAPHER:  We are going off the video
17   record.  The time is 11:09 a.m.
18       (A brief recess was taken.)
19       THE VIDEOGRAPHER:  We are back on the video
20   record.  The time is 11:16 a.m.
21       THE WITNESS:  I have to remember to bring my
22   glasses next time so I don't have to wear my
23   sunglasses to read documents.
24   BY MS. GAINEY:
25       Q    Sir, I'm going to show you what I've marked as

1    Defendant's Exhibit 3 and ask you to identify those
2    documents.
3        A    They're all different fifteen-year operating
4    pro formas; some of them prepared by us and our office,
5    some of them prepared by one of the credit underwriters.
6        (Defendant's Exhibit 3 was marked for
7        identification.)
8        MR. PICCOLO:  Can you provide the Bates label?
9        THE WITNESS:  Yeah, she's got -- the Bates
10   labels are all mixed up here; and then I've got two
11   of the exact same documents with the same Bates.
12   And I've got a 2949, a 284, a 326, a 359, a 312, a
13   2930, it looks like a 2900, but it's stamped over,
14   and another, it looks like, an identical 2900.
15   Yeah, you have two of 2900 and two of 2874.
16   BY MS. GAINEY:
17       Q    We can remove the extra one.
18       A    Okay.  Those are extras.  And the 2900 and
19   2874 are from one of the credit underwriters.  The
20   others are our formats for the fifteen-year pro forma.
21       Q    Will you take a look at those and explain why
22   the numbers are different in all these different pro
23   formas that --
24       A    Sure.
25       Q    -- have been produced at various times?

W. Scott Culp
March 18, 2025

Page 74

1    A    Let's see.  It seems that all of the ones that
2  are in our format are for a hundred and five units.  It
3  seems that 2949 is for the set-asides for the four
4  percent Low-Income Housing Tax Credits.  284 are just
5  for the set-asides for the bond allocation.  326 is just
6  for the set-asides for the bond allocation.  And if
7  you're looking for differences there, the gross rents
8  are different.  And I haven't looked to see if those are
9  because we changed years from 2022 to 2023 and the gross
10  rents went up, but the gross rents are different between
11  those two.
12       359 has the same gross rents as 326.  Let's
13  see.  It has a different set of expenses.  Let's see.
14  Expenses are the same.  It looks like total revenue is
15  different.  It's a different allocation of the set-aside
16  units.  You have eighty-five at market and twenty at
17  fifty percent, where the other one has eighty-four at
18  market and twenty-one at fifty percent.  So that would
19  be the difference in that one.
20       And 312 is also based upon the twenty at fifty
21  and the balance at market.  And that one has slightly
22  different expenses than 359.  Expenses on that one are
23  just slightly lower than 359, and it looks like that's
24  due to -- oh, it's a lower number of units at a hundred
25  and one units instead of a hundred and five.  And

Page 75

1  lastly, 2930 is also the twenty at fifty, and the
2  balance at market for the hundred and five units.  And
3  it seems to be consistent with 359 in the first mortgage
4  amount and the gross revenues.  It looks like to be
5  almost identical to 359.
6       Q    Why are there so many different pro formas in
7  this project?
8       A    You probably asked us to produce every model
9  we had.  And oftentimes we have pro formas, you know, on
10  the network as we're progressing, you know, through the
11  development of the project and making different
12  projections based upon the set-asides.  And oftentimes
13  those pro formas would be saved on the network.
14       Q    So as prepared by Atlantic Housing Partners,
15  how many pro formas do you have there?
16       A    I have one, two, three, four, five; and I
17  wouldn't say I have six because this sixth one is
18  identical to one of the others with a different Bates
19  Stamp.
20       Q    So your five different pro formas and then
21  there's a couple prepared by the underwriting --
22       A    Right.
23       Q    -- the underwriting report?
24       A    There's -- this is probably one pro forma
25  because it's two different formats for AmeriNational who

Page 76

1  prepared this underwriting; and you'll see their
2  fifteen-year pro forma and then on Bates-Stamped 2874,
3  their first year per unit operating expenses.
4       Q    So going back to Missigman 0080, why did you
5  pick this pro forma versus one of the other versions
6  that's in this case?
7       A    It should have been the most up to date.
8       Q    Is this --
9       A    Most current.
10       Q    Is this Bates-Stamped 0080?
11       A    I'm not looking at 0080, I don't think.  I
12  think I'm looking at the pro formas you handed me.  Is
13  there a --
14       Q    Yeah, I was referring you back to 0080 and I
15  asked you why you picked this pro forma, and I think you
16  said it's because it's the most up to date?
17       A    Yes.
18       Q    0080 is the pro forma you used in actually
19  doing your model, correct?
20       A    The model that I provided to -- the updated
21  model that I provided to Paul Missigman, yes.
22       Q    But we don't know when this was actually
23  prepared; is that correct?
24       A    We don't know when that was actually updated,
25  no.

Page 77

1       Q    And so why are the pro forms changing?
2       A    Typically when you're developing a community
3  you start with a projection.  And as I noted, one of
4  these had a hundred and one units.  At one point there
5  were only a hundred and one units.  As you proceed
6  through the design development process you complete
7  further your design development, and we got to the
8  hundred and five units.
9       Rents changed from 2023 to 2024 or 2022 to
10  2023; and I think you see that in here, there was a
11  change in the gross rents, allowable gross rents under
12  the Florida Housing Finance Corporation.  So that would
13  have changed.  Expenses change during the term of the
14  project, and we try and utilize the most current
15  expenses that we're aware of.  So we make changes as we
16  go along until final credit underwriting, and then we
17  make changes after that until final cost cert, but...
18       Q    So in the time that you're considering this
19  project, which I understand to be approximately spring
20  of 2023 until December of 2023, there's multiple changes
21  that needed to be made with respect to the pro forma,
22  correct?
23       A    It was a multi-part question.  I think we were
24  considering this project prior to the spring of 2023.
25  But during the time frame from when we were first

Page 78

1  considering it to the time frame of final credit
2  underwriting, yes, there would be multiple changes.
3      Q    The land contract was May of 2023. Would you
4  have done a pro forma before you did the land contract?
5      A    Definitely.
6      Q    So when do you think you started
7  considering -- or actually get to a point where you're
8  doing a pro forma for a project?
9      A    I don't recall.
10     Q    But you think it's before the spring of 2023?
11     A    I'd have to look at the dates in the documents
12  that are in the record. We typically start very early
13  on when we're considering a bond allocation in a
14  particular location, typically even prior to signing a
15  land contract for purchase of land.
16     Q    The cash flow seems to fluctuate in each of
17  these pro formas as well. Do you agree with that?
18     A    Not in each of them but in most of them. I
19  think I indicated to you that there were two of them
20  that were identical.
21     Q    You can disregard.
22     A    Okay.
23     Q    That was unintentional.
24     A    And they're actually not -- I look at it now,
25  they're not identical. By the fifteenth year they're

Page 79

1  two thousand dollars difference, but it's, for all
2  intents and purposes, identical.
3      Q    So why does the cash flow vary with each pro
4  forma?
5      A    I mentioned that when I was reviewing these.
6  We had a change in the gross rents. The gross rents
7  obviously affect the cash flow. And then in one
8  scenario we had a change in a number of units set aside
9  at market and the number of units set aside at fifty
10  percent.
11     Q    Would there be any other thing -- other
12  reasons to change your productions as it relates to cash
13  flow?
14     A    Expenses. Anything that changes in the
15  expenses, you'll see changes in here. We had one cash
16  flow projection with an exemption for real estate taxes.
17  And we had other cash flow projections that had real
18  estate taxes that were not exempt for all the units
19  because at that time we were not considering the ability
20  to have an exemption for all the units.
21     Q    I think in one of the pro formas the cash flow
22  is zero; is that right?
23     A    The cash flow is eighteen dollars.
24     Q    I think it was a couple back.
25     A    I think that's the one you're referring to

Page 80

1  that says zero under eighteen dollars. I don't think
2  there's one that's actually zero. It's one that's
3  eighteen dollars and it says zero underneath it. It's
4  2949, cash flow of eighteen dollars, and it has a zero
5  underneath that.
6      Q    So that's projecting a zero cash flow?
7      A    On that pro forma, yes.
8      Q    I'm sorry, let me -- let me see all of them.
9  I'm sorry.
10     A    Oh.
11     Q    On Missigman 000326 there's actually a
12  negative cash flow. Would you agree with that?
13     A    Yes. In the first seven years under this
14  fifteen-year pro forma 326, which I'm not referencing as
15  Missigman's pro forma but the one you handed me, there
16  is a negative cash flow.
17     Q    And why would there be a negative cash flow?
18     A    If we had input a tax exempt bond amount and
19  the calculations for the first mortgage, based upon that
20  tax exempt bond amount, generated expenses and debt
21  service greater than the net operating income.
22     Q    You testified earlier that some of the numbers
23  that you used in your model were from the credit
24  underwriting report. The pro forma is something that
25  the company creates themselves, or do you rely on the

Page 81

1  credit underwriting report's pro formas?
2      A    Both. We discussed that. In the documents we
3  discussed earlier in my deposition there was a pro
4  forma; and I indicated that all of that had been updated
5  to be consistent with the final credit underwriting
6  report, with the exception of changing the set-asides
7  for the four percent Low-Income Housing Tax Credits. So
8  that pro forma would be updated through the credit
9  underwriting report but taken into consideration the
10  restrictions for the four percent Low-Income Housing Tax
11  Credit.
12     Q    If you look at the credit underwriting
13  reports, it's covered up. So maybe it's 02900.
14     A    Yes, maybe.
15     Q    That's where it looks like there's a cash flow
16  after debt service of zero up until year ten. Why is
17  that, or with the exception of year two, thirty-five
18  dollars, and three years, seventy-five dollars?
19     A    Yeah, this is an underwriter's pro forma, and
20  there it looks like they're sizing this amount
21  available. Yeah, so they're applying the net operating
22  income to the first mortgage tranche A and tranche B and
23  then to the issuer fees to arrive at the zero dollar
24  cash flow.
25     Q    And is that something that Atlantic Housing

Page 82

1  Partners has input on?
2      A.  No.  The underwriter prepares these
3  fifteen-year pro formas.  We prepare the ones that we've
4  gone over prior.
5      Q.  And I understood you to say the reason why you
6  picked this particular pro forma to include in your
7  damages model was because you believed that was the
8  most updated one.  Is that a correct understanding of
9  your testimony?
10      A.  No.  I believe I told you that that model was
11  my model that I provided to Paul Missigman for him to
12  use in his input, and there was a lot of other items
13  that were noted in that e-mail that we discussed that he
14  was going to be utilizing to create the damages.
15      Q.  Right.  I was just asking you why you chose
16  the numbers in this pro forma that's marked as Missigman
17  0080 versus the various other pro formas that have been
18  produced in this case, and I think you said that this
19  was the most updated pro forma.
20      A.  That would be the most updated as it relates
21  to the project as programmed to be four percent
22  Low-Income Housing Tax Credits.  I don't believe this
23  credit underwriting report was in any way related to
24  four percent Low-Income Housing Tax Credits; and,
25  therefore, their debt service calculation and their

Page 83

1  expenses would be different.
2      Q.  So I'm not sure exactly clear on what you're
3  saying.  You're saying that the credit underwriting
4  report didn't consider all the -- didn't consider the
5  four percent tax credit when they were doing their pro
6  forma?
7      A.  That's correct.  They have to only consider
8  what the requirements of the bonds are because they
9  don't know that you're eventually going to get the four
10  percent credits.  They know they're going to close on
11  the bonds.  If I choose not to take the credits, they
12  can't assume that.  They have to assume that all we have
13  is the bonds, and the bonds still have to be valid.
14      Q.  So all the pro formas that were generated
15  through the credit underwriting report were just
16  considering only the bonds?
17      A.  That's correct.
18      MS. GAINEY:  Let me show you what I've marked
19  as Defendant's Exhibit 4.
20      (Defendant's Exhibit 4 was marked for
21  identification.)
22      THE WITNESS:  You want these back?
23  BY MS. GAINEY:
24      Q.  No.
25      A.  They weren't marked, I don't think.  Well, I

Page 84

1  guess you did.
2      Q.  Yeah.
3      A.  You marked them as 3.
4      Q.  We just need to keep them in order for the
5  court reporter --
6      A.  Okay.
7      Q.  -- if you don't mind.  I won't have any other
8  questions --
9      A.  I've got 1, 2, 3 there.  This says 4, but it's
10  2 for this deposition.  So we know that.
11      Q.  Right.
12      A.  Right.
13      Q.  These have various Bates-Stamps at the bottom.
14  Jay Brock 1.27.25, 728, Paul Missigman 341, Paul
15  Missigman 314, Paul Missigman --
16      A.  Sounds like it came from their depositions,
17  huh?
18      Q.  -- 328, Brock 721, Brock 747 and Plaintiffs
19  2931, for purposes of the record.  What are these?
20      A.  These are the sources and uses statements that
21  would come from different models that either Paul or Jay
22  or I might have been working on and have in our records
23  on the network.  So they were produced for this case.
24      Q.  Why are there so many different versions of
25  the sources and uses statement?

Page 85

1      A.  Again, all of these are going to change
2  depending upon when they were done and what the basis
3  was for those at that time.  Like we mentioned earlier,
4  whether it was in 2022 with certain incomes and certain
5  bond amounts.  You'll note the bond amounts in both the
6  construction and permanent are different on several of
7  these.  You'll note the construction costs are
8  different.  They get updated as we proceed.
9      You'll notice the financial costs are
10  different.  You'll note the developer fee is not shown
11  on, it looks like -- is it all of them?  Yeah, so it
12  looks like all of these were prepared for the bond
13  allocation without regard to the Low-Income Housing Tax
14  Credits 'cause they're showing owners' equity without
15  regard to Low-Income Housing Tax Credits.
16      Q.  And when you were preparing your model, which
17  sources and uses statement did you use?
18      A.  The one you reviewed with me.
19      Q.  And why did -- I'm sorry.
20      A.  And that -- the one that you reviewed with me
21  and I transmitted to Paul Missigman as the most updated.
22      Q.  And is that the same reason, because that was
23  the most up-to-date one at the time you gave it to Paul?
24      A.  In my impression at that point I believe it
25  was most up to date, yes.

W. Scott Culp
March 18, 2025

Page 86

1      Q    And I think you established earlier that that
2  was in February 2023?
3      A    I think it -- yeah, February 24th.  Let me
4  see --
5      Q    I'm sorry, that would have been 2024?
6      A    2024, yeah.
7      Q    Excuse me.
8      A    I was trying to see if there was a -- yeah,
9  that was when I sent that to him.  I don't know that
10 that one may have been prepared anytime between that
11 final credit underwriting report and February 24th.  So
12 the final credit underwriting report was December.  This
13 e-mail was February 24th.  So my model could have been
14 prepared anytime in those two -- in that two-month
15 period.
16     Q    The dates that are in the lower right-hand
17 corner of these, they actually have dates, most of them
18 end 2025.
19     A    That would be date printed.
20     Q    That's what I was going to ask.
21     A    That's just date printed.  None of these --
22     Q    That wouldn't have been date prepared?
23     A    Yeah, none of these are date prepared.
24     Q    Is there any way to determine when these
25 sources and uses statements were prepared?

Page 87

1      A    If we still have the Excel spreadsheet models
2  we might have a creation date in the metadata.  Some of
3  these in this format don't retain the Excel data.  They
4  go into applications in pdf format, and we might not
5  even have that.
6      Q    As a part of this lawsuit and any production
7  with any of the documents related to this lawsuit, did
8  you do a search for any type of Excel spreadsheets?
9  Because, but for one, I believe I've only been produced
10 one Excel spreadsheet and that's recently.
11     A    Well, let's make sure we're talking the same
12 language here.
13     Q    Sure.
14     A    When you're saying produced, digitally or
15 produced in paper?  Because on paper it doesn't tell you
16 whether it's an Excel spreadsheet or a pdf.
17     Q    Digitally produced including any metadata that
18 would be available.
19     A    Yeah.  I know that we have produced digitally.
20 Whether or not you actually received those digitally or
21 you received them in printed copy, I don't know.
22     Q    And do you know if the sources and uses
23 statements were produced digitally?
24     A    I don't know for each of these specific
25 sources and uses statements, if any of these were

Page 88

1  produced digitally.  I doubt that most of these were
2  because typically the models are updated on a regular
3  basis, and many of them are not -- the Excel spreadsheet
4  is not retained.
5      MS. GAINEY:  I'll show you what I'm marking as
6  Defendant's Exhibit 5.
7      (Defendant's Exhibit 5 was marked for
8  identification.)
9  BY MS. GAINEY:
10     Q    Actually, my apologies.  Oh, I have an extra
11 page of this.  I decided to stop killing paper since
12 they're all marked, but you could reference them.  What
13 is this?
14     A    It's estimating the 2024 incoming rents.  And
15 it provides in summary the estimate of the net rents
16 based upon the estimate of the engineered utility
17 allowances as of October 5th of 2023.
18     Q    All right.  Let me show you what I'll mark as
19 Exhibit 6 and ask you what that is.
20     A    That is a rent calculation.  Again, it's
21 providing an estimate of the net rents and with an
22 estimate of the utility allowances.  And it appears
23 these utility allowances were taken from Venue at Viera
24 at that time.
25     (Defendant's Exhibit 6 was marked for

Page 89

1  identification.)
2  BY MS. GAINEY:
3      Q    Number 5, for purposes the record, is
4  Bates-Stamped Plaintiffs 02736, and Number 6 is
5  Bates-Stamped Missigman 1.27.25, 0323, correct?
6      A    Correct.
7      Q    And so it looks like we have a date on
8  Exhibit 5 which appears to be October 5th, 2023,
9  correct?
10     A    Well, you have a date that these income and
11 rents are as of.  I don't know --
12     Q    Right.
13     A    -- if that's the date of this document.
14     Q    Understood.  Thanks for the clarification.
15 So the document appears to provide a summary
16 of estimated 2024 income and rents as of December --
17 excuse me, October 5th, 2023, correct?
18     A    I hate to say correct to that because it's
19 providing an estimate of the net rents and the income
20 limits.  I know the title says 2024 income, backslash,
21 rents.  That's the rent limits for the household.  It's
22 not the income to the property.
23     Q    So does the document at the top say, quote,
24 estimated 2024 income, slash, rents as of 10-5-2023,
25 close quotes?

Page 90

1    A    Yes.
2    Q    And Exhibit 6, it appears we do not have a
3 date for when these rent calculations were made; is that
4 correct?
5    A    That's correct.
6    Q    There appears to be a difference in the
7 average median income at the top of 5 versus 6.  Why is
8 that?
9    A    I would have to look at the Florida Housing
10 Finance Corporation, but I'm assuming that the
11 rents increased.  And you see an adjusted median income
12 of ninety-one nine for the Palm Bay MSA at the top of
13 the one with the 10-5-2023, and you see an adjusted
14 median income of eighty-six for -- on the other
15 document.  I'd have to look at the Florida Housing
16 Finance Corporation website to determine if there was a
17 change between 2022 or 2023 and did the rents go up or
18 did they go down.  And that is most likely where the
19 difference is, unless we made an error.  And if I look
20 at the website I'll be able to tell you if one of these
21 is an error or are they just two different ones based
22 upon two different years published by Florida Housing
23 Finance Corporation.
24    Q    Is it fair to assume that the adjusted median
25 income likely went up and, therefore, Number 5 is

Page 91

1 probably the more current document --
2    A    I would --
3    Q    -- is that fair?
4    A    -- not assume that because the median incomes
5 have gone down.
6    Q    Okay.
7    A    And you have, as you'll note in the one that
8 doesn't -- is not dated 10-5-2023, there is a median
9 income and adjusted median income, and they're different
10 numbers, where the other one doesn't have two different
11 numbers.  Sometimes when the rents go down you don't
12 have to adjust as far as it goes down, you know.  HUD
13 provides the data.
14    Q    Why would these documents have been prepared
15 by the company?
16    A    We're always looking at the maximum rent and
17 the net rent as we proceed with the development.  So
18 we're always updating our pro formas.  And the
19 underwriters will also be updating with the most current
20 data, so we would have been trying to use the most
21 current data.  The other reason for an update could be
22 an error.
23    Q    Would you have used one or both of these
24 documents in order to do your model?
25    A    My model I would not have used either of these

Page 92

1 documents.  We went over where my model came from, and I
2 would have gotten the gross rents from the Florida
3 Housing Finance Corporation website, and I believe my
4 model used the Venue at Viera engineered utility
5 allowances.
6    Q    And so where would the numbers from these two
7 documents have come from, the rents, the estimated
8 rents?
9    A    The rents and the gross rents should come from
10 the Florida Housing Finance Corporation website.  Could
11 have been an error.  I don't know that without looking
12 at that website.  That's why you'll see the eight
13 sixty-two and the eight oh six, and we saw that in
14 different fifteen-year pro formas.  That could have been
15 a change from year to year, could have been an error.
16 I'd have to look at the corporation's website.  The
17 utility allowances are different because you have on one
18 of these documents an engineered utility allowance
19 estimate, and on another document you have the Venue at
20 Viera utility allowances.
21    Q    We'll show you what we're marking as
22 Defendant's Exhibit 7 and ask you to identify Exhibit 7.
23    MS. GAINEY:  For purposes of the record, it's
24 Missigman 324, 325, 337 and 338.
25    (Defendant's Exhibit 7 was marked for

Page 93

1 identification.)
2    THE WITNESS:  The first page is a table of
3 rents, less utility allowances for the fifty
4 percent units, and net rents for the eighty percent
5 of the units that are market that don't have any
6 indication of a monthly gross or a utility
7 allowance, 'cause that does not relate to market
8 rate rents.  The second page relates to expenses;
9 and there's a second table that has the actual
10 expenses from Town West, another one of our
11 developments.  They are comparing the two, and
12 they're comparing property taxes and how to project
13 the property taxes.
14 BY MS. GAINEY:
15    Q    Is that from Town West or Parc Hill Senior?
16    A    325 that I'm looking at says Town West above
17 the second block of expenses.
18    Q    All right.  And then on the right it says
19 based on Parc Hill Senior.  So are you pulling from both
20 Town West --
21    A    I'm not seeing based on Parc Hill Senior.
22 What are you looking at?
23    Q    At the very top, top line.
24    A    That's the first block of expense, not the
25 Town West expenses.  So the first block of expenses are

Page 94

1  expenses based upon Parc Hill Senior.  The second block
2  of expenses is Town West.  So somebody's doing an
3  analysis to determine, you know, what they project the
4  expenses should be based upon other senior communities.
5      Q    And who's the someone doing that, do you know?
6      A    It could be me, it could be Paul, it could be
7  Jay, it could have Ammon.  We're all working on
8  projections at some point in the development of a pro
9  forma to give to the HFA.
10     Q    And then the next two documents?
11     A    In rent schedules, that's our different --
12 based upon the monthly gross rent and different utility
13 allowances.  And the expenses seem to be identical.
14 They're giving the same analysis of comparable expenses
15 for two other projects that are seniors.
16     Q    So why are the numbers different from 000324
17 versus 000337?
18     A    The monthly gross rents are different.
19     Q    And why is that?
20     A    And as I stated when you asked that a few
21 minutes ago, I'd have to look and see whether the
22 Florida Housing Finance Corporation HUD-published rents
23 changed --
24     Q    They did.
25     A    -- in that time frame, or whether or not one

Page 95

1  of these was an error.
2      Q    So I guess I'm just trying to figure out, you
3  know, why these documents were created and then why are
4  the numbers different, and which and which ones -- well,
5  let me start with that.  Why were these documents
6  created?
7      A    When we develop a community we create
8  documents that help us estimate the rents, the net
9  rents; and we create documents that help us estimate the
10 expenses.  We update those documents with the best
11 information we have.  The information may change because
12 Florida Housing Finance Corporation changes it or HUD
13 has changed it and Florida Housing Finance Corporation
14 has published the HUD change, or we can have an error.
15 And if I was to look at the Florida Housing Finance
16 Corporation website, I could tell you whether these
17 monthly gross rents were a change from year to year or
18 if they were an error in one of these documents.  If you
19 want me to do that, I can do it on my phone right now.
20     Q    You can do it, if it can be done quickly.
21     A    Yeah, it's pretty quick.  It's really not that
22 complicated.  They publish this and they keep it on
23 their website for every year, so it's -- the rental
24 housing -- rental housing rent limits.  Let's look at
25 2023.  Let's see if I can get 2023 pulled up.  It wants

Page 96

1  to do 2024.  2023, there we go.  Income limits, '23.
2  Let me get to Brevard County.  Fortunately it's not very
3  far since it's a B, Brevard County, and then look at our
4  one-bedroom fifty percent rent.  Our one-bedroom fifty
5  percent rent for Brevard County --
6      Q    Fifty percent of AMI is what you mean?
7      A    Yeah.  That's eight oh six.  So in 2023 that
8  schedule is right, eight oh six nine sixty-seven eleven
9  eighteen, okay.
10     Q    So that's 324?
11     A    Bates-Stamped 324, yeah.  So that was correct
12 for what was published by HUD effective May 15th of
13 2023.
14          Then we have the other one.  We can go to
15 2024, 2024 which was effective on April 1st of 2024.  We
16 have Brevard County.  Fifty percent rents for
17 one-bedroom units.  And it says eight eighty-six and a
18 thousand sixty-three.  So that seems to be an error, the
19 eight sixty-two and the thousand thirty-five, at that
20 time.
21     Q    You're referring to Missigman 337?
22     A    Yes.
23     Q    So I'm understanding you to say, and correct
24 me if I'm wrong, that Missigman 324 would have been the
25 monthly gross rent for 2023 for fifty percent AMI?

Page 97

1      A    Correct.
2      Q    And that was as of -- what was the date?
3      A    I'd have to go back now.
4      Q    That's okay.  It will be on the record.
5      A    Yeah.
6      Q    And then 337 appears to be an error.
7      A    Well, I would also say that -- yeah, you had
8  given me under Exhibit 5, we often estimate the
9  HUD-published future year rents.  We try and estimate
10 what the increase is going to be.  And you'll see in
11 that estimated 2024 the gross was eight sixty-two, which
12 is consistent with this one.  So that was an estimate
13 before it was published.  You see as of 10-5, so that
14 was an estimate of the 2024 rents as of 10-5.  The 2024
15 rents weren't published until April 1st.  So we couldn't
16 bring those accurate to the HUD-published rents.  So
17 this was an estimate of what was 2024.
18     Q    So Exhibit 5 and Missigman 337 in Exhibit 6
19 are both estimates?
20     A    That's correct.
21     Q    And then what's actually published on the
22 website was what, eight -- what did you say it was?
23     A    Eight eighty -- it's a little bit higher than
24 the eight sixty-two that was estimated.  Eight eighty --
25 eight eighty-five -- eight-six.

W. Scott Culp
March 18, 2025

1    Q    But when you did your model what number did
2   you use?
3    A    Want to hand me back the model we looked at?
4    Q    Yeah.
5    A    Because these are all just different pages.
6    Q    It should be right in front of you.
7    A    Oh, that's right.  Yeah, you gave me that.
8   Let me see here.  So let's go back to the model you
9   asked me questions about that I provided to Paul.
10   Q    And just refer to the page number, please.
11   A    The model I provided Paul, which is the
12  Bates-Stamped 0078, we didn't have fifty percent rents.
13  We had sixty percent rents.  And those sixty percent
14  rents, it looks like they were from -- it looks like
15  2023.  Let me look.  There's 2024.  Yeah, and even it
16  was, it says it up at the top, the HUD.  The model that
17  I provided to Paul was based upon the HUD-published of
18  May 13th of 2023.  Now, I don't know that Paul's damages
19  summary used that.  I was provided this for his input,
20  made notes in the e-mail that we needed to update for
21  other items.
22   Q    Mr. Missigman testified that after he did his
23  model, and I'll just quote it, quote, I believe I took
24  the models, the numbers from my model and put it in a
25  schedule for Scott, just a printed schedule for him to

1   provide to our attorneys, close quote.  And then I asked
2   him where is the printed schedule, and he responded you
3   have to ask him.  Is there a printed schedule of his
4   model that you were provided?
5    A    We talked about that earlier.  I reviewed that
6   schedule yesterday.  That was the first time I had seen
7   it.  It was the pdf of his model that was provided to
8   our attorneys.  And the first time I had reviewed it was
9   yesterday I looked at that printed model.
10   Q    Okay.  So I need to clarify because I'm a
11  little bit confused.  Mr. Missigman brought documents to
12  his deposition with him that was all the documents
13  responsive to the subpoena duces tecum.  So I was asking
14  him where his schedule was at, and he said I had to ask
15  you.
16   A    What he --
17   Q    So --
18   A    -- brought with him, I think, was his printout
19  of his Excel model.  What I looked at was the printed
20  version that I believe is the exact same thing.  I don't
21  have his Excel model.  I never have had his Excel model.
22  The first time I've ever reviewed a printout of that
23  model was yesterday.
24   Q    Okay.  So I'm just --
25   A    But I think that printout is what you're

1   asking about.
2    Q    Yeah, I'm just trying to see if there is a
3   separate document out there floating around.  Because as
4   I read this and as I know from what he testified to, it
5   seems like he almost did a summary for you of his model
6   and gave it to you or his schedule.  And so I asked him
7   where that schedule was at, and he said I'd have to ask
8   you.
9    A    Yeah.
10   Q    As in it wasn't attached to his documents --
11  his deposition.
12   A    Yeah, I don't recall ever getting any summary
13  of his model.  And as I testified earlier, I didn't
14  review his model.  The first time I ever reviewed his
15  model was yesterday, and the only copy I have is a pdf
16  copy of what he produced to our counsel of his model.
17   Q    Mr. Missigman also indicated that someone
18  named Trisha Doody, if I'm pronouncing that correctly,
19  may have assisted in providing documents for his model.
20  Who is Trisha Doody?
21   A    Trisha Doody is our vice president in charge
22  of finance.  It's not likely that she would have
23  provided documents for his model, although he sometimes
24  gets information from her.  She works with the credit
25  underwriters, and she takes data from me or Ammon or Jay

1   and transmits those to the underwriters.  So he may be
2   thinking that she has information that the underwriters
3   had that he got from her in working on his models; but
4   it would be information that you already have, and it's
5   been produced.
6    Q    Other than what you have already told me about
7   and testified to, are there any other data or datasets
8   or documents or summaries that support the assumptions
9   that you made in your model that you provided to Mr.
10  Missigman?
11   A    That's a mouthful, isn't it?  You ask are
12  there any other documents or data.  We discussed the
13  total development cost limitations that are in my model,
14  the documents and data for that on the Florida Housing
15  Finance Corporation website.
16   Q    Yes, sir.  I meant any other -- any other
17  documents --
18   A    Are you --
19   Q    -- that we have not already discussed or --
20   A    Well, I don't think that's what you asked.  So
21  let's be clear, because you asked me about any other
22  documents that would lead to the model that I provided
23  to Paul.  There's documents that lead to these numbers.
24  So I don't want to say that, you know, there was no
25  other documents or data when there actually were.

W. Scott Culp
March 18, 2025

Page 102

1    Q    Okay.  Tell me --
2    A    So if you want to ask it differently, that's
3  fine, but...
4    Q    **Tell me what documents and data.**
5    A    The, as I said, total development cost
6  limitations and the factors that adjust that as
7  published by the Florida Housing Finance Corporation,
8  that documentation, that information is within the
9  information that I provided to Paul.  The impact fee
10  schedules have a note on where we gathered that
11  documentation, that information.  We gathered that from
12  the websites of the city and the county.  So there is
13  documentation and data at the city and the county that
14  is the basis for the impact and connection fee
15  calculations.
16         There is Florida Housing Finance Corporation
17  approved utility allowances for Viera.  That's the
18  backup documentation for the data that I gave Paul with
19  regard to the utility allowances.  And I believe that's
20  all the other data or documentation related to the model
21  that I gave to Paul.
22    Q    **You did -- in fairness, you told me about Town**
23  **West.**
24    A    Town West and Parc Hill.
25    Q    **And Parc Hill.**

Page 103

1    A    Right.  We have historical data from Town West
2  and Parc Hill.
3    Q    **All right.  Other than what you have already**
4  **told me and testified about, are there any other**
5  **datasets or documents that support the assumptions that**
6  **you made in your model?**
7    A    Yes.
8    Q    **What are they?**
9    A    The expenses that are in our model are based
10  upon the expenses in our portfolio.  And that would
11  include the entire portfolio of senior communities in a
12  similar geography and building type.  Those are not just
13  made up, they came from data that we have with regard to
14  our expenses.
15    Q    **Your entire senior portfolio expenses?**
16    A    Yes.  I know those numbers, Paul knows those
17  numbers in his head; but you're asking for data that
18  supports those.  The data that supports the numbers we
19  know come from our actual expenses.
20    Q    **How do I get those documents?**
21    A    With two different methods.  Our expenses are
22  audited annually by Florida Housing Finance Corporation,
23  and it's public record.  And I believe our auditors also
24  have our expense reports for each of the seniors
25  communities.

Page 104

1    Q    How many senior communities are we talking
2  about?
3    A    I don't recall.
4    Q    So you're saying that the numbers that you
5  based your expenses on for your damages model are from
6  the entire portfolio of senior communities for Atlantic
7  Housing Partners?
8    A    It's based upon our estimation that is based
9  upon our experience and knowledge of our expenses on all
10  of our senior communities, yes.
11    Q    I'm hearing you to say there's a dataset that
12  has all the expenses for each of your senior portfolio
13  communities that's accessible and, it sounds like,
14  audited.
15    A    That's correct.  We have access to and is
16  audited annually.
17    Q    **Did you ever access those expenses for this**
18  **lawsuit?**
19    A    No.
20    Q    **Why not?**
21    A    Because we know them in our head because we
22  work with them every day and every month.  And so we
23  have a very good understanding of what our expenses are.
24  So we don't need to go look into the datasets to make a
25  determination because we're monitoring that on a monthly

Page 105

1  basis.
2    Q    **So if someone like me that doesn't know what's**
3  **in your head, how would I have known that without those**
4  **documents?**
5    A    The expenses we provided to you; but to know
6  how we came up with and determined what those expenses
7  are, you would ask us, as you have in deposition.  And
8  if you were trying to prove or disprove whether what we
9  thought was accurate, you'd probably want to see some
10  additional backup with regard to those expenses.
11    Q    **Yes.  And how -- what additional backup is**
12  **available with respect to those expenses, if any**
13  **documents exist?**
14    A    Yeah.  There's actual expense reports for each
15  of the communities.
16    Q    **How many communities?**
17    A    I don't recall how many senior communities.  I
18  could look and see, but I don't recall.
19    Q    **Okay.**
20    A    It's not a huge number.
21    Q    **Well, you have a lot of communities, so I**
22  **don't know how many are senior.**
23    A    Yeah.  Eighteen.
24    Q    **Thank you.**
25         Why did you use senior communities to document

W. Scott Culp
March 18, 2025

Page 106

1  your expenses for Venue at --
2      A    Expenses --
3      Q    -- Heritage Oaks?
4      A    Expenses are fairly well related to the
5  demographic of the occupancy, and they also are fairly
6  well related to the construction type and the geography.
7  So we would be considering the expenses for a like-kind,
8  comparable community.
9      Q    So when you're thinking about expenses for
10  Venue at Heritage Oaks, you deem your other senior
11  communities as communities that are most related to the
12  proposed Venue at Heritage Oaks development, correct?
13      A    Correct.
14      Q    When you were doing your damages model did you
15  account for any tenant turnovers, vacancy or nonpayment
16  of rent assumptions?
17      A    I didn't do a damages model when I did my
18  financial model to provide to Paul.  Yes, it's in the
19  pro forma, it identifies the vacancies.
20      Q    And just for clarification, I mean in your
21  capacity as Atlantic Housing Partners.  When Atlantic
22  Housing Partners did their damages model did they
23  account for any turnover, vacancies or nonpayment of
24  rent in the assumptions?
25      A    I don't recall.

Page 107

1      Q    Did the company analyze comparable affordable
2  housing partners in Brevard County to determine
3  projected rental revenues?
4      A    We have comparable affordable housing
5  communities in Brevard, so we know what the affordable
6  rents are and the ability to obtain maximum rents in
7  that area.
8      Q    So you're saying you looked at your other four
9  affordable housing communities in order to project the
10  rents?
11      A    Yes; but not to project the rents, to project
12  the occupancy and vacancy.
13      Q    With respect to cash flow, did you look at
14  other Brevard County properties, affordable housing
15  properties?
16      A    Cash flow relates to revenue and expenses.  We
17  look at revenue and expenses.  The cash flow is just
18  math.  So we don't --
19      Q    Let me --
20      A    We don't look at cash flow, cash flow in one
21  community versus another community.  We look at expenses
22  and revenues.
23      Q    With respect to revenue, did you look at other
24  affordable housing developments in Brevard County?
25      A    We utilized the maximum gross rents and allow

Page 108

1  the utility allowances, and in our experience we believe
2  that we would have no concern for achieving maximum
3  rents.
4      Q    Did the company consult with any independent
5  financial expert to validate damages calculations?
6      A    I don't believe we've consulted with any
7  outside third-party independent damages expert.
8      Q    As I understand, Mr. Missigman's testimony is
9  that he did not review his damages expert with anyone in
10  this case.  Is that the company -- is that Atlantic
11  Housing Partners' understanding?
12      A    Yes.
13      Q    Did the company take any steps to ensure that
14  the financial projections and assumptions in this case
15  were accurate?
16      A    The financial projections and assumptions were
17  reviewed by the credit underwriter for the bond
18  allocation, and they review it to determine if they're
19  accurate.  I don't believe anybody reviewed the damages
20  calculations.
21      Q    Let me show you what's Bates-Stamped Jay Brock
22  357.  What is that?
23      A    This is an e-mail from me to Ammon asking for
24  his Excel model for the application for Venue at
25  Heritage.

Page 109

1      Q    And so did Ammon also do models related to the
2  proposed development?
3      A    He does models at the application stage, and
4  he'll provide those models to me for review prior to
5  submitting an application.
6      Q    And what type of models is he doing?
7      A    Essentially the same model that we reviewed
8  that I provided to Paul Missigman.  They're almost
9  identical in format.  And he runs those models, and then
10  I take those and review those.
11      Q    And did the company preserve those models that
12  Ammon created?
13      A    We don't typically preserve every model that
14  gets created.  We preserve models that get submitted;
15  and we update those, as indicated in my prior testimony.
16      Q    Referring you back to the e-mail that you sent
17  Mr. Missigman.  I have a couple of admitted questions.
18  I'm referring you to Bates-Stamped Missigman 0001.  It's
19  the e-mail --
20      A    Yes.
21      Q    -- from you to Mr. Missigman dated March 1st,
22  2024.  And about halfway down he -- in this e-mail
23  communication, he says, quote, other income is
24  forty-seven two five zero a year is low.  So can I
25  increase this in my loss numbers, close quote.  Do you

W. Scott Culp
March 18, 2025

1  know what he means when he's saying that?
2      A    Yes.
3      Q    Can you explain?
4      A    Yeah.  We provide projections to the
5  underwriters that are conservative, and oftentimes the
6  underwriters are using industry standards that may be
7  different than our experience in our portfolio.  So my
8  model, with other income of forty-seven thousand
9  dollars, may not be consistent with what Paul Missigman
10  knows as our actual experience for our communities.
11      Q    Missigman 002 is an e-mail communication, and
12  this appears to be the information Mr. Thomas provided
13  to Mr. Missigman.  Did you have any input regarding the
14  data that Mr. Thomas was providing to form
15  Mr. Missigman's damages model?
16      A    No.
17      Q    Mr. Thomas would be the best person to talk
18  about that -- those e- -- that e-mail?
19      A    Yes.
20      Q    On 0004 bottom it says Tricia was only using
21  forty-seven two five for other income.  I think you
22  already told me who Tricia was.  Is she the one pulling
23  the other income numbers?
24      A    Tricia is communicating with the underwriters.
25  The one providing the other income numbers would be me

1  or -- we're talking me, Ammon, Paul, Jay.  Tricia would
2  be interacting with the underwriters to transmit the
3  information.  So he may be commenting on what Tricia has
4  and has provided to the underwriters.
5      Q    006, your e-mail dated March 4th, 2004 (sic),
6  quote, this was only underwritten for a twenty fifty
7  scenario, close quote.  What does that mean?
8      A    Say that again.
9      Q    Quote, this was only underwritten for the
10  twenty at fifty scenario.
11      A    Yeah, I thought you said 2024 scenario.  I
12  didn't --
13      Q    I could have.  My apologies.
14      A    Yeah, the underwriters underwrote the job for
15  the twenty percent at fifty percent set-aside.  They did
16  not underwrite it for the four percent Low-Income
17  Housing Tax Credit.  They would do that at a subsequent
18  time when we applied for four percent tax credits.
19      Q    Next line, this CRU (sic), credit underwriting
20  report, does provide indication that there are two rates
21  and two schedules based on bonds.  What does that mean?
22      A    If you'll recall in the prior testimony and in
23  the damages calculation there's a tranche A and a
24  tranche B, and there are two different amortization
25  schedules and two different interest rates; and that's

1  what that is indicating.  You want this back?
2      Q    Actually the e-mail.  I don't need to attach
3  that.  Atlantic Housing Partners' answers to
4  interrogatories and request for production of documents,
5  have you seen those before?
6      A    Let me see.  I'm confused about the question.
7      Q    Let me -- Let me just --
8      A    Sorry.  I'm just --
9      Q    You're fine.  Please ask me to clarify
10  anything.
11      A    I must have, I signed it.  So, yes, I've seen
12  it before.
13      Q    What date did you sign it?
14      A    I signed it, it looks like, the 13th day of
15  May of 2024.
16      Q    On page eight the question is asking for
17  Atlantic Housing's lost fees or alleged damages.  And
18  the response indicates the amount of damages is four
19  million two hundred fifty-nine thousand six hundred and
20  fifty-eight.  Below that it says all documents
21  supporting these facts, to the extent such documents
22  exist, are within Atlantic Housing's possession, custody
23  or control or being produced in response to Brevard
24  County's request for production to Atlantic Housing.
25           Based on Mr. Missigman's testimony and your

1  testimony earlier on behalf of Atlantic Housing
2  Partners, you agree that that statement is an inaccurate
3  statement in that Mr. Missigman's damages model was not
4  produced when you signed these interrogatories in May of
5  2024?
6           MR. PICCOLO:  Object to form.
7           THE WITNESS:  At the time I signed this in May
8  of 2024 the statement was accurate.
9  BY MS. GAINEY:
10      Q    I thought we established earlier that Mr.
11  Missigman did not produce his damages model until 2025;
12  did we not?
13           MR. PICCOLO:  Object to form.
14           THE WITNESS:  I think you asked that question
15  and I indicated I don't know when he produced it.
16  I know that we had discussion about when I gave him
17  information and asked that he generate work on his
18  financial model.  I don't think we came to a
19  conclusion on when it was actually produced to our
20  attorneys.
21  BY MS. GAINEY:
22      Q    Okay.  So if you're saying this statement is
23  accurate, it's your testimony that in May of 2024
24  Atlantic Housing Partners produced Mr. Missigman's
25  damages model which was the core damages document of

W. Scott Culp
March 18, 2025

Page 114

1   this case?
2        A    I didn't say that.
3        Q    All right.  You said this was accurate.
4        A    Well, I guess I'm trying to figure out what
5   you're saying is inaccurate.  Our projection of the lost
6   fees of four million two fifty-nine six fifty-eight was
7   an accurate projection when I signed this, okay.  The
8   document supporting that projection had been produced at
9   that time, which included the pro formas, sources and
10  uses, credit underwriting report.  They all support the
11  Atlantic Housing's fees.
12       The question with regard to production of the
13  damages calculation by Mr. Missigman, I don't have in my
14  head the date on which Mr. Missigman produced his
15  damages calculation to our counsel.  It doesn't change
16  the accuracy of our fees.  That doesn't matter with
17  regard to his damages calculation, whether he produced
18  the damages calculation ever.  Those fees would still be
19  accurate at that time in our projection.  So I'm trying
20  to figure out what you're saying is inaccurate.  I don't
21  see any inaccuracy.
22       Q    Do you think that Brevard County was entitled
23  to have Mr. Missigman's model produced in May of 2024?
24            MR. PICCOLO:  Object to form.
25            THE WITNESS:  I think that Brevard County was

Page 115

1   entitled to have Mr. Missigman's damages
2   calculation produced timely.
3   BY MS. GAINEY:
4        Q    And do you think producing Mr. -- assume that
5   it's true and that Mr. Missigman's testimony is accurate
6   that he did not produce his damages calculation and
7   model until 2025, do you think that's timing -- timely?
8            MR. PICCOLO:  Object to form.
9            THE WITNESS:  I don't know with regard to the
10           court system.  Timely in my opinion would be
11           whatever the Court requires.
12  BY MS. GAINEY:
13       Q    So if the Court required all discovery to be
14  completed in this case by March 1st, 2025, as a
15  representative from Atlantic Housing Partners do you
16  think that producing a core doc -- financial
17  document two months before discovery close is timely?
18           MR. PICCOLO:  Object to form.
19           THE WITNESS:  I would think that if you
20           produced it on the last day of the deadline it's
21           timely.  They have deadlines for a purpose.  I
22           don't know that there's a deadline that says a
23           document has to be produced a certain number of
24           days prior to the close of discovery.  I'm not a
25           litigator.

Page 116

1   BY MS. GAINEY:
2        Q    So as the representative of Atlantic Housing
3   Partners is there any reason for you to dispute
4   Mr. Missigman's testimony that he didn't produce his
5   damages model until 2025?
6            MR. PICCOLO:  Object to form.
7            THE WITNESS:  I don't have any reason to
8   dispute Mr. Missigman's testimony other than what
9   may be in the records.  He may have made an error.
10  I don't have the date that the document was
11  produced to our counsel or to Brevard County.
12  BY MS. GAINEY:
13       Q    And so when you signed this document, this
14  interrogatory number five on May 13th, 2024, and if you
15  assume that Mr. Missigman did not produce his damages
16  model until 2025, would it be accurate to state, quote,
17  all documents supporting these facts, to the extent such
18  documents exist, are being produced in response to
19  Brevard County's request for production?
20       A    Yes, absolutely.
21       Q    That's accurate?
22       A    Yes, absolutely.
23       Q    Even though Mr. Missigman's core financial
24  document was not produced, you still think that's
25  accurate -- that's an accurate statement?

Page 117

1            MR. PICCOLO:  Object to form.
2            THE WITNESS:  I believe the statement there
3            indicates that the documents supporting the facts
4            that I signed to have been produced.
5   BY MS. GAINEY:
6        Q    Is Atlantic Housing's damages claim based on
7   Mr. Missigman's model?
8        A    Mr. Missigman's damages calculation is a
9   document that we provided for the calculation of our
10  damages.
11       Q    So yes?
12           MR. PICCOLO:  Object to form.
13           THE WITNESS:  It's not the only document.
14  BY MS. GAINEY:
15       Q    I understand that.
16       A    And --
17       Q    But you and others provided documents to Mr.
18  Missigman which he used to produce a model in this case;
19  is that correct?
20       A    That's correct.
21       Q    So I understand your testimony to say that you
22  believe that you provided the underlying documents in
23  2024, in May of 2024.  Did I understand that correctly
24  or not?
25       A    Or prior to that date.

W. Scott Culp
March 18, 2025

Page 118

1    Q    Okay.  Will you acknowledge that
2  Mr. Missigman's damages model was not produced in May of
3  2024?
4    A    I've indicated in answers to your questions
5  earlier that I don't know the date it was produced.  I
6  don't have any reason to dispute Mr. Missigman's
7  testimony with regard to a date it was produced.  That
8  doesn't change my answer to the question with regard to
9  this statement that I signed saying all documents
10  supporting these facts are being produced, and to the we
11  reserve the right to supplement them up to conclusion of
12  discovery.  That was an accurate statement that I
13  signed.  So you're asking me if this statement is
14  accurate that I signed.  And I'm saying yes, this
15  statement that I signed is an accurate statement.
16    Q    So you don't believe that Mr. Missigman's
17  model is a document that supports Atlantic Housing's
18  damages in this case?
19        MR. PICCOLO:  Object to form.
20        THE WITNESS:  I believe that all documents
21        supporting these facts, to the extent such
22        documents exist, are within Atlantic Housing's
23        possession, custody or control are being produced
24        in response to Brevard County's request.  And I
25        believe that we've expressly reserved the right to

Page 119

1  supplement such documents up to the conclusion of
2  discovery, and I signed that and I believe it to be
3  accurate.
4  BY MS. GAINEY:
5    Q    On March -- excuse me, May 13th, 2024 was Paul
6  Missigman's damages model in the possession, custody or
7  control of Atlantic Housing?
8    A    I don't know.
9    Q    Is Paul Missigman not in Atlantic Housing's
10  care, custody or control?
11    A    Yes, he is.
12    Q    And so documents he creates are in the
13  possession, custody or control of Atlantic Housing,
14  correct?
15    A    Yes, they are.
16    Q    What did you do before you signed this
17  document to ensure that, in fact, all documents
18  supporting these facts were produced?
19    A    I reviewed what I had produced as of the date
20  I signed it.
21    Q    I think you said in your prior deposition that
22  you are the only one that produced documents in response
23  to request for production, correct?
24    A    I don't know that I said I'm the only one that
25  produced documents.  I said that I'm the only one that

Page 120

1  produced docu -- I think delivered documents to our
2  counsel.  There may have been other employees like Cindy
3  and Jay and Ammon that we've talked about that had
4  information on the network or within e-mails that we
5  produced.  So I don't know that I actually produced
6  those, me personally; but Atlantic Housing produced
7  those, yes.
8    Q    So what did Atlantic Housing do in order to
9  ensure that all documents, which are responsive to
10  request for production, are responsive to answering
11  interrogatories were, in fact, produced?
12    A    We reviewed with our responsible members
13  anything that they had in their possession, and we
14  reviewed our network files to see anything that we had
15  in our possession to produce to our counsel.
16    Q    And who -- specifically who did you review
17  with?
18    A    All the members of our team, Marc Gauthier,
19  Jay Brock, Ammon Smith, Trisha Doody, Paul Missigman,
20  Mike Sciarrino.  I think that's it.
21    Q    So your testimony is --
22    A    Cindy.  Cindy.
23    Q    Your testimony is that you, on behalf of
24  Atlantic Housing, requested from Paul Missigman
25  documents relevant to this lawsuit prior to signing this

Page 121

1  interrogatory and responding to request for production?
2    A    Yes.
3    Q    So if Mr. Missigman testified that he was
4  never asked for his model, how do you reconcile that
5  with the testimony you just provided?
6        MR. PICCOLO:  Object to form.
7        THE WITNESS:  I don't believe that I asked him
8        for a financial model for damages calculation at
9        that time.  I asked him for production of documents
10        related to this case and anything that related to
11        the Venue at Heritage.
12  BY MS. GAINEY:
13    Q    And what did he give you?
14    A    I don't recall.
15    Q    Whatever he purportedly gave you you would
16  have produced them, correct?
17    A    Yes.  Yes.
18    Q    Do you agree with the statement that Paul
19  Missigman's model is a core financial document in your
20  damages claim in this case?
21    A    Is a core financial document?  All I know is
22  that he prepared a damages calculation consistent with
23  the financial information for this development.  You
24  call it a core financial document.  I believe it's an
25  expert opinion on the damages.

W. Scott Culp
March 18, 2025

Page 122

1    Q    You think Mr. Missigman is an expert?
2    A    I do.
3    Q    Have you designated him as an expert?
4    A    I don't know.
5    Q    So is the answer to my question no, you don't
6    think that his model is a core financial document in
7    this lawsuit?
8    A    No, I said I don't know what a core financial
9    document is.
10   Q    Important.
11   A    I told you it's an expert opinion.
12   Q    Important.
13   A    I told you it's an expert opinion.
14   Q    All right.  Let me ask it differently.
15   A    Okay.
16   Q    Is Mr. Missigman's model, which are used in
17   this case to project alleged damages, is that model an
18   important financial document?
19   A    It's important.
20   Q    And you at least concede that.  Will you
21   concede that it's a document that should have been
22   produced in May of 2025 -- 2024, excuse me, assuming
23   that it wasn't produced until January of 2025?
24   A    No.
25   Q    So as a representative of Atlantic Housing you

Page 123

1    don't have any issue with waiting until January of
2    '25 -- 2025 to produce an important financial document
3    which forms the basis of the alleged damages in this
4    case?
5         MR. PICCOLO:  Object to form.
6         THE WITNESS:  I believe we have abided by the
7    obligations and have made accurate statements with
8    regard to our projections in our damages, and I
9    don't believe we've been delinquent or in any way
10   obstructing the process for this case.
11   BY MS. GAINEY:
12   Q    Your expert disclosures, which were served
13   September 16th, 2025 (sic), does identify Paul
14   Missigman --
15   A    They were served September 16th, 2025?  That's
16   about a few months from now.
17   Q    Let me rephrase.  Thank you for correcting me.
18   Appreciate that.
19        September 16th, 2024 indicate that Paul
20   Missigman will testify as to the damages plaintiffs
21   incurred as a result of the actions as described in the
22   complaint.  And the damages all are itemized.  When
23   Atlantic Housing identified expert disclosures, do you
24   know if you had an understanding that you were also
25   supposed to disclose all documents which support the

Page 124

1    alleged damages?
2         MR. PICCOLO:  Object to form.
3         THE WITNESS:  I don't know that at the time
4    you disclose -- or that we disclosed our experts,
5    that we had to, at the same time, disclose all
6    reports or calculations that that export -- expert
7    was -- had done or was to have done.  I don't know
8    that that was a requirement as of that date.
9    BY MS. GAINEY:
10   Q    So it's your testimony, based on what you said
11   earlier, that the company, Atlantic Housing Partners,
12   has no issue with waiting 'til January 2025, shortly
13   before the discovery close, in order to disclose an
14   important financial document that which forms the basis
15   of the alleged damages?
16        MR. PICCOLO:  Object to form.
17        THE WITNESS:  Atlantic Housing complies with
18   the schedule for the litigation and is -- continues
19   to attempt to provide documentation in a manner
20   that's consistent with that schedule, and I do not
21   believe we've been delinquent in any way in
22   providing any documents for discovery.
23   BY MS. GAINEY:
24   Q    Let me ask you this:  Why didn't you just make
25   sure that the model had been provided when it was asked

Page 125

1    for back in May of 2024?
2         MR. PICCOLO:  Object to form.
3         THE WITNESS:  There's a lot of documentation
4    in this litigation.  And providing documentation in
5    a reasonable manner and a reasonable time frame,
6    and I believe we have done that.
7    BY MS. GAINEY:
8    Q    And was there any discussion with Paul from
9    the time he created the model, back in March of 2024,
10   until recently as to ensuring that that document was, in
11   fact, produced?
12   A    You assume by that question that he created
13   that model in March of 2024?
14   Q    He testified to that.
15   A    Okay.
16   Q    So...
17   A    But you told me that.  And I don't know that
18   he had a completed damages model.
19   Q    He testified that he did.
20   A    Okay.  Then you probably want to present that
21   testimony to me if you want to ask me a question about
22   his testimony.
23   Q    Well, you're the representative of Atlantic
24   Housing.  I wouldn't think I would have to present that
25   testimony to you.  I would think --

W. Scott Culp
March 18, 2025

Page 126

1    A    You're asking me --

2    Q    -- that you would know that.

3    A    -- about his testimony. Let's look at his

4    testimony. If you ask me what Atlantic Housing knows or

5    is agreeing to, I've told you.

6    Q    So my question is: As the representative of

7    Atlantic Housing and knowing, and you've conceded that

8    Paul Missigman's damages model is an important financial

9    document which forms the basis of the alleged damages in

10   this case --

11   A    I told you that it's an important document.

12   You have added the words which forms the basis.

13   Q    All right. So let me ask you that. Does Paul

14   Missigman's model form the basis of the alleged damages

15   in this case?

16         MR. PICCOLO: Object to form.

17         THE WITNESS: It is a document that provides

18   the calculations of our claimed damages in this

19   case.

20   BY MS. GAINEY:

21   Q    Yes. It's not a trick question.

22   A    It is a document that calculates the damages

23   that we've claimed in this case.

24   Q    So would you concede that it's an important

25   document since you're --

Page 127

1    A    I told you it was an important document.

2    Q    All right. So you agree with the statement

3    that Paul Missigman's model is an important financial

4    document which forms, at least in part, the damages

5    alleged in this case?

6    A    I don't know that it forms the basis. I

7    believe it is a damages calculation. I don't know that

8    it forms the basis. I believe we have a lot of other

9    documentation that forms the basis. It's just one piece

10   of paper with one calculation by an expert. It doesn't

11   form the basis. Without all the other documentation,

12   there is no basis.

13   Q    Well, you told me in your original deposition,

14   when I asked about damages question, that Mr. Missigman

15   was the numbers guy, correct?

16   A    Yes, I did.

17   Q    All right. And so what I'm kind of scratching

18   my head over is why you seem to be now downplaying that

19   model created by Mr. Missigman, when all along he seems

20   to have been the one identified in filings as your

21   damages guy. You tell me in a deposition he is your

22   numbers guy, and yet his document that he produced

23   wherein the alleged damages in this case come from,

24   originated from, you seem to now be suggesting that

25   that's not an important document that should have been

Page 128

1    produced when it was asked for.

2         MR. PICCOLO: Object to form.

3         THE WITNESS: You wrapped a lot of statements

4    in there that I don't agree with. One, I've told

5    you that it's an important document. We've agreed

6    on that.

7    BY MS. GAINEY:

8    Q    We can concede to that.

9    A    Okay. I've told you that I don't believe

10   we've been delinquent in the production of documents.

11   You stated that you believe we have been, or at least

12   you've inferred that. I don't believe we have been.

13   You crafted a question that indicated that his

14   calculations, damages calculations were the basis for

15   our damages. The basis is all the documentation that

16   we've been providing that we've produced. It's not just

17   the damages calculation. So I don't agree with that

18   statement.

19         I'm not disagreeing with the fact that Paul

20   Missigman's calculations are important. I'm not

21   disagreeing with the fact that Paul Missigman's

22   qualifications are important. I'm not disagreeing with

23   the fact that Paul Missigman's determination of those

24   calculations are important. I'm also not disagreeing

25   with the fact that all these documents that you've

Page 129

1    produced and that we've produced are important basis for

2    our damages, not just Paul Missigman's damage

3    calculation.

4    Q    Would you be surprised to hear that Mr.

5    Missigman testified that he did not consider the credit

6    underwriting report when he did his model?

7    A    Not at all. I would not be surprised at all.

8    Q    Would you be surprised to learn that Mr.

9    Missigman testified that the documents that I have

10   produced here as Defendant's Exhibit 2 were the only

11   documents he relied on in order to do his damages model?

12   A    Not at all. I would not be surprised.

13   Q    So these few documents right here, that's all

14   he relied on. That doesn't surprise you at all?

15   A    I don't think he said that's all he relied on.

16   Q    No, he definitely --

17   A    I think --

18   Q    -- said that.

19   A    Do you want me to finish or do you want to

20   keep interrupting and asking me questions that are

21   trying to lead me somewhere else? You interrupted me.

22   Q    Because you're stating things that aren't

23   true.

24   A    And you're asking me questions in a way

25   that are --

W. Scott Culp
March 18, 2025

Page 130

1  Q   That's fine.
2  A   -- inferring an answer.
3  Q   That's fine.  Go ahead.
4  A   So you ask the question again and I'll try and
5  answer it.
6  Q   Go ahead.
7  A   No, you ask a question again and I will try
8  and answer it.  That's what I said.
9  Q   I would like for you to assume that Mr.
10 Missigman -- because I appreciate that you haven't
11 reviewed his deposition, and I appreciate you weren't at
12 his deposition; but I was and I have reviewed his
13 deposition.  And he specifically said that there's three
14 sets of documents he relied on in order to do his model.
15 One was the documents that you provided to him.  Two was
16 the documents that Mr. Thomas provided to him.  And
17 three were the documents that Mr. Griese provided to
18 him, all of which you have in front of you as
19 Defendant's Exhibit 2.  And so --
20 A   So we have the documents in front of me as
21 Defendant's Exhibit 2 that form a basis for the damages
22 calculation.
23 Q   So my question to you is that:  Why did
24 Atlantic Housing Partners not produce Paul Missigman's
25 model in May of 2025 (sic)?

Page 131

1       MR. PICCOLO:  Object to form.
2       THE WITNESS:  We produced Paul Missigman's
3       damage calculation model timely.
4  BY MS. GAINEY:
5  Q   That's not my question.  My question is -- and
6  I'll even assume, without the benefit of attending
7  Mr. Missigman's testimony, that my question is accurate,
8  that Mr. Missigman said he did not produce the model
9  until January 2025.  My question to you as the
10 representative of Atlantic Housing, assume that to be
11 true, why wasn't it produced in May of 2024 when it was
12 asked for?
13      MR. PICCOLO:  Object to form.
14      THE WITNESS:  I disagree with the entire
15      question, the length of the question, the
16      statements within it, that were inaccurate.  I'm
17      not going to answer it.  You're going to start
18      over.
19 BY MS. GAINEY:
20 Q   Assume that Mr. Missigman testified, just
21 recently, that he didn't produce his damages model until
22 January of 2025.
23 A   I assume that Mr. Missigman, fairly an
24 assumption because you've asked me to assume, that he
25 did not produce his model until January of 2025.

Page 132

1  Because you've asked me to assume that, I've assumed
2  that.
3  Q   My question is:  As the representative of
4  Atlantic Housing and pursuant to 30(b)(6), why were
5  those documents not produced in May of 2024 in response
6  to defendant's initial request for documents?
7       MR. PICCOLO:  Object to form.
8       THE WITNESS:  I don't believe we had an
9       obligation to present those documents at that time.
10 BY MS. GAINEY:
11 Q   Same assumption, assume that the document,
12 Mr. Missigman's model, was not produced until January of
13 2025.  Why was it not produced when you disclosed Mr.
14 Missigman as an expert witness?
15 A   I don't believe we had --
16      MR. PICCOLO:  Object to form.
17      THE WITNESS:  -- an obligation -- I don't
18      believe we had an obligation to produce that
19      document at that time.
20 BY MS. GAINEY:
21 Q   A second request for production of documents
22 was sent to Atlantic Housing.  And the document that
23 we're referring to, Mr. Missigman's model, wasn't
24 produced until he responded to a subpoena duces tecum
25 which I sent to him.  My question is:  Why wasn't the

Page 133

1  document produced in response to Brevard County's second
2  request for production of documents?
3  A   I don't believe we had an obligation to
4  produce the financial damages calculation until such
5  time that we produced it.
6       MS. GAINEY:  Does anybody need a break?
7       All right.  We'll keep going.
8  BY MS. GAINEY:
9  Q   Have you seen the request for admissions in
10 this case?
11 A   I believe I have.  Yes, I believe I have.
12 Q   I'll need it back.  Unfortunately, I didn't
13 make a copy.  And you just briefly reviewed those.
14 After you -- I can certainly give you more time to.  Are
15 there any changes that you want to make or do you
16 believe that when these requests for admissions were
17 served on February 18th, 2025 that they were accurate?
18      MS. GAINEY:  Actually, let's take a brief
19      break while he does that.  I have to use the
20      restroom.
21      THE VIDEOGRAPHER:  Going off the video record.
22      The time is 12:44 p.m.
23      (A luncheon recess was taken.)
24      THE VIDEOGRAPHER:  We are back on the record.
25      The time is 1:42 p.m.

W. Scott Culp
March 18, 2025

Page 134

BY MS. GAINEY:

Q    Sir, we took a brief break for lunch; and you took some documents with you during the break, which I asked you to review to determine their relevancy. They were produced in responses to request for production of documents. And so a couple of things, housekeeping matters. First of all, before we took a break I showed you interrogatories, which is the other documents. And over the break I marked that as Defendant's Exhibit 7.

A    8.

Q    Oh, did I? Exhibit 8.

A    8. 7 was --

MS. GAINEY: Yeah, so I need to mark this as 9.

(Defendant's Exhibit 8 was marked for identification.)

BY MS. GAINEY:

Q    So is that a copy of your interrogatories that we've discussed prior to the break?

A    Yes.

Q    And is that a fair and accurate copy of the interrogatories?

A    Yes.

Q    Are there any modifications or changes that you need to make with respect to the interrogatories or

Page 135

updates?

A    No, I don't have any updates at this time.

Q    And you, sir, you signed those as the manager of Atlantic Housing Partners, L.L.L.P., correct?

A    Yes.

Q    But that is --

A    However --

Q    -- your signature, right?

A    That is my signature.

Q    Okay.

A    But I'm the manager of the general partner. It's a limited liability limited partnership, which has a general partner which I am the manager of.

Q    And who identified that organization, please?

A    I think it's Atlantic Housing Partners Managers, LLC.

Q    Any other changes, corrections you want to make to the interrogatories?

A    No.

MS. GAINEY: I've marked Defendant's Exhibit 9.

(Defendant's Exhibit 9 was marked for identification.)

BY MS. GAINEY:

Q    And those were the documents that you reviewed

Page 136

over the break, and I had asked you prior to the break in order -- asked you to review them in order to tell me what relevancy, if any, they have to this lawsuit. And have you had a chance to review those documents?

A    I have.

Q    And how are --

A    They are the --

Q    -- they relevant, please?

A    They are the documents that form the basis for our conceptual estimates of the soft cost of development, and that being permitting, design, engineering, that type of thing, and the conceptual budgets for the hard construction costs.

Q    Which I don't have any other questions about those documents, so you can set those aside.

During the break did you also have an opportunity to review your responses to requests for product -- or for requests for admissions? Excuse me.

A    I did.

Q    And do you have any modifications, changes or updates to those responses?

A    The only comment on page seventeen, defendant's request for admission number forty-four with regard to what I told the county commissioners regarding the twenty percent of the units at fifty percent and the

Page 137

balance will have a maximum of a hundred and twenty percent, I don't recall the exact language I used to reflect that the balance were unrestricted. We knew that there would definitely be a portion restricted at one twenty. We knew that we couldn't achieve those rents 'cause they were higher than the market. So I don't recall the actual statements made to the county commissioners in that regard.

Q    And that's request for admission seventeen?

A    It looks -- forty-four.

Q    On page?

A    Page seventeen.

Q    Seventeen.

A    Request for admission number forty-four. So it's just a clarification. I think it's accurate, but I would want to make sure from the transcript of that county commission meeting what I actually said.

Q    Are there any other requests for admissions that need clarification?

A    I don't see any, no. Maybe just hold just one second. Let me just make sure.

MS. GAINEY: I'll show you what we'll mark as Defendant's Exhibit 10, which is two documents. One is the first plaintiff, Atlantic Housing Partners, L.L.L.P.'s, responses and objections to

W. Scott Culp
March 18, 2025

Page 138

1   defendant's second request for produce; and that is
2   dated January 24th, 2025.  And the other document
3   is plaintiff, Atlantic Housing Partners,
4   L.L.L.P.'s, responses and objections to defendant,
5   Brevard County's, request to produce; and that is
6   dated May 1st, 2024.
7           (Defendant's Exhibit 10 was marked for
8       identification.)
9   BY MS. GAINEY:
10      Q    Do you recognize those documents?
11      A    Yes.
12      Q    And did you participate in responding to the
13  request for production of documents?
14      A    Yes.
15      Q    And you said, before the break, that on behalf
16  of Atlantic Housing Partners, L.L.L.P. you believe that
17  you have provided all documents responsive to those
18  requests for production in a timely manner, correct?
19      A    Correct.
20      Q    So request to produce that was responded to
21  back in -- or on May 1st, 2024, request for production
22  number twenty-three specifically asks for, quote, any
23  and all documents which refer or relate to plaintiffs'
24  claim for damages, close quote.  And it's your testimony
25  that you provided any and all documents which relate to

Page 139

1   plaintiffs' claim for damages on May 1st, 2024?
2       A    At that time I produced all the documents that
3   were available.
4       Q    Available to Atlantic Housing Partners,
5   L.L.L.P.?
6       A    Yes.
7       Q    The second request to produce was dated
8   January 24th, 2025.  And request number thirty-two asks,
9   quote, any and all documents supporting your alleged
10  damages in your Rule 26 disclosures, close quote.  The
11  response is, AHP will produce all responsive documents
12  to this request that are in AHP's possession, custody or
13  control.  And that response was dated January 24th,
14  2025.  Is that an accurate response?
15      A    Yes.
16      Q    Do you have an explanation why Mr. Missigman's
17  damages model wasn't produced on January 24th, 2025?
18      A    No.
19      Q    Do you have an explanation as to why
20  Mr. Missigman's damages model was not produced on
21  May 1st, 2024?
22      A    No.
23      Q    That's all I have about those documents, sir.
24      A    Are both of these Exhibit 10?
25      Q    Yes.  There you go.  The matters of

Page 140

1   examination for the deposition here today asked for the
2   person most knowledgeable about the tax exempt bond
3   financing for Hammock Harbor in Brevard County.  Are you
4   that person?
5       A    I believe so.
6       Q    What type of financing structure is available
7   or does Hammock Harbor have?
8       A    I don't remember.
9       Q    I'm going to show you a document which might
10  refresh your recollection.  I believe that's from the
11  Florida Housing Finance Authority.  Does that assist at
12  all?  Actually, let me give you this.
13      A    It's got a label at top saying other property
14  Florida Housing Finance Authority.  I don't know of a
15  Florida Housing Finance Authority.  I don't know that
16  one exists.  There's a Florida Housing Finance
17  Corporation.  So I'm not quite sure where this document
18  came from.  I doubt that anybody in our office would
19  have produced it because -- or created it, I should say,
20  we might have produced it -- because I don't think they
21  would have used those terms.  Perhaps somebody from the
22  HFA or elsewhere might have.
23      Q    Sir, I'm really just trying to get to on all
24  your Brevard County properties, just the financing
25  structure and the set-asides.  And so I'm trying to get

Page 141

1   testimony in that regard.
2       A    Yeah, I see that you provided me with a table
3   that lists the restrictions with regard to Brevard
4   County communities that we've developed.  I don't know
5   who provided those restrictions or if they're accurate.
6   They would be most accurate coming from the extended use
7   agreement or the land use restriction agreement.  So if
8   these are consistent with the recorded public record
9   extended use agreement and land use agreement, then I
10  would have no reason to think they were wrong.
11      Q    Did Hammock Harbor receive bond financing?
12      A    I believe so.
13      Q    And how much was the bond financing?
14      A    I don't recall.
15      Q    What are the set-asides for Hammock Harbor?
16      A    Don't recall.
17      Q    Did you attempt to find that information prior
18  to your deposition here today?
19      A    I did not.
20      Q    Did you -- or does Atlantic Housing still have
21  a copy of the Hammock Harbor bond application?  I know
22  some of these are older developments.
23      A    I don't know if we still have a copy of the
24  application.  We would, of course, have a copy of the
25  closing documents and the recorded land use restriction

W. Scott Culp
March 18, 2025

Page 142

1  agreement and extended use agreement.
2      Q    Let me ask you this, which may be helpful and
3  more generally:  Have all four of Atlantic Housing
4  properties been developed with the use of tax exempt
5  bond financing?
6      A    I'm really not sure if one of these might have
7  been developed with nine percent tax credits.  I don't
8  recall.  I'd have to look.
9      Q    Have all four properties been developed with
10  some type of financing, whether that be tax exempt bonds
11  or credits?
12      A    Yes.
13      Q    And so when you're dealing with credits, do
14  you still have to go through the finance -- Housing
15  Finance Authority?
16      A    The Brevard County Housing Finance Authority
17  has no relationship, jurisdiction or input with regard
18  to Low-Income Housing Tax Credits.
19      Q    So the one that if you just developed it with
20  tax credits you wouldn't have necessarily had to have
21  dealt with the Brevard County Housing Finance Authority?
22      A    Correct.  And you don't have to deal with
23  Brevard County Housing Finance Authority if you're using
24  Florida Housing Finance Corporation bonds.
25      Q    Let me show you another document that may

Page 143

1  help.  This appears to be an e-mail from Angela Abbott.
2      A    It looks like an e-mail from Angela Abbott to
3  you.
4      Q    And does it indicate how much bond
5  financing -- is that the Venue at Viera?
6      A    This is with relation to the Venue at Viera,
7  yes.  It has the increase in the bond amount, letters
8  regarding the increase in the bond amount.
9      Q    So do you have an independent recollection of
10  how much bond financing Venue at Viera received?
11      A    I don't remember without looking at the
12  closing documents.
13      Q    If you assume that e-mail to be accurate, how
14  much bond financing did Venue at Viera receive?
15      A    If there were no other increases after this,
16  then it would be sixteen million seven hundred and
17  fifty-five thousand.
18      Q    And it appears that that was an increased
19  amount from what was originally requested?
20      A    That's correct.
21      Q    How much was originally requested?
22      A    Fifteen million seven hundred and fifty-five
23  thousand.
24      Q    Let me show you -- well, let me ask you:  How
25  much bond financing, if any, did Wickham Club receive?

Page 144

1      A    I don't recall.
2      Q    Let me show you this document to refresh your
3  recollection, which is an e-mail from Angela Abbott.
4  How much bond financing does Ms. Abbott indicate was
5  received by Wickham?
6      A    An allocation of seven million six for tax
7  exempt bonds.  An allocation of four hundred thousand of
8  taxable.
9      Q    Does that refresh your recollection as to the
10  amounts received?
11      A    I am relying upon Angela Abbott's e-mail to
12  you.  I don't have any reason to believe it's incorrect.
13      Q    How much bond financing, if any, did Malabar
14  Cove receive?
15      A    I don't recall.
16      Q    Unfortunately, I think because that's an older
17  development, I don't have an amount on that either, if
18  they did receive financing.  But you think that even
19  Malabar Cove was developed with some type of --
20      A    Two phases of Malabar Cove, they were both
21  developed with affordable housing financing.  I don't
22  recall, without looking at the documents, the amount, if
23  any, of Brevard County Housing Finance Authority bond
24  allocation and/or any resources provided through the
25  Florida Housing Finance Corporation.

Page 145

1      Q    Are you the most knowledgeable in that regard?
2      A    Yes.
3      Q    And you didn't attempt to seek out that
4  information prior to today's deposition?
5      A    We have that in our records.  I just don't
6  recall it in my head.
7      Q    And did you look at the records or attempt to
8  look at the records prior to today's deposition?
9      A    No.
10      Q    The application for Venue at Viera Senior
11  Living, that was submitted to Brevard County Finance --
12  Housing Finance Authority.  Was that submitted as an
13  elderly development?
14      A    I don't recall.
15      Q    Let me show you the application, and I've
16  tabbed it there to see if that refreshes your
17  recollection.
18      A    In the application they have -- or you choose
19  between family or elderly, and we did choose elderly in
20  the application.
21      Q    Why did you choose elderly in the Venue at
22  Viera application but not at the Venue at Heritage Oaks
23  application?
24      A    Venue at Heritage Oaks, we were targeting a
25  different demographic, and we weren't desiring to

W. Scott Culp
March 18, 2025

Page 146

1  restrict to the requirements of an elderly demographic
2  selection.
3      Q    What demographic were you targeting for the
4  Venue at Heritage Oaks?
5      A    When we initially applied we had not made the
6  determination on whether we wanted to do family or
7  seniors, seniors in accordance with the Housing for
8  Older Persons Act.  But we did eventually decide that we
9  would prefer, although not for a restriction in the bond
10  application, but we would prefer as we proceed to
11  develop it with a restriction for seniors in accordance
12  with the Housing for Older Persons Act.
13      Q    When did you decide to switch the demographic
14  from family to senior?
15      A    We didn't actually make a decision to switch
16  the demographic.  We were, at the time of even the
17  county commission meeting, considering that with the
18  restrictive covenants that would be recorded at a later
19  date, we were considering providing Venue at Heritage
20  Oaks as a seniors-restricted community in accordance
21  with the Housing for Older Persons Act.
22      Q    So you're saying at the time of the
23  commissioner meeting on December 5th of 2023 where the
24  bond was denied, you hadn't made a decision?
25      A    We had not made a firm decision.  I did

Page 147

1  indicate to the commissioners that we prefer seniors and
2  we like that demographic and they're good for our
3  communities; and that we were considering making a
4  change, or I wouldn't even say making a change because
5  the family demographic can be seniors, that we were
6  considering having a restrictive covenant for seniors.
7      Q    So am I understanding your testimony that
8  originally, at the time when this application for Venue
9  at Heritage Oaks was submitted in July of 2023, the
10  demographic for the proposed project was going to be
11  non-senior?
12      A    We had not made a decision on whether or not
13  we were going to have a seniors restriction.  We chose,
14  if I remember correctly in the application, a family
15  demographic 'cause we were not willing to choose
16  elderly.  And we had not made a decision at that point
17  with whether or not we were going to restrict it to
18  seniors.
19          The taxes and bond allocation does not require
20  seniors restriction or does not have any -- give any
21  preference to a seniors or elderly restriction.  So we
22  didn't make a decision.  We had considered, and going
23  back and forth a number of times, proceeding with a
24  seniors community.
25      Q    And you're saying that even up and to the

Page 148

1  point of the bond denial, you had not firmly made the
2  decision to switch to seniors community?
3      A    We'd not made a firm commitment.  Whether we
4  had made a decision or not, I think we were of the mind
5  that we would be proceeding with it restricted to
6  seniors in accordance with the Housing for Older Persons
7  Act; but I don't think we had made any commitments.  I
8  know there were no commitments with regard to the taxes
9  and bond allocation.
10      Q    When was the decision made to consider it to
11  be a senior development?
12      A    We'd been considering that decision from the
13  beginning.  So from the very beginning when we first
14  conceptualized and purchased the property and the
15  application for the bonds, we were considering it being
16  a seniors community.
17      Q    And then if that was the case, then why didn't
18  you submit the application as a senior application to
19  Brevard Housing Authority?
20      A    And I think we discussed this before.  Their
21  selections are family or elderly.  We're not agreeing
22  with the elderly demographic.  That's a different
23  demographic than senior, and so we chose family.  We
24  know that the taxes and bond allocation has no
25  preference for family versus elderly versus seniors

Page 149

1  restriction.  So we didn't want to make a commitment
2  that we had not determined would be our final
3  commitment, and it was not relevant to the allocation of
4  the bonds.
5      Q    Did you say elderly is different from senior?
6      A    Yes.
7      Q    Explain that.
8      A    The elderly demographic requires one -- all
9  members of the household to be age sixty-two and over,
10  and requires certain features within the community that
11  we don't always choose to comply with because our
12  residents don't necessarily like those.  It has to do
13  with a lot of the elderly-type design features you might
14  have in the units.  And they're somewhat discouraging to
15  some senior residents, particularly when you have
16  seniors that have families.  So we prefer to not make
17  that decision on every community until we have a
18  determination that the elderly demographic might be good
19  for that location.
20          So the seniors selection is one member of the
21  household age fifty-five and older, and twenty percent
22  of the units unrestricted with regard to age of
23  household members.  And that's a preference for us
24  because it provides a wider band.  If we're already
25  limiting our band with regard to income of the

W. Scott Culp
March 18, 2025

Page 150

1  households, when you limit it to elderly where all
2  members are sixty-two and older, you limited the band of
3  people that are available to rent the units.
4      Q    So even though you've compared Venue at
5  Heritage Oaks as being comparable to Venue at Viera, are
6  you saying that the two are different as to senior
7  versus elderly?
8      A    They are different.  And when we said compared
9  to their comparable, we were talking about expenses and
10  revenues, 'cause the expenses and the revenues have a
11  negligible difference between the two.  The revenues are
12  based upon the HUD-published rents for household size.
13  The expenses are based upon density of the product,
14  maintenance of the product, parking spaces, landscaping,
15  construction type.  Some of it based upon the
16  demographic, but we don't really see a whole lot of
17  difference in the expenses from a senior restriction
18  versus an elderly restriction, no.
19          MS. GAINEY:  I'm going to mark that as
20      Defendant's exhibit --
21          THE WITNESS:  Do you want me to hold onto it?
22          MS. GAINEY:  No.  I don't have any questions.
23          (Defendant's Exhibit 11 was marked for
24      identification.)
25  BY MS. GAINEY:

Page 151

1      Q    When did a land --
2      A    Do you want these back or do you want to mark
3  these?
4      Q    Oh, no.  They don't need to be marked.  Thank
5  you.
6          When did Atlantic Housing Partners hire Dr.
7  Hank Fishkind?
8      A    I don't recall the date.
9          MS. GAINEY:  Let me show you what we'll mark
10      as Defendant's Exhibit 12.
11          (Defendant's Exhibit 12 was marked for
12      identification.)
13  BY MS. GAINEY:
14      Q    Do you recognize that document, or those
15  documents, I should say?
16      A    Yikes, this guy's expensive.
17      Q    You would know.
18      A    Yes, I recognize them.
19      Q    And is it his invoices and, it looks like,
20  initial letter to you regarding his services?
21      A    Yeah, it's his initial letter where I accepted
22  his proposal for his hourly rate and expenses, and it's
23  his wiring instructions so I can pay him.  And then he
24  starts billings.  And these are definitely not all the
25  billings.  I wish they were.

Page 152

1      Q    That's what was produced to us.  So we might
2  have to request a supplement on this.
3      A    I'm sure I got another one this week, so...
4      Q    What is the date of the initial letter?
5      A    The initial letter is dated January 17th of
6  2024.
7      Q    So do you think that Atlantic Housing hired
8  Dr. Fishkind on or about January 17th, 2024?
9      A    Yes, it appears so.  It might have been --
10  well, let me take that back because Dr. Fishkind sent
11  the letter on January 17th.  I don't have a date on when
12  I signed this and sent it back to him.  So I don't know
13  that --
14      Q    Check his invoices, that might help, when he
15  first started working.
16      A    Well, he sent an invoice the day he sent the
17  letter.  So I'm sure he was sending me a bill for
18  sending me the letter, January 17th.  But then he did
19  some work on January 29th.  So it could have been about
20  January 29th.
21      Q    All right.  So sometime between January
22  17th --
23      A    Sometime in January of 2024 he was engaged.
24      Q    There's a few documents that were in Dr.
25  Fishkind's production file that I want to ask you about.

Page 153

1  What is that?
2      A    That's the Florida Housing Finance Corporation
3  published rent and income limits as released by HUD on
4  May 15th of 2023 for Brevard County.
5      Q    And then this was also in his file.  What is
6  that?  I know we've talked about it.
7      A    This is the rent schedule with monthly gross
8  rents, less utility allowances, by unit type and by
9  set-aside.
10      Q    Then I want to show you this document, and I'm
11  going to purport to you that this was an Excel
12  spreadsheet that was too small to read, so I've blown it
13  up.  But does that document look familiar to you?  It
14  was in Dr. Fishkind's file.
15      A    No.  I just barely skimmed Dr. Fishkind's
16  reports, so the fact that I don't remember it doesn't
17  mean much; and I haven't spent much time looking at Dr.
18  Fishkind's reports.
19      Q    At some point did someone from Atlantic
20  Housing Partners provide, or their representative
21  provide, demographic information regarding age and race
22  ethnicity of other Brevard properties?
23      A    Not with regard to Atlantic Housing
24  properties.  You're going to depose me with regard to
25  Concord, I think?

Page 154

1    Q    Yes.
2    A    And I don't want to, you know, try and be
3  evasive, but nobody at Atlantic Housing would have
4  provided Dr. Fishkind with any information that you've
5  referenced.
6    Q    Did you personally, as Scott Culp, provide any
7  information to Dr. Fishkind?
8    A    No.
9    Q    So the person most knowledgeable at Atlantic
10  Housing as it relates to documents provided to Dr.
11  Fishkind is essentially nobody?  It would be --
12    A    No, it's me.  It's me.
13    Q    Okay.  Let me ask it differently.  Let me just
14  confirm that no one from Atlantic Housing Partners
15  provided Dr. Fishkind any documents related to race and
16  age of other Brevard properties?
17    A    Correct.
18    Q    So you're saying that those documents, had
19  they been provided, would have been done on behalf of
20  Concord?
21    A    Correct.
22    Q    We'll come back to that.  Did Atlantic Housing
23  Partners provide Dr. Fishkind any documents related to
24  any other topics or subjects?
25    A    If I recall correctly, we provided him with

Page 155

1  the -- and, again, I'm hesitant because anything we
2  provided to Dr. Fishkind would have been provided
3  through our counsel.  And I believe we provided through
4  our counsel the application to the Housing Finance
5  Authority of Brevard County for the Venue at Viera.  And
6  I don't recall what other documents, if any, we provided
7  Dr. Fishkind through our counsel from Atlantic Housing.
8  There were other documents that you've referenced and
9  asked questions about with regard to information that
10  Concord has.
11    Q    Number eleven on the matters of examination
12  asks for the person that's most knowledgeable about
13  traffic studies performed, and I assume that's you?
14    A    Yes.
15    Q    Tell me about any traffic studies that were
16  performed regarding the property at Minton Road and
17  Heritage Oaks Road.
18    A    I think it was VHB, if I remember correctly,
19  the name of the traffic engineer who did the traffic
20  studies; and we've produced those.
21    Q    Were those studies outdated?
22    A    No.
23    Q    Did citizens complain that the traffic studies
24  were outdated?
25    A    Yes.

Page 156

1    Q    And it's your testimony that the studies were
2  not outdated?
3    A    Correct.
4    Q    Did you tell Brevard Housing Authority, on
5  December 6th, 2023, that it did appear that the studies
6  were outdated?
7    A    I don't recall.
8    Q    Do you have any information as to why citizens
9  complained that the traffic studies were outdated?
10    A    I don't remember.
11    Q    Well, number eleven asks for the person most
12  knowledgeable regarding traffic studies performed in
13  anticipation of the development, and you're saying
14  that's you?
15    A    Correct.
16    Q    Including the dates said studies were
17  performed and the information relied upon to conduct
18  said studies?
19    A    Correct.
20    Q    And that person's you?
21    A    Correct.
22    Q    So did you go back and look at the traffic
23  studies prior to this deposition?
24    A    No.
25    Q    Why not?

Page 157

1    A    I have lots of documents.  Didn't have time to
2  review every single document and every exhibit that you
3  presented to me.
4    Q    Yes, sir, that's why we do these depositions;
5  and I specifically identify the things I'm going to ask
6  you about, including the traffic studies.
7    A    Other traffic studies --
8        MR. PICCOLO:  Object to form.  There wasn't a
9  question pending.
10  BY MS. GAINEY:
11    Q    So knowing that and having reviewed the
12  subpoena duces -- or the subpoena 30(b)(6) deposition
13  notice, why didn't you go back and review the traffic
14  studies in anticipation of this deposition?
15    A    I didn't believe it was necessary.  I believe
16  the traffic studies speak for themselves and have dates
17  with regard to when they were prepared and the backup
18  documentation that was obtained to prepare those
19  reports.
20    Q    As it relates to traffic in the area, was
21  Atlantic Housing aware that there was only one road into
22  the subdivision that was next to the proposed project?
23    A    If I understood your question correctly,
24  you're asking about the road that was the entrance to
25  the single-family neighborhood behind the property we

Page 158

1  were proposing to develop.
2      Q    Correct.
3      A    And I don't think I considered whether or not
4  there were any other roadways into that subdivision.
5      Q    As you sit here today, do you have any
6  knowledge as to if there are other roadways into that
7  subdivision?
8      A    I do not.
9      Q    Is Atlantic Housing aware that multiple
10 citizens objected to the proposed development Venue at
11 Heritage Oaks because of traffic concerns?
12     A    Yes.
13     Q    And what's -- does Atlantic Housing have a
14 position in that regard?
15     A    Traffic concerns were unfounded.  The
16 approvals for land use entitlements and approvals for
17 that particular property were in place.  And the traffic
18 generation from the approved uses was significantly in
19 excess of the traffic generation from our proposed use,
20 and there had been master plan approvals for this site
21 utilizing the public right-of-way and boulevard
22 contiguous to the property.
23     Q    Does Atlantic Housing have a position as it
24 relates to only having one road of ingress and egress
25 concerning the single-family division -- the

Page 159

1  single-family subdivision?  Excuse me.
2      A    We have no position with regard to the ingress
3  and egress from the neighboring single-family
4  subdivision on the public right-of-way.
5      Q    If that was, indeed, a concern raised by
6  community members, do you dispute that that was a valid
7  concern of community members?
8      A    Yes, I do dispute that.
9      Q    And why is that?
10     A    There's nothing in the land development code
11 or in the traffic study or any information entitled that
12 would present a reason to not develop the parcel for the
13 traffic generation that was allowed.
14     Q    So community members' concern just based on
15 their observations and the traffic backup in the area,
16 would that have been a valid concern?
17     A    No.
18     Q    The Brevard Housing Finance Authority meeting
19 which occurred the day after the county commission
20 meeting, did you attend that via phone?
21     A    I don't remember that there was a -- I don't
22 recall.  I don't remember a Brevard County Housing
23 Finance Authority meeting the day after the commission
24 meeting that had a denial.  There may have been, but I
25 don't remember that.

Page 160

1      Q    Let me show you the minutes from the
2  December 6th, 2023 meeting and see if that refreshes
3  your recollection.
4      A    Yes.
5      Q    Let me switch you out because it's got my
6  notes on the side of that one, I think.
7      A    I was reading your notes.
8      Q    I don't think I have a lot of notes, but you
9  can certainly read them.
10     A    Yes, it does appear that I attended by phone
11 at that meeting, and it does seem that it was the day
12 after the commission denial.
13     Q    Does it refresh your recollection as to any
14 discussions related to traffic studies?
15     A    Lots of discussions.
16     Q    And what was your position as of December 6th,
17 2023 related to traffic studies?
18     A    That the traffic studies were accurate, that
19 the traffic generation was less than what was allowable
20 by the entitlements on the property, and that the
21 concerns of the citizens were unfounded with regard to
22 traffic generation or development of the parcel.
23     Q    Are you aware that those meetings are
24 recorded?
25     A    What meetings are you referencing?

Page 161

1      Q    The meeting, the December 6th Housing Finance
2  Authority.  You're looking at the minutes.
3      A    Yes.
4      Q    So you're aware that they're recorded?
5      A    Yes.
6      Q    Did you state in that meeting that, quote, we
7  did provide traffic studies and they claimed they were
8  outdated.  I wouldn't disagree that current traffic
9  studies might not have been used, close quote.  Did you
10 state that?
11     A    I may have.
12     Q    So by that statement it appears that you
13 believed that current traffic studies might not have
14 been used?
15     A    That's correct.
16     Q    So a community -- community members expressing
17 concern about outdated traffic studies would have been a
18 valid concern?
19     A    No.
20     Q    Why not if they were outdated?
21     A    The studies were recent enough, and the
22 approvals for development of the property provided for
23 significantly more traffic generation than our
24 development, as our traffic study showed.  So the -- any
25 updates to those traffic studies, which would be

W. Scott Culp
March 18, 2025

Page 162

1  required by the City of West Melbourne prior to our
2  pulling permits, would provide evidence that the traffic
3  generation was not in excess of what was previously
4  approved. That's a requirement of the permitting, as is
5  the building permit, foundation permit, site permit.
6  And those would be provided timely as required by the
7  land development code and the City of West Melbourne.
8      Q    Do you live in the city of West Melbourne?
9      A    What do you think?
10     Q    I think you live in Winter Park.
11     A    I don't. I live in Seminole County. I think
12 you know I didn't live in the city of West Melbourne.
13     Q    So, no, you don't live in the --
14     A    No, I don't live in the city of West
15 Melbourne.
16     Q    Okay. Do you regularly visit the city of West
17 Melbourne?
18     A    No.
19     Q    So any residents that may have expressed
20 objections based on their daily observations of traffic,
21 you wouldn't really have any reason to dispute that
22 since you don't regularly visit or live in the city of
23 West Melbourne; would that be fair?
24     A    No.
25     Q    That's not fair?

Page 163

1      A    No. My basis for review of traffic
2  considerations would be based upon traffic studies and
3  the land development code requirements for permitting in
4  a particular local jurisdiction.
5      Q    I don't think I need to mark that, so I'll
6  take that back for now.
7      A    I'm not aware of any resident that had an
8  expert opinion with regard to traffic.
9      Q    Is Atlantic Housing aware that the City of
10 West Melbourne passed a moratorium regarding the Live
11 Local Act?
12     A    Yes.
13     Q    And what actions, if any, did Atlantic Housing
14 take in regard to the proposal and passage of the City
15 of West Melbourne's moratorium regarding the Live Local
16 Act?
17     A    I don't believe we took any. I believe that
18 moratorium was enacted after the denial by the county
19 commission. I'm not a hundred percent sure of that, but
20 I believe that's accurate.
21     Q    Was it proposed prior to the county
22 commissioners' denial?
23     A    Yes, it was.
24     Q    And what action, if any, did you take with
25 regard to the City of West Melbourne's moratorium prior

Page 164

1  to the denial of the bond application?
2      A    I don't recall if we took any action.
3      Q    Why not?
4      A    I don't remember.
5      Q    Would that moratorium have had effect on the
6  proposed development?
7      A    It could have delayed it. I don't believe had
8  the county commission not denied the bond allocation
9  that the moratorium would have stopped it.
10     Q    It would have delayed it six months?
11     A    Correct.
12     Q    How did you become aware of the moratorium?
13     A    I don't remember.
14     Q    Were you aware of any objections by community
15 members regarding the actual application as far as
16 noncompliance or incompleteness?
17     A    There were a number of objections. I can't
18 recall all of them. There were e-mails sent to the
19 City, I'm not -- and to, I believe, the county
20 commissioners and, I believe, to the HFA with a number
21 of different objections and making claims with regard to
22 the application and with regard to the development.
23     Q    And did Atlantic Housing attempt to do or to
24 take any action in order to remedy or address the
25 concerns residents may have relayed regarding the actual

Page 165

1  application itself?
2      A    I don't recall. I know that we reviewed each
3  of the complaints that we received to make sure there
4  wasn't anything that was a basis for denial and found
5  none. But I don't recall each specific instance or each
6  specific e-mail or information that we received.
7      Q    Are you familiar Florida Statute 159.616 -- or
8  615? Excuse me.
9      A    Give me the title of it and I'll probably tell
10 you whether I'm more familiar with it.
11     Q    Actions to contest the validity of bond.
12     A    I'm not real familiar with it.
13     Q    It states that, quote, an action or proceeding
14 to contest the validity of any bond issued under this
15 act, other than a proceeding, pursuant to 159.615, must
16 be commenced within thirty days after notification in a
17 newspaper or general circulation within the area of the
18 passage by the Housing Finance Authority of the
19 resolution authorizing the issuance of such bond, close
20 quote. Does that refresh your recollection?
21     A    Something about the requirements that you have
22 to go by for approval of a bond allocation and issuance,
23 but I don't really -- without reading that in detail,
24 that's a -- that's a mouthful.
25     Q    Are you aware of any residents who suggested

W. Scott Culp
March 18, 2025

Page 166

1  or, I'll say, threatened, but I may not necessarily mean
2  that, but questioned or suggested the possibility of
3  filing an action pursuant to that statute?
4      A    I'm not. I don't recall any, no.
5      Q    Did Atlantic Housing Partners do anything in
6  that regard regarding a potential action by citizens
7  relating to the bond?
8      A    Not that I recall.
9      Q    So prior to today were you or Atlantic Housing
10 Partners aware at all that at least some community
11 members were discussing that possibility?
12     A    I don't remember if I was aware of the
13 discussion of that possibility or not.
14     Q    Did you do anything in preparation for today's
15 deposition to determine or search for any correspondence
16 related to that specific statute?
17     A    No, I'm not aware of any correspondence in
18 that relation.
19     Q    Does Atlantic Housing have any information
20 regarding motivation of Brevard citizens for objecting
21 to the proposed Venue at Heritage Oaks?
22     A    Only as provided in the e-mails and
23 discussions with ourselves at the community meeting,
24 with the commissioners, with the HFA, with our engineer.
25 But other than that, we have no knowledge of motivation.

Page 167

1      Q    Are you aware of any statements made by
2  citizens regarding their motivation and objecting to the
3  proposed development?
4      A    I'm aware of statements made. I don't recall
5  the word motivation used in those statements, although
6  it may have been.
7      Q    Does Atlantic Housing have any evidence that
8  the motivation of any community member to objecting to
9  the proposed project was racist or discriminatory
10 against black people?
11     MR. PICCOLO: Object to form.
12     THE WITNESS: I don't recall any evidence in
13     that regard.
14 BY MS. GAINEY:
15     Q    Does Atlantic Housing have any evidence of any
16 statements made by community members which were racist
17 or discriminatory against black people?
18     MR. PICCOLO: Object to form.
19     THE WITNESS: I don't recall any statements in
20     that regard.
21 BY MS. GAINEY:
22     Q    We already established that you attended the
23 December 5th, 2023 commission meeting where the bond was
24 considered, correct?
25     A    Yes.

Page 168

1      Q    I'm going to briefly review some of the
2  objections community members had to the proposed
3  development as noted in the minutes from that meeting.
4  I understand that you may not agree with the statements.
5  But my question is: Do you agree that the objection was
6  made to the commissioners; the first objection made to
7  the commissioners at that meeting were that it heavily
8  favors the developers and it allows the developers to
9  bypass local building restrictions on building height,
10 capacity and zoning?
11     A    I disagree with that, but I understand that
12 that objection was made.
13     Q    The next objection that -- was that the
14 problem is traffic in this particular location, that a
15 traffic study needed to be done and the roads didn't
16 support the traffic?
17     A    I disagree with that, and I recognize that
18 that statement was made.
19     Q    Was there an objection that only twenty
20 percent of the proposed hundred and five units were
21 going to be set aside for affordable housing while the
22 other eighty percent was not?
23     A    I don't remember that objection, and the
24 objection is not valid.
25     Q    Do you agree that that objection was made to

Page 169

1  the county commissioners on or about December 5th, 2023?
2      A    I don't recall.
3      Q    Was there an objection made to county
4  commissioners that the bond was not financially or
5  fiscally responsible?
6      A    I don't recall that objection, and I disagree
7  with it.
8      Q    Was there an objection that the proposed
9  development hurt the seven hundred and thirty-five
10 families in the five communities in Heritage Oaks?
11     A    I don't know if those exact words were used,
12 but I seem to recall some objection of that manner, and
13 I disagree with it.
14     Q    Were there objections as to the proposed
15 height of the building, the proposed building?
16     A    I recall hearing objections in that regard,
17 and I disagree with it.
18     Q    How tall was the building to be?
19     A    If I remember correctly, we were using a
20 four-story building.
21     Q    Do you know how tall that was in terms of
22 feet?
23     A    I don't remember.
24     Q    Are you aware of any modifications or changes
25 to the Live Local Act as it relates to height of

W. Scott Culp
March 18, 2025

1   proposed buildings that are developed in commercial
2   areas?
3       A    Yes.
4       Q    And what's the change as you know it?
5       A    It was a change that had to do with the height
6   within a community that is adjoining by a certain number
7   of single-family residents on two sides.  I don't
8   remember the exact statutory language, but there is --
9   there was a revision of the Live Local Act in that
10  regard.
11      Q    Everything else aside, would you have been
12  able to develop a four-story building under Live Local?
13      A    I don't remember whether it was three- or
14  four-story in this location.  I believe it was four, but
15  I really would need to refresh my memory with the
16  documents.
17      Q    Okay.  I'm going to purport to you that it
18  does appear that it was four stories.  And if you assume
19  that to be true, had you applied for the proposed
20  development here being a four-story building, would it
21  have been allowed in this location?
22      A    Yes.
23      Q    Even with the modifications to the Live Local?
24      A    Yes.
25      Q    Was the proposed location surrounded by -- on

1   two sides by single-family housing?
2       A    No.
3       Q    Explain what you mean.
4       A    I'd have to pull the statute on that first
5   before I could explain it.
6       Q    Let me just ask you generally.  Was the
7   proposed development going to have two sides with
8   single-family housing?
9       A    No, not completely.
10      Q    And tell me what you mean.
11      A    I need to see the site plan, the aerial and
12  the statute and -- so that I can refer to exactly the
13  configuration and what is contiguous to the property and
14  what the statute says with regard to limitation on
15  height for uses contiguous to the property.
16      Q    So are you not sure if there was going to be
17  -- that's fine.  Strike that.
18           I thought the application had an aerial photo
19  in it.
20      A    Let me see.  I probably have one on Google
21  Earth on my phone --
22      Q    That's actually the --
23      A    -- and the easiest way.
24      Q    That's actually Venue at Viera, I think.
25      A    Oh, no wonder I --

1       Q    It won't help you.
2       A    Let's see.  What's the road we were talking
3   about here?  This was -- actually I should remember the
4   name of this road.
5       Q    Heritage Oaks and --
6       A    Was it Heritage --
7       Q    Minton Road.
8       A    Oh, Minton Road.
9       Q    Oh, here.  Sorry.
10      A    Minton Road and Heritage Oaks.
11      Q    Here you go.
12      A    It popped right up.
13      Q    I'm showing you an aerial.
14      A    Yeah, there we go.  Yeah, so there's a
15  retention pond on the back of the property that was
16  already constructed and in place.  This aerial is
17  somewhat dated.  A portion of the property to the south
18  has a single-family neighborhood across a public
19  right-of-way.  Contiguous is only one, two, three, four,
20  five, six, if you count the ones across the public
21  right-of-way.  So then we need to look at the statute
22  with regard to the revisions to the Live Local Act with
23  regard to height in an area that is in proximity to
24  single-family.
25      Q    Do you agree that this proposed development

1   had single-family homes on two sides?
2       A    Yes.
3       Q    So if you assume that that is the case and the
4   statute, in fact, was modified such that Live Local
5   would not allow a four-story building to be built if
6   there are two --
7       A    I don't want --
8       Q    -- sides of single-family -- hang on a
9   second -- two sides of single-family homes to the
10  proposed development, do you agree with the statement
11  that you would not have been able to develop a
12  four-story building at this location as we sit here
13  today?
14      A    I'm not going to respond to the conjecture
15  with regard to what the statute says.  I'll only respond
16  to what the statute actually says.  So if you want to
17  present the statute or have us look at the statute, I'm
18  not going to respond to some assumption of what the
19  statute might say.
20      Q    Have you developed any four-story buildings
21  that are located near subdivisions on two sides --
22      A    Yes.
23      Q    -- in the last --
24      A    Yes.
25      Q    And was that -- where was that located?

W. Scott Culp
March 18, 2025

Page 174

1    A    We have one we're starting construction on in
2    the city of Sanford. And then we have one we're
3    starting construction on in the city of Palm Coast.
4    Those are two that come to mind right now. But, again,
5    the statute has provisions in it, and I don't want to
6    assume that I know with regard to the statute.
7    Q    It's fine. We can move on. Back to the
8    objection. Was there an objection by the community
9    member that the application asked if the developer or
10   principal or general partner had been found in
11   noncompliance and the application indicated that yes,
12   the applicant had been found in noncompliance?
13   A    Yes, there was an objection in that regard.
14   Q    And did Atlantic Housing address that
15   objection?
16   A    You say did they address that objection?
17   Q    Counter it, address it, correct it.
18   A    We were not provided an opportunity to address
19   objections.
20   Q    Did you -- do you agree you -- strike that.
21        Was there an objection by a citizen that the
22   bond proposal was without specificity?
23   A    I don't recall that, but I would definitely
24   disagree with it.
25   Q    Was there an objection that a fiscal impact

Page 175

1    statement needed to be done?
2    A    I don't recall that, but I would disagree with
3    it.
4    Q    Was there an objection that a pedestrian had
5    recently been hit in the area and there were safety
6    concerns as it relates to traffic?
7    A    I don't remember that.
8    Q    Was there an objection about motor vehicle
9    accidents that had occurred in the area and also
10   concerns about increased traffic?
11   A    I remember some comments in that regard, and I
12   disagree.
13   Q    Did Atlantic Housing hire a lobbyist as it
14   relates to Live Local?
15   A    Atlantic Housing has a lobbyist. We didn't
16   hire a lobbyist specifically as it relates to Live
17   Local.
18   Q    Did your lobbyist take any actions as it
19   relates to Live Local?
20   A    I and my lobbyist had numerous discussions
21   with representatives in the legislature, with staff and
22   elected representatives with regard to the Live Local
23   Act when it was being developed.
24   Q    And was Atlantic Housing in support of the
25   legislation?

Page 176

1    A    Yes.
2    Q    And why is that?
3    A    Because it benefits the provision of
4    affordable housing and meets a significant need that is
5    documented and established by the need studies that are
6    prepared annually by the State.
7    Q    And, I'm sorry, did you have -- did your
8    lobbyist or anyone on behalf of Atlantic Housing have
9    conversations with legislatures advocating for passage
10   of Live Local?
11   A    Yes.
12   Q    How many?
13   A    I don't recall.
14   Q    Would there be any documents to reflect that?
15   A    No.
16   Q    And who is your lobbyist, Jason Unger?
17   A    He's one of them, yes.
18   Q    How many do you have?
19   A    Jason's firm represents us. So there's any
20   attorney within his firm that registers as a lobbyist
21   for Atlantic Housing can lobby in our regard. So I
22   don't recall each of the individuals named in his firm
23   that has registered.
24   Q    I'll show you what's Bates-Stamped John Thomas
25   18. Is that an e-mail to one of the -- one of Atlantic

Page 177

1    Housing's lobbyists?
2    A    No, this was an e-mail to Jonathan Thomas, who
3    I think you took the deposition of.
4    Q    Go a little --
5    A    Oh, okay. And there's an e-mail below that
6    which is an e-mail to Jason Unger from me.
7    Q    And what were you telling Jason at that time
8    and --
9    A    I was letting him know that there are
10   neighbors that are vehemently opposing our four-story
11   seniors affordable mixed-income housing.
12   Q    Does that refresh your recollection on the
13   height?
14   A    It reflects my recollection that I told Jason
15   that the neighbors were opposing a four-story seniors
16   affordable mixed-income housing.
17   Q    Was the building proposed to be four stories
18   or not?
19   A    I think so.
20   Q    What's the date on that e-mail?
21   A    December -- the one to Jason was December 3rd
22   of 2023.
23        MS. GAINEY: I'll mark that as --
24   BY MS. GAINEY:
25   Q    Is that a fair and accurate copy of that

W. Scott Culp
March 18, 2025

Page 178

1  e-mail?
2      A   I think so.
3      MS. GAINEY:  We'll mark that as Exhibit 13.
4      (Defendant's Exhibit 13 was marked for
5  identification.)
6  BY MS. GAINEY:
7      Q   Did you also tell Angela Abbott on or about
8  December 4th, 2023 that the neighbors were, quote,
9  vehemently opposed to the development?
10     A   I think so.
11     Q   Let me show you an e-mail from you to Angela
12  in that regard.
13     A   I see that.
14     Q   And the e-mail seems to indicate that you were
15  aware in advance of commissioners' votes; is that
16  accurate?
17     A   I couldn't be aware of commissioners' votes
18  'cause they can't vote in advance.  I was aware of
19  indications of what their votes might be.
20     Q   Well, what does your e-mail to Angela say?
21     A   It says, we are aware of two definite no votes
22  and one definite yes vote.  That was my interpretation
23  of what I thought was going to happen.
24     Q   Who were the definite no votes as you're
25  referring to there?

Page 179

1      A   I don't remember.
2      Q   Who was the definite yes vote?
3      A   I don't remember.
4      Q   How did you become aware of the definite no
5  votes?
6      A   I don't remember.
7      Q   How did you become aware of the definite yes
8  vote?
9      A   Don't remember.
10     Q   To me that suggests that someone from Atlantic
11  Housing had conversations with Brevard County
12  Commissioners prior to the vote.  Is that a fair
13  assumption?
14     A   I don't -- I don't remember if I had any
15  conversations directly with any of the commissioners.
16     Q   Number eighteen in our subpoena asked for the
17  person most knowledgeable related to, quote, actual or
18  attempted correspondence, contact and/or communications
19  with Brevard County Commissioners regarding Venue at
20  Heritage Oaks, period.  Are you the person most
21  knowledgeable regarding contact or communications with
22  commissioners?
23     A   I am.
24     Q   And did you do anything in order to refresh
25  your recollection as to contact or communications with

Page 180

1  commissioners prior to today's deposition?
2      A   I thought about it.
3      Q   Other than thinking about it.
4      A   I don't have any written communications with
5  any commissioners from the commission, so I thought
6  about it.
7      Q   All right.  So is it fair to assume, based on
8  that e-mail, that there was at least some correspondence
9  with --
10     A   No --
11     Q   Let me finish, please -- commissioners prior
12  to the vote as to how the commissioners were going to
13  vote?
14     A   No.
15     Q   And why is that not fair?
16     A   There was communication from commissioners to
17  the neighbors, and there was some communication from
18  commissioners, I believe, to Angela.  And we had gotten
19  indication of the commissioners being concerned, but I
20  don't -- no, I don't agree that there was any discussion
21  or communication between anybody at Atlantic with any of
22  the commissioners.
23     Q   Did anyone at Atlantic have any --
24     A   And I don't -- I'm sorry.
25     Q   Go ahead.

Page 181

1      A   I'm saying I don't think there were any yes
2  votes, if I think about the votes.  So obviously a
3  definite yes vote couldn't have been predetermined if
4  there were none.
5      Q   Did you review the minutes from the Brevard
6  County Commissioner meeting regarding the bond --
7      A   No.
8      Q   -- prior to this deposition?
9      A   Not recently.  I've watched the video several
10  times, but I haven't done anything recently.
11     Q   And you don't remember what the votes were?
12     A   I don't.  I really don't.
13     Q   Were you aware that West Melbourne City
14  Councilman Dittmore appeared at the commission meeting
15  in objection to the project?
16     A   I am.
17     Q   What conversations, if any, did anyone from
18  Brevard have with City Councilman Dittmore regarding the
19  project?
20     A   I don't know.
21     Q   Did you attempt to find or locate or talk to
22  anyone or think about any conversations your company had
23  with City Councilman Dittmore in response to number
24  twenty of our deposition notice?
25     A   We had communications and e-mail with the

W. Scott Culp
March 18, 2025

Page 182

1    City. And I don't recall if Commissioner Dittmore was
2    part of those communications, and I believe he was the
3    city commissioner that was at the community meeting. He
4    made some comments, and I believe he was the city
5    commissioner that was at the county commission meeting
6    that made some comments. I don't recall any other
7    direct conversation or communication that we had with
8    him. I know we did have some communication with the
9    City, but I can't remember whether it was just the city
10   manager and one of the other city staff persons, or if
11   any of the commissioners were copied on that.
12       Q    Did Congress -- Congress, excuse me -- city
13   councilman state that he objected to the bond because it
14   was a sixteen-million-dollar bond for only providing a
15   minimal impact for families in need?
16       A    I don't remember his statement, but I think he
17   made some statement in that regard.
18       Q    Did he object to the fact that it was a twenty
19   percent or twenty-one apartments were -- was going to be
20   a small amount to help families in need?
21       A    I don't recall the exact words, but I think he
22   made some reference to the percentage set-aside, which
23   he was not accurate in that regard.
24       Q    Well, he was accurate pursuant to what had
25   been submitted to the Brevard Housing Authority in

Page 183

1    Atlantic -- or in the application by the plaintiffs,
2    right?
3        A    With regard to what was going to be required
4    by the bond allocation, that is correct.
5        Q    Did City Councilman Dittmore object to the
6    project because the rental numbers are roughly the same
7    as the market rate for a one-bedroom apartment in the
8    city of West Melbourne?
9        A    I don't remember his exact language, but I
10   have no reason to believe he didn't state that.
11       Q    Is it true that the rent was going to be
12   roughly the same for -- as a market rate for a
13   one-bedroom apartment in the city of West Melbourne?
14       A    No.
15       Q    And how is that not true?
16       A    We discussed at length the underwriting
17   reports and the financial models that show what the
18   set-asides were going to be for the four percent
19   Low-Income Housing Tax Credits, and those rents are
20   significantly less than market for this geographic area.
21       Q    I'll show you John Thomas 232519 Bates-Stamped
22   right-hand corner. And that's an e-mail between you and
23   Gray Robinson?
24       A    Correct.
25       Q    Is that the lobbying firm that you were

Page 184

1    speaking of earlier?
2        A    Correct.
3        Q    At the bottom of the first page you state,
4    quote, we are in the city of West Melbourne and the City
5    can't have any public hearings because we are using Live
6    Local for our land use zoning and height, exactly as
7    Live Local is intended, close quote. Did you say that?
8        A    That is what my e-mail states, yes.
9        Q    What did you mean when you said we, quote,
10   can't have any public hearings, close quote?
11       A    The Live Local Act prevents local
12   jurisdictions from having public hearings to make
13   determinations with regard to the approvals of an
14   affordable housing project developed on commercial
15   property under the Live Local Act.
16       Q    Do you agree that TEFRA requires public
17   hearings?
18       A    TEFRA is a public hearing unrelated to the
19   land use zoning and height. TEFRA is a public hearing
20   related to the public purpose of tax exempt bonds and is
21   not what is referenced by the Live Local Act with regard
22   to public hearings and approvals.
23       Q    My question was just: Do you agree that
24   TEFRA, as it relates to bond financing, requires public
25   hearings?

Page 185

1        A    I answered your question.
2        Q    Is that a yes?
3        A    No. You can ask again if you'd like.
4        Q    Do you agree that TEFRA requires public
5    hearings as it relates to bond financing?
6        A    Yes.
7        Q    On the next page it says --
8        A    And that, of course, is not a city public
9    hearing. It's a county public hearing.
10       Q    On the next page it says, quote, also
11   important to note, dash, we are committing to a
12   seniors-occupancy restriction, closed quote. What does
13   that mean?
14       A    It means as we have discussed, that we were
15   committing to a seniors-occupancy restriction and this
16   is consistent with what you and I have talked about. We
17   had not made that commitment prior to that point because
18   obviously on December 3rd, when this e-mail was written,
19   I said we are committing doesn't mean we have committed.
20       Q    Kind of splitting hairs there, aren't you?
21       A    Aren't you?
22       Q    So as of December 3rd, 2023 you agree that you
23   are telling people you are committing to a
24   seniors-occupancy restriction; but it's your testimony
25   that you, at that point, had not committed to a

W. Scott Culp
March 18, 2025

Page 186

1    seniors-occupancy restriction.  Am I --
2        A    One hundred percent correct.
3        Q    -- understanding that?
4        A    One hundred percent correct.
5        Q    Okay.  What did you tell the people at the
6    community meeting on November 30th, 2023?
7        A    I believe we told them we were considering a
8    seniors-occupancy restriction.
9        Q    But had not committed at that point?
10       A    I don't recall having a commitment at that
11   point.
12       Q    If you go back a few pages, page five of that
13   document, John Thomas 00022, this appears to be an
14   e-mail that was sent by Woodfield at Heritage Oaks
15   homeowners' association, which you forwarded; is that
16   correct?
17       A    That's correct.
18       Q    And this e-mail states, quote, new information
19   that we heard at the November 30th developer meeting are
20   in subsequent corresponding.  Nothing is set in stone.
21   The developer hasn't purchased the land yet.  It's just
22   under contract.  Many things may change.  But the
23   current plan is one hundred and five units, though that
24   number could climb.  All units will be reserved for
25   seniors, quote, in parentheses, requires at least one

Page 187

1    family member be fifty-five plus and no everyone under
2    eighteen.  Everyone must be listed on the lease, closed
3    quote.  Is that an accurate statement as to what was
4    discussed at the November 30th meeting?
5        A    No.  As it states in this correspondence, it
6    was delivered from the homeowners' association to
7    everybody that subscribes to their mailings, nothing is
8    set in stone, which was what they're saying, has been
9    info received at the November 30th developer meeting.
10   So they're saying that info received at the November
11   30th developer meeting is nothing is set in stone and
12   that many things may change.
13            They indicate information with regard to the
14   seniors restriction that is not accurate.  Some of it's
15   not accurate.  It says no one under the age of eighteen.
16   It's accurate that -- it's really not accurate that
17   everyone must be listed on the lease.  Everyone of legal
18   age must be listed on the lease.  I could go through
19   each of the rest of them if you'd like, but I'll wait
20   'til you ask a question.
21       Q    So is it true or is it not true that you told
22   the residents at the November 30th meeting that all
23   units would be reserved for seniors?
24       A    I did.  Well, I told them that we were
25   consideration reserving all units for seniors.  I told

Page 188

1    them nothing is set in stone.
2        Q    Is it true or is it not true that you told the
3    residents at the November 30th meeting that if the
4    Brevard County Finance Housing Authority bond is denied
5    on December 5th, Atlantic Housing would apply for a
6    state -- Florida State bond?
7        A    I indicated that we may.
8        Q    And did you indicate that the Florida State
9    bond will likely not be for age-restricted senior
10   residents?
11       A    Yes.
12       Q    As it relates to entrances, two planned, one
13   on Heritage Oaks Boulevard and the other on Minton, what
14   discussion was held at the November 30th meeting in that
15   regard?
16       A    We showed our site plan.  And it showed the
17   entrances that already previously had been approved for
18   development of this property with an entrance an
19   Heritage Oaks Boulevard and on Minton.
20       Q    The small medical facility that was going to
21   be part of the development, why was that added or why
22   was that part of the development?
23       A    Under the Live Local Act the development needs
24   to be mixed use and provide a small mixed-use component.
25   And the medical facility or other type of commercial use

Page 189

1    would be allowable on this site and was located on the
2    site plan that we had been providing and reviewing with
3    the City staff.
4        Q    And was it the City staff that told you about
5    the mixed-use requirement?
6        A    The mixed-use requirement is in the Live Local
7    Act statute.  So whether the City staff told us about
8    it, I don't know; but it's in the statute.
9        Q    Prior to the meeting with the City of West
10   Melbourne was there plans for it to be a mixed use?
11       A    Yes.
12       Q    Number six says, quote, the traffic study data
13   they presented with old, dash, newer info exists because
14   of the Dougherty Road extension project.  They'll
15   reexamine that, period.  Is that a true statement?
16       A    It's true that new information does exist and
17   that we were going to update our traffic study for that,
18   correct.
19       Q    The next one is about, I guess, were residents
20   expressing privacy concerns?
21       A    There are three or four single-family homes
22   across the retention pond from the proposed building.
23   And we had designed that building such that there would
24   be no windows looking in that direction.
25       Q    The next one, number eight, is about building

W. Scott Culp
March 18, 2025

Page 190

1    height.  It says, building height allowed by Live Local
2    could go as high as sixty-five feet, and even a
3    four-story building is likely to go above fifty
4    something feet, allowing for roof line height.  Was
5    there discussion at the meeting regard the height of the
6    building?
7       A    Yes, there was.
8       Q    And what did you tell the residents regarding
9    the height of the building at the November 30th meeting?
10      A    I think we even gave them a presentation
11   showing the sight line from the location of the building
12   and the single-family residence in the location of the
13   single-family residence that are contiguous to the
14   property so that they could understand better the view
15   of the building and the view the building would have of
16   the single-family residences.
17      Q    The next one is about I think you were
18   explaining your operations.  The next one is about
19   number ten.  It says, quote, they buy the bonds and take
20   the tax offsets, close quote.  Is that true?
21      A    That's a statement they're making of their
22   interpretation, but it's not necessarily an accurate
23   statement.
24      Q    Number eleven says, quote, Councilman Dittmore
25   asked if the City suggested alternative properties,

Page 191

1    would the developer considerate it.  Scott Culp said
2    yes, but that they like this property because it's
3    already leveled, it has the retention pond, curb-outs,
4    et cetera, close quotes.  Is that a true statement?
5       A    Yes.  It cuts it a little bit short.  I told
6    them we're always considering other properties and we
7    have developed quite a bit in Brevard County and would
8    always consider other properties for development of
9    affordable housing.
10      Q    What other properties did you consider in
11   Brevard County, if any, after the bond was denied?
12      A    None after the bond was denied.
13      Q    Prior to the bond being denied what other
14   properties did Atlantic Housing consider?
15      A    We had a few listings come to us that we
16   looked at that weren't going to fit with what we were
17   trying to do.  We didn't find any others that were
18   offered at a price that would be economically feasible.
19      Q    Did you tell Angela Abbott that the project
20   would be built whether or not it's financed with bonds?
21      A    There was an e-mail in that regard, I believe.
22   I think there's been some confusion about what we were
23   speaking about, or maybe I was confused about what we
24   were speaking about in that regard.
25      Q    Do you remember the e-mail?

Page 192

1       A    Not totally.  I --
2       Q    Let me show --
3       A    -- remember there was an e-mail, but...
4            MS. GAINEY:  Let me show it to you to refresh
5    your recollection, and we'll mark that as
6    Defendant's Exhibit 14.
7            (Defendant's Exhibit 14 was marked for
8    identification.)
9    BY MS. GAINEY:
10      Q    Wait, I'm sorry.  Did I mark this one?
11      A    I don't know if you marked this one or not.
12      Q    I'm going to mark for purposes --
13      A    I don't know if you marked that one either.
14      Q    Let me actually -- I can jointly mark them.
15      A    Okay.
16           MS. GAINEY:  For purposes of the record, I'm
17   marking as Defendant's Exhibit 14, e-mails dated
18   March -- excuse me, March -- Monday, December 4th,
19   from Mr. Culp, and then also an e-mail dated
20   December 3rd, Bates-Stamped 2-3-25.
21           So we'll mark that e-mail, Mr. Culp, as
22   Defendant's Exhibit 15, if you don't mind.
23           THE WITNESS:  Oh, I'm sorry.  I was reading
24   it.  I wasn't paying attention to you.
25           MS. GAINEY:  I find that if I don't mark them

Page 193

1    immediately, I forget.
2            (Defendant's Exhibit 15 was marked for
3    identification.)
4    BY MS. GAINEY:
5       Q    Is that the e-mail that you were referring to?
6       A    Yeah, this is what I remember.
7       Q    Does that refresh your recollection?
8       A    Yeah.  This is the one there's been a little
9    confusion on because the discussion, as I recall it, was
10   related to whether or not we could develop the property
11   without bonds.  The Live Local Act doesn't require that
12   you use taxes and bonds to develop affordable housing on
13   the property.  So I was telling Angela yes, the Live
14   Local legislation provides land-use approvals.  The
15   bonds merely provide an opportunity for some of the
16   apartments to be more affordable.
17           So I was explaining that yes, you know, this
18   is not a question of using bonds to be in compliance
19   with Live Local.  It was the Live Local Acts allows you
20   to build affordable, and affordable is below a hundred
21   and twenty percent AMI.  And as we've seen in some of
22   the other information we've reviewed, below a hundred
23   and twenty percent AMI is essentially market in this
24   location.  So that was the discussion, as I recall it,
25   although I think my answer wasn't as clear because she

Page 194

1  said "will" versus "can" in her question.
2      Q    Well, it seems pretty --
3      A    It seems pretty --
4      Q    -- straightforward.
5      A    -- clear to me.  Seems pretty clear to me.
6      Q    Seems pretty straightforward that she asked,
7  quote, is it safe to say that this project will be built
8  whether or not it is financed with bonds --
9      A    Yeah.
10     Q    -- question mark, close quote.  Hang on, let
11 me finish.  And your response is, quote, yes, period.
12 Live Local --
13     A    Yes, and my response is that, as I indicated,
14 we were talking about the development of the property,
15 the neighbors' opposition, the land use entitlements,
16 the ability to develop affordable housing in this
17 location.  And I was explaining Live Local legislation
18 with regard to the land use approvals, which it states
19 in the sentence that's connected to the yes, period.  So
20 it's clear that I was discussing the land use approvals
21 and the Live Local legislation and the ability to
22 provide some more affordable apartments with the bonds.
23 So I think it's clear in my answer.  And I understand
24 your position with regard to clarity of her question.
25     Q    And her response is, quote, got it.  Isn't

Page 195

1  this a family project as opposed to senior, question
2  mark, close quote.  And your response is, quote, we are
3  planning to restrict to seniors mixed income, close
4  quote.
5      A    That's correct.
6      Q    So up until that point was there some
7  confusion as to whether it was a family project as
8  opposed to seniors?
9      A    There was no commitment, and still at this
10 point was no commitment to seniors because it's not
11 required under the bond allocation.  Bond allocation
12 does not require you to make a commitment, family,
13 seniors, elderly.  And as we've had extensive testimony
14 about, we had not made that commitment.  And even at
15 this point we are saying that we are planning to
16 restrict to seniors.  We didn't say that we have
17 restricted or that we are committed to restricting, but
18 we were planning on that day that we're going to have
19 seniors mixed income.
20     Q    Did Ms. Abbott ask you, after the bond denial,
21 if you would go ahead with the development?
22     A    I don't recall.
23     Q    Specifically at the December 2nd Housing
24 Finance Authority meeting, as you know, it's recorded; I
25 think as we've established.  And according to your

Page 196

1  statement, she -- and her question was, quote, do you
2  think you will go ahead with the development.  And your
3  response is, quote, we are not sure at this point.  We
4  have a lot of different options, close quote.  Assuming
5  that to be true, did you have a lot of different options
6  after the denial?
7      A    I have options.  I don't know that any of them
8  are good options.  We were unsure, but we have options.
9      Q    What did you do to explore those options, if
10 anything?
11     A    Looked at the economic viability of developing
12 without loans, which would also be without tax credits,
13 and providing it still require to be restricted
14 affordable under the Live Local Act.  So we still are
15 considering and unsure about whether or not we have the
16 ability to develop in an economically feasible program.
17 So that's what we did.
18     Q    Could you have switched from being a seniors
19 and do a Live Local sale application?
20     A    The Live Local sale application is extremely
21 competitive and would have been the following fall.  And
22 I don't think we would have had land control.  We would
23 have had to close on a land, which we wouldn't have done
24 knowing the extremely competitive nature of the sale
25 applications are probably one in twenty awards for

Page 197

1  applications.
2          And I don't recall, as I'm sitting here today,
3  whether this particular site scored with the what's
4  called proximity preference scoring.  You have proximity
5  items in the Florida Housing Finance Corporation
6  application.  And I would have had to review, and I may
7  have done after this denial, the proximity scoring for
8  this site to see if we even could meet the proximity
9  scoring which would make us competitive.
10     Q    Are there any records to reflect any actions
11 you took with respect to the possibility of applying for
12 a sale financing?
13     A    There wouldn't be any records 'cause I would
14 have just looked at the prior year's sale application,
15 because there wasn't one at that time published for the
16 coming year, for 2025.  I would have also had to
17 recognize that I would have had to apply for Florida
18 Housing Finance Corporation bonds, which is a different
19 economic model than the local Housing Finance Authority
20 bonds.  And their set-asides would be different; and the
21 competitiveness of the sale restrictions would make it
22 highly unlikely that we'd get an award, unless you
23 believe we're going to be the one in twenty in the
24 applications that might win an award.
25          And if I determined that the proximity

W Scott Culp
March 18, 2025

Page 198

1  preference scoring was adequate, then there'd be almost
2  zero chance of getting an award.  But I wouldn't have
3  some document.  I would have needed to e-mail somebody
4  about that.  I would have looked on the Florida Housing
5  Finance Corporation website and reviewed that at my
6  desk.
7      Q     Is there any evidence or documents or
8  information to reflect what, if anything, you did
9  regarding pursuing possible sale application?
10     A     I thought I just answered that question.  I
11 think I did.  I think I answered that question.
12     Q     There's nothing written?
13     A     No, there's nothing written.  No.
14     Q     What about the possibility of doing at market
15 rate without bonds?  Did you tell Ms. Abbott on
16 December 6th, 2023 that you would look at the
17 possibility of doing market rate without bonds?
18     A     Yes.
19     Q     And did you, in fact, do that?
20     A     Yes.
21     Q     And are there any written documents in order
22 to reflect that?
23     A     No.
24     Q     So what actions did you take in order to look
25 at doing it at market rate without bond?

Page 199

1      A     I looked at my models to see if it would be
2  economically feasible.  And I think I even asked Mike,
3  who I would have had to get approval from if I wanted to
4  even try and do it; and it wasn't -- it's not feasible.
5  It's not --
6      Q     So did you --
7      A     -- economically feasible.
8      Q     -- run the numbers or...
9      A     I did, yeah.
10     Q     And you're saying there's no written --
11     A     No.
12     Q     -- evidence of that?
13     A     No.  I could run them again for you today.
14 It's pretty easy.  There's no economic feasibility to an
15 affordable housing development that meets the Live Local
16 legislation without tax exempt bonds or Low-Income
17 Housing Tax Credits in this location with the market
18 rents that have already been established by the market
19 study engaged and provided by the credit underwriter for
20 the Brevard County Housing Finance Authority.
21     Q     Do you agree that you could have developed the
22 -- proposed it at a different location?
23     A     No.  I can't develop -- if I could have
24 developed a proposal?  No, I can't move the bonds.  I
25 can't take a hundred-and-five-unit building designed for

Page 200

1  a specific site, put it on a different location.  It's a
2  different site.  And could I have found another site in
3  the country or in the state to develop?  Yes, I'm
4  continuing to do that.
5      Q     And I think you said in your deposition you
6  didn't do it in Brevard County because you had filed a
7  lawsuit, correct?
8      A     I don't know if I said I didn't do it because
9  I filed a lawsuit.  I think I said I didn't do it and I
10 filed a lawsuit.  Did I say I didn't do it because I
11 filed a lawsuit?  If I did, I should retract that.  I
12 didn't do it.  I don't think I will.
13     Q     I think you said something along the lines of
14 why would you do it, you had a lawsuit pending against
15 them.
16     A     Oh, I do remember saying that, why would I do
17 it.  You tell me, why would I do it.
18     Q     Well, do you understand you have a duty to
19 mitigate your damages?
20     A     Do you understand that I did mitigate my
21 damages?
22     Q     Good to hear.  What'd you do to mitigate your
23 damages?
24     A     First, I didn't close on the property.  If I
25 had closed on the property I would have been forced to

Page 201

1  develop an affordable housing community at a loss with
2  no tax exempt bonds and no tax credits.
3      Q     All right.  And the reason why you didn't
4  close on the property was because of the City of West
5  Melbourne ordinance, correct?
6      A     That was one of the reasons, yes.
7      Q     What are the other reasons?
8      A     I was denied the bond financing by the county
9  commission.
10     Q     Do you agree that the letter that your
11 attorney sent regarding the cancelation of the land
12 contract didn't reference the bond denial at all?
13     A     I do, intentionally.
14     Q     And why is that?
15     A     The land control or land documents require --
16 allow us to terminate based upon a moratorium.  We've
17 provided the termination based upon what was in our
18 purchase agreement.  I don't need to --
19     Q     So it was --
20     A     -- expound upon that.
21     Q     So you agree that per that letter from Scott
22 Culp, the reason for the termination of the land
23 contract was the moratorium?
24         MR. PICCOLO:  Object to the form.
25         THE WITNESS:  No.  I agree that that letter

W. Scott Culp
March 18, 2025

Page 202

1    that we terminated based upon the provisions of our
2    contract that allowed us to terminate because of
3    the moratorium.  I was also mitigating my damages.
4  BY MS. GAINEY:
5        Q    I'm sorry, I didn't hear you.
6        A    I was also mitigating my damages by
7    terminating it in accordance with the contract.  If I
8    had terminated not in accordance with the contract, I
9    would have additional damages.
10       Q    So the actions that Atlantic Housing took in
11   order to mitigate their damages in this case were to,
12   one, terminate the contract?
13       A    Yes.
14       Q    What else?
15       A    Not proceed with the development of affordable
16   housing in this location.
17       Q    What other -- I'm sorry, were you done?
18       A    Yes.
19       Q    What other actions, if any, did Atlantic
20   Housing do in order to mitigate damages?
21       A    I'm trying to recall if I asked my engineers
22   and architects for discounts on their bills because we
23   were not going to build it and we had already incurred a
24   significant amount of cost that had not yet been paid.
25   I typically would do that in a situation.  So it's

Page 203

1    probably mitigating my damages in that regard.  I don't
2    really remember, but typically that's what I do.
3        Q    How many affordable housing developments does
4    Atlantic Housing currently have in the works?
5        A    Oh, in the works?
6        Q    Uh-huh.
7        A    Not ones we own, but --
8        Q    No, no, no.
9        A    -- ones we're developing?
10       Q    Yes.
11       A    Probably five.  I say in the works, from
12   completing construction to starting the acquisition
13   process, probably seven.
14       Q    And how is that in comparison to what Atlantic
15   Housing normally has?  Is it pretty consistent or...
16       A    For the past five years it's probably pretty
17   consistent.
18       Q    So the resources that would have been devoted
19   to Venue at Heritage Oaks, did you divert those
20   resources to another development?
21       A    We had to, I call, suck up some cost of
22   resources, because we align our resources for start
23   times.  We had an anticipated schedule for starting
24   this.  Starting another one, you know, from the day we
25   start looking at another location, is typically eighteen

Page 204

1    months.  So we had some period of time where we had, you
2    know, resources planned to start this community and we
3    wouldn't be able to.  We had to look for another one
4    which would be in a schedule that would put us farther
5    out.
6        Q    What other actions, if any, did Atlantic
7    Housing take in order to mitigate damages, other than
8    what you've already told me?
9        A    Other than considering what other options
10   there might be for affordable housing on this property,
11   I don't know if there were any others.
12       Q    Did Atlantic Housing take any steps to
13   consider other options on this property?
14       A    We considered whether or not there would be a
15   bond allocation available, whether there would be other
16   resources from the State available; and we were not able
17   to identify anything that would be available.
18       Q    My understanding, and we talked about this a
19   little bit in your original deposition, that the bond
20   allocation amounts were available for 2024 in region --
21   in that region, correct?
22       A    You stated that.  I said that I don't believe
23   that's accurate, and it's not accurate.
24       Q    All right.  And so you're saying that the bond
25   that was -- you were applying for for this project

Page 205

1    essentially was not something you could have reapplied
2    for in 2024?
3        A    There was not allocation available in 2024.
4    This bond allocation expired in December and was part of
5    a carryover, which has a three-year time frame.  It was
6    ending at the end of December, and you can't carry it
7    forward to the next year.  And there was no new bond
8    allocation in 2024 available to Brevard County to close
9    on bonds in 2024 for multi-family.
10       Q    And how did you learn that?
11       A    How'd I learn that?
12       Q    Yeah.
13       A    I keep track of the areas that we're working
14   in to keep abreast of their bond allocations and what
15   bond allocations are being used and applied for and
16   allocated.
17       Q    Did you have a conversation with Ms. Abbott in
18   that regard as far as what bonds were available in 2024?
19       A    I think there was some discussion or e-mails
20   about that at one point, but I don't really remember the
21   context of it.
22       Q    So if Ms. Abbott would testify that there was
23   2024 bond allocations that could have been applied for
24   by Atlantic Housing, you would dispute that testimony?
25       A    I would, yeah, depending on the date that she

W. Scott Culp
March 18, 2025

Page 206

1    testified to that.
2        Q    So it's your testimony that there wouldn't
3    have been any possibility in order to mitigate your
4    damages in order to try to reapply for the bond at a
5    different location?
6        A    I could reapply for a different bond in a
7    different location.  I can't use the same bond.  The
8    same bond's expired the end of December.
9        Q    I see what you're doing.  Pretty slick.
10       A    Yeah.  I could also say there is no other --
11       Q    All right.
12       A    -- bond allocation available in Brevard County
13   to develop a multi-family affordable housing community
14   in 2024.
15       Q    All right.  I see what you're doing there.
16       A    I hope you do.
17       Q    I appreciate what you're now saying that this
18   specific bond expired on December 31st, 2023.
19       A    The allocation for bond authority in Brevard
20   County --
21       Q    Correct.
22       A    -- in this amount expired.
23       Q    Was there bond financing available that
24   Atlantic Housing could have applied for in 2024 in
25   Brevard County?

Page 207

1        A    No.
2        Q    The well dried up?
3        A    Absolutely not.
4        Q    No bond financing available to you in Brevard
5    County in 2024?
6        A    For any multi-family affordable housing in
7    Brevard County in 2024 through an allocation from
8    Brevard County division of bond finance, no.  From
9    Brevard County Housing and Finance Authority, none,
10   correct.
11       Q    And where did you get that information from?
12       A    State division of bond finance.
13       Q    And you said Ms. Abbott and yourself had a
14   conversation about that?
15       A    No, I didn't say that.  You asked me about --
16       Q    There were some e-mails?
17       A    You asked me about a conversation with
18   Ms. Abbott where her and I were discussing future bond
19   allocation authority.  And I do recall there was some
20   e-mail traffic between her and I somewhere towards the
21   end of the year.  Definitely not after -- I don't think
22   there was any after the bond denial.  I know there was
23   none in January of 2024.
24       Q    And what's your source for testifying that
25   there was no bond financing available in Brevard County?

Page 208

1        A    State division of bond finance.  All
2    allocation authority comes through the state division of
3    bond finance, even to the regions and to the local
4    housing finance authorities.
5        Q    And who did you speak to there?
6        A    Don't recall.
7        Q    And when did you speak to that person?
8        A    Don't recall.
9        Q    Are you aware of any bond financing
10   applications submitted by any affordable housing
11   development in 2024?
12       A    Anywhere in the state?
13       Q    In Brevard County.
14       A    I'm not aware of any.  It doesn't mean there
15   weren't any.  They couldn't close in 2024, but it
16   doesn't mean there weren't any.
17       Q    According to you and your testimony, as I
18   understand it, the bond financing pot wasn't available
19   in 2024.
20       A    Correct.  Didn't say you couldn't make an
21   application.
22       Q    Okay.  And someone at the state division of
23   bond finance told you that?
24       A    Told me what?
25       Q    That there was no bond financing available in

Page 209

1    Brevard County in 2024.
2        A    For multi-family.
3        Q    As opposed to single-family?
4        A    Correct.
5        Q    All right.  Anything else that your company
6    did in order to mitigate damages in this case?
7        A    Not that I remember.
8        Q    Back to that conversation about the state
9    division bond finance.
10       A    State division of bond finance.
11       Q    Thank you.
12            Was that an e-mail or was that a telephone
13   conversation?
14       A    I left a voicemail, e-mail at the division of
15   bond finance.  I don't think I got a specific -- don't
16   remember.
17       Q    Someone called you back?
18       A    I don't remember whether someone called me
19   back or sent me an e-mail in that regard.
20       Q    Why didn't you just ask Angela Abbott?  Isn't
21   that who you'd been talking to for years?
22       A    Yes.
23       Q    Okay.  So why didn't you just ask her about
24   the availability of bond financing in 2024 in Brevard
25   County?

W. Scott Culp
March 18, 2025

Page 210

1    A    I was pretty sure I knew what happened.  I
2  wanted to confirm it with the people that can confirm it
3  with a hundred percent accuracy, which are the people
4  that provide the allocations.
5    Q    So what do you mean when you say I'm pretty
6  sure I knew what happened?
7    A    I'm pretty sure I know that Brevard County
8  Housing Finance Authority had TEFRA'd and induced --
9  induced and TEFRA'd a single-family bond issue utilizing
10  all of the bond allocation to that region that they
11  submitted on the first business day of January 2024,
12  which would provide that they can have single-family
13  allocation through 2024.  That didn't get used.  They
14  could roll it over in 2025, and then have another
15  multi-family bond development.
16    Q    And how did you get that information?
17    A    The Volusia County Housing Finance Authority,
18  where I also develop, made me aware in a public meeting.
19  We were talking about other developments, that they were
20  frustrated because Brevard County, who is in the same
21  region with Volusia County had --
22    Q    Seventeen?
23    A    Yep.  Well, used to be seventeen.  It no
24  longer is.
25    Q    Right.

Page 211

1    A    -- had requested all the bond allocation and
2  reserved it for single-family, which means nobody has
3  any multi-family allocation for 2024 other than
4  potential carry forward, which we were using in Volusia.
5  So they had no new allocation in Volusia because Brevard
6  had taken all the region's allocation for single-family,
7  and would then carry it forward into 2025 for future
8  applications.
9    Q    Could you have applied in Brevard County for
10  2025 for --
11    A    Yes.
12    Q    -- multi-family?
13    A    Yes.
14    Q    So it's your understanding that just for the
15  year 2024 there was no bond financing available in
16  Brevard County for multi-family developments?
17    A    That's correct.
18    Q    And that's based on, if I'm understanding you
19  correctly, someone in Volusia County told you that and
20  then you called the state division of bond finance and
21  confirmed it?
22    A    To confirm that, yes, that's correct.
23    Q    And I wasn't clear, you said you left a
24  voicemail --
25    A    Yes, and they --

Page 212

1    Q    -- but --
2    A    I can't remember whether they called back and
3  left a voicemail for me or sent me an e-mail in
4  response, but they confirmed it.
5    Q    Okay.  And I think I've understood your
6  testimony to say that you never had a conversation with
7  Ms. Abbott about that?
8    A    I did not.
9    Q    All right.  Anything else that Atlantic
10  Housing did as it relates to mitigation of damages in
11  this case?
12    A    Not that I remember.
13    MS. GAINEY:  I think it's probably a good time
14  to take a break.
15    THE WITNESS:  Okay.  What time we going to
16  end?
17    MS. GAINEY:  I don't know.
18    THE VIDEOGRAPHER:  We are going off the video
19  record.  The time is 3:31 p.m.
20    (A brief recess was taken.)
21    THE VIDEOGRAPHER:  We are back on the video
22  record.  The time is 3:46 p.m.
23    MS. GAINEY:  Mr. Culp, I'm going to show you
24  what I have marked as Defendant's Exhibit 16.
25    (Defendant's Exhibit 16 was marked for

Page 213

1  identification.)
2  BY MS. GAINEY:
3    Q    We were referencing an attorney regarding the
4  cancelation of the land contract earlier.  Does that
5  appear to be a true and accurate copy of the letter from
6  an attorney representing Atlantic Housing regarding the
7  cancelation of the land contract?
8    A    It does appear to be a memo from one of our
9  attorneys to me regarding the land contract, and it's
10  regarding title notes.
11    Q    I'm sorry.  It's been a long day.  This is not
12  the footer.  I'll come back to that.  What does that
13  memo have to do with?
14    A    It's talking about the relationship of notes
15  or items entitled to the property that may or may not
16  have impact on the development of the property.
17    Q    And did you receive that memo, and is it a
18  true and accurate copy of the memo you received?
19    A    Yes, I believe it is.
20    MS. GAINEY:  Let me show you what we've also
21  marked as Defendant's Exhibit 17.
22    (Defendant's Exhibit 17 was marked for
23  identification.)
24  BY MS. GAINEY:
25    Q    This is an e-mail with a land use restriction

W. Scott Culp
March 18, 2025

Page 214

1    agreement. Have you ever seen -- I'm sure you haven't
2    seen the e-mail before, but have you seen the land use
3    restriction agreement before?
4        A    I don't remember whether I reviewed this in
5    connection with the pending closing or not.
6        Q    Does that appear to be the land use
7    restriction agreement for the proposed project Venue at
8    Heritage Oaks?
9        A    It appears to be the proposed land use
10   restriction agreement for the Venue at Heritage Oaks.
11       Q    Was there more than one land use restriction
12   agreement for the project?
13       A    Not with regard to the bond financing.
14       Q    So in this case if there is a referral to the
15   land use restriction agreement, would that be the only
16   land use restriction agreement that would be the
17   proposed land use restriction agreement that would be
18   applicable?
19       A    Only if you had that defined, as a defined
20   term. There are land use restriction agreements that
21   are required under the Live Local Act. This particular
22   land use restriction agreement, if it's a defined term,
23   you know, related specifically to the bond closing and
24   the taxes and bond allocation, then that would -- there
25   would only be one. But there will be a land use

Page 215

1    restriction agreement, and it'd be -- have those exact
2    same words in the title with regard to the Live Local
3    Act in the event that this had proceeded.
4        Q    So I'm hearing you to say that that was a
5    proposed or a draft, if you will. Would there have been
6    any changes by the company as it relates to the lane use
7    restriction agreement?
8        A    I'd have to review the document to see if this
9    had been finally approved. We were headed towards the
10   closing, so I would expect that this would be the final
11   document subject to some final edits. Our counsel at
12   Nelson Mullins would have been reviewing this land
13   restriction agreement prior to closing and prior to
14   execution to see if there was anything in here that
15   needed to be revised. But since this didn't proceed
16   towards closing, that final review would not have been
17   completed.
18       Q    Was there a -- I don't have any other
19   questions about that document. Switching gears, was
20   there, in this case, a request for an additional bond
21   amount, increasing it by, I think, about a million
22   dollars?
23       A    I seem to recall -- I don't remember the exact
24   amount, but I do remember there was a request for an
25   increase in the bond amount.

Page 216

1        Q    And it's your understanding that the request
2    for additional bond amount required an additional TEFRA
3    hearing and a meeting from the Brevard County Housing
4    Finance Authority to address the request for additional
5    moneys?
6        A    I don't know that all of that statement is
7    correct. There is provisions in the inducements and the
8    statutes with regard to the bond allocation for a -- I
9    think it's called, a de minimis amount of an increase
10   without a new TEFRA hearing, which I believe is ten
11   percent of the original issue. So if the original issue
12   had been fifteen million and you want to add a million
13   five to it, I believe you could do that without
14   additional TEFRA. I don't claim to be an expert on
15   that; but the author of that land use restriction
16   agreement that you showed me is the counsel for the
17   Housing Finance Authority, and he'd be advising on what
18   steps would be necessary in order to obtain the
19   additional allocation.
20       Q    Let me show you an e-mail from Angela Abbott
21   that may refresh your recollection or provide insight as
22   to whether another hearing would be needed.
23       A    Angela indicates that they'd have to hold a
24   new TEFRA hearing and adopt a new inducement resolution.
25   I don't know if that's a hundred percent accurate, but I

Page 217

1    would rely upon Mark Mustian to determine whether or not
2    a new TEFRA and a new inducement was necessary.
3        Q    So are you disputing that that was necessary
4    in this case?
5        A    I'm not disputing it. What I said was Mark
6    Mustian, who is bond counsel -- Angela Abbott is
7    issuer's counsel, Mark Mustian is bond counsel. He
8    would provide his opinion with regard to whether a new
9    inducement or a new TEFRA hearing is required to
10   increase the bond amount from fifteen seven fifty to
11   sixteen seven fifty.
12       Q    In this case in particular did that require
13   additional time in order to get the matter to the
14   commissioners for final approval?
15       A    I don't know that it did. We may have taken
16   that time. It may have been the decision of the Brevard
17   County HFA that they wanted to include it in the
18   application to the Brevard County Commissioners. So we
19   may have done that. And it sounds like from e-mail that
20   looking at that timeline, because she's talking about an
21   October meeting for the TEFRA and getting pushed back to
22   November 14th because the bond counsel is out of town,
23   so it sounds like it's all consistent with the December
24   board meeting by the county commission.
25       MS. GAINEY: We'll go ahead and mark that --

W. Scott Culp
March 18, 2025

Page 218

1   what are we on?
2        THE COURT REPORTER:  That's 17.
3        THE WITNESS:  That's 17, this is 16.
4        MS. GAINEY:  -- 18.
5        (Defendant's Exhibit 18 was marked for
6   identification.)
7   BY MS. GAINEY:
8        Q    Did Atlantic Housing Partners wish to avoid a
9   public meeting regarding the proposed project?
10       A    I don't know that we wished to avoid a public
11  community meeting.  We definitely wished to avoid any
12  votes of elected officials in a public hearing, but we
13  had no objection to a public community meeting.
14       Q    Why?
15       A    Why do we have no objection to a public
16  community meeting?
17       Q    No, the first part of your answer.
18       A    Oh.  The city counsel members or commission,
19  you know, if we had public hearings would be voting on
20  approvals.  And the Live Local Act provides for those
21  approvals at an administrative level without any votes
22  or public hearings.
23       Q    And Atlantic Housing Partners expected that
24  this project would proceed without being reviewed by
25  commissioners or having any type of public input?

Page 219

1        A    The public input, anybody can have input.  The
2   statute is referenced to public hearings and elected
3   official approvals.  There may have been a comment about
4   public input; but, as you know, anybody can have input.
5   You know, like freedom of speech.
6        MS. GAINEY:  We'll show you what we'll mark as
7   Defendant's Exhibit 19.
8        (Defendant's Exhibit 19 was marked for
9   identification.)
10       THE WITNESS:  Yeah, Marc's choice of words.
11  Marc Gauthier works for me, of without public
12  input.  It's not really accurate.  Public input,
13  anybody can input whatever they want.  You can't
14  have, on the Live Local Act, public hearings or
15  elected official votes.
16  BY MS. GAINEY:
17       Q    What about the next page with Mr. Thomas
18  saying that --
19       A    Jonathan in May of '23, he's asking about a
20  parking waiver that would be needed under a proposal
21  that Jonathan might have.  And that parking waiver I
22  don't think would be available without a public hearing.
23  And we wouldn't want to proceed with a public hearing
24  because that waiver would open up land use entitlements,
25  different from what the Live Local legislation provides

Page 220

1   for.
2        Q    And Thomas, at that point, is saying that he
3   didn't want to, quote, risk a public hearing, correct?
4        A    I don't know that he was saying he didn't want
5   to.  But he was saying that he didn't know the risk of
6   public hearing.  He didn't say he was objecting to it,
7   didn't want to do it.  Jonathan has no authority to do
8   anything with regard to the development.  He was
9   commenting on not knowing the risk of public hearing.
10       Q    So he appeared to be at least aware that the
11  action that was being discussed would, quote, risk a
12  public hearing?
13       A    He had indicated that Marc had made him aware
14  of that.
15       Q    The area that was proposed for the project, it
16  was not zoned residential, correct?
17       A    No, it was not.
18       Q    It was commercially zoned and it was being
19  proposed for development pursuant to the Live Local Act,
20  correct?
21       A    That is correct.
22       Q    During the time Atlantic Housing spent
23  attempting to develop the project, were there
24  investigations or any type of research as to any
25  ordinances that may be applicable to the area?

Page 221

1        A    Yes.
2        Q    And tell me about what those --
3        A    We do --
4        Q    -- investigations or research were?
5        A    We do a due diligence study on every property.
6   It reviews all of the land use entitlements and
7   restrictions related thereto for the local jurisdiction.
8   It reviewed all of the ordinances and codes related to
9   the development on this property.
10       Q    And did you also look into or investigate
11  the -- any overlays that may be applicable to the area?
12       A    We did, yes.
13       Q    And what did you determine?
14       A    We determined that our development as proposed
15  was consistent with the Live Local Act legislation and
16  as it relates to the local codes and ordinance in the
17  City of West Melbourne for this site.
18       Q    Was it consist -- was the proposed development
19  consistent with the overlay?
20       A    When considered in conjunction with the Live
21  Local Act, yes.
22       Q    Did you investigate or research featured land
23  use for the proposed area?
24       A    Yes.
25       Q    And what did you determine in that regard?

Page 222

1    A    I don't remember the future land use, but it's
2    in the feasibility reports and probably in the
3    application even.
4    Q    Did you investigate for research the Minton
5    Road project and comprehensive plan for the area?
6    A    Yes, we did.
7    Q    And what did you determine in that regard?
8    A    I reviewed the plan and determined that our
9    plan, in conjunction with the Live Local Act, was
10   consistent with the local government ordinances and
11   jurisdiction.
12   Q    What about without considering the Live Local
13   Act, would it have been consistent?
14   A    I don't recall.  I wouldn't have even
15   considered it without the Live Local Act 'cause it's a
16   commercially zoned piece of property and I would not
17   have been able to develop it for residential.
18        MS. GAINEY:  I'll show you what is marked as
19   Defendant's Exhibit 20.
20        (Defendant's Exhibit 20 was marked for
21   identification.)
22   BY MS. GAINEY:
23   Q    You've probably seen those before, but
24   basically just the land use and comprehensive.  And I
25   think it's the brochure for the -- for the proposed land

Page 223

1    project -- or the land where the proposed projects was
2    at.  Does that appear to be a fair and accurate copy of
3    those documents?
4    A    Yes.  Well, it's the listing brochure for the
5    land and my review of the local codes and ordinances
6    related to the parcel.  It has to do with the Commercial
7    Parkway District, the town center overlay and the zoning
8    and future land use for the property.
9    Q    Did Atlantic Housing have any understanding
10   that the land was intended to be walkable land that
11   service the area's single-family housing, have things
12   like stores and shops and things along those lines?
13   A    Zoned for commercial uses.  So whatever the
14   commercial use is allowed under the land development
15   code, it was our understanding that they were allowed.
16   Q    And did you have that understanding regarding
17   the future land use, the town center overlay, the Minton
18   Road project, the comprehensive plan prior to entering
19   into the land contract?
20   A    Not completely, no.
21   Q    Is it something you learned after you signed
22   the contract?
23   A    Something we confirmed after we signed the
24   contract.
25   Q    We referenced the credit underwriting report

Page 224

1    earlier in your deposition, so I'm just going to attach
2    it here for purposes of the record.  Let me show you
3    what we'll mark as Defendant's Exhibit 21 and ask you to
4    identify that.
5    A    It looks like the credit underwriting report.
6        (Defendant's Exhibit 21 was marked for
7    identification.)
8    BY MS. GAINEY:
9    Q    And does that appear to be a fair and accurate
10   copy of the credit underwriting report?
11   A    Well, let's -- we may have more than the
12   underwriting report here.  I think you do.  The
13   underwriting report I don't think is this long.  If we
14   look at the table and the sections and the exhibits we
15   get down to -- and I think you get down to information
16   beyond here that is not within the underwriting report.
17   So I'm just trying to see where the underwriting report
18   ends --
19   Q    Just --
20   A    -- and other stuff starts.
21   Q    Just for efficiency, we can correct that.
22   A    Okay.
23   Q    I intend it only to be the underwriting
24   report.  So if some --
25   A    Yeah, some of this --

Page 225

1    Q    -- other stuff has been copied in it, that's
2    fine.
3    A    Yeah, some of this in the back is other
4    documents that are not part of the credit underwriting
5    report.
6    Q    All right.  We can agree to correct that off
7    the record.
8    A    Or we can agree to correct it on the record.
9    Q    Well, we can sit here and wait.  Let's --
10   A    No, I don't -- I'm not saying I'm going to
11   correct it right now.  I'm just saying you --
12   Q    No --
13   A    -- asked me if this was a true and accurate
14   copy of the draft report, and I don't think it is
15   because --
16   Q    Let me have it.
17   A    -- it has information --
18   Q    Thank you, sir.
19   A    -- behind it.
20        MS. GAINEY:  So I am attaching as Defendant's
21   Exhibit 21, Plaintiffs 2855 through 2905, and it
22   stops with a FedEx thing.
23   BY MS. GAINEY:
24   Q    So I'm assuming that's where the credit
25   underwriting report was FedEx'd.

W. Scott Culp
March 18, 2025

Page 226

1    A    Let's see here. That seems consistent with
2   the index in the front. Yeah, it is consistent with the
3   index in the front.
4       Q    Is that now a true and accurate copy of the
5   credit underwriting report as we discussed earlier in
6   your deposition?
7       A    To the best of my knowledge, yes.
8       Q    I'll show you what we marked as Defendant's
9   Exhibit 22, and ask you if you've ever seen that before.
10      A    I have.
11          (Defendant's Exhibit 22 was marked for
12          identification.)
13  BY MS. GAINEY:
14      Q    And what is that?
15      A    An organizational chart for the developer
16  Atlantic Housing Partners, L.L.L.P.
17      Q    And is that a fair and accurate copy of the
18  organizational chart for Atlantic Housing Partners?
19      A    Yes.
20      Q    That's 22?
21      A    Yes, it is.
22      Q    I will show you what we'll mark as Defendant's
23  Exhibit 23, and ask you to identify that.
24      A    It looks like an e-mail in Angela Abbott to
25  Marianne Edmonds who is the financial advisor for the

Page 227

1   Housing Finance Authority, a copy and an e-mail from Bob
2   Reid to me, and discussion of the projects located
3   outside of region seventeen.
4          (Defendant's Exhibit 23 was marked for
5          identification.)
6   BY MS. GAINEY:
7       Q    And does that appear to be a fair and accurate
8   copy of an e-mail exchange that you were involved in?
9       A    It does, yes.
10      Q    Specifically I think the e-mails are you
11  talking about financing, and so that's the purpose of
12  attaching it. You kind of were simplifying the finance
13  issues as it relates to this project; is that -- is that
14  fair?
15      A    Yes. Well, it wasn't specific to this project
16  'cause I wouldn't be corresponding with Bob Reid
17  specific --
18      Q    Yeah.
19      A    -- to this project. I think we were looking
20  at --
21      Q    Bond financing issues.
22      A    -- bond financing in this region.
23      Q    Yeah. Excuse me. I misspoke.
24      A    I just wanted to make sure we were not saying
25  this --

Page 228

1       Q    Sure.
2       A    -- was specific to this project, 'cause I
3   don't think it was.
4       Q    What number are we on?
5       A    This was 23.
6       Q    All right. When did you -- when did Atlantic
7   Housing Partners decide to file a federal lawsuit?
8       A    Decide to is the thing I'm struggling with.
9   I've got the authority to commence discussions with
10  counsel with regard to a lawsuit. I don't have the
11  authority, you know, to actually have that lawsuit filed
12  without Mike Sciarrino's approval. And I know we
13  discussed it, you know, shortly after the denial, and I
14  don't recall any date certain. It would have been just
15  discussions he and I had.
16      Q    Was it the next day after the denial?
17      A    I don't know.
18          MS. GAINEY: Let me show you what we'll mark
19  as Defendant's Exhibit 24.
20          (Defendant's Exhibit 24 was marked for
21          identification.)
22  BY MS. GAINEY:
23      Q    That appears to be a letter from your attorney
24  dated the day after the denial requesting -- public
25  records request to Brevard County, correct?

Page 229

1       A    That is a public records request to Brevard
2   County.
3       Q    And to be very clear about this, I'm not
4   requesting any or asking about anything you -- any
5   conversations you had with your attorney. But as it
6   relates to Mike, does that refresh your recollection as
7   to when you contemplated or decided to or had
8   discussions regarding filing a federal lawsuit?
9       A    No. I instructed Rebecca to file the public
10  records request. I hadn't made a decision on filing a
11  suit. I instructed Rebecca to file a public records
12  request.
13      Q    And this lawsuit was filed on December 28th,
14  2023, correct?
15      A    I don't know.
16      Q    Let me show you this document, the complaints,
17  at the top.
18      A    It says filed December 28th of 2023.
19      Q    So does that refresh your recollection at all
20  as to when Atlantic Housing decided to proceed with a
21  federal lawsuit?
22      A    Sometime between the denial and December 28th.
23  So in December of 2023.
24      Q    And so had you exhausted all other remedies as
25  far as options prior to December 28th, 2023 as it

W. Scott Culp
March 18, 2025

Page 230

1  relates to mitigation of damages or pursuing another
2  piece of property or anything along those lines?
3      MR. PICCOLO: Object to form.
4      THE WITNESS: I'm not aware of any other
5  opportunities to pursue other avenues. And I am
6  aware that we have certain deadlines for filing
7  complaints with regard to county commission
8  actions, and I'm always concerned that we stay
9  within those deadlines.
10 BY MS. GAINEY:
11     Q   Did Atlantic Housing Partners ever file any
12 type of complaint with the -- any other state or federal
13 agency complaining of discriminatory actions against
14 Brevard County?
15     A   That's a lengthy question, but I think you
16 asked if --
17     Q   Let me -- I can rephrase it.
18     A   Yeah.
19     Q   After the denial of the bond, did Atlantic
20 Housing file any other types of complaints with any
21 state, local or federal agency regarding alleged
22 discriminatory conduct?
23     A   I don't recall.
24     Q   I'm not going to attach that. Thank you.
25         Does Atlantic Housing have any evidence of --

Page 231

1  any direct evidence that Brevard County officials made
2  racist remarks?
3      MR. PICCOLO: Object to form.
4      THE WITNESS: Any evidence we have with regard
5  to racist remarks would be in the public record. I
6  don't recall any specific racist remarks.
7  BY MS. GAINEY:
8      Q   Does Atlantic Housing have any evidence that
9  the objections to the project were a pretext for racial
10 bias or discrimination?
11     MR. PICCOLO: Object to form.
12     THE WITNESS: I believe they were, but I
13 don't, as of today, recall evidence to that fact.
14 BY MS. GAINEY:
15     Q   What evidence, if any, do you have that the
16 bond denial was based on racial discrimination?
17     MR. PICCOLO: Object to form.
18     THE WITNESS: I think I answered the question.
19 I said that I don't have any evidence. I believe
20 that to be the case.
21 BY MS. GAINEY:
22     Q   Was the racial demographic of the tenants at
23 the proposed property ever discussed prior to the bond
24 denial by anyone from Atlantic Housing Partners?
25     A   With who?

Page 232

1      Q   With anyone. Was there ever any discussions
2  regarding the racial composition of the tenants prior to
3  the bond denial?
4      A   Not that I recall.
5      Q   Was there any discussion regarding any alleged
6  discriminatory impact or segregate impact to black
7  residents prior to the bond denial?
8      MR. PICCOLO: Object to form.
9      THE WITNESS: Not that I recall.
10 BY MS. GAINEY:
11     Q   Concord's Management's demographic report
12 shows that less than ten percent of tenants at Venue at
13 Viera were black. How does this data support a claim of
14 disparate impact in this case?
15     A   Disparate impact is based upon the market
16 demographics for the targeted demographic. Venue at
17 Viera is not the exact same market, and is definitely
18 not the same demographic. So it would vary
19 significantly from the target demographic for Venue at
20 Heritage Oaks.
21     Q   How is Venue at Viera not the same market as
22 the proposed project?
23     A   Venue at Heritage Oaks was intended to either
24 be family or seniors under the Housing for Older Persons
25 Act, which allows for one member of the household to be

Page 233

1  fifty-five or older and any age for the rest of the
2  household members, and for twenty percent of the units
3  to be unrestricted with regard to age.
4      Q   So that's your position, that it's not the
5  same demographics or not the same market?
6      A   Both.
7      Q   Okay. Other than that do you have any other
8  argument that Venue at Viera was not comparable as it
9  relates to race and age to the proposed project?
10     A   I don't have information with regard to the
11 market area. The market area for the residents would
12 not be identical. All of the market area may be
13 similar. The demographic is definitely significantly
14 different, but the market area is slightly different as
15 well.
16     Q   Other than the documents relied on or drafted
17 by Dr. Fishkind, do you have any factual evidence that
18 the race of the tenants at the proposed project would
19 have been thirty-five percent black?
20     MR. PICCOLO: Object to form.
21     THE WITNESS: I only rely upon Dr. Fishkind's
22 evaluation of the disparate impact.
23 BY MS. GAINEY:
24     Q   Okay. So aside from Dr. Fishkind's opinions
25 and evaluations, Atlantic Housing doesn't have any

W. Scott Culp
March 18, 2025

Page 234

1  additional evidence regarding what you claim would be
2  the race of the tenants at the proposed property?
3       MR. PICCOLO:  Object to form.
4       THE WITNESS:  Aside from Dr. Fishkind's
5       opinions and the data that he is using as his basis
6       for those opinions, we have no other information in
7       that regard.
8  BY MS. GAINEY:
9       Q    So is it Atlantic Housing's belief and
10  position that although Venue at Viera's black population
11  is less than ten percent, this proposed development
12  would have had a black population of thirty-five
13  percent?
14      A    Atlantic Housing's position that Dr. Fishkind
15  has prepared a disparate impact analysis and has the
16  available data and basis information to make that
17  opinion.  Atlantic Housing doesn't have that
18  information.
19      Q    And is it your understanding that Dr. Fishkind
20  based his opinions in part on the racial composition of
21  your other four Brevard properties?
22      A    I understand that Dr. Fishkind considered the
23  racial composition of our other four properties.  I
24  don't believe that Dr. Fishkind used that as his sole
25  determination or basis for his opinion.

Page 235

1       Q    And so Venue at Viera was comparable enough to
2  the proposed project that your own expert relied on its
3  racial composition in order to render his opinion, at
4  least in part?
5       A    I think you're misstating or misconstruing.  I
6  think it would be negligent on his part to not even
7  consider or review the demographic makeup of one of our
8  communities in close proximity.  But to consider that
9  and determine that the demographic is significantly
10  different would be something that would be, I think, his
11  expert -- or his expertise in order to be able to make a
12  determination and opinion on; but not considering it
13  would also be negligent in trying to make a
14  determination.
15      Q    Is the demographic makeup at Hammock Harbor
16  comparable to the proposed project Venue at Viera?
17      A    I don't know.
18      Q    Well, you say Venue at Viera was not
19  comparable as far as demographics, correct?
20      A    I did say that, yes.
21      Q    Okay.  But you don't know if Hammock Harbor is
22  comparable as far as --
23      A    I don't.
24      Q    -- demographics?
25           What about Malabar Cove?

Page 236

1       A    I don't know.
2       Q    What about Wickham?
3       A    I don't know.
4       Q    So why do you only know that Venue at Viera is
5  not comparable when you're looking at demographics, but
6  you don't know if the other three properties are
7  comparable when you --
8       A    You brought it up --
9       Q    -- look at the demographics?
10      A    -- with regard to Dr. Fishkind's report and
11  the relationship of the demographics at that community.
12  I haven't reviewed in detail Dr. Fishkind's report to
13  determine if those other communities, which are not the
14  entire market and may be representative of some portion
15  of the market, you know, whether or not those are
16  appropriately considered in his disparate impact report.
17  That's not my expertise.  That's Dr. Fishkind's.  And I
18  don't have an opinion on the disparate impact in those
19  communities and how that impacts the market for this
20  community.
21      Q    But you do have an opinion as to whether or
22  not Venue at Viera is comparable to the proposed
23  project, or was comparable to the proposed project as it
24  relates to demographics and marketing, as you testified
25  to?

Page 237

1       A    I have an opinion with regard to whether or
2  not a demographic of sixty-two and over is the same
3  demographic as a community with one household member
4  fifty-five and older and the balance being unrestricted.
5  I don't believe that to be the same demographic, and I
6  don't believe that to have the same market.
7       Q    What is the demographic as far as age, if you
8  know, for Hammock Harbor?
9       A    I believe Hammock Harbor is unrestricted.
10      Q    Is Malabar Cove restricted?
11      A    I don't believe so.
12      Q    And is Wickham --
13      A    I don't believe --
14      Q    -- unrestricted?
15      A    I don't believe so.
16      Q    So does Atlantic Housing Partners support
17  comparing three unrestricted properties to a restricted
18  property when it comes to demographics?
19      A    We support the best methodology of a
20  professional expert with regard to disparate impacts.
21  We're not the experts.  We hired the expert, and we
22  believe that he is best to determine the market and the
23  demographic makeup of the market based upon the
24  restrictions intended for our community.
25      Q    Have you paid Dr. Fishkind over a hundred

W. Scott Culp
March 18, 2025

Page 238

1  thousand dollars?
2      A    Not yet.
3      Q    Getting close to it?
4      A    Getting pretty close.
5      Q    Was there an issue with respect to him
6  refusing to work because of failure to pay?
7      A    Yep.
8      Q    What was that?
9      A    He wanted me to pay him.
10     Q    Why weren't you paying him?
11     A    I was on vacation in Alaska.
12     Q    And --
13     A    Gone for a month.  I paid him when I got back.
14  He was mad.  We settled.  We're big boys.
15     Q    I think he's -- I think in the e-mails
16  exchanged regarding that you've worked with Dr. Fishkind
17  for a very long time?
18     A    Since 1989, I believe.
19     Q    And how many --
20     A    Maybe '85.
21     Q    How many times has he testified on behalf of
22  Atlantic Housing Partners or any entity associated with
23  the plaintiffs?
24     A    I don't know if he's ever testified.  We've
25  hired him as an expert a number of times.  I can't

Page 239

1  recall if he's ever actually had to testify.
2      Q    How many --
3      A    Now, he's provided expert reports.
4      Q    How many times have you hired Dr. Fishkind?
5      A    Oh, I don't know.  Probably half a dozen.
6      THE VIDEOGRAPHER:  There's five minutes left
7  on this media.
8      MS. GAINEY:  Okay.  Give me -- let's keep
9  going.
10     THE WITNESS:  Do we need to change the media
11  or no?
12     MS. GAINEY:  Not yet.
13     THE WITNESS:  Okay.
14  BY MS. GAINEY:
15     Q    Are you aware of any procedural errors Brevard
16  County committed when denying the bond?
17     MR. PICCOLO:  Object to form.
18     THE WITNESS:  I think the denial of bond was a
19  procedural error.  I don't know what that means.
20  BY MS. GAINEY:
21     Q    Well, is it your position that they failed --
22  they --
23     A    They shouldn't have denied the bond, yes,
24  that's my position.
25     Q    Outside of that, is it your position that

Page 240

1  there was any procedural deficiencies in how the bond
2  was handled?
3      A    Oh, I don't know what a --
4      MR. PICCOLO:  Object to form.
5      THE WITNESS:  -- procedural deficiency is.  I
6  don't think they should have denied the bond.  I
7  don't think they had the right to deny.  I don't
8  think they should have denied the bond, but here we
9  are.
10  BY MS. GAINEY:
11     Q    Did anyone from your company ever request a
12  reconsideration of the bond denial with any member of
13  the commission?
14     A    Not that I'm aware of.
15     Q    Has your company had any issues with
16  discrimination as it relates to how Brevard County
17  handled your other projects and applications for bond
18  financing?
19     A    No.
20     MS. GAINEY:  Let's go off the record.
21     THE VIDEOGRAPHER:  Going off the video record.
22  The time is 4:26 p.m.
23     (A brief recess was taken.)
24     THE VIDEOGRAPHER:  We're back on the video
25  record.  The time is 4:29.

Page 241

1      MS. GAINEY:  We agreed off the record, counsel
2  and the deponent and all parties in the room, that
3  we would continue this deposition remotely at a
4  subsequent date in the next few -- next week or so,
5  hopefully.
6      MR. PICCOLO:  Yes.
7      MS. GAINEY:  And that will include continuing
8  the deposition of Atlantic Housing Partners, as I
9  have some additional questions as well as the
10  30(b)(6) deposition of the other named plaintiffs.
11     THE VIDEOGRAPHER:  Okay.  That will complete
12  today's videotaped deposition.  The time is 4:30
13  p.m.  We are going off the record.
14     MR. PICCOLO:  We'll read, and we'll take a
15  copy.
16     THE COURT REPORTER:  I think you said earlier
17  you are going to order the transcript?
18     MS. GAINEY:  Yes, please.
19     (The proceeding was concluded at 4:30 p.m.,
20  and reading and signing of the deposition was not
21  waived by the witness and all parties.)
22
23
24
25

W. Scott Culp
March 18, 2025

Page 242

1                    CERTIFICATE OF OATH

2

STATE OF FLORIDA

3   COUNTY OF ORANGE

4

5        I, Andrea C. Rivera, Professional Court

6   Reporter and Notary Public, State of Florida, certify

7   that the witness, W. SCOTT CULP, personally appeared

8   before me on this 18th day of March, 2025 and was duly

9   sworn or affirmed.

10        Signed this 20th day of March, 2025.

11

12

13

14

15

                    Andrea C. Rivera, Court Reporter

16                  Notary Public, State of Florida

                    Commission Number:  HH185694

17                  Expires:  January 20, 2026

18

19

20

21

22

23

24

25

Page 243

1                  CERTIFICATE OF REPORTER

2

STATE OF FLORIDA

3   COUNTY OF ORANGE

4

5        I, Andrea C. Rivera, Professional Court

6   Reporter and Notary Public, do hereby certify that I was

7   authorized to and did stenographically report the

8   proceeding of W. SCOTT CULP; pages 1 through 241; that a

9   review of the transcript was requested; and that the

10  transcript is a true record of my stenographic notes.

11        I further certify that I am not a relative,

12  employee, attorney, or counsel of any of the parties,

13  nor am I a relative or employee of any of the parties'

14  attorneys or counsel connected with the action, nor am I

15  financially interested in the action.

16        Dated this 20th day of March, 2025.

17

18

19

20

                    Andrea C. Rivera

21

22

23

24

25

Page 244

1                  WITNESS NOTIFICATION LETTER

2

3   March 20, 2025

4

5   W. Scott Culp

    c/o Michael D. Piccolo, Esquire

6   Lowndes, Drosdick, Doster, Kantor & Reed, P.A.

    215 North Eola Drive

7   Orlando, Florida 32801

8   IN RE:  ATLANTIC HOUSING v. BREVARD COUNTY

            Deposition taken on March 18, 2025

9           U.S. Legal Support Job No:  6832310

10

11  Dear Mr. Piccolo:

12  The transcript of the above-referenced proceeding has

    been prepared and is being provided to your office for

13  review by the witness.

14  We respectfully request that the witness complete their

    review within 30 days and return the errata sheet to our

15  office at the below address, or via e-mail to:

    southeastproduction@uslegalsupport.com.

16

17  Sincerely,

18

19  Andrea C. Rivera

    Professional Court Reporter

20  U.S. Legal Support, Inc.

    16825 Northchase Drive

21  Suite 900

    Houston, Texas 77060

22  407-649-9193

23  cc:  Susan G. Gainey, Esquire

24

25

Page 245

1                       ERRATA SHEET

2   DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES ON THIS PAGE

3

       IN RE:  ATLANTIC HOUSING vs. BREVARD COUNTY

4         DEPOSITION OF:  W. SCOTT CULP

            TAKEN:  March 18, 2025

5         U.S. LEGAL JOB NO:  6832310

6

    PAGE   LINE      CHANGE           REASON

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  Under penalties of perjury, I declare that I have read

    the foregoing document, and that the facts stated in it

21  are true.

22

23

24  _____   _____

    Date               W. SCOTT CULP

25

# EXHIBIT 9

Scott Culp Volume II
December 18, 2024

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS
L.L.P., a Florida limited liability
partnership; CANTON CONSTRUCTION, LLC,
a Florida limited liability corporation;
CONCORD MANAGEMENT, LTD., a Florida
limited partnership; THE VENUE AT
HERITAGE OAKS PARTNERS, LTD.,

        Plaintiffs,

v.

BREVARD COUNTY, a political subdivision
of the state of Florida,

        Defendant.
_____/


VIDEOTAPED CONTINUED DEPOSITION OF
SCOTT CULP

VOLUME II
PAGE 183-339

December 18, 2024
9:34 a.m. - 1:31 p.m.
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Orlando, Florida  32802




Stenographically Reported By:
Brandy S. Payment, FPR
Florida Professional Reporter
Appearing Remotely from Orange County, Florida

Scott Culp Volume II
December 18, 2024

```
 1                        APPEARANCES

 2

 3   On behalf of the Plaintiffs:

 4        REBECCA E. RHODEN, ESQUIRE (present as noted.)
          MICHAEL PICCOLO, ESQUIRE (present as noted.)
 5        Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
          215 North Eola Drive
 6        Orlando, Florida  32802
          Rebecca.rhoden@lowndes-law.com
 7        Michael.piccolo@lowndes-law.com

 8

 9   On behalf of the Defendant:

10        SUSAN GAINEY, ESQUIRE
          Roper, Townsend, Sutphen, P.A.
11        255 South Orange Avenue, Suite 750
          Orlando, Florida  32801
12        (407) 470-1468
          Sgainey@roperpa.com

13

14

15   ALSO PRESENT:

16        The Videographer:  Shawn Lane

17

18

19

20

21

22

23

24

25
```

1                    INDEX OF PROCEEDINGS

2     CONTINUED DEPOSITION OF SCOTT CULP

3      Direct Examination Cont'd by Ms. Gainey      186

4     Certificate of Oath                           336
       Certificate of Reporter                      337
5     Witness Review Letter                         338
       Errata Sheet                                 339
6

7                         EXHIBITS

8     Defendant's Exhibit G..................... 187
       (Plaintiffs' Response to Request for Production with
9     relevant Bates-stamped documents)

10    Defendant's Exhibit H..................... 233
       (Emails to city and homeowners association)
11

12    Defendant's Exhibit I..................... 246
       (Website printouts from other Brevard
13    County developments)

14    Defendant's Exhibit J..................... 251
       (Bond applications from other Brevard County
15    developments)

16    Defendant's Exhibit K..................... 272
       (Documents from the City of West Melbourne)

17    Defendant's Exhibit L..................... 282
       (Documents from Brevard Housing Finance Authority)
18

19    Defendant's Exhibit M..................... 300
       (Interrogatories)

20    Defendant's Exhibit N..................... 310
       (Rule 26 Disclosures)
21

22    Defendant's Exhibit O..................... 310
       (Pro Forma; sources and uses statement)

23    Defendant's Exhibit P..................... 321
       (Ordinances)
24

25    Defendant's Exhibit Q..................... 323
       (Venue at Hickory Tree Sunbiz)

Scott Culp Volume II
December 18, 2024

```
 1              THE VIDEOGRAPHER:  We are now on the record.
 2      And the time is 9:34 a.m. Eastern Standard Time.
 3      This is Volume 2 of the video-recorded deposition of
 4      Scott Culp.  Will counsel please introduce
 5      themselves for the record.
 6              MS. RHODEN:  Rebecca Rhoden on behalf of
 7      plaintiff.
 8              MS. GAINEY:  Susan Gainey for defendant Brevard
 9      County.
10              THE VIDEOGRAPHER:  And will our court reporter
11      please swear in the witness.
12              THE COURT REPORTER:  If you could raise your
13      right hand.  Do you swear or affirm the testimony
14      you shall give will be the truth, the whole truth
15      and nothing but the truth?
16              THE WITNESS:  I do.
17              THE COURT REPORTER:  Thank you.
18   SCOTT CULP, called as a witness by the Defendant, having
19        been first duly sworn, testified as follows:
20                  DIRECT EXAMINATION CONT'D
21   BY MS. GAINEY:
22      Q.   Good afternoon -- or good morning, Mr. Culp.
23      A.   Good morning.
24      Q.   How are you doing today?
25      A.   Doing good.
```

Scott Culp Volume II
December 18, 2024

1    Q.    Good.    We meet again.    This is a continuation of

2    the deposition that we started about a month ago or so.

3    And between that deposition and this deposition, did you

4    speak with anyone other than your attorney regarding that

5    deposition?

6    A.    No.

7    Q.    And did you review any documents in preparation

8    for today's deposition?

9    A.    I reviewed the transcript of the first half of

10   this deposition.

11   Q.    And other than that transcript, did you review

12   any other documents?

13   A.    No.

14   Q.    I've put in front of you what we will mark as

15   Culp Deposition Exhibit G.

16   (Defendant's Exhibit G was marked for identification.)

17   BY MS. GAINEY:

18   Q.    And purport to you the first couple of pages are

19   your answers -- are the corporation's answers to

20   interrogatory -- excuse me, request for production in

21   this matter.    Did you work with your team in order to

22   gather documents in response to request for production?

23   A.    Yes.

24   Q.    And who in your -- with your team -- and when I

25   say team, I'm talking about many of the plaintiffs.    I

1    know you are associated with all of the plaintiffs in

2    some way, but who helped prepare those documents or

3    response to?

4           A.    I don't know that anyone other than myself.

5           Q.    See, I told you you're the one that knows the

6    most.

7           A.    We have a good filing system.

8           Q.    Very good.

9                 So the first couple of documents are just there

10   for purposes to show that they are in fact your responses

11   to request for production.  I have some specific

12   questions as far as the documents that were produced.

13   There was over 4,000 documents produced, so I'm not going

14   to ask you about 4,000 documents.  But there is a few

15   questions that I have.  So if you want to flip past the

16   actual response to request for production and get to the

17   first e-mail.

18                Give you a moment to review that and let me know

19   when you're ready.

20          A.    I have it.

21          Q.    All right.  So this appears to be an e-mail from

22   you dated July 11th, 2023; is that correct?

23          A.    Yes.

24          Q.    And what you say is that, quote, There's no SAIL

25   app for West Melbourne.  What did you mean by that?

Scott Culp Volume II
December 18, 2024

1        A.   This was an e-mail to Ammon Smith who works with

2   our property management company and was indicating that

3   we would not be applying for SAIL for this particular

4   development.

5        Q.   And why is that?

6        A.   I don't recall.

7        Q.   Are there any documents that you can review that

8   would refresh your recollection as to why you didn't

9   apply for SAIL?

10       A.   I don't know if there are any documents I would

11   look at to -- to refresh my recollection.  I would look

12   at the SAIL RFA for that year from Florida Housing

13   Finance Corporation and the requirements of that RFA and

14   as they are related to this particular location to

15   determine if I would have thought that we could be

16   competitive in that application and would be willing to

17   spend the resources to apply.

18       Q.   All right.  And so based on this e-mail, my

19   presumption is at some point, possibly in July of 2023,

20   you did, in fact, evaluate whether or not to apply for a

21   SAIL?

22            MS. RHODEN:  Object to form.

23            THE WITNESS:  You said that was your assumption.

24       You didn't ask me a question.

25            MS. GAINEY:  Okay.

1          THE WITNESS:  I'm okay if that's your

2      assumption.

3   BY MS. GAINEY:

4      Q.  Is that true?

5      A.  Is what true?  That it's your assumption?  I

6   don't know.  Is that true?

7      Q.  Let me start over.

8      A.  I'm sorry.  You just told me that was your

9   assumption and I'm okay with that.

10     Q.  Did you consider in -- on or before July 11,

11  2023, whether or not applying for a SAIL application or

12  SAIL funding was applicable for this particular project?

13     A.  I don't recall.

14     Q.  All right.  And is there any document or people

15  I can talk to as to how you -- what you relied on in

16  order to make that decision?

17         MS. RHODEN:  Object to form.

18         THE WITNESS:  It was my decision, so you'd be

19     talking to me.  And I gave you in the earlier answer

20     what I would rely upon to make that decision.

21  BY MS. GAINEY:

22     Q.  All right.  And what is SAIL?

23     A.  State Apartment Incentive Loan.

24     Q.  And we talked about it a little bit in your

25  first deposition, so, but it is fair to say that --

Scott Culp Volume II
December 18, 2024

1   strike that.

2           After you initially determined that SAIL was not

3   an option, did you ever revisit to determine if SAIL was

4   an option?

5           MS. RHODEN:  Object to form.

6           THE WITNESS:  You made a statement in the

7       question that I determined that SAIL was not an

8       option.  I told you I don't recall and I'd have to

9       look at other documents.  So if I determined that it

10      was not an option -- what was your question?

11      Because you made a statement --

12          MS. GAINEY:  Right.

13          THE WITNESS:  -- as leading into the question

14      which is answering a question that I didn't answer.

15  BY MS. GAINEY:

16      Q.   Did you determine on or before July 11, 2023,

17  that SAIL was not an option for West Melbourne?

18      A.   I determined that we were not going to apply.

19      Q.   Okay.  And how was that different from my

20  question where I asked if it was an option?  You're

21  saying --

22      A.   The question on whether it's an option or

23  determining whether or not we're going to apply are two

24  different questions.  Based upon this e-mail that you

25  gave me, which is an e-mail from myself to a person that

Scott Culp Volume II
December 18, 2024

1    works on these applications as far as administrating the

2    paperwork, I had told him that we were not going to

3    apply.

4         Q.   So my understanding of your testimony is that it

5    could have been an option, but you determined that we

6    were not going to but -- that you were not going to

7    apply?

8         A.   No.  I determined that we were not going to

9    apply.  I have not said that I determined that it was not

10   an option or that it was.  I told you that I would need

11   to look back at the RFA documents as it relates to this

12   particular site to review and refresh my recollection on

13   why I determined that we were not going to apply.

14        Q.   But is it fair to say as we sit here today, you

15   never applied for SAIL funding for this project?

16        A.   I don't believe we did.  But I am not 100

17   percent sure of that.  I'd have to look at the SAIL RFA

18   and see if we did apply or not.

19        Q.   The next statement that you have is land price

20   for bond app equals 2 million.  What does that mean?

21        A.   The land for the bond application needs to be

22   split between the overall purchase price, because the

23   overall purchase price included the commercial outparcel.

24   And in the affordable housing development, which is the

25   subject of the taxes and bond application, you would only

Scott Culp Volume II
December 18, 2024

1    include the land price applicable to the affordable

2    rental development.

3         Q.   And would -- or could that have potentially been

4    different than the actual land price?

5         A.   The -- it wouldn't be different than the actual

6    land price for the affordable housing development.  It

7    could be different than the actual land price for the

8    total parcel which included the commercial parcel that's

9    not the subject of the taxes and bond allocation.

10        Q.   And in this case in particular, was the entire

11   parcel going to be used for the affordable housing

12   development?

13        A.   No.  Well, I want to clarify that.  When you say

14   used for the affordable housing development, under the

15   Live Local Act legislation, the entitlements for this

16   would require in West Melbourne a mixed use component.

17   So it would include a commercial component.  That

18   commercial component is not the subject of the tax exempt

19   bond allocation, but is part of the overall development.

20   Because under Live Local, the overall development is

21   mixed use; affordable residential and a commercial

22   component.

23        Q.   And I think in this case in particular, there

24   was discussion about making it a medical or some type of

25   office along those lines?

1      A.   There was discussion about that, yes.

2      Q.   Was it ever finalized as to what exactly the --

3  what type of office or use that that would have?

4      A.   No, because there's no requirement for that.  It

5  would only be that it meet the uses allowed under the

6  existing zoning.

7      Q.   You state in this e-mail:  We can revise for the

8  four percent HC app later.

9           What does that mean?

10     A.   The four percent housing credits as we discussed

11 at length in the earlier half of my deposition are

12 applied for later.  And if we made a determination at a

13 later time that the allocation of the land purchase price

14 was more appropriate to be a different number, we can do

15 that at that time.

16     Q.   So as referenced in this e-mail, the land

17 purchase price is to land $850,000, correct?

18     A.   That -- yes, that's referenced in this e-mail.

19     Q.   And would that -- could that have been different

20 when --

21     A.   It could have been different.  I don't have the

22 land purchase agreement in front of me.  That's what it

23 states in this e-mail.  And I believe that to be

24 accurate, but without the land purchase agreement and all

25 the amendments thereto, I wouldn't be able to testify to

Scott Culp Volume II
December 18, 2024

1    the final land purchase price.

2        Q.   In this e-mail, you give a seller's cost price

3    of $693,969.22.  What is that?

4        A.   The question, seller's cost, it references

5    seller's cost for development to date.  The seller had

6    provided information of cost that they had spent on

7    improving that site to date, and that was where the

8    number 693,969 and 22 cents comes from.

9        Q.   And why was that relevant for your purposes?

10       A.   In affordable housing, there is eligible basis

11   and noneligible basis, and seller's cost of improvements,

12   depending on what those improvements are, may be eligible

13   basis for tax credits.  And it is depending on the IRS

14   guidelines and what those costs are for.

15       Q.   Would that have been an amount that you were

16   expected to reimburse the seller in any regard?

17       A.   The -- it would be included in the total

18   purchase price.  So we would break out the purchase price

19   between the land and cost for development of entitlements

20   and improvements to date.

21       Q.   The next line has a figure of $204,934 and is

22   the cost of mitigation and import fill and therefore will

23   not be eligible basis.  Tell me what you mean when you

24   said that.

25       A.   In what we're buying for the seller, his land --

Scott Culp Volume II
December 18, 2024

1    sorry -- land and improvements is included, his cost of

2    the mitigation and import fill, and we separate that.

3    You know, we're paying it, we separate it because it is

4    not eligible basis.  It is considered land and not

5    eligible basis for tax credits.

6        Q.   And it looked like at that point, you thought

7    that 101 units was achievable, correct?

8        A.   Correct.

9        Q.   You recommended allocating $360,964.78 to the

10   outparcel; what does that mean?

11       A.   I was determining what I thought was an

12   appropriate allocation of land purchase price to the

13   commercial parcel.

14       Q.   And two million to the residential, that's what

15   you were referring to earlier?

16       A.   Correct.

17       Q.   The last line, can you explain what that means?

18       A.   Yeah, the infrastructure reimbursement in the

19   bond app, for the bond purposes, eligible or ineligible

20   basis is irrelevant.  It is not part of the restrictions.

21   So we said we don't need to break out or show the

22   infrastructure reimbursement separately in the bond app.

23   We can deal with that later if we get into eligible

24   basis, which would be related to the low-income housing

25   tax credits.

Scott Culp Volume II
December 18, 2024

1      Q.   And just for purposes of this e-mail, why did

2   Ammon Smith need it; he is with Concord Rent, the

3   management company?

4      A.   Ammon.  Concord Rents --

5      Q.   Uh-huh.

6      A.   -- is their website.

7      Q.   Uh-huh.

8      A.   Concord Management is the management company.

9      Q.   And why are you forwarding it -- these figures

10   to him?

11      A.   Ammon works on our applications.  He's worked

12   for different companies within our group, and he's still

13   with the property management company, works on the

14   applications.

15      Q.   Which application was he working on?

16      A.   On this particular one, it was related to the

17   bond application, which is why I was sending him the note

18   that the land price with the bond application would be

19   two million.

20      Q.   And did he actually participate in completing

21   the application then for The Venue at Heritage Oaks?

22      A.   Yes.

23      Q.   Who else participated in completing the bond

24   application for The Venue at Heritage Oaks?

25      A.   Gosh.  Every member of our team.  We've got, you

Scott Culp Volume II
December 18, 2024

1  know -- yeah.  When you say participated, we have

2  secretaries that get forms, we have people that type

3  information that goes in the application.  Show me every

4  page of the application, I could probably tell you which

5  individuals in our organization worked on each page.

6  I -- you know.

7       Q.   Are you the -- the person who, though, is

8  primarily responsible for ensuring accuracy and final

9  version of the application?

10      A.   Yes.

11      Q.   We don't need to talk to your entire team.

12      A.   When you were asking, I was thinking, do you

13  really want to know all that?

14      Q.   No, I don't.

15           I see you're sending this to Mike.  We talked

16  about Mike a little bit before in the prior deposition.

17  What -- to what extent did -- was he involved, if any, in

18  the submission of the bond application for Venue at

19  Heritage Oaks?

20      A.   Other than he's the boss and lets me know if

21  can't do something.  Doesn't really let me know when I

22  can but lets me know when I can't.

23      Q.   Yeah, I didn't actually see his name too much,

24  so was he involved really in the day-to-day stuff when

25  you were -- when you were submitting the application for

Scott Culp Volume II
December 18, 2024

1    Venue at Heritage Oaks?

2         A.    No.

3         Q.    Again, that would be you?

4         A.    Yes.

5         Q.    I'm finished asking about that document.  The

6    next document appears to be a letter dated December 28th,

7    2023.  And it says -- it looks like it's electronically

8    signed from Scott Clark, correct?

9         A.    Yes.

10        Q.    And who is Scott Clark?

11        A.    He's a real estate attorney that handles a

12   number of our real estate transactions.

13        Q.    Have you seen this document before?

14        A.    Yes.

15        Q.    All right.  It appears from this document that

16   the -- the purchaser entered into a contract on May 23rd,

17   2023; is that correct?

18        A.    That's what it says on this document, yes.

19        Q.    Does that sound like the accurate date as to

20   when the contract was entered into?

21        A.    I'd have to look at the contract.  I don't have

22   any recollection of the date.

23        Q.    Mr. Scott references the Live Local Act, and he

24   says specifically, quote:  Under the Live Local Act,

25   properties and commercially and industrially zoned

1  districts can obtain expedited mandatory approval for

2  development.  The Live Local Act had been adopted and was

3  signed into law by Governor Ron DeSantis on March 23rd,

4  2023.

5          And we talked about the Live Local Act in the

6  last deposition, but do you have any sense of why

7  Mr. Clark was representing -- representing that

8  specifically in this letter?

9      A.   This letter has to do with an ordinance relating

10  to a moratorium on the development of property under the

11  Live Local Act.  So I would assume that he included the

12  reference in his preface to the letter as informational

13  to the seller's attorney related to Live Local Act.

14      Q.   And what is the purpose of this document?

15      A.   To terminate the contract.

16      Q.   And was this document drafted with your advice

17  and -- and consent?

18      A.   Yes.

19      Q.   And there's an ordinance attached, correct?

20      A.   Yes.

21      Q.   Do you know why Mr. Scott was attaching the

22  ordinance?

23      A.   On the second page of his letter, he says why.

24  The ordinance imposes a moratorium on development

25  property -- of property under the Live Local Act.

Scott Culp Volume II
December 18, 2024

1    Q.   So was the contract being canceled because of

2  the ordinance?

3    A.   It was terminated for failure of the required

4  conditions to be true at the closing date.

5    Q.   And that would include the ordinance?

6    A.   It would include 10C, no moratorium, lack of

7  concurrency, change in ordinance or other condition

8  which is outside of purchaser's control shall exist,

9  which would prevent or delay purchaser's development and

10  construction.

11         And that is what this ordinance did.

12    Q.   And do you agree with Mr. Scott's conclusion

13  that the contract was canceled pursuant to the ordinance?

14         MS. RHODEN:  Object to form.

15         THE WITNESS:  I didn't understand the question.

16     I think his letter was terminating the contract.  I

17     don't know -- I don't understand the question.

18  BY MS. GAINEY:

19    Q.   All right.  Do you agree with the conclusions

20  that Mr. Scott has outlined in this letter?

21    A.   I don't know if he has any conclusions in the

22  letter.  I agree that this letter terminated the

23  contract.

24    Q.   Do you agree with the statements Mr. --

25  Mr. Clark made in this letter?

Scott Culp Volume II
December 18, 2024

 1        A.    Yes.

 2        Q.    The next document, Plaintiffs' 2386 at the

 3   bottom, this appears to be an e-mail chain including an

 4   e-mail from you dated July 16, 2023, to Robert Bowser.

 5   Who is Robert?

 6        A.    He's a land attorney with Akerman.

 7        Q.    And what was the purpose of your e-mail to

 8   Mr. Bowser?

 9        A.    Mr. Bowser was reviewing the land use

10   entitlements for this specific parcel as it relates to

11   the Live Local Act and the requirements of that

12   legislation.

13        Q.    And are you requesting a letter communication

14   from Mr. Bowser -- are you requesting a letter --

15   Mr. Bowser to draft a letter or communication?

16        A.    Let me see.  Yes.

17        Q.    I understand that you needed it for the

18   application; is that a fair understanding?

19        A.    We wanted to pro -- provide it for the

20   application, that's correct.

21        Q.    All right.  A couple other things that you

22   referenced -- and, again, I'm referring to your July 16th

23   e-mail to Mr. Bowser -- you indicate that there's a town

24   center overlay, and you give a link -- link to apparently

25   a town center overlay.  What is -- why is that relevant?

Scott Culp Volume II
December 18, 2024

1        A.    Overlay district relates to the entitlements for

2    use on a particular piece of property.  The Live Local

3    legislation has criteria identified relating to density

4    and height and that the zoning and land use districts and

5    overlay districts would relate to.

6        Q.    Did the fact that there was a town center

7    overlay have any effect on the application or your

8    consider -- consideration for the development?

9        A.    It would have had effect on my consideration,

10   yes.

11       Q.    And how so?

12       A.    I would -- I don't recall the requirements in

13   the town center overlay for this particular site, but I

14   would review those to make sure that they are consistent

15   with the intended use based upon utilization of the Live

16   Local Act.

17       Q.    The last paragraph on the first page also has a

18   discussion about height.  Tell me why that was relevant.

19       A.    The Live Local Act legislation has certain

20   criteria with regard to building height, and you have to

21   look at the zoning criteria and all of the land use

22   restrictions and ordinances related to the site to

23   determine what your allowable use will be.

24       Q.    How tall was the building intended to be?

25       A.    I don't know.

Scott Culp Volume II
December 18, 2024

1    Q.   The photos appear -- it appears to be four

2    floors?

3    A.   It was four stories, yes.

4    Q.   And so my understanding of what you're saying is

5    that pursuant to the Live Lo -- Local Act, you had to

6    have some type of consideration as to what apparently

7    sites in -- within a mile radius had for their height

8    regulations?

9    A.   I don't remember if the height is specific to

10   the one-mile radius in the Live Local Act.  There is

11   specific criteria in that regard, but I don't recall the

12   exact statutory language.

13   Q.   On the next page going back to the overlay, you

14   talk about bonuses available with regard to height.  Tell

15   me why that was relevant.

16   A.   Again, it is relating to the Live Local Act

17   legislation and the allowable uses for the property.

18   Q.   A little bit further down the page and back to

19   the question I was asking you, it appears that you did,

20   in fact, need a letter for the development that you are

21   calling Venue at Heritage Oaks; is that correct?

22   A.   I indicated to Robert Bowser that we needed a

23   letter confirming the land use and zoning, that's

24   correct.

25   Q.   I'm done with that particular document.

Scott Culp Volume II
December 18, 2024

1              The next document that you have in front of you,
2    can you tell me what that is?
3         A.   Looks like a flier -- some people call it a
4    flier, some people call it a brochure -- from the broker
5    who was selling the parcel.
6         Q.   And would this have been a document that you had
7    reviewed prior to proceeding with the project?
8         A.   I would have looked at it, yes.
9         Q.   Do you have any recollection about what you
10   considered in this document as to when you made your
11   decision to proceed with the project?
12        A.   Nothing.
13        Q.   And why do you say that?
14        A.   I don't consider a broker's representation to
15   provide me with any information I need to make a decision
16   on a parcel.
17        Q.   The last -- the next page has some information
18   about zoning in the area.  Did you consider this document
19   before proceeding with the project?
20        A.   I don't remember.
21             MS. RHODEN:  Are you talking about the brokers?
22             THE WITNESS:  No, she's talking about the next
23        page.  Sorry.
24             MS. GAINEY:  Yeah, they were attachments to an
25        e-mail.  So I'm talking about --

Scott Culp Volume II
December 18, 2024

```
 1            MS. RHODEN:  Making sure.

 2            MS. GAINEY:  It's titled at the top Milton and

 3       Heritage Oaks NEC 6.21 acres.

 4  BY MS. GAINEY:

 5       Q.   So -- I'm sorry, did you consider this document

 6  at all prior to proceeding?

 7       A.   I don't recall.

 8       Q.   The next document at the top says future land

 9  use.  Have you seen that before?

10       A.   Yes.

11       Q.   And what is it?

12       A.   It's a document from the City of West Melbourne

13  relating to some discussion of their future land use.

14       Q.   And why was this relevant, if it was, for your

15  purposes?

16       A.   Future land use relates to the entitlements for

17  a particular parcel as well as to the zoning.  So to the

18  extent that it placed any restrictions or entitlements on

19  the property, it would -- it would relate to the

20  development.

21       Q.   And did this, in fact, place any restrictions on

22  the property?

23       A.   This parcel -- this piece of paper doesn't

24  because it is not the actual comprehensive plan future

25  land use, it is a publication from the City that gives
```

1  you some information about it.  But it can't give me

2  anything to rely upon.

3      Q.   Did the comprehensive plan place any

4  restrictions on the -- the project?

5      A.   Yes.

6      Q.   And what were those?

7      A.   I don't recall.  Comprehensive plans always

8  place restrictions on the plans, so...

9      Q.   The next document has Plaintiffs' 125 at the

10  bottom.  And tell me what this is.

11      A.   It's a conceptual land plan, conceptual site

12  plan --

13      Q.   And who --

14      A.   -- for the property.

15      Q.   Excuse me.  Who would have prepared this?

16      A.   Marc Gauthier.

17      Q.   125 says that it is a senior housing units which

18  appears to be 108 senior housing units; is that correct?

19      A.   That is what it says, yes.

20      Q.   And it says Heritage Oaks mixed use 6/26/23,

21  would this have been prepared around 6/26/23?

22      A.   That's my understanding, yes.

23      Q.   That's all the questions I have about that.

24           The next document is Bates stamped 6 -- excuse

25  me, 2394.  And this appears to be some discussion about

Scott Culp Volume II
December 18, 2024

1    the SAIL application and impact fees; is that correct?

2         A.   Yes.

3         Q.   On the second page, it appears that you are

4    sending an e-mail to Alan and Linda.  And who is Alan and

5    Linda?

6         A.   Looks like Alan is with Brevard County, and

7    Linda is with Brevard County, and Keith is with Brevard

8    County.

9         Q.   Do you know what their titles are or...

10        A.   No.

11        Q.   Why are you having this conversation by e-mail

12   with Brevard County?

13        A.   With any affordable housing development, we

14   explore any resources that are available to help provide

15   the sources for development in affordable housing.  And

16   so we would contact the local government that has the

17   resources and see if there are any resources available.

18        Q.   At the bottom of the first page, it indicates

19   that, quote:  If you receive the 140,479 from the City of

20   West -- West Melbourne, will that satisfy the local

21   contribution question?

22             Tell me why that is being discussed.

23        A.   If you -- I would imagine back through some of

24   this e-mail trail it would discuss the SAIL application

25   requires a minimum local government contribution as part

Scott Culp Volume II
December 18, 2024

1    of the scoring criteria and eligibility criteria.  And

2    the person from the County was asking if that fee

3    waiver -- I think it is a fee waiver they're referring

4    to, the 140,000 -- would count as a local contribution.

5    And my answer was yes.

6         Q.   At that point, had you already gotten a

7    commitment from the City of West Melbourne in order to

8    have that local contribution?

9         A.   No, this was a discussion with the County --

10        Q.   Uh-huh.

11        A.   -- not the City of West Melbourne.

12        Q.   So as -- as of July 2023, had you had

13   discussions with the City of West Melbourne as far as

14   contribution or impact fees or financing for the project?

15        A.   Let -- let's see.  Four-part question.  Let's

16   see.  The first one was had I had a discussion about

17   financing of the project.  I don't think so.  Had I had a

18   discussion with the City about impact fees.  As of July,

19   I don't recall, but if we had the pre-app by that date,

20   the answer would be yes.  The two other parts of that

21   question, I don't remember now.

22        Q.   Impact fees?

23        A.   I said impact fees.  Pre-app was before this,

24   and yes.

25        Q.   Local contribution?

Scott Culp Volume II
December 18, 2024

1      A.   Local contribution, if the pre-app had been

2   before this, we would have had discussion with the City

3   about that, yes.

4      Q.   And on the second page, you indicate as of

5   July 14, 2023, that you were considering applying for

6   SAIL; is that correct?

7      A.   Yes.

8      Q.   And it appears the applications were due

9   August 8, 2023, correct?

10      A.   Correct.  August 3rd I believe it says.

11      Q.   You're right.  August 3rd, 2023.

12           And I think you said earlier as you sit here

13   today, you don't have any additional recollection as to

14   the SAIL application or if -- if you -- how you decided

15   not to apply for the SAIL application?

16      A.   No, I don't recall.

17      Q.   On the page that's Bates stamped 2398 at the

18   bottom, looks like there's an e-mail from Keith with

19   Brevard County and some discussion about affordable

20   housing impact fee incen -- incentive.  And tell me what

21   incentive, if any, you were offered from Brevard County

22   for this particular project.

23      A.   I don't know that we were offered any.  There

24   was a discussion about what the development might be

25   eligible for.  And that particular paragraph you were

1  referencing in your question had to do with a deferral as

2  opposed to a waiver.  And he discussed the potential for

3  a deferral and consideration of the deferral.

4      Q.   And it sounds common sense, but tell me the

5  difference between deferral and waiver.

6      A.   Deferral means you pay it later, waiver means

7  you don't pay it.

8      Q.   And is there a specific set time as far as how

9  long it would be deferred; you said pay it later?

10     A.   Yes, so deferral is pay it later.  Is there a

11 specific set time, a deferral can be two days, two years,

12 two centuries.  It's a deferral.

13     Q.   What I mean specifically, in this project, was

14 there discussion as to whether or not it would --

15 ultimately you would have a deferral or a waiver?

16     A.   I don't recall.

17     Q.   The next page that's Bates stamped 2719 at the

18 bottom is titled Resolution Number 2023, dash, 05.  What

19 is that?

20     A.   I believe that's what we refer to as the

21 inducement resolution, where the Housing Finance

22 Authority reviews your application and indicates their

23 desire to proceed.

24     Q.   Did that -- did the amount of requests change

25 after the initial resolution was adopted?

Scott Culp Volume II
December 18, 2024

 1      A.   I don't recall.

 2      Q.   The next document Bates stamped 2737, what is

 3  that?

 4      A.   That is the first page of our sources and uses

 5  statement.  And I'm not sure whether this was the one

 6  that was included within the Brevard County Housing

 7  Finance Authority application.  But it may have been.

 8      Q.   And we talked about this a little bit in the

 9  first deposition, but the owner's equity is the amount

10  that you or your partners put in the project; is that

11  correct?

12      A.   No, it's the amount that we stated on the source

13  and uses statement that we would be putting on the

14  project.

15      Q.   And why is there a different column for

16  construction and permanent?

17      A.   Because during the construction phase, the

18  entire amount of the tax exempt bond allocation is used

19  for construction.  At permanent, that is paid down to a

20  stabilization amount that is governed by the loan

21  documents based upon required debt service coverage.  And

22  at that point, the equity amount has to increase for the

23  paydown in the bonds.

24      Q.   So these -- the numbers that are on here are

25  fluid, correct, they can change?

Scott Culp Volume II
December 18, 2024

1    A.   I can change these numbers, yes.  I'm not quite

2  sure what you're asking.  Yes, I can change these

3  numbers.

4    Q.   Do they -- do they tend to change throughout the

5  course of a project?

6    A.   Yes.

7    Q.   Did they change specifically for Venue at

8  Heritage Oaks?

9    A.   I'm sure that at some stage prior to the denial

10  of the allocation by the county commissioners, the

11  numbers changed between the day we first envisioned the

12  project and the day that the commission denied the bond

13  allocation.

14    Q.   Well, it looks like there's a number directly

15  above Plaintiffs' 02737, and it looks like it's dated

16  10/6/23; is that accurate?

17    A.   Yes.

18    Q.   Do you believe that these numbers would have

19  been updated or changed in any way since October 6, 2023?

20    A.   I would have to review other documents to see if

21  there had been any updates.

22    Q.   Where would we look -- or where would I look for

23  final numbers as to the sources and uses statement?

24    A.   The Housing Finance Authority would have a final

25  credit underwriting report which would have the final

Scott Culp Volume II
December 18, 2024

1  numbers that were used for moving forward with the tax

2  exempt bond allocation.

3      Q.   And so once they are submitted for the credit

4  underwriting report, they tend to stay the same

5  or there's no updates or finalization after that

6  submission?

7      A.   No, that would be incorrect.  The final credit

8  underwriting report would not change up to the bond

9  closing based upon that.  They always change all the way

10  through place and service because you are required to

11  have cost-certified actual cost, and it is not possible

12  to have the actual cost prior to the cost being actual.

13     Q.   Do you have any knowledge or recollection as to

14  if the sources and use statement changed from October --

15  October 6, 2023, until the time that the bond was denied

16  in December of 2023?

17     A.   I don't recall.

18     Q.   The next page is a resolution, it's Bates

19  stamped 2749 at the bottom.  And this has a different

20  number of $16,750.00.  Does that refresh your

21  recollection as to the amount changed?

22     A.   It has $16,750,000.  You referenced 16,000.  It

23  references 16 million, which is the same as the sources

24  and uses statement that you showed me dated October 6th.

25  Although it was a greater amount than the inducement

Scott Culp Volume II
December 18, 2024

1   resolution you showed me, 2023, dash, 05.  And that would

2   be consistent with a change that would have happened

3   during that timeframe.

4       Q.   Why did the request for funding amount of

5   16,750,000 change?

6       A.   I don't know that the 16,750,000 changed.  I

7   know that the 15,750,000 from the resolution you provided

8   earlier changed to the 16 million --

9       Q.   Let me ask it differently.

10      A.   Okay.

11      Q.   Excuse me.  Why did the request for funding

12  change from 15,750,000 to 16,750,000?

13      A.   I don't recall.

14      Q.   The next page is Bates stamped at the bottom

15  2855.  What is that?

16      A.   It is pages from the credit underwriting report

17  for The Venue at Heritage Oaks.

18      Q.   And just referenced this, is this what -- strike

19  that.

20           What's the purpose of the credit underwriting

21  report?

22      A.   I believe we covered that in my prior half of my

23  deposition.  It essentially covers everything about the

24  financing and development of the proposed affordable

25  housing community.

Scott Culp Volume II
December 18, 2024

1      Q.   And this appears to be dated December 4th, 2023,

2   correct?

3      A.   That's correct.

4      Q.   So for purposes of this lawsuit and The Venue at

5   Heritage Oaks, would these have been the final numbers,

6   too, that would have been considered in the development

7   of this project?

8           MS. RHODEN:  Object to form.

9           THE WITNESS:  You ask if these would be

10          considered for the -- as the final numbers in

11          development of this project.  What you've handed me

12          is the first draft of a credit underwriting report

13          that would have been at some point updated to a

14          final credit underwriting report.  I don't recall

15          whether there was a final credit underwriting report

16          published after this draft which you handed me.  So

17          there could have been a difference.  There also

18          would have been a difference as we proceeded to the

19          four percent loan housing tax credit application,

20          and there would have been another credit

21          underwriting report done at that time and the

22          numbers would have changed for that.  And then I

23          think your question related to other potential

24          changes in the numbers, and the numbers would change

25          all the way through being placed in service with the

Scott Culp Volume II
December 18, 2024

```
 1        final cost certification to Florida Housing Finance

 2        Corporation.

 3   BY MS. GAINEY:

 4        Q.   So the fact that this says final first draft

 5   report, I'm hearing you to say there would have been a

 6   final draft report?

 7        A.   There definitely would have been a final credit

 8   underwriting report, not a final draft.  It would have

 9   been a final credit underwriting report prior to the bond

10   closing.

11        Q.   And I guess just very simply my question is, do

12   you know if there was a final report generated?

13        A.   I don't recall as we sit here.  I would have --

14   well, I shouldn't say that.  If they provided me with a

15   copy of the final report, I would have it.  I don't know

16   if there was one generated as I sit here from my

17   recollection.  And this is not the complete draft report.

18        Q.   Understood.  I'm not purporting it to be.

19        A.   I just wanted to make sure because you had

20   presented it to me as a document.

21        Q.   Well, again, I'm not going through 4,000 pages

22   that was produced.

23        A.   Right.

24        Q.   I'm trying to streamline this, so I

25   definitely --
```

Scott Culp Volume II
December 18, 2024

```
1        A.   I'm just trying to clarify what you presented
2   me.
3        Q.   Thank you for that.
4             All right.  So on the page that's marked 02858,
5   we talked about this a little bit in your first
6   deposition.  But is it fair to say that as of December 4,
7   2023, these were the numbers for -- as far as rent
8   numbers for Venue at Heritage Oaks?
9        A.   These were the rents based upon the set-asides
10  for the credit underwriting for the bond allocation.
11       Q.   And I've understood you to say that these
12  numbers could change depend -- depending on what you are
13  applying for?
14       A.   Yeah, we discussed at length that these numbers
15  represent the restrictions for the bond allocation.  They
16  don't necessarily represent what we'll be proceeding with
17  for the development of the community.
18       Q.   On the next page which is marked 2059, the
19  allocation of the 105 units at 150 percent AMI for 15
20  years, what is that?
21       A.   I'm just reading the asterisk, and all I can
22  tell you is what the asterisk says.  I don't have any
23  other recollection from other than what the sentence
24  besides the asterisk besides the line in that table
25  indicates.
```

Scott Culp Volume II
December 18, 2024

1    Q.    I thought we established in your prior

2    deposition that 20 percent of the units would be at

3    50 percent AMI and then the remaining 80 percent units

4    would be at 80 percent AMI; did I understand that

5    correctly?

6    A.    For purposes of the tax exempt bonds, that's

7    correct.

8    Q.    So do you have an explanation as to why the

9    numbers are different here?

10    A.    The 20 percent at 50 percent doesn't appear to

11    be different.  They've got a row on this indicating that

12    there's a set-aside for a hundred percent of the units

13    which would include the 20 percent at 150 percent median

14    income.  And they have a sentence that explains that in

15    accordance with the -- a statutory reference, which I

16    don't claim to understand or have represented.

17    Q.    Was this project ever going to be developed with

18    some of the units at 150 percent of AMI?

19    A.    No.

20    Q.    Would that put it out of the affordable housing

21    realm or not?

22    A.    Under the statutory definition of affordable

23    housing, 120 percent is the max.  This reference to 150

24    has to do with something else unrelated to affordable

25    housing.

1    Q.   Do you know why it is represented -- represented

2    in this underwriting report?

3    A.   Other than what is written beside the asterisk,

4    no.

5    Q.   On Plaintiffs' 2860 -- I think it's the next

6    page -- I think there's a chart with permanent financing

7    information.  The first source has the lenders and then

8    it has a second source.  Tell me what this chart

9    explains.

10   A.   That's the sources for the bonds.  And it's

11   telling you who the lenders are, they are providing the

12   amounts of those sources for the bonds.

13   Q.   And do you select the -- the source for the bond

14   or is that -- or not?

15   A.   When you say do I select the source for the

16   bonds, are you talking about the bond purchaser?

17   Q.   Yes.

18   A.   That reference here to the bond purchaser is us.

19   MSPJ; I'm the S in there.  Do I select?

20   Q.   I'm sorry, I didn't realize that.  So MSPJ is --

21   is one of your companies?

22   A.   Yes.

23   Q.   What's HFA stand for?

24   A.   Housing Finance Authority.  HFA, yeah, Housing

25   Finance Authority.  What this is -- to clarify, the bonds

Scott Culp Volume II
December 18, 2024

1    are the source of the first mortgage.  The buyer of the

2    bonds in this particular development and this

3    underwriting was proposed to be our MSPJ Bond Holdings.

4         Q.   All right.  And then on the next page, it has

5    construction permanent sources.  Bates stamped 2861 at

6    the bottom.

7         A.   Yes.

8         Q.   So does Southern Affordable Services, Inc.,

9    actually contribute money to construction?

10        A.   Southern Affordable Services, Inc., is a

11   principal in the applicant entity, and they would

12   contribute the equity.

13        Q.   And did those amounts look accurate as to the

14   sources?

15        A.   They're accurate as to the credit underwriter's

16   analysis of what would be required for the development.

17        Q.   So are you providing -- you or someone with your

18   team providing the credit underwriter those numbers?

19        A.   We provide them with our version of the numbers,

20   and they review those and make a determination if they

21   think they need to revise them.  That's why if you have

22   the complete report -- and it may be in here -- you'll

23   often see applicant's numbers, credit underwriter's

24   numbers, adjusted numbers.  They would tell you in the

25   complete underwriter report what had been submitted and

Scott Culp Volume II
December 18, 2024

1   what they might have adjusted.

2       Q.   The next page Bates stamped 2891.

3       A.   28 -- okay.

4       Q.   It appears it is just providing borrower

5   information.

6       A.   I guess that's the pages of the credit

7   underwriter report.  Well, that particular page is

8   borrower information, page from the credit underwriting

9   report.

10      Q.   And this information would have been information

11  that you or your team or someone from the plaintiffs

12  provided?

13      A.   We would have provided information.  The credit

14  underwriter does this write-up, and they may have

15  information in this write-up that we didn't provide and

16  that they obtained independently.

17      Q.   The next document Bates stamped 28 -- excuse me,

18  2927, a rent calculation, correct?

19      A.   Yes.

20      Q.   And what was the purpose of creating this

21  document?

22      A.   The rent calculations are based upon HUD

23  published information.  And this document would identify

24  at the time it was created the HUD published calculations

25  for the -- the rents at the different set-asides.

Scott Culp Volume II
December 18, 2024

1    Q.   And the calculations were based on the

2  50 percent AMI rent and then the 120 percent AMI rent

3  calculation, correct?

4    A.   Yes.

5    Q.   And what would you or your -- anyone from the

6  plaintiffs or your team had used this document for?

7    A.   We have to determine what the allowable maximum

8  rents are based upon the HUD guidelines.  This document

9  helps us to determine what the allowable maximums are for

10  the set-asides at that time period.

11    Q.   And then I think I've seen from your other

12  properties that you post the allowable maximum -- maximum

13  rent on the website ultimately, correct?

14    A.   Not necessarily.  We post the rent.  I don't

15  know that we post the allowable maximum rent.

16    Q.   Strike that.

17        Do you post allowable maximum salary on your

18  website?

19    A.   I don't recall.

20    Q.   Page 2959.  It is a letter from Mr. Browser --

21  Bowser dated July 19th, 2023; is that correct?

22    A.   Yes.

23    Q.   And --

24    A.   I don't know why that is stapled to this other.

25    Q.   You can tear it off.

```
 1        A.   It makes no sense for that to be stapled to the
 2   other document.
 3        Q.   It is a copy.
 4        A.   Yeah, I just wanted to point out it was not part
 5   of the other document.
 6        Q.   Understood.
 7             The letter from Mr. Bowser, it indicates that as
 8   of July 19, 2023, it was -- this was intended to be a
 9   senior housing or a senior living multi-family dwelling,
10   correct?
11        A.   Yes.
12        Q.   The next document 3433, who is Connie Jennings;
13   if you know.
14        A.   She's a senior appraiser with Meridian Appraisal
15   Group.
16        Q.   And is that who you would have -- well, it looks
17   like -- why was she involved in the project?
18        A.   The credit underwriter typically engages an
19   appraisal as part of the underwriting.  And I assume that
20   the credit underwriter engaged Meridian Appraisal Group
21   and that Connie was sending questions to complete her
22   appraisal.  Yep, that's what it says.
23        Q.   On the -- on the second page, there's a page
24   that is stamped 3434 at the bottom.  It says:  Density
25   approval is consistent with the Live Local legislation.
```

Scott Culp Volume II
December 18, 2024

```
1            What does that mean?

2       A.   Second page.  I'm looking for your reference

3  here.

4       Q.   It's the second line.

5       A.   What's the stamp at the bottom?

6       Q.   3434.

7       A.   And where are you reading on that page?

8       Q.   The second page -- excuse me, the second line at

9  the top of the page.

10       A.   Oh, the top.  Okay.  Yes, I see that.

11       Q.   What does that mean?

12       A.   The Live Local legislation has criteria with

13  regard to density, and this answer was indicating that

14  the density was consistent with that legislation.

15       Q.   Do you have any specific memory as to what the

16  density requirements were for this unit?

17       A.   I don't recall.  Now I know why that other page

18  was attached to here.  Because it says it's attached.

19  Mr. Bowser.  So it is appropriate for that to be

20  attached.  You were right to staple it there.

21            MS. RHODEN:  No, it wasn't stapled there though.

22       It was stapled on this.

23            THE WITNESS:  Oh, so it was stapled in the wrong

24       spot.  Unless that was part of this.  I don't know.

25            MS. GAINEY:  It doesn't matter.  They're Bates
```

Scott Culp Volume II
December 18, 2024

1      stamped at the bottom.

2          THE WITNESS:  Sorry.  I was just trying to

3      figure out how they got together that way.

4          MS. GAINEY:  I don't know.  Somewhere in the

5      copying process.

6          THE WITNESS:  It makes sense now.

7  BY MS. GAINEY:

8      Q.   The next document is 3444.  What is this?

9      A.   It's an estimated schedule for the development

10  of the community.

11      Q.   And for this particular community, the scheduled

12  place and service date was May 30th, 2025, correct?

13      A.   Correct.

14      Q.   Document 3603, what is that?

15      A.   An assignment of the engineering contract for

16  the development of the community.

17      Q.   And that's Mr. Brock is signing it to you?

18      A.    No, it's Atlantic Housing Partners who had the

19  contract with the engineer, assigning that contract to

20  the applicant owner entity, which is The Venue at

21  Heritage Oaks Partners whose general partner was Southern

22  Affordable Services who Mr. Brock is the executive vice

23  president of.

24      Q.   3606, what is that?

25      A.    That's a developer's certification of the

Scott Culp Volume II
December 18, 2024

1   compliance with the fair housing requirements for section

2   504 units and 88 units within the community.

3        Q.   Next Page 3622.  It's an e-mail from you dated

4   June 16th, 2023.  What's going on with this e-mail?

5        A.   At that time, there was an application for

6   Brevard County Housing Finance Authority, and I was

7   informing Ammon that that site had died.  I don't know

8   that this is the site that we're talking about because it

9   doesn't have any reference on this e-mail.

10       Q.   So did you originally consider a different site?

11       A.   We considered many sites in Brevard.  So I don't

12  know if this was a consideration of another site.  I

13  don't know.

14       Q.   But since this was June 2023, it's not the site

15  that ultimately you applied for for development?

16       A.   I don't know that to be accurate.  There are

17  times when a site can die and come back to life.  I don't

18  know if that's a correct term.  But things happen where

19  you believe that for some reason or another, you're not

20  going to proceed with it, and then it does proceed

21  through other information you obtain after that point.

22  So from this document, I can't tell you whether this was

23  Venue at Heritage or another site we were working on in

24  Brevard County.

25            MS. GAINEY:  We've been going about an hour.  Do

Scott Culp Volume II
December 18, 2024

 1       we need a break?

 2              THE COURT REPORTER:  I'm good.

 3              MS. GAINEY:  Anybody need a break?

 4              THE VIDEOGRAPHER:  No.

 5    BY MS. GAINEY:

 6       Q.   From the time that the commissioners didn't

 7    approve the bond financing until the time that the sales

 8    contract was canceled, and I think we established from

 9    the letter it was December 28th, 2023, correct?

10       A.   We'd have to look at the letter.  I don't

11    remember the date.

12       Q.   Do you want to look?  We can look back at the

13    letter if you want.

14       A.   I mean, we have the letter in front of us.  I --

15    I don't remember the date.  You -- you referenced it.

16       Q.   I will purport to you that it was December 8th,

17    2023.  Can you just give me a general sense of what was

18    going on in those several weeks as far as considerations

19    for additional financing or a different location?

20       A.   I don't recall.  I'd have to be looking at all

21    the documents, see what the land contract would have

22    required.  I know the bond allocation would have been

23    lost at that point.  So I'd have to look at all the

24    documents to determine, you know, what was being

25    considered, I think was your question, after the board

Scott Culp Volume II
December 18, 2024

1    denied the bond allocation.

2        Q.    Who would have been involved in the decision or

3    consideration as to if you could consider other

4    properties for this development?

5        A.    Other properties, I would be primarily.

6        Q.    And do you have any recollection as to if you

7    did, in fact, consider other properties after the bond

8    funding was denied?

9        A.    We wouldn't have considered other properties for

10   this particular bond allocation because that bond

11   allocation expired in December.  So we would have had to

12   start over.  And of course I'm considering other

13   properties even today.

14       Q.    Are you considering other properties in Brevard

15   County?

16       A.    Not today.

17       Q.    Were you yesterday?

18       A.    Yesterday.

19       Q.    Let me ask it differently.  At any point since

20   December 6th, 2023, have you considered other properties

21   in Brevard County?

22       A.    I have looked at other properties in Brevard

23   County since then, yes.

24       Q.    And other than looking at them, have you done

25   anything in order to try to develop the property?

Scott Culp Volume II
December 18, 2024

1        A.    No.

2              THE WITNESS:  Little warm, isn't it?

3              MS. RHODEN:  Want me to turn it down?

4              THE WITNESS:  Yeah, if you could.  I wasn't

5        going to say anything, but she seemed a little warm,

6        too.  So there's two of us.

7              MS. RHODEN:  See, I'm comfortable, I know

8        everyone else must be warm.

9              MS. GAINEY:  Let's just take a very quick break.

10       I have to use the restroom.

11             THE VIDEOGRAPHER:  Going off the record.  The

12       time is 10:37 a.m.

13                     (A break was taken.)

14             THE VIDEOGRAPHER:  Going back on the record.

15       The time is 10:40 a.m.

16   BY MS. GAINEY:

17       Q.    What, if anything, did you do to try to mitigate

18   your damages after the bond financing was denied?

19       A.    I don't recall.

20       Q.    Would there be any paperwork that you have in

21   your possession as far as looking for other property or

22   trying to get other financing?

23       A.    Well, looking for the property and trying to get

24   other financing would relate to the purchase agreement.

25   And we discussed the termination of land contract based

1    upon the moratorium that was put in place by the City of

2    West Melbourne.  The bond allocation was expiring, so

3    there wouldn't have been an opportunity for another piece

4    of property.  So I wouldn't have looked for another piece

5    of property for that.  Anything I would have done other

6    than that would have been for a new development, because

7    this particular development at that point died.  There

8    wasn't a way to revive this particular development.

9    There was a moratorium in place, and the bond allocation

10   had been denied and was expiring.

11        Q.    We talked about this a little bit in your prior

12   deposition, but once 2024 started -- and my understanding

13   is that there would be additional funding available from

14   bond -- for bonds from Brevard County; is that your

15   understanding?

16        A.    There is bond allocation available to each of

17   the regions on the first of each year.  What the region

18   chooses to do with that bond allocation could affect

19   whether or not it is available to other applicants.  If

20   that particular region or county in that region had

21   denied a bond allocation for a particular location, I

22   wouldn't be going back to ask them to do the same thing

23   again.  So I don't know if that, you know, answer s your

24   question at all, but this particular bond allocation for

25   this location, I wouldn't go back and ask the commission

Scott Culp Volume II
December 18, 2024

1    if they would reconsider.

2         Q.   I'm -- I'm not asking that.  I'm asking, was

3    there anything to prohibit you from finding a different

4    piece of property or a different land and reapplying in

5    2024?

6         A.   There's nothing to keep me from finding a piece

7    of property and applying anywhere.

8         Q.   I'm talking about for Brevard County

9    specifically.

10        A.   Nothing to keep me from finding a piece of

11   property in Brevard and applying anywhere.

12        Q.   In this particular instance, you did not look

13   for a different piece of property in region 17 and apply

14   for funding again; is that correct?

15        A.   You referenced region 17 before, I'll assume

16   that you know the region numbers.  I don't.  But I did

17   not look for another piece of property to apply for a new

18   bond allocation from Brevard County HFA to then have to

19   go back to the Brevard County Commission who had already

20   denied a bond allocation for a prior approval of the

21   Brevard County HFA.  No, I did not do that.

22        Q.   Was this -- this was not the first time that you

23   had gotten financing from Brevard County, correct?

24        A.   Correct.

25        Q.   How about Volusia County, is Volusia County in

Scott Culp Volume II
December 18, 2024

1  the same region as Brevard, do you know?

2      A.   What day is this?  Is this still December?

3      Q.   Good question.  As of December 6th, 2023.

4      A.   Yes, they were in the same region at that time.

5      Q.   Were you -- were you working on any projects in

6  Volusia County in December of 2023?

7      A.   Yes.

8      Q.   And how many projects?

9      A.   I don't recall.

10      Q.   What do you recall about the projects?

11      A.   That I was working on projects in Volusia County

12  during 2023.

13      Q.   Do you remember the names or...

14      A.   Closing on four this week.  Probably was working

15  on them in 2023.  Howland Station (ph), Kingston at Old

16  Kings (ph), River Bend 1 (ph), River Bend 2 (ph).  There

17  are probably others.  I think there were about ten that I

18  was working on and closing on four this week.

19      Q.   And was Venue at Heritage Oaks the only

20  development project that you were working on in Brevard

21  County in 2023?

22      A.   I think so.

23    (Defendant's Exhibit H was marked for identification.)

24  BY MS. GAINEY:

25      Q.   Let me show you what we'll mark as Culp

Scott Culp Volume II
December 18, 2024

1   Deposition H.

2        A.   Wow.  Should have brought my glasses, huh?

3        Q.   Sorry.

4        A.   Who printed this?  I don't use that small of

5   font.

6        Q.   We talked a little bit earlier about impact

7   fees, and I also think in the first deposition you did.

8   So this is an e-mail to you from Naomi Adkins Hickon

9   [sic].  And it's talking about the impact fee schedule.

10  Tell me why this was relevant for purposes of development

11  of Venue at Heritage Oaks.

12       A.   This e-mail you referenced at the top dated July

13  17th, the first part of it, is referencing the

14  calculation of the county impact fees for 101-unit,

15  three-story apartment.  We always get confirmation of our

16  impact fee amounts to provide to the issuer for an

17  application to the Housing Finance Authority, to the

18  underwriter if we are in underwriting, to ourselves in

19  putting together our financial models.  Below that, I

20  think that e-mail you might have shown me before.  That's

21  discussion about deferral of impact fees.  That they said

22  there could be a potential to grant deferrals.  They'd

23  have to route it to the board for approval.  And

24  referencing the need for a no objection letter from the

25  City of West Melbourne.

Scott Culp Volume II
December 18, 2024

1    Q.   That's all I have about that document.  For

2    completeness, I always try to attach most of the e-mail

3    chain.  But the next document is an e-mail from you to

4    Christy Fischer.  Who is Christy Fischer?

5    A.   Christy Fischer was with the City of West

6    Melbourne, and I believe she had reached out to me and I

7    was responding.  If I read on down, yeah, she says:  I

8    don't know if you're the right person to ask.  I learned

9    of a form for SAIL funds.  Will be asked to sign for

10   another project to seek state funds.  Are you also

11   seeking SAIL funds?

12          And I was answering her.

13   Q.   And it looks like this e-mail chain occurred in

14   November of 2023, correct?

15   A.   Yes.

16   Q.   And you tell Christy on the first page, quote:

17   Venue at Heritage Oaks is intended to be affordable as

18   defined by FS420.004 and consistent with the Live Local

19   legislation of FS166.041517.

20          Correct?

21   A.   Yes.

22   Q.   You also note at that time that Venue at

23   Heritage Oaks is intended to be restricted to occupancy

24   by seniors in accordance with the Housing for Older

25   Persons Act, correct?

Scott Culp Volume II
December 18, 2024

1        A.    Yes.

2        Q.    And I think you said in your earlier deposition

3   that Venue at Heritage Oaks was always intended to be

4   housing restricted to seniors, correct?

5        A.    In accordance with the Housing for Older Persons

6   Act, correct.

7        Q.    You talk a little bit about the housing finance

8   structure, and then you note that it's not contingent

9   upon nor will you be applying for any of the competitive

10  resources allocated through the Florida Housing Finance

11  Corporation.  What did you mean there?

12       A.    Continue reading on there, it says:  I.e., SAIL

13  and/or nine percent federal housing credits.

14            Those are the typical competitive resources that

15  you might apply for at Florida Housing Finance

16  Corporation.  And this development was not contingent

17  upon those and we were not intending to apply for those.

18       Q.    We talked about SAIL, but what is the nine

19  percent federal housing credit?

20       A.    It's the low-income housing tax credits.  It's

21  two programs, there is a nine percent program and a four

22  percent program.

23       Q.    You also note:  At a later date, you may apply

24  for a noncompetitive, quote, as of right, end quote, four

25  percent federal housing credit.  What does that mean?

Scott Culp Volume II
December 18, 2024

1        A.    With tax exempt bonds, you have the ability to

2   apply for the four percent federal housing credits.  And

3   refer to those "as of right" because they're not

4   competitive.  And as long as you meet all the federal

5   requirements, you are allocated those credits.

6        Q.    Then you also state that at a later date, you

7   may need verification consistent with the requirements of

8   Florida Statute 166.041517.  What did that mean?

9        A.    That's the reference to the Live Local Act.  And

10  the local government would need to verify that our use is

11  consistent with the Live Local Act with regard to this

12  particular parcel.

13       Q.    And you refer to a similar financing structure,

14  designed amenities and restriction property, and it looks

15  like I can tell by the link that was at Venue at Viera

16  Senior Living, correct?

17       A.    Correct.

18       Q.    The last page of that document, you are

19  referencing the community meeting that you had in

20  response to community concerns.  And it appears that Jake

21  Wise and Marc -- is it Gunther (ph)?

22       A.    Gauthier.

23       Q.    Not even close.  Those were the two that

24  appeared at the meeting with you; is that correct?

25       A.    I don't know that Jake actually was at the

Scott Culp Volume II
December 18, 2024

1    meeting.  He is an engineer in that area, civil engineer.

2    I don't know that he was at the meeting.  Marc Gauthier

3    was.

4         Q.   Was anyone else from Atlantic Housing Partners

5    or the plaintiff present at that meeting?

6         A.   Other than Marc Gauthier and myself, no.  Now,

7    we did mention that we had our traffic engineer there.

8         Q.   Yes.

9              All right.  The next document I'm going to

10   purport to you is a printout from the homeowners

11   association.  Have you ever seen that document or their

12   website from which this printout was made?

13        A.   I don't remember.

14        Q.   Do you have an understanding that the homeowners

15   association distributed materials or passed out

16   information regarding your project?

17        A.   Yes.

18        Q.   And what's your understanding?

19        A.   They disseminated information or passed out

20   information regarding our project.  I was on their e-mail

21   mailing list.

22        Q.   Did you keep copies of any of those e-mails?

23        A.   No.

24        Q.   Did you have conversations with anyone from the

25   homeowners association regarding the project?

Scott Culp Volume II
December 18, 2024

1       A.   I don't think so.

2       Q.   Are you still on their e-mail list?

3       A.   Yes.

4       Q.   What's your memory from anything they had said

5    by e-mail regarding the project?

6       A.   I don't have any specific recollection other

7    than numerous e-mails in opposition to the project.

8       Q.   And what were the concerns that they were

9    expressing via e-mail as a foundation for their

10   opposition?

11      A.   They had a concern over traffic.  And I don't

12   recall other items that were expressed.

13      Q.   Did you keep copies of any of those e-mails?

14      A.   No.

15      Q.   The next document appears to be a letter from

16   Commissioner -- or excuse me, from James and Lisa Steele

17   to one of the commissioners?

18      A.   I think it's from the commissioner to James and

19   Lisa Steele.

20      Q.   Well, earlier in the --

21      A.   Oh, I was looking at the one, you said next

22   document.  Is there another one that you're looking at?

23      Q.   Oh, I might be out of order.

24           MS. RHODEN:  No, it's the next page.

25           MS. GAINEY:  Yeah, it's the next page.

Scott Culp Volume II
December 18, 2024

```
 1            THE WITNESS:  Oh, okay, yeah, because this
 2       e-mail was in response, I guess.
 3            MS. GAINEY:  Yeah, it's -- it's an e-mail --
 4            THE WITNESS:  Okay.
 5            MS. GAINEY:  -- train.  Excuse me.
 6  BY MS. GAINEY:
 7       Q.   So just for clarification, they sent the
 8  commissioner an e-mail, he responds; that is what this
 9  document is, agreed?
10            MS. RHODEN:  Object to form.
11            THE WITNESS:  That's what this represents, yes.
12  BY MS. GAINEY:
13       Q.   And this appears to be a summary of their
14  impression of the community meeting you had.  And they
15  state, and it's the second page of the document, quote:
16  The following are examples the developer failed to answer
17  or had no knowledge of.  Number one, the planned access
18  off of Heritage Oaks Boulevard on the east side of the
19  property is designed as, quote, emergency access only,
20  and not open to through traffic.
21            Is that a correct statement or not a correct
22  statement?
23            MS. RHODEN:  Object to form.
24            THE WITNESS:  No, it is not correct.
25  BY MS. GAINEY:
```

Scott Culp Volume II
December 18, 2024

1      Q.   Why is it not correct?

2      A.   That access off of Heritage Oaks Boulevard is

3   not designated as emergency access on -- only and is not

4   restricted.

5      Q.   Number two, quote:  They could not or would not

6   answer what the height of the proposed structure is, end

7   quote.

8           Is that a true statement?

9           MS. RHODEN:  Object to form.

10          THE WITNESS:  No.

11   BY MS. GAINEY:

12     Q.   And why not?

13     A.   Because we indicated that it would be maximum of

14   four stories.  They were asking for -- well, this goes

15   back to your earlier question.  You asked the height.  I

16   don't know the exact number of feet.  I did tell them

17   that it would be a maximum of four stories.  I didn't --

18   I did tell them I don't know the exact height.

19     Q.   Number three is they had no knowledge -- quote:

20   They had no knowledge of the number of homes in the five

21   neighborhoods of Heritage Oaks which is 735 single-family

22   homes that would suffer if this complex is allowed, end

23   quote.

24          Did you have any knowledge of the number of

25   homes in the five neighborhoods that comprise Heritage

Scott Culp Volume II
December 18, 2024

1   Oaks?

2        A.    No.

3              MS. RHODEN:  Object to form.

4              THE WITNESS:  No.

5   BY MS. GAINEY:

6        Q.    Did you do any type of study or an investigation

7   as to what impact, if any, Venue at Heritage Oaks would

8   have had on that neighborhood?

9        A.    We discussed in my first half of my dep --

10  deposition a study with regard to traffic impact.  We did

11  that study.  The only other investigation we did was with

12  regard to the applicability of the zoning, which included

13  the density and height limitations under the entitlements

14  of the property under the Live Local legislation.

15       Q.    Did you have any impression or knowledge as to

16  what this tract of land was intended -- originally

17  intended for, whether that be part of the overlay or any

18  other information you got from the City of West

19  Melbourne?

20             MS. RHODEN:  Object to form.

21             THE WITNESS:  I don't remember.  I know that I

22        did have some review of what the original intent was

23        and the overall development plan, but I don't

24        remember what that was.

25  BY MS. GAINEY:

Scott Culp Volume II
December 18, 2024

1       Q.   Number four, quote:  When asked if Atlantic

2   Housing Partners found this tract of land or if they were

3   approached by the seller, Mr. Culp would not give a yes

4   or no answer.  He said, I do not recall, although prior

5   to this, he stated, the reason we sought this property

6   out was, close quote.

7            Is that correct?

8       A.   Yes.

9            MS. RHODEN:  Object to form.

10  BY MS. GAINEY:

11      Q.   And what was the reason you sought the property

12  out?

13      A.   I don't remember the statement that was made at

14  that point.  We looked for properties, as I explained in

15  my deposition earlier, where there is job growth and we

16  think that the economic feasibility, the demand, costs

17  are in line.

18      Q.   So do you have any recollection of what you told

19  the community members at the meeting as to the reason why

20  you sought the property out?

21      A.   I don't recall that, no.

22      Q.   Number five is the traffic study.  We already

23  talked about that.

24           Number six is, quote:  They could not or would

25  not answer where the main entrance of the building would

Scott Culp Volume II
December 18, 2024

 1  be.

 2          Is that a correct statement?

 3          MS. RHODEN:  Object to form.

 4          THE WITNESS:  No.

 5  BY MS. GAINEY:

 6      Q.   And why not?

 7      A.   We showed a site plan that showed where it would

 8  be.

 9      Q.   The last paragraph of that same page, it says,

10  quote:  The developer verbally agreed to consider

11  alternative properties more suited for this type of

12  structure when asked to do so by the West Melbourne City

13  Council members.

14          Is that a true statement?

15          MS. RHODEN:  Object to form.

16          THE WITNESS:  It is a misrepresentation of what

17      was asked and answered.

18  BY MS. GAINEY:

19      Q.   Tell me what you mean.

20      A.   I think the council member asked me if we would

21  consider other properties in the area for affordable

22  housing, and I said, yes, we would like to.

23      Q.   But I've understood you to say that you don't

24  have a recollection of what, if any, other properties you

25  considered; is that a correct understanding?

Scott Culp Volume II
December 18, 2024

1          A.   At that time, we weren't considering any

2     other -- any other properties.

3          Q.   At the time of the community meeting?

4          A.   Correct.

5          Q.   All right.

6          A.   He asked me if I would consider others, and I

7     said, yes, we would.

8          Q.   All right.  And then I've understood you to say

9     that you don't have any independent recollection as to

10    what, if any, other properties you considered?

11              MS. RHODEN:  Object to form.

12              THE WITNESS:  I don't recall.

13              MS. GAINEY:  That's all the questions I have

14         about that.  I feel like Forrest Gump sometimes.

15         That's all I can say.

16              THE WITNESS:  We have an e-mail from you.

17    BY MS. GAINEY:

18         Q.   It is definitely an e-mail to me.  And I know

19    you've never seen this, but this is from The Venue -- or

20    the housing -- homeowners association with Field at

21    Heritage Oaks.  And what -- what Mr. Hintz or Hintz is

22    doing is he's forwarding me apparently an e-mail that you

23    sent to them.  At the bottom of Page 1 to beginning of

24    Page 2 and 3, does that, in fact, appear to be a true and

25    accurate copy of the e-mail that you sent to Woodfield at

Scott Culp Volume II
December 18, 2024

```
 1   Heritage Oaks HOA?

 2        A.   Yes, it appears to be.

 3        Q.   I think we've covered a lot that's already --

 4   that's in that e-mail, so I don't really have any

 5   questions on that e-mail.

 6             I'm going to show you what we will mark as Culp

 7   Deposition Exhibit I.

 8      (Defendant's Exhibit I was marked for identification.)

 9   BY MS. GAINEY:

10        Q.   And I'm going to purport to you those are

11   printouts from four of the development properties that

12   I'm aware of in Brevard County as developed by Atlantic

13   Housing or Partners or plaintiffs or anyone associated

14   with Atlantic Housing.  I want to ask you a few questions

15   about these other developments.  And I'm going to start

16   with Hammock Harbor.

17             It appears that Hammock Harbor is -- they have

18   posted on their website that they are an unrestricted and

19   restricted in -- income property.  What does that mean?

20        A.   It means that there are units within the

21   community that are unrestricted with regard to the income

22   of the residents, and there are units that are

23   restricted.

24        Q.   Do you have available to you on these prop -- on

25   the property Hammock Harbor how -- what percentage is
```

Scott Culp Volume II
December 18, 2024

1    restricted and what percentage is unrestricted?

2        A.    Yes.

3        Q.    And the restricted income units were because of

4    the low-income housing tax credit program?

5        A.    I would have to review the recorded restrictive

6    agreements.  Could be taxes and bond restrictions,

7    low-income housing tax credit restrictions, SAIL

8    restrictions or other depending on what financing sources

9    were utilized for the development.

10        Q.    And at the bottom of the first page and

11    continuing to the second page, the website posts a table

12    indicating the maximum allowable household income based

13    on the number of -- the number that reside in the home,

14    correct?

15        A.    Correct.

16        Q.    Do you have any information available to you as

17    to the racial make-up of Hammock Harbor in 2023?

18        A.    I don't have the information.  We do have

19    information in the property management company database

20    with regard to the -- I believe it's ethnicity defined by

21    the residents.

22        Q.    And we talked about that in your first

23    deposition?

24        A.    Correct.

25        Q.    The next property in Brevard County is The Venue

Scott Culp Volume II
December 18, 2024

1    at Viera Senior Living.  And that property has a

2    restriction limited to age 62 or older or age 55 or older

3    if one person in the household is currently disabled as

4    evidenced by completion of the form; is that correct?

5         A.   I believe so.

6         Q.   So I think I've seen you reference Venue at

7    Viera Senior Living a couple times in e-mails or in

8    presentations or correspondence.  So would the

9    eligibility have been the same for Venue at Heritage

10   Oaks, or would it have been different than the

11   eligibility at Viera Senior Living?

12        A.   What we had intended and represented was that

13   Venue at Heritage Oaks would be a seniors restricted

14   community in accordance with the Housing for Older

15   Persons Act.  Venue at Viera has some other restrictive

16   requirements related to elderly, age 62 or older which is

17   somewhat different than the restrictions that we were

18   proposing for Venue at Heritage.

19        Q.   What -- when we talked before, you explained a

20   little bit about I think -- and correct me if I'm

21   wrong, but 80 percent of the complex would be restricted

22   to age, but then there would be, if available, a

23   percentage of the complex that would be allowed for less

24   than 55 if the units were empty or available?

25        A.   If you're referring to Venue at Heritage and the

Scott Culp Volume II
December 18, 2024

1   proposed --

2        Q.   I am.

3        A.   -- restrictions there, we had indicated it would

4   be seniors in accordance with the Housing for Older

5   Persons Act, which requires that one member of the

6   household be age 55 or older for 80 percent of the units.

7   20 percent of the units would be totally unrestricted.

8        Q.   So although similar, it sounds like the

9   restrictions for Venue at Viera Senior Living were a

10  little different than the restrictions for Venue at

11  Heritage Oaks?

12       A.   They are different than what was proposed for

13  Venue at Heritage Oaks.  That's correct.

14       Q.   But you're proposing that Venue at Viera Senior

15  Living as -- as an example for -- because it is similar

16  in restrictions or why were you using --

17       A.   It's --

18            MS. RHODEN:  Object to form.

19            THE WITNESS:  -- a similar development.  It's a

20       tax and bond development and affordable housing

21       development.  It does have different restrictions

22       with regard to the age of the occupants.

23  BY MS. GAINEY:

24       Q.   All right.  The next property is Malabar Cove?

25       A.   Yes.

Scott Culp Volume II
December 18, 2024

1    Q.   And this restriction -- well, it says it's also

2    unrestricted and restricted income residents, and also

3    the website refers to the low-income housing tax credit

4    program as a basis for the restricted income units,

5    correct?

6    A.   Correct.

7    Q.   The last property is the Wickham Club

8    Apartments.  And it says on the website:  We offer lower

9    rents than market rate communities.

10          And it also again references the low-income

11   housing tax credit program, correct?

12   A.   Correct.

13   Q.   So do you have developments in Brevard County

14   that -- that you or one of your partners or one of the

15   plaintiffs continue to operate outside these four

16   developments?

17   A.   I don't recall.

18   Q.   How would I find that out?

19   A.   Concordrents.com.

20   Q.   We're not going --

21          THE WITNESS:  It's off the record.

22          THE COURT REPORTER:  It's on the video.

23          MS. GAINEY:  Do we need to change it?

24          THE WITNESS:  What did you turn it down to?

25          MS. RHODEN:  74.

Scott Culp Volume II
December 18, 2024

1          MS. GAINEY:  You're right, though.  It is

2     getting chilly.

3          MS. RHODEN:  I can turn it up.

4          THE WITNESS:  We're slightly off the record.  We

5     definitely need air conditioning.

6          THE VIDEOGRAPHER:  The time is 11:11 a.m.

7               (A break was taken.)

8   (Defendant's Exhibit J was marked for identification.)

9          THE VIDEOGRAPHER:  This is the beginning of

10     media number two in volume 2 of the deposition of

11     Scott Culp.  The time is 11:14 a.m.  We are on the

12     record.

13   BY MS. GAINEY:

14     Q.   Sir, we've marked as Culp Deposition Exhibit I

15   [sic] several documents, and I'm going to purport to you

16   they're all related to bond financing through the Housing

17   Finance Authority of Brevard County.

18          MS. RHODEN:  This is Exhibit J?

19          MS. GAINEY:  Oh, did I say I?  J.  Excuse me.

20     Thank you.

21   BY MS. GAINEY:

22     Q.   These are documents from the Housing Finance

23   Authority of Brevard County.  The first document appears

24   to be The Venue at Viera Senior Living application which

25   Atlantic Housing Partners submitted; is that a correct

Scott Culp Volume II
December 18, 2024

1    assessment of what that document is?

2        A.   It appears to be, yes.

3        Q.   And it looks like on Page 6, the application

4    checks the category that describes the population to be

5    observed as elderly; is that correct?

6        A.   It was proposed to be a senior community, and

7    elderly is, I guess, most related to what would be a

8    senior-restricted community.

9        Q.   And then on Page 11, the application is

10   asking -- asking for an attachment for an elderly

11   development and to attach certain requests as Exhibit 1

12   or IV-1.  And it looks like there is, in fact, an exhibit

13   attached to IV-1.  Would you agree with that?

14       A.   I'm looking for the four, dash, one.  Let me --

15       Q.   I can show it to you if it is easier.

16       A.   I'm trying to find it, too.

17           MS. RHODEN:  What is it?

18           MS. GAINEY:  Sorry, they don't have page

19       numbers.  But it's toward the back, Exhibit IV-1 or

20       four, dash, one.

21           THE WITNESS:  There's a reference to amenities

22       and it references the window type, plumbing

23       fixtures, tile, things like that in four, dash, one.

24       And in four, dash, three, energy efficiency items.

25       Energy conservation features.

Scott Culp Volume II
December 18, 2024

1   BY MS. GAINEY:

2       Q.   Do you agree that The Venue at Viera Senior

3   Living was financed through bond financing in Brevard

4   County?

5       A.   No.  Say -- say that again.

6       Q.   Let me ask it differently.

7       A.   Oh.

8       Q.   I know you're -- you're very technical.

9       A.   Can we -- can we back up?  I didn't realize you

10  had handed me The Venue at Viera.  I thought I was

11  looking at Venue at Heritage Oaks and I was thinking, why

12  does that say elderly?  This is not --

13      Q.   Yeah, we can back up.  Do you need to correct

14  anything?

15      A.   Yeah, can we -- yeah, if we can go back to the

16  start.

17      Q.   Sure.

18      A.   Because I thought I was looking at Venue at

19  Heritage Oaks and I flipped the first page.

20      Q.   No problem.  Correct --

21      A.   Yeah.

22      Q.   -- whatever you need to correct.

23      A.   Well, you had -- I was confused about the

24  designation of elderly because I was sure that we didn't

25  check elderly at Venue at Heritage.

Scott Culp Volume II
December 18, 2024

```
1        Q.    Understood.

2        A.    You set it over here and I was thinking that

3    doesn't sound right, but now I understand because Venue

4    at Viera, which we discussed earlier in my deposition,

5    had a different designation and it was elderly.

6        Q.    All right.  Is there anything about your prior

7    answer -- I mean, I think you clarified it, but is there

8    anything else that you need to add?

9        A.    I think that clarifies my prior answer.

10        Q.    All right.  So back to my question.  Was -- and

11   my next series of questions are about your other project.

12   We are not talking about Venue at Heritage Oaks for --

13   for now.

14        A.    We're talking about Venue at Viera.

15        Q.    Yes.

16        A.    Okay.

17        Q.    All right.  Do all your elderly projects start

18   with Venue?

19        A.    No, we have some non-elderly seniors, others

20   that start with the word "venue."  I just kind of like

21   that.

22        Q.    Okay.  And that's what I was going to ask, is

23   there any particular reason why.

24        A.    No, no.  I got some venues that are

25   unrestricted, non-affordable.
```

Scott Culp Volume II
December 18, 2024

```
1         Q.    All right.  So I just want to quickly talk about
2    the financing for your other projects, and then I'm
3    giving you these documents to kind of --
4         A.    Okay.
5         Q.    -- refresh your recollection.
6         A.    I apologize.  I didn't realize I had moved to
7    another project, so...
8         Q.    Okay.  So The Venue at Viera Senior Living
9    appears to have gotten a bond from the Brevard Housing --
10   Brevard County Housing Finance Authority or got an
11   approved bond.  Do you agree with that?
12        A.    I believe bonds were issued by the Brevard
13   County Housing Finance Authority, yes.
14        Q.    If you look at the next document.  I don't have
15   any other questions about the application.
16        A.    The resolution approving the bonds.
17        Q.    And how much was the bond that was issued?
18        A.    This resolution indicates it was 16,755,000.
19        Q.    Then the next document indicates that there may
20   have been an additional request for financing; is that
21   correct?
22        A.    Yes, those were completion bonds.
23        Q.    And what are completion bonds?
24        A.    There's a 50 percent test and four percent tax
25   credits where you need to have issued bonds at least
```

Scott Culp Volume II
December 18, 2024

1   50 percent of your eligible basis.  And so sometimes if

2   your costs go up due to inflation, construction cost

3   increases, you may issue additional bonds for completion

4   so that you meet the 50 percent test.  And this would

5   have been a resolution to add additional bonds for

6   completion of -- I believe this was Venue at Viera.  I

7   didn't read this.  Yes, Venue at Viera.

8        Q.   As I said, these are really just to refresh your

9   recollection because I -- I assume that you --

10       A.   Understood, yep.

11       Q.   -- remember these numbers.

12            So for The Venue at Viera development, you got

13   the initial bond, and then there was an additional bond

14   issued in the amount of $1,990,000; is that correct?

15       A.   That's what this resolution was approving.

16   That's correct.

17       Q.   Well, what -- what did you receive, or did you

18   receive the credit or the bond or the -- the financing?

19       A.   I know we closed on bond finance and I don't

20   have anything in front of or recollection of the exact

21   dollar amounts.  I agree with the resolutions that you

22   provided.

23       Q.   Okay.  And it looks like that resolution was

24   approved and adopted June 22nd of 2022; is that correct?

25       A.   Yes.

Scott Culp Volume II
December 18, 2024

1      Q.   Just for completeness, the original bond date

2   would have been in April of 2020, agreed?

3      A.   I believe the resolution approving the bond

4   issue was in April of 2020.  I don't know the closing

5   date of those bonds or issuance date.

6      Q.   It looks like it was the commissioners approved

7   the resolution May 5th, 2020, per the -- the cover

8   letter.  And then so I'm assuming sometime in May or June

9   is when everything was finalized for the bond or not?

10      A.   You assume that.

11      Q.   Yeah.

12      A.   I wouldn't assume it.  It -- I would have to

13   look at the closing date or documents related to the

14   issuance.  I -- I would assume with you that somewhere in

15   that time period, they would have closed, yeah.

16      Q.   I'm only trying to get confirmation that you got

17   the bond.

18      A.   We closed on those bonds at some point and

19   developed Venue at Viera.  That's correct.

20      Q.   And I'm going to refer you to the next page.

21   Looks like a cover letter dated March 12th, 2020, from

22   Jay Brock.  And what is that document?

23      A.   It's a request to the Housing Finance Authority

24   to increase the taxes and bond request.

25      Q.   And what was the basis for the increased

Scott Culp Volume II
December 18, 2024

1  request?

2       A.   Increased construction cost.

3       Q.   Is that something you find often in your line of

4  work?

5       A.   Only in the last five years.

6       Q.   Is that COVID related?

7       A.   I would assume that the pandemic had something

8  to do with the construction increases in the last five

9  years, but I couldn't claim to be an expert on what

10 caused construction price increases to be significant

11 under the last five-year period.

12      Q.   Has that been an across-the-board increase?

13      A.   For construction pricing, yes.

14      Q.   The next document is an application for Hammock

15 Harbor.  Do you have any recollection of the bond process

16 or application for that specific property Hammock Harbor?

17      A.   I don't have specific recollections.  This was

18 a -- phase one and phase two, I believe you have both the

19 short form covers for the application on those within

20 this document.

21      Q.   Well, my question is -- and I'm going to purport

22 to you that it appears that the bond was applied for

23 but -- but potentially not approved and it was -- the

24 records are old enough that I don't have access to them

25 right now.  But do you have any explanation, memory or

Scott Culp Volume II
December 18, 2024

1   reason as to why that bond wasn't approved --

2          MS. RHODEN:  Object to form.

3          MS. GAINEY:  -- for Hammock Harbor?

4          THE WITNESS:  I don't recall the issuance of

5     bonds not being approved for Hammock Harbor.

6   BY MS. GAINEY:

7     Q.  Like I said, I don't have access to the records,

8   so I'm not purporting to you that they absolutely weren't

9   approved.  I'm just trying to figure out if you had any

10  information about that.

11    A.  I -- I may have information, but what you

12  presented in front of me today, I don't recall bonds not

13  being approved for Hammock Harbor.

14    Q.  All right.  The next document is Malabar Cove.

15    A.  I think the next one was Wickham, wasn't it?

16    Q.  Did I get them out of order?

17    A.  Unless I'm wrong.

18    Q.  It doesn't matter.

19    A.  Yeah, Wickham Club.

20    Q.  Okay.  Wickham Club.  Appears that there was an

21  approval of the bond in the amount of 7,600,000; is that

22  correct?

23    A.  It is an unsigned resolution you provided.

24    Q.  Again, that's all I had access to.  So looks

25  like that date was May 3rd, 2024.  Let me just ask you --

Scott Culp Volume II
December 18, 2024

1        A.    I think it was 2004.  You said 2024?

2        Q.    Excuse me.  2004.  Thank you for the correction.

3  Did you actually get the bond?

4             MS. RHODEN:  Object to form.

5             THE WITNESS:  I don't have memory.  I don't have

6        any reason to believe we did not receive an

7        allocation of bonds for that development.

8  BY MS. GAINEY:

9        Q.    All right.  And then the next one you have is --

10 what I have in front of me is the Malabar Cove; is that

11 what you have?

12       A.    No, I have another Wickham Cove.

13       Q.    These got out of order while they were being

14 copied, but...

15       A.    Oh, there I see Malabar now.

16       Q.    Well, let's stay on Wickham --

17       A.    Okay.

18       Q.    -- if that's what you have in front of you.

19       A.    They're both here.

20       Q.    Is that an additional bond for 20 million?

21       A.    Wickham Cove you have some unsigned resolutions

22 for seven million six and you have an unsigned resolution

23 also for seven million six which include the resolution

24 number.  The $20 million reference I think was for

25 Malabar Cove.

Scott Culp Volume II
December 18, 2024

1      Q.   All right.  You're right.  So --

2      A.   And that one is a signed resolution.

3      Q.   Let's -- just for purposes of the record and for

4  clarification, I think you said that as it relates to

5  Wickham Club that you have no reason to believe that the

6  bond for 7,600,000 wasn't approved?

7      A.   I do not recall, but I don't have any reason to

8  believe it was not.  I know the development was completed

9  and occupied.

10     Q.   Okay.  And then the last one is the Malabar

11 Cove, which may have been in phases because this

12 references phase one, and it's a $20 million bond,

13 correct?

14          MS. RHODEN:  Object to form.

15          MS. GAINEY:  I'm on resolution 0805.

16          MS. RHODEN:  Object to form still.

17          THE WITNESS:  Under resolution 0805, that was a

18      resolution in two series for phase one and phase

19      two.  It's stated in the title of the resolution

20      that $20 million was for both series.

21 BY MS. GAINEY:

22     Q.   And then it appears to be a different

23 resolution, a resolution number 08-035 for $20 million,

24 correct?

25          MS. RHODEN:  Object to form.

Scott Culp Volume II
December 18, 2024

 1        THE WITNESS:  Yes.

 2   BY MS. GAINEY:

 3        Q.   So how -- how much did Malabar Cove receive

 4   whether that be for phase one or phase two?

 5        A.   I don't know the exact number of the bond

 6   allocation.  And if you're asking about how much they

 7   received, you're talking about in bond allocation?

 8        Q.   Yes.  Yes, I am.

 9        A.   The bond allocation, without looking at the

10   closing documents, I don't know the amount of bond

11   allocation.  These resolutions are authorizing the

12   issuance of a certain amount of bonds.  It doesn't

13   necessarily mean that that is what the bond was closed

14   upon.

15        Q.   Understood.  But do we agree that the Brevard

16   County approved res -- a resolution authorizing up to

17   $20 million to Malabar Cove?

18        A.   In resolution 0805, yes.  And then also in

19   resolution 08-035, 20 million as well.  I'm not sure

20   which of those relates to the amount of bonds it was

21   actually closed upon.

22        Q.   What documents would I look at in order to

23   determine how much of each of these properties had

24   allocated for affordable housing?

25        MS. RHODEN:  Object to form.

```
 1              THE WITNESS:  How to answer that.  Are you
 2        talking about the bond allocation?
 3   BY MS. GAINEY:
 4        Q.   No, I'm actually switching back to some of these
 5   properties had restricted and unrestricted units,
 6   correct?
 7        A.   Yes.
 8        Q.   All right.  So if it's an unrestricted unit,
 9   would it be affordable housing?
10        A.   Yes.
11        Q.   And so what's the distinction there; is it just
12   the -- the income?
13        A.   Well, affordable housing under the statutory
14   definition goes all the way up to income and rents
15   restricted at or below 120 percent of the area median
16   income as adjusted for family size.
17        Q.   All right.  So then are all four of the other
18   units that we just discussed, are they all considered
19   affordable housing?
20        A.   Yes.
21        Q.   So my question is, where do I find the
22   allocation as far as the AMI limitation?
23        A.   In the recorded public records, every one of the
24   communities has an extended use agreement --
25        Q.   Uh-huh.
```

Scott Culp Volume II
December 18, 2024

1      A.    -- and a land use agreement.  The land use

2    agreement relates to the restrictions underneath the bond

3    allocation.  The extended use agreement has the

4    restrictions underneath the four percent low-income

5    housing tax credits.  Those are recorded documents in the

6    public records.

7      Q.    And I'm going to assume that given the number of

8    properties you worked on, you don't have any specific

9    memory as far as what the AMI restrictions are for these

10   properties?

11     A.    I do not.

12     Q.    I think we've established that Hammock Harbor

13   was not a senior restricted community; do you agree with

14   that?

15          MS. RHODEN:  Object to form.

16          THE WITNESS:  To the best of my recollection, it

17       was not.

18   BY MS. GAINEY:

19     Q.    Would it be on the website if it had been a

20   senior restricted community?

21     A.    It may be.  It's not required to be, but it may

22   be.

23     Q.    And where would I get confirmation one way or

24   the other as to if Hammock Harbor was a senior restricted

25   community?

Scott Culp Volume II
December 18, 2024

```
1        A.   Again, in the public records.  If it's

2   restricted as senior, there will be a restrictive

3   covenant in title recorded in the public records.

4        Q.   It doesn't seem plausible, however, that they

5   would be a senior restricted community and that not be

6   posted on your -- on Hammock Harbor's website; do you

7   agree or not?

8             MS. RHODEN:  Object to form.

9             THE WITNESS:  I question the word "plausible."

10       Websites --

11            MS. GAINEY:  Practical.

12            THE WITNESS:  -- show lots of things.

13            MS. GAINEY:  Practical?

14            THE WITNESS:  I wouldn't consider it practical

15       for it not to be posted that way.  You asked if I

16       knew that it was or if it actually was, I don't

17       really know.

18  BY MS. GAINEY:

19       Q.   What about Malabar Cove, is that a senior

20  restricted community?

21       A.   Not to the best of my recollection.

22       Q.   Is Wickham Club a senior restricted community?

23       A.   Wickham, no.

24       Q.   So would you agree that as far as comparing the

25  race compensation of renters for Hammock Harbor that it's
```

Scott Culp Volume II
December 18, 2024

```
 1  not comparable to compare it to Venue at Heritage Oaks?

 2          MS. RHODEN:  Object to form.

 3          THE WITNESS:  No.

 4  BY MS. GAINEY:

 5      Q.   You don't agree?

 6      A.   No, I do not.

 7      Q.   Okay.  Tell me why.

 8      A.   Venue at Heritage Oaks was proposed to be

 9  seniors with one person in the household 55 years or

10  older.  Other members of the household can be younger or

11  older and be unrestricted, and 20 percent of the units

12  would have -- be totally unrestricted.  So the comparison

13  would be very similar.  The household differentiation

14  between unrestricted community with regard to age and a

15  seniors restricted community in accordance with the

16  Housing for Older Persons Act would be negligible other

17  than you'll have one person in 80 percent of the units

18  that is over the age of 55.

19      Q.   All right.  So are you saying that if I look at

20  the race composition of renters at Hammock Harbor, it

21  should be fairly comparable to the race composition of

22  residents of Venue at Viera?

23      A.   Venue at Viera is --

24          MS. RHODEN:  Objection.

25          THE WITNESS:  -- and elderly restricted
```

Scott Culp Volume II
December 18, 2024

```
1          community at 62 or older.  That could be different
2          than the race compsen -- not compensation --
3          composition at one of the other communities because
4          there is no residents under the age of 62.  So I
5          think in my perception, that might have a -- a
6          bearing on the racial make-up of the household.
7     BY MS. GAINEY:
8          Q.   Well, Venue at Viera could have residents under
9     the age of 62.  They could have residents at 55 and one
10    person in the household with a disability per their
11    website, correct?
12              MS. RHODEN:  Object to form.
13              THE WITNESS:  I saw that's what it says on the
14         website.  I'm not sure that that's accurate.
15    BY MS. GAINEY:
16         Q.   So you're testifying that the website is
17    inaccurate?
18              MS. RHODEN:  Object to form.
19              THE WITNESS:  I did not testify the website's
20         inaccurate.  I told you that I'm not sure it is
21         accurate.
22    BY MS. GAINEY:
23         Q.   How would one verify that?
24         A.   I would check the public records with regard to
25    restrictive covenants.  I would check with our own
```

Scott Culp Volume II
December 18, 2024

1    property management company to see what the restrictive

2    covenants were.

3        Q.   So, again, would that be practical to have

4    something posted on the website that's not accurate?

5        A.   Wouldn't be practical, no.

6        Q.   And so am I understanding you to say that even

7    though the proposed complex Venue at Heritage Oaks was

8    limited by age, a/k/a senior facility, that you believe

9    it would have had the same racial composition as your

10   other developments that were not limited by age?

11           MS. RHODEN:   Object to form.

12           THE WITNESS:   Substantially similar, because the

13       age limitation is with regard to one member of the

14       household at age 55 or older.

15   BY MS. GAINEY:

16       Q.   So in -- as we sit here today, do you have any

17   information as to how many racial minorities live at

18   Venue at Viera?

19       A.   I don't know.

20       Q.   And that goes back to what we were talking about

21   earlier that they could put their race on the application

22   and then -- then Concord gathers that information,

23   correct?

24       A.   Correct.

25       Q.   And outside of that, you have no way or the

1  plaintiffs or anyone associated with you have any way to

2  know what the racial composition of Venue at Viera is?

3          MS. RHODEN:  Object to form.

4          THE WITNESS:  I wouldn't say we don't have any

5      way.  I would say that the information that's

6      provided in the applications is inputted into the

7      database.  Whether there is a way to

8      determination -- to make a determination on the

9      racial make-up, I wouldn't say there is not any way.

10 BY MS. GAINEY:

11     Q.   All right.  Would you say that you currently do

12 not have any database that has that information?

13     A.   I don't know.

14     Q.   As it relates to Hammock Harbor, other than what

15 you've already talked about with people self-reporting

16 potentially their racial comp -- make-up or composition,

17 do you have any data available to you as to the racial

18 composition of the residents at Hammock Harbor?

19     A.   I don't know.

20     Q.   Other than what we've talked about, do you have

21 any data available to you as to the racial composition of

22 the tenants at Malabar Cove?

23     A.   I don't know.

24     Q.   Other than what we talked about, do you have any

25 data available to you as to the race -- racial

Scott Culp Volume II
December 18, 2024

1    composition of the ten -- the tenants at Wickman Club

2    [sic]?

3         A.    Wickham Club.  I don't know.

4         Q.    It's not Wickman?

5         A.    No.

6         Q.    How is it spelled?

7         A.    W-I-C-K-H-A-M.

8         Q.    All right.  I have a typo.  I'll put a

9    correction.

10            Do you have a number as far as how many times

11   Atlantic Housing or any company associated with Atlantic

12   Housing was approved for tax credit or bond financing in

13   Brevard County?

14            MS. RHODEN:  Object to form.

15            THE WITNESS:  No.

16   BY MS. GAINEY:

17        Q.    Do you agree that based on these records that

18   Atlantic Housing or its partners have been approved for

19   bond financing in Brevard County at least four times?

20        A.    Yes.

21        Q.    We mentioned Christy Fischer a little bit

22   earlier, she is with the City of -- of Melbourne.  Do you

23   have any other recollection of any conversations you may

24   have had with her?

25        A.    No.

Scott Culp Volume II
December 18, 2024

1      Q.    At any point while you were considering this

2   project, did you review the City of West Melbourne's

3   Minton Road corridor study that's posted on their

4   website?

5      A.    Yes.

6      Q.    And, again, I appreciate that we brought it up a

7   little bit earlier, but what is your impressions or

8   recollection of that study?

9      A.    I don't recall.

10     Q.    Do you know if anyone else that worked with you

11   or is associated with the plaintiffs -- the plaintiffs

12   reviewed that study?

13     A.    I don't know.

14     Q.    My understanding is that there's two different

15   Minton Road corridor studies, one dated April 19, 2016,

16   and one dated March 2021.  Did you review both of them?

17     A.    I don't know.

18     Q.    Have you reviewed any other comprehensive plans

19   by the City of West Melbourne -- Melbourne for the area

20   that you proposed to develop?

21     A.    I only reviewed what was available on their

22   website.

23     Q.    You mentioned earlier Councilman Ditmore, what

24   conversations did you have with him regarding this

25   development?

Scott Culp Volume II
December 18, 2024

1        A.    I mentioned him only because you handed me an

2    e-mail with his name on it.  I don't recall conversations

3    we had.  I don't recall.

4              MS. GAINEY:  We're on K.

5      (Defendant's Exhibit K was marked for identification.)

6    BY MS. GAINEY:

7        Q.    I'm going to show you what we'll mark as

8    Deposition Exhibit K.  And I'm going to purport to you

9    that these are some e-mail correspondence that I received

10   from the City of West Melbourne.  Once we get at this

11   point in the deposition, a lot of times, we have already

12   covered some of the things.  So I'm going to try to

13   streamline this a bit.

14             These e-mails reference City Manager Tim Rhode

15   or Rhode, however it is pronounced.  Did you have any

16   conversations with the city manager -- manager from the

17   City of West Melbourne?

18       A.    I don't recall.

19       Q.    Is that something that your engineers typically

20   would do as it relates to your developments?  The reason

21   why I ask is I see Jake Wise is referenced in here.  Is

22   that his department for corresponding with the City

23   regarding requirements from the City of West Melbourne?

24       A.    No.  The engineer would typically talk to the

25   staff.  The City manager typically would not be involved.

1   If I remember correctly, Christy Fischer was contacting

2   me on behalf of the City manager to get some questions

3   and clarifications.  And I believe that's what this

4   e-mail correspondence is responsive to.

5       Q.   The second document is an e-mail from you.  And

6   I think this corresp -- this e-mail trail has to do with

7   the community member that we've talked about -- or

8   community meeting, excuse me, that we talked about.  And

9   it appears that community meeting was scheduled for

10  November 30th at 6:00 p.m.; is that correct?

11      A.   I'm looking at an e-mail from Christy Fischer to

12  Cyntia Snay and Denise Curry.

13      Q.   It says --

14      A.   And it was --

15          MS. RHODEN:  That's what mine is, too.

16          THE WITNESS:  Is that the one you're referring

17      to?  I'm not sure which e-mail you're referring to

18      at this point.  If you could give me a little more

19      information, because you've got five e-mails here.

20          MS. GAINEY:  On the next document, at the top,

21      it says from Scott Culp.

22          MS. RHODEN:  I think it is the third document.

23          MS. GAINEY:  I'm done with the first two

24      documents.  Sorry.

25          THE WITNESS:  The next document is from Scott

Scott Culp Volume II
December 18, 2024

1          Culp to Christy Fischer.  And we were confirming the

2          availability of the conference room for a community

3          meeting.

4    BY MS. GAINEY:

5          Q.   And that appears to be November 30th at

6    6:00 p.m., correct?

7          A.   Yes.

8          Q.   And I believe we've already talked about the

9    contents of this e-mail.  So I have no more questions

10   about that e-mail chain.

11          The next document appears to be a document from

12   Christy Fischer dated December 1st, 2023, to John Cary.

13   And she's saying, quote:  Some of the neighbors stated

14   that the stabilized path that currently leads from the

15   memory care facility to Heritage Oaks is only supposed to

16   be emergency access.

17          Is that a cor -- a correct statement, or is that

18   not a correct statement, to your knowledge?

19         A.   I do not believe it is a correct statement.

20         Q.   And why -- what's the basis for that belief?

21         A.   I have a recollection of us doing a title search

22   and to be sure that we had appropriate access as we

23   developed our site plan.  And we saw no restriction to

24   emergency access on that roadway.

25         Q.   And on the third page of that same document,

Scott Culp Volume II
December 18, 2024

1   there's some e-mails going back and forth, and it looks

2   like Denise says -- I'm about halfway down -- quote:

3   Apartments are not a perm -- are not a permitted in the

4   C-4 [sic] zoning district.

5        A.    C-P?

6        Q.    C-P4 -- excuse me.  Let me start over.

7              Quote:  Apartments are not a permitted in the C,

8   dash, P zoning district.

9              Is that a correct statement?

10             MS. RHODEN:  Object to form.

11             THE WITNESS:  Not totally correct.  The issue

12         is, she hasn't incorporated the Live Local Act

13         legislation that allows affordable rental

14         developments on property that is zoned commercial

15         and industrial with allowable commercial and

16         industrial uses.

17   BY MS. GAINEY:

18        Q.    So am I understanding you correctly that that --

19   while that may be true that apartments are not a

20   permitted development in a C, dash, P zoning district

21   that lists local legislation provided for apartments to

22   be developed in that zoning district?

23        A.    Affordable apartments, yes.

24        Q.    And the last page, it looks like it's just notes

25   from that community meeting.

Scott Culp Volume II
December 18, 2024

1      A.   I see that.

2      Q.   And, again, this is from the City of West --

3    West Melbourne.  I'll be honest with you, I don't know

4    who took these notes.  I just want to see if --

5      A.   Oh, that.  I was on the last page of the other

6    one.  Another exhibit, sorry.  Okay.

7      Q.   And this is someone's notes from the community

8    meeting, so I just want to verify accuracy.  So it says

9    that it is 105 senior apartments, four story, M, dash, F.

10   I assume that means multi-family?

11           MS. RHODEN:  Object to form.

12           THE WITNESS:  I didn't write this, but I would

13       believe that --

14           MS. GAINEY:  Commonly --

15           THE WITNESS:  -- to be true.

16           MS. GAINEY:  Commonly known as -- MF is

17       multi-family, correct?

18           THE WITNESS:  Whoever wrote this, that probably

19       was their intent by writing MF.  But I don't know

20       that because I didn't write it.

21   BY MS. GAINEY:

22      Q.   All right.  Let me just ask it differently.  The

23   development as I believe we've established was 105-unit

24   senior apartment four-story multi-family development,

25   correct?

Scott Culp Volume II
December 18, 2024

1    A.    I believe it was 105.  We had a number of

2    different stages and development process from 101 up to

3    108.  But I think it ended at 105.

4    Q.    And was it proposed to be L-shaped?

5    A.    Yes.

6    Q.    It says 15,000 units on here.

7    A.    This looks like somebody has taken some notes on

8    my presentation.  Because I might have mentioned Atlantic

9    Housing located in Florida, develops multi-family

10   rentals, still owns and operates approximately 15,000

11   units, referencing the town Weston, Port Orange, as a

12   similar community.  Probably on the screen a

13   representative image of that.  And then going to the site

14   plan for Venue at Heritage and talking about the 105

15   seniors in a four-story building, L-shaped building.

16   Q.    And I understood you earlier to say that this

17   meeting was not recorded, correct?

18   A.    That's my understanding.

19   Q.    And are you aware of any minutes or anything

20   along those lines that were --

21   A.    No.

22   Q.    -- taken at this community meet -- meeting?

23   A.    I'm not aware of any, no.

24   Q.    The 20, dash, 50 percent bracket, do you know

25   what that is referring to?

1          MS. RHODEN:  Object to form.

2          THE WITNESS:  I don't know because somebody else

3      wrote this.  I assume that it was based on my rep --

4      my presentation which you have a copy of that

5      referenced the 20 percent and 50 percent and the

6      balance at 120.

7  BY MS. GAINEY:

8      Q.   And -- and just for clarification, I understand

9  you didn't write this, but it is the closest thing I have

10  for -- from a written summary of what you may or may have

11  said at that meeting.  So that is why I'm getting you to

12  verify if you have any knowledge as to -- you know, or

13  memory as to what you actually said.

14      A.   And I'll answer that question.

15      Q.   Do you have any knowledge or memory as to what

16  you said at the community meeting on November 30th, 2023?

17      A.   I have knowledge as to what I said, and I think

18  you and I have gone over the presentation and reviewed it

19  at length.  These are notes from somebody else, and

20  you're asking me, you know, what they meant.  I don't

21  know what they meant.  I know what I presented.

22      Q.   Did you present that 80 percent of the units

23  would be at 120 percent of AMI?

24      A.   I presented that that is what the private

25  activity bond allocation would be restricted to.

Scott Culp Volume II
December 18, 2024

1      Q.   Did you tell the community members that?

2      A.   Yes.

3      Q.   Did you --

4      A.   And it is noted above in their handwriting

5  there.

6      Q.   Did you present that 20 percent of the units

7  will be at 50 percent AMI?

8      A.   Yes.

9      Q.   And did you tell the community that you had done

10  a study?

11          MS. RHODEN:  Object to form.

12          MS. GAINEY:  And I'm assuming they are referring

13      to the traffic study.

14          THE WITNESS:  (No response.)

15  BY MS. GAINEY:

16      Q.   Did you tell them -- do you want me to phrase it

17  differently?

18      A.   I'm thinking.

19      Q.   Oh, you're thinking?  Okay.

20      A.   No, I'm thinking.  I seem to recall

21  discussion -- and I have to go back.  I think you and I

22  went through that presentation document before, and I

23  believe we presented some summaries of that traffic study

24  in the presentation.  And I seem to recall discussing

25  that traffic study summary in the presentation.

Scott Culp Volume II
December 18, 2024

```
 1        Q.   Did you tell the -- at that community
 2   presentation that the four story would be closer to the
 3   retention pond or parking?
 4        A.   I don't recall anything about -- I don't
 5   understand that written comment on a four story closer to
 6   retention or parking.  Yes, it is closer to one or the
 7   other.  That doesn't make sense.
 8        Q.   Well, was there any discussion about parking at
 9   the community min -- meeting?
10        A.   We had a site plan that was shown that you and I
11   reviewed in deposition that showed parking area and the
12   area of the retention and the location of the building.
13        Q.   And I think if you look at the next page,
14   there's some notes in that regard.  How many elevators
15   would have been available to the residents at Venue at
16   Heritage Oaks?
17        A.   Two.
18        Q.   Was there discussion at the community meeting
19   regarding asphalt?
20        A.   Not that I recall.
21        Q.   Did you tell the community members that the
22   entire building was for seniors?
23             MS. RHODEN:  Object to form.
24             THE WITNESS:  I'm sure I included information
25        that we were intending to restrict the occupancy for
```

Scott Culp Volume II
December 18, 2024

```
 1        seniors in accordance with the Housing for Older
 2        Persons Act.
 3   BY MS. GAINEY:
 4        Q.   So are you saying that you did not say that the
 5   entire building was for seniors?
 6        A.   I don't know that I used the exact words the
 7   entire building was for seniors.  I know that I would
 8   have represented that the community was being developed
 9   for occupancy by seniors in accordance with the Housing
10   for Older Persons Act.
11        Q.   Was there discussion at the community meeting
12   regarding school zones and students walking to school?
13        A.   Not that I recall.
14        Q.   Was there discussion at the community meeting
15   regarding landscaping?
16        A.   Not that I recall.
17        Q.   How many entrances would have been available to
18   Venue at Heritage Oaks?
19        A.   Two public right-of-way, two.
20        Q.   Was there discussion at the community meeting
21   regarding density issues?
22        A.   I don't recall.
23        Q.   Was there discussion at the November 30th
24   community meeting regarding utility systems and capacity?
25        A.   Could you repeat that?  I couldn't hear you.
```

Scott Culp Volume II
December 18, 2024

1    Q.   Yeah.  Was there a discussion at the community

2  min -- meeting on November 30th as to the utility system

3  capacity?

4    A.   Not that I recall.

5    Q.   Did you say at the community meeting that the

6  construction period was 12 to 18 months?

7    A.   I don't remember that, but it would be an

8  accurate statement if I said it.

9    Q.   An accurate or inaccurate?

10    A.   Accurate.  Are we done with these?

11    Q.   Yes, we are.  Thank you.

12    (Defendant's Exhibit L was marked for identification.)

13  BY MS. GAINEY:

14    Q.   All right.  I will show you what we're marking

15  as Culp Deposition Exhibit L.  Thank you.

16        MS. RHODEN:  Are you going to be done by 12:30?

17        MS. GAINEY:  What time is it?

18        MS. RHODEN:  11:58.

19        MS. GAINEY:  Do you want me to switch out?  I

20     can't guarantee that I'm going to be done by 12:30.

21     Do you want to take a break and switch?

22        MS. RHODEN:  No.  I'll have him -- I'll e-mail

23     him.

24        MS. GAINEY:  Okay.  Do you want me to take a

25     break at 12:25?

Scott Culp Volume II
December 18, 2024

1           MS. RHODEN:  Yeah.

2    BY MS. GAINEY:

3        Q.    All right.  I'm going to purport to you these

4    are documents received from the -- excuse me, from the

5    Housing Finance Authority.  And the first document is an

6    e-mail from you to Angela Abbott dated August 16, 2023;

7    is that correct?

8        A.    Yes.

9        Q.    Do you remember sending this e-mail?

10       A.    Yes.

11       Q.    And tell me what you remember about the e-mail.

12       A.    Just the discussion about the affordability

13   period and the set-asides we would be committing to for

14   the bond allocation.

15       Q.    What was the discussion about the length of the

16   bond?

17       A.    The term of the bonds is 30 years, and there's a

18   qualified project period that's 15 years under the

19   federal guidelines.  There's been some discussion about

20   the desire to have an extended qualified project period,

21   and we were not willing to have that as part of the bond

22   restrictions.

23       Q.    And why not?

24       A.    We don't consider the bonds to provide enough of

25   a resource to place that great a restriction.  The bonds

Scott Culp Volume II
December 18, 2024

1    are just low interest debt.  The "as of right" four

2    percent credits provide tax equity.  Those provide the

3    ability for us to provide those additional restrictions.

4    So we don't like to have the restrictions that are not

5    provided by the tax and bond allocation included in the

6    bond documents.  The -- the resources that provide the

7    ability for a financially feasible community will put

8    into those documents which would be the four percent tax

9    credits.

10        Q.   So what makes a -- a development profitable to

11   you would be both, both the bond and the tax credits; is

12   that a fair statement?

13        A.   The bonds don't make it profitable at all.  The

14   bonds are sized as we discussed in my deposition earlier

15   to be supported by the restricted rents.  So they're just

16   debt just like anybody's mortgage.

17        Q.   Uh-huh.

18        A.   That makes nothing profitable.  The only thing

19   that makes it economically feasible -- that is different

20   than profitable, but economically feasible would then be

21   tax credit equity which is why the low-income housing tax

22   credit program was developed in 1985.

23        Q.   Can you get the tax credit without getting the

24   bonds?

25        A.   You can't get four percent low-income housing

Scott Culp Volume II
December 18, 2024

1    tax credits without tax-exempt bonds.

2        Q.   Was everything that you said in this e-mail to

3    Ms. Abbott accurate?

4        A.   At the time I wrote it, yes.

5        Q.   Has -- has it changed where it is no longer

6    accurate?

7        A.   Let me see.  I have to read it.

8             It's accurate.

9        Q.   The last paragraph on this -- this particular

10   e-mail on the second page, I think you bring in David

11   Leon and Robert Bowser.  You've already told me about

12   Mr. Bowser.  Who is David Leon?

13       A.   David Leon is an attorney with Nelson Mullins.

14   They're our counsel with regard to taxes and bond

15   financing and low-income housing tax credits.

16       Q.   The paragraph where you refer that -- refer to

17   Florida Statute 420, dash, 0004, parentheses, 12,

18   that's -- what is that?

19       A.   That's the chapter in the Florida Statute that

20   defines affordable housing.  And sub 12 is the definition

21   for moderate-income persons as referenced in that

22   sentence.

23       Q.   And the next page, I just printed out a copy of

24   the statute in case it came up.  Moderate-income persons

25   means one or more natural persons or family the total

Scott Culp Volume II
December 18, 2024

1  annual adjusted gross income of which is less than 120

2  percent of the median annual adjusted gross income for

3  households within the state.  And it continues.

4          Is that your understanding of moderate-income

5  persons?

6      A.   Yes.

7      Q.   And then you reference the affordable,

8  specifically you refer to subsection three.  Again,

9  affordable -- pursuant to the statute, affordable means

10  the monthly rents are -- monthly mortgage payments

11  including taxes, insurance and utilities do not exceed 30

12  percent of the amount which represents the percentage of

13  the median adjusted gross annual income for households as

14  indicated in section 9, 11, 12 and 17.  Sorry I was

15  reading that so fast.

16          Is that your understanding of how the statute

17  defines affordable?

18      A.   Yes.

19      Q.   I'm done with that document.  On the next

20  document is the minutes from the August 23rd, 2023,

21  Brevard County Housing Finance Authority meeting.  It

22  does appear that Mr. Leon and Mr. Bowser attended on your

23  behalf; is that correct?

24      A.   Yes.

25      Q.   And on Page 3, that's wherein the discussion was

Scott Culp Volume II
December 18, 2024

1   regarding the 30-year -- or let me just say The Venue at

2   Heritage Oaks con -- development.  And just for

3   confirmation, you did not attend this particular meeting;

4   is that correct?

5       A.   Not in person, no.

6       Q.   That's all the questions I have on that

7   document.

8            The next one is dated October 4th, 2023.  It's

9   an e-mail from Jay Brock.  And what is this document?

10  Not the e-mail, it's a letter from Jay Brock.

11      A.   It is a request for an increase in the allocated

12  bond amount.

13      Q.   And what were the reasons for the increase?

14      A.   Generally inflated construction costs.

15      Q.   And was the increased amount approved?

16      A.   To the best of my recollection, yes.

17      Q.   Okay.  The next document is the minutes from the

18  October 25th, 2023, Housing Finance -- Housing -- excuse

19  me, Housing Finance Authority meeting.  Looks like

20  Mr. Bowser attended that on behalf of Atlantic Housing;

21  is that correct?

22      A.   Yes.

23      Q.   The next document is the minutes from

24  December 6th, 2023, from Brevard County Housing Finance

25  Authority.  You were present by phone; is that correct?

Scott Culp Volume II
December 18, 2024

1      A.    Yes.

2      Q.    And why did you attend that meeting?

3      A.    We had an item on the agenda.

4      Q.    What was the item?

5      A.    Discussion regarding application of Venue at

6   Heritage Oaks Partners Limited.

7      Q.    It looks like on the second page of the minutes,

8   it says that residents had been contacted in the

9   commissioners' office -- offices.  Is that a -- do you

10  have any information as to if that is a true statement?

11     A.    I believe that to be accurate.

12     Q.    It says, quote:  The residents expressed

13  objections to the location of the project which is the

14  corner of Minton and Heritage Oaks Boulevard.  Heritage

15  Oaks Boulevard is the only access road to single -- to

16  several single-family subdivisions containing hundreds of

17  homes.  The residents primarily expressed concerns about

18  height, density and mostly traffic.

19           Is that a true statement?

20     A.    I believe it's --

21           MS. RHODEN:  Object to form.

22           THE WITNESS:  -- true that the residents

23     expressed those concerns, yes.

24  BY MS. GAINEY:

25     Q.    It says, quote:  The applicant held the

Scott Culp Volume II
December 18, 2024

1   community meeting last week, but the residents remained

2   opposed to the project, close quote.

3           Is that a true statement?

4       A.   That is my understanding.

5       Q.   Three of the county commissioners voted in

6   opposition.  There was discussion about how the Live

7   Local Act takes decision-making away from local

8   government in regards to zoning and land use.  Is that a

9   true statement?

10      A.   I believe it is.

11           MS. RHODEN:  Object to form.

12  BY MS. GAINEY:

13      Q.   Scott Culp stated that he thinks the decision

14  and the basis for it were incorrect.  He is not sure at

15  this time how or whether the project will move forward.

16  He believes the Live Local Act was acting as it was

17  intended, but the commissioners chose to listen to the

18  vocal minority which was the residents closest to the

19  proposed project.  It is possible that they may apply to

20  FHFC for a SAIL loan for a family project or develop the

21  project as a market rate project without bonds.

22           Is that a true -- are those true statements?

23           MS. RHODEN:  Object to form.

24           THE WITNESS:  Yes.

25  BY MS. GAINEY:

Scott Culp Volume II
December 18, 2024

1    Q.   And it goes on to talk about the -- Ms. Abbott

2    stated the Authority is holding 167,500 developer deposit

3    for the application which needs to be applied to

4    professional fees and the balance refunded to the

5    applicant.

6         Did you, in fact -- or you or Atlantic Housing

7    receive the balance refund?

8    A.   Yes.

9    Q.   Do you know that amount?

10   A.   No.

11   Q.   How -- how would one discover that amount?

12   A.   We probably produced that in our damages.  I

13   don't know that we have that, but we have the

14   documentation.

15   Q.   The next paragraph about midway through, it

16   says:  Ms. Abbott stated that height, traffic and lack of

17   control by the City of West Melbourne were the primary

18   concerns expressed.

19        Do you agree with Ms. Abbott's statement?

20   A.   That those were the primary concerns expressed,

21   yes.

22   Q.   Were there any other buildings within the

23   immediate area of the proposed project that were three or

24   four stories high?

25   A.   How do you define the immediate area?

Scott Culp Volume II
December 18, 2024

1      Q.    Within a half mile.

2      A.    Not that I recall.

3      Q.    Little bit further down it says, quote:  Under

4    the Live Local Act, multi-family affordable developments

5    may occur in commercial and industrial zoning without any

6    zoning or land use change.  There are also increased

7    height and density limits.

8           Is that true?

9      A.    Yes.

10     Q.    Little bit further down it says, quote:  The

11   elected official approval of zoning height and density is

12   replaced by the regulatory provision of Live Local.

13          Is that true?

14     A.    Yes

15     Q.    Last paragraph, Ms. Abbott stated that the Board

16   of County Commissioners is -- is considering amending the

17   Authority's ordinance in regard to future TEFRA hearing.

18   If the proposed project is new construction in an area

19   that is not zoned for multi-family, then the public

20   hearing must be held within the municipality or ZIP code

21   of the project.  A written notice must be mailed to all

22   residents within 500 feet and a notice must be sent to

23   the municipality with a solicitation for comment.

24          Do you remember Ms. Abbott saying that at the

25   meeting?

Scott Culp Volume II
December 18, 2024

```
 1         A.   I don't remember.

 2         Q.   Do you have any information as to the proposed

 3    ordinance as Ms. Abbott relates to there?

 4              MS. RHODEN:  Object to form.

 5              THE WITNESS:  I think you showed me some minutes

 6         of a --

 7              MS. GAINEY:  Other than what we already

 8         discussed, I'm sorry.

 9              THE WITNESS:  No.

10    BY MS. GAINEY:

11         Q.   The next paragraph -- and I'm on Page 3.  I

12    think it's memorializing something you potentially said.

13    It says:  Mr. Culp suggested that the commissioners

14    should be cautioned that if it becomes too difficult to

15    issue bonds through the HFA, affording -- affordable

16    housing developers may go to the FHFC for bonds which

17    will eliminate local input.

18              What did you mean -- first of all, did you say

19    that?

20         A.   Yes.

21         Q.   What did you mean when you said that?

22         A.   Florida Housing Finance Corporation can issue

23    bonds without a local TEFRA hearing or local input.

24         Q.   And you are suggesting that developers may go

25    through FHFC?
```

Scott Culp Volume II
December 18, 2024

 1        A.    Yes.

 2        Q.    Essentially do you mean bypass local

 3   commissioners?

 4        A.    With regard to the taxes and bond allocation,

 5   yes.

 6        Q.    Toward the end of that paragraph, quote:  She

 7   encouraged Atlantic Housing to con -- continue to try to

 8   develop in Brevard County, and she will contact the

 9   commissioners to let them know how important the work of

10   the HFA is.

11             What was your response to that encouragement?

12        A.    I don't recall.

13        Q.    The meet -- minutes go on to talk about other

14   developments including Emerald Place and Oak Meadows.  Do

15   you have any knowledge as to other bonds that were

16   approved at the December 5th commission meeting?

17             MS. RHODEN:  Object to form.

18             THE WITNESS:  I don't have any information on

19        those.

20   BY MS. GAINEY:

21        Q.    That's all the questions I have about that.

22             The next e-mail has to do with a placement

23   agenda.  What is this e-mail?

24        A.    It's with regard to placement agent, not

25   placement agenda.

Scott Culp Volume II
December 18, 2024

```
 1        Q.    Thank you.   What's placement agent?

 2        A.    Oftentimes the Housing Finance Authority

 3   utilizes the services of something called a placement

 4   agent to place the bonds.   That is typically in a public

 5   offering.   This is a private placement with us purchasing

 6   the bonds, so the role of the placement agent was in

 7   question as to why we would need to have a placement

 8   agent or pay the fees for a placement agent.

 9        Q.    The next document is an e-mail dated July 17th,

10   2023.   And I think it is you -- it is an e-mail chain

11   with various dates where you're inquiring about a carry

12   forward that's available; what is that?

13        A.    Housing Finance Authority can carry forward bond

14   allocation for a subsequent number of years.   And at some

15   point, that carry forward expires and they lose that

16   allocation.   I was getting verification they still had

17   carry forward available that would need to close prior to

18   July 31st, 2023, or the allocation would be lost.

19        Q.    How did you know the amount of 43 million?

20        A.    I don't recall.

21        Q.    Is that publicly available information?

22        A.    There is a state division of bond finance that

23   typically tracks the carry-forward allocations for

24   Housing Finance Authorities.   And there are other

25   professionals in the field, and I think you have an
```

Scott Culp Volume II
December 18, 2024

1   e-mail further below where I got information from Suzanne

2   Hurst who is a representative of the Coalition of

3   Obtainable Housing Providers, and an e-mail from Helen

4   Feinberg who's managing director of RBC Capital Markets

5   who keeps track of all the regional bond allocations and

6   the amounts that have been issued in the carry-forward

7   amounts, and there's mention of 43 million carry forward

8   in that e-mail.

9        Q.   The next document is an e-mail chain between you

10  and Angela and some others.  And I don't have any

11  specific questions other than to ask you to verify if

12  that is, in fact, an e-mail chain sent by you.

13       A.   Yes.

14       Q.   The next document I believe we've already

15  verified, but since it's here, we'll go ahead and ask you

16  to -- this appears to be the presentation that you sent

17  to Angela Abbott requesting it be forwarded to the

18  commissioners; is that correct?

19       A.   Yes.

20       Q.   And does it include the -- the presentation that

21  you actually submitted to the Brevard County

22  Commissioners in preparation for the December 5th, 2023,

23  meeting?

24       A.   No, not the document you handed me.  It just was

25  the cover.

Scott Culp Volume II
December 18, 2024

 1        Q.   Oh, excuse me.  I will attach it.  You can just
 2   add it to that.

 3             THE WITNESS:  You okay with that?

 4             MS. GAINEY:  I get to decide that.

 5             THE WITNESS:  Okay.  I wasn't sure if she had to

 6        mark something since she already marked it.

 7   BY MS. GAINEY:

 8        Q.   All right.  It's the -- your e-mail and the

 9   presentation as submitted to the Brevard County

10   Commissioners for the December 5th, 2023, meeting,

11   correct?

12             MS. RHODEN:  One second.  Is that the

13        presentation that was previously marked as a

14        different exhibit?  Because I don't have a copy.

15        You just handed it to him.

16             THE WITNESS:  Yeah, this might be slightly

17        different because the presentation to the County

18        Commission may not have been an exact duplicate of

19        the community meeting.  So if we were referring to

20        the community meeting exhibit before, this one could

21        be slightly different.  Because I don't remember

22        where you were in your exhibits.

23             MS. GAINEY:  Okay.

24             THE WITNESS:  This does look -- appear to be an

25        accurate presentation given to the County

Scott Culp Volume II
December 18, 2024

1    Commission.  She was asking a question if she has a

2    copy of this.  We previously spoke about the

3    presentation given to the community meeting, and

4    they are very, very similar, but they may not have

5    the same exact duplicate slides.

6  BY MS. GAINEY:

7    Q.   Okay.  I -- I'm sorry that I don't have a copy

8  for you.  I can absolutely make a copy for you, but I --

9  I'm just asking you to verify if that is the e-mail and

10  the presentation that you submitted to the Brevard County

11  Commissioners to be presented at the December 5th, 2023,

12  meeting.

13    A.   Is it December 5th?

14    Q.   It should be on the cover page.

15    A.   Because this was a December 5th e-mail to Angela

16  that was on that day.  Yes, it was that evening.  You're

17  right.  I just couldn't remember the dates.  It appears

18  to be.

19    Q.   The next document is an e-mail apparently that

20  you sent to -- well, halfway down the document, it says

21  November 24th, 2024, e-mail that you sent to the board

22  and the president of Woodfield@HeritageOaks.org; is that

23  accurate?

24    A.   Yes.

25    Q.   The next document is just a printout of the --

Scott Culp Volume II
December 18, 2024

1    what's on the HUD website as far as the Housing for Older

2    Persons Act.  And I think we've already covered this,

3    but -- so I don't have any questions in that regard.

4            Next is an e-mail from Angela Abbott forwarding

5    an e-mail that you sent dated November 17th; is that

6    correct?

7        A.   Yes.

8        Q.   Angela says in her forwarded e-mail -- and I'm

9    on the top of the first page -- that, quote:  Contrary to

10   what was stated by the applicant at the meeting, the

11   initial site plan was submitted to the City of West

12   Melbourne on November 9th.  Also the developer has

13   changed the tenant demographics from family to senior.

14           Is that a correct statement by Ms. Abbott?

15       A.   It's not totally accurate.  The application only

16   had the places to check, as we discussed in my deposition

17   earlier, family or elderly.  And we intended it to be

18   senior.  And I think she was just clarifying that it was

19   a senior representation even though the bond application

20   didn't have a "check the box" available for senior.

21       Q.   So if Ms. Abbott would testify that the

22   application was not submitted to the Housing Finance

23   Authority as a senior restricted development, would you

24   take issue with that or not?

25           MS. RHODEN:  Object to form.

Scott Culp Volume II
December 18, 2024

```
1            THE WITNESS:  I would look at the application

2       and the representations that were made in all the

3       meetings.  I think that the -- well, I shouldn't say

4       I think.  I know that the letter that you and I

5       discussed from Mr. Bowser identified it as senior,

6       and that was within the application.

7    BY MS. GAINEY:

8       Q.   All right.  The next two documents are just

9    e-mails again.  Just asking you to verify that those are

10   e-mails that you sent to Ms. Abbott and are true and

11   accurate copies of those e-mails.

12      A.   Yes.

13      Q.   The last document is the minutes from the April

14   27th, 2022, Brevard County Housing Finance Authority

15   meeting.  And they have to -- first of all, did you

16   attend that meeting in person?

17      A.   Yes.

18      Q.   And I think the purpose of your attendance was

19   related to additional bonds for Venue at Brevard -- or

20   Venue at Viera project?

21           MS. RHODEN:  Object to form.

22           THE WITNESS:  Yes, I believe that was my reason

23       for being in attendance at that meeting.

24   BY MS. GAINEY:

25      Q.   It says that your company -- your company is the
```

Scott Culp Volume II
December 18, 2024

1    largest user of tax credits and tax-exempt bonds in the

2    state; is that true?

3         A.   I believe it was at the time.

4         Q.   Is it still true?

5         A.   I don't know.

6              MS. GAINEY:  Let's take a break.

7              THE WITNESS:  I can do that.

8              THE VIDEOGRAPHER:  Going off the record.  The

9         time is 12:23 p.m.

10                      (A break was taken.)

11     (Attorney Michael Piccolo joins proceeding and Attorney

12                      Rebecca Rhoden exits.)

13     (Defendant's Exhibit M was marked for identification.)

14             THE VIDEOGRAPHER:  Going back on the record.

15        The time is 12:34 p.m.

16   BY MS. GAINEY:

17        Q.   Mr. Culp, we took a short break, and now we're

18   back on the record.  I have put in front of you what we

19   have marked as Culp Deposition Exhibit M and ask you if

20   you recognize those documents.

21        A.   I think so.  They seem to be responses that I

22   communicated with our counsel on with regard to this

23   case.

24        Q.   And the first document is plaintiff Atlantic

25   Housing's responses and objections to interrogatories.

Scott Culp Volume II
December 18, 2024

1   On the last page, is that -- is that your signature?

2        A.   Yes, that is my signature.

3        Q.   It's a little hard to read there.

4        A.   Gets harder every year.

5        Q.   All right.  I have a few questions about this.

6        A.   Same document?

7        Q.   Yes.

8        A.   Okay.

9        Q.   On Page 8 and -- and also 9, you list, and I'll

10  quote:  Atlantic Housing lost fees from the development

11  of the project in the amount of 4,259,658; is that

12  correct?

13       A.   Yes.

14       Q.   And as we sit here today, is that -- has that

15  amount changed or does it remain the same?

16       A.   I'm not aware of any change in that amount.

17       Q.   How did you calculate that amount?

18       A.   The developer fee is governed by the IRS

19  regulations with regard to low-income housing tax credit

20  communities, and there is a calculation based upon

21  eligible basis for those fees, and it's calculated based

22  upon that.

23       Q.   Is there a maximum allowed profit for

24  developers?

25       A.   It's not a maximum allowed of profit.  There is

Scott Culp Volume II
December 18, 2024

1    a maximum allowed fee, and it is governed by the

2    tax-exempt bond program.

3         Q.   What is that maximum allowed fee for developers?

4         A.   If I remember correctly, it's 18 percent of the

5    eligible basis.

6         Q.   And is that 18 percent of the total development

7    cost?

8         A.   There are some items that are not included in

9    that.  Total development cost includes the land, and

10   there are other items I believe that are not included in

11   the calculation of the developer fee.

12        Q.   And so the amount of 4,259,658, is that

13   18 percent of some total amount that you looked at in

14   order to calculate this amount?

15        A.   Yes.

16        Q.   And that total amount represents what?

17        A.   Cost in the development.  And it excludes

18   certain items that are not allowable for the developer

19   fee to be charged on, such as the land.  And there are

20   other items that I don't recall at this moment.

21        Q.   Who figured those totals?

22        A.   Paul Missigman (ph).

23        Q.   Lucky for you, I'm taking his deposition, so I

24   don't have to ask you a lot about that.  But did you

25   participate in those calculation?

Scott Culp Volume II
December 18, 2024

1      A.    No.

2      Q.    And have you seen a document that has what Paul

3  was basing his -- the total amount as we referenced as to

4  what Paul was basing his calculations on?

5      A.    Yes.

6      Q.    And which document is that?

7      A.    Paul's calculations on what he was basing the

8  developer fee on.

9      Q.    Do you know if that's been produced?

10      A.    I don't recall.

11      Q.    Did you review the calculations or did you just

12  defer to Paul?

13      A.    I viewed them.  When you say, reviewed, I wasn't

14  reviewing for any kind of approval or recommendation that

15  they were accurate.  But I know that I saw them.

16      Q.    Was Paul the only one that did those

17  calculations, or did other people participate or

18  contribute?

19      A.    For this particular answer to this question,

20  Paul was --

21      Q.    Yeah, I'm only asking --

22      A.    -- the only one.

23      Q.    -- at this point about calculating the

24  developer's alleged damages or -- or lost fee.

25      A.    And in that respect, yes, only Paul Missigman.

Scott Culp Volume II
December 18, 2024

1    Q.   On Page 13, the question is asking the name and

2    address of every person including their job or duties and

3    description who worked for or on behalf of plaintiff in

4    any way not limited to employees during all times

5    pertinent to the allegations in the underlying complaint

6    till present day.  There is an objection and the answer

7    just lists you.  Do you agree with that?

8    A.   I agree with the answer, because there's an

9    objection with regard to listing all of Atlantic Housing

10   employees.

11   Q.   Well, actually the question doesn't ask for all

12   employees, it asked for all times pertinent to the

13   allegation.  Are -- you're saying there is more --

14   A.   I'm comfortable with the response.

15   Q.   Are you aware of other employees that have --

16   employees of Atlantic Housing that have knowledge of the

17   allegations in the complaint?

18   A.   We discussed Paul Missigman who's a partner and

19   prepared the damages.  And you're taking the deposition

20   of Marc Gauthier who's in charge of design and

21   permitting.  Those two people do have information with

22   regard to the nature of this complaint.  Other than that,

23   there would be administrative.  There are secretaries

24   that handle the information.  I don't know that their

25   discussions or representations are pertinent.  They're

Scott Culp Volume II
December 18, 2024

1    just administrative.

2        Q.    The next set of interrogatories are from Canton

3    Construction, and it looks like you signed those as well;

4    is that correct?

5        A.    I did.

6        Q.    On Page 8 and 9, it's talking about the lost

7    profit of Canton Construction, and the total there is

8    1,428,584; is that correct?

9        A.    Yes.

10       Q.    Has that number changed in any regard?

11       A.    Not that I'm aware of.

12       Q.    Who calculated that number?

13       A.    Paul.

14       Q.    Did you participate in calculating that number?

15       A.    No.

16       Q.    The next set of interrogatories is from Heritage

17   Oaks Partners.  It looks like Mr. Brock signed these

18   interrogatories; do you agree?

19            Let me be fair.  This is not all of the

20   interrogatories, these are the -- just Page 9 and 10.

21   But do you agree that Mr. Brock was the one that signed

22   these interrogatories?

23       A.    Yes.

24       Q.    Page 9 is -- is asking about the cash flow

25   through sale of 2040, amount of 8,072,217.  Do you agree?

Scott Culp Volume II
December 18, 2024

```
 1        A.    Yes.
 2        Q.    And what does it mean when it says used nine
 3   percent discount rate for cash flow through 2020 -- 2039,
 4   excuse me, and 15 percent dis -- discount rate for sale
 5   in 2040?
 6        A.    I think that question would best be asked of
 7   Paul Missigman.  I don't want to claim to be able to
 8   intelligently answer that question.
 9        Q.    All right.  Very good.  I can definitely do
10   that.
11              Did you participate in this particular
12   calculation at all?
13        A.    No.
14        Q.    Well, do you just as a general sense know --
15   know what is being referred to when it's talking about
16   the nine percent discount rate versus 15 percent discount
17   rate?
18        A.    I don't want to guess.
19        Q.    So you've testified in the first deposition that
20   as -- that you had ownership equity in -- in this
21   development, correct?
22        A.    Yes.
23        Q.    How do you get your money back?
24        A.    Through cash flow and sale of the community.
25        Q.    When do you get it back?
```

Scott Culp Volume II
December 18, 2024

1       A.   As the cash flow is available.

2       Q.   And is that -- I mean, I'm just curious as

3   through these years through 2039 and 2040, are you

4   waiting till 2039 or 2040 to get your money back?

5       A.   The majority of it, yes.

6       Q.   And as we talked about a little bit earlier, the

7   15-year versus 30-year bond, would that have affected

8   when you could have gotten your owner equity back?

9       A.   Not necessarily, no.

10      Q.   But -- but for this particular development, you

11  expected to have your owner equity returned by 2040; is

12  that -- is that a correct assessment of what you're

13  saying?

14      A.   I expected that that was a real estate

15  potential, yes.

16      Q.   And is that norm for the industry that it takes

17  that long to get your equity returned?

18      A.   I don't -- I don't know that I would be able to

19  answer that intelligently.

20      Q.   What about specifically related to your

21  projects, is that generally how long it takes to get your

22  equity returned?

23      A.   At a minimum, yes.

24      Q.   Takes longer sometimes?

25      A.   Yes.

Scott Culp Volume II
December 18, 2024

1    Q.   And how -- how do you determine, is it -- how

2    long it takes for the equity to be returned?

3    A.   It's the entire financial picture and entire

4    history of the development and what's going on in the

5    world globally.

6    Q.   But is it fair to say that you generally know

7    that as you're going into the project and assessment or

8    not?

9    A.   No.

10   Q.   Well -- and I understand what you're saying, if

11   there's --

12   A.   I don't know what the interest rate is going to

13   be seven years from now or...

14   Q.   But you have a general sense at the beginning of

15   the project as -- that relates to available return of

16   equity?

17   A.   No.  Projections are what we think might happen.

18   We don't have a general sense of what might happen.

19   Q.   The next document is the interrogatories from

20   Concord Management.  These appear to be signed by Paul.

21   And I'm going to -- I'm sorry.  Is that -- is that your

22   signature?  Oh, it is your signature.

23   A.   Yes, but it is the Canton Construction signature

24   block.  But I don't know why that got attached onto

25   there.

Scott Culp Volume II
December 18, 2024

1       Q.   Yeah.

2       A.   Because that's Page 18 from the...

3       Q.   All right.  But that could be a copy error or

4    whatever, but --

5       A.   Yeah.

6       Q.   -- is -- is Paul the representative for Concord

7    Management?

8       A.   Yes.

9       Q.   All right.  I'm going to anticipate your answer

10   based on your last answer, but would he be the person

11   that I need to talk to regarding the calculations as to

12   the cash flow sale for Concord Management?

13      A.   Yes.

14      Q.   Do you know what the maximum allowed fee for a

15   general contractor is?

16      A.   Yes.

17      Q.   How much is that?

18      A.   Fourteen percent.

19      Q.   And is there a -- a maximum fee for the

20   management company?

21      A.   I don't know if there is a maximum fee.  I do

22   know there is an industry standard and one that's

23   recognized as reasonable in the industry with regard to

24   credit underwriting.

25      Q.   Is that five percent?

Scott Culp Volume II
December 18, 2024

```
 1        A.   Yes.

 2        Q.   I'm going to show you what we have marked as --

 3   excuse me -- Culp Deposition Exhibit N.

 4     (Defendant's Exhibit N was marked for identification.)

 5   BY MS. GAINEY:

 6        Q.   And ask if you have seen that document before.

 7        A.   I think so.

 8        Q.   If you look at Page 3, it itemizes the alleged

 9   damages to plaintiffs.  And just for confirmation, these

10   damages would -- this is not necessarily something you

11   participated in calculating that we would -- we would

12   defer to Paul on that; is that right?

13        A.   That's correct.

14        Q.   That was easy.

15             All right.  I'm going to show you what we'll

16   mark as Exhibit O.

17     (Defendant's Exhibit O was marked for identification.)

18             THE WITNESS:  Is this two of the same?

19             MS. GAINEY:  Actually these are stapled together

20        if you want to...

21   BY MS. GAINEY:

22        Q.   And I understand that these are different

23   documents from different -- other documents, but they

24   have to do with financial damages, so that's why I am

25   going to ask about them together.
```

Scott Culp Volume II
December 18, 2024

1           Is the biggest component of damages the cash

2   flow from the project?

3       A.   I'd have to ask Paul Missigman.  I don't recall.

4       Q.   And I think we probably already talked about

5   this, but let me just confirm.  Does -- do the tax credit

6   fee in -- are those considered when we are talking about

7   overall damages, or is that a Paul question?

8       A.   You are going to have to restate that question

9   because -- just restate the question.  I don't

10  understand.

11      Q.   All right.  So when you're considering the --

12  the potential profit of -- of -- of developing a project,

13  I assume you consider the -- the tax credits that are

14  available, correct?

15      A.   Correct.

16      Q.   And then so as these damages were calculated,

17  was that considered in the -- the calculations as to the

18  alleged damages?

19      A.   Paul Missigman prepared the calculations, so you

20  can discuss that with him.

21      Q.   Could this project have upended for other

22  reasons other than the bond financing not being approved?

23      A.   Could it have upended?

24      Q.   Or not completed or not opened?

25      A.   I guess we could have an earthquake or

Scott Culp Volume II
December 18, 2024

1    something -- or a hole in the ground or a hurricane.

2         Q.   Barring that, was there any -- was there

3    anything barring this project from completing?

4         A.   I'm not aware of anything that would have

5    prevented it from being completed had the County

6    Commission approved the bond allocation request.

7         Q.   Well, we talked a little bit earlier about the

8    cost of construction going up significantly in the last

9    five years.

10        A.   Yes.

11        Q.   All right.  Would that have changed these

12   numbers?

13        A.   It may have.

14        Q.   And -- and how -- how did the cost of

15   construction going up affect these numbers, if you know?

16        A.   You saw, I believe, an increase in the bond

17   request.  But even if there was an increase in

18   construction cost during the project, that would not have

19   prevented it from being completed.

20        Q.   We confirmed earlier that the completion date,

21   if I remember correctly, was May of 2025?

22        A.   It was in 2025, I recall that.

23        Q.   And do your projects generally complete on time?

24        A.   Almost always.

25        Q.   Do your projects generally stay within budget?

Scott Culp Volume II
December 18, 2024

```
 1        A.   Almost never.

 2        Q.   So at what percentage would you say that your

 3   projects are over budget?

 4        A.   I don't have a good recollection of a percentage

 5   over the original budget.

 6        Q.   And if I've understood you -- your testimony

 7   earlier that on the construction side, there's -- there's

 8   not profit once the project is completed because of the

 9   bond, it is really the -- the tax credits that generate

10   the profit; is that a fair...

11        A.   No.

12        Q.   Okay.

13        A.   You have to ask a question.  That -- that was a

14   roundabout statement that was not at all accurate.

15        Q.   All right.  So how do you make profit off

16   developments?

17        A.   The construction company earns a fee, and the

18   construction company realizes an annual profit based upon

19   its volume and its fees.  The developer earns a fee, and

20   the developer makes a profit based upon its annual fees

21   and expenses and overhead.  The management company earns

22   a fee.  The management company makes a profit based upon

23   its overhead in comparison to the fees it receives.  The

24   owner and the respective partners within the ownership

25   receive cash flow from the community after all of the
```

1  fees and expenses are paid.  The cash flow net of the

2  expenses creates a pro -- profit for the owners, and the

3  sale of the community, ultimate sale of the community

4  should generate a profit.

5      Q.   So for this pro -- project in particular, we're

6  talking about approximately $25 million cost, correct?

7      A.   I don't remember, but I think that sounds

8  accurate.

9      Q.   All right.  And if the bond was in the -- you

10  know, the 17-, $18 million range and then your owner

11  equity was around in the $8 million range?

12      A.   I think so, yes.

13      Q.   So the bond doesn't cover the expenses, correct?

14      A.   Again, as we discussed, bond amount issued is

15  really based upon the 50 percent test.  The bond amount

16  outstanding after stabilization is a calculation based

17  upon debt service coverage.  The bond is just debt just

18  like any other mortgage.  The bond debt has to be paid

19  off at some point.  It will be paid off at the sale of

20  the community.  So depending on the debt structure and

21  the ownership of those bonds, which in this case we were

22  purchasing the bonds, there could be a profit in that

23  particular transaction as well.

24      Q.   So after the completion and -- and you apply for

25  and get the -- the tax credit, is -- is the fact that you

1    have the tax credit, is that what makes the -- the

2    development more lucrative or profitable; it's not the

3    rents?

4         A.    It doesn't make it necessarily more lucrative or

5    profitable.  It makes it economically feasible, meaning

6    that the debt is covered by the rents.  The cost has to

7    be covered by the equity.  The equity return is provided

8    through the annual tax credits.  Because you have the

9    annual tax credits for a period of ten years.  So that

10   equity is you're getting a return on your equity

11   investment by the tax credits.  And then of course if

12   there's a -- you have cash flow if there is available

13   cash flow to distribute to the owners, and you have sales

14   proceeds if there's available sales proceeds when you

15   sell the community.

16        Q.    Are the tax credits transferrable?

17        A.    You can sell the tax credits, and we often do.

18   The difficulty in that is that the tax credit purchasers

19   need a guarantee on their tax credits for the ten-year

20   period because the IRS can recapture those credits.  And

21   the tax credit equity investor has no control over the

22   community to be able to make sure that it main -- stays

23   in compliance to receive those credits.  So if the

24   owners, ourselves, that are the guarantors for when you

25   sell the tax credit equity.

Scott Culp Volume II
December 18, 2024

1        Q.    And is the tax credit always ten years?

2        A.    The tax credit is received over a ten-year

3   period.

4        Q.    Uh-huh.

5        A.    So yes.

6        Q.    So after ten years, you are no longer getting

7   tax credit or is it --

8        A.    That's correct.

9        Q.    So from the ten years -- from -- in this case,

10  you would have gotten tax credits had this project

11  completed until approximately 2035, correct?

12       A.    That's correct.

13       Q.    And then the -- the projections are through

14  20 -- 2039, 2040?

15       A.    Correct.

16       Q.    So for that period of time, you're not getting

17  any type of tax credit?

18       A.    Not getting tax credits, but you're still

19  required to comply as what is referred to as the

20  qualifying project period.

21       Q.    Uh-huh.

22       A.    And if you don't comply through that qualified

23  project period, the IRS can recapture those tax credits

24  you've already used.

25       Q.    You have to pay it back?

Scott Culp Volume II
December 18, 2024

1      A.   Yes.

2      Q.   Okay.  On this exhibit, there is a pro forma.

3   What is that?

4      A.   You stapled two pro formas together.

5      Q.   Yes.

6      A.   The top one is the credit underwriters pro

7   forma.  You see at the top right, Amerinat is the

8   underwriter.

9      Q.   Uh-huh.

10      A.   The second page is our internal pro forma that

11   was, I believe, included with the application to the

12   Housing Finance Authority.  Yes, and that would be

13   accurate because this is the one at 20, 50 and 80 at

14   market.  And those are just two projections of an

15   operating pro forma over the 15-year period.

16      Q.   And -- and what is a pro forma?

17      A.   It's a financial model of the rents and incomes.

18      Q.   Profit and loss?

19      A.   Rents and expenses.  Rents and expenses.

20      Q.   Yeah.

21      A.   Not necessarily profit and loss because having

22   revenue doesn't mean you have a profit.  So it's rents

23   and expenses over the 15-year period.

24      Q.   So, again, I think you clarified this, but

25   the -- the top pro forna -- pro forma you can see is from

Scott Culp Volume II
December 18, 2024

1    the underwriting report.  And then the -- the one that is

2    Bates stamped 2930, that's the pro forma that was part of

3    the application, is that what you said?

4         A.   I don't know that to be.  We typically have a

5    pro forma in this format in the application.  You stapled

6    it to this one, so I'm not sure where it came from.  And

7    I can't read it without my glasses, so.  But it appears

8    to be one that probably came from the application.

9         Q.   Is the tax credit always four percent of the

10   project cost or does it vary?

11        A.   It's definitely not ever four percent of the

12   project cost.

13        Q.   Okay.  Well, you mentioned four percent earlier,

14   so how --

15        A.   Commonly referred to as the four percent

16   low-income housing tax credit.

17        Q.   Four percent of what?

18        A.   That's what I was going into.

19        Q.   Okay.

20        A.   It's four percent of the eligible basis,

21   eligible basis multiplied by the basis boost.  If you are

22   in a smaller or difficult-to-develop area or a qualified

23   census tract, multiplied by the fractional percentage of

24   the units that are qualifying for the tax credits,

25   multiplied by four percent, and then multiplied by ten

Scott Culp Volume II
December 18, 2024

```
 1   years.
 2        Q.   You've been doing it for four years.
 3             Was there any plan to sell this development as
 4   part of your financing structure or -- or considerations?
 5        A.   We always consider that in the long-term, we're
 6   going to sell the development.
 7        Q.   Was re -- refinancing a consideration in this
 8   case?
 9        A.   Not during the first 15 years.
10        Q.   So if you're going to refinance, it's -- it's
11   going to be after 15 years; is that generally the case?
12        A.   Generally, yes.
13        Q.   What about selling, is that generally done
14   within a normal or specific timeframe?
15        A.   Very, very rarely done in less than 15 years.
16   Typically very rarely done in less than 18 years.
17        Q.   I asked you earlier about other projects that
18   may have been initiated since December of 2023.  Do you
19   know how many projects you have currently pending in any
20   county?
21        A.   Pending?  What do you mean by pending?
22        Q.   That you've purchased the land and are in the
23   process of development or securing financing.
24        A.   Since October of 2023?
25        Q.   In the last year basically.
```

1      A.    In the last year?  Seven, I think.

2      Q.    If I remember correctly, four of them are in

3  region 17 or Volusia County?

4      A.    No.  The discussion was the Volusia County

5  Housing Finance Authority --

6      Q.    Uh-huh.

7      A.    -- which is the same region today as Brevard,

8  has issued the bonds for four of them.  Not because of --

9  certain counties don't have a housing finance authority,

10  and other house -- housing finance authorities currently

11  today can issue bonds if they get an area of operation

12  approval from that county.  So we have communities

13  developed in Seminole County and Flagler County for which

14  Volusia County issued the bonds.

15      Q.    All right.  So -- I'm sorry, were you done?

16      A.    (Nods head.)

17      Q.    The -- the seven that you referred to earlier,

18  what counties are those different projects in?

19      A.    Seminole, Volusia, Flagler, Lake, Orange and

20  Sumter.

21      Q.    And I apologize, you may have already gone

22  through this, and definitely tell me if you have.  But

23  what criteria is used to determine the project's

24  eligibility for the four percent low-income housing

25  credit?

Scott Culp Volume II
December 18, 2024

1     A.   It's a -- it's a lengthy list.  But project's
2   eligibility is primarily based upon income and rents.
3     Q.   I have a damages question, but I feel like I
4   probably need to defer to Paul on those questions.
5          Do you agree that Paul is the numbers guy and
6   he's -- he's the one -- let me strike that.
7          Is Paul the most knowledgeable about the damages
8   alleged in this lawsuit?
9     A.   Yes.
10    Q.   Let me show you what we've marked -- will mark
11  as Culp Deposition Exhibit P.
12    (Defendant's Exhibit P was marked for identification.)
13  BY MS. GAINEY:
14    Q.   I have two documents.  And we already talked
15  about this, so I'll just ask you, the first document has
16  to do with the ordinance passed by Brevard County related
17  to the TEFRA hearing notice.  We already discussed this.
18  Is there anything else that you have knowledge about
19  regarding this specific ordinance that -- as it relates
20  to this project?
21    A.   No.
22    Q.   The next one is the ordinance passed by the City
23  of West Melbourne relating to the Live Local Act.  I
24  appreciate that we've already discussed that to an
25  extent.  Is there anything else that you have knowledge

Scott Culp Volume II
December 18, 2024

1    regarding that -- the City of West Melbourne ordinance as

2    it relates to this lawsuit or the project?

3         A.   You referenced this document as the ordinance,

4    it is actually the publication of notice of the public

5    hearing for the ordinance.

6         Q.   Thank you.  And in the publication notice,

7    there's a copy of the ordinance.

8         A.   I don't see that.

9         Q.   Ordinance -- an ordinance in the City of West

10   Melbourne?

11        A.   That's the title of the ordinance.

12        Q.   Okay.  Any -- all right.  Let me just ask it

13   differently.

14             Sir, do you have any other information related

15   to this -- the ordinance that was passed by the City of

16   West Melbourne as it relates to the Live -- Live Local

17   Act?

18        A.   I don't have anything in possession -- my

19   possession today.  There is an ordinance that's not

20   included in what you handed me.

21        Q.   Understood.

22        A.   Okay.

23        Q.   You -- but I'm asking you, irrespective of I

24   appreciate that --

25        A.   You asked me if I know of anything else with

Scott Culp Volume II
December 18, 2024

1   regard to the Live Local ordinance.  Yes, there is an

2   ordinance.  It's not here.  It's not what you handed me.

3        Q.    Thank you.

4             Do you have any other knowledge related to that

5   ordinance?

6        A.    Other than what I stated, no.

7        Q.    Let me show you what we'll mark as Exhibit Q.

8   And it's the last one.

9        A.    I don't believe you.

10    (Defendant's Exhibit Q was marked for identification.)

11   BY MS. GAINEY:

12        Q.    Well, it's not my last question, it's the last

13   exhibit.

14        A.    Oh, okay.

15        Q.    A little bit earlier in your deposition, we were

16   talking about the possibility that another project was

17   initially considered for development.  And I saw

18   reference to The Venue at Hickory Tree Partners.  What is

19   Venue at Hickory Tree Partners Ltd., if you know?

20        A.    I believe it was a partnership we created to

21   develop another affordable housing community in Osceola

22   County.

23        Q.    All right.  So it is -- and it's been

24   administratively dissolved?

25        A.    To the best of my knowledge, yes.

Scott Culp Volume II
December 18, 2024

1    Q.   Why was it administratively dissolved?

2    A.   We didn't proceed with the development.

3    Q.   The -- and the only -- the reason why I'm asking

4  is because I saw Venue at Hickory Tree in some of the

5  paperwork related to this particular project, and I'm

6  talking about The Venue at Heritage Oaks.  Do you know if

7  that has any relation to The Venue at Heritage Oaks?

8    A.   I don't believe it does.

9    Q.   Have you spoken with Dr. Fishkind?

10   A.   Yes.

11   Q.   Tell me about those conversations.

12        MR. PICCOLO:  As long as an attorney wasn't

13        present and you had direct conversations with

14        Dr. Fishkind, you can answer.

15        THE WITNESS:  The only time I've spoken with

16        Dr. Fishkind is with attorneys present.

17  BY MS. GAINEY:

18   Q.   And all my questions, I'm not entitled to and I

19  don't want to know any conversations with -- you've had

20  with an attorney -- with your attorneys.

21        So are you telling me that you have not spoken

22  to Dr. Fishkind directly?

23   A.   I have spoken directly with counsel present with

24  me.

25   Q.   All right.  Because in your first deposition, we

Scott Culp Volume II
December 18, 2024

1   talked about that survey, and there was some conversation

2   about you giving the survey for Dr. Fishkind.  Was that

3   through your attorneys?

4        A.   Correct.

5        Q.   So outside an attorney-protected --

6   attorney-client protection -- protected conversation,

7   have you had any other conversations with Dr. Fishkind?

8        A.   Yes.

9        Q.   Outside of?

10       A.   Yes.

11       Q.   Tell me about those.

12       A.   I called him --

13            MR. PICCOLO:  Again, just so we're all clear, if

14       you have had -- as long as an attorney wasn't

15       present, you can testify to the conversations about

16       that.

17            THE WITNESS:  I'm clear.

18            MS. GAINEY:  Go ahead.

19            THE WITNESS:  I called him to let him know what

20       day his fees would be received.

21   BY MS. GAINEY:

22       Q.   Any other conversations you've had outside of an

23   attorney-client protected conversation?

24       A.   No.

25       Q.   What role, if any, did you have in the

Scott Culp Volume II
December 18, 2024

1   preparation of his report?

2        A.   None.

3        Q.   Is it a true statement that had Venue at

4   Heritage Hokes -- Oaks, excuse me, had been developed

5   that not all black people would have lived there?

6        A.   I can't make that definitive statement.

7        Q.   Do you -- do you know how many minorities live

8   in Brevard County?

9        A.   I do not know that, no.

10       Q.   Do any of your developments have exclusively

11   minorities?

12       A.   I don't know that.

13       Q.   Was Venue at Heritage Oaks limited to -- or

14   strike that.

15            Do you have any evidence as to how many black

16   seniors would have lived at Venue at Heritage Oaks?

17       A.   I don't have any factual evidence of that, no.

18       Q.   Do you have any opinions?

19       A.   I'll rely upon the expert reports for that.  And

20   that would be projections.

21       Q.   Dr. Fishkind uses in his report percentages that

22   are not the 20 percent of 50 percent of AMI or the

23   80 percent, 120 percent AMI in his report.  Do you know

24   why?

25       A.   Yes.

1        Q.    Tell me.

2        A.    The development was intended to be a low-income

3    housing tax credit community with four percent low-income

4    housing tax credits and would have had set-asides in

5    accordance with those regulatory restrictions.  And it is

6    my understanding that Dr. Fishkind used those set-asides

7    with regard to the rents and incomes.

8        Q.    Where did he get those set-aside figures from,

9    if you know?

10       A.    I don't recall.

11       Q.    Is that some -- something you or your team would

12   have assisted him with?

13       A.    We would have provided information to our

14   attorneys, yes.

15       Q.    Other than the survey that we talked about in

16   your first deposition, what other documents did you

17   provide to Dr. Fishkind?  And when I say "you," I mean

18   the plaintiffs.

19       A.    I'm not sure that we provided him anything other

20   than the set-asides and information about the number of

21   units and unit mix, location of the property.

22       Q.    And -- and the survey that we talked about?

23       A.    Right.  You asked other than the survey.

24       Q.    Correct.

25       A.    I think other than the survey, I think the

Scott Culp Volume II
December 18, 2024

1   things that we provided him were just related to the

2   location, units, unit mix and set-asides.

3        Q.   Do you agree that the percentages that

4   Dr. Fishkind used were not the percentage that were

5   submitted to the Brevard County County Commissioners on

6   December 5th, 2023?

7        A.   Yes.

8        Q.   Do you agree that even if vintage -- Venue at

9   Heritage Oaks had been built, the maximum number of black

10  seniors who could have lived at the property was 21?

11       A.   I have no knowledge of anything related to that

12  question.

13       Q.   Do you agree that even if Venue at Heritage Oaks

14  had been built, the maximum number of black seniors who

15  would have paid less than the market price for rent was

16  21?

17       A.   I have no knowledge of that question.

18       Q.   Do you have any information as to what

19  percentage of your properties or the properties you

20  developed are rented to racial minorities?

21       A.   I do not have that information in my head, no.

22       Q.   Is it -- other than what we've already talked

23  about, are there any other documents that would reflect

24  the percentage of your developments that are rented by

25  racial minorities?

Scott Culp Volume II
December 18, 2024

1      A.   We talked about the application database.  That
2  would be the only place that would have the information.
3      Q.   Dr. Fishkind noted that the racial composition
4  of the other apartments that Atlantic Housing or its
5  partners had developed in Brevard County is 35 percent
6  black and 45 percent white; does that sound accurate to
7  you?
8      A.   I don't have any knowledge.
9      Q.   Have you done any statistical analysis of the
10  overall racial composition of your developments?
11      A.   I have not personally.
12      Q.   Do you know of anyone else that has?
13      A.   No.
14      Q.   Are you rendering any opinions on disparate
15  impact or segregate impact claims or are you leaving
16  those opinions to Dr. Fishkind?
17          MR. PICCOLO:  Object to form.
18          THE WITNESS:  I'm leaving the statistical
19      analysis to Dr. Fishkind.  I'm not sure I'm leaving
20      the opinions to him.
21  BY MS. GAINEY:
22      Q.   What opinions do you have regarding disparate
23  impact or segregate impact as it relates to this case?
24      A.   To me, that sounds like a request for a legal
25  opinion.  I don't have the legal opinion.

Scott Culp Volume II
December 18, 2024

1      Q.    Do you have any nonlegal opinions?

2      A.    I believe the County Commission's actions caused

3   a disparate impact.

4      Q.    And what evidence do you have to support that?

5      A.    I don't personally have evidence of that.

6      Q.    We've talked in your deposition a bit about

7   Southern Affordable Services which is -- which was the

8   partner on this project, agreed?

9      A.    Is a partner on this project, yes.

10      Q.    Do you know why they are not a named party in

11  this lawsuit?

12          MR. PICCOLO:  Object to form.

13  BY MS. GAINEY:

14      Q.    If you can tell me without attorney-client

15  protected discussions.

16          MR. PICCOLO:  That's correct.  If you have

17      knowledge about the answer to that question based

18      upon your conversations with attorneys, you do not

19      need to answer.

20          THE WITNESS:  Can you ask -- ask the question

21      again?

22  BY MS. GAINEY:

23      Q.    Do you have any information as to why Southern

24  Affordable Services is not a named party in this lawsuit?

25      A.    I don't know.

Scott Culp Volume II
December 18, 2024

1    Q.   Did -- did you have a conversation with Jay

2  Brock as to why they're not a named party?

3    A.   No.

4    Q.   How many lawsuits has Atlantic Housing filed

5  against the city -- cities or counties for denial of

6  funding for development plans?

7    A.   I don't know.

8    Q.   How many lawsuits have you personally been

9  involved in related to denial of develop -- development

10  funding?

11    A.   I don't recall.

12    Q.   How many have you been involved in in the last

13  five years?

14    A.   I don't recall.

15    Q.   Are we talking hundreds of lawsuits?

16    A.   No.

17    Q.   More than ten?

18    A.   I don't recall.

19    Q.   Do you agree that the Brevard County

20  Commissioners could not have modified the bond, they

21  either had the option to approve or disapprove it at the

22  meeting?

23    A.   I don't know what their authority was at the

24  meeting.

25    Q.   Are you offering any testimony or options as to

Scott Culp Volume II
December 18, 2024

```
 1   an alternative practice the board could have done except
 2   for approve the board -- the bond, excuse me?
 3            MR. PICCOLO:  Object to form.
 4            THE WITNESS:  I'm not offering any testimony in
 5       that regard.
 6   BY MS. GAINEY:
 7       Q.   Do you have any evidence of a racial animus held
 8   by Brevard County Commissioners?
 9            MR. PICCOLO:  Object to form.
10            THE WITNESS:  Can you ask the question again?
11   BY MS. GAINEY:
12       Q.   Do you have any evidence of a racial animus held
13   by Brevard County Commissioners?
14            MR. PICCOLO:  Object to form.
15            THE WITNESS:  I personally do not.
16   BY MS. GAINEY:
17       Q.   Have you heard of -- you said I personally?
18       A.   I personally do not.  I'm being deposed as a
19   person.
20       Q.   Does the company have any evidence of that?
21            MR. PICCOLO:  Object to form.
22            MS. GAINEY:  Atlantic Housing or the
23       construction company or any of the plaintiffs?
24            MR. PICCOLO:  Sorry, I didn't mean to cut you
25       off.  Object to form.
```

Scott Culp Volume II
December 18, 2024

1        THE WITNESS:  I personally don't know.

2   BY MS. GAINEY:

3        Q.    There was an Affordable Housing Summit in

4   Brevard County on May 17, 2023.  Did you or anyone from

5   Atlantic Housing attend it?

6        A.    I don't believe so.

7        Q.    Do you or anyone from Atlantic Housing or any of

8   the plaintiffs work with homeless coalitions or

9   organizations on affordable housing issues?

10       A.    In Brevard County?

11       Q.    Yes.

12       A.    Not that I'm aware of.

13       Q.    Outside of Brevard County?

14       A.    I know we have correspondence with homeless

15   coalitions outside of Brevard County.  When you say

16   worked with, we don't have a contractual agreement with a

17   homeless services provider.

18       Q.    Have you ever served on the board of directors

19   of Southern Affordable Housing?

20       A.    Southern Affordable Housing is not an entity.

21   Southern Affordable Services, no, I have not ever served

22   on the board.

23       Q.    Have you reviewed the report of Dr. Shawn

24   Malone?

25       A.    No.

Scott Culp Volume II
December 18, 2024

1              THE COURT REPORTER:  Spell that name for me.

2              MS. GAINEY:  M-A-L-O-N-E.

3              Let's take a break.  I think I'm done.  I'm

4       going to look at my notes to make sure.

5              THE VIDEOGRAPHER:  Going off the record at time

6       1:20 p.m.

7                        (A break was taken.)

8              THE VIDEOGRAPHER:  Going back on the record.

9       The time is 1:29 p.m.

10   BY MS. GAINEY:

11       Q.   Does Atlantic Housing work with any advocacy

12   groups or organizations that promote the interests of

13   racial minorities?

14       A.   Not that I'm aware of.

15       Q.   Do any of the plaintiffs?

16       A.   I'm not aware.

17              MS. GAINEY:  That's all the questions I have.

18              MR. PICCOLO:  I have no questions.  We'll read.

19              MS. GAINEY:  That's two questions.

20              THE VIDEOGRAPHER:  This concludes volume two in

21       the deposition of Scott Culp.  The time is 1:29 p.m.

22       We are off the record.

23              MS. GAINEY:  Sir, thank you.  I know it's been

24       very long.

25              THE WITNESS:  Thank you.

Scott Culp Volume II
December 18, 2024

1              MS. GAINEY:  There was a lot to cover.  But I

2        appreciate your patience with me.

3              THE COURT REPORTER:  Do you need to order this?

4              MS. GAINEY:  I do.

5              MR. PICCOLO:  Copy, please.

6          (This deposition was concluded at 1:31 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Scott Culp Volume II
December 18, 2024

1                    CERTIFICATE OF REPORTER OATH

2

3    STATE OF FLORIDA )

4    COUNTY OF ORANGE )

5

6

7            I, Brandy S. Payment, Florida Professional

8    Reporter, Notary Public, State of Florida, certify that

9    the witness named, Scott Culp, herein appeared before me

10   and was duly sworn.

11

12

13

14        Witness my hand and official seal this 18th day of

15   December, 2024.

16

17

18

19

20   _____

21        Brandy S. Payment, FPR

22        Notary Public – State of FL
           Commission No. HH082640
23        Expires:  03/28/2025
           US Legal Support

24

25

Scott Culp Volume II
December 18, 2024

```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3   STATE OF FLORIDA )

 4   COUNTY OF ORANGE )

 5

 6         I, Brandy S. Payment, Florida Professional

 7   Reporter, in and for the State of Florida at large,

 8   hereby certify that the witness appeared before me for

 9   the taking of the foregoing deposition, and that I was

10   authorized to and did stenographically and electronically

11   report the deposition, that a review of the transcript

12   was requested, and that the transcript is a true and

13   complete record of my stenographic notes and recording

14   thereof.

15      I further certify that I am neither an attorney, nor

16   counsel for the parties to this cause, nor a relative or

17   employee of any attorney or party connected with this

18   litigation, nor am I financially interested in the

19   outcome of this action.

20      DATED THIS 2nd day of January, 2025, at Orange

21   County, Florida.

22

23

24   _____

                 Brandy S. Payment, FPR
25               US Legal Support
```

1                    WITNESS NOTIFICATION LETTER

2
     January 2, 2025
3
     Scott Culp
4    C/o    Rebecca E. Rhoden, Esquire
            Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
5           215 North Eola Drive
            Orlando, Florida  32802
6           Rebecca.rhoden@lowndes-law.com

7

8    In Re:      Atlantic Housing Partners, et al. v. Brevard
                 County
9                Deposition taken on December 18, 2024
                 U.S. Legal Support Job No. 6769849-001
10
             The transcript of the above-referenced
11   proceeding has been prepared and is being provided to
     your office for review by the witness.
12
             We respectfully request that the witness
13   complete their review within 30 days and return the
     errata sheet to our office.
14

15
     Sincerely,
16   Brandy S. Payment, FPR
     U.S. Legal Support, Inc.
17   20 North Orange Avenue, Suite 1209
     Orlando, Florida  32802
18   (407)649-9193

19

20   CC via transcript:
     Susan Gainey, Esquire
21

22

23

24

25

ERRATA SHEET
DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS PAGE
IN RE: Atlantic Housing Partners, et al. v. Brevard
County
Scott Culp
December 18, 2024
U.S. Legal Job No. 6769849-001

Page No. Line No.          Change               Reason
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.

_____    _____
Date                       Scott Culp

**Exhibits**

EX G Scott Cu
lp 121824
  185:8
  187:15,16
EX H Scott Cu
lp 121824
  185:10
  233:23
EX I Scott Cu
lp 121824
  185:11
  246:7,8
  251:14
EX J Scott Cu
lp 121824
  185:13
  251:8,18
EX K Scott Cu
lp 121824
  185:15
  272:5,8
EX L Scott Cu
lp 121824
  185:17
  282:12,15
EX M Scott Cu
lp 121824
  185:18
  300:13,19
EX N Scott Cu
lp 121824
  185:20
  310:3,4
EX O Scott Cu
lp 121824
  185:21
  310:16,17
EX P Scott Cu
lp 121824
  185:23
  321:11,12
EX Q Scott Cu
lp 121824
  185:24

323:7,10

**$**

$1,990,000
  256:14
$16,750,000
  214:22
$16,750.00
  214:20
$18
  314:10
$20
  260:24
  261:12,20,23
  262:17
$204,934
  195:21
$25
  314:6
$360,964.78
  196:9
$693,969.22
  195:3
$8
  314:11
$850,000
  194:17

**0**

0004
  285:17
02737
  213:15
02858
  218:4
05
  211:18 215:1
08-035
  261:23
  262:19
0805
  261:15,17
  262:18

**1**

1
  233:16
  245:23
  252:11
1,428,584
  305:8
10
  305:20
10/6/23
  213:16
100
  192:16
101
  196:7 277:2
101-unit
  234:14
105
  218:19 276:9
  277:1,3,14
105-unit
  276:23
108
  207:18 277:3
10:37
  230:12
10:40
  230:15
10C
  201:6
11
  190:10
  191:16 252:9
  286:14
11:11
  251:6
11:14
  251:11
11:58
  282:18
11th
  188:22
12
  282:6

285:17,20
286:14
120
  219:23 223:2
  263:15
  278:6,23
  286:1 326:23
125
  207:9,17
12:23
  300:9
12:25
  282:25
12:30
  282:16,20
12:34
  300:15
12th
  257:21
13
  304:1
14
  210:5
140,000
  209:4
140,479
  208:19
15
  218:19
  283:18
  306:4,16
  319:9,11,15
15,000
  277:6,10
15,750,000
  215:7,12
15-year
  307:7
  317:15,23
150
  218:19
  219:13,18,23
16
  202:4 214:23
  215:8 283:6
16,000
  214:22

**16,750,000**
  215:5,6,12
**16,755,000**
  255:18
**166.041517**
  237:8
**167,500**
  290:2
**16th**
  202:22 227:4
**17**
  232:13,15
  286:14 320:3
  333:4
**17-**
  314:10
**17th**
  234:13 294:9
  298:5
**18**
  282:6 302:4,
  6,13 309:2
  319:16
**186**
  185:3
**187**
  185:8
**19**
  224:8 271:15
**1985**
  284:22
**19th**
  223:21
**1:20**
  334:6
**1:29**
  334:9,21
**1st**
  274:12

——————————

                **2**
——————————

**2**
  186:3 192:20
  233:16
  245:24
  251:10

**20**
  219:2,10,13
  249:7 260:20
  262:19
  266:11
  277:24 278:5
  279:6 316:14
  317:13
  326:22
**2004**
  260:1,2
**2016**
  271:15
**2020**
  257:2,4,7,21
  306:3
**2021**
  271:16
**2022**
  256:24
  299:14
**2023**
  188:22
  189:19
  190:11
  191:16
  199:7,17
  200:4 202:4
  209:12
  210:5,9,11
  211:18
  213:19
  214:15,16
  215:1 216:1
  218:7 223:21
  224:8 227:4,
  14 228:9,17
  229:20
  233:3,6,12,
  15,21 235:14
  247:17
  274:12
  278:16 283:6
  286:20
  287:8,18,24
  294:10,18
  295:22
  296:10

  297:11
  319:18,24
  328:6 333:4
**2024**
  231:12 232:5
  259:25 260:1
  297:21
**2025**
  226:12
  312:21,22
**2035**
  316:11
**2039**
  306:3 307:3,
  4 316:14
**2040**
  305:25 306:5
  307:3,4,11
  316:14
**2059**
  218:18
**21**
  328:10,16
**22**
  195:8
**22nd**
  256:24
**233**
  185:10
**2386**
  202:2
**2394**
  207:25
**2398**
  210:17
**23rd**
  199:16 200:3
  286:20
**246**
  185:11
**24th**
  297:21
**251**
  185:13
**255**
  184:11

**25th**
  287:18
**26**
  185:20
**2719**
  211:17
**272**
  185:15
**2737**
  212:2
**2749**
  214:19
**27th**
  299:14
**28**
  222:3,17
**282**
  185:17
**2855**
  215:15
**2860**
  220:5
**2861**
  221:5
**2891**
  222:2
**28th**
  199:6 228:9
**2927**
  222:18
**2930**
  318:2
**2959**
  223:20

——————————

                **3**
——————————

**3**
  245:24
  286:25
  292:11 310:8
**30**
  283:17
  286:11
**30-year**
  287:1 307:7

Scott Culp Volume II
December 18, 2024

**300**
  185:18
**30th**
  226:12
  273:10  274:5
  278:16
  281:23  282:2
**310**
  185:20,21
**31st**
  294:18
**321**
  185:23
**323**
  185:24
**32801**
  184:11
**32802**
  184:6
**336**
  185:4
**337**
  185:4
**338**
  185:5
**339**
  185:5
**3433**
  224:12
**3434**
  224:24  225:6
**3444**
  226:8
**35**
  329:5
**3603**
  226:14
**3606**
  226:24
**3622**
  227:3
**3rd**
  210:10,11
  259:25

---

**4**

**4**
  218:6
**4,000**
  188:13,14
  217:21
**4,259,658**
  301:11
  302:12
**407 470-1468**
  184:12
**420**
  285:17
**43**
  294:19  295:7
**45**
  329:6
**4th**
  216:1  287:8

---

**5**

**50**
  219:3,10
  223:2  255:24
  256:1,4
  277:24  278:5
  279:7  314:15
  317:13
  326:22
**500**
  291:22
**504**
  227:2
**55**
  248:2,24
  249:6  266:9,
  18  267:9
  268:14
**5th**
  257:7  293:16
  295:22
  296:10
  297:11,13,15
  328:6

---

**6**

**6**
  207:24
  213:19
  214:15  252:3
**6.21**
  206:3
**6/26/23**
  207:20,21
**62**
  248:2,16
  267:1,4,9
**693,969**
  195:8
**6:00**
  273:10  274:6
**6th**
  214:24
  229:20  233:3
  287:24

---

**7**

**7,600,000**
  259:21  261:6
**735**
  241:21
**74**
  250:25
**750**
  184:11

---

**8**

**8**
  210:9  301:9
  305:6
**8,072,217**
  305:25
**80**
  219:3,4
  248:21  249:6
  266:17
  278:22

---

  317:13
  326:23
**88**
  227:2
**8th**
  228:16

---

**9**

**9**
  286:14  301:9
  305:6,20,24
**9:34**
  186:2
**9th**
  298:12

---

**A**

**a.m.**
  186:2
  230:12,15
  251:6,11
**a/k/a**
  268:8
**Abbott**
  283:6  285:3
  290:1,16
  291:15,24
  292:3  295:17
  298:4,14,21
  299:10
**Abbott's**
  290:19
**ability**
  237:1  284:3,
  7
**able**
  194:25  306:7
  307:18
  315:22
**above**
  213:15  279:4
**absolutely**
  259:8  297:8
**access**
  240:17,19

Scott Culp Volume II
December 18, 2024

241:2,3
258:24
259:7,24
274:16,22,24
288:15
accordance
219:15
235:24 236:5
248:14 249:4
266:15
281:1,9
327:5
accuracy
198:8 276:8
accurate
194:24
199:19
213:16
221:13,15
227:16
245:25
267:14,21
268:4 282:8,
9,10 285:3,
6,8 288:11
296:25
297:23
298:15
299:11
303:15
313:14 314:8
317:13 329:6
achievable
196:7
acres
206:3
across-the-
board
258:12
Act
193:15
199:23,24
200:2,5,11,
13,25 202:11
203:16,19
204:5,10,16
235:25 236:6
237:9,11

248:15 249:5
266:16
275:12
281:2,10
289:7,16
291:4 298:2
321:23
322:17
acting
289:16
actions
330:2
activity
278:25
actual
188:16
193:4,5,7
206:24
214:11,12
add
254:8 256:5
296:2
additional
210:13
228:19
231:13
255:20
256:3,5,13
260:20 284:3
299:19
address
304:2
adjusted
221:24 222:1
263:16
286:1,2,13
Adkins
234:8
administratin
g
192:1
administrativ
e
304:23 305:1
administrativ
ely
323:24 324:1

adopted
200:2 211:25
256:24
advice
200:16
advocacy
334:11
affect
231:18
312:15
affected
307:7
affirm
186:13
affordability
283:12
affordable
192:24
193:1,6,11,
14,21 195:10
208:13,15
210:19
215:24
219:20,22,24
221:8,10
226:22
235:17
244:21
249:20
262:24
263:9,13,19
275:13,23
285:20
286:7,9,17
291:4 292:15
323:21
330:7,24
333:3,9,19,
20,21
affording
292:15
afternoon
186:22
age
248:2,16,22
249:6,22
266:14,18
267:4,9

268:8,10,13,
14
agenda
288:3
293:23,25
agent
293:24
294:1,4,6,8
ago
187:2
agree
201:12,19,
22,24 252:13
253:2 255:11
256:21
262:15
264:13
265:7,24
266:5 270:17
290:19
304:7,8
305:18,21,25
321:5 328:3,
8,13 331:19
agreed
240:9 244:10
257:2 330:8
agreement
194:22,24
230:24
263:24
264:1,2,3
333:16
agreements
247:6
ahead
295:15
325:18
air
251:5
Akerman
202:6
Alan
208:4,6
allegation
304:13

allegations
304:5,17
alleged
303:24 310:8
311:18 321:8
allocated
236:10 237:5
262:24
287:11
allocating
196:9
allocation
193:9,19
194:13
196:12
212:18
213:10,13
214:2
218:10,15,19
228:22
229:1,10,11
231:2,9,16,
18,21,24
232:18,20
260:7 262:6,
7,9,11
263:2,22
264:3 278:25
283:14 284:5
293:4
294:14,16,18
312:6
allocations
294:23 295:5
allowable
203:23
204:17
223:7,9,12,
15,17 247:12
275:15
302:18
allowed
194:5 241:22
248:23
301:23,25
302:1,3
309:14

allows
275:13
alternative
244:11 332:1
amending
291:16
amendments
194:25
amenities
237:14
252:21
Amerinat
317:7
AMI
218:19
219:3,4,18
223:2 263:22
264:9 278:23
279:7
326:22,23
Ammon
189:1 197:2,
4,11 227:7
amount
195:15
211:24
212:9,12,18,
20,22
214:21,25
215:4 256:14
259:21
262:10,12,20
286:12
287:12,15
290:9,11
294:19
301:11,15,
16,17
302:12,13,
14,16 303:3
305:25
314:14,15
amounts
220:12
221:13
234:16
256:21
295:6,7

analysis
221:16
329:9,19
and/or
236:13
Angela
283:6
295:10,17
297:15
298:4,8
animus
332:7,12
annual
286:1,2,13
313:18,20
315:8,9
answer
190:19
191:14
209:5,20
225:13
231:23
240:16 241:6
243:4,25
254:7,9
263:1 278:14
303:19
304:6,8
306:8 307:19
309:9,10
324:14
330:17,19
answered
244:17
answering
191:14
235:12
answers
187:19
anticipate
309:9
Anybody
228:3
anybody's
284:16
anyone
187:4 188:4

223:5 238:4,
24 246:13
269:1 271:10
329:12
333:4,7
apartment
190:23
234:15
276:24
apartments
250:8 275:3,
7,19,21,23
276:9 329:4
apologize
255:6 320:21
app
188:25
192:20 194:8
196:19,22
apparently
202:24 204:6
245:22
297:19
APPEARANCES
184:1
appeared
237:24
appears
188:21
199:6,15
202:3 204:1,
19 207:18,25
208:3 210:8
216:1 222:4
237:20
239:15
240:13
246:2,17
251:23 252:2
255:9 258:22
259:20
261:22 273:9
274:5,11
295:16
297:17 318:7
applicability
242:12

applicable
  190:12 193:1
applicant
  221:11
  226:20
  288:25 290:5
  298:10
applicant's
  221:23
applicants
  231:19
application
  189:16
  190:11
  192:21,25
  197:15,17,
  18,21,24
  198:3,4,9,
  18,25
  202:18,20
  203:7 208:1,
  24 210:14,15
  211:22 212:7
  216:19 227:5
  234:17
  251:24
  252:3,9
  255:15
  258:14,16,19
  268:21 288:5
  290:3
  298:15,19,22
  299:1,6
  317:11
  318:3,5,8
  329:1
applications
  185:14 192:1
  197:11,14
  210:8 269:6
applied
  192:15
  194:12
  227:15
  258:22 290:3
apply
  189:9,17,20
  191:18,23

192:3,7,9,
13,18 210:15
232:13,17
236:15,17,23
237:2 289:19
314:24
applying
  189:3 190:11
  210:5 218:13
  232:7,11
  236:9
appraisal
  224:14,19,
  20,22
appraiser
  224:14
appreciate
  271:6 321:24
  322:24
approached
  243:3
appropriate
  194:14
  196:12
  225:19
  274:22
approval
  200:1 224:25
  232:20
  234:23
  259:21
  291:11
  303:14
  320:12
approve
  228:7 331:21
  332:2
approved
  255:11
  256:24 257:6
  258:23
  259:1,5,9,13
  261:6 262:16
  270:12,18
  287:15
  293:16
  311:22 312:6

approving
  255:16
  256:15 257:3
approximately
  277:10 314:6
  316:11
April
  257:2,4
  271:15
  299:13
area
  205:18 238:1
  244:21
  263:15
  271:19
  280:11,12
  290:23,25
  291:18
  318:22
  320:11
around
  207:21
  314:11
asked
  191:20 235:9
  241:15 243:1
  244:12,17,20
  245:6 265:15
  304:12 306:6
  319:17
  322:25
  327:23
asking
  198:12 199:5
  204:19 209:2
  213:2 232:2
  241:14
  252:10 262:6
  278:20
  297:1,9
  299:9 303:21
  304:1 305:24
  322:23 324:3
asphalt
  280:19
assessment
  252:1 307:12
  308:7

assigning
  226:19
assignment
  226:15
assisted
  327:12
associated
  188:1 246:13
  269:1 270:11
  271:11
association
  185:10
  238:11,15,25
  245:20
assume
  200:11
  224:19
  232:15 256:9
  257:10,12,14
  258:7 264:7
  276:10 278:3
  311:13
assuming
  257:8 279:12
assumption
  189:23
  190:2,5,9
asterisk
  218:21,22,24
  220:3
Atlantic
  226:18 238:4
  243:1
  246:12,14
  251:25
  270:11,18
  277:8 287:20
  290:6 293:7
  300:24
  301:10
  304:9,16
  329:4 331:4
  332:22
  333:5,7
  334:11
attach
  235:2 252:11
  296:1

Scott Culp Volume II
December 18, 2024

**attached**
200:19
225:18,20
252:13
308:24
**attaching**
200:21
**attachment**
252:10
**attachments**
205:24
**attend**
287:3 288:2
299:16 333:5
**attendance**
299:18,23
**attended**
286:22
287:20
**attorney**
187:4 199:11
200:13 202:6
285:13
300:11
324:12,20
325:14
**attorney-client**
325:6,23
330:14
**attorney-protected**
325:5
**attorneys**
324:16,20
325:3 327:14
330:18
**August**
210:9,10,11
283:6 286:20
**authorities**
294:24
320:10
**authority**
185:17
211:22 212:7
213:24

220:24,25
227:6 234:17
251:17,23
255:10,13
257:23 283:5
286:21
287:19,25
290:2 294:2,
13 298:23
299:14
317:12
320:5,9
331:23
**Authority's**
291:17
**authorizing**
262:11,16
**availability**
274:2
**available**
204:14
208:14,17
231:13,16,19
246:24
247:16
248:22,24
269:17,21,25
271:21
280:15
281:17
294:12,17,21
298:20 307:1
308:15
311:14
315:12,14
**Avenue**
184:11
**aware**
246:12
277:19,23
301:16
304:15
305:11 312:4
333:12
334:14,16

---

**B**

**back**
192:11
204:13,18
208:23
227:17
228:12
230:14
231:22,25
232:19
241:15
252:19
253:9,13,15
254:10 263:4
268:20 275:1
279:21
300:14,18
306:23,25
307:4,8
316:25 334:8
**balance**
278:6 290:4,
7
**barring**
312:2,3
**based**
189:18
191:24
203:15
212:21 214:9
218:9 222:22
223:1,8
230:25
247:12
270:17 278:3
301:20,21
309:10
313:18,20,22
314:15,16
321:2 330:17
**basically**
319:25
**basing**
303:3,4,7
**basis**
195:10,11,

13,23 196:4,
5,20,24
250:4 256:1
257:25
274:20
289:14
301:21 302:5
318:20,21
**Bates**
207:24
210:17
211:17 212:2
214:18
215:14 221:5
222:2,17
225:25 318:2
**Bates-stamped**
185:9
**bearing**
267:6
**beginning**
245:23 251:9
308:14
**behalf**
184:3,9
186:6 273:2
286:23
287:20 304:3
**belief**
274:20
**believe**
192:16
194:23
210:10
211:20
213:18
215:22
227:19 235:6
247:20 248:5
255:12 256:6
257:3 258:18
260:6 261:5,
8 268:8
273:3 274:8,
19 276:13,23
277:1 279:23
288:11,20
289:10

Scott Culp Volume II
December 18, 2024

295:14
299:22 300:3
302:10
312:16
317:11
323:9,20
324:8 330:2
333:6
**believes**
289:16
**below**
234:19
263:15 295:1
**Bend**
233:16
**beside**
220:3
**besides**
218:24
**best**
264:16
265:21
287:16 306:6
323:25
**biggest**
311:1
**bit**
190:24
198:16
204:18 212:8
218:5 231:11
234:6 236:7
248:20
270:21 271:7
272:13
291:3,10
307:6 312:7
323:15 330:6
**black**
326:5,15
328:9,14
329:6
**block**
308:24
**board**
228:25
234:23

291:15
297:21
332:1,2
333:18,22
**bond**
185:14
192:20,21,25
193:9,19
196:19,22
197:17,18,23
198:18
212:18
213:12
214:2,8,15
217:9
218:10,15
220:13,16,18
221:3 228:7,
22 229:1,7,
10 230:18
231:2,9,14,
16,18,21,24
232:18,20
247:6 249:20
251:16 253:3
255:9,11,17
256:13,18,19
257:1,3,9,
17,24
258:15,22
259:1,21
260:3,20
261:6,12
262:5,7,9,
10,13 263:2
264:2
270:12,19
278:25
283:14,16,21
284:5,6,11
285:14
287:12 293:4
294:13,22
295:5 298:19
302:2 307:7
311:22
312:6,16
313:9 314:9,
13,14,15,17,

18 331:20
332:2
**bonds**
212:23 219:6
220:10,12,
16,25 221:2
231:14 237:1
255:12,16,
22,23,25
256:3,5
257:5,18
259:5,12
260:7
262:12,20
283:17,24,25
284:13,14,24
285:1 289:21
292:15,16,23
293:15
294:4,6
299:19 300:1
314:21,22
320:8,11,14
**bonuses**
204:14
**boost**
318:21
**borrower**
222:4,8
**boss**
198:20
**bottom**
202:3 207:10
208:18
210:18
211:18
214:19
215:14 221:6
224:24 225:5
226:1 245:23
247:10
**Boulevard**
240:18 241:2
288:14,15
**Bowser**
202:4,8,9,
14,15,23
204:22

223:21 224:7
225:19
285:11,12
286:22
287:20 299:5
**box**
298:20
**bracket**
277:24
**break**
195:18
196:21
228:1,3
230:9,13
251:7
282:21,25
300:6,10,17
334:3,7
**Brevard**
185:12,14,17
186:8 208:6,
7,12 210:19,
21 212:6
227:6,11,24
229:14,21,22
231:14
232:8,11,18,
19,21,23
233:1,20
246:12
247:25
250:13
251:17,23
253:3 255:9,
10,12 262:15
270:13,19
286:21
287:24 293:8
295:21 296:9
297:10
299:14,19
320:7 321:16
326:8 328:5
329:5 331:19
332:8,13
333:4,10,13,
15

Scott Culp Volume II
December 18, 2024

bring
285:10
brochure
205:4
Brock
226:17,22
257:22
287:9,10
305:17,21
331:2
broker
205:4
broker's
205:14
brokers
205:21
brought
234:2 271:6
Browser
223:20
budget
312:25
313:3,5
building
203:20,24
243:25
277:15
280:12,22
281:5,7
buildings
290:22
built
328:9,14
buyer
221:1
buying
195:25
bypass
293:2

C

C-4
275:4
C-P
275:5

C-P4
275:6
calculate
301:17
302:14
calculated
301:21
305:12
311:16
calculating
303:23
305:14
310:11
calculation
222:18 223:3
234:14
301:20
302:11,25
306:12
314:16
calculations
222:22,24
223:1 303:4,
7,11,17
309:11
311:17,19
call
205:3,4
called
186:18 294:3
325:12,19
calling
204:21
canceled
201:1,13
228:8
Canton
305:2,7
308:23
capacity
281:24 282:3
Capital
295:4
care
274:15
carry
294:11,13,

15,17 295:7
carry-forward
294:23 295:6
Cary
274:12
case
193:10,23
285:24
300:23
314:21 316:9
319:8,11
329:23
cash
305:24
306:3,24
307:1 309:12
311:1 313:25
314:1
315:12,13
category
252:4
caused
258:10 330:2
cautioned
292:14
census
318:23
center
202:24,25
203:6,13
cents
195:8
centuries
211:12
certain
203:19
252:11
262:12
302:18 320:9
Certificate
185:4
certification
217:1 226:25
chain
202:3 235:3,
13 274:10
294:10

295:9,12
change
201:7 211:24
212:25
213:1,2,4,7
214:8,9
215:2,5,12
216:24
218:12
250:23 291:6
301:16
changed
213:11,19
214:14,21
215:6,8
216:22 285:5
298:13
301:15
305:10
312:11
changes
216:24
chapter
285:19
charge
304:20
charged
302:19
chart
220:6,8
check
253:25
267:24,25
298:16,20
checks
252:4
chilly
251:2
chooses
231:18
chose
289:17
Christy
235:4,5,16
270:21
273:1,11
274:1,12

Scott Culp Volume II
December 18, 2024

cities
  331:5
city
  185:10,16
  206:12,25
  208:19
  209:7,11,13,
  18 210:2
  231:1 234:25
  235:5 242:18
  244:12
  270:22
  271:2,19
  272:10,14,
  16,17,22,23,
  25 273:2
  276:2 290:17
  298:11
  321:22
  322:1,9,15
  331:5
civil
  238:1
claim
  219:16 258:9
  306:7
claims
  329:15
clarification
  240:7 261:4
  278:8
clarifications
  273:3
clarified
  254:7 317:24
clarifies
  254:9
clarify
  193:13 218:1
  220:25
clarifying
  298:18
Clark
  199:8,10
  200:7 201:25

clear
  325:13,17
close
  237:23 243:6
  289:2 294:17
closed
  256:19
  257:15,18
  262:13,21
closer
  280:2,5,6
closest
  278:9 289:18
closing
  201:4 214:9
  217:10
  233:14,18
  257:4,13
  262:10
Club
  250:7
  259:19,20
  261:5 265:22
  270:1,3
Coalition
  295:2
coalitions
  333:8,15
code
  291:20
column
  212:15
come
  227:17
comes
  195:8
comfortable
  230:7 304:14
comment
  280:5 291:23
commercial
  192:23
  193:8,17,18,
  21 196:13
  275:14,15
  291:5

commercially
  199:25
commission
  213:12
  231:25
  232:19
  293:16
  296:18 297:1
  312:6
Commission's
  330:2
commissioner
  239:16,18
  240:8
commissioners
  213:10 228:6
  239:17 257:6
  289:5,17
  291:16
  292:13
  293:3,9
  295:18,22
  296:10
  297:11 328:5
  331:20
  332:8,13
commissioners
'
  288:9
commitment
  209:7
committing
  283:13
common
  211:4
Commonly
  276:14,16
  318:15
communicated
  300:22
communication
  202:13,15
communities
  250:9 263:24
  267:3 301:20
  320:12

community
  215:25
  218:17
  226:10,11,16
  227:2
  237:19,20
  240:14
  243:19 245:3
  246:21
  248:14
  252:6,8
  264:13,20,25
  265:5,20,22
  266:14,15
  267:1 273:7,
  8,9 274:2
  275:25 276:7
  277:12,22
  278:16
  279:1,9
  280:1,9,18,
  21 281:8,11,
  14,20,24
  282:1,5
  284:7 289:1
  296:19,20
  297:3 306:24
  313:25
  314:3,20
  315:15,22
  323:21 327:3
comp
  269:16
companies
  197:12
  220:21
company
  189:2 197:3,
  8,13 247:19
  268:1 270:11
  299:25
  309:20
  313:17,18,
  21,22
  332:20,23
comparable
  266:1,21

compare
  266:1
comparing
  265:24
comparison
  266:12
  313:23
compensation
  265:25 267:2
competitive
  189:16
  236:9,14
  237:4
complaint
  304:5,17,22
complete
  217:17
  221:22,25
  224:21
  312:23
completed
  261:8 311:24
  312:5,19
  313:8 316:11
completeness
  235:2 257:1
completing
  197:20,23
  312:3
completion
  248:4
  255:22,23
  256:3,6
  312:20
  314:24
complex
  241:22
  248:21,23
  268:7
compliance
  227:1 315:23
comply
  316:19,22
component
  193:16,17,
  18,22 311:1

composition
  266:20,21
  267:3 268:9
  269:2,16,18,
  21 270:1
  329:3,10
comprehensive
  206:24
  207:3,7
  271:18
comprise
  241:25
compsen
  267:2
con
  287:2 293:7
conceptual
  207:11
concern
  239:11
concerns
  237:20 239:8
  288:17,23
  290:18,20
concludes
  334:20
conclusion
  201:12
conclusions
  201:19,21
Concord
  197:2,4,8
  268:22
  308:20
  309:6,12
Concordrents.
com.
  250:19
concurrency
  201:7
condition
  201:7
conditioning
  251:5
conditions
  201:4

conference
  274:2
confirm
  311:5
confirmation
  234:15
  257:16
  264:23 287:3
  310:9
confirmed
  312:20
confirming
  204:23 274:1
confused
  253:23
Connie
  224:12,21
consent
  200:17
conservation
  252:25
consider
  190:10 203:8
  205:14,18
  206:5 227:10
  229:3,7
  244:10,21
  245:6 265:14
  283:24
  311:13 319:5
consideration
  203:8,9
  204:6 211:3
  227:12 229:3
  319:7
consideration
s
  228:18 319:4
considered
  196:4 205:10
  216:6,10
  227:11
  228:25
  229:9,20
  244:25
  245:10
  263:18

311:6,17
  323:17
considering
  210:5
  229:12,14
  245:1 271:1
  291:16
  311:11
consistent
  203:14 215:2
  224:25
  225:14
  235:18
  237:7,11
construction
  201:10
  212:16,17,19
  221:5,9
  256:2 258:2,
  8,10,13
  282:6 287:14
  291:18
  305:3,7
  308:23
  312:8,15,18
  313:7,17,18
  332:23
Cont'd
  185:3 186:20
contact
  208:16 293:8
contacted
  288:8
contacting
  273:1
contents
  274:9
contingent
  236:8,16
continuation
  187:1
continue
  236:12
  250:15 293:7
CONTINUED
  185:2

Scott Culp Volume II
December 18, 2024

continues
  286:3
continuing
  247:11
contract
  199:16,20,21
  200:15
  201:1,13,16,
  23 226:15,19
  228:8,21
  230:25
contractor
  309:15
contractual
  333:16
Contrary
  298:9
contribute
  221:9,12
  303:18
contribution
  208:21,25
  209:4,8,14,
  25 210:1
control
  201:8 290:17
  315:21
conversation
  208:11
  325:1,6,23
  331:1
conversations
  238:24
  270:23
  271:24
  272:2,16
  324:11,13,19
  325:7,15,22
  330:18
copied
  260:14
copies
  238:22
  239:13
  299:11
copy
  217:15 224:3

245:25 278:4
285:23
296:14
297:2,7,8
309:3 322:7
copying
  226:5
cor
  274:17
corner
  288:14
Corporation
  189:13 217:2
  236:11,16
  292:22
corporation's
  187:19
correct
  188:22
  194:17
  196:7,8,16
  199:8,17
  200:19
  202:20
  204:21,24
  207:18 208:1
  210:6,9,10
  212:11,25
  216:2,3
  219:7 222:18
  223:3,13,21
  224:10
  226:12,13
  227:18 228:9
  232:14,23,24
  235:14,20,25
  236:4,6
  237:16,17,24
  240:21,24
  241:1 243:7
  244:2,25
  245:4
  247:14,15,24
  248:4,20
  249:13
  250:5,6,11,
  12 251:25
  252:5

253:13,20,22
255:21
256:14,16,24
257:19
259:22
261:13,24
263:6 267:11
268:23,24
273:10
274:6,17,18,
19 275:9,11
276:17,25
277:17 283:7
286:23
287:4,21,25
295:18
296:11
298:6,14
301:12
305:4,8
306:21
307:12
310:13
311:14,15
314:6,13
316:8,11,12,
15 325:4
327:24
330:16
correction
  260:2 270:9
correctly
  219:5 273:1
  275:18 302:4
  312:21 320:2
corresp
  273:6
correspondenc
e
  248:8 272:9
  273:4 333:14
corresponding
  272:22
corridor
  271:3,15
cost
  195:2,4,5,6,
  11,19,22

196:1
214:11,12
217:1 256:2
258:2 302:7,
9,17 312:8,
14,18 314:6
315:6
318:10,12
cost-
certified
  214:11
costs
  195:14
  243:16 256:2
  287:14
council
  244:13,20
Councilman
  271:23
counsel
  186:4 285:14
  300:22
  324:23
count
  209:4
counties
  320:9,18
  331:5
county
  185:12,14
  186:9 208:6,
  7,8,12
  209:2,9
  210:19,21
  212:6 213:10
  227:6,24
  229:15,21,23
  231:14,20
  232:8,18,19,
  21,23,25
  233:6,11,21
  234:14
  246:12
  247:25
  250:13
  251:17,23
  253:4
  255:10,13

262:16
270:13,19
286:21
287:24 289:5
291:16 293:8
295:21
296:9,17,25
297:10
299:14 312:5
319:20
320:3,4,12,
13,14 321:16
323:22 326:8
328:5 329:5
330:2 331:19
332:8,13
333:4,10,13,
15
**couple**
187:18 188:9
202:21 248:7
**course**
213:5 229:12
315:11
**court**
186:10,12,17
228:2 250:22
334:1
**Cove**
249:24
259:14
260:10,12,
21,25 261:11
262:3,17
265:19
269:22
**covenant**
265:3
**covenants**
267:25 268:2
**cover**
257:7,21
295:25
297:14
314:13
**coverage**
212:21
314:17

**covered**
215:22 246:3
272:12 298:2
315:6,7
**covers**
215:23
258:19
**COVID**
258:6
**created**
222:24
323:20
**creates**
314:2
**creating**
222:20
**credit**
213:25
214:3,7
215:16,20
216:12,14,
15,19,20
217:7,9
218:10
221:15,18,23
222:6,8,13
224:18,20
236:19,25
247:4,7
250:3,11
256:18
270:12
284:21,22,23
301:19
309:24 311:5
314:25
315:1,18,21,
25 316:1,2,
7,17 317:6
318:9,16
320:25 327:3
**credits**
194:10
195:13
196:5,25
236:13,20
237:2,5
255:25 264:5

284:2,9,11
285:1,15
300:1 311:13
313:9 315:8,
9,11,16,17,
19,20,23
316:10,18,23
318:24 327:4
**criteria**
203:3,20,21
204:11 209:1
225:12
320:23
**Culp**
185:2 186:4,
18,22 187:15
233:25 243:3
246:6
251:11,14
273:21 274:1
282:15
289:13
292:13
300:17,19
310:3 321:11
334:21
**curious**
307:2
**Curry**
273:12
**cut**
332:24
**Cyntia**
273:12

---

**D**

---

**damages**
230:18
290:12
303:24
304:19
310:9,10,24
311:1,7,16,
18 321:3,7
**dash**
211:18 215:1

252:14,20,
23,24 275:8,
20 276:9
277:24
285:17
**data**
269:17,21,25
**database**
247:19
269:7,12
329:1
**date**
195:5,7,20
199:19,22
201:4 209:19
226:12
228:11,15
236:23 237:6
257:1,5,13
259:25
312:20
**dated**
188:22 199:6
202:4 213:15
214:24 216:1
223:21 227:3
234:12
257:21
271:15,16
274:12 283:6
287:8 294:9
298:5
**dates**
294:11
297:17
**David**
285:10,12,13
**day**
213:11,12
233:2 297:16
304:6 325:20
**day-to-day**
198:24
**days**
211:11
**deal**
196:23

**debt**
  212:21
  284:1,16
  314:17,18,20
  315:6
**December**
  199:6 214:16
  216:1 218:6
  228:9,16
  229:11,20
  233:2,3,6
  274:12
  287:24
  293:16
  295:22
  296:10
  297:11,13,15
  319:18 328:6
**decide**
  296:4
**decided**
  210:14
**decision**
  190:16,18,20
  205:11,15
  229:2 289:13
**decision-making**
  289:7
**defendant**
  184:9 186:8,
  18
**defendant's**
  185:8,10,11,
  13,15,17,18,
  20,21,23,24
  187:16
  233:23 246:8
  251:8 272:5
  282:12
  300:13
  310:4,17
  321:12
  323:10
**defer**
  303:12
  310:12 321:4

**deferral**
  211:1,3,5,6,
  10,11,12,15
  234:21
**deferrals**
  234:22
**deferred**
  211:9
**define**
  290:25
**defined**
  235:18
  247:20
**defines**
  285:20
  286:17
**definitely**
  217:7,25
  245:18 251:5
  306:9 318:11
  320:22
**definition**
  219:22
  263:14
  285:20
**definitive**
  326:6
**delay**
  201:9
**demand**
  243:16
**demographics**
  298:13
**denial**
  213:9 331:5,
  9
**denied**
  213:12
  214:15
  229:1,8
  230:18
  231:10,21
  232:20
**Denise**
  273:12 275:2
**density**
  203:3 224:24

  225:13,14,16
  242:13
  281:21
  288:18
  291:7,11
**dep**
  242:9
**department**
  272:22
**depend**
  218:12
**depending**
  195:12,13
  218:12 247:8
  314:20
**deposed**
  332:18
**deposit**
  290:2
**deposition**
  185:2 186:3
  187:2,3,5,8,
  10,15 190:25
  194:11
  198:16 200:6
  212:9 215:23
  218:6 219:2
  231:12
  234:1,7
  236:2 242:10
  243:15 246:7
  247:23
  251:10,14
  254:4 272:8,
  11 280:11
  282:15
  284:14
  298:16
  300:19
  302:23
  304:19
  306:19 310:3
  321:11
  323:15
  324:25
  327:16 330:6
  334:21

**Desantis**
  200:3
**describes**
  252:4
**description**
  304:3
**design**
  304:20
**designated**
  241:3
**designation**
  253:24 254:5
**designed**
  237:14
  240:19
**desire**
  211:23
  283:20
**determination**
  194:12
  221:20 269:8
**determine**
  189:15
  191:3,16
  203:23
  223:7,9
  228:24
  262:23 308:1
  320:23
**determined**
  191:2,7,9,18
  192:5,8,9,13
**determining**
  191:23
  196:11
**develop**
  229:25
  271:20
  289:20 293:8
  323:21 331:9
**developed**
  219:17
  246:12
  257:19
  274:23
  275:22 281:8
  284:22

Scott Culp Volume II
December 18, 2024

320:13 326:4
328:20 329:5
**developer**
240:16
244:10 290:2
298:12
301:18
302:11,18
303:8
313:19,20
**developer's**
226:25
303:24
**developers**
292:16,24
301:24 302:3
**developing**
311:12
**development**
189:4 192:24
193:2,6,12,
14,19,20
195:5,19
200:2,10,24
201:9 203:8
204:20
206:20
208:13,15
210:24
215:24
216:6,11
218:17
221:2,16
226:9,16
227:15 229:4
231:6,7,8
233:20
234:10
236:16
242:23
246:11 247:9
249:19,20,21
252:11
256:12 260:7
261:8 271:25
275:20
276:23,24
277:2 284:10

287:2 298:23
301:10
302:6,9,17
306:21
307:10 308:4
315:2 319:3,
6,23 323:17
324:2 327:2
331:6,9
**developments**
185:12,14
246:15
250:13,16
268:10
272:20
275:14 291:4
293:14
313:16
326:10
328:24
329:10
**develops**
277:9
**die**
227:17
**died**
227:7 231:7
**difference**
211:5
216:17,18
**different**
191:19,24
193:4,5,7
194:14,19,21
197:12
212:15
214:19
219:9,11
222:25
227:10
228:19
232:3,4,13
248:10,17
249:10,12,21
254:5 261:22
267:1 271:14
277:2 284:19
296:14,17,21

310:22,23
320:18
**differentiati
on**
266:13
**differently**
215:9 229:19
253:6 276:22
279:17
322:13
**difficult**
292:14
**difficult-to-
develop**
318:22
**difficulty**
315:18
**direct**
185:3 186:20
324:13
**directly**
213:14
324:22,23
**director**
295:4
**directors**
333:18
**dis**
306:4
**disability**
267:10
**disabled**
248:3
**disapprove**
331:21
**Disclosures**
185:20
**discount**
306:3,4,16
**discover**
290:11
**discuss**
208:24
311:20
**discussed**
194:10
208:22 211:2

218:14
230:25 242:9
254:4 263:18
284:14 292:8
298:16 299:5
304:18
314:14
321:17,24
**discussing**
279:24
**discussion**
193:24 194:1
203:18
206:13
207:25
209:9,16,18
210:2,19,24
211:14
234:21
279:21
280:8,18
281:11,14,
20,23 282:1
283:12,15,19
286:25 288:5
289:6 320:4
**discussions**
209:13
304:25
330:15
**disparate**
329:14,22
330:3
**disseminated**
238:19
**dissolved**
323:24 324:1
**distinction**
263:11
**distribute**
315:13
**distributed**
238:15
**district**
203:1 275:4,
8,20,22
**districts**

Scott Culp Volume II
December 18, 2024

200:1 203:4,
5
**Ditmore**
271:23
**division**
294:22
**document**
190:14
199:5,6,13,
15,18
200:14,16
202:2 204:25
205:1,6,10,
18 206:5,8,
12 207:9,24
212:2 217:20
222:17,21,23
223:6,8
224:2,5,12
226:8,14
227:22
235:1,3
237:18
238:9,11
239:15,22
240:9,15
251:23 252:1
255:14,19
257:22
258:14,20
259:14
273:5,20,22,
25 274:11,25
279:22 283:5
286:19,20
287:7,9,17,
23 294:9
295:9,14,24
297:19,20,25
299:13
300:24 301:6
303:2,6
308:19 310:6
321:15 322:3
**documentation**
290:14
**documents**
185:9,16,17

187:7,12,22
188:2,9,12,
13,14 189:7,
10 191:9
192:11
212:21
213:20
228:21,24
251:15,22
255:3 257:13
262:10,22
264:5 273:24
283:4 284:6,
8 299:8
300:20
310:23
321:14
327:16
328:23
**doing**
186:24,25
245:22
274:21 319:2
**dollar**
256:21
**Doster**
184:5
**draft**
202:15
216:12,16
217:4,6,8,17
**drafted**
200:16
**Drive**
184:5
**Drosdick**
184:5
**due**
210:8 256:2
**duly**
186:19
**duplicate**
296:18 297:5
**duties**
304:2
**dwelling**
224:9

---

**E**

**e-mail**
188:17,21
189:1,18
191:24,25
194:7,16,18,
23 195:2
197:1 202:3,
4,7,23
205:25
208:4,11,24
210:18
227:3,4,9
234:8,12,20
235:2,3,13
238:20
239:2,5,9
240:2,3,8
245:16,18,
22,25 246:4,
5 272:2,9
273:4,5,6,
11,17 274:9,
10 282:22
283:6,9,11
285:2,10
287:9,10
293:22,23
294:9,10
295:1,3,8,9,
12 296:8
297:9,15,19,
21 298:4,5,8
**e-mails**
238:22
239:7,13
248:7 272:14
273:19 275:1
299:9,10,11
**earlier**
190:19
194:11
196:15
210:12 215:8
234:6 236:2
239:20

241:15
243:15 254:4
268:21
270:22
271:7,23
277:16
284:14
298:17 307:6
312:7,20
313:7 318:13
319:17
320:17
323:15
**earns**
313:17,19,21
**earthquake**
311:25
**easier**
252:15
**east**
240:18
**Eastern**
186:2
**easy**
310:14
**economic**
243:16
**economically**
284:19,20
315:5
**effect**
203:7,9
**efficiency**
252:24
**either**
331:21
**elderly**
248:16
252:5,7,10
253:12,24,25
254:5,17
266:25
298:17
**elected**
291:11

Scott Culp Volume II
December 18, 2024

electronically
199:7
elevators
280:14
eligibility
209:1 248:9,
11 320:24
321:2
eligible
195:10,12,23
196:4,5,19,
23 210:25
256:1 301:21
302:5
318:20,21
eliminate
292:17
emails
185:10
Emerald
293:14
emergency
240:19 241:3
274:16,24
employees
304:4,10,12,
15,16
empty
248:24
encouraged
293:7
encouragement
293:11
end
236:24
241:6,22
293:6
ended
277:3
energy
252:24,25
engaged
224:20
engages
224:18

engineer
226:19
238:1,7
272:24
engineering
226:15
engineers
272:19
ensuring
198:8
entered
199:16,20
entire
193:10
198:11
212:18
280:22
281:5,7
308:3
entitled
324:18
entitlements
193:15
195:19
202:10 203:1
206:16,18
242:13
entity
221:11
226:20
333:20
entrance
243:25
entrances
281:17
envisioned
213:11
Eola
184:5
equals
192:20
equity
212:9,22
221:12
284:2,21
306:20
307:8,11,17,

22 308:2,16
314:11
315:7,10,21,
25
Errata
185:5
error
309:3
ESQUIRE
184:4,10
essentially
215:23 293:2
established
219:1 228:8
264:12
276:23
estate
199:11,12
307:14
estimated
226:9
ethnicity
247:20
evaluate
189:20
evening
297:16
everyone
230:8
evidence
326:15,17
330:4,5
332:7,12,20
evidenced
248:4
exact
204:12
241:16,18
256:20 262:5
281:6 296:18
297:5
exactly
194:2
Examination
185:3 186:20
examples
240:16

exceed
286:11
excludes
302:17
exclusively
326:10
excuse
187:20
207:15,24
215:11
222:17 225:8
239:16 240:5
251:19 260:2
273:8 275:6
283:4 287:18
296:1 306:4
310:3 326:4
332:2
executive
226:22
exempt
193:18
212:18 214:2
219:6 237:1
exhibit
185:8,10,11,
13,15,17,18,
20,21,23,24
187:15,16
233:23
246:7,8
251:8,14,18
252:11,12,19
272:5,8
276:6
282:12,15
296:14,20
300:13,19
310:3,4,16,
17 317:2
321:11,12
323:7,10,13
exhibits
185:7 296:22
exist
201:8
existing
194:6

Scott Culp Volume II
December 18, 2024

exits
  300:12
expected
  195:16
  307:11,14
expedited
  200:1
expenses
  313:21
  314:1,2,13
  317:19,23
expert
  258:9 326:19
expired
  229:11
expires
  294:15
expiring
  231:2,10
explain
  196:17
explained
  243:14
  248:19
explains
  219:14 220:9
explanation
  219:8 258:25
explore
  208:14
expressed
  239:12
  288:12,17,23
  290:18,20
expressing
  239:9
extended
  263:24 264:3
  283:20
extent
  198:17
  206:18
  321:25

---

F

---

facility
  268:8 274:15
fact
  188:10
  189:20 203:6
  204:20
  206:21 217:4
  229:7 245:24
  252:12 290:6
  295:12
  314:25
factual
  326:17
failed
  240:16
failure
  201:3
fair
  190:25
  192:14
  202:18 218:6
  227:1 284:12
  305:19 308:6
  313:10
fairly
  266:21
family
  263:16
  285:25
  289:20
  298:13,17
far
  188:12 192:1
  209:13 211:8
  218:7 228:18
  230:21
  263:22 264:9
  265:24
  270:10 298:1
fast
  286:15
feasibility
  243:16

feasible
  284:7,19,20
  315:5
features
  252:25
federal
  236:13,19,25
  237:2,4
  283:19
fee
  209:2,3
  210:20
  234:9,16
  301:18
  302:1,3,11,
  19 303:8,24
  309:14,19,21
  311:6
  313:17,19,22
feel
  245:14 321:3
fees
  208:1
  209:14,18,
  22,23 234:7,
  14,21 290:4
  294:8
  301:10,21
  313:19,20,23
  314:1 325:20
feet
  241:16
  291:22
Feinberg
  295:4
FHFC
  289:20
  292:16,25
field
  245:20
  294:25
figure
  195:21 226:3
  259:9
figured
  302:21

figures
  197:9 327:8
filed
  331:4
filing
  188:7
fill
  195:22 196:2
final
  195:1 198:8
  213:23,24,25
  214:7 216:5,
  10,14,15
  217:1,4,6,7,
  8,9,12,15
finalization
  214:5
finalized
  194:2 257:9
finance
  185:17
  189:13
  211:21 212:7
  213:24 217:1
  220:24,25
  227:6 234:17
  236:7,10,15
  251:17,22
  255:10,13
  256:19
  257:23 283:5
  286:21
  287:18,19,24
  292:22
  294:2,13,22,
  24 298:22
  299:14
  317:12
  320:5,9,10
financed
  253:3
financial
  234:19 308:3
  310:24
  317:17
financially
  284:7

Scott Culp Volume II
December 18, 2024

financing
 209:14,17
 215:24 220:6
 228:7,19
 230:18,22,24
 232:23
 237:13 247:8
 251:16 253:3
 255:2,20
 256:18
 270:12,19
 285:15
 311:22
 319:4,23
find
 250:18
 252:16 258:3
 263:21
finding
 232:3,6,10
finished
 199:5
first
 186:19
 187:9,18
 188:9,17
 190:25
 203:17
 208:18
 209:16
 212:4,9
 213:11
 216:12 217:4
 218:5 220:7
 221:1 231:17
 232:22
 234:7,13
 235:16 242:9
 247:10,22
 251:23
 253:19
 273:23 283:5
 292:18 298:9
 299:15
 300:24
 306:19 319:9
 321:15
 324:25

327:16
Fischer
 235:4,5
 270:21
 273:1,11
 274:1,12
Fishkind
 324:9,14,16,
 22 325:2,7
 326:21
 327:6,17
 328:4 329:3,
 16,19
five
 241:20,25
 243:22
 258:5,8
 273:19
 309:25 312:9
 331:13
five-year
 258:11
fixtures
 252:23
Flagler
 320:13,19
flier
 205:3,4
flip
 188:15
flipped
 253:19
floors
 204:2
Florida
 184:6,11
 189:12 217:1
 236:10,15
 237:8 277:9
 285:17,19
 292:22
flow
 305:24
 306:3,24
 307:1 309:12
 311:2 313:25
 314:1

315:12,13
fluid
 212:25
following
 240:16
follows
 186:19
font
 234:5
form
 189:22
 190:17 191:5
 201:14 216:8
 235:9
 240:10,23
 241:9 242:3,
 20 243:9
 244:3,15
 245:11 248:4
 249:18
 258:19 259:2
 260:4
 261:14,16,25
 262:25
 264:15 265:8
 266:2
 267:12,18
 268:11 269:3
 270:14
 275:10
 276:11 278:1
 279:11
 280:23
 288:21
 289:11,23
 292:4 293:17
 298:25
 299:21
 329:17
 330:12
 332:3,9,14,
 21,25
forma
 185:22
 317:2,7,10,
 15,16,25
 318:2,5

formas
 317:4
format
 318:5
forms
 198:2
forna
 317:25
Forrest
 245:14
forth
 275:1
forward
 214:1 289:15
 294:12,13,
 15,17 295:7
forwarded
 295:17 298:8
forwarding
 197:9 245:22
 298:4
found
 243:2
foundation
 239:9
four
 194:8,10
 204:1,3
 216:19
 233:14,18
 236:21,24
 237:2
 241:14,17
 243:1 246:11
 250:15
 252:14,20,
 23,24 255:24
 263:17 264:4
 270:19 276:9
 280:2,5
 284:1,8,25
 290:24
 318:9,11,13,
 15,17,20,25
 319:2 320:2,
 8,24 327:3

Scott Culp Volume II
December 18, 2024

Four-part
  209:15
four-story
  276:24
  277:15
Fourteen
  309:18
fractional
  318:23
front
  187:14
  194:22 205:1
  228:14
  256:20
  259:12
  260:10,18
  300:18
FS166.041517.
  235:19
FS420.004
  235:18
funding
  190:12
  192:15
  215:4,11
  229:8 231:13
  232:14
  331:6,10
funds
  235:9,10,11
future
  206:8,13,16,
  24 291:17

───────────

G

───────────

Gainey
  184:10 185:3
  186:8,21
  187:17
  189:25
  190:3,21
  191:12,15
  201:18
  205:24
  206:2,4
  217:3 225:25

226:4,7
227:25
228:3,5
230:9,16
233:24
239:25
240:3,5,6,
12,25 241:11
242:5,25
243:10
244:5,18
245:13,17
246:9 249:23
250:23
251:1,13,19,
21 252:18
253:1 259:3,
6 260:8
261:15,21
262:2 263:3
264:18
265:11,13,18
266:4 267:7,
15,22 268:15
269:10
270:16
272:4,6
273:20,23
274:4 275:17
276:14,16,21
278:7
279:12,15
281:3
282:13,17,
19,24 283:2
288:24
289:12,25
292:7,10
293:20
296:4,7,23
297:6 299:7,
24 300:6,16
310:5,19,21
321:13
323:11
324:17
325:18,21
329:21
330:13,22

332:6,11,16,
22 333:2
334:2,10,17,
19,23
gather
  187:22
gathers
  268:22
Gauthier
  207:16
  237:22
  238:2,6
  304:20
gave
  190:19
  191:25
general
  226:21
  228:17
  306:14
  308:14,18
  309:15
generally
  287:14
  307:21 308:6
  312:23,25
  319:11,12,13
generate
  313:9 314:4
generated
  217:12,16
getting
  251:2 278:11
  284:23
  294:16
  315:10
  316:6,16,18
give
  186:14
  188:18 195:2
  202:24 207:1
  228:17 243:3
  273:18
given
  264:7 296:25
  297:3

giving
  255:3 325:2
glasses
  234:2 318:7
globally
  308:5
goes
  198:3 241:14
  263:14
  268:20 290:1
going
  188:13
  191:18,23
  192:2,6,8,13
  193:11
  204:13
  217:21
  219:17
  227:4,20,25
  228:18
  230:5,11,14
  231:22 238:9
  246:6,10,15
  250:20
  251:15
  254:22
  257:20
  258:21 264:7
  272:7,8,12
  275:1 277:13
  282:16,20
  283:3 300:8,
  14 308:4,7,
  12,21 309:9
  310:2,15,25
  311:8 312:8,
  15 318:18
  319:6,10,11
  334:4,5,8
good
  186:22,23,25
  187:1 188:7,
  8 228:2
  233:3 306:9
  313:4
Gosh
  197:25

**governed**
  212:20
  301:18  302:1
**government**
  208:16,25
  237:10  289:8
**Governor**
  200:3
**grant**
  234:22
**great**
  283:25
**greater**
  214:25
**gross**
  286:1,2,13
**ground**
  312:1
**group**
  197:12
  224:15,20
**groups**
  334:12
**growth**
  243:15
**guarantee**
  282:20
  315:19
**guarantors**
  315:24
**guess**
  217:11  222:6
  240:2  252:7
  306:18
  311:25
**guidelines**
  195:14  223:8
  283:19
**Gump**
  245:14
**Gunther**
  237:21
**guy**
  321:5

---

**H**

**half**
  187:9  194:11
  215:22  242:9
  291:1
**halfway**
  275:2  297:20
**Hammock**
  246:16,17,25
  247:17
  258:14,16
  259:3,5,13
  264:12,24
  265:6,25
  266:20
  269:14,18
**hand**
  186:13
**handed**
  216:11,16
  253:10  272:1
  295:24
  296:15
  322:20  323:2
**handle**
  304:24
**handles**
  199:11
**handwriting**
  279:4
**happen**
  227:18
  308:17,18
**happened**
  215:2
**Harbor**
  246:16,17,25
  247:17
  258:15,16
  259:3,5,13
  264:12,24
  265:25
  266:20
  269:14,18

**Harbor's**
  265:6
**hard**
  301:3
**harder**
  301:4
**HC**
  194:8
**head**
  320:16
  328:21
**hear**
  281:25
**heard**
  332:17
**hearing**
  217:5
  291:17,20
  292:23
  321:17  322:5
**height**
  203:4,18,20
  204:7,9,14
  241:6,15,18
  242:13
  288:18
  290:16
  291:7,11
**held**
  288:25
  291:20
  332:7,12
**Helen**
  295:3
**help**
  208:14
**helped**
  188:2
**helps**
  223:9
**Heritage**
  197:21,24
  198:19  199:1
  204:21  206:3
  207:20  213:8
  215:17  216:5
  218:8  226:21

  227:23
  233:19
  234:11
  235:17,23
  236:3  240:18
  241:2,21,25
  242:7  245:21
  246:1  248:9,
  13,18,25
  249:11,13
  253:11,19,25
  254:12
  266:1,8
  268:7  274:15
  277:14
  280:16
  281:18  287:2
  288:6,14
  305:16
  324:6,7
  326:4,13,16
  328:9,13
**HFA**
  220:23,24
  232:18,21
  292:15
  293:10
**Hickon**
  234:8
**Hickory**
  185:25
  323:18,19
  324:4
**high**
  290:24
**Hintz**
  245:21
**history**
  308:4
**HOA**
  246:1
**Hokes**
  326:4
**holding**
  290:2
**Holdings**
  221:3

Scott Culp Volume II
December 18, 2024

hole
    312:1
home
    247:13
homeless
    333:8,14,17
homeowners
    185:10
    238:10,14,25
    245:20
homes
    241:20,22,25
    288:17
honest
    276:3
hour
    227:25
house
    320:10
household
    247:12 248:3
    249:6 266:9,
    10,13 267:6,
    10 268:14
households
    286:3,13
housing
    185:17
    189:12
    192:24
    193:6,11,14
    194:10
    195:10
    196:24
    207:17,18
    208:13,15
    210:20
    211:21 212:6
    213:24
    215:25
    216:19 217:1
    219:20,23,25
    220:24 224:9
    226:18
    227:1,6
    234:17
    235:24
    236:4,5,7,

10,13,15,19,
20,25 237:2
238:4 243:2
244:22
245:20
246:13,14
247:4,7
248:14
249:4,20
250:3,11
251:16,22,25
255:9,10,13
257:23
262:24
263:9,13,19
264:5 266:16
270:11,12,18
277:9 281:1,
9 283:5
284:21,25
285:15,20
286:21
287:18,19,
20,24 290:6
292:16,22
293:7 294:2,
13,24 295:3
298:1,22
299:14
301:10,19
304:9,16
317:12
318:16
320:5,9,10,
24 323:21
327:3,4
329:4 331:4
332:22
333:3,5,7,9,
19,20 334:11
Housing's
    300:25
Howland
    233:15
HUD
    222:22,24
    223:8 298:1

hundred
    219:12
hundreds
    288:16
    331:15
hurricane
    312:1
Hurst
    295:2

------

I

I.e.
    236:12
identificatio
n
    187:16
    233:23 246:8
    251:8 272:5
    282:12
    300:13
    310:4,17
    321:12
    323:10
identified
    203:3 299:5
identify
    222:23
image
    277:13
imagine
    208:23
immediate
    290:23,25
impact
    208:1
    209:14,18,
    22,23 210:20
    234:6,9,14,
    16,21 242:7,
    10 329:15,23
    330:3
import
    195:22 196:2
important
    293:9

imposes
    200:24
impression
    240:14
    242:15
impressions
    271:7
improvements
    195:11,12,20
    196:1
improving
    195:7
inaccurate
    267:17,20
    282:9
incen
    210:20
incentive
    190:23
    210:20,21
include
    193:1,17
    201:5,6
    219:13
    260:23
    295:20
included
    192:23 193:8
    195:17 196:1
    200:11 212:6
    242:12
    280:24 284:5
    302:8,10
    317:11
    322:20
includes
    302:9
including
    202:3 286:11
    293:14 304:2
income
    219:14
    246:19,21
    247:3,12
    250:2,4
    263:12,14,16
    286:1,2,13

321:2

**incomes**
317:17  327:7

**incorporated**
275:12

**incorrect**
214:7  289:14

**increase**
212:22
257:24
258:12
287:11,13
312:16,17

**increased**
257:25  258:2
287:15  291:6

**increases**
256:3  258:8,
10

**independent**
245:9

**independently**
222:16

**INDEX**
185:1

**indicate**
202:23  210:4

**indicated**
204:22
241:13  249:3
286:14

**indicates**
208:18
211:22
218:25  224:7
255:18,19

**indicating**
189:2  219:11
225:13
247:12

**individuals**
198:5

**inducement**
211:21
214:25

**industrial**
275:15,16

291:5

**industrially**
199:25

**industry**
307:16
309:22,23

**ineligible**
196:19

**inflated**
287:14

**inflation**
256:2

**information**
195:6  198:3
205:15,17
207:1  220:7
222:5,8,10,
13,15,23
227:21
238:16,19,20
242:18
247:16,18,19
259:10,11
268:17,22
269:5,12
273:19
280:24
288:10  292:2
293:18
294:21  295:1
304:21,24
322:14
327:13,20
328:18,21
329:2  330:23

**informational**
200:12

**informing**
227:7

**infrastructure**
196:18,22

**initial**
211:25
256:13
298:11

**initially**

191:2  323:17

**initiated**
319:18

**input**
292:17,23

**inputted**
269:6

**inquiring**
294:11

**instance**
232:12

**insurance**
286:11

**intelligently**
306:8  307:19

**intended**
203:15,24
224:8
235:17,23
236:3
242:16,17
248:12
289:17
298:17  327:2

**intending**
236:17
280:25

**intent**
242:22
276:19

**interest**
284:1  308:12

**interests**
334:12

**internal**
317:10

**interrogatories**
185:19
300:25
305:2,16,18,
20,22  308:19

**interrogatory**
187:20

**introduce**
186:4

**investigation**
242:6,11

**investment**
315:11

**investor**
315:21

**involved**
198:17,24
224:17  229:2
272:25
331:9,12

**irrelevant**
196:20

**irrespective**
322:23

**IRS**
195:13
301:18
315:20
316:23

**issuance**
257:5,14
259:4  262:12

**issue**
256:3  257:4
275:11
292:15,22
298:24
320:11

**issued**
255:12,17,25
256:14  295:6
314:14
320:8,14

**issuer**
234:16

**issues**
281:21  333:9

**item**
288:3,4

**itemizes**
310:8

**items**
239:12
252:24
302:8,10,18,
20

Scott Culp Volume II
December 18, 2024

**IV-1**
  252:12,13,19

---

**J**

**Jake**
  237:20,25
  272:21
**James**
  239:16,18
**Jay**
  257:22
  287:9,10
  331:1
**Jennings**
  224:12
**job**
  243:15 304:2
**John**
  274:12
**joins**
  300:11
**July**
  188:22
  189:19
  190:10
  191:16
  202:4,22
  209:12,18
  210:5 223:21
  224:8 234:12
  294:9,18
**June**
  227:4,14
  256:24 257:8

---

**K**

**Kantor**
  184:5
**keep**
  232:6,10
  238:22
  239:13
**Keith**
  208:7 210:18

**kind**
  254:20 255:3
  303:14
**Kings**
  233:16
**Kingston**
  233:15
**knew**
  265:16
**know**
  188:1,4,18
  189:10 190:6
  196:3 198:1,
  6,13,20,21,
  22 200:21
  201:17,21
  203:25 208:9
  210:23
  215:6,7
  217:12,15
  220:1
  223:15,24
  224:13
  225:17,24
  226:4 227:7,
  12,13,16,18
  228:22,24
  230:7 231:23
  232:16 233:1
  235:8 237:25
  238:2
  241:16,18
  242:21
  245:18 253:8
  256:19 257:4
  261:8 262:5,
  10 265:17
  268:19
  269:2,13,19,
  23 270:3
  271:10,13,17
  276:3,19
  277:24
  278:2,12,20,
  21 281:6,7
  290:9,13
  293:9 294:19
  299:4 300:5

**303**:9,15
  304:24
  306:14,15
  307:18
  308:6,12,24
  309:14,21,22
  312:15
  314:10 318:4
  319:19
  322:25
  323:19
  324:6,19
  325:19
  326:7,9,12,
  23 327:9
  329:12
  330:10,25
  331:7,23
  333:1,14
  334:23
**knowledge**
  214:13
  240:17
  241:19,20,24
  242:15
  274:18
  278:12,15,17
  293:15
  304:16
  321:18,25
  323:4,25
  328:11,17
  329:8 330:17
**knowledgeable**
  321:7
**known**
  276:16

---

**L**

**L-SHAPED**
  277:4,15
**lack**
  201:6 290:16
**Lake**
  320:19
**land**
  192:19,21

**193**:1,4,6,7
  194:13,16,
  17,22,24
  195:1,19,25
  196:1,4,12
  197:18
  202:6,9
  203:4,21
  204:23
  206:8,13,16,
  25 207:11
  228:21
  230:25 232:4
  242:16 243:2
  264:1 289:8
  291:6 302:9,
  19 319:22
**landscaping**
  281:15
**Lane**
  184:16
**language**
  204:12
**largest**
  300:1
**law**
  200:3
**lawsuit**
  216:4 321:8
  322:2
  330:11,24
**lawsuits**
  331:4,8,15
**leading**
  191:13
**leads**
  274:14
**learned**
  235:8
**leaving**
  329:15,18,19
**legal**
  329:24,25
**legislation**
  193:15
  202:12
  203:3,19

204:17
224:25
225:12,14
235:19
242:14
275:13,21
**lenders**
220:7,11
**length**
194:11
218:14
278:19
283:15
**lengthy**
321:1
**Leon**
285:11,12,13
286:22
**lets**
198:20,22
**letter**
185:5 199:6
200:8,9,12,
23 201:16,
20,22,25
202:13,14,15
204:20,23
223:20 224:7
228:9,10,13,
14 234:24
239:15
257:8,21
287:10 299:4
**life**
227:17
**limitation**
263:22
268:13
**limitations**
242:13
**limited**
248:2 268:8,
10 288:6
304:4 326:13
**limits**
291:7

**Linda**
208:4,5,7
**line**
195:21
196:17
218:24
225:4,8
243:17 258:3
**lines**
193:25
277:20
**link**
202:24
237:15
**Lisa**
239:16,19
**list**
238:21 239:2
301:9 321:1
**listen**
289:17
**listing**
304:9
**lists**
275:21 304:7
**little**
190:24
198:16
204:18 212:8
218:5 230:2,
5 231:11
234:6 236:7
248:20
249:10
270:21 271:7
273:18
291:3,10
301:3 307:6
312:7 323:15
**live**
193:15,20
199:23,24
200:2,5,11,
13,25 202:11
203:2,15,19
204:5,10,16
224:25
225:12

235:18
237:9,11
242:14
268:17
275:12
289:6,16
291:4,12
321:23
322:16 323:1
326:7
**lived**
326:5,16
328:10
**living**
224:9 237:16
248:1,7,11
249:9,15
251:24 253:3
255:8
**Lo**
204:5
**loan**
190:23
212:20
216:19
289:20
**local**
193:15,20
199:23,24
200:2,5,11,
13,25 202:11
203:2,16,19
204:5,10,16
208:16,20,25
209:4,8,25
210:1 224:25
225:12
235:18
237:9,10,11
242:14
275:12,21
289:7,16
291:4,12
292:17,23
293:2 321:23
322:16 323:1
**located**
277:9

**location**
189:14
228:19
231:21,25
280:12
288:13
327:21 328:2
**long**
211:9 237:4
307:17,21
308:2 324:12
325:14
334:24
**long-term**
319:5
**longer**
285:5 307:24
316:6
**look**
189:11 191:9
192:11,17
199:21
203:21
213:22
221:13
228:10,12,23
232:12,17
255:14
257:13
262:22
266:19
280:13
296:24 299:1
310:8 334:4
**looked**
196:6 205:8
229:22 231:4
243:14
302:13
**looking**
225:2 228:20
229:24
230:21,23
239:21,22
252:14
253:11,18
262:9 273:11

**looks**
  199:7 205:3
  208:6 210:18
  213:14,15
  224:16
  235:13
  237:14
  252:3,12
  256:23
  257:6,21
  259:24
  275:1,24
  277:7 287:19
  288:7 305:3,
  17
**lose**
  294:15
**loss**
  317:18,21
**lost**
  228:23
  294:18
  301:10
  303:24 305:6
**lot**
  246:3 272:11
  302:24
**lots**
  265:12
**low**
  284:1
**low-income**
  196:24
  236:20
  247:4,7
  250:3,10
  264:4
  284:21,25
  285:15
  301:19
  318:16
  320:24
  327:2,3
**lower**
  250:8
**Lowndes**
  184:5

**Lucky**
  302:23
**lucrative**
  315:2,4

———————

**M**

**M-A-L-O-N-E**
  334:2
**made**
  191:6,11
  194:12
  201:25
  205:10
  238:12
  243:13 299:2
**mailed**
  291:21
**mailing**
  238:21
**main**
  243:25
  315:22
**majority**
  307:5
**make**
  190:16,20
  203:14
  205:15
  217:19
  221:20 269:8
  280:7 284:13
  297:8 313:15
  315:4,22
  326:6 334:4
**make-up**
  247:17 267:6
  269:9,16
**makes**
  224:1 226:6
  284:10,18,19
  313:20,22
  315:1,5
**making**
  193:24 206:1
**Malabar**
  249:24

  259:14
  260:10,15,25
  261:10
  262:3,17
  265:19
  269:22
**Malone**
  333:24
**management**
  189:2 197:3,
  8,13 247:19
  268:1 308:20
  309:7,12,20
  313:21,22
**manager**
  272:14,16,25
  273:2
**managing**
  295:4
**mandatory**
  200:1
**Marc**
  207:16
  237:21
  238:2,6
  304:20
**March**
  200:3 257:21
  271:16
**mark**
  187:14
  233:25 246:6
  272:7 296:6
  310:16
  321:10 323:7
**marked**
  187:16
  218:4,18
  233:23 246:8
  251:8,14
  272:5 282:12
  296:6,13
  300:13,19
  310:2,4,17
  321:10,12
  323:10
**market**
  250:9 289:21

  317:14
  328:15
**Markets**
  295:4
**marking**
  282:14
**materials**
  238:15
**matter**
  187:21
  225:25
  259:18
**max**
  219:23
**maximum**
  223:7,12,15,
  17 241:13,17
  247:12
  301:23,25
  302:1,3
  309:14,19,21
  328:9,14
**maximums**
  223:9
**Meadows**
  293:14
**mean**
  188:25
  192:20 194:9
  195:23
  196:10
  211:13
  225:1,11
  228:14
  236:11,25
  237:8 244:19
  246:19 254:7
  262:13
  292:18,21
  293:2 306:2
  307:2 317:22
  319:21
  327:17
  332:24
**meaning**
  315:5
**means**

196:17 211:6
246:20
276:10
285:25 286:9
**meant**
278:20,21
**media**
251:10
**median**
219:13
263:15
286:2,13
**medical**
193:24
**meet**
187:1 194:5
256:4 277:22
293:13
**meet all**
237:4
**meeting**
237:19,24
238:1,2,5
240:14
243:19 245:3
273:8,9
274:3 275:25
276:8
277:17,22
278:11,16
280:9,18
281:11,14,
20,24 282:2,
5 286:21
287:3,19
288:2 289:1
291:25
293:16
295:23
296:10,19,20
297:3,12
298:10
299:15,16,23
331:22,24
**meetings**
299:3
**Melbourne**
185:16

188:25
191:17
193:16
206:12
208:20
209:7,11,13
231:2 234:25
235:6 242:19
244:12
270:22
271:19
272:10,17,23
276:3 290:17
298:12
321:23
322:1,10,16
**Melbourne's**
271:2
**member**
197:25
244:20 249:5
268:13 273:7
**members**
243:19
244:13
266:10 279:1
280:21
**memorializing**
292:12
**memory**
225:15 239:4
258:25 260:5
264:9 274:15
278:13,15
**mention**
238:7 295:7
**mentioned**
270:21
271:23 272:1
277:8 318:13
**Meridian**
224:14,20
**MF**
276:16,19
**Michael**
184:4 300:11

**Michael.
piccolo@
lowndes-law.
com**
184:7
**midway**
290:15
**Mike**
198:15,16
**mile**
204:7 291:1
**million**
192:20
196:14
197:19
214:23 215:8
260:20,22,
23,24
261:12,20,23
262:17,19
294:19 295:7
314:6,10,11
**Milton**
206:2
**min**
280:9 282:2
**mine**
273:15
**minimum**
208:25
307:23
**minorities**
268:17
326:7,11
328:20,25
334:13
**minority**
289:18
**Minton**
271:3,15
288:14
**minutes**
277:19
286:20
287:17,23
288:7 292:5
293:13

299:13
**misrepresenta
tion**
244:16
**Missigman**
302:22
303:25
304:18 306:7
311:3,19
**mitigate**
230:17
**mitigation**
195:22 196:2
**mix**
327:21 328:2
**mixed**
193:16,21
207:20
**model**
317:17
**models**
234:19
**moderate-
income**
285:21,24
286:4
**modified**
331:20
**moment**
188:18
302:20
**money**
221:9 306:23
307:4
**month**
187:2
**monthly**
286:10
**months**
282:6
**moratorium**
200:10,24
201:6 231:1,
9
**morning**
186:22,23

mortgage
  221:1 284:16
  286:10
  314:18
move
  289:15
moved
  255:6
moving
  214:1
MSPJ
  220:19,20
  221:3
Mullins
  285:13
multi-family
  224:9
  276:10,17,24
  277:9 291:4,
  19
multiplied
  318:21,23,25
municipality
  291:20,23

_____

            N

_____

name
  198:23 272:2
  304:1 334:1
named
  330:10,24
  331:2
names
  233:13
Naomi
  234:8
natural
  285:25
nature
  304:22
NEC
  206:3
necessarily
  218:16
  223:14
  262:13 307:9

310:10 315:4
317:21
need
  192:10
  196:21 197:2
  198:11
  204:20
  205:15
  221:21
  228:1,3
  234:24
  237:7,10
  250:23 251:5
  253:13,22
  254:8 255:25
  294:7,17
  309:11
  315:19 321:4
  330:19
needed
  202:17
  204:22
needs
  192:21 290:3
negligible
  266:16
neighborhood
  242:8
neighborhoods
  241:21,25
neighbors
  274:13
Nelson
  285:13
net
  314:1
never
  192:15
  245:19 313:1
nine
  236:13,18,21
  306:2,16
nods
  320:16
non-
affordable
  254:25

non-elderly
  254:19
noncompetitiv
e
  236:24
noneligible
  195:11
nonlegal
  330:1
norm
  307:16
normal
  319:14
North
  184:5
note
  197:17
  235:22
  236:8,23
noted
  184:4 279:4
  329:3
notes
  275:24
  276:4,7
  277:7 278:19
  280:14 334:4
notice
  291:21,22
  321:17
  322:4,6
November
  235:14
  273:10 274:5
  278:16
  281:23 282:2
  297:21
  298:5,12
number
  194:14 195:8
  199:12
  211:18
  213:14
  214:20
  240:17
  241:5,16,19,
  20,24 243:1,

22,24 247:13
251:10
260:24
261:23 262:5
264:7 270:10
277:1 294:14
305:10,12,14
327:20
328:9,14
numbers
  212:24
  213:1,3,11,
  18,23 214:1
  216:5,10,22,
  24 218:7,8,
  12,14 219:9
  221:18,19,
  23,24 232:16
  252:19
  256:11
  312:12,15
  321:5
numerous
  239:7

_____

            O

_____

Oak
  293:14
Oaks
  197:21,24
  198:19 199:1
  204:21 206:3
  207:20 213:8
  215:17 216:5
  218:8 226:21
  233:19
  234:11
  235:17,23
  236:3 240:18
  241:2,21
  242:1,7
  245:21 246:1
  248:10,13
  249:11,13
  253:11,19
  254:12
  266:1,8

268:7 274:15
280:16
281:18 287:2
288:6,14,15
305:17
324:6,7
326:4,13,16
328:9,13
Oath
185:4
Object
189:22
190:17 191:5
201:14 216:8
240:10,23
241:9 242:3,
20 243:9
244:3,15
245:11
249:18 259:2
260:4
261:14,16,25
262:25
264:15 265:8
266:2
267:12,18
268:11 269:3
270:14
275:10
276:11 278:1
279:11
280:23
288:21
289:11,23
292:4 293:17
298:25
299:21
329:17
330:12
332:3,9,14,
21,25
objection
234:24
266:24
304:6,9
objections
288:13
300:25

observed
252:5
obtain
200:1 227:21
Obtainable
295:3
obtained
222:16
occupancy
235:23
280:25 281:9
occupants
249:22
occupied
261:9
occur
291:5
occurred
235:13
October
213:19
214:14,15,24
287:8,18
319:24
offer
250:8
offered
210:21,23
offering
294:5 331:25
332:4
office
193:25 194:3
288:9
offices
288:9
official
291:11
Oftentimes
294:2
okay
189:25
190:1,9
191:19
215:10 222:3
225:10
240:1,4

254:16,22
255:4,8
256:23
259:20
260:17
261:10 266:7
276:6 279:19
282:24
287:17
296:3,5,23
297:7 301:8
313:12 317:2
318:13,19
322:12,22
323:14
older
235:24 236:5
248:2,14,16
249:4,6
266:10,11,16
267:1 268:14
281:1,10
298:1
once
214:3 231:12
272:10 313:8
one
188:5 197:16
209:16 212:5
217:16
220:21
239:17,21,22
240:17 248:3
249:5 250:14
252:14,20,23
258:18
259:15 260:9
261:2,10,12,
18 262:4
263:23
264:23
266:9,17
267:3,9,23
268:13
271:15,16
273:16 276:6
280:6 285:25
287:8 290:11

296:12,20
303:16,22
305:21
309:22
317:6,13
318:1,6,8
321:6,22
323:8
one-mile
204:10
open
240:20
opened
311:24
operate
250:15
operates
277:10
operating
317:15
operation
320:11
opinion
329:25
opinions
326:18
329:14,16,
20,22 330:1
opportunity
231:3
opposed
211:2 289:2
opposition
239:7,10
289:6
option
191:3,4,8,
10,17,20,22
192:5,10
331:21
options
331:25
Orange
184:11
277:11
320:19

order
    187:21
    190:16  209:7
    229:25
    239:23
    259:16
    260:13
    262:22
    302:14
ordinance
    200:9,19,22,
    24  201:2,5,
    7,11,13
    291:17  292:3
    321:16,19,22
    322:1,3,5,7,
    9,11,15,19
    323:1,2,5
ordinances
    185:23
    203:22
organization
    198:5
organizations
    333:9  334:12
original
    242:22  257:1
    313:5
originally
    227:10
    242:16
Orlando
    184:6,11
Osceola
    323:21
outlined
    201:20
outparcel
    192:23
    196:10
outside
    201:8  250:15
    268:25
    325:5,9,22
    333:13,15
outstanding
    314:16

overhead
    313:21,23
overlay
    202:24,25
    203:1,5,7,13
    204:13
    242:17
owner
    226:20
    307:8,11
    313:24
    314:10
owner's
    212:9
owners
    314:2
    315:13,24
ownership
    306:20
    313:24
    314:21
owns
    277:10

_____

P

P.A.
    184:5,10
p.m.
    273:10  274:6
    300:9,15
    334:6,9,21
page
    198:4,5
    200:23
    203:17
    204:13,18
    205:17,23
    208:3,18
    210:4,17
    211:17  212:4
    214:18
    215:14
    218:4,18
    220:6  221:4
    222:2,7,8
    223:20

224:23
    225:2,7,8,9,
    17  227:3
    235:16
    237:18
    239:24,25
    240:15  244:9
    245:23,24
    247:10,11
    252:3,9,18
    253:19
    257:19
    274:25
    275:24  276:5
    280:13
    285:10,23
    286:25  288:7
    292:11
    297:14  298:9
    301:1,9
    304:1  305:6,
    20,24  309:2
    310:8  317:10
pages
    187:18
    215:16
    217:21  222:6
paid
    212:19
    314:1,18,19
    328:15
pandemic
    258:7
paper
    206:23
paperwork
    192:2  230:20
    324:5
paragraph
    203:17
    210:25  244:9
    285:9,16
    290:15
    291:15
    292:11  293:6
parcel
    193:8,11
    196:13

202:10
    205:5,16
    206:17,23
    237:12
parentheses
    285:17
parking
    280:3,6,8,11
part
    193:19
    196:20
    208:25
    224:4,19
    225:24
    234:13
    242:17
    283:21  318:2
    319:4
participate
    197:20
    302:25
    303:17
    305:14
    306:11
participated
    197:23  198:1
    310:11
particular
    189:3,14
    190:12
    192:12
    193:10,23
    197:16
    203:2,13
    204:25
    206:17
    210:22,25
    221:2  222:7
    226:11
    229:10
    231:7,8,20,
    21,24  232:12
    237:12
    254:23  285:9
    287:3  303:19
    306:11
    307:10
    314:5,23

Scott Culp Volume II
December 18, 2024

324:5

**partner**
226:21
304:18
330:8,9

**partners**
212:10
226:18,21
238:4 243:2
246:13
250:14
251:25
270:18 288:6
305:17
313:24
323:18,19
329:5

**partnership**
323:20

**parts**
209:20

**party**
330:10,24
331:2

**passed**
238:15,19
321:16,22
322:15

**past**
188:15

**path**
274:14

**Paul**
302:22
303:2,4,12,
16,20,25
304:18
305:13 306:7
308:20 309:6
310:12
311:3,7,19
321:4,5,7

**Paul's**
303:7

**pay**
211:6,7,9,10
294:8 316:25

**paydown**
212:23

**paying**
196:3

**payments**
286:10

**pending**
319:19,21

**people**
190:14 198:2
205:3,4
269:15
303:17
304:21 326:5

**percent**
192:17
194:8,10
216:19
218:19
219:2,3,4,
10,12,13,18,
23 223:2
236:13,19,
21,22,25
237:2 248:21
249:6,7
255:24
256:1,4
263:15 264:4
266:11,17
277:24
278:5,22,23
279:6,7
284:2,8,25
286:2,12
302:4,6,13
306:3,4,16
309:18,25
314:15
318:9,11,13,
15,17,20,25
320:24
326:22,23
327:3 329:5,
6

**percentage**
246:25 247:1
248:23

286:12
313:2,4
318:23
328:4,19,24

**percentages**
326:21 328:3

**perception**
267:5

**period**
223:10
257:15
258:11 282:6
283:13,18,20
315:9,20
316:3,16,20,
23 317:15,23

**perm**
275:3

**permanent**
212:16,19
220:6 221:5

**permitted**
275:3,7,20

**permitting**
304:21

**person**
191:25 198:7
209:2 235:8
248:3 266:9,
17 267:10
287:5 299:16
304:2 309:10
332:19

**personally**
329:11 330:5
331:8
332:15,17,18
333:1

**persons**
235:25 236:5
248:15 249:5
266:16
281:2,10
285:21,24,25
286:5 298:2

**pertinent**
304:5,12,25

**ph**
233:15,16
237:21
302:22

**phase**
212:17
258:18
261:12,18
262:4

**phases**
261:11

**phone**
287:25

**photos**
204:1

**phrase**
279:16

**Piccolo**
184:4 300:11
324:12
325:13
329:17
330:12,16
332:3,9,14,
21,24 334:18

**picture**
308:3

**piece**
203:2 206:23
231:3,4
232:4,6,10,
13,17

**place**
206:21
207:3,8
214:10
226:12
231:1,9
283:25
293:14 294:4
329:2

**placement**
293:22,24,25
294:1,3,5,6,
7,8

**places**
298:16

plaintiff
    186:7 238:5
    300:24 304:3
plaintiffs
    184:3 187:25
    188:1 222:11
    223:6 246:13
    250:15 269:1
    271:11 310:9
    327:18
    332:23 333:8
    334:15
plaintiffs'
    185:8 202:2
    207:9 213:15
    220:5
plan
    206:24
    207:3,11,12
    242:23 244:7
    274:23
    277:14
    280:10
    298:11 319:3
planned
    240:17
plans
    207:7,8
    271:18 331:6
plausible
    265:4,9
please
    186:4,11
plumbing
    252:22
point
    189:19 196:6
    209:6 212:22
    216:13 224:4
    227:21
    228:23
    229:19 231:7
    243:14
    257:18 271:1
    272:11
    273:18
    294:15
    303:23

314:19
pond
    280:3
population
    252:4
Port
    277:11
possession
    230:21
    322:18,19
possibility
    323:16
possible
    214:11
    289:19
possibly
    189:19
post
    223:12,14,
    15,17
posted
    246:18
    265:6,15
    268:4 271:3
posts
    247:11
potential
    211:2 216:23
    234:22
    307:15
    311:12
potentially
    193:3 258:23
    269:16
    292:12
practical
    265:11,13,14
    268:3,5
practice
    332:1
pre-app
    209:19,23
    210:1
preface
    200:12
preparation
    187:7 295:22

326:1
prepare
    188:2
prepared
    207:15,21
    304:19
    311:19
present
    184:4,15
    238:5 278:22
    279:6 287:25
    304:6
    324:13,16,23
    325:15
presentation
    277:8 278:4,
    18 279:22,
    24,25 280:2
    295:16,20
    296:9,13,17,
    25 297:3,10
presentations
    248:8
presented
    217:20 218:1
    259:12
    278:21,24
    279:23
    297:11
president
    226:23
    297:22
presumption
    189:19
prevent
    201:9
prevented
    312:5,19
previously
    296:13 297:2
price
    192:19,22,23
    193:1,4,6,7
    194:13,17
    195:1,2,18
    196:12
    197:18

258:10
    328:15
pricing
    258:13
primarily
    198:8 229:5
    288:17 321:2
primary
    290:17,20
principal
    221:11
printed
    234:4 285:23
printout
    238:10,12
    297:25
printouts
    185:12
    246:11
prior
    198:16 205:7
    206:6 213:9
    214:12
    215:22 217:9
    219:1 231:11
    232:20 243:4
    254:6,9
    294:17
private
    278:24 294:5
pro
    185:22
    202:19
    314:2,5
    317:2,4,6,
    10,15,16,25
    318:2,5
probably
    198:4
    233:14,17
    276:18
    277:12
    290:12 311:4
    318:8 321:4
problem
    253:20

proceed
  205:11
  211:23
  227:20 324:2
proceeded
  216:18
proceeding
  205:7,19
  206:6 218:16
  300:11
PROCEEDINGS
  185:1
proceeds
  315:14
process
  226:5 258:15
  277:2 319:23
produced
  188:12,13
  217:22
  290:12 303:9
production
  185:8
  187:20,22
  188:11,16
professional
  290:4
professionals
  294:25
profit
  301:23,25
  305:7 311:12
  313:8,10,15,
  18,20,22
  314:2,4,22
  317:18,21,22
profitable
  284:10,13,
  18,20 315:2,
  5
program
  236:21,22
  247:4 250:4,
  11 284:22
  302:2
programs
  236:21

prohibit
  232:3
project
  190:12
  192:15
  205:7,11,19
  207:4
  209:14,17
  210:22
  211:13
  212:10,14
  213:5,12
  216:7,11
  219:17
  224:17
  233:20
  235:10
  238:16,20,25
  239:5,7
  254:11 255:7
  271:2
  283:18,20
  288:13
  289:2,15,19,
  20,21 290:23
  291:18,21
  299:20
  301:11
  308:7,15
  311:2,12,21
  312:3,18
  313:8 314:5
  316:10,20,23
  318:10,12
  321:20 322:2
  323:16 324:5
  330:8,9
project's
  320:23 321:1
projections
  308:17
  316:13
  317:14
  326:20
projects
  233:5,8,10,
  11 254:17
  255:2 307:21

312:23,25
  313:3
  319:17,19
  320:18
promote
  334:12
pronounced
  272:15
prop
  246:24
properties
  199:25
  223:12
  229:4,5,7,9,
  13,14,20,22
  243:14
  244:11,21,24
  245:2,10
  246:11
  262:23 263:5
  264:8,10
  328:19
property
  189:2 197:13
  200:10,25
  203:2 204:17
  206:19,22
  207:14
  229:25
  230:21,23
  231:4,5
  232:4,7,11,
  13,17 237:14
  240:19
  242:14
  243:5,11,20
  246:19,25
  247:19,25
  248:1 249:24
  250:7 258:16
  268:1 275:14
  327:21
  328:10
proposed
  215:24 221:3
  241:6 249:1,
  12 252:6
  266:8 268:7

271:20 277:4
  289:19
  290:23
  291:18 292:2
proposing
  248:18
  249:14
protected
  325:6,23
  330:15
protection
  325:6
provide
  202:19
  205:15
  208:14
  221:19
  222:15
  234:16
  283:24
  284:2,3,6
  327:17
provided
  195:6 215:7
  217:14
  222:12,13
  256:22
  259:23 269:6
  275:21 284:5
  315:7
  327:13,19
  328:1
provider
  333:17
Providers
  295:3
providing
  220:11
  221:17,18
  222:4
provision
  291:12
public
  263:23 264:6
  265:1,3
  267:24
  281:19
  291:19 294:4

322:4

**publication**
206:25
322:4,6

**publicly**
294:21

**published**
216:16
222:23,24

**purchase**
192:22,23
194:13,17,
22,24 195:1,
18 196:12
230:24

**purchased**
319:22

**purchaser**
199:16
220:16,18

**purchaser's**
201:8,9

**purchasers**
315:18

**purchasing**
294:5 314:22

**purport**
187:18
228:16
238:10
246:10
251:15
258:21 272:8
283:3

**purporting**
217:18 259:8

**purpose**
200:14 202:7
215:20
222:20
299:18

**purposes**
188:10 195:9
196:19 197:1
206:15 216:4
219:6 234:10
261:3

**pursuant**
201:13 204:5
286:9

**put**
187:14
212:10
219:20 231:1
268:21 270:8
284:7 300:18

**putting**
212:13
234:19

---

**Q**

**qualified**
283:18,20
316:22
318:22

**qualifying**
316:20
318:24

**question**
189:24
191:7,10,13,
14,20,22
195:4
201:15,17
204:19
208:21
209:15,21
211:1 216:23
217:11
228:25
231:24 233:3
241:15
254:10
258:21
263:21 265:9
278:14 294:7
297:1 303:19
304:1,11
306:6,8
311:7,8,9
313:13 321:3
323:12
328:12,17
330:17,20

332:10

**questions**
188:12,15
191:24
207:23
224:21
245:13
246:5,14
254:11
255:15 273:2
274:9 287:6
293:21
295:11 298:3
301:5 321:4
324:18
334:17,18,19

**quick**
230:9

**quickly**
255:1

**quite**
213:1

**quote**
188:24
199:24
208:19
235:16
236:24
240:15,19
241:5,7,19,
23 243:1,6,
24 244:10
274:13
275:2,7
288:12,25
289:2 291:3,
10 293:6
298:9 301:10

---

**R**

**race**
265:25
266:20,21
267:2 268:21
269:25

**racial**
247:17 267:6

268:9,17

269:2,9,16,
17,21,25
328:20,25
329:3,10
332:7,12
334:13

**radius**
204:7,10

**raise**
186:12

**range**
314:10,11

**rarely**
319:15,16

**rate**
250:9 289:21
306:3,4,16,
17 308:12

**RBC**
295:4

**reached**
235:6

**read**
235:7 256:7
285:7 301:3
318:7 334:18

**reading**
218:21 225:7
236:12
286:15

**ready**
188:19

**real**
199:11,12
307:14

**realize**
220:20 253:9
255:6

**realizes**
313:18

**realm**
219:21

**reapplying**
232:4

**reason**
227:19

243:5,11,19
254:23 259:1
260:6 261:5,
7 272:20
299:22 324:3
**reasonable**
309:23
**reasons**
287:13
311:22
**Rebecca**
184:4 186:6
300:12
**Rebecca.**
**rhoden@**
**lowndes-law.**
**com**
184:6
**recall**
189:6 190:13
191:8 203:12
204:11 206:7
207:7 209:19
210:16
211:16 212:1
214:17
215:13
216:14
217:13
223:19
225:17
228:20
230:19
233:9,10
239:12
243:4,21
245:12
250:17
259:4,12
261:7 271:9
272:2,3,18
279:20,24
280:4,20
281:13,16,22
282:4 291:2
293:12
294:20
302:20

303:10 311:3
312:22
327:10
331:11,14,18
**recapture**
315:20
316:23
**receive**
208:19
256:17,18
260:6 262:3
290:7 313:25
315:23
**received**
262:7 272:9
283:4 316:2
325:20
**receives**
313:23
**recognize**
300:20
**recognized**
309:23
**recollection**
189:8,11
192:12
199:22 205:9
210:13
214:13,21
217:17
218:23 229:6
239:6 243:18
244:24 245:9
255:5 256:9,
20 258:15
264:16
265:21
270:23 271:8
274:21
287:16 313:4
**recollections**
258:17
**recommendatio**
**n**
303:14
**recommended**
196:9

**reconsider**
232:1
**record**
186:1,5
230:11,14
250:21
251:4,12
261:3 300:8,
14,18 334:5,
8,22
**recorded**
247:5 263:23
264:5 265:3
277:17
**records**
258:24 259:7
263:23 264:6
265:1,3
267:24
270:17
**Reed**
184:5
**refer**
211:20
237:3,13
257:20
285:16 286:8
**reference**
200:12
219:15,23
220:18 225:2
227:9 237:9
248:6 252:21
260:24
272:14 286:7
323:18
**referenced**
194:16,18
202:22
214:22
215:18
228:15
232:15
234:12
272:21 278:5
285:21 303:3
322:3

**references**
195:4 199:23
214:23
250:10
252:22
261:12
**referencing**
211:1
234:13,24
237:19
277:11
**referred**
306:15
316:19
318:15
320:17
**referring**
196:15
202:22 209:3
248:25
273:16,17
277:25
279:12
296:19
**refers**
250:3
**refinance**
319:10
**refinancing**
319:7
**reflect**
328:23
**refresh**
189:8,11
192:12
214:20 255:5
256:8
**refund**
290:7
**refunded**
290:4
**regard**
195:16
203:20
204:11,14
225:13
237:11

Scott Culp Volume II
December 18, 2024

242:10,12
246:21
247:20
249:22
266:14
267:24
268:13
280:14
285:14
291:17
293:4,24
298:3 300:22
301:19
304:9,22
305:10
309:23 323:1
327:7 332:5
**regarding**
187:4
238:16,20,25
239:5 271:24
272:23
280:19
281:12,15,
21,24 287:1
288:5 309:11
321:19 322:1
329:22
**region**
231:17,20
232:13,15,16
233:1,4
320:3,7
**regional**
295:5
**regions**
231:17
**regulations**
204:8 301:19
**regulatory**
291:12 327:5
**reimburse**
195:16
**reimbursement**
196:18,22
**relate**
203:5 206:19
230:24

**related**
189:14
196:24
197:16
200:13
203:22
216:23
248:16
251:16 252:7
257:13 258:6
299:19
307:20
321:16
322:14 323:4
324:5 328:1,
11 331:9
**relates**
192:11
202:10 203:1
206:16 261:4
262:20 264:2
269:14
272:20 292:3
308:15
321:19
322:2,16
329:23
**relating**
200:9 203:3
204:16
206:13
321:23
**relation**
324:7
**relevant**
185:9 195:9
202:25
203:18
204:15
206:14
234:10
**relied**
190:15
**rely**
190:20 207:2
326:19
**remain**
301:15

**remained**
289:1
**remaining**
219:3
**remember**
204:9 205:20
209:21
228:11,15
233:13
238:13
242:21,24
243:13
256:11 273:1
282:7 283:9,
11 291:24
292:1 296:21
297:17 302:4
312:21 314:7
320:2
**rendering**
329:14
**rent**
197:2 218:7
222:18,22
223:2,13,14,
15 328:15
**rental**
193:2 275:13
**rentals**
277:10
**rented**
328:20,24
**renters**
265:25
266:20
**rents**
197:4 218:9
222:25 223:8
250:9 263:14
284:15
286:10
315:3,6
317:17,19,22
321:2 327:7
**rep**
278:3
**repeat**

281:25
**replaced**
291:12
**report**
213:25
214:4,8
215:16,21
216:12,14,
15,21 217:5,
6,8,9,12,15,
17 220:2
221:22,25
222:7,9
318:1 326:1,
21,23 333:23
**reporter**
185:4
186:10,12,17
228:2 250:22
334:1
**reports**
326:19
**represent**
218:15,16
**representatio
n**
205:14
298:19
**representatio
ns**
299:2 304:25
**representative**
277:13 295:2
309:6
**represented**
219:16 220:1
248:12 281:8
**representing**
200:7
**represents**
240:11
286:12
302:16
**request**
185:8
187:20,22

188:11,16
215:4,11
255:20
257:23,24
258:1 287:11
312:6,17
329:24
**requesting**
202:13,14
295:17
**requests**
211:24
252:11
**require**
193:16
**required**
201:3 212:21
214:10
221:16
228:22
264:21
316:19
**requirement**
194:4
**requirements**
189:13
202:11
203:12
225:16 227:1
237:5,7
248:16
272:23
**requires**
208:25 249:5
**res**
262:16
**reside**
247:13
**residential**
193:21
196:14
**residents**
246:22
247:21 250:2
266:22
267:4,8,9
269:18

280:15
288:8,12,17,
22 289:1,18
291:22
**resolution**
211:18,21,25
214:18
215:1,7
255:16,18
256:5,15,23
257:3,7
259:23
260:22,23
261:2,15,17,
18,19,23
262:16,18,19
**resolutions**
256:21
260:21
262:11
**resource**
283:25
**resources**
189:17
208:14,17
236:10,14
284:6
**respect**
303:25
**respective**
313:24
**responding**
235:7
**responds**
240:8
**response**
185:8 187:22
188:3,16
237:20 240:2
279:14
293:11
304:14
**responses**
188:10
300:21,25
**responsible**
198:8

**responsive**
273:4
**restate**
311:8,9
**restrict**
280:25
**restricted**
235:23 236:4
241:4
246:19,23
247:1,3
248:13,21
250:2,4
263:5,15
264:13,20,24
265:2,5,20,
22 266:15,25
278:25
284:15
298:23
**restriction**
237:14 248:2
250:1 274:23
283:25
**restrictions**
196:20
203:22
206:18,21
207:4,8
218:15
247:6,7,8
248:17
249:3,9,10,
16,21 264:2,
4,9 283:22
284:3,4
327:5
**restrictive**
247:5 248:15
265:2 267:25
268:1
**restroom**
230:10
**retention**
280:3,6,12
**return**
308:15
315:7,10

**returned**
307:11,17,22
308:2
**revenue**
317:22
**review**
185:5 187:7,
11 188:18
189:7 192:12
203:14
213:20
221:20
242:22 247:5
271:2,16
303:11
**reviewed**
187:9 205:7
271:12,18,21
278:18
280:11
303:13
333:23
**reviewing**
202:9 303:14
**reviews**
211:22
**revise**
194:7 221:21
**revisit**
191:3
**revive**
231:8
**RFA**
189:12,13
192:11,17
**Rhode**
272:14,15
**Rhoden**
184:4 186:6
189:22
190:17 191:5
201:14
205:21 206:1
216:8 225:21
230:3,7
239:24
240:10,23

Scott Culp Volume II
December 18, 2024

241:9 242:3,
20 243:9
244:3,15
245:11
249:18
250:25
251:3,18
252:17 259:2
260:4
261:14,16,25
262:25
264:15 265:8
266:2,24
267:12,18
268:11 269:3
270:14
273:15,22
275:10
276:11 278:1
279:11
280:23
282:16,18,22
283:1 288:21
289:11,23
292:4 293:17
296:12
298:25
299:21
300:12
**right**
186:13
188:21
189:18
190:14,22
191:12
199:15
201:19
202:21
210:11
217:23 218:4
221:4 225:20
235:8 236:24
237:3 238:9
245:5,8
249:24 251:1
254:3,6,10,
17 255:1
258:25
259:14 260:9

261:1 263:8,
17 266:19
269:11 270:8
276:22
282:14 283:3
284:1 296:8
297:17 299:8
301:5 306:9
309:3,9
310:12,15
311:11
312:11
313:15 314:9
317:7 320:15
322:12
323:23
324:25
327:23
**right-of-way**
281:19
**River**
233:16
**road**
271:3,15
288:15
**roadway**
274:24
**Robert**
202:4,5
204:22
285:11
**role**
294:6 325:25
**Ron**
200:3
**room**
274:2
**Roper**
184:10
**roundabout**
313:14
**route**
234:23
**row**
219:11
**rule**
185:20

**S**

**SAIL**
188:24
189:3,9,12,
21 190:11,
12,22 191:2,
3,7,17
192:15,17
208:1,24
210:6,14,15
235:9,11
236:12,18
247:7 289:20
**salary**
223:17
**sale**
305:25
306:4,24
309:12
314:3,19
**sales**
228:7
315:13,14
**satisfy**
208:20
**saying**
191:21 204:4
266:19
274:13 281:4
291:24
304:13
307:13
308:10
**says**
199:7,18,24
200:23 206:8
207:17,19,20
210:10 217:4
218:22
224:22,24
225:18 235:7
236:12 244:9
250:1,8
267:13
273:13,21
275:2 276:8

277:6 288:8,
12,25 290:16
291:3,10
292:13
297:20 298:8
299:25 306:2
**schedule**
226:9 234:9
**scheduled**
226:11 273:9
**school**
281:12
**scoring**
209:1
**Scott**
185:2 186:4,
18 199:8,10,
23 200:21
201:20
251:11
273:21,25
289:13
334:21
**Scott's**
201:12
**screen**
277:12
**search**
274:21
**second**
200:23 208:3
210:4 220:8
224:23
225:2,4,8
240:15
247:11 273:5
285:10 288:7
296:12
317:10
**secretaries**
198:2 304:23
**section**
227:1 286:14
**securing**
319:23
**see**
188:5 192:18

Scott Culp Volume II
December 18, 2024

198:15,23
202:16
208:17
209:15,16
213:20
221:23
225:10
228:21 230:7
260:15 268:1
272:21
276:1,4
285:7 317:7,
25 322:8
**seek**
235:10
**seeking**
235:11
**segregate**
329:15,23
**select**
220:13,15,19
**self-
reporting**
269:15
**sell**
315:15,17,25
319:3,6
**seller**
195:5,16,25
243:3
**seller's**
195:2,4,5,11
200:13
**selling**
205:5 319:13
**Seminole**
320:13,19
**sending**
197:17
198:15 208:4
224:21 283:9
**senior**
207:17,18
224:9,14
237:16
248:1,7,11
249:9,14

251:24 252:6
253:2 255:8
264:13,20,24
265:2,5,19,
22 268:8
276:9,24
298:13,18,
19,20,23
299:5
**senior-
restricted**
252:8
**seniors**
235:24 236:4
248:13 249:4
254:19
266:9,15
277:15
280:22
281:1,5,7,9
326:16
328:10,14
**sense**
200:6 211:4
224:1 226:6
228:17 280:7
306:14
308:14,18
**sentence**
218:23
219:14
285:22
**separate**
196:2,3
**separately**
196:22
**series**
254:11
261:18,20
**served**
333:18,21
**service**
212:21
214:10
216:25
226:12
314:17

**services**
221:8,10
226:22 294:3
330:7,24
333:17,21
**set**
211:8,11
254:2 305:2,
16
**set-aside**
219:12 327:8
**set-asides**
218:9 222:25
223:10
283:13
327:4,6,20
328:2
**seven**
260:22,23
308:13
320:1,17
**several**
228:18
251:15
288:16
**Sgainey@
roperpa.com**
184:12
**Shawn**
184:16
333:23
**Sheet**
185:5
**short**
258:19
300:17
**show**
188:10
196:21 198:3
233:25 246:6
252:15
265:12 272:7
282:14
310:2,15
321:10 323:7
**showed**
214:24 215:1

244:7 280:11
292:5
**shown**
234:20
280:10
**sic**
234:9 251:15
270:2 275:4
**side**
240:18 313:7
**sign**
235:9
**signature**
301:1,2
308:22,23
**signed**
199:8 200:3
261:2 305:3,
17,21 308:20
**significant**
258:10
**significantly**
312:8
**signing**
226:17
**similar**
237:13
249:8,15,19
266:13
268:12
277:12 297:4
**simply**
217:11
**single**
288:15
**single-family**
241:21
288:16
**Sir**
251:14
322:14
334:23
**sit**
192:14
210:12
217:13,16
268:16

301:14

**site**
192:12 195:7
203:13,22
207:11
227:7,8,10,
12,14,17,23
244:7 274:23
277:13
280:10
298:11

**sites**
204:7 227:11

**size**
263:16

**sized**
284:14

**slides**
297:5

**slightly**
251:4
296:16,21

**small**
234:4

**smaller**
318:22

**Smith**
189:1 197:2

**Snay**
273:12

**solicitation**
291:23

**someone's**
276:7

**sought**
243:5,11,20

**sound**
199:19 254:3
329:6

**sounds**
211:4 249:8
314:7 329:24

**source**
212:12
220:7,8,13,
15 221:1

**sources**
185:22
208:15 212:4
213:23
214:14,23
220:10,12
221:5,14
247:8

**South**
184:11

**Southern**
221:8,10
226:21
330:7,23
333:19,20,21

**speak**
187:4

**specific**
188:11
202:10
204:9,11
211:8,11
225:15 239:6
258:16,17
264:8 295:11
319:14
321:19

**specifically**
199:24 200:8
211:13 213:7
232:9 286:8
307:20

**Spell**
334:1

**spelled**
270:6

**spend**
189:17

**spent**
195:6

**split**
192:22

**spoke**
297:2

**spoken**
324:9,15,21,
23

**spot**
225:24

**stabilization**
212:20
314:16

**stabilized**
274:14

**staff**
272:25

**stage**
213:9

**stages**
277:2

**stamp**
225:5

**stamped**
207:24
210:17
211:17 212:2
214:19
215:14 221:5
222:2,17
224:24 226:1
318:2

**stand**
220:23

**standard**
186:2 309:22

**staple**
225:20

**stapled**
223:24 224:1
225:21,22,23
310:19 317:4
318:5

**start**
190:7 229:12
246:15
253:16
254:17,20
275:6

**started**
187:2 231:12

**state**
190:23 194:7
235:10 237:6
240:15 286:3

294:22 300:2

**stated**
212:12 243:5
261:19
274:13
289:13
290:2,16
291:15
298:10 323:6

**statement**
185:22
191:6,11
192:19
212:5,13
213:23
214:14,24
240:21,22
241:8 243:13
244:2,14
274:17,18,19
275:9 282:8
284:12
288:10,19
289:3,9
290:19
298:14
313:14
326:3,6

**statements**
201:24
289:22

**states**
194:23

**Station**
233:15

**statistical**
329:9,18

**statute**
237:8
285:17,19,24
286:9,16

**statutory**
204:12
219:15,22
263:13

**stay**
214:4 260:16
312:25

stays
  315:22
Steele
  239:16,19
stories
  204:3
  241:14,17
  290:24
story
  276:9 280:2,
  5
streamline
  217:24
  272:13
strike
  191:1 215:18
  223:16 321:6
  326:14
structure
  236:8 237:13
  241:6 244:12
  314:20 319:4
students
  281:12
studies
  271:15
study
  242:6,10,11
  243:22
  271:3,8,12
  279:10,13,
  23,25
stuff
  198:24
sub
  285:20
subdivisions
  288:16
subject
  192:25
  193:9,18
submission
  198:18 214:6
submitted
  214:3 221:25
  251:25
  295:21 296:9

297:10
298:11,22
328:5
submitting
  198:25
subsection
  286:8
subsequent
  294:14
Substantially
  268:12
suffer
  241:22
suggested
  292:13
suggesting
  292:24
Suite
  184:11
suited
  244:11
summaries
  279:23
summary
  240:13
  278:10
  279:25
Summit
  333:3
Sumter
  320:20
Sunbiz
  185:25
support
  330:4
supported
  284:15
supposed
  274:15
sure
  192:17
  203:14 206:1
  212:5 213:2,
  9 217:19
  253:17,24
  262:19
  267:14,20

273:17
274:22
280:24
289:14 296:5
315:22 318:6
327:19
329:19 334:4
survey
  325:1,2
  327:15,22,
  23,25
Susan
  184:10 186:8
Sutphen
  184:10
Suzanne
  295:1
swear
  186:11,13
switch
  282:19,21
switching
  263:4
sworn
  186:19
system
  188:7 282:2
systems
  281:24

---

**T**

table
  218:24
  247:11
take
  230:9
  282:21,24
  298:24 300:6
  334:3
taken
  230:13 251:7
  277:7,22
  300:10 334:7
takes
  289:7
  307:16,21,24

308:2
taking
  302:23
  304:19
talk
  190:15
  198:11
  204:14 236:7
  255:1 272:24
  290:1 293:13
  309:11
talked
  190:24
  198:15 200:5
  212:8 218:5
  231:11 234:6
  236:18
  243:23
  247:22
  248:19
  269:15,20,24
  273:7,8
  274:8 307:6
  311:4 312:7
  321:14 325:1
  327:15,22
  328:22 329:1
  330:6
talking
  187:25
  190:19
  205:21,22,25
  220:16 227:8
  232:8 234:9
  254:12,14
  262:7 263:2
  268:20
  277:14 305:6
  306:15 311:6
  314:6 323:16
  324:6 331:15
tall
  203:24
tax
  193:18
  195:13
  196:5,25
  212:18 214:1

216:19 219:6
236:20 237:1
247:4,7
249:20
250:3,11
255:24 264:5
270:12
284:2,5,8,
11,21,23
285:1,15
300:1 301:19
311:5,13
313:9 314:25
315:1,8,9,
11,16,17,18,
19,21,25
316:1,2,7,
10,17,18,23
318:9,16,24
327:3,4
**tax-exempt**
285:1 300:1
302:2
**taxes**
192:25 193:9
247:6 257:24
285:14
286:11 293:4
**team**
187:21,24,25
197:25
198:11
221:18
222:11 223:6
327:11
**tear**
223:25
**technical**
253:8
**TEFRA**
291:17
292:23
321:17
**tell**
195:23 198:4
203:18
204:14 205:2
207:10

208:22
210:20 211:4
218:22 220:8
221:24
227:22
234:10
235:16
237:15
241:16,18
244:19 266:7
279:1,9,16
280:1,21
283:11
320:22
324:11
325:11 327:1
330:14
**telling**
220:11
324:21
**ten**
233:17 270:1
315:9 316:1,
6,9 318:25
331:17
**ten-year**
315:19 316:2
**tenant**
298:13
**tenants**
269:22 270:1
**tend**
213:4 214:4
**term**
227:18
283:17
**terminate**
200:15
**terminated**
201:3,22
**terminating**
201:16
**termination**
230:25
**test**
255:24 256:4
314:15

**testified**
186:19
306:19
**testify**
194:25
267:19
298:21
325:15
**testifying**
267:16
**testimony**
186:13 192:4
313:6 331:25
332:4
**thank**
186:17 218:3
251:20 260:2
282:11,15
294:1 322:6
323:3
334:23,25
**thereto**
194:25
**thing**
231:22 278:9
284:18
**things**
202:21
227:18
252:23
265:12
272:12 328:1
**think**
193:23
201:16
209:3,17
210:12
216:23
220:5,6
221:21
223:11
228:8,25
233:17,22
234:7,20
236:2 239:1,
18 243:16
244:20 246:3
248:6,20

254:7,9
259:15
260:1,24
261:4 264:12
267:5 273:6,
22 277:3
278:17
279:21
280:13
285:10
292:5,12
294:10,25
298:2,18
299:3,4,18
300:21 306:6
308:17 310:7
311:4 314:7,
12 317:24
320:1 327:25
334:3
**thinking**
198:12
253:11 254:2
279:18,19,20
**thinks**
289:13
**third**
273:22
274:25
**thought**
189:15
196:6,11
219:1
253:10,18
**three**
241:19
252:24 286:8
289:5 290:23
**three-story**
234:15
**tile**
252:23
**till**
304:6 307:4
**Tim**
272:14
**time**
186:2

194:13,15
211:8,11
214:15
216:21
222:24
223:10  227:5
228:6,7
230:12,15
232:22 233:4
235:22
245:1,3
251:6,11
257:15
282:17 285:4
289:15
300:3,9,15
312:23
316:16
324:15
334:5,9,21
**timeframe**
215:3 319:14
**times**
227:17 248:7
270:10,19
272:11
304:4,12
**title**
261:19 265:3
274:21
322:11
**titled**
206:2 211:18
**titles**
208:9
**today**
186:24
192:14
210:13
229:13,16
259:12
268:16
301:14
320:7,11
322:19
**today's**
187:8

**told**
188:5 190:8
191:8 192:2,
10 243:18
267:20
285:11
**top**
206:2,8
225:9,10
234:12
273:20 298:9
317:6,7,25
**total**
193:8 195:17
285:25
302:6,9,13,
16 303:3
305:7
**totally**
249:7 266:12
275:11
298:15
**totals**
302:21
**town**
202:23,25
203:6,13
277:11
**Townsend**
184:10
**track**
295:5
**tracks**
294:23
**tract**
242:16 243:2
318:23
**traffic**
238:7 239:11
240:20
242:10
243:22
279:13,23,25
288:18
290:16
**trail**
208:24 273:6

**train**
240:5
**transaction**
314:23
**transactions**
199:12
**transcript**
187:9,11
**transferrable**
315:16
**Tree**
185:25
323:18,19
324:4
**true**
190:4,5,6
201:4 241:8
244:14
245:24
275:19
276:15
288:10,19,22
289:3,9,22
291:8,13
299:10
300:2,4
326:3
**truth**
186:14,15
**try**
229:25
230:17 235:2
272:12 293:7
**trying**
217:24 218:1
226:2
230:22,23
252:16
257:16 259:9
**turn**
230:3 250:24
251:3
**two**
191:23
196:14
197:19
209:20

211:11,12
230:6 236:21
237:23 241:5
251:10
258:18
261:18,19
262:4 271:14
273:23
280:17
281:19 299:8
304:21
310:18
317:4,14
321:14
334:19,20
**type**
193:24 194:3
198:2 204:6
242:6 244:11
252:22
316:17
**typical**
236:14
**typically**
224:18
272:19,24,25
294:4,23
318:4 319:16
**typo**
270:8

___

**U**

**Uh-huh**
197:5,7
209:10
263:25
284:17
316:4,21
317:9 320:6
**ultimate**
314:3
**ultimately**
211:15
223:13
227:15
**underlying**

304:5
**underneath**
264:2,4
**understand**
201:15,17
202:17
219:4,16
254:3 278:8
280:5 308:10
310:22
311:10
**understanding**
192:4 202:18
204:4 207:22
231:12,15
238:14,18
244:25 268:6
271:14
275:18
277:18
286:4,16
289:4 327:6
**understood**
217:18
218:11 224:6
244:23 245:8
254:1 256:10
262:15
277:16 313:6
322:21
**underwriter**
221:18,25
222:7,14
224:18,20
234:18 317:8
**underwriter's**
221:15,23
**underwriters**
317:6
**underwriting**
213:25
214:4,8
215:16,20
216:12,14,
15,21 217:8,
9 218:10
220:2 221:3
222:8 224:19

234:18
309:24 318:1
**unit**
225:16 263:8
327:21 328:2
**units**
196:7
207:17,18
218:19
219:2,3,12,
18 227:2
246:20,22
247:3 248:24
249:6,7
250:4 263:5,
18 266:11,17
277:6,11
278:22 279:6
318:24
327:21 328:2
**unrelated**
219:24
**unrestricted**
246:18,21
247:1 249:7
250:2 254:25
263:5,8
266:11,12,14
**unsigned**
259:23
260:21,22
**updated**
213:19
216:13
**updates**
213:21 214:5
**upended**
311:21,23
**user**
300:1
**utilities**
286:11
**utility**
281:24 282:2
**utilization**
203:15

**utilized**
247:9
**utilizes**
294:3

———————

**V**

———————

**various**
294:11
**vary**
318:10
**venue**
185:25
197:21,24
198:18 199:1
204:21 213:7
215:17 216:4
218:8 226:20
227:23
233:19
234:11
235:17,22
236:3 237:15
242:7 245:19
247:25
248:6,9,13,
15,18,25
249:9,10,13,
14 251:24
253:2,10,11,
18,25 254:3,
12,14,18,20
255:8 256:6,
7,12 257:19
266:1,8,22,
23 267:8
268:7,18
269:2 277:14
280:15
281:18 287:1
288:5
299:19,20
323:18,19
324:4,6,7
326:3,13,16
328:8,13
**venues**
254:24

**verbally**
244:10
**verification**
237:7 294:16
**verified**
295:15
**verify**
237:10
267:23 276:8
278:12
295:11 297:9
299:9
**version**
198:9 221:19
**versus**
306:16 307:7
**vice**
226:22
**video**
250:22
**video-
recorded**
186:3
**Videographer**
184:16
186:1,10
228:4
230:11,14
251:6,9
300:8,14
334:5,8,20
**Viera**
237:15
248:1,7,11,
15 249:9,14
251:24
253:2,10
254:4,14
255:8 256:6,
7,12 257:19
266:22,23
267:8 268:18
269:2 299:20
**viewed**
303:13
**vintage**
328:8

vocal
  289:18
volume
  186:3 251:10
  313:19
  334:20
Volusia
  232:25
  233:6,11
  320:3,4,14,
  19
voted
  289:5

---

W

W-I-C-K-H-A-M
  270:7
waiting
  307:4
waiver
  209:3 211:2,
  5,6,15
walking
  281:12
want
  188:15
  193:13
  198:13
  228:12,13
  230:3 246:14
  255:1 276:4,
  8 279:16
  282:19,21,24
  306:7,18
  310:20
  324:19
wanted
  202:19
  217:19 224:4
warm
  230:2,5,8
way
  188:2 213:19
  214:9 216:25
  226:3 231:8
  263:14

264:23
265:15
268:25
269:1,5,7,9
304:4
website
  185:12 197:6
  223:13,18
  238:12
  246:18
  247:11
  250:3,8
  264:19 265:6
  267:11,14,16
  268:4 271:4,
  22 298:1
website's
  267:19
Websites
  265:10
week
  233:14,18
  289:1
weeks
  228:18
went
  279:22
West
  185:16
  188:25
  191:17
  193:16
  206:12
  208:20
  209:7,11,13
  231:2 234:25
  235:5 242:18
  244:12
  271:2,19
  272:10,17,23
  276:2,3
  290:17
  298:11
  321:23
  322:1,9,16
Weston
  277:11

white
  329:6
Wickham
  250:7
  259:15,19,20
  260:12,16,21
  261:5
  265:22,23
  270:3
Wickman
  270:1,4
window
  252:22
Wise
  237:21
  272:21
witness
  185:5
  186:11,16,18
  189:23
  190:1,18
  191:6,13
  201:15
  205:22 216:9
  225:23
  226:2,6
  230:2,4
  240:1,4,11,
  24 241:10
  242:4,21
  244:4,16
  245:12,16
  249:19
  250:21,24
  251:4 252:21
  259:4 260:5
  261:17 262:1
  263:1 264:16
  265:9,12,14
  266:3,25
  267:13,19
  268:12 269:4
  270:15
  273:16,25
  275:11
  276:12,15,18
  278:2 279:14
  280:24

288:22
289:24
292:5,9
293:18
296:3,5,16,
24 299:1,22
300:7 310:18
324:15
325:17,19
329:18
330:20
332:4,10,15
333:1 334:25
Woodfield
  245:25
Woodfield@
heritageoaks.
org
  297:22
word
  254:20 265:9
words
  281:6
work
  187:21 258:4
  293:9 333:8
  334:11
worked
  197:11 198:5
  264:8 271:10
  304:3 333:16
working
  197:15
  227:23
  233:5,11,14,
  18,20
works
  189:1 192:1
  197:11,13
world
  308:5
Wow
  234:2
write
  276:12,20
  278:9

**write-up**
  222:14,15
**writing**
  276:19
**written**
  220:3  278:10
  280:5  291:21
**wrong**
  225:23
  248:21
  259:17
**wrote**
  276:18  278:3
  285:4

---

**Y**

---

**yeah**
  196:18
  198:1,23
  205:24
  218:14
  220:24  224:4
  230:4  235:7
  239:25
  240:1,3
  253:13,15,21
  257:11,15
  259:19  282:1
  283:1  296:16
  303:21
  309:1,5
  317:20
**year**
  189:12
  231:17  301:4
  319:25  320:1
**years**
  211:11
  218:20
  258:5,9
  266:9
  283:17,18
  294:14  307:3
  308:13  312:9
  315:9  316:1,
  6,9  319:1,2,
  9,11,15,16

  331:13
**yesterday**
  229:17,18
**younger**
  266:10

---

**Z**

---

**ZIP**
  291:20
**zoned**
  199:25
  275:14
  291:19
**zones**
  281:12
**zoning**
  194:6  203:4,
  21  204:23
  205:18
  206:17
  242:12
  275:4,8,20,
  22  289:8
  291:5,6,11

# EXHIBIT 10

**Subject:**
Resolution approving the issuance by Brevard County Housing Finance Authority of Multi-Family Housing Revenue Bonds (The Venue at Heritage Oaks Project), in an amount not to exceed $16,750,000

**Fiscal Impact:**
None.

**Dept/Office:**
County Attorney's Office

**Requested Action:**

The Brevard County Housing Finance Authority (the "Authority") is requesting that the Board approve a Resolution to allow the issuance by the Authority of multi-family housing revenue bonds to finance the acquisition, rehabilitation, equipping and development of The Venue at Heritage Oaks (the "Project").

**Summary Explanation and Background:**

The Authority received an application from The Venue at Heritage Oaks Partners, Ltd. (the general partner of which is Southern Affordable Services, Inc., a not-for-profit corporation), for the issuance of multi-family housing revenue bonds in an amount not to exceed $16,750,000 to finance the acquisition, construction, equipping and development of the Project. The Project is new construction of 105 apartment units (63 one bedroom, 26 two bedroom and 12 three bedroom apartments) located at the northeast corner of the intersection of Heritage Oaks Boulevard and Minton Road, West Melbourne, Florida. The apartments will be rented to individuals and families. A Land Use Restriction Agreement encumbering the property will require that a minimum of 20% of the apartment units will be set aside and available only to persons earning less than 50% of area median income with the remaining 80% available to persons earning less than 120% of area median income, for as long as the financing is outstanding, or for a term of 15 years, or as long as a real estate tax exemption is available to the Project, whichever is longer. The Project will include 15 seer air conditioning, Energy Star ceiling fans, low-e, dual pane windows, low flow plumbing fixtures, ceramic tile and Berber-style carpeting, granite countertops and balconies.

On October 25, 2023, the Authority held a public hearing, following proper publication of notice, for the purpose of receiving public input on the proposed issue, a report on which is attached. The proposed Resolution acknowledges the public hearing and authorizes the issuance by the Authority of the bonds. In order to issue tax-exempt bonds for the Project, the Authority must receive the limited approval of the Board of County Commissioners as required by applicable federal tax law. The Authority has sufficient carryforward allocation (permission to issue bonds) to issue the bonds prior to December 31, 2023. If the carryforward allocation is not used to issue

bonds prior to December 31, 2023, it will expire.  This is the only application before the Authority capable of closing by the end of this year.

The bonds will be payable solely from revenues of the Project and will not pledge the revenues or ad valorem taxes of the County or the Authority.

The County's financial advisor (PFM Financial Advisors) has reviewed the transaction and anticipates the funding will be within the County's debt issuance guidelines if it remains at proposed levels. (See attachment).

The County's outside bond counsel has reviewed the project and provided the following statement: "The resolution proposed to be adopted by the BOCC satisfies the pertinent federal and state law requirements and provides that neither the County nor any of the elected officials or staff of the County will have any obligation or liability, financial or otherwise, with respect to the Project or the Bonds." (See attachment.)

Cost Benefit Analysis provided by Brevard County Housing Finance Authority:

This issue will provide funds to finance the acquisition, construction, equipping and development of 105 rental housing units which will be available to Brevard County families of lower and moderate income.  There is no fiscal impact to the Board of County Commissioners or the Authority.  The County is only authorizing the Housing Finance Authority to issue the bonds under the IRS requirements for tax exempt bonds and the County shall be indemnified from the issuance of bonds and the Project.

A representative of the Housing Finance Authority will be available for questions at the meeting.

Contact Person: Angela A. Abbott, 264-0334, angelaabbott@cfl.rr.com; Steven E. Miller, (813) 281-2222, smiller@ngn-tampa.com; Jay Glover, PFM Financial Advisors LLC, (407) 406-5760, gloverj@pfm.com

**Clerk to the Board Instructions:**  Return a signed Resolution to the County Attorney's Office.

**RESOLUTION NO. 2023-_____**

**A RESOLUTION OF THE BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA, APPROVING THE ISSUANCE OF NOT EXCEEDING $16,750,000 MULTI-FAMILY HOUSING REVENUE BONDS OF THE BREVARD COUNTY HOUSING FINANCE AUTHORITY, BREVARD COUNTY, FLORIDA FOR THE VENUE AT HERITAGE OAKS PROJECT; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, the Board of County Commissioners of Brevard County, Florida (the "Board"), by resolution adopted on February 8, 1979, declared a need for a Housing Finance Authority to function within both the incorporated and unincorporated areas of Brevard County, Florida, to alleviate a shortage of housing and capital for investment in housing within such areas of operation; and

**WHEREAS**, the Board adopted Ordinance No. 79-09 on March 15, 1979, as amended by Ordinance No. 84-16, adopted on May 10, 1984 (the "Ordinance"), creating the Brevard County Housing Finance Authority (the "Authority"); and

**WHEREAS**, the Florida Housing Finance Authority Law, Part IV, Chapter 159, Florida Statutes (the "Act"), provides that the Authority may issue bonds for the purpose of the Act; and

**WHEREAS**, the Authority, on October 25, 2023, adopted a resolution (the "Resolution") to implement a financing plan in concept to issue Multifamily Housing Revenue Bonds, Series 2023 (The Venue at Heritage Oaks) (the "Bonds") in one or more series and held a public hearing with respect to the issuance of the Bonds; and

**WHEREAS**, the proceeds of the Bonds will be used (1) to finance the acquisition, construction, equipping and development of The Venue at Heritage Oaks project in Brevard County (the "Project") and (2) to fund Bond financing costs and Bond reserves; and

**WHEREAS,** The Venue at Heritage Oaks Partners, Ltd., a Florida limited partnership (the "Borrower"), and Southern Affordable Services, Inc., a Florida not-for-profit corporation, the borrower and general partner of the borrower of the proposed Bonds, respectively, have submitted the Indemnification Certificate attached hereto as Exhibit A; and

**WHEREAS**, Section 147 of the Internal Revenue Code of 1986, as amended (the "Code"), requires public approval of the Bonds and the Project by an applicable elected official (in this case, the Board), following a public hearing; and

1

RRTPBC000003

**WHEREAS**, such a public hearing following the public notice required by the Code was held by the Authority on October 25, 2023 (the "Hearing"), and the report regarding such Hearing is attached hereto as Exhibit B (the "Hearing Report"); and

**WHEREAS**, at the Hearing reasonable opportunity was provided for all interested individuals to express their views, both orally and in writing, concerning the issuance of the Bonds and the Project; and

**WHEREAS**, the Board has considered all comments and concerns, if any, expressed by such individuals; and

**WHEREAS**, the Board desires to express its approval of the action taken by the Authority and its officials pursuant to the Resolution.

**NOW THEREFORE, BE IT RESOLVED BY THE BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA,** that:

**Section 1.**    This resolution is adopted pursuant to the provisions of Section 1-181 of the Ordinance.

**Section 2.**    This resolution is adopted following the Hearing held by the Authority on October 25, 2023 with reference to the Bonds and the Project.  After consideration of the Hearing Report and the information provided to this Board, the Board hereby approves the issuance by the Authority of the Bonds in an aggregate principal amount not exceeding $16,750,000 for the purposes expressed in the Authority's Resolution.

**Section 3.**    The County shall have no responsibility with respect to the repayment of the Bonds.  The Bonds and the interest thereon shall not constitute an indebtedness or pledge of the general credit or taxing power of the County but shall be payable solely from revenues pledged therefor pursuant to financing agreements entered into by and among the Authority and the Borrower and/or parties other than the County prior to or contemporaneously with the issuance of the Bonds.  Neither the County nor any of the members of the Board or staff of the County will have any obligation or liability, financial or otherwise, with respect to the Project or the Bonds.

**Section 4.**    The approval given herein shall not be construed as: (i) an endorsement of the creditworthiness of the Borrower or the financial viability of the Project, (ii) a recommendation to any prospective purchaser to purchase the Bonds, (iii) an evaluation of the likelihood of the repayment of the debt service on the Bonds, or (iv) approval of any necessary rezoning applications or approval or acquiescence to the alteration of existing zoning or land use nor approval for any other regulatory permits relating to the Project, and the Board shall not be construed by reason of its adoption of this Resolution to make any endorsement, finding or recommendation or to have waived any right of the Board or to have estopped the Board from asserting any rights or responsibilities it may have in such regard.

RRTPBC000004

**Section 5.**    This resolution shall take effect immediately upon adoption.

RRTPBC000005

This Resolution passed and adopted this ___ day of _____, 2023.

**BOARD OF COUNTY COMMISSIONERS OF BREVARD COUNTY, FLORIDA**

(SEAL)

By: _____
      Rita Pritchett, Chair

Attest:

By: _____
      Rachel M. Sadoff, Clerk of the Circuit
      Court and Ex-Officio Clerk to the Board
      of County Commissioners of Brevard
      County, Florida

RRTPBC000006

**EXHIBIT A**

**INDEMNIFICATION CERTIFICATE**

The undersigned hereby certifies that he or she is authorized to execute and deliver this Indemnification Certificate and further represents, in the name of and on behalf of The Venue at Heritage Oaks Partners, Ltd., a Florida limited partnership (the "Borrower") and Southern Affordable Services, Inc., a Florida not-for-profit corporation (the "General Partner" and, collectively with the Borrower, the "Indemnitors"), the following:

(1)    At the request of the Borrower, the Brevard County Housing Finance Authority (the "Issuer") proposes to issue its tax-exempt housing revenue bonds in an aggregate principal amount not to exceed $16,750,000, in one or more series issued at one or more times (collectively, the "Bonds"), the proceeds of which are to be used to (i) finance all or a portion of the cost of the acquisition, construction, equipping and development financing and ownership of an approximately 105-unit multifamily rental housing development known as The Venue at Heritage Oaks located at the Northeast corner of the intersection of Heritage Oaks Boulevard and Minton Road, West Melbourne, Florida 32904, Brevard County, Florida (the "Project");

(2)    The issuance of the Bonds to finance the Project:  (i) is appropriate to the needs and circumstances of, and will make a significant contribution to the economic growth of the community in which it is located, (ii) will provide or preserve gainful employment, (iii) will promote commerce and economic development within the State of Florida and (iv) will serve a public purpose by advancing the general welfare of the State and its people by providing for a housing development within the meaning of Chapter 159, Part IV, Florida Statutes, as amended;

(3)    Brevard County, Florida (the "County") will continue to be able to cope satisfactorily with the impact of the Project and will be able to provide, or cause to be provided when needed, the public facilities, including utilities and public services, that will be necessary for the operation, repair, and maintenance of the Project and on account of any increases in population or other circumstances resulting therefrom;

(4)    In order to finance the costs of the Project from the proceeds of the Bonds on a tax-exempt basis, it is necessary to hold a public hearing and approve the issuance of the Bonds for the purposes of Section 147(f) of the Internal Revenue Code of 1986, as amended (the "Code");

(5)    The Issuer held a public hearing with respect to the issuance of the Bonds on October 25, 2023;

RRTPBC000007

(6)    The Borrower has requested the Board of County Commissioners (the "Board") of the County to approve the issuance of the Bonds for purposes of Section 147(f) of the Code; and

(7)    The County desires indemnification from the Indemnitors as a material inducement to the Board granting the foregoing approval.

NOW THEREFORE, THE UNDERSIGNED, ON BEHALF OF THE INDEMNITORS, DOES HEREBY: Agree to defend the County and its officials, employees, attorneys and agents and the members of the Board, and hold the County and its officials, employees, attorneys and agents and the members of the Board, harmless against any and all claims, losses, liabilities or damages to property or any injury or death of any person or persons occurring in connection with the issuance of the Bonds or the acquisition, development, construction, ownership or operation of the Project by or on behalf of the Borrower, including in the case of any and all negligence of such indemnitee, or in any way growing out of or resulting from the Project or from the issuance, sale or delivery of the Bonds, including, but not limited to, liabilities or costs arising under the Internal Revenue Code of 1986, as amended, the Securities Act of 1933, the Securities Exchange Act of 1934 or any applicable securities law of the State of Florida, including, without limitation, all costs and expenses of the County, including reasonable attorneys' fees, incurred in connection therewith.

IN WITNESS WHEREOF, the Indemnitors have executed this Indemnification Certificate this 25 day of October , 2023.

THE VENUE AT HERITAGE OAKS PARTNERS, LTD., a Florida limited partnership

By:    Southern Affordable Services, Inc., a Florida not-for-profit corporation, its general partner

By:    _____
Jay P. Brock
Executive Vice President

SOUTHERN AFFORDABLE SERVICES, INC., a Florida not-for-profit corporation

By:    _____
Jay P. Brock
Executive Vice President

A-2

**EXHIBIT B**

**REPORT OF**
**BREVARD COUNTY HOUSING FINANCE AUTHORITY**

**REPORT REGARDING PUBLIC HEARING**

The Brevard County Housing Finance Authority (the "Authority") conducted a public hearing on the proposed issuance by the Authority of not to exceed $16,750,000 in Multifamily Housing Revenue Bonds, (The Venue at Heritage Oaks Project) (the "Bonds") and on the nature and location of the project to be financed with the Bonds.

The public hearing was held on October 25, 2023, commencing at 3:06 p.m. and closing at 3:07 p.m., at the Brevard County Agricultural Center, 3695 Lake Drive, Cocoa, Florida, pursuant to the notice of such hearing which was published on October 13 , 2023, on the County's website and on October 11, 2023, on the Authority's website. Copies of the Notice of Public Hearing and screenshots as to publication of the Notice are attached as Exhibits B and C to Resolution 2023-06. Interested individuals were given the opportunity to express their views, both orally and in writing.

The following numbers of people attended the hearing or submitted written comments and were in favor of or opposed to the proposed issuance of the Bonds or the nature or location of the project to be financed with the Bonds:

| | |
|---|---|
| Number of people in attendance: | 10 |
| Number of written comments: | 0 |
| Number of people in favor: | 0 |
| Number of people opposed: | 0 |

Respectfully submitted this 25th day of October, 2023.

ANGELA A. ABBOTT, ESQUIRE, Attorney for the Brevard County Housing Finance Authority

RESOLUTION NO. 2023-06

**RESOLUTION AMENDING AND RESTATING RESOLUTION NO. 23-05 OF THE BREVARD COUNTY HOUSING FINANCE AUTHORITY, TO READ AS FOLLOWS:**

**"RESOLUTION REGARDING THE OFFICIAL ACTION OF THE BREVARD COUNTY HOUSING FINANCE AUTHORITY RELATIVE TO THE ISSUANCE OF NOT TO EXCEED $16,750,000 IN MULTIFAMILY HOUSING REVENUE BONDS FOR THE PURPOSE OF ACQUIRING, CONSTRUCTING, EQUIPPING, AND DEVELOPING A MULTIFAMILY RESIDENTIAL HOUSING FACILITY FOR PERSONS OR FAMILIES OF LOW, MIDDLE OR MODERATE INCOME; FURTHER AUTHORIZING THE EXECUTION AND DELIVERY OF AN AGREEMENT BY AND BETWEEN THE AUTHORITY AND THE VENUE AT HERITAGE OAKS PARTNERS, LTD.; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS,** The Venue at Heritage Oaks Partners, Ltd. (the "Company") has applied to the Brevard County Housing Finance Authority (the "Authority") to (i) issue its multifamily housing revenue bonds in a principal amount not to exceed $16,750,000 (the "Bonds") for the purpose of financing the acquisition, construction, equipping and development of a multifamily residential housing facility for persons or families of low, middle or moderate income to be located in Brevard County, Florida, (the "Project"), and (ii) to loan the proceeds of the Bonds to the Company pursuant to Chapter 159, Part IV, Florida Statutes, and Chapter 159, Part II, Florida Statutes, or such other provision or provisions of Florida law as the Authority may determine advisable (the "Act"); and

**WHEREAS,** subject to the terms set forth herein and in the Memorandum of Agreement attached hereto as Exhibit A, the Company has requested that the Authority make a determination to issue the Bonds under the Act in one or more issues or series not exceeding an aggregate principal amount of $16,750,000 and to loan the proceeds thereof available to finance the Project under a loan agreement or other financing agreement which will provide that payments thereunder be at least sufficient to pay the principal of and interest and redemption premium, if any, on such Bonds and such other costs in connection therewith as may be incurred by the Authority, to assist the Company and promote the purposes provided in the Act; and

**WHEREAS,** the Company has submitted the Memorandum of Agreement relating to the issuance of the Bonds, attached hereto; and

1

**WHEREAS,** in order to satisfy certain of the requirements of Section 147(f) of the Internal Revenue Code of 1986, as amended, the Authority intends to hold a public hearing on the proposed issuance of the Bonds for the purposes herein stated, which date will be at least 7 days following the first publication of a notice of such public hearing as required by law (a form of such notice is attached hereto as Exhibit B), which public hearing will be conducted in a manner that provides a reasonable opportunity for persons with differing views to be heard, both orally and in writing, on both the issuance of such Bonds and the location and nature of the portion of the Project to be financed with the proceeds therefrom; and

**WHEREAS,** an affidavit as to such notice is attached hereto as Exhibit C; and

**WHEREAS,** it is intended that this Resolution shall constitute official action toward the issuance of the Bonds within the meaning of the applicable United States Treasury Regulations;

**IT IS, THEREFORE, DETERMINED AND RESOLVED BY THE BREVARD COUNTY HOUSING FINANCE AUTHORITY, THAT:**

1. **APPROVAL OF THE PROJECT.** The acquisition, construction, equipping and development of the Project and the financing thereof by the Authority through the issuance of the Bonds, pursuant to the Act, will promote the health and welfare of the citizens of Brevard County, Florida, and will thereby serve the public purposes of the Act.

2. **EXECUTION AND DELIVERY OF THE MEMORANDUM OF AGREEMENT.** The Chairman or Vice Chairman of the Authority hereby are authorized and directed to execute, for and on behalf of the Authority, the Memorandum of Agreement attached hereto as Exhibit A between the Authority and the Company providing understandings relative to the proposed issuance of the Bonds by the Authority to finance the Project in an aggregate principal amount not to exceed $16,750,000.

3. **AUTHORIZATION OF THE BONDS.** Subject to the terms and conditions set forth herein and in the Memorandum of Agreement attached hereto, there is hereby authorized to be issued and the Authority hereby determines to issue the Bonds, if so requested by the Company, in one or more issues or series in an aggregate principal amount not to exceed $16,750,000 for the purpose of financing the Project described in such Memorandum of Agreement. The Bonds shall be designated the "Brevard County Housing Finance Authority Multifamily Housing Revenue Bonds, Series 2023 (The Venue at Heritage Oaks)". The rates of interest payable on the Bonds shall not exceed the rate permitted by law.

4. **RECOMMENDATION FOR APPROVAL TO BOARD OF COUNTY COMMISSIONERS.** The Authority hereby recommends that the Board of County Commissioners of Brevard County, Florida (the "Board") approve the issuance of the Bonds and the financing of the Project. The Authority hereby directs the Chairman, Vice Chairman or Authority's Counsel, either alone or jointly, at the expense of the Company, to seek approval for the issuance of the Bonds and the financing of the Project by the Board as the applicable elected

2

RRTPBC000011

representatives of Brevard County, Florida, under and pursuant to the Act and Section 147(f) of the Internal Revenue Code of 1986, as amended.

**5.    GENERAL AUTHORIZATION.**    The Chairman, the Vice Chairman, the Secretary-Treasurer and counsel for the Authority hereby are further authorized to proceed, upon execution of the Memorandum of Agreement, with the undertakings provided for therein on the part of the Authority and are further authorized to take such steps and actions as may be required and necessary in order to cause the Authority to issue the Bonds subject to the terms and conditions set forth herein and in the Memorandum of Agreement authorized hereby.

**6.    AFFIRMATIVE ACTION.**    This Resolution is an affirmative action of the Authority toward the issuance of the Bonds, as contemplated in said Memorandum of Agreement, in accordance with the purposes of the laws of the State of Florida and the applicable United States Treasury Regulations.

**7.    APPROVAL OF NOTICE AND PUBLICATION OF PUBLIC HEARING.** The form of notice of public hearing attached hereto as Exhibit B is hereby approved and the publishing thereof authorized on behalf of the Authority as referenced in Exhibit C ratified and approved by the Authority.

**8.    APPOINTMENT OF COUNSEL.**    The firm of Nabors, Giblin & Nickerson, P.A. is duly appointed Bond Counsel in connection with the issuance of the Bonds.  Angela A. Abbott, P.A., is duly appointed Issuer's Counsel.

**9.    LIMITED OBLIGATIONS.**    The Bonds and the interest thereon shall not constitute an indebtedness or pledge of the general credit or taxing power of the Authority, Brevard County, the State of Florida or any political subdivision or agency thereof but shall be payable solely from the revenue pledged therefor pursuant to a loan agreement or other financing agreement entered into by and between the Authority and the Company prior to or contemporaneously with the issuance of the Bonds.

**10.    LIMITED APPROVAL.** The approval given herein shall not be construed as an approval of any necessary zoning applications nor for any other regulatory permits relating to the Project, and the Authority shall not be construed by reason of its adoption of this Resolution to have waived any right of the County and/or of any city in which the proposed Project is to be located or to have estopped the County and/or such city, if any, from asserting any rights or responsibilities it may have in that regard.  In addition, this Resolution and the Memorandum of Agreement attached hereto as Exhibit A are conditioned upon and subject to: (1) the determination by the Authority, in its sole and absolute discretion at a future date in the future, that it is in the best interests of the Authority and the residents of Brevard County, Florida, to use the tax exempt volume cap allocation potentially available to the Authority to issue the Bonds; (2) receipt of the necessary volume cap tax exempt allocation from the State of Florida, Division of Bond Finance; (3) receipt of the approval of the Project and the proposed financing of the Project by the Board; (4) the ownership and control of the Company and its principals not

3

varying more than five (5%) percent from what has been represented to the Authority in the Company's Application; (5) the number of multi-family units to be constructed by the Company not decreasing by more than five (5%) percent from the 136 units referenced in the Company's Application; (6) the proposed Project, including, but not limited to design, materials, type of construction materials, etc. not changing materially without the prior written consent of the Authority; and (7) the closing of the Bonds occurring on or before one hundred and fifty-five (155) days after receipt of volume cap allocation from the State of Florida Division of Bond Finance, unless extended by the Authority in its sole and absolute discretion. In the event that any of the foregoing events shall not take place, if applicable, or shall occur or take place, if applicable, it shall operate as a termination of this Resolution and the Memorandum of Agreement.

**11.    BOND ALLOCATION.** Upon a determination by the Authority as set forth in the Memorandum of Agreement to request private activity bond allocation with respect to such Bonds, the Chairman, Vice Chairman or Authority's Counsel are hereby authorized to execute all necessary documents for obtaining and preserving an allocation from the State of Florida, Division of Bond Finance upon request by the Company."

This Resolution shall take effect immediately.

**ADOPTED** this 25th day of October, 2023.

BREVARD      COUNTY      HOUSING
FINANCE AUTHORITY

(SEAL)

By: _____
        Chairman

ATTEST:

By: _____
        Secretary-Treasurer

4

RRTPBC000013

**EXHIBIT A**

## MEMORANDUM OF AGREEMENT FOR ISSUANCE OF
## MULTIFAMILY HOUSING REVENUE BONDS

This Agreement between the Brevard County Housing Finance Authority (the "Authority"), a body corporate and politic of the State of Florida and The Venue at Heritage Oaks Partners, Ltd. (the "Company"), a Florida limited partnership organized and validly existing under the laws of the State of Florida and authorized to do business in the State of Florida.

### W I T N E S S E T H :

1.    **PRELIMINARY STATEMENT.** Among the matters of mutual understanding which have resulted in the execution of this Memorandum of Agreement are the following:

(a)    The Florida Housing Finance Authority Law (Chapter 159, Part IV, Florida Statutes), as amended, and the Florida Industrial Development Financing Act (Chapter 159, Part II, Florida Statutes) (collectively, the "Act") provides that the Authority may issue its revenue bonds and loan the proceeds thereof to one or more persons, firms or private corporations, or use such proceeds to defray the cost of acquiring, by purchase or rehabilitation, certain qualifying facilities.

(b)    The Company is in the process of acquiring, constructing, equipping and developing a multifamily residential housing facility for persons or families of low, middle or moderate income (the "Project") to be located within the boundaries of Brevard County, Florida. It is estimated that the cost of the acquisition, construction, equipping and development of the Project will be in excess of $16,750,000.

(c)    The Authority intends this Memorandum of Agreement to constitute its official binding commitment, subject to the terms and conditions set forth herein and in the Resolution authorizing the Authority to enter into this Memorandum of Agreement, to issue its bonds in a principal amount not to exceed $16,750,000 (the "Bonds") in one or more series or issues pursuant to the Act in an amount to be agreed upon by the Authority and the Company and to loan the proceeds thereof to the Company, and to use such proceeds to finance the cost of acquiring, constructing, equipping and developing the Project, including all costs incurred in connection with the issuance of the Bonds by the Authority, up to an amount not to exceed $16,750,000.

(d)    The Authority considers the issuance and sale of the Bonds, for the purpose hereinabove set forth, consistent with the objectives of the Act.    This commitment is an affirmative official action of the Authority toward the issuance of the Bonds as herein

A-1

contemplated in accordance with the purposes of both the Act and the applicable United States
Treasury Regulations.

     **2.**    **UNDERTAKINGS ON THE PART OF THE AUTHORITY.** Subject to the
terms and conditions set forth herein and in the Authority's Resolution dated August 23, 2023
(the "Inducement Resolution") authorizing the Authority to enter into this Memorandum of
Agreement, the Authority agrees as follows:

     (a)    The Authority will authorize the issuance of the Bonds in the aggregate principal
amount necessary and sufficient to finance the cost of acquiring, constructing, equipping and
developing the Project as the Authority and the Company shall agree in writing, but in all events,
the principal amount of such Bonds shall not exceed $16,750,000.

     (b)    The Authority will cooperate with the Company and with the underwriters or
purchasers of the Bonds and the Authority's Counsel with respect to the issuance and sale of the
Bonds and will take such further action and authorize the execution of such documents as shall
be mutually satisfactory to the Authority and the Company for the authorization, issuance and
sale of such Bonds and the use of the proceeds thereof to finance the cost of acquiring,
constructing, equipping and developing the Project.

     (c)    Such actions and documents may permit the issuance from time to time in the
future of additional bonds on terms which shall be set forth therein, whether pari passu with
other series of bonds or otherwise, for the purpose of defraying the cost of completion,
enlargements, improvements and expansion of the Project, or any segment thereof, or refunding
of the Bonds.

     (d)    The loan or financing agreement (the "Loan Agreement") between the Authority
and the Company shall, under the terms agreed upon by the parties, provide for payments to be
made by the Company in such sums as shall be necessary to pay the amounts required under the
Act, including the principal of and interest and redemption premium, if any, on the Bonds, as and
when the same shall become due and payable.

     (e)    In authorizing the issuance of the Bonds pursuant to the Loan Agreement, the
Authority will make no warranty, either expressed or implied, that the proceeds of the Bonds will
be sufficient to pay all costs of acquiring, constructing, equipping and developing the Project, or
that those facilities encompassed by the Project will be suitable for the Company's purposes or
needs.

     (f)    The Bonds shall specifically provide that they are payable solely from the
revenues derived from the Loan Agreement between the Authority and the Company or other
agreements approved by the Authority, except to the extent payable out of amounts attributable
to Bond proceeds. The Bonds and the interest thereon shall not constitute an indebtedness or
pledge of the general credit of the Authority, Brevard County or of the State of Florida, and such
fact shall be plainly stated on the face of the Bonds.

<div align="center">A-2</div>

(g)     Due to the tax exempt volume cap limitations established by the State of Florida on the issuance of tax exempt bonds, the Authority reserves the right, in its sole and absolute discretion, to determine if, in what amount, and when to file a Request for Allocation for the Project with the State of Florida, Division of Bond Finance. Subject to the foregoing, at any time after receipt of this Memorandum of Agreement properly executed by the Company (but before the expiration date), the Authority may file with the State of Florida, Division of Bond Finance a Request for Allocation upon receipt from the Company of an executed request therefor in the form set forth herein. Nothing contained herein shall be deemed to be a guarantee of the tax-exempt private activity bond allocation for the Company's Project.

(h)     The Company has advised the Authority of the need to proceed timely to develop the Project. In that regard, assuming that the proposed financing of the Project and other matters are ultimately worked out and acceptable to the Authority, including a satisfactory third-party credit underwriting review, the Authority is desirous of assisting the Company in the financing of the Project. Accordingly, the Authority is entering into this Memorandum of Agreement so as to assist the Company in obtaining its financing for the Project. However, it is specifically understood and agreed by the Authority and the Company that the Authority, in its sole discretion, reserves the right not to issue the Bonds if it does not ultimately approve the financing.

**3.     UNDERTAKINGS ON THE PART OF THE COMPANY.** Subject to the terms hereof, the Company acknowledges and agrees as follows:

(a)     Although the Authority has approved the proposed Project, it has reserved the right, in its sole and absolute discretion, to determine whether or not to proceed with the issuance of the Bonds as set forth in Section 2(h) above. The Company acknowledges, understands and agrees that the Authority retains said right.

(b)     The Company has been advised that the State of Florida has adopted rules and regulations regarding the use of allocations and requires that an issuer issue its bonds in substantially the entire amount of the allocation within one hundred and fifty-five (155) days from the date of the granting of an allocation, unless it is extended under certain circumstances. The Company further acknowledges that the failure to timely actually issue bonds within a specified percentage of the allocation can result in the loss of the allocation and/or additional fees to be paid by the Authority. Accordingly, the Company shall be fully responsible for determining the size of the allocation to be requested, subject to the proviso that the request shall not be for a principal amount of Bonds which exceed the amounts set forth in paragraph 2(a).

(c)     The Company will use reasonable efforts to ensure that the Bonds in the aggregate principal amount as stated above are timely sold; provided, however, that the terms of such Bonds and of the sale and delivery thereof shall be mutually satisfactory to the Authority and the Company.

RRTPBC000016

(d)     Prior to the issuance of the Bonds, in one or more series or issues from time to time as the Authority and the Company shall agree in writing, the Company will enter into a Loan Agreement with the Authority, the terms of which shall be mutually agreeable to the Authority and Company, providing for the loan or use of the proceeds of the Bonds to finance the Project. Such agreement will provide that the Company will be obligated to pay the Authority (or pay to trustees for holders of the Bonds on behalf of the Authority, as the case may be) sums sufficient in the aggregate to enable the Authority to pay the principal of and interest and redemption premium, if any, on the Bonds, as and when the same shall become due and payable, and all other expenses related to the issuance and delivery of the Bonds.  The Company will agree in such documents that if the cost of acquisition and construction of the Project exceeds the amounts allocated therefor, it shall not be entitled to any reimbursement for any such excess either from the Authority, the Bondholders or the trustee for the Bondholders.

(e)     The Company shall be responsible for and timely pay the Developer Deposit required by the Authority's Guidelines for Bond Issues, the issuance fee in effect at the time the Bonds are issued and the fees and costs of Counsel to the Issuer and the fees and costs of Bond Counsel to the Issuer, plus such other fees and costs as may be required.

(f)     The Company shall, in addition to paying the amount set forth in the Loan Agreement, pay all costs of operation, maintenance, taxes, governmental and other charges that may be assessed or levied against or with respect to the Project.

(g)     The Company will hold the Authority free and harmless from any loss or damage and from any taxes or other charges levied or assessed by reason of any mortgaging or other disposition of the Project.

(h)     The Company will take such further action as may be required to implement its aforesaid undertakings and as it may deem appropriate in pursuance thereof.

(i)     All fees and costs that the Company is required to pay, including but not limited to, the issuance fee, and counsel fees and costs not paid at the time of application shall be paid in full at the time of the sale and delivery of the Bonds.

(j)     The number of multi-family units to be constructed by the Company will not decrease more than five (5%) percent from the number of multi-family units that it represented that it would construct in its Application to the Authority that resulted in the issuance of the Inducement Resolution and this Memorandum of Agreement.

(k)     There shall not have been a material change in the proposed Project as represented to the Authority by the Company in the Application that it filed with the Authority, including, but not limited to design, materials, type of construction materials, etc. without the prior written consent of the Authority.

A-4

(l)    The closing of the sale of the Bonds shall occur on or before one hundred and fifty-five days from the date of the granting of an allocation, unless extended by the Authority at its sole and absolute discretion.  In the event that the closing on the sale of the Bonds does not occur on or before said time, and the Authority chooses not to extend the closing date, the Company shall have no further rights under this Memorandum of Agreement.  Further, in such event, the Authority may apply for and use the tax exempt volume allocation, if available, for the funding of such other multifamily housing projects or single family housing as it deems best serves the interests of the residents of Brevard County, Florida.

(m)    The ownership and control of the Company and its principals shall not vary more than five (5%) percent from what has been represented in the Company's Application to the Authority without the prior written consent of the Authority.

(n)    The Company and its principals shall have fully and timely complied with the terms of the Authority's Guidelines for Bond Issuers, including, but not limited to the timely payment of all fees and costs due to the Authority, its Counsel and its Bond Counsel.

(o)    The Company and certain related parties or guarantors as determined by the Authority shall be required to enter into an environmental indemnity and certain other guaranties.

**4.    GENERAL PROVISIONS.**  All commitments of the Authority under Section 2 hereof and of the Company under Section 3 hereof are subject to the conditions that the following events shall have occurred not later than one hundred and fifty-five days from the date of receipt of an allocation, or such other date as shall be mutually satisfactory to the Authority and Company:

(a)    The Authority shall be lawfully entitled to issue the Bonds as herein contemplated.

(b)    The Authority and Company shall have agreed on mutually acceptable terms for the Bonds and the sale and delivery thereof and mutually acceptable terms and conditions of any trust instrument in respect thereto and Loan Agreement or other agreements incidental to the financing or referred to in Sections 2 and 3 hereof.

(c)    Such other rulings, approvals, consents, certificates of compliance, opinions of counsel and other instruments and proceedings satisfactory to the Company and to the Authority as to such matters with respect to the Bonds, the Project, the Loan Agreement and any trust instrument, as shall be specified by the Company or the Authority, shall have been obtained from such governmental, as well as non-governmental, agencies and entities as may have or assert competence or jurisdiction over or interest in matters pertinent thereto and shall be in full force and effect at the time of issuance of the Bonds.

A-5

RRTPBC000018

(d)     The Company and the Authority each reserve the absolute right to unilaterally cancel this Memorandum of Agreement at any time prior to the time the Bonds are issued by the Authority upon written notice of cancellation.

(e)     If the events set forth in this Section 4 do not take place within the time set forth or any extension thereof, or if the Company or the Authority exercises its rights of cancellation as set forth in this Section 4, the Company agrees that it will reimburse the Authority for all the reasonable and necessary direct or indirect expenses which the Authority may incur at the Company's request arising from the execution of this Memorandum of Agreement, and the performance by the Authority of its obligations hereunder, including legal fees and expenses for counsel to the Authority and Bond Counsel.  In addition, the Authority shall be entitled to keep all fees paid to it pursuant to the Authority's Application Procedures and Program Guidelines.

(f)     The Company acknowledges that the Authority may, during the time this Memorandum of Agreement is in effect, issue similar "inducement" agreements to other companies for other multifamily housing projects, and/or may issue bonds or participate jointly with other authorities to issue bonds for single family housing.  This Memorandum of Agreement will create no priority or rights vis a vis subsequent agreements for the issuance of multifamily or single family housing bonds.

(g)     The Authority shall have obtained the consent of the Brevard County Board of County Commissioners as to the issuance of the Bonds.  Further, the Authority shall have obtained private activity bond allocation sufficient to allow the issuance of the Bonds from the State of Florida, Division of Bond Finance.

**5.     BINDING EFFECT.**  All covenants and agreements herein contained by or on behalf of the Authority and the Company shall bind and inure to the benefit of the respective successors and assigns of the Authority and the Company whether so expressed or not.

A-6

RRTPBC000019

**IN WITNESS WHEREOF,** the parties hereto have entered into this Agreement by their officers thereunder duly authorized as of the 25th day of October, 2023.

<div style="margin-left:40%">

**BREVARD     COUNTY     HOUSING FINANCE AUTHORITY**

By: _____

Chairman


**THE VENUE AT HERITAGE OAKS PARTNERS, LTD.,** a Florida limited partnership

By:  Southern Affordable Services, Inc., a Florida not-for-profit corporation, its general partner


By:_____

Jay P. Brock
Executive Vice President

</div>

A-7

RRTPBC000020

**IN WITNESS WHEREOF,** the parties hereto have entered into this Agreement by their officers thereunder duly authorized as of the 25th day of October, 2023.

<div style="text-align:right">

**BREVARD    COUNTY    HOUSING FINANCE AUTHORITY**

By: _____
    Chairman


**THE VENUE AT HERITAGE OAKS PARTNERS, LTD.,** a Florida limited partnership

By:  Southern Affordable Services, Inc., a Florida not-for-profit corporation, its general partner


By:_____
    Jay P. Brock
    Executive Vice President

</div>

A-7

RRTPBC000021

**EXHIBIT B**

**NOTICE OF PUBLIC HEARING**
**CONCERNING THE BREVARD COUNTY HOUSING FINANCE AUTHORITY'S**
**PROPOSED ISSUANCE OF ITS**
**MULTIFAMILY HOUSING REVENUE BONDS, SERIES 2023, IN AN**
**AGGREGATE AMOUNT OF NOT TO EXCEED $16,750,000**

**Public Notice** is hereby given that the Brevard County Housing Finance Authority (the "Authority") will conduct a public hearing on October 25, 2023 at 3:00 p.m., or thereafter, at the Brevard County Agricultural Center, 3695 Lake Drive, Cocoa, Florida, in accordance with the Tax Equity Fiscal Responsibility Act ("TEFRA") on the proposed issuance by the Authority of its Multi-Family Housing Revenue Bonds, Series 2023 in the aggregate principal amount of not to exceed $16,750,000 for purposes of financing the Project referenced below. The proceeds of such bonds will be used to finance the acquisition, construction, and equipping of the following Project located at the following location in Brevard County, Florida:

| | |
|---|---|
| Owner: | THE VENUE AT HERITAGE OAKS PARTNERS, LTD. |
| Project Name: | THE VENUE AT HERITAGE OAKS |
| Location: | Northeast corner of the intersection of Heritage Oaks Boulevard and Minton Road, West Melbourne, Florida 32904 |
| No. of Units: | 105 |

Aggregate principal amount of tax exempt Bonds: not exceeding $16,750,000

If any member of the general public wishes to be heard at the hearing he or she may do so by appearing in person at the time and place set forth above or by submitting their views in writing delivered at least 24 hours prior to the date and time of the meeting set forth above to Angela Abbott, Esq. at angelaabbott@cfl.rr.com.

The purpose of the public hearing is to afford members of the general public an opportunity to be heard with respect to the proposed issuance of the Bonds by the Authority.

All interested parties are invited to attend and present their comments at the time and place set forth above.

IF ANY PERSON WISHES TO APPEAL ANY DECISION MADE BY THE AUTHORITY WITH RESPECT TO ANY MATTER CONSIDERED AT THIS HEARING, HE OR SHE WILL NEED A RECORD OF THE PROCEEDINGS, AND FOR SUCH PURPOSE, HE OR SHE MAY NEED TO ENSURE THAT A VERBATIM RECORD OF THE PROCEEDINGS IS MADE, WHICH RECORD INCLUDES THE TESTIMONY AND EVIDENCE UPON WHICH THE APPEAL IS MADE.

BREVARD COUNTY HOUSING FINANCE
AUTHORITY

B-1

# EXHIBIT C

## AFFIDAVIT AS TO PUBLICATION OF NOTICE

I, Angela A. Abbott, Esquire, attorney for the Brevard County Housing Finance Authority (the "Authority") do hereby affirm that the documents attached hereto as Schedule 1 and Schedule 2 represent (a) a screen shot showing notice of the Authority's TEFRA public hearing scheduled for October 25, 2023, which notice was placed on the Authority's website on October 11, 2023, and (b) a screen shot showing said notice of public hearing as displayed on the Brevard County calendar of events as of October 13, 2023.

**IN WITNESS WHEREOF,** I have hereunto set my hand this 25th day of October, 2023.

_____
Angela A. Abbott, Esq.

C-1

RRTPBC000023

SCHEDULE 1



HFA Website posting of TEFRA Notice

10/11/23

RRTPBC000024