# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

Case No. 6:23-cv-2473-JSS-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., A FLORIDA LIMITED
LIABILITY    PARTNERSHIP;
CANTON CONSTRUCTION, LLC,
A FLORIDA LIMITED LIABILITY
CORPORATION; CONCORD
MANAGEMENT, LTD., A FLORIDA LIMITED
PARTNERSHIP; THE VENUE AT HERITAGE OAKS PARTNERS, LTD.,

Plaintiffs,

v.

BREVARD COUNTY, A POLITICAL
SUBDIVISION OF THE STATE OF
FLORIDA,

          Defendant.

_____/

## PLAINTIFFS' NOTICE OF FILING EXHIBITS IN SUPPORT OF MOTION TO EXCLUDE OPINION AND EXPERT TESTIMONY OF PATRICK KELLEHER ON MITIGATION OF DAMAGES AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs, Atlantic Housing Partners, L.L.L.P. ("AHP"), Canton Construction, LLC ("Canton"), Concord Management, Ltd. ("Concord"), and The Venue at Heritage Oaks Partners, Ltd. ("VHO"), by and through its undersigned counsel, hereby gives notice of the filing of the exhibits in support of their *Motion to Exclude Opinion and Expert Testimony of Patrick Kelleher on Mitigation of Damages, and Incorporated Memorandum of Law*.

- 1 -

DATED on April 1, 2025.

/ s /   R e b e c c a   E .   R h o d e n
**Rebecca E. Rhoden**
Florida Bar No. 0019148
**Michael D. Piccolo**
Florida Bar No. 1003505
**Lowndes, Drosdick, Doster, Kantor & Reed, P.A.**
215 North Eola Drive
Orlando, Florida 32802-2809
Telephone: (407) 843-4600
rebecca.rhoden@lowndes-law.com
michael.piccolo@lowndes-law.com
courtnay.holt@lowndes-law.com
litcontrol@lowndes-law.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of April, 20254, a true and correct copy of the foregoing was electronically filed with this Court and served on all attorneys of record.

/s/ Rebecca E. Rhoden
**Rebecca E. Rhoden, Esquire**

- 2 -

# EXHIBIT 1



**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
Case No. 6:23-cv-2473-JSS-DCI

_____

ATLANTIC HOUSING PARTNERS L.L.L.P., A FLORIDA LIMITED LIABILITY PARTNERSHIP; CANTON CONSTRUCTION, LLC, A FLORIDA LIMITED LIABILITY CORPORATION; CONCORD MANAGEMENT, LTD., A FLORIDA LIMITED PARTNERSHIP; THE VENUE AT HERITAGE OAKS PARTNERS, LTD.,
Plaintiffs,
v.
BREVARD COUNTY, A POLITICAL SUBDIVISION OF THE STATE OF FLORIDA,
Defendant.

_____

EXPERT REPORT AND DISCLOSURE OF
PATRICK F. KELLEHER, CPA / CFF

Submitted February 28, 2025

CONFIDENTIAL

155 Federal Street, Suite 1104 | Boston, MA 02110-1727 | P (617) 357-7300 | F (617) 357-7300 | meadenmoore.com

**Meaden & Moore, LLP**

AKRON | BOSTON | CHARLOTTE | CHICAGO | CLEVELAND | COLUMBUS
LOS ANGELES | MIAMI | NEW YORK | ORLANDO | PITTSBURGH
Meaden & Moore International/London

Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 2 of 20

## Table of Contents

|      |                                                                                 |     |
|------|---------------------------------------------------------------------------------|-----|
| I.   | Scope of Retention                                                              | 3   |
| II.  | Statement of Opinions                                                           | 4   |
| III. | Documents Considered                                                            | 5   |
| IV.  | Background                                                                       | 5   |
| V.   | Plaintiffs' Rule 26 Disclosures and Responses and Objections to Interrogatories | 6   |
| VI.  | Complaint                                                                        | 7   |
| VII. | The Project                                                                      | 7   |
| VIII.| Testimony From Culp                                                             | 11  |
| IX.  | Testimony From Missigman                                                        | 12  |
| X.   | Industry Analysis                                                               | 14  |
| XI.  | Plaintiffs' 2.6.2025 Damages Model & M&M M Critique                             | 15  |
| XII. | Meaden & Moore Analysis                                                         | 17  |
| XIII.| Compensation                                                                     | 19  |
| XIV. | Conclusion                                                                       | 20  |

## Table of Exhibits

Exhibit 1:      242730 – Atlantic Housing Partners et al v. Brevard County Florida – M&M Analysis
Exhibit 2:      CV
Exhibit 3:      Case History
Exhibit 4:      Documents Considered

MEADEN & MOORE

Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 3 of 20

*Sent Via Electronic Mail*

Ms. Susan Gainey, Esq.
Roper Townsend Sutphen, P.A.
255 S. Orange Avenue, Suite 750
Orlando, FL 32801

RE:    Atlantic Housing Partners et al v. Brevard County, Florida
       Case No. 6:23-CV-2473-JSS-DCI
       M&M File No: 242730

Dear Attorney Gainey:

Your office retained the undersigned to provide expert analysis and opinion in regard to the Complaint dated October 18, 2024, and the related damages referenced within the Rule 26 Disclosures dated April 26, 2024 (and further detailed in the Responses and Objections to Interrogatories dated May 13, 2024), in the matter of Atlantic Housing Partners et al (the "Plaintiffs") v. Brevard County, A Political Subdivision of the State of Florida ("the "Defendant").

**<u>Scope</u>**
The scope of my assignment was threefold:

1.  To analyze the relevant financial and non-financial documentation provided by the Plaintiff.
2.  To evaluate the Apartment Construction Industry and the Florida Affordable Housing Market Industry in which the Plaintiffs' participate and formulate opinions as to the damages, if any, that the Plaintiffs' suffered as a result of the denial of the bond financing that is the subject of this matter.
3.  To comment and opine on the analysis, calculations, conclusions and opinions contained in the Rule 26 Disclosures, the related model provided by the Plaintiff on February 6, 2025 [1], and the Responses to Interrogatories dated May 13, 2024 submitted by Plaintiffs' Counsel.

My report and the schedules that accompany it set forth my conclusions and opinions in this matter. Those opinions and conclusions are stated to a reasonable degree of accounting certainty, and are based on my education, training and experience as an accountant. My report, calculations and analysis were prepared in accordance with the American Institute of Certified Public Accountants ("AICPA") Statement on Standards for Forensic Services. Please note that this report is based on the information made available to Meaden & Moore ("M&M") to date. A majority of the items requested in discovery have not been provided by the Plaintiff. If additional pertinent information becomes available, I reserve the right to revise and supplement the findings and conclusions presented in this report.

The concept of reasonable certainty is defined within the *AICPA's Forensic & Valuation Services Practice Aid: Discount Rates, Risk and Uncertainty in Economic Damages Calculations:*

"Damages are to be proven with reasonable certainty and without undue conjecture and speculation. However, mathematical precision or absolute certainty is not generally required for damages measurements."[2]

The *AICPA's Forensic and Valuation Services Practice Aid: Attaining Reasonable Certainty in Economic Damages Calculations* further elaborates on the concept of Reasonable Certainty and how a practitioner should make efforts to attain this by understanding the expectations courts impose upon experts as a result of Rule 702 of the Federal Rules of Evidence (FRE):[3]

---

[1] Paul M 17.pdf – Paul Missigman 2.6.2025 0081-104
[2] *AICPA's Forensic & Valuation Services Practice Aid: Discount Rates, Risk and Uncertainty in Economic Damages Calculations,* p. 28
[3] *AICPA's Forensic & Valuation Services Practice Aid: Attaining Reasonable Certainty in Economic Damages Calculations,* p.9



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 4 of 20

Methods suggested as part of the guide include:

1. The expert should use client supplied information, including projections, and growth rates while testing the reliability of these inputs.[4]
2. The expert should properly consider causation.[5]
3. The expert should take care to gather and analyze a sufficient amount of reliable data.[6]

Importantly, the proper analysis and methodology allows for a calculation that is anchored in facts and data, eliminating any speculative nature of the calculation. This is mentioned throughout the Guide referenced and noted throughout this report.

The *AICPA's Forensic and Valuation Services Practice Aid: Calculating Lost Profits* further discusses this:

> In practice, the issue of reasonable certainty is interwoven throughout a damages analysis. For example, the damages expert should be reasonably certain of issues, including:
>
> - another obvious cause of the damages does not exist;
> - the data used in the analysis, including data supplied by the client, are reliable; and
> - the assumptions applied in the damages analysis are reasonable and tethered to the evidence expected to be admitted in the case.
>
> As noted in the *Attaining Reasonable Certainty in Economic Damages Calculations* practice aid, a key objective of the reasonable certainty standard is to ensure that plaintiffs are not awarded speculative, overly optimistic, or unrealistic damages.[7]

**Statement of Opinions:**

As noted above, I prepared my analysis to a reasonable degree of accounting certainty and as part of this had the calculation reviewed by another CPA within my group. My opinions are noted below:

1. <u>Accuracy of Plaintiffs' Model</u>: Based on my review of relevant deposition testimony, and the documents provided in this litigation by the Plaintiffs, it is my opinion that the Plaintiffs have not demonstrated any economic damages with reasonable certainty, but rather have provided a model that does not reflect the timing and accuracy of the cash flows associated with this project. The model in itself, if accepted without sufficient testing on reliability, contains oversights and errors that materially overstate the damages.

2. <u>Reliability & Factual Basis</u>: The Plaintiffs provided a model that included multiple assumptions about revenue, expenses and related cash flow, but supplies no underlying historical or other data underpinning the model. Because the Plaintiffs did not gather, analyze and provide sufficient information, the Plaintiffs' conclusions can neither be tested nor relied upon. The damage amounts presented by the Plaintiffs contains limited data that is anchored in the factual documents that have been provided to date.

3. <u>Peer Reviewed</u> – The 2.6.25 Plaintiffs' Model, by their accountant's own admission, was not peer reviewed.

4. <u>No Consideration for Mitigation</u>: The Plaintiffs' damages presentation does not consider mitigation that should have and likely did occur as a result of the bond denial, if economic harm was caused. The Plaintiff, if injured, could have deployed its capital in a number of other investments, including other properties or investments that are consistent with their risk appetite. This is especially true, if injured, over an extended period of time like the Plaintiffs are claiming.

---

[4] *AICPA's Forensic & Valuation Services Practice Aid: Attaining Reasonable Certainty in Economic Damages Calculations,* p.17
[5] *AICPA's Forensic & Valuation Services Practice Aid: Attaining Reasonable Certainty in Economic Damages Calculations,* p.35
[6] *AICPA's Forensic & Valuation Services Practice Aid: Attaining Reasonable Certainty in Economic Damages Calculations,* p.17, 70
[7] *AICPA's Forensic & Valuation Services Practice Aid: Calculating Lost Profits,* p.15 & 16



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 5 of 20

The AICPA's *Forensic & Valuation Services Practice Aid: Calculating Lost Profits* clearly explains the expectations of Plaintiff's:

> A plaintiff has a duty to mitigate its damages. *Mitigation* is an action taken by a plaintiff to lessen or avoid loss from a wrongful act. The "mitigation-of-damages doctrine" is defined in *Black's Law Dictionary* as:
>
> > The principle requiring a plaintiff, after an injury or breach of contract, to make reasonable efforts to alleviate the effects of the injury or breach. If the defendant can show that the plaintiff failed to mitigate damages, the plaintiff's recovery may be reduced. fn1
>
> A defendant that argues that a plaintiff has failed to mitigate damages may attempt to show how the plaintiff could have avoided damages in a reasonable manner without undue risk but did not do so. The defendant generally has the duty to show that reasonable mitigation possibilities existed but were not acted upon. The court's application of the mitigation doctrine may "consider whether a reasonable person, acting in light of the known facts and circumstances, would have taken steps to avoid certain damages." fn 4 Courts have found that mitigation does not extend to arrangements that would expose the plaintiff to undue risk.fn5 Courts have also found that a failure to mitigate does not necessarily bar recovery of damages but, rather, affects the amount of damages recoverable.fn6[8]

Emails provided by the Plaintiffs show that other projects were being pursued at the same time as the project that is the subject of this litigation[9], and one of the principals of the Plaintiffs states in their testimony that they were litigating this matter in lieu of mitigating the damages, viewing these avenues as mutually exclusive. Given that a material portion of the damages presented by the Plaintiff span over 15 years, it is likely and certain the Plaintiff should have pursued mitigation associated with the avoidable consequences doctrine, if they were in fact injured at all.[10]

Additionally, the Plaintiffs have not provided a holistic view of how this project inflicted economic harm on the Plaintiff entities and how this was or was not mitigated by pursuing other projects in light of losing out on the bond financing.

5. <u>Macroeconomic Factors</u>: The Plaintiffs' damages model does not demonstrate that it has considered other macroeconomic factors, including a constrained labor market, a high interest rate environment and overall rising costs of construction.

As a result of the opinions included above and analysis contained herein, I've calculated zero economic damages attributable to the bond financing being denied. Please note that my opinions are limited to the damages component of this case and do not include any opinions regarding liability.

## **Documents and Data Considered**
The documents and data that I considered in forming the opinions set forth in this report are listed in Exhibit 4 to this report.

## **Background**
The Plaintiffs undertook efforts to pursue the development of a parcel of land to construct 105 new apartment units located in the northeast corner of the intersection of Heritage Oaks Boulevard and Minton Road, in West Melbourne, Florida. The Plaintiffs planned to fund this development using multi-family housing tax-exempt revenue bonds in the amount not to exceed

---

[8] *AICPA's Forensic & Valuation Services Practice Aid: Calculating Lost Profits,* p.68
[9] Jay Brock 1.27.25 – 000570 (p.570 of 1183)
[10] *AICPA's Forensic & Valuation Services Practice Aid: Calculating Lost Profits,* p.68



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 6 of 20

$16,750,000, as well as Tax Credit Equity (TCE) associated with the 4% Low Income Housing Tax Credits, for which the Plaintiffs planned to apply.

The applicant for the bonds is The Venue at Heritage Oak Partners (VHO), Ltd (the general partner of which is Southern Affordable Services, Inc., a not for profit corporation).[11]  Atlantic Housing Partners (AHP) would serve as the developer of the project and Canton Construction (CC) would be engaged by Atlantic Housing Partners (AHP) to construct and develop the property with a project development and construction timeline as follows:

Development – 5.1.23 through 5.30.25 – 545 days
Construction – 4.3.24 through 4.28.25 – 279 days with property placed in service on 5.30.25.[12]

The construction contract provides that the construction will take no longer than 425 days from the date of the commencement of the work.[13]  The schedule of values included within the contract provides the following breakdown of GC purported profit associated with the project:

- GC Corporate Overhead - $340,139
- GC Fee - $1,020,417
  - Total GC Profit: $1,360,556[14]

Importantly, the Plaintiffs are claiming damages associated with the general contractor's lost profit of $1,428,584, amongst other damages, an amount which is $68,028 above the GC fee referenced above in the contract document.  However, the Plaintiff provided a GC fee and overhead amount in its "2.6.2025 Plaintiffs' Model"[15] that agrees with its damages, but conflicts with the contract provided.

Upon completion of the project, Concord Management (CM) would manage the property.  Southern Affordable Services, Inc. (SAS) is an additional related entity that was involved in development, but is a non-party to this action, serving as the General Partner .005% of the Venue @ Heritage Oaks (VHO).

**<u>Plaintiff's Rule 26 Disclosures and Responses and Objections to Interrogatories</u>**
As part of the action brought by the Plaintiffs, damages were presented by each of the parties noted above and below, including their role in the project (shown on the Summary Schedule, "As Claimed"):

- The Venue @ Heritage Oaks Partners, Ltd. (VHO) – Applicant – $8,072,208
  - Lost Cash Flow from Operation of Development – $7,491,905 (Using a discount rate of 9%)
  - Lost Cash Flow from Sales Proceeds of Property – $580,304 (Using a discount rate of 15%)[16]
- Concord Management – (CM) – Management Company – Lost management fees – $662,601 (using a discount rate of 9%) – Management Agent[17]
- Atlantic Housing Partners (AH) – Developer – Lost development fee – $4,259,658 - Atlantic Housing Partners, LLP is the developer of the project with Scott Culp as the principal of Atlantic Housing Partners, LLP (AH)[18]
- Canton Construction (CC) – General Contractor - Lost construction profit / fee – $1,428,584[19]

Please note that the amounts included above may include minor rounding differences between what is shown in the M&M Schedules and the Disclosures and Responses.

---

[11] Culp Presentation Minutes Commissioner Meeting Dec.pdf – p. 531 (p. 1 of the pdf)
[12] Venue at Heritage Oaks Application to FHA – p. 38 – Construction Schedule
[13] AIA Contractor Agreement with Schedule of Values – PL 03634 (p. 3 of the pdf)
[14] AIA Contractor Agreement with Schedule of Values – PL 03656 (p. 25 of the pdf)
[15] Paul M 17.pdf – Paul Missigman 2.6.2025 0082
[16] ROG ANS (HO) – Ans to Brev ROGS
[17] ROG ANS (CM) – Ans to Brev ROGS
[18] ROG ANS (AH) – Ans to Brev ROGS
[19] ROG ANS (CC) – Ans to Brev ROGS



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 7 of 20

The detailed inputs and assumptions of how the Plaintiff arrived at the damage amounts noted above are included in the Damages Model provided by the Plaintiffs on 2.6.2025, hereafter referred to as the 2.6.2025 Plaintiffs' Model.[20]

The Plaintiffs are also alleging damages in the form of attorneys' fees and costs, but have not submitted any documentation, interim or otherwise, supporting the computation of the attorney fee amounts as they are "ongoing".

## Complaint

The Complaint details the mix of how the units would be rented in order to be eligible for the financing of the project:

> 21. As a condition of the Bond Financing, a Land Use Restriction Agreement encumbering the Property would have required that a minimum of 20% of the apartment units be set aside and available only to households earning less than 50% of area median income or 40% of the units set aside and available only to households earning less than 60% of the area median income with the remaining 80% available to households earning less than 120% of area median income, for as long as a real estate tax exemption is available to the Development, whichever is longer. Additionally, the Live Local Act requires 40% of the apartment units be set aside and available to households earning less than 120% of area median income for a term of 30 years. Finally, the Low Income Housing Tax Credits awarded by FHFC will provide that 100% of the units be available only to households earning less than 60% of the area median income when using Private Activity Multi-Family Mortgage Revenue Bonds Issued by the Local HFA, which is the BCHFA in this case.[21]

## The Project

*Land Purchase Price*
Based on the MMBR Credit Underwriting Report, I understand that a Purchase and Sale Agreement (PSA) was executed between S&A Minto Road Corp. ("Seller") and Southern Investment Group, LLLP, ("Buyer"). The terms of the sale were amended a number of times with the final price being $2,840,000; however, the documents related to the final executed purchase price were not provided.[22]

*Financing – Overview*
The 2.6.2025 Plaintiffs' Model summarizes the sources of funding for development and construction of $29,819,455, with the funding coming from bonds of $16,094,134, as well as a tax credit equity investment of $13,725,321.[23]

Based on the testimony from Mr. Culp and the documents provided, I understand that the bondholders would be affiliated entities of the Plaintiffs. Effectively, the principals of this action are investing $16M through MSPJ Bond Holdings, LLC and collecting cash flow from the project that services that debt and would flow to the bondholders as interest income against that investment of $16M.[24]

*Bonds*
As part of the financing of the project, Atlantic Housing Partners, LLP initially submitted an application for tax exempt financing of $15,750,000. I understand that the bond application amount was increased to $16,750,000 as a result of increased construction costs.[25]

According to the MMBR Credit Underwriting Report provided by the Plaintiff, the project was structured to be financed with a mix of debt and equity as follows:

---

[20] Paul M 17.pdf – Paul Missigman 2.6.2025 0081-104
[21] Complaint 10.18.24 – p.4 & 5
[22] MMBR Credit Underwriting Report PL 02873
[23] Paul M 17.pdf – Paul Missigman 2.6.2025 0089 (p. 9 of pdf)
[24] MMBR Credit Underwriting Report – PL 02864
[25] MMBR Credit Underwriting Report PL 02861-62



- Bonds Tranche A: $10,000,000 with a fixed interest rate for 10 years @ 6.5%; interest will be a hard pay. After 10 years, the interest rate will reset every 5 years at the higher of the previous interest rate or the five year US Treasury plus 200 basis points.[26] The debt service will be interest only with a 30 year amortization.[27]

- Bonds Tranche B: $6,750,000 with a variable weekly floating interest rate tied to Ameribor. The interest rate will adjust at 5 year intervals with an estimated all in interest rate of 8.95%.[28] The debt service will be paid from available cash flow with a 42 year amortization.[29]

- Per the 2.6.2025 Plaintiffs' Model, Tranche A's principal was lowered to $9,344,134, showing a total of $16,094,134 in bond financing.[30] This amount was planned to be purchased by MSPJ, an entity that I understand has similar ownership as the plaintiff.[31]

*Tax Credit Equity / Equity*
If certain rental restriction criteria were met, the project would be eligible for Tax Credit Equity investment in the form of Low Income Housing Tax Credits (LIHTCs), which I understand from testimony and the documents provided that the Plaintiff planned to pursue.

*LIHTC*
The low-income housing tax credit program is the federal government's program tool for subsidizing and encouraging the development of affordable rental housing. The program awards developers with tax credits that can be used or sold to offset construction costs.[32] The tax credits are a mechanism by which equity from institutional investors can serve as capital for the development of projects. The credits can be claimed over a 10-year period by institutional investors provided certain criteria are met with respect to the rent restrictions on the subject property. The 4% credit that is part of the subject matter of this litigation is:

> typically used for projects utilizing federally tax-exempt bond financing and was originally designed to deliver up to a 30% subsidy. The 30% and 70% subsidy levels are computed as the present value of the 10-year stream of tax credits divided by the development's qualified basis (roughly the cost of construction excluding land) [The present value concept allows for the comparison of dollar amounts that are received at different points in time since, for example, a dollar received today has a different value than a dollar received in five years because of the opportunity to earn a return on investments. Effectively, a dollar received today and a dollar received in five years are in different currencies. The present value calculation converts dollar amounts received at different points in time into a common currency—today's dollars.][33]

LIHTC projects also can assign net operating "paper losses" to Tax Credit Equity Investors (Federal Investor) to further incentivize investment from institutional investors.

Based on the testimony of Mr. Scott Culp, I understand that the project that is the subject of this litigation was planned to be financed with bonds and 4% LIHTC Equity. To be eligible for an LIHTC allocation, in addition to qualifying for and receiving

---

[26] MMBR Credit Underwriting Report – PL 02866
[27] MMBR Credit Underwriting Report – PL 02868
[28] MMBR Credit Underwriting Report – PL 02866
[29] MMBR Credit Underwriting Report – PL 02868
[30] Paul M 17.pdf – Paul Missigman 2.6.2025 0092
[31] MSPJ, LLC Org Chart
[32] RS22389 – An Introduction to the Low-Income Housing Tax Credit
[33] RS22389 – An Introduction to the Low-Income Housing Tax Credit – p. 2 (5 of pdf)



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 9 of 20

the tax exempt bond financing, properties are required to meet certain rental restriction tests (which are inclusive of the bond requirements) that restrict rent charges and the income of the eligible tenants:

1. First test, at least 20% of the units must be occupied by individuals with income of 50% or less of the area's median gross income (AMI), adjusted for family size.
2. To satisfy the second test, at least 40% of the units must be occupied by individuals with income of 60% or less of AMI, adjusted for family size.
3. The 2018 Consolidated Appropriations Act (P.L. 115-141) added a third income test option that allows owners to average the income of tenants. Specifically, under the income averaging option, the income test is satisfied if at least 40% of the units are occupied by tenants with an average income of no greater than 60% of AMI, and no individual tenant has an income exceeding 80% of AMI. Thus, for example, renting to someone with an income equal to 80% of AMI would also require renting to someone with an income no greater than 40% of AMI, so the tenants would have an average income equal to 60% of AMI.
4. In addition to the income test, a qualified low-income housing project must also meet the "gross rents test" by ensuring rents (adjusted for bedroom size) do not exceed 30% of the 50% or 60% of AMI, depending on which income test option the project elected.

   Properties located in difficult development areas (DDAs) or qualified census tracts (QCTs) are eligible to receive a "basis boost" as an incentive for developers to invest in more distressed areas. In these areas, the LIHTC can be claimed for 130% (instead of the normal 100%) of the project's eligible basis. This also means that available credits can be increased by up to 30%. HERA (P.L. 110-289) enacted changes that allow an HFA to classify any LIHTC project that is not financed with tax-exempt bonds as difficult to develop, and hence, eligible for a basis boost.[34]

As I understand it, this project was located in a difficult development area (DDA) and may have been eligible for the basis boost. This is supported by Mr. Culp's testimony regarding "basis boost".[35] The basis boost and related Tax Credits were expected to finance the project in conjunction with the bonds.

*Unit Mix*
As a condition of being eligible for the Tax Credit Equity, the 2.6.2025 Plaintiffs' Model, contemplates 21 units were to be sold at 30% AMI, 31 units were to be sold at 80% AMI, and 53 units were to be sold at 60% AMI. While other models shown in the Credit Underwriting Report demonstrate higher levels of yearly revenue, they do so at the cost of not meeting the requirements of the 4% Low Income Housing Tax Credits (LIHTC), which overall negatively impacts cash flow. The Meaden & Moore Analysis assumes that the Plaintiffs would pursue the highest level of cash flows possible consistent with the bond and LIHTC criteria, and also consistent with the Plaintiffs' 2.6.2025 Model.

Based on the testimony from Mr. Culp and the underlying records, the equity for the project would flow through the principals of the project and the limited partner according to the Limited Partnership Agreement between Southern Affordable Services, Inc. and Southern Affordable Development, LLC "limited partner" and Tax Credit Equity Investor.[36]

---

[34] RS22389 – An Introduction to the Low-Income Housing Tax Credit – p. 4-5 (7-8 of pdf)
[35] DEPO Trans Culp 11-21-24 – p. 82
[36] DEPO Trans Culp 11-21-24 – p.85 + 101



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 10 of 20



Source: PL 00341

The Plaintiff provided within its 2.6.2025 Plaintiffs' Model the timing and flow of the Tax Credit Equity of the project from the start of the project through the stabilized earnings phase of operations at the end of 2025 from its Limited Partner as follows and detailed below: [37]

**CAPITAL CONTRIBUTIONS**

| Payment Date | | Federal Investor | State Investor | Total | |
|---|---|---|---|---|---|
| Total | | 13,725,321 | | 13,725,321 | |
| 07/01/23 | | - | - | - | 0% |
| 10/01/23 | | - | - | - | 0% |
| 01/01/24 | | - | - | - | 0% |
| 04/01/24 | Closing | 2,058,798 | - | 2,058,798 | 15% |
| 07/01/25 | Completion | 10,293,991 | - | 10,293,991 | 75% |
| 01/01/26 | Stabilization | 686,266 | - | 686,266 | 5% |
| 01/01/26 | 8609 | 686,266 | - | 686,266 | 5% |
| Total | | 13,725,321 | - | 13,725,321 | |

**Testimony From Culp**

As part of my analysis, I reviewed the testimony of the deponent and noted a number of key statements that were made and used in my analysis:

***Culps Testimony confirms that all units in the rental property are below market:***

      Q.· All right.· So how do you fill the gap if
18·· you're renting -- some of these units that you develop
19·· are at below market rate?
20·· · · · A.· They all are.
21·· · · · Q.· All the units you develop are below market
22·· rate?
23·· · · · A.· In that community it would be, yes.
24·· · · · Q.· And -- Venue at Heritage Oaks?

---

[37] Paul M 17.pdf – Paul Missigman 2.6.2025 0083 (p. 3 of pdf)



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 11 of 20

        25·· · · A.· Yes.[38]

*Culp's testimony continues:*
        ·5·· · · A.· You know, Venue at Heritage Oaks was a
        ·6·· ·community that was being developed to be -- for
        ·7·· ·100 percent of the units to be below market rate, to
        ·8·· ·be affordable.[39]

This statement directly conflicts with what is included in the Brevard County Housing Finance Authority Meeting Minutes on 8/23/2023, but is supportive of the project pursuing LIHTCs.[40]  However, I understand that the project was still in the development phase during the August 23, 2023 meeting and that changes were being made based on the financing.

*Culp's email confirms that the project would have been pursued regardless of the tax credit equity and LIHTC funding:*
On November 21, 2023, in an email between the City of West Melbourne Planning department and himself, Mr. Culp affirms that the Venue @ Heritage Oaks (VHO) is not contingent on tax credits, or other funding, but that it may pursue 4% low income housing tax credits. The email also affirms that the project is intended to be restricted to occupancy by Seniors.[41]

*Culp's testimony confirms that the development fee may not be achieved and would be subject to discounting:*
Mr. Culp's testimony further describes how the bond funding wouldn't be enough to construct the job, so 4 percent tax credits are sought to fill a portion of the gap, with the tax credits sometimes filling all of the gap.  There are also additional costs, including the developer's fee that Mr. Culp explains is deferred and isn't paid until the project is showing cash flows remaining after the debt service of the project is met.  Culp's testimony explains that fee often may not be realized for 15 years.[42]

*Culp's testimony confirms the mix of units under the LIHTC environment:*
Mr. Culp's testimony explains that in order to be eligible for the bond financing, the property would need to meet minimum set asides of 20% @ 50% AMI with the balance (80%) of the units being unrestricted.  However, Mr. Culp's testimony explains that it was his intent to use "income averaging" which would allow AHP to have households at different set asides from as low as 30% AMI up to 80% AMI, while also meeting the minimum set aside for the bonds, which would allow for the property to be LIHTC eligible.[43]

Mr. Culp's testimony explains that typically after the bond financing is approved, the project will apply for the low income housing tax credits (LIHTC), which have separate set asides.[44]  The set asides for the 4 percent low income housing tax credit program are overlaid with the bond restrictions, or the 20% @ 50% AMI would be included within the LIHTC restrictions. Culp's testimony details the mix of units as meeting the following criteria:

- 20% Minimum Set Aside @ 50% AMI – Bond Eligible
- All Units 100% affordable – 4% LIHTC Eligible
- Average Rents from a low of 30% AMI to 80% AMI – 4% LIHTC Eligible[45]
- Average AMI 60% – 4% LIHTC Eligible

This mix was the intent of the project so that it was eligible for the bond financing and 4% LIHTC.[46]

---

[38] DEPO Trans Culp 11-21-24 – p. 82
[39] DEPO Trans Culp 11-21-24 – p. 83
[40] Culp Presentation Minutes Commissioner Meeting Dec.pdf – p. 35
[41] EML from Culp re affordable housing – p. 1
[42] DEPO Trans Culp 11-21-24 – p.85
[43] DEPO Trans Culp 11-21-24 – p. 101
[44] DEPO Trans Culp 11-21-24 – p. 115-116
[45] DEPO Trans Culp 11-21-24 – p. 173
[46] DEPO Trans Culp 11-21-24 – p. 116



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 12 of 20

### *Culp's Testimony on Mitigation*
Culp's testimony demonstrates that once the bond financing was denied, no efforts were made to remedy this issue other than filing a lawsuit.[47]

### **Testimony From Missigman**
As part of my analysis, I reviewed the testimony from Mr. Paul Missigman.  Mr. Missigman confirms that he was responsible for preparing the model that was used as the basis for the Plaintiffs' damages.

### *Missigman's Model is not anchored in facts only inputs from 3 other individuals which were not verified*
Mr. Missigman's testimony clearly indicates that he relied on information from Mr. Scott Culp (Sources and Uses). Mr. Jonathan Thomas (Voucher and Other Income), and Mr. William Griese (Depreciation Schedules), but did not do other testing of the information that was provided to him, but rather used his own inputs without anchoring those inputs in facts and data from any other sources.[48]

Mr. Missigman's testimony confirms this point with clarity by confirming that he didn't use any historical data:

·8· · · Q.· I want to go back.· So, are there any other
·9· ·calculations you used in order to calculate the damages?
10· · · A.· No.
11· · · Q.· I have some questions regarding your documents.
12· ·So, we'll just start if you want to piece it back
13· ·together, we can start with number 1.
14· · · A.· Okay.
15· · · Q.· So, at the top of -- and I'm on Paul Missigman
16· ·2625001, Scott's asking you to:· "You can use anything
17· ·you can prove statistically from historical data from
18· ·our portfolio."
19· · · · · Did you, in fact, use anything from the portfolio
20· ·or historical data in order to calculate the alleged
21· ·damages other than what you've already told me?
22· · · A.· No.[49]

### **Mr. Missigman didn't do any independent testing**
Mr. Missigmans's testimony confirms that he used numbers from a number of his colleagues, but simply plugged them in and didn't test them.  Additionally, he does not know how the numbers are anchored in factual data:

·3· · · Q.· And do you think that maybe he got it from Venue
·4· ·At Viera?
·5· · · A.· It looks like that could be it.
·6· · · Q.· So, again, you didn't do any independent research
·7· ·or calculations in that regard, you just took Jonathan's
·8· ·numbers and plugged it in?
·9· · · A.· Yes.[50]

### **Mr. Missigman didn't have his analysis peer reviewed**
Mr. Missigman testified that he didn't have his model reviewed by anyone.

19· · · Q.· The last line in that sentence says, "Send me the
20· ·draft model with your damages calculation."

---

[47] DEPO Trans Culp 11-21-24 – p. 61
[48] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 40-53
[49] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 88
[50] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 91



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 13 of 20

> 21· · · · · Do you know when you sent Mr. Culp the draft
> 22· ·model with your damages calculation?
> 23· · · A.· I don't believe I ever sent him this model.
> 24· · · Q.· You didn't?· He never asked for it or never
> 25· ·reviewed it?
>
> ·1· · · A.· I didn't give him the model.· I believe what I
> ·2· ·just provided him was a summary of the model, which
> ·3· ·you've had me read from the interrogatories.[51]

Mr. Missigman continues with his affirmation that the model wasn't reviewed:

> ·7· · · Q.· I'm trying to figure out how you got from Point A
> ·8· ·to Point B.· You have your model where you have all the
> ·9· ·numbers, then you ended up with interrogatory summary.
> 10· ·So, how did the numbers get from your model in the form
> 11· ·of a summary?
> 12· · · A.· I believe I took the models, the numbers from my
> 13· ·model and put it in a schedule for Scott, just a printed
> 14· ·schedule for him to provide to our attorneys.
> 15· · · Q.· And where is that printed schedule?
> 16· · · A.· You have to ask him.
> 17· · · Q.· You don't have a copy of it?
> 18· · · A.· No.· Everything I need is in my model.
> 19· · · Q.· Okay.· Do you know when you provided him the
> 20· ·printed schedule?
> 21· · · A.· Right after I finished my model.
> 22· · · Q.· So.
> 23· · · A.· Within a couple days, probably within late March
> 24· ·of 2024.
> 25· · · Q.· Mr. Culp then says:· "We will review and discuss.
> ·1· ·Did you, in fact, review and discuss the alleged damages
> ·2· ·calculation?
> ·3· · · A.· I don't really recall having much of a
> ·4· ·conversation with him other than just handing him the
> ·5· ·schedule from my model.[52]

**Mr. Missigman's calculation doesn't factor in the bond interest despite his conflicting testimony**
Mr. Missigman's calculation doesn't properly factor in the bond interest despite his conflicting testimony suggesting that he did consider it.

> ·9· · · Q.· What effect did the bond interest have in the
> 10· ·cash flow projections, if any?
> 11· · · A.· I guess not really much to me.· I mean, it's --
> 12· ·it's I -- like I showed you in that one we had the sales
> 13· ·proceeds, we had the accrued interest that we had to pay
> 14· ·but, I took that out.
> 15· · · Q.· So, there was no consideration of the bond
> 16· ·interest?

---

[51] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 92-93
[52] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 93-94



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 14 of 20

17· · · A.· I'm not sure I understand.· I mean there's
18· ·consideration that you have to pay bond interest, but
19· ·that's just part of the.
20· · · Q.· Is that reflected in any of your projections?
21· · · A.· It's in the middle.· It shows how much interest
22· ·was paid each year.
23· · · Q.· And where's that?
24· · · A.· Again, to show you what the interest would have
25· ·been each year, but we didn't pay all the subordinate..

·1· ·interest, which that's why I took that out.· If you go
·2· ·to 0091 and 0092, that's the two bond amounts that must
·3· ·pay in the soft.· And you'll see there's an interest
·4· ·column each year.· And then those amounts pull up to
·5· ·page 0085.
·6· · · Q.· Um-hmm.
·7· · · A.· Give me one second because if you ask me a
·8· ·question on numbers, I need to be able to read it.
·9· ·Okay, so, if you're on 0085, you'll see, almost there,
10· ·almost there, 0085, yeah.· So, you see the column a
11· ·little to the right of center called Bond Payment
12· ·Interest & Principal & Fees?
13· · · Q.· Yes?
14· · · A.· So, there you go.· So, that's the -- so, those
15· ·amounts are -- those amounts are the must pay amount.
16· ·So, that's there.· And then if you go to 0086.
17· · · Q.· And let me just stop you there.· So, how is that
18· ·affecting the projected cash flow?
19· · · A.· It's just it.· So, you have cash flow and you
20· ·have your payments and you have what's left over, and
21· ·then when you go to the next page, you'll see there's an
22· ·asset management fee that gets paid to limited partner.[53]

Mr. Missigman suggests that the bond interest is taken out, but a review of the model clearly indicates that it does not reduce the cash flow shown on Bates Stamp Paul M.17 - 0085, further undermining the reliability of the model.

Mr. Missigman did not properly anchor his analysis to facts that are relevant including data from other properties that would serve as a basis.  Additionally, despite repeated requests for information related to other properties, the Plaintiffs did not supply this information, nor did the tie their analysis to that factual information as a basis.  Given this lack of testing back to the assumptions and the lack of peer review that occurred, the model cannot be tested and is therefore unreliable.

**Industry**
*Overall Market Review*
According to the IBISWorld Industry Report on Apartment & Condominium Construction dated September 2024, the drastic need for apartments has led to an expansion in apartment construction over the last 5 years.  However, an uneven interest rate environment has led to growth and contraction amongst contractors and developers. Multifamily complexes are still very much needed as young professionals and immigrants move to major cities, leading to growth in 2024.  Home prices are set to push down, causing a shift in the housing market back to homeownership. Also, rate cuts will incentivize consumers to build homes

---

[53] DEPO TX – Paul Missigman 022125 FULL PDFA – p. 107-108



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 15 of 20

instead of renting. While that may be the case, apartment construction is set to continue to account for the growing population in the US. Affordable housing complexes remain crucial in many large cities and will be needed as more people enter.[54]

*Need for Housing*
Additionally, more than 4 million affordable units were lost between 2015 and 2022 and the need within the US will grow to 4.3 million new units by 2035 to address the ongoing shortage. Texas, California and Florida are three states that require the bulk of these new units.[55]

*Government Programs*
The IBIS World Report, amongst other industry data, supports that the government affordable housing programs are critical in assisting builders/developers multi-family buildings for low income consumers.[56]

*Cost Increases / Labor Shortages*
The IBIS World Report continues in identifying challenges to the construction of new housing by citing labor shortages, price competition for labor and price increases for materials, all of which erode contractor / developer profits.[57]

*Brevard County Housing Trends – Shimberg Ctr*
High interest rates, low vacancy and increasing median home prices will continue to impact the lower income strata of the populace. As shown on p. 6 of the Shimberg Study from May 2023, very low-income owners and renters make up the largest groups of cost-burdened households in Brevard County.[58] This continues while wages stagnate and continue to be outpaced by housing costs.

Based on my analysis, there is a strong immediate need for affordable housing and this would drive effectively near full occupancy.

## 2.6.2025 Plaintiffs' Damages Model & M&M Critique

*Discount Rate*
The 2.6.2025 Plaintiffs' Model does not provide any underlying support related to their cost of capital or the discount rates of 9% and 15% that they used on the cash flows referenced herein, respectively.

According to Pratt and Grabowski's *Cost of Capital,* the cost of capital is the expected rate of return that market participants require in order to attract funds to a particular investment. In economic terms, the cost of capital for a potential investment represents the opportunity cost, or the cost and related risk of accepting this project versus another project that is more or less profitable.[59] It is the return on the use of capital that management and investors use in determining whether to invest and at what level and price point. Logically speaking, companies will make investments in projects that exceed their own cost of capital as those types of investment creates additive shareholder. The proper way to add value to an entity is to invest in projects that exceed the entity's existing cost of capital. However, information pertaining to the cost of capital for the Plaintiffs and their underlying entities was not provided.

As part of undertaking this project, the Plaintiffs' 2.6.2025 Model implies an internal rate of return (IRR) of 13.62%, once the timing and direction of the cash flow models are corrected. Capital forces suggest that parties pursue projects with an IRR that exceeds their own cost of capital. The IRR equates the present value of the future cash flows of the investment to the cost of investment and should have been what was contemplated in the Plaintiffs' original investment thesis. It would allow the Plaintiff to determine if this project was favorable to them as an investment opportunity. The IRR suggests that this project would have been a favorable project for the Plaintiff if that rate exceeded the Plaintiffs' weighted average cost of capital

---

[54] 23611C Apartment Condominium Construction in in the US Industry Report – p. 4 (7 of the pdf)
[55] 23611C Apartment Condominium Construction in in the US Industry Report – p. 9 (12 of the pdf)
[56] 23611C Apartment Condominium Construction in in the US Industry Report – p. 7 (10 of the pdf)
[57] 23611C Apartment Condominium Construction in in the US Industry Report – p. 7 (10 of the pdf)
[58] Brevard Cnty Housing Trends – Shimberg Ctr – p. 6
[59] Cost of Capital – Estimations and Applications, Shannon Pratt & Roger Grabowski, 2nd ed (Hoboken, New Jersey: John Wiley & Sons, Inc.) 1.1.02: 3



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 16 of 20

(WACC), a datapoint for which no information was supplied, but 9% was implied by the Plaintiff. Importantly, even a ½ of a percentage change in the discount rate would impact the 2.6.2025 Plaintiffs' Model output materially.

Nevertheless, I undertook to analyze the damages asserted by the Plaintiff using their discount rate.

*Cash Flow*
As shown on Schedules 2 (present value of Sch 4) and 4 (cash flow in real dollars), the Plaintiffs' Model provided on 2.6.2025 presents damages consistent with its Rule 26 Disclosures. However, the damages amounts contained therein include several deficiencies:

*Primary Issue*
The primary issue with the Plaintiffs' 2.6.2025 Damages Model stems from the model failing to consider the cash outflow in year 1 associated with the principals of the project being the bondholders (purchasers) which is noted in 1a below. There are other issues associated with the model and I've listed those below as well. However, modifying the impact and timing of the bondholder investment overlaps and in some instances countervails the other differences:

1. <u>Accuracy: The Plaintiffs' Model includes errors regarding the accuracy and timing of cash flows</u>:

   a. *Bond Investment in Year 1 Ignored:* The 2.6.2025 Plaintiffs' Model incorrectly includes the cash flow impact of the bond instrument in year 16 of the project as a cash outflow at the exit of the project. I understand that interest payments were excluded from the Plaintiffs' Model in years 1 through 15 because the principals of the development team are also principals of the intended bondholder, MSPJ Bond Holdings, LLC; however, the Plaintiffs' testimony is not clear on the reasoning for this, but the debt service is clearly not deducted in arriving at the cash flow in its calculations.

   The Plaintiffs' Model should consider the bond's initial investment in year 1 of the project, when the cash is invested, rather than at the sale of the project as the bondholder (Plaintiffs' principals) is effectively investing $16M+ in the project in year 1, a cash outflow, and not receiving the return of those funds until year 16 when the property is sold.

*Other Methodology Issues Affecting the Accuracy of the Plaintiffs' Model If the Bond Investment Deficiency Was Ignored*
Notwithstanding the timing of the bond investment cash flows, if M&M were to accept that no investment in the form of the bondholder was made and that the project simply cash flowed with only outside investment dollars associated with unrelated parties, the Plaintiff's Model as presented contains a number of material errors which overstate the cash flow of the project:

   b. *Interest Costs Excluded:* The cash flow presentation for VHO included within the 2.6.2025 Plaintiffs' Model excludes the debt service costs of all of the interest on the $16M bond deemed as the primary debt instrument for the project. By excluding the interest on the bonds from its cash flow damages calculation, the Plaintiffs are effectively asserting a claim for the interest income on the bonds and ignoring any cash flow deficit that the project would experience as a result of paying the bondholder. If the interest on the bonds were to be included as a reduction in the cash flow of the project, consistent with the presentation of the Plaintiffs' Model, the damages included would be overstated by $8M+.

   c. *Consideration of Deferred Operating Losses:* The 2.6.2025 Plaintiffs' Model excludes interest payments in its cash flow projections, so as to seemingly account for the fact that the bondholder is a related entity, and payments between the Plaintiff and the bondholder have a net $0 impact on the Plaintiff. However, when calculating the net selling price of the property, the net operating loss of the project over the 15 years of operations results in cash deficit of $890,962 which is deducted from the gross selling price in the Plaintiffs Model. The Plaintiffs' Model doesn't factor in interest in its cash flows, so to include consideration for the net operating loss that is a function of the debt service would be inconsistent and incorrect.

MEADEN & MOORE

Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 17 of 20

    d. *Deduction of Principal Payments:* The 2.6.2025 Plaintiffs' Model does not consider the impact on cash flow associated with the principal repayment related to one of the tranches of the bonds during years 1 through 15, and then incorrectly reflects the principal repayment when calculating the net equity position after debt at exit in year 16. This results in an overstatement of the damages of nearly $450,000 in real dollars before the time value of money is applied.

*Other Factual Errors in the Plaintiffs' Model Affecting Its Accuracy*

    e. *Bond Interest Rate Amount:* The 2.6.2025 Plaintiffs' Model includes the same interest rate on both tranches of the bond related debt, while the bond application suggests that the $10M tranche would include an estimated 8.95% rate.

    f. *Bond Debt Subordination:* The 2.6.2025 Plaintiffs' Model suggests that the $10M loan would be subordinated (and paid out of cash flow) to the $6.75M, while the bond application suggests the $6.75M loan would be subordinated to the $10M loan.

    g. *Development Fee Timing:* The Plaintiffs' claimed lost development fees does not consider the time value of when these funds would have accrued and been paid to the Plaintiffs. This doesn't consider the fact that the development fee would have been paid in stages as the capital from the Tax Credit Equity Investor was released and is customary.

    h. *Construction Profit Timing:* The Plaintiffs' claimed lost construction fees does not consider the time value of when these funds would have accrued and been paid to the Plaintiffs. This doesn't consider that some portion of these fees would likely be paid at the onset of the project, and some portion would have been paid upon project completion.

2. <u>Reliability and Factual Basis: Assumptions Unsupported and Unproven</u> – The 2.6.2025 Plaintiffs' Model includes multiple of unproven assumptions related to revenue, expenses and related cash flow. No historical profit and loss and cash flow data was provided for other similar properties which the Plaintiff has developed and maintained for decades and could have been used as factual underpinning in its analysis including data points specific to:
    a. *Discount Rate:* The 2.6.2025 Plaintiffs' Model provides no information pertaining to its internal cost of capital and no basis for the discount rate used other than it being standard.
    b. Section 8 and other voucher income
    c. Other income
    d. Operating expenses
    e. Capital improvements
    f. Sale price and capital gains associated with the price appreciation of the property.

3. <u>No Consideration of Mitigation</u> – The 2.6.2025 Plaintiffs' Model does not consider how any perceived damages were mitigated.

4. <u>Exit Challenges:</u> The 2.6.2025 Plaintiffs' Model does not consider any disputes or other challenges associated with tax, compliance, credit, and depreciation recapture risks associated with an exit from the project in year 15, all of which could jeopardize the financial stability of the stakeholders.

**Meaden & Moore Analysis**
*Heritage Oaks – Lost Cash Flow – Plaintiffs' Model*
Setting aside facts which are in dispute, assumptions that are unproven and whether any liability exists, I undertook to make a number of modifications to the 2.6.2025 Plaintiffs' Model to try to correctly determine if damages were appropriate due to the loss of bond financing. As part of the damages submitted by the Plaintiffs, they are alleging the lost cash flow associated with not developing the project and operating the rental property for 15 years. The cash flow is based on 15 years of cash inflows



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 18 of 20

(revenue less expenses,) but the underpinning of the assumptions utilized in arriving at these amounts was not provided by the Plaintiff to support the revenue or expenses included in its model. Nevertheless, I attempted to correct a number of the assumptions and errors in the 2.6.2025 Plaintiffs' Model.

I approached the analysis of the project holistically, viewing the cash outflows from the development team and the cash inflows to the development team. Specifically, I made the following corrections to the Plaintiffs' 2.6.2025 Model:

1.  I included all investments made by the Plaintiffs ($16,094,134) as a cash outflow, rather than just the remaining balance upon the sale of the property ($15,745,929) included by the Plaintiff, which incorrectly ignores the principal amortization of the debt and its impact on cash flow on years 1 through 15. This represents the only change in actual cash flow made by my analysis. The remaining differences are due to correcting the timing in the present value considerations of the cash flows.

2.  I included the Bondholder's investment in the project in year 1 as a cash outflow. The Bondholder and the Plaintiffs are affiliated and are operated by the same principals and invested cash in the construction of the project at the outset, which would not be returned until the assumed project exit in year 16 using the Plaintiffs' model.

3.  I removed the outstanding interest (NOL) deduction from the gross selling price of the property ($890,962) to be consistent with the holistic approach of considering interest payments as a having a net neutral impact due to the Plaintiff and the bold holder's status as related entities.

4.  I included the construction fee to Canton Construction in years 1 and 2 as a cash inflow.

5.  I included the development fee to Atlantic Housing Partners in years 1, 2 and 3 as a cash inflow in conjunction with the Tax Credit Investors investment in the project, as I understand this would be the primary funding mechanism for the fee.

When corrected and as shown on Schedule 1, the potential present value of the cash flows associated with the project amounts to $1,045,484.

However, there are additional deficiencies that exist in the 2.6.2025 Plaintiffs' model which are more qualitative v. quantitative as I've outlined below.

*Concord Management – Management Fee*
As part of the development and operational process, I understand that Concord Management oversees the operations of the project ensuring that the project is in compliance with the rental restrictions, among other things, that are required to maintain the property.

However, this amount would reflect the allocation and expenditure of resources associated with running the property. Given that the Plaintiff has not provided any documentation supporting the activities associated with these costs, nor any potential agreements at this or other properties as a proxy for support, I've excluded the presented lost management fees ($662,601) as having no basis. Additionally, if the Plaintiff was not required to operate the project given the bond denial that is the subject of this action, these expenses would represent an amount not expended, or a savings that resulted from the alleged wrongdoing. This amount represents nearly 2/3rd of the amount included in the corrected and assumed $1,045,484 amount noted above, which sets asides many facts.

The amount presented by the Plaintiffs, on behalf of CM, is purely speculative and is unsupported. As a result, I've excluded this amount from my calculation.

*Canton Construction – Lost Construction Profit*
As mentioned in the background section of this report, Canton Construction is claiming the lost fee and other costs that conflict with the information provided. The draft contract provided by the Plaintiffs does not agree with the damages presented by the



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 19 of 20

Plaintiffs, nor was any other factual information supplied by the Plaintiff supporting Canton's ability to generate fees that exceed any normal cost overruns that occur during construction projects. Within the documents provided, the GC's principal references the challenging conditions of the rising cost environment that may be present, as well as other issues associated with construction.[60] Additionally, the amount presented includes the allocation of overhead related costs that are fixed in nature and not profit related. Finally, information was requested, but not provided related to the GC's other projects that it likely had taken up as a means to mitigate the loss of the project that is the subject of this matter.

The amount presented by the Plaintiffs, on behalf of CC, is purely speculative and is unsupported. As a result, I've excluded this amount from my calculation.

### M&M Analysis – Summary

The Plaintiff also provided no supporting information related to the mitigation of damages related to all categories of costs that are being claimed despite there being evidence in the form of emails that other projects could and should have been pursued.[61]
[62] [63] [64] [65] [66] [67] [68] [69]

Given the numerous deficiencies in the Plaintiff's model and the errors of calculation, any damages presented herein are wholly unsupported and speculative and are therefore excluded.

### Compensation

The hourly rates of me and my team working on this engagement range from $200 to $395, with an expected blended rate of $250+. The amount of my fees are not contingent on the outcome of this matter, nor are they contingent on the opinions expressed within this report.

| SCHEDULE OF PROFESSIONAL RATES | |
|---|---|
| **PERSONNEL CLASSIFICATION** | **HOURLY RATE** |
| Senior Partner | $395 |
| Partner | $350 - $375 |
| Director | $325 |
| Senior Manager | $310 |
| Manager | $280 - $300 |
| Senior Staff | $230 - $250 |
| Staff | $190 - $200 |
| Paraprofessional | $125 |

---

[60] Jay Brock 1.27.25 – 000365 (p. 366 of 1183)
[61] Jay Brock 1.27.25 – 000571 (p.571 of 1183)
[62] Jay Brock 1.27.25 – Redacted 000571 (p.593-593 of 1183)
[63] Jay Brock 1.27.25 – 000601 (p.601 of 1183)
[64] Jay Brock 1.27.25 – 000702 (p.702 of 1183)
[65] Jay Brock 1.27.25 – 000704 (p.704 of 1183)
[66] Jay Brock 1.27.25 – 000706 (p.706 of 1183)
[67] Jay Brock 1.27.25 – 000708 (p.708 of 1183)
[68] Jay Brock 1.27.25 – 000758-759 (p.758-759 of 1183)
[69] Jay Brock 1.27.25 – 000776 (p.776 of 1183)



Ms. Susan Gainey, Esq - **CONFIDENTIAL**
February 28, 2025
Page 20 of 20

<u>Conclusion</u>

Based on my analysis of industry data, the data and documents provided, and other materials described in this report, I hold the following opinions to a reasonable degree of accounting certainty:

1. <u>Accuracy:</u> The 2.6.2025 Plaintiffs' Model contains numerous errors in both its inputs and the timing of the inputs.

2. <u>Reliability:</u> The 2.6.2025 Plaintiffs' Model is based on assumptions that cannot be tested. The Plaintiffs' presentation of damages is not anchored in facts nor is it based on sufficient factual evidence that can be tested and is therefore deemed unreliable.

3. <u>Peer Reviewed</u> – The 2.6.25 Plaintiffs' Model, by their accountant's own admission, was not peer reviewed.

4. <u>Mitigation:</u> The 2.6.2025 Plaintiffs' damages do not consider mitigation. Testimony and information provided within emails supplied by the Plaintiffs provides conflicting information that demonstrates the Plaintiff undertook or should have undertaken efforts to meet its duty to mitigate any perceived damages.

5. <u>Macroeconomic Factors</u> – The Plaintiffs' damages does not consider other macroeconomic factors, including a high interest rate environment and overall rising costs of construction.

There are numerous and fundamental deficiencies in the damages presented by the Plaintiff and in the methodology that was used to compute their $14,423,051 damages. Those deficiencies led to opinions that are wholly speculative and unreliable. As a result, I calculate zero economic damages.

Very truly yours,
**MEADEN & MOORE, LLP**

Patrick F. Kelleher, CPA/CFF

Enclosures (4)

| | |
|---|---|
| Exhibit 1: | 242730 – Atlantic Housing Partners v. Brevard – M&M Analysis |
| Exhibit 2: | CV |
| Exhibit 3: | Case History |
| Exhibit 4: | Documents Considered |

MEADEN & MOORE

**Index of Schedules** *Preliminary* **Index**

**Name of Insured: Atlantic Housing Partners et al v. Brevard County Florida**

**Date of Complaint: October 18, 2024**

**Case No.: 6:23-CV-2473-JSS-DCI**

| Schedule Title | Schedule Reference | Page Reference | Comments |
|---|---|---|---|
| Index of Schedules | Index | 1 of 8 | |
| Summary | Summary | 2 of 8 | |
| Present Value of M&M Corrected Cash Flows | 1 | 3 of 8 | |
| Present Value of Claimed Cash Flows | 2 | 4 of 8 | |
| Projected Cash Flow - M&M Corrected Claim | 3 | 5 of 8 | |
| Projected Cash Flow - Claim | 4 | 6 of 8 | |
| Capital Contributions | 5 | 7 of 8 | |
| Bonds Amortization Calculation | 6 | 8 of 8 | |

Summary                                                          *Preliminary*                                                          Summary
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

| | | From Sch 2 | | | | From Sch 1 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **Description on Claim** | **Entity** | **Amount as Claimed** | **Difference** | **Measured Per M&M** | **Measurement Allowing Unproven / Untested Assumptions** | **Comments** |
| Lost Cash Flow from Operations & Sale of Property | The Venue at Heritage Oaks Partners | $ 8,072,208 | $ 12,987,363 | $ - | $ (4,915,155) | Note 1 |
| Lost Management Fees | Concord Management | $ 662,601 | $ - | $ - | $ 662,601 | Note 1 |
| Lost Development Fees | Atlantic Housing Partners | $ 4,259,658 | $ 331,225 | $ - | $ 3,928,433 | Note 1 |
| Lost Construction Profit | Canton Construction | $ 1,428,584 | $ 58,978 | $ - | $ 1,369,606 | Note 1 |
| **Total** | | **$ 14,423,051** | **$ 13,377,567** | **$ -** | **$ 1,045,484** | |

Note 1: Our measured amount of lost income from operations is an upper limit based on the following assumptions:
  - Any mitigation of the loss that could and should have taken place following the loss incident.
  - The Plaintiff would have prioritized meeting LIHTC requirements.
  - The Plaintiff's annual loan obligation as calculated in the claim basis is accurate, despite it not matching the other support provided.
  - The Plaintiff's selling price is accurate.
  - The Plaintiff's rate of return is accurate.
  - The Plaintiff's operating expenses estimates are accurate.
  - Every tenant of a 30% market rate unit would employ Section 8 benefits, resulting in voucher revenue for the plaintiff.
  - The Plaintiff's claimed lost development fees are accurate.
  - The Plaintiff's claimed lost construction profit is accurate.
All of the above assumptions have been made because limited support from the Plaintiff's other properties or from any industry sources has been provided supporting the above,
despite our requests.

**Present Value of M&M Corrected Cash Flows**                                             *Preliminary*                                                                          Schedule 1
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: ROG ANS (HO) - Ans to Brevard ROGS.pdf (p. 10)

| | | Note 1 | Note 2 | | Note 3 | | Note 4 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Claimed Cash Flow by Plaintiff (From Sch 3) | | | | | | PV of Claimed Cash Flow by Plaintiff | | | | | |
| Year | Description | Canton Construction | Atlantic Housing Partners | Concord Management | Venue at Heritage Oaks | Total | PV Factor | Canton Construction | Atlantic Housing Partners | Concord Management | Venue at Heritage Oaks | Total | Comments |
| 2024 | Construction | $ 714,292 | $ 638,949 | $ - | $ - | $ 1,353,241 | 1.00 | $ 714,292 | $ 638,949 | $ - | $ - | $ 1,353,241 | |
| 2025 | Construction / Operating | $ 714,292 | $ 3,194,744 | $ 38,173 | $ (15,648,106) | $ (11,700,898) | 0.92 | $ 655,314 | $ 2,930,957 | $ 35,021 | $ (14,356,060) | $ (10,734,768) | |
| 2026 | Operating | $ - | $ 425,966 | $ 79,128 | $ 920,367 | $ 1,425,461 | 0.84 | $ - | $ 358,527 | $ 66,600 | $ 774,654 | $ 1,199,782 | |
| 2027 | Operating | $ - | $ - | $ 80,711 | $ 933,888 | $ 1,014,599 | 0.77 | $ - | $ - | $ 62,323 | $ 721,133 | $ 783,457 | |
| 2028 | Operating | $ - | $ - | $ 82,325 | $ 947,515 | $ 1,029,840 | 0.71 | $ - | $ - | $ 58,321 | $ 671,244 | $ 729,565 | |
| 2029 | Operating | $ - | $ - | $ 83,971 | $ 961,244 | $ 1,045,215 | 0.65 | $ - | $ - | $ 54,576 | $ 624,743 | $ 679,318 | |
| 2030 | Operating | $ - | $ - | $ 85,651 | $ 975,072 | $ 1,060,722 | 0.60 | $ - | $ - | $ 51,071 | $ 581,403 | $ 632,474 | |
| 2031 | Operating | $ - | $ - | $ 87,364 | $ 988,995 | $ 1,076,359 | 0.55 | $ - | $ - | $ 47,791 | $ 541,014 | $ 588,805 | |
| 2032 | Operating | $ - | $ - | $ 89,111 | $ 1,003,011 | $ 1,092,122 | 0.50 | $ - | $ - | $ 44,722 | $ 503,377 | $ 548,099 | |
| 2033 | Operating | $ - | $ - | $ 90,893 | $ 1,017,115 | $ 1,108,008 | 0.46 | $ - | $ - | $ 41,850 | $ 468,308 | $ 510,158 | |
| 2034 | Operating | $ - | $ - | $ 92,711 | $ 1,031,304 | $ 1,124,015 | 0.42 | $ - | $ - | $ 39,162 | $ 435,634 | $ 474,796 | |
| 2035 | Operating | $ - | $ - | $ 94,565 | $ 1,045,573 | $ 1,140,138 | 0.39 | $ - | $ - | $ 36,647 | $ 405,194 | $ 441,841 | |
| 2036 | Operating | $ - | $ - | $ 96,457 | $ 1,059,918 | $ 1,156,374 | 0.36 | $ - | $ - | $ 34,294 | $ 376,838 | $ 411,131 | |
| 2037 | Operating | $ - | $ - | $ 98,386 | $ 1,074,333 | $ 1,172,719 | 0.33 | $ - | $ - | $ 32,091 | $ 350,425 | $ 382,516 | |
| 2038 | Operating | $ - | $ - | $ 100,353 | $ 1,088,815 | $ 1,189,169 | 0.30 | $ - | $ - | $ 30,030 | $ 325,824 | $ 355,855 | |
| 2039 | Operating | $ - | $ - | $ 102,360 | $ 1,103,357 | $ 1,205,718 | 0.27 | $ - | $ - | $ 28,102 | $ 302,914 | $ 331,015 | |
| 2040 | Sale of Property | $ - | $ - | $ - | $ 22,067,150 | $ 22,067,150 | 0.11 | $ - | $ - | $ - | $ 2,358,201 | $ 2,358,201 | |
| **Total** | | **$ 1,428,584** | **$ 4,259,658** | **$ 1,302,158** | **$ 20,569,552** | **$ 27,559,952** | | **$ 1,369,606** | **$ 3,928,433** | **$ 662,601** | **$ (4,915,155)** | **$ 1,045,484** | To Summary |

Note 1: Per the claimed losses for Canton Construction, all construction fees would be earned and paid in 2024. Based on the construction timelines provided, I have estimated that half these fees would have been paid in 2025.

Note 2: Per the claimed losses for Atlantic Housing Partners, all development fees would be earned and paid in 2024. Based on the capital contribution schedule of the project, I estimate that 15% of the fees would be paid in 2024, 75% in 2025, and 10% in 2026.

Note 3: Per the claimed losses for the Venue at Heritage Oaks, the plaintiff did not consider interest payments in their net cash flow estimations, because the entity that owns the bonds is under the same ownership as the plaintiff. This being the case, the plaintiff's consideration of the bond repayment upon the sale of the property should instead be considered when the capital was first invested by the bond-holding entity, in 2025, to correctly consider the Present Value of operations.

Note 4: A 9% discount rate was used through 2039. In 2040, a 15% discount rate was used to calculate the NPV of the sale of the property. I have used these rates in my corrected model, but they remain unproven to date.

**Present Value of Claimed Cash Flows**                                        *Preliminary*                                                        Schedule 2
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: ROG ANS (HO) - Ans to Brevard ROGS.pdf (p. 10)

| | | Claimed Cash Flow by Plaintiff (From Sch 4) | | | | | | Note 1 | PV of Claimed Cash Flow by Plaintiff | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Description | Canton Construction | Atlantic Housing Partners | Concord Management | Venue at Heritage Oaks | Total | PV Factor | | Canton Construction | Atlantic Housing Partners | Concord Management | Venue at Heritage Oaks | Total | Comments |
| 2024 | Construction | $ 1,428,584 | $ 4,259,658 | $ - | $ - | $ 5,688,242 | 1.00 | | $ 1,428,584 | $ 4,259,658 | $ - | $ - | $ 5,688,242 | |
| 2025 | Construction / Operating | $ - | $ - | $ 38,173 | $ 446,028 | $ 484,201 | 0.92 | | $ - | $ - | $ 35,021 | $ 409,200 | $ 444,221 | |
| 2026 | Operating | $ - | $ - | $ 79,128 | $ 920,367 | $ 999,495 | 0.84 | | $ - | $ - | $ 66,600 | $ 774,654 | $ 841,255 | |
| 2027 | Operating | $ - | $ - | $ 80,711 | $ 933,888 | $ 1,014,599 | 0.77 | | $ - | $ - | $ 62,323 | $ 721,133 | $ 783,457 | |
| 2028 | Operating | $ - | $ - | $ 82,325 | $ 947,515 | $ 1,029,840 | 0.71 | | $ - | $ - | $ 58,321 | $ 671,244 | $ 729,565 | |
| 2029 | Operating | $ - | $ - | $ 83,971 | $ 961,244 | $ 1,045,215 | 0.65 | | $ - | $ - | $ 54,576 | $ 624,743 | $ 679,318 | |
| 2030 | Operating | $ - | $ - | $ 85,651 | $ 975,072 | $ 1,060,722 | 0.60 | | $ - | $ - | $ 51,071 | $ 581,403 | $ 632,474 | |
| 2031 | Operating | $ - | $ - | $ 87,364 | $ 988,995 | $ 1,076,359 | 0.55 | | $ - | $ - | $ 47,791 | $ 541,014 | $ 588,805 | |
| 2032 | Operating | $ - | $ - | $ 89,111 | $ 1,003,011 | $ 1,092,122 | 0.50 | | $ - | $ - | $ 44,722 | $ 503,377 | $ 548,099 | |
| 2033 | Operating | $ - | $ - | $ 90,893 | $ 1,017,115 | $ 1,108,008 | 0.46 | | $ - | $ - | $ 41,850 | $ 468,308 | $ 510,158 | |
| 2034 | Operating | $ - | $ - | $ 92,711 | $ 1,031,304 | $ 1,124,015 | 0.42 | | $ - | $ - | $ 39,162 | $ 435,634 | $ 474,796 | |
| 2035 | Operating | $ - | $ - | $ 94,565 | $ 1,045,573 | $ 1,140,138 | 0.39 | | $ - | $ - | $ 36,647 | $ 405,194 | $ 441,841 | |
| 2036 | Operating | $ - | $ - | $ 96,457 | $ 1,059,918 | $ 1,156,374 | 0.36 | | $ - | $ - | $ 34,294 | $ 376,838 | $ 411,131 | |
| 2037 | Operating | $ - | $ - | $ 98,386 | $ 1,074,333 | $ 1,172,719 | 0.33 | | $ - | $ - | $ 32,091 | $ 350,425 | $ 382,516 | |
| 2038 | Operating | $ - | $ - | $ 100,353 | $ 1,088,815 | $ 1,189,169 | 0.30 | | $ - | $ - | $ 30,030 | $ 325,824 | $ 355,855 | |
| 2039 | Operating | $ - | $ - | $ 102,360 | $ 1,103,357 | $ 1,205,718 | 0.27 | | $ - | $ - | $ 28,102 | $ 302,914 | $ 331,015 | |
| 2040 | Sale of Property | $ - | $ - | $ - | $ 5,430,262 | $ 5,430,262 | 0.11 | | $ - | $ - | $ - | $ 580,304 | $ 580,304 | |
| **Total** | | **$ 1,428,584** | **$ 4,259,658** | **$ 1,302,158** | **$ 20,026,798** | **$ 27,017,198** | | | **$ 1,428,584** | **$ 4,259,658** | **$ 662,601** | **$ 8,072,208** | **$ 14,423,051** | To Summary |

Note 1: A 9% discount rate was used through 2039. In 2040, a 15% discount rate was used to calculate the NPV of the sale of the property.



**Projected Cash Flow - M&M Corrected Claim**          *Preliminary*                                          Schedule 3
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: Paul M 17 - 0082, 0085, 0086

| | From Sch 5 | | | | Note 3 | From Paul M | |
|---|---|---|---|---|---|---|---|
| Note 1 | Note 2 | | | | From Sch 6 | 17 - 0086 | To Sch 1 |
| From Paul M 17 - 0082 | From Paul M 17 - 0085 | | | | | | |
| To Sch 1 | | | | Venue at Heritage Oaks Cash Flows | | | |

| Count of Year | Year | Description | Construction Profit | Development Fee | Management Fee | Net Cash from Operations | Bond Purchase | Cash In (Sales Proceeds) | Total Heritage Oaks Cash Flows | Net Total Cash Flows | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 2024 | Construction | $ 714,292 | $ 638,949 | | | | | | $ 1,353,241 | |
| 1 | 2025 | Construction / Operating | $ 714,292 | $ 3,194,744 | $ 38,173 | $ 446,028 | $(16,094,134) | | $ (15,648,106) | $ (11,700,898) | |
| 2 | 2026 | Operating | | $ 425,966 | $ 79,128 | $ 920,367 | | | $ 920,367 | $ 1,425,461 | |
| 3 | 2027 | Operating | | | $ 80,711 | $ 933,888 | | | $ 933,888 | $ 1,014,599 | |
| 4 | 2028 | Operating | | | $ 82,325 | $ 947,515 | | | $ 947,515 | $ 1,029,840 | |
| 5 | 2029 | Operating | | | $ 83,971 | $ 961,244 | | | $ 961,244 | $ 1,045,215 | |
| 6 | 2030 | Operating | | | $ 85,651 | $ 975,072 | | | $ 975,072 | $ 1,060,722 | |
| 7 | 2031 | Operating | | | $ 87,364 | $ 988,995 | | | $ 988,995 | $ 1,076,359 | |
| 8 | 2032 | Operating | | | $ 89,111 | $ 1,003,011 | | | $ 1,003,011 | $ 1,092,122 | |
| 9 | 2033 | Operating | | | $ 90,893 | $ 1,017,115 | | | $ 1,017,115 | $ 1,108,008 | |
| 10 | 2034 | Operating | | | $ 92,711 | $ 1,031,304 | | | $ 1,031,304 | $ 1,124,015 | |
| 11 | 2035 | Operating | | | $ 94,565 | $ 1,045,573 | | | $ 1,045,573 | $ 1,140,138 | |
| 12 | 2036 | Operating | | | $ 96,457 | $ 1,059,918 | | | $ 1,059,918 | $ 1,156,374 | |
| 13 | 2037 | Operating | | | $ 98,386 | $ 1,074,333 | | | $ 1,074,333 | $ 1,172,719 | |
| 14 | 2038 | Operating | | | $ 100,353 | $ 1,088,815 | | | $ 1,088,815 | $ 1,189,169 | |
| 15 | 2039 | Operating | | | $ 102,360 | $ 1,103,357 | | | $ 1,103,357 | $ 1,205,718 | |
| 16 | 2040 | Sale of Property | | | | | | $ 22,067,150 | $ 22,067,150 | $ 22,067,150 | |
| **Total** | | | **$ 1,428,584** | **$ 4,259,658** | **$ 1,302,158** | **$14,596,536** | **$(16,094,134)** | **$22,067,150** | **$ 20,567,552** | **$ 27,559,952** | |

Note 1: Per the claimed losses for Canton Construction, all construction fees would be earned and paid in 2024. Based on the construction timelines provided, I have estimated that half these fees would have been paid in 2025.

Note 2: Per the claimed losses for Atlantic Housing Partners, all development fees would be earned and paid in 2024. Based on the capital contribution schedule of the project, I estimate that 15% of the fee would be paid in 2024, 75% in 2025, and 10% in 2026.

Note 3: Per the claimed losses for the Venue at Heritage Oaks, the plaintiff did not consider interest payments in their net cash flow estimations, because the entity that owns the bonds is under the same ownership as the plaintiff. This being the case, the plaintiff's consideration of the bond repayment upon the sale of the property should instead be considered when the capital was first invested by the bond-holding entity, in 2025, to correctly consider the Present Value of operations.

**Projected Cash Flow - Claim**　　　　　　*Preliminary*　　　　　　Schedule 4
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: ROG ANS (HO), ROG ANS (AH), ROG ANS (CC), ROG ANS (CM)

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | From Paul M 17 - 0082 | From Paul M 17 - 0085 | | From Paul M 17 - 0086 | | From Sch 6 | To Sch 2 | | |
| | | | To Sch 2 | | | Venue at Heritage Oaks Cash Flows | | | | | |
| Count of Year | Year | Description | Construction Profit | Development Fee | Management Fees | Net Cash from Operations | Cash In (Sales Proceeds) | Deferred Interest on Subordinated Debt | Cash Out (Outstanding Obligations) | Total Heritage Oaks Cash Flows | Net Total Cash Flows | Comments |
| 0 | 2024 | Construction | $ 1,428,584 | $ 4,259,658 | | | | | | | $ 5,688,242 | |
| 1 | 2025 | Construction / Operating | | | $ 38,173 | $ 446,028 | | | | $ 446,028 | $ 484,201 | |
| 2 | 2026 | Operating | | | $ 79,128 | $ 920,367 | | | | $ 920,367 | $ 999,495 | |
| 3 | 2027 | Operating | | | $ 80,711 | $ 933,888 | | | | $ 933,888 | $ 1,014,599 | |
| 4 | 2028 | Operating | | | $ 82,325 | $ 947,515 | | | | $ 947,515 | $ 1,029,840 | |
| 5 | 2029 | Operating | | | $ 83,971 | $ 961,244 | | | | $ 961,244 | $ 1,045,215 | |
| 6 | 2030 | Operating | | | $ 85,651 | $ 975,072 | | | | $ 975,072 | $ 1,060,722 | |
| 7 | 2031 | Operating | | | $ 87,364 | $ 988,995 | | | | $ 988,995 | $ 1,076,359 | |
| 8 | 2032 | Operating | | | $ 89,111 | $ 1,003,011 | | | | $ 1,003,011 | $ 1,092,122 | |
| 9 | 2033 | Operating | | | $ 90,893 | $ 1,017,115 | | | | $ 1,017,115 | $ 1,108,008 | |
| 10 | 2034 | Operating | | | $ 92,711 | $ 1,031,304 | | | | $ 1,031,304 | $ 1,124,015 | |
| 11 | 2035 | Operating | | | $ 94,565 | $ 1,045,573 | | | | $ 1,045,573 | $ 1,140,138 | |
| 12 | 2036 | Operating | | | $ 96,457 | $ 1,059,918 | | | | $ 1,059,918 | $ 1,156,374 | |
| 13 | 2037 | Operating | | | $ 98,386 | $ 1,074,333 | | | | $ 1,074,333 | $ 1,172,719 | |
| 14 | 2038 | Operating | | | $ 100,353 | $ 1,088,815 | | | | $ 1,088,815 | $ 1,189,169 | |
| 15 | 2039 | Operating | | | $ 102,360 | $ 1,103,357 | | | | $ 1,103,357 | $ 1,205,718 | |
| 16 | 2040 | Sale of Property | | | | | $ 22,067,150 | $ (890,959) | $ (15,745,929) | $ 5,430,262 | 5,430,262 | |
| **Total** | | | **$ 1,428,584** | **$ 4,259,658** | **$ 1,302,158** | **$ 14,596,536** | **$ 22,067,150** | **$ (890,959)** | **$ (15,745,929)** | **$ 20,026,798** | **$ 27,017,198** | |

**Capital Contributions**
*Preliminary*
Schedule 5

**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: Paul M 17.pdf - 0083

Note 1

| Date | Description | Federal Investor | State Investor | Total | % of Total | Development Fee Allocation | Comments |
|------|-------------|-----------------:|---------------:|------:|-----------:|---------------------------:|----------|
| 07/01/23 | | $ - | $ - | $ - | 0.00% | $ - | |
| 10/01/23 | | $ - | $ - | $ - | 0.00% | $ - | |
| 01/01/24 | | $ - | $ - | $ - | 0.00% | $ - | |
| 04/01/24 | Closing | $ 2,058,798 | $ - | $ 2,058,798 | 15.00% | $ 638,949 | To Sch 3 |
| 07/01/25 | Completion | $ 10,293,991 | $ - | $ 10,293,991 | 75.00% | $ 3,194,744 | To Sch 3 |
| 01/01/26 | Stabilization | $ 1,372,532 | $ - | $ 1,372,532 | 10.00% | $ 425,966 | To Sch 3 |
| **Total** | | **$ 13,725,321** | **$ -** | **$ 13,725,321** | | **$ 4,259,658** | *From ROG ANS (AH)* |
| | | | | | | | *Or Paul M 17 - 0082* |
| Syndication Rate | | | | $ 0.9860 | | | |
| Quarterly Yield | | | | 4.63% | | | |

Note 1: Per the claimed losses for Atlantic Housing Partners, all development fees would be earned and paid in 2024. Based on the capital contribution schedule of the project, I estimate that 15% of the fees would be paid in 2024, 75% in 2025, and 10% in 2026.

**Bonds Amortization Calculation**                    *Preliminary*                    Schedule 6
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

Source: Paul M 17.pdf - 0091 & 0092

| | | | | | | | Loan 1 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month** | **Year** | **P&I Payment** | | **Principal (12%)** | | **Interest (6.5%)** | | **Ending Balance** | **Ending Balance Loan 2** | **Total Loan Balance** | |
| 1 | 2025 | $ | 255,938 | $ | - | $ | 255,938 | $ 6,750,000 | $ 9,344,134 | $ 16,094,134 | To Sch 3 |
| 13 | 2026 | $ | 438,750 | $ | - | $ | 438,750 | $ 6,750,000 | $ 9,344,134 | $ 16,094,134 | |
| 25 | 2027 | $ | 449,844 | $ | 11,865 | $ | 437,979 | $ 6,738,135 | $ 9,344,134 | $ 16,082,269 | |
| 37 | 2028 | $ | 450,479 | $ | 13,369 | $ | 437,110 | $ 6,724,766 | $ 9,344,134 | $ 16,068,900 | |
| 49 | 2029 | $ | 451,196 | $ | 15,065 | $ | 436,131 | $ 6,709,701 | $ 9,344,134 | $ 16,053,835 | |
| 61 | 2030 | $ | 452,003 | $ | 16,976 | $ | 435,027 | $ 6,692,725 | $ 9,344,134 | $ 16,036,859 | |
| 73 | 2031 | $ | 452,912 | $ | 19,128 | $ | 433,784 | $ 6,673,597 | $ 9,344,134 | $ 16,017,731 | |
| 85 | 2032 | $ | 453,937 | $ | 21,554 | $ | 432,383 | $ 6,652,043 | $ 9,344,134 | $ 15,996,177 | |
| 97 | 2033 | $ | 455,092 | $ | 24,288 | $ | 430,804 | $ 6,627,755 | $ 9,344,134 | $ 15,971,889 | |
| 109 | 2034 | $ | 456,393 | $ | 27,368 | $ | 429,025 | $ 6,600,387 | $ 9,344,134 | $ 15,944,521 | |
| 121 | 2035 | $ | 457,860 | $ | 30,839 | $ | 427,021 | $ 6,569,548 | $ 9,344,134 | $ 15,913,682 | |
| 133 | 2036 | $ | 460,642 | $ | 34,751 | $ | 424,762 | $ 6,534,797 | $ 9,344,134 | $ 15,878,931 | |
| 145 | 2037 | $ | 462,647 | $ | 39,158 | $ | 422,217 | $ 6,495,639 | $ 9,344,134 | $ 15,839,773 | |
| 157 | 2038 | $ | 464,907 | $ | 44,124 | $ | 419,348 | $ 6,451,515 | $ 9,344,134 | $ 15,795,649 | |
| 169 | 2039 | $ | 467,453 | $ | 49,720 | $ | 416,117 | $ 6,401,795 | $ 9,344,134 | $ 15,745,929 | To Sch 4 |
| **Total at Sale** | | **$** | **6,630,053** | **$** | **348,205** | **$** | **6,276,394** | | | | |



## CURRICULUM VITAE
**Patrick F. Kelleher, CPA, CFF**
Vice President
Investigative Accounting and Litigation Support Services

## EDUCATIONAL BACKGROUND

Providence College
Bachelor of Science in Accounting – *Cum Laude*

Boston College – Wallace E. Carroll School of Management
Master of Business Administration – Concentration in Finance

## PROFESSIONAL ORGANIZATIONS

Builder's Risk & Construction Symposium, Panelist & Executive Board Member
American Institute of Certified Public Accountants, Member
Massachusetts Society of Certified Public Accountants, Member
New England Claims Executives Association, ***Past President*** and Member
American Bar Association, Member
Boston Bar Association, Member

## EXPERIENCE

Over twenty years of forensic accounting experience focused on forensic and investigative accounting services, including litigation support, expert testimony and insurance claim analysis. Forensic analysis experiences including builder's risk losses, business interruption losses, property damage, inventory losses, liability and fidelity insurance losses. Construction management claims analysis including builders' risk and soft cost analysis. Experience performing analyses of construction schedules, invoices, and requests for payment to determine financial impact of insurable losses on large-scale construction projects. Industry experience includes municipalities, energy/mining, power generation, restaurants, retail operations, healthcare, manufacturing facilities, hospitality, law, real estate, technology, software development and architect practices resulting from catastrophes and other insured perils. Forensic and investigative accounting services performed in the following areas:

- Business Interruption Claims
- Inventory and Contents Claims
- Employee Dishonesty Claims
- Builder's Risk Analysis
- Financial Motive
- Subrogation

- Extra Expense Claims
- Product Recall / Contamination
- Fraud Investigation/Analysis
- Damages Evaluation
- Loss of Profits
- Economic Damages

- Liability Claims
- Financial Condition Analysis
- Theft Claims
- Business Valuation
- Partner Disputes
- Asset Misappropriation

## SEMINARS

Various Continuing Education Seminars at major insurance carriers, law firms and universities

**Meaden & Moore, LLP**

155 Federal Street, Suite 1104 | Boston, MA 02110-1727 | P (617) 357-7300 | F (617) 357-7300 | meadenmoore.com

AKRON | BOSTON | CHARLOTTE | CHICAGO | CLEVELAND | COLUMBUS
LOS ANGELES | MIAMI | NEW YORK | ORLANDO | PITTSBURGH
Meaden & Moore International/London

**Expert Case History**                                               *Preliminary*                                                          **Exhibit 3**
**Atlantic Housing Partners et al v. Brevard County Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-cv-2473-JSS-DCI**

| Case Name | Venue | Case No. | Complaint Date | Testimony |
|---|---|---|---|---|
| Acadia Insurance Company, Petitioner v. Envrionmental Composites, Inc. | Supreme Court of the State of New York - County of Oneida | EFCA2024-0032291 | 11/08/24 | |
| Stirista, LLC v. Skydeo, Inc. | U.S. District Court, For the District of Delaware | 1:23-cv-00856-UNA | 08/07/23 | Deposition Testimony |
| DigitalBridge Group (F/K/A Colony Capital, Inc.) v. XL Specialty et al | Superior Court of the State of California For the County of Los Angeles | 22STCV35339 | 11/07/22 | |
| Bekita Brands, LLC and John Lewis v. Infinity Sign, Inc., Pro Sign Service LLC, ProSign Graphic, James Haluch et al | Suffolk Count Superior Court | 2384cv01637 | 07/17/23 | |
| LiquidAgents Healthcare, LLC v. Evanston Insurance Company | U.S. District Court, District of Oregon - Medford Division | 1:20-cv-02225-CL | 10/04/22 | Deposition Testimony |
| Kevin Boyle v. Turner Construction and Massachusetts Mutual Life Insurance | Commonwealth of Massachusetts - Middlesex Superior Court | 2281CV02206 | 05/16/22 | |
| Park Square Homes I, LLC v. Allied World, Tokio Marine, WNC Insurance Services, Westchester Insurance Company, Crawford - | In the Circuit Court for Baltimore City | 24-C-19-004296 | 07/02/21 | |
| Peabody WR Properties, LLC, Successor-In-Interest to William F. Rogers, Jr., and All America Insurance Company, as Subrogee of Peabody WR Properties, LLC v. Lifoam Packaging Solutions, LLC, f/k/a Life-Like Packaging Solutions, LLC; Lifoam Industries, LLC, f/k/a Life-Like Products, LLC; Allain & Son, Inc.; Ledvance LLC d/b/a Sylvania; and Metro-Swift Sprinkler Corporation | Commonwealth of Massachusetts - Essex Superior Court | 1777VV00281-C | 03/16/21 | |
| Katrina Thompson-Burnett v. Coastal Medical, Inc. et al, | State of Rhode Island - Superior Court | PC-2021-01581 | 03/08/21 | |
| John Angelucci v. Eva Rosato and Algerino Rosato, as Trustees of the Four House Trust, and Paula Rosato, as Trustee of the Rosato Family Trust-2017 | Commonwealth of Massachusetts - Norfolk Superior Court | 20-0268 | 02/05/21 | |
| 7950 Investments, LLC, and on behalf of Patriot West, LLC v. NJG Investments, LLC; Nicholas Giacobbi; and Joseph Giacobbi | State of Rhode Island - Superior Court | 2020-0365 | 12/11/20 | |
| David Fish v. Shawmut Woodworking | Commonwealth of Massachusetts - Middlesex Superior Court | 1981CV03470 | 11/26/19 | |
| Asia Zaheen, M.D. and Zaheen Medical Center, LLC v. David Farzan, M.D. and Merrimack Medical and Walk-In Center, LLC | Commonwealth of Massachusetts - Essex Superior Court | 1977CV00640-D | 04/19/19 | |
| Nina Jachimowicz, v. Argonaut Insurance Company, United States | Federal District Court – Eastern District of New York | 19 cv 01266 | 03/05/19 | Trial Testimony |
| Riverside Center Site 5 Owner LLC v. Lexington Insurance Company | Supreme Court - New York County | 650043/2019 | 12/14/18 | |
| Kerry Sue O'Riley v. Timothy M. Brazee, TJ Property Services, LLC, SPS New England, Inc. And Safety Insurance Company | Commonwealth of Massachusetts - Hampshire Superior Court | 1800CV 00108 | 05/31/18 | |
| Elizabeth Caron v. American Refrigeration Company, et al. - Commonwealth of Massachusetts | Superior Court Division of the Trial Court - Suffolk Superior Court | 1884CV00291 | 01/26/18 | |
| Cristine A. Jones v. Douglas W. Jones | Commonwealth of Massachusetts - Trial Court – Essex County | ES16D0289DR | 11/28/17 | |
| JMA Wireless, LLC v. The Travelers Indemnity Company, The Phoenix Insurance Company, Company Roofing Company, Inc. and Marsh USA, Inc. | Supreme Court for the State of New York, County of Onondoga | 2017EF1796 | 10/10/17 | Deposition Testimony |
| Douglas Tocchio vs. Turner Construction Company, Inc. and S&F Concrete Contractor, Inc. | Commonwealth of Massachusetts - Suffolk Superior Court | 16-1408G | 05/02/16 | |

**Documentation Considered**
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

*Preliminary*

Exhibit 4

### Document Title

~$ Rehab PCR Engagement Letter 7.23.12.doc

~$ Rehab PCR Engagement Letter Draft 7.02.12.doc

~$A Engagement Letter 3.22.16.doc

~$R Engagement Letter 10.25.2022.doc

~$rtification - PFS or TX RTN.docx

0 CNA Review Fee.txt

0. Info on Development Venue at Heritage Oaks market study and appraisal data request.pdf

040-GCCC Excel Forms.xlsx

052918 CNA Full Package (Corrected).pdf

1. Re_ Venue at Heritage Oaks market study and appraisal data request.pdf

1.8(a) Specimen Bond (Senior).VHO.1.docx

1.8(b) Specimen Bond (Subordinate).VHO.1.docx

1.9 Arbitrage Rebate Agreement.VHO.1.doc

2. Re_ Venue at Heritage Oaks market study and appraisal data request 2.pdf

2.08a.pdf

2.10 CertAsToSigsSeals.VHO.1.doc

2.11(a) Section 42(m)(2)(D) Certification of Issuer.VHO.1.doc

2.11(b) Certificate of Borrower for 42(m)(2)(D).VHO.1.doc

2.12 IRS Form 8038.VHO.1.pdf

2.13 State Division of Bond Finance Forms.VHO.1.pdf

2.15 Notification of Issuance.VHO.1.pdf

2.18 Certificate as to Computation Regarding Interest Rate.VHO.1.docx

2.2(a) CertReAuthorityReso.VHO.1.doc

2.2(b) CertReAuthorityReso.VHO.1.doc

2.2(c) CertReAuthorityReso.VHO.1.doc

2.5 SignatureNoLitigationCert.VHO.1.doc

2.6 TrusteeCertToAuthenticateDeliver.VHO.1.doc

2.7 CertAsToDeliveryPaymt.VHO.1.doc

2.8 ArbitrageCertificate.VHO.1.doc

2.9 Incumbency Certificate.VHO.1.doc

2010-09-07 Morse Blvd. Capital Holdings Ltd.pptx

2021 Southern Affordable Services Inc 2021 form 990PF.pdf

2022 Federal Extension approved for Southern Affordable Services, Inc_.pdf

2023 Fee Schedule - 2011 Contract.pdf

2023 Fee Schedule - 2017 Contract.pdf

2023.10.23 Email AB VENUE AT HERITAGE OAKS - market study Payment Direction.pdf

2023.11.2 Email AB Invoice 23361-00 Moran Construction Consultants Payment Direction.pdf

2023.11.7 Email to AB & BH Venue at Heritage Oaks Appraisal (Invoice Payment Direction).pdf



**Documentation Considered**                                           *Preliminary*                                           Exhibit 4
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

### Document Title

2023_TradeReferences Canton Construction.pdf

2023-07-20 Org Chart The Venue at Heritage Oaks Partners, Ltd.pdf

2023-07-28_Rpt_Phase I ESA_Venue at Heritage Oaks.pdf

2023-08-04_R_UES_PrelimSoils.pdf

2023-08-07_ALTA - Venue Heritage Oaks.pdf

20230816 - Venue at Heritage Oaks.pdf

2023-09-05_Venue @ Heritage Oaks Mixed Use #3 Block.pdf

2023-09-06_Aerial.pdf

20230922 - Brevard Venue at Heritage.pdf

20230925 - For Acknowledgement_ MSRB G-17 Disclosure - Placement Agent (The Venue at Heritage Oaks - Brevar.pdf

20230926 - Brevard County Housing Finance Authority Venue at Heritage Oaks Apartments.pdf

20230926 - Brevard HFA Multifamily Housing Revenue Bonds, Series 2023A&B (The Venue at Heritage Oaks Apartm.pdf

2023-09-27_C_CEG_HeritageOaks_CivilEngineering - approved.pdf

2023-09-27_Venue @ Heritage Oaks_Arch Design Set (5).pdf

2023-09-29_C_SP_ArchDesign_FullyExecuted.pdf

2023-09-30 FL Tax Holdings fina.pdf

2023-10-01 Management Agmt_The Venue at Heritage Oaks.pdf

20231006 - Venue at Heritage Oaks.pdf

20231010 - Brevard HFA - Venue at Heritage Oaks - Draft Financing Schedule.pdf

2023-10-16_Venue at Heritage Oaks SpecificationManual.pdf

2023-10-26 Management Plan.pdf

20231102 - Draft Bond Documents - Venue at Heritage Oaks.pdf

20231114 - Heritage Oaks.pdf

20231116 - Draft Funding and Loan Agreement - Venue at Heritage Oaks.pdf

20231119 - Brevard County Housing Finance Authority - Venue at Heritage Oaks.pdf

20231121 - Brevard County Housing Finance Authority - Venue at Heritage Oaks.pdf

2023-11-29_AuthorizationRelease_SAD.pdf

2023-11-29_FinancialCertification_SAD.pdf

2023-11-29_Rpt_Final Soils_Venue at Heritage Oaks.pdf

2023-11-29_StatementFinancial_SAD revised.pdf

2023-11-29_StatementFinancial_SAD.pdf

2023-11-30_AHPM_References.pdf

2023-11-30_AuthorizationRelease_AHGP.pdf

2023-11-30_AuthorizationRelease_AHP.pdf

2023-11-30_AuthorizationRelease_MSPJ.pdf

2023-11-30_FinancialCert_AHP.pdf

2023-11-30_FinancialCert_AHPM.pdf

2023-11-30_FinancialCert_CantonConstruction.pdf

2023-11-30_FinancialCert_FBH.pdf



### Document Title

2023-11-30_FinancialCertification_MSPJ.pdf

2023-11-30_FinancialCertification_SAD.pdf

2023-11-30_StatementFinancial_MSPJ.pdf

20231204 - Brevard HFA _ The Venue at Heritage Oaks.pdf

20231204 - The Venue at Heritage Oaks - CUR draft.pdf

20231204 - The Venue at Heritage Oaks - discussion items (1).pdf

20231204 - The Venue at Heritage Oaks - discussion items.pdf

2023-12-04 Sources-Uses-Proforma - Heritage Oak 105MMRB 4% HC.xlsx

20231205 - My response.pdf

20231208 - Region 17.pdf

20231211 - INVOICE_ PRAG _ Brevard County HFA - The Venue at Heritage Oaks.pdf

20231211 - Invoices.pdf

2023-8-31 Financial Certification_AHP.pdf

2023-housing-credit-compliance-monitoring-fees-2017-contract.xlsx

2024-08-31_GCLicense_WSC_Canton.pdf

204b_Pratt - Cost of Capital Estimation and Applications 2nd Edition.pdf

23-053 VENUE AT HERITAGE OAKS APT-BLDG I-ASMEP-DD SET 10-6-23.pdf

23361-00-The Venue at Heritage Oaks- Plan  Cost Review 11.17.23.pdf

23611B Apartment Condominium Construction in the US Industry Report.pdf

23611C Housing Developers in the US Industry Report.pdf

23-PRF invoice.pdf

23-PRI invoice.pdf

2nd Amendment to purchase and sale agreement.pdf

3. Re_ Venue at Heritage Oaks market study and appraisal data request 3.pdf

3.3 Certificate of Borrower.VHO.1.doc

3.5(a) Loan Account Requisition.VHO.1.doc

3.5(b) Costs of Issuance Requisition (Authority).VHO.1.docx

3.5(c) Costs of Issuance Requisition (Borrower).VHO.1.docx

3.6 Borrower'sTaxCert.VHO.1.doc

37 - COMPLAINT 2nd Amnd (P).pdf

4.1 Certificate of Trustee.VHO.1.doc

4.2 TrusteeCertReAppOfProceeds.VHO.1.doc

4.3 TrusteeNoteRec.VHO.1.doc

5.1 Disclosure Statement.VHO.1.doc

5.2(a) Investor Letter - Senior Bond.VHO.1.docx

5.2(b) Investor Letter - Subordinate Bonds.VHO.1.docx

6.1 Opinion of Bond Counsel.VHO.1.docx

6.2 Supplemental Opinion of BC.VHO.1.docx

6.3 Reliance Letter of BC.VHO.1.docx



Documentation Considered

*Preliminary*

Exhibit 4

**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

## Document Title

6.4 Issuer'sCounselOp.VHO.1.doc

A201_General Conditions - Deland Commons.pdf

AHP Resume_MarcG.pdf

AIA contractor Agreement with Schedule of Values.pdf

AIA owner and contractor agreement.pdf

Amelia Court at Creative Village Phase II CUR - Final clean copy.docx

Amendment to purchase and sale agreement.pdf

Amenities and constr req Venue at Heritage Oaks.pdf

AmeriNat Sig Pg Pkg - The Venue at Heritage Oaks.pdf

AmeriNational Closing Checklist - MASTER.xls

AmeriNational Credit Underwriting Checklist.xls

Appraisal Engagement The Venue at Heritage Oaks (EXEC).pdf

Appraisal Engagement The Venue at Heritage Oaks.doc

Appraisal Engagement The Venue at Heritage Oaks.pdf

Appraisal Review Checklist v4.docx

Architect Resume and experience.pdf

Architect's Consent and Certificate - The Venue at Heritage Oaks - 4869-8386-4459 2.docx

Articles of incorp Southern Affordable Service Inc.pdf

As Built with Exception Forms 10.2.17.pdf

Assignment of Mortgage and Security Documents (Bond Mortgage) - The Venue at Heritage Oaks - 4885-1529-4341 2.docx

ASTM E2018-08 5.24.12.pdf

ASTM-E-2018-15-for-Commercial-inspections.pdf

Atlantic Housing Group Partners Ltd.-DUNS034564902_12-01-2023.pdf

Atlantic Housing Info for HFA app.pdf

ATLANTIC HOUSING PARTNERS L.L.L.P.-DUNS783987618_11-16-2023.pdf

ATLANTIC HOUSING PARTNERS LLLP - 2021 TAX RETURNS-1.PDF

ATLANTIC HOUSING PARTNERS LLLP - 2022 TAX RETURNS-2.PDF

Atlantic Housing Partners LLLP org chart.pptx

Attaining Reasonable Certainty in Economic Damages Calculations 2020.pdf

Authorization to Release Info_AHP.pdf

Authorization to Release Info_CantonConstruction.pdf

Authorization to Release Info_SAS.pdf

Authorization to Release Info_VenueHeritageOaks.pdf

Authorization to Release Information - Applicant.doc

Authorization to Release Information - FL Tax.doc

Authorization to Release Information - Individual.doc

Authorization to Release Information - Participating Entity.doc

Bank&Trade Ref FL Tax.doc

Bank&Trade Ref FL Tax.pdf



| Document Title |
| --- |
| Bond Letter-construction term sheet. rev 10172023.pdf |
| Bond Letter-construction term sheet. rev 11022023.pdf |
| Bond Letter-construction term sheet..pdf |
| Bond terms 2.pdf |
| Bond terms.pdf |
| bond typo correction.pdf |
| break out medical office portion of site.pdf |
| Brevard Cnty Housing Trends - Shimberg Ctr.pdf |
| Brevard County Housing Finance Authority Venue at Heritage Oaks Apartments.pdf |
| Brevard HFA _ The Venue at Heritage Oaks.pdf |
| Brevard HFA Zoning letter Venue at Heritage.pdf |
| Brevard HFA_The Venue at Heritage Oaks -Resolution.pdf |
| Brevard Venue at Heritage Oaks COI 11-30-23.pdf |
| By laws Southern Affordable Service Inc.pdf |
| Calctn Summary of Small Area Fair Market Rents for 32922.pdf |
| Calculating Lost Profits.pdf |
| Canton Construction resume.pdf |
| Canton Construction VOD.pdf |
| Canton Construction, LLC - Search Results.pdf |
| Canton Resume_Paul_jeff and Danny.pdf |
| Certificate as to Management Agreement - The Venue at Heritage Oaks - 4891-4249-2299 2.docx |
| Certification - PFS or TX RTN 7.31.18.pdf |
| Certification - PFS or TX RTN.docx |
| Certification - PFS or TX RTN.pdf |
| Civil drawings venue_at_heritage_oaks_230134_11_08_23.pdf |
| CNA Engagement Letter - Final Dec CNA 03112021.docx |
| CNA Engagement Letter - Final Dec CNA 10252022.docx |
| CNA Engagement Letter - Final Dec CNA.docx |
| CNA Engagement Letter - Final.docx |
| CNA Engagement Letter 1.24.18.doc |
| CNA Engagement Letter 3.22.16.doc |
| CNA Engagement Letter 6.19.12.doc |
| CNA list of approved providers of CNAs.pdf |
| CNA Scope Items from RFP 4 30 2012.pdf |
| cna-appendix-a---material-building-systems-and-components.pdf |
| cna-appendix-b---accessibility-features-checklist--as-of-12_10_18.pdf |
| cna-appendix-b-crh_slu.pdf |
| cna-appendix-c---fhfc-construction-features-and-amenities-checklist.pdf |
| cna-appendix-d---problematic-materials-and-design-issues.pdf |



**Documentation Considered**                                        *Preliminary*                                        Exhibit 4
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

## Document Title

cna-appendix-e---pre-site-visit-questionnaire.pdf

cna-appendix-f---estimated-useful-life-(eul)-tables.pdf

cna-appendix-g---unit-mix-table.pdf

cna-appendix-h---summary-of-recommended-repair-and-replacement-probable-costs.pdf

cna-appendix-i---property-useful-life-table.pdf

cna-appendix-j---cost-estimate-schedule-for-repairs.pdf

cna-appendix-k---cost-estimate-schedule-for-replacement-of-capital-items.pdf

cna-appendix-l---definitions.pdf

Collateral Assignment of Construction Contracts and Permits - The Venue at Heritage Oaks - 4856-7181-8629 1.docx

Compliance Monitoring Agreement.Venue at Heritage.1.doc

Conceptual Budget.pdf

Construction Loan Servicing Agreement.Venue at Heritage.1.docx

Consumption model (signed).pdf

Contract for Purchase and Sale.pdf

Copy of 2022 real estate survey - SAS - under construction.xlsm

Copy of Brevard Venue at Heritage Oaks COI 11-19-23.xls

Copy of Brevard Venue at Heritage Oaks COI 11-20-23.xls

Copy of Brevard Venue at Heritage Oaks COI 11-21-23.xls

Copy of TDC PU Limitation Template 2022-10-24.xlsx

correction to HFA fee.pdf

cost breakdown 10102023.pdf

Culp Presentation & Minutes Comm'r Mtng Dec.pdf

CUR - Venue at Viera - Final to HFA - 7.1.20.pdf

CUR Pinnacle at Tropical Pointe COPY.xlsx

CUR Pinnacle at Tropical Pointe FINAL 03012023 COPY.docx

CUR The Salix on VineCOPY.docx

CUR The Venue at Heritage Oaks(old draw).xlsx

CUR The Venue at Heritage Oaks.xlsx

Deal Notes Venue at Heritage.docx

DEPO Trans Culp 11-21-24.pdf

DEPO TX - Paul Missigman 022125 FULL PDFA.pdf

Developers_ADA_HeritageOaks (126).pdf

Development Design & Permitting Soft Cost Summary.pdf

DISCL - Rule 26 (P).pdf

Discount Rates, Risk, and Uncertainty in Economic Damages Calculations.pdf

Draft Bond Documents - Venue at Heritage Oaks.pdf

Draw Schedule.pdf

Due Diligence Summary.pdf

Due Diligence Underwriting Checklist The Venue at Heritage Oaks 10272023.xls



Documentation Considered
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

*Preliminary*

Exhibit 4

| **Document Title** |
| --- |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11062023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11152023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11172023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11212023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11222023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 11282023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 12012023.pdf |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 12012023.xls |
| Due Diligence Underwriting Checklist The Venue at Heritage Oaks 12042023.xls |
| ELIGIBLE RESERVE FOR REPLACEMENT ITEMS.docx |
| Email  transaction terminated.pdf |
| Emails Culp-Co regarding impact fees.pdf |
| EML from Culp re affordable housing.pdf |
| Engagement letter - CNA - Template - Revised 5.4.18 and Amended 5.8.18.doc |
| Engagement letter - CNA - Template - Revised 5.4.18.doc |
| Engineer License.pdf |
| Engineer Resume and experience.pdf |
| Engineer's Consent and Certificate - Venue at Heritage Oaks - 4885-2127-2715 2.docx |
| Environmental Indemnity.Venue at Heritage.1.doc |
| Equity Letter.pdf |
| EX A Culp 112124.pdf |
| EX B Culp 112124.pdf |
| EX C Culp 112124.pdf |
| EX D Culp 112124.pdf |
| EX E Culp 112124.pdf |
| EX F Culp 112124.pdf |
| Fannie Mae Estimated Useful Life Tables.pdf |
| Features and Amenities added to reveiw The Venue at Heritage Oaks.pdf |
| FHFC CUR The Enclave at Lake Shadow FINAL copy.docx |
| FHFC Template.CUR.docx |
| fhfc-cna-guide-2018-12-10-final.pdf |
| financial certification - FL TAX 2010.doc |
| Financial Certification_AHP.pdf |
| Financial Certification_SAS.pdf |
| Financial Certification_VenueHeritageOaks.pdf |
| financial stmt - Canton Construction.pdf |
| Financial stmt 08312023.pdf |
| Financial stmt VenueHeritageOaks 08312023.pdf |
| Financing Agreement.Venue at Heritage.1.docx |



| Document Title |
| --- |
| Financing Agreement.Venue at Heritage.3.docx |
| Financing Agreement.Venue at Heritage.3BL.docx |
| First Mortgage, Assignment of Rents and Security Agreement (Bond) - Venue at Heritage Oaks - 4855-4402-2917 2.docx |
| FL TAX - Stmt of Financial-Credit Affairs.pdf |
| FL TAX- Authorization to Relesaes Info.pdf |
| FL TAX holdings info.pdf |
| FL Tax Holdings Resume.docx |
| florida-housing-rental-programs---2024-income-and-rent-limits-(eff-4-1-24---4-22-24-update).pdf |
| FLU_Zoning Verification Pursuant to Live Local Act - The Venue at Herita..._.pdf |
| Form 121_Architect Design_Revised 10_15_14.pdf |
| form-121_architect-design-rev.-02-20.pdf |
| form-122_architect_completed-rev.-02-20.pdf |
| form-126_developer-design-rev.-02-20.pdf |
| form-127_developer-completed-rev.-02-20.pdf |
| form-128_construction-consultant_design-rev-02-20.pdf |
| form-129_construction-consultant_completed-rev-02-20.pdf |
| FTH 2010 - Financial Certification.pdf |
| Funding and Loan Agreement - Venue at Heritage Oaks - 4878-9450-8931 4.docx |
| FW_ Section 3 GC Addendum Requirement.pdf |
| General Contractor Certification of Requirements (BL).docx |
| General Contractor Certification of Requirements (Rev 05252022).docx |
| General Contractor Certification of Requirements Rev 06072022.docx |
| General Contractor Certification of Requirements Rev 06072022.pdf |
| General Contractor Certification of Requirements.docx |
| General Contractor Cost Certification (GCCC) Instructions, Rev. October 2014.pdf |
| General Contractor's Consent and Certificate - The Venue at Heritage Oaks - 4860-4204-6347 2.docx |
| GENERAL INSURANCE REQUIREMENTS FOR NEW CONSTRUCTION.pdf |
| Gty Completion.Venue at Heritage.1.doc |
| Gty Of Recourse.Venue at Heritage.1.doc |
| Gty Oper Def.Venue at Heritage.1.docx |
| Guarantors from Venu at Viera CUR.pdf |
| HFA Bond questions.docx |
| HFA CUR The Venue at Heritage Oaks v1.docx |
| HFA CUR The Venue at Heritage Oaks v1.pdf |
| HFA CUR The Venue at Heritage Oaks v2.docx |
| HFA CUR The Venue at Heritage Oaks.docx |
| HFA Resolution 2023-06.pdf |
| HUD PNA exhibits w EUL table.pdf |
| Impact fees  2023-10-01_HeritageOaks_West Melbourne_No City Fees.pdf |



| Document Title |
| --- |
| Insurance Questionnaire-ACS (2).xls |
| Invite to creidt underwriting The Venue at Heritage Oaks (Brevard HFA).pdf |
| Invoice_2336100_from_Moran_Construction_Consultants_LLC.pdf |
| IRS form Southern Affordable Service Inc.pdf |
| Jay Brock's Responsive Documents 1.27.25.pdf |
| Land condo.pdf |
| License GC 2024-08-31_GCLicense_WSC_Canton.pdf |
| license970142_Slocum.pdf |
| List of closing docs.VHO.1.doc |
| lithc_how_it_works_and_who_it_serves_final_0.pdf |
| Location for Addressing.pdf |
| LURA.Venue at Heritage.1.doc |
| LURA.Venue at Heritage.3.doc |
| LURA.Venue at Heritage.3BL.docx |
| Malone Report 2024-11-29.pdf |
| Market Study Engagement The Venue at Heritage Oaks .doc |
| Market Study Engagement The Venue at Heritage Oaks .pdf |
| Market Study Engagement The Venue at Heritage Oaks Quote.doc |
| Market Study Engagement The Venue at Heritage Oaks_ (EXEC).pdf |
| Market study revview of the Venue at Heritage Oaks.docx |
| Meridian told deal termiated.pdf |
| minimum-qualifying-first-mortgage-determination-template-2023-07-10.xlsx |
| MMBR CREDIT UNDERWRITING REPORT and financials.pdf |
| mspj - artciles of organization.pdf |
| MSPJ Bond Capital Holdings, LLC - Search Results.pdf |
| MSPJ Bond Holdings Filing.pdf |
| MSPJ Bond Holdings LLC org chart.pptx |
| MSPJ, L.L.C. Org Chart.ppt |
| Operating Agreement for MSJP.pdf |
| Operating Agreement for Venue at Heritage Oaks Capital Holdings.pdf |
| Org chart 2023-07-20 Org Chart The Venue at Heritage Oaks Partners, Ltd.pdf |
| Org Structure Chart.pdf |
| Paul M  3.pdf |
| Paul M 1.pdf |
| Paul M 10.pdf |
| Paul M 11.pdf |
| Paul M 12.pdf |
| Paul M 13.pdf |
| Paul M 14.pdf |



**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

| Document Title |
| --- |
| Paul M 15.pdf |
| Paul M 16.pdf |
| Paul M 17.pdf |
| Paul M 2.pdf |
| Paul M 4.pdf |
| Paul M 5.pdf |
| Paul M 6.pdf |
| Paul M 7.pdf |
| Paul M 8.pdf |
| Paul M 9.pdf |
| Paul Missigman's Responsive Documents 1.27.25.pdf |
| PCR Engagement The Venue at Heritage Oaks Executed.pdf |
| PCR Engagement The Venue at Heritage Oaks for quote.pdf |
| PCR Engagement The Venue at Heritage Oaks.doc |
| PCR Engagement The Venue at Heritage Oaks.pdf |
| PCR Exhibit B.xlsx |
| PFM Review Memo -- Venue at Heritage Oaks - Oct 2023.pdf |
| Photographic Documentation Guidelines.pdf |
| Plaintiff Produced various financials.pdf |
| Plaintiffs 1.31.25 Bates Stamped Documents-0001 to 0025.pdf |
| Pre Development Costs.pdf |
| Preliminary Dist list The Venue at Heritage Oaks (Brevard 2023)_Sept 21.pdf |
| Proforma Venue at Heritage Oaks 09-27.pdf |
| QAR Checklist for Auditors.xls |
| Re Venue at Heritage document questions.msg |
| Re Venue at Heritage.msg |
| RE: The Venue at Heritage Oaks - PP Bond and guarantors.msg |
| RE_ The Venue at Heritage Oaks - appraisal and market study quotes.pdf |
| Re_ The Venue at Heritage Oaks - geotechnical report (answer).pdf |
| RE_ The Venue at Heritage Oaks - PCR quote.pdf |
| Rehabilitation Work Scope 05-2018.xlsx |
| rehabilitation-work-scope-12-2018.xlsx |
| Rents as of 10102023 corrected 3BR rent.pdf |
| Rents as of 10102023.pdf |
| REQ - Venue at Heritage Oaks supplemental request.pdf |
| Resolution.Venue at Heritage.1.doc |
| Resume Concord.pdf |
| Review PCR The Venue at Heritage Oaks.docx |
| revised MSJP Term sheet sent 10-31-2023.pdf |



**Documentation Considered**                                 *Preliminary*                                 **Exhibit 4**
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

| Document Title |
| --- |
| RFA 2017-108 CNA Feature Worksheet.pdf |
| RFA 2017-108 CNA Feature Worksheet.xlsx |
| RFA 2023-211 Viability Loan Sizing Template 2023-05-30.xlsx |
| ROG ANS (AH) - Ans to Brevard ROGS.pdf |
| ROG ANS (CC) - Ans to Brevard ROGS.pdf |
| ROG ANS (CM) - Ans to Brevard ROGS.pdf |
| ROG ANS (HO) - Ans to Brevard ROGS.pdf |
| RPRT - Expert Fishkind, Henry (P).pdf |
| RS22389 - An Introduction to the Low-Income Housing Tax Credit.pdf |
| RTP (From D to Atlantic Housing) 2nd - Status as of 02.03.25.docx |
| RTP (From D to Atlantic Housing) 2nd.pdf |
| Sale Brochure.pdf |
| Sample Underwriting Checklist.pdf |
| SAS and SAD resume.pdf |
| Schedule of RE Owned and Contingent Liabilities.xls |
| Section 3 GC Contract Requirement (Addendum).pdf |
| Sources and Uses Venue at Heritage Oaks 09-27.xlsm.pdf |
| Sources and Uses Venue at Heritage Oaks 09-27-2023.pdf |
| Sources and Uses with expanded version 10102023.pdf |
| Southern Affordable Development L.L.C.-DUNS018610914_12-01-2023.pdf |
| SOUTHERN AFFORDABLE DEVELOPMENT LLC_.pptx |
| Southern Affordable Services Inc 2020 form 990PF.pdf |
| Southern Affordable Services Inc.-DUNS831299677_11-16-2023.pdf |
| SOUTHERN AFFORDABLE SERVICES INC_.pptx |
| Square footage.pdf |
| Statement of Financial  Credit Affairs Tax Hold 2010.doc |
| Statement of Financial & Credit Affairs.doc |
| Statement of Financial_AHP.pdf |
| Statement of Financial_VenueHeritageOaks.pdf |
| Sunbiz 1.pdf |
| Sunbiz 2.pdf |
| Sunbiz 3.pdf |
| Sunbiz FL TAX Holdings 2010, Ltd..pdf |
| Sunbiz SOUTHERN AFFORDABLE DEVELOPMENT, L.L.C. 1.pdf |
| Sunbiz SOUTHERN AFFORDABLE DEVELOPMENT, L.L.C. 2 .pdf |
| Sunbiz SOUTHERN AFFORDABLE DEVELOPMENT, L.L.C. 3.pdf |
| Sunbiz SOUTHERN AFFORDABLE DEVELOPMENT, L.L.C. 4.pdf |
| sunbiz SOUTHERN AFFORDABLE SERVICES, INC 1.pdf |
| sunbiz SOUTHERN AFFORDABLE SERVICES, INC 2.pdf |



**Documentation Considered**                                *Preliminary*                                Exhibit 4
**Atlantic Housing Partners et al v. Brevard County, Florida**
**Date of Complaint: October 18, 2024**
**Case No.: 6:23-CV-2473-JSS-DCI**

### Document Title

sunbiz SOUTHERN AFFORDABLE SERVICES, INC 3.pdf

Sunbiz THE VENUE AT HERITAGE OAKS PARTNERS, LTD.pdf

Sunbiz Venue at Heritage Oaks Capital Holdings, L.L.C..pdf

Template for review of TDC Limitations.pdf

The Venue at Heritage Oaks (2).pdf

The Venue at Heritage Oaks 3rd party reports and credit Invoice.pdf

The Venue at Heritage Oaks MMRB CU Invoice 9-18-23.pdf

The Venue At Heritage Oaks Partners Ltd-DUNS130351956_11-16-2023.pdf

The Venue at Heritage Oaks.pdf

Timetable The Venue at Heritage Oaks (Brevard)_Oct 10.pdf

Trust Indenture, Venue at Heritage.2 (BL).docx

Trust Indenture. Venue at Heritage.1.docx

Trust Indenture. Venue at Heritage.3.docx

Trust Indenture. Venue at Heritage.3BL.docx

Unit floor plan count Heritage Oaks (3 BR).pdf

unknown DD.pdf

USA Patriot Act Disclosure - The Venue at Heritage Oaks - 4883-1057-7803 2.docx

Utilities cert of completeness.pdf

Venue at Heritage numbers.msg

Venue at Heritage Oaks - unit mix.msg

Venue at Heritage Oaks Application to FHA.pdf

Venue at Heritage Oaks -appraisal.pdf

Venue at Heritage Oaks Bank and trade (new entity letter).pdf

Venue at Heritage Oaks Capital Holdings LLC Org Chart.ppt

Venue at Heritage Oaks Capital Holdings, L.L.C - Search Results.pdf

Venue at Heritage Oaks Control Estimate Schedule of Values.pdf

VENUE AT HERITAGE OAKS market study.pdf

Venue at Heritage Oaks no info letter.pdf

Venue cannot move forward.pdf

Vista Breeze - HFAMDC CUR 1st draft  (COPY).docx

Why no PP Bond  Heritage Oaks.pdf

WPGC CONSTRUCTION LLC-DUNS069648193_12-04-2023.pdf

x - old 23361-00-The Venue at Heritage Oaks- Plan  Cost Review.pdf





*Sent Via Electronic Mail*

November 27, 2024

Susan Gainey, Esq.
Roper Townsend Sutphen, P.A.
255 S. Orange Avenue, Suite 750
Orlando, FL 32801

RE:    Atlantic Housing Partners et al v. Brevard County, Florida
       Case No. 6:23-CV-02473-CEM-DC

Dear Attorney Gainey:

Meaden & Moore, LLP is uniquely qualified to complete the scope of work and to meet any time requirement expectations. Our forensic practice is a dedicated group of professionals that will not be distracted by the traditional CPA firm audit and tax "busy season" work that may occur during the required period of the scope of services. Our professionals will be focused on your engagement.

We have provided continuity to our clients and responsiveness to their needs for over 100 years.  The professionals that will be part of your engagement service team have many years of forensic accounting experience and experience working in similar matters such as yours.

This letter outlines the scope and terms of Meaden & Moore LLP's retention by Roper Townsend Sutphen, P.A. on behalf of its client, Brevard County.  The scope of this engagement will be to analyze the facts and provide you with our opinion on the damages as it relates to the financial impacts and losses related to the above-referenced matter.

Our procedures will include gathering and analyzing available documents, interviewing key personnel, performing applicable market research, and performing financial and other analyses of the relevant parties involved in the case.  We will prepare a written expert report and corresponding schedules as required by Counsel.  We agree to supply expert testimony at arbitration, deposition, trial, or other hearings if requested, but that is outside the scope of the work related to this letter.

Details related to our billing procedures, payments due from counsel and retainers are outlined below in the notes to <u>Section C</u> of this letter.  No payments will be accepted directly from your clients.

In the event we are requested or authorized by you, or are required by government regulation, subpoena, or other legal process to produce our documents or our personnel as witnesses with respect

**Meaden & Moore, LLP**

155 Federal Street, Suite 1104 | Boston, MA 02110-1727 | P (617) 357-7300 | F (617) 357-7313 | meadenmoore.com

**MEADEN & MOORE U.S.** AKRON | BOSTON | CHICAGO | CLEVELAND | COLUMBUS | DENVER | LOS ANGELES | NEW YORK | ORLANDO | PITTSBURGH | SAN FRANCISCO
**MEADEN & MOORE FORENSIC SERVICES, LLC** CHARLOTTE
**MEADEN & MOORE INTERNATIONAL** CALGARY | LONDON, U.K. | MONTREAL | TORONTO | VANCOUVER

Ms. Susan Gainey, Esq.
November 27, 2024
Page 2 of 10

to this engagement, you will reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel incurred in responding to such requests.

We agree to abide by any court orders provided to us in writing and signed by us regarding confidentiality. We will, at your request, transmit information to you by facsimile, e-mail, or over the Internet. If any confidentiality breaches occur because of data transmission over the Internet pursuant to your request, you agree that this will not constitute a breach of any obligation of confidentiality. If you wish to limit such transmission to information that is not highly confidential, or seek more secure means of communication for highly confidential information, you will need to inform us.

The scope of this engagement does not constitute the provision by Meaden & Moore, LLP, its owners, or staff of any legal advice. Moreover, because our engagement is limited in nature and scope, it cannot be relied upon to discover all documents and other information or provide all analyses which may have importance to this matter. This engagement does not anticipate the compilation or audit of financial records or financial statements.

A copy of my Curriculum Vitae is enclosed with this correspondence. If a court determines that we are not qualified to testify in this matter, such determination will not be deemed a breach of this agreement; you will remain liable for payment of fees and expenses as set forth herein under the payment apportionment agreed to by your clients.

We have undertaken a limited inquiry of our records to determine conflicts with this engagement that have been communicated to you and you have advised us that these relationships do not preclude our retention. However, the very nature, diversity, magnitude, and volume of Meaden & Moore, LLP, and its past and present clients and professional relationships, does not allow us to be certain that each and every possible relationship or potential conflict has come to our attention. In the event that additional relationships or potential conflicts come to our attention, we will promptly notify you.

Neither you or your clients or any other party acting on their behalf shall hold Meaden & Moore, LLP or any of its affiliates or representatives legally responsible for any loss or liability that may result from the non-discovery of facts or information that could otherwise have influenced the outcome or interpretation of our findings and/or testimony. Furthermore, you and your clients agree to indemnify and hold harmless, including legal defense costs, Meaden & Moore, LLP and its representatives from any claim brought by a third party asserting that Meaden & Moore, LLP or any of its representatives were negligent or acted in bad faith in providing the services covered by this letter.

Any controversy or claim arising out of or relating to this letter or the services provided by Meaden & Moore, LLP pursuant hereto (including any such matter involving any parent, subsidiary, affiliate, successor in interest, or agent of your client or of Meaden & Moore, LLP) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the rules and procedures of the American Arbitration Association (AAA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event an arbitration or litigation (including but not limited to any proceeding to compel arbitration) is initiated to resolve or settle any dispute or claim between the parties, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable costs, including but not limited to reasonable attorney's fees and fees of Meaden & Moore, LLP incurred in connection with the arbitration or litigation.



Ms. Susan Gainey, Esq.
November 27, 2024
Page 3 of 10


If any portion of this letter is held to be void, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.

During the course of the engagement, you may contact me at any time. My contact information is as follows:

Patrick F. Kelleher, CPA, CFF
Vice President – Officer – Investigative Accounting and Litigation Support Services
155 Federal Street, Suite 1104
Boston, MA 02110
(617) 357-7300
(617) 966-0231
pkelleher@meadenmoore.com

We appreciate your consideration of our firm and look forward to working with you.  This letter shall remain valid for a period of no more than 5 days from the date of submittal.

Let us know if you have any questions or require any further information.

Very truly yours,

Meaden & Moore, LLP



Patrick F. Kelleher, CPA / CFF

Ms. Susan Gainey, Esq.
November 27, 2024
Page 4 of 10

## TABLE OF CONTENTS

A.  Introduction / Scope .................................................................................................  5

B.  Background/Qualifications ......................................................................................  6

C.  Proposed Rates ........................................................................................................  9

MEADEN & MOORE

Ms. Susan Gainey, Esq.
November 27, 2024
Page 5 of 10

## A. INTRODUCTION / SCOPE

It is the goal of Meaden & Moore, LLP (M&M) to complete the following scope of services in its entirety:

1. Meaden & Moore, LLP will analyze all relevant financial documentation provided by the Plaintiff.

2. Meaden & Moore, LLP will request and analyze relevant financial documentation to be provided by the Defendant.

3. Meaden & Moore, LLP will analyze all other potentially significant non-financial data, as provided by either the Plaintiff or the Defendant.

4. Meaden & Moore, LLP will conduct relevant market research and inspect any publicly available datasets or information that may be relevant to our analysis.

5. Meaden & Moore, LLP will determine damages, if applicable.

6. Meaden & Moore, LLP's analysis is limited to the documentation provided and any industry information that is readily available. ***Please note that Meaden & Moore, LLP's professional standards as dictated by the AICPA preclude us from disclosing any confidential documents.***

7. Meaden & Moore, LLP will prepare a written expert report of its findings.

MEADEN & MOORE

Ms. Susan Gainey, Esq.
November 27, 2024
Page 6 of 10

## B. BACKGROUND/QUALIFICATIONS

*Firm Overview*
For over 100 years, Meaden & Moore, LLP has focused our expertise and resources on providing the highest quality assurance, tax and business consulting services to organizations throughout the country. As a full service accounting firm, we examine the issues that affect business success and assist you in developing strategies to thrive in today's changing economy.

Meaden & Moore, LLP recognizes that hard work and dedication translate into building trusted business relationships. The Investigative Accounting Group has offices in multiple locations and states, providing both national and international services. Additionally, through our worldwide network of affiliates we can provide local coverage throughout the world.

*Firm Size and Location*
Meaden & Moore, LLP was founded in 1919 and is entering into its fifth generation of private owners. With thirteen offices in several states and two countries, Meaden & Moore, LLP is one of the top professional services firms in the country. We are proud of the growth and development of our firm to its current size of more than 250 employees in the following offices:

*U.S. Based:*

| | | |
|---|---|---|
| Cleveland, OH (*Headquarters*) | Akron, OH | Boston, MA |
| Charlotte, NC | Chicago, IL | New York, NY |
| Denver, CO | Columbus, OH | Los Angeles, CA |
| San Francisco, CA | Orlando, FL | Pittsburgh, PA |

*International:*

| | | |
|---|---|---|
| London, UK | Calgary, CA | Montreal, CA |
| Toronto, CA | Vancouver, CA | |

*Quality Control*
As members of the SEC and Private Companies Practice Sections of the American Institute of CPAs, Meaden & Moore, LLP, is required to participate in an extensive peer review program every three years. This is a program dedicated to ensuring that participating firms have quality control systems in place over their accounting and auditing practices. We are pleased to report that under this program, we have had nine peer reviews and have received nine unqualified opinions—our profession's highest recognition. In addition, no disciplinary action has been taken against or pending against Meaden & Moore, LLP from any state regulatory bodies or professional organizations.

*Independence*
Meaden & Moore, LLP, is not aware of any relationships between any member of our firm and parties provided that would impair our independence.

*Engagement Service Team*
Our dedicated engagement service team has many years of forensic accounting experience and experience working with organizations similar to the entities included in the referenced matter.
The engagement service team leader and qualifications are as follows:



Ms. Susan Gainey, Esq.
November 27, 2024
Page 7 of 10

**Patrick F. Kelleher, CPA, CFF**
Vice President – Officer
Meaden & Moore, LLP
Investigative Accounting and Litigation Support Group
pkelleher@meadenmoore.com

155 Federal Street – Suite 1104
Boston, MA 02110
(617) 357-7300

## EDUCATIONAL BACKGROUND
Providence College
Bachelor of Science in Accounting – *Cum Laude*

Boston College – Wallace E. Carroll School of Management
Master of Business Administration – Concentration in Finance

## PROFESSIONAL ORGANIZATIONS
Builder's Risk & Construction Symposium, Panelist & Executive Board Member
American Institute of Certified Public Accountants, Member
Massachusetts Society of Certified Public Accountants, Member
American Bar Association, Member
Boston Bar Association, Member

## EXPERIENCE
Over twenty years of forensic accounting experience focused on forensic and investigative accounting services, including litigation support, expert testimony and insurance claim analysis. Forensic analysis experiences including builder's risk losses, business interruption losses, property damage, inventory losses, liability and fidelity insurance losses. Construction management claims analysis including builders' risk and soft cost analysis. Experience performing analyses of construction schedules, invoices, and requests for payment to determine financial impact of insurable losses on large-scale construction projects. Industry experience includes municipalities, energy/mining, power generation, restaurants, retail operations, healthcare, manufacturing facilities, hospitality, law, real estate, technology, software development and architect practices resulting from catastrophes and other insured perils. Forensic and investigative accounting services performed in the following areas:

- Business Interruption Claims
- Inventory and Contents Claims
- Employee Dishonesty Claims
- Builder's Risk Analysis
- Financial Motive
- Product Recall / Contamination
- Extra Expense Claims
- Financial Condition Analysis
- Fraud Investigation/Analysis
- Damages Evaluation
- Loss of Profits
- Economic Damages
- Theft Claims
- Liability Claims
- Partner Disputes
- Business Valuation
- Subrogation

## SEMINARS
Various Continuing Education Seminars at major insurance carriers, law firms and universities

MEADEN & MOORE

Ms. Susan Gainey, Esq.
November 27, 2024
Page 8 of 10

Other Meaden & Moore, LLP, professional staff will be part of the engagement service team as
necessary to complete the engagement objectives.  Other Meaden & Moore, LLP professional staff
will be identified once the engagement is awarded.  The professional staff will be from our Boston,
Massachusetts office (locally) and other offices as necessary.  Mr. Kelleher will supervise the
engagement service team and be directly involved in all fieldwork, review, analysis, and report
preparation.

MEADEN & MOORE

Ms. Susan Gainey, Esq.
November 27, 2024
Page 9 of 10

## C. PROPOSED RATES

### SCHEDULE OF PROFESSIONAL RATES

| PERSONNEL CLASSIFICATION | HOURLY RATE |
|---|---|
| Senior Partner | $395 |
| Partner | $350 - $375 |
| Director | $325 |
| Senior Manager | $310 |
| Manager | $280 - $300 |
| Senior Staff | $230 - $250 |
| Staff | $190 - $200 |
| Paraprofessional | $125 |

*Notes Applicable to Fees and Retention*

*Note 1: Prior to testimony (if required) all outstanding fees must be paid. Testimony fees will be at our normal hourly rates.*

*Note 2: A retainer of $10,000 will be required and maintained beyond the term of the engagement noted above. Once this retainer is exhausted, it will be immediately replenished. This retainer is not intended to be an estimate for the total cost of work performed. If the payment and retainer exceeds total fees and costs incurred, we will refund the excess. We require full payment of any indebtedness prior to the expression of any opinion, or issuance of any report or testimony. We may stop work at any time in the event of any unpaid balance. We may resign from this engagement at our sole discretion at any time.*

*Note 3: We will provide a detailed bill to you on a monthly basis, based on the fees and expenses incurred. You agree to pay hourly rates as outlined above for all professionals on the engagement. You will also reimburse us for out-of-pocket expenses that we incur on your behalf, including but not limited to travel costs, lodging, outside research, copy costs, messengers or outside consulting costs.*

*Note 4: Our fee is not contingent on the results obtained as we do not warrant or predict results or the final outcome of this matter.*



Ms. Susan Gainey, Esq.
November 27, 2024
Page 10 of 10

**Note 5:** *Any controversy, claim, or counterclaim arising out of or relating to this contract, the breach thereof, or the services performed by Meaden & Moore, LLP shall be settled by binding arbitration before a single arbitrator in accordance with the rules and procedures of the American Arbitration Association (AAA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  In the event an arbitration or litigation (including but not limited to any proceeding to compel arbitration) is initiated to resolve or settle any dispute or claim between the parties, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable costs, including but not limited to reasonable attorney's fees and fees of Meaden & Moore, LLP incurred in connection with the arbitration or litigation.*

**Note 6:** *You or opposing counsel will advise us, with sufficient notice, of the work to be performed by us and the requirement for appearance in court.  If information becomes known that would make our continued involvement in this engagement inappropriate, or if the attorneys or parties involved in this litigation change, we reserve the right to withdraw from this engagement.*

**Note 7:** *We may refuse to perform any act that we deem a violation of law, public policy, or our professional ethical standards, and in such event we may withdraw from the engagement without penalty.*

**Note 8:** *If any portion of this letter is held to be void, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.*

We appreciate the opportunity to assist you and believe this letter accurately summarizes the significant terms of our potential engagement.  If you have any questions, please contact me.  If you agree with the terms of our engagement as described in this letter, please sign a copy and return it to me.

Accepted by:

_____          _____
Name                                              Date

_____          _____
Name                                              Date



Ms. Susan Gainey, Esq.
November 27, 2024
Page 10 of 10

*Note 5:* *Any controversy, claim, or counterclaim arising out of or relating to this contract, the breach thereof, or the services performed by Meaden & Moore, LLP shall be settled by binding arbitration before a single arbitrator in accordance with the rules and procedures of the American Arbitration Association (AAA), and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event an arbitration or litigation (including but not limited to any proceeding to compel arbitration) is initiated to resolve or settle any dispute or claim between the parties, the prevailing party shall be entitled to recover from the non-prevailing party or parties its reasonable costs, including but not limited to reasonable attorney's fees and fees of Meaden & Moore, LLP incurred in connection with the arbitration or litigation.*

*Note 6:* *You or opposing counsel will advise us, with sufficient notice, of the work to be performed by us and the requirement for appearance in court. If information becomes known that would make our continued involvement in this engagement inappropriate, or if the attorneys or parties involved in this litigation change, we reserve the right to withdraw from this engagement.*

*Note 7:* *We may refuse to perform any act that we deem a violation of law, public policy, or our professional ethical standards, and in such event we may withdraw from the engagement without penalty.*

*Note 8:* *If any portion of this letter is held to be void, or otherwise unenforceable, in whole or part, the remaining portions of this letter shall remain in effect.*

We appreciate the opportunity to assist you and believe this letter accurately summarizes the significant terms of our potential engagement. If you have any questions, please contact me. If you agree with the terms of our engagement as described in this letter, please sign a copy and return it to me.

Accepted by:

_____
Name

_____
Date

_____
Name

_____
Date

MEADEN & MOORE



# MEADEN & MOORE

January 31, 2025

Invoice No.:      141140

**Interim Billing**
Via E-mail

Roper Townsend Sutphen Attorneys at Law
c/o:    Susan G. Gainey
Email:   sgainey@roperpa.com

Federal Identification Number: 54-2084609

Professional Services Re:        Atlantic Housing Partners et al v. Brevard County Florida
                                 File No.:          IMS 58395
                                 M&M Assignment No.:  242730

Total Professional Fees:
November 22, 2024 through December 31, 2024
(see attached detail)

| Position | Hours | Amount |
|----------|-------|--------|
| Officer | 21.4 | |
| Staff | 22.8 | |
| Total | 44.2 | $   13,013.00 |

Total Invoice        $   13,013.00

**PAYMENT DUE WITHIN 30 DAYS OF INVOICE DATE**
*Electronic Funds Transfer or ACH Payment:*
        **KeyBank**    Routing No.: 041001039    Account No.: 352141023502   Swift Code: KEYBUS33

*Check Remittal:*
        **Meaden & Moore, LLP**  P.O. Box 92925  Cleveland, OH  44194-2925

**Please include the M&M Assignment Number on all correspondence**

**DETAILED HOURS**
**FILE NAME: ATLANTIC HOUSING PARTNERS ET AL V. BREVARD COUNTY FLORIDA**
**FILE #:  242730**

| DATE | PERSONNEL | DESCRIPTION | DETAILED DESCRIPTION | HOURS |
|------|-----------|-------------|----------------------|-------|
| 11/22/24 | P.F.K. | TELEPHONE | WITH COUNSEL ABOUT THE CASE | 0.5 |
| 12/11/24 | P.F.K. | REVIEW & ANALYSIS | PRELIMINARY DOCUMENTS PERTAINING TO COMPLAINT | 2.5 |
| 12/11/24 | S.Z.P. | REVIEW & ANALYSIS | CULP DEPOSITION | 2.0 |
| 12/12/24 | J.E.T. | REVIEW & ANALYSIS | UNDERWRITING REPORT PRO FORMAS | 0.9 |
| 12/12/24 | P.F.K. | REVIEW & ANALYSIS | DEPO REVIEW OF W. SCOTT CULP | 2.0 |
| 12/12/24 | S.Z.P. | REVIEW & ANALYSIS | COMPLAINT AND CONTEXT SURROUNDING | 1.0 |
| 12/13/24 | J.E.T. | REVIEW & ANALYSIS | COMPLAINT | 0.9 |
| 12/13/24 | O.Z.P. | REVIEW & ANALYSIS | OF ASSIGNMENT BACKGROUND & DETAILS | 0.3 |
| 12/13/24 | P.F.K. | REVIEW & ANALYSIS | CONTINUED REVIEW OF CULP DEPO | 1.5 |
| 12/13/24 | S.Z.P. | REVIEW & ANALYSIS | CULP DEPOSITION | 1.5 |
| 12/16/24 | J.E.T. | REVIEW & ANALYSIS | CLAIMED LOSS AMOUNT FOR EACH ENTITY | 0.6 |
| 12/16/24 | P.F.K. | REVIEW & ANALYSIS | CONTINUED ANALYSIS OF DOCS PROVIDED BY COUNSEL | 2.5 |
| 12/17/24 | J.E.T. | REVIEW & ANALYSIS | PERMANENT & CONSTRUCTION FINANCING OUTLINE | 1.8 |
| 12/17/24 | J.E.T. | REVIEW & ANALYSIS | RENTAL UNIT MIXES | 0.8 |
| 12/17/24 | J.E.T. | REVIEW & ANALYSIS | CONSTRUCTION USE OF FUNDS | 0.9 |
| 12/17/24 | J.E.T. | REVIEW & ANALYSIS | TAX CREDIT & ROGS | 1.0 |
| 12/17/24 | P.F.K. | REVIEW & ANALYSIS | REVIEW OF ADDITIONAL DOCS | 1.5 |
| 12/17/24 | S.Z.P. | REVIEW & ANALYSIS | INITIAL DOCUMENTATION NECESSARY TO REVIEW LOSS | 1.1 |
| 12/17/24 | P.F.K. | CORRESPONDENCE | TO COUNSEL RE: OUTSTANDING DOCS AND REQUESTS | 0.9 |
| 12/17/24 | P.F.K. | TELEPHONE | WITH COUNSEL RE: DEPOSITION AND DOCS PROVIDED | 0.7 |
| 12/18/24 | P.F.K. | REVIEW & ANALYSIS | DAMAGE ANALYSIS AND RECORDS PROVIDED BY COUNSEL | 2.0 |
| 12/19/24 | J.E.T. | REVIEW & ANALYSIS | PROJECT PRO FORMAS & INCOME CALCULATIONS | 2.8 |
| 12/19/24 | S.Z.P. | REVIEW & ANALYSIS | CULP DEPOSITION | 0.7 |
| 12/20/24 | J.E.T. | REVIEW & ANALYSIS | DEVELOPMENT AND FINANCIAL COSTS MMBR REPORT | 1.2 |
| 12/24/24 | J.E.T. | REVIEW & ANALYSIS | YEAR OVER YEAR INCREASE TO RENT AND EXPENSES | 1.6 |
| 12/24/24 | J.E.T. | REVIEW & ANALYSIS | TAX CREDIT CALCULATION BASED OFF DEVELOPMENT COSTS | 0.8 |
| 12/27/24 | P.F.K. | REVIEW & ANALYSIS | REVIEW OF PRELIMINARY ANALYSIS | 3.0 |
| 12/27/24 | P.F.K. | REVIEW & ANALYSIS | ENGAGEMENT PLANNING | 1.0 |
| 12/27/24 | P.F.K. | CORRESPONDENCE | WITH COUNSEL | 0.3 |
| 12/31/24 | J.E.T. | REVIEW & ANALYSIS | OPERATION CASH FLOW AND DEVELOPMENT COSTS | 1.5 |
| 12/31/24 | P.F.K. | REVIEW & ANALYSIS | NPV ANALYSIS | 3.0 |
| 12/31/24 | S.Z.P. | REVIEW & ANALYSIS | CULP DEPOSITION | 1.4 |
| | | | TOTAL | 44.2 |

**HOURS BY INDIVIDUAL**

| INITIALS | NAME | POSITION | HOURS | HOURLY RATE | AMOUNT |
|----------|------|----------|-------|-------------|--------|
| P.F.K. | PATRICK F. KELLEHER | OFFICER | 21.4 | $ 395.00 | $ 8,453.00 |
| O.Z.P. | OLIVIA Z. PON | STAFF | 0.3 | $ 200.00 | $ 60.00 |
| S.Z.P. | SAM POPE | STAFF | 7.7 | $ 200.00 | $ 1,540.00 |
| J.E.T. | JAMES E. TAMBURRO | STAFF | 14.8 | $ 200.00 | $ 2,960.00 |
| | | TOTAL | 44.2 | | $ 13,013.00 |



February 11, 2025

## MEADEN & MOORE

Invoice No.:        141486

**Interim Billing**
Via E-mail

Roper Townsend Sutphen Attorneys at Law
c/o:      Susan G. Gainey
Email:   sgainey@roperpa.com

Federal Identification Number: 54-2084609

Professional Services Re:               Atlantic Housing Partners et al v. Brevard County Florida
                                        File No:        IMS 58395
                                        M&M Assignment No.:   242730

Total Professional Fees:
January 2, 2025 through January 31, 2025
(see attached detail)

| Position | Hours | Amount |
|----------|-------|--------|
| Officer  | 34.6  |        |
| Staff    | 42.8  |        |
| Total    | 77.4  | $   22,201.00 |

Total Invoice          $   22,201.00

**PAYMENT DUE WITHIN 30 DAYS OF INVOICE DATE**
*Electronic Funds Transfer or ACH Payment:*
          **KeyBank**    Routing No.: 041001039      Account No.: 352141023502    Swift Code: KEYBUS33

*Check Remittal:*
          **Meaden & Moore, LLP**   P.O. Box 92925   Cleveland, OH   44194-2925

**Please include the M&M Assignment Number on all correspondence**

**DETAILED HOURS**
**FILE NAME: ATLANTIC HOUSING PARTNERS ET AL V. BREVARD COUNTY FLORIDA**
**FILE #:    242730**

| DATE | PERSONNEL | DESCRIPTION | DETAILED DESCRIPTION | HOURS |
|------|-----------|-------------|----------------------|-------|
| 01/02/25 | J.E.T. | REVIEW & ANALYSIS | DEVELOPER FEE AT 18% AND 0% | 1.1 |
| 01/02/25 | J.E.T. | REVIEW & ANALYSIS | CONSTRUCTION FEE OF 14% OF HARD COSTS | 0.7 |
| 01/02/25 | J.E.T. | REVIEW & ANALYSIS | MANAGEMENT FEES CLAIMED IN ROGS | 0.6 |
| 01/03/25 | P.F.K. | REVIEW & ANALYSIS | DISCOUNT RATE AND CASH FLOW ANALYSIS | 1.8 |
| 01/03/25 | S.Z.P. | REVIEW & ANALYSIS | INTEREST RATE EFFECT ON ANALYSIS | 1.1 |
| 01/03/25 | S.Z.P. | REVIEW & ANALYSIS | TAX CREDIT DETAIL / RESEARCH | 0.4 |
| 01/07/25 | P.F.K. | REVIEW & ANALYSIS | SOURCES AND USES ANALYSIS AND RENT PRO FORMA | 2.9 |
| 01/08/25 | P.F.K. | REVIEW & ANALYSIS | TAX CREDIT ANALYSIS | 1.5 |
| 01/08/25 | P.F.K. | REVIEW & ANALYSIS | INCOME LIMIT ANALYSIS ON RENTS | 1.2 |
| 01/09/25 | P.F.K. | REVIEW & ANALYSIS | RENT ANALYSIS | 2.0 |
| 01/09/25 | S.Z.O. | REVIEW & ANALYSIS | OF INCOME AND RENT LIMITS FOR 2024 | 1.6 |
| 01/09/25 | S.Z.P. | REVIEW & ANALYSIS | BREVARD COUNTY INCOME / RENT LIMITS | 0.9 |
| 01/10/25 | J.E.T. | REVIEW & ANALYSIS | CASH FLOW PROJECTIONS - OPERATIONS | 1.2 |
| 01/10/25 | P.F.K. | REVIEW & ANALYSIS | PRO FORMA MODEL | 2.4 |
| 01/10/25 | S.Z.P. | REVIEW & ANALYSIS | CLAIMED LOST CASH - HOLES IN METHODOLOGY | 2.1 |
| 01/10/25 | S.Z.P. | REVIEW & ANALYSIS | TAX CREDIT REQUIREMENTS | 0.7 |
| 01/10/25 | J.E.T. | CORRESPONDENCE | TEST OF UNIT MIXES TO QUALIFY FOR TAX CREDITS | 0.9 |
| 01/13/25 | P.F.K. | REVIEW & ANALYSIS | PREPARED FOR PM DEPO | 2.9 |
| 01/14/25 | J.E.T. | REVIEW & ANALYSIS | SOURCES AND USES OF FUNDS | 0.9 |
| 01/14/25 | J.E.T. | REVIEW & ANALYSIS | SAIL FINANCING APPLICANTS AND SELECTIONS | 0.8 |
| 01/14/25 | J.E.T. | REVIEW & ANALYSIS | BOND FINANCING | 0.5 |
| 01/14/25 | J.E.T. | REVIEW & ANALYSIS | ESTIMATED RENT AND INCOME 2024 | 0.5 |
| 01/14/25 | P.F.K. | REVIEW & ANALYSIS | ADDITIONAL DOCUMENTS PROVIDED BY COUNSEL | 2.5 |
| 01/14/25 | S.Z.P. | REVIEW & ANALYSIS | CORRESPONDENCE SUPPORT PROVIDED | 0.8 |
| 01/14/25 | S.Z.P. | REVIEW & ANALYSIS | IMPACT OF UPDATED RENT & UNIT MIX ON PRO FORMA | 0.6 |
| 01/15/25 | J.E.T. | REVIEW & ANALYSIS | SAIL FINANCING REQUIREMENTS | 0.8 |
| 01/15/25 | J.E.T. | REVIEW & ANALYSIS | SOURCES AND USES IN COMPARISON TO UNDERWRITING REPORT | 0.7 |
| 01/17/25 | P.F.K. | REVIEW & ANALYSIS | MISSIGMAN DEPO PREP | 2.1 |
| 01/17/25 | S.Z.P. | REVIEW & ANALYSIS | CLIENT INTERACTIONS & CORRESPONDENCE | 0.5 |
| 01/20/25 | P.F.K. | REVIEW & ANALYSIS | SCHEDULE ANALYSIS | 1.4 |
| 01/20/25 | P.F.K. | REVIEW & ANALYSIS | ADDITIONAL DOCS PROVIDED BY COUNSEL | 1.0 |
| 01/20/25 | P.F.K. | TELEPHONE | CALL WITH COUNSEL | 1.8 |
| 01/27/25 | E.Z.A. | REVIEW & ANALYSIS | OF V @ HOA APPLICATION TO FHA - EXHIBIT 2 | 1.0 |
| 01/27/25 | J.E.T. | REVIEW & ANALYSIS | EXHIBIT A-2 OF FHA APPLICATION | 0.4 |
| 01/27/25 | J.E.T. | REVIEW & ANALYSIS | 2024 ACTUAL RENTAL VALUE PRO FORMA | 0.6 |
| 01/27/25 | P.F.K. | REVIEW & ANALYSIS | MALONE AND FISHKIND REPORTS | 1.0 |
| 01/27/25 | S.Z.P. | REVIEW & ANALYSIS | FISHKIND REPORT CLAIMS AS THEY RELATE TO REVENUE PROJECTIONS | 0.9 |
| 01/27/25 | S.Z.P. | REVIEW & ANALYSIS | UPDATED PRO FORMA WITH 2024 MEDIAN RENT AMOUNTS | 0.5 |
| 01/27/25 | S.Z.P. | REVIEW & ANALYSIS | UNIT BREAKDOWN PER MALONE REPORT | 0.5 |
| 01/27/25 | P.F.K. | CORRESPONDENCE | WITH COUNSEL RE: DOCUMENTS | 0.2 |
| 01/28/25 | J.E.T. | REVIEW & ANALYSIS | SUMMARY OF JAY BROCK RESPONSE DOCS | 1.6 |
| 01/28/25 | J.E.T. | REVIEW & ANALYSIS | SOURCES AND USES JAY BROCK RESPONSE AND INITIALLY PROVIDED DOCUMENTATION | 0.7 |
| 01/28/25 | J.E.T. | REVIEW & ANALYSIS | PRO FORMA USING UNIT AND RENT MIX MENTIONED IN JAY BROCK RESPONSIVE | 0.9 |
| 01/28/25 | P.F.K. | REVIEW & ANALYSIS | ADDITIONAL DOC PRODUCTION | 4.5 |
| 01/28/25 | S.Z.P. | REVIEW & ANALYSIS | PAUL MISSIGMAN'S RESPONSIVE DOCUMENTS | 1.0 |
| 01/28/25 | S.Z.P. | REVIEW & ANALYSIS | POSSIBLE DEPRECIATION CONSIDERATION IN PRO FORMA | 0.7 |
| 01/28/25 | S.Z.P. | REVIEW & ANALYSIS | DOCUMENTATION PRODUCED BY JAY BROCK | 1.9 |
| 01/28/25 | S.Z.P. | REVIEW & ANALYSIS | ORGANIZATION STRUCTURE CHART | 0.5 |
| 01/29/25 | J.E.T. | REVIEW & ANALYSIS | 2024 ESTIMATED RENT PROFORMA | 1.0 |
| 01/29/25 | J.E.T. | REVIEW & ANALYSIS | 2024 ACTUAL RENT PROFORMA | 0.9 |
| 01/29/25 | J.E.T. | REVIEW & ANALYSIS | CLAIMED NPV OF CASH FLOWS AND 2024 ACTUAL RENT PROFORMA, LIHTC APPROVED PROFORMA, AND 2024 ESTIMATED RENT PROFORMA | 1.9 |
| 01/29/25 | P.F.K. | REVIEW & ANALYSIS | LIHTC AND NON-LIHTC MODELS | 3.4 |
| 01/29/25 | S.Z.P. | REVIEW & ANALYSIS | POSSIBILITY OF HYBRID MODEL METHODOLOGY USED BY CLAIM | 0.7 |
| 01/30/25 | S.Z.P. | REVIEW & ANALYSIS | QUESTIONS SURROUNDING NET SALE PROCEEDS CLAIM CALCULATION | 1.6 |
| 01/30/25 | S.Z.P. | REVIEW & ANALYSIS | EXPENSE METHODOLOGY ON PRO FORMAS | 0.7 |
| 01/30/25 | S.Z.P. | REVIEW & ANALYSIS | CONFIRMATION OF DOCUMENT RELATIONSHIP - TYING OUT DOCS FROM CREDIT REPORT TO RECENTLY PROVIDED FINANCIALS | 0.8 |
| 01/30/25 | S.Z.P. | REVIEW & ANALYSIS | ESTIMATED GROSS SELLING PRICE ASSUMING CLAIM SELLING PRICE IS NET OF OBLIGATIONS | 1.1 |
| 01/31/25 | P.F.K. | REVIEW & ANALYSIS | MEASUREMENT OF DAMAGES | 2.0 |
| 01/31/25 | S.Z.P. | REVIEW & ANALYSIS | TAX CREDIT CALCULATION | 1.4 |
| 01/31/25 | S.Z.P. | REVIEW & ANALYSIS | CATALOGUE OF ASSUMPTIONS MADE RE: CLAIM METHODOLOGY | 1.7 |
| 01/31/25 | S.Z.P. | REVIEW & ANALYSIS | PRO FORMAS - DIFFERENCES IN RENT ASSUMED VS. ACTUAL | 1.5 |
| 01/31/25 | S.Z.P. | REVIEW & ANALYSIS | ESTIMATED OUTSTANDING OBLIGATIONS | 0.9 |

TOTAL 77.4

**HOURS BY INDIVIDUAL**

| INITIALS | NAME | POSITION | HOURS | HOURLY RATE | AMOUNT |
|----------|------|----------|-------|-------------|--------|
| P.F.K. | PATRICK F. KELLEHER | OFFICER | 34.6 | $ 395.00 | $13,667.00 |
| S.Z.P. | SAM POPE | STAFF | 23.5 | $ 200.00 | $ 4,700.00 |
| J.E.T. | JAMES E. TAMBURRO | STAFF | 16.7 | $ 200.00 | $ 3,340.00 |
| E.Z.A. | EMMY Z. ALVAREZ | STAFF | 1.0 | $ 190.00 | $ 190.00 |
| S.Z.O. | STELLA Z. OLDAKOWSKI | STAFF | 1.6 | $ 190.00 | $ 304.00 |
| | | TOTAL | 77.4 | | $22,201.00 |

# EXHIBIT 2

Patrick Kelleher, CPA, CFF
March 19, 2025

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.: 6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited liability
partnership; CANTON CONSTRUCTION, LLC,
A Florida limited liability corporation;
CONCORD MANAGEMENT, LTD., a Florida
limited partnership; THE VENUE AT
HERITAGE OAKS PARTNERS, LTD.,

     Plaintiffs,
v.

BREVARD COUNTY, a political
subdivision of the state of Florida,

     Defendant.

_____/

DEPOSITION OF PATRICK KELLEHER, CPA, CFF

Pages 1 through 142

Via Remote Video Conference

Taken on behalf of the Plaintiffs

DATE TAKEN:      MARCH 19, 2025

TIME:            8:59 A.M. - 12:18 P.M.

PLACE:           REMOTE VIDEO CONFERENCE

Stenographically reported by:

JENNIFER B. SANDERS, RPR, FPR-C
Notary Public, State of Florida

## Page 2

1  APPEARANCES:
2  APPEARING ON BEHALF OF PLAINTIFFS:
3  MICHAEL PICCOLO, ESQUIRE (Video Conference)
   LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.
4  215 N. Eola Drive
   Orlando, FL  32802
5  michael.piccolo@lowndes-law.com
6
7  APPEARING ON BEHALF OF DEFENDANT:
8  SUSAN GAINEY, ESQUIRE (Video Conference)
   ROPER, P.A.
9  255 S. Orange Avenue, Suite 750
   Orlando, FL  32801
10 sgainey@roperpa.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1                I N D E X
2  MARCH 19, 2025
3  DEPOSITION OF PATRICK KELLEHER, CPA, CFF
4     Direct Examination by Mr. Piccolo          4
5     Cross-Examination by Ms. Gainey          135
6  CERTIFICATE OF REPORTER                     139
7  CERTIFICATE OF OATH                         140
8  ERRATA SHEET                                141
9  NOTIFICATION LETTER                         142
10
11
12              * * * * *
13            E X H I B I T S
14 Plaintiffs' Exhibit 1 (Referenced)          10
15 (Subpoena)
16 Plaintiffs' Exhibit 2 (Referenced)          12
17 (Report)
18 Defendants' Exhibit 1 (Referenced)         136
19 (Organizational chart)
20
21
22
23
24
25

## Page 4

```
1               P R O C E E D I N G S
2                 * * * * * * *
3             PATRICK KELLEHER, CPA, CFF,
4      Having been first duly sworn to tell the
5      truth, was examined and testified upon his oath as
6      follows:
7             THE WITNESS:  I do, yes.
8             THE COURT REPORTER:  Thank you.
9                 DIRECT EXAMINATION
10 BY MR. PICCOLO:
11     Q    Good morning.  My name is Michael Piccolo.  I
12 represent the plaintiffs in this case.
13          Will you please state your full name for the
14 record.
15     A    Good morning.  My name is Patrick Francis
16 Kelleher.
17     Q    Mr. Kelleher, can you provide your address of
18 residence?
19     A    My professional address is 155 Federal Street
20 and that is in Boston, Massachusetts.  It's Suite 1104.
21 If you need my personal address, I can give that, as
22 well.
23     Q    You can just tell me where you reside, which
24 city and state.
25     A    Norfolk, Massachusetts.
```

## Page 5

```
1     Q    Okay.  And, Mr. Kelleher, are you under the
2  influence of any substance that would affect the
3  testimony that you're about to give?
4     A    No.  But I will mention that I'm feeling a
5  little bit under the weather this morning.  I don't know
6  if it's a cold or Covid, so if I'm coughing, just bear
7  with me.  It shouldn't affect anything I do today, so
8  just bear with me here as I try to manage that part of
9  my health.
10    Q    I appreciate you toughing it out, and I'm glad
11 that we're via Zoom so we don't have any issues with
12 potentially contaging (ph) here.
13         If you have to take any breaks during the
14 deposition, just let us know and we can go off the
15 record.
16    A    Thank you.
17    Q    Mr. Kelleher, where are you currently?
18    A    I'm sitting in my home office in Norfolk,
19 Massachusetts.
20    Q    Okay.  Are there any persons with you in your
21 home office?
22    A    No.
23    Q    All right.  Did you bring any papers with you
24 or documents or electronic documents to your deposition
25 this morning?
```

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 6

1    A    The only two documents I have are a hard copy
2 of my report with no notes on it, and I can -- you know,
3 I'm happy to remove these, and then I also have the --
4 and I guess what I referred to as the 2.6 Model which is
5 Paul M. 17, I think is the PDF.  Those are the only two
6 documents that I have with me.
7    Q    Got it.  And that -- the 2.6 Model which I'll
8 refer to as "Plaintiffs' Model" during the course of
9 this deposition; does that make sense?
10   A    That works for me.
11   Q    Does there -- is there any numbers or letters
12 at the bottom right-hand corner of that?
13   A    Yes.  It's Paul Missigman 2.6.2025, 81
14 pages -- Bates stamp 81 all the way to 104.
15   Q    And you said there were notes, or were no
16 notes on the copies that you have?
17   A    There are no notes.
18   Q    Okay.
19   A    No notes.
20   Q    And then in terms of the screen you're looking
21 at, are you looking at a laptop, or desktop monitors, or
22 a phone?
23   A    This is a laptop.
24   Q    Got it.  And do you have any other screens
25 open aside from the Zoom?

Page 7

1    A    I don't.  The only other thing I have here is
2 a calculator if we need to get that granular.
3    Q    Okay.  Hopefully, we won't have to do so.
4         I'm assuming you've been deposed previously,
5 correct?
6    A    I have.
7    Q    When was the last time you were deposed?
8    A    The last time I was deposed was back in -- I
9 think it was -- the spring or the summer of 2024.
10   Q    Okay.  So you're a veteran at this.  I'm not
11 going to go through all the general instructions.  The
12 only instruction I'll go through is this:  I'm sure I'll
13 ask a question during the course of this deposition that
14 you don't understand.  If you don't understand the
15 question, please let me know, so I can rephrase it, but
16 if you answer the question, I'll assume that you
17 understood it; does that make sense?
18   A    That sounds fair.
19   Q    Okay.  Did you do anything to prepare for your
20 deposition today?
21   A    I did.
22   Q    All right.  What did you do?
23   A    I reviewed my report.  I reviewed the
24 plaintiffs' model from pages 81 to 104.
25   Q    Other than reviewing your report and reviewing

Page 8

1 Plaintiffs' Model, did you do anything else to prepare
2 for your deposition today?
3    A    I did not.
4    Q    When was the last time you reviewed the
5 report?
6    A    Yesterday.
7    Q    And when was the last time you reviewed
8 Plaintiffs' Model?
9    A    Yesterday.
10   Q    Have you spoken with anyone in preparation for
11 your deposition today?
12   A    Last week, counsel and I had a discussion.  I
13 guess -- I think it was scheduled to be in preparation
14 for the depo.  I'd have to think about whether we ended
15 up talking about that or other procedural things related
16 to the case.  So I guess, yeah, that would qualify, too,
17 as preparation but that was last week.
18   Q    Have you -- when was the last time you
19 corresponded with counsel electronically?
20   A    Yesterday maybe, two days ago.
21   Q    And were those communications, did they
22 involve any facts or data provided by counsel to aid in
23 your opinion that you're going to give today?
24   A    No.
25   Q    Did counsel provide you with any assumptions

Page 9

1 for you to base your opinions on today in those
2 correspondence that you just referred to?
3    A    No.
4         (Clarification by the Court Reporter.)
5         THE WITNESS:  Yeah.  I'm sorry.  So it's my
6 expert report, dated February 28.  The name of it
7 -- I don't know -- I guess I'd called it the Meaden
8 Moore report, the Patrick Kelleher report, but
9 whatever counsel has agreed to calling that, but
10 it's dated February 28, and I don't think -- the
11 copy I have does not bear a Bates stamp.
12        THE COURT REPORTER:  That's what I was looking
13 for, the name.  Thank you.
14        MR. PICCOLO:  And we'll admit that into the
15 record at some point during this deposition.
16 BY MR. PICCOLO:
17   Q    I guess since we're here, I'm going probably
18 to refer to that report, your report, as "your report"
19 or "your expert report"; you understand?
20   A    Yes.
21   Q    Okay.  All right.  Let's move to the first
22 exhibit.  All right.  Do you-all see my screen share?
23   A    I do.
24        MS. GAINEY:  Yes.
25   Q    Okay.  This reputes to be subpoena duces tecum

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 10

1  and notice of taking video deposition of Dr. Patrick
2  Kelleher.  I think my legal assistant promoted you to
3  doctor.  I understand that you're not a doctor, correct?
4      A    That's correct.
5      Q    Okay.  You've seen this subpoena before?
6      A    I have.
7      Q    Okay.  And this subpoena will be marked as
8  Exhibit 1 to your deposition.
9           And have you reviewed Exhibit A to your --
10  Exhibit A to Exhibit 1 to your deposition?
11      A    I have.
12      Q    Okay.  And have you provided all of the
13  documents requested in Exhibit A to Exhibit 1 to your
14  deposition to counsel?
15      A    I have.
16      Q    When did you do that?
17      A    I think when I -- yeah -- when I submitted my
18  report, February 28 -- let me just read these again.
19      Q    Sure.  Sorry.  Just trying to Zoom in for you.
20      A    Yeah.  I can read it good.  Thank you.
21           February 28.
22      Q    So today's -- I didn't mean to interrupt you.
23  Please continue.
24      A    February 28.  That was it.  I was done.
25      Q    So today's March 19; do you know whether or

Page 11

1  not you have created or received correspondence or
2  created documents that would be responsive to this
3  subpoena between February 28 and today that have not
4  been produced yet?
5      A    There might be some emails but, again, they
6  were -- I guess it would -- that would be number four,
7  but I'm not sure -- yeah -- I wouldn't -- it wouldn't
8  really affect my opinion.  I think they're more
9  procedural and timing and -- so I don't really think
10  they would fall under that category.  There were
11  communications, though, about scheduling and things of
12  that nature.
13      Q    Have you done a search since February 28 for
14  responsive documents to this subpoena?
15      A    No.  I wouldn't need to either, and it's the
16  substance of number -- what my testimony reflects.
17      Q    So just to be clear, you have already produced
18  all documents and communications that identify facts per
19  data that defendant's attorney provided and that you
20  considered in forming your opinions in this case --
21      A    Right, right.
22      Q    -- correct?
23      A    Yes, of course.  I'm sorry to cut you off, but
24  my opinions were formed as of February 28 and those have
25  not changed.  So there wasn't any other information that

Page 12

1  was provided to me, I guess, number one, and number two,
2  that was provided to me and I relied on in forming my
3  opinions because my opinions are -- you know, they're
4  committed to the February 28 document.
5      Q    How about number five, receipts, checks, bills
6  and invoices reflecting total amount of monies paid to
7  you for your study, opinions, report, or testimony in
8  this case?
9      A    There haven't been any other invoices sent
10  since February 28.
11      Q    And since February 28, your file has not been
12  updated in any regard with respect to this case?
13      A    That's correct.
14      Q    All right.  Now, we're going to turn to the
15  expert report and disclosure of Patrick F. Kelleher,
16  CPA, CFF, submitted February 28,2025, marked as
17  confidential.  This is 57 pages; are you familiar with
18  this document?
19      A    I am.
20      Q    Okay.  And is this what we've agreed to refer
21  to as "your expert report"?
22      A    It looks that way, yes.
23      Q    And I will mark this as Exhibit 2 to your
24  deposition.
25           Does your expert report contain a complete

Page 13

1  statement of all of your opinions that you will express
2  in this case?
3      A    Yes.
4      Q    And does your expert report contain all bases
5  and reasons for your opinions that you will express in
6  this case?
7      A    Can you repeat that question?
8      Q    Sure.
9           Does your expert report contain all bases and
10  reasons for your opinions that you will express in this
11  case?
12      A    I think, as a practical matter, to inform a
13  response there -- I mean, all of the most substantive
14  basis are included there.  Is it every single thing?  I
15  think this report could read a lot longer and, as a
16  practical matter, I've included the ones that are most
17  substantive.
18      Q    And when you're saying that you've included
19  the ones that are most substantive, are you -- you're
20  saying you're including the bases and reasons that are
21  most substantive, in your opinion?
22      A    That's correct.
23      Q    All right.  So what percentage of bases or
24  reasons for your opinions is reflected in your expert
25  report?

Patrick Kelleher, CPA, CFF
March 19, 2025

---

Page 14

1    A    I haven't done that calculation.  I -- yeah.
2  I'm not sure how to answer that.
3    Q    Yeah.  And what, I guess, I'm trying to
4  understand in a -- in a succinct way, is how much is
5  missing from this report in terms of bases and reasons
6  for your opinions in this case, if anything?
7    A    Yeah.  Yes.  Fair enough.  I think I would say
8  "not much."  That's my best estimate.  That's my best
9  estimate at this stage.
10    Q    And so what is missing from your expert report
11  in terms of reasons and bases that support your opinion?
12    A    I really have to think about that, and I
13  don't -- I haven't put much thought to it.  I think the
14  focus of my efforts has been the substantive basis.
15    Q    So just to be clear, your expert report does
16  not contain all bases and reasons for your opinions that
17  you'll express in this case?
18    MS. GAINEY:  Object to the form.
19    Q    You can answer.
20    A    I think it includes all substantive basis for
21  my opinions.
22    THE COURT REPORTER:  Wait.  There was a lag in
23    the Zoom.
24    (Clarification by the Court Reporter.)
25    (The last question was read back by the court

---

Page 15

1    reporter.)
2  BY MR. PICCOLO:
3    Q    Can you answer the question again,
4  Mr. Kelleher?  Did you hear the court reporter ask the
5  question?
6    A    I did.  I think any answer, though, was not
7  recorded properly or I misspoke.  All substantive basis
8  were included.
9    THE COURT REPORTER:  Thank you.
10  BY MR. PICCOLO:
11    Q    And so what was not included in the report in
12  terms of bases and reasons for your opinions that you'll
13  express in this case?
14    A    I would really have to think about that, and
15  I'm not sure I have an answer as we sit right here.  I
16  think it would be things that are less important at this
17  stage when I was concluding my report.  So if I deem
18  them to be less substantive, I really have to reflect on
19  that and think about why it's not included and what --
20  what it is that I didn't include.
21    But to say every single factor is included in
22  there, I think, is -- I guess I would -- I would pause
23  before I would answer that with certainty.
24    Q    Right.  And I'm not asking for factors; I'm
25  asking for bases and reasons for your expert opinion in

---

Page 16

1  your report.  So I guess I'll ask the question again.
2    Does your expert report not contain all the
3  bases and reasons for your opinions that you will
4  express in this case?
5    A    I think it includes all the ones that matter.
6    Q    Meaning all the ones that you'll use to
7  support your opinion?
8    A    That's correct.
9    Q    You prepared expert reports before, correct?
10    A    I have.
11    Q    Are you familiar with the requirements for
12  expert reports, what's required to be in them,
13  specifically?
14    MS. GAMEY:  Objection.
15    A    I am.
16    Q    Okay.  Do you know whether or not there's a
17  requirement that your expert report must contain all
18  bases and reasons for your opinions that you'll express
19  in this case?
20    A    I guess I'm not 100 percent on that.
21    Q    You don't know, correct?
22    A    That's correct.
23    Q    Do you have -- did you review any rules of
24  federal procedure, too, before you prepared your expert
25  report?

---

Page 17

1    A    Yes.  I think I referred to them in my report.
2    Q    So when you say Rule 26 Disclosures, are you
3  referring to Federal Rule of Civil Procedure 26?
4    A    That's one of them, but there's other
5  references.  I think, it's at the bottom of that first
6  page, Rule 702 of Federal Rules of Evidence.
7    Q    And I will show you, to see if I can refresh
8  your memory, this is Rule 26 of the Federal Rules of
9  Civil Procedure; you said you reviewed this rule before?
10    A    I have, yes.
11    Q    Did you review this rule in preparation for
12  your expert opinion in this case?
13    A    No.  But I have seen it before.
14    Q    Okay.  I going to refer you to Rule 26 -- 26
15  (A), (B), titled:  Witness who must provide a written
16  report.
17    Have you ever seen this rule before that's
18  highlighted on your screen?
19    A    I have.
20    Q    Okay.  And it provides here, quote, the report
21  must contain -- and it says -- the facts or data
22  considered by the witness informing them -- and I will
23  represent to you that "them" is in reference to your
24  expert opinions in this case -- do you know whether or
25  not there's been facts or data considered by you --

---

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 18

1  excuse me.  Strike that.
2           We'll look at Subsection (1), and it says:  A
3  complete statement of all opinions the witness will
4  express and the bases and reasons for them.
5           Do you see that?
6      A    Yes.
7      Q    All right.  Do you believe that your expert
8  report contains a complete statement of all opinions
9  that you will express and the bases and reasons for
10 them?
11     A    It does.  It contains a complete statement of
12 all my substantive opinions and the substantive basis
13 and the substantive reasons for them.
14     Q    What do you mean by substantive bases and
15 reasons?
16     A    I mean, there's a practical level of what to
17 include and what not to include.  Is it every single
18 document?  I mean, I think when you read this report,
19 you can see that it's pretty comprehensive, and there's
20 a balance that I have to strike between including every
21 single element of every single document that I read and
22 then what goes into a report that summarizes all of
23 that.
24          So my opinions that I included here are
25 comprehensive.  Am I referring to every single document

Page 19

1  that I refer to, that I have looked at?  I -- you know,
2  I don't do it necessarily in the body of the report, but
3  there's an exhibit in there that shows the nearly 500
4  documents that I considered, so it's comprehensive.
5           I didn't list out every time I looked at a
6  document and it somehow -- it somehow gave me some piece
7  of information that informed a decision point in my
8  analysis.
9      Q    As you sit here today, are you aware of any
10 bases or reasons that support your opinion that are not
11 included in your expert report?
12     A    I'm not.
13     Q    Okay.  Does your expert report contain all the
14 facts or data considered by you in forming all of your
15 opinions that you will express in this case?
16     A    Yes.
17     Q    Does your expert report contain all exhibits
18 that you will use to summarize or support your opinions
19 that you will express in this case?
20     A    Yes.
21     Q    Does your expert report contain your
22 qualifications to testify as an expert in this case?
23     A    Yes.
24     Q    Does your expert report have a list of all
25 other case in which, during the previous four years, you

Page 20

1  testified as an expert at trial or by deposition?
2      A    Yes.
3      Q    And does your expert report provide a
4  statement of the compensation to be paid for the study
5  and testimony that you're going to give in this case?
6      A    Yes.
7      Q    All right.
8           (A brief interruption was had.)
9           MR. PICCOLO:  All right.  Back on the record?
10          THE COURT REPORTER:  Yes.
11 BY MR. PICCOLO:
12     Q    All right.  So we're looking at Exhibit 2 to
13 your deposition, and we're looking at page four at the
14 subtitle "Statement of Opinions."  Subsection (1) of
15 that provides accuracy of Plaintiffs' Model --
16 Plaintiffs' Model is being referred to as the Paul
17 Missigman Model that we spoke about earlier that you
18 have a hard copy of that we agreed to refer to as
19 "Plaintiffs' Model" during the course of this
20 deposition, correct?
21     A    That's correct.
22     Q    When did you receive Plaintiffs' Model for the
23 first time?
24     A    I distinctly remember that.  It was on the eve
25 of Mr. Missigman's planned deposition.  I don't know if

Page 21

1  that was the first plan to date for him, but it was -- I
2  think it was February 7 was his deposition scheduled and
3  I received it from counsel the evening of the 6th.  So I
4  distinctly remember that.
5      Q    The 6th of February, correct?
6      A    That's correct.
7      Q    February 6, 2025, right?
8      A    That's correct.
9      Q    And you published your -- this plaintiffs' --
10 excuse me.
11          You published your expert report on
12 February 28, 2025, correct?
13     A    That's correct.
14     Q    Did you have sufficient time to review
15 Plaintiffs' Model in preparation for your expert report?
16     A    I did.
17     Q    And you were able to obviously review
18 Plaintiffs' Model before you published your expert
19 report in this case, right?
20     A    I -- yes, I did.  I don't think I had much of
21 a choice.  I had to look at it, there was -- you know,
22 there were some time bumpers there, so "sufficient
23 time," I think, is subjective.
24          I would have liked to have had more time as a
25 practical matter rather than getting it when I did,

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 22

1  which I thought was challenging and -- questionable, is
2  probably the kindest way that I can say, especially
3  given that the model was prepared almost a year ago.
4      Q    What are your qualifications to evaluate the
5  accuracy of Plaintiffs' Model?
6      A    I'm a licensed accountant in the Common Wealth
7  of Massachusetts. I'm certified in financial forensics.
8  I have an MBA. I've been working for almost 25 years in
9  the forensic accounting field.
10      I'm on the executive board of the Builders
11  Risk and Construction Symposium, and I have worked on
12  thousands of measurement-related issues and dozens of
13  matters that are in litigation and dozens of
14  construction-related measurement engagements.
15      Q    When you're saying "measurement engagement,"
16  what does that mean?
17      A    Sometimes my firm will be retained by a party
18  outside of the context of litigation and we'll be asked
19  to measure the impact of a particular event. Might be
20  in anticipation of litigation, might be to try and
21  fulfill a contractual obligation.
22      Q    Do you know what industry the plaintiffs
23  operate in?
24      A    I do.
25      Q    What industry?

Page 23

1      A    The real estate development, construction,
2  affordable housing industry.
3      Q    Which of the plaintiffs operate in the
4  construction industry?
5      A    I think there's a number of them.
6      Q    Which ones?
7      A    I think Mr. Culp has testified that he is one
8  of the principals of Canton Construction. I'd have to
9  go back -- I don't know this a hundred percent -- but I
10  believe there's testimony that the principals -- other
11  principles are involved in those ventures and they all
12  include real estate development and construction to some
13  degree.
14      Q    Do you consider real estate and development
15  the same industry as construction?
16      A    They're related, for sure, 100 percent.
17      Q    But are they the same?
18      A    Well, I think they're related. I think that's
19  my answer is they're not mutually, especially when we
20  get to a context like this.
21      Q    I -- I didn't ask you if they were related.
22  I'm asking if they're the same. Is the construction
23  industry and real estate industry and development
24  industry the same?
25      A    Think they --

Page 24

1      MS. GAINEY:  Objection.
2      A    Are they the same?  They're not mutually
3  exclusive.
4      THE COURT REPORTER:  Ms. Gainey.  Did you make
5      an objection?
6      MS. GAINEY:  Object to the form.
7  BY MR. PICCOLO:
8      Q    When you say that they're not mutually
9  exclusive, what do you mean by that?
10      A    Well, if you're going to construct something
11  on a property, you need to develop it, and in order to
12  engage in contractor, there's certain prerequisites that
13  the developer needs to go through, right?
14      There needs to be an acquisition of real
15  estate, in many instances, before the construction can
16  begin. And there's certain milestones that need to be
17  met before the construction actually starts, and, you
18  know, those two are tied together very clearly.
19      Q    Do you consider affordable housing an
20  industry?
21      A    I would say it's a subset of real estate
22  development.
23      Q    Do you think it's a subset of the construction
24  industry?
25      A    It's part of it.

Page 25

1      Q    Not my question.
2      Do you consider a subset of the construction
3  industry; yes or no?
4      MS. GAINEY:  Object to the form.
5      A    Can you repeat your question, please.
6      MR. PICCOLO:  Madam Court Reporter, can you
7      read it back, please.
8      (The pending question was read back by the
9      court reporter.)
10      A    I think you're going to have to ask the
11  question a different way.  I'm not really 100 percent
12  sure how to --
13      Q    Sure.  Let's -- then let's back up and go
14  through the question again.
15      Is affordable housing an industry?
16      A    It's a subset and it's contained within real
17  estate development.
18      Q    Okay.  Is affordable housing a subset of the
19  construction industry?
20      A    I think my answer is very similar to the real
21  estate and the construction industries.  It's -- their
22  related, right?  It's a subset.  It's part of.
23      Q    So the answer is yes, right?
24      A    Yes.  I'm trying to be as specific as
25  possible.  I'm not trying to be difficult here.  I'm

Page 26

1  trying to answer your question, and I don't think it's
2  a yes or no.
3      Q    You mentioned you're on the board of
4  construction symposium -- or what did you say about
5  that?
6      A    I'm on the Executive Board of the Builders
7  Risk and Construction Symposium.
8      Q    Where is that based out of?
9      A    New York City.
10      Q    Do -- where are the members of this symposium;
11  where do they hail from?
12      A    All over the U.S.
13      Q    And tell me about your experience with the
14  symposium.
15      A    So probably five-plus years now, I've been on
16  the executive committee, but part of my responsibilities
17  are curating, developing content for a conference that
18  occurs every year in May, and the content of that
19  conference pertains to construction, real estate
20  development and all the risks that are associated with
21  that.
22      Q    Have you ever worked for a business that
23  engages in real estate development?
24      A    I worked for counsel for a business that
25  develops real estate.

Page 27

1      Q    What do you mean by that?
2      A    Counsel usually retains me, not the actual
3  business themselves.
4      Q    So you're referring to your capacity as an
5  expert witness in litigation?
6      A    Sometimes it's expert witness, sometimes it's
7  consulting witness, sometimes it's just to measure a
8  contractual obligation.
9      Q    How about that last one, measuring a
10  contractual obligation; give me an example when you
11  measure a contractual obligation with respect to real
12  estate development.
13      A    So, you know, one that's probably most
14  germane, several years ago, there was an affordable
15  housing development in Boston and just about completed
16  with the construction -- actually, very sad story -- and
17  housing's quite -- quite a challenge here in the
18  northeast as it is in most areas, especially affordable
19  housing, and the property was a LIHTC property -- LIHTC,
20  that's "low-income housing tax credit" -- and just about
21  done with it, the developer was, and it burned to the
22  ground.
23          And so there was a measurement of economic
24  damages that needed to take place, and the -- in this
25  instance -- I don't think it was counsel who retained

Page 28

1  us -- but it was an insurance company who retained me
2  and my firm to measure the impact to the real estate
3  developer.
4      Q    Do you have any experience with affordable
5  housing developments or properties in Florida?
6      A    I'd have to think about that.  I don't think
7  so.
8      Q    As you sit here today, you have no knowledge
9  or you don't recall having any experience with
10  affordable housing developments or properties in the
11  state of Florida, correct?
12      A    That's correct.
13      Q    So on Subsection 1 of the statement of
14  opinions on page four of Exhibit 2 to your deposition,
15  which is your expert report, you provide, quote, in
16  part:  Plaintiffs have not -- here, let me start here:
17  It is my opinion that the plaintiffs have not
18  demonstrated any economic damages with reasonable
19  certainty but, rather, have provided a model that does
20  not reflect the timing and accuracy of the cash flows
21  associated with this project.
22          Do you see that?
23      A    I do.
24      Q    Okay.  What are the cash flows that you're
25  referring to in that statement?

Page 29

1      A    The cash flows that are included in the
2  plaintiffs' 2.6 model.
3      Q    Okay.  And are there -- is there one cash
4  flow, or are there multiple cash flows?
5      A    There are multiple cash flows.
6      Q    Okay.  What are those cash flows?
7      A    The cash flows associated with the bond.  The
8  cash flows associated with all the monies that flow from
9  the project, the planned -- according to that model, the
10  planned monies that would flow from that project.
11      Q    What are the monies that flow from the planned
12  project?
13      A    So I'm going to refer to the model here, if I
14  could use the --
15      Q    Yeah.  Absolutely.  And you're referring to
16  Paul Missigman's model?
17      A    Well, I think I would rather use my report.
18      Q    Oh, that's fine.  You just said you were
19  referring to the model.  I just want to make sure I know
20  what you're referring to.  So you're referring to your
21  report?
22      A    Yeah.  Fair enough, yes.
23          So if we go to -- and if it's okay with you,
24  I've got a hard copy in front of me.
25      Q    Yeah.  I'll scroll on the screen.

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 30

1    A    So if we go to the cash flows that are
2 represented on page four.  This is Schedule 2 -- I'm
3 sorry.  It's page four of my schedules.  I don't know
4 what page it is on here.  This would be the schedules
5 piled in the index.  There you go.
6    Q    Schedule -- this is three, here's four.  Page
7 four of eight?
8    A    That's correct.  Those are the claimed cash
9 flows that have been presented by the plaintiff.
10    Q    All right.  So we have a claimed cash flow of
11 Canton Construction for $1,428,584, correct?
12    A    That's correct.
13    Q    And here, let me -- let me expedite this.
14        All of the claimed cash flow by plaintiffs
15 from Schedule 4 reflected on page four of eight of your
16 schedules, those are the cash flows that you're
17 referring to in your statement and your report that,
18 quote, rather have provided a model that does not
19 reflect the timing and accuracy of the cash flows
20 associated with this project, correct?
21    A    That's correct.
22    Q    Okay.  So let's refer back to the cash flows
23 on your schedule, and we'll start with Canton
24 Construction.
25        And so there's a -- there's a claimed cash

Page 31

1 flow by plaintiffs for Canton Construction of
2 $1,428,584; do you see that?
3    A    I do.
4    Q    Okay.  Was there anything inaccurate about the
5 timing of the cash flow -- of that cash flow?
6    A    Yes.
7    Q    Okay.  What was the inaccuracy?
8    A    Canton Construction would not be paid in full
9 before the construction was completed.  If the
10 construction was going to last a year and a half or two
11 years, they would be paid in increments.  That is not
12 factored into this model.
13    Q    So what did the model provide in terms of when
14 this cash flow for Canton Construction would be
15 realized?
16    A    What's reflected in the schedule is what the
17 model provided.
18    Q    Meaning that it was reflected immediately?
19    A    Yes.
20    Q    Okay.  And you're saying that the timing of
21 this cash flow would have been realized or gained or
22 obtained within two years of construction of the
23 project?
24    A    Over the span of the project; that's correct.
25    Q    You say within the span of the project, what

Page 32

1 does that mean?
2    A    So the contractor will submit pay application,
3 as you probably know, and that's how they would receive
4 the money, right?  As they complete the construction,
5 there will be increments that are paid to them, not all
6 at once up front, and that would cover two years, not
7 one.
8    Q    Okay.
9    A    And I think the exact duration of the
10 construction would be how that would be reflected and I
11 think it's -- I know, from the documents, that the plan
12 for that was -- so I'd have to go to my report to have
13 the exact plan.
14        So let me just find that section because there
15 is a duration of construction, and I comment on this in
16 my report, so if you just bear with me while I find
17 that.
18    Q    Sure.  And when you find it, just call out
19 where you're looking at so we can all be on the same
20 page.
21    A    Right.  So that is page six of my report at
22 the very -- towards the top of the page.
23    Q    And are you looking at where it says, on page
24 six of your report, "Construction - 279 days with
25 property placed in service on 6.30.25"?

Page 33

1    A    That's correct.
2    Q    Because I understand, from your report, that
3 you have taken the cash flows of plaintiffs who claimed
4 and that you have discounted them to present value,
5 right?
6    A    That's correct.
7    Q    Okay.  And the discounting of present value
8 means that you're saying that these cash flows are going
9 to accumulate or be realized in the future and so we
10 have to discount them from their future value to present
11 value, right?
12    A    That's correct.  And I think in this instance,
13 present value, again, would only be part of this
14 payment, right, that 1.4 million.  Some of it would be
15 realized in 2024.  Some of it would also be realized in
16 '25, and the timing of it, what's absent from the
17 plaintiff's model is the portion that should get
18 discounted from '25 back to '24.
19    Q    Okay.  And so this -- these aren't trick
20 questions, and what I'm trying to gain here -- and
21 you're answering my question -- I don't mean to infer
22 anything otherwise -- but what I'm just trying to go
23 through on this portion of your deposition is I want to
24 know what was the period -- how many years you used into
25 the future to discount these -- these cash flows to

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 34

1 present value; is that reflected somewhere on your
2 report?
3        A    It is.
4        Q    Okay.  Which schedule is that?
5        A    Well, it's going to be very close to
6 Schedule 2.  I think it's -- bear with me here while I
7 unclip this -- oh, you found it before me.
8        Q    Yeah.  Is it Schedule 1?
9        A    That's it.
10       Q    Okay.
11       A    So you could -- I'm sorry.  Pardon me.  I
12 don't mean to interrupt you.
13       Q    And I don't mean to interrupt you.
14            So I guess here, so my understanding that this
15 Schedule 1 where it's says "claimed cash flow by
16 plaintiffs from Schedule 3," this is your schedule of
17 the -- of the future cash flows; is that accurate?
18       A    It's correcting the Plaintiffs' Model to
19 reflect the accurate timing that is not properly
20 reflected in the Plaintiffs' Model.
21       Q    Got it.  So -- but, for instance, on this
22 Canton Construction column where you have the
23 1.4 million -- well, let's be exact -- $1,428,584, that
24 matches your amount on Schedule 2.  And I can see now,
25 here, on your claimed cash flow from plaintiffs'

Page 35

1 Schedule 4, you have the year 2024 which I think
2 you're -- what you're saying is that plaintiff claimed
3 that they were going to receive the $1,428,584 in 2024;
4 is that accurate?
5        A    That's what their model suggests, correct.
6        Q    So what you're saying here on Schedule 1 is
7 that, no, really they were going to receive half of that
8 amount in 2024 and half that amount in 2025, correct?
9        A    That's what my correction to their model
10 shows.
11            And is that the same logic with respect to
12 each of these columns reflected in the claimed cash flow
13 by plaintiff from of Schedule 3?
14       A    That's correct.
15       Q    Okay.  So when I look at the column for
16 Atlantic Housing Partners and your -- I guess -- how
17 would you -- how would you title it; what would you
18 refer this as?
19       A    That is the --
20       Q    Your corrected cash flow statement?
21       A    Yeah.  I think the top left-hand corner of the
22 schedule is -- has a pretty good descriptor, that's the
23 corrected cash flows.  The present value of the cash
24 flows is the table of data to the right of that.
25       Q    Got it.

Page 36

1        A    So it's the real values, right, the value
2 before present values on the left, but the value after
3 the present value, you see that column where it says,
4 "Note 4," that's where the present valuing --
5        Q    Yeah.
6        A    -- factor is -- you know, that's the
7 multiplier to get you to all the data that's on the
8 right side.
9        Q    Got it.  Okay.  So I'm going to refer to this
10 Schedule 1 as your corrected cash flows, but I know --
11 and I understand what you're saying -- is that the
12 schedule on the left is just the claimed cash flows;
13 whereas, the schedule on the right is discounted for
14 present value?
15       A    That's correct.
16       Q    And so when I look at your corrected cash flow
17 with respect to Atlantic Housing Partners and I look at
18 the plaintiffs' claimed cash flow for Atlantic Housing
19 Partners, it appears that you made adjustments for the
20 timing of the cash flows with respect to Atlantic
21 Housing Partners, correct?
22       A    I did.
23       Q    How about for Concord Management, did you make
24 any cash -- did you make any adjustments to the timing
25 of the cash flows for Concord Management?

Page 37

1        A    I don't -- I think that that may be one -- as
2 I'm looking at it, that may be one where there was no
3 change to the timing of it.
4        Q    So you didn't make any adjustments to the
5 timing of the cash flows for Concord Management in your
6 corrected cash flow report, correct?
7        A    I did not make any changes, because none --
8 none were warranted to correct the timing.  And this, I
9 guess, my opinion with respect to all of these amounts
10 is that I'm just using the amounts that they presented
11 and my opinion extends well beyond the timing and
12 accuracy.  I think there's a factual matter, there's an
13 underpinning matter related to all these amounts.
14       Q    Sure.  And we'll get to that, and I understand
15 that.  I think right now, we're just talking about the
16 timing of the cash flows.
17       A    Understood.
18       Q    So with respect to the venue at the Heritage
19 Oaks cash flow, the timing of the cash flows, did you
20 find anything inaccurate about those cash flows claimed
21 by plaintiff?
22       A    I did, yes.
23       Q    Okay.  So there were adjustments made here?
24       A    Significant adjustments.
25       Q    Got it.  And so explain to me the adjustments

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 38

1  made for -- the timing adjustments of the cash flows for
2  Atlantic Housing Partners.
3      A    So similar to the Canton Construction, they
4  would not receive their fee all at once, and their model
5  reflects that they get the developer's fee immediately
6  in 2024.  And my experience, knowledge and training very
7  clearly shows that the source of those funds and other
8  evidence in this case shows that the source of that
9  funds -- those funds -- are the tax credit equity.
10          And that tax credit equity is not released
11 until certain milestones in the project.  So the
12 increments that I'm showing there are reflective of the
13 timing of the tax credit equity being released to the
14 developer.  So the fee gets paid as the tax credit
15 equity is released.
16     Q    Got it.  How about The Venue at Carriage Oaks,
17 what timing adjustments did you make or what was the
18 basis for your timing adjustments on the cash flows
19 claimed by plaintiffs with respect to Venue at Heritage
20 Oaks?
21     A    So the Plaintiffs' Model shows the debt being
22 extinguished in year 2040.  It's baked within that
23 five-point-four million down there in 2040 at the sale
24 of the property.
25     Q    Okay.

Page 39

1      A    And what's not correct about that, among other
2  things, is that the plaintiffs in this case are also the
3  bondholders, so they're the ones fronting the money.
4  There's a cash-out that, in their model, that is not
5  being reflected here.
6          So they -- by buying the bonds, being the
7  bondholder, they have to invest 15 million, and part of
8  the benefit to that is getting the interest income, but
9  they also have to invest 15 million before they get it
10 back, right?  And that 15 million is money out and it's
11 not returned to them until the sale of the property, and
12 their model shows it -- it doesn't show it properly.
13     Q    You say plaintiffs are the bondholders,
14 correct?
15     A    That was the plan.
16     Q    So plaintiffs are the planned bondholders with
17 respect to this project?
18     A    That's correct.
19     Q    Do you know who the plaintiffs are in this
20 case?
21     A    Yes.
22     Q    Okay.  Who are the plaintiffs?
23     A    (No response.)
24     Q    Here, I'll give you -- I'll help you --
25     A    I've got it.

Page 40

1      Q    -- out.
2      A    I've got it.  Atlantic Housing, Canton
3  Construction, Concord Management, The Venue at Heritage
4  Oaks, and the principals of those entities are the same
5  principals of the bondholder, MSPJ.
6      Q    What was that last acronym you said?
7      A    MSPJ.
8      Q    Is that an acronym or what is that?
9      A    That's probably a question for the plaintiff.
10 I don't know what it stands for, but it's within the
11 documents that were provided to me.
12     Q    So you don't know what MSPJ means?
13     A    I could guess, but I'd rather not.
14     Q    I'm not asking you to guess.  I'm asking you
15 if you know.  Do you know?
16     A    I don't.
17     Q    Okay.  And MSPJ -- your understanding is MSPJ
18 is the bondholder?
19     A    They would have been the bondholder.  That's
20 what the documents demonstrate.
21     Q    MSPJ would have been the bondholder --
22     A    That's correct.
23     Q    -- that's your understanding?
24     A    That's what the documents suggest and that's
25 my understanding.

Page 41

1      Q    So Atlantic Housing Partners, LLP was not
2  going to be a bondholder, correct?
3      A    No.  But they -- it's the same principals
4  involved.
5      Q    And, Mr. Kelleher, I want to get you out of
6  here as soon as I can, and I just need answers to the
7  questions.  I don't need explanations.
8          So I'm going to ask you again.  You're an
9  accountant.  You're a business guy.  You understand that
10 legal entities are different than the owners.
11          What I'm asking you is whether or not Atlantic
12 Housing Partners, LLP was the planned bondholder, yes or
13 no?
14     A    They were not the planned bondholder, but -- I
15 mean, my answer is -- is my answer.  So whether you want
16 to get me out of here in a certain amount of time,
17 that's -- I mean, that's your prerogative, but I think
18 the question requires more than a yes/no.  So I'll
19 answer the question how I want to answer it and how I
20 think it will properly reflect the record, and if the
21 principals of this planned development are the same
22 principals that are the plaintiffs, that is certainly
23 relevant and germane to drawing conclusions on this.
24          If they're going to take money out of
25 their pocket, to ignore that is to circumvent and

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 42

1  mislead what the economic damages are here.
2      Q    Atlantic Housing Partners, LLP; do you know
3  what type of entity that is?
4      A    It's an LLLP.
5      Q    Which is what?
6      A    A limited liability -- a limited partner
7  limited liability partnership (sic).
8      Q    Do you understand whether or not there's a
9  distinction between partners of an LLP and the entity,
10  itself?
11      A    I'm aware that there's a distinction.
12      Q    Okay.  And so let's, hypothetically, say that
13  Atlantic Housing Partners, LLLP incurs a liability,
14  would you believe that the partners incurred that same
15  liability?
16          MS. GAINEY:  Objection --
17      A    That depends.
18      Q    Right.  So I guess what I'm driving at is
19  this, it's back to the simple question that is a yes or
20  no, and I think you know what the answer is:  Is -- was
21  Atlantic Housing Partners, LLLP the planned bondholder
22  for this project?
23          MS. GAINEY:  Object to form.
24      A    They were not the entity that was the planned
25  bondholder.

Page 43

1      Q    Okay.  Same question with respect to Canton
2  Construction, LLC:  Was Canton Construction, LLC the
3  planned bondholder for this project?
4      A    No.
5      Q    Was Concord Management, Limited, the planned
6  bondholder for this project?
7      A    No.
8      Q    Was The Venue at Heritage Oaks Partners,
9  Limited, the planned bondholder for this project?
10      A    No.  But with respect to each of those
11  questions, there are entities that sit underneath and
12  own each of these LLLPs, LTDs, LLCs, and those entities
13  that own the plaintiffs have common ownership with MSPJ.
14      Q    Where, in your report, do you show the common
15  ownership that you're referring to?
16      A    I refer to it?  Bear with me here while I find
17  this.
18      Q    Sure.
19      A    But there is -- in the documents considered,
20  there is -- there are a number of flowcharts that show
21  this kind of nested ownership where certain entities
22  owned by the principals in this matter, they also own
23  MSPJ.
24      Q    Who were the principals in this matter?
25      A    The owners of each of these entities.

Page 44

1      Q    Which are whom?
2      A    Paul Missigman, Scott Culp, Michael -- I'm
3  going to try and say his name -- Scariano (ph).  I don't
4  know if that's an exhaustive list, but they are the
5  persons that sit behind these investment vehicles.
6      Q    And it's your understanding, based upon the
7  review of everything, that MSPJ was the proposed
8  bondholder for this project, right?
9      A    That's what the credit underwriting report
10  says.  That's what the testimony reflects.  That's
11  correct.
12      Q    I'm asking for your opinion, sir.
13          Is it your opinion, based upon the review of
14  all the documents and data that you went through, that
15  MSPJ was the proposed bondholder for this project?
16          MS. GAINEY:  Object to form.
17      A    That is my opinion which is based on the
18  factual evidence.
19      Q    Okay.  And is it your opinion that MSPJ which,
20  in your opinion, is the proposed bondholder for this
21  project, is the principals of the plaintiffs in this
22  case?
23      A    That's correct.
24      Q    And your understanding of the principals of
25  the plaintiffs in this case is Paul Missigman, Scott

Page 45

1  Culp and Michael S. -- and you can tell me what his last
2  name is.  That's a question.
3      A    Those are the individuals who have ownership
4  stakes in each of these entities, the plaintiff entities
5  and MSPJ.  And if you look at the flowcharts that you
6  produced, you'll see that.  And all of that is in the
7  documents considered, but I'm still looking for this --
8  one of your questions that is still outstanding which I
9  believe you asked me:  Where, in your report, I reflect
10  that there's ownership commonalities?
11          So if you can give me a minute to find that --
12      Q    Yeah, sure.
13      A    -- because otherwise I'm going to be
14  distracted or we can move on, but I know it's in here.
15      Q    No.  I want to know where it is because I'm
16  not -- I'm looking up -- let's see -- I'll try to help
17  you out, too.
18      A    Yeah.  So on page eight of my report, there's
19  a footnote, Footnote 31 which is referring to the MSPJ
20  org chart -- and I know in -- it's credit underwriting
21  report, I'm trying to locate it -- that MSPJ is an
22  affiliated entity, that's almost verbatim, yes, that
23  would be helpful if you could do that.
24      Q    Yes.  That's what I'm doing.
25      A    Thank you.

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 46

1   Q    MSPJ Bond Holdings, LLC.
2   A    That's that correct.
3   Q    So let's clear up the record then.
4        Your understanding that -- your understanding
5   is that -- or your opinion is that the proposed
6   bondholder of this planned project was going to be MSPJ
7   Bond Holdings, LLC, correct?
8   A    That's correct.
9   Q    Okay.  And it's also your opinion that the
10  members of MSPJ Bond Holdings, LLC were also the
11  principals of the named plaintiffs in this case,
12  correct?
13  A    It's my opinion, but it's my opinion based on
14  the factual information that's been produced.  I think
15  there's a clear distinction there.
16  Q    So you're just saying it's a fact?
17  A    It's in the documents that your client
18  produced.  I mean, I'm relying on that.  I mean, there's like an
19  opinion where I draw certain conclusions, but that's
20  very, you know, fundamental.  It's a factual matter.
21  Q    Yeah.  And I believe -- I think it's very
22  fundamental to your opinion here because you're -- you
23  are reducing my clients damages by $15 million based
24  upon this concept here that MSPJ Bond Holding, LLC is
25  the proposed bondholder and because there's commonality

Page 47

1   of ownership between MSPJ, LLC and the plaintiffs,
2   you're saying that's how you get there, right?
3   A    That's correct.
4   Q    And so I guess what I'm asking, and --
5   opinion, fact or your understanding or otherwise, is
6   that is it true that the members of MSPJ Bond Holdings,
7   LLC are the principals of plaintiffs?
8   A    There's common ownership there.
9   Q    What does that mean?
10  A    The owners of the plaintiffs are also owners
11  of the bondholder.
12  Q    And the owners of plaintiffs are whom?
13  A    It's in the documents produced.  I mean we can
14  spend all day here going through the --
15  Q    Do you know, as you sit here; do you know?
16  A    I do.
17  Q    Okay.  Who are they?
18  A    Let's go to the documents considered and you
19  can pull up each one of them.
20  Q    All right.
21  Q    Go to the documents considered and there's --
22  Q    What are you talking about, going to the
23  documents considered?  Do you know, as you sit here
24  right now, off the top of your head, who the owners of
25  the plaintiffs are?

Page 48

1   A    Yeah.  I'm going to refer to my report and
2   we're going to --
3   Q    I just asked you off the top of your head,
4   sir.
5   A    I have my report here.
6   Q    I understand you have your report.  I
7   understand you have your report.  What don't you
8   understand?  Do you not understand the phrase "off the
9   top of your head"?
10       MS. GAINEY:  Objection to form; badgering.
11  Q    It's a simple question.  I want to get through
12  this, too, and so I'm not going to sit here and go
13  through documents for you to figure out who the
14  plaintiffs' owners are.
15       Do you know who they are, as you sit here
16  right now, without the benefit of documents or not?
17  A    Not --
18       MS. GAINEY:  Sorry.
19       The owners -- can you repeat the question?
20  Q    Do you know who the owners of the plaintiffs
21  are without the benefit of looking at documents or not?
22       MS. GAINEY:  Object to form.
23  A    Not off the top of my head, but I don't have
24  every fact committed to memory.
25  Q    And I don't expect you to and that's fine.

Page 49

1        So when we look at your corrected cash flow
2   model and it's -- and you put the $15 million --
3   $15,648,106 deduction on The Venue at Heritage Oaks
4   column, why did you put it there?
5   A    That's where it belongs.  It's the money out.
6   I can put it in any one of the columns, but it really
7   doesn't matter which column it belongs in.
8   Q    Why does it belong there?
9   A    I mean, I could add another column that has
10  MSPJ Holdings -- Bond Holdings -- but that's, you know,
11  that's form over substance, doesn't matter.
12  Q    Do you know whether or not Venue at Heritage
13  Oaks was planned to incur and pay -- (remote audio
14  difficulty) --
15       THE COURT REPORTER:  I'm sorry. would you say
16       the number again?
17       (Clarification by the Court Reporter.)
18  Q    -- $15,648,106?
19  A    (No response.)
20  Q    Do you know?
21  A    They weren't.  But the principals -- again,
22  this is -- this is -- I mean you have to look at this
23  holistically --
24  Q    No.  I need it --
25  A    Well, let me finish.  Let me finish, right?

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 50

1  Let me finish.  You've cut me off a number of times
2  now --
3          (Simultaneously speaking.)
4      Q   Yeah.
5      A   -- and --
6      Q   You keep non-responding to my questions and
7  you keep interjecting stuff that's not responsive.  I
8  could object and strike what you're saying, but I want
9  to get through this.
10     I get -- I understand what you're saying.  I
11  just need these simple questions answered --
12         (Simultaneously speaking.)
13     A   I think --
14     Q   -- and you answered it already, so I don't
15  need the explanation.  It's yes or no.
16     A   I think it warrants an explanation --
17     Q   Okay.  Go ahead.
18     A   And you can have whatever question you want --
19         (Simultaneously speaking.)
20     Q   Give your explanation, sir.
21     A   -- okay?
22         MS. GAINEY:  Object to form.
23     A   You've interrupted me again, right, as I try
24  to give this explanation, so --
25     Q   You've already given the explanation, but go

Page 51

1  ahead, again.  Let's hear it.
2          MS. GAINEY:  Wait.  I'm sorry.  What's the
3  question?
4      Q   What is the question that you're giving
5  explanation to, sir?  That's the question.
6          MS. GAINEY:  Object to the form.  I'm --
7  counsel does not understand what question is
8  pending.  Can it either be repeated --
9      Q   The question pending is:  What explanation are
10  you attempting to give -- or what question are you
11  attempting to give an explanation for, sir?  That's the
12  question pending.
13         MS. GAINEY:  Object to form.
14     A   You asked me if The Venue at Heritage Oaks
15  would incur 15 million in money out, if I understand
16  your correct -- your question correctly.
17         My answer is, no, but you have to have look at
18  this holistically; otherwise, there's an enrichment
19  issue.
20     Q   Does the Plaintiffs' Model contain overstated
21  amounts?
22     A   Yes.
23     Q   All right.  Which amounts are -- and when --
24  I'm referring to the present value of plain cash flows
25  for the plaintiff, and what we're looking now at

Page 52

1  Schedule 2 of your expert report, which of the amounts
2  reflected on the claimed cash flow by plaintiffs from
3  Schedule 4 is overstated?
4      A   Independent of this MSPJ Bond Holdings issue,
5  which we covered, I think, extensively, the cash flow in
6  The Venue at Heritage Oaks' column, starting with the
7  number 446,028 in the year 2025, each of those numbers,
8  including the 446 below that, are overstated.
9      Q   Are any of the numbers -- or is the number in
10  the Canton Construction column overstated?
11     A   It's -- it conflicts with the contract that
12  was produced in this matter, and I believe the contract
13  that was produced had a lower amount.
14     Q   How much lower?
15     A   60-something thousand.  It's detailed in my
16  report.
17     Q   So why doesn't that reflect that in your
18  current -- in your corrected cash flow?
19     A   I don't agree with any of the amounts or the
20  model that they used, and so I just took their model and
21  tried not to change any of the dollar amounts but,
22  rather, just use their model and correct the timing of
23  the cash flows.
24     Q   Okay.  And so how about Atlantic Housing
25  Partners, is the $4 million amount -- $4,259,658 amount

Page 53

1  reflected in the Atlantic Housing Partners column, is
2  that overstated?
3      A   I think it's -- you know, there's a
4  distinction here -- and I know you're probably looking
5  for a yes-or-no answer -- but none of these -- many of
6  these amounts haven't been -- haven't been anchored to
7  facts, and that's a pretty principled issue when damages
8  are being presented.
9          There hasn't been any underlying support for
10  any of these amounts.  It's just the model without what
11  went into the model and how that is anchored in facts
12  and the sufficient data and reliable information.  So
13  all of these amounts are lacking the support that is
14  needed to demonstrate damages.
15     Q   So, in your opinion, is the $4,259,658
16  reflected in the Atlantic Housing Partners column
17  overstated?
18     A   Potentially, yes.
19     Q   And are you saying that it's overstated
20  because there's not sufficient factual back -- factual
21  data to support it?
22     A   That's correct.  I would say that it's
23  potentially overstated, it's potentially understated,
24  too.
25     Q   Right.  And with respect to Canton

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 54

1  Construction, you pointed to the contract and said, hey,
2  I -- and look, I get your opinion.  I understand, look,
3  all -- your ultimate opinion is there's zero economic
4  damages here and, you know, you have a plethora of
5  reasons, but I'm going through each of the reasons
6  to figure out which ones you agree with and which ones
7  you don't agree with.
8      So this is just with respect to the
9  overstatement of these cash flows, right?  And with
10 Canton Construction, you said, "Hey, there's a contract
11 here.  The contract price was about $60,000 less than
12 the cash flow here, that's why it's overstated."  I get,
13 also, what's going on is you're saying it's overstated
14 because there's no factual background to support it;
15 does that make sense?
16     A    Understood, yes.
17     Q    So with respect to the Atlantic Housing
18 Partners column, right, I'm asking -- I get you don't
19 accept it, I get you don't think there's factual data,
20 is there another reason why it's overstated similar to
21 the one in Canton Construction?
22     A    No.
23     Q    And then with respect to Concord Management,
24 is there -- I get you're saying no factual data to
25 support it, but is there some other factual reason why

Page 55

1  you believe that these amounts are overstated?
2      A    It could be understated or overstated but
3  there's no -- no other factual basis.
4      Q    And then with respect to Venue at Heritage
5  Oaks, right, you -- I believe you went and reduced them
6  even in your corrected cash flow model, right?
7      A    I guess -- I don't know that I did.  If you
8  scroll -- if you scroll down.
9      Q    Sure.  Right.  If you -- yeah.  Maybe you
10 didn't.  Yeah, I apologize.  You're right.
11     A    No, I didn't.  The bond -- pardon me for
12 interrupting -- the bond piece was the only change made
13 there and this -- I guess, this is where it gets a
14 little bit tricky and I'll try and explain this clearly,
15 but the Plaintiffs' Model, the way that it's set up --
16 if you could scroll down to the next schedule there --
17 they're showing the bondholder as being an unrelated
18 third party.  So there's money loaned out and The Venue
19 at Heritage Oaks, that column, is the revenue less the
20 expenses of the property.  Those expenses don't include
21 the actual bond interest that would clearly affect the
22 cash flow of the project.
23     So consider the project is generating a
24 certain amount of rent, there's certain expenses that go
25 along with that, and if we accept the presentation -- if

Page 56

1  I accept the presentation as it stands right here on
2  Schedule 3, including this -- this issue of the
3  bondholder not being a plaintiff -- if you're with me
4  still -- those cash flows there, they do not reflect the
5  debt service associated with paying the bondholder
6  whoever that bondholder is, related or unrelated.  Those
7  are just revenue less expenses and it stops short of
8  backing out the interest that the plaintiff would have
9  to pay.
10     Q    Which plaintiff would be paying the bond
11 interest?
12     A    It would be The Venue at Heritage Oaks.
13     Q    And why would they be obligated to pay the
14 bond interest?
15     A    It's either Atlantic Housing or The Venue at
16 Heritage Oaks.
17     Why would they be obligated to pay the
18 interest?  They borrowed money, right, there's a bond
19 and that's a pretty basic concept.  You borrow money,
20 and a bond, you have to pay the interest, the debt
21 service on it and, you know, at least one of these bonds
22 is amortizing, as well, so they'd have to pay the
23 principal on that, as well, which would also reduce the
24 cash flow.
25     Q    And you're saying that either Atlantic Housing

Page 57

1  Partners or Venue at Heritage Oaks would have to pay the
2  principal and interest of a bond of which they don't
3  hold?
4      MS. GAINEY:  Object to form.
5      A    That's correct.
6      Q    Okay.  With respect to these cash flows here
7  on Venue at Heritage Oaks, this is cash flow from the
8  operation of the projected property, right?
9      A    That's correct.
10     Q    And so when you looked at the numbers that
11 plaintiff provided, with the caveat being that you don't
12 believe that they're factually supported, did you do any
13 analysis to figure out whether or not these numbers were
14 wrong, analogous to the Canton Construction, where you
15 said:  Hey the contract price is X; you're saying that
16 you're going to get Y?
17     With respect to Venue at Heritage Oaks, did
18 you do that type of analysis to say you-all are saying
19 in 2025 -- or 2026 -- we can remove 2025 for the bond
20 issue -- but you're saying in 2026, you're going to get
21 operations of $920,367?
22     I get you're saying you don't have any factual
23 support for that, but did you do any analysis to say
24 really what you would have got was this, assuming that
25 what you're saying is true?

Patrick Kelleher, CPA, CFF
March 19, 2025

---

Page 58

1    A    I certainly tried to -- and in given how the
2  property was structured as an affordable housing
3  development, there's certain data points that are
4  publicly available that can be used to test the
5  reliability of what the plaintiff produced -- so I tried
6  to but, you know, the right way to do this is to anchor
7  it in as much factual information as possible -- and I
8  don't want to veer off into answering a question that
9  you're not asking -- but I certainly tried to.
10        I could not complete that exercise, and the
11 reason I -- you know, I couldn't complete that exercise
12 is because I asked for these other properties that the
13 insured -- pardon me -- the plaintiff may own and
14 operate and I think could serve -- may have served -- as
15 some of the underpinning for their model.
16        I didn't have that information, though.  So I
17 couldn't complete that test and figure out whether
18 there's a known rate of error here and whether this is a
19 reliable model.  So I tried to.  I could not complete
20 that exercise, though, because there was not
21 sufficient -- was not sufficient response to discovery
22 requests.
23    Q    With respect to Venue at Heritage Oaks, these
24 cash flows for each of these years, a large percentage,
25 if not all percentage of this, is rent, right?

---

Page 59

1    A    I don't think I understand your question.
2    Q    Sure.  So we agree that the cash flow amounts
3  provided for in Venue at Heritage Oaks are cash flows
4  from operations at the proposed property, right?
5    A    That's correct.
6    Q    And so part of that cash flow from the
7  operation proposed property is rent paid by the
8  prospective tenants, right?
9    A    I would agree with that, yes.
10    Q    Okay.  Do you know how plaintiffs arrived at
11 the rent amounts that they had projected for the cash
12 flows of Venue at Heritage Oaks?
13    A    I do.
14    Q    Okay.  How did they do that?
15    A    They took the mix of the units and they
16 maximized it so that it met the criteria of a bond
17 finance project and also met the criteria of a LIHTC
18 project, L-I-H-T-C, and they, you know, put that into
19 the model for what rent they could charge according to
20 the HUB parameters that I understand dictate what rent
21 can be charged for each income level.
22    Q    You -- what you just went through, do you
23 think that that is based in fact, or is that just
24 speculation and conjecture?
25    A    The rent piece, I think, had more definition

---

Page 60

1  than all the other pieces, but you're talking about the
2  money -- one part of the money in, right, the cash in,
3  the -- well, let me finish my answer, right?  I mean --
4    Q    I didn't say anything.
5    A    If I may.
6        That's only one part of this, though.  The
7  expenses, the other income from the vouchers, those are
8  things that can and should be tested and they weren't
9  tested here and they weren't anchored back to the facts
10 and sufficient data.
11    Q    But I'm just -- and I get there are other
12 components, right, other parts of the cash flow.  I'm
13 just asking about rent, sir.
14        With respect to the rent amounts that my
15 client's projecting for the cash flows of Venue at
16 Heritage Oaks, do you believe that those amounts were
17 based on speculation and conjecture?
18    A    No.
19    Q    So let me ask you about the expenses and the
20 vouchers that you just referred to, right?  Your opinion
21 is that those amounts, those projected amounts, are
22 conjecture and speculation, right?
23    A    That's correct.
24    Q    Okay.  And when you're saying that those
25 amounts are speculation and conjecture, are you just

---

Page 61

1  saying that my clients pulled those amounts out of thin
2  air or what are you saying that that's conjecture and
3  speculation?
4    A    I'm saying they haven't been supported at all.
5    Q    So meaning they're just made up?
6    A    I don't know whether they're -- sorry.
7        THE COURT REPORTER:  Ms. Gainey, did you say
8  something?
9        (Clarification by the Court Reporter.)
10       MS. GAINEY:  Object to form.
11 BY MR. PICCOLO:
12    Q    You can answer.
13    Q    Can you read the question back, so that I can
14 answer this properly?
15    Q    Sure.  I said:  Meaning that they're just made
16 up?
17    A    I don't know whether they're made up or not.
18 That's the issue here, is I cannot test them to the
19 underpinning of where they came from.
20    Q    And fair enough.  So I guess what you're
21 saying is, look, I mean, look, they could be valid.
22 They very well may not be valid, but because the
23 plaintiffs didn't provide sufficient support, you can't
24 formulate an opinion; is that accurate?
25       MS. GAINEY:  Object to form.

---

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 62

1    A    I think that is my opinion, but, yes. I can't
2  form an opinion, that's correct. And I think that's --
3  what you just described there is the very definition of
4  speculative, could be, might be, might not be.
5    Q    Do you know who came up with the amounts and
6  figures reflected in the cash flow, the projected cash
7  flow?
8    A    (No response.)
9    Q    Did you say something? I don't know if
10 it picked up. Did you say something?
11   A    No, I didn't say something.
12       But my understanding is Mr. Missigman prepared
13 the model and there may have been some collaboration, I
14 think the testimony suggests, between him and Mr. Culp.
15   Q    Do you know Mr. Missigman's and Mr. Culp's
16 experience with developing affordable housing projects
17 in the state of Florida?
18   A    I've read about it in the testimony and in the
19 other documents.
20   Q    So do you know?
21   A    I do know, yes.
22   Q    Okay. And how would you characterize
23 Mr. Culp and Mr. Missigman's experience with affordable
24 housing developments in the state of Florida?
25   A    Yeah. It seems extensive.

Page 63

1    Q    Okay. And would you believe it be conjecture
2  or speculation if Mr. Culp and Mr. Missigman based their
3  projected cash flows based upon their extensive
4  experience in developing affordable housing in the state
5  of Florida?
6    A    I would have no way of knowing without
7  actually testing it. They could put any number they
8  want into this schedule, and without the underpinning,
9  without the basis there, without the factual information
10 that would allow for testability and rates of error,
11 those are just principles that, you know, are baseline
12 to rendering an opinion in a matter like this.
13       So to know or not know or just rely on
14 someone's undocumented inputs into a model, that's, you
15 know, something that I'm not willing to and is not
16 fundamental to rendering an opinion.
17   Q    And you're saying rendering an opinion in the
18 court of law?
19   A    In the court of law, or -- yes.
20   Q    You don't have a legal degree, correct?
21   A    I don't.
22   Q    Okay. Do you know the requirements of
23 rendering an opinion in the court of law?
24   A    I'm very familiar with them.
25   Q    What are they?

Page 64

1    A    The testimony, the results, the opinions, they
2  need to be based on sufficient data. They need to be
3  reliable. They need to be a product of reliable
4  principles and methods. Those methods and principles
5  need to be properly applied to the facts of the case and
6  the circumstances.
7        They need to be testable. There needs to be a
8  known rate of error. They need to be generally accepted
9  within the scientific community, the accounting world,
10 finance world. There needs to be some intellectual
11 rigor that's brought to the opinion, and I think that's
12 absent when you look at the Plaintiffs' Model.
13   Q    Entirely absent?
14   A    Materially absent.
15   Q    What about this development fee right here,
16 $4,259,658, do you think that's based upon conjecture
17 and speculation?
18   A    My opinion's the same. I don't have enough
19 information to render an opinion about that.
20   Q    So your opinion is that plaintiffs didn't
21 provide the factual underpinnings or data, so you can't
22 render an opinion on whether or not this $4,259,658 is
23 accurate or inaccurate, right?
24   A    I think it can't be tested. I think that's
25 correct.

Page 65

1    Q    How about with respect to the $1,428,584 of
2  Canton Construction, is that based upon speculation and
3  conjecture?
4    A    Yes.
5    Q    Why is that based upon speculation and
6  conjecture?
7    A    It's not anchored in facts.
8    Q    So where did the plaintiffs get this from, if
9  you know?
10   A    I don't know that.
11   Q    How about the $4,259,658, do you know where
12 the plaintiffs got this from?
13   A    I don't.
14   Q    How about the cash flows provided for under
15 Concord Management; do you know where the plaintiffs
16 obtained the $1,302,158 from?
17   A    That is a product of 5 percent of the planned
18 rent of the property -- and forgive me, it may be the
19 planned rent plus the vouchers -- but that's how they
20 calculated that. And whether they can generate that at
21 this and other properties, again, there's no
22 underpinning there. There's no factual basis to
23 determine whether that is something that they generally
24 get and they regularly get, and there's no agreement
25 that could demonstrate that, at least, that's been

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 66

1  produced to me.
2      Q    So you know where the plaintiffs got this, the
3  cash flows for Concord Management, correct?
4      A    I mean, I know how they calculated each of
5  these.  I just don't know what inputs they used to get
6  to the amounts that produced these numbers.
7      Q    I thought you just told me the input they got
8  to get to 1.3 million.  They took the -- they took
9  the -- a percentage and times it by the rent and the
10  vouchers.
11     A    I did tell you that, but I don't know where
12  they got the input -- well --
13     Q    You know where they got the rent from, right?
14     A    Let me back up.  You're right.  The rent, I
15  think is -- is kind of a fundamental thing that I think
16  can be verified, so you're right.  Forgive me.
17          That's a product of the rent, but the
18  multiplier -- right -- the 5 percent, I don't know if
19  they get 2 percent, I don't know if they get 3 percent,
20  I don't know if they get 5 percent on a regular basis.
21  I don't know if they get 8 percent, right?
22          I don't know what is -- what their model is,
23  because they haven't produced anything other than,
24  "Here's what the damages are in this case."
25     Q    You know what they -- and maybe not off the

Page 67

1  top of your head -- but you know what they -- that they
2  multiplied the rent by -- by a percentage to get to
3  these amounts to Concord Management, right?
4      A    I do, yes.
5      Q    Okay.  And I guess I'm trying to figure out,
6  is your opinion that the amount that they multiplied
7  that by, inaccurate?
8      A    I don't know whether it is or it isn't.
9      Q    You have no opinion on whether or not the
10  amount that Concord Management used to multiply the rent
11  by is inaccurate or accurate, right?
12     A    My opinion is that there hasn't been any
13  information supplied to document that multiplier.
14     Q    Would you have -- do you have any experience
15  or expertise to say that the multiplier is incorrect?
16     A    I mean, I have -- I've seen management fees on
17  lots of damages cases, sometimes they're three,
18  sometimes they're four, sometimes they're seven.  So to
19  render an opinion and say five is the right number, it
20  could be two, it could be seven and that materially
21  changes this.
22     Q    Right.  But I mean who's to say what the
23  management fee is other than Concord Management?
24     A    What's the question?
25     Q    My -- the question is, is basically you're --

Page 68

1  what I think I'm hearing from you is that you're not --
2  you can't render an opinion on whether or not Concord
3  Management's management fee, the multiplier is
4  incorrect, right?
5          You've seen management fees, you just
6  testified, at two, at three, at seven.  What's the --
7  this is a -- let me ask you this:  Do you know how
8  Concord Management arrived at the multiplier?
9      A    I do not.
10     Q    Okay.  And let's say you were going to somehow
11  test the multiplier that Concord Management used, how
12  would you test that?
13     A    Against other properties.  That --
14          (Simultaneously speaking.)
15     Q    Against --
16     A    -- would be one test.
17     Q    Sorry.  I didn't mean to interrupt.  Please
18  continue.
19     A    That's okay.
20          I would test it against other properties to
21  see what they -- they normally received, to see --
22     Q    And did you do that?
23     A    I did not.  I was precluded from doing that
24  because no other property data was provided.
25     Q    Are you qualified to opine as an expert on

Page 69

1  low-income housing tax credits?
2      A    I am.
3      Q    Okay.  How so?
4      A    Well, I mean, we can go through my experience
5  again.  I've been doing this for 20 years.  I've worked
6  on hundreds of construction-related measurement and
7  dispute matters.
8          I'm not sure -- I'm not sure if you want me to
9  go through my experience again, but I've been at --
10          (Simultaneously speaking.)
11     Q    Let's do -- we can do this --
12     A    -- this 22 years.
13     Q    -- you went through your experience previously
14  in your deposition to an answer to one of my prior
15  questions, right?
16     A    That's correct.
17     Q    And you rely upon that same experience with
18  respect to my question about whether or not you qualify
19  to opine as an expert on low-income housing tax credits;
20  is that accurate?
21     A    I think -- let me -- let me add a qualifier,
22  if I may.
23     Q    Sure, you can.
24     A    The actual credits.  I think the actual
25  credits as a mechanism that produces financing -- that

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 70

1  allows for financing in the affordable housing
2  development.
3      Q    Have you ever been an expert in a lawsuit that
4  involved low-income housing tax credits?
5      A    I have not.
6      Q    Have you ever rendered an opinion in
7  litigation that involved low-income housing tax credits?
8      A    No.  But I've rendered an opinion
9  in anticipation of a lawsuit.
10     Q    Okay.  And which -- and was that lawsuit ever
11 filed?
12     A    No.  The parties resolved the matter.
13     Q    Have you ever published anything on low-income
14 housing tax credits?
15     A    Published probably a number of reports as part
16 of being retained as an expert.
17     Q    Wait a second.  But you're talking about being
18 retained as an expert in a non-litigation capacity,
19 correct?
20     A    Yes.  It would probably not be expert
21 retention but consulting retention, to draw that
22 distinction.
23     Q    And I'm talking about publication to the
24 public, right, an article or a peer-reviewed journal.
25 Have you done any type -- do you have any type of

Page 71

1  publications with respect to low-income housing tax
2  credits, using my definition of publications.
3      A    Using your definition, I believe that I
4  published something -- gosh -- it was probably a decade
5  ago.
6      Q    Is it reflected on your report?
7      A    I don't think it is, no.
8      Q    Is there a reason why it isn't?
9      A    Is there a -- is there a reason why something
10 that I published 10 years ago about LIHTC credits are
11 not included in my report; do I have that question
12 correct?
13     Q    That's correct.
14     A    There's no reason for me to included that in
15 my report.
16     Q    With respect to your education, do you have
17 any certifications in LIHTC credits?
18     A    I'm a licensed CPA.  Other than that, no.
19     Q    Are you an expert in affordable housing?
20     A    No.
21     Q    Do you have familiarity with tax credits and
22 bond financing for the affordable housing industry?
23     A    Yes.
24     Q    What is your familiarity with tax credits and
25 bond financing for the affordable housing industry?

Page 72

1      A    They usually go hand in hand.
2      Q    That's it?
3      A    I mean, there's more to it.  I mean, it's
4  included in my report and I can read it to you, but I'm
5  not sure I understand your question.  You asked me if I
6  had familiarity --
7      Q    Right.
8      A    -- and I said yes.  So maybe -- maybe we can
9  have the question read back, maybe I didn't quite --
10     Q    No, I don't think we need to have the question
11 read back, right?  I think you heard my question.
12          I guess, maybe, here -- maybe this will help
13 you, right, you list here on your relevant experience
14 that you have familiarity with tax credits and bond
15 financing for the affordable housing industry; are you
16 just saying that because they go hand in hand or why are
17 you saying that?
18     A    Why am I saying that I have familiarity?
19     Q    You're listing it as relevant experience, sir.
20 So familiarity with tax credits and bond financing for
21 the affordable housing industry, what's your relevant
22 experience?
23     A    I think if you read that one below, experience
24 had on damages associated with low-income housing, tax
25 credits, including the largest ever commericial

Page 73

1  construction dispute between Hanover Insurance and
2  Trinity Development.
3      Q    So that's your experience?
4      A    I've handled other cases with them but none in
5  litigation.
6      Q    Have you ever handled any litigation involving
7  affordable housing?
8      A    No.
9      Q    How about bond financing for the affordable
10 housing industry; have you ever been retained as an
11 expert to opine in a case that involves bond financing
12 for the affordable housing industry?
13     A    No.
14     Q    Have you ever been retained as an expert to
15 opine in a case involving tax credits for affordable --
16 for the affordable housing industry?
17     A    No.
18     Q    Have you ever provided any expert opinions on
19 cost certifications in the state of Florida?
20     A    Can you be more specific?  I'm not sure what
21 you mean by "cost certifications."
22     Q    Do you know what cost certifications are?
23     A    I'm not sure.  No, I'm not.
24     Q    You don't know what cost certifications are,
25 correct?

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 74

1    A    I don't.
2    Q    All right.  Do you know whether or not cost
3  certifications were used to develop my client's damages
4  model in this case?
5    A    I haven't seen that term used once in this
6  litigation.
7    Q    So I will ask the question again:  Do you know
8  whether or not my client used cost certifications to
9  develop its damages model in this case?
10    A    I don't know.
11    Q    Have you ever provided an expert opinion on
12  carryovers in the state of Florida?
13    A    No.
14    Q    You know what carryovers are, though, correct?
15    A    It depends on the context that you're using
16  them.  I don't know if you're talking about a net
17  operating loss, a paper loss or something else.  You'd
18  have to be more specific with your question.
19    Q    Do you know whether or not you ever provided
20  expert opinions on carryovers in the state of Florida?
21    A    I have not.
22    Q    With respect to carryovers, did my client
23  utilize or were they related to my client's damages
24  model in this case?
25    A    I'm looking at their model right now.  Bear

Page 75

1  with me.
2         I see how they used them in their model.
3    Q    You see how they used them?
4    A    Yes.
5    Q    Do you know how rents are determined in
6  Florida for low-income housing developments?
7    A    I do.
8    Q    How?
9    A    I think the rents are set at the affordable
10  housing based on the income levels of the individuals
11  living in the units, and HUD publishes a document that
12  dictates what rents can be collected from the tenants.
13    Q    Have you ever provided an expert opinion on a
14  low-income housing development in the state of Florida?
15    A    I have not.
16    Q    I guess, let me -- that was kind of a weird
17  question.  Let me ask you this way:  Have you ever
18  provided an expert opinion in a case that involved
19  low-income housing development in the state of Florida?
20    A    No.
21    Q    Do you know what an engineered utility
22  allowance is?
23    A    I don't.
24    Q    Do you know whether or not it has any
25  relevance to a tax-credit deal in the state of Florida?

Page 76

1    A    No.
2    Q    Have you ever been involved in a case -- or
3  excuse me.
4         Have you ever been retained as an expert in a
5  case that involved engineered utility allowances?
6    A    I have not.
7    Q    And because you don't know what engineered
8  utility allowances are, I suspect that you can't opine
9  as an expert on that, correct?
10    A    I can't, nor do I see how it's relevant here.
11    Q    And I guess -- let me ask another question.
12  You had not opined, as an expert in this case, on
13  engineered utility allowances, right?
14    A    I have not.
15    Q    That's correct?
16    A    That is correct.
17    Q    Do you know how much rent can be collected
18  from a tenant if they're using a voucher?
19    A    Not specifically.  But it would depend on
20  probably the tenant and the unit that they're in and
21  what the State resources are available to them.
22    Q    In developing your opinion in this case, did
23  you make -- did you ever utilize or calculate how much
24  rent could be collected from a prospective tenant if
25  they used a voucher?

Page 77

1    A    I used -- I guess there are two parts to that
2  answer.  For illustration purposes, I used the amount
3  that was included in the Plaintiffs' Model for the
4  voucher income, the other income, but getting back to
5  the other part of my answer is, did I do anything to
6  determine that.  I tried to.
7         I asked for certain documents at other
8  properties to use as a proxy, as a test for the
9  underpinning for the foundational piece to support -- to
10  support, to demonstrate whether what the plaintiff has
11  presented is overstated or understated, but that
12  information wasn't provided.
13         MR. PICCOLO:  Anyone need to take a break?
14         MS. GAINEY:  I have to use the restroom.
15         MR. PICCOLO:  Okay.  Let's take a break.
16         THE WITNESS:  Okay.
17         MR. PICCOLO:  You want to come back at 10:50?
18         MS. GAINEY:  Sure.  Thanks.
19         THE WITNESS:  Works for me.
20         THE COURT REPORTER:  We're off the record.
21         (A brief recess was taken.)
22         THE COURT REPORTER:  We're back on the record.
23  BY MR. PICCOLO:
24    Q    All right.  Mr. Kelleher, I'm going to share
25  my screen again.  You have rendered an expert opinion on

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 78

1 the mitigation of damages in this case, correct?

2    A    I have.

3    Q    All right.  Have you ever been retained as an

4 expert to render an opinion on the mitigation of damages

5 in any other -- in any prior litigation?

6    A    Yes, definitely.

7    Q    Okay.  Which cases?

8    A    (No response.)

9    Q    And, here, I can go through -- I can go to

10 your list of cases, maybe that will help.

11   A    Yeah.  There's one I can think of right away.

12 LiquidAgents was one of them and so at least that one.

13 I mean, it's a question, a factor in nearly every case

14 that, you know, what's the holistic damages and, you

15 know, did the plaintiff or the defendant -- well, the

16 plaintiff in this case -- did they take actions

17 following a lawsuit that allowed them to minimize any

18 economic impact of hoarded (ph) wrongful act.

19        I'm happy to elaborate on the LiquidAgents

20 mitigation if that's helpful but, at least, that one

21 and --

22   Q    And I guess here -- let me ask a question --

23   A    Sure.

24   Q    -- so we can kind of drill down a little more.

25        So on the list of cases that you're looking at

Page 79

1 which is page -- it's page -- or it's Exhibit 3 to your

2 expert report.

3    A    Yes.

4    Q    Would it be easier for you to tell me every

5 case where you rendered an opinion that involves

6 mitigation of damages, or would it be easier for you to

7 tell me every case that you didn't render an opinion on

8 mitigation of damages in?

9        I know you said it's involved in most cases,

10 so I don't know which way it's easier to ask that

11 question.  You tell me.

12   A    Yeah.  That's a practical way to look at it.

13 Let's go -- I mean, it's a factor -- it's a factor that

14 we look at in nearly every case to see whether it's

15 possible, logical, probable.  So that's always present.

16 I would say that's present in every one of these cases,

17 whether we do or we don't and whether the plaintiff or

18 the party that's been wronged, if they've -- if they can

19 mitigate, I guess.

20        So I guess there's a distinction there -- and

21 I'm sorry to kind of ramble on here -- but we always

22 look to see if there's mitigation potential and whether

23 the plaintiff should have taken action to mitigate their

24 damages.  Whether mitigation is taken and I render an

25 opinion about it, that's a different, I think, question

Page 80

1 and a different qualifier.

2    Q    And that's fair, and that's part of what I

3 want to ask you.  Maybe I'll just get to it now, right?

4    Are you saying -- is your opinion in this

5 case, and it's going to be multi-part, so I'm going to

6 ask you, kind of -- this is a compartmentalized

7 question, I hope it is, at least:  Is your opinion in

8 this case that the plaintiffs failed to mitigate their

9 damages?

10   A    I don't remember enough information to render

11 that opinion.  I certainly think that they could have,

12 should have, would have redeployed capital if they could

13 not use it here in this development.

14   Q    Do you have an opinion on the amount of

15 damages that plaintiff could have mitigated?

16   A    I don't have enough information to be able to

17 say the quantum of that.

18   Q    So is the answer no?

19   A    Can you read back the question?

20   Q    Sure.  And, look, I'm just -- I just need to

21 know what your opinions are for discovery.  I need to

22 know what your opinions are.  This is -- these aren't

23 trick questions.  I'm just asking:  Do you have an

24 opinion on the amount of damages that my client could

25 have mitigated in this case; yes or no?

Page 81

1    A    I think they could have mitigated a material

2 amount of their damages.

3    Q    And when you say "material amount," what does

4 that mean?

5    A    Well, you have a $30 million development here

6 in real estate, right, and the plaintiff is alleging

7 that it could not move forward with that development and

8 the cash flow that it would have generated, right?

9        Is it my opinion that they sat around and did

10 nothing with their capital?  I think that would be

11 incredibly unlikely, incredibly unlikely.

12        I've asked for information about other

13 developments that have not been supplied here, but

14 capital forces would suggest that an experienced

15 developer, construction team like the plaintiffs, would

16 not simply do nothing, but I also have testimony that it

17 conflicts with that, coming from the plaintiff.

18   Q    Okay.  So this is what I want to figure out:

19 I want to figure out whether or not you have an opinion

20 on whether the plaintiffs could have mitigated their

21 damages, whether you have an opinion on whether or not

22 the plaintiffs did or did not, in fact, mitigate their

23 damages, and I want to know whether or not you have an

24 opinion on what was the amount that they could have

25 mitigated their damages, and what was the amount that

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 82

1 they did or did not mitigate their damages, right?  And
2 the distinction --
3        (Simultaneously speaking.)
4    A    Okay.
5    Q    -- being they could have and did, right --
6    A    Okay.
7    Q    And there's -- so I'm not trying to hide the
8 ball on the lease --
9    A    Sure.
10    Q    -- so I just want to start there.
11        Do you have an opinion on whether or not the
12 plaintiffs could have mitigated their damages?
13    A    Yes.
14    Q    Okay.  Do you have an opinion on whether or
15 not the plaintiffs did mitigate their damages?
16    A    I have -- I don't believe I have enough
17 information, other than the testimony from the plaintiff
18 that suggests that they pursued litigation in lieu of
19 any mitigation.  That's the only thing I have.  So I
20 want to answer your question completely because I
21 appreciate this distinction that you're making and thank
22 you for breaking it into the "could" and "did."
23        I don't know what they did, but the testimony
24 said they didn't do anything, because they chose to
25 pursue litigation instead.  But that, I think, is really

Page 83

1 challenging for me to understand and accept, especially
2 if you have an experienced development team.
3    Q    And I guess -- maybe I'll ask it this way:
4 Have you been retained to provide an opinion on whether
5 or not the plaintiffs did mitigate their damages?
6    A    100 percent, I was retained -- that was part
7 of my retention.
8    Q    Okay.  And what are your qualifications to
9 opine on whether or not someone mitigated their damages,
10 not talking about the amount, but they did mitigate
11 their damages?
12    A    My qualifications as an expert accountant
13 would be -- I mean that would be sufficient, right?  If
14 there's an economic loss and that triggered another
15 decision point to deploy capital, that's a measurement
16 issue, right, and that's a measurement issue that
17 could -- I don't know if it did or not -- could be used
18 as an offset.  And I was retained to try and determine
19 the quantum of that.  I could not complete that task,
20 though.
21    Q    Right.  And so let me ask you this:  I mean,
22 generally, when we're talking about the question of
23 whether or not the plaintiffs did mitigate their
24 damages, is that more qualitative to you, or
25 quantitative?

Page 84

1    A    Whether they did, is that more qualitative, or
2 quantitative?  I think it's both.
3    Q    Because I think I'm -- and maybe disagree with
4 me -- but I think I'm making a distinction here
5 between -- and we're going to go through this next,
6 right -- I'm asking you:  Did they mitigate, which, in
7 my mind's eye, is they engaged in some type of action or
8 omission to avoid or reduce damages, and then I think
9 there's a subset to that, is, okay, what are those
10 amounts.  That's more of the quantitative versus the
11 qualitative.
12    A    Uh-huh.
13    Q    Did you agree with that, kind of, logic or
14 what do you make of that?
15    A    What do I make of that?  Qualitatively?  They
16 should have quantitatively.  Did they?  I don't have the
17 information to be able to say whether they did or they
18 did not.
19    Q    Okay.  And so I guess that's where we'll go
20 next is, do you have an expert opinion in this case on
21 the amount of the damages that my client could have
22 mitigated?
23    A    I do.
24    Q    Okay.
25    A    The amount --

Page 85

1    Q    Let's just stop there.  We'll get into -- I
2 just want to know yes or no because we'll go into the --
3    A    Fair enough.
4    Q    So -- and do you have an expert opinion on the
5 amount of the damages that my client did or did not
6 mitigate in this case?
7    A    Not a specific amount, but, you know,
8 materially speaking, if the capital wasn't deployed, the
9 effort, the time, effort, money, resources weren't
10 deployed and their damages span 15-plus years, does that
11 mean nothing happens that mitigates that in those 15
12 years?
13        So qualitatively, yes, they should have.
14 Quantitatively, given that that window of time that
15 they're claiming damages is so wide, quantitatively they
16 absolutely would have minimized that -- that economic
17 impact from that in a material way, and you're going to
18 -- you may or may not ask me what, you know, what I mean
19 by materially.  But, you know, significantly?  Yes.
20    Q    But you don't have a number in this report
21 that says this is the amount that the plaintiffs did or
22 did not mitigate of damages, right?
23    A    I think it would have been nearly all of the
24 damages.
25    Q    But let's stick to the question here, right?

Page 86

1    In your expert report, you don't provide an
2  amount that my clients did or did not mitigate damages,
3  right?
4    A    I do not.
5    Q    And you said that you're going to provide --
6  you're providing an expert opinion on the amount of the
7  damages -- the alleged damages by my client that they
8  could have mitigated, right?
9    A    Correct.
10   Q    Okay.  And what is that amount?
11   A    Nearly all of it.
12   Q    And when you say "nearly all of it," what is
13  that amount?
14   A    If they had any damages, right -- so I have to
15  kind of operate under a number of assumptions here.  So
16  if they had any damages, if I took their model, right,
17  and I corrected it for the dollar amounts and the timing
18  of those dollar amounts, that's the damages with no
19  mitigation.  Assuming all of the facts that I think are
20  absent from the Plaintiffs' Model.  But that -- if I
21  take that amount -- I'm referring to the million 45 --
22  I'm not trying to be cute here --
23   Q    Right.
24   A    -- so I'll wait for you to get to that, right,
25  that million 45 there -- and that's me correcting their

Page 87

1  model -- I'm saying my opinion on mitigation is it could
2  have likely mitigated nearly all of that.
3    Q    Okay.  But your opinion is, is that they would
4  not have mitigated all of it, correct?
5    A    Potentially not.
6    Q    And I guess do you -- I mean, do you really
7  have an opinion, definitively, on what the amount that
8  they could have mitigated?  I know you're saying they
9  potentially could have or potentially could not have; do
10  you know?
11   A    I don't know as a factual matter.  And I think
12  the reason I don't know is it's been asked --
13       (Simultaneously speaking.)
14   Q    They didn't provide you with a factual
15  background.  They didn't provide you with what you asked
16  for, right?
17   A    Agreed, yes.
18   Q    So on this expert case history of your expert
19  report, did you provide any type of analysis on the
20  mitigation of damages in the Stirista case?
21   A    Let me think about that one.
22       I don't think there was any mitigation in that
23  instance.
24   Q    In the LiquidAgents, you said that you
25  provided an analysis -- or you opined on mitigation of

Page 88

1  damages in LiquidAgents case, right?
2    A    That's correct, yes.
3    Q    Did the Jak-a-mow-witz --
4    A    Ja-sim-oe-witz.
5    Q    Jachimowicz --
6    A    Yes.
7    Q    -- case where you provided trial testimony,
8  did you provide any type of expert opinion on mitigation
9  of damages in that case?
10   A    There was no mitigation opportunities
11  available.
12   Q    So the answer is no?
13   A    Correct.
14   Q    In the JMA Wireless, LLC case, did you provide
15  any opinion on mitigation of damages?
16   A    There was no mitigation in that case and no.
17   Q    The answer's no?
18   A    (Remote audio difficulty.)
19       THE COURT REPORTER:  Wait, wait.
20       MR. PICCOLO:  You're breaking up.
21       THE COURT REPORTER:  The audio is going out.
22       (Clarification by the Court Reporter.)
23       (The pending question was read back by the
24       court reporter.)
25  / / /

Page 89

1  BY MR. PICCOLO:
2    Q    Answer?
3    A    My answer -- can you-all here me?
4    Q    Yeah.  I can hear you now.
5    A    Sorry.  Can you hear me?
6    Q    I can hear you now.
7    A    Okay.  JMA Wireless, my opinion was that there
8  was no mitigation that occurred.
9    Q    Any other opinion rendered in that case with
10  respect to mitigation of damages?
11   A    Not that I can think of.
12   Q    And then on the LiquidAgents Healthcare case,
13  succinctly, what opinions did you render on mitigation
14  of damages?
15   A    So the plaintiff in this case, they lost
16  customers related to the action, but they also gained
17  customers that were functionally a result of having
18  available capacity.  So they mitigated their damages by
19  adding new customers to offset the lost customers and
20  the revenue associated with it.
21   Q    So did you opine on whether or not the
22  plaintiff's mitigated their damages in the LiquidAgents
23  case?
24   A    I did.
25   Q    And did you opine on what the amount that the

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 90

1  plaintiffs in the LiquidAgents Healthcare case did or
2  did not, in fact, mitigate their damages?
3      A    I did.  I had the available information.  It
4  was produced as part of the litigation.
5      Q    And then with respect to JMA Wireless, LLC
6  case, I understood your testimony that you simply opined
7  on whether or not the plaintiff could have mitigated
8  damages; is that accurate?
9      A    My opinion was that there was no mitigation
10 opportunities available to them because the plaintiff
11 had a number of operational deficiencies that precluded
12 them from mitigating their damages and largely where the
13 cause of the damages, not any wrongdoing on the
14 defendants -- by the defendant.
15     Q    Were you representing the plaintiff in that
16 case?
17     A    No.  I was representing the defendant.
18     Q    With respect to the deposition testimony in
19 JMA Wireless, LLC, do you still have a copy of the
20 transcript of that, your deposition testimony?
21     A    I do.
22     Q    And how about in LiquidAgents Healthcare, LLC,
23 did you still have a copy of the transcript of your
24 deposition testimony in that case?
25     A    I think so, yes.

Page 91

1      Q    You're able to readily obtain it and
2  potentially provide it to me?
3      A    That's fine with me.
4           THE COURT REPORTER:  Ms. Gainey, did you say
5  something?
6           MS. GAINEY:  Object to form.
7           THE WITNESS:  Counselor, will you have a
8  minute here?  Do you mind if I just switch -- my
9  headset's dying here.  I'm just going to go to
10 speaker on my computer, if you'll allow that.
11          MR. PICCOLO:  Totally fine.
12          (A brief interruption was had.)
13 BY MR. PICCOLO:
14     Q    All right.  So I think you said that your
15 providing an expert opinion in this case on whether or
16 not the plaintiffs could have mitigated their damages,
17 correct?
18     A    Yes.
19     Q    What is your opinion in that regard?
20     A    They could have mitigated their damages.
21     Q    Fair enough.  So how could have plaintiffs
22 mitigated their damages, in your opinion?
23     A    They could have taken the money that they
24 would have invested in this project and invested it
25 in another investment vehicle.

Page 92

1      Q    In your opinion, was there any other actions
2  or omissions that the plaintiffs could have taken
3  to mitigate their damages in this case, other than what
4  you just provided?
5      A    Any other actions that they could have pursued
6  -- not that I can think of.
7      Q    And how about omissions?  Do you know what
8  omissions means?
9      A    Can you maybe ask that question a different
10 way?  I just want to make sure I get to the heart of it.
11     Q    Sure.  I'm not using it in a legally technical
12 sense.  I'm just saying inaction, right?  You're saying,
13 you know, someone can either act or they cannot act, and
14 I'm saying an omission, they didn't do something.
15          Was there anything -- other than what you just
16 described in terms of investing the money in other
17 project, was there anything else, in your expert
18 opinion, that the plaintiff could have done to mitigate
19 their damages, including omissions?
20     A    So the omissions piece, I've read testimony
21 from Mr. Culp that says he decided to sue the defendant
22 in this case instead of mitigating.
23     Q    I don't know if that's really responsive.  I'm
24 not trying to argue.  I'm just trying to get to the
25 bottom of your opinion, right?

Page 93

1           I'm asking -- I'm asking:  Do you have an
2  opinion on that -- your opinion is that the plaintiffs
3  could have mitigated their damages, right?
4      A    Correct.
5      Q    And your opinion is that they could have
6  mitigated the damages by taking the money that they
7  invested in this project and investing it in other
8  vehicle, correct?
9      A    That's correct.
10     Q    Is there anything else that the plaintiffs
11 could have done or could not have done to mitigate their
12 damages, in your opinion?
13          MS. GAINEY:  Object to form.
14     A    None that I can think of.
15     Q    Do you have an opinion on whether or not the
16 plaintiffs did, in fact, mitigate their damages in this
17 case?
18     A    I don't have the information available to
19 reliably render an opinion on that.
20     Q    So the answer is no, correct?
21     A    That is correct.
22          But there's a suggestion that they did develop
23 other properties, and there's a number of emails that
24 reference these other properties.  So to be able to
25 totally and properly assess that, I couldn't do

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 94

1  that exercise but there's certainly evidence in the
2  record that suggests that they did.
3      Q   All right.  But you're not rendering an
4  opinion on this case whether or not the plaintiffs did,
5  in fact, mitigate their damages, right?
6          MS. GAINEY:  Object to form.
7      A   That's correct.
8      Q   Okay.  Now, when you say that plaintiffs could
9  have mitigated their damages by taking the money that
10  they invested in this project and investing it in
11  another vehicle, that's your opinion, right?
12     A   That is.
13     Q   How -- what's the amount that they could have
14  invested in another vehicle?
15     A   All of the money that they invested in this
16  project, all of the capital that they deployed,
17  potentially more.  It really depends on what's on their
18  balance sheet.
19     Q   How much money -- how much capital did they
20  deploy in this project?
21     A   Well, it's the 16 million as the bondholder
22  and then any development costs in advance of that, and I
23  don't have the exact dollar amount of what that is.
24     Q   Was the development cost part of the amounts
25  provided in Paul Missigman's damages model?

Page 95

1      A   Looks like it is.  It's part of the 29 million
2  that's on page 82 -- page 82 of the Plaintiffs' Model.
3      Q   And so the 16 million that you're saying could
4  have been deployed elsewhere, whose coffers was the
5  16 million in that could have been deployed elsewhere?
6      A   I don't have the information available to --
7      Q   Do you know?
8      A   Do I know whose coffers, I guess, whose
9  balance sheet the money was in?  No, I don't.
10     Q   Right.  Because I think what I'm hearing you
11  saying is that, you know, look, the 16 million that was
12  going to be used to buy the bond could have been
13  deployed for other investments to receive gains on that
14  16 million, right?
15     A   Yes.
16     Q   And so do you know whether or not Canton
17  Construction had $16 million to deploy after the bond
18  application was denied?
19     A   No.  But they certainly could have pursued
20  other projects.
21     Q   Canton Construction could have?
22     A   Yes.
23     Q   And what other projects could Canton
24  Construction have pursued?
25     A   There's a number that are referenced in the

Page 96

1  emails but, again, I don't have a complete record of
2  that.
3      Q   And Atlantic Housing Partners, did they have
4  the $16 million that you're referring to, to deploy on
5  other projects; do you know?
6      A   I can't say that definitively.
7      Q   And with respect to Concord Management, do you
8  know whether or not Concord Management had $16 million
9  to deploy after the bond financing application was
10  denied by Brevard County?
11     A   Again, I don't have the financial information.
12  It wasn't provided.
13     Q   So you don't know, correct?
14     A   That's correct.  I don't know, because that
15  information was not provided.
16     Q   Sure.  And so Venue at Heritage Oaks, you
17  don't know whether or not they had $16 million to deploy
18  on other investments after the bond application was
19  denied by Brevard County, right?
20     A   Well, I don't think it's -- I don't think that
21  accurately reflects what the mitigation can and should
22  be.
23     Q   Sure.  You can explain that, but I just want
24  an answer to the question first.
25     You don't know that, right?

Page 97

1          I guess, let me repeat the question.
2          You don't know whether or not Venue at
3  Heritage Oaks had $16 million to deploy after Brevard
4  County denied the bond application, correct?
5      A   I don't think they did.  I know they actually
6  didn't but it's not about that entity.  It's about the
7  principals of that entity.
8      Q   Sure.  Are you going to render an opinion in
9  this case on whether or not the plaintiffs had a legal
10  duty to mitigate their damages?
11     A   You're asking -- I mean, I'm not sure if
12  you're asking me for a legal opinion, I guess.  I'm not
13  going to render a legal opinion, so I guess I'll answer
14  this how I think I should answer it.
15          Did they have a duty to mitigate their
16  damages?  I think that's present in any case.
17     Q   That's not the question, though.  If you can
18  just answer the questions, right, which is this:  Are
19  you going to render an opinion in this case on whether
20  plaintiffs had a legal duty to mitigate their damages?
21     A   I have no legal opinion about that.
22          THE COURT REPORTER:  Ms. Gainey, did you say
23  something?
24          MS. GAINEY:  Object to the form.
25          They're always going to be object to form.  So

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 98

1    if you're not hearing it, I'm sorry.  I'll try to
2    speak up.
3    BY MR. PICCOLO:
4         Q    So the answer is:  You're not going to provide
5    an expert opinion in this case on whether plaintiffs had
6    a legal duty to mitigate their damages, correct?
7         A    That is not my opinion.  I am going to provide
8    an expert opinion that says they should have mitigated
9    their damages.  It is not going to be a legal opinion.
10        Q    Are you contesting that the plaintiffs had a
11   legal duty to mitigate their damages in this case?
12        A    They had a duty to mitigate their damages.
13   That's my expert accounting answer.
14        Q    Correct.
15        A    I didn't have an opinion about what their
16   legal obligation is, because I'm not a lawyer -- which
17   we've covered that already -- so I think I've answered
18   your question sufficiently.
19             If you want to ask me again, I can tell you.
20   I don't have a legal opinion about that.  If that's not
21   the question that's being asked, I would --
22             (Simultaneously speaking.)
23        Q    Yes.
24        A    -- (inaudible) -- that you please --
25        Q    It's not.  It's -- you keep omitting the word

Page 99

1    "legal" from my question.
2             So I will ask it again because it hasn't been
3    answered yet.
4         A    Okay.  Fair enough.
5         Q    Are you going to provide an expert opinion in
6    this case on whether plaintiffs had a legal duty to
7    mitigate their damages; yes or no?
8             MS. GAINEY:  Object to form.
9         A    I got to think about that question.  I
10   don't -- I don't -- there's a couple of qualifiers in
11   there that I'm not comfortable answering.
12             The legal piece is obviously -- I'm struggling
13   with that a little bit.  I don't -- you know, me making
14   an argument about a legal duty, I don't want to go out
15   of my lane, so I'm kind of struggling there, counselor.
16   I'm not trying to be difficult.  What their legal duty
17   was, that would be outside of my purview.
18        Q    Okay.
19        A    Okay.
20        Q    So I guess I will ask this:  Do you know
21   whether or not the plaintiffs had a legal duty to
22   mitigate their damages in this case; do you know?
23        A    I do not.
24        Q    Okay.  So if you don't know, I assume or I
25   infer that you're not going to provide an expert opinion

Page 100

1    in this case that the plaintiffs did have a legal duty
2    in this case to mitigate their damages, right?
3         A    Again, I feel like we're kind of going in
4    circles here a little bit.  I have no legal opinion
5    about that, but it is my expert testimony that they
6    should have.
7             As an expert, when you're harmed economically,
8    you have a duty to mitigate, and you're asking me
9    whether that's a legal argument?  I'm saying, as an
10   expert, you have to -- you have a duty to mitigate your
11   damages.
12        Q    You don't know whether or not that's a legal
13   duty to mitigate damages, right?
14        A    I don't.  I'll leave that to you and
15   Ms. Gainey.
16        Q    Were you instructed to include a mitigation of
17   damages analysis in your expert report?
18        A    I was not.
19        Q    You came up with that on your own?
20        A    Yes.
21        Q    And on your statement opinions on page four of
22   Exhibit 2 to your deposition, under the subtitle, "No
23   Consideration for Mitigation," you provide, quote, the
24   plaintiffs' damages presentation does not consider
25   mitigation that should have and likely did secure as a

Page 101

1    result of the bond denial, if economic harm was caused.
2             When you're referring to, quote, mitigation,
3    again, you're referring there to what the plaintiffs
4    could have taken the money that they were going to
5    invest in the project and invest it in another project,
6    correct?
7         A    Correct.
8         Q    Do you have an opinion on the financial
9    feasibility of developing affordable housing without the
10   benefit of tax credits or bond financing?
11        A    My opinion would be that it's very difficult,
12   if not impossible.
13        Q    Okay.  Did you analyze and come to an opinion
14   on the economic impact on the plaintiffs in this case if
15   they had moved forward with purchasing the property
16   despite having the bond financing denied?
17        A    I did not.
18        Q    Did you analyze the economic impact on the
19   plaintiffs in this case if they were to move forward
20   with purchasing and developing the property without the
21   bond financing?
22        A    I did not do a study related to that.
23        Q    Did you do any analysis or arrive at an
24   opinion on the economic impact on the plaintiffs if they
25   purchased the property and developed the property

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 102

1 without low-income housing tax credits?
2      A    I did not.  And -- I did not.  I did not do
3 that.
4      Q    Okay.  And did you analyze whether it would be
5 financially feasible for the plaintiffs to purchase the
6 property without bond financing and without low-income
7 housing tax credits in charging rent promulgated by HUD?
8      A    Can we read that one back?
9      Q    Sure.  Did you analyze or arrive at any
10 opinion on whether it would be financially feasible for
11 plaintiffs to purchase the property without the bond
12 financing, without low-income housing tax credits, and
13 charging rent promulgated by HUD?
14           MS. GAINEY:  Object to form.
15      A    So I did not do any such exercise.
16      Q    Did you -- do you have an opinion on whether
17 or not the plaintiffs mitigated their damages by not
18 moving forward with purchasing the property after the
19 bond financing application was denied by Brevard County?
20      A    Can you read that question again?
21           MR. PICCOLO:  Madam Court Reporter, can you
22      read it back, please.
23           (The pending question was read back by the
24      court reporter.)
25      A    My opinion is that they could have redeployed

Page 103

1 the capital someplace else.
2           MR. PICCOLO:  Can you read back the question
3      for him, so he can answer it.
4           (The pending question was reread by the court
5      reporter.)
6      A    I don't have an opinion on that, because the
7 information that I would need to render an opinion on
8 that has not been provided.
9      Q    And what information would you need to render
10 opinion on that --
11           (Simultaneously speaking.)
12      A    -- (inaudible) --
13           THE COURT REPORTER:  Wait.
14           THE WITNESS:  Excuse me.
15           MR. PICCOLO:  I didn't hear the end of your
16      question.
17           (Clarification by the Court Reporter.)
18 BY MR. PICCOLO:
19      Q    What information would you need, Mr. Kelleher,
20 to render an opinion on that, that was not provided by
21 the plaintiffs?
22      A    I would need to look at their portfolio of
23 investments from each of the plaintiff entities and
24 other entities that share common ownership with the
25 principals of the plaintiff.

Page 104

1      Q    Do you have an opinion on whether or not the
2 plaintiffs mitigated their damages in this case by not
3 developing the property after Brevard County denied the
4 bond application?
5      A    I don't have an opinion, because I don't have
6 the information available to render an opinion about
7 whether they did or did not mitigate.
8      Q    And when I'm referring to the property in
9 those last set of questions, you know what property I'm
10 referring to, right?
11      A    I do.  The property that is the subject -- I'm
12 assuming it's the subject of this litigation.
13      Q    That's correct.  I just want to make sure for
14 the record.
15      A    So I guess -- and I want to make sure I'm
16 answering your question properly.  I guess the questions
17 that you're asking me, are they specific to this
18 property or, you know -- we're talking about mitigation
19 here.  I guess, I'd ask for some clarity there.  Maybe
20 you've given it, but forgive me if I've overlooked that
21 qualifier in your questions.  I guess that's what --
22      Q    No.  It was more for the record because I know
23 I keep referring to the "property," and we didn't
24 previously -- like we did previously with your report
25 and with plaintiffs' damages model, we defined those

Page 105

1 terms.
2      A    Uh-huh.
3      Q    We didn't define "property," and I just want
4 to make sure, for the record, that we're on the same
5 page when I'm referring to the "property."
6      A    Understood.  I think we are on the same page
7 with respect to that.
8      Q    Do you have any experience with Florida's Live
9 Local Act?
10      A    Other than this -- this case?  No.
11      Q    Are you -- do you contend that you're
12 qualified to opine as an expert on Florida's Live Local
13 Act?
14      A    Not specifically on the act, but on economic
15 damages, where that's a factor, I would say that's not a
16 disqualifier.
17      Q    So are you qualified to opine as an expert on
18 Florida's Live Local Act; yes or no?
19      A    No, no.
20      Q    Do you know how the property, at the time
21 Brevard County denied plaintiffs' bond application, was
22 zoned?
23      A    Not specifically, offhand.  I think it was --
24 my recollection was it was commercial property and part
25 of the Live Local allowed for residential development

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 106

1  with some other qualifiers.
2      Q    On page five of Exhibit 2 to your deposition,
3  I'll quote from your expert report that you say, quote,
4  one of the principals of the plaintiffs' states in their
5  testimony that they were litigating this matter in lieu
6  of mitigating the damages, viewing these avenues as
7  mutually exclusive.
8          Where did you get that?
9      A    If you look at that footnote, if I can scroll
10 down, please.
11     Q    Sure.
12     A    Let me make sure I've got the right footnote
13 here.
14     Q    There is no footnote after what I just quoted
15 for you, if that helps.
16     A    So there's -- that footnote references -- and
17 I want to answer this in its entirety -- but that
18 footnote refers to an email, but then there's also
19 reference made, but not specific, and I think that's
20 what you're question is.
21     Q    Which footnote are you referring -- I don't
22 see a footnote there, so which one are you referring to?
23     A    To footnote nine there, subject of this
24 litigation.
25     Q    Yeah?

Page 107

1      A    Second line, you see that footnote, and it
2  says "Jay Brock" down at the bottom.
3      Q    Yes.
4      A    So that's referring to some emails about other
5  developments.
6      Q    And then you go on, you have -- so let's just
7  be clear for the record -- footnote nine is right after
8  litigation and then there's a comma, and then it says
9  and -- it says, quote, and one of the principals of the
10 plaintiffs states in their testimony that they were
11 litigating this matter in lieu of mitigating the
12 damages, viewing these avenues as mutually exclusive,
13 period.
14         No footnote.
15     A    So I was getting there, and that's not a quote
16 either.
17     Q    I was quoting from your expert report.
18     A    Fair enough.
19         So Mr. Culp, I know, has testimony when asked
20 about this very issue of mitigation, and I did -- I
21 specifically reference it here.  I did not -- I made
22 reference to it, I guess I just wasn't specific to which
23 pages it was on in his deposition.  It may be in another
24 place in my report, but that's -- it's in his deposition
25 testimony.

Page 108

1      Q    Okay.  So you pulled -- so the source for your
2  assertion in your expert report that, quote, one of the
3  principals of the plaintiffs state in their testimony
4  that they were litigating this matter in lieu of
5  mitigating the damages, viewing these avenues as
6  mutually exclusive, end quote.  That is from Scott
7  Culp's deposition testimony, right?
8      A    That's correct.
9      Q    Do you agree with the statement that
10 litigation and mitigation are mutually exclusive?
11     A    No.
12     Q    Do you have an opinion on whether the
13 plaintiffs in this case could have avoided damages or
14 mitigated their damages in a reasonable manner without
15 undue risk?
16         MS. GAINEY:  Object to form.
17         MR. PICCOLO:  What's the basis?
18         MS. GAINEY:  (No response.)
19         MR. PICCOLO:  Ms. Gainey, what's the basis for
20 that objection?
21         MS. GAINEY:  I'm sorry?
22         MR. PICCOLO:  What's the basis for that
23 objection?
24         MS. GAINEY:  Object to form.
25         MR. PICCOLO:  I understand the -- what's the

Page 109

1  form that you're objecting to?
2          MS. GAINEY:  If you repeat the question, I'll
3  state it more succinctly.
4          MR. PICCOLO:  Sure.  Madam Court Reporter, can
5  you repeat that question.
6          (The pending question was read back by the
7  court reporter.)
8          MS. GAINEY:  Well, it's a compound question
9  and it doesn't clearly define what you mean by
10 undue risk.
11 BY MR. PICCOLO:
12     Q    Do you know what undue risk means,
13 Mr. Kelleher?
14         MS. GAINEY:  In the context of this
15 litigation, it doesn't clarify.
16         But go ahead, answer as you may.
17     A    All right.  So we have two questions pending.
18 BY MR. PICCOLO:
19     Q    Here, let's get -- let's cut to the chase.
20 I'm not going to hide the ball.
21         On page five of your expert report, you
22 provide a quote from AICPA's Forensic and Valuation
23 Services Practice Aid:  Calculation Lost Profits, and it
24 goes on to say, quote, a defendant that argues that a
25 plaintiff has failed to mitigate damages may attempt to

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 110

1  show how the plaintiff could have avoided damages in a
2  reasonable manner without undue risk but did not do so.
3          Is that in your report, sir?
4      A   You just read it from my report, so, yes, you
5  know that.
6      Q   Okay.  And so are you providing an opinion on
7  whether or not the plaintiffs in this case have failed
8  to have mitigate their damages by not undertaking,
9  within a reasonable manner and without undue risk,
10  certain actions?
11     A   My opinion is, I do not have the information
12  to be able to assess whether they mitigated their
13  damages or not.
14         Could they have without undue risk?  Yes.
15  They are a developer.  They have -- they have
16  represented that they have dozens, hundreds of
17  properties, and capital forces would certainly suggest
18  and require that they redeploy capital that otherwise
19  could have been used on this project.
20     Q   Whose capital would have been redeployed?
21     A   Any of the principals who are part of this
22  action.
23     Q   But are not parties to this action, right?
24     A   I mean, you're making a distinction there that
25  I think is misleading.

Page 111

1      Q   It's obviously -- it's a distinction.  I mean,
2  let me ask you this:  Is Scott Culp a plaintiff to this
3  case?
4      A   He is a principal of the plaintiffs.
5      Q   I didn't ask that.  I didn't ask that.  Answer
6  the question, sir.  Is Scott Culp a plaintiff to this
7  case?
8      A   He is a not plaintiff.
9      Q   Is Paul Missigman a plaintiff to this case?
10     A   He is not.
11     Q   Okay.  Who's the other principal plaintiff
12  that you referred to, Michael -- what's his last name?
13     A   Scariano?
14     Q   Is Michael Scariano a plaintiff in this case?
15     A   No.
16     Q   Which of the plaintiffs' capital are you
17  referring to that could have been deployed, the
18  plaintiffs?
19     A   All of them.
20     Q   All of them.  And how much of the capital?
21  What's the amounts?
22     A   I mean, again, you're making a distinction
23  here, and I'm looking at this holistically.  There's --
24  and if I don't look at it holistically, it leads to,
25  really, an unrealistic -- and it leads to a situation

Page 112

1  where there's unjust enrichment.
2          If I were to ignore this other entity that
3  you're suggesting I ignore, and any of the capital that
4  they would have put in, even though the plaintiffs are
5  owners of that entity, if I ignore that and -- and just
6  because they're not named in this litigation and there's
7  a judgment that's rendered in this and we ignore the
8  economic benefit that is associated with that other
9  entity he's -- investment in this, the outcome of that
10  is going to be an enrichment issue where all the parties
11  have more than they did before, and how they carve that
12  up is, to me, is semantics.
13     Q   Is it your opinion that the distinction
14  between owners of entities and entities, themselves, is
15  semantics?
16     A   It could be.
17     Q   Really?  You're a CPA, right?
18     A   Yes.
19     Q   All right.  Do you deal with tax -- tax
20  accounting, at all?
21     A   No.
22     Q   No.  Okay.  Do you deal with balance sheets?
23     A   Yes.
24     Q   Would you agree with me that the balance
25  sheets of an entity are not the same balance sheets of

Page 113

1  an owner?
2      A   They certainly affect the owner, though.
3      Q   Not my question.
4      A   They're not the same.  They're not.  I mean
5  that's the simple way, but it's -- this is not a simple
6  matter, so . . .
7      Q   Right.  So it's not a matter of semantics that
8  an owner is different than an entity, right?
9      A   (No response.)
10     Q   Right?
11     A   I think with respect to economic loss, it is.
12     Q   Do you have an opinion on whether Brevard
13  County has shown that reasonable mitigation
14  possibilities existed but were not acted upon by
15  plaintiffs?
16     A   I don't have an opinion on that.
17     Q   All right.  Let's go back to Schedule 1 of
18  your expert report, and then we're looking at the
19  claimed cash flow of -- by plaintiffs.  These are the
20  cash flows of each of the plaintiffs, at least as
21  provided by the plaintiffs, right?
22     A   Correct.  Except that column under Venue at
23  Heritage Oaks where that bond amount has been flipped
24  forward.
25     Q   Correct.  I agree with you on that.

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 114

1    And so on -- you have one chart that provides
2  the claimed cash flow by the plaintiffs from Schedule 3,
3  and then you have a second chart right next to it that
4  says PV of claimed cash flow by plaintiffs; do you see
5  that on Schedule 1 to Exhibit 2 to your deposition?
6    A    I do, yes.
7    Q    And so in the -- in the chart on the -- on the
8  right, the PV of claimed cash flow by plaintiffs, you
9  have discounted some of the amounts in the claimed cash
10 flow by plaintiffs on the left chart.  Right?
11   A    I discounted nearly all of them except 2024.
12   Q    Right.  So when you are discounting future
13 cash flows to present value, you have to use a discount
14 rate, correct?
15   A    That's correct.
16   Q    Where, in your expert report, do you provide
17 the discount rates -- or scratch -- strike that.
18        When you did this analysis and you discounted
19 the amounts on the chart on the left to the present
20 value on the chart on the right, you used plaintiffs'
21 discount rate, right?
22   A    I did.
23   Q    And the discount rate was 9 percent for all
24 amounts except for the sale of the property which was
25 15 percent, right?

Page 115

1    A    Correct.
2    Q    Do you have an expert opinion on the
3  appropriate amount of the discount rate that should have
4  been used by the plaintiffs in their damages model?
5    A    I do not, because the information related to
6  that was not provided.
7    Q    Okay.  Because you haven't done, anywhere in
8  your expert report, another analysis that says:  Here's
9  what the plaintiffs have claimed their cash flow is, and
10 here's what they should have discounted it by, and these
11 are the -- the present values of those amounts, right;
12 you didn't do that in your expert report, correct?
13   A    I didn't.  But a small change in that discount
14 rate, as you probably know, can materially change the
15 outcome here.  I think that that was part of my opinion.
16 I just didn't use a different discount rate.
17   Q    Discount rates are based upon the potential
18 risk involved with the future cash flows, right?
19   A    That's correct.
20   Q    So do you think that the cash flows of each of
21 the plaintiffs' entities had the same risk profile?
22   A    I don't have enough information to be able to
23 opine on that.
24   Q    On page 11 of Exhibit 2 to your deposition,
25 which is your expert reports, you provide, quote, Culp's

Page 116

1  testimony confirms that the development fee may not be
2  achieved and would be subject to discounting.
3        Do you see that?
4    A    Yes.
5    Q    And the development fee that you're referring
6  to is the future cash flow for Atlantic Housing
7  Partners, right?
8    A    That's correct.
9    Q    And when you say, on page 11, that Culp's
10 testimony confirms that the development fee may not be
11 achieved, what do you mean by "may not be achieved"?
12   A    I mean, it's his testimony so, I mean, I guess
13 my understanding of his testimony is what I'll give you.
14 But if the project doesn't have sufficient cash flow to
15 pay the developer fee, there would be a shortfall there,
16 and that's the reason for my commentary about that is
17 I'm pointing that out.  I'm saying this development fee
18 is not automatic.  It's subject to the facts and
19 circumstances of the development and things that arise
20 that are a part of that.
21   Q    So it's your opinion that he could have but --
22 excuse me.
23        It's your opinion that Atlantic Housing
24 Partners could have realized the development fee, but it
25 also could not have realized the development fee, right?

Page 117

1    A    May have, may not have or it may have taken
2  longer than expected to realize it, I guess, is the
3  third distinction there.
4    Q    On that third distinction, why is that an
5  issue?
6    A    I mean, you'd have to ask Mr. Culp, that's his
7  testimony.  He said if there's not enough cash coming
8  from the sources of the project to pay the developer,
9  they might have to wait on part of that and it might
10 come out of the cash flow of the project.
11   Q    Would it be deferred; do you know if it could
12 be deferred?
13   A    It could be.  I think that's what his
14 testimony is.
15   Q    So then it wouldn't come out of the cash flow
16 of the project if it was deferred, correct?
17   A    It would.  Deferred but still paid is paid
18 later.
19   Q    Right.  But it could have been paid later by
20 the sale of the property, correct?
21   A    Yes.  That would be another instance of
22 deferral.
23   Q    And do you know whether or not the
24 plaintiffs -- if there was a deferral of the development
25 fee, whether or not the plaintiffs would have earned

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 118

1  interest on the deferred amount; do you know?
2      A   I don't know that.  I don't think I have the
3  terms of the development fee agreement.
4      Q   Do you have any idea what the plaintiffs'
5  track record is on achieving its development fees in
6  similar projects in the past?
7      A   I don't know what that track record is, but I
8  would -- I've certainly invited that track record to
9  become part of my analysis, it just has not been met
10 with any kind of substantive response.
11     Q   When you say, "has not been met by any
12 substantive response," you're talking about documents
13 being produced?
14     A   Yeah.  Let me just plainly state it.  Like, I
15 asked counsel -- and I believe they passed along these
16 requests -- for other properties to use as an
17 underpinning for this, understanding that each property
18 has its own wrinkles, none of that information was
19 provided, and it may or may not have been used by the
20 plaintiff, but I can't tell.
21     I can't test that to see whether they picked,
22 you know, the best outcome from each of the last, you
23 know, 10 properties they did or if they picked some mix
24 of each of those data points to be used.  I just can't
25 tell that, and I wish I had.  I think it would -- it

Page 119

1  would provide more underpinning to any kind of opinion,
2  but it's just absent here.
3      Q   Did you have the -- do you have the deposition
4  transcript of Scott Culp when you -- when you made your
5  expert report?
6      A   I did.
7      Q   Do you have the deposition testimony of Paul
8  Missigman when you made your expert report?
9      A   I did.
10     Q   Did you have the deposition transcripts of any
11 other persons associated or employed by any of the
12 plaintiffs?
13     A   I did not.
14     Q   So Scott Culp and Paul Missigman were the only
15 deposition transcripts that you had in terms of
16 developing this report?
17     A   That's correct.
18     Q   You didn't get -- you didn't get the
19 deposition testimony of Jonathan Thomas?
20     A   No.
21     Q   On page 20 of your expert report, you have a
22 subsection titled, "Conclusion," and you provide that:
23 I hold the following opinions to a reasonable degree of
24 accounting certainty.
25     Do you see that?

Page 120

1      A   I do.
2      Q   You say in here one of the opinions that you
3  hold with a reasonable degree of accounting certainty is
4  that the Plaintiffs' Model by their accountant's own
5  admission was not peer reviewed; do you see that?
6      A   I do, yes.
7      Q   What's your definition of peer reviewed?
8      A   It's an evaluation that's done on some
9  professional level.
10     Q   And when you're referring to, "by their
11 accountant's own admission," what accountant are you
12 referring to?
13     A   Missigman.
14     Q   Paul Missigman.  Do you know what his
15 qualifications are?
16     A   I understand that he is an accountant.
17     Q   Would you consider Paul Missigman a
18 professional?
19     A   I mean, I've only read his deposition.
20 Certainly, it seems that way, yes.
21     Q   Was your opinion peer reviewed --
22     A   Yes.
23     Q   -- your expert report?
24     Your expert report was peer reviewed?
25     A   Yes, sir.

Page 121

1      Q   By whom?
2      A   One of my colleagues.
3      Q   What's your colleague's name?
4      A   Lexi May.
5      Q   Where does Lexi May work?
6      A   Meaden Moore.
7      Q   What's her position with Meaden Moore?
8      A   She's a partner.
9      Q   Are you a partner?
10     A   I am.
11     Q   And you said Lexi May, or Lexi Moore?
12     A   Lexi May of Meaden & Moore.  She goes by
13 Alexandria -- she goes by Lexi but her name is
14 Alexandria.  That's a mouthful.
15     Q   And so Lexi May is a co-owner of Meaden &
16 Moore which you also are an owner of, correct?
17     A   That's correct.
18     Q   And the defendant in this case is paying
19 Meaden & Moore for your expert opinion in this case,
20 right?
21     A   That's correct.
22     Q   And did anyone else, aside from Lexi May,
23 provide peer review of this expert report?
24     A   No.
25     Q   You say that your opinion that the plaintiffs

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 122

1  did not -- strike that.
2          You say that you have an opinion, based upon a
3  reasonable degree of accounting certainty,
4  that plaintiffs undertook or should have undertaken
5  efforts to meet its duty to mitigate any perceived
6  damages, right?
7      A    That's correct.
8      Q    How do you -- what does accounting have to do
9  with determining whether or not plaintiff undertook or
10 should have undertaken efforts to meet its duty to
11 mitigate any perceived damages?
12     A    What does accounting have to do --
13     Q    And the reason I ask is you say, "I hold the
14 following opinions to a reasonable degree of accounting
15 certainty." I mean, what -- what's the reasonable --
16 what's the degree of accounting certainty that you have
17 that plaintiffs undertook or should have undertaken
18 efforts to meet its duty to mitigate any perceived
19 damages?
20     A    Well, the plaintiffs in this case. They're
21 asserting an economic harm. So assessing whether they
22 could and should have mitigated their damages is part of
23 the measurement of certainty.
24         So if I -- if we go back to one of the
25 examples that we talked about, if there's some alleged

Page 123

1  wrongful act that results in a shortfall to the
2  aggrieved party, and as a result of that shortfall, the
3  aggrieved party turns around and redeploys capital and
4  they receive a benefit from that, they've made an effort
5  to mitigate. That's an economic accounting issue that
6  has to be assessed when we're analyzing damages.
7      Q    Are you an economist?
8      A    No.
9      Q    So what's the account -- what accounting did
10 you perform to arrive at that opinion?
11     A    The plaintiff has alleged a cash-flow loss
12 associated with this, and the accounting, it is my
13 expert opinion that they could have taken that money and
14 generated cash flow in some other manner.
15     Q    The accounting and -- but, yet, you don't even
16 know what the amount that they had to redeploy to
17 potentially mitigate damages, right?
18     A    No. I do. They have at least this much
19 capital, right?
20     Q    What capital, how much?
21     A    All of the capital that's part of this
22 project.
23     Q    Which is what amount?
24     A    At least 16 million.
25     Q    Who had 16 million?

Page 124

1      A    The principals of the plaintiffs.
2      Q    The plaintiffs didn't have 16 million, though,
3  correct?
4      A    Well, they had access to it.
5      Q    Oh, really? How did they have access to it?
6      A    Well, they were going to be the bondholders,
7  the principals of the plaintiffs.
8      Q    Right. How did the plaintiffs have access to
9  $16 million?
10     A    Well, if I'm an owner in one business over
11 here and, you know, that business was going to buy the
12 bond, and now this project is no longer, that same set
13 of circumstances, facts and circumstances, could be
14 applied to another project. Where me, as an owner in a
15 different entity, could have taken that capital that
16 would have been used as the bondholder and used it in a
17 different project.
18     Q    Right. I understand -- I understand how the
19 bondholder could have redeployed the $16 million worth
20 of capital, but what I'm failing to understand -- and I
21 think you just said the plaintiffs have access to
22 $16 million because there's somehow common ownership
23 here, is that -- I guess, let me ask the question: It's
24 your opinion that the plaintiffs had access to
25 $16 million because the principals of plaintiffs had

Page 125

1  $16 million?
2      A    Yes.
3      Q    And when you say "access," what type of access
4  is that?
5      A    Well, it's the same -- it's a similar
6  ownership structure in the bondholder.
7      Q    What does it mean "access"? You used the word
8  "access," so what do you mean by access?
9      A    So if I'm Scott Culp and I'm the bondholder,
10 I'm Scott Culp, Paul Missigman, and this other
11 gentleman -- who I'm not going to try and say his last
12 name again -- but if I have this bond-holding entity and
13 I also have a real estate development project that is a
14 different LLC, the bondholder is not the plaintiff but
15 it's the same principals, and I lose out on a project
16 that that bondholder was going to come in and buy the
17 bond and I go and pursue a different project, that
18 bondholder buys the bonds on that other project, I
19 don't -- you know, I'm failing to kind of understand
20 what you're suggesting how that wouldn't -- how that
21 shouldn't be looked at holistically to really assess
22 what the total accounting damages are in this instance.
23     Q    So MSPJ, right -- would it change your opinion
24 if MSPJ Bond Holdings, LLC had an additional member that
25 was not Scott Culp or was not Paul Missigman or was not

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 126

1  Michael S.?
2      A    I would have to look at all the holdings of
3  each of these entities to see how that is.  It might
4  change my opinion, it might not, too.
5      Q    Right.  So if there's a -- say there's another
6  member of MSPJ Bond Holdings, LLC that's not a, quote,
7  principal of the plaintiffs, would you agree with me, at
8  that point, that now the plaintiffs don't just have
9  access to take $16 million and redeploy wherever they
10 want, because the principals of the plaintiffs have to
11 go get someone else's authority and approval to do so,
12 right?
13     A    Yeah.  I don't think it's like a yes or no
14 answer, right?  It's not like yes or no.  It depends on
15 what the controlling interest is and, you know, so I
16 think it really depends on the ownership structure.
17     Q    Sure.  So if that other member of the LLC had
18 authority or authorization or control to veto the rights
19 of whether or not $16 million could be deployed
20 elsewhere, you would agree with me, at that point, that
21 the plaintiffs don't have access to the $16 million as
22 you're saying?
23         MS. GAINEY:  Object to form.
24     A    (No response.)
25     Q    Right?  Because you're saying, hey, MSPJ Bond

Page 127

1  Holdings, LLC is -- is owned by the same three people
2  that are owned by the plaintiffs and that the plaintiffs
3  can go and just go ahead and take the 16 million from
4  SPJ (sic) Bond Holding, LLC, but they're going to deploy
5  on the plaintiffs' project and go deploy it somewhere
6  else and that's how they mitigate their damages because
7  we have to look at this holistically and it's just a
8  matter of semantics, right?
9      A    I think I understand your question.  If there
10 was -- so let me jump back two questions, if I may.
11     Q    Sure.
12     A    If there was veto power there, okay, I think
13 that could change things.  I haven't seen anything to
14 demonstrate there's veto power there.  I think it's just
15 been holistically ignored from this.
16     Q    And you don't know whether or not there's
17 another potential member of MSPJ, LLC -- or excuse me --
18 MSPJ Bond Holdings, LLC as you sit here right now,
19 correct?
20     A    I think there is, but there's many different
21 kind of netted entities that own each of the plaintiffs.
22 So when I look at, you know, who the owners are of each
23 of these entities, and then there's an order chart
24 that's in the document production, so do I know it
25 offhand, as we sit here today, I think was your

Page 128

1  question?  I don't know exactly, but we can pull it up
2  and look at it.  It's just -- I don't know it off the
3  top of my head.
4      Q    Well, if there is, you certainly -- you
5  certainly considered that, right?
6      A    I did.
7      Q    And so how would that -- how did that play on
8  your opinion then, if there's this other member of MSPJ
9  Bond Holding, LLC that's not the principal of the
10 plaintiffs?
11     A    You're telling me that they have veto power.
12 I don't have any information to suggest that there's
13 veto power, so I have $16 million in capital that the
14 plan was deploy it and then collect tax exempt interest
15 on it, and you're saying there's veto power where --
16     Q    I'm not -- I'm not saying that.  I said to
17 assume it for my question -- but I guess maybe this
18 is -- maybe this is more germane, right?  Your
19 assumption is that this -- this other member of the LLC
20 does not have veto power, right?
21     A    Correct.
22         MS. GAINEY:  Object to form.  I think you're
23     assuming facts not in evidence and you're running
24     around in circles here, but please continue.
25         I mean, the org chart is in his file.  If you

Page 129

1      would like him to pull it up, but we can just keep
2      going.
3      Q    Did you assume when you -- when you engaged in
4  this mitigation analysis that the other member of the
5  LLC that was not a principal of plaintiffs did not have
6  veto power?
7      A    That is -- that is an assumption that I used,
8  yes.
9      Q    And what was you're assumption based upon?
10     A    I don't have any information to conflict with
11 that, so I went with what I had and what was produced.
12     So if you're telling me there's veto power
13 now, right, and that's pretty -- you know, factually
14 important matter, I would -- I would question why that
15 wasn't produced before, and I would question the
16 veracity of any kind of veto power that materializes
17 post litigation and at the 11th hour of discovery.
18     So, you know, there's certain things that I
19 have to do as I look through this.  Looking at it
20 holistically is one element, and you're asking me why I
21 assumed it; why would I assume anything else?
22     Q    Yeah.  You're right.  I get it.  You're making
23 assumptions -- had to make assumptions.  I get it.
24     So with respect to the macroeconomic factors,
25 tell me how that impacted plaintiffs' damages.

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 130

1    A    Well, I think that's more abstract.  It's, you
2  know, what -- what could have happened to the bond
3  interest here?  If the interest went up, it could have
4  reduced the cash flows.  The rising costs of
5  construction, you know, how that would have affected it,
6  I think, is more abstract.
7        But, certainly, the interest rate is more
8  quantitative if that interest rate was a floating
9  rate -- which I think I saw some information in the
10  credit underwriting report suggesting that it was -- at
11  least one tranche of the bond was going to be a floating
12  interest rate, that's how it would affect the damages.
13    Q    You're not an economist, right?
14    A    I'm not.  But I think you're making a
15  distinction here where I think one is not appropriate.
16    Q    I'm just asking you questions, sir.
17        And so -- so with respect to rising costs
18  of construction, what accounting did you use to come up
19  with that?
20    A    My knowledge, experience and training.  It's
21  very specialized, what I do, and I know that
22  construction costs rise over time.  And, you know, we
23  don't need to look any further than the last five years
24  to realize that relevant and germane point.
25    Q    That's an accounting principle, that

Page 131

1  construction costs rise over time?
2    A    Absolutely.  Any economic factors are in a
3  damages case.
4        MS. GAINEY:  Michael, may I have another
5    restroom break whenever you --
6        MR. PICCOLO:  I'm almost done, if you don't
7    mind just bearing with me for five minutes.
8        MS. GAINEY:  I'm just going to have few
9    questions though, too.  So just FYI.
10        MR. PICCOLO:  All right.  That's fine.
11  BY MR. PICCOLO:
12    Q    On the reliability issue, you provide, quote,
13  the plaintiffs' presentation of damages is not anchored
14  in facts nor is it based on sufficient factual evidence
15  that can be tested and is therefore deemed unreliable.
16        Do you see that?
17    A    I do.
18    Q    You're not here to opine, nor are you
19  qualified to opine, on what's admissible evidence in a
20  court of law, correct?
21    A    That's correct.  But there's a bar for
22  measuring --
23    Q    You answered the question.
24        Do you know whether --
25    A    Hold on.  Hold on.  Please stop interrupting

Page 132

1  me.
2    Q    What is -- what is responsive more than the
3  yes or no?  It was a yes-or-no question.
4    A    It's my answer, right?  You're asking me the
5  question.  I'm giving you the answer and you're
6  cutting --
7        MR. PICCOLO:  Nonresponsive.
8    Q    Go ahead.  Continue.
9    A    Can you read the question back, please.
10        (The requested question, beginning on Page
11    131, Line 18, was read back by the court reporter.)
12    A    I am qualified as an expert.  I have to know
13  what the criteria are in order to render an opinion that
14  is anchored in facts and defensible.
15        Using assumptions that are with no factual
16  underpinning, as an accounting expert, as a CPA, I am
17  qualified to do that.
18  BY MR. PICCOLO:
19    Q    Are you qualified to render an opinion as an
20  expert on what is admissible evidence in a court of law?
21    A    No.
22    Q    I'm sorry.  I misunderstood your question.
23  I'm just -- I'm trying to be as specific as I can, and
24  if that, you know, is displeasing to you, well, it's not
25  meant to be.

Page 133

1    Q    Do you know whether a person's testimony, upon
2  which they have personal knowledge, is admissible
3  evidence in a court of law?
4    A    I don't know that specifically, but I know
5  what the bar is for reasonable accounting certainty and
6  that is part of my expert qualifications.
7    Q    You say on the accuracy point, that --
8  (inaudible) -- in both its inputs and the timing of the
9  inputs --
10        THE COURT REPORTER:  I'm sorry.  I need you to
11    repeat that.
12        (Clarification by the Court Reporter.)
13        MR. PICCOLO:  Sure.
14  BY MR. PICCOLO:
15    Q    You say on your accuracy conclusion that,
16  quote, the 2.6.25 Plaintiffs' Model contains numerous
17  errors in both its inputs and the timing of the inputs;
18  do you see that?
19    A    I do.
20    Q    Do you quantify what the amount of the errors
21  are in your expert report?
22    A    I do.
23    Q    Okay.  Where, in your expert report, do you
24  quantify that?
25    A    Well, I think they would be fundamentally

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 134

1  baked into the difference between the 14 million and the
2  1 million.
3      Q    So it's quantified in Schedule 1?
4      A    If you go up one, that $13 million difference
5  is the timing and accuracy and --
6      Q    And that -- sorry.  Please continue.  I didn't
7  mean to interrupt.
8      A    I'm sorry.
9           So just to make a clear distinction here, the
10 timing and accuracy of the inputs is what that
11 13 million is.  The difference between the zero and the
12 14 million is really the factual underpinning, right?  I
13 don't have any factual information.  I have -- I have
14 testimony and I have your clients' model, but I don't
15 have the factual underpinning.
16          There is another place that I do quantify a
17 specific difference that's baked into this, but let me
18 just pause there.
19     Q    And you're referring to the $13,377,567 on
20 page -- on this page two of your summary, correct?
21     A    That's correct.
22          But there's also another instance where I
23 quantify part of the damages differences as far as the
24 timing and accuracy.  It's more about accuracy, and I'm
25 happy to elaborate on that.

Page 135

1      Q    Where is that in your report?
2      A    Let me find it.  If you search 8 million -- I
3  think it's just 8M -- it's in the narrative component of
4  the report.
5      Q    Oh, right there.
6      A    Okay.  You got it.
7      Q    (Peruses document) -- make sure it stops.
8  Okay.
9          MR. PICCOLO:  I have no further questions at
10 this time.
11         MS. GAINEY:  Just a few points of
12 clarification.
13              CROSS-EXAMINATION
14 BY MS. GAINEY:
15     Q    I think you maybe misspoke and I want to
16 clarify.  You were asked what depositions you had
17 available to you, and if you look on page 19 of your
18 report, it looks -- appears you also relied on Jay
19 Brock's deposition which you didn't mention when you
20 answered the question; is that right, Mr. Kelleher?
21     A    Let me catch up to you.  Did you say page 19?
22     A    Correct.  Down in the footnotes, it looks like
23 you cite to --
24     A    Yeah.  That's not his deposition.
25     Q    Okay.  Excuse me.  Let me rephrase.

Page 136

1          You had his documents available to you?
2      A    His documents, not his deposition.
3      Q    Correct.  And then if you go back to page 12,
4  you were asked about Mr. Thomas, and you refer to
5  Mr. Thomas's documents which Mr. Missigman relied on;
6  did you have Mr. Thomas's documents available to you to
7  which Mr. Missigman relied upon?
8      A    (No response.)
9      Q    I'm in the third paragraph down in
10 parentheses.
11     A    So Mr. Thomas -- just to the clarify --
12 Mr. Thomas provided inputs to Mr. Missigman, and I do
13 have -- I do have Mr. Missigman's testimony to
14 that effect, and I also have -- if my recollection
15 serves me correctly -- is some emails between these two
16 gentlemen.
17     Q    The MSPJ Bond Holdings, which we spent some
18 time talking about, it's Bates stamped down in the
19 right-hand corner.
20         MS. GAINEY:  And I'll attach this as an
21 exhibit.  It's Bates stamped RRTPBC 015003.
22     Q    Is this the organizational chart you were
23 referring to?
24     A    It is.
25     Q    And I have it put up on the screen.  Does it

Page 137

1  refresh your recollection regarding anything you may not
2  have been able to testify to in your direct examination,
3  as far as the ownership of the MSPJ Bond Holdings?
4      A    Yeah.  I would -- I guess I would have to look
5  at this side by side with the plaintiffs' entities to
6  see if all these individuals that are kind of sitting in
7  this nested flowchart are also entity -- are also
8  principals in the plaintiff entities.
9          Reading these names off:  Scott
10 Culp, Missigman, Jonathan Thomas, and MJS irrevocable
11 and revocable trust which I'm assuming is Michael
12 Scariano.
13     Q    His name's actually Michael J. Scariano.
14     A    Okay.  So we're making an assumption that
15 that's one and the same, and those -- those are all
16 parties who have been officers, managers of these other
17 related entities that are plaintiffs in this action, and
18 there's no question that there's affiliation here.  It's
19 included in the credit underwriting report and the
20 credit underwriting application that the plaintiff
21 submitted.
22     Q    And MSPJ just so happens to be the same
23 initials as Michael, Scott, Paul, and John, correct?
24     A    That could be happenstance, but it's unlikely,
25 but those are the same initials.

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 138

1          MS. GAINEY:  I don't have anything further,
2    thank you.
3          THE COURT REPORTER:  Do you want this to be
4    Plaintiffs' 1, or No. 3?
5          MS. GAINEY:  No.  It's Defendant's 1.
6          That's all I have.  Thank you.  And we'll --
7    he'll read and sign.
8          MR. PICCOLO:  We take a copy.
9          MS. GAINEY:  We'll take a copy, too.
10         (The reading and signing of this deposition
11   were reserved.)
12         (The deposition concluded at 12:18 p.m.)
13         (Plaintiffs' Exhibits 1 and 2 were marked for
14   identification.)
15         (Defendant's Exhibit 1 was marked for
16   identification.)
17
18
19
20
21
22
23
24
25

Page 139

1                    CERTIFICATE OF REPORTER
2    STATE OF FLORIDA)
     COUNTY OF ORANGE)
3
4          I, JENNIFER B. SANDERS, Registered
5    Professional Reporter, Florida Professional Reporter, do
6    hereby certify that I was authorized to and did,
7    remotely, stenographically report the foregoing video
8    conference deposition of PATRICK KELLEHER, CPA, CFF;
9    that a review of the transcript was requested; and that
10   the foregoing transcript, pages 4 through 138, is a true
11   record of my stenographic notes.
12         I FURTHER CERTIFY that I am not a relative,
13   employee, attorney or counsel of any of the parties, nor
14   am I a relative or employee of any of the parties'
15   attorneys or counsel connected with the action, nor am I
16   financially interested in the action.
17
18         Signed this 24th day of March 2025, Orange
19   County, Florida.
20
21
22            Jennifer B. Sanders, RPR, FPR-C
23
24
25

Page 140

1                    CERTIFICATE OF OATH
2    STATE OF FLORIDA)
     COUNTY OF ORANGE)
3
4          I, Jennifer B. Sanders, Registered
5    Professional Reporter, Florida Professional Reporter, a
6    Notary Public for the State of Florida, certify that the
7    witness, PATRICK KELLEHER, CPA, CFF, remotely appeared
8    before me, via video conference, on this 19th day of
9    March 2025, and was sworn remotely.
10         WITNESS my hand and official seal this 24th
11   day of March 2025.
12
13   Identification:  Massachusetts Driver's License
14
15
16
17
18        Jennifer B. Sanders, RPR, FPR-C
          Notary Public - State of Florida
19        Commission #HH 582377
20        My Commission Expires: 9/16/2028
21
22
23
24
25

Page 141

1                      ERRATA SHEET
2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE
3     IN RE:  ATLANTIC HOUSING PARTNERS L.L.L.P., a Florida
     limited liability partnership, et al, v. BREVARD COUNTY,
4       a  political subdivision of the state of Florida
5             PATRICK KELLEHER, CPA, CFF
6                   March 19, 2025
7             U.S. Legal Job No. 6831134-001
8    _____
9    PAGE      LINE        CHANGE              REASON
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
23   are true.
24   DATE:_____    _____
25                             Patrick Kelleher, CPA, CFF

Patrick Kelleher, CPA, CFF
March 19, 2025

Page 142

```
1              WITNESS NOTIFICATION LETTER
2   March 24, 2025
3   Patrick Kelleher, CPA, CFF
    c/o Susan Gainey, Esquire
4   Roper P.A.
    255 S. Orange Avenue, Suite 750
5   Orlando, FL  32801
6   IN RE:  ATLANTIC HOUSING PARTNERS L.L.L.P v. BREVARD
7   COUNTY
8         DEPOSITION TAKEN ON MARCH 19, 2025
9         U.S. LEGAL SUPPORT JOB NO.:  6831134-001
10  The transcript of the above-referenced proceeding has
    been prepared and is being provided to your office for
11  review by the witness.
12  We respectfully request that the witness complete their
    review within a reasonable amount of time and return the
13  errata sheet to our office at the below address or via
    email to:  Southeastproduction@uslegalsupport.com.
14
15  Sincerely,
    Jennifer B. Sanders, RPR, FPR-C
16  U.S. Legal Support, Inc.
    16825 Northchase Drive
17  Suite 800
    Houston, Texas  77060
18  (407) 649-9193
19
20  CC via transcript:  Michael Piccolo, Esquire
21
22
23
24
25
```

Patrick Kelleher, CPA, CFF
March 19, 2025

## Exhibits

EX 0001 Patri
ck Kelleher,
 CPA,
 CFF DEFT 031
925
  3:14,18
  10:8,10,13
  138:15
EX 0002 Patri
ck Kelleher,
 CPA,
 CFF PLTF 031
925
  3:16 12:23
  20:12 28:14
  100:22 106:2
  114:5 115:24
EX 0001 Patri
ck Kelleher,
 CPA,
 CFF PLTF 031
925
  79:1

## $

$1,302,158
  65:16
$1,428,584
  30:11 31:2
  34:23 35:3
  65:1
$13
  134:4
$13,377,567
  134:19
$15
  46:23 49:2
$15,648,106
  49:3,18
$16
  95:17 96:4,
  8,17 97:3
  124:9,19,22,

25 125:1
126:9,19,21
128:13
$30
  81:5
$4
  52:25
$4,259,658
  52:25 53:15
  64:16,22
  65:11
$60,000
  54:11
$920,367
  57:21

## (

(1)
  18:2 20:14
(A)
  17:15
(B)
  17:15

## 0

015003
  136:21

## 1

1
  10:8,10,13
  28:13 34:8,
  15 35:6
  36:10 113:17
  114:5 134:2,
  3 138:4,5,
  13,15
1.3
  66:8
1.4
  33:14 34:23
10
  71:10 118:23

100
  16:20 23:16
  25:11 83:6
104
  6:14 7:24
10:50
  77:17
11
  115:24 116:9
1104
  4:20
11th
  129:17
12
  136:3
12:18
  138:12
13
  134:11
131
  132:11
14
  134:1,12
15
  39:7,9,10
  51:15 85:11
  114:25
15-plus
  85:10
155
  4:19
16
  94:21 95:3,
  5,11,14
  123:24,25
  124:2 127:3
17
  6:5
18
  132:11
19
  10:25
  135:17,21

## 2

2
  12:23 20:12
  28:14 30:2
  34:6,24 52:1
  66:19 100:22
  106:2 114:5
  115:24
  138:13
2.6
  6:4,7 29:2
2.6.2025
  6:13
2.6.25
  133:16
20
  69:5 119:21
2024
  7:9 33:15
  35:1,3,8
  38:6 114:11
2025
  21:7,12 35:8
  52:7 57:19
2026
  57:19,20
2040
  38:22,23
22
  69:12
24
  33:18
25
  22:8 33:16,
  18
26
  17:2,3,8,14
279
  32:24
28
  9:6,10
  10:18,21,24
  11:3,13,24
  12:4,10,11
  21:12

Patrick Kelleher, CPA, CFF
March 19, 2025

**28,2025**
  12:16
**29**
  95:1

---

**3**

**3**
  34:16 35:13
  56:2 66:19
  79:1 114:2
  138:4
**31**
  45:19

---

**4**

**4**
  30:15 35:1
  36:4 52:3
**446**
  52:8
**446,028**
  52:7
**45**
  86:21,25

---

**5**

**5**
  65:17 66:18,
  20
**500**
  19:3
**57**
  12:17

---

**6**

**6**
  21:7
**6.30.25**
  32:25
**60-something**
  52:15

**6th**
  21:3,5

---

**7**

**7**
  21:2
**702**
  17:6

---

**8**

**8**
  66:21 135:2
**81**
  6:13,14 7:24
**82**
  95:2
**8M**
  135:3

---

**9**

**9**
  114:23

---

**A**

**able**
  21:17 80:16
  84:17 91:1
  93:24 110:12
  115:22 137:2
**absent**
  33:16 64:12,
  13,14 86:20
  119:2
**absolutely**
  29:15 85:16
  131:2
**abstract**
  130:1,6
**accept**
  54:19 55:25
  56:1 83:1

**accepted**
  64:8
**access**
  124:4,5,8,
  21,24 125:3,
  7,8 126:9,21
**account**
  123:9
**accountant**
  22:6 41:9
  83:12
  120:11,16
**accountant's**
  120:4,11
**accounting**
  22:9 64:9
  98:13 112:20
  119:24 120:3
  122:3,8,12,
  14,16 123:5,
  9,12,15
  125:22
  130:18,25
  132:16 133:5
**accumulate**
  33:9
**accuracy**
  20:15 22:5
  28:20 30:19
  37:12 133:7,
  15 134:5,10,
  24
**accurate**
  34:17,19
  35:4 61:24
  64:23 67:11
  69:20 90:8
**accurately**
  96:21
**achieved**
  116:2,11
**achieving**
  118:5
**acquisition**
  24:14
**acronym**
  40:6,8

**act**
  78:18 92:13
  105:9,13,14,
  18 123:1
**acted**
  113:14
**action**
  79:23 84:7
  89:16
  110:22,23
  137:17
**actions**
  78:16 92:1,5
  110:10
**actual**
  27:2 55:21
  69:24
**add**
  49:9 69:21
**adding**
  89:19
**additional**
  125:24
**address**
  4:17,19,21
**adjustments**
  36:19,24
  37:4,23,24,
  25 38:1,17,
  18
**admissible**
  131:19
  132:20 133:2
**admission**
  120:5,11
**admit**
  9:14
**advance**
  94:22
**affect**
  5:2,7 11:8
  55:21 113:2
  130:12
**affected**
  130:5
**affiliated**
  45:22

Patrick Kelleher, CPA, CFF
March 19, 2025

affiliation
  137:18
affordable
  23:2 24:19
  25:15,18
  27:14,18
  28:4,10 58:2
  62:16,23
  63:4 70:1
  71:19,22,25
  72:15,21
  73:7,9,12,
  15,16 75:9
  101:9
aggrieved
  123:2,3
ago
  8:20 22:3
  27:14 71:5,
  10
agree
  52:19 54:6,7
  59:2,9 84:13
  108:9 112:24
  113:25
  126:7,20
agreed
  9:9 12:20
  20:18 87:17
agreement
  65:24 118:3
ahead
  50:17 51:1
  109:16 127:3
  132:8
AICPA's
  109:22
aid
  8:22 109:23
air
  61:2
Alexandria
  121:13,14
alleged
  86:7 122:25
  123:11

alleging
  81:6
allow
  63:10 91:10
allowance
  75:22
allowances
  76:5,8,13
allowed
  78:17 105:25
allows
  70:1
amortizing
  56:22
amount
  12:6 34:24
  35:8 41:16
  52:13,25
  55:24 67:6,
  10 77:2
  80:14,24
  81:2,3,24,25
  83:10 84:21,
  25 85:5,7,21
  86:2,6,10,
  13,21 87:7
  89:25 94:13,
  23 113:23
  115:3 118:1
  123:16,23
  133:20
amounts
  37:9,10,13
  51:21,23
  52:1,19,21
  53:6,10,13
  55:1 59:2,11
  60:14,16,21,
  25 61:1 62:5
  66:6 67:3
  84:10 86:17,
  18 94:24
  111:21
  114:9,19,24
  115:11
analogous
  57:14

analysis
  19:8 57:13,
  18,23 87:19,
  25 100:17
  101:23
  114:18 115:8
  118:9 129:4
analyze
  101:13,18
  102:4,9
analyzing
  123:6
anchor
  58:6
anchored
  53:6,11 60:9
  65:7 131:13
  132:14
answer
  7:16 14:2,19
  15:3,6,15,23
  23:19 25:20,
  23 26:1
  41:15,19
  42:20 51:17
  53:5 60:3
  61:12,14
  69:14 77:2,5
  80:18 82:20
  88:12 89:2,3
  93:20 96:24
  97:13,14,18
  98:4,13
  103:3 106:17
  109:16 111:5
  126:14
  132:4,5
answer's
  88:17
answered
  50:11,14
  98:17 99:3
  131:23
  135:20
answering
  33:21 58:8
  99:11 104:16

answers
  41:6
anticipation
  22:20 70:9
anyone
  8:10 77:13
  121:22
apologize
  55:10
appears
  36:19 135:18
application
  32:2 95:18
  96:9,18 97:4
  102:19 104:4
  105:21
  137:20
applied
  64:5 124:14
appreciate
  5:10 82:21
appropriate
  115:3 130:15
approval
  126:11
areas
  27:18
argue
  92:24
argues
  109:24
argument
  99:14 100:9
arise
  116:19
around
  81:9 123:3
  128:24
arrive
  101:23 102:9
  123:10
arrived
  59:10 68:8
article
  70:24
asked
  22:18 45:9

Patrick Kelleher, CPA, CFF
March 19, 2025

48:3 51:14
58:12 72:5
77:7 81:12
87:12,15
98:21 107:19
118:15
135:16 136:4
asking
15:24,25
23:22 40:14
41:11 44:12
47:4 54:18
58:9 60:13
80:23 84:6
93:1 97:11,
12 100:8
104:17
129:20
130:16 132:4
asserting
122:21
assertion
108:2
assess
93:25 110:12
125:21
assessed
123:6
assessing
122:21
assistant
10:2
associated
26:20 28:21
29:7,8 30:20
56:5 72:24
89:20 112:8
119:11
123:12
assume
7:16 99:24
128:17
129:3,21
assumed
129:21
assuming
7:4 57:24

86:19 104:12
128:23
137:11
assumption
128:19
129:7,9
137:14
assumptions
8:25 86:15
129:23
132:15
Atlantic
35:16 36:17,
18,20 38:2
40:2 41:1,11
42:2,13,21
52:24 53:1,
16 54:17
56:15,25
96:3 116:6,
23
attach
136:20
attempt
109:25
attempting
51:10,11
attorney
11:19
audio
49:13 88:18,
21
authority
126:11,18
authorization
126:18
automatic
116:18
available
58:4 76:21
88:11 89:18
90:3,10
93:18 95:6
104:6 135:17
136:1,6
avenues
106:6 107:12

108:5
avoid
84:8
avoided
108:13 110:1
aware
19:9 42:11

B

back
7:8 14:25
20:9 23:9
25:7,8,13
30:22 33:18
39:10 42:19
53:20 60:9
61:13 66:14
72:9,11
77:4,17,22
80:19 88:23
102:8,22,23
103:2 109:6
113:17
122:24
127:10
132:9,11
136:3
background
54:14 87:15
backing
56:8
badgering
48:10
baked
38:22 134:1,
17
balance
18:20 94:18
95:9 112:22,
24,25
ball
82:8 109:20
bar
131:21 133:5
base
9:1

based
26:8 44:6,
13,17 46:13,
23 59:23
60:17 63:2,3
64:2,16
65:2,5 75:10
115:17 122:2
129:9 131:14
baseline
63:11
bases
13:4,9,20,23
14:5,11,16
15:12,25
16:3,18
18:4,9,14
19:10
basic
56:19
basically
67:25
basis
13:14 14:14,
20 15:7
18:12 38:18
55:3 63:9
65:22 66:20
108:17,19,22
Bates
6:14 9:11
136:18,21
bear
5:6,8 9:11
32:16 34:6
43:16 74:25
bearing
131:7
begin
24:16
beginning
132:10
behind
44:5
believe
18:7 23:10
42:14 45:9

Patrick Kelleher, CPA, CFF
March 19, 2025

46:21 52:12
55:1,5 57:12
60:16 63:1
71:3 82:16
118:15
**belong**
49:8
**belongs**
49:5,7
**below**
52:8 72:23
**benefit**
39:8 48:16,
21 101:10
112:8 123:4
**best**
14:8 118:22
**bills**
12:5
**bit**
5:5 55:14
99:13 100:4
**board**
22:10 26:3,6
**body**
19:2
**bond**
29:7 46:1,7,
10,24 47:6
49:10 52:4
55:11,12,21
56:10,14,18,
20 57:2,19
59:16 71:22,
25 72:14,20
73:9,11
95:12,17
96:9,18 97:4
101:1,10,16,
21 102:6,11,
19 104:4
105:21
113:23
124:12
125:17,24
126:6,25
127:4,18
128:9 130:2,

11 136:17
137:3
**bond-holding**
125:12
**bondholder**
39:7 40:5,
18,19,21
41:2,12,14
42:21,25
43:3,6,9
44:8,15,20
46:6,25
47:11 55:17
56:3,5,6
94:21
124:16,19
125:6,9,14,
16,18
**bondholders**
39:3,13,16
124:6
**bonds**
39:6 56:21
125:18
**borrow**
56:19
**borrowed**
56:18
**Boston**
4:20 27:15
**bottom**
6:12 17:5
92:25 107:2
**break**
77:13,15
131:5
**breaking**
82:22 88:20
**breaks**
5:13
**Brevard**
96:10,19
97:3 102:19
104:3 105:21
113:12
**brief**
20:8 77:21

91:12
**bring**
5:23
**Brock**
107:2
**Brock's**
135:19
**brought**
64:11
**Builders**
22:10 26:6
**bumpers**
21:22
**burned**
27:21
**business**
26:22,24
27:3 41:9
124:10,11
**buy**
95:12 124:11
125:16
**buying**
39:6
**buys**
125:18

---

## C

**calculate**
76:23
**calculated**
65:20 66:4
**calculation**
14:1 109:23
**calculator**
7:2
**call**
32:18
**called**
9:7
**calling**
9:9
**Canton**
23:8 30:11,
23 31:1,8,14

34:22 38:3
40:2 43:1,2
52:10 53:25
54:10,21
57:14 65:2
95:16,21,23
**capacity**
27:4 70:18
89:18
**capital**
80:12 81:10,
14 83:15
85:8 94:16,
19 103:1
110:17,18,20
111:16,20
112:3 123:3,
19,20,21
124:15,20
128:13
**Carriage**
38:16
**carryovers**
74:12,14,20,
22
**carve**
112:11
**case**
4:12 8:16
11:20 12:8,
12 13:2,6,11
14:6,17
15:13 16:4,
19 17:12,24
19:15,19,22,
25 20:5
21:19 38:8
39:2,20
44:22,25
46:11 64:5
66:24 73:11,
15 74:4,9,24
75:18 76:2,
5,12,22
78:1,13,16
79:5,7,14
80:5,8,25
84:20 85:6

Patrick Kelleher, CPA, CFF
March 19, 2025

87:18,20
88:1,7,9,14,
16 89:9,12,
15,23 90:1,
6,16,24
91:15 92:3,
22 93:17
94:4 97:9,
16,19 98:5,
11 99:6,22
100:1,2
101:14,19
104:2 105:10
108:13 110:7
111:3,7,9,14
121:18,19
122:20 131:3
**cases**
67:17 73:4
78:7,10,25
79:9,16
**cash**
28:20,24
29:1,3,4,5,
6,7,8 30:1,
8,10,14,16,
19,22,25
31:5,14,21
33:3,8,25
34:15,17,25
35:12,20,23
36:10,12,16,
18,20,24,25
37:5,6,16,
19,20 38:1,
18 49:1
51:24 52:2,
5,18,23
54:9,12
55:6,22
56:4,24
57:6,7 58:24
59:2,3,6,11
60:2,12,15
62:6 63:3
65:14 66:3
81:8 113:19,
20 114:2,4,

8,9,13
115:9,18,20
116:6,14
117:7,10,15
123:14 130:4
**cash-flow**
123:11
**cash-out**
39:4
**catch**
135:21
**category**
11:10
**caused**
101:1
**caveat**
57:11
**certain**
24:12,16
38:11 41:16
43:21 46:19
55:24 58:3
77:7 110:10
129:18
**certainly**
41:22 58:1,9
80:11 94:1
95:19 110:17
113:2 118:8
120:20
128:4,5
130:7
**certainty**
15:23 28:19
119:24 120:3
122:3,15,16,
23 133:5
**certifications**
71:17 73:19,
21,22,24
74:3,8
**certified**
22:7
**CFF**
4:3 12:16

**challenge**
27:17
**challenging**
22:1 83:1
**change**
37:3 52:21
55:12
115:13,14
125:23 126:4
127:13
**changed**
11:25
**changes**
37:7 67:21
**characterize**
62:22
**charge**
59:19
**charged**
59:21
**charging**
102:7,13
**chart**
45:20 114:1,
3,7,10,19,20
127:23
128:25
136:22
**chase**
109:19
**checks**
12:5
**choice**
21:21
**chose**
82:24
**circles**
100:4 128:24
**circumstances**
64:6 116:19
124:13
**circumvent**
41:25
**cite**
135:23
**city**
4:24 26:9

**Civil**
17:3,9
**claimed**
30:8,10,14,
25 33:3
34:15,25
35:2,12
36:12,18
37:20 38:19
52:2 113:19
114:2,4,8,9
115:9
**claiming**
85:15
**clarification**
9:4 14:24
49:17 61:9
88:22 103:17
133:12
135:12
**clarify**
109:15
135:16
136:11
**clarity**
104:19
**clear**
11:17 14:15
46:3,15
107:7 134:9
**clearly**
24:18 38:7
55:14,21
109:9
**client**
46:17 74:8,
22 80:24
84:21 85:5
86:7
**client's**
60:15 74:3,
23
**clients**
46:23 61:1
86:2
**clients'**
134:14

close
  34:5
co-owner
  121:15
coffers
  95:4,8
cold
  5:6
collaboration
  62:13
colleague's
  121:3
colleagues
  121:2
collect
  128:14
collected
  75:12 76:17,
  24
column
  34:22 35:15
  36:3 49:4,7,
  9 52:6,10
  53:1,16
  54:18 55:19
  113:22
columns
  35:12 49:6
come
  77:17 101:13
  117:10,15
  125:16
  130:18
comfortable
  99:11
comma
  107:8
comment
  32:15
commentary
  116:16
commercial
  105:24
commericial
  72:25
committed
  12:4 48:24

committee
  26:16
common
  22:6 43:13,
  14 47:8
  103:24
  124:22
commonalities
  45:10
commonality
  46:25
communication
  s
  8:21 11:11,
  18
community
  64:9
company
  28:1
compartmental
  ized
  80:6
compensation
  20:4
complete
  12:25 18:3,
  8,11 32:4
  58:10,11,17,
  19 83:19
  96:1
completed
  27:15 31:9
completely
  82:20
component
  135:3
components
  60:12
compound
  109:8
comprehensive
  18:19,25
  19:4
computer
  91:10
concept
  46:24 56:19

concluded
  138:12
concluding
  15:17
conclusion
  119:22
  133:15
conclusions
  41:23 46:19
Concord
  36:23,25
  37:5 40:3
  43:5 54:23
  65:15 66:3
  67:3,10,23
  68:2,8,11
  96:7,8
conference
  26:17,19
confidential
  12:17
confirms
  116:1,10
conflict
  129:10
conflicts
  52:11 81:17
conjecture
  59:24 60:17,
  22,25 61:2
  63:1 64:16
  65:3,6
consider
  23:14 24:19
  25:2 55:23
  100:24
  120:17
Consideration
  100:23
considered
  11:20 17:22,
  25 19:4,14
  43:19 45:7
  47:18,21,23
  128:5
construct
  24:10

construction
  22:11 23:1,
  4,8,12,15,22
  24:15,17,23
  25:2,19,21
  26:4,7,19
  27:16 30:11,
  24 31:1,8,9,
  10,14,22
  32:4,10,15,
  24 34:22
  38:3 40:3
  43:2 52:10
  54:1,10,21
  57:14 65:2
  73:1 81:15
  95:17,21,24
  130:5,18,22
  131:1
construction-
related
  22:14 69:6
consulting
  27:7 70:21
contaging
  5:12
contained
  25:16
contains
  18:8,11
  133:16
contend
  105:11
content
  26:17,18
contesting
  98:10
context
  22:18 23:20
  74:15 109:14
continue
  10:23 68:18
  128:24 132:8
  134:6
contract
  52:11,12
  54:1,10,11

57:15
**contractor**
24:12 32:2
**contractual**
22:21 27:8,
10,11
**control**
126:18
**controlling**
126:15
**copies**
6:16
**copy**
6:1 9:11
20:18 29:24
90:19,23
138:8,9
**corner**
6:12 35:21
136:19
**correct**
7:5 10:3,4
11:22 12:13
13:22 16:8,
9,21,22
20:20,21
21:5,6,8,12,
13 28:11,12
30:8,11,12,
20,21 31:24
33:1,6,12
35:5,8,14
36:15,21
37:6,8 39:1,
14,18 40:22
41:2 44:11,
23 46:2,7,8,
12 47:3
51:16 52:22
53:22 57:5,9
59:5 60:23
62:2 63:20
64:25 66:3
69:16 70:19
71:12,13
73:25 74:14
76:9,15,16
78:1 86:9

87:4 88:2,13
91:17 93:4,
8,9,20,21
94:7 96:13,
14 97:4
98:6,14
101:6,7
104:13 108:8
113:22,25
114:14,15
115:1,12,19
116:8
117:16,20
119:17
121:16,17,21
122:7 124:3
127:19
128:21
131:20,21
134:20,21
135:22 136:3
137:23
**corrected**
35:20,23
36:10,16
37:6 49:1
52:18 55:6
86:17
**correcting**
34:18 86:25
**correction**
35:9
**correctly**
51:16 136:15
**corresponded**
8:19
**correspondence**
9:2 11:1
**cost**
73:19,21,22,
24 74:2,8
94:24
**costs**
94:22 130:4,
17,22 131:1
**coughing**
5:6

**counsel**
8:12,19,22,
25 9:9 10:14
21:3 26:24
27:2,25 51:7
118:15
**counselor**
91:7 99:15
**County**
96:10,19
97:4 102:19
104:3 105:21
113:13
**couple**
99:10
**course**
6:8 7:13
11:23 20:19
**court**
4:8 9:4,12
14:22,24,25
15:4,9 20:10
24:4 25:6,9
49:15,17
61:7,9
63:18,19,23
77:20,22
88:19,21,22,
24 91:4
97:22
102:21,24
103:4,13,17
109:4,7
131:20
132:11,20
133:3,10,12
138:3
**cover**
32:6
**covered**
52:5 98:17
**Covid**
5:6
**CPA**
4:3 12:16
71:18 112:17
132:16

**created**
11:1,2
**credit**
27:20 38:9,
10,13,14
44:9 45:20
130:10
137:19,20
**credits**
69:1,19,24,
25 70:4,7,14
71:2,10,17,
21,24 72:14,
20,25 73:15
101:10
102:1,7,12
**criteria**
59:16,17
132:13
**CROSS-EXAMINATION**
135:13
**Culp**
23:7 44:2
45:1 62:14,
23 63:2
92:21 107:19
111:2,6
117:6 119:4,
14 125:9,10,
25 137:10
**Culp's**
62:15 108:7
115:25 116:9
**curating**
26:17
**current**
52:18
**customers**
89:16,17,19
**cut**
11:23 50:1
109:19
**cute**
86:22
**cutting**
132:6

Patrick Kelleher, CPA, CFF
March 19, 2025

**D**

**damages**
27:24 28:18
42:1 46:23
53:7,14 54:4
66:24 67:17
72:24 74:3,
9,23 78:1,4,
14 79:6,8,24
80:9,15,24
81:2,21,23,
25 82:1,12,
15 83:5,9,
11,24 84:8,
21 85:5,10,
15,22,24
86:2,7,14,
16,18 87:20
88:1,9,15
89:10,14,18,
22 90:2,8,
12,13 91:16,
20,22 92:3,
19 93:3,6,
12,16 94:5,
9,25 97:10,
16,20 98:6,
9,11,12
99:7,22
100:2,11,13,
17,24 102:17
104:2,25
105:15 106:6
107:12
108:5,13,14
109:25
110:1,8,13
115:4 122:6,
11,19,22
123:6,17
125:22 127:6
129:25
130:12
131:3,13
134:23

**data**
8:22 11:19
17:21,25
19:14 35:24
36:7 44:14
53:12,21
54:19,24
58:3 60:10
64:2,21
68:24 118:24
**date**
21:1
**dated**
9:6,10
**day**
47:14
**days**
8:20 32:24
**deal**
75:25
112:19,22
**debt**
38:21 56:5,
20
**decade**
71:4
**decided**
92:21
**decision**
19:7 83:15
**deduction**
49:3
**deem**
15:17
**deemed**
131:15
**defendant**
78:15 90:14,
17 92:21
109:24
121:18
**defendant's**
11:19 138:5,
15
**defendants**
90:14

**defensible**
132:14
**deferral**
117:22,24
**deferred**
117:11,12,
16,17 118:1
**deficiencies**
90:11
**define**
105:3 109:9
**defined**
104:25
**definitely**
78:6
**definition**
59:25 62:3
71:2,3 120:7
**definitively**
87:7 96:6
**degree**
23:13 63:20
119:23 120:3
122:3,14,16
**demonstrate**
40:20 53:14
65:25 77:10
127:14
**demonstrated**
28:18
**denial**
101:1
**denied**
95:18 96:10,
19 97:4
101:16
102:19 104:3
105:21
**depend**
76:19
**depends**
42:17 74:15
94:17
126:14,16
**deploy**
83:15 94:20
95:17 96:4,

9,17 97:3
127:4,5
128:14
**deployed**
85:8,10
94:16 95:4,
5,13 111:17
126:19
**depo**
8:14
**deposed**
7:4,7,8
**deposition**
5:14,24 6:9
7:13,20 8:2,
11 9:15
10:1,8,10,14
12:24 20:1,
13,20,25
21:2 28:14
33:23 69:14
90:18,20,24
100:22 106:2
107:23,24
108:7 114:5
115:24
119:3,7,10,
15,19 120:19
135:19,24
136:2
138:10,12
**depositions**
135:16
**described**
62:3 92:16
**descriptor**
35:22
**desktop**
6:21
**detailed**
52:15
**determine**
65:23 77:6
83:18
**determined**
75:5

Patrick Kelleher, CPA, CFF
March 19, 2025

determining
122:9
develop
24:11 74:3,9
93:22
developed
101:25
developer
24:13 27:21
28:3 38:14
81:15 110:15
116:15 117:8
developer's
38:5
developing
26:17 62:16
63:4 76:22
101:9,20
104:3 119:16
development
23:1,12,14,
23 24:22
25:17 26:20,
23 27:12,15
41:21 58:3
64:15 70:2
73:2 75:14,
19 80:13
81:5,7 83:2
94:22,24
105:25
116:1,5,10,
17,19,24,25
117:24
118:3,5
125:13
developments
28:5,10
62:24 75:6
81:13 107:5
develops
26:25
dictate
59:20
dictates
75:12
difference

134:1,4,11,
17
differences
134:23
different
25:11 41:10
79:25 80:1
92:9 113:8
115:16
124:15,17
125:14,17
127:20
difficult
25:25 99:16
101:11
difficulty
49:14 88:18
direct
4:9 137:2
disagree
84:3
disclosure
12:15
Disclosures
17:2
discount
33:10,25
114:13,17,
21,23 115:3,
13,16,17
discounted
33:4,18
36:13 114:9,
11,18 115:10
discounting
33:7 114:12
116:2
discovery
58:21 80:21
129:17
discussion
8:12
displeasing
132:24
dispute
69:7 73:1

disqualifier
105:16
distinction
42:9,11
46:15 53:4
70:22 79:20
82:2,21 84:4
110:24
111:1,22
112:13
117:3,4
130:15 134:9
distinctly
20:24 21:4
distracted
45:14
doctor
10:3
document
12:4,18
18:18,21,25
19:6 67:13
75:11 127:24
135:7
documents
5:24 6:1,6
10:13 11:2,
14,18 19:4
32:11 40:11,
20,24 43:19
44:14 45:7
46:17 47:13,
18,21,23
48:13,16,21
62:19 77:7
118:12
136:1,2,5,6
doing
45:24 68:23
69:5
dollar
52:21 86:17,
18 94:23
dozens
22:12,13
110:16
draw
46:19 70:21

drawing
41:23
drill
78:24
driving
42:18
duces
9:25
duly
4:4
duration
32:9,15
duty
97:10,15,20
98:6,11,12
99:6,14,16,
21 100:1,8,
10,13 122:5,
10,18
dying
91:9

E

earlier
20:17
earned
117:25
easier
79:4,6,10
economic
27:23 28:18
42:1 54:3
78:18 83:14
85:16 101:1,
14,18,24
105:14 112:8
113:11
122:21 123:5
131:2
economically
100:7
economist
123:7 130:13
education
71:16

effect
  136:14
effort
  85:9 123:4
efforts
  14:14 122:5,
  10,18
eight
  30:7,15
  45:18
either
  11:15 51:8
  56:15,25
  92:13 107:16
elaborate
  78:19 134:25
electronic
  5:24
electronically
  8:19
element
  18:21 129:20
else's
  126:11
email
  106:18
emails
  11:5 93:23
  96:1 107:4
  136:15
employed
  119:11
end
  103:15 108:6
ended
  8:14
engage
  24:12
engaged
  84:7 129:3
engagement
  22:15
engagements
  22:14
engages
  26:23

engineered
  75:21 76:5,
  7,13
enrichment
  51:18 112:1,
  10
Entirely
  64:13
entirety
  106:17
entities
  40:4 41:10
  43:11,12,21,
  25 45:4
  103:23,24
  112:14
  115:21 126:3
  127:21,23
  137:5,8,17
entity
  42:3,9,24
  45:22 97:6,7
  112:2,5,9,25
  113:8 124:15
  125:12 137:7
equity
  38:9,10,13,
  15
error
  58:18 63:10
  64:8
errors
  133:17,20
estate
  23:1,12,14,
  23 24:15,21
  25:17,21
  26:19,23,25
  27:12 28:2
  81:6 125:13
estimate
  14:8,9
evaluate
  22:4
evaluation
  120:8

eve
  20:24
evening
  21:3
event
  22:19
evidence
  17:6 38:8
  44:18 94:1
  128:23
  131:14,19
  132:20 133:3
exact
  32:9,13
  34:23 94:23
exactly
  128:1
examination
  4:9 137:2
examined
  4:5
examples
  122:25
exclusive
  24:3,9 106:7
  107:12
  108:6,10
excuse
  18:1 21:10
  76:3 103:14
  116:22
  127:17
  135:25
executive
  22:10 26:6,
  16
exempt
  128:14
exercise
  58:10,11,20
  94:1 102:15
exhaustive
  44:4
exhibit
  9:22 10:8,9,
  10,13 12:23
  19:3 20:12

  28:14 79:1
  100:22 106:2
  114:5 115:24
  136:21
  138:15
exhibits
  19:17 138:13
existed
  113:14
expect
  48:25
expected
  117:2
expedite
  30:13
expenses
  55:20,24
  56:7 60:7,19
experience
  26:13 28:4,9
  38:6 62:16,
  23 63:4
  67:14 69:4,
  9,13,17
  72:13,19,22,
  23 73:3
  105:8 130:20
experienced
  81:14 83:2
expert
  9:6,19
  12:15,21,25
  13:4,9,24
  14:10,15
  15:25 16:2,
  9,12,17,24
  17:12,24
  18:7 19:11,
  13,17,21,22,
  24 20:1,3
  21:11,15,18
  27:5,6 28:15
  52:1 68:25
  69:19 70:3,
  16,18,20
  71:19 73:11,
  14,18 74:11,
  20 75:13,18

Patrick Kelleher, CPA, CFF
March 19, 2025

76:4,9,12
77:25 78:4
79:2 83:12
84:20 85:4
86:1,6 87:18
88:8 91:15
92:17 98:5,
8,13 99:5,25
100:5,7,10,
17 105:12,17
106:3 107:17
108:2 109:21
113:18
114:16
115:2,8,12,
25 119:5,8,
21 120:23,24
121:19,23
123:13
132:12,16,20
133:6,21,23
**expertise**
 67:15
**explain**
 37:25 55:14
 96:23
**explanation**
 50:15,16,20,
 24,25 51:5,
 9,11
**explanations**
 41:7
**express**
 13:1,5,10
 14:17 15:13
 16:4,18
 18:4,9
 19:15,19
**extends**
 37:11
**extensive**
 62:25 63:3
**extensively**
 52:5
**extinguished**
 38:22
**eye**
 84:7

---

**F**

**fact**
 46:16 47:5
 48:24 59:23
 81:22 90:2
 93:16 94:5
**factor**
 15:21 36:6
 78:13 79:13
 105:15
**factored**
 31:12
**factors**
 15:24 129:24
 131:2
**facts**
 8:22 11:18
 17:21,25
 19:14 53:7,
 11 60:9 64:5
 65:7 86:19
 116:18
 124:13
 128:23
 131:14
 132:14
**factual**
 37:12 44:18
 46:14,20
 53:20 54:14,
 19,24,25
 55:3 57:22
 58:7 63:9
 64:21 65:22
 87:11,14
 131:14
 132:15
 134:12,13,15
**factually**
 57:12 129:13
**failed**
 80:8 109:25
 110:7
**failing**
 124:20

125:19
**fair**
 7:18 14:7
 29:22 61:20
 80:2 85:3
 91:21 99:4
 107:18
**fall**
 11:10
**familiar**
 12:17 16:11
 63:24
**familiarity**
 71:21,24
 72:6,14,18,
 20
**far**
 134:23 137:3
**feasibility**
 101:9
**feasible**
 102:5,10
**February**
 9:6,10
 10:18,21,24
 11:3,13,24
 12:4,10,11,
 16 21:2,5,7,
 12
**federal**
 4:19 16:24
 17:3,6,8
**fee**
 38:4,5,14
 64:15 67:23
 68:3 116:1,
 5,10,15,17,
 24,25 117:25
 118:3
**feel**
 100:3
**feeling**
 5:4
**fees**
 67:16 68:5
 118:5

**field**
 22:9
**figure**
 48:13 54:6
 57:13 58:17
 67:5 81:18,
 19
**figures**
 62:6
**file**
 12:11 128:25
**filed**
 70:11
**finance**
 59:17 64:10
**financial**
 22:7 96:11
 101:8
**financially**
 102:5,10
**financing**
 69:25 70:1
 71:22,25
 72:15,20
 73:9,11 96:9
 101:10,16,21
 102:6,12,19
**find**
 32:14,16,18
 37:20 43:16
 45:11 135:2
**fine**
 29:18 48:25
 91:3,11
 131:10
**finish**
 49:25 50:1
 60:3
**firm**
 22:17 28:2
**first**
 4:4 9:21
 17:5 20:23
 21:1 96:24
**five**
 12:5 67:19
 106:2 109:21

Patrick Kelleher, CPA, CFF
March 19, 2025

130:23 131:7
**five-plus**
 26:15
**five-point-
four**
 38:23
**flipped**
 113:23
**floating**
 130:8,11
**Florida**
 28:5,11
 62:17,24
 63:5 73:19
 74:12,20
 75:6,14,19,
 25
**Florida's**
 105:8,12,18
**flow**
 29:4,8,10,11
 30:10,14
 31:1,5,14,21
 34:15,25
 35:12,20
 36:16,18
 37:6,19 49:1
 52:2,5,18
 54:12 55:6,
 22 56:24
 57:7 59:2,6
 60:12 62:6,7
 81:8 113:19
 114:2,4,8,10
 115:9 116:6,
 14 117:10,15
 123:14
**flowchart**
 137:7
**flowcharts**
 43:20 45:5
**flows**
 28:20,24
 29:1,4,5,6,
 7,8 30:1,9,
 16,19,22
 33:3,8,25
 34:17 35:23,

24 36:10,12,
20,25 37:5,
16,19,20
38:1,18
51:24 52:23
54:9 56:4
57:6 58:24
59:3,12
60:15 63:3
65:14 66:3
113:20
114:13
115:18,20
130:4
**focus**
 14:14
**following**
 78:17 119:23
 122:14
**follows**
 4:6
**footnote**
 45:19 106:9,
 12,14,16,18,
 21,22,23
 107:1,7,14
**footnotes**
 135:22
**forces**
 81:14 110:17
**forensic**
 22:9 109:22
**forensics**
 22:7
**forgive**
 65:18 66:16
 104:20
**form**
 14:18 24:6
 25:4 42:23
 44:16 48:10,
 22 49:11
 50:22 51:6,
 13 57:4
 61:10,25
 62:2 91:6
 93:13 94:6
 97:24,25

99:8 102:14
108:16,24
109:1 126:23
128:22
**formed**
 11:24
**forming**
 11:20 12:2
 19:14
**formulate**
 61:24
**forward**
 81:7 101:15,
 19 102:18
 113:24
**found**
 34:7
**foundational**
 77:9
**four**
 11:6 19:25
 20:13 28:14
 30:2,3,6,7,
 15 67:18
 100:21
**Francis**
 4:15
**front**
 29:24 32:6
**fronting**
 39:3
**fulfill**
 22:21
**full**
 4:13 31:8
**functionally**
 89:17
**fundamental**
 46:20,22
 63:16 66:15
**fundamentally**
 133:25
**funds**
 38:7,9
**future**
 33:9,10,25
 34:17 114:12

115:18 116:6
**FYI**
 131:9

---

G

**gain**
 33:20
**gained**
 31:21 89:16
**Gainey**
 9:24 14:18
 24:1,4,6
 25:4 42:16,
 23 44:16
 48:10,18,22
 50:22 51:2,
 6,13 57:4
 61:7,10,25
 77:14,18
 91:4,6 93:13
 94:6 97:22,
 24 99:8
 100:15
 102:14
 108:16,18,
 19,21,24
 109:2,8,14
 126:23
 128:22
 131:4,8
 135:11,14
 136:20
 138:1,5,9
**gains**
 95:13
**GAMEY**
 16:14
**gave**
 19:6
**general**
 7:11
**generally**
 64:8 65:23
 83:22
**generate**
 65:20

**generated**
81:8 123:14
**generating**
55:23
**gentleman**
125:11
**gentlemen**
136:16
**germane**
27:14 41:23
128:18
130:24
**getting**
21:25 39:8
77:4 107:15
**give**
4:21 5:3
8:23 20:5
27:10 39:24
45:11 50:20,
24 51:10,11
116:13
**given**
22:3 50:25
58:1 85:14
104:20
**giving**
51:4 132:5
**glad**
5:10
**goes**
18:22 109:24
121:12,13
**going**
7:11 8:23
9:17 12:14
17:14 20:5
24:10 25:10
29:13 31:10
33:8 34:5
35:3,7 36:9
41:2,8,24
44:3 45:13
46:6 47:14,
22 48:1,2,12
54:5,13
57:16,20

68:10 77:24
80:5 84:5
85:17 86:5
88:21 91:9
95:12 97:8,
13,19,25
98:4,7,9
99:5,25
100:3 101:4
109:20
112:10
124:6,11
125:11,16
127:4 129:2
130:11 131:8
**good**
4:11,15
10:20 35:22
**gosh**
71:4
**granular**
7:2
**ground**
27:22
**guess**
6:4 8:13,16
9:7,17 11:6
12:1 14:3
15:22 16:1,
20 34:14
35:16 37:9
40:13,14
42:18 47:4
55:7,13
61:20 67:5
72:12 75:16
76:11 77:1
78:22 79:19,
20 83:3
84:19 87:6
95:8 97:1,
12,13 99:20
104:15,16,
19,21 107:22
116:12 117:2
124:23
128:17 137:4

**guy**
41:9

**H**

**hail**
26:11
**half**
31:10 35:7,8
**hand**
72:1,16
**handled**
73:4,6
**Hanover**
73:1
**happened**
130:2
**happenstance**
137:24
**happy**
6:3 78:19
134:25
**hard**
6:1 20:18
29:24
**harm**
101:1 122:21
**harmed**
100:7
**he'll**
138:7
**head**
47:24 48:3,
9,23 67:1
128:3
**headset's**
91:9
**health**
5:9
**Healthcare**
89:12 90:1,
22
**hear**
15:4 51:1
89:4,5,6
103:15

**heard**
72:11
**hearing**
68:1 95:10
98:1
**heart**
92:10
**help**
39:24 45:16
72:12 78:10
**helpful**
45:23 78:20
**helps**
106:15
**Heritage**
37:18 38:19
40:3 43:8
49:3,12
51:14 52:6
55:4,19
56:12,16
57:1,7,17
58:23 59:3,
12 60:16
96:16 97:3
113:23
**hey**
54:1,10
57:15 126:25
**hide**
82:7 109:20
**highlighted**
17:18
**history**
87:18
**hoarded**
78:18
**hold**
57:3 119:23
120:3 122:13
131:25
**Holding**
46:24 127:4
128:9
**holdings**
46:1,7,10
47:6 49:10

Patrick Kelleher, CPA, CFF
March 19, 2025

52:4 125:24
126:2,6
127:1,18
136:17 137:3
**holistic**
78:14
**holistically**
49:23 51:18
111:23,24
125:21
127:7,15
129:20
**home**
5:18,21
**hope**
80:7
**hour**
129:17
**housing**
23:2 24:19
25:15,18
27:15,19,20
28:5,10
35:16 36:17,
18,21 38:2
40:2 41:1,12
42:2,13,21
52:24 53:1,
16 54:17
56:15,25
58:2 62:16,
24 63:4
69:1,19
70:1,4,7,14
71:1,19,22,
25 72:15,21,
24 73:7,10,
12,16 75:6,
10,14,19
96:3 101:9
102:1,7,12
116:6,23
**housing's**
27:17
**HUB**
59:20
**HUD**
75:11 102:7,

13
**hundred**
23:9
**hundreds**
69:6 110:16
**hypothetically**
42:12

---

**I**

---

**idea**
118:4
**identification**
138:14,16
**identify**
11:18
**ignore**
41:25 112:2,
3,5,7
**ignored**
127:15
**illustration**
77:2
**immediately**
31:18 38:5
**impact**
22:19 28:2
78:18 85:17
101:14,18,24
**impacted**
129:25
**important**
15:16 129:14
**impossible**
101:12
**inaccuracy**
31:7
**inaccurate**
31:4 37:20
64:23 67:7,
11
**inaction**
92:12
**inaudible**

98:24 103:12
133:8
**include**
15:20 18:17
23:12 55:20
100:16
**included**
13:14,16,18
15:8,11,19,
21 18:24
19:11 29:1
71:11,14
72:4 77:3
137:19
**includes**
14:20 16:5
**including**
13:20 18:20
52:8 56:2
72:25 92:19
**income**
39:8 59:21
60:7 75:10
77:4
**incorrect**
67:15 68:4
**incredibly**
81:11
**increments**
31:11 32:5
38:12
**incur**
49:13 51:15
**incurred**
42:14
**incurs**
42:13
**Independent**
52:4
**index**
30:5
**individuals**
45:3 75:10
137:6
**industries**
25:21

**industry**
22:22,25
23:2,4,15,
23,24 24:20,
24 25:3,15,
19 71:22,25
72:15,21
73:10,12,16
**infer**
33:21 99:25
**influence**
5:2
**inform**
13:12
**information**
11:25 19:7
46:14 53:12
58:7,16 63:9
64:19 67:13
77:12 80:10,
16 81:12
82:17 84:17
90:3 93:18
95:6 96:11,
15 103:7,9,
19 104:6
110:11
115:5,22
118:18
128:12
129:10 130:9
134:13
**informed**
19:7
**informing**
17:22
**initials**
137:23,25
**input**
66:7,12
**inputs**
63:14 66:5
133:8,9,17
134:10
136:12
**instance**
27:25 33:12
34:21 87:23

117:21
125:22
134:22
**instances**
24:15
**instructed**
100:16
**instruction**
7:12
**instructions**
7:11
**insurance**
28:1 73:1
**insured**
58:13
**intellectual**
64:10
**interest**
39:8 55:21
56:8,11,14,
18,20 57:2
118:1 126:15
128:14
130:3,7,8,12
**interjecting**
50:7
**interrupt**
10:22 34:12,
13 68:17
134:7
**interrupted**
50:23
**interrupting**
55:12 131:25
**interruption**
20:8 91:12
**invest**
39:7,9 101:5
**invested**
91:24 93:7
94:10,14,15
**investing**
92:16 93:7
94:10
**investment**
44:5 91:25
112:9

**investments**
95:13 96:18
103:23
**invited**
118:8
**invoices**
12:6,9
**involve**
8:22
**involved**
23:11 41:4
70:4,7 75:18
76:2,5 79:9
115:18
**involves**
73:11 79:5
**involving**
73:6,15
**irrevocable**
137:10
**issue**
51:19 52:4
53:7 56:2
57:20 61:18
83:16 107:20
112:10 117:5
123:5 131:12
**issues**
5:11 22:12

---

**J**

**Ja-sim-oe-
witz**
88:4
**Jachimowicz**
88:5
**Jak-a-mow-
witz**
88:3
**Jay**
107:2 135:18
**JMA**
88:14 89:7
90:5,19
**John**
137:23

**Jonathan**
119:19
137:10
**journal**
70:24
**judgment**
112:7
**jump**
127:10

---

**K**

**keep**
50:6,7 98:25
104:23 129:1
**Kelleher**
4:3,16,17
5:1,17 9:8
10:2 12:15
15:4 41:5
77:24 103:19
109:13
135:20
**kind**
43:21 66:15
75:16 78:24
79:21 80:6
84:13 86:15
99:15 100:3
118:10 119:1
125:19
127:21
129:16 137:6
**kindest**
22:2
**know**
5:5,14 6:2
7:15 9:7
10:25 12:3
16:16,21
17:24 19:1
20:25 21:21
22:22 23:9
24:18 27:13
29:19 30:3
32:3,11
33:24 36:6,

10 39:19
40:10,12,15
42:2,20 44:4
45:14,15,20
46:20 47:15,
23 48:15,20
49:10,12,20
53:3,4 54:4
55:7 56:21
58:6,11
59:10,18
61:6,17
62:5,9,15,
20,21 63:11,
13,15,22
65:9,10,11,
15 66:2,4,5,
11,13,18,19,
20,21,22,25
67:1,8 68:7
73:22,24
74:2,7,10,
14,16,19
75:5,21,24
76:7,17
78:14,15
79:9,10
80:21,22
81:23 82:23
83:17 85:2,
7,18,19
87:8,10,11,
12 92:7,13,
23 95:7,8,
11,16 96:5,
8,13,14,17,
25 97:2,5
99:13,20,22,
24 100:12
104:9,18,22
105:20
107:19
109:12 110:5
115:14
117:11,23
118:1,2,7,
22,23 120:14
123:16
124:11

Patrick Kelleher, CPA, CFF
March 19, 2025

125:19
126:15
127:16,22,24
128:1,2
129:13,18
130:2,5,21,
22 131:24
132:12,24
133:1,4
**knowing**
63:6
**knowledge**
28:8 38:6
130:20 133:2
**known**
58:18 64:8

---

**L**

---

**L-I-H-T-C**
59:18
**lacking**
53:13
**lag**
14:22
**lane**
99:15
**laptop**
6:21,23
**large**
58:24
**largely**
90:12
**largest**
72:25
**law**
63:18,19,23
131:20
132:20 133:3
**lawsuit**
70:3,9,10
78:17
**lawyer**
98:16
**leads**
111:24,25

**lease**
82:8
**leave**
100:14
**left**
36:2,12
114:10,19
**left-hand**
35:21
**legal**
10:2 41:10
63:20 97:9,
12,13,20,21
98:6,9,11,
16,20 99:1,
6,12,14,16,
21 100:1,4,
9,12
**legally**
92:11
**letters**
6:11
**level**
18:16 59:21
120:9
**levels**
75:10
**Lexi**
121:4,5,11,
12,13,15,22
**liability**
42:6,7,13,15
**licensed**
22:6 71:18
**lieu**
82:18 106:5
107:11 108:4
**LIHTC**
27:19 59:17
71:10,17
**limited**
42:6,7 43:5,
9
**line**
107:1 132:11
**Liquidagents**
78:12,19

87:24 88:1
89:12,22
90:1,22
**list**
19:5,24 44:4
72:13 78:10,
25
**listing**
72:19
**litigating**
106:15 107:11
108:4
**litigation**
22:13,18,20
27:5 70:7
73:5,6 74:6
78:5 82:18,
25 90:4
104:12
106:24 107:8
108:10
109:15 112:6
129:17
**little**
5:5 55:14
78:24 99:13
100:4
**Live**
105:8,12,18,
25
**living**
75:11
**LLC**
43:2 46:1,7,
10,24 47:1,7
88:14 90:5,
19,22
125:14,24
126:6,17
127:1,4,17,
18 128:9,19
129:5
**LLCS**
43:12
**LLLP**
42:4,13,21
**LLLPS**

43:12
**LLP**
41:1,12
42:2,9
**loaned**
55:18
**Local**
105:9,12,18,
25
**locate**
45:21
**logic**
35:11 84:13
**logical**
79:15
**longer**
13:15 117:2
124:12
**look**
18:2 21:21
35:15 36:16,
17 45:5
49:1,22
51:17 54:2
61:21 64:12
79:12,14,22
80:20 95:11
103:22 106:9
111:24 126:2
127:7,22
128:2 129:19
130:23
135:17 137:4
**looked**
19:1,5 57:10
125:21
**looking**
6:20,21 9:12
20:12,13
32:19,23
37:2 45:7,16
48:21 51:25
53:4 74:25
78:25 111:23
113:18
129:19
**looks**

Patrick Kelleher, CPA, CFF
March 19, 2025

12:22 95:1
135:18,22
**lose**
125:15
**loss**
74:17 83:14
113:11
123:11
**lost**
89:15,19
109:23
**lot**
13:15
**lots**
67:17
**low-income**
27:20 69:1,
19 70:4,7,13
71:1 72:24
75:6,14,19
102:1,6,12
**lower**
52:13,14
**LTDS**
43:12

_____

**M**
_____

**macroeconomic**
129:24
**Madam**
25:6 102:21
109:4
**made**
36:19 37:23
38:1 55:12
61:5,15,17
106:19
107:21
119:4,8
123:4
**make**
6:9 7:17
24:4 29:19
36:23,24
37:4,7 38:17
54:15 76:23

84:14,15
92:10
104:13,15
105:4 106:12
129:23 134:9
135:7
**making**
82:21 84:4
99:13 110:24
111:22
129:22
130:14
137:14
**manage**
5:8
**management**
36:23,25
37:5 40:3
43:5 54:23
65:15 66:3
67:3,10,16,
23 68:3,5,8,
11 96:7,8
**Management's**
68:3
**managers**
137:16
**manner**
108:14
110:2,9
123:14
**March**
10:25
**mark**
12:23
**marked**
10:7 12:16
138:13,15
**Massachusetts**
4:20,25 5:19
22:7
**matches**
34:24
**material**
81:1,3 85:17
**materializes**
129:16

**materially**
64:14 67:20
85:8,19
115:14
**matter**
13:12,16
16:5 21:25
37:12,13
43:22,24
46:20 49:7,
11 52:12
63:12 70:12
87:11 106:5
107:11 108:4
113:6,7
127:8 129:14
**matters**
22:13 69:7
**maximized**
59:16
**MBA**
22:8
**Meaden**
9:7 121:6,7,
12,15,19
**mean**
10:22 13:13
18:14,16,18
22:16 24:9
27:1 32:1
33:21 34:12,
13 41:15,17
46:18 47:9,
13 49:9,22
60:3 61:21
66:4 67:16,
22 68:17
69:4 72:3
73:21 78:13
79:13 81:4
83:13,21
85:11,18
87:6 97:11
109:9 110:24
111:1,22
113:4
116:11,12
117:6 120:19

122:15
125:7,8
128:25 134:7
**meaning**
16:6 31:18
61:5,15
**means**
33:8 40:12
92:8 109:12
**meant**
132:25
**measure**
22:19 27:7,
11 28:2
**measurement**
22:14,15
27:23 69:6
83:15,16
122:23
**measurement-
related**
22:12
**measuring**
27:9 131:22
**mechanism**
69:25
**meet**
122:5,10,18
**member**
125:24
126:6,17
127:17
128:8,19
129:4
**members**
26:10 46:10
47:6
**memory**
17:8 48:24
**mention**
5:4 135:19
**mentioned**
26:3
**met**
24:17 59:16,
17 118:9,11

Patrick Kelleher, CPA, CFF
March 19, 2025

methods
    64:4
Michael
    4:11 44:2
    45:1 111:12,
    14 126:1
    131:4
    137:11,13,23
milestones
    24:16 38:11
million
    33:14 34:23
    38:23 39:7,
    9,10 46:23
    49:2 51:15
    52:25 66:8
    81:5 86:21,
    25 94:21
    95:1,3,5,11,
    14,17 96:4,
    8,17 97:3
    123:24,25
    124:2,9,19,
    22,25 125:1
    126:9,19,21
    127:3 128:13
    134:1,2,4,
    11,12 135:2
mind
    91:8 131:7
mind's
    84:7
minimize
    78:17
minimized
    85:16
minute
    45:11 91:8
minutes
    131:7
mislead
    42:1
misleading
    110:25
Missigman
    6:13 20:17
    44:2,25

62:12 63:2
111:9 119:8,
14 120:13,
14,17
125:10,25
136:5,7,12
137:10
Missigman's
    20:25 29:16
    62:15,23
    94:25 136:13
missing
    14:5,10
misspoke
    15:7 135:15
misunderstood
    132:22
mitigate
    79:19,23
    80:8 81:22
    82:1,15
    83:5,10,23
    84:6 85:6,22
    86:2 90:2
    92:3,18
    93:11,16
    94:5 97:10,
    15,20 98:6,
    11,12 99:7,
    22 100:2,8,
    10,13 104:7
    109:25 110:8
    122:5,11,18
    123:5,17
    127:6
mitigated
    80:15,25
    81:1,20,25
    82:12 83:9
    84:22 86:8
    87:2,4,8
    89:18,22
    90:7 91:16,
    20,22 93:3,6
    94:9 98:8
    102:17 104:2
    108:14
    110:12

122:22
mitigates
    85:11
mitigating
    90:12 92:22
    106:6 107:11
    108:5
mitigation
    78:1,4,20
    79:6,8,22,24
    82:19 86:19
    87:1,20,22,
    25 88:8,10,
    15,16 89:8,
    10,13 90:9
    96:21
    100:16,23,25
    101:2 104:18
    107:20
    108:10
    113:13 129:4
mix
    59:15 118:23
MJS
    137:10
model
    6:4,7,8 7:24
    8:1,8 20:15,
    16,17,19,22
    21:15,18
    22:3,5 28:19
    29:2,9,13,
    16,19 30:18
    31:12,13,17
    33:17 34:18,
    20 35:5,9
    38:4,21
    39:4,12 49:2
    51:20 52:20,
    22 53:10,11
    55:6,15
    58:15,19
    59:19 62:13
    63:14 64:12
    66:22 74:4,
    9,24,25 75:2
    77:3 86:16,
    20 87:1

94:25 95:2
104:25 115:4
120:4 133:16
134:14
money
    32:4 39:3,10
    41:24 49:5
    51:15 55:18
    56:18,19
    60:2 85:9
    91:23 92:16
    93:6 94:9,
    15,19 95:9
    101:4 123:13
monies
    12:6 29:8,
    10,11
monitors
    6:21
Moore
    9:8 121:6,7,
    11,12,16,19
morning
    4:11,15 5:5,
    25
mouthful
    121:14
move
    9:21 45:14
    81:7 101:19
moved
    101:15
moving
    102:18
MSPJ
    40:5,7,12,
    17,21 43:13,
    23 44:7,15,
    19 45:5,19,
    21 46:1,6,
    10,24 47:1,6
    49:10 52:4
    125:23,24
    126:6,25
    127:17,18
    128:8 136:17
    137:3,22

multi-part
  80:5
multiple
  29:4,5
multiplied
  67:2,6
multiplier
  36:7 66:18
  67:13,15
  68:3,8,11
multiply
  67:10
mutually
  23:19 24:2,8
  106:7 107:12
  108:6,10

N

name
  4:11,13,15
  9:6,13 44:3
  45:2 111:12
  121:3,13
  125:12
name's
  137:13
named
  46:11 112:6
names
  137:9
narrative
  135:3
nature
  11:12
necessarily
  19:2
need
  4:21 7:2
  11:15 24:11,
  16 41:6,7
  49:24 50:11,
  15 64:2,3,5,
  7,8 72:10
  77:13 80:20,
  21 103:7,9,
  19,22 130:23

133:10
needed
  27:24 53:14
needs
  24:13,14
  64:7,10
nested
  43:21 137:7
net
  74:16
netted
  127:21
nine
  106:23 107:7
non-
litigation
  70:18
non-
responding
  50:6
Nonresponsive
  132:7
Norfolk
  4:25 5:18
northeast
  27:18
Note
  36:4
notes
  6:2,15,16,
  17,19
notice
  10:1
number
  11:6,16
  12:1,5 23:5
  43:20 49:16
  50:1 52:7,9
  63:7 67:19
  70:15 85:20
  86:15 90:11
  93:23 95:25
numbers
  6:11 52:7,9
  57:10,13
  66:6

numerous
  133:16

O

Oaks
  37:19 38:16,
  20 40:4 43:8
  49:3,13
  51:14 55:5,
  19 56:12,16
  57:1,7,17
  58:23 59:3,
  12 60:16
  96:16 97:3
  113:23
Oaks'
  52:6
oath
  4:5
object
  14:18 24:6
  25:4 42:23
  44:16 48:22
  50:8,22
  51:6,13 57:4
  61:10,25
  91:6 93:13
  94:6 97:24,
  25 99:8
  102:14
  108:16,24
  126:23
  128:22
objecting
  109:1
objection
  16:14 24:1,5
  42:16 48:10
  108:20,23
obligated
  56:13,17
obligation
  22:21 27:8,
  10,11 98:16
obtain
  91:1

obtained
  31:22 65:16
obviously
  21:17 99:12
  111:1
occurred
  89:8
occurs
  26:18
offhand
  105:23
  127:25
office
  5:18,21
officers
  137:16
offset
  83:18 89:19
okay
  5:1,20 6:18
  7:3,10,19
  9:21,25
  10:5,7,12
  12:20 16:16
  17:14,20
  19:13 25:18
  28:24 29:3,
  6,23 30:22
  31:4,7,20
  32:8 33:7,19
  34:4,10
  35:15 36:9
  37:23 38:25
  39:22 40:17
  42:12 43:1
  44:19 46:9
  47:17 50:17,
  21 52:24
  57:6 59:10,
  14 60:24
  62:22 63:1,
  22 67:5
  68:10,19
  69:3 70:10
  77:15,16
  78:7 81:18
  82:4,6,14
  83:8 84:9,

Patrick Kelleher, CPA, CFF
March 19, 2025

19,24 86:10
87:3 89:7
94:8 99:4,
18,19,24
101:13 102:4
108:1 110:6
111:11
112:22 115:7
127:12
133:23
135:6,8,25
137:14
**omission**
84:8 92:14
**omissions**
92:2,7,8,19,
20
**omitting**
98:25
**once**
32:6 38:4
74:5
**one**
12:1 17:4
23:7 27:9,13
29:3 32:7
37:1,2 45:8
47:19 49:6
54:21 56:21
60:2,6 68:16
69:14 72:23
78:11,12,20
79:16 87:21
102:8 106:4,
22 107:9
108:2 114:1
120:2 121:2
122:24
124:10
129:20
130:11,15
134:4 137:15
**ones**
13:16,19
16:5,6 23:6
39:3 54:6
**open**
6:25

**operate**
22:23 23:3
58:14 86:15
**operating**
74:17
**operation**
57:8 59:7
**operational**
90:11
**operations**
57:21 59:4
**opine**
68:25 69:19
73:11,15
76:8 83:9
89:21,25
105:12,17
115:23
131:18,19
**opined**
76:12 87:25
90:6
**opinion**
8:23 11:8
13:21 14:11
15:25 16:7
17:12 19:10
28:17 37:9,
11 44:12,13,
17,19,20
46:5,9,13,
19,22 47:5
53:15 54:2,3
60:20 61:24
62:1,2
63:12,16,17,
23 64:11,19,
20,22 67:6,
9,12,19 68:2
70:6,8 74:11
75:13,18
76:22 77:25
78:4 79:5,7,
25 80:4,7,
11,14,24
81:9,19,21,
24 82:11,14
83:4 84:20

85:4 86:6
87:1,3,7
88:8,15
89:7,9 90:9
91:15,19,22
92:1,18,25
93:2,5,12,
15,19 94:4,
11 97:8,12,
13,19,21
98:5,7,8,9,
15,20 99:5,
25 100:4
101:8,11,13,
24 102:10,
16,25 103:6,
7,10,20
104:1,5,6
108:12
110:6,11
112:13
113:12,16
115:2,15
116:21,23
119:1 120:21
121:19,25
122:2
123:10,13
124:24
125:23 126:4
128:8
132:13,19
**opinion's**
64:18
**opinions**
9:1 11:20,24
12:3,7 13:1,
5,10,24
14:6,16,21
15:12 16:3,
18 17:24
18:3,8,12,24
19:15,18
20:14 28:14
64:1 73:18
74:20 80:21,
22 89:13
100:21

119:23 120:2
122:14
**opportunities**
88:10 90:10
**order**
24:11 127:23
132:13
**org**
45:20 128:25
**organizational**
136:22
**outcome**
112:9 115:15
118:22
**outside**
22:18 99:17
**outstanding**
45:8
**overlooked**
104:20
**overstated**
51:20 52:3,
8,10 53:2,
17,19,23
54:12,13,20
55:1,2 77:11
**overstatement**
54:9
**owned**
43:22 127:1,
2
**owner**
113:1,2,8
121:16
124:10,14
**owners**
41:10 43:25
47:10,12,24
48:14,19,20
112:5,14
127:22
**ownership**
43:13,15,21
45:3,10
47:1,8
103:24

Patrick Kelleher, CPA, CFF
March 19, 2025

124:22 125:6
126:16 137:3

---

**P**

---

p.m.
  138:12
page
  17:6 20:13
  28:14 30:2,
  3,4,6,15
  32:20,21,22,
  23 45:18
  79:1 95:2
  100:21
  105:5,6
  106:2 109:21
  115:24 116:9
  119:21
  132:10
  134:20
  135:17,21
  136:3
pages
  6:14 7:24
  12:17 107:23
paid
  12:6 20:4
  31:8,11 32:5
  38:14 59:7
  117:17,19
paper
  74:17
papers
  5:23
paragraph
  136:9
parameters
  59:20
pardon
  34:11 55:11
  58:13
parentheses
  136:10
part
  5:8 24:25
  25:22 26:16

28:16 33:13
39:7 59:6
60:2,6 70:15
77:5 80:2
83:6 90:4
94:24 95:1
105:24
110:21
115:15
116:20 117:9
118:9 122:22
123:21 133:6
134:23
particular
  22:19
parties
  70:12 110:23
  112:10
  137:16
partner
  42:6 121:8,9
partners
  35:16 36:17,
  19,21 38:2
  41:1,12
  42:2,9,13,
  14,21 43:8
  52:25 53:1,
  16 54:18
  57:1 96:3
  116:7,24
partnership
  42:7
parts
  60:12 77:1
party
  22:17 55:18
  79:18 123:2,
  3
passed
  118:15
past
  118:6
Patrick
  4:3,15 9:8
  10:1 12:15
Paul

6:5,13 20:16
29:16 44:2,
25 94:25
111:9 119:7,
14 120:14,17
125:10,25
137:23
pause
  15:22 134:18
pay
  32:2 49:13
  56:9,13,17,
  20,22 57:1
  116:15 117:8
paying
  56:5,10
  121:18
payment
  33:14
PDF
  6:5
peer
  120:5,7,21,
  24 121:23
peer-reviewed
  70:24
pending
  25:8 51:8,9,
  12 88:23
  102:23 103:4
  109:6,17
people
  127:1
perceived
  122:5,11,18
percent
  16:20 23:9,
  16 25:11
  65:17 66:18,
  19,20,21
  83:6 114:23,
  25
percentage
  13:23 58:24,
  25 66:9 67:2
perform
  123:10

period
  33:24 107:13
person's
  133:1
personal
  4:21 133:2
persons
  5:20 44:5
  119:11
pertains
  26:19
peruses
  135:7
ph
  5:12 44:3
  78:18
phone
  6:22
phrase
  48:8
Piccolo
  4:10,11
  9:14,16
  15:2,10
  20:9,11 24:7
  25:6 61:11
  77:13,15,17,
  23 88:20
  89:1 91:11,
  13 98:3
  102:21
  103:2,15,18
  108:17,19,
  22,25 109:4,
  11,18 131:6,
  10,11 132:7,
  18 133:13,14
  135:9 138:8
picked
  62:10
  118:21,23
piece
  19:6 55:12
  59:25 77:9
  92:20 99:12
pieces
  60:1

Patrick Kelleher, CPA, CFF
March 19, 2025

piled
    30:5
place
    27:24 107:24
    134:16
plain
    51:24
plainly
    118:14
plaintiff
    30:9 35:2,13
    37:21 40:9
    45:4 51:25
    56:3,8,10
    57:11 58:5,
    13 77:10
    78:15,16
    79:17,23
    80:15 81:6,
    17 82:17
    89:15 90:7,
    10,15 92:18
    103:23,25
    109:25 110:1
    111:2,6,8,9,
    11,14 118:20
    122:9 123:11
    125:14
    137:8,20
plaintiff's
    33:17 89:22
plaintiffs
    4:12 22:22
    23:3 28:16,
    17 30:14
    31:1 33:3
    34:16 38:19
    39:2,13,16,
    19,22 41:22
    43:13 44:21,
    25 46:11
    47:1,7,10,
    12,25 48:20
    52:2 59:10
    61:23 64:20
    65:8,12,15
    66:2 80:8
    81:15,20,22

82:12,15
83:5,23
85:21 90:1
91:16,21
92:2 93:2,
10,16 94:4,8
97:9,20
98:5,10
99:6,21
100:1 101:3,
14,19,24
102:5,11,17
103:21 104:2
107:10
108:3,13
110:7 111:4,
18 112:4
113:15,19,
20,21 114:2,
4,8,10
115:4,9
117:24,25
119:12
121:25
122:4,17,20
124:1,2,7,8,
21,24,25
126:7,8,10,
21 127:2,21
128:10 129:5
137:17
plaintiffs'
    6:8 7:24
    8:1,8 20:15,
    16,19,22
    21:9,15,18
    22:5 29:2
    34:18,20,25
    36:18 38:21
    48:14 51:20
    55:15 64:12
    77:3 86:20
    95:2 100:24
    104:25
    105:21 106:4
    111:16
    114:20
    115:21 118:4
    120:4 127:5

129:25
131:13
133:16 137:5
138:4,13
plan
    21:1 32:11,
    13 39:15
    128:14
planned
    20:25 29:9,
    10,11 39:16
    41:12,14,21
    42:21,24
    43:3,5,9
    46:6 49:13
    65:17,19
play
    128:7
please
    4:13 7:15
    10:23 25:5,7
    68:17 98:24
    102:22
    106:10
    128:24
    131:25 132:9
    134:6
plethora
    54:4
pocket
    41:25
point
    9:15 19:7
    83:15 126:8,
    20 130:24
    133:7
pointed
    54:1
pointing
    116:17
points
    58:3 118:24
    135:11
portfolio
    103:22
portion
    33:17,23

position
    121:7
possibilities
    113:14
possible
    25:25 58:7
    79:15
post
    129:17
potential
    79:22 115:17
    127:17
potentially
    5:12 53:18,
    23 87:5,9
    91:2 94:17
    123:17
power
    127:12,14
    128:11,13,
    15,20 129:6,
    12,16
practical
    13:12,16
    18:16 21:25
    79:12
Practice
    109:23
precluded
    68:23 90:11
preparation
    8:10,13,17
    17:11 21:15
prepare
    7:19 8:1
prepared
    16:9,24 22:3
    62:12
prerequisites
    24:12
prerogative
    41:17
present
    33:4,7,10,13
    34:1 35:23
    36:2,3,4,14
    51:24 79:15,

Patrick Kelleher, CPA, CFF
March 19, 2025

16 97:16
114:13,19
115:11
**presentation**
55:25 56:1
100:24
131:13
**presented**
30:9 37:10
53:8 77:11
**pretty**
18:19 35:22
53:7 56:19
129:13
**previous**
19:25
**previously**
7:4 69:13
104:24
**price**
54:11 57:15
**principal**
56:23 57:2
111:4,11
126:7 128:9
129:5
**principals**
23:8,10
40:4,5 41:3,
21,22 43:22,
24 44:21,24
46:11 47:7
49:21 97:7
103:25 106:4
107:9 108:3
110:21
124:1,7,25
125:15
126:10 137:8
**principle**
130:25
**principled**
53:7
**principles**
23:11 63:11
64:4

**prior**
69:14 78:5
**probable**
79:15
**probably**
9:17 22:2
26:15 27:13
32:3 40:9
53:4 70:15,
20 71:4
76:20 115:14
**procedural**
8:15 11:9
**procedure**
16:24 17:3,9
**produced**
11:4,17 45:6
46:14,18
47:13 52:12,
13 58:5
66:1,6,23
90:4 118:13
129:11,15
**produces**
69:25
**product**
64:3 65:17
66:17
**production**
127:24
**professional**
4:19 120:9,
18
**profile**
115:21
**Profits**
109:23
**project**
28:21 29:9,
10,12 30:20
31:23,24,25
38:11 39:17
42:22 43:3,
6,9 44:8,15,
21 46:6
55:22,23
59:17,18

91:24 92:17
93:7 94:10,
16,20 101:5
110:19
116:14
117:8,10,16
123:22
124:12,14,17
125:13,15,
17,18 127:5
**projected**
57:8 59:11
60:21 62:6
63:3
**projecting**
60:15
**projects**
62:16 95:20,
23 96:5
118:6
**promoted**
10:2
**promulgated**
102:7,13
**properly**
15:7 34:19
39:12 41:20
61:14 64:5
93:25 104:16
**properties**
28:5,10
58:12 65:21
68:13,20
77:8 93:23,
24 110:17
118:16,23
**property**
24:11 27:19
32:25 38:24
39:11 55:20
57:8 58:2
59:4,7 65:18
68:24
101:15,20,25
102:6,11,18
104:3,8,9,
11,18,23
105:3,5,20,

24 114:24
117:20
118:17
**proposed**
44:7,15,20
46:5,25
59:4,7
**prospective**
59:8 76:24
**provide**
4:17 8:25
17:15 20:3
28:15 31:13
61:23 64:21
83:4 86:1,5
87:14,15,19
88:8,14 91:2
98:4,7 99:5,
25 100:23
109:22
114:16
115:25
119:1,22
121:23
131:12
**provided**
8:22 10:12
11:19 12:1,2
28:19 30:18
31:17 40:11
57:11 59:3
65:14 68:24
73:18 74:11,
19 75:13,18
77:12 87:25
88:7 92:4
94:25 96:12,
15 103:8,20
113:21 115:6
118:19
136:12
**provides**
17:20 20:15
114:1
**providing**
86:6 91:15
110:6

Patrick Kelleher, CPA, CFF
March 19, 2025

proxy
  77:8
public
  70:24
publication
  70:23
publications
  71:1,2
publicly
  58:4
published
  21:9,11,18
  70:13,15
  71:4,10
publishes
  75:11
pull
  47:19 128:1
  129:1
pulled
  61:1 108:1
purchase
  102:5,11
purchased
  101:25
purchasing
  101:15,20
  102:18
purposes
  77:2
pursue
  82:25 125:17
pursued
  82:18 92:5
  95:19,24
purview
  99:17
put
  14:13 49:2,
  4,6 59:18
  63:7 112:4
  136:25
PV
  114:4,8

_____

Q

_____

qualifications
  19:22 22:4
  83:8,12
  120:15 133:6
qualified
  68:25
  105:12,17
  131:19
  132:12,17,19
qualifier
  69:21 80:1
  104:21
qualifiers
  99:10 106:1
qualify
  8:16 69:18
qualitative
  83:24 84:1,
  11
qualitatively
  84:15 85:13
quantified
  134:3
quantify
  133:20,24
  134:16,23
quantitative
  83:25 84:2,
  10 130:8
quantitatively
  84:16 85:14,
  15
quantum
  80:17 83:19
question
  7:13,15,16
  13:7 14:25
  15:3,5 16:1
  25:1,5,8,11,
  14 26:1
  33:21 40:9
  41:18,19

42:19 43:1
45:2 48:11,
19 50:18
51:3,4,5,7,
9,10,12,16
58:8 59:1
61:13 67:24,
25 69:18
71:11 72:5,
9,10,11
74:7,18
75:17 76:11
78:13,22
79:11,25
80:7,19
82:20 83:22
85:25 88:23
92:9 96:24
97:1,17
98:18,21
99:1,9
102:20,23
103:2,4,16
104:16
106:20
109:2,5,6,8
111:6 113:3
124:23 127:9
128:1,17
129:14,15
131:23
132:3,5,9,
10,22 135:20
137:18
questionable
  22:1
questions
  33:20 41:7
  43:11 45:8
  50:6,11
  69:15 80:23
  97:18 104:9,
  16,21 109:17
  127:10
  130:16 131:9
  135:9
quite
  27:17 72:9

quote
  17:20 28:15
  30:18 100:23
  101:2 106:3
  107:9,15
  108:2,6
  109:22,24
  115:25 126:6
  131:12
  133:16
quoted
  106:14
quoting
  107:17

_____

R

_____

ramble
  79:21
rate
  58:18 64:8
  114:14,21,23
  115:3,14,16
  130:7,8,9,12
rates
  63:10 114:17
  115:17
read
  10:18,20
  13:15 14:25
  18:18,21
  25:7,8 61:13
  62:18 72:4,
  9,11,23
  80:19 88:23
  92:20 102:8,
  20,22,23
  103:2 109:6
  110:4 120:19
  132:9,11
  138:7
readily
  91:1
reading
  137:9 138:10
real
  23:1,12,14,

Patrick Kelleher, CPA, CFF
March 19, 2025

23 24:14,21
25:16,20
26:19,23,25
27:11 28:2
36:1 81:6
125:13
**realize**
117:2 130:24
**realized**
31:15,21
33:9,15
116:24,25
**reason**
54:20,25
58:11 71:8,
9,14 87:12
116:16
122:13
**reasonable**
28:18 108:14
110:2,9
113:13
119:23 120:3
122:3,14,15
133:5
**reasons**
13:5,10,20,
24 14:5,11,
16 15:12,25
16:3,18
18:4,9,13,15
19:10 54:5
**recall**
28:9
**receipts**
12:5
**receive**
20:22 32:3
35:3,7 38:4
95:13 123:4
**received**
11:1 21:3
68:21
**recess**
77:21
**recollection**
105:24

136:14 137:1
**record**
4:14 5:15
9:15 20:9
41:20 46:3
77:20,22
94:2 96:1
104:14,22
105:4 107:7
118:5,7,8
**recorded**
15:7
**redeploy**
110:18
123:16 126:9
**redeployed**
80:12 102:25
110:20
124:19
**redeploys**
123:3
**reduce**
56:23 84:8
**reduced**
55:15 130:4
**reducing**
46:23
**refer**
6:8 9:18
12:20 17:14
19:1 20:18
29:13 30:22
35:18 36:9
43:16 48:1
136:4
**reference**
17:23 93:24
106:19
107:21,22
**referenced**
95:25
**references**
17:5 106:16
**referred**
6:4 9:2 17:1
20:16 60:20
111:12

**referring**
17:3 18:25
27:4 28:25
29:15,19,20
30:17 43:15
45:19 51:24
86:21 96:4
101:2,3
104:8,10,23
105:5
106:21,22
107:4 111:17
116:5
120:10,12
134:19
136:23
**refers**
106:18
**reflect**
15:18 28:20
30:19 34:19
41:20 45:9
52:17 56:4
**reflected**
13:24 30:15
31:16,18
32:10 34:1,
20 35:12
39:5 52:2
53:1,16 62:6
71:6
**reflecting**
12:6
**reflective**
38:12
**reflects**
11:16 38:5
44:10 96:21
**refresh**
17:7 137:1
**regard**
12:12 91:19
**regarding**
137:1
**regular**
66:20
**regularly**

65:24
**related**
8:15 23:16,
18,21 25:22
37:13 56:6
74:23 89:16
101:22 115:5
137:17
**released**
38:10,13,15
**relevance**
75:25
**relevant**
41:23 72:13,
19,21 76:10
130:24
**reliability**
58:5 131:12
**reliable**
53:12 58:19
64:3
**reliably**
93:19
**relied**
12:2 135:18
136:5,7
**rely**
63:13 69:17
**relying**
46:18
**remember**
20:24 21:4
80:10
**remote**
49:13 88:18
**remove**
6:3 57:19
**render**
64:19,22
67:19 68:2
78:4 79:7,24
80:10 89:13
93:19 97:8,
13,19 103:7,
9,20 104:6
132:13,19

Patrick Kelleher, CPA, CFF
March 19, 2025

rendered
70:6,8 77:25
79:5 89:9
112:7

rendering
63:12,16,17,
23 94:3

rent
55:24 58:25
59:7,11,19,
20,25 60:13,
14 65:18,19
66:9,13,14,
17 67:2,10
76:17,24
102:7,13

rents
75:5,9,12

repeat
13:7 25:5
48:19 97:1
109:2,5
133:11

repeated
51:8

rephrase
7:15 135:25

report
6:2 7:23,25
8:5 9:6,8,
18,19 10:18
12:7,15,21,
25 13:4,9,
15,25 14:5,
10,15 15:11,
17 16:1,2,
17,25 17:1,
16,20 18:8,
18,22 19:2,
11,13,17,21,
24 20:3
21:11,15,19
28:15 29:17,
21 30:17
32:12,16,21,
24 33:2 34:2
37:6 43:14
44:9 45:9,

18,21 48:1,
5,6,7 52:1,
16 71:6,11,
15 72:4 79:2
85:20 86:1
87:19 100:17
104:24 106:3
107:17,24
108:2 109:21
110:3,4
113:18
114:16
115:8,12
119:5,8,16,
21 120:23,24
121:23
130:10
133:21,23
135:1,4,18
137:19

reporter
4:8 9:4,12
14:22,24
15:1,4,9
20:10 24:4
25:6,9
49:15,17
61:7,9
77:20,22
88:19,21,22,
24 91:4
97:22
102:21,24
103:5,13,17
109:4,7
132:11
133:10,12
138:3

reports
16:9,12
70:15 115:25

represent
4:12 17:23

represented
30:2 110:16

representing
90:15,17

reputes
9:25

requested
10:13 132:10

requests
58:22 118:16

require
110:18

required
16:12

requirement
16:17

requirements
16:11 63:22

requires
41:18

reread
103:4

reserved
138:11

reside
4:23

residence
4:18

residential
105:25

resolved
70:12

resources
76:21 85:9

respect
12:12 27:11
35:11 36:17,
20 37:9,18
38:19 39:17
43:1,10
53:25 54:8,
17,23 55:4
57:6,17
58:23 60:14
65:1 69:18
71:1,16
74:22 89:10
90:5,18 96:7
105:7 113:11
129:24
130:17

response
13:13 39:23
49:19 58:21
62:8 78:8
108:18 113:9
118:10,12
126:24 136:8

responsibilit
ies
26:16

responsive
11:2,14 50:7
92:23 132:2

restroom
77:14 131:5

result
89:17 101:1
123:2

results
64:1 123:1

retained
22:17 27:25
28:1 70:16,
18 73:10,14
76:4 78:3
83:4,6,18

retains
27:2

retention
70:21 83:7

returned
39:11

revenue
55:19 56:7
89:20

review
16:23 17:11
21:14,17
44:7,13
121:23

reviewed
7:23 8:4,7
10:9 17:9
120:5,7,21,
24

reviewing
7:25

Patrick Kelleher, CPA, CFF
March 19, 2025

revocable
  137:11
right
  5:23 7:22
  9:21,22
  11:21 12:14
  13:23 15:15,
  24 18:7
  20:7,9,12
  21:7,19
  24:13 25:22,
  23 30:10
  32:4,21
  33:5,11,14
  35:24 36:1,
  8,13 37:15
  39:10 42:18
  44:8 47:2,
  20,24 48:16
  49:25 50:23
  51:23 53:25
  54:9,18
  55:5,6,9,10
  56:1,18 57:8
  58:6,25
  59:4,8 60:2,
  3,12,20,22
  64:15,23
  66:13,14,16,
  18,21 67:3,
  11,19,22
  68:4 69:15
  70:24 72:7,
  11,13 74:2,
  25 76:13
  77:24 78:3,
  11 80:3
  81:6,8 82:1,
  5 83:13,16,
  21 84:6
  85:22,25
  86:3,8,14,
  16,23,24
  87:16 88:1
  91:14 92:12,
  25 93:3
  94:3,5,11
  95:10,14
  96:19,25

97:18 100:2,
13 104:10
106:12 107:7
108:7 109:17
110:23
112:17,19
113:7,8,10,
17,21 114:3,
8,10,12,20,
21,25
115:11,18
116:7,25
117:19
121:20 122:6
123:17,19
124:8,18
125:23
126:5,12,14,
25 127:8,18
128:5,18,20
129:13,22
130:13
131:10 132:4
134:12
135:5,20
right-hand
  6:12 136:19
rights
  126:18
rigor
  64:11
rise
  130:22 131:1
rising
  130:4,17
risk
  22:11 26:7
  108:15
  109:10,12
  110:2,9,14
  115:18,21
risks
  26:20
RRTPBC
  136:21
rule
  17:2,3,6,8,
  9,11,14,17

rules
  16:23 17:6,8
running
  128:23

_____

S

_____

sad
  27:16
sale
  38:23 39:11
  114:24
  117:20
sat
  81:9
saying
  13:18,20
  22:15 31:20
  33:8 35:2,6
  36:11 46:16
  47:2 50:8,10
  53:19 54:13,
  24 56:25
  57:15,18,20,
  22,25 60:24
  61:1,2,4,21
  63:17 72:16,
  17,18 80:4
  87:1,8
  92:12,14
  95:3,11
  100:9 116:17
  126:22,25
  128:15,16
says
  17:21 18:2
  32:23 34:15
  36:3 44:10
  85:21 92:21
  98:8 107:2,
  8,9 114:4
  115:8
Scariano
  44:3 111:13,
  14 137:12,13
schedule
  30:2,6,15,23

31:16 34:4,
6,8,15,16,24
35:1,6,13,22
36:10,12,13
52:1,3 55:16
56:2 63:8
113:17
114:2,5
134:3
scheduled
  8:13 21:2
schedules
  30:3,4,16
scheduling
  11:11
scientific
  64:9
Scott
  44:2,25
  108:6 111:2,
  6 119:4,14
  125:9,10,25
  137:9,23
scratch
  114:17
screen
  6:20 9:22
  17:18 29:25
  77:25 136:25
screens
  6:24
scroll
  29:25 55:8,
  16 106:9
search
  11:13 135:2
second
  70:24 107:1
  114:3
section
  32:14
secure
  100:25
see
  9:22 17:7
  18:5,19
  28:22 31:2

Patrick Kelleher, CPA, CFF
March 19, 2025

34:24 36:3
45:6,16
68:21 75:2,3
76:10 79:14,
22 106:22
107:1 114:4
116:3 118:21
119:25 120:5
126:3 131:16
133:18 137:6
**semantics**
112:12,15
113:7 127:8
**sense**
6:9 7:17
54:15 92:12
**serve**
58:14
**served**
58:14
**serves**
136:15
**service**
32:25 56:5,
21
**Services**
109:23
**set**
55:15 75:9
104:9 124:12
**seven**
67:18,20
68:6
**several**
27:14
**share**
9:22 77:24
103:24
**sheet**
94:18 95:9
**sheets**
112:22,25
**short**
56:7
**shortfall**
116:15
123:1,2

**show**
17:7 39:12
43:14,20
110:1
**showing**
38:12 55:17
**shown**
113:13
**shows**
19:3 35:10
38:7,8,21
39:12
**sic**
42:7 127:4
**side**
36:8 137:5
**sign**
138:7
**Significant**
37:24
**significantly**
85:19
**signing**
138:10
**similar**
25:20 38:3
54:20 118:6
125:5
**simple**
42:19 48:11
50:11 113:5
**simply**
81:16 90:6
**simultaneousl
y**
50:3,12,19
68:14 69:10
82:3 87:13
98:22 103:11
**single**
13:14 15:21
18:17,21,25
**sir**
44:12 48:4
50:20 51:5,
11 60:13
72:19 110:3

111:6 120:25
130:16
**sit**
15:15 19:9
28:8 43:11
44:5 47:15,
23 48:12,15
127:18,25
**sitting**
5:18 137:6
**situation**
111:25
**small**
115:13
**someone's**
63:14
**someplace**
103:1
**sounds**
7:18
**source**
38:7,8 108:1
**sources**
117:8
**span**
31:24,25
85:10
**speak**
98:2
**speaker**
91:10
**speaking**
50:3,12,19
68:14 69:10
82:3 85:8
87:13 98:22
103:11
**specialized**
130:21
**specific**
25:24 73:20
74:18 85:7
104:17
106:19
107:22
132:23
134:17

**specifically**
16:13 76:19
105:14,23
107:21 133:4
**speculation**
59:24 60:17,
22,25 61:3
63:2 64:17
65:2,5
**speculative**
62:4
**spend**
47:14
**spent**
136:17
**SPJ**
127:4
**spoke**
20:17
**spoken**
8:10
**spring**
7:9
**stage**
14:9 15:17
**stakes**
45:4
**stamp**
6:14 9:11
**stamped**
136:18,21
**stands**
40:10 56:1
**start**
28:16 30:23
82:10
**starting**
52:6
**starts**
24:17
**state**
4:13,24
28:11 62:17,
24 63:4
73:19 74:12,
20 75:14,19,
25 76:21

Patrick Kelleher, CPA, CFF
March 19, 2025

| | | | |
|---|---|---|---|
| 108:3 109:3 | **subpoena** | 82:18 94:2 | **switch** |
| 118:14 | 9:25 10:5,7 | **Suite** | 91:8 |
| **statement** | 11:3,14 | 4:20 | **sworn** |
| 13:1 18:3,8, | **subsection** | **summarize** | 4:4 |
| 11 20:4,14 | 18:2 20:14 | 19:18 | **symposium** |
| 28:13,25 | 28:13 119:22 | **summarizes** | 22:11 26:4, |
| 30:17 35:20 | **subset** | 18:22 | 7,10,14 |
| 100:21 108:9 | 24:21,23 | **summary** | |
| **states** | 25:2,16,18, | 134:20 | ——————— |
| 106:4 107:10 | 22 84:9 | **summer** | **T** |
| **stick** | **substance** | 7:9 | ——————— |
| 85:25 | 5:2 11:16 | **supplied** | **table** |
| **Stirista** | 49:11 | 67:13 81:13 | 35:24 |
| 87:20 | **substantive** | **support** | **take** |
| **stop** | 13:13,17,19, | 14:11 16:7 | 5:13 27:24 |
| 85:1 131:25 | 21 14:14,20 | 19:10,18 | 41:24 77:13, |
| **stops** | 15:7,18 | 53:9,13,21 | 15 78:16 |
| 56:7 135:7 | 18:12,13,14 | 54:14,25 | 86:21 126:9 |
| **story** | 118:10,12 | 57:23 61:23 | 127:3 138:8, |
| 27:16 | **subtitle** | 77:9,10 | 9 |
| **Street** | 20:14 100:22 | **supported** | **taken** |
| 4:19 | **succinct** | 57:12 61:4 | 33:3 77:21 |
| **strike** | 14:4 | **sure** | 79:23,24 |
| 18:1,20 50:8 | **succinctly** | 7:12 10:19 | 91:23 92:2 |
| 114:17 122:1 | 89:13 109:3 | 11:7 13:8 | 101:4 117:1 |
| **structure** | **sue** | 14:2 15:15 | 123:13 |
| 125:6 126:16 | 92:21 | 23:16 25:12, | 124:15 |
| **structured** | **sufficient** | 13 29:19 | **taking** |
| 58:2 | 21:14,22 | 32:18 37:14 | 10:1 93:6 |
| **struggling** | 53:12,20 | 43:18 45:12 | 94:9 |
| 99:12,15 | 58:21 60:10 | 55:9 59:2 | **talked** |
| **study** | 61:23 64:2 | 61:15 69:8, | 122:25 |
| 12:7 20:4 | 83:13 116:14 | 23 72:5 | **talking** |
| 101:22 | 131:14 | 73:20,23 | 8:15 37:15 |
| **stuff** | **sufficiently** | 77:18 78:23 | 47:22 60:1 |
| 50:7 | 98:18 | 80:20 82:9 | 70:17,23 |
| **subject** | **suggest** | 92:10,11 | 74:16 83:10, |
| 104:11,12 | 40:24 81:14 | 96:16,23 | 22 104:18 |
| 106:23 | 110:17 | 97:8,11 | 118:12 |
| 116:2,18 | 128:12 | 102:9 | 136:18 |
| **subjective** | **suggesting** | 104:13,15 | **task** |
| 21:23 | 112:3 125:20 | 105:4 | 83:19 |
| **submit** | 130:10 | 106:11,12 | **tax** |
| 32:2 | **suggestion** | 109:4 126:17 | 27:20 38:9, |
| **submitted** | 93:22 | 127:11 | 10,13,14 |
| 10:17 12:16 | **suggests** | 133:13 135:7 | 69:1,19 |
| 137:21 | 35:5 62:14 | **suspect** | 70:4,7,14 |
| | | 76:8 | 71:1,21,24 |

Patrick Kelleher, CPA, CFF
March 19, 2025

72:14,20,24
73:15 101:10
102:1,7,12
112:19
128:14
**tax-credit**
75:25
**team**
81:15 83:2
**technical**
92:11
**tecum**
9:25
**tell**
4:4,23 26:13
45:1 66:11
79:4,7,11
98:19
118:20,25
129:25
**telling**
128:11
129:12
**tenant**
76:18,20,24
**tenants**
59:8 75:12
**term**
74:5
**terms**
6:20 14:5,11
15:12 31:13
92:16 105:1
118:3 119:15
**test**
58:4,17
61:18 68:11,
12,16,20
77:8 118:21
**testability**
63:10
**testable**
64:7
**tested**
60:8,9 64:24
131:15

**testified**
4:5 20:1
23:7 68:6
**testify**
19:22 137:2
**testimony**
5:3 11:16
12:7 20:5
23:10 44:10
62:14,18
64:1 81:16
82:17,23
88:7 90:6,
18,20,24
92:20 100:5
106:5
107:10,19,25
108:3,7
116:1,10,12,
13 117:7,14
119:7,19
133:1 134:14
136:13
**testing**
63:7
**thank**
4:8 5:16
9:13 10:20
15:9 45:25
82:21 138:2,
6
**Thanks**
77:18
**thin**
61:1
**thing**
7:1 13:14
66:15 82:19
**things**
8:15 11:11
15:16 39:2
60:8 116:19
127:13
129:18
**think**
6:5 7:9
8:13,14 9:10
10:2,17

11:8,9
13:12,15
14:7,12,13,
20 15:6,14,
16,19,22
16:5 17:1,5
18:18 21:2,
20,23 23:5,
7,18,25
24:23 25:10,
20 26:1
27:25 28:6
29:17 32:9,
11 33:12
34:6 35:1,21
37:1,12,15
41:17,20
42:20 46:14,
21 50:13,16
52:5 53:3
54:19 58:14
59:1,23,25
62:1,2,14
64:11,16,24
66:15 68:1
69:21,24
71:7 72:10,
11,23 75:9
78:11 79:25
80:11 81:1,
10 82:25
84:2,3,4,8
85:23 86:19
87:11,21,22
89:11 90:25
91:14 92:6
93:14 95:10
96:20 97:5,
14,16 98:17
99:9 105:6,
23 106:19
110:25
113:11
115:15,20
117:13
118:2,25
124:21
126:13,16
127:9,12,14,

20,25 128:22
130:1,6,9,
14,15 133:25
135:3,15
**third**
55:18 117:3,
4 136:9
**Thomas**
119:19
136:4,11,12
137:10
**Thomas's**
136:5,6
**thought**
14:13 22:1
66:7
**thousand**
52:15
**thousands**
22:12
**three**
30:6 67:17
68:6 127:1
**tied**
24:18
**time**
7:7,8 8:4,7,
18 19:5
20:23 21:14,
22,23,24
41:16 85:9,
14 105:20
130:22 131:1
135:10
136:18
**times**
50:1 66:9
**timing**
11:9 28:20
30:19 31:5,
20 33:16
34:19 36:20,
24 37:3,5,8,
11,16,19
38:1,13,17,
18 52:22
86:17 133:8,

Patrick Kelleher, CPA, CFF
March 19, 2025

17 134:5,10,
24
**title**
35:17
**titled**
17:15 119:22
**today**
5:7 7:20
8:2,11,23
9:1 11:3
19:9 28:8
127:25
**today's**
10:22,25
**told**
66:7
**top**
32:22 35:21
47:24 48:3,
9,23 67:1
128:3
**total**
12:6 125:22
**totally**
91:11 93:25
**toughing**
5:10
**track**
118:5,7,8
**training**
38:6 130:20
**tranche**
130:11
**transcript**
90:20,23
119:4
**transcripts**
119:10,15
**trial**
20:1 88:7
**trick**
33:19 80:23
**tricky**
55:14
**triggered**
83:14

**Trinity**
73:2
**true**
47:6 57:25
**trust**
137:11
**truth**
4:5
**try**
5:8 22:20
44:3 45:16
50:23 55:14
83:18 98:1
125:11
**trying**
10:19 14:3
25:24,25
26:1 33:20,
22 45:21
67:5 82:7
86:22 92:24
99:16 132:23
**turn**
12:14
**turns**
123:3
**two**
6:1,5 8:20
12:1 24:18
31:10,22
32:6 67:20
68:6 77:1
109:17
127:10
134:20
136:15
**type**
42:3 57:18
70:25 84:7
87:19 88:8
125:3

---

**U**

---

**U.S.**
26:12

**Uh-huh**
84:12 105:2
**ultimate**
54:3
**unclip**
34:7
**underlying**
53:9
**underneath**
43:11
**underpinning**
37:13 58:15
61:19 63:8
65:22 77:9
118:17 119:1
132:16
134:12,15
**underpinnings**
64:21
**understand**
7:14 9:19
10:3 14:4
33:2 36:11
37:14 41:9
42:8 48:6,7,
8 50:10
51:7,15 54:2
59:1,20 72:5
83:1 108:25
120:16
124:18,20
125:19 127:9
**understanding**
34:14 40:17,
23,25 44:6,
24 46:4 47:5
62:12 116:13
118:17
**understated**
53:23 55:2
77:11
**understood**
7:17 37:17
54:16 90:6
105:6
**undertaken**
122:4,10,17

**undertaking**
110:8
**undertook**
122:4,9,17
**underwriting**
44:9 45:20
130:10
137:19,20
**undocumented**
63:14
**undue**
108:15
109:10,12
110:2,9,14
**unit**
76:20
**units**
59:15 75:11
**unjust**
112:1
**unrealistic**
111:25
**unrelated**
55:17 56:6
**unreliable**
131:15
**updated**
12:12
**utility**
75:21 76:5,
8,13
**utilize**
74:23 76:23

---

**V**

---

**valid**
61:21,22
**Valuation**
109:22
**value**
33:4,7,10,
11,13 34:1
35:23 36:1,
2,3,14 51:24
114:13,20

Patrick Kelleher, CPA, CFF
March 19, 2025

| | | | |
|---|---|---|---|
| values | voucher | week | wrongful |
| 36:1,2 | 76:18,25 | 8:12,17 | 78:18 123:1 |
| 115:11 | 77:4 | weird | |
| valuing | vouchers | 75:16 | ——————— |
| 36:4 | 60:7,20 | went | |
| veer | 65:19 66:10 | 44:14 53:11 | Y |
| 58:8 | | 55:5 59:22 | ——————— |
| vehicle | ——————— | 69:13 129:11 | yeah |
| 91:25 93:8 | | 130:3 | 8:16 9:5 |
| 94:11,14 | W | wide | 10:17,20 |
| vehicles | ——————— | 85:15 | 11:7 14:1,3, |
| 44:5 | wait | window | 7 29:15,22, |
| ventures | 14:22 51:2 | 85:14 | 25 34:8 |
| 23:11 | 70:17 86:24 | Wireless | 35:21 36:5 |
| venue | 88:19 103:13 | 88:14 89:7 | 45:12,18 |
| 37:18 38:16, | 117:9 | 90:5,19 | 46:21 48:1 |
| 19 40:3 43:8 | want | witness | 50:4 55:9,10 |
| 49:3,12 | 29:19 33:23 | 4:7 9:5 | 62:25 78:11 |
| 51:14 52:6 | 41:5,15,19 | 17:15,22 | 79:12 89:4 |
| 55:4,18 | 45:15 48:11 | 18:3 27:5,6, | 106:25 |
| 56:12,15 | 50:8,18 58:8 | 7 77:16,19 | 118:14 |
| 57:1,7,17 | 63:8 69:8 | 91:7 103:14 | 126:13 |
| 58:23 59:3, | 77:17 80:3 | word | 129:22 |
| 12 60:15 | 81:18,19,23 | 98:25 125:7 | 135:24 137:4 |
| 96:16 97:2 | 82:10,20 | work | year |
| 113:22 | 85:2 92:10 | 121:5 | 22:3 26:18 |
| veracity | 96:23 98:19 | worked | 31:10 35:1 |
| 129:16 | 99:14 | 22:11 26:22, | 38:22 52:7 |
| verbatim | 104:13,15 | 24 69:5 | years |
| 45:22 | 105:3 106:17 | working | 19:25 22:8 |
| verified | 126:10 | 22:8 | 26:15 27:14 |
| 66:16 | 135:15 138:3 | works | 31:11,22 |
| versus | warranted | 6:10 77:19 | 32:6 33:24 |
| 84:10 | 37:8 | world | 58:24 69:5, |
| veteran | warrants | 64:9,10 | 12 71:10 |
| 7:10 | 50:16 | worth | 85:10,12 |
| veto | way | 124:19 | 130:23 |
| 126:18 | 6:14 12:22 | wrinkles | yes-or-no |
| 127:12,14 | 14:4 22:2 | 118:18 | 53:5 132:3 |
| 128:11,13, | 25:11 55:15 | written | yes/no |
| 15,20 129:6, | 58:6 63:6 | 17:15 | 41:18 |
| 12,16 | 75:17 79:10, | wrong | Yesterday |
| video | 12 83:3 | 57:14 | 8:6,9,20 |
| 10:1 | 85:17 92:10 | wrongdoing | York |
| viewing | 113:5 120:20 | 90:13 | 26:9 |
| 106:6 107:12 | Wealth | wronged | you-all |
| 108:5 | 22:6 | 79:18 | 9:22 57:18 |
| | weather | | 89:3 |
| | 5:5 | | |

Patrick Kelleher, CPA, CFF
March 19, 2025

| **Z** |
| --- |

**zero**
  54:3 134:11
**zoned**
  105:22
**Zoom**
  5:11 6:25
  10:19 14:23