UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited liability
partnership; CANTON
CONSTRUCTION, LLC, A Florida
limited liability corporation;
CONCORD MANAGEMENT, LTD., a
Florida limited partnership; THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD.,
     Plaintiffs,
  v.
BREVARD COUNTY, a political
subdivision of the state of Florida,
     Defendant.

Case No.
6:23-CV-02473-CEM-DCI

**DEFENDANT BREVARD COUNTY'S**
**MOTION FOR FINAL SUMMARY JUDGMENT**

Comes Now Defendant, BREVARD COUNTY, by and through its undersigned

counsel and, pursuant to Fla. R. Civ. P. 1.510, hereby files its Motion for Final

Summary Judgment in its favor with respect to all claims asserted by Plaintiffs. In

support of its Motion, Brevard County states as follows:

## I.      INTRODUCTION

On December 27, 2023, this action was brought by the Plaintiffs, Atlantic Housing

Partners, L.L.L.P., ("AHP"); Canton Construction, LLC ("Canton"); Concord

Management, Ltd. ("Concord") and The Venue at Heritage Oaks Partners, Ltd.

("VHO") ("Plaintiffs") (Doc. 1). VHO and AHP intended to develop property in

Brevard County into an affordable housing 105 multifamily dwelling units for rental

("Proposed Development") (Doc. 37 at ¶12). Canton was to construct the proposed

1

development and Concord was to manage the proposed development (Doc. 37 at ¶15, 16). Plaintiffs claim violation under the Fair Housing Act ("FHA") and the Florida Fair Housing Act ("FFHA") for Defendant's denial of a bond application pursuant to TEFRA. Defendant seeks final summary judgment in its favor.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    Florida's Live Local Act

VHO and AHP planned to develop the Property under Florida's "Live Local Act," codified at Fla. Stat. § 166.0415(7)[1] (Doc. 37 at ¶14).  Plaintiffs lobbied for passage of Live Local and "had numerous discussions" with legislators and staff regarding Live Local (Culp Dep. 3/18/25, p. 175, attached as "Exhibit A").

### B.    Plaintiffs Enter Into A Land Contract

On or about May 23, 2023, Southern Investment Group, LLLP, who is not a party to this lawsuit, entered into a land contract to purchase land at Minton Road and Heritage Oaks Blvd.  The land zoned for commercial use, rather than residential. Plaintiffs liked the location because it was already leveled and curb cutouts, among other things (Dittmore Affidavit, Hintz Declaration, "Exhibit B.")

### C.    The Application Process

On May 25, 2023, one of the principals of Plaintiffs, Scott Culp (hereafter "Culp") emailed Angela Abbott (hereafter "Abbott"), the attorney for the Brevard

---

[1] On March 29, 2023, SB 102 or "Live Local" Act, was signed into law. Live Local requires municipalities to authorize multifamily and mixed-use residential developments in any area zoned for commercial, industrial, or mixed use if the developments will be "affordable" as defined by statute.  Fla. Stat. § 166.0415(7).

County Housing Finance Authority (hereafter "BCHFA"). Culp requested copies the latest multi-family bond financing guidelines. (Abbott Affidavit, ¶5, "Exhibit C."). Relevant provisions of the guidelines state as follows:

- Bond applications are approved by the Board of County Commissioners and approval by BCHFA "in no way constitutes approval by BCC."
- BCHFA holds a TEFRA hearing and Application is submitted to BCC for TERFA approval.
- The BCHFA advises the Applicant to expect the process of approval by the BCHFA and the BCC to take up to six months.[2]

On July 31, 2023, Venue at Heritage Oaks submitted an application for bond financing in the amount of $15,750,000 (hereafter "VHO Application"). The VHO Application stated that there would be 105 total units consisting of 63 one-bedroom units, 26 two-bedroom units and 12 three-bedroom units (VHO App, p. 2). On page 6 of the application, VHO selected "family." (VHO App, p. 6).

Based on the VHO application, 20% of the units, or 21 units of the 105 total units, would be available to those earning up to 50% AMI (area medium income) (thirteen (13) one-bedroom units; five (5) two-bedroom units; three (3) 3-bedroom units) (VHO App, p. 7). The VHO application specifies that "the project will have the federal minimum affordable set asides at 20% at 50% [of AMI] and VHO opted to select "20% of units at 50% of area median income" (VHO App. pp. 2, 7).

Initially, a BCHFA member expressed concern that the application. BCHFA had previously determined that any units financed with tax exempt bonds must remain

---

[2] Included in the VHO application was a signed statement by a representative of Venue at Heritage Oaks, Jay Brock, acknowledging the BCHFA guidelines, attached hereto as Exhibit D.

affordable for a minimum of 30 years, rather than 15 years. The member also questioned, "Why would we issued $15,750,000 of bonds for 21 affordable units? That is $750K per unit" (Abbott Aff. ¶10). On August 15, 2023, Abbott emailed Culp advising that the BCHFA had concerns about the application. (Abbott Aff. ¶11).

On October 6, 2023, VHO submitted a bond request for $16,750,000. (Abbott Aff. ¶14).[3] Although BCHFA had concerns, it recommends approval of the bond financing application on October 25, 2023 (Doc. 17 at ¶20) (Abbott Aff. ¶15).

On November 14, 2023, Abbott asked Culp, "Is it safe to say that this project will be built whether or not it is financed with bonds?" Culp responded, "Yes. The Live Local legislation provides the land use approvals and the bonds merely provide opportunity for some of the apartments to be more affordable for the Seniors needing housing in the community." Abbott responded, "Got it. Isn't this a family project, as opposed to seniors?" Culp then replied, "We are planning to restrict to seniors mixed use." (Exhibit B of Abbott Aff. ¶17).

## D.    November 14, 2023 BCBCC Meeting

At the BCBCC meeting, community members spoke at the meeting and voiced opposition to the project (Abbott Aff. ¶18). Some of the stated objections to the Proposed Development included: 1) Heritage Oaks Blvd only offers "One way in, one way out" to five subdivisions; 2) "Traffic on Minton Road is a nightmare;" 3)

---

[3] BCHFA had previously considered the VHO application and recommended approval of $15,750,000 in bond financing to VHO. However, VHO requested an additional $1,000,000 so the bond consideration was resubmitted (Abbott Aff. ¶12).

traffic studies are needed; 4) height; 5) location; 6) doesn't fit with what the community and West Melbourne planned for that area; 7) traffic accidents in the area (a week before a pedestrian was hit at the intersection; a few months before there was a motorcycle accident); and 8) lack of notice about the BCHFA public hearing. Some residents specifically stated that they do not oppose affordable housing, but objection to the location (Verbatim, "Exhibit E"). Community members also began contacting commissioners in November 2023 objecting to the proposed development (Declaration of Suzy Kedzierski, "Exhibit F").

Marc Gauthier, a representative of Plaintiffs, stated "rent would be somewhere in the low thousands," "it's a senior community," "we'll have some that are closer to market and some that are a little bit lower on the scale." Mr. Gauthier agreed that was not really low income, it's just affordable." Gautier agreed that Plaintiffs would host a community meeting to address the concerns of the residents (Verbatim, "Exhibit E").

At the November 14, 2023 BCBCC Meeting, the commission approved the Plan of Finance for two other affordable housing developments named Oak Meadows and Emerald Place (Abbott Aff. ¶19).

### E. Material Facts between BCBCC meetings

On November 17, 2024, Culp emailed Abbott stating Venue at Vierra[4] was a comparable property with "similar financing structure, set-asides, restrictions,

---

[4] Plaintiffs developed/own/manage four other properties in Brevard County: Venue at Vierra, Malabar Cove (Phases I and II), Hammock Harbor and Wickham Club.

amenities and design." Culp further stated, "we recognize the wisdom of giving the community residents the opportunity to learn more about our development plan and to express any concerns they may have when approving the public purpose for the issuance of the tax-exempt bonds ("Exhibit G").

On November 20, 2023, Abbott received an email from a resident Suzy Kedzierski posing various questions regarding an action or preceding to contest the validity of a bond, pursuant to Florida Statute 159.616. There were concerns about an action from the Homeowner's Association. (Abbott Aff. ¶21, Kedzierski Declaration ¶6).

On November 30, 2023, Plaintiffs hosted a community meeting with residents, presenting the attached PowerPoint ("Exhibit H"). At the community meeting, Culp stated the land had not been purchased yet, AHP would apply for other financing if the bond was denied, and the development would be restricted to seniors. Culp addressed issues regarding height, privacy, the traffic study and responded to a question about considering another location for the development. (Hintz Declaration, Dittmore Aff, "Exhibit B").

On December 1, 2023, Culp emailed community members stating, Plaintiffs had availability of bond financing from other sources ("Exhibit A" Kedzierski Dec).

### E.    December 5, 2023 BCBCC Meeting

At the December 5, 2023 BOCC meeting, members of the public spoke in opposition to the approval of the bond application; a representative of Atlantic also spoke at the meeting (Doc. 37 at ¶24-25). The BOCC declined to approve the issuance

of the tax-exempt bonds (Doc. 37 at ¶26).

John Dittmore, City of West Melbourne City Council, spoke in opposition to the proposed development. Dittmore said the development had minimum impact to families in need, 20 percent or 21 apartments, in this case. Dittmore also said the rental numbers are roughly the same as the market rate for a one-bedroom apartment the City of West Melbourne. Dittmore said the developer did not attempt to use properties zoned residential and the City was proposing an ordinance regarding the Live Local Act (Dittmore Aff., "Exhibit B").

Culp sent a PowerPoint presentation to the commissioners ("Exhibit I") and told BCBCC that the community was a "senior's affordable housing community building on a commercial parcel utilizing the Live Local legislation." Culp stated, "20 percent of the units will be at 50 percent of the median income and the balance will have a maximum of 120 percent of median income." When asked if a site plan had been turned in the City of West Melbourne, Culp responded, "We have not completed a formal site plan submittal application for the City" ("Exhibit J").

Community members objected to the Proposed Development including:

- "Need traffic study. Roads don't support the traffic."
- "Only 20 percent of the proposed 105 units are going to be set aside as affordable housing, the other 80 percent are not."
- "It hurts the 735 families in the five communities in Heritage Oaks."
- "Approving the bond negatively impacts the entire city as this 40- to 65-foot-high building will forever mar the look and feel of our community."
- "If we'd wanted an apartment on that corner, we would have approved that one when it was proposed last year, and that was just a three-story building."

- "I sent you all an email regarding the inconsistencies, namely that the HFA application asked if the developer or principal, and or general partner have been found in non-compliance."
- "They're presenting a bond proposal without specificity, but high-risk."
- "Concerned about infrastructure, as far as roads and so forth."

## F.    Post-denial Events And The Current Lawsuit

Culp attended a BCHFA meeting via phone on December 6, 2023. Abbott asked Culp if he would go ahead with the development. Culp responded, "We are not sure at this point. We have a lot of different options." Culp discussed applying for SAIL as a family development and developing the project at market rate without bonds, but said they have not totally decided how to proceed (Abbott Aff, ¶24). Culp further stated that traffic studies were provided which residents claimed were outdated and he "wouldn't disagree that current traffic studies might not have been used" (Abbott Aff, ¶25). Culp also stated that there was still an opportunity for someone to not ask for local bonds and go to the state for a Bond/SAIL program and still enforce Live Local.  Culp further stated that developers can "just go to the state and then there will be no TEFRA hearings because it will get done at the state level without any discussion at all" (Abbott Aff, ¶26). Finally, Culp stated that, "you guys know me, I don't like to get punched – I like to punch back" (Abbott Aff, ¶27).

On December 28, 2023, Attorney Scott Clark cancelled the purchase agreement for the land, citing the City of West Melbourne's ordinance regarding the Live Local Act.  The bond financing was not referenced in the letter ("Exhibit K").

As of January 1, 2024, the BCHFA had $50,000,000 in carry forward allocation available through December 31, 2025.  Two multifamily bonds have been issued. The BCHFA has an additional $50,000,000 in carryforward allocation which may be used for multifamily bond issues through December 31, 2027, and $14,000,000 in plan of finance allocation in 2025, which may be carried forward in 2026.  A multifamily application is pending and expected to close by the end of 2025, and a multifamily application, submitted March 25, 2025, is pending and will close in mid-2026. Allocation would have been available to Atlantic Housing Partners, LLP had they applied for bond financing in 2024 or early 2025. (Abbott Aff, ¶28-30).

The proposed Land Use Restriction Agreement encumbering the property required a minimum of 20% of the apartment units be set aside and available only to households earning less than 50% of area median income for as long as the financing is outstanding. ("Exhibit L") (Abbott Aff, ¶31).

## III.   DISCUSSION

### A. Legal Standard For Summary Judgment

A court should grant summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits" establish that there is no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden initially falls on the movant to point the court to portions of the record that it contends show the absence of a genuine issue of material fact. *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (citation omitted).

If the movant has shown a lack of evidence on a fact material to the non-movant's claim, the non-movant must respond by either identifying evidence in the record that the movant failed to consider or by presenting additional evidence sufficient to survive a motion for directed verdict at trial. Id. at 1116–17.

### B. Plaintiffs Cannot Establish A Prima Facie Case of Segregative Effect Or Disparate Impact

In filing an FHA action, "[a] plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that [a defendant's] decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group." *Hallmark Developers, Inc. v. Fulton Cty., Ga.,* 466 F.3d 1276, 1286 (11th Cir. 2006). Segregative-effect claims focus on how a challenged action affects residential segregation in the local community, as opposed to "disparate impact" claims which focus on the harm done to a racial minority or protected group. *River Cross Land Co., LLC v. Seminole Cnty.,* No. 6:18-CV-1646-ACC-LRH, 2021 WL 2291344, at 21 (M.D. Fla. 2021).

All discriminatory-effect cases have a three-step burden shifting analysis. 24 C.F.R. §100.500(c). First, the plaintiff has the initial burden of establishing a prima facie case by proving that "a challenged practice caused or predictably will cause a discriminatory effect." Id. Second, if the plaintiff proves a prima facie case, the burden shifts to the defendant to prove that its "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Id. Finally, if the defendant satisfies this burden, the plaintiff must prove that the

defendant's interest in "the challenged practice could be served by another practice that has a less discriminatory effect." Id.

The Plaintiffs filed this lawsuit on December 27, 2023. Culp testified that other than the report of Plaintiffs' hired expert, Dr. Hank Fishkind, Plaintiffs have no evidence of discrimination or that the race of the tenants at the Venue at Vierra would be 35% black (Culp Dep, pp 167, 230-231, 233, 234 "Exhibit M"). Culp was advised on December 13, 2023 by Jonathan Thomas, President of Concord Management, when analyzing the demographics at Venue at Vierra "you will see the data is not in our favor in terms of underrepresented minorities." At Venue at Vierra, 93.3% of the residents reported race and ethnicity and only 7.78% of the residents were Black/African American ("Exhibit N").

Dr. Fishkind was retained as an expert witness in January 2024. As such, at the time of filing this lawsuit on December 27, 2023, Plaintiffs had no evidence to support their claims. Setting aside Plaintiffs' baseless claims at the time of the filing on December 27, 2023, Dr. Fishkind was paid almost $100,000 after the lawsuit was filed to prepare his report in this case Culp has worked with Dr. Fishkind since 1989 and has hired Dr. Fishkind as an expert "a number of times." (Culp Dep, pp 151-152, 237-239, "Exhibit M.") The level of statistical analysis performed by Dr. Fishkind is wholly insufficient to show discrimination or segregated housing patterns. Defendant filed contemporaneously hereto a Motion In Limine to exclude the testimony of Dr. Fishkind because it is not reliable and is not helpful to the jury. Dr. Fishkind's report, and expected testimony, relies on set-

asides that have no basis in fact.[5]  Dr. Fishkind's entire analysis relies upon a non-existent "Plaintiffs' project plan" with "a) 21 units affordable to households earning 30% of the area median income ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI." (Fishkind p. 3).  Dr. Fishkind uses these set-asides to determine "the relevant market" (p. 4).  However, these set-asides were not presented in the VHO Application, were not presented by Culp at the community meeting, were not presented by Culp in his numerous correspondence to BCHFA, community members and city officials, and, most importantly, were not presented to BCBCC at the December 5, 2023 meeting (see also attached PowerPoint presentations). Instead, Plaintiffs and Culp repeatedly said that the proposed development would be at 20% at 50% Area Medium Income, or 21 of the 105 units. In fact, community members and BCHFA members objected to the set-asides as not being affordable enough. Dr. Fishkind and Plaintiffs now wish to re-write history and base their allegations on set-aside numbers that were never presented and may have ultimately never been used had the project been completed, or they may have.  The set-asides in Dr. Fishkind's report are pure speculation and conjecture, **and were never presented to the commissioners before the bond was denied.**

---

[5] Dr. Fishkind's report is attached as "Exhibit O." As outlined in Defendant's Motion In Limine to exclude Dr. Fishkind, Defendant's Expert, Dr. Sean Malone, outlines numerous other deficiencies in Dr. Fishkind's report. After reviewing Dr. Malone's report, Dr. Fishkind basically prepared a new report to address the deficiencies in his first report.  It is Defendant's position that Dr. Fishkind's supplemental report should be disregarded by the Court because it is not consistent with FRCP 26 disclosure requirements, including that the report was not timely filed.

Moreover, Dr. Fishkind states, "Plaintiffs' other four apartment projects in the Relevant Market are rented by members of the Affected Group." (p. 4) Dr. Fishkind states on page 22 as follows:

> As Table 10 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located. The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households. The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability. Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market. In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households. The data show that the Decision perpetuates racially segregated housing patterns in West Melbourne.

This information in Dr. Fishkind's report is false. As discussed above, Thomas' email dated December 13, 2023 states at Plaintiffs only other senior restricted community, Venue at Viera, 93.3% of the residents reported race and ethnicity and only 7.78% of the residents were Black/African American. Further, Thomas sent Culp an email on February 14, 2024, with the race and ethnicity of Plaintiffs' other properties ("Exhibit N"). Pursuant to Plaintiffs own data, regarding all other Brevard properties owned by Plaintiffs, 0.93% of the residents reporting were "Black or African American – Hispanic" and 21.15% of residents were "Black or African American – Non-Hispanic" ("Exhibit N"). Thomas provided the following testimony regarding race/ethnicity of the properties:

- Venue At Viera had a higher disclosure of those that provided that information. He thought because it was senior and different than the other properties. (34)
- Venue at Viera had a higher percentage of Caucasian non-Hispanic compared to the other Brevard properties and it is an "outlier." (35)

- 93% of the households at Venue at Viera provided race and/or ethnicity. (38)
- Venue at Viera age requirement is 55 plus. (40)
- Of those who reported race at Venue at Viera in December 2023, 15 residents were black or 8.9% - less than 10%. (45, 50)
- Regarding the remaining properties, one property had 35.5% black residents, one property had 52.4% black residents, one property had 35.2% black residents, and one property had 34.1% black residents. (48-50) (Malabar Cove reported as I and II)
- Venue at Viera's black population is "much lower than the others" and the only distinction is that Venue at Viera is senior. (50)

Dr. Fishkind's report would be accurate if he accounted for the age restrictions of the other properties.  While it appears to be true that the non-restricted properties are about 35% black, this statistic is wholly irrelevant to this case. Dr. Fishkind did not limit his data and report to the most comparable property, and the property that Culp repeatedly said was the most similar to the proposed development- the senior age-restricted Venue at Viera.  If he had, as Thomas told Culp before this current lawsuit was even filed, "you will see the data is not in our favor in terms of underrepresented minorities." Venue at Viera's black tenant population in December 2023, when the bond financing was denied, was only 8.9%. Yet, Dr. Fishkind grouped all Plaintiffs properties together including those that did not have a senior age restriction.  Dr. Fishkind should have based his report on seniors since those were restrictions proposed in the bond financing application.  The affected age group was black seniors.  Plaintiffs have 18 other senior properties in their portfolio.  Instead of harvesting the data from senior properties, which would have been readily available to Plaintiffs, Dr. Fishkind relied on irrelevant data from non-senior properties.

To further emphasis the point that the relevant demographic and dataset is black seniors, and the population Dr. Fishkind should have based his opinions on, the Court can review Culp's Affidavit in a previously filed similar lawsuit. Plaintiffs filed a very similar lawsuit against the *Atlantic Housing Partners, et al. v. City of Winter Springs*, Case No. 6:10-CV-1905-ORL-35DAB, USDC, Middle District (2011). In that case, Plaintiffs planned to develop an affordable housing development, but the community objected (See Culp Aff. "Exhibit Q"). Plaintiffs held a community meeting "to address the concerns of the various residents and groups." In response, Plaintiffs implemented a "senior restriction" and limited the residents to "age 55 or older" (Culp Aff. ¶13-17). Plaintiffs hired Meridian Appraisal Group to conduct a "Disparate Impact Study," prepared by Robert Von.  In the Disparate Impact Study, Mr. Von limited his study to "elderly households." Mr. Von did a full analysis of "elderly White households" and "elderly "Black households" and concluded, "if the subject property is not built, it will have a disparate impact on the elderly African American/Black households within the Primary Market Area" (See Meridian Report, "Exhibit Q").  It appears that Mr. Von correctly limited his disparate impact study to elderly households in Plaintiffs prior discrimination lawsuit, but Dr. Fishkind did not in the current lawsuit.  Dr. Fishkind's report is unreliable, not helpful and irrelevant and should not be used to support Plaintiffs' claims.

1. **Plaintiffs' Segregative Effect Claims Fails Because They Cannot Show The Bond Denial Caused, Reinforced Or Perpetuated A Segregative Effect (Counts I & III)**

To survive summary judgment, a plaintiff must establish a prima facie case showing: 1) a segregated housing pattern based on race within a specific community based on statistics and 2) that defendant's practice "caused" or "perpetuated" the segregation. 24 C.F.R. § 100.500(a)(2013 HUD Reg.); *Implementation of the Fair Housing Act's Discriminatory Effects Standard*, 78 FR 11460-01. *River Cross Land Co., LLC* at 23.

> To make a case for segregative effect, the plaintiff must have a [] thoroughly developed record that shows such indicia of segregation as localized concentrations of minority groups within the municipality; comparisons of the racial composition of the areas inside and outside the municipality, showing that minority groups have been excluded from the municipality; and historical practices of segregation, the effects of which linger in the present." *Housing Inv., Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999) (citing *Huntington v. Huntington Branch NAACP*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (noting that most of the black residents of the town, who comprised 4% of its population, lived clustered in six census tracts, and three quarters of the remaining census tracts, like the prospective site for low-income housing development, were 99% white)). Without such a showing of historical practices of segregation or a localized concentration, "[t]he statistic that the population….is 80.5% white and 19.5% nonwhite only repeats the otherwise unsurprising fact that racial minorities are minorities. Without more, this observation does little to support the claim of a segregative effect." *Housing Inv., Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999). *River Cross Land Co., LLC* at 31.

"A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. For instance, a plaintiff challenging the decision of a private

developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact <u>because such a one-time decision may not be a policy at all</u>." *Inclusive Communities Project, Inc.,* at 519. (emphasis added) *See City of Middletown,* 294 F.3d at 52–53. (RECAP does not challenge a facially neutral policy or practice; it challenges one specific act.) *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996) (The relevant question is not whether a single act or decision by that defendant has a significantly greater impact on members of a protected class, but instead the question is whether a policy, procedure, or practice specifically identified by the plaintiff has a significantly greater discriminatory impact on members of a protected class.)

Disparate impact claims generally challenge policies and practices, not a single bond denial. Defendant evaluated only the merits of the application before it. Although Plaintiffs are unhappy about the outcome, they cannot convert their singular disappointment into a disparate impact claim without showing that a single denial is a policy, procedure, or practice. It is fatal to Plaintiffs' claims that Defendant has approved four prior affordable housing developments **for the Plaintiffs** and approved two other affordable housing developments at the time Plaintiffs Proposed Development was being considered. Further, BCBCC has approved several other affordable housing bond applications since the denial.

Dr. Fishkind notes in his report that the area is predominately white. Without such a showing of historical practices of segregation or a localized concentration, the statistic "only repeats the otherwise unsurprising fact that racial minorities are

17

minorities. Without more, this observation does little to support the claim of a segregative effect."  Neither the facts of this case, nor Dr. Fishkind's report, establishes that Defendant has a policy or practice that "caused" or "reinforced" or "perpetuated" the segregation leading to racial imbalance in Brevard County. As such, Plaintiffs segregative impact claims must fail.

### 2. Plaintiffs' Disparate Impact Claims Must Fail (Counts II & IV)

"Disparate-impact liability has always been properly limited in key respects to avoid serious constitutional questions that might arise under the FHA, *e.g.,* if such liability were imposed based solely on a showing of a statistical disparity." *Inclusive Communities Project, Inc.,* at 521. The Supreme Court ruled in *Inclusive Communities Project, Inc.* as follows:

> A disparate-impact claim relying on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A robust causality requirement is important in ensuring that defendants do not resort to the use of racial quotas. Courts must therefore examine with care whether a plaintiff has made out a prima facie showing of disparate impact, and prompt resolution of these cases is important. Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are "artificial, arbitrary, and unnecessary barriers." *Griggs,* 401 U.S., at 431, 91 S.Ct. 849. Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision. These limitations are also necessary to protect defendants against abusive disparate-impact claims. *Id.* at 521-522

Plaintiffs must satisfy a "robust causality requirement" by showing facts or statistical evidence establishing a "causal connection" between the challenged policy and the alleged disparate impact. *Inclusive Cmtys.*, 135 S. Ct. at 2523–24; *see also Hallmark Dev., Inc.*, 466 F.3d at 1286. A plaintiff who fails to produce statistical evidence demonstrating a causal connection fails to make out a prima

facie case of disparate impact. *Inclusive Cmtys.*, 135 S. Ct. at 2523. *Oviedo Town Center II, L.L.L.P. v. City of Oviedo, Florida* No. 616CV1005ORL37GJK, 2017 WL 3621940 (M.D. Fla. Aug. 23, 2017), aff'd, 759 F. App'x 828 (11th Cir. 2018). If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability. *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 527, 135 S. Ct. 2507, 2514, 192 L. Ed. 2d 514 (2015)

> The inconvenient truth is that OTC's racial imbalance is endemic to affordable housing, as such housing caters to a disproportionately higher percentage of racial minorities. Regrettably, these vestiges of racial inequality remain today; but this fact does not establish the crucial element of causation. To hold otherwise ignores the FHA's unequivocal "robust causality requirement," which "ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 2523. This principle is well-illustrated here, as the Demographic Survey fails to demonstrate the City's responsibility for the racial imbalance present in OTC. As such, Plaintiffs' statistical evidence fails to draw the requisite causal connection between the imposition of the 2012 Policy and its impact on racial minorities. *Oviedo Town Ctr. II, L.L.L.P.*

As discussed above, Dr. Fishkind's report is unreliable and not helpful. Further, Dr. Fishkind's report merely establishes that the City of West Melbourne is primarily white. Dr. Fishkind fails to demonstrate how Brevard County's denial of ONE bond application caused the connection between the racial imbalance.  Further, as noted by Thomas's testimony, Venue at Viera only had 15 black senior residents.  It is likely that had the proposed development been completed, the black senior population would

have been similar to Venue at Viera, or less than 10%. Dr. Fishkind does not establish the necessary robust causality requirement for a disparate impact claim. As such, Plaintiffs disparate impact claim must fail.

### C. Assuming, *Arguendo,* Plaintiffs Can Establish A Prima Facie Case, Defendant Had Substantial, Legitimate, Nondiscriminatory Interests

The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) affords tax-exempt status to "private activity bonds" only if an "applicable elected representative" approves the issuance of the bond after (1) a public hearing, (2) following "reasonable" public notice. Pub. L. No. 97-248, § 215, 96 Stat. 468; 26 U.S.C. § 147(f)(2)(B).[6] TERRA approval can occur in one of two ways:

> (B) Approval by a governmental unit. --For purposes of subparagraph (A), an issue shall be treated as having been approved by any governmental unit if such issue is approved--
> (i) by the applicable elected representative of such governmental unit after a public hearing following reasonable public notice, or
> (ii) by voter referendum of such governmental unit. 26 U.S.C.A. § 147

"Public hearing" is defined as "<u>a forum providing a reasonable opportunity for interested individuals to express their views, orally or in writing, on the proposed issue of bonds and the location and nature of the proposed project to be financed</u>." 26 U.S.C.A. § 1.147(f)-1(d)(1) (emphasis added).[7]

In *Affordable Hous. Dev. Corp. v. City of Fresno,* 433 F.3d 1182 (9th Cir. 2006), the Court addressed the City of Fresno's approval of a bond pursuant to TEFRA. AHDC sought to develop a low-income housing complex in Fresno. To finance the project, they required approval from the Fresno City Council pursuant to TEFRA.

---

[6] The VHO Application Guidelines, which was acknowledged by Plaintiffs, specifically states that "BCHFA holds TEFRA hearing and Application is submitted to BCC for TERFA approval."

[7] "The purpose of the public notice requirement is to ensure that the affected public will be notified of the pending bond issue and made aware of the intended use of proceeds to elicit comments that will ensure a substantial public benefit from issuing bonds." IRS Publication 200049022, December 8, 2000, https://www.irs.gov/pub/irs-wd/0049022.pdf

The City Council denied the bonds, citing "vigorous opposition" by the community and concerns about neighborhood impact. AHDC filed suit against the City alleging Fair Housing Act violations and state law claims alleging race discrimination, among other things.  The community was opposed and concerns were voiced at neighborhood meetings, flyer distribution and a public hearing held by the City Council before the vote. The *Fresno* Court concluded that the City could reject TEFRA bonds for "legitimate non-discriminatory reason without incurring liability under state law or other federal law." *Id*.  The Court concluded, "We agree with the City that the federal statute's explicit provisions for a voter referendum or approval by an elected representative indicate that Congress did not intend to make approval automatic or to exclude the play of democratic process in the local decision." *Id*. at 1194.

> For approval of every kind of private activity bond, TEFRA calls, first, for a public hearing, then for a popular vote or a decision by an elected authority. A public hearing would be a sham if any opponent of housing bonds would have to keep silent. There is no point in the statute's requirement if, as in a dictatorship, a referendum could have only one correct outcome. There is no need for the statute to specify that, alternatively, an elected representative is to decide on approval if the task to be performed is the bureaucratic job of determining whether the developer met minimal qualifications.
>
> The housing authority was not an elected representative of the people of Fresno. Only the people or the elected council had the statutory authority to act for the City in approving or disapproving the bond issue.
>
> Congress required the city council to hold a public hearing and vote on the TEFRA bond financing approval question. TEFRA mandates that the city council decide the matter after considering local residents' views, and by clear implication requires the city council to consider city priorities and housing needs, the wisdom of preferential financing for the project, and all manner of other relevant considerations to which elected representatives normally give weight in executing their office. Imposing automatic liability for the exercise of this decision for causing a disparate impact would write the relevant considerations and the discretion out of the legislative duties in the

statute. It is nearly impossible for a reviewing court to pass judgment on what considerations were "necessary" to the City's business of good governance and to implement its vision for the future of Fresno.

We hold only in this case of first impression under TEFRA that if an elected representative authority declines to approve TEFRA housing bonds for a legitimate non-discriminatory reason, the defense is good. A governmental interest in not giving approval may outweigh the desirability of furnishing low-rent housing. *Id.* at 1194-96.

In the current case, even Culp acknowledged, "we recognize the wisdom of giving the community residents the opportunity to learn more about our development plan and to express any concerns they may have." Nonetheless, if this Court disagrees that TEFRA *alone* mandates Defendant to consider public comments and decide accordingly, Defendant nonetheless prevails in establishing legitimate, non-discriminatory justifications for the denial. "There is nothing inherently wrong with responding to community pressure. Here, with no racial animus expressed to the Board, bowing to political pressure does not demonstrate racial animus." *Hallmark Devs., Inc. v. Fulton Cnty., Ga.,* 466 F.3d 1276, 1285 (11th Cir. 2006). See also *River Cross Land Co.* at 24. ("Officials must often make decisions based on a mix of factors such as cost and traffic patterns or preserving historic architecture.")

The Fair Housing Act is a civil rights statute intended to eradicate discriminatory housing practices. It was not intended to be usurped by profit-maximizing developers to force municipalities to approve their residential development plans despite their conflict with a municipality's vision of the rate and character of its growth. *Arbor Bend Villas Hous., L.P.* at 14 (citations omitted).

As discussed above and in the attached Affidavits, the community complained of a number of issues including, but not limited to, the completeness of the application, congestion, traffic, community planning, outdated traffic study, location, lack of notice of the hearing, the possibility of a citizen lawsuit, height, minimal benefit to the community, the changes in the demographics, lack of a formal cite plan to the City, incompleteness of the application and expected rent at

the proposed project. It is also fatal to Plaintiffs claim that Plaintiffs represented on multiple occasions that the proposed development would be built even if the bond financing was denied.  The letter canceling the land contract made no mention of the bond denial. The FHA "was not intended to be usurped by profit-maximizing developers" to force Brevard County to approve their development. As such, Defendant had legitimate, no-discriminatory reasons for the denial.

### D. Plaintiffs Cannot Establish That The Challenged Practice Could Be Served By Another Practice That Has A Less Discriminatory Effect

The *Fresno* Court addressed the third prong of the *McDonnell Douglas* burden shifting approach and concluded:

> We need not and do not decide what other defenses exist to a claim of disparate impact or whether such a showing by a defendant shifts the burden back to the plaintiff to show that no alternative would serve that interest with less discriminatory effect. The City here was called upon to make an up or down vote on a single housing proposal. There were no alternatives at issue. *Id*. at 1195-1196.

As was the case in *Fresno*, there was not "another practice" available in this case – the BCBCC was called upon to make an up or down vote.  While Plaintiffs had other options to pursue (and stated several times as such), including taking advantage of the carryforward financing available in 2024 at a different location, there was no alternatives for Defendant as it related to the VHO application voted on.

### E. Brevard County Is Entitled To Immunity

#### 1. BCBCC Is Entitled To Legislative Immunity

BCBCC was fulfilling a legislative decision mandated by TEFRA and Congress when it voted to deny the bond application.  In a case directly on point, the Ninth Circuit ruled that when councilmembers make a decision pursuant to TEFRA, the councilmembers are entitled to legislative immunity.

> The councilmembers were engaged in legislative action in making the
> TEFRA decision. The statute makes clear that approval of TEFRA
> bonds is to be by voter referendum or by elected representative. 26
> U.S.C. § 147(f)(2)(B). The federal focus is on the democratic nature of
> the approval-granting authority: it is either the electorate as a whole
> or persons chosen by the electorate. In their actions and votes on the
> council, the councilmembers were elected representatives acting in a
> legislative decision affecting a substantial area. In these activities,
> they were entitled to legislative immunity. *San Pedro Hotel Co. v. City
> of Los Angeles,* 159 F.3d 470, 476 (9th Cir.1998). We affirm the
> district court's decision of March 9, 2004 with respect to legislative
> immunity. The city councilmembers were plainly shielded from
> liability because their actions were legislative in nature.
> *Affordable Hous. Dev. Corp.* at 1192 (9th Cir. 2006)

Similarly, BCBCC was performing a legislative function, as mandated by

TEFRA, and is entitled to legislative immunity for its decision.

### 2. Brevard County is Entitled to Sovereign Immunity On The State Law Claim

In *City of Pompano Beach v. Coral Rock Development Group, LLC*, No.

4D2024-1263, 2024 WL 4964590, (Fla. Dist. Ct. App. Dec. 4, 2024), the Court

ruled a city retained sovereign immunity from claims brought under Florida's Fair

Housing Act. The developers alleged the City discriminated against their affordable

housing project based on its source of financing. The Court ruled the City was

entitled to sovereign immunity. In reaching its decision, the Court concluded that

section 760.26 of Florida's Fair Housing Act does not contain a clear and

unequivocal waiver of sovereign immunity, which is required by the Florida

Constitution. Because any waiver of sovereign immunity must be strictly construed

and cannot be implied, the court ruled the City was immune from suit. Similarly,

Brevard County is entitled to dismissal based on sovereign immunity and Plaintiffs' state law claims should be dismissed as a matter of law.

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should be entered in favor of Defendant Brevard County as a matter of law.   Defendant requests this Honorable Court for entry of Final Summary Judgment in its favor for all claims, and grant such further relief as the Court deems just and proper.

Respectfully submitted,

<u>*/s/ Susan G. Gainey*</u>
Susan G. Gainey, Esquire.
Florida Bar No.:  1016477
Roper, Townsend & Sutphen, P.A.
255 S. Orange Avenue, Suite 750
Orlando, FL 32801
Attorney for Brevard County