W. Scott Culp
March 18, 2025

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.:  6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS,
L.L.L.P., a Florida limited
liability partnership;
CANTON CONSTRUCTION, LLC, a
Florida limited liability
corporation; CONCORD
MANAGEMENT, LTD., a Florida
limited partnership; THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD.,

        Plaintiffs,

vs.

BREVARD COUNTY, a political
subdivision of the state of
Florida,

        Defendant.

_____/


    VIDEO-RECORDED DEPOSITION OF THE CORPORATE
REPRESENTATIVE FOR ATLANTIC HOUSING PARTNERS, L.L.L.P.,
  PURSUANT TO FLORIDA RULE OF CIVIL PROCEDURE 30(B)(6)


        DEPONENT:    W. SCOTT CULP

        DATE:        Tuesday, March 18, 2025

        TIME:        9:34 a.m. to 4:30 p.m.

        PLACE:       Lowndes, Drosdick, Doster,
                     Kantor & Reed, P.A.
                     215 North Eola Drive
                     Orlando, Florida 32801


    Stenographically Reported By:  Andrea C. Rivera
        Professional Court Reporter, Notary Public

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:
      BY:  MICHAEL D. PICCOLO, ESQUIRE
LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.
      215 North Eola Drive
      Orlando, Florida 32801
      407-843-4600
      michael.piccolo@lowndes-law.com

ON BEHALF OF THE DEFENDANT:
      BY:  SUSAN G. GAINEY, ESQUIRE
      ROPER, TOWNSEND & SUTPHEN, P.A.
      2707 East Jefferson Street
      Orlando, Florida 32803
      407-897-5150
      sgainey@roperpa.com

ALSO PRESENT:  DESTINEY OTALVARO (Legal Videographer)

---

Page 3

INDEX OF PROCEEDINGS

DEPOSITION OF W. SCOTT CULP

Direct Examination by Ms. Gainey                    5

Certificate of Oath                                242

Certificate of Reporter                            243

Witness Review Letter                              244

Errata Sheet                                       245

- - - - -

DEFENDANT'S EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1 | Subpoena duces tecum | 6 |
| Exhibit 2 | Mr. Missigman's report | 11 |
| Exhibit 3 | Fifteen-year pro formas | 73 |
| Exhibit 4 | Sources and uses statements | 83 |
| Exhibit 5 | Estimated 2024 incoming rents | 88 |
| Exhibit 6 | Rent calculations | 88 |
| Exhibit 7 | Table of rents | 92 |
| Exhibit 8 | Interrogatories | 114 |
| Exhibit 9 | Large stack of documents | 135 |
| Exhibit 10 | Plaintiffs' responses | 138 |
| Exhibit 11 | Venue at Viera Senior Living | 150 |
| Exhibit 12 | Dr. Fishkind's production file | 151 |
| Exhibit 13 | E-mail dated 12/3/2023 | 178 |
| Exhibit 14 | E-mails dated 12/4/2023 | 192 |
| Exhibit 15 | E-mails dated 11/14/2023 | 193 |
| Exhibit 16 | Memo to Scott Culp | 213 |
| Exhibit 17 | E-mail 11/29/2023 w/attachments | 213 |
| Exhibit 18 | E-mail dated 10/2/2023 | 216 |
| Exhibit 19 | Letter dated 7/28/2023 | 219 |
| Exhibit 20 | Land use and comprehensive | 222 |
| Exhibit 21 | Credit underwriting report | 224 |
| Exhibit 22 | AHP's organizational chart | 226 |
| Exhibit 23 | E-mails dated 12/7/2023 | 227 |
| Exhibit 24 | Letter dated 12/6/2023 | 228 |

---

Page 4

Proceedings taken before Andrea C. Rivera, Professional Court Reporter and Notary Public, in and for the State of Florida at Large in the above cause.

- - - - - - -

THEREUPON:
      The following proceedings occurred:
      THE VIDEOGRAPHER:  Good morning.  We are now on the record on March 18th, 2025 at 9:34 a.m. Audio and video recording will continue to take place until all parties agree to go off the record. Please note that microphones are sensitive and may pick up whispering and private conversations.
      This is the video-recorded proceeding of witness Scott Culp, corporate representative of Atlantic Housing Partners, L.L.L.P., taken by counsel for defendant in the matter of Atlantic Housing Partners, L.L.L.P. versus Brevard County, filed in the United States District Court, Middle District of Florida, Orlando Division.  This proceeding is being held at 215 North Eola Drive, Orlando, Florida 32802.
      My name is Destiney Otalvaro.  I'm the videographer on behalf of U.S. Legal Support.  The court reporter is Andrea Rivera on behalf of U.S. Legal Support.  Counsel will state their

---

Page 5

appearances for the record, after which the court reporter will swear in the witness.
      MR. PICCOLO:  Michael Piccolo here on behalf of the plaintiffs.
      MS. GAINEY:  Susan Gainey for the defendant.
      THE COURT REPORTER:  Please raise your right hand.
                    W. SCOTT CULP,
having been first duly sworn or affirmed to tell the truth, was examined and testified as follows:
      THE WITNESS:  I do.
                    DIRECT EXAMINATION
BY MS. GAINEY:
      Q    Please state your name for the record.
      A    Scott Culp.
      Q    Mr. Culp, nice to meet you again.  You know I'm Susan Gainey.  I represent the defendant in this lawsuit, and I'm going to be asking you various questions today.  I understand that you have been designated the corporate representative for actually all four plaintiffs in this case; is that correct?
      A    That's correct.
      Q    For purposes of this first deposition, I'd like to just have you be designated as the representative of Atlantic Housing Partners, L.L.L.P.

Page 6

1  And if there is anything I ask you about during the
2  course of this deposition that is more appropriately
3  asked of another party, then just let me know. But I
4  did send you a subpoena with regard to Atlantic Housing
5  L.L. -- Atlantic Housing Partners, L.L.L.P. And you
6  received that subpoena?
7      A   Yes, I have.
8      Q   And I have showed you what we are going to
9  mark as Defendant's Exhibit 1, and ask you if that's the
10 subpoena you received pursuant to Federal Civil
11 Procedure 30(b)(6)?
12     A   Yes, it's a copy.
13         (Defendant's Exhibit 1 was marked for
14 identification.)
15 BY MS. GAINEY:
16     Q   And attached to that subpoena are various
17 items of inquiry under exhibit A. Have you reviewed
18 exhibit A prior to your deposition here today?
19     A   Yes.
20     Q   And in your capacity as the 30(b)(6)
21 representative of Atlantic Partners -- Atlantic Housing
22 Partners, L.L.L.P., what is your designation, officer,
23 director, managing agent?
24     A   I am a manager of the general partner of
25 Atlantic Housing Partners, L.L.L.P.

Page 7

1      Q   All right. And for purposes of today, I'll
2  either say Atlantic Housing or AHP or maybe some
3  variation of that. You understand that we're all asking
4  you about Atlantic Housing Partners, L.L.L.P., correct?
5      A   Yes.
6      Q   And you are the person who is most
7  knowledgeable and, as so, designated regarding the
8  matters of inquiry under exhibit A?
9      A   I believe so.
10     Q   Are there any areas of inquiry as identified
11 in exhibit A that you are not the most knowledgeable
12 person for Atlantic Housing Partners, L.L.L.P.?
13     A   The only question in that regard is with
14 regard to expert opinions with regard to damages. I am
15 knowledgeable and probably most knowledgeable with
16 regard to the facts concerning the damages. I don't
17 know how to answer the question with regard to most
18 knowledgeable compared to an expert preparing damages.
19 Does that make sense?
20     Q   Well, which specific number are you referring
21 to?
22     A   Two.
23     Q   And number two asks for all documents and
24 communications relied on to support plaintiffs' claim
25 for damages including, but not limited to, estimated

Page 8

1  rent or rent calculations for Venue at Heritage Oaks,
2  operating pro formas for Venue at Heritage Oaks, voucher
3  income and other incomes, annual rent variance and
4  sources and uses statement for Venue at Heritage Oaks,
5  close quote. Is that what number two says?
6      A   It does.
7      Q   All right. And so you don't believe that you
8  are the most knowledgeable person at Atlantic Housing
9  Partners, L.L.L.P. in response to number two?
10     A   I didn't say that. My question was with
11 regard -- and I think reading now number two, you're
12 talking about documents and communication relied on.
13 And I have as much knowledge as anyone with regard to
14 the documents and communication relied on.
15     Q   Yea, I think that's probably a fair
16 assessment. I understand that the plaintiffs have hired
17 an expert in this case by the name of Dr. Hank Fishkind,
18 correct?
19     A   Dr. Fishkind is not an expert provided by us
20 with regard to damages.
21     Q   And also Paul Missigman who's been designated
22 at your trial Rule 26 damages witness?
23     A   That is my understanding.
24     Q   So just a point of clarification, I know you
25 were talking about experts. Do you have a hired or

Page 9

1  retained expert as it relates to damages?
2      A   Not at this time.
3      Q   So now that you have reviewed number two, are
4  you the most knowledgeable person as it relates to
5  number two?
6      A   With regard to my understanding of number two,
7  yes.
8      Q   And just to refresh your recollection on some
9  of the ground rules in giving a deposition, if there's
10 any of my questions that you do not understand, please
11 ask me to clarify. Is that fair?
12     A   Yes.
13     Q   If you answer my question I'm going to assume
14 that you understood what I was asking you. Is that
15 fair?
16     A   Yes.
17     Q   And, of course, if you need a break during any
18 point in this deposition, please don't hesitate to ask
19 for one.
20     A   Okay.
21     Q   Did you review any documents in preparation
22 for today's deposition?
23     A   I reviewed Paul Missigman's damage
24 calculations.
25     Q   And can you be more specific as to what you

W. Scott Culp
March 18, 2025

Page 10

1  reviewed?
2      A    He had a report that he provided to our
3  counsel with regard to our damages, and it's my
4  understanding that's been produced; and I reviewed that
5  report in a pdf format.
6      Q    All right.  And just for clarification, I
7  haven't seen an actual report from Paul.  Are you
8  talking about an outline or some type of written report
9  from Paul or are you talking about his model?
10     A    What I reviewed you would probably consider to
11 be his model, multiple pages, and that I reviewed in pdf
12 format.  And the reason I clarified that, I think you
13 may have received that also in a spreadsheet format.
14 I'm not sure though.
15     Q    Were the pages that you reviewed Bates-Stamped
16 on the lower right-hand corner?
17     A    I don't believe so.
18     Q    And other than Paul's documents, did you
19 review anything else in preparation for today's
20 deposition?
21     A    No.
22     Q    Other than your attorneys, did you talk to
23 anyone in preparation for today's deposition?
24     A    No.  Although, I did talk to my wife.  I told
25 her you would keep me here way too long.  That was in

Page 11

1  preparation though for this deposition, because she
2  needs to know.
3         MS. GAINEY:  I'm going to show you what we'll
4      mark as Defendant's Exhibit 2, a report to you that
5      you'll see an exhibit marker at the top, exhibit 4,
6      which was exhibit 4 from Paul Missigman's
7      deposition.
8         (Defendant's Exhibit 2 was marked for
9      identification.)
10 BY MS. GAINEY:
11     Q    Were those the documents that you reviewed in
12 preparation for today's deposition?
13     A    No.
14     Q    And can you further identify the documents you
15 reviewed in preparation for today's deposition?
16     A    Did you say can I further identify them?
17     Q    Uh-huh.
18     A    The first page is an e-mail from me to --
19     Q    No, sir.  I'm sorry, let me clarify my
20 question.
21     A    All right.
22     Q    You said those were not the -- what I've
23 handed you as Defendant's Exhibit 2 were not the
24 documents you reviewed in preparation for today's
25 deposition?

Page 12

1      A    Correct.
2      Q    So I'm asking you aside from what I've just
3  handed you, further identify what you did review in
4  preparation for today's deposition, because --
5      A    A pdf format of Paul Missigman's financial
6  model calculating the damages.
7      Q    Very good.  So what I've handed you is
8  exhibit 4, which -- or actually portions of exhibit 4,
9  and I'm going to purport to you that Mr. Missigman
10 produced those in response to a subpoena duces tecum
11 before his deposition.  The reason why I've pulled out
12 those portions of exhibit 4 is because Mr. Missigman
13 testified that you were the one that provided documents
14 to him in order to do his model for damages in this
15 case; is that accurate?
16     A    Partially.  As noted in the exhibit you've
17 handed me, there is information that I provided to Paul
18 Missigman that he could utilize in referencing as he
19 creates his model for damages.  In addition, you have
20 other documents in exhibit 4 that didn't come from me
21 that he utilized in prepping his damages calculation.
22 I've seen some of those.  Some of them I have not.  Some
23 of this exhibit 4 I provided, some I did not.  None of
24 this exhibit is the exhibit that you asked me about
25 previously if I had reviewed anything prior to this

Page 13

1  deposition.
2      Q    So I'm understanding you to say that you only
3  reviewed his model and not necessarily the other
4  documents that you've relied on in order to produce his
5  model.  Did I understand you correctly?
6      A    In preparation for this deposition, that is
7  correct.  None of this exhibit 4 are the items that I
8  reviewed in preparation for this deposition.
9      Q    Prior to today's deposition had you ever seen
10 the documents in exhibit 4 between the time they were
11 created until --
12     A    Obviously --
13     Q    -- this deposition?
14     A    Obviously the e-mail from me --
15     Q    Correct.
16     A    -- with the attachments, and provided by me
17 I've seen and --
18     Q    That's why I asked from the time they were
19 created until --
20     A    Right.  You also have some information in here
21 that's not from me.  And you have information from
22 William Griese to Paul Missigman.
23     Q    Who's William Griese?
24     A    He is an employee, and I'm not exactly sure
25 which entity he's employed by.

W. Scott Culp
March 18, 2025

Page 14

1   Q   By one of the plaintiffs?
2   A   By an affiliate of one of the plaintiffs. We
3   have a number of employees, and their employer may be
4   Westmore Capital Holdings or -- so as far as he is
5   employed by an affiliate of one of the plaintiffs. He
6   does tax returns and tax documents and he's provided
7   some information to Paul Missigman, and you noted that
8   in the exhibit. It's e-mails from him to Paul
9   Missigman. Those items I have never reviewed.
10  Q   There's also some items what I believe to be
11  items provided by Mr. Thomas?
12  A   Yes, and I believe the items provided by Mr.
13  Thomas I have seen but haven't reviewed them recently.
14  And the only other ones I don't recognize, because I
15  haven't reviewed them, don't recall ever seeing them
16  before, are the attachments to Mr. Griese's e-mails.
17  And then later on you have additional attachments that
18  are from me.
19  Q   So as it relates to Mr. Griese, who would be
20  the most knowledgeable person as to who Mr. Griese works
21  for?
22  A   I would probably be the most knowledgeable,
23  but I would need to look at our payroll records to see
24  exactly which entity he works for.
25  Q   And as the designated representative of

Page 15

1   Atlantic Housing, you're saying that you have never seen
2   the document provided by Mr. Griese to Mr. Missigman?
3   A   That's correct.
4   Q   And -- but the other documents as they relate
5   to e-mails between you and Mr. Thomas, you have seen
6   those?
7   A   Yes.
8   Q   Any other documents in there other than the
9   documents from Mr. Griese and potentially attachments
10  provided by Mr. Griese that you have not seen before?
11  A   No.
12  Q   So when I took your deposition in your
13  personal capacity, you deferred the damages opinion to
14  Mr. Missigman; is that correct?
15  A   That's correct.
16  Q   And when I took Mr. Missigman's deposition, he
17  indicated that it was, in fact, you who provided the
18  underlying documents and Mr. Griese and Mr. Thomas that
19  he relied on in order to do his damages model; is that
20  correct?
21      MR. PICCOLO: Object to form.
22      THE WITNESS: You made a statement, and if you
23  have his deposition transcript and you want to ask
24  me if what you said and what he said is correct, I
25  can read that; but I can't tell you what he said in

Page 16

1   his deposition and what you said. So that's the
2   question you asked and I can't answer that question
3   without you presenting the transcript of the
4   deposition.
5   BY MS. GAINEY:
6   Q   All right. So let me back up and ask a --
7   A   Okay.
8   Q   -- different question.
9   A   Okay.
10  Q   Did you provide the underlying documents to
11  Mr. Missigman in order for him to provide his damages
12  model --
13      MR. PICCOLO: Object to form.
14  BY MS. GAINEY:
15  Q   -- and damages in this case?
16      MR. PICCOLO: Same objection.
17      THE WITNESS: I provided the documents that
18  you have provided to me just now within exhibit 4
19  for him to utilize in his preparation of his
20  damages. I don't know that those are all of the
21  underlying data and documents that he used to
22  develop his damages. I do know what I provided him
23  and what you have provided me a copy of in this
24  exhibit 4.
25  BY MS. GAINEY:

Page 17

1   Q   So is the answer to my question yes?
2   A   No, it's not.
3       MR. PICCOLO: Object to form.
4   BY MS. GAINEY:
5   Q   All right.
6   A   No, it's not.
7   Q   So yes or no, did you --
8   A   It's not a --
9   Q   Let me --
10  A   -- yes-or-no answer.
11  Q   Let me -- let me finish my question, please.
12  A   All right.
13  Q   The court reporter is going to be very upset
14  with --
15  A   You do the ---
16  Q   -- us if we talk --
17  A   -- same for me, let me finish my answer and
18  I'll let you finish your question.
19  Q   Did you or did you not, at least in part,
20  provide the -- some of the documents Mr. Missigman used
21  in order to do his damages model in this case?
22  A   I provided Mr. Missigman the information you
23  have identified in exhibit 4.
24  Q   And as the representative of Atlantic Housing
25  Partners, did other people provide documents in order

W. Scott Culp
March 18, 2025

---

Page 18

1  for Mr. Missigman to do his damages model in this case?
2      A    Yes.
3      Q    And who are those other people.
4      A    Jonathan Thomas and William Griese.
5      Q    And have you spoken to Mr. Thomas regarding
6  the documents he provided to Mr. Missigman that underlie
7  the damages model in this case?
8      A    No.
9      Q    Have you spoken to Mr. Griese regarding the
10 documents he provided to Mr. Missigman that underlies
11 the damages model in this case?
12     A    No.
13     Q    Have you spoken to Mr. Missigman specifically
14 regarding his damages model?
15     A    Yes.
16     Q    And tell me about that conversation.
17     A    It's been quite some time.  There was a
18 question about had he provided the damages calculations
19 to our counsel.  There was a question about in general
20 the extent of the damages in total dollars.  Not much
21 more than that.
22     Q    When you say sometime, can you give me an
23 estimate of how long ago?
24     A    I really don't recall.  Sometime around the
25 time of producing the damages calculations, because I

---

Page 19

1  was asking had he produced them for our attorneys; and I
2  don't recall when that was.
3      Q    I'm going to purport to you that Mr. Missigman
4  testified that he did not produce any of the damages
5  calculations until mid January 2025.  Does that sound
6  accurate to you?
7      A    I don't recall.
8      Q    Who at Atlantic Housing Partners would know
9  and speak on behalf of the company as to when Mr.
10 Missigman produced his damages model?
11     A    I could speak to that.  I have to look at the
12 records of what I produced to our counsel, or what was
13 produced to our counsel by other people; and that would
14 be the date.
15     Q    So if that were Mr. Missigman's testimony, you
16 have no reason to dispute that it wasn't until mid
17 January 2025 that he produced documents related to the
18 litigation?
19     A    I don't know that to be inaccurate.
20     Q    I'm going to purport to you that Mr. Missigman
21 testified that prior to January 2025 he was not asked to
22 produce any documents related to the damages in this
23 litigation.  Would you agree with that or would you not
24 agree as the representative of Atlantic Housing
25 Partners?

---

Page 20

1      A    What am I agreeing or not agreeing to?
2      Q    I'm going to purport to you that Mr. Missigman
3  testified that he was not asked to produce any damages
4  documents until January of 2025, this year.  Would you
5  agree with that or would you disagree with that?
6      A    I would agree that you're reporting that to
7  me.
8      Q    Sir, listen, this might be --
9      A    I don't know the question.
10     Q    -- a very long deposition.
11     A    It could be if you don't get different kind of
12 questions.
13     Q    Let's be clear about this.  You are here as a
14 representative of Atlantic Housing Partners, L.L.L.P. --
15     A    I think --
16     Q    -- so not --
17     A    -- I agreed to that when we started.
18     Q    -- not in your personal capacity.
19     A    Right.
20     Q    So I am asking you questions pursuant to
21 Federal Civil Procedure 30(b)(6).  So you're the company
22 today.
23     A    I agree.
24     Q    So Mr. Missigman is testi -- has testified
25 that he was not asked by anyone from Atlantic Housing

---

Page 21

1  Partners or any of the plaintiffs to produce any damages
2  documents prior to mid January 2025.  As the
3  representative of Atlantic Housing Partners, is that a
4  true statement or is that a -- not a true statement?
5          MR. PICCOLO:  Object to form.
6          If you know.
7          THE WITNESS:  I know that I had asked Mr.
8      Missigman to prepare damages prior to that date.  I
9      don't know whether or not he was asked to produce
10     that damages calculation prior to that date.
11 BY MS. GAINEY:
12     Q    When did you ask Mr. Missigman to prepare
13 damages calculations?
14     A    I see the e-mail you provided me on March 1st
15 where I had told him he can use anything to prove
16 statistically with historical data from our portfolio
17 with regard to his question.  And February 24th, in the
18 same e-mail trail, I'm giving him my financial model to
19 use for input in his damages calculation.  That was
20 February 24th of 2024.  None of that answers your
21 question about when he was asked to produce the damages
22 calculation.  I believe we've produced all e-mails and
23 correspondence.  I don't have any recollection of a date
24 and time that Paul Missigman was asked to produce his
25 damages calculation, but I do have some documents that

W. Scott Culp
March 18, 2025

Page 22

1    you've provided me to refresh my recollection of when I
2    asked Paul Missigman to begin preparation of his damages
3    calculation.
4        Q    Mr. Missigman testified that he doesn't
5    believe that he ever sent you the model.
6        A    That is correct.
7             MR. PICCOLO:  Object to form.
8    BY MS. GAINEY:
9        Q    My question was going to be is that accurate,
10   but you anticipated my question, so...
11       A    Well, let me complete that answer, because you
12   asked me if I prepared anything -- if I'd read anything
13   in preparation for this deposition.  And the first time
14   I had ever seen his model or he had ever given me any
15   copies of the pdf format of his model was yesterday.  So
16   as of the time of his deposition, that was accurate.  He
17   had not -- I had never looked at, nor had he presented
18   to me his model.
19       Q    And for purposes of the record, his deposition
20   was on February 21st, 2025.  So I'm understanding your
21   testimony to say that from the time he completed his
22   damages model up until yesterday, he had not provided a
23   copy of the damages model to you?
24       A    That is correct.  Now, the only -- because you
25   are deposing me as the corporate rep, the corporation

Page 23

1    produced those damages to our attorney.
2        Q    When was that?
3        A    You asked that question before and I don't
4    have a recollection of that.
5        Q    Was it this year?
6        A    You asked that question before and I don't
7    have a recollection of that.
8        Q    You have no recollection whether it was this
9    year, last year?
10       A    I told you in the answer earlier that I don't
11   know when Paul Missigman, without looking at the records
12   of correspondence with our attorney, produced those
13   financial damages calculations.
14       Q    As the representative from AHP you have no
15   reason to dispute Mr. Missigman's testimony that it was
16   -- he did not produce those damages records to the
17   attorneys until January of 2025; is that correct?
18            MR. PICCOLO:  Object to form.
19            THE WITNESS:  I have no knowledge that would
20       be contrary to that that I recollect.
21   BY MS. GAINEY:
22       Q    Mr. Missigman also testified that the records
23   that he -- that you, Mr. Culp individually, provided to
24   him which he relied on in order to do his damages models
25   are Bates-Stamped 68 through 80.  Can you please take a

Page 24

1    look at Exhibit 2 to see if those are the documents that
2    you, in fact, provided to Mr. Missigman in order to do
3    his damages model?
4             MR. PICCOLO:  Object to form.
5             THE WITNESS:  These are documents that I
6        provided to Mr. Missigman for his use in inputting
7        for his damages calculation.
8    BY MS. GAINEY:
9        Q    And where did you get the information that you
10   used in order to produce those documents to Mr.
11   Missigman?
12       A    This information comes primarily from the
13   application to the Brevard County Housing Finance
14   Authority, any revisions we may have been making in
15   process with the credit underwriter during that process
16   of underwriting for the closing on the taxes and bonds,
17   although it's hard to read.
18       Q    Any -- sorry, that's how they were produced to
19   us.
20       A    Yeah.  I know it's my sunglasses, but they're
21   also prescription, so it helps.  There is some input
22   here that relates to revisions being made in
23   anticipation of the four percent Low-Income Housing Tax
24   Credits, and it was included in the financial model that
25   was provided to Paul Missigman.

Page 25

1        Q    Did some of that information come from Venue
2    at Viera?
3        A    No -- well, let me take that -- let me make
4    sure of it.  When you say come from Venue at Viera, you
5    mean the entity, or was it related to cost information
6    pertaining to Venue at Viera?
7        Q    Well, I'm just trying to get an idea of where
8    the numbers that underlie the damages model in this came
9    from.  And if you look at 0078 --
10       A    78.
11       Q    -- it says Viera FHFC approved at the top.
12       A    Yes.  That is the utility allowances that were
13   approved by Florida Housing Finance Corporation for
14   Venue at Viera, because utility allowances are
15   engineered and approved by the corporation for use.  And
16   the best data that would provide the most realistic
17   projection of utility allowance would be the closest
18   identical product in geography and in construction to
19   Venue at Heritage Oaks, which was Venue at Viera.  So I
20   had utilized Viera to approve utility allowances to
21   provide this schedule of rents.
22       Q    Also if you look at 68 --
23       A    68, yeah, that's my cover e-mail.
24       Q    -- it also references Venue at Viera --
25       A    Let's see.

W. Scott Culp
March 18, 2025

Page 26

1    Q    -- in the second to the last paragraph.

2    A    Yeah.  None of the data behind there -- I

3    indicated to Paul that he could add in the fair market

4    rents and the Section 8 vouchers, and could modify

5    expenses from historical data for Venue at Viera because

6    my information that I was providing did not include any

7    historical data with regard to fair market rents,

8    Section 8 vouchers or expenses related to Venue at

9    Viera.

10   Q    On document marked 0069 there's numbers there.

11   Where did those numbers come from?

12   A    I created this.  And with regard to each of

13   the numbers, let's see, the unit mix comes from the

14   plans.  I determined from the plans that we had

15   developed there were seventy-one one-bedroom units and

16   thirty two-bedroom units and four three-bedroom units.

17   That's where those numbers came from.  I determined that

18   in a four percent low-income housing tax rate

19   application utilizing income averaging we would restrict

20   the units based upon the affordability that's in the

21   columns to the right of that at thirty percent, sixty

22   percent and eighty percent AMI.  I provided that input.

23   Q    Those are not the numbers that were provided

24   to the Brevard County Commissioners on December 5th,

25   2023, were they?

Page 27

1    A    No, they were not.

2    Q    Okay.  Go ahead.  Where did you get the rest

3    of the numbers?

4    A    The -- of course the total is just math.  The

5    income averaging percentage is just math.

6    Q    Can you tell me -- and excuse me to interrupt

7    you, but there's some very small numbers underneath the

8    totals.  What are those numbers?

9    A    They're math that's utilized to determine the

10   income average under sixty percent.  You'll see out to

11   the right 59.9048.  Those grayed-out numbers, actually

12   you see that in the model, they're grayed out

13   intentionally because it's just math.  And I look at

14   those when I'm looking at my models to make sure I'm

15   using the right math.

16        So if you look at the spreadsheet you'll see

17   that's just math.  And it helps to generate the

18   59.9048 percentage.  It has to be below sixty percent in

19   income averaging.  The hard construction costs,

20   two-bedroom, two-bath of one ninety-seven six fifty-six,

21   that's a number that I input based upon my estimation

22   based upon our historical data for our construction

23   costs.

24   Q    Let me be very specific about -- where did you

25   get the historical data where you came up with this

Page 28

1    estimate?

2    A    Yeah, I maintain primarily in my head.  But

3    I've done, what, close to a hundred and fifty

4    communities now.  And each year I keep an update as to

5    what our costs are.  We do cost certifications.  We do

6    budgeting.

7        And so I'm aware of what our costs are, and I

8    try and keep abreast of the costs by product type.  So

9    I'm fairly aware of those.  So I create conceptual

10   estimates.  And I created the estimate for the Housing

11   Finance Authority on the construction cost for this

12   community.  So I had in my mind what I thought those

13   were.  That doesn't mean this number will specifically

14   match that.

15        When I'm developing a model, this number here,

16   one ninety-six six fifty-six is a reference number.

17   It's not actually used anywhere else in the model, but

18   it's a reference number for me so I know that what I'm

19   working on has some basis for reality.  I don't want to

20   see that I have nineteen thousand dollars in

21   construction costs per unit.  So it just helps me with a

22   reference to make sure I have some basis for the -- in

23   reality to what I'm doing.

24   Q    So are there any actual documents or data that

25   you can point to as to where you came up with that

Page 29

1    number?

2    A    No.  Literally it comes out of my head.  I do

3    have historical data on every job we've ever built, but

4    I don't go back to that when I'm creating this.  I

5    literally come up with it out of my head because I'm

6    very familiar.  I'm bidding projects constantly,

7    developing several projects every year.  So I have some

8    idea in my mind of what our construction cost is.  So

9    that's what I put in there.  It doesn't really tie back

10   to the rest of the financial model, as you would see if

11   you tied them together and if you tried to look from

12   each one.  But it helps me in referencing that I have a

13   real estate model.

14   Q    Underneath that it says mid-rise four?

15   A    Yes.

16   Q    What does that mean?

17   A    All of our product types are categorized in

18   the Florida Housing Finance Corporation construction

19   types.  Mid-rise four is one of the Florida Housing

20   Finance Corporation construction types.  And I need to

21   make sure that I'm thinking about the correct product

22   type.  I have, you know, one-story villas, three-story

23   garden, mid-rise four, high-rise seven.  And those are

24   all Florida Housing Finance construction types, and I

25   just want to make sure that I'm thinking about the

W. Scott Culp
March 18, 2025

Page 30

1  correct type.
2      Q    So does that mean mid-rise building, four
3  stories?
4      A    Correct.
5      Q    The next number, eighteen million seven six
6  seven four three seven.
7      A    Yeah, that's a calculation based upon the
8  conceptual per unit estimate in my mind at one
9  ninety-seven six fifty-six, and I make some adjustments.
10  It's the math there based upon unit type, one-bedroom,
11  two-bedroom, three-bedroom, and adjust the total
12  construction cost; and that's how you get to eighteen
13  million seven sixty-seven four thirty-seven.
14     Q    Are there any records or data where you're
15  doing those calculations?
16     A    No.
17     Q    Or is that -- that's in your head again?
18     A    Yeah.  No.
19     Q    The next number, is that math, one seven eight
20  seven three seven average per unit hard costs?
21     A    It should be.  Eighteen million seven
22  sixty-seven four thirty-seven divided by the one oh
23  five.  I haven't checked that; but if you want me to,
24  I'll do that right now.  Eighteen seven six seven four
25  three seven divided by one oh five.  It looks like one

Page 31

1  seventy-eight seven thirty-seven.  Sounds right.
2      Q    Underneath that it says CX against concept
3  budget.  What does that mean?
4      A    I want to make sure that this number is
5  consistent with the conceptual budget.  The conceptual
6  budget is required to provide to the Housing Finance
7  Authority in our applications.  So I want to make sure
8  my model is consistent with, even though it may be
9  slightly different than, the conceptual budgets that
10  we're using.  So I'm just -- I'm checking that.  It's a
11  reminder to myself to check.
12     Q    All right.  And did you, in fact, check it
13  against the conceptual budget?
14     A    I don't remember.
15     Q    So that is more or less just a note to
16  yourself?
17     A    It's a note to myself.  And I do these
18  numerous times throughout the process, maybe weekly,
19  monthly.  So I may be checking -- so I don't remember.
20  I probably at one point looked at that, because I do
21  this a lot for each individual project.  I'm always
22  checking, you know, to see where we are.
23     Q    And is there any separate document that
24  reflects that you checked it against the conceptual
25  budget?

Page 32

1      A    No, I don't -- wouldn't have a separate
2  document.  The other thing that would be helpful is in
3  the number just below it, and the question you're going
4  to ask me next from the HFA credit underwriting report;
5  that tells me what the HFA had for that number.  And so
6  the HFA had a number of seventeen million eight
7  fifty-seven three oh five.  And I'm checking to make
8  sure my numbers and my conceptual idea of what the
9  construction costs should be are in range with what has
10  been provided.
11     Q    And is it, in fact, in range with what had
12  been provided?
13     A    Yes.
14     Q    The interest rate at sixty point five percent,
15  how did you determine that?
16     A    That's a plug by me.  And, again, I have some
17  historical knowledge of interest rates on tax exempt
18  bonds that changes every month.  But when I'm preparing
19  models I try and make sure I have something that's
20  consistent with the historical trends.
21     Q    What is the current interest rate?
22     A    Don't know.
23     Q    I'm sorry, I thought you said --
24     A    I don't know.
25     Q    Do you check it every month or --

Page 33

1      A    I do, but I don't know what it is today.
2      Q    When you last checked it what was it?
3      A    I don't remember.
4      Q    Land cost per unit --
5      A    Yes.
6      Q    -- twenty-four thousand seven sixty-two.  What
7  is that number?
8      A    It's the land cost divided by the number of
9  units.  Let's see.  If we calculate twenty-four seven
10  sixty-two times one oh five, it gives you two million
11  six.
12     Q    And --
13     A    Then we see to the right two million eight
14  fifty is our land purchase price.  We had allocated a
15  value of two hundred and fifty thousand to the office
16  pad to reach a net land purchase price for the
17  multi-family affordable housing of two million six.
18     Q    How did you come up with the office pad value?
19     A    Just created it out of our head.
20     Q    You also have one million eight hundred
21  thousand ninety-five zero three three one as the net land
22  purchase price from HFA credit underwriting report,
23  correct?
24     A    Correct, yes.
25     Q    And why does that number differ?

W. Scott Culp
March 18, 2025

Page 34

1     A     You see the note to the right of that that you
2  can't barely read there assumes soils remediation is in
3  the construction costs.  There was a soils remediation
4  on this site because the soils were required to be
5  remediated.  And instead of -- that would not be land
6  under the Florida Housing Finance Corporation
7  categorization of costs, so we would have moved that to
8  construction costs, and the net would be the one million
9  eight ninety-five oh thirty-one.
10    Q     The next page on 71 --
11    A     70 or 71?
12    Q     Sorry.  This is --
13    A     My next page is 70.
14    Q     I'm missing a page.  Are you missing a page?
15    A     No, I have 70.
16    Q     Okay.  So tell me about 70.
17    A     That's the summary of the sources and uses.
18 Provides all the sources by categories and the uses by
19 categories.
20    Q     And where did you get those numbers?
21    A     They are math generated from the numbers that
22 are presented on page 72 and 73, with the exception of
23 there's a block that has some information with regard to
24 the total development cost limitations based upon
25 Florida Housing Finance Corporation rules.  And there's

Page 35

1  some information at the bottom right that's checking the
2  fifty percent test for the bond issue.  But the sources
3  and uses and numbers within those are math coming from
4  pages 72 and 73, which is the detailed costs.
5     Q     Page 71, where did you get those numbers?
6     A     There again, that's math, and it comes from
7  the input parameters you saw on 69.  And then in the
8  table below, the costs per unit limitations, those were
9  the -- by category the cost lim -- total cost -- total
10 development cost limitations provided from Florida
11 Housing Finance Corporation for each development type.
12 And then the math to determine the total development
13 cost limitation.
14    Q     Why does the top row -- or why are there two
15 different rows, top row at sixty percent, forty percent,
16 and the bottom row eighty percent, one twenty percent,
17 thirty percent?
18    A     Not two different rows, they're all different
19 blocks.  And depending on what your set-asides are,
20 you'll see that we have a number of units, a total
21 number of units in the first block, project total, that
22 equals a hundred and five units.  You'll see the second
23 block we have units that are set aside at sixty percent
24 AMI.  That's fifty-three units.  You'll see that's
25 consistent with -- it should be, unless I made a

Page 36

1  mistake, let's see -- consistent with page 69, sixty
2  percent units, there's fifty-three of them.
3        The second set of columns, the eighty percent
4  AMI, you'll see thirty-one units at eighty percent, that
5  comes from page 69, the thirty-one units.  Then the
6  thirty percent AMI with twenty-one units, that also
7  comes from page 69.  That's all just math coming from
8  the input parameters on Bates-Stamped 69.
9     Q     We established in your first -- your first
10 deposition, first two depositions that what was
11 presented to the Brevard County Commissioners was -- and
12 also in the application, was twenty percent at fifty
13 percent AMI, eighty percent up to a hundred and twenty
14 percent AMI, correct?
15    A     We established in that deposition what we
16 presented the correct restrictions for the bond
17 allocation.  The Low-Income Housing Tax Credit
18 restrictions include the restrictions that were in the
19 bond allocation, but further restricted to comply with
20 the four percent Low-Income Housing Tax Credits.
21    Q     Yes, sir, I understand you have an explanation
22 for it, but I just want to talk about the numbers
23 themselves as they represented to the Brevard County --
24    A     I think we just did.
25    Q     Can you please let me finish my question

Page 37

1  before you --
2     A     Sure.
3     Q     -- cut me off?  Thank you.
4        What we established and what I think is very
5  clear in this case what was actually presented as far as
6  the numbers to the Brevard County Commissioners was
7  twenty percent of the units would be up to fifty percent
8  AMI, and the remainder of the units would be up to a
9  hundred and twenty percent AMI; is that correct or is
10 that not correct?
11        MR. PICCOLO:  Object to form.
12        THE WITNESS:  Could you repeat the question?
13        MS. GAINEY:  Sure.  Actually, I will have her
14 read it back to you so that we're very clear about
15 this.
16        (The court reporter complied.)
17        MR. PICCOLO:  Same objection.
18        THE WITNESS:  I don't recall if that is
19 correct.
20 BY MS. GAINEY:
21    Q     All right.  Let's look at the application so
22 that we can refresh your recollection.
23    A     Are we going to look at the application or are
24 we going to look at what is presented to the
25 commissioners?

W. Scott Culp
March 18, 2025

Page 38

1  Q   We're going to look at both.

2  A   Okay.

3  Q   So on the application, I will show you what is

4  marked as plaintiffs 02419, and ask you what the

5  set-asides were in the application that was submitted to

6  the Brevard Housing authority on or about July 31st,

7  2023.

8  A   I'm seeing in Bates-Stamped 2419, item D, that

9  we have twenty percent set-aside units, which is

10  twenty-one units. I'm seeing a table of what the rents

11  would be by unit type in item F for that twenty percent

12  set-aside units. I'm seeing in item G, the selection,

13  which is the required to be chosen in the application of

14  twenty percent at fifty percent or forty percent at

15  sixty percent, and we chose twenty percent at fifty

16  percent. That was in the application.

17  Q   And then it's twenty percent was at fifty

18  percent. What was the remainder of the eighty percent,

19  is it a hundred and twenty percent AMI?

20  A   I don't recall if there was anything in the

21  application that had any restriction on the balance of

22  the units. The taxes and bonds do not require any

23  further restrictions other than the twenty percent at

24  fifty percent or forty percent at sixty percent, and

25  this selection was twenty percent of fifty percent.

Page 39

1  Q   Sir, did you review the application in

2  preparation for today's deposition?

3  A   No.

4  Q   So when we asked for the person at Atlantic

5  Housing Partners with the most knowledge with respect to

6  the application that was submitted to the Brevard County

7  Housing Finance Authority, is that you?

8  A   Yes, it is.

9  Q   And you don't recall the application?

10  A   I do recall the application.

11  Q   So --

12  A   I don't recall every specific note and detail

13  and word in the application; but if you have the

14  application in front of you, you could probably present

15  it to me and I could look and see whether there are

16  other restrictions other than the twenty percent at

17  fifty percent.

18  Q   Absolutely. I'm happy to do that for you,

19  because I certainly want to refresh your recollection.

20  A   The application on the coverage page says that

21  eighty percent of the units will be unrestricted by the

22  bond covenants. I'll look through, if you'd like, the

23  rest of the application to see if there's any other

24  reference to any further restriction.

25  Q   So per the application, just to make sure I

Page 40

1  understand your testimony, only twenty percent of the

2  units as proposed for Venue at Heritage Oaks would be

3  restricted to up to fifty percent of AMI; is that

4  correct or is that not correct?

5  A   I'm looking at the application. I don't

6  recall a restriction under the bonds or the bond

7  application beyond the twenty percent at fifty percent.

8  I could be incorrect, but I don't think I am; but I'm

9  looking through the application to see if we had any

10  other set-asides within the application. It shouldn't

11  be too hard to determine.

12      Now, the application development cost pro

13  forma Bates-Stamped 2474 had the twenty percent at fifty

14  percent and the balance at market rate. I'll look to

15  see if there's any other items within the application

16  that might have provided anything different, but I don't

17  believe there are. And, again, this is the application

18  for the taxes and bonds. It doesn't represent what the

19  ultimate set-asides would be, but it would be with the

20  set-asides that would be restricted under the bond

21  allocation. And I'm not seeing anything other than the

22  twenty percent at fifty percent in the bond application.

23  Q   I'll take that back for now. Thank you.

24  A   Do you want this page also that you had handed

25  me, 2419? It was the twenty percent of fifty percent.

Page 41

1  Q   Thanks.

2      Based on that, what set-aside amounts were

3  presented to the county commissioners in December of

4  2023?

5  A   I don't recall what was in my presentation,

6  and I don't recall what was in the information provided

7  to the commissioners by the Housing Finance Authority.

8  I didn't provide that information. I believe I reviewed

9  it and looked at it at one point. I don't remember on

10  the top of my head right now, but that documentation

11  that was provided from the HFA to the county

12  commissioners would be what was presented to them. And

13  other than that it would only be my presentation to the

14  commissioners at the county commission meeting.

15  Q   Did you review your presentation in

16  preparation for today's deposition?

17  A   I did not. Thanks.

18  Q   I'm going to show you what I believe is a copy

19  of a presentation to see if that refreshes your

20  recollection as to what set-asides were presented to the

21  Brevard County Commissioners in December of 2023.

22  A   Was this my presentation to the commission or

23  was this my presentation to the community?

24  Q   It's a document produced by your attorneys,

25  so --

W. Scott Culp
March 18, 2025

Page 42

```
 1      A    Right --
 2      Q    -- it's Bates-Stamped.
 3      A    -- but we -- there was a document that was the
 4 presentation to the community and there was a document
 5 that was a presentation to the commissioners, that's why
 6 I was asking.  They're very similar.
 7      Q    I was just going to say, I think they're very
 8 similar, are they not?
 9      A    Yes, they are very similar.  On Bates-Stamped
10 2818 there was a table that identified the maximum
11 allowable incomes for a hundred and twenty-eight -- a
12 hundred and twenty percent income limits.  And on 2819
13 there was identification of the rents that would be at
14 the fifty percent AMI.  And there was a note the
15 anticipated market rate rents, those are not a hundred
16 and twenty percent AMI rents because they are
17 anticipated at market.  A hundred and twenty percent of
18 AMI would be above market.  So we were indicating there
19 that those were at market.
20      Q    So after reviewing those documents, what
21 set-asides was presented to the Brevard County
22 Commissioners in December of 2023?
23      A    Twenty percent, fifty percent.  The reference,
24 again, to the other, the balance of those were shown
25 here as market rate rents.
```

Page 43

```
 1      Q    Any other set-asides that were presented to
 2 the Brevard County Commissioners in December of 2023?
 3      A    Not from this document.  I don't know what the
 4 Brevard County HFA presented to the commission without
 5 seeing the report that they provided.
 6      Q    Do you have any evidence or information that
 7 what the Brevard County Housing Authority presented was
 8 different than what you presented in the application and
 9 in your presentation?
10           MR. PICCOLO:  Object to form.
11           THE WITNESS:  It was different.  It was
12      something else.
13 BY MS. GAINEY:
14      Q    As far as set-asides.
15      A    I don't know.  I can't -- I really can't
16 recall what they presented to the HF -- I mean, to the
17 commission in their HFA report.
18      Q    Back to the documents that we were talking
19 about, Paul Missigman, 0071.  So no various set-asides
20 that Mr. Missigman used in order to do his damages
21 calculation, correct?
22      A    Yes.
23      Q    And --
24      A    Well --
25      Q    Go ahead.
```

Page 44

```
 1      A    Note set-asides that I prepared and provided
 2 to Mr. Missigman that he could utilize in his input for
 3 preparing his damages calculation.
 4      Q    And after reviewing both the application and
 5 the community -- or the presentation that you prepared
 6 at some point in this case, do you agree that those
 7 set-asides are not consistent with what was presented to
 8 the Brevard County Commissioners on or about December
 9 5th, 2023?
10      A    No, I do not.
11      Q    You don't agree with that?
12      A    No, I do not.
13      Q    Okay.  Tell me why you don't agree with that.
14      A    The restrictions that were presented to the
15 commissioners were consistent with the bond application,
16 and these restrictions consistent with what was
17 presented to them when --
18      Q    Yes.
19      A    You want me to finish or you want to ask
20 another question?
21      Q    I said -- I was just saying yes.
22      A    Okay.  If your maximum restriction is twenty
23 percent at fifty percent and all others are
24 restricted -- are unrestricted, I can restrict those
25 further for the four percent low-income housing credits,
```

Page 45

```
 1 which is what this does.
 2      Q    Sir, I understand you have an explanation as
 3 to why the set-asides are different, and I get that.  I
 4 understand that.  What I am trying to get to, as the
 5 representative for Atlantic Housing Partners is what was
 6 actually presented to the Brevard County Commissioners
 7 on December 5th, 2023 as far as set-asides?
 8      A    And you presented to me the presentation that
 9 I made to the county commission.  I read from that
10 presentation, told you what page on that presentation.
11 I presented information with regard to the rants.  You
12 did not present to me what the HFA presented to the
13 commission, and I told you without reading that I don't
14 know what the HFA presented to the commission.
15      Q    And based on what you have reviewed, is there
16 any indication that the set-asides, as you have noted in
17 Missigman's 0071, were ever presented to the Brevard
18 County Commissioners?
19      A    I'm not aware whether the Brevard County
20 Commissioners had any information with regard to the
21 four percent Low-Income Housing Tax Credit set-asides.
22      Q    Was units at sixty percent AMI ever presented
23 to the Brevard County Commissioners?
24      A    Again, I would need to see what the HFA
25 presented; but I don't recall any presentation to the
```

W. Scott Culp
March 18, 2025

Page 46

1  commissioners with regard to sixty percent set-asides.
2      Q    Well, was there any presentation made to the
3  commissioners regarding forty percent set-asides?
4      A    Not that I recall.
5      Q    Was there any presentation to the
6  commissioners regarding thirty percent set-asides?
7      A    Not that I recall.
8      Q    Is there a document that will refresh your
9  recollection other than the presentation that you did to
10 the commissioners?
11     A    As I answered previously, the HFA presented a
12 document to the commission.  And you've asked me about
13 what was presented to the commission, and I said I don't
14 recall what was in the HFA's document.  But whatever was
15 in the HFA's document was also presented to the
16 commission.
17     Q    Aside from what the HFA may have presented to
18 the commissioners, did the plaintiffs or Atlantic
19 Housing Partners present any other set-asides other than
20 what you have testified here with respect to twenty
21 percent of AMI --
22     A    No.
23     Q    -- to the commissioners?
24     A    No.
25     Q    Referring you back to the document marked

Page 47

1  Missigman 0071, at the bottom it has TDC costs per unit
2  limitation.  What does that mean?
3      A    Yeah, we reviewed that a minute ago; but
4  that's total development costs provided by Florida
5  Housing Finance Corporation by construction type,
6  multiplied by the number of units and utilizing the
7  factors provided by the Florida Housing Finance
8  Corporation to adjust those total development cost
9  limitations.
10     Q    And the plus six percent, what is that?
11     A    A factor provided by Florida Housing Finance
12 Corporation to adjust the total development cost
13 limitations.
14     Q    What's MMRB add-on?
15     A    Multi-family mortgage revenue bonds.  Those
16 total development cost limitations have a factor when
17 you're utilizing multi-family mortgage revenue bonds
18 determined by Florida Housing Finance Corporation to be
19 as indicated in the table.
20     Q    Going to the next page, 72.  The numbers that
21 are in this document, where do those numbers come from?
22     A    I apologize for having to put my sunglasses
23 back on for the video, but these numbers were all
24 created or input by me into my financial model.  The new
25 rental units is my estimate of construction cost,

Page 48

1  excluding the ineligible basis items which are
2  identified; and those are my estimates of the ineligible
3  basis items.  The numbers to the right are my
4  calculations for the ineligible basis items.  The
5  general contractor fees is my calculation of the fees.
6          And I'm verifying that with the Housing
7  Finance Authority credit underwriting report.  You'll
8  see to the right that note.  And then the total actual
9  construction cost, including the fees.  And then all of
10 the financial costs have been revised to be consistent
11 with the Housing Finance Authority's credit underwriting
12 report.
13     Q    Did you prepare a separate financial model?
14     A    Other than this?
15     Q    (Nods head.)
16     A    I probably did.  I prepare a number of them
17 throughout the process.  I could have prepared one for
18 the application.  This one's obviously prepared after
19 the HFA credit underwriting report because this is
20 revised for the HFA credit underwriting report.  I don't
21 typically save all of my models.  I update them as we
22 get new information.
23     Q    Is that an Excel workbook?
24     A    Yes.
25     Q    So in the documents that have been produced

Page 49

1  because of this lawsuit, I have not seen a separate
2  model prepared by you.  That doesn't mean -- there's
3  been thousands of pages, and I mean Excel workbook
4  model.
5      A    Well, Excel workbook model would be a digital
6  file.  This is an Excel workbook model, this document
7  we're looking at today.  This is not a Word document.
8  This is not a PowerPoint document.  This is --
9      Q    Let me --
10     A    -- a print-off of my Excel Word document -- my
11 Excel spreadsheet document.
12     Q    Let me just ask it differently.  What is
13 marked as Missigman 68 through 80, is that what you
14 consider your financial model that you referred to in
15 your testimony?
16     A    69.  68's an e-mail.
17     Q    Excuse me, 69.  Thank you.
18     A    69, let me see if we're going to 80.  Yes.
19     Q    Other than those documents, are there any
20 other financial documents that you used in order to
21 assist Mr. Missigman in calculating the damages in this
22 case?
23     A    Other than information I would have used to
24 create this model, no.
25     Q    Referring you back to 0072, the new rental

W. Scott Culp
March 18, 2025

Page 50

1  unit, seventeen million five seventy-six two zero three,
2  where's that number from?
3      A    My construction estimate.
4      Q    Your head?
5      A    No.  There was actually a construction
6  schedule of values provided to the underwriter, and that
7  number comes from that construction schedule of values.
8      Q    What's the underlying basis for that number,
9  is --
10     A    My determination of construction cost, my
11 estimate.
12     Q    And do you rely on any data or documents in
13 order to come up with that estimate?
14     A    As I referenced earlier, when we talked
15 about -- I believe it's page 69, I have the historical
16 knowledge of our construction cost and the information
17 with regard to our current construction cost; and that
18 helps me to come up with a conceptual budget.  And I
19 create a schedule of values that's provided to the
20 underwriter.
21     Q    So if we want to look at the underlying
22 numbers for that particular seventeen-million-dollar
23 number, you look at the schedule of value which was
24 provided to the underwriter?
25     A    That's correct.

Page 51

1      Q    Any other documents that form the basis of
2  that seventeen-million-dollar new rental units number?
3      A    No.
4      Q    Why is this categorized as eligible versus
5  ineligible?
6      A    The cost in an affordable housing community
7  financed to a four percent Low-Income Housing Tax Credit
8  equity are categorized as eligible and ineligible.
9  There are certain items that are not in -- not eligible
10 for tax credits, and we've identified those items in
11 this model.
12     Q    The ineligible items in the next several lines
13 there, what form the basis of those numbers, where did
14 you --
15     A    My --
16     Q    -- get those?
17     A    My estimate.
18     Q    So would all the numbers in this document come
19 from your construction cost estimate?
20     A    In the top part with regard to construction
21 cost, yes.
22     Q    Excuse me, yes.  That's what I meant.
23     A    Yes.
24     Q    And as it relates to washers and dryers, what
25 forms the basis of sixty-five thousand oh fifty

Page 52

1  estimate?
2      A    That is a mathematical calculation you'll see
3  to the right, washer and dryers.  You'll see a
4  percentage that we anticipate will be purchased by the
5  owner/applicant, which is, I believe, seventy percent,
6  which relate to the number seventy-four.  You'll see a
7  unit price of eight hundred and seventy-nine dollars and
8  six cents, which is our cost at that time I prepared
9  this for washer and dryers.  You multiply that
10 seventy-four times eight seventy-nine oh six and you
11 should get sixty-five thousand oh fifty.
12     Q    And these are estimates, correct?
13     A    Correct.
14     Q    And are you basing them on other developments
15 or is it just your experience in the industry?
16     A    That's yes and yes.
17     Q    Okay.  Tell me what you mean.
18     A    Other developments is my experience.  All of
19 our developments is my experience.  And I use the most
20 current information we have with regard to our cost to
21 develop these estimates.  It's a conceptual estimate.
22 It's my belief on what would be our cost based upon what
23 we're currently experiencing and what we believe to be
24 the cost when this development is contracted for.
25     Q    And are there any ways that you can go -- that

Page 53

1  a person can go back and check how you came up with
2  these numbers, other than --
3      A    How I came up with the numbers?  I come up
4  with the numbers out of my head based upon our
5  historical data.  If you're trying to check on that
6  historical data, all of our cost certifications are
7  public record for every job we've ever built; and they
8  have data with regard to every line item, including
9  the ineligible line items.
10     Q    So in this case you didn't actually do that,
11 you just used your experience in the industry in
12 order --
13     A    That's correct.
14     Q    -- to come up with the numbers?
15     A    That's correct.
16     Q    And I would assume that that would be the case
17 for the numbers that you have with respect to parking?
18     A    That's correct.
19     Q    And those are -- parking is the fees that
20 people pay to park at the development?
21     A    No.  This is the cost for those parking
22 spaces.
23     Q    Got it.
24     A    Because that's ineligible cost.  But these
25 they pay are in the pro forma under the revenues.

W. Scott Culp
March 18, 2025

Page 54

1  Q  Why are there no fees -- or costs related to
2  fitness club or community club?
3  A  'Cause those are not optional items charged to
4  the residents and, therefore, are not ineligible.
5  Q  The general contractor fee?
6  A  Yes.
7  Q  Where did you come up with that number?
8  A  That's based upon the maximum percentage
9  allowable by Florida Housing Finance Corporation for the
10  general contractor fees.  And because I was matching to
11  the Housing Finance Authority credit underwriting
12  report, it comes in just below the maximum.  The maximum
13  is fourteen percent.  I was matching to the dollar
14  amount in the credit underwriting report which gets you
15  to that thirteen point three three percent.
16  Q  And is that thirteen point three three percent
17  of the total cost?
18  A  That is thirteen point three three percent of
19  the total hard construction cost, correct.
20  Q  And the last line there, is that math?
21  A  Yes, that's just the totals.
22  Q  Regarding the financial cost, the next set of
23  numbers, the construction loan interest?
24  A  All those items are taken from the Housing
25  Finance Authority credit underwriting report.  And the

Page 55

1  credit underwriting takes our application and our
2  information and creates their own estimate of the
3  financial cost, and I use the credit underwriter's
4  estimate of the financial cost.
5  Q  So am I hearing you to say the credit
6  underwriting reports comes up with the numbers and then
7  you pull those numbers back into your model?
8  A  That's correct.
9  Q  You have there, off to the side, need Paul N's
10  estimate.  I'm assuming that's another note to yourself?
11  A  Yes.  And that would be a note in my model
12  that I'm using.  But to the right of that you see the
13  note throughout where I've revised all of these to be
14  what the HFA credit underwriting report included.  So I
15  no longer need Paul's estimate because I have the HFA's
16  credit underwriting report.
17  Q  So one could essentially disregard that note?
18  A  Yes.
19  Q  You didn't need it anymore?
20  A  Yeah.  I could have deleted that note.  I
21  don't.  I just added a further note to say what my
22  numbers are based upon.
23  Q  So would you have had an earlier model that
24  you then revised and updated per the credit underwriting
25  report?

Page 56

1  A  Yes.
2  Q  In this case I understand that there was a
3  draft credit underwriting report dated early December of
4  2023.  Is that where you're pulling these numbers from?
5  A  Yes.
6  Q  And I believe you said in your prior
7  deposition that that was the -- although it was marked
8  draft, that was the last credit report done in this
9  case, correct?
10  A  Yeah.  And I don't recall whether there was
11  actually ever -- I think we had this discussion in my
12  prior deposition, where the draft was turned into a
13  final or the draft was the final.  I think we had that
14  question before, but the one that we reviewed in my
15  deposition that was published in December.
16  Q  The writing is very small but I think it says
17  updated with Ammon's, does it say e-mail, estimate?
18  A  Ammon's.
19  Q  Ammon?
20  A  Ammon is an employee that works with us, and
21  he will oftentimes provide me with information.  But, of
22  course in this instance I've revised those per the
23  underwriter's report.
24  Q  So that can also be disregarded?
25  A  Yes.

Page 57

1  Q  What does it say after Ammon?  Can you see it?
2  A  E-S-T-I.  It would have said -- would have
3  finished out as estimated if it could fit in the block.
4  Q  0073, these numbers -- let me actually just
5  back up.  On 0072 it has Brevard County, City of Sanford
6  up in the left-hand corner.
7  A  Yes, it does.
8  Q  Is that an error?
9  A  That is an error.
10  Q  On 0073 it has the same, Brevard County, City
11  of Sanford.  Is that an error?
12  A  Yes.  That's probably pulling from some of the
13  other pages, which is why the error is there; but I
14  don't see it.  Anyway, yes, it's an error.
15  Q  It should read City of West Melbourne?
16  A  That's correct.
17  Q  Where did these numbers come from on 0073?
18  A  You'll note to the far right all these numbers
19  came from the HFA credit underwriting report with the
20  exception of a few that -- in the middle having to do
21  with the Florida Housing Finance Corporation fees.  And
22  down under contingencies there seems to be a note there,
23  and I can't really read it.
24  Q  Updated with does that say Marc's budget?  And
25  this is how they were produced to us.

W. Scott Culp
March 18, 2025

Page 58

1    A    And that's fine.  I know.

2    Q    So I apologize.

3    A    Yeah, those columns in the center are just
4  like on the prior page.  Those are my notes that I would
5  update those.  But then to the right is where I got my
6  final numbers.  So I would have updated originally with
7  Marc's budget.  Marc is my development manager, works
8  for me.

9    Q    What's his last name?

10    A    Gauthier, G-A-U-T-H-I-E-R.  But I update with
11  his budgets.  And then when the underwriter updates with
12  their final estimate, I update the model with what the
13  underwriter has agreed to.

14    Q    It appears there is also a note that says
15  updated with Cindy's budget?

16    A    That probably had to do with impact and
17  connection fees, because Cindy prepares an impact fee
18  estimate for me, which is the next page you're going to
19  see, I think.  And she drafts those for my approval, and
20  I use those again until the underwriter tells me they're
21  using something different.

22    Q    What's Cindy's last name?

23    A    The reason I pause, 'cause it was Bell at one
24  point and it was Piurkowski at one point.  I don't
25  remember which she is now.  Either Bell or Piurkowski.

Page 59

1    Q    And I understand you to say that you do an
2  initial estimate, I'll call it, and you make notes to
3  yourself that those estimates may need to be updated.
4  But then when you get the HFA credit underwriting report
5  you just use the numbers from the credit underwriting
6  report to update your original estimates.

7    A    Yes.

8    Q    Am I understanding that correctly?  Sorry.

9    A    Yes, the process is that we submit our
10  information to the credit underwriter.  They verify.
11  They may go to the local government for fees.  They may
12  go to their own records for Florida housing fees.  They
13  may have other data information.  They provide a final
14  report that that bond allocation is then going to be
15  based upon.  So I update my model based upon the credit
16  underwriter's report and their final numbers.

17    Q    When was this model prepared?

18    A    Oh, gosh.  I don't recall the first time it
19  was prepared.  It would have been before we submitted an
20  application to the Florida -- to the HFA.  But then this
21  model was updated after the credit underwriter report,
22  because we updated for the anticipation of four percent
23  Low-Income Housing Tax Credits.  So sometime after the
24  credit underwriting report.

25    Q    So sometime after early December 2023; is that

Page 60

1  fair?

2    A    Correct, yeah.

3    Q    There is a note over to the side that says,
4  about halfway down, revised per HFA CUR, dash, plan and
5  cost review added.  What does plan and cost review added
6  mean?

7    A    The credit underwriter engages a plan and cost
8  review from a third-party professional, and they pay
9  fees that we pay.  And I believe that means that the
10  fees I had listed for the credit underwriting fee were
11  not inclusive at one point of the plan and cost review,
12  and the credit underwriter had me add the plan and cost
13  review fees.  So the number total for FHFC credit
14  underwriting fee at one point was probably not
15  conclusive of the plan and cost review, and the credit
16  underwriting report came back with adding the plan and
17  cost review fee.

18    Q    I'm hearing you to testify that you relied
19  pretty extensively on the numbers from the credit
20  underwriting report.  Is that a fair assessment of what
21  you're saying?

22    A    When you say relied pretty extensively, we
23  provide information to the credit underwriter; and we
24  work together with the credit underwriter to get to a
25  final set of numbers that we agree upon.  And I want to

Page 61

1  be consistent because we're closing on that set of
2  numbers.  So I update my models to be consistent with
3  the credit underwriter's report.

4    Q    When you say "we," who provides the original
5  numbers to the credit underwriters?

6    A    It is we.  It's me.  It's whoever in our
7  organization, you know, who sends the e-mail, who
8  prepares the application, who, you know, drafts the
9  model.  It is a group.  It is we.

10    Q    That would probably include Marc and Cindy
11  and --

12    A    They're all providing numbers typically to me.
13  I'm typically providing numbers and these models to
14  people in organizations that are actually preparing the
15  application, putting it into binders, sending it to the
16  HFA.  And I'm not meaning to be vague, but it is we that
17  provides the information to the HFA.

18    Q    A little bit further down it says HFA CUR,
19  credit underwriting report, added increase over GC
20  contract that includes contingency, I think is what it
21  says.  It's very small.

22    A    Yeah.  I can't really read that, but what that
23  has to do with is the contingency.

24    Q    Explain what you mean.

25    A    Let me see.  I can't really read all that

W. Scott Culp
March 18, 2025

**Page 62**

1  detail there, but the HFA credit underwriting report
2  would have provided for a five percent hard cost
3  contingency, and that number doesn't look like five
4  percent hard cost contingency. So there might have been
5  a note as to why that would be different than five
6  percent, but I can't see it.
7      Q    Is there an Excel workbook or Excel document
8  that still exists that has these numbers on it that can
9  be more readily viewed?
10     A    Probably.
11     Q    Have you produced that document to your
12 attorneys?
13     A    I think so.
14     Q    So I also can't read what that says.
15     A    Yeah.
16     Q    But you're saying that the hard contingency
17 number that's under eligible is not the -- is not five
18 percent?
19     A    It doesn't look like it, 'cause forty-two
20 thousand dollars is not five percent of the hard cost of
21 construction, which is the typical hard cost
22 contingency. Now, that doesn't mean that the
23 underwriter, for one reason or another, didn't make a
24 determination that the hard cost contingency didn't need
25 to be five percent. And I can't read that note to

**Page 63**

1  determine why we got to forty-two thousand. I could go
2  back. Let me see. That wouldn't be right. It'd be a
3  lot more than that. Sorry. I can't read that and it
4  doesn't come to five percent, so I'm not exactly sure
5  what the reason was that that was different.
6      Q    A little bit further down it says developer
7  fee only on HC eligible cost. Is that hard cost?
8      A    Yes.
9      Q    And what does that mean?
10     A    As we looked at earlier on the prior page,
11 there's eligible construction -- eligible cost and
12 ineligible cost. And that number represented a
13 developer fee only on the eligible cost, although I
14 don't think at the end of the day this number is
15 accurate. This was my estimation. It was not
16 consistent with the credit underwriting report. The
17 percentage of the fee is not accurate. And what the
18 developer fee is calculated on is not accurate.
19     Q    Is there anything else that's not accurate in
20 0073?
21     A    I think we just touched on, just to make sure
22 I'm answering the question, the hard cost contingency.
23 And, again, that's the maximum limit, the five percent.
24 So to say it's not accurate, it is less than the
25 maximum. So it's accurate. It's not what would be

**Page 64**

1  consistent with what you would normally see.
2          Again, with the developer fee there's a
3  maximum, I believe it's eighteen percent; and all the
4  items that the developer fee can be charged on are not
5  necessarily just the ineli -- the eligible items I've
6  listed here. So it meets and is accurate, but could be
7  different in the cost certification. So it does meet
8  the maximum, below the maximum, but there could be
9  different -- a different number in the final cost cert.
10     Q    Do -- you are -- the company, if you know,
11 still have the original documents so that we can -- so
12 this is more legible?
13     A    Yeah, you asked that and I'm going to check.
14     Q    I actually asked if you provided it to your
15 attorney --
16     A    Oh.
17     Q    -- if you or the com -- maybe Marc or Cindy
18 or --
19     A    Yeah.
20     Q    -- someone else that assists you still have
21 it.
22     A    Yeah. I wouldn't have deleted it since the
23 beginning of the litigation. So if it existed at the
24 time we started this litigation, I still have it. I
25 believe I produced all those files to our attorney, but

**Page 65**

1  I'll review again to see if it was something that I
2  might have missed. I'm going to make a note --
3      Q    Yeah.
4      A    -- if you don't mind for just a second.
5      Q    It's a good thing you brought your notebook,
6  because I think it would certainly be helpful to have
7  the --
8      A    Yeah, I agree.
9      Q    -- the original document. Going on to --
10     A    And I'm going to reference your Bates Stamps
11 so that I make sure I'm looking for the right thing.
12     Q    We'll take a break here.
13     A    Is it 62 to 80, that number; or 68 to 80? Let
14 me look back here.
15     Q    I think it was 69. You noted --
16     A    Yeah, 69 to 80. 69 to 80. Okay. I'll look
17 for that.
18     Q    We'll take a break here in just one moment.
19 Let me just get through a few more of these documents.
20 0074, where did those numbers come from?
21     A    Typically Cindy. Ah, looks up there CLB. She
22 must be Bell at that time instead of Piurkowski. I
23 can't remember when the divorce was and when the name
24 was. But anyway, it came from Cindy initially. I would
25 then review them, and oftentimes I'll make some

W. Scott Culp
March 18, 2025

Page 66

1    adjustments to them in my final model.
2        Q    So 6-5-23 is the date that Cindy, an employee
3    with the organization, provided these numbers?
4        A    That's correct.
5        Q    Do you know if they were ever updated or
6    changed maybe after the credit underwriting report or
7    anything?
8        A    I would have reviewed them at the time of the
9    final draft, final credit underwriting report. I don't
10   know whether or not they were changed from June 23rd to
11   the credit underwriting report.
12       Q    The last column there has payment due and it
13   has three numbers underneath it. What are those
14   numbers?
15       A    I don't know.
16       Q    Going on -- going on to 75, this may be a
17   continuation of impact fees; or does this reflect
18   something different?
19       A    Oh, it's a continuation, yeah. What you've
20   got here is -- by the way, this printed -- it normally
21   would all be on one page, but you have some three pages
22   now and it's supposed to all be on one. But to see if
23   this is in the right order, what you have here is city
24   impact fees, county impact fees and connection fees.
25   And if they're in the right order, the second set --

Page 67

1    page, page 75 is the city impact fees. And the first
2    page is the county impact fees. So that's what it's
3    showing.
4        Q    And what's page 76?
5        A    And 76 is the connection fees, water and sewer
6    connections, which are the city's. And then you'll see
7    at the bottom of that page the total fees is combined
8    for all three pages. And then you'll see notes with
9    regard to where Cindy got the information for the fee
10   schedule. That's to help me determine if I'm
11   comfortable with the information we have.
12       Q    Where are the notes that -- the bottom of --
13       A    Page 76 --
14       Q    -- 76?
15       A    -- where it says notes.
16       Q    And it appears that there is, on Bates-Stamped
17   0074, right above it, page six of twelve, on 0075
18   there's -- it says page seven of twelve, and 0076 it
19   says page eight of twelve.
20       A    It is.
21       Q    Where's the rest of the pages?
22       A    The other pages that we've been referencing,
23   all the other pages, they just didn't have the footer
24   note because this is all in my model. So this is
25   probably the sixth, seventh and eighth. They shouldn't

Page 68

1    be though because these are printed -- oh, it's when
2    they're printed. When you print a pdf and you put a
3    custom footer at the bottom, it puts a custom footer on
4    the printed page, 'cause these three pages, 74, 75 and
5    76 are one page in my model. But when they're printed
6    and split up, the pdf will put a footer at the bottom of
7    them.
8        Q    Page 0077, up in the left it says Brevard
9    County, City of Sanford. That's an error, correct?
10       A    Yes, it's carrying over from the other pages.
11       Q    The -- well, what are these numbers?
12       A    It's a calculation of the qualified basis for
13   the tax credits and a qualification of the annual tax
14   credit allocation that would be available to apply for
15   and a calculation of a reasonable estimate of the tax
16   credit equity that might be able to be achieved through
17   the sale of those tax credits.
18       Q    And where did you get these numbers?
19       A    All of the A and B come from the documents we
20   just looked at, total development cost and total
21   eligible basis. I think if you were to look back at
22   page -- yeah, page -- yeah, I think that's right, page
23   73, the numbers tie to page 77 for total development
24   cost, land cost, other ineligible cost. And then we get
25   into a calculation for qualified basis.

Page 69

1        Q    And where did you get the -- is that math, the
2    calculations, the --
3        A    The qualified basis.
4        Q    -- qualified basis?
5        A    Yeah, you'll note the hundred percent is the
6    affordable units, 'cause all of them are being
7    restricted under the four percent Low-Income Housing Tax
8    Credit program. We discussed before, in my previous
9    deposition, basis boost, which is what that hundred and
10   thirty percent is for either being in a DDA or a QCT.
11   And the math generates the qualified basis you can use
12   for your tax credit allocation.
13       Q    Off to the right in the line applicable
14   fraction one hundred percent it says check --
15       A    Yes.
16       Q    -- and it has a number.
17       A    Yeah.
18       Q    What does that mean?
19       A    That's a calculation coming from our unit
20   distribution. And you can see that it's consistent with
21   the total eligible basis above. It says twenty-six in
22   B, total eligible basis, and the unit in -- the number
23   in gray is identical. So we're checking to make sure
24   that these numbers carry forward correctly, they match.
25       Q    A little bit further down it says update.

W. Scott Culp
March 18, 2025

Page 70

1  What does that mean?
2      A    It's just a reminder to update the tax credit
3  allocation, if there are any changes to that.
4      Q    And was it ever updated?
5      A    This would be the updated.  I mean, I'm
6  constantly up -- it's just a reminder to me to make sure
7  I'm updating it when I look at my model.
8      Q    Another note to yourself?
9      A    Yes.
10     Q    The next page, 0078, where did you get these
11  numbers?
12     A    The rents come from the Florida Housing
13  Finance Corporation website where they publish the
14  HUD-established rents, gross rents for each unit type in
15  each metropolitan statistical area; and that's where the
16  monthly gross rent comes from.  And we spoke earlier
17  about the utility allowances and where they came from.
18     Q    And the sixty percent AMI, thirty percent AMI
19  and eighty percent AMI, those were not the set-asides
20  that were presented to the Brevard County Commissioners
21  in December 2023, correct?
22     A    Not that I'm aware of.
23     Q    And the Viera FHFC, Florida Housing Finance
24  Commission, why is Viera referenced there?
25     A    Because as we mentioned, when you asked the

Page 71

1  question earlier, is the closest in geography and the
2  closest with regard to construction type with this
3  community.  Therefore, an engineered utility allowance
4  would be most accurately estimated to be similar to the
5  closest development in the geography with the closest
6  construction type.
7      Q    Right.  I guess what I was trying to clarify
8  is is I thought you said that the numbers came from the
9  Florida Housing Finance Commission website, or is that
10  related to the rents?
11     A    I've said that with relation to the gross
12  rent.
13     Q    Got it.  So --
14     A    And then we talked about the utility
15  allowances coming from the engineered utility allowances
16  that were approved for Viera.
17     Q    Just to clarify, the rent amount is from the
18  FHFC website, the less utility allowances from Viera; is
19  that correct or not?
20     A    That is correct.
21     Q    0079, what are these numbers?
22     A    It's our estimate of expenses.
23     Q    Where did you get those numbers?
24     A    From my head.
25     Q    080, the pro forma, where did you get these

Page 72

1  numbers?
2      A    From all the pages before.  Essentially all of
3  this is a calculation that pulls from everything we just
4  looked at.  It pulls the expenses, the revenues based
5  upon the unit mix and the set-asides.  And the only
6  thing it really doesn't pull is I have to manually input
7  the first mortgage at stabilization to generate the one
8  oh debt service coverage in the first year.  It's
9  identified in the lower right column, which goes back to
10  our sources and uses and determines what our first
11  mortgage is going to be at the balance.
12         MS. GAINEY:  I think it's probably a good time
13     to take a break.
14         THE WITNESS:  Sounds like it.
15         MS. GAINEY:  So let's go off the record.
16         THE VIDEOGRAPHER:  We are going off the video
17     record.  The time is 11:09 a.m.
18         (A brief recess was taken.)
19         THE VIDEOGRAPHER:  We are back on the video
20     record.  The time is 11:16 a.m.
21         THE WITNESS:  I have to remember to bring my
22     glasses next time so I don't have to wear my
23     sunglasses to read documents.
24  BY MS. GAINEY:
25     Q    Sir, I'm going to show you what I've marked as

Page 73

1  Defendant's Exhibit 3 and ask you to identify those
2  documents.
3      A    They're all different fifteen-year operating
4  pro formas; some of them prepared by us and our office,
5  some of them prepared by one of the credit underwriters.
6         (Defendant's Exhibit 3 was marked for
7     identification.)
8         MR. PICCOLO:  Can you provide the Bates label?
9         THE WITNESS:  Yeah, she's got -- the Bates
10     labels are all mixed up here; and then I've got two
11     of the exact same documents with the same Bates.
12     And I've got a 2949, a 284, a 326, a 359, a 312, a
13     2930, it looks like a 2900, but it's stamped over,
14     and another, it looks like, an identical 2900.
15     Yeah, you have two of 2900 and two of 2874.
16  BY MS. GAINEY:
17     Q    We can remove the extra one.
18     A    Okay.  Those are extras.  And the 2900 and
19  2874 are from one of the credit underwriters.  The
20  others are our formats for the fifteen-year pro forma.
21     Q    Will you take a look at those and explain why
22  the numbers are different in all these different pro
23  formas that --
24     A    Sure.
25     Q    -- have been produced at various times?

W. Scott Culp
March 18, 2025

Page 74

```
 1      A    Let's see.  It seems that all of the ones that
 2 are in our format are for a hundred and five units.  It
 3 seems that 2949 is for the set-asides for the four
 4 percent Low-Income Housing Tax Credits.  284 are just
 5 for the set-asides for the bond allocation.  326 is just
 6 for the set-asides for the bond allocation.  And if
 7 you're looking for differences there, the gross rents
 8 are different.  And I haven't looked to see if those are
 9 because we changed years from 2022 to 2023 and the gross
10 rents went up, but the gross rents are different between
11 those two.
12           359 has the same gross rents as 326.  Let's
13 see.  It has a different set of expenses.  Let's see.
14 Expenses are the same.  It looks like total revenue is
15 different.  It's a different allocation of the set-aside
16 units.  You have eighty-five at market and twenty at
17 fifty percent, where the other one has eighty-four at
18 market and twenty-one at fifty percent.  So that would
19 be the difference in that one.
20           And 312 is also based upon the twenty at fifty
21 and the balance at market.  And that one has slightly
22 different expenses than 359.  Expenses on that one are
23 just slightly lower than 359, and it looks like that's
24 due to -- oh, it's a lower number of units at a hundred
25 and one units instead of a hundred and five.  And
```

Page 75

```
 1 lastly, 2930 is also the twenty at fifty, and the
 2 balance at market for the hundred and five units.  And
 3 it seems to be consistent with 359 in the first mortgage
 4 amount and the gross revenues.  It looks like to be
 5 almost identical to 359.
 6      Q    Why are there so many different pro formas in
 7 this project?
 8      A    You probably asked us to produce every model
 9 we had.  And oftentimes we have pro formas, you know, on
10 the network as we're progressing, you know, through the
11 development of the project and making different
12 projections based upon the set-asides.  And oftentimes
13 those pro formas would be saved on the network.
14      Q    So as prepared by Atlantic Housing Partners,
15 how many pro formas do you have there?
16      A    I have one, two, three, four, five; and I
17 wouldn't say I have six because this sixth one is
18 identical to one of the others with a different Bates
19 Stamp.
20      Q    So your five different pro formas and then
21 there's a couple prepared by the underwriting --
22      A    Right.
23      Q    -- the underwriting report?
24      A    There's -- this is probably one pro forma
25 because it's two different formats for AmeriNational who
```

Page 76

```
 1 prepared this underwriting; and you'll see their
 2 fifteen-year pro forma and then on Bates-Stamped 2874,
 3 their first year per unit operating expenses.
 4      Q    So going back to Missigman 0080, why did you
 5 pick this pro forma versus one of the other versions
 6 that's in this case?
 7      A    It should have been the most up to date.
 8      Q    Is this --
 9      A    Most current.
10      Q    Is this Bates-Stamped 0080?
11      A    I'm not looking at 0080, I don't think.  I
12 think I'm looking at the pro formas you handed me.  Is
13 there a --
14      Q    Yeah, I was referring you back to 0080 and I
15 asked you why you picked this pro forma, and I think you
16 said it's because it's the most up to date?
17      A    Yes.
18      Q    0080 is the pro forma you used in actually
19 doing your model, correct?
20      A    The model that I provided to -- the updated
21 model that I provided to Paul Missigman, yes.
22      Q    But we don't know when this was actually
23 prepared; is that correct?
24      A    We don't know when that was actually updated,
25 no.
```

Page 77

```
 1      Q    And so why are the pro formas changing?
 2      A    Typically when you're developing a community
 3 you start with a projection.  And as I noted, one of
 4 these had a hundred and one units.  At one point there
 5 were only a hundred and one units.  As you proceed
 6 through the design development process you complete
 7 further your design development, and we got to the
 8 hundred and five units.
 9           Rents changed from 2023 to 2024 or 2022 to
10 2023; and I think you see that in here, there was a
11 change in the gross rents, allowable gross rents under
12 the Florida Housing Finance Corporation.  So that would
13 have changed.  Expenses change during the term of the
14 project, and we try and utilize the most current
15 expenses that we're aware of.  So we make changes as we
16 go along until final credit underwriting, and then we
17 make changes after that until final cost cert, but...
18      Q    So in the time that you're considering this
19 project, which I understand to be approximately spring
20 of 2023 until December of 2023, there's multiple changes
21 that needed to be made with respect to the pro forma,
22 correct?
23      A    It was a multi-part question.  I think we were
24 considering this project prior to the spring of 2023.
25 But during the time frame from when we were first
```

W. Scott Culp
March 18, 2025

Page 78

1  considering it to the time frame of final credit
2  underwriting, yes, there would be multiple changes.
3      Q    The land contract was May of 2023.  Would you
4  have done a pro forma before you did the land contract?
5      A    Definitely.
6      Q    So when do you think you started
7  considering -- or actually get to a point where you're
8  doing a pro forma for a project?
9      A    I don't recall.
10     Q    But you think it's before the spring of 2023?
11     A    I'd have to look at the dates in the documents
12 that are in the record.  We typically start very early
13 on when we're considering a bond allocation in a
14 particular location, typically even prior to signing a
15 land contract for purchase of land.
16     Q    The cash flow seems to fluctuate in each of
17 these pro formas as well.  Do you agree with that?
18     A    Not in each of them but in most of them.  I
19 think I indicated to you that there were two of them
20 that were identical.
21     Q    You can disregard.
22     A    Okay.
23     Q    That was unintentional.
24     A    And they're actually not -- I look at it now,
25 they're not identical.  By the fifteenth year they're

Page 79

1  two thousand dollars difference, but it's, for all
2  intents and purposes, identical.
3      Q    So why does the cash flow vary with each pro
4  forma?
5      A    I mentioned that when I was reviewing these.
6  We had a change in the gross rents.  The gross rents
7  obviously affect the cash flow.  And then in one
8  scenario we had a change in a number of units set aside
9  at market and the number of units set aside at fifty
10 percent.
11     Q    Would there be any other thing -- other
12 reasons to change your productions as it relates to cash
13 flow?
14     A    Expenses.  Anything that changes in the
15 expenses, you'll see changes in here.  We had one cash
16 flow projection with an exemption for real estate taxes.
17 And we had other cash flow projections that had real
18 estate taxes that were not exempt for all the units
19 because at that time we were not considering the ability
20 to have an exemption for all the units.
21     Q    I think in one of the pro formas the cash flow
22 is zero; is that right?
23     A    The cash flow is eighteen dollars.
24     Q    I think it was a couple back.
25     A    I think that's the one you're referring to

Page 80

1  that says zero under eighteen dollars.  I don't think
2  there's one that's actually zero.  It's one that's
3  eighteen dollars and it says zero underneath it.  It's
4  2949, cash flow of eighteen dollars, and it has a zero
5  underneath that.
6      Q    So that's projecting a zero cash flow?
7      A    On that pro forma, yes.
8      Q    I'm sorry, let me -- let me see all of them.
9  I'm sorry.
10     A    Oh.
11     Q    On Missigman 000326 there's actually a
12 negative cash flow.  Would you agree with that?
13     A    Yes.  In the first seven years under this
14 fifteen-year pro forma 326, which I'm not referencing as
15 Missigman's pro forma but the one you handed me, there
16 is a negative cash flow.
17     Q    And why would there be a negative cash flow?
18     A    If we had input a tax exempt bond amount and
19 the calculations for the first mortgage, based upon that
20 tax exempt bond amount, generated expenses and debt
21 service greater than the net operating income.
22     Q    You testified earlier that some of the numbers
23 that you used in your model were from the credit
24 underwriting report.  The pro forma is something that
25 the company creates themselves, or do you rely on the

Page 81

1  credit underwriting report's pro formas?
2      A    Both.  We discussed that.  In the documents we
3  discussed earlier in my deposition there was a pro
4  forma; and I indicated that all of that had been updated
5  to be consistent with the final credit underwriting
6  report, with the exception of changing the set-asides
7  for the four percent Low-Income Housing Tax Credits.  So
8  that pro forma would be updated through the credit
9  underwriting report but taken into consideration the
10 restrictions for the four percent Low-Income Housing Tax
11 Credit.
12     Q    If you look at the credit underwriting
13 reports, it's covered up.  So maybe it's 02900.
14     A    Yes, maybe.
15     Q    That's where it looks like there's a cash flow
16 after debt service of zero up until year ten.  Why is
17 that, or with the exception of year two, thirty-five
18 dollars, and three years, seventy-five dollars?
19     A    Yeah, this is an underwriter's pro forma, and
20 there it looks like they're sizing this amount
21 available.  Yeah, so they're applying the net operating
22 income to the first mortgage tranche A and tranche B and
23 then to the issuer fees to arrive at the zero dollar
24 cash flow.
25     Q    And is that something that Atlantic Housing

W. Scott Culp
March 18, 2025

Page 82

1    Partners has input on?
2        A    No.  The underwriter prepares these
3    fifteen-year pro formas.  We prepare the ones that we've
4    gone over prior.
5        Q    And I understood you to say the reason why you
6    picked this particular pro forma to include in your
7    damages model was because you believed that that was the
8    most updated one.  Is that a correct understanding of
9    your testimony?
10       A    No.  I believe I told you that that model was
11   my model that I provided to Paul Missigman for him to
12   use in his input, and there was a lot of other items
13   that were noted in that e-mail that we discussed that he
14   was going to be utilizing to create the damages.
15       Q    Right.  I was just asking you why you chose
16   the numbers in this pro forma that's marked as Missigman
17   0080 versus the various other pro formas that have been
18   produced in this case, and I think you said that this
19   was the most updated pro forma.
20       A    That would be the most updated as it relates
21   to the project as programmed to be four percent
22   Low-Income Housing Tax Credits.  I don't believe this
23   credit underwriting report was in any way related to
24   four percent Low-Income Housing Tax Credits; and,
25   therefore, their debt service calculation and their

Page 83

1    expenses would be different.
2        Q    So I'm not sure exactly clear on what you're
3    saying.  You're saying that the credit underwriting
4    report didn't consider all the -- didn't consider the
5    four percent tax credit when they were doing their pro
6    forma?
7        A    That's correct.  They have to only consider
8    what the requirements of the bonds are because they
9    don't know that you're eventually going to get the four
10   percent credits.  They know they're going to close on
11   the bonds.  If I choose not to take the credits, they
12   can't assume that.  They have to assume that all we have
13   is the bonds, and the bonds still have to be valid.
14       Q    So all the pro formas that were generated
15   through the credit underwriting report were just
16   considering only the bonds?
17       A    That's correct.
18            MS. GAINEY:  Let me show you what I've marked
19   as Defendant's Exhibit 4.
20            (Defendant's Exhibit 4 was marked for
21   identification.)
22            THE WITNESS:  You want these back?
23   BY MS. GAINEY:
24       Q    No.
25       A    They weren't marked, I don't think.  Well, I

Page 84

1    guess you did.
2        Q    Yeah.
3        A    You marked them as 3.
4        Q    We just need to keep them in order for the
5    court reporter --
6        A    Okay.
7        Q    -- if you don't mind.  I won't have any other
8    questions --
9        A    I've got 1, 2, 3 there.  This says 4, but it's
10   2 for this deposition.  So we know that.
11       Q    Right.
12       A    Right.
13       Q    These have various Bates-Stamps at the bottom.
14   Jay Brock 1.27.25, 728, Paul Missigman 341, Paul
15   Missigman 314, Paul Missigman --
16       A    Sounds like it came from their depositions,
17   huh?
18       Q    -- 328, Brock 721, Brock 747 and Plaintiffs
19   2931, for purposes of the record.  What are these?
20       A    These are the sources and uses statements that
21   would come from different models that either Paul or Jay
22   or I might have been working on and have in our records
23   on the network.  So they were produced for this case.
24       Q    Why are there so many different versions of
25   the sources and uses statement?

Page 85

1        A    Again, all of these are going to change
2    depending upon when they were done and what the basis
3    was for those at that time.  Like we mentioned earlier,
4    whether it was in 2022 with certain incomes and certain
5    bond amounts.  You'll note the bond amounts in both the
6    construction and permanent are different on several of
7    these.  You'll note the construction costs are
8    different.  They get updated as we proceed.
9            You'll notice the financial costs are
10   different.  You'll note the developer fee is not shown
11   on, it looks like -- is it all of them?  Yeah, so it
12   looks like all of these were prepared for the bond
13   allocation without regard to the Low-Income Housing Tax
14   Credits 'cause they're showing owners' equity without
15   regard to Low-Income Housing Tax Credits.
16       Q    And when you were preparing your model, which
17   sources and uses statement did you use?
18       A    The one you reviewed with me.
19       Q    And why did -- I'm sorry.
20       A    And that -- the one that you reviewed with me
21   and I transmitted to Paul Missigman as the most updated.
22       Q    And is that the same reason, because that was
23   the most up-to-date one at the time you gave it to Paul?
24       A    In my impression at that point I believe it
25   was most up to date, yes.

W. Scott Culp
March 18, 2025

Page 86

1    Q    And I think you established earlier that that
2    was in February 2023?
3    A    I think it -- yeah, February 24th.  Let me
4    see --
5    Q    I'm sorry, that would have been 2024?
6    A    2024, yeah.
7    Q    Excuse me.
8    A    I was trying to see if there was a -- yeah,
9    that was when I sent that to him.  I don't know that
10   that one may have been prepared anytime between that
11   final credit underwriting report and February 24th.  So
12   the final credit underwriting report was December.  This
13   e-mail was February 24th.  So my model could have been
14   prepared anytime in those two -- in that two-month
15   period.
16   Q    The dates that are in the lower right-hand
17   corner of these, they actually have dates, most of them
18   end 2025.
19   A    That would be date printed.
20   Q    That's what I was going to ask.
21   A    That's just date printed.  None of these --
22   Q    That wouldn't have been date prepared?
23   A    Yeah, none of these are date prepared.
24   Q    Is there any way to determine when these
25   sources and uses statements were prepared?

Page 87

1    A    If we still have the Excel spreadsheet models
2    we might have a creation date in the metadata.  Some of
3    these in this format don't retain the Excel data.  They
4    go into applications in pdf format, and we might not
5    even have that.
6    Q    As a part of this lawsuit and any production
7    with any of the documents related to this lawsuit, did
8    you do a search for any type of Excel spreadsheets?
9    Because, but for one, I believe I've only been produced
10   one Excel spreadsheet and that's recently.
11   A    Well, let's make sure we're talking the same
12   language here.
13   Q    Sure.
14   A    When you're saying produced, digitally or
15   produced in paper?  Because on paper it doesn't tell you
16   whether it's an Excel spreadsheet or a pdf.
17   Q    Digitally produced including any metadata that
18   would be available.
19   A    Yeah.  I know that we have produced digitally.
20   Whether or not you actually received those digitally or
21   you received them in printed copy, I don't know.
22   Q    And do you know if the sources and uses
23   statements were produced digitally?
24   A    I don't know for each of these specific
25   sources and uses statements, if any of these were

Page 88

1    produced digitally.  I doubt that most of these were
2    because typically the models are updated on a regular
3    basis, and many of them are not -- the Excel spreadsheet
4    is not retained.
5        MS. GAINEY:  I'll show you what I'm marking as
6    Defendant's Exhibit 5.
7        (Defendant's Exhibit 5 was marked for
8    identification.)
9    BY MS. GAINEY:
10   Q    Actually, my apologies.  Oh, I have an extra
11   page of this.  I decided to stop killing paper since
12   they're all marked, but you could reference them.  What
13   is this?
14   A    It's estimating the 2024 incoming rents.  And
15   it provides in summary the estimate of the net rents
16   based upon the estimate of the engineered utility
17   allowances as of October 5th of 2023.
18   Q    All right.  Let me show you what I'll mark as
19   Exhibit 6 and ask you what that is.
20   A    That is a rent calculation.  Again, it's
21   providing an estimate of the net rents and with an
22   estimate of the utility allowances.  And it appears
23   these utility allowances were taken from Venue at Viera
24   at that time.
25       (Defendant's Exhibit 6 was marked for

Page 89

1    identification.)
2    BY MS. GAINEY:
3    Q    Number 5, for purposes the record, is
4    Bates-Stamped Plaintiffs 02736, and Number 6 is
5    Bates-Stamped Missigman 1.27.25, 0323, correct?
6    A    Correct.
7    Q    And so it looks like we have a date on
8    Exhibit 5 which appears to be October 5th, 2023,
9    correct?
10   A    Well, you have a date that these income and
11   rents are as of.  I don't know --
12   Q    Right.
13   A    -- if that's the date of this document.
14   Q    Understood.  Thanks for the clarification.
15       So the document appears to provide a summary
16   of estimated 2024 income and rents as of December --
17   excuse me, October 5th, 2023, correct?
18   A    I hate to say correct to that because it's
19   providing an estimate of the net rents and the income
20   limits.  I know the title says 2024 income, backslash,
21   rents.  That's the rent limits for the household.  It's
22   not the income to the property.
23   Q    So does the document at the top say, quote,
24   estimated 2024 income, slash, rents as of 10-5-2023,
25   close quotas?

W. Scott Culp
March 18, 2025

Page 90

1    A    Yes.

2    Q    And Exhibit 6, it appears we do not have a

3 date for when these rent calculations were made; is that

4 correct?

5    A    That's correct.

6    Q    There appears to be a difference in the

7 average median income at the top of 5 versus 6. Why is

8 that?

9    A    I would have to look at the Florida Housing

10 Finance Corporation website, but I'm assuming that the

11 rents increased. And you see an adjusted median income

12 of ninety-one nine for the Palm Bay MSA at the top of

13 the one with the 10-5-2023, and you see an adjusted

14 median income of eighty-six for -- on the other

15 document. I'd have to look at the Florida Housing

16 Finance Corporation website to determine if there was a

17 change between 2022 or 2023 and did the rents go up or

18 did they go down. And that is most likely where the

19 difference is, unless we made an error. And if I look

20 at the website I'll be able to tell you if one of these

21 is an error or are they just two different ones based

22 upon two different years published by Florida Housing

23 Finance Corporation.

24    Q    Is it fair to assume that the adjusted median

25 income likely went up and, therefore, Number 5 is

Page 91

1 probably the more current document --

2    A    I would --

3    Q    -- is that fair?

4    A    -- not assume that because the median incomes

5 have gone down.

6    Q    Okay.

7    A    And you have, as you'll note in the one that

8 doesn't -- is not dated 10-5-2023, there is a median

9 income and adjusted median income, and they're different

10 numbers, where the other one doesn't have two different

11 numbers. Sometimes when the rents go down you don't

12 have to adjust as far as it goes down, you know. HUD

13 provides the data.

14    Q    Why would these documents have been prepared

15 by the company?

16    A    We're always looking at the maximum rent and

17 the net rent as we proceed with the development. So

18 we're always updating our pro formas. And the

19 underwriters will also be updating with the most current

20 data, so we would have been trying to use the most

21 current data. The other reason for an update could be

22 an error.

23    Q    Would you have used one or both of these

24 documents in order to do your model?

25    A    My model I would not have used either of these

Page 92

1 documents. We went over where my model came from, and I

2 would have gotten the gross rents from the Florida

3 Housing Finance Corporation website, and I believe my

4 model used the Venue at Viera engineered utility

5 allowances.

6    Q    And so where would the numbers from these two

7 documents have come from, the rents, the estimated

8 rents?

9    A    The rents and the gross rents should come from

10 the Florida Housing Finance Corporation website. Could

11 have been an error. I don't know that without looking

12 at that website. That's why you'll see the eight

13 sixty-two and the eight oh six, and we saw that in

14 different fifteen-year pro formas. That could have been

15 a change from year to year, could have been an error.

16 I'd have to look at the corporation's website. The

17 utility allowances are different because you have on one

18 of these documents an engineered utility allowance

19 estimate, and on another document you have the Venue at

20 Viera utility allowances.

21    Q    We'll show you what we're marking as

22 Defendant's Exhibit 7 and ask you to identify Exhibit 7.

23        MS. GAINEY: For purposes of the record, it's

24 Missigman 324, 325, 337 and 338.

25        (Defendant's Exhibit 7 was marked for

Page 93

1 identification.)

2        THE WITNESS: The first page is a table of

3 rents, less utility allowances for the fifty

4 percent units, and net rents for the eighty percent

5 of the units that are market that don't have any

6 indication of a monthly gross or a utility

7 allowance, 'cause that does not relate to market

8 rate rents. The second page relates to expenses;

9 and there's a second table that has the actual

10 expenses from Town West, another one of our

11 developments. They are comparing the two, and

12 they're comparing property taxes and how to project

13 the property taxes.

14 BY MS. GAINEY:

15    Q    Is that from Town West or Parc Hill Senior?

16    A    325 that I'm looking at says Town West above

17 the second block of expenses.

18    Q    All right. And then on the right it says

19 based on Parc Hill Senior. So are you pulling from both

20 Town West --

21    A    I'm not seeing based on Parc Hill Senior.

22 What are you looking at?

23    Q    At the very top, top line.

24    A    That's the first block of expense, not the

25 Town West expenses. So the first block of expenses are

W. Scott Culp
March 18, 2025

Page 94

1  expenses based upon Parc Hill Senior.  The second block
2  of expenses is Town West.  So somebody's doing an
3  analysis to determine, you know, what they project the
4  expenses should be based upon other senior communities.
5      Q    And who's the someone doing that, do you know?
6      A    It could be me, it could be Paul, it could be
7  Jay, it could have Ammon.  We're all working on
8  projections at some point in the development of a pro
9  forma to give to the HFA.
10     Q    And then the next two documents?
11     A    In rent schedules, that's our different --
12  based upon the monthly gross rent and different utility
13  allowances.  And the expenses seem to be identical.
14  They're giving the same analysis of comparable expenses
15  for two other projects that are seniors.
16     Q    So why are the numbers different from 000324
17  versus 000337?
18     A    The monthly gross rents are different.
19     Q    And why is that?
20     A    And as I stated when you asked that a few
21  minutes ago, I'd have to look and see whether the
22  Florida Housing Finance Corporation HUD-published rents
23  changed --
24     Q    They did.
25     A    -- in that time frame, or whether or not one

Page 95

1  of these was an error.
2      Q    So I guess I'm just trying to figure out, you
3  know, why these documents were created and then why are
4  the numbers different, and which and which ones -- well,
5  let me start with that.  Why were these documents
6  created?
7      A    When we develop a community we create
8  documents that help us estimate the rents, the net
9  rents; and we create documents that help us estimate the
10  expenses.  We update those documents with the best
11  information we have.  The information may change because
12  Florida Housing Finance Corporation changes it or HUD
13  has changed it and Florida Housing Finance Corporation
14  has published the HUD change, or we can have an error.
15  And if I was to look at the Florida Housing Finance
16  Corporation website, I could tell you whether these
17  monthly gross rents were a change from year to year or
18  if they were an error in one of these documents.  If you
19  want me to do that, I can do it on my phone right now.
20     Q    You can do it, if it can be done quickly.
21     A    Yeah, it's pretty quick.  It's really not that
22  complicated.  They publish this and they keep it on
23  their website for every year, so it's -- the rental
24  housing -- rental housing rent limits.  Let's look at
25  2023.  Let's see if I can get 2023 pulled up.  It wants

Page 96

1  to do 2024.  2023, there we go.  Income limits, '23.
2  Let me get to Brevard County.  Fortunately it's not very
3  far since it's a B, Brevard County, and then look at our
4  one-bedroom fifty percent rent.  Our one-bedroom fifty
5  percent rent for Brevard County --
6      Q    Fifty percent of AMI is what you mean?
7      A    Yeah.  That's eight oh six.  So in 2023 that
8  schedule is right, eight oh six nine nine sixty-seven eleven
9  eighteen, okay.
10     Q    So that's 324?
11     A    Bates-Stamped 324, yeah.  So that was correct
12  for what was published by HUD effective May 15th of
13  2023.
14          Then we have the other one.  We can go to
15  2024, 2024 which was effective on April 1st of 2024.  We
16  have Brevard County.  Fifty percent rents for
17  one-bedroom units.  And it says eight eighty-six and a
18  thousand sixty-three.  So that seems to be an error, the
19  eight sixty-two and the thousand thirty-five, at that
20  time.
21     Q    You're referring to Missigman 337?
22     A    Yes.
23     Q    So I'm understanding you to say, and correct
24  me if I'm wrong, that Missigman 324 would have been the
25  monthly gross rent for 2023 for fifty percent AMI?

Page 97

1      A    Correct.
2      Q    And that was as of -- what was the date?
3      A    I'd have to go back now.
4      Q    That's okay.  It will be on the record.
5      A    Yeah.
6      Q    And then 337 appears to be an error.
7      A    Well, I would also say that -- yeah, you had
8  given me under Exhibit 5, we often estimate the
9  HUD-published future year rents.  We try and estimate
10  what the increase is going to be.  And you'll see in
11  that estimated 2024 the gross was eight sixty-two, which
12  is consistent with this one.  So that was an estimate
13  before it was published.  You see as of 10-5, so that
14  was an estimate of the 2024 rents as of 10-5.  The 2024
15  rents weren't published until April 1st.  So we couldn't
16  bring those accurate to the HUD-published rents.  So
17  this was an estimate of what was 2024.
18     Q    So Exhibit 5 and Missigman 337 in Exhibit 6
19  are both estimates?
20     A    That's correct.
21     Q    And then what's actually published on the
22  website was what, eight -- what did you say it was?
23     A    Eight eighty -- it's a little bit higher than
24  the eight sixty-two that was estimated.  Eight eighty --
25  eight eighty-five -- eight-six.

W. Scott Culp
March 18, 2025

Page 98

1   Q   But when you did your model what number did
2   you use?
3   A   Want to hand me back the model we looked at?
4   Q   Yeah.
5   A   Because these are all just different pages.
6   Q   It should be right in front of you.
7   A   Oh, that's right. Yeah, you gave me that.
8   Let me see here. So let's go back to the model you
9   asked me questions about that I provided to Paul.
10  Q   And just refer to the page number, please.
11  A   The model I provided Paul, which is the
12  Bates-Stamped 0078, we didn't have fifty percent rents.
13  We had sixty percent rents. And those sixty percent
14  rents, it looks like they were from -- it looks like
15  2023. Let me look. There's 2024. Yeah, and even it
16  was, it says it up at the top, the HUD. The model that
17  I provided to Paul was based upon the HUD-published of
18  May 13th of 2023. Now, I don't know that Paul's damages
19  summary used that. I was provided this for his input,
20  made notes in the e-mail that we needed to update for
21  other items.
22  Q   Mr. Missigman testified that after he did his
23  model, and I'll just quote it, quote, I believe I took
24  the models, the numbers from my model and put it in a
25  schedule for Scott, just a printed schedule for him to

Page 99

1   provide to our attorneys, close quote. And then I asked
2   him where is the printed schedule, and he responded you
3   have to ask him. Is there a printed schedule of his
4   model that you were provided?
5   A   We talked about that earlier. I reviewed that
6   schedule yesterday. That was the first time I had seen
7   it. It was the pdf of his model that was provided to
8   our attorneys. And the first time I had reviewed it was
9   yesterday I looked at that printed model.
10  Q   Okay. So I need to clarify because I'm a
11  little bit confused. Mr. Missigman brought documents to
12  his deposition with him that was all the documents
13  responsive to the subpoena duces tecum. So I was asking
14  him where his schedule was at, and he said I had to ask
15  you.
16  A   What he --
17  Q   So --
18  A   -- brought with him, I think, was his printout
19  of his Excel model. What I looked at was the printed
20  version that I believe is the exact same thing. I don't
21  have his Excel model. I never have had his Excel model.
22  The first time I've ever reviewed a printout of that
23  model was yesterday.
24  Q   Okay. So I'm just --
25  A   But I think that printout is what you're

Page 100

1   asking about.
2   Q   Yeah, I'm just trying to see if there is a
3   separate document out there floating around. Because as
4   I read this and as I know from what he testified to, it
5   seems like he almost did a summary for you of his model
6   and gave it to you or his schedule. And so I asked him
7   where that schedule was at, and he said I'd have to ask
8   you.
9   A   Yeah.
10  Q   As in it wasn't attached to his documents --
11  his deposition.
12  A   Yeah, I don't recall ever getting any summary
13  of his model. And as I testified earlier, I didn't
14  review his model. The first time I ever reviewed his
15  model was yesterday, and the only copy I have is a pdf
16  copy of what he produced to our counsel of his model.
17  Q   Mr. Missigman also indicated that someone
18  named Trisha Doody, if I'm pronouncing that correctly,
19  may have assisted in providing documents for his model.
20  Who is Trisha Doody?
21  A   Trisha Doody is our vice president in charge
22  of finance. It's not likely that she would have
23  provided documents for his model, although he sometimes
24  gets information from her. She works with the credit
25  underwriters, and she takes data from me or Ammon or Jay

Page 101

1   and transmits those to the underwriters. So he may be
2   thinking that she has information that the underwriters
3   had that he got from her in working on his models; but
4   it would be information that you already have, and it's
5   been produced.
6   Q   Other than what you have already told me about
7   and testified to, are there any other data or datasets
8   or documents or summaries that support the assumptions
9   that you made in your model that you provided to Mr.
10  Missigman?
11  A   That's a mouthful, isn't it? You ask are
12  there any other documents or data. We discussed the
13  total development cost limitations that are in my model,
14  the documents and data for that on the Florida Housing
15  Finance Corporation website.
16  Q   Yes, sir. I meant any other -- any other
17  documents --
18  A   Are you --
19  Q   -- that we have not already discussed or --
20  A   Well, I don't think that's what you asked. So
21  let's be clear, because you asked me about any other
22  documents that would lead to the model that I provided
23  to Paul. There's documents that lead to these numbers.
24  So I don't want to say that, you know, there was no
25  other documents or data when there actually were.

W. Scott Culp
March 18, 2025

1    Q    Okay. Tell me --
2    A    So if you want to ask it differently, that's
3    fine, but...
4    Q    Tell me what documents and data.
5    A    The, as I said, total development cost
6    limitations and the factors that adjust that as
7    published by the Florida Housing Finance Corporation,
8    that documentation, that information is within the
9    information that I provided to Paul. The impact fee
10   schedules have a note on where we gathered that
11   documentation, that information. We gathered that from
12   the websites of the city and the county. So there is
13   documentation and data at the city and the county that
14   is the basis for the impact and connection fee
15   calculations.
16        There is Florida Housing Finance Corporation
17   approved utility allowances for Viera. That's the
18   backup documentation for the data that I gave Paul with
19   regard to the utility allowances. And I believe that's
20   all the other data or documentation related to the model
21   that I gave to Paul.
22   Q    You did -- in fairness, you told me about Town
23   West.
24   A    Town West and Parc Hill.
25   Q    And Parc Hill.

1    A    Right. We have historical data from Town West
2    and Parc Hill.
3    Q    All right. Other than what you have already
4    told me and testified about, are there any other
5    datasets or documents that support the assumptions that
6    you made in your model?
7    A    Yes.
8    Q    What are they?
9    A    The expenses that are in our model are based
10   upon the expenses in our portfolio. And that would
11   include the entire portfolio of senior communities in a
12   similar geography and building type. Those are not just
13   made up, they came from data that we have with regard to
14   our expenses.
15   Q    Your entire senior portfolio expenses?
16   A    Yes. I know those numbers, Paul knows those
17   numbers in his head; but you're asking for data that
18   supports those. The data that supports the numbers we
19   know come from our actual expenses.
20   Q    How do I get those documents?
21   A    With two different methods. Our expenses are
22   audited annually by Florida Housing Finance Corporation,
23   and it's public record. And I believe our auditors also
24   have our expense reports for each of the seniors
25   communities.

1    Q    How many senior communities are we talking
2    about?
3    A    I don't recall.
4    Q    So you're saying that the numbers that you
5    based your expenses on for your damages model are from
6    the entire portfolio of senior communities for Atlantic
7    Housing Partners?
8    A    It's based upon our estimation that is based
9    upon our experience and knowledge of our expenses on all
10   of our senior communities, yes.
11   Q    I'm hearing you to say there's a dataset that
12   has all the expenses for each of your senior portfolio
13   communities that's accessible and, it sounds like,
14   audited.
15   A    That's correct. We have access to and is
16   audited annually.
17   Q    Did you ever access those expenses for this
18   lawsuit?
19   A    No.
20   Q    Why not?
21   A    Because we know them in our head because we
22   work with them every day and every month. And so we
23   have a very good understanding of what our expenses are.
24   So we don't need to go look into the datasets to make a
25   determination because we're monitoring that on a monthly

1    basis.
2    Q    So if someone like me that doesn't know what's
3    in your head, how would I have known that without those
4    documents?
5    A    The expenses we provided to you; but to know
6    how we came up with and determined what those expenses
7    are, you would ask us, as you have in deposition. And
8    if you were trying to prove or disprove whether what we
9    thought was accurate, you'd probably want to see some
10   additional backup with regard to those expenses.
11   Q    Yes. And how -- what additional backup is
12   available with respect to those expenses, if any
13   documents exist?
14   A    Yeah. There's actual expense reports for each
15   of the communities.
16   Q    How many communities?
17   A    I don't recall how many senior communities. I
18   could look and see, but I don't recall.
19   Q    Okay.
20   A    It's not a huge number.
21   Q    Well, you have a lot of communities, so I
22   don't know how many are senior.
23   A    Yeah. Eighteen.
24   Q    Thank you.
25        Why did you use senior communities to document

W. Scott Culp
March 18, 2025

Page 106

1  your expenses for Venue at --
2      A    Expenses --
3      Q    -- Heritage Oaks?
4      A    Expenses are fairly well related to the
5  demographic of the occupancy, and they also are fairly
6  well related to the construction type and the geography.
7  So we would be considering the expenses for a like-kind,
8  comparable community.
9      Q    So when you're thinking about expenses for
10 Venue at Heritage Oaks, you deem your other senior
11 communities as communities that are most related to the
12 proposed Venue at Heritage Oaks development, correct?
13     A    Correct.
14     Q    When you were doing your damages model did you
15 account for any tenant turnovers, vacancy or nonpayment
16 of rent assumptions?
17     A    I didn't do a damages model when I did my
18 financial model to provide to Paul.  Yes, it's in the
19 pro forma, it identifies the vacancies.
20     Q    And just for clarification, I mean in your
21 capacity as Atlantic Housing Partners.  When Atlantic
22 Housing Partners did their damages model did they
23 account for any turnover, vacancies or nonpayment of
24 rent in the assumptions?
25     A    I don't recall.

Page 107

1      Q    Did the company analyze comparable affordable
2  housing partners in Brevard County to determine
3  projected rental revenues?
4      A    We have comparable affordable housing
5  communities in Brevard, so we know what the affordable
6  rents are and the ability to obtain maximum rents in
7  that area.
8      Q    So you're saying you looked at your other four
9  affordable housing communities in order to project the
10 rents?
11     A    Yes; but not to project the rents, to project
12 the occupancy and vacancy.
13     Q    With respect to cash flow, did you look at
14 other Brevard County properties, affordable housing
15 properties?
16     A    Cash flow relates to revenue and expenses.  We
17 look at revenue and expenses.  The cash flow is just
18 math.  So we don't --
19     Q    Let me --
20     A    We don't look at cash flow, cash flow in one
21 community versus another community.  We look at expenses
22 and revenues.
23     Q    With respect to revenue, did you look at other
24 affordable housing developments in Brevard County?
25     A    We utilized the maximum gross rents and allow

Page 108

1  the utility allowances, and in our experience we believe
2  that we would have no concern for achieving maximum
3  rents.
4      Q    Did the company consult with any independent
5  financial expert to validate damages calculations?
6      A    I don't believe we've consulted with any
7  outside third-party independent damages expert.
8      Q    As I understand, Mr. Missigman's testimony is
9  that he did not review his damages expert with anyone in
10 this case.  Is that the company -- is that Atlantic
11 Housing Partners' understanding?
12     A    Yes.
13     Q    Did the company take any steps to ensure that
14 the financial projections and assumptions in this case
15 were accurate?
16     A    The financial projections and assumptions were
17 reviewed by the credit underwriter for the bond
18 allocation, and they review it to determine if they're
19 accurate.  I don't believe anybody reviewed the damages
20 calculations.
21     Q    Let me show you what's Bates-Stamped Jay Brock
22 357.  What is that?
23     A    This is an e-mail from me to Ammon asking for
24 his Excel model for the application for Venue at
25 Heritage.

Page 109

1      Q    And so did Ammon also do models related to the
2  proposed development?
3      A    He does models at the application stage, and
4  he'll provide those models to me for review prior to
5  submitting an application.
6      Q    And what type of models is he doing?
7      A    Essentially the same model that we reviewed
8  that I provided to Paul Missigman.  They're almost
9  identical in format.  And he runs those models, and then
10 I take those and review those.
11     Q    And did the company preserve those models that
12 Ammon created?
13     A    We don't typically preserve every model that
14 gets created.  We preserve models that get submitted;
15 and we update those, as indicated in my prior testimony.
16     Q    Referring you back to the e-mail that you sent
17 Mr. Missigman.  I have a couple of admitted questions.
18 I'm referring you to Bates-Stamped Missigman 0001.  It's
19 the e-mail --
20     A    Yes.
21     Q    -- from you to Mr. Missigman dated March 1st,
22 2024.  And about halfway down he -- in this e-mail
23 communication, he says, quote, other income at
24 forty-seven two five zero a year is low.  So can I
25 increase this in my loss numbers, close quote.  Do you

Page 110

1  know what he means when he's saying that?
2      A    Yes.
3      Q    Can you explain?
4      A    Yeah.  We provide projections to the
5  underwriters that are conservative, and oftentimes the
6  underwriters are using industry standards that may be
7  different than our experience in our portfolio.  So my
8  model, with other income of forty-seven thousand
9  dollars, may not be consistent with what Paul Missigman
10  knows as our actual experience for our communities.
11     Q    Missigman 002 is an e-mail communication, and
12  this appears to be the information Mr. Thomas provided
13  to Mr. Missigman.  Did you have any input regarding the
14  data that Mr. Thomas was providing to form
15  Mr. Missigman's damages model?
16     A    No.
17     Q    Mr. Thomas would be the best person to talk
18  about that -- those e- -- that e-mail?
19     A    Yes.
20     Q    On 0004 bottom it says Tricia was only using
21  forty-seven two five for other income.  I think you
22  already told me who Tricia was.  Is she the one pulling
23  the other income numbers?
24     A    Tricia is communicating with the underwriters.
25  The one providing the other income numbers would be me

Page 111

1  or -- we're talking me, Ammon, Paul, Jay.  Tricia would
2  be interacting with the underwriters to transmit the
3  information.  So he may be commenting on what Tricia has
4  and has provided to the underwriters.
5      Q    006, your e-mail dated March 4th, 2004 (sic),
6  quote, this was only underwritten for a twenty fifty
7  scenario, close quote.  What does that mean?
8      A    Say that again.
9      Q    Quote, this was only underwritten for the
10  twenty at fifty scenario.
11     A    Yeah, I thought you said 2024 scenario.  I
12  didn't --
13     Q    I could have.  My apologies.
14     A    Yeah, the underwriters underwrote the job for
15  the twenty percent at fifty percent set-aside.  They did
16  not underwrite it for the four percent Low-Income
17  Housing Tax Credit.  They would do that at a subsequent
18  time when we applied for four percent tax credits.
19     Q    Next line, this CRU (sic), credit underwriting
20  report, does provide indication that there are two rates
21  and two schedules based on bonds.  What does that mean?
22     A    If you'll recall in the prior testimony and in
23  the damages calculation there's a tranche A and a
24  tranche B, and there are two different amortization
25  schedules and two different interest rates; and that's

Page 112

1  what that is indicating.  You want this back?
2      Q    Actually the e-mail.  I don't need to attach
3  that.  Atlantic Housing Partners' answers to
4  interrogatories and request for production of documents,
5  have you seen those before?
6      A    Let me see.  I'm confused about the question.
7      Q    Let me -- Let me just --
8      A    Sorry.  I'm just --
9      Q    You're fine.  Please ask me to clarify
10  anything.
11     A    I must have, I signed it.  So, yes, I've seen
12  it before.
13     Q    What date did you sign it?
14     A    I signed it, it looks like, the 13th day of
15  May of 2024.
16     Q    On page eight the question is asking for
17  Atlantic Housing's lost fees or alleged damages.  And
18  the response indicates the amount of damages is four
19  million two hundred fifty-nine thousand six hundred and
20  fifty-eight.  Below that it says all documents
21  supporting these facts, to the extent such documents
22  exist, are within Atlantic Housing's possession, custody
23  or control or being produced in response to Brevard
24  County's request for production to Atlantic Housing.
25          Based on Mr. Missigman's testimony and your

Page 113

1  testimony earlier on behalf of Atlantic Housing
2  Partners, you agree that that statement is an inaccurate
3  statement in that Mr. Missigman's damages model was not
4  produced when you signed these interrogatories in May of
5  2024?
6          MR. PICCOLO:  Object to form.
7          THE WITNESS:  At the time I signed this in May
8  of 2024 the statement was accurate.
9  BY MS. GAINEY:
10     Q    I thought we established earlier that Mr.
11  Missigman did not produce his damages model until 2025;
12  did we not?
13         MR. PICCOLO:  Object to form.
14         THE WITNESS:  I think you asked that question
15  and I indicated I don't know when he produced it.
16  I know that we had discussion about when I gave him
17  information and asked that he generate work on his
18  financial model.  I don't think we came to a
19  conclusion on when it was actually produced to our
20  attorneys.
21  BY MS. GAINEY:
22     Q    Okay.  So if you're saying this statement is
23  accurate, it's your testimony that in May of 2024
24  Atlantic Housing Partners produced Mr. Missigman's
25  damages model which was the core damages document of

W. Scott Culp
March 18, 2025

Page 114

1  this case?
2      A    I didn't say that.
3      Q    All right.  You said this was accurate.
4      A    Well, I guess I'm trying to figure out what
5  you're saying is inaccurate.  Our projection of the lost
6  fees of four million two fifty-nine six fifty-eight was
7  an accurate projection when I signed this, okay.  The
8  document supporting that projection had been produced at
9  that time, which included the pro formas, sources and
10 uses, credit underwriting report.  They all support the
11 Atlantic Housing's fees.
12          The question with regard to production of the
13 damages calculation by Mr. Missigman, I don't have in my
14 head the date on which Mr. Missigman produced his
15 damages calculation to our counsel.  It doesn't change
16 the accuracy of our fees.  That doesn't matter with
17 regard to his damages calculation, whether he produced
18 the damages calculation ever.  Those fees would still be
19 accurate at that time in our projection.  So I'm trying
20 to figure out what you're saying is inaccurate.  I don't
21 see any inaccuracy.
22     Q    Do you think that Brevard County was entitled
23 to have Mr. Missigman's model produced in May of 2024?
24          MR. PICCOLO:  Object to form.
25          THE WITNESS:  I think that Brevard County was

Page 115

1  entitled to have Mr. Missigman's damages
2  calculation produced timely.
3  BY MS. GAINEY:
4      Q    And do you think producing Mr. -- assume that
5  it's true and that Mr. Missigman's testimony is accurate
6  that he did not produce his damages calculation and
7  model until 2025, do you think that's timing -- timely?
8          MR. PICCOLO:  Object to form.
9          THE WITNESS:  I don't know with regard to the
10 court system.  Timely in my opinion would be
11 whatever the Court requires.
12 BY MS. GAINEY:
13     Q    So if the Court required all discovery to be
14 completed in this case by March 1st, 2025, as a
15 representative from Atlantic Housing Partners do you
16 think that producing a core doc -- financial
17 document two months before discovery close is timely?
18          MR. PICCOLO:  Object to form.
19          THE WITNESS:  I would think that if you
20 produced it on the last day of the deadline it's
21 timely.  They have deadlines for a purpose.  I
22 don't know that there's a deadline that says a
23 document has to be produced a certain number of
24 days prior to the close of discovery.  I'm not a
25 litigator.

Page 116

1  BY MS. GAINEY:
2      Q    So as the representative of Atlantic Housing
3  Partners is there any reason for you to dispute
4  Mr. Missigman's testimony that he didn't produce his
5  damages model until 2025?
6          MR. PICCOLO:  Object to form.
7          THE WITNESS:  I don't have any reason to
8  dispute Mr. Missigman's testimony other than what
9  may be in the records.  He may have made an error.
10 I don't have the date that the document was
11 produced to our counsel or to Brevard County.
12 BY MS. GAINEY:
13     Q    And so when you signed this document, this
14 interrogatory number five on May 13th, 2024, and if you
15 assume that Mr. Missigman did not produce his damages
16 model until 2025, would it be accurate to state, quote,
17 all documents supporting these facts, to the extent such
18 documents exist, are being produced in response to
19 Brevard County's request for production?
20     A    Yes, absolutely.
21     Q    That's accurate?
22     A    Yes, absolutely.
23     Q    Even though Mr. Missigman's core financial
24 document was not produced, you still think that's
25 accurate -- that's an accurate statement?

Page 117

1          MR. PICCOLO:  Object to form.
2          THE WITNESS:  I believe the statement there
3  indicates that the documents supporting the facts
4  that I signed to have been produced.
5  BY MS. GAINEY:
6      Q    Is Atlantic Housing's damages claim based on
7  Mr. Missigman's model?
8      A    Mr. Missigman's damages calculation is a
9  document that we provided for the calculation of our
10 damages.
11     Q    So yes?
12          MR. PICCOLO:  Object to form.
13          THE WITNESS:  It's not the only document.
14 BY MS. GAINEY:
15     Q    I understand that.
16     A    And --
17     Q    But you and others provided documents to Mr.
18 Missigman which he used to produce a model in this case;
19 is that correct?
20     A    That's correct.
21     Q    So I understand your testimony to say that you
22 believe that you provided the underlying documents in
23 2024, in May of 2024.  Did I understand that correctly
24 or not?
25     A    Or prior to that date.

W. Scott Culp
March 18, 2025

Page 118

1    Q    Okay. Will you acknowledge that
2  Mr. Missigman's damages model was not produced in May of
3  2024?
4    A    I've indicated in answers to your questions
5  earlier that I don't know the date it was produced.  I
6  don't have any reason to dispute Mr. Missigman's
7  testimony with regard to a date it was produced.  That
8  doesn't change my answer to the question with regard to
9  this statement that I signed saying all documents
10  supporting these facts are being produced, and to the we
11  reserve the right to supplement them up to conclusion of
12  discovery.  That was an accurate statement that I
13  signed.  So you're asking me if this statement is
14  accurate that I signed.  And I'm saying yes, this
15  statement that I signed is an accurate statement.
16    Q    So you don't believe that Mr. Missigman's
17  model is a document that supports Atlantic Housing's
18  damages in this case?
19        MR. PICCOLO:  Object to form.
20        THE WITNESS:  I believe that all documents
21  supporting these facts, to the extent such
22  documents exist, are within Atlantic Housing's
23  possession, custody or control are being produced
24  in response to Brevard County's request.  And I
25  believe that we've expressly reserved the right to

Page 119

1  supplement such documents up to the conclusion of
2  discovery, and I signed that and I believe it to be
3  accurate.
4  BY MS. GAINEY:
5    Q    On March -- excuse me, May 13th, 2024 was Paul
6  Missigman's damages model in the possession, custody or
7  control of Atlantic Housing?
8    A    I don't know.
9    Q    Is Paul Missigman not in Atlantic Housing's
10  care, custody or control?
11    A    Yes, he is.
12    Q    And so documents he creates are in the
13  possession, custody or control of Atlantic Housing,
14  correct?
15    A    Yes, they are.
16    Q    What did you do before you signed this
17  document to ensure that, in fact, all documents
18  supporting these facts were produced?
19    A    I reviewed what I had produced as of the date
20  I signed it.
21    Q    I think you said in your prior deposition that
22  you are the only one that produced documents in response
23  to request for production, correct?
24    A    I don't know that I said that I'm the only one that
25  produced documents.  I said that I'm the only one that

Page 120

1  produced docu -- I think delivered documents to our
2  counsel.  There may have been other employees like Cindy
3  and Jay and Ammon that we've talked about that had
4  information on the network or within e-mails that we
5  produced.  So I don't know that I actually produced
6  those, me personally; but Atlantic Housing produced
7  those, yes.
8    Q    So what did Atlantic Housing do in order to
9  ensure that all documents, which are responsive to
10  request for production, are responsive to answering
11  interrogatories were, in fact, produced?
12    A    We reviewed with our responsible members
13  anything that they had in their possession, and we
14  reviewed our network files to see anything that we had
15  in our possession to produce to our counsel.
16    Q    And who -- specifically who did you review
17  with?
18    A    All the members of our team, Marc Gauthier,
19  Jay Brock, Ammon Smith, Trisha Doody, Paul Missigman,
20  Mike Sciarrino.  I think that's it.
21    Q    So your testimony is --
22    A    Cindy.  Cindy.
23    Q    Your testimony is that you, on behalf of
24  Atlantic Housing, requested from Paul Missigman
25  documents relevant to this lawsuit prior to signing this

Page 121

1  interrogatory and responding to request for production?
2    A    Yes.
3    Q    So if Mr. Missigman testified that he was
4  never asked for his model, how do you reconcile that
5  with the testimony you just provided?
6        MR. PICCOLO:  Object to form.
7        THE WITNESS:  I don't believe that I asked him
8    for a financial model for damages calculation at
9    that time.  I asked him for production of documents
10    related to this case and anything that related to
11    the Venue at Heritage.
12  BY MS. GAINEY:
13    Q    And what did he give you?
14    A    I don't recall.
15    Q    Whatever he purportedly gave you you would
16  have produced them, correct?
17    A    Yes.  Yes.
18    Q    Do you agree with the statement that Paul
19  Missigman's model is a core financial document in your
20  damages claim in this case?
21    A    Is a core financial document?  All I know is
22  that he prepared a damages calculation consistent with
23  the financial information for this development.  You
24  call it a core financial document.  I believe it's an
25  expert opinion on the damages.

W. Scott Culp
March 18, 2025

Page 122

1    Q    You think Mr. Missigman is an expert?
2    A    I do.
3    Q    Have you designated him as an expert?
4    A    I don't know.
5    Q    So is the answer to my question no, you don't
6    think that his model is a core financial document in
7    this lawsuit?
8    A    No, I said I don't know what a core financial
9    document is.
10   Q    Important.
11   A    I told you it's an expert opinion.
12   Q    Important.
13   A    I told you it's an expert opinion.
14   Q    All right.  Let me ask it differently.
15   A    Okay.
16   Q    Is Mr. Missigman's model, which are used in
17   this case to project alleged damages, is that model an
18   important financial document?
19   A    It's important.
20   Q    And you at least concede that.  Will you
21   concede that it's a document that should have been
22   produced in May of 2025 -- 2024, excuse me, assuming
23   that it wasn't produced until January of 2025?
24   A    No.
25   Q    So as a representative of Atlantic Housing you

Page 123

1    don't have any issue with waiting until January of
2    '25 -- 2025 to produce an important financial document
3    which forms the basis of the alleged damages in this
4    case?
5         MR. PICCOLO:  Object to form.
6         THE WITNESS:  I believe we have abided by the
7    obligations and have made accurate statements with
8    regard to our projections in our damages, and I
9    don't believe we've been delinquent or in any way
10   obstructing the process for this case.
11   BY MS. GAINEY:
12   Q    Your expert disclosures, which were served
13   September 16th, 2025 (sic), does identify Paul
14   Missigman --
15   A    They were served September 16th, 2025?  That's
16   about a few months from now.
17   Q    Let me rephrase.  Thank you for correcting me.
18   Appreciate that.
19         September 16th, 2024 indicate that Paul
20   Missigman will testify as to the damages plaintiffs
21   incurred as a result of the actions as described in the
22   complaint.  And the damages all were itemized.  When
23   Atlantic Housing identified expert disclosures, do you
24   know if you had an understanding that you were also
25   supposed to disclose all documents which support the

Page 124

1    alleged damages?
2         MR. PICCOLO:  Object to form.
3         THE WITNESS:  I don't know that at the time
4    you disclose -- or that we disclosed our experts,
5    that we had to, at the same time, disclose all
6    reports or calculations that that export -- expert
7    was -- had done or was to have done.  I don't know
8    that that was a requirement as of that date.
9    BY MS. GAINEY:
10   Q    So it's your testimony, based on what you said
11   earlier, that the company, Atlantic Housing Partners,
12   has no issue with waiting 'til January 2025, shortly
13   before the discovery close, in order to disclose an
14   important financial document that which forms the basis
15   of the alleged damages?
16         MR. PICCOLO:  Object to form.
17         THE WITNESS:  Atlantic Housing complies with
18   the schedule for the litigation and is -- continues
19   to attempt to provide documentation in a manner
20   that's consistent with that schedule, and I do not
21   believe we've been delinquent in any way in
22   providing any documents for discovery.
23   BY MS. GAINEY:
24   Q    Let me ask you this:  Why didn't you just make
25   sure that the model had been provided when it was asked

Page 125

1    for back in May of 2024?
2         MR. PICCOLO:  Object to form.
3         THE WITNESS:  There's a lot of documentation
4    in this litigation.  And providing documentation in
5    a reasonable manner and a reasonable time frame,
6    and I believe we have done that.
7    BY MS. GAINEY:
8    Q    And was there any discussion with Paul from
9    the time he created the model, back in March of 2024,
10   until recently as to ensuring that that document was, in
11   fact, produced?
12   A    You assume by that question that he created
13   that model in March of 2024?
14   Q    He testified to that.
15   A    Okay.
16   Q    So...
17   A    But you told me that.  And I don't know that
18   he had a completed damages model.
19   Q    He testified that he did.
20   A    Okay.  Then you probably want to present that
21   testimony to me if you want to ask me a question about
22   his testimony.
23   Q    Well, you're the representative of Atlantic
24   Housing.  I wouldn't think I would have to present that
25   testimony to you.  I would think --