W. Scott Culp
March 18, 2025

Page 126

```
1     A    You're asking me --
2     Q    -- that you would know that.
3     A    -- about his testimony.  Let's look at his
4  testimony.  If you ask me what Atlantic Housing knows or
5  is agreeing to, I've told you.
6     Q    So my question is:  As the representative of
7  Atlantic Housing and knowing, and you've conceded that
8  Paul Missigman's damages model is an important financial
9  document which forms the basis of the alleged damages in
10 this case --
11    A    I told you that it's an important document.
12 You have added the words which forms the basis.
13    Q    All right.  So let me ask you that.  Does Paul
14 Missigman's model form the basis of the alleged damages
15 in this case?
16         MR. PICCOLO:  Object to form.
17         THE WITNESS:  It is a document that provides
18    the calculations of our claimed damages in this
19    case.
20 BY MS. GAINEY:
21    Q    Yes.  It's not a trick question.
22    A    It is a document that calculates the damages
23 that we've claimed in this case.
24    Q    So would you concede that it's an important
25 document since you're --
```

Page 127

```
1     A    I told you it was an important document.
2     Q    All right.  So you agree with the statement
3  that Paul Missigman's model is an important financial
4  document which forms, at least in part, the damages
5  alleged in this case?
6     A    I don't know that it forms the basis.  I
7  believe it is a damages calculation.  I don't know that
8  it forms the basis.  I believe we have a lot of other
9  documentation that forms the basis.  It's just one piece
10 of paper with one calculation by an expert.  It doesn't
11 form the basis.  Without all the other documentation,
12 there is no basis.
13    Q    Well, you told me in your original deposition,
14 when I asked about damages question, that Mr. Missigman
15 was the numbers guy, correct?
16    A    Yes, I did.
17    Q    All right.  And so what I'm kind of scratching
18 my head over is why you seem to be now downplaying that
19 model created by Mr. Missigman, when all along he seems
20 to have been the one identified in filings as your
21 damages guy.  You tell me in a deposition he is your
22 numbers guy, and yet his document that he produced
23 wherein the alleged damages in this case come from,
24 originated from, you seem to now be suggesting that
25 that's not an important document that should have been
```

Page 128

```
1  produced when it was asked for.
2         MR. PICCOLO:  Object to form.
3         THE WITNESS:  You wrapped a lot of statements
4     in there that I don't agree with.  One, I've told
5     you that it's an important document.  We've agreed
6     on that.
7  BY MS. GAINEY:
8     Q    We can concede to that.
9     A    Okay.  I've told you that I don't believe
10 we've been delinquent in the production of documents.
11 You stated that you believe we have been, or at least
12 you've inferred that.  I don't believe we have been.
13 You crafted a question that indicated that his
14 calculations, damages calculations were the basis for
15 our damages.  The basis is all the documentation that
16 we've been providing that we've produced.  It's not just
17 the damages calculation.  So I don't agree with that
18 statement.
19         I'm not disagreeing with the fact that Paul
20 Missigman's calculations are important.  I'm not
21 disagreeing with the fact that Paul Missigman's
22 qualifications are important.  I'm not disagreeing with
23 the fact that Paul Missigman's determination of those
24 calculations are important.  I'm also not disagreeing
25 with the fact that all these documents that you've
```

Page 129

```
1  produced and that we've produced are important basis for
2  our damages, not just Paul Missigman's damage
3  calculation.
4     Q    Would you be surprised to hear that Mr.
5  Missigman testified that he did not consider the credit
6  underwriting report when he did his model?
7     A    Not at all.  I would not be surprised at all.
8     Q    Would you be surprised to learn that Mr.
9  Missigman testified that the documents that I have
10 produced here as Defendant's Exhibit 2 were the only
11 documents he relied on in order to do his damages model?
12    A    Not at all.  I would not be surprised.
13    Q    So these few documents right here, that's all
14 he relied on.  That doesn't surprise you at all?
15    A    I don't think he said that's all he relied on.
16    Q    No, he definitely --
17    A    I think --
18    Q    -- said that.
19    A    Do you want me to finish or do you want to
20 keep interrupting and asking me questions that are
21 trying to lead me somewhere else?  You interrupted me.
22    Q    Because you're stating things that aren't
23 true.
24    A    And you're asking me questions in a way
25 that are --
```

W. Scott Culp
March 18, 2025

Page 130

1    Q    That's fine.
2    A    -- inferring an answer.
3    Q    That's fine.  Go ahead.
4    A    So you ask the question again and I'll try and
5    answer it.
6    Q    Go ahead.
7    A    No, you ask a question again and I will try
8    and answer it.  That's what I said.
9    Q    I would like for you to assume that Mr.
10   Missigman -- because I appreciate that you haven't
11   reviewed his deposition, and I appreciate you weren't at
12   his deposition; but I was and I have reviewed his
13   deposition.  And he specifically said that there's three
14   sets of documents he relied on in order to do his model.
15   One was the documents that you provided to him.  Two was
16   the documents that Mr. Thomas provided to him.  And
17   three were the documents that Mr. Griese provided to
18   him, all of which you have in front of you as
19   Defendant's Exhibit 2.  And so --
20   A    So we have the documents in front of me as
21   Defendant's Exhibit 2 that form a basis for the damages
22   calculation.
23   Q    So my question to you is that:  Why did
24   Atlantic Housing Partners not produce Paul Missigman's
25   model in May of 2025 (sic)?

Page 131

1         MR. PICCOLO:  Object to form.
2         THE WITNESS:  We produced Paul Missigman's
3    damage calculation model timely.
4    BY MS. GAINEY:
5    Q    That's not my question.  My question is -- and
6    I'll even assume, without the benefit of attending
7    Mr. Missigman's testimony, that my question is accurate,
8    that Mr. Missigman said he did not produce the model
9    until January 2025.  My question to you as the
10   representative of Atlantic Housing, assume that to be
11   true, why wasn't it produced in May of 2024 when it was
12   asked for?
13        MR. PICCOLO:  Object to form.
14        THE WITNESS:  I disagree with the entire
15   question, the length of the question, the
16   statements within it, that were inaccurate.  I'm
17   not going to answer it.  You're going to start
18   over.
19   BY MS. GAINEY:
20   Q    Assume that Mr. Missigman testified, just
21   recently, that he didn't produce his damages model until
22   January of 2025.
23   A    I assume that Mr. Missigman, fairly an
24   assumption because you've asked me to assume, that he
25   did not produce his model until January of 2025.

Page 132

1    Because you've asked me to assume that, I've assumed
2    that.
3    Q    My question is:  As the representative of
4    Atlantic Housing and pursuant to 30(b)(6), why were
5    those documents not produced in May of 2024 in response
6    to defendant's initial request for documents?
7         MR. PICCOLO:  Object to form.
8         THE WITNESS:  I don't believe we had an
9    obligation to present those documents at that time.
10   BY MS. GAINEY:
11   Q    Same assumption, assume that the document,
12   Mr. Missigman's model, was not produced until January of
13   2025.  Why was it not produced when you disclosed Mr.
14   Missigman as an expert witness?
15   A    I don't believe we had --
16        MR. PICCOLO:  Object to form.
17        THE WITNESS:  -- an obligation -- I don't
18   believe we had an obligation to produce that
19   document at that time.
20   BY MS. GAINEY:
21   Q    A second request for production of documents
22   was sent to Atlantic Housing.  And the document that
23   we're referring to, Mr. Missigman's model, wasn't
24   produced until he responded to a subpoena duces tecum
25   which I sent to him.  My question is:  Why wasn't the

Page 133

1    document produced in response to Brevard County's second
2    request for production of documents?
3    A    I don't believe we had an obligation to
4    produce the financial damages calculation until such
5    time that we produced it.
6         MS. GAINEY:  Does anybody need a break?
7         All right.  We'll keep going.
8    BY MS. GAINEY:
9    Q    Have you seen the request for admissions in
10   this case?
11   A    I believe I have.  Yes, I believe I have.
12   Q    I'll need it back.  Unfortunately, I didn't
13   make a copy.  And you just briefly reviewed those.
14   After you -- I can certainly give you more time to.  Are
15   there any changes that you want to make or do you
16   believe that when these requests for admissions were
17   served on February 18th, 2025 that they were accurate?
18        MS. GAINEY:  Actually, let's take a brief
19   break while he does that.  I have to use the
20   restroom.
21        THE VIDEOGRAPHER:  Going off the video record.
22   The time is 12:44 p.m.
23        (A luncheon recess was taken.)
24        THE VIDEOGRAPHER:  We are back on the record.
25   The time is 1:42 p.m.

Page 134

```
 1  BY MS. GAINEY:
 2       Q    Sir, we took a brief break for lunch; and you
 3  took some documents with you during the break, which I
 4  asked you to review to determine their relevancy. They
 5  were produced in responses to request for production of
 6  documents. And so a couple of things, housekeeping
 7  matters. First of all, before we took a break I showed
 8  you interrogatories, which is the other documents. And
 9  over the break I marked that as Defendant's Exhibit 7.
10       A    8.
11       Q    Oh, did I?  Exhibit 8.
12       A    8.  7 was --
13            MS. GAINEY:  Yeah, so I need to mark this as
14       9.
15            (Defendant's Exhibit 8 was marked for
16       identification.)
17  BY MS. GAINEY:
18       Q    So is that a copy of your interrogatories that
19  we've discussed prior to the break?
20       A    Yes.
21       Q    And is that a fair and accurate copy of the
22  interrogatories?
23       A    Yes.
24       Q    Are there any modifications or changes that
25  you need to make with respect to the interrogatories or
```

Page 135

```
 1  updates?
 2       A    No, I don't have any updates at this time.
 3       Q    And you, sir, you signed those as the manager
 4  of Atlantic Housing Partners, L.L.L.P., correct?
 5       A    Yes.
 6       Q    But that is --
 7       A    However --
 8       Q    -- your signature, right?
 9       A    That is my signature.
10       Q    Okay.
11       A    But I'm the manager of the general partner.
12  It's a limited liability limited partnership, which has
13  a general partner which I am the manager of.
14       Q    And who identified that organization, please?
15       A    I think it's Atlantic Housing Partners
16  Managers, LLC.
17       Q    Any other changes, corrections you want to
18  make to the interrogatories?
19       A    No.
20            MS. GAINEY:  I've marked Defendant's
21       Exhibit 9.
22            (Defendant's Exhibit 9 was marked for
23       identification.)
24  BY MS. GAINEY:
25       Q    And those were the documents that you reviewed
```

Page 136

```
 1  over the break, and I had asked you prior to the break
 2  in order -- asked you to review them in order to tell me
 3  what relevancy, if any, they have to this lawsuit. And
 4  have you had a chance to review those documents?
 5       A    I have.
 6       Q    And how are --
 7       A    They are the --
 8       Q    -- they relevant, please?
 9       A    They are the documents that form the basis for
10  our conceptual estimates of the soft cost of
11  development, and that being permitting, design,
12  engineering, that type of thing, and the conceptual
13  budgets for the hard construction costs.
14       Q    Which I don't have any other questions about
15  those documents, so you can set those aside.
16            During the break did you also have an
17  opportunity to review your responses to requests for
18  product -- or for requests for admissions?  Excuse me.
19       A    I did.
20       Q    And do you have any modifications, changes or
21  updates to those responses?
22       A    The only comment on page seventeen,
23  defendant's request for admission number forty-four with
24  regard to what I told the county commissioners regarding
25  the twenty percent of the units at fifty percent and the
```

Page 137

```
 1  balance will have a maximum of a hundred and twenty
 2  percent, I don't recall the exact language I used to
 3  reflect that the balance were unrestricted. We knew
 4  that there would definitely be a portion restricted at
 5  one twenty. We knew that we couldn't achieve those
 6  rents 'cause they were higher than the market. So I
 7  don't recall the actual statements made to the county
 8  commissioners in that regard.
 9       Q    And that's request for admission seventeen?
10       A    It looks -- forty-four.
11       Q    On page?
12       A    Page seventeen.
13       Q    Seventeen.
14       A    Request for admission number forty-four. So
15  it's just a clarification. I think it's accurate, but I
16  would want to make sure from the transcript of that
17  county commission meeting what I actually said.
18       Q    Are there any other requests for admissions
19  that need clarification?
20       A    I don't see any, no. Maybe just hold just one
21  second. Let me just make sure.
22            MS. GAINEY:  I'll show you what we'll mark as
23       Defendant's Exhibit 10, which is two documents.
24       One is the first plaintiff, Atlantic Housing
25       Partners, L.L.L.P.'s, responses and objections to
```

W. Scott Culp
March 18, 2025

Page 138

```
 1    defendant's second request for produce; and that is
 2    dated January 24th, 2025.  And the other document
 3    is plaintiff, Atlantic Housing Partners,
 4    L.L.L.P.'s, responses and objections to defendant,
 5    Brevard County's, request to produce; and that is
 6    dated May 1st, 2024.
 7         (Defendant's Exhibit 10 was marked for
 8         identification.)
 9    BY MS. GAINEY:
10         Q    Do you recognize those documents?
11         A    Yes.
12         Q    And did you participate in responding to the
13    request for production of documents?
14         A    Yes.
15         Q    And you said, before the break, that on behalf
16    of Atlantic Housing Partners, L.L.L.P. you believe that
17    you have provided all documents responsive to those
18    requests for production in a timely manner, correct?
19         A    Correct.
20         Q    So request to produce that was responded to
21    back in -- or on May 1st, 2024, request for production
22    number twenty-three specifically asks for, quote, any
23    and all documents which refer or relate to plaintiffs'
24    claim for damages, close quote.  And it's your testimony
25    that you provided any and all documents which relate to
```

Page 139

```
 1    plaintiffs' claim for damages on May 1st, 2024?
 2         A    At that time I produced all the documents that
 3    were available.
 4         Q    Available to Atlantic Housing Partners,
 5    L.L.L.P.?
 6         A    Yes.
 7         Q    The second request to produce was dated
 8    January 24th, 2025.  And request number thirty-two asks,
 9    quote, any and all documents supporting your alleged
10    damages in your Rule 26 disclosures, close quote.  The
11    response is, AHP will produce all responsive documents
12    to this request that are in AHP's possession, custody or
13    control.  And that response was dated January 24th,
14    2025.  Is that an accurate response?
15         A    Yes.
16         Q    Do you have an explanation why Mr. Missigman's
17    damages model wasn't produced on January 24th, 2025?
18         A    No.
19         Q    Do you have an explanation as to why
20    Mr. Missigman's damages model was not produced on
21    May 1st, 2024?
22         A    No.
23         Q    That's all I have about those documents, sir.
24         A    Are both of these Exhibit 10?
25         Q    Yes.  There you go.  The matters of
```

Page 140

```
 1    examination for the deposition here today asked for the
 2    person most knowledgeable about the tax exempt bond
 3    financing for Hammock Harbor in Brevard County.  Are you
 4    that person?
 5         A    I believe so.
 6         Q    What type of financing structure is available
 7    or does Hammock Harbor have?
 8         A    I don't remember.
 9         Q    I'm going to show you a document which might
10    refresh your recollection.  I believe that's from the
11    Florida Housing Finance Authority.  Does that assist at
12    all?  Actually, let me give you this.
13         A    It's got a label at top saying other property
14    Florida Housing Finance Authority.  I don't know of a
15    Florida Housing Finance Authority.  I don't know that
16    one exists.  There's a Florida Housing Finance
17    Corporation.  So I'm not quite sure where this document
18    came from.  I doubt that anybody in our office would
19    have produced it because -- or created it, I should say,
20    we might have produced it -- because I don't think they
21    would have used those terms.  Perhaps somebody from the
22    HFA or elsewhere might have.
23         Q    Sir, I'm really just trying to get to on all
24    your Brevard County properties, just the financing
25    structure and the set-asides.  And so I'm trying to get
```

Page 141

```
 1    testimony in that regard.
 2         A    Yeah, I see that you provided me with a table
 3    that lists the restrictions with regard to Brevard
 4    County communities that we've developed.  I don't know
 5    who provided those restrictions or if they're accurate.
 6    They would be most accurate coming from the extended use
 7    agreement or the land use restriction agreement.  So if
 8    these are consistent with the recorded public record
 9    extended use agreement and land use agreement, then I
10    would have no reason to think they were wrong.
11         Q    Did Hammock Harbor receive bond financing?
12         A    I believe so.
13         Q    And how much was the bond financing?
14         A    I don't recall.
15         Q    What are the set-asides for Hammock Harbor?
16         A    Don't recall.
17         Q    Did you attempt to find that information prior
18    to your deposition here today?
19         A    I did not.
20         Q    Did you -- or does Atlantic Housing still have
21    a copy of the Hammock Harbor bond application?  I know
22    some of these are older developments.
23         A    I don't know if we still have a copy of the
24    application.  We would, of course, have a copy of the
25    closing documents and the recorded land use restriction
```

W. Scott Culp
March 18, 2025

Page 142

1  agreement and extended use agreement.
2       Q    Let me ask you this, which may be helpful and
3  more generally:  Have all four of Atlantic Housing
4  properties been developed with the use of tax exempt
5  bond financing?
6       A    I'm really not sure if one of these might have
7  been developed with nine percent tax credits.  I don't
8  recall.  I'd have to look.
9       Q    Have all four properties been developed with
10  some type of financing, whether that be tax exempt bonds
11  or credits?
12      A    Yes.
13      Q    And so when you're dealing with credits, do
14  you still have to go through the finance -- Housing
15  Finance Authority?
16      A    The Brevard County Housing Finance Authority
17  has no relationship, jurisdiction or input with regard
18  to Low-Income Housing Tax Credits.
19      Q    So the one that if you just developed it with
20  tax credits you wouldn't have necessarily had to have
21  dealt with the Brevard County Housing Finance Authority?
22      A    Correct.  And you don't have to deal with
23  Brevard County Housing Finance Authority if you're using
24  Florida Housing Finance Corporation bonds.
25      Q    Let me show you another document that may

Page 143

1  help.  This appears to be an e-mail from Angela Abbott.
2       A    It looks like an e-mail from Angela Abbott to
3  you.
4       Q    And does it indicate how much bond
5  financing -- is that the Venue at Viera?
6       A    This is with relation to the Venue at Viera,
7  yes.  It has the increase in the bond amount, letters
8  regarding the increase in the bond amount.
9       Q    So do you have an independent recollection of
10  how much bond financing Venue at Viera received?
11      A    I don't remember without looking at the
12  closing documents.
13      Q    If you assume that e-mail to be accurate, how
14  much bond financing did Venue at Viera receive?
15      A    If there were no other increases after this,
16  then it would be sixteen million seven hundred and
17  fifty-five thousand.
18      Q    And it appears that that was an increased
19  amount from what was originally requested?
20      A    That's correct.
21      Q    How much was originally requested?
22      A    Fifteen million seven hundred and fifty-five
23  thousand.
24      Q    Let me show you -- well, let me ask you:  How
25  much bond financing, if any, did Wickham Club receive?

Page 144

1       A    I don't recall.
2       Q    Let me show you this document to refresh your
3  recollection, which is an e-mail from Angela Abbott.
4  How much bond financing does Ms. Abbott indicate was
5  received by Wickham?
6       A    An allocation of seven million six for tax
7  exempt bonds.  An allocation of four hundred thousand of
8  taxable.
9       Q    Does that refresh your recollection as to the
10  amounts received?
11      A    I am relying upon Angela Abbott's e-mail to
12  you.  I don't have any reason to believe it's incorrect.
13      Q    How much bond financing, if any, did Malabar
14  Cove receive?
15      A    I don't recall.
16      Q    Unfortunately, I think because that's an older
17  development, I don't have an amount on that either, if
18  they did receive financing.  But you think that even
19  Malabar Cove was developed with some type of --
20      A    Two phases of Malabar Cove, they were both
21  developed with affordable housing financing.  I don't
22  recall, without looking at the documents, the amount, if
23  any, of Brevard County Housing Finance Authority bond
24  allocation and/or any resources provided through the
25  Florida Housing Finance Corporation.

Page 145

1       Q    Are you the most knowledgeable in that regard?
2       A    Yes.
3       Q    And you didn't attempt to seek out that
4  information prior to today's deposition?
5       A    We have that in our records.  I just don't
6  recall it in my head.
7       Q    And did you look at the records or attempt to
8  look at the records prior to today's deposition?
9       A    No.
10      Q    The application for Venue at Viera Senior
11  Living, that was submitted to Brevard County Finance --
12  Housing Finance Authority.  Was that submitted as an
13  elderly development?
14      A    I don't recall.
15      Q    Let me show you the application, and I've
16  tabbed it there to see if that refreshes your
17  recollection.
18      A    In the application they have -- or you choose
19  between family or elderly, and we did choose elderly in
20  the application.
21      Q    Why did you choose elderly in the Venue at
22  Viera application but not at the Venue at Heritage Oaks
23  application?
24      A    Venue at Heritage Oaks, we were targeting a
25  different demographic, and we weren't desiring to

W. Scott Culp
March 18, 2025

Page 146

1  restrict to the requirements of an elderly demographic
2  selection.
3     Q    What demographic were you targeting for the
4  Venue at Heritage Oaks?
5     A    When we initially applied we had not made the
6  determination on whether we wanted to do family or
7  seniors, seniors in accordance with the Housing for
8  Older Persons Act. But we did eventually decide that we
9  would prefer, although not for a restriction in the bond
10 application, but we would prefer as we proceed to
11 develop it with a restriction for seniors in accordance
12 with the Housing for Older Persons Act.
13    Q    When did you decide to switch the demographic
14 from family to senior?
15    A    We didn't actually make a decision to switch
16 the demographic. We were, at the time of even the
17 county commission meeting, considering that with the
18 restrictive covenants that would be recorded at a later
19 date, we were considering providing Venue at Heritage
20 Oaks as a seniors-restricted community in accordance
21 with the Housing for Older Persons Act.
22    Q    So you're saying at the time of the
23 commissioner meeting on December 5th of 2023 where the
24 bond was denied, you hadn't made a decision?
25    A    We had not made a firm decision. I did

Page 147

1  indicate to the commissioners that we prefer seniors and
2  we like that demographic and they're good for our
3  communities; and that we were considering making a
4  change, or I wouldn't even say making a change because
5  the family demographic can be seniors, that we were
6  considering having a restrictive covenant for seniors.
7     Q    So am I understanding your testimony that
8  originally, at the time when this application for Venue
9  at Heritage Oaks was submitted in July of 2023, the
10 demographic for the proposed project was going to be
11 non-senior?
12    A    We had not made a decision on whether or not
13 we were going to have a seniors restriction. We chose,
14 if I remember correctly in the application, a family
15 demographic 'cause we were not willing to choose
16 elderly. And we had not made a decision at that point
17 with whether or not we were going to restrict it to
18 seniors.
19         The taxes and bond allocation does not require
20 seniors restriction or does not have any -- give any
21 preference to a seniors or elderly restriction. So we
22 didn't make a decision. We had considered, and going
23 back and forth a number of times, proceeding with a
24 seniors community.
25    Q    And you're saying that even up and to the

Page 148

1  point of the bond denial, you had not firmly made the
2  decision to switch to seniors community?
3     A    We'd not made a firm commitment. Whether we
4  had made a decision or not, I think we were of the mind
5  that we would be proceeding with it restricted to
6  seniors in accordance with the Housing for Older Persons
7  Act; but I don't think we had made any commitments. I
8  know there were no commitments with regard to the taxes
9  and bond allocation.
10    Q    When was the decision made to consider it to
11 be a senior development?
12    A    We'd been considering that decision from the
13 beginning. So from the very beginning when we first
14 conceptualized and purchased the property and the
15 application for the bonds, we were considering it being
16 a seniors community.
17    Q    And then if that was the case, then why didn't
18 you submit the application as a senior application to
19 Brevard Housing Authority?
20    A    And I think we discussed this before. Their
21 selections are family or elderly. We're not agreeing
22 with the elderly demographic. That's a different
23 demographic than senior, and so we chose family. We
24 know that the taxes and bond allocation has no
25 preference for family versus elderly versus seniors

Page 149

1  restriction. So we didn't want to make a commitment
2  that we had not determined would be our final
3  commitment, and it was not relevant to the allocation of
4  the bonds.
5     Q    Did you say elderly is different from senior?
6     A    Yes.
7     Q    Explain that.
8     A    The elderly demographic requires one -- all
9  members of the household to be age sixty-two and over,
10 and requires certain features within the community that
11 we don't always choose to comply with because our
12 residents don't necessarily like those. It has to do
13 with a lot of the elderly-type design features you might
14 have in the units. And they're somewhat discouraging to
15 some senior residents, particularly when you have
16 seniors that have families. So we prefer to not make
17 that decision on every community until we have a
18 determination that the elderly demographic might be good
19 for that location.
20         So the seniors selection is one member of the
21 household age fifty-five and older, and twenty percent
22 of the units unrestricted with regard to age of
23 household members. And that's a preference for us
24 because it provides a wider band. If we're already
25 limiting our band with regard to income of the

W. Scott Culp
March 18, 2025

Page 150

```
1  households, when you limit it to elderly where all
2  members are sixty-two and older, you limited the band of
3  people that are available to rent the units.
4       Q    So even though you've compared Venue at
5  Heritage Oaks as being comparable to Venue at Viera, are
6  you saying that the two are different as to senior
7  versus elderly?
8       A    They are different.  And when we said compared
9  to their comparable, we were talking about expenses and
10 revenues, 'cause the expenses and the revenues have a
11 negligible difference between the two.  The revenues are
12 based upon the HUD-published rents for household size.
13 The expenses are based upon density of the product,
14 maintenance of the product, parking spaces, landscaping,
15 construction type.  Some of it based upon the
16 demographic, but we don't really see a whole lot of
17 difference in the expenses from a senior restriction
18 versus an elderly restriction, no.
19      MS. GAINEY:  I'm going to mark that as
20      Defendant's exhibit --
21      THE WITNESS:  Do you want me to hold onto it?
22      MS. GAINEY:  No.  I don't have any questions.
23      (Defendant's Exhibit 11 was marked for
24      identification.)
25 BY MS. GAINEY:
```

Page 151

```
1       Q    When did a land --
2       A    Do you want these back or do you want to mark
3  these?
4       Q    Oh, no.  They don't need to be marked.  Thank
5  you.
6            When did Atlantic Housing Partners hire Dr.
7  Hank Fishkind?
8       A    I don't recall the date.
9            MS. GAINEY:  Let me show you what we'll mark
10 as Defendant's Exhibit 12.
11           (Defendant's Exhibit 12 was marked for
12 identification.)
13 BY MS. GAINEY:
14      Q    Do you recognize that document, or those
15 documents, I should say?
16      A    Yikes, this guy's expensive.
17      Q    You would know.
18      A    Yes, I recognize them.
19      Q    And is it his invoices and, it looks like,
20 initial letter to you regarding his services?
21      A    Yeah, it's his initial letter where I accepted
22 his proposal for his hourly rate and expenses, and it's
23 his wiring instructions so I can pay him.  And then he
24 starts billings.  And these are definitely not all the
25 billings.  I wish they were.
```

Page 152

```
1       Q    That's what was produced to us.  So we might
2  have to request a supplement on this.
3       A    I'm sure I got another one this week, so...
4       Q    What is the date of the initial letter?
5       A    The initial letter is dated January 17th of
6  2024.
7       Q    So do you think that Atlantic Housing hired
8  Dr. Fishkind on or about January 17th, 2024?
9       A    Yes, it appears so.  It might have been --
10 well, let me take that back because Dr. Fishkind sent
11 the letter on January 17th.  I don't have a date on when
12 I signed this and sent it back to him.  So I don't know
13 that --
14      Q    Check his invoices, that might help, when he
15 first started working.
16      A    Well, he sent an invoice the day he sent the
17 letter.  So I'm sure he was sending me a bill for
18 sending me the letter, January 17th.  But then he did
19 some work on January 29th.  So it could have been about
20 January 29th.
21      Q    All right.  So sometime between January
22 17th --
23      A    Sometime in January of 2024 he was engaged.
24      Q    There's a few documents that were in Dr.
25 Fishkind's production file that I want to ask you about.
```

Page 153

```
1  What is that?
2       A    That's the Florida Housing Finance Corporation
3  published rent and income limits as released by HUD on
4  May 15th of 2023 for Brevard County.
5       Q    And then this was also in his file.  What is
6  that?  I know we've talked about it.
7       A    This is the rent schedule with monthly gross
8  rents, less utility allowances, by unit type and by
9  set-aside.
10      Q    Then I want to show you this document, and I'm
11 going to purport to you that this was an Excel
12 spreadsheet that was too small to read, so I've blown it
13 up.  But does that document look familiar to you?  It
14 was in Dr. Fishkind's file.
15      A    No.  I just barely skimmed Dr. Fishkind's
16 reports, so the fact that I don't remember it doesn't
17 mean much; and I haven't spent much time looking at Dr.
18 Fishkind's reports.
19      Q    At some point did someone from Atlantic
20 Housing Partners provide, or their representative
21 provide, demographic information regarding age and race
22 ethnicity of other Brevard properties?
23      A    Not with regard to Atlantic Housing
24 properties.  You're going to depose me with regard to
25 Concord, I think?
```

W. Scott Culp
March 18, 2025

Page 154

1    Q    Yes.

2    A    And I don't want to, you know, try and be

3   evasive, but nobody at Atlantic Housing would have

4   provided Dr. Fishkind with any information that you've

5   referenced.

6    Q    Did you personally, as Scott Culp, provide any

7   information to Dr. Fishkind?

8    A    No.

9    Q    So the person most knowledgeable at Atlantic

10  Housing as it relates to documents provided to Dr.

11  Fishkind is essentially nobody?  It would be --

12   A    No, it's me.  It's me.

13   Q    Okay.  Let me ask it differently.  Let me just

14  confirm that no one from Atlantic Housing Partners

15  provided Dr. Fishkind any documents related to race and

16  age of other Brevard properties?

17   A    Correct.

18   Q    So you're saying that those documents, had

19  they been provided, would have been done on behalf of

20  Concord?

21   A    Correct.

22   Q    We'll come back to that.  Did Atlantic Housing

23  Partners provide Dr. Fishkind any documents related to

24  any other topics or subjects?

25   A    If I recall correctly, we provided him with

Page 155

1   the -- and, again, I'm hesitant because anything we

2   provided to Dr. Fishkind would have been provided

3   through our counsel.  And I believe we provided through

4   our counsel the application to the Housing Finance

5   Authority of Brevard County for the Venue at Viera.  And

6   I don't recall what other documents, if any, we provided

7   Dr. Fishkind through our counsel from Atlantic Housing.

8   There were other documents that you've referenced and

9   asked questions about with regard to information that

10  Concord has.

11   Q    Number eleven on the matters of examination

12  asks for the person that's most knowledgeable about

13  traffic studies performed, and I assume that's you?

14   A    Yes.

15   Q    Tell me about any traffic studies that were

16  performed regarding the property at Minton Road and

17  Heritage Oaks Road.

18   A    I think it was VHB, if I remember correctly,

19  the name of the traffic engineer who did the traffic

20  studies; and we've produced those.

21   Q    Were those studies outdated?

22   A    No.

23   Q    Did citizens complain that the traffic studies

24  were outdated?

25   A    Yes.

Page 156

1    Q    And it's your testimony that the studies were

2   not outdated?

3    A    Correct.

4    Q    Did you tell Brevard Housing Authority, on

5   December 6th, 2023, that it did appear that the studies

6   were outdated?

7    A    I don't recall.

8    Q    Do you have any information as to why citizens

9   complained that the traffic studies were outdated?

10   A    I don't remember.

11   Q    Well, number eleven asks for the person most

12  knowledgeable regarding traffic studies performed in

13  anticipation of the development, and you're saying

14  that's you?

15   A    Correct.

16   Q    Including the dates said studies were

17  performed and the information relied upon to conduct

18  said studies?

19   A    Correct.

20   Q    And that person's you?

21   A    Correct.

22   Q    So did you go back and look at the traffic

23  studies prior to this deposition?

24   A    No.

25   Q    Why not?

Page 157

1    A    I have lots of documents.  Didn't have time to

2   review every single document and every exhibit that you

3   presented to me.

4    Q    Yes, sir, that's why we do these depositions;

5   and I specifically identify the things I'm going to ask

6   you about, including the traffic studies.

7    A    Other traffic studies --

8        MR. PICCOLO:  Object to form.  There wasn't a

9   question pending.

10  BY MS. GAINEY:

11   Q    So knowing that and having reviewed the

12  subpoena duces -- or the subpoena 30(b)(6) deposition

13  notice, why didn't you go back and review the traffic

14  studies in anticipation of this deposition?

15   A    I didn't believe it was necessary.  I believe

16  the traffic studies speak for themselves and have dates

17  with regard to when they were prepared and the backup

18  documentation that was obtained to prepare those

19  reports.

20   Q    As it relates to traffic in the area, was

21  Atlantic Housing aware that there was only one road into

22  the subdivision that was next to the proposed project?

23   A    If I understood your question correctly,

24  you're asking about the road that was the entrance to

25  the single-family neighborhood behind the property we

W. Scott Culp
March 18, 2025

Page 158

1  were proposing to develop.
2      Q    Correct.
3      A    And I don't think I considered whether or not
4  there were any other roadways into that subdivision.
5      Q    As you sit here today, do you have any
6  knowledge as to if there are other roadways into that
7  subdivision?
8      A    I do not.
9      Q    Is Atlantic Housing aware that multiple
10  citizens objected to the proposed development Venue at
11  Heritage Oaks because of traffic concerns?
12      A    Yes.
13      Q    And what's -- does Atlantic Housing have a
14  position in that regard?
15      A    Traffic concerns were unfounded. The
16  approvals for land use entitlements and approvals for
17  that particular property were in place. And the traffic
18  generation from the approved uses was significantly in
19  excess of the traffic generation from our proposed use,
20  and there had been master plan approvals for this site
21  utilizing the public right-of-way and boulevard
22  contiguous to the property.
23      Q    Does Atlantic Housing have a position as it
24  relates to only having one road of ingress and egress
25  concerning the single-family division -- the

Page 159

1  single-family subdivision? Excuse me.
2      A    We have no position with regard to the ingress
3  and egress from the neighboring single-family
4  subdivision on the public right-of-way.
5      Q    If that was, indeed, a concern raised by
6  community members, do you dispute that that was a valid
7  concern of community members?
8      A    Yes, I do dispute that.
9      Q    And why is that?
10      A    There's nothing in the land development code
11  or in the traffic study or any information entitled that
12  would present a reason to not develop the parcel for the
13  traffic generation that was allowed.
14      Q    So community members' concern just based on
15  their observations and the traffic backup in the area,
16  would that have been a valid concern?
17      A    No.
18      Q    The Brevard Housing Finance Authority meeting
19  which occurred the day after the county commission
20  meeting, did you attend that via phone?
21      A    I don't remember that there was a -- I don't
22  recall. I don't remember a Brevard County Housing
23  Finance Authority meeting the day after the commission
24  meeting that had a denial. There may have been, but I
25  don't remember that.

Page 160

1      Q    Let me show you the minutes from the
2  December 6th, 2023 meeting and see if that refreshes
3  your recollection.
4      A    Yes.
5      Q    Let me switch you out because it's got my
6  notes on the side of that one, I think.
7      A    I was reading your notes.
8      Q    I don't think I have a lot of notes, but you
9  can certainly read them.
10      A    Yes, it does appear that I attended by phone
11  at that meeting, and it does seem that it was the day
12  after the commission denial.
13      Q    Does it refresh your recollection as to any
14  discussions related to traffic studies?
15      A    Lots of discussions.
16      Q    And what was your position as of December 6th,
17  2023 related to traffic studies?
18      A    That the traffic studies were accurate, that
19  the traffic generation was less than what was allowable
20  by the entitlements on the property, and that the
21  concerns of the citizens were unfounded with regard to
22  traffic generation or development of the parcel.
23      Q    Are you aware that those meetings are
24  recorded?
25      A    What meetings are you referencing?

Page 161

1      Q    The meeting, the December 6th Housing Finance
2  Authority. You're looking at the minutes.
3      A    Yes.
4      Q    So you're aware that they're recorded?
5      A    Yes.
6      Q    Did you state in that meeting that, quote, we
7  did provide traffic studies and they claimed they were
8  outdated. I wouldn't disagree that current traffic
9  studies might not have been used, close quote. Did you
10  state that?
11      A    I may have.
12      Q    So by that statement it appears that you
13  believed that current traffic studies might not have
14  been used?
15      A    That's correct.
16      Q    So a community -- community members expressing
17  concern about outdated traffic studies would have been a
18  valid concern?
19      A    No.
20      Q    Why not if they were outdated?
21      A    The studies were recent enough, and the
22  approvals for development of the property provided for
23  significantly more traffic generation than our
24  development, as our traffic study showed. So the -- any
25  updates to those traffic studies, which would be

W. Scott Culp
March 18, 2025

Page 162

1  required by the City of West Melbourne prior to our
2  pulling permits, would provide evidence that the traffic
3  generation was not in excess of what was previously
4  approved.  That's a requirement of the permitting, as is
5  the building permit, foundation permit, site permit.
6  And those would be provided timely as required by the
7  land development code and the City of West Melbourne.
8    Q    Do you live in the city of West Melbourne?
9    A    What do you think?
10   Q    I think you live in Winter Park.
11   A    I don't.  I live in Seminole County.  I think
12  you know I didn't live in the city of West Melbourne.
13   Q    So, no, you don't live in the --
14   A    No, I don't live in the city of West
15  Melbourne.
16   Q    Okay.  Do you regularly visit the city of West
17  Melbourne?
18   A    No.
19   Q    So any residents that may have expressed
20  objections based on their daily observations of traffic,
21  you wouldn't really have any reason to dispute that
22  since you don't regularly visit or live in the city of
23  West Melbourne; would that be fair?
24   A    No.
25   Q    That's not fair?

Page 163

1    A    No.  My basis for review of traffic
2  considerations would be based upon traffic studies and
3  the land development code requirements for permitting in
4  a particular local jurisdiction.
5    Q    I don't think I need to mark that, so I'll
6  take that back for now.
7    A    I'm not aware of any resident that had an
8  expert opinion with regard to traffic.
9    Q    Is Atlantic Housing aware that the City of
10  West Melbourne passed a moratorium regarding the Live
11  Local Act?
12   A    Yes.
13   Q    And what actions, if any, did Atlantic Housing
14  take in regard to the proposal and passage of the City
15  of West Melbourne's moratorium regarding the Live Local
16  Act?
17   A    I don't believe we took any.  I believe that
18  moratorium was enacted after the denial by the county
19  commission.  I'm not a hundred percent sure of that, but
20  I believe that's accurate.
21   Q    Was it proposed prior to the county
22  commissioners' denial?
23   A    Yes, it was.
24   Q    And what action, if any, did you take with
25  regard to the City of West Melbourne's moratorium prior

Page 164

1  to the denial of the bond application?
2    A    I don't recall if we took any action.
3    Q    Why not?
4    A    I don't remember.
5    Q    Would that moratorium have had effect on the
6  proposed development?
7    A    It could have delayed it.  I don't believe had
8  the county commission not denied the bond allocation
9  that the moratorium would have stopped it.
10   Q    It would have delayed it six months?
11   A    Correct.
12   Q    How did you become aware of the moratorium?
13   A    I don't remember.
14   Q    Were you aware of any objections by community
15  members regarding the actual application as far as
16  noncompliance or incompleteness?
17   A    There were a number of objections.  I can't
18  recall all of them.  There were e-mails sent to the
19  City, I'm not -- and to, I believe, the county
20  commissioners and, I believe, to the HFA with a number
21  of different objections and making claims with regard to
22  the application and with regard to the development.
23   Q    And did Atlantic Housing attempt to do or to
24  take any action in order to remedy or address the
25  concerns residents may have relayed regarding the actual

Page 165

1  application itself?
2    A    I don't recall.  I know that we reviewed each
3  of the complaints that we received to make sure there
4  wasn't anything that was a basis for denial and found
5  none.  But I don't recall each specific instance or each
6  specific e-mail or information that we received.
7    Q    Are you familiar Florida Statute 159.616 -- or
8  615?  Excuse me.
9    A    Give me the title of it and I'll probably tell
10  you whether I'm more familiar with it.
11   Q    Actions to contest the validity of bond.
12   A    I'm not real familiar with it.
13   Q    It states that, quote, an action or proceeding
14  to contest the validity of any bond issued under this
15  act, other than a proceeding, pursuant to 159.615, must
16  be commenced within thirty days after notification in a
17  newspaper or general circulation within the area of the
18  passage by the Housing Finance Authority of the
19  resolution authorizing the issuance of such bond, close
20  quote.  Does that refresh your recollection?
21   A    Something about the requirements that you have
22  to go by for approval of a bond allocation and issuance,
23  but I don't really -- without reading that in detail,
24  that's a -- that's a mouthful.
25   Q    Are you aware of any residents who suggested

W. Scott Culp
March 18, 2025

Page 166

1    or, I'll say, threatened, but I may not necessarily mean
2    that, but questioned or suggested the possibility of
3    filing an action pursuant to that statute?
4        A    I'm not.  I don't recall any, no.
5        Q    Did Atlantic Housing Partners do anything in
6    that regard regarding a potential action by citizens
7    relating to the bond?
8        A    Not that I recall.
9        Q    So prior to today were you or Atlantic Housing
10   Partners aware at all that at least some community
11   members were discussing that possibility?
12       A    I don't remember if I was aware of the
13   discussion of that possibility or not.
14       Q    Did you do anything in preparation for today's
15   deposition to determine or search for any correspondence
16   related to that specific statute?
17       A    No, I'm not aware of any correspondence in
18   that relation.
19       Q    Does Atlantic Housing have any information
20   regarding motivation of Brevard citizens for objecting
21   to the proposed Venue at Heritage Oaks?
22       A    Only as provided in the e-mails and
23   discussions with ourselves at the community meeting,
24   with the commissioners, with the HFA, with our engineer.
25   But other than that, we have no knowledge of motivation.

Page 167

1        Q    Are you aware of any statements made by
2    citizens regarding their motivation and objecting to the
3    proposed development?
4        A    I'm aware of statements made.  I don't recall
5    the word motivation used in those statements, although
6    it may have been.
7        Q    Does Atlantic Housing have any evidence that
8    the motivation of any community member to objecting to
9    the proposed project was racist or discriminatory
10   against black people?
11           MR. PICCOLO:  Object to form.
12           THE WITNESS:  I don't recall any evidence in
13       that regard.
14   BY MS. GAINEY:
15       Q    Does Atlantic Housing have any evidence of any
16   statements made by community members which were racist
17   or discriminatory against black people?
18           MR. PICCOLO:  Object to form.
19           THE WITNESS:  I don't recall any statements in
20       that regard.
21   BY MS. GAINEY:
22       Q    We already established that you attended the
23   December 5th, 2023 commission meeting where the bond was
24   considered, correct?
25       A    Yes.

Page 168

1        Q    I'm going to briefly review some of the
2    objections community members had to the proposed
3    development as noted in the minutes from that meeting.
4    I understand that you may not agree with the statements.
5    But my question is:  Do you agree that the objection was
6    made to the commissioners; the first objection made to
7    the commissioners at that meeting were that it heavily
8    favors the developers and it allows the developers to
9    bypass local building restrictions on building height,
10   capacity and zoning?
11       A    I disagree with that, but I understand that
12   that objection was made.
13       Q    The next objection that -- was that the
14   problem is traffic in this particular location, that a
15   traffic study needed to be done and the roads didn't
16   support the traffic?
17       A    I disagree with that, and I recognize that
18   that statement was made.
19       Q    Was there an objection that only twenty
20   percent of the proposed hundred and five units were
21   going to be set aside for affordable housing while the
22   other eighty percent was not?
23       A    I don't remember that objection, and the
24   objection is not valid.
25       Q    Do you agree that that objection was made to

Page 169

1    the county commissioners on or about December 5th, 2023?
2        A    I don't recall.
3        Q    Was there an objection made to county
4    commissioners that the bond was not financially or
5    fiscally responsible?
6        A    I don't recall that objection, and I disagree
7    with it.
8        Q    Was there an objection that the proposed
9    development hurt the seven hundred and thirty-five
10   families in the five communities in Heritage Oaks?
11       A    I don't know if those exact words were used,
12   but I seem to recall some objection of that manner, and
13   I disagree with it.
14       Q    Were there objections as to the proposed
15   height of the building, the proposed building?
16       A    I recall hearing objections in that regard,
17   and I disagree with it.
18       Q    How tall was the building to be?
19       A    If I remember correctly, we were using a
20   four-story building.
21       Q    Do you know how tall that was in terms of
22   feet?
23       A    I don't remember.
24       Q    Are you aware of any modifications or changes
25   to the Live Local Act as it relates to height of

W. Scott Culp
March 18, 2025

Page 170

1  proposed buildings that are developed in commercial
2  areas?
3      A    Yes.
4      Q    And what's the change as you know it?
5      A    It was a change that had to do with the height
6  within a community that is adjoining by a certain number
7  of single-family residents on two sides.  I don't
8  remember the exact statutory language, but there is --
9  there was a revision of the Live Local Act in that
10 regard.
11     Q    Everything else aside, would you have been
12 able to develop a four-story building under Live Local?
13     A    I don't remember whether it was three- or
14 four-story in this location.  I believe it was four, but
15 I really would need to refresh my memory with the
16 documents.
17     Q    Okay.  I'm going to purport to you that it
18 does appear that it was four stories.  And if you assume
19 that to be true, had you applied for the proposed
20 development here being a four-story building, would it
21 have been allowed in this location?
22     A    Yes.
23     Q    Even with the modifications to the Live Local?
24     A    Yes.
25     Q    Was the proposed location surrounded by -- on

Page 171

1  two sides by single-family housing?
2      A    No.
3      Q    Explain what you mean.
4      A    I'd have to pull the statute on that first
5  before I could explain it.
6      Q    Let me just ask you generally.  Was the
7  proposed development going to have two sides with
8  single-family housing?
9      A    No, not completely.
10     Q    And tell me what you mean.
11     A    I need to see the site plan, the aerial and
12 the statute and -- so that I can refer to exactly the
13 configuration and what is contiguous to the property and
14 what the statute says with regard to limitation on
15 height for uses contiguous to the property.
16     Q    So are you not sure if there was going to be
17 -- that's fine.  Strike that.
18          I thought the application had an aerial photo
19 in it.
20     A    Let me see.  I probably have one on Google
21 Earth on my phone --
22     Q    That's actually the --
23     A    -- and the easiest way.
24     Q    That's actually Venus at Viera, I think.
25     A    Oh, no wonder I --

Page 172

1      Q    It won't help you.
2      A    Let's see.  What's the road we were talking
3  about here?  This was -- actually I should remember the
4  name of this road.
5      Q    Heritage Oaks and --
6      A    Was it Heritage --
7      Q    Minton Road.
8      A    Oh, Minton Road.
9      Q    Oh, here.  Sorry.
10     A    Minton Road and Heritage Oaks.
11     Q    Here you go.
12     A    It popped right up.
13     Q    I'm showing you an aerial.
14     A    Yeah, there we go.  Yeah, so there's a
15 retention pond on the back of the property that was
16 already constructed and in place.  This aerial is
17 somewhat dated.  A portion of the property to the south
18 has a single-family neighborhood across a public
19 right-of-way.  Contiguous is only one, two, three, four,
20 five, six, if you count the ones across the public
21 right-of-way.  So then we need to look at the statute
22 with regard to the revisions to the Live Local Act with
23 regard to height in an area that is in proximity to
24 single-family.
25     Q    Do you agree that this proposed development

Page 173

1  had single-family homes on two sides?
2      A    Yes.
3      Q    So if you assume that that is the case and the
4  statute, in fact, was modified such that Live Local
5  would not allow a four-story building to be built if
6  there are two --
7      A    I don't want --
8      Q    -- sides of single-family -- hang on a
9  second -- two sides of single-family homes to the
10 proposed development, do you agree with the statement
11 that you would not have been able to develop a
12 four-story building at this location as we sit here
13 today?
14     A    I'm not going to respond to the conjecture
15 with regard to what the statute says.  I'll only respond
16 to what the statute actually says.  So if you want to
17 present the statute or have us look at the statute, I'm
18 not going to respond to some assumption of what the
19 statute might say.
20     Q    Have you developed any four-story buildings
21 that are located near subdivisions on two sides --
22     A    Yes.
23     Q    -- in the last --
24     A    Yes.
25     Q    And was that -- where was that located?

W. Scott Culp
March 18, 2025

Page 174

1    A    We have one we're starting construction on in
2    the city of Sanford. And then we have one we're
3    starting construction on in the city of Palm Coast.
4    Those are two that come to mind right now. But, again,
5    the statute has provisions in it, and I don't want to
6    assume that I know with regard to the statute.
7        Q    It's fine. We can move on. Back to the
8    objection. Was there an objection by the community
9    member that the application asked if the developer or
10    principal or general partner had been found in
11    noncompliance and the application indicated that yes,
12    the applicant had been found in noncompliance?
13    A    Yes, there was an objection in that regard.
14        Q    And did Atlantic Housing address that
15    objection?
16    A    You say did they address that objection?
17        Q    Counter it, address it, correct it.
18    A    We were not provided an opportunity to address
19    objections.
20        Q    Did you -- do you agree you -- strike that.
21            Was there an objection by a citizen that the
22    bond proposal was without specificity?
23    A    I don't recall that, but I would definitely
24    disagree with it.
25        Q    Was there an objection that a fiscal impact

Page 175

1    statement needed to be done?
2    A    I don't recall that, but I would disagree with
3    it.
4        Q    Was there an objection that a pedestrian had
5    recently been hit in the area and there were safety
6    concerns as it relates to traffic?
7    A    I don't remember that.
8        Q    Was there an objection about motor vehicle
9    accidents that had occurred in the area and also
10    concerns about increased traffic?
11    A    I remember some comments in that regard, and I
12    disagree.
13        Q    Did Atlantic Housing hire a lobbyist as it
14    relates to Live Local?
15    A    Atlantic Housing has a lobbyist. We didn't
16    hire a lobbyist specifically as it relates to Live
17    Local.
18        Q    Did your lobbyist take any actions as it
19    relates to Live Local?
20    A    I and my lobbyist had numerous discussions
21    with representatives in the legislature, with staff and
22    elected representatives with regard to the Live Local
23    Act when it was being developed.
24        Q    And was Atlantic Housing in support of the
25    legislation?

Page 176

1    A    Yes.
2        Q    And why is that?
3    A    Because it benefits the provision of
4    affordable housing and meets a significant need that is
5    documented and established by the need studies that are
6    prepared annually by the State.
7        Q    And, I'm sorry, did you have -- did your
8    lobbyist or anyone on behalf of Atlantic Housing have
9    conversations with legislatures advocating for passage
10    of Live Local?
11    A    Yes.
12        Q    How many?
13    A    I don't recall.
14        Q    Would there be any documents to reflect that?
15    A    No.
16        Q    And who is your lobbyist, Jason Unger?
17    A    He's one of them, yes.
18        Q    How many do you have?
19    A    Jason's firm represents us. So there's any
20    attorney within his firm that registers as a lobbyist
21    for Atlantic Housing can lobby in our regard. So I
22    don't recall each of the individuals named in his firm
23    that has registered.
24        Q    I'll show you what's Bates-Stamped John Thomas
25    18. Is that an e-mail to one of the -- one of Atlantic

Page 177

1    Housing's lobbyists?
2    A    No, this was an e-mail to Jonathan Thomas, who
3    I think took the deposition of.
4        Q    Go a little --
5    A    Oh, okay. And there's an e-mail below that
6    which is an e-mail to Jason Unger from me.
7        Q    And what were you telling Jason at that time
8    and --
9    A    I was letting him know that there are
10    neighbors that are vehemently opposing our four-story
11    seniors affordable mixed-income housing.
12        Q    Does that refresh your recollection on the
13    height?
14    A    It reflects my recollection that I told Jason
15    that the neighbors were opposing a four-story seniors
16    affordable mixed-income housing.
17        Q    Was the building proposed to be four stories
18    or not?
19    A    I think so.
20        Q    What's the date on that e-mail?
21    A    December -- the one to Jason was December 3rd
22    of 2023.
23            MS. GAINEY:  I'll mark that as --
24    BY MS. GAINEY:
25        Q    Is that a fair and accurate copy of that

Page 178

1  e-mail?
2     A   I think so.
3     MS. GAINEY:  We'll mark that as Exhibit 13.
4     (Defendant's Exhibit 13 was marked for
5  identification.)
6  BY MS. GAINEY:
7     Q   Did you also tell Angela Abbott on or about
8  December 4th, 2023 that the neighbors were, quote,
9  vehemently opposed to the development?
10    A   I think so.
11    Q   Let me show you an e-mail from you to Angela
12 in that regard.
13    A   I see that.
14    Q   And the e-mail seems to indicate that you were
15 aware in advance of commissioners' votes; is that
16 accurate?
17    A   I couldn't be aware of commissioners' votes
18 'cause they can't vote in advance.  I was aware of
19 indications of what their votes might be.
20    Q   Well, what does your e-mail to Angela say?
21    A   It says, we are aware of two definite no votes
22 and one definite yes vote.  That was my interpretation
23 of what I thought was going to happen.
24    Q   Who were the definite no votes as you're
25 referring to there?

Page 179

1     A   I don't remember.
2     Q   Who was the definite yes vote?
3     A   I don't remember.
4     Q   How did you become aware of the definite no
5  votes?
6     A   I don't remember.
7     Q   How did you become aware of the definite yes
8  vote?
9     A   Don't remember.
10    Q   To me that suggests that someone from Atlantic
11 Housing had conversations with Brevard County
12 Commissioners prior to the vote.  Is that a fair
13 assumption?
14    A   I don't -- I don't remember if I had any
15 conversations directly with any of the commissioners.
16    Q   Number eighteen in our subpoena asked for the
17 person most knowledgeable related to, quote, actual or
18 attempted correspondence, contact and/or communications
19 with Brevard County Commissioners regarding Venue at
20 Heritage Oaks, period.  Are you the person most
21 knowledgeable regarding contact or communications with
22 commissioners?
23    A   I am.
24    Q   And did you do anything in order to refresh
25 your recollection as to contact or communications with

Page 180

1  commissioners prior to today's deposition?
2     A   I thought about it.
3     Q   Other than thinking about it.
4     A   I don't have any written communications with
5  any commissioners from the commission, so I thought
6  about it.
7     Q   All right.  So is it fair to assume, based on
8  that e-mail, that there was at least some correspondence
9  with --
10    A   No --
11    Q   Let me finish, please -- commissioners prior
12 to the vote as to how the commissioners were going to
13 vote?
14    A   No.
15    Q   And why is that not fair?
16    A   There was communication from commissioners to
17 the neighbors, and there was some communication from
18 commissioners, I believe, to Angela.  And we had gotten
19 indication of the commissioners being concerned, but I
20 don't -- no, I don't agree that there was any discussion
21 or communication between anybody at Atlantic with any of
22 the commissioners.
23    Q   Did anyone at Atlantic have any --
24    A   And I don't -- I'm sorry.
25    Q   Go ahead.

Page 181

1     A   I'm saying I don't think there were any yes
2  votes, if I think about the votes.  So obviously a
3  definite yes vote couldn't have been predetermined if
4  there were none.
5     Q   Did you review the minutes from the Brevard
6  County Commissioner meeting regarding the bond --
7     A   No.
8     Q   -- prior to this deposition?
9     A   Not recently.  I've watched the video several
10 times, but I haven't done anything recently.
11    Q   And you don't remember what the votes were?
12    A   I don't.  I really don't.
13    Q   Were you aware that West Melbourne City
14 Councilman Dittmore appeared at the commission meeting
15 in objection to the project?
16    A   I am.
17    Q   What conversations, if any, did anyone from
18 Brevard have with City Councilman Dittmore regarding the
19 project?
20    A   I don't know.
21    Q   Did you attempt to find or locate or talk to
22 anyone or think about any conversations your company had
23 with City Councilman Dittmore in response to number
24 twenty of our deposition notice?
25    A   We had communications and e-mail with the

W. Scott Culp
March 18, 2025

Page 182

1    City. And I don't recall if Commissioner Dittmore was
2    part of those communications, and I believe he was the
3    city commissioner that was at the community meeting. He
4    made some comments, and I believe he was the city
5    commissioner that was at the county commission meeting
6    that made some comments. I don't recall any other
7    direct conversation or communication that we had with
8    him. I know we did have some communication with the
9    City, but I can't remember whether it was just the city
10   manager and one of the other city staff persons, or if
11   any of the commissioners were copied on that.
12       Q    Did Congress -- Congress, excuse me -- city
13   councilman state that he objected to the bond because it
14   was a sixteen-million-dollar bond for only providing a
15   minimal impact for families in need?
16       A    I don't remember his statement, but I think he
17   made some statement in that regard.
18       Q    Did he object to the fact that it was a twenty
19   percent or twenty-one apartments were -- was going to be
20   a small amount to help families in need?
21       A    I don't recall the exact words, but I think he
22   made some reference to the percentage set-aside, which
23   he was not accurate in that regard.
24       Q    Well, he was accurate pursuant to what had
25   been submitted to the Brevard Housing Authority in

Page 183

1    Atlantic -- or in the application by the plaintiffs,
2    right?
3        A    With regard to what was going to be required
4    by the bond allocation, that is correct.
5        Q    Did City Councilman Dittmore object to the
6    project because the rental numbers are roughly the same
7    as the market rate for a one-bedroom apartment in the
8    city of West Melbourne?
9        A    I don't remember his exact language, but I
10   have no reason to believe he didn't state that.
11       Q    Is it true that the rent was going to be
12   roughly the same for -- as a market rate for a
13   one-bedroom apartment in the city of West Melbourne?
14       A    No.
15       Q    And how is that not true?
16       A    We discussed at length the underwriting
17   reports and the financial models that show what the
18   set-asides were going to be for the four percent
19   Low-Income Housing Tax Credits, and those rents are
20   significantly less than market for this geographic area.
21       Q    I'll show you John Thomas 232519 Bates-Stamped
22   right-hand corner. And that's an e-mail between you and
23   Gray Robinson?
24       A    Correct.
25       Q    Is that the lobbying firm that you were

Page 184

1    speaking of earlier?
2        A    Correct.
3        Q    At the bottom of the first page you state,
4    quote, we are in the city of West Melbourne and the City
5    can't have any public hearings because we are using Live
6    Local for our land use zoning and height, exactly as
7    Live Local is intended, close quote. Did you say that?
8        A    That is what my e-mail states, yes.
9        Q    What did you mean when you said we, quote,
10   can't have any public hearings, close quote?
11       A    The Live Local Act prevents local
12   jurisdictions from having public hearings to make
13   determinations with regard to the approvals of an
14   affordable housing project developed on commercial
15   property under the Live Local Act.
16       Q    Do you agree that TEFRA requires public
17   hearings?
18       A    TEFRA is a public hearing unrelated to the
19   land use zoning and height. TEFRA is a public hearing
20   related to the public purpose of tax exempt bonds and is
21   not what is referenced by the Live Local Act with regard
22   to public hearings and approvals.
23       Q    My question was just: Do you agree that
24   TEFRA, as it relates to bond financing, requires public
25   hearings?

Page 185

1        A    I answered your question.
2        Q    Is that a yes?
3        A    No. You can ask again if you'd like.
4        Q    Do you agree that TEFRA requires public
5    hearings as it relates to bond financing?
6        A    Yes.
7        Q    On the next page it says --
8        A    And that, of course, is not a city public
9    hearing. It's a county public hearing.
10       Q    On the next page it says, quote, also
11   important to note, dash, we are committing to a
12   seniors-occupancy restriction, closed quote. What does
13   that mean?
14       A    It means as we have discussed, that we were
15   committing to a seniors-occupancy restriction and this
16   is consistent with what you and I have talked about. We
17   had not made that commitment prior to that point because
18   obviously on December 3rd, when this e-mail was written,
19   I said we are committing doesn't mean we have committed.
20       Q    Kind of splitting hairs there, aren't you?
21       A    Aren't you?
22       Q    So as of December 3rd, 2023 you agree that you
23   are telling people you are committing to a
24   seniors-occupancy restriction; but it's your testimony
25   that you, at that point, had not committed to a

Page 186

1  seniors-occupancy restriction.  Am I --
2      A    One hundred percent correct.
3      Q    -- understanding that?
4      A    One hundred percent correct.
5      Q    Okay.  What did you tell the people at the
6  community meeting on November 30th, 2023?
7      A    I believe we told them we were considering a
8  seniors-occupancy restriction.
9      Q    But had not committed at that point?
10     A    I don't recall having a commitment at that
11 point.
12     Q    If you go back a few pages, page five of that
13 document, John Thomas 00022, this appears to be an
14 e-mail that was sent by Woodfield at Heritage Oaks
15 homeowners' association, which you forwarded; is that
16 correct?
17     A    That's correct.
18     Q    And this e-mail states, quote, new information
19 that we heard at the November 30th developer meeting are
20 in subsequent corresponding.  Nothing is set in stone.
21 The developer hasn't purchased the land yet.  It's just
22 under contract.  Many things may change.  But the
23 current plan is one hundred and five units, though that
24 number could climb.  All units will be reserved for
25 seniors, quote, in parentheses, requires at least one

Page 187

1  family member be fifty-five plus and no everyone under
2  eighteen.  Everyone must be listed on the lease, closed
3  quote.  Is that an accurate statement as to what was
4  discussed at the November 30th meeting?
5      A    No.  As it states in this correspondence, it
6  was delivered from the homeowners' association to
7  everybody that subscribes to their mailings, nothing is
8  set in stone, which was what they're saying, has been
9  info received at the November 30th developer meeting.
10 So they're saying that info received at the November
11 30th developer meeting is nothing is set in stone and
12 that many things may change.
13          They indicate information with regard to the
14 seniors restriction that is not accurate.  Some of it's
15 not accurate.  It says no one under the age of eighteen.
16 It's accurate that -- it's really not accurate that
17 everyone must be listed on the lease.  Everyone of legal
18 age must be listed on the lease.  I could go through
19 each of the rest of them if you'd like, but I'll wait
20 'til you ask a question.
21     Q    So is it true or is it not true that you told
22 the residents at the November 30th meeting that all
23 units would be reserved for seniors?
24     A    I did.  Well, I told them that we were
25 consideration reserving all units for seniors.  I told

Page 188

1  them nothing is set in stone.
2      Q    Is it true or is it not true that you told the
3  residents at the November 30th meeting that if the
4  Brevard County Finance Housing Authority bond is denied
5  on December 5th, Atlantic Housing would apply for a
6  state -- Florida State bond?
7      A    I indicated that we may.
8      Q    And did you indicate that the Florida State
9  bond will likely not be for age-restricted senior
10 residents?
11     A    Yes.
12     Q    As it relates to entrances, two planned, one
13 on Heritage Oaks Boulevard and the other on Minton, what
14 discussion was held at the November 30th meeting in that
15 regard?
16     A    We showed our site plan.  And it showed the
17 entrances that already previously had been approved for
18 development of this property with an entrance an
19 Heritage Oaks Boulevard and on Minton.
20     Q    The small medical facility that was going to
21 be part of the development, why was that added or why
22 was that part of the development?
23     A    Under the Live Local Act the development needs
24 to be mixed use and provide a small mixed-use component.
25 And the medical facility or other type of commercial use

Page 189

1  would be allowable on this site and was located on the
2  site plan that we had been providing and reviewing with
3  the City staff.
4      Q    And was it the City staff that told you about
5  the mixed-use requirement?
6      A    The mixed-use requirement is in the Live Local
7  Act statute.  So whether the City staff told us about
8  it, I don't know; but it's in the statute.
9      Q    Prior to the meeting with the City of West
10 Melbourne was there plans for it to be a mixed use?
11     A    Yes.
12     Q    Number six says, quote, the traffic study data
13 they presented with old, dash, newer info exists because
14 of the Dougherty Road extension project.  They'll
15 reexamine that, period.  Is that a true statement?
16     A    It's true that new information does exist and
17 that we were going to update our traffic study for that,
18 correct.
19     Q    The next one is about, I guess, were residents
20 expressing privacy concerns?
21     A    There are three or four single-family homes
22 across the retention pond from the proposed building.
23 And we had designed that building such that there would
24 be no windows looking in that direction.
25     Q    The next one, number eight, is about building

W. Scott Culp
March 18, 2025

Page 190

1  height. It says, building height allowed by Live Local
2  could go as high as sixty-five feet, and even a
3  four-story building is likely to be about fifty
4  something feet, allowing for roof line height. Was
5  there discussion at the meeting regard the height of the
6  building?
7        A    Yes, there was.
8        Q    And what did you tell the residents regarding
9  the height of the building at the November 30th meeting?
10       A    I think we even gave them a presentation
11  showing the sight line from the location of the building
12  and the single-family residence in the location of the
13  single-family residence that are contiguous to the
14  property so that they could understand better the view
15  of the building and the view the building would have of
16  the single-family residences.
17       Q    The next one is about I think you were
18  explaining your operations. The next one is about
19  number ten. It says, quote, they buy the bonds and take
20  the tax offsets, close quote. Is that true?
21       A    That's a statement they're making of their
22  interpretation, but it's not necessarily an accurate
23  statement.
24       Q    Number eleven says, quote, Councilman Dittmore
25  asked if the City suggested alternative properties,

Page 191

1  would the developer considerate it. Scott Culp said
2  yes, but that they like this property because it's
3  already leveled, it has the retention pond, curb-outs,
4  et cetera, close quotes. Is that a true statement?
5        A    Yes. It cuts it a little bit short. I told
6  them we're always considering other properties and we
7  have developed quite a bit in Brevard County and would
8  always consider other properties for development of
9  affordable housing.
10       Q    What other properties did you consider in
11  Brevard County, if any, after the bond was denied?
12       A    None after the bond was denied.
13       Q    Prior to the bond being denied what other
14  properties did Atlantic Housing consider?
15       A    There was a few listings come to us that we
16  looked at that weren't going to fit with what we were
17  trying to do. We didn't find any others that were
18  offered at a price that would be economically feasible.
19       Q    Did you tell Angela Abbott that the project
20  would be built whether or not it's financed with bonds?
21       A    There was an e-mail in that regard, I believe.
22  I think there's been some confusion about what we were
23  speaking about, or maybe I was confused about what we
24  were speaking about in that regard.
25       Q    Do you remember the e-mail?

Page 192

1        A    Not totally. I --
2        Q    Let me show --
3        A    -- remember there was an e-mail, but...
4        MS. GAINEY:  Let me show it to you to refresh
5  your recollection, and we'll mark that as
6  Defendant's Exhibit 14.
7        (Defendant's Exhibit 14 was marked for
8  identification.)
9  BY MS. GAINEY:
10       Q    Wait, I'm sorry. Did I mark this one?
11       A    I don't know if you marked this one or not.
12       Q    I'm going to mark for purposes --
13       A    I don't know if you marked that one either.
14       Q    Let me actually -- I can jointly mark them.
15       A    Okay.
16       MS. GAINEY:  For purposes of the record, I'm
17  marking as Defendant's Exhibit 14, e-mails dated
18  March -- excuse me, March -- Monday, December 4th,
19  from Mr. Culp, and then also an e-mail dated
20  December 3rd, Bates-Stamped 2-3-25.
21       So we'll mark that e-mail, Mr. Culp, as
22  Defendant's Exhibit 15, if you don't mind.
23       THE WITNESS:  Oh, I'm sorry. I was reading
24  it. I wasn't paying attention to you.
25       MS. GAINEY:  I find that if I don't mark them

Page 193

1  immediately, I forget.
2        (Defendant's Exhibit 15 was marked for
3  identification.)
4  BY MS. GAINEY:
5        Q    Is that the e-mail that you were referring to?
6        A    Yeah, this is what I remember.
7        Q    Does that refresh your recollection?
8        A    Yeah. This is the one there's been a little
9  confusion on because the discussion, as I recall it, was
10  related to whether or not we could develop the property
11  without bonds. The Live Local Act doesn't require that
12  you use taxes and bonds to develop affordable housing on
13  the property. So I was telling Angela yes, the Live
14  Local legislation provides land-use approvals. The
15  bonds merely provide an opportunity for some of the
16  apartments to be more affordable.
17       So I was explaining that yes, you know, this
18  is not a question of using bonds to be in compliance
19  with Live Local. It was the Live Local Acts allows you
20  to build affordable, and affordable is below a hundred
21  and twenty percent AMI. And as we've seen in some of
22  the other information we've reviewed, below a hundred
23  and twenty percent AMI is essentially market in this
24  location. So that was the discussion, as I recall it,
25  although I think my answer wasn't as clear because she

W. Scott Culp
March 18, 2025

Page 194

1    said "will" versus "can" in her question.
2    Q    Well, it seems pretty --
3    A    It seems pretty --
4    Q    -- straightforward.
5    A    -- clear to me. Seems pretty clear to me.
6    Q    Seems pretty straightforward that she asked,
7    quote, is it safe to say that this project will be built
8    whether or not it is financed with bonds --
9    A    Yeah.
10   Q    -- question mark, close quote. Hang on, let
11   me finish. And your response is, quote, yes, period.
12   Live Local --
13   A    Yes, and my response is that, as I indicated,
14   we were talking about the development of the property,
15   the neighbors' opposition, the land use entitlements,
16   the ability to develop affordable housing in this
17   location. And I was explaining Live Local legislation
18   with regard to the land use approvals, which it states
19   in the sentence that's connected to the yes, period. So
20   it's clear that I was discussing the land use approvals
21   and the Live Local legislation and the ability to
22   provide some more affordable apartments with the bonds.
23   So I think it's clear in my answer. And I understand
24   your position with regard to clarity of her question.
25   Q    And her response is, quote, got it. Isn't

Page 195

1    this a family project as opposed to senior, question
2    mark, close quote. And your response is, quote, we are
3    planning to restrict to seniors mixed income, close
4    quote.
5    A    That's correct.
6    Q    So up until that point was there some
7    confusion as to whether it was a family project as
8    opposed to seniors?
9    A    There was no commitment, and still at this
10   point was no commitment to seniors because it's not
11   required under the bond allocation. Bond allocation
12   does not require you to make a commitment, family,
13   seniors, elderly. And as we've had extensive testimony
14   about, we had not made that commitment. And even at
15   this point we are saying that we are planning to
16   restrict to seniors. We didn't say that we have
17   restricted or that we are committed to restricting, but
18   we were planning on that day that we're going to have
19   seniors mixed income.
20   Q    Did Ms. Abbott ask you, after the bond denial,
21   if you would go ahead with the development?
22   A    I don't recall.
23   Q    Specifically at the December 2nd Housing
24   Finance Authority meeting, as you know, it's recorded; I
25   think as we've established. And according to your

Page 196

1    statement, she -- and her question was, quote, do you
2    think you will go ahead with the development. And your
3    response is, quote, we are not sure at this point. We
4    have a lot of different options, close quote. Assuming
5    that to be true, did you have a lot of different options
6    after the denial?
7    A    I have options. I don't know that any of them
8    are good options. We were unsure, but we have options.
9    Q    What did you do to explore those options, if
10   anything?
11   A    Looked at the economic viability of developing
12   without loans, which would also be without tax credits,
13   and providing it still require to be restricted
14   affordable under the Live Local Act. So we still are
15   considering and unsure about whether or not we have the
16   ability to develop in an economically feasible program.
17   So that's what we did.
18   Q    Could you have switched from being a seniors
19   and do a Live Local sale application?
20   A    The Live Local sale application is extremely
21   competitive and would have been the following fall. And
22   I don't think we would have had land control. We would
23   have had to close on a land, which we wouldn't have done
24   knowing the extremely competitive nature of the sale
25   applications are probably one in twenty awards for

Page 197

1    applications.
2         And I don't recall, as I'm sitting here today,
3    whether this particular site scored with the what's
4    called proximity preference scoring. You have proximity
5    items in the Florida Housing Finance Corporation
6    application. And I would have had to review, and I may
7    have done after this denial, the proximity scoring for
8    this site to see if we even could meet the proximity
9    scoring which would make us competitive.
10   Q    Are there any records to reflect any actions
11   you took with respect to the possibility of applying for
12   a sale financing?
13   A    There wouldn't be any records 'cause I would
14   have just looked at the prior year's sale application,
15   because there wasn't one at that time published for the
16   coming year, for 2025. I would have also had to
17   recognize that I would have had to apply for Florida
18   Housing Finance Corporation bonds, which is a different
19   economic model than the local Housing Finance Authority
20   bonds. And their set-asides would be different; and the
21   competitiveness of the sale restrictions would make it
22   highly unlikely that we'd get an award, unless you
23   believe we're going to be the one in twenty in the
24   applications that might win an award.
25        And if I determined that the proximity

Page 198

1   preference scoring was adequate, then there'd be almost
2   zero chance of getting an award. But I wouldn't have
3   some document. I would have needed to e-mail somebody
4   about that. I would have looked on the Florida Housing
5   Finance Corporation website and reviewed that at my
6   desk.
7        Q    Is there any evidence or documents or
8   information to reflect what, if anything, you did
9   regarding pursuing possible sale application?
10       A    I thought I just answered that question. I
11  think I did. I think I answered that question.
12       Q    There's nothing written?
13       A    No, there's nothing written. No.
14       Q    What about the possibility of doing at market
15  rate without bonds? Did you tell Ms. Abbott on
16  December 6th, 2023 that you would look at the
17  possibility of doing market rate without bonds?
18       A    Yes.
19       Q    And did you, in fact, do that?
20       A    Yes.
21       Q    And are there any written documents in order
22  to reflect that?
23       A    No.
24       Q    So what actions did you take in order to look
25  at doing it at market rate without bond?

Page 199

1        A    I looked at my models to see if it would be
2   economically feasible. And I think I even asked Mike,
3   who I would have had to get approval from if I wanted to
4   even try and do it; and it wasn't -- it's not feasible.
5   It's not --
6        Q    So did you --
7        A    -- economically feasible.
8        Q    -- run the numbers or...
9        A    I did, yeah.
10       Q    And you're saying there's no written --
11       A    No.
12       Q    -- evidence of that?
13       A    No. I could run them again for you today.
14  It's pretty easy. There's no economic feasibility to an
15  affordable housing development that meets the Live Local
16  legislation without tax exempt bonds or Low-Income
17  Housing Tax Credits in this location with the market
18  rents that have already been established by the market
19  study engaged and provided by the credit underwriter for
20  the Brevard County Housing Finance Authority.
21       Q    Do you agree that you could have developed the
22  -- proposed it at a different location?
23       A    No. I can't develop -- if I could have
24  developed a proposal? No, I can't move the bonds. I
25  can't take a hundred-and-five-unit building designed for

Page 200

1   a specific site, put it on a different location. It's a
2   different site. And could I have found another site in
3   the county or in the state to develop? Yes, I'm
4   continuing to do that.
5        Q    And I think you said in your deposition you
6   didn't do it in Brevard County because you had filed a
7   lawsuit, correct?
8        A    I don't know if I said I didn't do it because
9   I filed a lawsuit. I think I said I didn't do it and I
10  filed a lawsuit. Did I say I didn't do it because I
11  filed a lawsuit? If I did, I should retract that. I
12  didn't do it. I don't think I will.
13       Q    I think you said something along the lines of
14  why would you do it, you had a lawsuit pending against
15  them.
16       A    Oh, I do remember saying that, why would I do
17  it. You tell me, why would I do it.
18       Q    Well, do you understand you have a duty to
19  mitigate your damages?
20       A    Do you understand that I did mitigate my
21  damages?
22       Q    Good to hear. What'd you do to mitigate your
23  damages?
24       A    First, I didn't close on the property. If I
25  had closed on the property I would have been forced to

Page 201

1   develop an affordable housing community at a loss with
2   no tax exempt bonds and no tax credits.
3        Q    All right. And the reason why you didn't
4   close on the property was because of the City of West
5   Melbourne ordinance, correct?
6        A    That was one of the reasons, yes.
7        Q    What are the other reasons?
8        A    I was denied the bond financing by the county
9   commission.
10       Q    Do you agree that the letter that your
11  attorney sent regarding the cancelation of the land
12  contract didn't reference the bond denial at all?
13       A    I do, intentionally.
14       Q    And why is that?
15       A    The land control or land documents require --
16  allow us to terminate based upon a moratorium. We've
17  provided the termination based upon what was in our
18  purchase agreement. I don't need to --
19       Q    So it was --
20       A    -- expound upon that.
21       Q    So you agree that per that letter from Scott
22  Culp, the reason for the termination of the land
23  contract was the moratorium?
24            MR. PICCOLO: Object to the form.
25            THE WITNESS: No. I agree that that letter

Page 202

1    that we terminated based upon the provisions of our
2    contract that allowed us to terminate because of
3    the moratorium.  I was also mitigating my damages.
4    BY MS. GAINEY:
5         Q    I'm sorry, I didn't hear you.
6         A    I was also mitigating my damages by
7    terminating it in accordance with the contract.  If I
8    had terminated not in accordance with the contract, I
9    would have additional damages.
10        Q    So the actions that Atlantic Housing took in
11   order to mitigate their damages in this case were to,
12   one, terminate the contract?
13        A    Yes.
14        Q    What else?
15        A    Not proceed with the development of affordable
16   housing in this location.
17        Q    What other -- I'm sorry, were you done?
18        A    Yes.
19        Q    What other actions, if any, did Atlantic
20   Housing do in order to mitigate damages?
21        A    I'm trying to recall if I asked my engineers
22   and architects for discounts on their bills because we
23   were not going to build it and we had already incurred a
24   significant amount of cost that had not yet been paid.
25   I typically would do that in a situation.  So it's

Page 203

1    probably mitigating my damages in that regard.  I don't
2    really remember, but typically that's what I do.
3         Q    How many affordable housing developments does
4    Atlantic Housing currently have in the works?
5         A    Oh, in the works?
6         Q    Uh-huh.
7         A    Not ones we own, but --
8         Q    No, no, no.
9         A    -- ones we're developing?
10        Q    Yes.
11        A    Probably five.  I say in the works, from
12   completing construction to starting the acquisition
13   process, probably seven.
14        Q    And how is that in comparison to what Atlantic
15   Housing normally has?  Is it pretty consistent or...
16        A    For the past five years it's probably pretty
17   consistent.
18        Q    So the resources that would have been devoted
19   to Venus at Heritage Oaks, did you divert those
20   resources to another development?
21        A    We had to, I call, suck up some cost of
22   resources, because we align our resources for start
23   times.  We had an anticipated schedule for starting
24   this.  Starting another one, you know, from the day we
25   start looking at another location, is typically eighteen

Page 204

1    months.  So we had some period of time where we had, you
2    know, resources planned to start this community and we
3    wouldn't be able to.  We had to look for another one
4    which would be in a schedule that would put us farther
5    out.
6         Q    What other actions, if any, did Atlantic
7    Housing take in order to mitigate damages, other than
8    what you've already told me?
9         A    Other than considering what other options
10   there might be for affordable housing on this property,
11   I don't know if there were any others.
12        Q    Did Atlantic Housing take any steps to
13   consider other options on this property?
14        A    We considered whether or not there would be a
15   bond allocation available, whether there would be other
16   resources from the State available; and we were not able
17   to identify anything that would be available.
18        Q    My understanding, and we talked about this a
19   little bit in your original deposition, that the bond
20   allocation amounts were available for 2024 in region --
21   in that region, correct?
22        A    You stated that.  I said that I don't believe
23   that's accurate, and it's not accurate.
24        Q    All right.  And so you're saying that the bond
25   that was -- you were applying for for this project

Page 205

1    essentially was not something you could have reapplied
2    for in 2024?
3         A    There was not allocation available in 2024.
4    This bond allocation expired in December and was part of
5    a carryover, which has a three-year time frame.  It was
6    ending at the end of December, and you can't carry it
7    forward to the next year.  And there was no new bond
8    allocation in 2024 available to Brevard County to close
9    on bonds in 2024 for multi-family.
10        Q    And how did you learn that?
11        A    How'd I learn that?
12        Q    Yeah.
13        A    I keep track of the areas that we're working
14   in to keep abreast of the bond allocations and what
15   bond allocations are being used and applied for and
16   allocated.
17        Q    Did you have a conversation with Ms. Abbott in
18   that regard as far as what bonds were available in 2024?
19        A    I think there was some discussion or e-mails
20   about that at one point, but I don't really remember the
21   context of it.
22        Q    So if Ms. Abbott would testify that there was
23   2024 bond allocations that could have been applied for
24   by Atlantic Housing, you would dispute that testimony?
25        A    I would, yeah, depending on the date that she

W. Scott Culp
March 18, 2025

Page 206

1    testified to that.
2        Q    So it's your testimony that there wouldn't
3    have been any possibility in order to mitigate your
4    damages in order to try to reapply for the bond at a
5    different location?
6        A    I could reapply for a different bond in a
7    different location. I can't use the same bond. The
8    same bond's expired the end of December.
9        Q    I see what you're doing. Pretty slick.
10       A    Yeah. I could also say there is no other --
11       Q    All right.
12       A    -- bond allocation available in Brevard County
13   to develop a multi-family affordable housing community
14   in 2024.
15       Q    All right. I see what you're doing there.
16       A    I hope you do.
17       Q    I appreciate what you're now saying that this
18   specific bond expired on December 31st, 2023.
19       A    The allocation for bond authority in Brevard
20   County --
21       Q    Correct.
22       A    -- in this amount expired.
23       Q    Was there bond financing available that
24   Atlantic Housing could have applied for in 2024 in
25   Brevard County?

Page 207

1        A    No.
2        Q    The well dried up?
3        A    Absolutely not.
4        Q    No bond financing available to you in Brevard
5    County in 2024?
6        A    For any multi-family affordable housing in
7    Brevard County in 2024 through an allocation from
8    Brevard County division of bond finance, no. From
9    Brevard County Housing and Finance Authority, none,
10   correct.
11       Q    And where did you get that information from?
12       A    State division of bond finance.
13       Q    And you said Ms. Abbott and yourself had a
14   conversation about that?
15       A    No, I didn't say that. You asked me about --
16       Q    There were some e-mails?
17       A    You asked me about a conversation with
18   Ms. Abbott where her and I were discussing future bond
19   allocation authority. And I do recall there was some
20   e-mail traffic between her and I somewhere towards the
21   end of the year. Definitely not after -- I don't think
22   there was any after the bond denial. I know there was
23   none in January of 2024.
24       Q    And what's your source for testifying that
25   there was no bond financing available in Brevard County?

Page 208

1        A    State division of bond finance. All
2    allocation authority comes through the state division of
3    bond finance, even to the regions and to the local
4    housing finance authorities.
5        Q    And who did you speak to there?
6        A    Don't recall.
7        Q    And when did you speak to that person?
8        A    Don't recall.
9        Q    Are you aware of any bond financing
10   applications submitted by any affordable housing
11   development in 2024?
12       A    Anywhere in the state?
13       Q    In Brevard County.
14       A    I'm not aware of any. It doesn't mean there
15   weren't any. They couldn't close in 2024, but it
16   doesn't mean there weren't any.
17       Q    According to you and your testimony, as I
18   understand it, the bond financing pot wasn't available
19   in 2024.
20       A    Correct. Didn't say you couldn't make an
21   application.
22       Q    Okay. And someone at the state division of
23   bond finance told you that?
24       A    Told me what?
25       Q    That there was no bond financing available in

Page 209

1    Brevard County in 2024.
2        A    For multi-family.
3        Q    As opposed to single-family?
4        A    Correct.
5        Q    All right. Anything else that your company
6    did in order to mitigate damages in this case?
7        A    Not that I remember.
8        Q    Back to that conversation about the state
9    division bond finance.
10       A    State division of bond finance.
11       Q    Thank you.
12            Was that an e-mail or was that a telephone
13   conversation?
14       A    I left a voicemail, e-mail at the division of
15   bond finance. I don't think I got a specific -- don't
16   remember.
17       Q    Someone called you back?
18       A    I don't remember whether someone called me
19   back or sent me an e-mail in that regard.
20       Q    Why didn't you just ask Angela Abbott? Isn't
21   that who you'd been talking to for years?
22       A    Yes.
23       Q    Okay. So why didn't you just ask her about
24   the availability of bond financing in 2024 in Brevard
25   County?

W. Scott Culp
March 18, 2025

Page 210

1    A    I was pretty sure I knew what happened.  I
2    wanted to confirm it with the people that can confirm it
3    with a hundred percent accuracy, which are the people
4    that provide the allocations.
5        Q    So what do you mean when you say I'm pretty
6    sure I knew what happened?
7        A    I'm pretty sure I know that Brevard County
8    Housing Finance Authority had TEFRA'd and induced --
9    induced and TEFRA'd a single-family bond issue utilizing
10   all of the bond allocation to that region that they
11   submitted on the first business day of January 2024,
12   which would provide that they can have single-family
13   allocation through 2024.  That didn't get used.  They
14   could roll it over in 2025, and then have another
15   multi-family bond development.
16       Q    And how did you get that information?
17       A    The Volusia County Housing Finance Authority,
18   where I also develop, made me aware in a public meeting.
19   We were talking about other developments, that they were
20   frustrated because Brevard County, who is in the same
21   region with Volusia County had --
22       Q    Seventeen?
23       A    Yep.  Well, used to be seventeen.  It no
24   longer is.
25       Q    Right.

Page 211

1        A    -- had requested all the bond allocation and
2    reserved it for single-family, which means nobody has
3    any multi-family allocation for 2024 other than
4    potential carry forward, which we were using in Volusia.
5    So they had no new allocation in Volusia because Brevard
6    had taken all the region's allocation for single-family,
7    and would then carry it forward into 2025 for future
8    applications.
9        Q    Could you have applied in Brevard County for
10   2025 for --
11       A    Yes.
12       Q    -- multi-family?
13       A    Yes.
14       Q    So it's your understanding that just for the
15   year 2024 there was no bond financing available in
16   Brevard County for multi-family developments?
17       A    That's correct.
18       Q    And that's based on, if I'm understanding you
19   correctly, someone in Volusia County told you that and
20   then you called the state division of bond finance and
21   confirmed it?
22       A    To confirm that, yes, that's correct.
23       Q    And I wasn't clear, you said you left a
24   voicemail --
25       A    Yes, and they --

Page 212

1        Q    -- but --
2        A    I can't remember whether they called back and
3    left a voicemail for me or sent me an e-mail in
4    response, but they confirmed it.
5        Q    Okay.  And I think I've understood your
6    testimony to say that you never had a conversation with
7    Ms. Abbott about that?
8        A    I did not.
9        Q    All right.  Anything else that Atlantic
10   Housing did as it relates to mitigation of damages in
11   this case?
12       A    Not that I remember.
13           MS. GAINEY:  I think it's probably a good time
14   to take a break.
15           THE WITNESS:  Okay.  What time we going to
16   end?
17           MS. GAINEY:  I don't know.
18           THE VIDEOGRAPHER:  We are going off the video
19   record.  The time is 3:31 p.m.
20           (A brief recess was taken.)
21           THE VIDEOGRAPHER:  We are back on the video
22   record.  The time is 3:46 p.m.
23           MS. GAINEY:  Mr. Culp, I'm going to show you
24   what I have marked as Defendant's Exhibit 16.
25           (Defendant's Exhibit 16 was marked for

Page 213

1    identification.)
2    BY MS. GAINEY:
3        Q    We were referencing an attorney regarding the
4    cancelation of the land contract earlier.  Does that
5    appear to be a true and accurate copy of the letter from
6    an attorney representing Atlantic Housing regarding the
7    cancelation of the land contract?
8        A    It does appear to be a memo from one of our
9    attorneys to me regarding the land contract, and it's
10   regarding title notes.
11       Q    I'm sorry.  It's been a long day.  This is not
12   the footer.  I'll come back to that.  What does that
13   memo have to do with?
14       A    It's talking about the relationship of notes
15   or items entitled to the property that may or may not
16   have impact on the development of the property.
17       Q    And did you receive that memo, and is it a
18   true and accurate copy of the memo you received?
19       A    Yes, I believe it is.
20           MS. GAINEY:  Let me show you what we've also
21   marked as Defendant's Exhibit 17.
22           (Defendant's Exhibit 17 was marked for
23   identification.)
24   BY MS. GAINEY:
25       Q    This is an e-mail with a land use restriction

W. Scott Culp
March 18, 2025

Page 214

1  agreement. Have you ever seen -- I'm sure you haven't
2  seen the e-mail before, but have you seen the land use
3  restriction agreement before?
4      A    I don't remember whether I reviewed this in
5  connection with the pending closing or not.
6      Q    Does that appear to be the land use
7  restriction agreement for the proposed project Venue at
8  Heritage Oaks?
9      A    It appears to be the proposed land use
10 restriction agreement for the Venue at Heritage Oaks.
11     Q    Was there more than one land use restriction
12 agreement for the project?
13     A    Not with regard to the bond financing.
14     Q    So in this case if there is a referral to the
15 land use restriction agreement, would that be the only
16 land use restriction agreement that would be the
17 proposed land use restriction agreement that would be
18 applicable?
19     A    Only if you had that defined, as a defined
20 term.  There are land use restriction agreements that
21 are required under the Live Local Act.  This particular
22 land use restriction agreement, if it's a defined term,
23 you know, related specifically to the bond closing and
24 the taxes and bond allocation, then that would -- there
25 would only be one.  But there will be a land use

Page 215

1  restriction agreement, and it'd be -- have those exact
2  same words in the title with regard to the Live Local
3  Act in the event that this had proceeded.
4      Q    So I'm hearing you to say that that was a
5  proposed or a draft, if you will.  Would there have been
6  any changes by the company as it relates to the land use
7  restriction agreement?
8      A    I'd have to review the document to see if this
9  had been finally approved.  We were headed towards the
10 closing, so I would expect that this would be the final
11 document subject to some final edits.  Our counsel at
12 Nelson Mullins would have been reviewing this land
13 restriction agreement prior to closing and prior to
14 execution to see if there was anything in here that
15 needed to be revised.  But since this didn't proceed
16 towards closing, that final review would not have been
17 completed.
18     Q    Was there a -- I don't have any other
19 questions about that document.  Switching gears, was
20 there, in this case, a request for an additional bond
21 amount, increasing it by, I think, about a million
22 dollars?
23     A    I seem to recall -- I don't remember the exact
24 amount, but I do remember there was a request for an
25 increase in the bond amount.

Page 216

1      Q    And it's your understanding that the request
2  for additional bond amount required an additional TEFRA
3  hearing and a meeting from the Brevard County Housing
4  Finance Authority to address the request for additional
5  moneys?
6      A    I don't know that all of that statement is
7  correct.  There is provisions in the inducements and the
8  statutes with regard to the bond allocation for a -- I
9  think it's called, a de minimis amount of an increase
10 without a new TEFRA hearing, which I believe is ten
11 percent of the original issue.  So if the original issue
12 had been fifteen million and you want to add a million
13 five to it, I believe you could do that without
14 additional TEFRA.  I don't claim to be an expert on
15 that; but the author of that land use restriction
16 agreement that you showed me is the counsel for the
17 Housing Finance Authority, and he'd be advising on what
18 steps would be necessary in order to obtain the
19 additional allocation.
20     Q    Let me show you an e-mail from Angela Abbott
21 that may refresh your recollection or provide insight as
22 to whether another hearing would be needed.
23     A    Angela indicates that they'd have to hold a
24 new TEFRA hearing and adopt a new inducement resolution.
25 I don't know if that's a hundred percent accurate, but I

Page 217

1  would rely upon Mark Mustian to determine whether or not
2  a new TEFRA and a new inducement was necessary.
3      Q    So are you disputing that that was necessary
4  in this case?
5      A    I'm not disputing it.  What I said was Mark
6  Mustian, who is bond counsel -- Angela Abbott is
7  issuer's counsel, Mark Mustian is bond counsel.  He
8  would provide his opinion with regard to whether a new
9  inducement or a new TEFRA hearing is required to
10 increase the bond amount from fifteen seven fifty to
11 sixteen seven fifty.
12     Q    In this case in particular did that require
13 additional time in order to get the matter to the
14 commissioners for final approval?
15     A    I don't know that it did.  We may have taken
16 that time.  It may have been the decision of the Brevard
17 County HFA that they wanted to include it in the
18 application to the Brevard County Commissioners.  So we
19 may have done that.  And it sounds like from e-mail that
20 looking at that timeline, because she's talking about an
21 October meeting for the TEFRA and getting pushed back to
22 November 14th because the bond counsel is out of town,
23 so it sounds like it's all consistent with the December
24 board meeting by the county commission.
25         MS. GAINEY:  We'll go ahead and mark that --

W. Scott Culp
March 18, 2025

Page 218

1  what are we on?
2      THE COURT REPORTER:  That's 17.
3      THE WITNESS:  That's 17, this is 16.
4      MS. GAINEY:  -- 18.
5      (Defendant's Exhibit 18 was marked for
6  identification.)
7  BY MS. GAINEY:
8      Q    Did Atlantic Housing Partners wish to avoid a
9  public meeting regarding the proposed project?
10     A    I don't know that we wished to avoid a public
11 community meeting.  We definitely wished to avoid any
12 votes of elected officials in a public hearing, but we
13 had no objection to a public community meeting.
14     Q    Why?
15     A    Why do we have no objection to a public
16 community meeting?
17     Q    No, the first part of your answer.
18     A    Oh.  The city counsel members or commission,
19 you know, if we had public hearings would be voting on
20 approvals.  And the Live Local Act provides for those
21 approvals at an administrative level without any votes
22 or public hearings.
23     Q    And Atlantic Housing Partners expected that
24 this project would proceed without being reviewed by
25 commissioners or having any type of public input?

Page 219

1      A    The public input, anybody can have input.  The
2  statute is referenced to public hearings and elected
3  official approvals.  There may have been a comment about
4  public input; but, as you know, anybody can have input.
5  You know, like freedom of speech.
6      MS. GAINEY:  We'll show you what we'll mark as
7  Defendant's Exhibit 19.
8      (Defendant's Exhibit 19 was marked for
9  identification.)
10     THE WITNESS:  Yeah, Marc's choice of words.
11 Marc Gauthier works for me, of without public
12 input.  It's not really accurate.  Public input,
13 anybody can input whatever they want.  You can't
14 have, on the Live Local Act, public hearings or
15 elected official votes.
16 BY MS. GAINEY:
17     Q    What about the next page with Mr. Thomas
18 saying that --
19     A    Jonathan in May of '23, he's asking about a
20 parking waiver that would be needed under a proposal
21 that Jonathan might have.  And that parking waiver I
22 don't think would be available without a public hearing.
23 And we wouldn't want to proceed with a public hearing
24 because that waiver would open up land use entitlements,
25 different from what the Live Local legislation provides

Page 220

1  for.
2      Q    And Thomas, at that point, is saying that he
3  didn't want to, quote, risk a public hearing, correct?
4      A    I don't know that he was saying he didn't want
5  to.  But he was saying that he didn't know the risk of
6  public hearing.  He didn't say he was objecting to it,
7  didn't want to do it.  Jonathan has no authority to do
8  anything with regard to the development.  He was
9  commenting on not knowing the risk of public hearing.
10     Q    So he appeared to be at least aware that the
11 action that was being discussed would, quote, risk a
12 public hearing?
13     A    He had indicated that Marc had made him aware
14 of that.
15     Q    The area that was proposed for the project, it
16 was not zoned residential, correct?
17     A    No, it was not.
18     Q    It was commercially zoned and it was being
19 proposed for development pursuant to the Live Local Act,
20 correct?
21     A    That is correct.
22     Q    During the time Atlantic Housing spent
23 attempting to develop the project, were there
24 investigations or any type of research as to any
25 ordinances that may be applicable to the area?

Page 221

1      A    Yes.
2      Q    And tell me about what those --
3      A    We do --
4      Q    -- investigations or research were?
5      A    We do a due diligence study on every property.
6  It reviews all of the land use entitlements and
7  restrictions related thereto for the local jurisdiction.
8  It reviewed all of the ordinances and codes related to
9  the development on this property.
10     Q    And did you also look into or investigate
11 the -- any overlays that may be applicable to the area?
12     A    We did, yes.
13     Q    And what did you determine?
14     A    We determined that our development as proposed
15 was consistent with the Live Local Act legislation and
16 as it relates to the local codes and ordinance in the
17 City of West Melbourne for this site.
18     Q    Was it consist -- was the proposed development
19 consistent with the overlay?
20     A    When considered in conjunction with the Live
21 Local Act, yes.
22     Q    Did you investigate or research featured land
23 use for the proposed area?
24     A    Yes.
25     Q    And what did you determine in that regard?

W. Scott Culp
March 18, 2025

Page 222

1    A    I don't remember the future land use, but it's
2    in the feasibility reports and probably in the
3    application even.
4         Q    Did you investigate for research the Minton
5    Road project and comprehensive plan for the area?
6    A    Yes, we did.
7         Q    And what did you determine in that regard?
8    A    I reviewed the plan and determined that our
9    plan, in conjunction with the Live Local Act, was
10   consistent with the local government ordinances and
11   jurisdiction.
12        Q    What about without considering the Live Local
13   Act, would it have been consistent?
14   A    I don't recall.  I wouldn't have even
15   considered it without the Live Local Act 'cause it's a
16   commercially zoned piece of property and I would not
17   have been able to develop it for residential.
18        MS. GAINEY:  I'll show you what is marked as
19   Defendant's Exhibit 20.
20        (Defendant's Exhibit 20 was marked for
21   identification.)
22   BY MS. GAINEY:
23        Q    You've probably seen those before, but
24   basically just the land use and comprehensive.  And I
25   think it's the brochure for the -- for the proposed land

Page 223

1    project -- or the land where the proposed projects was
2    at.  Does that appear to be a fair and accurate copy of
3    those documents?
4    A    Yes.  Well, it's the listing brochure for the
5    land and my review of the local codes and ordinances
6    related to the parcel.  It has to do with the Commercial
7    Parkway District, the town center overlay and the zoning
8    and future land use for the property.
9         Q    Did Atlantic Housing have any understanding
10   that the land was intended to be a walkable land that
11   service the area's single-family housing, have things
12   like stores and shops and things along those lines?
13   A    Zoned for commercial uses.  So whatever the
14   commercial use is allowed under the land development
15   code, it was our understanding that they were allowed.
16        Q    And did you have that understanding regarding
17   the future land use, the town center overlay, the Minton
18   Road project, the comprehensive plan prior to entering
19   into the land contract?
20   A    Not completely, no.
21        Q    Is it something you learned after you signed
22   the contract?
23   A    Something we confirmed after we signed the
24   contract.
25        Q    We referenced the credit underwriting report

Page 224

1    earlier in your deposition, so I'm just going to attach
2    it here for purposes of the record.  Let me show you
3    what we'll mark as Defendant's Exhibit 21 and ask you to
4    identify that.
5    A    It looks like the credit underwriting report.
6         (Defendant's Exhibit 21 was marked for
7    identification.)
8    BY MS. GAINEY:
9         Q    And does that appear to be a fair and accurate
10   copy of the credit underwriting report?
11   A    Well, let's -- we may have more than the
12   underwriting report here.  I think you do.  The
13   underwriting report I don't think is this long.  If we
14   look at the table and the sections and the exhibits we
15   get down to -- and I think you get down to information
16   beyond here that is not within the underwriting report.
17   So I'm just trying to see where the underwriting report
18   ends --
19        Q    Just --
20   A    -- and other stuff starts.
21        Q    Just for efficiency, we can correct that.
22   A    Okay.
23        Q    I intend it only to be the underwriting
24   report.  So if some --
25   A    Yeah, some of this --

Page 225

1         Q    -- other stuff has been copied in it, that's
2    fine.
3    A    Yeah, some of this in the back is other
4    documents that are not part of the credit underwriting
5    report.
6         Q    All right.  We can agree to correct that off
7    the record.
8    A    Or we can agree to correct it on the record.
9         Q    Well, we can sit here and wait.  Let's --
10   A    No, I don't -- I'm not saying I'm going to
11   correct it right now.  I'm just saying you --
12        Q    No --
13   A    -- asked me if this was a true and accurate
14   copy of the draft report, and I don't think it is
15   because --
16        Q    Let me have it.
17   A    -- it has information --
18        Q    Thank you, sir.
19   A    -- behind it.
20        MS. GAINEY:  So I am attaching as Defendant's
21   Exhibit 21, Plaintiffs 2855 through 2905, and it
22   stops with a FedEx thing.
23   BY MS. GAINEY:
24        Q    So I'm assuming that's where the credit
25   underwriting report was FedEx'd.

W. Scott Culp
March 18, 2025

Page 226

1      A    Let's see here.  That seems consistent with
2   the index in the front.  Yeah, it is consistent with the
3   index in the front.
4      Q    Is that now a true and accurate copy of the
5   credit underwriting report as we discussed earlier in
6   your deposition?
7      A    To the best of my knowledge, yes.
8      Q    I'll show you what we marked as Defendant's
9   Exhibit 22, and ask you if you've ever seen that before.
10     A    I have.
11          (Defendant's Exhibit 22 was marked for
12     identification.)
13  BY MS. GAINEY:
14     Q    And what is that?
15     A    An organizational chart for the developer
16  Atlantic Housing Partners, L.L.L.P.
17     Q    And is that a fair and accurate copy of the
18  organizational chart for Atlantic Housing Partners?
19     A    Yes.
20     Q    That's 22?
21     A    Yes, it is.
22     Q    I will show you what we'll mark as Defendant's
23  Exhibit 23, and ask you to identify that.
24     A    It looks like an e-mail to Angela Abbott to
25  Marianne Edmonds who is the financial advisor for the

Page 227

1   Housing Finance Authority, a copy and an e-mail from Bob
2   Reid to me, and discussion of the projects located
3   outside of region seventeen.
4          (Defendant's Exhibit 23 was marked for
5     identification.)
6   BY MS. GAINEY:
7      Q    And does that appear to be a fair and accurate
8   copy of an e-mail exchange that you were involved in?
9      A    It does, yes.
10     Q    Specifically I think the e-mails are you
11  talking about financing, and so that's the purpose of
12  attaching it.  You kind of were simplifying the finance
13  issues as it relates to this project; is that -- is that
14  fair?
15     A    Yes.  Well, it wasn't specific to this project
16  'cause I wouldn't be corresponding with Bob Reid
17  specific --
18     Q    Yeah.
19     A    -- to this project.  I think we were looking
20  at --
21     Q    Bond financing issues.
22     A    -- bond financing in this region.
23     Q    Yeah.  Excuse me.  I misspoke.
24     A    I just wanted to make sure we were not saying
25  this --

Page 228

1      Q    Sure.
2      A    -- was specific to this project, 'cause I
3   don't think it was.
4      Q    What number are we on?
5      A    This was 23.
6      Q    All right.  When did you -- when did Atlantic
7   Housing Partners decide to file a federal lawsuit?
8      A    Decide to is the thing I'm struggling with.
9   I've got the authority to commence discussions with
10  counsel with regard to a lawsuit.  I don't have the
11  authority, you know, to actually have that lawsuit filed
12  without Mike Sciarrino's approval.  And I know we
13  discussed it, you know, shortly after the denial, and I
14  don't recall any date certain.  It would have been just
15  discussions he and I had.
16     Q    Was it the next day after the denial?
17     A    I don't know.
18          MS. GAINEY:  Let me show you what we'll mark
19     as Defendant's Exhibit 24.
20          (Defendant's Exhibit 24 was marked for
21     identification.)
22  BY MS. GAINEY:
23     Q    That appears to be a letter from your attorney
24  dated the day after the denial requesting -- public
25  records request to Brevard County, correct?

Page 229

1      A    That is a public records request to Brevard
2   County.
3      Q    And to be very clear about this, I'm not
4   requesting any or asking about anything you -- any
5   conversations you had with your attorney.  But as it
6   relates to Mike, does that refresh your recollection as
7   to when you contemplated or decided to or had
8   discussions regarding filing a federal lawsuit?
9      A    No.  I instructed Rebecca to file the public
10  records request.  I hadn't made a decision on filing a
11  suit.  I instructed Rebecca to file a public records
12  request.
13     Q    And this lawsuit was filed on December 28th,
14  2023, correct?
15     A    I don't know.
16     Q    Let me show you this document, the complaints,
17  at the top.
18     A    It says filed December 28th of 2023.
19     Q    So does that refresh your recollection at all
20  as to when Atlantic Housing decided to proceed with a
21  federal lawsuit?
22     A    Sometime between the denial and December 28th.
23  So in December of 2023.
24     Q    And so had you exhausted all other remedies as
25  far as options prior to December 28th, 2023 as it

W. Scott Culp
March 18, 2025

Page 230

1  relates to mitigation of damages or pursuing another
2  piece of property or anything along those lines?
3       MR. PICCOLO: Object to form.
4       THE WITNESS: I'm not aware of any other
5   opportunities to pursue other avenues. And I am
6   aware that we have certain deadlines for filing
7   complaints with regard to county commission
8   actions, and I'm always concerned that we stay
9   within those deadlines.
10 BY MS. GAINEY:
11      Q    Did Atlantic Housing Partners ever file any
12 type of complaint with the -- any other state or federal
13 agency complaining of discriminatory actions against
14 Brevard County?
15      A    That's a lengthy question, but I think you
16 asked if --
17      Q    Let me -- I can rephrase it.
18      A    Yeah.
19      Q    After the denial of the bond, did Atlantic
20 Housing file any other types of complaints with any
21 state, local or federal agency regarding alleged
22 discriminatory conduct?
23      A    I don't recall.
24      Q    I'm not going to attach that. Thank you.
25           Does Atlantic Housing have any evidence of --

Page 231

1  any direct evidence that Brevard County officials made
2  racist remarks?
3       MR. PICCOLO: Object to form.
4       THE WITNESS: Any evidence we have with regard
5   to racist remarks would be in the public record. I
6   don't recall any specific racist remarks.
7  BY MS. GAINEY:
8       Q    Does Atlantic Housing have any evidence that
9  the objections to the project were a pretext for racial
10 bias or discrimination?
11      MR. PICCOLO: Object to form.
12      THE WITNESS: I believe they were, but I
13  don't, as of today, recall evidence to that fact.
14 BY MS. GAINEY:
15      Q    What evidence, if any, do you have that the
16 bond denial was based on racial discrimination?
17      MR. PICCOLO: Object to form.
18      THE WITNESS: I think I answered the question.
19  I said that I don't have any evidence. I believe
20  that to be the case.
21 BY MS. GAINEY:
22      Q    Was the racial demographic of the tenants at
23 the proposed property ever discussed prior to the bond
24 denial by anyone from Atlantic Housing Partners?
25      A    With who?

Page 232

1       Q    With anyone. Was there ever any discussions
2  regarding the racial composition of the tenants prior to
3  the bond denial?
4       A    Not that I recall.
5       Q    Was there any discussion regarding any alleged
6  discriminatory impact or segregate impact to black
7  residents prior to the bond denial?
8       MR. PICCOLO: Object to form.
9       THE WITNESS: Not that I recall.
10 BY MS. GAINEY:
11      Q    Concord's Management's demographic report
12 shows that less than ten percent of tenants at Venue at
13 Viera are black. How does this data support a claim of
14 disparate impact in this case?
15      A    Disparate impact is based upon the market
16 demographics for the targeted demographic. Venue at
17 Viera is not the exact same market, and is definitely
18 not the same demographic. So it would vary
19 significantly from the target demographic for Venue at
20 Heritage Oaks.
21      Q    How is Venue at Viera not the same market as
22 the proposed project?
23      A    Venue at Heritage Oaks was intended to either
24 be family or seniors under the Housing for Older Persons
25 Act, which allows for one member of the household to be

Page 233

1  fifty-five or older and any age for the rest of the
2  household members, and for twenty percent of the units
3  to be unrestricted with regard to age.
4       Q    So that's your position, that it's not the
5  same demographics or not the same market?
6       A    Both.
7       Q    Okay. Other than that do you have any other
8  argument that Venue at Viera was not comparable as it
9  relates to race and age to the proposed project?
10      A    I don't have information with regard to the
11 market area. The market area for the residents would
12 not be identical. All of the market area may be
13 similar. The demographic is definitely significantly
14 different, but the market area is slightly different as
15 well.
16      Q    Other than the documents relied on or drafted
17 by Dr. Fishkind, do you have any factual evidence that
18 the race of the tenants at the proposed project would
19 have been thirty-five percent black?
20      MR. PICCOLO: Object to form.
21      THE WITNESS: I only rely upon Dr. Fishkind's
22  evaluation of the disparate impact.
23 BY MS. GAINEY:
24      Q    Okay. So aside from Dr. Fishkind's opinions
25 and evaluations, Atlantic Housing doesn't have any

W. Scott Culp
March 18, 2025

Page 234

1  additional evidence regarding what you claim would be
2  the race of the tenants at the proposed property?
3        MR. PICCOLO:  Object to form.
4        THE WITNESS:  Aside from Dr. Fishkind's
5  opinions and the data that he is using as his basis
6  for those opinions, we have no other information in
7  that regard.
8  BY MS. GAINEY:
9        Q    So is it Atlantic Housing's belief and
10  position that although Venue at Viera's black population
11  is less than ten percent, this proposed development
12  would have had a black population of thirty-five
13  percent?
14        A    Atlantic Housing's position that Dr. Fishkind
15  has prepared a disparate impact analysis and has the
16  available data and basis information to make that
17  opinion.  Atlantic Housing doesn't have that
18  information.
19        Q    And is it your understanding that Dr. Fishkind
20  based his opinions in part on the racial composition of
21  your other four Brevard properties?
22        A    I understand that Dr. Fishkind considered the
23  racial composition of our other four properties.  I
24  don't believe that Dr. Fishkind used that as his sole
25  determination or basis for his opinion.

Page 235

1        Q    And so Venue at Viera was comparable enough to
2  the proposed project that your own expert relied on its
3  racial composition in order to render his opinion, at
4  least in part?
5        A    I think you're misstating or misconstruing.  I
6  think it would be negligent on his part to not even
7  consider or review the demographic makeup of one of our
8  communities in close proximity.  But to consider that
9  and determine that the demographic is significantly
10  different would be something that would be, I think, his
11  expert -- or his expertise in order to be able to make a
12  determination and opinion on; but not considering it
13  would also be negligent in trying to make a
14  determination.
15        Q    Is the demographic makeup at Hammock Harbor
16  comparable to the proposed project Venue at Viera?
17        A    I don't know.
18        Q    Well, you say Venue at Viera was not
19  comparable as far as demographics, correct?
20        A    I did say that, yes.
21        Q    Okay.  But you don't know if Hammock Harbor is
22  comparable as far as --
23        A    I don't.
24        Q    -- demographics?
25             What about Malabar Cove?

Page 236

1        A    I don't know.
2        Q    What about Wickham?
3        A    I don't know.
4        Q    So why do you only know that Venue at Viera is
5  not comparable when you're looking at demographics, but
6  you don't know if the other three properties are
7  comparable when you --
8        A    You brought it up --
9        Q    -- look at the demographics?
10        A    -- with regard to Dr. Fishkind's report and
11  the relationship of the demographics at that community.
12  I haven't reviewed in detail Dr. Fishkind's report to
13  determine if those other communities, which are not the
14  entire market and may be representative of some portion
15  of the market, you know, whether or not those are
16  appropriately considered in his disparate impact report.
17  That's not my expertise.  That's Dr. Fishkind's.  And I
18  don't have an opinion on the disparate impact in those
19  communities and how that impacts the market for this
20  community.
21        Q    But you do have an opinion as to whether or
22  not Venue at Viera is comparable to the proposed
23  project, or was comparable to the proposed project as it
24  relates to demographics and marketing, as you testified
25  to?

Page 237

1        A    I have an opinion with regard to whether or
2  not a demographic of sixty-two and over is the same
3  demographic as a community with one household member
4  fifty-five and older and the balance being unrestricted.
5  I don't believe that to be the same demographic, and I
6  don't believe that to have the same market.
7        Q    What is the demographic as far as age, if you
8  know, for Hammock Harbor?
9        A    I believe Hammock Harbor is unrestricted.
10        Q    Is Malabar Cove restricted?
11        A    I don't believe so.
12        Q    And is Wickham --
13        A    I don't believe --
14        Q    -- unrestricted?
15        A    I don't believe so.
16        Q    So does Atlantic Housing Partners support
17  comparing three unrestricted properties to a restricted
18  property when it comes to demographics?
19        A    We support the best methodology of a
20  professional expert with regard to disparate impacts.
21  We're not the experts.  We hired the expert, and we
22  believe that he is best to determine the market and the
23  demographic makeup of the market based upon the
24  restrictions intended for our community.
25        Q    Have you paid Dr. Fishkind over a hundred

W. Scott Culp
March 18, 2025

Page 238

1    thousand dollars?
2        A    Not yet.
3        Q    Getting close to it?
4        A    Getting pretty close.
5        Q    Was there an issue with respect to him
6    refusing to work because of failure to pay?
7        A    Yep.
8        Q    What was that?
9        A    He wanted me to pay him.
10       Q    Why weren't you paying him?
11       A    I was on vacation in Alaska.
12       Q    And --
13       A    Gone for a month.  I paid him when I got back.
14   He was mad.  We settled.  We're big boys.
15       Q    I think he's -- I think in the e-mails
16   exchanged regarding that you've worked with Dr. Fishkind
17   for a very long time?
18       A    Since 1989, I believe.
19       Q    And how many --
20       A    Maybe '85.
21       Q    How many times has he testified on behalf of
22   Atlantic Housing Partners or any entity associated with
23   the plaintiffs?
24       A    I don't know if he's ever testified.  We've
25   hired him as an expert a number of times.  I can't

Page 239

1    recall if he's ever actually had to testify.
2        Q    How many --
3        A    Now, he's provided expert reports.
4        Q    How many times have you hired Dr. Fishkind?
5        A    Oh, I don't know.  Probably half a dozen.
6             THE VIDEOGRAPHER:  There's five minutes left
7    on this media.
8             MS. GAINEY:  Okay.  Give me -- let's keep
9    going.
10            THE WITNESS:  Do we need to change the media
11   or no?
12            MS. GAINEY:  Not yet.
13            THE WITNESS:  Okay.
14   BY MS. GAINEY:
15       Q    Are you aware of any procedural errors Brevard
16   County committed when denying the bond?
17            MR. PICCOLO:  Object to form.
18            THE WITNESS:  I think the denial of bond was a
19   procedural error.  I don't know what that means.
20   BY MS. GAINEY:
21       Q    Well, is it your position that they failed --
22   they --
23       A    They shouldn't have denied the bond, yes,
24   that's my position.
25       Q    Outside of that, is it your position that

Page 240

1    there was any procedural deficiencies in how the bond
2    was handled?
3        A    Oh, I don't know what a --
4             MR. PICCOLO:  Object to form.
5             THE WITNESS:  -- procedural deficiency is.  I
6    don't think they should have denied the bond.  I
7    don't think they had the right to deny.  I don't
8    think they should have denied the bond, but here we
9    are.
10   BY MS. GAINEY:
11       Q    Did anyone from your company ever request a
12   reconsideration of the bond denial with any member of
13   the commission?
14       A    Not that I'm aware of.
15       Q    Has your company had any issues with
16   discrimination as it relates to how Brevard County
17   handled your other projects and applications for bond
18   financing?
19       A    No.
20            MS. GAINEY:  Let's go off the record.
21            THE VIDEOGRAPHER:  Going off the video record.
22   The time is 4:26 p.m.
23            (A brief recess was taken.)
24            THE VIDEOGRAPHER:  We're back on the video
25   record.  The time is 4:29.

Page 241

1             MS. GAINEY:  We agreed off the record, counsel
2    and the deponent and all parties in the room, that
3    we would continue this deposition remotely at a
4    subsequent date in the next few -- next week or so,
5    hopefully.
6             MR. PICCOLO:  Yes.
7             MS. GAINEY:  And that will include continuing
8    the deposition of Atlantic Housing Partners, as I
9    have some additional questions as well as the
10   30(b)(6) deposition of the other named plaintiffs.
11            THE VIDEOGRAPHER:  Okay.  That will complete
12   today's videotaped deposition.  The time is 4:30
13   p.m.  We are going off the record.
14            MR. PICCOLO:  We'll read, and we'll take a
15   copy.
16            THE COURT REPORTER:  I think you said earlier
17   you are going to order the transcript?
18            MS. GAINEY:  Yes, please.
19            (The proceeding was concluded at 4:30 p.m.,
20   and reading and signing of the deposition was not
21   waived by the witness and all parties.)
22
23
24
25

W. Scott Culp
March 18, 2025

Page 242

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF ORANGE

        I, Andrea C. Rivera, Professional Court
Reporter and Notary Public, State of Florida, certify
that the witness, W. SCOTT CULP, personally appeared
before me on this 18th day of March, 2025 and was duly
sworn or affirmed.

        Signed this 20th day of March, 2025.




                    Andrea C. Rivera
                    Andrea C. Rivera, Court Reporter
                    Notary Public, State of Florida
                    Commission Number:  HH185694
                    Expires:  January 20, 2026

Page 243

CERTIFICATE OF REPORTER

STATE OF FLORIDA
COUNTY OF ORANGE

        I, Andrea C. Rivera, Professional Court
Reporter and Notary Public, do hereby certify that I was
authorized to and did stenographically report the
proceeding of W. SCOTT CULP; pages 1 through 241; that a
review of the transcript was requested; and that the
transcript is a true record of my stenographic notes.
        I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am I
financially interested in the action.
        Dated this 20th day of March, 2025.




                    Andrea C. Rivera
                    Andrea C. Rivera

Page 244

WITNESS NOTIFICATION LETTER


March 20, 2025

W. Scott Culp
c/o Michael D. Piccolo, Esquire
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Orlando, Florida 32801

IN RE:  ATLANTIC HOUSING v. BREVARD COUNTY
        Deposition taken on March 18, 2025
        U.S. Legal Support Job No:  6832310

Dear Mr. Piccolo:

The transcript of the above-referenced proceeding has
been prepared and is being provided to your office for
review by the witness.

We respectfully request that the witness complete their
review within 30 days and return the errata sheet to our
office at the below address, or via e-mail to:
southeastproduction@uslegalsupport.com.

Sincerely,

Andrea C. Rivera
Andrea C. Rivera
Professional Court Reporter
U.S. Legal Support, Inc.
16825 Northchase Drive
Suite 900
Houston, Texas 77060
407-649-9193

cc:  Susan G. Gainey, Esquire

Page 245

ERRATA SHEET
DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES ON THIS PAGE

IN RE:  ATLANTIC HOUSING vs. BREVARD COUNTY
        DEPOSITION OF:  W. SCOTT CULP
        TAKEN:  March 18, 2025
        U.S. LEGAL JOB NO:  6832310

PAGE   LINE    CHANGE          REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document, and that the facts stated in it
are true.


_____    _____
Date                W. SCOTT CULP