**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No: 6:23-cv-2473-JSS-DCI**

ATLANTIC HOUSING PARTNERS L.L.L.P.,
CANTON CONSTRUCTION LLC,
CONCORD MANAGEMENT, LTD and
THE VENUE AT HERITAGE OAKS PARTNERS, LTD,

Plaintiffs,

v.

BREVARD COUNTY,
Defendant.
_____/

**EXPERT REPORT**

September 12, 2024

Hank
Fishkind

Digitally signed by Hank
Fishkind
Date: 2024.09.12
10:30:49 -04'00'

-----------------------------------------------------------
Hank Fishkind, Ph.D., President
Fishkind Litigation Services, Inc.
3504 Lake Lynda Dr, Suite 107
Orlando, Florida 32817
(407) 382-3256
www.fishkindls.com

Exhibit O

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
Case No: 6:23-cv-2473-JSS-DCI**

**I.0    Introduction**

1.0    Fishkind Litigation Services ("FLS") was retained by counsel for the Plaintiffs to: (a) determine if the Defendant's actions resulted in illegal discrimination against racial minorities protected under the Federal Fair Housing Act, 42 U.S.C.; (b) calculate Plaintiffs' economic damages if the court finds for the Plaintiffs; (c) draft this expert report; (d) provide litigation support; and (e) testify at deposition and/or trial if required.

2.0    I conducted the research in this engagement along with Mr. Edghill in my firm; I drafted this opinion and will offer the testimony.  Other members of my firm provided clerical support.  My resume is attached as Exhibit #1, and my court experience as an expert is provided in Exhibit #2.  The materials reviewed and relied upon in rendering this opinion are presented in Exhibit #3.  A list of all publications I have authored is provided in Exhibit #4.

3.0    My standard hourly fees apply in this engagement.  These are as follows:

Dr. Fishkind          $600/hour for research, and
                      $1,200/hour for testimony at trial or deposition

Mr. Edghill           $500/hour for research

**II.0    Qualifications to Provide Expert Opinion in this Matter**

4.0    I am qualified to provide the Court with this expert opinion because of my education and my experience.  I am an economist and President of Fishkind Litigation Services ("FLS").  FLS was formed in 2019 after Dr. Hank Fishkind sold the non-litigation practices of Fishkind & Associates, Inc. to PFM.  Dr. Fishkind leads the FLS team.  He has over 40-years of litigation experience and has testified as an expert in federal and state courts and acted as a Special Master to the U.S. Tax Court.  My clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, as well as both Plaintiff and defendants in litigation.

5.0    My resume is included as Exhibit #1 which documents my qualifications.  I have a Ph.D. in economics with specialties in Urban and Regional Economics and in Econometrics.

6.0    For many years, I was a Research Economist with the Bureau of Economic and Business Research at the University of Florida, and from time-to-time I served as its Acting Director and its Associate Director. During the course of my work at the Bureau, I conducted numerous economic studies mostly concerning Florida's economy. I designed, launched, and administered the Bureau's monthly economic confidence index which involved sample surveys of Floridians. I also designed and executed the Bureau's economic forecasting program.

7.0    I have served on the State of Florida's Governor's Council of Economic Advisors under two different administrations.

8.0    While I was employed at the Bureau, I was also a faculty member in the Department of Economics at the University of Florida. I achieved the rank of Associate Professor and obtained tenure before I decided to leave the University and work as an economic consultant and financial advisor in the private sector.

9.0    I was a founding board member of Engle Homes, a publicly traded (NASDAQ) homebuilding company until it was sold to TOUSA. I was also a founding board member of Summit Properties, which was a large, national apartment Real Estate Investment Trust (REIT) traded on the NYSE until the company was sold to Camden Properties. As a board member of these real estate development companies, I served on their asset allocation and audit committees among other assignments.

10.0   I have published expert reports concerning the disparate impact on racial minorities and other groups protected under the FHA on numerous occasions. I have provided expert opinions on these matters in front of city and county commissions.

11.0   I have been qualified as an expert witness to provide economic testimony on more than 50 occasions by both the federal and state courts in Florida and in federal courts in Tennessee and Washington, D.C., and in the U.S. Court of Federal Claims. I have also served as a court-appointed expert to provide valuation reports to the U.S. Tax Court. Exhibit #2 lists my court experience.

### III.0    Background

12.0    This case arises from Brevard County's decision on December 5, 2023 ("Decision") denying Plaintiffs' request for approval of tax exempt bonds to fund The Venue at Heritage Oaks  ("Project").[1]  The Project was to be a 105-unit, rental apartment community, with apartments offered at below market rates: (a) 21 units affordable to households earning 30% of the area median income ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.[2]  HUD calculates the AMI for all markets each year.[3]

13.0    By denying bond approval, the Project lost its favorable financing which expired December 31, 2023.  As a result, the Project became economically unfeasible as an affordable apartment project and was terminated by the Plaintiffs.[4]

14.0    Plaintiffs claim that the Decision violated the Federal Fair Housing Act, 42 U.S.C. §3604(a) ("FHA") and the Florida Fair Housing Act §§ 760.23, 760.26, and 760.35 ("FFHA"), by denying the approval necessary for the Project to be developed as an affordable apartment community.  Plaintiffs argue that the denial: (a) had a disparate impact on racial minorities; (b) caused a discriminatory effect by having a greater adverse impact on racial minorities than on other groups; and (c) perpetuated segregated housing patterns.[5]

15.0    Defendant asserts that the denial was based on public opposition to the Project expressed at its public hearing on the matter on December 5, 2023.[6]

### IV.    Summary of Expert Opinions

16.0    HUD's Final Rule for its discriminatory effects standard (24 CFR 100.500) states that a discriminatory effect is a practice that "has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin".

17.0    Assuming the court finds that the Decision denying approval of the bonds was not for a legitimate non-discriminatory reason, the Decision had a disparate impact on a protected class, and perpetuated racial segregation in housing markets.

---

[1] Complaint, Document #1.
[2] Plaintiffs' project plan.
[3] https://www.huduser.gov/portal/datasets/il.html
[4] Complaint, Document #1, ¶ 24.
[5] Complaint, Document #1, ¶ 25-41.
[6] Complaint, Document #1, ¶ 20-23.

18.0  The first step in the analysis is to identify the relevant market for the analysis.[7]  The Plaintiffs have successfully developed four, affordable apartment communities in Brevard County.  Analysis of their renters shows that more than 73% of their tenants moved in from the local market, roughly from Titusville to Palm Bay and west of the intracoastal.  Since the Project was located centrally among the Plaintiffs' four existing projects, the Relevant Market would be similar to the historical market for the Plaintiffs' Brevard County projects including Titusville, Cocoa, Melbourne, West Melbourne, and Palm Bay and west of the intracoastal.

19.0  The second step is to determine the Affected Group.[8]  The Affected Group comprises all households in the Relevant Market with incomes of: (a) 30% or less of AMI; (b) 60% or less of AMI, and (c) 80% or less of AMI.  The Decision by the Defendant limited their opportunity to obtain affordable housing in the relevant market.

20.0  Third, three conditions precedent must be satisfied to support a finding of discriminatory impact.

a.  First, there cannot be a surplus of available housing in the relevant market that could satisfy the housing needs of the Affected Group.[9] Analysis of the Relevant Market demonstrates that there is no surplus available that could satisfy the housing needs of the Affected Group.

b.  Second, is evidence that the units in the Project would be rented by members of the Affected Group.[10]  The Project was designed to address the housing needs of the Affected Group in the Relevant Market.  In addition, the Plaintiffs' other four apartment projects in the Relevant Market are rented by members of the Affected Group.

c.  Third, courts recognize that racial imbalance is endemic to affordable housing, because the housing typically caters to a disproportionately higher percentage of racial minorities.  To satisfy the "robust causality requirement," the statistical analysis must demonstrate that the Decision resulted in the racial imbalance. Here the statistical analysis clearly points to the Decision as the cause of the discrimination as courts have specified.[11]

---

[7] Schwemm (2016), Pages 700-702.
[8] Schwemm (2016), page 698.
[9] Hallmark Developers, 466 F.3d 1276 (2006).
[10] IBID.
[11] Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo, Case No. 6:16-cv-1005-Orl-37GJK 08-23-2017

21.0    Disparate Impact is measured by comparing the impact of the disputed policy on members of the Affected Group.[12]  Statistical proof is needed to demonstrate that members of a protected class (as defined in the FHA) within the Group are more impacted than other members of the Group.  In other words, while all members of the Group may be negatively affected by the disputed policy, protected members must incur greater harm that can be measured to a reasonable degree of statistical certainty.

22.0    Table 1 shows that the Decision had a disparate impact on blacks, a protected class under the FHA.  As noted above, the Project planned to offer 1, 2, and 3 bedroom apartments priced to be affordable to households earning 30% AMI, 60% AMI, and 80% AMI.  In all cases, there is a statistically significant difference in the impact of the Decision on white households and black households as measured by the Chi-square statistic ($X^2$).  However, in three cases the sampling variation (margin of error) in the data are large, causing the significance to deteriorate to 52% or 76%.  In the remaining six cases the differences are statistically significant at 87% or more based on the sampling variation in the underlying data.

### Table 1. Analysis of Disparate Impact Measured by the Percentage of Households who can Afford the Rental Rate by AMI

| AMI and Bedrooms | White | Black | Difference | Significance |
|---|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% | 52% |
| 30% AMI 2 Bedroom | 90% | 83% | -7% | 52% |
| 30% AMI 3 Bedroom | 85% | 76% | -9% | 76% |
| 60% AMI 1 Bedroom | 77% | 61% | -16% | 91% |
| 60% AMI 2 Bedroom | 77% | 61% | -16% | 91% |
| 60% AMI 3 Bedroom | 69% | 31% | -38% | 99% |
| 80% AMI 1 Bedroom | 65% | 51% | -14% | 87% |
| 80% AMI 2 Bedroom | 57% | 42% | -15% | 87% |
| 80% AMI 3 Bedroom | 46% | 31% | -15% | 94% |

23.0    The Decision also perpetuates racial segregation in the Relevant Market. Segregative-effects claims differ from disparate impact claims.  Segregative impacts focus on the harm done to the community, whereas disparate impact claims analyze the harm done to a protected class under the FHA.[13]

---

[12] Schwemm (2016), pages 698-699.
[13] Schwemm (2017), page 713.

24.0    As Table 2 demonstrates, the Decision perpetuates segregation in West
        Melbourne where the Project was to be located.  The racial composition
        of the Plaintiffs' four existing apartment complexes in the Relevant Market is
        45% white households and 35% black households.  The Plaintiffs planned
        to rent apartments in the Project similar to their existing projects with a focus
        on affordability.  Therefore, the racial mix for the Project would have been
        very similar to the Plaintiffs' other projects in the Relevant Market.  In stark
        contrast, black households constitute just 4% of households in West
        Melbourne where 77% of the households are white, whereas in Brevard
        County black households account for 9% of households.  The data shows
        that the Decision perpetuates racially segregated housing patterns in West
        Melbourne.

**Table 2. Analysis of Segregative Impact Based on Racial Characteristics of
Households Impacted by the Decision**

| Category | White | Black |
|---|---|---|
| Project | 45% | 35% |
| Brevard County | 80% | 9% |
| West Melbourne | 79% | 4% |

25.0    The final issue relates to the robust causality requirement.  The statistical
        analysis must demonstrate that the Decision resulted in the racial
        imbalance.  The Relevant Market has a significant shortage of affordable
        housing.  The Decision exacerbated the shortage by limiting the supply of
        affordable housing in the Relevant Market.   The shortage affects all
        households in the Relevant Market who need affordable housing.  However,
        as the data in Table 3 demonstrate, black households are harmed more
        than white households.

26.0    Table 3 presents the statistical data addressing the issue of robust causality
        showing that the Decision caused the discrimination.   The analysis
        compares the total percentage of white households needing affordable
        housing (27%) to the percentage of black households needing affordable
        housing (43%).  Affordable housing is defined for Table 3 using HUD's small
        area fair market rent reports for a 2-bedroom unit in zip code 32922[14], the
        predominate area from which the Plaintiffs' projects draw their tenants.
        Based on the data in Table 3, the Decision had a discriminatory impact on
        black households in the Relevant Market.

---

[14]https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2024_code/2024zip_code_calc.odn?zcta=32922&m
etro_code=METRO37340M37340&year=2024&hypo=

**Table 3. Demonstration of Robust Causality – The Decision Resulted in the Discrimination**

| Category | White | Black |
|---|---|---|
| Total Households | 91,861 | 13,095 |
| Needing Affordable Housing | 24,725 | 5,580 |
| Percent Affordable Housing | 27% | 43% |

**V.0    Determining the Relevant Market**

27.0    The first step in the analysis is to determine the Relevant Market for the Project.  The Project was to be a 105-unit, rental apartment community located at 2395 Minton Road (northeast corner of Minton Road and Heritage Oaks Boulevard) in West Melbourne. The Plaintiffs planned to develop apartments offered at below market rates: (a) 21 units affordable to households earning 30% AMI; (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.

28.0    The Plaintiffs have developed, and currently own and manage, four other affordable apartment projects in Brevard County: Wickham Club, Hammock Harbor, Malabar Cove, and Venue at Viera.  Figure 1 shows their locations along with the Project.  As Figure 1 shows, the Project would have been north of Malabar Cove and south of Wickham Club, Hammock Harbor, and the Venue at Viera.

29.0    The Project's location and product offerings would have positioned it to serve the same market as the Plaintiffs' other apartment communities.

[The balance of this page left intentionally blank.]

**Figure 1. Map of Plaintiffs' Apartment Communities in Brevard County**



30.0    The Plaintiffs survey their residents on a regular basis in the normal course
of their business.  Among other things, their survey provides information
about the racial and ethnic composition of their tenants and where the
tenants previously lived.  This data shows that 71% of the tenants moved
from 16 zip codes in Melbourne, West Melbourne, Rockledge, Palm Bay,
Cocoa, Viera, and Titusville.

31.0   Therefore, the Relevant Market for the Project is from Titusville on the north to Palm Bay on the south, west of the intracoastal, and including Cocoa, Rockledge, Viera, Melbourne, and West Melbourne.

## VI.0   Identifying the Affected Group

32.0   As noted previously, the Project was designed to provide affordable apartments to those in the Relevant Market earning 30%, 60% and 80% of AMI.   All households in the Relevant Market with these income characteristics are in the Affected Group, because the Decision limited their housing opportunities in the Relevant Market.

## VII.0   Demonstration of Market Need for the Project – No Surplus

33.0   The Relevant Market has a shortage of affordable housing.  Brevard County recognized the need for affordable housing dating back to March 15, 1979, when it created the Brevard County Housing Finance Authority ("BCHFA"). Its mission is to "alleviate the shortage of affordable residential housing facilities, and to provide capital for investment in such facilities, for low, moderate or middle income families, by issuing its revenue bonds to acquire home mortgages, by purchasing the same and by pledging such home mortgages as security for the payment of the principal and interest on any such revenue bonds and by entering into any agreements in connection therewith."[15]

34.0   BCHFA reports that since its inception it has issued almost $200 million in bonds making 4,791 rental units available to the families of lower and moderate income.[16]   BCHFA provided bond funding for the Plaintiffs' Malabar Cove, Wickham Club, and Venue at Viera communities.[17]

35.0   However, there remains a significant shortage of affordable housing in Brevard County.  The Federal Reserve Bank of Atlanta reports that there is a deficit of 9,181 affordable and available rental units in the market.[18] Therefore, there is no surplus of available housing in the Relevant Market that could satisfy the housing needs of the Affected Group.  As a result, the Project would have contributed to reducing the substantial deficit of affordable housing in the Relevant Market.

---

[15] BCHFA Website emphasis added. https://brevardhfa.org/programs/#/
[16] IBID.
[17] IBID.
[18] https://www.atlantafed.org/community-development/data-and-tools/southeastern-rental-affordability-tracker

**VIII.0  Demonstration that the Project would Serve the Affected Group**

36.0  First, the Project was specifically designed by the Plaintiffs to serve the needs of the Affected Group.  The Project would have provided housing affordable to households earning 30% AMI to 80% AMI.

37.0  Second, as noted above, there is a substantial shortfall of affordable rental housing in the Relevant Market exceeding 9,000 units according to the Federal Reserve Bank of Atlanta.

38.0  Third, the Plaintiffs other four apartment communities in the Relevant Market provide affordable housing to members of the Affected Group. Plaintiffs planned for the Project to continue serving this market niche.

**IX.0  Analysis of Disparate Impact**

39.0  Disparate Impact is measured by comparing the impact of the Decision on members of the Affected Group in the Relevant Market.[19]  Statistical proof is needed to demonstrate that members of a protected class (as defined in the FHA) within the Group are more impacted than other members of the Group in the Relevant Market.  In other words, while all members of the Group in the Relevant Market will be negatively affected by the Decision, protected members must incur greater harm that can be measured to a reasonable degree of statistical certainty.

40.0  The methodology for the analysis includes the following procedures.

    a.  Adjust the rental rates proposed by the Plaintiffs for the units in the Project as of 2023 to their equivalent amounts as of 2022 to match the available income data.

    b.  Gather data on household income by race and ethnicity for households in the Relevant Market.  These data are available from the U.S. Census, American Community Surveys, for 2022, using data set ACSDT5Y2022.

    c.  Calculate the volumes and percentage of White, Latino, Black, and Asian households who could afford to rent the Project's apartments at each AMI threshold (30%, 60%, and 80%).

    d.  Compare the percentages of white households to black households who could afford the Project's apartments at each AMI threshold.

---

[19] Schwemm (2016), pages 698-699.

e.  Test the statistical significance of the differences in percentages of white households and black households who could rent the apartments at each AMI threshold.

## IX.1   Adjust the Rental Rates

41.0   The Plaintiffs' plan for the Project utilized the appropriate market and income data for the Palm Bay-Melbourne-Titusville MSA, which includes all of Brevard County, to set their expected rental rates for the apartments in the Project at each AMI threshold.  These data are vintage 2023.

42.0   However, the latest available income data from the U.S. Census, American Community Surveys ("ACS") is as of 2022.  Therefore, it is necessary to adjust the rental rates to 2022.  Fortunately, this can be readily accomplished by using the HUD data for income limits and rent limits for 2022 instead of the 2023 information used by the Plaintiffs.

43.0   Table 4 presents the adjusted rental rates using the 2022 HUD data for income and rent limits by apartment size.  The income thresholds are calculated at 30% of income for rent as per professional practice and HUD standards.[20]   FLS also reviewed and examined the HUD income tables provided here for Brevard County as part of the Palm Bay-Melbourne-Titusville, FL MSA[21].

[The balance of this left blank intentionally.]

---

[20] https://www.huduser.gov/portal/datasets/home-datasets/files/HOME_IncomeLmts_State_FL_2023.pdf and Herbert (2018).
[21] https://www.huduser.gov/portal/datasets/il/il2024/select_Geography.odn?STATES=12.0&statelist=12.0&stname=&wherefrom=%24wherefrom%24&statefp=00&year=&ne_flag=0&selection_type=&incpath=%24incpath%24&data=2024

**Table 4. Apartment Rents and Income Thresholds for the Project
Adjusted to 2022 HUD Data**

| **30% AMI** | Plaintiff's Proposed Rents | Income Threshold @ 30% |
|---|---|---|
| One Bedroom | $457 | $18,280 |
| Two Bedroom | $548 | $21,920 |
| Three Bedroom | $633 | $25,320 |
| **60% AMI** | Plaintiff's Proposed Rents | Income Threshold @ 30% |
| One Bedroom | $853 | $34,120 |
| Two Bedroom | $914 | $36,560 |
| Three Bedroom | $1,096 | $43,840 |
| **80% AMI** | Plaintiff's Proposed Rents | Income Threshold @ 30% |
| One Bedroom | $1,219 | $48,760 |
| Two Bedroom | $1,462 | $58,480 |
| Three Bedroom | $1,689 | $67,560 |

**IX.2    Gather the Income Data**

44.0    The next step is to gather the data for household incomes, by racial and ethnic group, for the Relevant Market.  These data are available by census tract from ACS.  Since the Relevant Market includes most, but not all, of Brevard County, the database had to be assembled from the census tracts.

45.0    There are 66 census tracts in the Relevant Market.  The following tracts comprise the Relevant Market: 621.15;  623.01;  623.02;  624.01;  624.02;  625;  626;  628;  629;  630;  631.02;  631.04;  631.05;  631.06;  631.08;  631.09;  641.02;  641.24;  641.23;  641.26;  641.27;  641.29;  641.28;  641.30;  642.01;  642.02;  643.01;  643.02;  644;  645;  646.01;  646.02;  647.01;  647.02;  648;  649.01;  649.02;  650.01;  650.22;  650.23;  650.24;  650.25;  651.23;  651.24;  651.26;  651.27;  651.28;  651.29;  651.30;  651.31;  652.01;  652.02;  652.31;  652.36;  652.37;  652.38;  652.39;  652.40;  712.01;  712.02;  712.04;  712.05;  713.35;  713.37;  713.39;  713.41.

### IX.3    Calculate the Percentages of Households who can Afford the Apartments in the Project

46.0    The ACS provides detailed data on the income distribution of households in each census tract by race and ethnicity.  For this analysis data were obtained for households with a householder who is: (a) White alone, not Hispanic or Latino l Table B19001H; (b) Hispanic or Latino l Table B19001I; (c) Black or African American alone l Table B19001B; and (d) Asian alone l Table B19001D.

47.0    The income data for each group is provided in ranges as shown in Table 5 here illustrated for White only households in the Relevant Market.  The ACS provides the data for the income range, the estimated number of households with incomes in the range, and the margin of error in measuring the estimates (to be discussed later below).  I added the midpoint for each income range for use in quantifying the number of households in each income range who could afford the apartments on offer in the Project at the rental rates and their equivalent income levels required as shown in Table 4 for the Project.

**Table 5. ACS Data for Household Incomes in the Relevant Market Illustration for White Only Households Table B19001H**

| Range | Midpoint of Range | Estimate | Margin of Error |
|---|---|---|---|
| Total: | | 91,861 | 16,119 |
| Less than $10,000 | $9,999 | 3,644 | 3,644 |
| $10,000 to $14,999 | $12,500 | 2,408 | 2,674 |
| $15,000 to $19,999 | $17,500 | 3,559 | 3,475 |
| $20,000 to $24,999 | $22,500 | 4,189 | 3,701 |
| $25,000 to $29,999 | $27,500 | 4,025 | 3,819 |
| $30,000 to $34,999 | $32,500 | 3,326 | 3,270 |
| $35,000 to $39,999 | $37,500 | 3,574 | 3,401 |
| $40,000 to $44,999 | $42,500 | 3,393 | 3,159 |
| $45,000 to $49,999 | $47,500 | 4,086 | 4,018 |
| $50,000 to $59,999 | $55,000 | 7,183 | 5,091 |
| $60,000 to $74,999 | $67,500 | 10,002 | 6,889 |
| $75,000 to $99,999 | $87,500 | 12,050 | 6,516 |
| $100,000 to $124,999 | $112,500 | 8,851 | 5,538 |
| $125,000 to $149,999 | $137,500 | 6,993 | 4,978 |
| $150,000 to $199,999 | $175,000 | 7,545 | 4,954 |
| $200,000 or more | $200,000 | 7,033 | 4,653 |

48.0    With this data I can calculate the number of households who can afford to rent the apartments in the Project at each AMI level and for each category of apartments (1, 2, or 3 bedroom).  For example, using the data in Table 4, the 1-bedroom apartment at 30% AMI had proposed rent of $457 per month.  The tenant would have to have household income of $18,280 or more to be able to afford to rent the apartment using no more than 30% of their annual income.  This income threshold translates to households earning more than the midpoint income level of $17,500 since $18,280 is at the top end of the income range of $15,000-$19,999.  As Table 5 shows, for White only households 9,611 or 10% of all White only households cannot afford to rent this apartment, because their income is too low, falling below the $17,500 level.

49.0    These calculations were repeated for each apartment category shown in Table 4 for each of the four racial/ethnic household groupings.  In this way, the percentage of each group that can afford each apartment type can be determined.  The detailed calculations are provided in Exhibit #5.

## IX.4    Compare the Percentages to Determine if there is Disparate Impact

50.0    To determine if there are any differences in the percentage of each racial/ethnic group that can afford each apartment type, the percentages are compared.

51.0    For example, the 3-bedroom apartment at 80% of AMI is rented at $1,689 as shown in Table 4.  To rent this apartment the tenant must have an income of $67,560 or more.  The income analysis shows that 69% of Black households cannot afford this apartment compared to 54% of White households in the Relevant Market.

52.0    Table 6 summarizes the analysis of the disparate impact of the Decision on Black households, a protected class under the FHA.  As the data in Table 6 show, in every case for each type of apartment at each AMI level, the percentage of Black households that can afford the apartment is less than the percentage of White households who can afford the apartment.  The detailed calculations are shown in Exhibit #6.

53.0    The Decision restricted the volume of affordable housing in the Relevant Market.  The Relevant Market has a shortage of over 9,000 affordable rental units.  The Decision reduced the opportunity for all households in the Affected Group to obtain affordable housing.  However, considerably more Black households were adversely affected compared to White households.  Therefore, the Decision had a disparate impact on the FHA protected group of Black households.

**Table 6. Analysis of Disparate Impact of the Decision**
**Percent of Households who can Afford the Apartment**

| AMI and Bedrooms | White | Black | Difference |
|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% |
| 30% AMI 2 Bedroom | 90% | 83% | -7% |
| 30% AMI 3 Bedroom | 85% | 76% | -9% |
| 60% AMI 1 Bedroom | 77% | 61% | -16% |
| 60% AMI 2 Bedroom | 77% | 61% | -16% |
| 60% AMI 3 Bedroom | 69% | 31% | -38% |
| 80% AMI 1 Bedroom | 65% | 51% | -14% |
| 80% AMI 2 Bedroom | 57% | 42% | -15% |
| 80% AMI 3 Bedroom | 46% | 31% | -15% |

54.0  The next question is whether these differences are statistically significant. This issue is addressed next.

**IX.5   Measure the Statistical Significance of the Disparate Impact Measures**

55.0  There are two basic approaches to assess the statistical significance of the differences calculated in Table 6: (1) $X^2$ test and (2) margin of error analysis. In this application the $X^2$ test is used to compare the observed percentage of households who can afford the apartments in the Project to the expected percentages if there was no disparate impact from the Decision. The margin of error ("MOE") method compares the differences in percentages of households after accounting for sampling error in measuring the number of households earning each range of income.

56.0  $X^2$ is widely used in science, medicine, social sciences, engineering, and most any other endeavor to check the differences between an expected outcome and an observed or measured outcome.[22]  In this application if there is no disparate impact from the Decision, the actual percentages of affordability for White households and Black households would be the same, or at least very similar.  The $X^2$ test measures the squared differences between the actual percentages and the expected (no disparate impact) percentages.  The larger the $X^2$ statistic the more likely there is disparate impact from the Decision.

---

[22] Witcov (2019), McHugh (2013), and Turhan (2020).

57.0   The results are summarized in Table 7 for the $X^2$ test.  Exhibit #6 contains detailed calculations.   In every case, the $X^2$ statistic is very large and significant at the 95% confidence level.  On this basis, the Decision had a statistically significant disparate impact on Black households.

**Table 7. Statistical Test for Disparate Impact using the $X^2$ Test**

| AMI and Bedrooms | White | Black | Difference | $X^2$ |
|---|---|---|---|---|
| 30% AMI 1 Bedroom | 90% | 83% | -7% | 449 |
| 30% AMI 2 Bedroom | 90% | 83% | -7% | 449 |
| 30% AMI 3 Bedroom | 85% | 76% | -9% | 506 |
| 60% AMI 1 Bedroom | 77% | 61% | -16% | 739 |
| 60% AMI 2 Bedroom | 77% | 61% | -16% | 739 |
| 60% AMI 3 Bedroom | 69% | 31% | -38% | 3,685 |
| 80% AMI 1 Bedroom | 65% | 51% | -14% | 585 |
| 80% AMI 2 Bedroom | 57% | 42% | -15% | 548 |
| 80% AMI 3 Bedroom | 46% | 31% | -15% | 398 |

58.0   The results from the $X^2$ tests are very strong.  However, the $X^2$ statistic does not consider sampling error in the actual measurement of the number of households in each income range as measured by the ACS.

59.0   The ACS is an annual, nation-wide, survey designed to provide communities with reliable and timely social, economic, housing, and demographic data.  The ACS has an annual sample size of about 3.5 million.[23]

60.0   The ACS is, as its name implies, a survey based on sampling the population, it is not a complete 100% count of the data.  As a result, like any other sample-based system, the ACS estimates have a degree of uncertainty associated with them.  This is called sampling error.  Generally, the larger the sample size the smaller the degree of sampling error.  The Census Bureau publishes a margin of error ("MOE") along with every ACS estimate to allow users to understand the MOE and the reliability of the estimates.[24]

---

[23] U.S. Census Bureau (September 2020), page 1.
[24] IBID.

61.0   The ACS' documentation also provides detailed instructions for calculating the statistical significance of differences between ACS data, such as the income differences between white and black households of interest in this report, using MOE.  The calculations begin with measuring the standard error ("SE") of the ACS estimate.  The SE quantifies the variability of an estimate due to sampling.  It is calculated by dividing the MOE by 1.65.[25]

62.0   The calculations for testing the statistical significance of any difference between two ACS estimates are as follows.[26]

a.  Calculate the SEs for the two ACS estimates.
b.  Square the resulting SE for each estimate.
c.  Sum the squared SEs.
d.  Calculate the square root of the sum of the squared SEs.
e.  Divide the difference between the two ACS estimates by the square root of the sum of the squared SEs.
f.  Compare the absolute value of the result from Step e with the critical value for the desired level of confidence – 1.65 for 90%.
g.  If the absolute value of the result from Step e is greater than the critical value, then the difference between the two estimates can be considered statistically significant, at the level of confidence corresponding to the critical value selected in Step f.

63.0   Algebraically, the test for statistical significance from the ACS is shown below.  $X_1$ and $X_2$ are the two ACS estimates being compared.  SE refers to the standard errors of $X_1$ and $X_2$.  Finally, Z is the critical level for the confidence interval (1.65 for 90%).[27]

$$\text{If} \quad \left| \frac{\hat{X}_1 - \hat{X}_2}{\sqrt{\left[SE(\hat{X}_1)\right]^2 + \left[SE(\hat{X}_2)\right]^2}} \right| > Z_{CL}$$

[25] U.S. Census Bureau, Op Cit., page 45.
[26] U.S. Census Bureau, Op Cit., page 47.
[27] IBID.

64.0    These calculations are straight forward in situations where the MOE is available.  However, in this application the income thresholds for each type of apartment at the Project encompass more than one income range measured by ACS.  For instance, a 1-bedroom apartment at 80% AMI has an income threshold of $48,760 as shown in Table 4.  This apartment is affordable for white households with incomes above $48,760, which includes households starting with the income range of $50,000 and including those earning over $200,000 as shown in the red box on Table 8.

**Table 8. Household Income for White Only Households in the Relevant Market**

| Income Range | Midpoint | Estimate | % of Total | MOE |
|---|---|---|---|---|
| Total: | | 91,861 | 100% | 16,119 |
| Less than $10,000 | $9,999 | 3,644 | 4% | 3,644 |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | 2,674 |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | 3,475 |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | 3,701 |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | 3,819 |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | 3,270 |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | 3,401 |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | 3,159 |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | 4,018 |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | 5,091 |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | 6,889 |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | 6,516 |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | 5,538 |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | 4,978 |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | 4,954 |
| $200,000 or more | $200,000 | 7,033 | 8% | 4,653 |

65.0    As Table 8 shows, there are seven income ranges included in the group of households who can afford the 1-bedroom apartment at 80% AMI.  Each range has its own specific MOE.  As ACS notes, the MOE declines as a percentage of the estimate, as the sample size increases.  For example, in Table 8 the MOE for the total sample is 16,119 or 18%.  The percentage MOE for the income range of $10,000 to $14,999 is over 100%, because the MOE is greater than the estimated number of households estimated in this group.  The other ratios of MOE to their estimates range from 54% to over 100%.

66.0    Continuing with the example of the seven income ranges where households can afford to rent the 1-bedroom apartment at 80% AMI, this group has 59,657 households. Since the relative MOE (MOE divided by the estimate) declines sharply as the sample size increases, the MOE for this group of seven households will be far lower than the MOE for any one of the individual estimates.

67.0    To estimate the percent MOE by sample size, I estimated an equation for the relationship using ordinary least squares regression. Figure 2 displays the relationship and provides the equation for the percent MOE by sample size. The relationship is highly nonlinear with the percent MOE dropping sharply as sample size increases. As shown in Figure 2, the best fitting equation ($y=15.184X^{0.567}$) is a power function with an $R^2$ (goodness of fit) of 0.915 meaning that the equation explains 91.5% of the variation between percent MOE and sample size.

**Figure 2. Relationship between Sample Size and the Percent MOE**



68.0    I used the equation to estimate the MOE for each income range that could afford each of the apartments for each racial/ethnic group. Using the MOE, I could then calculate the SE for each group. With the SE, I could then determine whether the differences between white and black households who could afford each apartment to be offered at the Project was statistically significant. Table 9 summarizes the results. The detailed calculations are provided in Exhibit #7.

69.0    As the data in Table 9 document shows the differences between white and
        black households are statistically significant in 6 of the 9 cases with 87% or
        more confidence.  For the 30% AMI group, the differences for the 1-
        bedroom and 2-bedroom apartments are not statistically significant.
        Although the differences are 7% for the 1 and 2-bedroom apartments, their
        relatively smaller sample sizes result in larger MOE and less precision in
        estimating the underlying income data.  The 3-bedroom apartments at 30%
        AMI have a difference of 9% between whites and blacks which is statistically
        significant at the 76% level of confidence.

### Table 9. Margin of Error Analysis of Statistical Significance

| Disparate Impact Analysis @ 30% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 10% | 10% | 15% |
| % Black Cannot Afford | 17% | 17% | 24% |
| SE White | 0.035 | 0.035 | 0.029 |
| SE Black | 0.087 | 0.087 | 0.073 |
| | | | |
| Test Score | 0.71 | 0.71 | 1.17 |
| Z Score | 52% | 52% | 76% |
| | | | |
| Disparate Impact Analysis @ 60% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
| % White Cannot Afford | 23% | 23% | 31% |
| % Black Cannot Afford | 39% | 39% | 69% |
| SE White | 0.022 | 0.022 | 0.019 |
| SE Black | 0.058 | 0.058 | 0.050 |
| | | | |
| Test Score | 1.67 | 1.67 | 4.83 |
| Z Score | 91% | 91% | 99% |
| | | | |
| Disparate Impact Analysis @ 80% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
| % White Cannot Afford | 35% | 43% | 54% |
| % Black Cannot Afford | 49% | 58% | 69% |
| SE White | 0.017 | 0.016 | 0.014 |
| SE Black | 0.048 | 0.044 | 0.040 |
| | | | |
| Test Score | 1.51 | 1.64 | 1.89 |
| Z Score | 87% | 90% | 94% |

**X.0    Analysis of Segregative Impact**

70.0    The analysis of Segregative impact differs from the disparate impact examination conducted above.  Segregative impact focuses on the harm done to the community, whereas disparate impact claims analyze the harm done to a protected class under the FHA.[28]

71.0    Schwemm notes that most claims for segregative impact are made against municipalities that are accused of using their land-use powers to block integrated housing developments in predominantly white areas. Furthermore, he notes that unlike disparate impact claims, segregative effect claims may challenge a particular action or decision as well as an across-the-board policy.[29]

72.0    In this case the Defendant defends its Decision claiming it was made for in response to public opposition to the Project.  While the Decision was not associated with a land use decision, it prevented development of an integrated housing development similar to those the Plaintiffs had previously developed in the Relevant Market.  Also, as noted previously, three of the Plaintiffs' four other communities in the Relevant Market were approved for bond financing by the Defendant.

73.0    The major difference in this instance was the proposed location for the Project in West Melbourne.  There was substantial public opposition to the Project at the December 5, 2023, public hearing held by the Defendant.

74.0    Some of the opposition was organized by residents of Woodfield at Heritage Oaks, a self-described "private subdivision of Heritage Oaks located in West Melbourne, Florida. It is comprised of waterfront and wooded custom homes within a gated community, developed by some of Brevard's finest builders including Lifestyle Homes, Belmont Homes, and Schwab Custom Homes. These prestigious houses range in size from 1,800 to over 6,000 total square feet. Woodfield at Heritage Oaks is located just south of Hwy 192 (New Haven Avenue) off Minton Road."[30]  The Project was to be located at the northeast corner of Minton Road and Heritage Oaks adjacent to Woodfield.   The organization encourage its members "Let's pack the room."[31]

---

[28] Schwemm (2017), page 713.
[29] Schwemm (2017), page 713.
[30] https://www.woodfieldatheritageoaks.org/hud-project-on-minton
[31] https://www.woodfieldatheritageoaks.org/hud-project-on-minton

75.0    The video record of the December 5, 2023, meeting included many residents of West Melbourne arguing against the Project, often complaining about development of apartments at the site allowed under Florida's Live Local Act, SB102.  Interestingly, the Chairman of the County Commission acknowledged the pressing need for more affordable housing and voted in favor of issuing the bonds.  Nevertheless, the majority of the Commission voted against approving the bond issue without any explanation for their votes.[32]

76.0    Regardless of their ultimate motivation, the Defendant decided not to approve the bond issue dooming the Project.  As Table 10 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located.  The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households.  The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability.  Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market.  In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households.   The data show that the Decision perpetuates racially segregated housing patterns in West Melbourne.

**Table 10. Analysis of Segregative Impact Based on Racial Characteristics of Households Impacted by the Decision**

| Category | White | Black |
|---|---|---|
| Plaintiffs other Projects | 45% | 35% |
| Brevard County | 80% | 9% |
| West Melbourne | 79% | 4% |

## XI.0    Analysis of Robust Causality

77.0    The final issue to address is the requirement for a demonstration of what is termed "robust causality". The robust causality requirement requires a showing that links the challenged neutral policy to a specific adverse racial or ethnic disparity.[33]

---

[32] https://spacecoastdaily.com/2023/12/watch-live-brevard-county-commission-holds-meeting-in-viera-on-tuesday-17/
[33] City of Miami v. Bank of Am. Corp., 171 F. Supp. 3d 1314, 1320 (S.D. Fla. 2016).

78.0   Schwemm explains the requirement for robust causality springs from the
       Supreme Court's decision in Texas Department of Housing & Community
       Affairs v. Inclusive Communities Project, Inc.[34]  Therein, the court stated
       that in order "to protect potential defendants against abusive disparate-
       impact claims…. [an impact claim] that relies on a statistical disparity must
       fail if the plaintiff cannot point to a defendant's policy or policies causing that
       disparity. A robust causality requirement ensures that [r]acial imbalance . .
       . does not, without more, establish a prima facie case of disparate impact
       and thus protects defendants from being held liable for racial disparities they
       did not create."

79.0   Schwemm goes on to explain that "Impact-based challenges based solely
       on racial imbalances, according to Inclusive Communities, "would almost
       inexorably lead . . . to . . . numerical quotas," presumably because potential
       defendants would seek racial balance to avoid liability, a situation that would
       raise "serious constitutional questions."[35]

80.0   More recently and closer to the Project, in Oviedo Town Ctr. II, L.L.L.P. v.
       City of Oviedo the court explained that "racial imbalance is endemic to
       affordable housing, as such housing caters to a disproportionately higher
       percentage of racial minorities. Regrettably, these vestiges of racial
       inequality remain today; but this fact does not establish the crucial element
       of causation. To hold otherwise ignores the FHA's unequivocal "robust
       causality requirement," which "ensures that racial imbalance does not,
       without more, establish a prima facie case of disparate impact and thus
       protects defendants from being held liable for racial disparities they did not
       create."[36]

81.0   The Oviedo court also provided a formula to demonstrate robust causation.
       The court prescribed comparing the % of racial minorities occupying
       multifamily properties in the City to the % of non-minorities occupying
       multifamily properties in the City.

82.0   The statistical analysis presented below, following the Oviedo court's
       recommendation, demonstrates that the Decision resulted in the racial
       imbalance.  The Relevant Market has a significant shortage of affordable
       housing.  The Decision exacerbated the shortage by limiting the supply of
       affordable housing in the Relevant Market.   The shortage affects all
       households in the Relevant Market who need affordable housing.  However,
       as the data in Table 11 demonstrate, black households are harmed more
       than white households.

---

[34] 135 S. Ct. 2507 (2015).
[35] Schwemm (2017), page 728.
[36] Case No. 6:16-cv-1005-Orl-37GJK

83.0    Table 11 presents the statistical data addressing the issue of robust causality showing that the Decision caused the discrimination. The analysis compares the total percentage of white households needing affordable housing (27%) to the percentage of black households needing affordable housing (43%). Affordable housing is defined for Table 11 using HUD's small area fair market rent reports for a 2-bedroom unit in zip code 32922[37], the predominate area from which the Plaintiffs' projects draw their tenants. Based on the data in Table 11, the Decision had a discriminatory impact on black households in the Relevant Market.

**Table 11. Demonstration of Robust Causality – The Decision Resulted in the Discrimination**

| Category | White | Black |
|---|---|---|
| Total Households | 91,861 | 13,095 |
| Needing Affordable Housing | 24,725 | 5,580 |
| Percent Affordable Housing | 27% | 43% |

## XII.0    Economic Damages

84.0    The Plaintiffs estimate that their economic damages are on the order of $10 million.

85.0    The Plaintiffs have asked me to defer analysis of the damages at this time.

## XIII.0    Discovery Still Open

86.0    I am informed that discovery remains open in this matter.

87.0    In the future, I plan to update this report to incorporate the analysis of economic damages and to reflect any additional material evidence provided.

---

[37]https://www.huduser.gov/portal/datasets/fmr/fmrs/FY2024_code/2024zip_code_calc.odn?zcta=32922&metro_code=METRO37340M37340&year=2024&hypo=

**Exhibit #1 – Resume**



# Henry H. Fishkind, Ph.D.

## President

hankf@fishkindls.com

### PROFESSIONAL SYNOPSIS

With over 40 years of experience in economic analysis and forecasting, Dr. Henry Fishkind is widely regarded as one of Florida's premier economists and financial advisors. Dr. Fishkind's career began in the public sector where he worked as an economist and associate professor at the University of Florida. In 1980, Dr. Fishkind became the associate director for programs at the University of Florida's Bureau of Economic and Business Research. During his tenure at the university, Dr. Fishkind served from 1979-1981 on the governor's economic advisory board. He began his career as a private sector consultant when he became president of M.G. Lewis Econometrics in Winter Park, Florida. In 1988, Dr. Fishkind formed Fishkind & Associates, Inc. as a full service economic and financial consulting firm. In 2019, Dr. Fishkind sold the financial advisory, consulting, and real estate advisory portions of his business while keeping the expert witness portion, Fishkind Litigation Services, Inc.

From 2001-2003 Dr. Fishkind was a member of Governor Bush's Council of Economic Advisors, and served on the board of directors of Engle Homes, Summit Properties, and ABT Funds until the companies were sold. Today, Dr. Fishkind is President of Fishkind Litigation Services.

### AREAS OF EXPERTISE

Expert Witness
Economic Analysis
Econometric Modeling
Project Finance & Feasibility
Privacy & Intellectual Property
Fiscal Impact Analysis
Real Estate Economics

### PROFESSIONAL EXPERIENCE

| | |
|---|---|
| President, Fishkind & Associates, Inc./Fishkind Litigation Services, Inc. | 1988 - Present |
| Chairman, FLSAFE | 2008 - 2011 |
| Managing Partner, Woodbridge Vintage Chips | 1994 - 2007 |
| President, M.G. Lewis Econometrics, Inc. | 1984 - 1987 |
| Associate Director for Programs, Bureau of Economics & Business Research, University of Florida | 1980 - 1983 |
| Economist/Associate Professor, University of Florida | 1975 - 1983 |

### EDUCATION

Indiana University, Doctor of Philosophy, Economics, 1975
Syracuse University, B.A., Economics, 1971

Fishkind Litigation Services, Inc.
3504 Lake Lynda Drive, Suite 107, Orlando, FL 32817
407.382.3256



**FISHKIND**
LITIGATION SERVICES™

### SELECT CLIENT LIST

Akerman
Bell Roper
Boatman Ricci
Burr Forman
Coleman Yovanovich
Conrad Scherer
de la Parte & Gilbert
Fulmer Leroy Albee
Fisher Rushmer
Foley Lardner
Gunster
Hill Ward Henderson
Holland & Knight
Morgan & Morgan
Nabors Giblin
Pendas Law
Smolker Bartlett
Tobin Reyes
Weiss Handler Cornwell
AEGON
Baron Collier
DR
Cemex/CSR/Rinker
City of Miami
Colonial Properties Trust
Collier Enterprises
Falcone Group
Fannie Mae
Florida Power Corporation
Forrest City Enterprises
FPL
King Ranch
Kitson & Partners
Lennar
Major Central FL Attraction Co.
Mosaic
Newland Communities
Pavey Capital
Rayonier
Starwood Land Ventures
State of Florida
State of Pennsylvania
St. Joe
U.S. Department of Justice
The Villages
Waste Management, Inc.

**Exhibit #2 – Court Experience**

| | DEPOSITIONS AND TESTIMONY | *2019-2020-2021-2022-2024* | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | HENRY H. FISHKIND, PH.D. | FISHKIND LITIGATION SERVICES, INC. | | | | | | |
| 3 | **CASE NAME** | **Court** | **Case Number** | **Represented** | **Opinion** | **Deposition** | **Testified** | **Affidavit** |
| 4 | B&B Bowling, LLC d/b/a Strikes @ Boca v. CRVII Boca TC, L.P. et al. | In the Circuit Court of the 15th Judicial Circuit, In and For Palm Beach County, Florida | 50-2020-CA-007031-XXXX-MB | Defendant | yes | yes | | |
| 5 | Benoit v. Benoit | Twentieth Judicial Circuit in and For Collier County | 19-DR-1569 | Respondent | | yes | | no |
| 6 | Blaine et al. v. North Brevard County Hospital District | United States District Court Middle District of Florida Orlando Division | 6:18-cv-487-ORL-22DCI | Plaintiff | yes | yes | | |
| 7 | Blume v. Blume | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Action | 16-DR-823 | Respondent | yes | no | yes | |
| 8 | Angelika Bovi et al. v. Daniel Shepherd et al. | In the Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida | 502017CP000747XXXXMB | Plaintiff | yes | yes | | yes |
| 9 | Buffalo Rock Company, Inc. v. Pepsico, Inc., et al. | In the Circuit Court of Jefferson County, Alabama | 01-CV-2019-900217.00 | Plaintiff | yes | yes | | |
| 10 | Cafita Media Group, LLC v. Star Over Orlando, Inc. et al. | American Arbitration Association | 01-18-0003-2715 | Respondent | yes | no | yes | |
| 11 | Celebrate Virginia South Holding Company, LLC, et al. v. CVAS Property Management, LLC, et al. | In The United States District Court Eastern District of Virginia Richond Division | 3:21-CV-00261 | Plaintiff | yes | yes | | yes |
| 12 | CSX Transportation, Inc. v. National Railroad Passenger Corporation | National Arbitration Panel, Washington, D.C. | | Claimant | yes | no | yes | no |
| 13 | DaVita, Inc., et al. v. Associates in Nephrology, et al. | In the Circuit Court in and For Lee County, Florida | 21-CA-01844 | Defendant | yes | yes | | |
| 14 | Citrosuco North America, Inc. v. Brown International Corporation, LLC | | | Claimant | yes | no | yes | |
| 15 | DeLuna Oyster Company, Inc. v. Skanska USA Civil Southeast, Inc. | In the Circuit Court In and For Escambia County, Florida | 2020-CA-001679 | Defendant | yes | yes | yes | |
| 16 | Dynamic Motion Rides GMBH, et al. v. Universal City Development Partners Ltd., et al. | United States District Court Middle District of Florida Orlando Division | 6:21-cv-752-RBDLRH | Plaintiff | yes | yes | | no |
| 17 | Estate of Hugh Corrigan, IV et al. v. Sebastian River Improvement District | In the Circuit Court of the Nineteenth Judicial Circuit of the State of Florida In and For Indian River County | 31-2019-CA-000811 | Plaintiff | yes | yes | | |
| 18 | ETNA Holding, LLP v. Magic Companies Group, LLC et al. | In the Circuit Court of the Ninth Judicial Circuit in and For Orange County, Florida, Civil Division | 2022-CA-000588-O | Defendant | yes | yes | | |
| 19 | Eveleigh et al. v. Eveleigh et al. | In the Circuit Court, Fourth Judicial Circuit, In and For Duval County, Florida | 2014-CP91607 | Defendant | yes | no | yes | |
| 20 | F&L Fiduciary Services, LLC et al. v. Ed Crapo as Property Tax Appraiser, et al. | In the Circuit Court of the Eighth Judicial Circuit in and For Alachua County, Florida, Civil Division | 2020-CA-001916 | Plaintiff | yes | yes | yes | |
| 21 | Fickling and Company, Inc. et al. v. West Shore Legacy, LLC | In the Circuit Court For the Eighth Judicial Circuit In and For Alachua County, Florida. | 2022-CA-002682 | Plaintiff | yes | yes | | |

| # | Case | Court | Case Number | Role | | | | | |
|---|------|-------|-------------|------|---|---|---|---|---|
| 22 | Matthew Finn v. Waterman Broadcasting Corporation | In the Circuit Court of the Twentieth Judicial Circuit in and For Lee County, Florida | 2020-CA-005712 | Plaintiff | yes | yes | | | no |
| 23 | Flagstone Island Gardens, LLC et al. v. City of Miami | In the Circuit Court of the 11th Judicial Circuit in and For Miami-Dade County, Florida, Complex Business Litigation | 2017-013829-CA-01 (44) | Defendant | yes | yes | | | |
| 24 | Florida Gas Transmission Company, LLC v. State of Florida Department of Transportation | United States District Court, Southern District of Florida, Fort Pierce Division | 2:22-cv-14071-DMM | Plaintiff | yes | yes | | | |
| 25 | Garvey Farm, LP et al. v. City of Elsmere, Kentucky et al. | United States District Court Eastern District of Kentucky Northern Division at Covington | 2:23-cv-00015-DCR | Defendant | yes | yes | | | |
| 26 | Grand Venezia COA, Inc. v. Clearwater Cay Community Development District et al | In the Sixth Judicial Circuit In And For Pinellas County, Florida | 16-001584-CI | Defendant | no | no | yes | | no |
| 27 | Hobe Sound Ranch, Ltd. V. Martin County | In the Circuit Court of the Nineteenth Judicial Circuit in and For Martin County, Florida Civil Division | 2018-CA-000710 | Plaintiff | yes | yes | | | yes |
| 28 | Home Builders Association of West Florida, Inc. et al. v. The Board of County Commissioners, Santa Rosa County, Florida et al. | In The Circuit Court of the First Judicial Circuit in and For Santa Rosa County, Florida | 2020-CA-0201 | Defendant | | | | yes | |
| 29 | Home Point Financial Corporation v. Donald Mark Lane, et al. | In the United States District Court For the Middle District of Florida, Orlando Division | 6:20-cv-01819-CEM-EJK | Defendant | yes | yes | | | |
| 30 | Jake H. Hunter, et al. v. A. Jefferey Tomassetti, PLC, et al. | In the Circuit Court of the Fourth Judicial Circuit, in and For Nassau County, Florida | 2014-CA-000427 | Plaintiff | yes | yes | | | |
| 31 | Island Estate Group, LLC et al. v. Michael J. Carroll, Sr. et al. | American Arbitration Association | 01-20-0001-6804 | Respondent | yes | yes | | | |
| 32 | John J. Jerue v. Drummond Company, Inc. | United States District Court For the Middle District of Florida Tampa Division | 8:17-cv-00587-EAK-AEP | Defendant | yes | yes | | | |
| 33 | Lawrence G. Kass, MD v. St. Anthony's Physicians Surgery Center, LLC | In the Circuit Court of the Sixth Judicial Circuit In and For Pinellas County, Florida | 20-002495-CI | Defendant | yes | yes | | | |
| 34 | Kimberly ReGenesis, LLC v. Lee County | United States District Court Middle District of Florida, Fort Myers Division | 2:19-cv-00538-FtM-38NPM | Plaintiff | yes | yes | | | |
| 35 | Las Olas Company, Inc. et al. v. Florida Power & Light Company | In the Circuit Court of the Seventeenth Judicial Circuit in and For Broward County, Florida | CACE 19-019911 (18) | Defendant | yes | yes | yes | | |
| 36 | Lemon Bay Cove, LLC v. United States of America | In the United States Court of Claims | 1:17-cv-00436-MCW | Plaintiff | yes | yes | | | yes |
| 37 | Lincoln Rock, LLC v. City of Tampa | United States District Court Middle District of Florida Tampa Division | 8:15-CV-01374-JSM-JSS | Plaintiff | yes | yes | | | |
| 38 | Richard John Lucibella v. Town of Ocean Ridge et al. | United States District Court Southern District Florida | 20-82156-CIV-Cannon/Brannon | Plaintiff | yes | yes | | | |

| # | Case | Court | Case Number | Role | | | | |
|---|------|-------|-------------|------|---|---|---|---|
| 39 | Luke Miller v.Gregg Uliano, et al. | In the Circuit Court for the Eighteenth Judicial Circuit In and for Seminole County, Florida | 2020-CA-000339-08-L | Defendant | yes | yes | | |
| 40 | Omni Interlocken Co., LLC. v. Broomfield County Board of Equalization | Board of Assessment Appeals, State of Colorado | 2021BAA2041 | Petitioner | | | yes | |
| 41 | River Cross Land Company, LLC v. Seminole County | United States District Court Middle District of Florida Orlando Division | 6:18-cv-1646-ORL-22KRS | Defendant | yes | yes | | |
| 42 | Mark Savage et al. v. Estate Homes by Stock, LLC | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Division | 2023-CA-2348 | Defendant | yes | no | yes | no |
| 43 | Sensor Systems, LLC et al. v. Blue Barn Holdings, Inc. et al. | United States District Court Middle District of Florida Tampa Division | 8:19-CV-02581-SCB-AAS | Plaintiff | yes | yes | | |
| 44 | Wayne Sforza v. Custom Homes by Kaye, Inc. d/b/a Kaye Lifestyle Homes | In the Circuit Court of the Twentieth Judicial Circuit in and for Collier County, Florida, Civil Action | 18-CA-2626 | Defendant | yes | yes | yes | no |
| 45 | SRQ Taxi Management, LLC v. Sarasota Manatee Airport Authority | United States Bankruptcy Court Middle District of Florida Tampa Division | 8:17-bk-07782-MGW | Defendant | yes | yes | yes | no |
| 46 | David W. Steffee v. Kerry C. Dustin | In the Circuit Court of the Fifteenth Judicial Circuit, In and For Palm Beach County, Florida | 502017CP002145XXXXMB Probate Division | Defendant | yes | yes | yes | no |
| 47 | Summit Construction Management Group, LLC v. City of Oviedo | In the Circuit Court of the Eighteenth Judicial Circuit In and For Seminole County, Florida | 2017-CA-001062 | Defendant | yes | yes | yes | yes |
| 48 | Town Center at Doral LLC, et al | United States Bankruptcy Court, Southern District of Florida, Miami Division | 2018 CA 000360 NC | Debtors | yes | yes | yes | |
| 49 | Town of Indian River Shores v. City of Vero Beach, et al. | United States District Court for the Southern District of Florida, Fort Pierce Division | 2:21-cv-14354 | Defendant | yes | yes | | |
| 50 | Unicorp Colony Units, LLC v. Colony Beach & Tennis Club Association, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida | 2016-CA-000360-NC | Plaintiff | | yes | | |
| 51 | Universal Health Care Group, Inc., et al. v. Warburg Pincus, LLC et al. | United States Bankruptcy Court Middle District of Florida Tampa Division | 8:13-bk-05952-KRM | Defendant | yes | | | yes |
| 52 | John Van Horn v. Richard Koon et al. | In the Ninth Judicial Circuit of Florida in and for Orange County, Florida | 2015-CA-010999-O | Plaintiff | yes | yes | | yes |
| 53 | Walt Disney Parks and Resorts US, Inc. v. Rick Singh et al. | In the Court of the Ninth Judicial Circuit of Florida In and For Orange County Civil Division | 2016-CA-005297-O | Plaintiff | yes | yes | yes | yes |
| 54 | Waters Mark Development Enterprises, LC v. Brevard County, Florida | In the Court of the 18th Judicial Circuit, In and For Brevard County, Florida | 05-2014-CA-41947 | Defendant | no | yes | | yes |
| 55 | Wayne's Aggregate & Materials, LLC v. Roy Wayne Yates et al. | In the Circuit Court of the Eighteenth Judicial Circuit In and For Brevard County, Florida | 05-2019-CA-18866 | Defendant/Counter-Claimants | yes | yes | | |
| 56 | Wellen Park, LLP et al. v. West Villages for Responsible Government, Inc. et al. | In the Circuit Court of the Twelfth Judicial Circuit In and For Sarasota County, Florida, Civil Division | 2020-CA-003838 | Plaintiff | yes | no | yes | yes |

**Exhibit #3 – Materials Reviewed or Relied Upon**

**Documents Filed with the Court:**

Complaint, 12.27.2023

Plaintiffs' Opposition to Defendant, City of New Smyrna Beach's Motion for Summary Judgment, 02.20.2014

Case Management and Scheduling Order, 03.26.2024

Notice of Electronic Filing, New Case Assigned (Judge Mendoza), 12.27.2023

Notice of Electronic Filing, Order, 01.02.2024

Return of Service, 01.03.2024

Summons in A Civil Action, 02.08.2023

Standing Order on Discovery Motions, 01.04.2024

Disclosure Statement Pursuant to Federal Rule of Civil Procedure 7.1 and Local Rule 3.03, 01.10.2024

Notice of Pendency of Other Actions, 01.10.2024

Notice of Electronic Filing, 01.11.2024

Notice of Lead Counsel Designation, 01.11.2024

Defendant, Brevard County's, Motion to Dismiss and Incorporated Memorandum of Law, 01.19.2024

**Production:**

HUD 2023 Income & Rent Limits – Brevard County, 05.15.2023

Rent Limits – Heritage Oaks 105 – MMRB – 4% HC, 12.04.2023

Demographic Information – Age and Race Ethnicity – Brevard

**References/Cases/Citations:**

Costar:
  Hammock Harbor
  Malabar Cove
  Melbourne, FL USA Multifamily Market, 05.06.2024
Venue at Viera
Wickham Club

Comprehensive Plans:
  Cocoa
  Melbourne
  Palm Bay
  Titusville
  West Melbourne

Robert G. Schwemm & Calvin Bradford, Proving Disparate Impact in Fair Housing Cases After Inclusive Communities, 19 N.Y.U. J. Legis. & Pub. Pol'y 685 (2016).

Robert G. Schwemm, Segregative-Effect Claims Under the Fair Housing Act, 20 N.Y.U. J. Legis. & Pub. Pol'y 709 (2017).

Christopher Herbert, Alexander Herman, and Daniel McCue, (2018), Measuring Housing Affordability: Assessing the 30-Percent of Income Standard, Joint Center for Housing Studies, Harvard University

Carey Witkov and Keith Zengel (2019), Chi-Squared Data Analysis and Model Testing
for Beginners, Oxford, Oxford, UK.

Comprehensive Annual Financial Report, Brevard County, Florida, Year Ending September 30, 2019, 2020, 2021, 2022

Housing Finance Authority Public Hearing Agenda, 10.15.2023

Brevard County Housing Finance Authority Meeting Minutes, 08.23.2023, 10-25-2023

Advisory Board Annual Reports, 2023

Debt Service: Financial Management

Calculation Summary of Small Area Fair Market Rents

McHugh, Mary L., "The Chi-Square Test of Independence," Department of Nursing, School of Health and Human Services, National University, Biochemia Medica 2013; 23(2):143-9

Turham, Nihan Solpuk, "Karl Pearson's Chi-Square Tests," Department of Educational Sciences, Faculty of Education, Faith Sultan Mehmet Foundation University, Academic Journals, Vol. 15(9), p.p. 575-580, September 2020

Affordable Housing v. City of Fresno, Nos. 04-15625, 04-15644, 04-15650, 04-15683, 04-15693, 04-15753, 04-15780, 04-17130, 05-15104, Argued and Submitted November 16, 2005, Filed January 11, 2006

Avenue 6E Investments., LLC v. City of Yuma Arizona, No. 13-16159, Decided March 25, 2016

City of Miami v. Bank of America Corporation., Case No. 13-24506-CIV-DIMITROULEAS

Hallmark Developers, Inc. v. Fulton County, Georgia, United States Court of Appeals, Eleventh Circuit, No. 05-15633, October 12, 2006

Oviedo Town Center. II, L.L.L.P. v. City of Oviedo, Case No. 6:16-cv-1005-Orl-37GJK, 08-23-2017

River Cross Land Company, LLC. v. Seminole County, 6:18-cv-1646-ACC-LRH, 06-04-2021

Texas Department of Housing and Community Affairs, et al. v. The Inclusive Communities Project, Inc., et al., On Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit, No. 13-1371, June 25, 2015

24 CFR 100 HUD Rule on FHA

42 USC FHA

Department of Housing and Urban Development, 24 CFR Part 100, Docket No. FR-6251-F-02,  Reinstatement of HUD's Discriminatory Effects Standard, Final Rule, 03.17.2023

American Community Survey, 5-Year Estimates: ACS and Margin of Error Values, Sage Data

Understanding Error and Determining Statistical Significance, U.S. Census Bureau, 2018, 2020

Section VII Proving Discrimination Disparate Impact, Title VI Legal Manual, United
State Department of Justice

Department of Housing and Urban Development, Implementation of the Fair
Housing Act's Disparate Impact Standard, 24 CFR Part 100, Docket No.
FR-6111-F-03

Fair Housing and Related Laws, U.S. Department of Housing and Urban
Development, 42 U.S.C. Section 3601-19, Title VIII of the Civil Rights Act
of 1968

Housing Discrimination Under the Fair Housing Act, U.S. Department of Housing
and Urban Development

Implementation of the Fair Housing Act's Discriminatory Effects Standard, A Rule
by the Housing and Urban Development Department, 02.15.2013, Federal
Register

Schwemm, Robert G., "Fair Housing Litigation After Inclusive Communities
What's New and What's Not," Columbia Law Review Sidebar, Vol. 115,
September 18, 2015,Pages 106-126

**Exhibit #4 Publications**

REFEREED PROFESSIONAL ARTICLES

(With Byron Walden) "Correctly Calculating the Present Value ofFuture
Medical Costs in Personal Injury Cases," *The Value ExaminerJ.* February
2015.

(With Stanley K. Smith) "Elderly Migration into Rapidly Growing Areas:  A
Time Series Approach," *Review of Regional Studies,* Spring 1985, pp.
11-27.

(With Blaine Roberts)  "An Empirical Note on Employment Forecasts,"
*Monthly  Labor Review,* March 1978, pp. 105-108.

(With Blaine Roberts) "The Role of Monetary Forces in Regional Economic
Activity: An Econometric Simulation Analysis," *Journal of Regional
Science,* April 1979, pp. 15-29.

(With Jerome Milliman and Richard Ellson) "A Pragmatic Econometric
Approach to Assessing Economic Impacts of Growth or Decline in
Urban Areas," *Land Economics,* February 1978, pp. 442-460.

The Regional Impact of Monetary Policy: An Econometric  Simulation  Study
of Indiana 1958-1973," *Journal of Regional Science,* April 1977, pp. 77-
88.

"Manitoba Interlake Area – A Review," *Journal of Regional Sciences,* April
1977, pp. 151-153.

BOOKS AND MONOGRAPHS

(With Jerome Milliman) "An Econometric Approach to Regional
Stagnation," in *Planning Under Regional Stagnation,* 1982.

(With Neil Sipe) *A Primer on Impact Fees in Florida,* 1981.

"The Impacts of Growth Management Policies on New Home Prices," in *Urban Land Markets: Price Indices, Supply Measurers and Public Policy Effects,* 1980.

"The Geographic Incidence of Monetary Policy: An Econometric Analysis," *Geographic Aspects of Inflationary Processes, Volume* 2, 1976.

(With Ernst Stromsdorder and Kamran Moayed-Dadkhan) *Cost Analysis ofManpower Programs: An Analysis of the Art,* 1973.

"The Big Green – The Fishkind Study," *Responses to an Aging Florida,* Florida Council on Aging, October 1998.

Topic: Light Rail System for Orlando, *The Orlando Sentinel,* Letter Writer'sForum, 1999

"Outlook 2000, A Leveling Off," *Florida Realtor,* January 2000.

## NONREFERRED JOURNALS AND NEWSLETTERS

*Econocast,* published quarterly November, 1984 – 1994.

*The Florida Outlook,* published quarterly 1977-1994.

*Economic Indicators,* published monthly, 1979-1982.

*Quarterly Forecasts for Florida and its counties,* published quarterly atFishkind.com since 1998.

Fund Newsletters for 27 Florida Counties, published monthly 2006-2009.

*Econocast Weekly,* published weekly.

## GRANT SPONSORED RESEARCH ACTIVITY

(With Jerome Milliman and Neil Sipe) *Modeling Financing Alternatives for Capital Improvements,* Gainesville, Florida: Bureau of Economic and Business Research, April 1983.
(For the Department of Community Affairs.)

(With Jerome Milliman and Neil Sipe) *A Regional Fiscal Impact Model,* Gainesville, Florida: Bureau of Economic and Business Research, June 1982.
(For the Department of Veterans and Community Affairs.)

(With Ron Dodson, Charles McDonald, and Scott Hargrave} *A Cost-Benefit Analysis of Consultants in the Florida Department of Transportation,* Gainesville, Florida: Bureau of Economic and Business Research, February 1981.
(For the Department of Transportation.)

*The Outlook for Residential Construction in Florida,* Gainesville, Florida: Bureau of Economic and Business Research, October 1979.
(For the Florida Home Builders Association.)

*The Outlook for Residential Construction,* Gainesville, Florida: Bureau of Economic and Business Research, March 1979.
(For the Florida Homebuilders Association.)

(With John Alexander and Carl Feiss} *Largo Prototype Assessment Model,* Gainesville, Florida, April 1979.
(For the Plan Board.)

(With Jerome Milliman) *An Economic Analysis of Growth Management in Sarasota County,* Sarasota, Florida: Contractors Association, November 1978.

(With Jerome Milliman) *Methodology for Assessing the Physical, Economic and Social Tradeoffs Between Increased Economic Development and Enhanced Environmental Quality,* Gainesville, Florida: Bureau of Economic and Business Research, July 1978.
(For the Department of Administration.)

(With Blaine Roberts) *A Comparative Regional Housing Market Analysis of Florida and California,* Gainesville, Florida: Bureau of Economic and Business Research, June 1978.
(For California Federal Savings.)

(With Blaine Roberts)

*A Short-Run Manpower Forecasting Model, Gainesville, Florida:* Bureau of Economic and Business Research,1977

(For the Department of Community Affairs, State of Florida.)

(With Blaine Roberts, Jerome Milliman, and Juan Gonzalez) *Florida Econometric Manpower Simulation Study,* Gainesville, Florida: Bureauof Economic and Business Research, 1976.
(For the Division of State Planning, State of Florida.)

(With Jerome Milliman and Richard Ellson) *Alachua County Econometric Study.* Gainesville, Florida: Bureau of Economic and Business Research, 1976.
(For the Gainesville-Alachua County Regional Utilities Board.)

(With Jerome Milliman and Richard Ellson) *Development of a Methodology for Determining the Need for Vocational and Technical Education in Urban Areas of Florida,* Gainesville, Florida: Bureau of Economic andBusiness Research, 1976.
(For the Florida State Advisory Council on Vocational and Technical Education.)

*The Economic Impacts of the Orlando International Airport,* 1992.(For the Greater Orlando Aviation Authority.)

*Tourism:  How Does It Affect Our Economy?  Fiscal Impacts of Tourism onCentral Florida,* 1996.
(For the Convention and Visitors Bureaus of Orlando/Orange County,Kissimmee/St. Cloud, and Seminole County.)

*The Economic Impact of the Bert Harris, Jr., Private Property Rights Protection Act and the Proposed Property Rights Amendment,* 1998.
(For the Florida Chapter of the American Planning Association.)

*South Carolina Private Property Rights Study:  Economic Impact of H.3591,*1998.
(For the South Carolina Coastal Conservation League, Association ofCounties, and Municipal Association.)


*Proposed 2 AM Liquor Ban Will Damage Miami Beach Economy for Years to Come*, 2021 (For the Miami Herald)

**Exhibit # 5 Analysis of the Number of Households who can Afford Apartments at the Project
By Household Incomes by Race/Ethnicity**

**Disparate Impact Analysis @ 30% AMI**                    **Households with a householder who is White alone, not Hispanic or Latino**

| | | | | $18,280 | $21,920 | $25,320 Three Bedroom |
|---|---|---|---|---|---|---|
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | |
| | | 91,861 | 100% | | | |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | 90% | 90% | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | | | 85% |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | | | |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | | | |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | | | |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | | | |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | | | |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | | | |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | | | |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | | | |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | | | |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | | | |
| $200,000 or more | $200,000 | 7,033 | 8% | | | |

## Disparate Impact Analysis @ 30% AMI

**Households with a householder who is Black or African American alone**

| Total: | Midpoint | Estimate | % of Total | $18,280 One Bedroom | $21,920 Two Bedroom | $25,320 Three Bedroom |
|---|---|---|---|---|---|---|
|  |  | 13,095 | 100% |  |  |  |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | 83% | 83% | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% |  |  | 76% |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% |  |  |  |
| $35,000 to $39,999 | $37,500 | 532 | 4% |  |  |  |
| $40,000 to $44,999 | $42,500 | 370 | 3% |  |  |  |
| $45,000 to $49,999 | $47,500 | 485 | 4% |  |  |  |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% |  |  |  |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% |  |  |  |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% |  |  |  |
| $100,000 to $124,999 | $112,500 | 871 | 7% |  |  |  |
| $125,000 to $149,999 | $137,500 | 511 | 4% |  |  |  |
| $150,000 to $199,999 | $175,000 | 852 | 7% |  |  |  |
| $200,000 or more | $200,000 | 276 | 2% |  |  |  |

**Disparate Impact Analysis @ 60% AMI**     **Households with a householder who is White alone, not Hispanic or Latino**

| Total: | Midpoint | Estimate | % of Total | $34,120 One Bedroom | $36,560.00 Two Bedroom | $43,840.00 Three Bedroom |
|---|---|---|---|---|---|---|
| | | 91,861 | 100% | | | |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | 77% | 77% | N/A |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | | | N/A |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | | | 69% |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | | | |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | | | |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | | | |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | | | |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | | | |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | | | |
| $200,000 or more | $200,000 | 7,033 | 8% | | | |

**Disparate Impact Analysis @ 60% AMI**                          Households with a householder who is Black or African American alone

|  |  |  |  | $34,120 | $36,560 | $43,840 |
|---|---|---|---|---|---|---|
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | Three Bedroom |
|  |  | 13,095 | 100% |  |  |  |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 532 | 4% | 61% | 61% | N/A |
| $40,000 to $44,999 | $42,500 | 370 | 3% |  |  | N/A |
| $45,000 to $49,999 | $47,500 | 485 | 4% |  |  | 55% |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% |  |  |  |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% |  |  |  |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% |  |  |  |
| $100,000 to $124,999 | $112,500 | 871 | 7% |  |  |  |
| $125,000 to $149,999 | $137,500 | 511 | 4% |  |  |  |
| $150,000 to $199,999 | $175,000 | 852 | 7% |  |  |  |
| $200,000 or more | $200,000 | 276 | 2% |  |  |  |

**Disparate Impact Analysis @ 80% AMI**      **Households with a householder who is White alone, not Hispanic or Latino**

| | | | | $48,760 | $58,480 | $67,560 |
|---|---|---|---|---|---|---|
| Total: | Midpoint | Estimate | % of Total | One Bedroom | Two Bedroom | Three Bedroom |
| | | 91,861 | 100% | | | |
| Less than $10,000 | $9,999 | 3,644 | 4% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 2,408 | 3% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 3,559 | 4% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 4,189 | 5% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 4,025 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 3,326 | 4% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 3,574 | 4% | N/A | N/A | N/A |
| $40,000 to $44,999 | $42,500 | 3,393 | 4% | N/A | N/A | N/A |
| $45,000 to $49,999 | $47,500 | 4,086 | 4% | N/A | N/A | N/A |
| $50,000 to $59,999 | $55,000 | 7,183 | 8% | 65% | N/A | N/A |
| $60,000 to $74,999 | $67,500 | 10,002 | 11% | | 57% | N/A |
| $75,000 to $99,999 | $87,500 | 12,050 | 13% | | | 46% |
| $100,000 to $124,999 | $112,500 | 8,851 | 10% | | | |
| $125,000 to $149,999 | $137,500 | 6,993 | 8% | | | |
| $150,000 to $199,999 | $175,000 | 7,545 | 8% | | | |
| $200,000 or more | $200,000 | 7,033 | 8% | | | |

**Disparate Impact Analysis @ 80% AMI**                    Households with a householder who is Black or African American alone

| Total: | Midpoint | Estimate | % of Total | $48,760 One Bedroom | $58,480 Two Bedroom | $67,560 Three Bedroom |
|---|---|---|---|---|---|---|
| | | 13,095 | 100% | | | |
| Less than $10,000 | $9,999 | 597 | 5% | N/A | N/A | N/A |
| $10,000 to $14,999 | $12,500 | 860 | 7% | N/A | N/A | N/A |
| $15,000 to $19,999 | $17,500 | 779 | 6% | N/A | N/A | N/A |
| $20,000 to $24,999 | $22,500 | 933 | 7% | N/A | N/A | N/A |
| $25,000 to $29,999 | $27,500 | 560 | 4% | N/A | N/A | N/A |
| $30,000 to $34,999 | $32,500 | 1,319 | 10% | N/A | N/A | N/A |
| $35,000 to $39,999 | $37,500 | 532 | 4% | N/A | N/A | N/A |
| $40,000 to $44,999 | $42,500 | 370 | 3% | N/A | N/A | N/A |
| $45,000 to $49,999 | $47,500 | 485 | 4% | N/A | N/A | N/A |
| $50,000 to $59,999 | $55,000 | 1,184 | 9% | 51% | N/A | N/A |
| $60,000 to $74,999 | $67,500 | 1,369 | 10% | | 42% | N/A |
| $75,000 to $99,999 | $87,500 | 1,597 | 12% | | | 31% |
| $100,000 to $124,999 | $112,500 | 871 | 7% | | | |
| $125,000 to $149,999 | $137,500 | 511 | 4% | | | |
| $150,000 to $199,999 | $175,000 | 852 | 7% | | | |
| $200,000 or more | $200,000 | 276 | 2% | | | |

## Exhibit #6 Analysis of Disparate Impact

| Disparate Impact Analysis @ 30% AMI | | 1 Bedroom | |
|---|---|---|---|

| 1 Bedroom Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 82,250 | 9,611 | 91,861 |
| Black | 10,859 | 2,236 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 90% | 10% | 100% |
| Black | 83% | 17% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 86% | 14% | 100% |
| Black | 86% | 14% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 79,213 | 12,648 | 91,861 |
| Black | 11,292 | 1,803 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 9,611 | 2,236 |
| Expected | 12,648 | 1,803 |

| | |
|---|---|
| Chi-square (Observed value) | 448.986 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 30% AMI**                    **2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 82,250 | 9,611 | 91,861 |
| Black | 10,859 | 2,236 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 90% | 10% | 100% |
| Black | 83% | 17% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 86% | 14% | 100% |
| Black | 86% | 14% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 79,213 | 12,648 | 91,861 |
| Black | 11,292 | 1,803 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 9,611 | 2,236 |
| Expected | 12,648 | 1,803 |

| | |
|---|---|
| Chi-square (Observed value) | 448.986 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 30% AMI**                    **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 78,061 | 13,800 | 91,861 |
| Black | 9,926 | 3,169 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 85% | 15% | 100% |
| Black | 76% | 24% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 80% | 20% | 100% |
| Black | 80% | 20% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 73,846 | 18,015 | 91,861 |
| Black | 10,527 | 2,568 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 13,800 | 3,169 |
| Expected | 18,015 | 2,568 |

| | |
|---|---|
| Chi-square (Observed value) | 505.655 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

| **Disparate Impact Analysis @ 60% AMI** | | **1 Bedroom** | |
|---|---|---|---|

1 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 70,710 | 21,151 | 91,861 |
| Black | 8,047 | 5,048 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 77% | 23% | 100% |
| Black | 61% | 39% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 69% | 31% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,580 | 28,281 | 91,861 |
| Black | 9,063 | 4,032 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 21,151 | 5,048 |
| Expected | 28,281 | 4,032 |

| Chi-square (Observed value) | 738.957 |
|---|---|
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 60% AMI**　　　　　**2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 70,710 | 21,151 | 91,861 |
| Black | 8,047 | 5,048 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 77% | 23% | 100% |
| Black | 61% | 39% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 69% | 31% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,580 | 28,281 | 91,861 |
| Black | 9,063 | 4,032 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 21,151 | 5,048 |
| Expected | 28,281 | 4,032 |

| | |
|---|---|
| Chi-square (Observed value) | 738.957 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 60% AMI**                          **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 63,743 | 28,118 | 91,861 |
| Black | 4,107 | 8,988 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 69% | 31% | 100% |
| Black | 31% | 69% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 50% | 50% | 100% |
| Black | 50% | 50% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 46,277 | 45,584 | 91,861 |
| Black | 6,597 | 6,498 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 28,118 | 8,988 |
| Expected | 45,584 | 6,498 |

| | |
|---|---|
| Chi-square (Observed value) | 3684.697 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**

**1
Bedroom**

1 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 59,657 | 32,204 | 91,861 |
| Black | 6,660 | 6,435 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 65% | 35% | 100% |
| Black | 51% | 49% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 58% | 42% | 100% |
| Black | 58% | 42% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 53,188 | 38,673 | 91,861 |
| Black | 7,582 | 5,513 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 32,204 | 6,435 |
| Expected | 38,673 | 5,513 |

| Chi-square (Observed value) | 585.373 |
|---|---|
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**                    **2 Bedroom**

2 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 52,474 | 39,387 | 91,861 |
| Black | 5,476 | 7,619 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 57% | 43% | 100% |
| Black | 42% | 58% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 49% | 51% | 100% |
| Black | 49% | 51% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 45,444 | 46,417 | 91,861 |
| Black | 6,478 | 6,617 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 39,387 | 7,619 |
| Expected | 46,417 | 6,617 |

| | |
|---|---|
| Chi-square (Observed value) | 547.870 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Disparate Impact Analysis @ 80% AMI**                    **3 Bedroom**

3 Bedroom

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 42,472 | 49,389 | 91,861 |
| Black | 4,107 | 8,988 | 13,095 |

| Observed | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 46% | 54% | 100% |
| Black | 31% | 69% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 39% | 61% | 100% |
| Black | 39% | 61% | 100% |

| Expected if No Disparate | Yes Afford | No Afford | Total |
|---|---|---|---|
| White | 35,641 | 56,220 | 91,861 |
| Black | 5,081 | 8,014 | 13,095 |

| Cannot Afford | White | Black |
|---|---|---|
| Observed | 49,389 | 8,988 |
| Expected | 56,220 | 8,014 |

| | |
|---|---|
| Chi-square (Observed value) | 398.376 |
| Chi-square (Critical value) | 3.841 |
| DF | 1 |
| p-value | **<0.0001** |
| alpha | 0.05 |

**Exhibit #7 Analysis of Margin of Error**

## Margin of Error Analysis

| Disparate Impact Analysis<br>@ 30% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 10% | 10% | 15% |
| % Black Cannot Afford | 17% | 17% | 24% |
| SE White | 0.035 | 0.035 | 0.029 |
| SE Black | 0.087 | 0.087 | 0.073 |
| | | | |
| Test Score | 0.71 | 0.71 | 1.17 |
| Z Score | 52% | 52% | 76% |

| Disparate Impact Analysis<br>@ 60% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 23% | 23% | 31% |
| % Black Cannot Afford | 39% | 39% | 69% |
| SE White | 0.022 | 0.022 | 0.019 |
| SE Black | 0.058 | 0.058 | 0.050 |
| | | | |
| Test Score | 1.67 | 1.67 | 4.83 |
| Z Score | 91% | 91% | 99% |

| Disparate Impact Analysis<br>@ 80% AMI | 1 Bedroom | 2 Bedroom | 3 Bedroom |
|---|---|---|---|
| % White Cannot Afford | 35% | 43% | 54% |
| % Black Cannot Afford | 49% | 58% | 69% |
| SE White | 0.017 | 0.016 | 0.014 |
| SE Black | 0.048 | 0.044 | 0.040 |
| | | | |
| Test Score | 1.51 | 1.64 | 1.89 |
| Z Score | 87% | 90% | 94% |

**Exhibit #7 Analysis of the Statistical Significance of Differences in Affordability for White and Black Households in the Relevant Market**

**White Only Households**

| 30% AMI | Midpoint of Range | % Cannot Afford | Count | % MOE | Standard Error |
|---|---|---|---|---|---|
| 1 BR | $18,280 | 10% | 9,611 | 0.0837831 | 0.050778 |
| 2 BR | $21,920 | 10% | 9,611 | 0.0837831 | 0.050778 |
| 3 BR | $25,320 | 15% | 13,800 | 0.0682456 | 0.041361 |
| 60% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $34,120 | 23% | 21,151 | 0.0535702 | 0.032467 |
| 2 BR | $36,560 | 23% | 21,151 | 0.0535702 | 0.032467 |
| 3 BR | $43,840 | 31% | 28,118 | 0.0455840 | 0.027627 |
| 80% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $48,760 | 35% | 32,204 | 0.0422086 | 0.025581 |
| 2 BR | $58,480 | 43% | 39,387 | 0.0376549 | 0.022821 |
| 3 BR | $67,560 | 54% | 49,389 | 0.0331206 | 0.020073 |

**Black Households**

| 30% AMI | Midpoint of Range | % Cannot Afford | Count | % MOE | Standard Error |
|---|---|---|---|---|---|
| 1 BR | $18,280 | 17% | 2,236 | 0.1915295 | 0.116078 |
| 2 BR | $21,920 | 17% | 2,236 | 0.1915295 | 0.116078 |
| 3 BR | $25,320 | 24% | 3,169 | 0.1571677 | 0.095253 |
| | | | | | |
| 60% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $34,120 | 39% | 5,048 | 0.1207029 | 0.073153 |
| 2 BR | $36,560 | 39% | 5,048 | 0.1207029 | 0.073153 |
| 3 BR | $43,840 | 45% | 5,950 | 0.1099601 | 0.066642 |
| | | | | | |
| 80% AMI | | % Cannot Afford | Count | % MOE | Standard Error |
| 1 BR | $48,760 | 49% | 6,435 | 0.1051815 | 0.063746 |
| 2 BR | $58,480 | 58% | 7,619 | 0.0955763 | 0.057925 |
| 3 BR | $67,560 | 69% | 8,988 | 0.0870280 | 0.052744 |