UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


Case No. 6:23-CV-02473-CEM-DCI

ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited
liability partnership;
CANTON CONSTRUCTION, LLC,
A Florida limited liability
corporation, CONCORD
MANAGEMENT, LTD., a Florida
limited partnership; THE
VENUE AT HERITAGE OAKS
PARTNERS, LTD.,

        Plaintiffs,

v.

BREVARD COUNTY, a political
subdivision of the state of
Florida,

        Defendant.
_____/


VIDEOTAPED DEPOSITION OF JONATHAN THOMAS

Pages 1 through 99

February 4, 2025

2:34 p.m. - 4:58 p.m.

Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Orlando, Florida 32801



Stenographically Reported By:


REGINA TOPPINS
FLORIDA COURT REPORTER

Exhibit P

Jonathan Thomas
February 04, 2025

---

**Page 2**

1        APPEARANCES
2  On Behalf of the Plaintiffs:
3        LOWNDES, DROSDICK, DOSTER, KANTOR & REED, P.A.
         215 North Eola Drive
4        Orlando, Florida 32801
         (407)843-4600
5        rebecca.rhoden@lowndes-law.com
         BY:  REBECCA E. RHODEN, ESQUIRE
6
7  On Behalf of the Defendant:
8        ROPER, TOWNSEND, SUTPHEN, P.A.
         255 South Orange Avenue
9        Suite 750
         Orlando, Florida 32801
10       (407)897-5150
         sgainey@roperpa.com
11       BY:  SUSAN G. GAINEY, ESQUIRE
12
   Also Present:
13
         Jeffrey Jin - Videographer
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              INDEX OF PROCEEDINGS
2
   Videotaped Deposition of JONATHAN THOMAS        Page
3
   Direct Examination by Ms. Gainey                   5
4  Certificate of Oath                               96
   Certificate of Reporter                           97
5  Errata Sheet                                      98
   Witness Notification Letter                       99
6
7              INDEX TO EXHIBITS
8
   DEFENDANT'S EXHIBITS:
9
   MARKED    DESCRIPTION                           PAGE
10
   Exhibit A  Subpoena Duces Tecum And Amended Notice
11            Of Taking Video Deposition of Jonathan
              Thomas.............................    8
12            E-mail, Bates stamped 000001-000017..  8
              E-mail, Bates stamped 000018-000057..  8
13            E-mail, Bates stamped 000058-000064..  8
              E-mail, Bates stamped 000065-000068..  8
14            E-mail, Bates stamped 000069-000070..  8
              E-mail, Bates stamped 000071-000076..  8
15            E-mail, Bates stamped 000077-000078..  8
              E-mail, Bates stamped 000079-000080..  8
16            E-mail, Bates stamped 000081-000082..  8
              E-mail, Bates stamped 000083-000085..  8
17            E-mail, Bates stamped 000086-000088..  8
              E-mail, Bates stamped 000089-000092..  8
18            E-mail, Bates stamped 000093-000095..  8
              E-mail, Bates stamped 000096-000105..  8
19            E-mail, Bates stamped 000106-000121..  8
              E-mail, Bates stamped 000122..........  8
20            E-mail, Bates stamped 000123-000126..  8
              E-mail, Bates stamped 000127..........  8
21            E-mail, Bates stamped 000128..........  8
              E-mail, Bates stamped 000130-000129..  8
22            E-mail, Bates stamped 000131-000136..  8
              E-mail, Bates stamped 000137-000139..  8
23            E-mail, Bates stamped 000140-000141..  8
              E-mail, Bates stamped 000142..........  8
24            E-mail, Bates stamped 000143-000151..  8
25  (Continued on next page)

---

**Page 4**

1  EXHIBITS:  (Continued)
2  DEFENDANT'S EXHIBITS:
3  MARKED    DESCRIPTION                           PAGE
4  Exhibit A  E-mail, Bates stamped 000152-000166.....  8
              E-mail, Bates stamped 000167-000171.....  8
5  Exhibit B  Handwritten Note......................  95
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 5**

1           Deposition taken before Regina Toppins, Florida Court
2  Reporter and Notary Public in and for the State of
3  Florida at Large in the above cause.
4
5           VIDEOGRAPHER:  We are on the record at 2:32
6  p.m., on February 4th, 2025.  Audio and video
7  recording will continue to take place until all
8  parties agree to go off the record.  Please note that
9  the microphones are sensitive and may pick up
10  whispering and private conversations.  This is the
11  video-recorded proceeding of Jonathan Thomas taken in
12  the matter of Atlantic Housing Partners, L.L.L.P.
13  versus Brevard County, filed in Orange County,
14  Florida.  This proceeding is being held at 215 North
15  Eola Drive, Orlando, Florida 32801.
16           My name is Jeffrey Jin.  I am the
17  videographer on behalf of U.S. Legal Support, located
18  Houston, Texas 77060.  I am not related to any party
19  in this action, nor am I financially interested in the
20  outcome.  The court reporter is Regina Toppins on
21  behalf of U.S. Legal Support.
22           Counsel will state their appearances for the
23  record, after which the court reporter will proceed.
24           MS. RHODEN:  Rebecca Rhoden, on behalf of
25  Plaintiffs.

---

Jonathan Thomas
February 04, 2025

Page 6

1          MS. GAINEY:  Susan Gainey, on behalf of the
2    Defendants, Brevard County.
3          THE COURT REPORTER:  Do you solemnly swear
4    that the testimony you are about to offer concerning
5    the cause herein under consideration shall be the
6    truth, the whole truth and nothing but the truth so
7    help you God?
8          THE WITNESS:  I do.
9    THEREUPON,
10              JONATHAN THOMAS
11    having been first duly sworn, was examined and testified
12    as follows:
13              DIRECT EXAMINATION
14    BY MS. GAINEY:
15       Q.  Mr. Thomas, please state and spell your name for
16    the record.
17       A.  Jonathan Thomas; J-O-N-A-T-H-A-N, Thomas,
18    T-H-O-M-A-S.
19       Q.  And you understand, Mr. Thomas, you are here
20    pursuant to the subpoena that was issued to the
21    attorneys that represent the Plaintiffs in this lawsuit?
22       A.  I do.
23       Q.  And I understand that you have brought some
24    documents in response to the Subpoena Duces Tecum that
25    was issued?

Page 7

1       A.  Yes.
2       Q.  And are those documents in front of you?
3       A.  Yes.
4       Q.  All right, I'm going to show you what we'll mark
5    as Deposition Exhibit A, and ask you if that's a copy of
6    the subpoena received in this lawsuit?
7          Just in fairness, have you seen that document
8    before?
9       A.  It looks familiar in terms of exact language I
10    assume it is.
11       Q.  So, on the last page there is an exhibit that
12    asks for specific materials.  Have you seen that exhibit
13    before?
14       A.  Yes.
15       Q.  And the documents that you brought here today,
16    are those documents that are in response to Exhibit A to
17    this Subpoena Duces Tecum?
18       A.  Yes.
19       Q.  And do the documents that you brought here with
20    you today represent all the documents in response to the
21    Subpoena Duces Tecum?
22       A.  Yes.
23       Q.  Are you in the process of gathering additional
24    documents or information in response to the subpoena?
25       A.  No.

Page 8

1       Q.  So, the documents that you have here with you
2    today, they are inclusive of all the documents that
3    would be responsive to the subpoena?
4       A.  Yes.
5       Q.  Okay.  We'll mark both the subpoena and the
6    documents that you brought with you today as Exhibit A.
7          (The referred to documents were marked for
8    identification as Defendant's Exhibit No. A.)
9       Q.  Sir, who do you work for?
10       A.  Concord Management.
11       Q.  And how long have you worked for Concord
12    Management?
13       A.  Very late 2010 is when I joined them.
14       Q.  What is your title there if you have one?
15       A.  President.
16       Q.  And how long have you been president?
17       A.  I believe 2019.
18       Q.  Do you understand that Concord Management is a
19    party in a lawsuit that's been filed against Brevard
20    County?
21       A.  Yes.
22       Q.  And you understand that I will be asking you
23    questions regarding that lawsuit here today?
24       A.  Yes.
25       Q.  You understand that I'm an attorney and you are

Page 9

1    under oath to testify fully and completely here today?
2       A.  Yes.
3       Q.  Have you ever given a deposition before?
4       A.  I've not.
5       Q.  Welcome to the club.
6       A.  Thank you.
7       Q.  I'm sure that your attorney's very good.  I'm
8    sure that she explained some ground rules to you, but
9    let me just briefly go over some things.  If you answer
10    my question, I'm going to assume you understood what I
11    was asking you; is that fair?
12       A.  Yes.
13       Q.  I've been known to ask bad questions or confusing
14    questions.  So, if I do that, just ask me to clarify,
15    all right?
16       A.  Yes.
17       Q.  If there's something you don't know or you don't
18    remember, please just let me know.
19       A.  Okay.
20       Q.  The purpose of today is really just to find out
21    what you do know, what you remember, and if there's
22    something you don't, just tell me that.
23       A.  Okay.
24       Q.  Sometimes we, as we continue the deposition, may
25    have a tendency to engage in conversation and talk over

Jonathan Thomas
February 04, 2025

Page 10

1    each other.  I will do my very best not to do that.  I
2    ask you to do the same so that, Regina, our wonderful
3    court reporter, can accurately take down everything
4    we're saying.
5        A.  I will endeavor to reciprocate.
6        Q.  Okay.  Do you hold any degrees?
7        A.  Yes.
8        Q.  What degrees do you hold?
9        A.  I have an undergraduate degree and a Master's
10   degree.
11       Q.  What is your undergraduate degree in?
12       A.  A double major in finance and real estate.
13       Q.  Where did you go to school?
14       A.  Undergraduate, Cal State Northridge.
15       Q.  And graduate?
16       A.  University of Florida.
17       Q.  What is your graduate degree?
18       A.  Real estate.
19       Q.  And is that a Master's in real estate?
20       A.  It is.
21       Q.  When did you obtain your Master's degree?
22       A.  2007.
23       Q.  And that was Florida State?
24       A.  University of Florida.
25       Q.  Excuse me.  I'm so sorry.  I know that's a sin in

Page 11

1    this state?
2            MS. RHODEN:  I was a little insulted.
3    BY MS. GAINEY:
4        Q.  University of Florida.
5        A.  A tinge of pain.  Yes.
6        Q.  And do you hold any other degrees?
7        A.  I do not.
8        Q.  And told me that you started working for Concord
9    management in 2010 I believe you said?
10       A.  Yes.
11       Q.  And you've been the president since 2019?
12       A.  Yes.
13       Q.  Between 2010 and 2019 tell me about what titles
14   you had, what duties you had?
15       A.  I started in an asset management capacity that
16   evolved into positions of increased responsibility that
17   included oversight over operations.  So, expanded
18   responsibility of beyond just on the analytical side.
19       Q.  Do you need a drink?
20       A.  I have one.  Thank you, though.
21       Q.  Since you became president in 2019, what are your
22   duties as president?
23       A.  So, I have oversights over not only what I was
24   doing before, but also all support departments, which
25   includes IT, compliance, accounting.

Page 12

1        Q.  Any other general duties?  I understand you have
2    probably a lot.
3        A.  That's right, and then operation continues.
4        Q.  Do your duties include rendering opinions or
5    having input as to affordable housing developments,
6    specifically which developments to pursue, or the
7    location of those developments?
8        A.  Occasionally.
9        Q.  This case in particular you understand that we're
10   here because of a proposed affordable housing
11   development known as Venue at Heritage Oaks?
12       A.  Yes.
13       Q.  At Heritage Oaks, excuse me.  And what, if any,
14   input did you have regarding the selection of location
15   for that proposed development?
16       A.  I recall somebody posing the question if I liked
17   that site.
18       Q.  Do you know who?
19       A.  I do not recall.
20       Q.  Is there someone that generally asks you those
21   questions?  I understand there's three principals to
22   Atlantic Housing; is that a fair understanding?
23       A.  Yes.
24       Q.  All right.  Is it Scott, Paul, or someone else
25   that normally asks you if you --

Page 13

1        A.  It would be either Scott, Mike, likely not Paul,
2    perhaps Dean Price, who I believe is an employee.  Not
3    when I say I believe he's an employee as opposed to a
4    partner.
5        Q.  All right.  You understand that there is four
6    plaintiffs in this lawsuit; do you?
7        A.  I don't.
8        Q.  I'm going to purport to you that there's four
9    plaintiffs in this lawsuit and I understand they're all
10   closely related.  It's Atlantic Housing Partners, LLLP,
11   Canton Construction, LLC, Concord Management, LTD., and
12   Venue At Heritage Oaks Partners, LTD.
13       A.  Okay.
14       Q.  And so, my question is going to be that obviously
15   Concord Management, LTD. Is your employer; is that right
16   or not?
17       A.  Yes.
18       Q.  And I understand from the prior deposition that
19   Concord Rents is a d/b/a of Concord Management, LTD.?
20       A.  Correct.
21       Q.  A lot of alphabets, letters going on here so you
22   correct me if I'm wrong on any of this.
23           Have you ever been employed for Atlantic Housing
24   Partners, LLLP?
25       A.  No.

Jonathan Thomas
February 04, 2025

Page 14

1    Q.  Have you ever been employed for construction --
2    excuse me, Canton Construction, LLC?
3    A.  No.
4    Q.  Have you ever been employed for Venue At Heritage
5    Oaks Partners, LTD.?
6    A.  No.
7    Q.  All right.  Do you know Atlantic Housing Partners
8    is, though?
9    A.  Yes.
10   Q.  And what's your understanding as to who they are?
11   A.  They own the management company and they are also
12   a development entity.
13   Q.  And do you have an understanding as to who Canton
14   Construction is?
15   A.  Less so.  Vaguely.
16   Q.  And what is your vague understanding?
17   A.  That they are an affiliated general contractor.
18   Q.  And do you have any understanding as to who Venue
19   At Heritage Oaks Partners, LTD. is?
20   A.  Not specifically.
21   Q.  All right.  Going back to your testimony, you
22   said that you had a recall of someone posing the
23   question to you as to if you liked the location; did I
24   understand that correctly?
25   A.  Yes.

Page 15

1    Q.  And I think you said you don't necessarily
2    remember who asked that question?
3    A.  Correct.
4    Q.  What else, if anything, do you remember about
5    discussions regarding the location at Venue At Heritage
6    Oaks?
7    A.  I don't recall specifically for Venue At Heritage
8    Oaks.  I am often presented with questions on various
9    sites, so I can't comment in terms of what specific
10   questions might have been asked.
11   Q.  And can you just generally tell me, you know,
12   what's your area of expertise as to why you're being
13   asked about sites?
14   A.  Having the responsibility that I have with the
15   management company, I have the pure joy of being able to
16   speak to other sites and experiences at other locations,
17   and if we have pleasant experiences in a particular
18   area, that would -- it would be a logical to assume that
19   another site close by we might have a similar experience
20   with.
21   Q.  So, I'm hearing you to say that based on your
22   experience and -- and education and knowledge of
23   specific areas, that your input is really what -- what
24   the experience has been for Concord Management in that
25   area; is that generally right?

Page 16

1    A.  Yes.
2    Q.  Okay.  And as to this specific proposed
3    development, what did you say regarding the area?
4    A.  I'm going speak generally.  Brevard County, we
5    have had pleasant experience with strong occupancy, and
6    when we have struggled in other markets Brevard has
7    really remained a staple, so I would have spoken along
8    those lines.
9    Q.  Can you provide any specifics as to what you mean
10   when you say you've had a pleasant experience?
11   A.  Strong occupancy and achieving mass allowable
12   rents on our other Brevard properties.
13   Q.  What Brevard properties does Concord Management
14   manage?
15   A.  So, we have Malabar, we have are Wickham Club,
16   and we have Venue at Viera.
17   Q.  And are you in charge of each of those
18   properties?
19   A.  I have responsibility over the team that has
20   direct oversight over those properties.
21   Q.  I think there's another property.  Is it Hammond?
22   A.  Oh, yes, yes.
23   Q.  You're responsible for that property as well?
24   A.  Correct, Hammock Harbor.
25   Q.  Hammock Harbor.

Page 17

1    Any other Brevard County properties that Concord
2    Management is responsible for?
3    A.  No, that would be it.  And that's embarrassing
4    that I forgot about Hammock.
5    Q.  We won't tell anybody.
6    A.  Thank you.
7         MS. RHODEN:  It's not like you're being
8    videoed.
9         MS. GAINEY:  You're not being recorded,
10   you're not being videoed.  It just stays in this room,
11   don't worry.
12        THE WITNESS:  This is Youtube later.
13        MS. RHODEN:  I'm texting it now.
14        THE WITNESS:  Thank you.
15   BY MS. GAINEY:
16   Q.  All right, when you say strong occupancy, tell me
17   what you mean by that.
18   A.  So, every week I look at the occupancy for all of
19   our properties, and so, relationally it's great insight
20   to be able see, as I mentioned earlier, when a
21   particular region is struggling and another region
22   maintains strong occupancy throughout that period.  That
23   lends support to, hey, if there's some macro economic
24   forces that are causing some softness in a particular
25   area while another area seems to be immune to that, that

Jonathan Thomas
February 04, 2025

Page 18

1  is one of the first things that I would look at.
2      Q.  Are any of the four properties that you manage in
3  Brevard County struggling?
4      A.  No.
5          MS. RHODEN:  Object to form.
6  BY MS. GAINEY:
7      Q.  What is the occupancy currently for Malabar?
8      A.  I do not recall the specific occupants.
9      Q.  Ballpark it for me if you know.
10     A.  98 or better percent.
11     Q.  Would that have been the case in 2023?
12     A.  It would likely be even stronger in 2023.
13     Q.  And why would that have been the case?
14     A.  Starting probably late second quarter, middle of
15  the second quarter of 2024, we had started to experience
16  some softness from an occupancy perspective on a lot of
17  our properties, some more so than others.  So, I believe
18  that that occupancy declined in starting middle to maybe
19  late 2024 on all of our properties.
20     Q.  And I'm assuming that part of your duties is to
21  track the occupancy of all of the companies, or, excuse
22  me, the properties that you manage?
23     A.  Yes.
24     Q.  And that's an internal dataset that you keep as
25  part of your course of business?

Page 19

1      A.  Yes.
2      Q.  And how often do you run those numbers:  Daily,
3  weekly, monthly?
4      A.  It's weekly.
5      Q.  And do you have an explanation as to why you
6  experienced some softness in 2024?
7      A.  Florida.  It's more of a Florida or a national
8  story.  A largely driven by supply coming online where
9  there was significant increase in permits pulled
10  starting in 2022ish.  And so, as those properties
11  started to come online, it was really 2023, early 2024.
12     Q.  What do you mean when you say increase in
13  permits, significant increase in permits?
14     A.  So, permit, in order to build a property you have
15  to first have a permit.  So, permit is a leading
16  indicator as to a property being built.  And so, when
17  you track permit data, you start to see a significant
18  increase.  It's really a COVID story.  A significant
19  increase in permit volume and there was immense
20  multifamily deliveries in most MSA's throughout Florida,
21  and a lot of the country, and that was really late 2023
22  and throughout 2024 that those started to come online.
23     Q.  So, if I'm understanding, if I'm understanding
24  you correctly, you're saying that an increase in permits
25  means that there's more developments in the county?

Page 20

1      A.  In the area, yes.
2      Q.  And is that something you track as part of your
3  course of business, the number of permits that are being
4  pulled?
5      A.  More so out of curiosity because it makes me more
6  effective in my role, but it's not anything I report on.
7      Q.  When was the last time you did the analysis of
8  the permits for Brevard County?
9      A.  Never specifically for Brevard.
10     Q.  All right.  I may have not asked that correctly.
11  When you say you're pulling permits, are you doing it by
12  county, or area, or --
13     A.  It's, I believe, it's just Orlando MSA.
14     Q.  And explain what you mean when you say Orlando
15  MSA.
16     A.  The metropolitan statistical area.  It's a
17  predetermined definition of regions.
18     Q.  All right.  So, when you're looking at that data,
19  it's not specific to Brevard County, for example, it's
20  Orlando and the surrounding areas?
21     A.  Correct.
22     Q.  And when was the last time you looked at that
23  data?
24     A.  I don't recall.  Probably late last year.
25     Q.  So.

Page 21

1      A.  So, in the last three, four months.
2      Q.  Just in layman's terms, I hear you saying that
3  since 2024 there has been an increase in available
4  properties in the Orlando MSA; is that correct?
5      A.  Correct.
6      Q.  And are you searching specifically for affordable
7  housing properties, or just all properties in general?
8      A.  All properties.
9      Q.  Is there any data that you review regarding
10  specifically affordable housing properties?
11     A.  A resource I've used in the past is Florida
12  Housing.  They publish occupancy reports, and that gives
13  me a glimpse as to other affordable properties and how
14  they're doing from what they're reporting in Florida
15  Housing in terms of occupancy.
16     Q.  And when was the last time you pulled Florida
17  Housing occupancy reports?
18     A.  Also within the last four, maybe five months.
19     Q.  And what was your impression as to the numbers
20  when you last pulled the Florida Housing occupancy
21  reports?
22     A.  Vague recollection of fairly consistent declines
23  in occupancy.
24     Q.  And what does that mean to you?
25     A.  I don't understand the question.

Jonathan Thomas
February 04, 2025

Page 22

1    Q.  Well, fairly consistent declines in occupancy,
2  meaning, less tenants are occupying affordable housing?
3    A.  Yes.
4    Q.  And how is that significant to you?  What does it
5  mean to you?
6    A.  It's simply an indicator that tells me property
7  was performing at these occupancy levels and all of a
8  sudden they're performing below those levels.
9    Q.  And do you have any sense as to why that is the
10  case?
11    A.  An assumption.  Just that it is also a result of
12  more product and more options for people to live.
13    Q.  The Florida Housing occupancy reports, are they
14  by county or by area?
15    A.  State of Florida, but you can filter by county,
16  city, I believe.  So, you can parse data.
17    Q.  Do your duties include only Brevard County, or is
18  it Orlando MSA, or multiple counties?
19    A.  My duties --
20    Q.  As the president?
21    A.  -- overall?
22    Q.  Yes?
23    A.  Our entire portfolio.  State of Florida.
24    Q.  You were anticipating my question.
25        I understand that Concord Management has

Page 23

1  properties all over the State of Florida, correct?
2    A.  Correct.
3    Q.  And so, your duties are to monitor and supervise
4  and be responsible for those properties all over the
5  State of Florida?
6    A.  Yes.
7    Q.  I was asking you about the occupancy of -- I
8  won't ask you about all the properties in the State of
9  Florida.  I want to limit it to, of course, Brevard
10  County.  For Wickham Club, when's the last time you
11  pulled the occupancy rates for Wickham Club?  What was
12  it if you recall?
13    A.  I don't recall.
14    Q.  Would that have been in the 98% range similar to
15  Malabar?
16    A.  I'd rather be able to look at the data.
17    Q.  So, what I want to ask you is that my impression
18  from your testimony was that Brevard County generally
19  performs fairly well; is that a correct?
20    A.  Correct impression.
21    Q.  So, at what level do you consider a property
22  performing well?  Like, what occupancy percentage level?
23    A.  It's not that binary where I would just look at
24  over 98, it's great; under 98, not so great.  It's more
25  so consistent performance and, again, relationally how

Page 24

1  other regions are doing.  If I see like as I'm stating
2  with Florida Housing, when I'm generally seeing
3  declining occupancy as I'm looking at other market rate
4  communities, I see more with concessions.  I interact
5  with colleagues of other companies and they tell me
6  they're war stories with softness.  And so, if there's a
7  particular region that has defined those odds, Brevard
8  being one of our stronger regions, that's -- that just
9  stands out to me.
10    Q.  So, although you have no specific recollection as
11  to what the occupancy was for Wickham Club, if I wanted
12  to find that out, where would I look?
13    A.  I could pull a report.
14    Q.  So, you just have essentially at your fingertips
15  where you run reports?
16    A.  Correct.
17    Q.  And that would be the case for all the Brevard
18  properties?
19    A.  That's correct.
20    Q.  And when you last looked at the Wickham Club
21  occupancy rate, nothing stood out to you as bad or --
22    A.  Alarming.
23    Q.  -- alarming?
24    A.  No.
25    Q.  What about Venue At Viera, what was the occupancy

Page 25

1  rate for Venue At Viera the last time you looked at it?
2    A.  I don't recall.
3    Q.  Was it in the 90 -- 90s?
4    A.  Absolutely in the 90s, yes.
5    Q.  Did you notice, although you may not recall the
6  specific numbers, did you notice any type of decline at
7  Venue At Viera?
8    A.  No.
9    Q.  Did you notice an increase at Venue At Viera?
10    A.  No.
11    Q.  Does Venue At Viera consistently stay about the
12  same?
13    A.  Yes.
14    Q.  Is that the case for Wickham Club also?
15    A.  Yes.
16    Q.  Is that the case for Malabar?
17    A.  Yes.
18    Q.  Same question as it relates to Hammock Harbor.
19  When you last looked at the occupancy numbers, what were
20  the Hammock Harbor occupancy numbers?
21    A.  I don't recall.
22    Q.  Did it -- was there anything alarming or any
23  change that you noted when you last looked at it?
24    A.  No.
25    Q.  Does Hammock Harbor occupancy rate generally stay

Page 26

1 about the same?

2    A. Yes.

3    Q. Is there someone on your team that is responsible
4 specifically for Brevard County?

5    A. No.  Can you clarify that question like?

6    Q. Yeah.  I understand that you are responsible
7 basically for all of Florida.  And so, my question is,
8 is your team divided up such that a specific person is
9 responsible for Brevard and Seminole, or is responsible
10 for Orange?

11    A. Got it.  So, from an operations perspective, no,
12 we do not bifurcate by county.

13    Q. There are a couple names that I've seen in the
14 documents and I think they work for Concord Rents, James
15 Fenton?

16    A. Yes.

17    Q. All right.  Tell me who James Fenton is?

18    A. So, James leads our Reporting Division.  So,
19 business analytics and reports.

20    Q. And why do you need reporting division like who
21 are you reporting to?

22    A. Well, produce reports for making decisions for
23 getting information really to do our jobs.

24    Q. So, you're talking about internal reports?

25    A. Yes.

Page 27

1    Q. And what's James's title; do you know?

2    A. I don't.

3    Q. It's okay, but you know that he's -- he's the
4 reports guy?

5    A. He's our lead reporting guy, yeah.

6    Q. And in this case in particular, did James pull
7 any reports?

8    A. Yes.

9    Q. And tell me what James did?

10    A. When I was looking through trying to pull this
11 information together, I asked him to provide me some
12 data on Brevard County for race and ethnicity of our
13 residents in those properties.

14    Q. And did you just recently do that?

15    A. No.

16    Q. When did you do it?

17    A. I believe it was a couple years ago.

18    Q. And what did you do with that, with those
19 reports?

20    A. I provided it to the Scott Culp.

21    Q. Is Scott the one that asked you to do it?

22    A. Yes.

23    Q. And understand -- I'm understanding you to say
24 that Scott asked you to pull some reports, you then
25 asked James to do the reports?

Page 28

1    A. Yes.

2    Q. And did you review the reports after James pulled
3 them?

4    A. I did.

5    Q. And what, if anything, do you remember about
6 those reports?

7    A. I recall, so, when I gave James the direction, I
8 wanted to make sure that he captured race, as well as
9 ethnicity.  And so, I wanted to make sure that the
10 reports did incorporate that and I recall that it did.

11    Q. What's the difference between race and ethnicity?

12    A. Ethnicity is more Hispanic or non-Hispanic would
13 be an example of what I would look for.

14    Q. And what data do you collect from residents in
15 order to have that information available to you?  Let me
16 ask you this way:  How do you get that information from
17 the residents?

18    A. So, I don't know if this is a HUD requirement or
19 a Florida Housing, I believe it's a HUD requirement
20 where when a household is moving in on the affordable,
21 into an affordable unit, we have a form that is
22 voluntary for them to fill out, which includes race,
23 ethnicity, and there's some other information on that
24 form such as household composition, how many other
25 people are in the household, age, and that form is the

Page 29

1 Tenant Income Certification.

2    Q. And you said that the form is voluntary?

3    A. Providing race and ethnicity is voluntary.  I --
4 I recall there's an option they can check that states
5 they do not wish to provide.  I believe they have to
6 sign the form, nonetheless, though.

7    Q. So, you didn't necessarily mean that providing
8 their income was voluntary?

9    A. So, that is on a different part of the form.  So,
10 this is a separate form that's part of that process.  I
11 can't remember the name of that form, though, but we do
12 need their incomes.

13    Q. So, does Concord Management track applicants'
14 race and ethnicity, or just tenants?

15       MS. RHODEN:  Object to form.

16 BY MS. GAINEY:

17    Q. Let me ask differently because I want to make
18 sure that I'm asking it right.  When someone comes in to
19 apply to live at one of Concord Management's properties,
20 the application they fill out, does it request what the
21 race or ethnicity is?

22    A. No.

23    Q. And so, the data that you're referring to, is
24 that -- where do you get that data as far as race and
25 ethnicity specifically?

Jonathan Thomas
February 04, 2025

Page 30

1    A. We don't get it from applicants. It's those that
2  are moving in.
3    Q. So, can you just kind of walk me through the
4  process of a potential tenant in Brevard County, what
5  paperwork they have to complete?
6    A. After they're approved to move in?
7    Q. No, before. Like, I come to your property and I
8  say, hey, I want to rent a one-bedroom apartment. What
9  does your team give to me?
10    A. Okay. So, you'd have to provide us your income,
11  your, name, Social Security number. We do a credit and
12  criminal background check. Once you pass those, we
13  start gathering all the information, documentation such
14  as pay stubs, bank statements to make sure there's no
15  inconsistent transactions, deposits into your bank
16  account that would be an indication of gig employment
17  like Uber driver. If we do see that, our application
18  team will have more questions surrounding that so you
19  can clarify.
20        That's all to make a determination as to if you
21  income qualify or not. If you do income qualify, we
22  will approve you, and then we would proceed to the
23  move-in process based off of your preferred move-in
24  date.
25    Q. So, at what point in the process from the time a

Page 31

1  potential applicant walks in the door, or, you know,
2  online? I understand that not everybody walks in the
3  door anymore these days. At what point are they asked
4  to provide their -- voluntarily, provide their race or
5  ethnicity?
6    A. I believe we don't do it until we know that
7  you're moving in. I just don't recall if it's right
8  before you move in, or if it's right after you move in.
9    Q. And what's the name of the document as best you
10  know that asks that question?
11    A. So, it's part of the Tenant Income Certification.
12  And I don't know if this is a section on that form, or
13  if this is a separate form itself that has the race, or
14  a section of that process that has the race and
15  ethnicity.
16    Q. So, if a perspective tenant does not complete
17  that form or that section, which ever it may be, does
18  your team follow-up with that, ask them to complete your
19  race and ethnicity, or basically just ignore if it's not
20  completed?
21        MS. RHODEN: Object to form. Go ahead.
22        THE WITNESS: We don't follow-up on it.
23  BY MS. GAINEY:
24    Q. So, when you say voluntarily, it's really
25  voluntarily; they can complete that section of the form

Page 32

1  or they cannot?
2    A. That's correct.
3    Q. And if I've heard you correctly, you're saying
4  that when a perspective tenant comes to apply, you don't
5  necessarily ask the person at that point what their race
6  or ethnicity is, correct?
7    A. Yes, correct.
8    Q. And it's not until they're approved to move in
9  and you do go through income verification that you think
10  that there's some form or a section of the form that
11  asks for race and ethnicity?
12    A. Yes.
13    Q. Are there any other forms or documents wherein
14  Concord Management collects race and ethnicity of their
15  tenants?
16    A. I don't think so.
17    Q. All right. And so, is it a matter of once they
18  complete that form, is that form entered into your --
19  your database?
20    A. That's correct.
21    Q. And do you have like a data entry clerk that is
22  entering all that information, or is it all electronic?
23    A. I'm hesitating because we had discussions in the
24  past about trying to find a more practical way for the
25  data entry, and I just don't know if we have

Page 33

1  accomplished that. At one point it was manual. I just
2  don't know if it is today or not.
3    Q. Probably not, but, so, when James was pulling
4  information for this case, specifically what would he
5  have had to have done to collect the information, the
6  race and ethnicity information?
7    A. He would mind a database table that all of this
8  information is housed in.
9    Q. And what's the name of that program, if you know?
10    A. It would -- at one point it would be entered into
11  Yardi.
12    Q. And what I'm trying to figure out is James or the
13  other employee that's gathering this information, are
14  they just asking for a report and the program spits it
15  out, or are they actually having to analyze the data
16  themselves?
17    A. Not analyzing it, just obtaining the data.
18    Q. So, you tell the program, hey, give me the race,
19  ethnicity and age of everyone that lives at Venue At
20  Viera and the program just generates the report for you?
21    A. He would pull all the residents and he would say
22  I want the -- the fields that he wants to pull the data
23  on, and then it will generate the report that will house
24  that.
25    Q. All right. So, if the tenant chooses not to

Jonathan Thomas
February 04, 2025

Page 34

1  disclose the data, is there any other way to collect the
2  data as to race and ethnicity?
3      A.  No.
4      Q.  And when you reviewed the reports in this
5  specific case, did anything stand out to you about the
6  data that James collected?
7      A.  Can you be more specific?
8      Q.  Did you have any thoughts or opinions as to the
9  amount of tenants that chose not to disclose their race
10  or ethnicity?
11      A.  No.
12      Q.  Do you feel like that property that is in Brevard
13  County that people generally did disclose their race and
14  ethnicity, or not?
15      A.  Oh, I remember Venue At Viera had a higher
16  disclosure of those that provided that information.
17      Q.  That's a very good memory, and I think that's
18  correct.  So, what was your impression as to why that
19  was the case?
20      A.  Speculating that it was senior.  I mean, that was
21  the only difference that I could have thought of for the
22  difference in that property versus the others.
23      Q.  And what was the disclosure rate at Venue At
24  Viera if you remember?
25      A.  I think it was more than 75%.

Page 35

1      Q.  And that was compared to the other properties.
2  What was the disclosure of the other properties, if you
3  remember?
4      A.  I don't remember.  I can assume less than 75%.
5      Q.  So, I'm hearing you to say that when you looked
6  at the data that James pulled, it stood out to you that
7  Venue At Viera had a higher disclosure rate as to the
8  race and ethnicity; did I understand you correctly?
9      A.  Yes.
10      Q.  Anything else that stood out to you as notable
11  when you reviewed the data that James pulled?
12      A.  Specific to all of Brevard?
13      Q.  Yeah, yeah.
14      A.  Venue At Viera, when I was comparing it, I
15  remember it had a higher percentage of Caucasian
16  non-Hispanic.
17      Q.  Compared to what?
18      A.  The other Brevard County properties.
19      Q.  And why was that significant to you?
20      A.  Just because I was looking at the other
21  properties and it was an outlier that stood out to me.
22      Q.  Do you see that in other senior complexes or not?
23          MS. RHODEN:  Object to form.
24  BY MS. GAINEY:
25      Q.  You understand my question?  What I want to know

Page 36

1  is do you find that your properties that are senior
2  living complexes, do they have a generally different
3  race or ethnic makeup than non-senior complexes?
4          MS. RHODEN:  Object to form.
5  BY MS. GAINEY:
6      Q.  She's going to object.  Unless she directs you
7  not to answer, you can go ahead and answer.
8      A.  All right.  I don't recall looking at other
9  senior properties and if I did -- compared to
10  non-senior, and if I did, nothing stood out as an
11  anomaly.
12      Q.  What were the percentage rates at Venue At Viera
13  as far as when you say had a higher percentage of
14  Caucasians; do you remember?
15      A.  I think it was more than 75%.
16      Q.  And compared to the other properties, what were
17  the percentage of Caucasian tenants at the other
18  properties?
19      A.  It was lower than 75%, but I do not recall the
20  actual percentages.
21      Q.  Is that information in what you brought with you
22  here today?
23          THE WITNESS:  (To Ms. Rhoden) Did you print
24      the Excel file?
25          MS. RHODEN:  You can just look at it.  I

Page 37

1  mean, she doesn't necessarily.
2          THE WITNESS:  Okay.
3          MS. GAINEY:  And you know what, let's go off
4      the record because I have to use the bathroom.
5          THE WITNESS:  Okay.
6          MS. GAINEY:  So, I'll give you a chance to
7      look at that.
8          VIDEOGRAPHER:  We are going off the record
9      at 3:14 p.m.  Please hold.
10          (RECESS TAKEN.)
11          VIDEOGRAPHER:  We are back on the record at
12      3:20 p.m.
13  BY MS. GAINEY:
14      Q.  Sir, we took a short break and during that break
15  did you have an opportunity to look at some of the
16  documents brought with you here today?
17      A.  Yes.
18      Q.  And I think we were going to maybe use those
19  documents to explain or to elaborate on your answer
20  regarding the Caucasian makeup at Venue At Viera?
21      A.  Yes.
22      Q.  Okay, go ahead?
23      A.  The caveat is the property name is not showing on
24  the Y axis here, so I know that Venue At Viera had the
25  highest, and so, therefore, I can deduce what Venue At

Page 38

1  Viera is.  Sorry, go ahead.
2      Q.  Can you tell which documents are Bates stamped in
3  the bottom right-hand corner?  Can you refer to what
4  document you're referring to?
5      A.  The one dated 2/3/25.
6      Q.  And there should be a number beneath it.
7      A.  000002.
8      Q.  Very good.  Go ahead.
9      A.  All right, so, 93% of households at Venue At
10 Viera provided race and/or ethnicity.
11     Q.  All right, which you said was a higher rate than
12 what the other Brevard Counties provided?
13     A.  Yes.
14     Q.  And what does that document show you as it
15 relates to the race of the tenants at Venue At Viera?
16     A.  This does not show the percentage, it just shows
17 the number.
18     Q.  Which is what?
19     A.  So, there were 108 that reported Caucasian
20 non-Hispanic.
21     Q.  Out of how many?
22     A.  Looks like 169.
23     Q.  So, what percentage is that?  You can use your
24 calculator if you'd like.
25     A.  I don't know.  Actually, I think it would be out

Page 39

1  of 169, or if it would be out of 180.
2      Q.  Why is that?
3      A.  Because one column says provided race and
4  ethnicity data count, including minors.  This is a
5  senior job, so I would anticipate that we have another
6  column that says Total Leaseholders Excluding minors.  I
7  would expect them to be one and the same, but that says
8  180.  So, I don't know if the denominator would be 169,
9  or if it would be 180.
10     Q.  How many units are at Venue At Viera?  Is it 180?
11     A.  No, less.
12     Q.  So, where does the 180 come from?
13     A.  You have more than one person in a unit if it's a
14 husband and wife or partner situation.
15     Q.  Understood.  So, it's not 180 units, it's 180
16 people?
17     A.  Correct.
18     Q.  And so, how many apartment units are at Venue At
19 Viera?
20     A.  I believe it's 145.
21     Q.  When that is referencing children, please correct
22 me if I'm wrong, but my understanding is that for Venue
23 At Viera children are allowed to live at the complex; is
24 that correct?
25     A.  No.

Page 40

1      Q.  All right.  So, no children are allowed to live
2  at the complex at Venue At Viera?
3      A.  That is correct.  There could be an accommodation
4  should somebody request a reasonable accommodation, like
5  a caretaker.
6      Q.  Um-hmm.
7      A.  Something to that effect, but that would not be a
8  minor.
9      Q.  So, what is the age requirements for Venue At
10 Viera?
11     A.  55 plus.
12     Q.  And other than the situation you just described
13 where someone's requesting an accommodation for a
14 caretaker for someone under 18, are there other
15 circumstances with that someone under 55 is allowed to
16 live at Venue At Viera?
17     A.  I can't think of any.
18     Q.  Does the data you have in front of you provide
19 the age of all your tenants?
20     A.  That's even smaller.
21     Q.  They're your papers.
22     A.  Yes, it does.
23     Q.  What -- can you tell me the document number of
24 what you're looking at?
25     A.  000007.

Page 41

1      Q.  Let me see it for a second.
2      A.  (Witness handing document.)
3      Q.  Do you have this in electronic format?
4      A.  I do.
5      Q.  Oh, good lord.  I see why you can't see these.
6          MS. RHODEN:  My office is sending you these.
7          MS. GAINEY:  In electronic?
8          MS. RHODEN:  Yeah, we'll send all the
9      documents that were presented out electronically
10     today.
11 BY MS. GAINEY:
12     Q.  So, as you're looking at document 7, which one is
13 the -- I see that there's -- I can see that there's a
14 column that lists age, and then a column right next to
15 it that lists range; is that correct?
16     A.  Yes.
17     Q.  So, how does Venue At Viera verify age?  Get a
18 driver's license, Social Security?
19     A.  Yes, we get a driver's license.  I don't know if
20 they just report their age, or if we reconcile what they
21 report with the driver's license.
22     Q.  As you look at document 7 of what you've produced
23 here today, do any of the tenants at Venue At Viera
24 satisfy an under 55 age range?  That's a bad question.
25     Look at doc -- look at document 007.  When that

Jonathan Thomas
February 04, 2025

Page 42

1  document was created it reflects the ages of Venue At
2  Viera. Are any of them under 55?
3      A. So, when I found that age column, it's tied with
4  one of the other properties. So, can I flip through
5  this --
6      Q. Sure.
7      A. -- to find where I might be able to see it for
8  Venue? Okay, I found it.
9      Q. Are there any residents under 55?
10     A. Yes.
11     Q. What document are you looking at?
12     A. 000016.
13     Q. And you're just going down the column for age on
14  00016?
15     A. Yes.
16     Q. How many -- how many residents are under 55?
17     A. Looks like approximately 11.
18     Q. Out of how many, either 169, or 180?
19     A. Yes, and that difference is also 11.
20     Q. So, can you tell looking at those documents how
21  many residents live at Venue At Viera, whether that be
22  169, or 180?
23     A. It would be 181.
24     Q. And that's as of what date?
25     A. I don't recall.

Page 43

1      Q. What document are you looking at to determine
2  that there's 181 residents at Venue At Viera?
3      A. 00002.
4      Q. Are these the documents that you said were
5  created a couple years ago?
6      A. Yes.
7      Q. And have they been updated in any way since you
8  originally created the documents?
9      A. No.
10     Q. And I understand that these documents were
11  created at the request of Scott Culp; is that correct?
12     A. Yes.
13     Q. And these are the documents that you turned over
14  to Mr. Culp?
15     A. Yes.
16     Q. And when would that have been?
17     A. Also a couple years ago.
18     Q. You told me earlier that by looking at the
19  documents you can tell that 108 of the residents at
20  Venue At Viera are Caucasian. What's the racial
21  composition of the remaining residents?
22     A. 1 reported as Asian.
23     Q. I'm sorry, Asian?
24     A. Asian.
25     Q. Um-hmm?

Page 44

1      A. 15 reported as Black or African American
2  non-Hispanic. 8 reported as Caucasian Hispanic. 12
3  declined to report on race, but reported as Hispanic.
4      Q. What does that mean?
5      A. So, on the race and ethnicity form they report
6  they're separate fields. They are race, then ethnicity,
7  so, I'm only assuming they declined to report race, but
8  did report ethnicity.
9      Q. Go ahead. What's the next category?
10     A. Oh, 9 declined to report race, but reported as
11  non-Hispanic. 9 reported as other for race and
12  Hispanic. 7 reported as other for race and
13  non-Hispanic. And 12 declined to report race and
14  declined to report ethnicity.
15     Q. What document are you looking at?
16     A. 000002.
17     Q. So, as you review document 0002, the number of
18  Black residents at Venue At Viera when this document was
19  created was 15, correct?
20     A. Yes.
21     Q. And can -- do you have any other information that
22  will tell you that number is different in any way? Is
23  there another dataset? Is there any other way to say
24  that number is not 15 of Black residents at Venue At
25  Viera?

Page 45

1      A. Can you clarify that question?
2      Q. Yeah. I just want to make sure we have complete
3  information, and so, the document that Concord
4  Management created is document number 2, and that that
5  summary is I think what it is as to what the race of
6  residents at Venue At Viera is, correct, with the
7  information that you had?
8      A. Correct.
9      Q. All right. So, basically, have they either
10  report their race or they don't, correct?
11     A. Correct.
12     Q. So, from those that reported their race, 15 of
13  the 181 residents are Black, correct?
14     A. That's correct.
15     Q. And do you have any other way to determine
16  whether that number should be more in those that did not
17  report their race?
18     A. No.
19     Q. All right. So, as I do the math, 15% of 181 is
20  .08%?
21     A. It would be less than 10%, yes. Yeah.
22     Q. And is there any reason to -- is that consistent
23  with what you know about Venue At Viera that the Black
24  residents are less than 10%?
25     A. I wouldn't be able to opine on that.

Jonathan Thomas
February 04, 2025

Page 46

1    Q.  Is there any other datasets out there or any
2  other documents that would show that the -- the
3  percentage of Black residents at Venue At Viera is
4  different than less than 10%?
5    A.  No.
6    Q.  All right.  And so, we kind of got down this
7  rabbit hole because you said earlier in your deposition
8  that as you reviewed those numbers, some things stood
9  out to you as far as the dataset from Venue At Viera,
10 correct?
11   A.  Correct.
12   Q.  And I think you said that the number of residents
13 that reported was higher than the other three Brevard
14 properties, correct?
15   A.  Correct.
16   Q.  And I think you said that the other thing that
17 stood out to you is that Venue At Viera had a higher
18 Caucasian rate than the other three Brevard properties?
19   A.  Had more Caucasians, yes.
20   Q.  And does it show in those documents what is the
21 Caucasian percentage at the other properties are, or
22 is --
23   A.  In percentages, no.  I can do the math, though.
24   Q.  Okay, go ahead.
25   A.  Okay.  And I can't tell you which property is

Page 47

1  which, though, either because it's not labeled.
2    Q.  Let me see what you're looking at.
3    A.  (Witness handing document.)
4    Q.  So, how did you determine from 02 which one was
5  Venue At Viera?
6    A.  I believe in the Excel file it shows that.  So
7  might be a print margin issue.
8    Q.  All right.  So, why don't you --
9    A.  Highlight them?
10   Q.  Yeah.  There's five columns here.  So, can you
11 tell me the percentage of Black residents of the other
12 properties in Brevard County?
13   A.  Yeah.  And the qualifier is all the numbers I
14 provide you are the numbers that provided.  I can't
15 speak to those that declined.
16   Q.  Yes, I accept that qualification.
17   A.  All right, so.
18   Q.  And let me just ask you just to confirm that
19 there's no other dataset that can give us those numbers
20 if -- if they choose not to disclose their race,
21 correct?
22   A.  That's correct.
23   Q.  Go ahead.
24   A.  All right.  So, the first one, okay, so I have
25 the denominator.  I'm going to use for arriving at these

Page 48

1  percentages are those that provided ethnicity count,
2  including minors.  Is it possible, can I use a pen and I
3  can just write out the numerator, denominator and then
4  just repeat it all?
5    Q.  Yeah.
6        MS. RHODEN:  There might be one behind you.
7  BY MS. GAINEY:
8    Q.  Do you need a --
9    A.  Oh, can I write on this or?
10   Q.  Yeah.  Yeah, I think it's okay to write on that
11 because you have the originals.
12   A.  Here's a notepad or Post-it.
13   Q.  Do you need a calculator?
14   A.  I'll probably use it once I write it out.  I have
15 to find the data first.
16       THE WITNESS:  (Sneezed.)
17       MS. RHODEN:  Bless you.
18       THE WITNESS:  Excuse me.
19       Okay, so, for the other properties,
20 excluding Venue At Viera, the first one had 49 out of
21 138.  49 reports as Black.  I did not include those
22 reporting as Black Hispanic.  I can fix that real
23 quick.
24 BY MS. GAINEY:
25   Q.  And Black Hispanic means what?

Page 49

1    A.  They reported as African American, and for
2  ethnicity they reported as Hispanic.
3    Q.  Okay, go ahead.
4    A.  Okay, so, 35.5% for one property.
5    Q.  Can you just walk us through the numbers?
6    A.  Yeah.  One property had 49 reporting as Black or
7  African-American non-Hispanic; and 0 reporting as Black
8  or African-American Hispanic.  So, I took 49 divided by
9  the 138 household members who provided race data.  So,
10 49 divided by 138 equals 35.5%.
11   Q.  Okay.
12   A.  Following that same methodology, the next
13 property reported 161 as Black or African-American not
14 Hispanic, and then another 5 as Black or
15 African-American Hispanic.  So, 166 divided by the 317
16 household members who reported race and/or ethnicity,
17 that's 52.4%.
18       The next property had 52 reporting as Black or
19 African-American non-Hispanic, plus four Black or
20 African-American Hispanic.  So, it's 56 divided by the
21 159 who provided race and/or ethnicity, and that result
22 is 35.2%.
23       And then the final one was 42 Black or
24 African-American non-Hispanic, plus 5 Black or
25 African-American Hispanic.  So, that's 47 divided by the

Jonathan Thomas
February 04, 2025

Page 50

1  138 that reported, and the resulting percentage is
2  34.1%.
3      Q.  And so back, to Venue At Viera, that percentage
4  do you want to confirm?
5      A.  Yeah.  Yes.
6      Q.  Go ahead.
7      A.  Okay.
8      Q.  All right.
9      A.  Applying that same approach for Venue At Viera,
10  15 divided by 169 is only 8.9%.
11      Q.  And what -- what did you conclude about that
12  difference, if anything?
13      A.  That's much lower than the others.
14      Q.  And do you have any reason as to why that's the
15  case, or understanding?
16      A.  No, just speculation that it's driven by it being
17  senior, but I don't -- that's the only distinction.  I
18  don't know if it's correlation or causation.
19      Q.  The numbers that you ran, were you limiting it to
20  Black residents?
21      A.  I don't know that I follow.  Oh, just now?
22      Q.  Yes.
23      A.  Yes.
24      Q.  All right.  And so, is there -- there's a
25  separate column for Hispanics, or I guess it wouldn't be

Page 51

1  Hispanic.  Is there another race column other than
2  Black?
3      A.  Yes, there's Asian.
4      Q.  Just Asian and Black?
5      A.  No, there's more.
6      Q.  Go ahead.
7      A.  Caucasian.  You want me to only speak to race or
8  all the columns?
9      Q.  Yes?
10      A.  Okay, so, Caucasian declined a report race and
11  other.
12      Q.  What's other?  That's a catchall?
13      A.  Yes.
14      Q.  So, someone from Hispanic descent, they're only
15  reporting ethnicity to indicate their Hispanic descent,
16  not necessarily reporting separately for race?
17      A.  Can you repeat that?
18      Q.  Yeah.  So, if someone who is Mexican, for
19  example, if they are reporting using your -- the
20  documents or the sections of the documents, do they have
21  the option to report both under the race category and
22  the ethnicity category?
23      A.  Yes, they would report independently.
24      Q.  All right.  And so, is there a category that
25  captures all non-Caucasian residents together?

Page 52

1      A.  Together?
2      Q.  Bad question.  Yeah.  So, for purposes of my
3  question I'm going to assume that Caucasians are the
4  majority.  And so, I'm asking is there a column or a
5  dataset that differentiates between Caucasian majority
6  and everyone else?
7      A.  No single column.  They're individual columns.
8      Q.  But you can add them together and then?
9      A.  Oh, sure, you can add them together.
10      Q.  Okay.  Can you do that for Venue At Viera, and
11  let us know how many non-Caucasian residents that
12  reported lived at Venue At Viera when this graphing was
13  created?
14      A.  Non-Caucasians.  How about ethnicity?
15      Q.  Based on both race and ethnicity.
16          MS. RHODEN:  Object to form.
17          THE WITNESS:  Okay, so, add it all up and
18      then exclude the Caucasian non-Hispanic from that
19      number?
20  BY MS. GAINEY:
21      Q.  Yes.
22      A.  Okay.
23      Q.  For Venue At Viera.
24      A.  Okay.  Okay, and do you want that the numerator
25  or do you want the percentage?

Page 53

1      Q.  Walk us through the numbers.
2      A.  Okay.  For each column, or you want the total?
3      Q.  You can do it for each column.
4      A.  Of course.
5      Q.  Completeness.  Didn't know you were going to do
6  math here today; did you?
7      A.  Okay.  One Asian, 15 Black non-Hispanic, 8
8  Caucasian Hispanic, there were 108 that were Caucasian
9  non-Hispanic, which I exclude.  An additional 12
10  declined to report race did report Hispanic.  Another 9
11  declined to report race reported non-Hispanic.  Another
12  9 reported other Hispanic.  Another 7 reported other
13  non-Hispanic.  And 12 declined to report race and
14  declined to report ethnicity.  So, I think I would
15  remove them as well.
16      Q.  So, of those that reported, there was one Asian?
17      A.  That's correct.
18      Q.  15 Black non-Hispanic?
19      A.  Sorry.  That's correct.
20      Q.  12 that declined to report race that reported as
21  Hispanic?
22      A.  That's correct.
23      Q.  And are there -- were there any others that were
24  non-Caucasian?
25      A.  I had 8 that were Caucasian, but reported

Jonathan Thomas
February 04, 2025

Page 54

1  Hispanic.
2      Q.  So, what does that mean?
3      A.  They reported Caucasian for race, but Hispanic
4  for ethnicity.
5      Q.  Okay.
6      A.  So, self-reported, so.
7      Q.  Okay, that's right.  All right, so, 8 that are
8  Caucasian Hispanics?
9      A.  Yes.
10     Q.  All right.  And -- and then were there others?
11     A.  I can't remember where you left off.  I don't
12  think I heard you say other Hispanic.
13     Q.  9 other Hispanic?
14     A.  That's correct for there were 9 other Hispanic.
15  I don't know if you said 9 declined to report race, but
16  reported non-Hispanic.  I did include them in my count
17  just now.
18     Q.  I'm sorry, which count?  The Caucasian count?
19     A.  The declined to report race, non-Hispanic.
20     Q.  All right.
21     A.  Because I don't know what race they are.
22     Q.  Right.  They didn't report race, but we know
23  they're not Hispanic?
24     A.  That's correct.
25     Q.  So, what I'm trying to figure out is can we tell

Page 55

1  the total of the non-Caucasians that reported?
2      A.  Okay, let me do it again.
3      Q.  All right.
4      A.  Sorry, do you -- do you want declined to report
5  race, but they reported Hispanic because I don't know
6  the race?
7      Q.  Yes, if they reported Hispanic.
8      A.  Okay.
9      Q.  But not if they reported Caucasian?
10     A.  Okay.  Okay.
11     Q.  What you got?
12     A.  53.
13     Q.  All right.  And so, the 53 is based on 15 Black?
14     A.  One Asian, 15 Black, 12 declined to report race
15  reported Hispanic.  9, I think I included this one.
16  I'll do it again, though.  9 declined to report race
17  non-Hispanic.
18         Exclude that?
19     Q.  Exclude that.
20     A.  Okay.  9, other Hispanic.
21     Q.  Yes.
22     A.  7, other non-Hispanic.
23     Q.  Wait you just gave me 9 other non-Hispanic?
24         MS. RHODEN:  He said 9 other Hispanic.
25         THE WITNESS:  There's 9 other Hispanic.

Page 56

1  BY MS. GAINEY:
2      Q.  Okay.  Sorry.
3      A.  And then there's 7 other non-Hispanic.
4      Q.  All right.  So, include the 9 Hispanic.
5      A.  Okay.  And then the -- also include the other
6  non-Hispanic, correct?
7      Q.  I'm only after the -- the ones that would be
8  considered minorities.  And I don't --
9      A.  So, other would be the, again, self-reported, a
10  catchall category.
11     Q.  But non-Hispanic?
12     A.  Non-Hispanic.
13     Q.  So, could be Sicilian?
14     A.  Sorry.  Now you put Italian in my head.  Indian,
15  Eskimo.
16     Q.  Okay.
17     A.  I think was one.
18     Q.  All right.  We can include them.
19         MS. RHODEN:  What was that number?
20         THE WITNESS:  That was 7.  Okay, so, 115,
21  16, 12 is 20.
22  BY MS. GAINEY:
23     Q.  Okay, you're mumbling.  Speak louder please.  1?
24     A.  Okay.
25     Q.  Plus 15?

Page 57

1      A.  Yeah.  Yes.
2      Q.  Go ahead.
3      A.  Plus 12, plus 9, plus 7.  That's it.
4      Q.  44?
5      A.  In my head, yes.
6      Q.  All right.  So, I believe what you're reporting,
7  and you correct me if I'm wrong, is that 44 residents at
8  Venue At Viera were non-Caucasian?
9      A.  That is correct.
10     Q.  All right.  And there's 108 -- I'm sorry, how
11  many?  Hundred and -- 181?
12     A.  Yes, but we have to do it based off of those that
13  reported, right?
14     Q.  Um-hmm.
15     A.  Which that number was 169.
16     Q.  All right.  So, that's 26% of those that were
17  reporting are non-Caucasian?
18     A.  26%, yes.
19     Q.  All right, but if you look at the total
20  residents, and I appreciate that from 161 to 181 --
21  well, let me ask it this way:  Is it correct that 181
22  residents lived at Venue At Viera when these numbers
23  were pulled in total?
24     A.  Yes.
25     Q.  And if we use the -- 181 number, as you sit

Jonathan Thomas
February 04, 2025

Page 58

1  here today, 44 of the 181 residents are the number that
2  you confirm can confirm are non-Caucasian, correct?
3       A.  Not correct.
4       Q.  Okay.  Tell me how I'm wrong.
5       A.  I can't assume the difference between the 181
6  residents that lived there and the 169 that provided
7  race or ethnicity.
8       Q.  You can't assume what their?
9       A.  Race or ethnicity.
10      Q.  All right, right.  What I'm -- what I'm just
11  after is we don't know from those 11 residents, they
12  could be Caucasian, they could be non-Caucasian?
13      A.  That's correct.
14      Q.  So, my question was as you sit here today you can
15  only confirm based on those numbers that at most 44 of
16  the residents were non-Caucasian?
17          MS. RHODEN:  Object to form.
18          THE WITNESS:  Can you repeat the question?
19  BY MS. GAINEY:
20      Q.  Yeah.  As you sit here today, you can only
21  confirm that at most only 44 of the residents were
22  non-Caucasian?
23      A.  Yes.
24          MS. RHODEN:  Object to form.
25  BY MS. GAINEY:

Page 59

1       Q.  And because even as you indicated earlier, when
2  they said other, they -- they could have been -- it's
3  self-reporting so they could have been Caucasians also.
4  They could consider Italians as other?
5          MS. RHODEN:  Objection.
6  BY MS. GAINEY:
7       Q.  Correct?  She'll keep objecting.  You just have
8  to answer.
9       A.  Yes.
10      Q.  Unless she tells you not to.
11      A.  Yes.
12      Q.  All right.  You didn't know you were going to go
13  math here today; did you?
14      A.  Or the magnifying glass.
15      Q.  Yeah, we're going to attach your numbers as an
16  exhibit?
17      A.  That's fair.
18      Q.  I'm not going to ask you to go through the other
19  -- the other three.  We'll be here all night.
20      A.  Never realized my reliance of Excel.
21      Q.  And so, just for the purposes of the record,
22  there's an Excel spreadsheet.  You've turn that over to
23  your attorney, she's going to turn that over to us?
24      A.  Yes.
25      Q.  All right.  Has any -- let me be very clear just

Page 60

1  at the onset.  When I'm asking about conversations, you
2  have an attorney/client privilege with your attorney,
3  so, none of my questions are intended ever to ask you
4  what you discussed with your attorney, all right?
5       A.  Okay.
6       Q.  With that caveat, outside of an attorney/client
7  privileged conversation, have you had any conversations
8  with anyone regarding the numbers that are in the
9  documents that you produced here today?
10      A.  Can you repeat the question?
11      Q.  Sure.  Outside of attorney/client conversations
12  you may have had regarding the documents you produced
13  here today, have you had any other conversations with
14  anybody else regarding those documents?
15      A.  When you say outside of attorney/client, you mean
16  other than with Rebecca?
17      Q.  Correct.
18      A.  Okay.  No.
19      Q.  All right.  So, let me just ask point-blank.  Did
20  you and Scott talk about the numbers?
21      A.  No.
22      Q.  And have you ever had any conversations with
23  Dr. Fishkind regarding the documents that you produced
24  here today?
25      A.  No.

Page 61

1       Q.  And so, other than attorney/client conversations,
2  you haven't had any other conversations with your staff
3  or anyone else regarding these numbers?
4       A.  Only James when I asked him to pull it.
5       Q.  So, did you and James have conversations about
6  the results, or did you just say, hey, James, pull these
7  numbers?
8       A.  Just asked him to pull the data.  No -- no
9  conversations on results.
10      Q.  Did James make any observations regarding the
11  data?
12      A.  He did not.
13      Q.  All right, back to Venue At Heritage Oaks.
14      A.  Okay.
15      Q.  You told me at the beginning of this deposition
16  that you believe there was some initial conversations
17  asking your opinion about the area, correct?
18      A.  Yes.
19      Q.  What other, if anything, did you do with respect
20  to Venue At Heritage Oaks as far as render opinions, or
21  collect data, or anything along those lines?
22      A.  I don't think anything other than look at Google
23  Earth, and I believe I even drove the site at one point.
24      Q.  What was your impression when you drove the site,
25  if you did?

Jonathan Thomas
February 04, 2025

Page 62

1     A.  I like it, but I can't remember anything in
2  particular that I noted or recall.
3     Q.  All right.  I have some bad news for you in that
4  I have not had a chance to look through all these
5  documents, so, it's likely I'm going to have to call you
6  back --
7     A.  Okay.
8     Q.  -- after I've had a chance to review them.  I did
9  glance through them just momentarily.  It looks like
10 there's some e-mail exchanges with you and Scott
11 regarding Venue At Viera -- excuse me, Venue At Heritage
12 Oaks specifically.  One of them that's document number
13 18, it appears Scott asked you to attend the commission
14 meeting.  Did you, in fact, do that?
15    A.  I did not.
16    Q.  All right.  And what was the reason why you
17 didn't attend?
18    A.  I don't recall him asking me.  I recall he was
19 asking like a member of our staff.
20    Q.  Got it.  Thanks for the clarification.  Did
21 anyone from your staff attend the December 5th meeting?
22    A.  Yes.
23    Q.  Who attended?
24    A.  A property manager.
25    Q.  Who was that?

Page 63

1     A.  Aleisha, I'm not going to be able to spell her
2  last name.
3     Q.  Oh, I think I might have it here?
4     A.  Abbey Hickey.
5     Q.  And what property does Abbey manage?
6     A.  She's no longer with our company.
7     Q.  What property did she manage?
8     A.  She was at Malabar at one point, Venue At Viera,
9  and then she was over another property and I can't
10 remember which.
11    Q.  Why did she leave the company?
12    A.  She was terminated, and I can't remember why.
13    Q.  Why did -- was it that she was the one that
14 attended?  Any specific reason?
15    A.  She was the property manager at Venue At Viera.
16 She also lived at Venue At Viera, and I think that's why
17 it was local for her.
18    Q.  Who is Jason Unger?
19    A.  I don't know who that is.
20    Q.  I'm just pulling from these documents, so, if you
21 don't know.
22    A.  Does it say the company, or?
23    Q.  It just says from Scott Culp to Jason Unger.
24 Here, I can show it to you.  (Handing document.)  Oh,
25 here.  Here's where it shows his e-mail, Gray Robinson?

Page 64

1     A.  Okay.
2     Q.  It's on here?
3     A.  Okay.
4     Q.  Does that give you any insight as to who he is
5  and why -- what his involvement is?
6     A.  No.
7     Q.  Who's -- what company is Gray Robinson?
8     A.  That's a law firm.
9     Q.  Oh.  All right, who's Ashley Minish?  Her name's
10 also on here.
11    A.  I don't know who that is.
12    Q.  Okay, that's fine.
13    A.  Can I see this?
14    Q.  Sure.
15    A.  Yeah, I don't know who that is.  I can't tell how
16 that's printed.
17    Q.  So, it looks like Scott Culp sent an e-mail to
18 Jason Unger on December 3rd, and he says:
19          Both the neighbors vehemently oppose our
20    four-story senior affordable mixed income housing.
21    20% at 50% AMI, 20% at 120% AMI.
22          How did you come in possession of that
23    e-mail?  I don't see that you're cc'd on it.
24    A.  Must have been in an e-mail thread, and there
25 could be other correspondence in there and he just

Page 65

1  forwarded an e-mail.
2     Q.  And then it looks like maybe did you get some
3  residents to appear at the December 5th meeting?
4     A.  Yes.
5     Q.  All right.  Tell me.
6     A.  Aleisha did.
7     Q.  Only Aleisha?
8     A.  Yes.
9          MS. RHODEN:  Object to form.
10         THE WITNESS:  Oh.
11 BY MS. GAINEY:
12    Q.  Yeah, let me backup.  So, Aleisha is an employee?
13    A.  Yes.
14    Q.  All right.  I was asking did residents.  I
15 thought maybe some Venue At Viera residents appeared?
16    A.  Yes, Aleisha organized their appearance.
17    Q.  That was my bad question.  Not that Aleisha
18 appeared, but Aleisha organized it?
19    A.  Yes.
20    Q.  Got it.  How many residents appeared?
21    A.  I don't know.
22    Q.  There's a document in here marked Bates stamped
23 65.  It's from you to Scott and Mark, dated June 1st,
24 2023, and it looks like you're giving some
25 recommendations on names?

Jonathan Thomas
February 04, 2025

Page 66

1    A.  Names for property?  Yes, yeah.
2    Q.  Tell me about that.
3    A.  Normally, when we're pursuing a site, I'll field
4  questions as to recommended names, and that was me
5  providing my recommendations.
6    Q.  So, were these all Brevard County locations, or
7  they're different counties?
8    A.  These include locations other than just Brevard.
9    Q.  Which one was -- is it the Minton Road that is
10  the Brevard location?
11   A.  That's correct.
12   Q.  All right.  And it appears that all of those have
13  Senior Living in the proposed name; why is that?
14   A.  At one point I would have been told that we're
15  planning on it being senior.
16   Q.  And included in this list is Venue At Heritage
17  Oaks, excuse me, Senior Living.  Do you know why the
18  name senior was removed from the proposed name of the
19  project?
20   A.  I do not.
21   Q.  Let me show you a document 69 and ask you what is
22  that?
23   A.  It looks like I did a market survey.  I state in
24  here I pulled market rate comps from around the subject
25  property's location.

Page 67

1    Q.  What's the date on that?  And why are you making
2  a face?
3    A.  The column's cut off, so I was trying to deduce
4  what I stated.
5    Q.  Oh, okay.
6    A.  The date the e-mail was sent was September 18,
7  2023.
8    Q.  And what was the purpose of pulling the market
9  rates?
10   A.  I don't even recall.  There's a second page on
11  there.  Can I read that.
12   Q.  Sure.  Sorry, I really haven't had a chance to
13  look at it either.  So, kind of going on the fly here.
14   A.  Look at this.  Yeah, it's just another way I
15  organized the data of the comps, but I don't recall why
16  or what purpose I was looking at that for.
17   Q.  All right.  Then I want to ask you about document
18  71.  Give you a chance to look at that.
19   A.  Okay.
20   Q.  First of all, what is it?
21   A.  It's an e-mail I sent to Scott in regards to the
22  demographic data.
23   Q.  And were you asked for that information?
24   A.  I was.
25   Q.  What's the date on it?

Page 68

1    A.  My e-mail response to Scott was December 13th of
2  2023.
3    Q.  What -- what was the date of his e-mail to you,
4  if it was an e-mail?
5    A.  I don't know.
6    Q.  Was it an e-mail, or did he ask you on the phone,
7  or in person?
8    A.  I don't recall an e-mail, and I don't think I saw
9  an e-mail when I was pulling this.  So, it must have
10  been over the phone.
11   Q.  All right.  And so, what was the purpose of
12  requesting that data if you know?
13   A.  I don't know.
14   Q.  And is the document that we were referring to
15  earlier, is that the document you used in order to send
16  Scott the demographics information?
17   A.  Yes.
18   Q.  All right.  And so, when you said a couple years
19  ago, is it fair for me to assume that you ran those
20  numbers in December of 2023?
21   A.  Yes.
22   Q.  And so, on or about December 13th of 2023, you're
23  providing Scott the racial composition of Venue At
24  Viera?
25   A.  Yes.  Yes.

Page 69

1    Q.  And you don't have any recollection as to why
2  Scott was asking for that, if you ever knew?
3    A.  No.
4    Q.  And was there a response or any subsequent
5  conversation after you sent this e-mail?
6    A.  No.
7    Q.  All right.  So, the e-mail from you to Scott
8  says:
9         "Attached as the data as well as a summary
10    of the results.  We looked at application data as well
11    as the recent data to find the most comprehensive
12    data."
13         What did you mean when you said that?
14   A.  So, prior address is -- this is not unusual for
15  me to be asked by the principals for information.  And
16  so, I'm used to trying to provide more information just
17  to kill two birds with one stone.  And so, in the past
18  they've asked for the county that they lived in
19  previously so we can get an idea as to where they're
20  moving from.  And so, that comes from application data.
21  And then race and ethnicity comes from that form that we
22  were talking about.  So I mind more than just race and
23  ethnicity.
24   Q.  Did the application data include race or
25  ethnicity?

Jonathan Thomas
February 04, 2025

Page 70

1    A.  No.
2    Q.  So, I'm hearing you to say that you pulled the
3  application data for completeness, but it didn't
4  necessarily give any insight as to the race or ethnicity
5  of the tenants?
6    A.  That's correct.
7         MS. RHODEN:  Object to form.
8  BY MS. GAINEY:
9    Q.  All right.  And so, your next sentence is:
10        "While we have the data for 93.9 -- excuse
11     me, let me start over.
12        "While we have the data for 93.3% of the
13     residents overall, you will see the data is not in our
14     favor in terms of under representative minority."
15        What did you mean?
16    A.  I assumed that with the Venue At Viera our data
17  skewed different than our other properties when I've
18  looked at this before, and I just made an assumption
19  that we would want data to be consistent with that of
20  our other properties.
21    Q.  I'm not following you.  Why -- why is that
22  significant to you?
23    A.  Just because Venue At Viera was an outlier with
24  compared to our other properties that we went through.
25    Q.  So, are you trying to show that your other

Page 71

1  properties have more minority residents and Venue At
2  Viera is an outlier?
3    A.  I wasn't trying to show.
4    Q.  Let me ask it differently.  I'm not, you know,
5  I'm just trying to get the purpose of what you're doing
6  here.
7    A.  Sure.
8    Q.  So, what's the purpose of pulling the data in
9  terms of underrepresented minorities?
10    A.  I don't know what the purpose was, but I made an
11  assumption that showing that the results of Venue At
12  Viera being different than what we're used to on our
13  properties.
14    Q.  So, based on the data, you reached the conclusion
15  that Venue At Viera has a different percentage of
16  underrepresented minorities than the other properties?
17    A.  That's correct.
18    Q.  And what did you mean when you said that is "not
19  in our favor"?
20    A.  I assumed that we would want to have something
21  consistent with our other properties.
22    Q.  But why?  I mean what -- what's -- for what
23  reason?
24    A.  Just an assumption on my part.
25    Q.  For purposes of the lawsuit?

Page 72

1    A.  I wasn't even aware of the lawsuit at that time,
2  and I just don't have context behind why he was asking
3  for this, so.
4    Q.  And that's what I'm trying to get at.  I mean, do
5  you have any idea or sense of why Scott is requesting
6  this data?
7    A.  I do not know why.
8    Q.  Based on this e-mail, does it follow that he was
9  asking for the data in terms of underrepresented
10  minorities for the Brevard properties?
11    A.  Can you repeat that question?
12    Q.  You say to Scott that, "you will see the data is
13  not in our favor in terms of underrepresented
14  minorities."
15        So, from that, is it fair to assume that Scott
16  was asking you for the data with respect to
17  underrepresented minorities?
18        MS. RHODEN:  Object to form.
19        THE WITNESS:  Yes.
20  BY MS. GAINEY:
21    Q.  All right.  And I'm hearing you to say that when
22  you pulled the -- the Venue At Viera data, it did not
23  show, based on your conclusions and observations, it did
24  not show a large percentage of underrepresented
25  minorities, correct?

Page 73

1    A.  That's correct.
2    Q.  And based on your experience and review of data,
3  it was much less than what the other Brevard properties
4  were, correct?
5    A.  For?
6    Q.  Underrepresented minorities.
7    A.  Correct.
8    Q.  And you told me earlier that you thought that
9  maybe guesstimating that that was because it was a
10  senior living complex?
11    A.  Correct.
12    Q.  How does Venue At Viera compare to other senior
13  living complexes that you manage as far as minorities?
14    A.  I don't know.
15    Q.  Were you ever asked to pull that data?
16    A.  No.
17    Q.  The Venue At Heritage Oaks was a senior proposed
18  senior complex, right?
19        MS. RHODEN:  Object to form.
20        THE WITNESS:  Yes, I vaguely recall, but
21     supported by the names that we just went over.
22  BY MS. GAINEY:
23    Q.  And so, do you know why someone asked for
24  residents of Venue At Viera to attend the commission
25  meeting on December 5th?

Jonathan Thomas
February 04, 2025

Page 74

1    A.  I believe it was because it was our newest
2  property.
3    Q.  Do you know if Mr. Culp or anyone else was using
4  Venue At Viera as an example of what the proposed
5  project Venue At Heritage Oaks would be?
6         MS. RHODEN:  Object to form.
7         THE WITNESS:  I don't know.
8  BY MS. GAINEY:
9    Q.  Continuing on this e-mail, your next line is:
10        "Specifically, 64.67 of the reported race
11    and ethnicity data is Caucasian non-Hispanic.  Next
12    largest concentration Black African-American,
13    non-Hispanic at 7.78%, and declined to report
14    ethnicity at 7.19%.  Please see the attached and
15    advise if you need us to dig into anything further
16    with this data."
17        How could you dig into this data any
18    further?  What else could you have done?
19    A.  I don't know what I was possibly referring to as
20  to getting additional information.  Not so much specific
21  to race and ethnicity, but, again, address or some of
22  the other information that's in this report.
23    Q.  So, again, I'm just looking at this on the fly,
24  but did the documents that you attached and provided to
25  Scott, are those the same documents that you've been

Page 75

1  testifying here from today, or are they different?
2    A.  No, they're the same.
3    Q.  How many senior affordable housing complexes does
4  Concord manage?
5    A.  Estimates, or do you want?
6    Q.  Sure.  We talked about a lot of numbers today,
7  so.
8    A.  15.
9    Q.  And do you have the data available to you to do
10  the same thing in those other complexes that you did at
11  Venue At Viera?
12    A.  I'm sure we would, yes.
13    Q.  How many senior complexes, if any, do you manage
14  in Seminole County?
15    A.  At least one.
16    Q.  How about Osceola?
17    A.  Oh, goodness.
18    Q.  A lot?
19    A.  No, no.  I don't think we have any senior in
20  Osceola.
21    Q.  How about St. John's County?
22    A.  None.
23    Q.  So, how about in the Orlando MSA?
24    A.  Probably close to 10.
25    Q.  And as you sit here today, no one has ever asked

Page 76

1  you to pull the data from any other senior complexes
2  other than Venue At Viera?
3    A.  That's correct.
4         MS. GAINEY:  I'll take a break, if anyone
5    needs it.
6  BY MS. GAINEY:
7    Q.  All right, do you need a break?
8    A.  No, I'm okay.
9    Q.  Has any other developments been proposed in
10  Brevard County since Venue At Heritage Oaks on behalf of
11  the Plaintiffs?
12    A.  I don't recall any.
13    Q.  Has anyone asked you about any sites for
14  additional proposed building sites?
15    A.  Possibly, but I don't recall.  I look at so many.
16    Q.  There was a commission meeting in November of
17  2023.  Do you have any knowledge about that and
18  specifically discussing this project?
19    A.  No, I -- I don't know if that was the one that we
20  had residents attend.
21    Q.  No, I'm going to purport to you that was the
22  December 5th, 2023 meeting.
23    A.  Okay.
24    Q.  So, the one that would have been before that,
25  were you asked to send any representatives, did you

Page 77

1  attend, do you have any knowledge about the November
2  2023 commission meeting?
3    A.  No.
4    Q.  There was a community meeting for residents that
5  occurred on November 30th about -- 2023; do you have any
6  knowledge regarding that meeting?
7    A.  No, I don't think I do.
8    Q.  As it relates specifically to Venue At Heritage
9  Oaks, other than what you have already told me, do you
10  have any other information regarding that proposed
11  development?
12    A.  Maybe unit count.  I remember in the e-mails I
13  saw you proposed plans.  Is there anything more
14  specific?
15    Q.  As it relates to the rents, were you asked to
16  give any additional opinions regarding proposed rents
17  for Venue At Heritage Oaks?
18    A.  Not that I recall specifically, but that is
19  something that is sometimes asked of me when we are
20  looking at sites.
21    Q.  Do these documents or any documents that are
22  available to you show what the proposed rents for 1, 2
23  and 3-bedroom apartments would have been for Venue At
24  Heritage Oaks?
25    A.  I just don't recall.

Jonathan Thomas
February 04, 2025

Page 78

1    Q.  Do you offer any input when affordable housing
2  units are developed as to what the proposed rents would
3  be?
4    A.  Yes.
5    Q.  And tell me about that involvement.
6    A.  So, we look at what max allowable rents are for
7  that area.
8    Q.  What do you mean when you say max allowable
9  rents?
10    A.  So, under the Affordable Housing Program
11  Department of Housing and Urban Development, there is a
12  process for determining and determining the maximum rent
13  that a landlord participating in the Section 42 Program
14  is able to charge, and those are called Gross Maximum
15  Allowable Rent.  And then Florida Housing is a state
16  agency that monitors compliance.
17    Q.  Do you have to submit reports to Florida Housing.
18    A.  Can you be more specific?
19    Q.  When you say they monitor compliance, how is the
20  compliance monitored?
21    A.  So, there is an audit that one of their monitors
22  will perform on the property, I believe it's annually.
23  So, they'll look at the books and records.  And then we
24  also submit to Florida Housing on a, and I believe this
25  is a monthly basis, what's called a Program Report, and

Page 79

1  it shows the rents and other information that we're
2  currently charging.
3    Q.  I know some documents, or, excuse me, some data
4  is posted on the website of each of the Brevard
5  properties?
6    A.  Okay.
7    Q.  Do you participate in posting those, that data?
8    A.  I have involvement in rents and marketing.  So,
9  in some cases, yes, but I don't post them myself.
10    Q.  Understood.  Sorry, I didn't mean that.  So, on
11  Hammock Harbor's website it has that it is a -- it
12  offers homes for unrestricted and restricted income
13  residents.  What does that mean?
14    A.  So, not all of the units at Hammock Harbor are
15  participating in the LIHTC Program, and so, the
16  unrestricted is a reference to market rate, there's no
17  income limitation.
18    Q.  What is the LIHTC program?
19    A.  Low-income Housing Tax Credit.
20    Q.  And what does that mean?
21    A.  Can you be more specific?
22    Q.  Yeah.  What I mean, so, that program your -- it's
23  only intended for low-income residents?
24    A.  Yes.
25    Q.  All right.  And that's when you're talking about

Page 80

1  earlier about you get the income verification so they
2  can qualify to participate in the program?
3    A.  That's correct.
4    Q.  And the Hammock Harbor website posts the maximum
5  allowable household income, and may sound like a dumb
6  question, but that's for all residents of the household,
7  there's a maximum amount they're allowed to make?
8    A.  That's correct.  Yes.
9    Q.  Why -- why did you hesitate?
10    A.  Because there are certain sources of income, I
11  just can't remember what they are, that do not get
12  factored into that calculation.
13    Q.  And I didn't see on the website that you post the
14  rent because would the rent be different for different
15  individuals based on their income, or not?
16    A.  No.  Well, so, under the LIHTC Program there
17  could be different set asides.  A set aside is income
18  and rent threshold.  For instance, it should be a 60%
19  household, it can be an 80% household, or any other
20  percentage.  I'm not sure what determines that, but
21  that's part of the initial underwriting with Florida
22  Housing when a property is being built.
23    Q.  For Venue At Heritage Oaks, did you have a sense
24  of how much the set aside would have been for this, for
25  that property?

Page 81

1    A.  I don't remember.
2    Q.  So.
3    A.  I don't even know if I knew.
4    Q.  Well, I think it's on one of these e-mails.
5    A.  The set asides?
6    Q.  The 20% at 50%; 80% percent at 120%?
7    A.  Yeah, that has to do with -- yes, that would be
8  set aside, but sometimes there's, for instance, it would
9  be 20 at 50, or 40 at 60, but it doesn't mean it's only
10  40 at 60, there could be other set asides on top of
11  that.
12    Q.  For Hammock Harbor, would -- do all the residents
13  pay the same rent?
14    A.  No.
15    Q.  And explain how it's different.
16    A.  So, the unrestricted the market rate, they would
17  have a rent more in line with what other market rate
18  jobs would have.
19    Q.  And who determines the market rate?
20    A.  For the subject property?
21    Q.  For Hammock Harbor.
22    A.  It would be based off the market rate comps in
23  the area who would look at what they're charging and see
24  what we think we might be able to charge and stay full.
25    Q.  And who's we?

Page 82

1    A.   Oh.
2    Q.   That's what I was after.  Sorry.
3    A.   Got it.  Our business analytics team in
4    partnership with the regional property manager and/or
5    the site staff over that property.
6    Q.   So, it's just collecting data and determining
7    in-house what you think the market rate would be for a
8    specific piece of property?
9    A.   That's correct.
10   Q.   All right, Venue At Viera, on the website it says
11   the eligibility is age 62 or older, or age 55 or older
12   and one person in the house with a disability; is that
13   correct?
14   A.   Yes.
15   Q.   So, are there any residents at Venue At Viera
16   that don't fall in one of those two categories?
17   A.   There must be because when we're going through
18   the ages, which I still don't know why we have some that
19   are the ages that I mentioned earlier.  So, I think
20   those would be the exceptions.
21   Q.   That could be like you mentioned earlier about
22   maybe a caretaker?
23   A.   Could be, yes.
24   Q.   Do you collect data or have any information as to
25   why the age would be not within one of these two

Page 83

1    categories?
2         MS. RHODEN:  Object to form.
3         THE WITNESS:  Can you repeat the question?
4    BY MS. GAINEY:
5    Q.   It's a bad question.  I'm sorry.
6    A.   I'm not saying that.
7    Q.   I'll say it.
8         When you pull the data and you see that a
9    resident may be under age 55, do you have any documents
10   that is explain why that resident is under age 55?
11   A.   Well, in the situation of a caretaker, we would
12   have forms where our compliance team would make sure
13   that they meet whatever qualifications they are to be a
14   valid caretaker.
15   Q.   And are those reasons entered into the database,
16   or is it just matter of --
17   A.   I don't know.  I'm not certain.
18   Q.   It appears Venue At Viera is also an unrestricted
19   and restricted income property, correct?
20        MS. RHODEN:  Object to form.
21        THE WITNESS:  Yes, we must have market -- I
22   think we have a small percentage of market rate units,
23   but I don't remember.
24   BY MS. GAINEY:
25   Q.   And how do you determine that?  I mean, how do

Page 84

1    you determine if something -- if the property can have
2    market rate or not?
3         MS. RHODEN:  Object to form.
4         THE WITNESS:  I don't determine that.  I
5    believe it has to do with the available financing
6    based off whatever sources of tax credit equity might
7    be available when the developer is applying for a
8    property.
9    BY MS. GAINEY:
10   Q.   So, on the Venue At Viera website when it says,
11   "We are pleased to offer apartment homes for
12   unrestricted and restricted income residents," does that
13   mean that there are residents at Venue At Viera that
14   have no income restrictions?
15   A.   That would be correct, yes.
16   Q.   And how do you find that information as to how
17   many residents if you have that available?
18   A.   I would look at our or what we internally refer
19   to as a renting policy for a particular property and
20   that will tell me what the restrictions are.
21   Q.   For the proposed project Venue at Heritage Oaks,
22   were any of the apartment homes going to be offered for
23   unrestricted income residents?
24        MS. RHODEN:  Object to form.
25        THE WITNESS:  I don't recall.

Page 85

1    BY MS. GAINEY:
2    Q.   Malabar Cove website also says, "We are pleased
3    to offer apartment homes for unrestricted and restricted
4    income residents."
5         Is that an accurate statement?
6         MS. RHODEN:  Object to form.
7         THE WITNESS:  Yes.  Can I ask approximately
8    when you pulled --
9    BY MS. GAINEY:
10   Q.   Sure.
11   A.   -- that, though.
12   Q.   Let me see if I have a date.  October 24th, 2024.
13   A.   Okay.  So, when a property is aging out of a tax
14   credit program, which some option -- some properties
15   have that option, Malabar, around that timeframe Malabar
16   went through what's called a release, so, where they're
17   released from the affordable program and become market
18   rate.  And so, I think prior to that we did not have
19   unrestricted units at Malabar.  So, that's why.
20   Q.   So, do any of your other Brevard County
21   properties -- well, strike that.
22        Is Malabar Cove the only one that's in that
23   situation where they're being released from income
24   restrictions?
25   A.   I think so.

Page 86

1   Q.  I'm going to just check the website as it says
2   today.  At least on the website it says that:  "We are
3   pleased to offer apartment homes for unrestricted and
4   restricted income residents."
5          So, Malabar Cove, as we sit here today, is
6   offering unrestricted income units?
7   A.  Yes.
8          MS. RHODEN:  Object to form.
9   BY MS. GAINEY:
10  Q.  And then what's the other one, Wickham, Wickham
11  Club.  Is -- do they have -- I don't see it posted on
12  their website, or at least in October of 2024, that they
13  had unrestricted income units?
14  A.  That would be consistent with my understanding as
15  well.
16  Q.  So, Wickham Club is exclusively for -- oh, I'm
17  sorry, let me back up.  It does say we offer lower rents
18  than market rate communities.  I'm not trying to set you
19  up or anything.
20  A.  Yeah, that's fine.
21  Q.  I'm just trying to get an explanation as to --
22         MS. RHODEN:  Object to form.
23  BY MS. GAINEY:
24  Q.  -- what these mean.
25  A.  The following sentence is an indication to me

Page 87

1   that this might have been released from a lower set
2   aside like a 60%, and the reference to moderate, that's
3   synonymous to me to be consistent with some 80% options.
4   Q.  So, moderate income is those earning at least 80%
5   of AMI?
6   A.  I believe it's not to exceed 80%.
7   Q.  And so, Wickham Club is still an affordable
8   housing unit, it's just the percentages are different as
9   far as what a percentage of AMI?
10  A.  Correct.
11         MS. RHODEN:  Object to form.
12  BY MS. GAINEY:
13  Q.  All right.  Do you offer any opinions or have any
14  knowledge about the alleged damages in this case?
15  A.  No.
16  Q.  So, you were never asked to participate in
17  calculating any type of damages as it relates to Concord
18  Management?
19  A.  Not that I recall.
20  Q.  Do you have any knowledge about the reason why
21  the land contract was terminated in this case?
22  A.  I don't.
23  Q.  Have you had any conversations with the city of
24  -- with representatives from the City of Melbourne, West
25  Melbourne regarding the Venue At Heritage Oaks?

Page 88

1   A.  I have not.
2   Q.  Have you had any conversations with any employee,
3   representative or commissioner from Brevard County
4   regarding Venue At Heritage Oaks?
5   A.  I have not.
6   Q.  Other than what you've testified here today, do
7   you have any other knowledge regarding the race,
8   ethnicity or racial composition of Venue At Heritage
9   Oaks, excuse me Venue At -- the other one?
10  A.  Viera?
11  Q.  Thank you.
12  A.  No.
13  Q.  I'm trying to wrap up, so.
14  A.  You're fine.
15  Q.  Do you have any knowledge regarding any proposed
16  ordinances or past ordinance as they relate to the Live
17  Local Act?
18         MS. RHODEN:  Object to form.
19         THE WITNESS:  I'm familiar with the Live
20  Local Act, but are you referring to this property?
21  BY MS. GAINEY:
22  Q.  Well, let me ask you this:  Where do you live,
23  which county?
24  A.  Orange County.
25  Q.  All right.  So, the answer to your question is

Page 89

1   yes.  Are you aware of any discussions or any knowledge
2   regarding the Live Local and this particular piece of
3   property?
4   A.  No.
5   Q.  The reason why I asked where you live is because
6   there's some ordinances that were passed about Live
7   Local and I didn't know if you live in Brevard County.
8   You do not, correct?
9   A.  That's correct.
10  Q.  Do you have any knowledge about a traffic study
11  relating to the area of Minton Road and Heritage Oaks?
12  A.  I do not.
13  Q.  Do you have any knowledge regarding community
14  members that objected to the proposed project?
15  A.  I know that there was objection.  I don't know
16  anything more than that.
17  Q.  Do you remember or have any knowledge as to what
18  the specific objections were to the project?
19  A.  I don't.
20  Q.  Do you have any evidence of any commissioner
21  discriminating against minorities as they made the
22  decision to deny the bond financing?
23         MS. RHODEN:  Object to form.
24         THE WITNESS:  No.
25  BY MS. GAINEY:

Jonathan Thomas
February 04, 2025

Page 90

1    Q.  Do you have any knowledge regarding alleged
2  discrimination by Brevard County as it relates to this
3  proposed project?
4          MS. RHODEN:  Object to form.
5          THE WITNESS:  I don't.
6  BY MS. GAINEY:
7    Q.  Do you have any evidence that race was a
8  motivating factor in the commission's decision to deny
9  the bond financing?
10         MS. RHODEN:  Object to form.
11         THE WITNESS:  I don't.
12 BY MS. GAINEY:
13   Q.  Do you have any knowledge of the racial animus in
14 the commission's decision to deny the bond financing?
15         MS. RHODEN:  Object to form.
16         THE WITNESS:  I don't.
17 BY MS. GAINEY:
18   Q.  Do you have any evidence regarding the
19 commissioners alleged motives for denying the bond
20 financing?
21         MS. RHODEN:  Object to form.
22         THE WITNESS:  I don't.
23 BY MS. GAINEY:
24   Q.  Do you have any evidence regarding other possible
25 sources for the proposed -- sources of financing for the

Page 91

1  proposed project?
2          MS. RHODEN:  Object to form.
3          THE WITNESS:  No.
4  BY MS. GAINEY:
5    Q.  Does -- is it Ammon Smith?
6    A.  Ammon.
7    Q.  Ammon, I pronounce it wrong every time.  Does he
8  still work for the company?
9    A.  He does.
10   Q.  And what is his title?
11   A.  He leads our strategic performance group, which
12 includes our marketing.
13   Q.  And was he involved in the Venue At Heritage Oaks
14 proposed project as best you know?
15   A.  Not to my knowledge, but he is sometimes involved
16 in applications, so, maybe.
17   Q.  Did you have any conversations with him regarding
18 the Venue At Heritage Oaks?
19   A.  Not that I recall.
20   Q.  I'm going to show you a document that was
21 produced by your attorney.  It's marked Plaintiff's
22 02927.  Ask you to take a look at that.
23   A.  Okay.
24   Q.  And have you ever seen that before?
25   A.  Not that I recall, but we have this standard form

Page 92

1  for some of our properties.
2    Q.  And so, did you participate in creating that
3  document at all?
4    A.  No, I don't think so.
5    Q.  And it says at the top Rent Calculations, and it
6  has various levels and various calculations as far as
7  income limits.  And then also on Plaintiff's Exhibit, or
8  Plaintiff's Bates stamp 2928, it has the Venue At
9  Heritage Oaks and a cup -- some numbers for rent.  Have
10 you seen that document before?
11   A.  I don't think so.  Sorry.
12   Q.  According to Plaintiff's 2928, the Venue At
13 Heritage Oaks net rent for a one-bedroom, someone
14 earning 20% of 50% AMI would be $710.  Is that
15 consistent with Venue At Viera?
16         MS. RHODEN:  Object to form.
17         THE WITNESS:  No, because I don't think
18 Venue At Viera has a 50%.
19 BY MS. GAINEY:
20   Q.  What does Venue At Viera have?
21   A.  60% unrestricted and I can't remember if there
22 was an ELI component, extremely low income component in
23 the vernacular anything less than.  I think we use 40%
24 set aside.  Anything below that we would just generally
25 refer to as ELI.

Page 93

1    Q.  This also has 80% at market, and the net rent for
2  a one bedroom would be $1479.  Is that consistent with
3  Venue At Viera?
4    A.  I don't remember what their unrestricted rents
5  are.
6    Q.  For a two bedroom, it would be $1699.  Is that
7  consistent with Venue At Viera?
8    A.  How much?
9    Q.  1699 for a two bedroom?
10   A.  I don't know.  I can't recall.
11   Q.  What about for three bedroom, $1849?
12   A.  I don't recall.
13   Q.  Do you have any information regarding Mr. Culp
14 saying that the property would be developed irrespective
15 of the bond financing?
16         MS. RHODEN:  Object to form.
17         THE WITNESS:  Can you repeat the question?
18 BY MS. GAINEY:
19   Q.  Sure.  It appear that's on or about November
20 14th, 2023, Mr. Culp was asked:  "This project will be
21 built whether or not it is financed with bonds."  And
22 his response was:  "Yes, the Live Local legislation
23 provides the land use approvals and the bonds merely
24 provide opportunities some of the apartments to be more
25 affordable for the seniors needing housing in the

Jonathan Thomas
February 04, 2025

Page 94

1   community."
2           Do you have any knowledge regarding that
3   statement?
4   A.  No.
5   Q.  The pres -- I'm sorry, I think I asked you this,
6   but let me just confirm.  The presentation that Mr. Culp
7   did to the Brevard County Commissioners, you did not
8   participate in drafting that presentation, correct?
9   A.  That's correct.
10          MS. GAINEY:  Sir, thank you very much for
11  your time.  I'm going to need to look through these
12  documents, so I'm going to reserve the right to
13  continue your deposition, but I'm going to end for
14  today since we're close to 5 o'clock.
15          THE WITNESS:  Okay.
16          MS. RHODEN:  Okay.  And we will read.
17          THE REPORTER:  And would you like to order?
18          MS. GAINEY:  Yes, ma'am, I definitely would
19  like to order.
20          THE REPORTER:  All righty.
21          And you would like a copy?
22          MS. RHODEN:  Yes.
23          THE REPORTER:  Thank you very much.
24          VIDEOGRAPHER:  This concludes the deposition
25  of Jonathan Thomas.  We are going off at 4:58 p.m.

Page 95

1   Please hold.
2           (Whereupon, the witness's handwritten note
3   was marked for identification as Defendant's Exhibit
4   B.)
5               - - - - - - -
6           (The deposition was concluded at 4:58 p.m.)
7   (Reading and signing of the deposition was not waived by
8           the witness and all parties.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 96

1               CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY OF ORANGE
5
6           I, Regina Toppins, Florida Court Reporter,
7   Notary Public, State of Florida, certify that JONATHAN
8   THOMAS personally appeared before me on the 4th day of
9   February, 2025, and was duly sworn.
10          Signed this 4th day of February, 2025.
11
12
13
14
15
16
17  _____
    Regina Toppins, Court Reporter
18  Notary Public, State of Florida
    Commission No.:  HH 562343
19  Commission Expires:  September 14, 2028
20
21
22
23
24
25

Page 97

1               CERTIFICATE OF REPORTER
2
3   STATE OF FLORIDA
4   COUNTY OF ORANGE
5
6           I, Regina Toppins, Florida Court Reporter,
7   certify that I was authorized to and did
8   stenographically report the deposition of JONATHAN
9   THOMAS, pages 1 through 99; that a review of the
10  transcript was requested; and that the transcript is a
11  true record of my stenographic notes.
12          I further certify that I am not a relative,
13  employee, attorney, or counsel of any of the parties,
14  nor am I a relative or employee of any of the parties'
15  attorneys or counsel connected with the action, nor am I
16  financially interested in the action.
17          Dated this 4th day of February, 2025.
18
19
20
21  _____
    Regina Toppins
22  Florida Court Reporter
23
24
25

Jonathan Thomas
February 04, 2025

Page 98

```
1                    DEPOSITION ERRATA SHEET
2        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES ON THIS PAGE
3         IN RE:  ATLANTIC HOUSING PARTNERS, LLLP vs. BREVARD
                                 COUNTY
4
                          (JONATHAN THOMAS)
5                         (February 4, 2025)
                   {U.S. LEGAL JOB NO. 6798927-001}
6        _____
         Page No._____ Line No._____
7
         Change:_____
8
         Reason for change:_____
9
         Page No._____ Line No._____
10
         Change:_____
11
         Reason for change:_____
12
         Page No._____ Line No._____
13
         Change:_____
14
         Reason for change:_____
15
         Page No._____ Line No._____
16
         Change:_____
17
         Reason for change:_____
18
         Page No._____ Line No._____
19
         Change:_____
20
         Reason for change:_____
21
22
         Under penalties of perjury, I declare that I have read
23       the foregoing document and that the facts stated in it
         are true.
24
25       _____          _____
         Date                             JONATHAN THOMAS
```

Page 99

```
1                    WITNESS NOTIFICATION LETTER
2
3
4        February 10, 2025
5        Jonathan Thomas
         c/o Rebecca E. Rhoden, Esq.
6        Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
         215 North Eola Drive
7        Orlando, Florida 32801
8        In Re:  Atlantic Housing Partners, LLLP v. Brevard
                 County
9                Deposition taken on February 4, 2025
                 U.S. Legal Support Job No. 6798927-001
10
         The transcript of the above-referenced proceeding has
11       been prepared and is being provided to your office for
         review by the witness.
12
         We respectfully request that the witness complete his
13       review within 30 days and return the errata sheet to our
         office at the below address or via e-mail to:
14       southeastproduction@uslegalsupport.com.
15       Sincerely,
16       Regina Toppins, Court Reporter
         U.S. Legal Support, Inc.
17       16825 Northchase Drive, Suite 900
         Houston, Texas 77060
18
19       cc via transcript:
20       Susan G. Gainey, Esq.
21
22
23
24
25
```