UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ATLANTIC HOUSING
PARTNERS L.L.L.P., CANTON       CASE NO.: 6:23-cv-02473-CEM-DCI
CONSTRUCTION LLC, CONCORD
MANAGEMENT, LTD
and THE VENUE AT HERITAGE OAKS
PARTNERS, LTD,
      Plaintiffs,
vs.
BREVARD COUNTY,
      Defendant.

## DEFENDANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF PLAINTIFFS' FRCP 26 EXPERT WITNESS, DR. HANK FISHKIND

COMES NOW Defendant, Brevard County (hereinafter "Brevard County" or "Defendant"), by and through its undersigned counsel, and hereby files its Motion In Limine to Exclude Testimony and Opinions of Plaintiffs' FRCP 26 Expert Witness, Dr. Hank Fishkind, and as grounds therefore would show unto the Court as follows:

### STATEMENT OF PRECISE RELIEF REQUESTED

Defendant seeks to exclude the testimony of Plaintiffs' FRCP 26 expert, Dr. Hank Fishkind, pursuant to 1) Federal Rules of Evidence 402, 403, 702 and 703, as well as *Daubert* and its progeny; and 2) failure to comply with FRCP 26.

### STATEMENT OF THE BASIS OF THE REQUEST AND MATERIAL FACTS

## I.  PLEADINGS SUMMARY

On December 27, 2023, this action is brought by the Plaintiffs, Atlantic Housing Partners, L.L.L.P., ("AHP"); Canton Construction, LLC ("Canton"); Concord

1

Management, Ltd. ("Concord"); and The Venue at Heritage Oaks Partners, Ltd. ("VHO") (collectively referred to as "Plaintiffs") against Brevard County for damages under the Fair Housing Act, 42 U.S.C. §§ 3604 and 3613 ("FHA") and the Florida Fair Housing Act, Fla. Stat. §§ 760.23, 760.26, and 760.35 ("FFHA") (Doc. 1).

VHO and AHP intended to develop the Property into an affordable housing 105 multifamily dwelling units for rental ("Proposed Development") (Doc. 37 at ¶12). Canton was to construct the proposed development and Concord was to manage the proposed development (Doc. 37 at ¶15, 16).

As it relates to the Proposed Development's Projected Demographics, Plaintiffs make the following allegations in the Second Amended Complaint:

> 34.    Black households comprise only 9% of the population in the County and 4% of the population in West Melbourne.
> 38.    Based upon an analysis of the racial composition of other communities owned by Plaintiffs or affiliated companies thereof in the County, Black households would have accounted for approximately 35% of the households in the Development.
> 39.    Thus, the Development's projected population of Black households would have been nearly four times higher than the County's population of Black households.
> 40.    Also, the Development's projected population of Black households would have been nearly nine times higher than West Melbourne's population of Black households.
> 41    Based upon an analysis of the racial composition of other communities owned by Plaintiffs or affiliated companies thereof in the County, White households would have accounted for approximately 45% of the households in the Development.
> 42.    Thus, the Development's projected population of White households would have been over 45% less than the County's population of White households. (Doc. 37 at pp. 7-8).

As it relates to the set-asides for the Proposed Development, Plaintiffs' have made different arguments as to what the Proposed Development would have required. The

Complaint, filed on December 27, 2023, and Amended Complaint, filed on February 9,

2024, state as follows:

> As a condition of the Bond Financing, a Land Use Restriction Agreement encumbering the Property would have required that a minimum of 20% of the apartment units be set aside and available only to persons earning less than 50% of area median income with the remaining 80% available to persons earning less than 120% of area median income, for as long as the financing is outstanding, or for a term of 15 years, or as long as a real estate tax exemption is available to the Project, whichever is longer.  (Doc. 1 at ¶ 17) and (Doc. 17 at ¶ 17)

However, when Plaintiffs filed the Second Amended Complaint on October 18,

2024, the allegation as it related to set-asides had changed to:

> As a condition of the Bond Financing, a Land Use Restriction Agreement encumbering the Property would have required that a minimum of 20% of the apartment units be set aside and available only to households earning less than 50% of area median income or 40% of the units set aside and available only to households earning less than 60% of the area median income with the remaining 80% available to households earning less than 120% of area median income, for as estate tax exemption is available to the Development, whichever is longer. Additionally, the Live Local Act requires 40% of the apartment units be set aside and available to households earning less than 120% of area median income for a term of 30 years. Finally, the Low-Income Housing Tax Credits awarded by FHFC will provide that 100% of the units be available only to households earning less than 60% of the area median income when using Private Activity Multi-Family Mortgage Revenue Bonds Issued by the Local HFA, which is the BCHFA in this case. (Doc. 37 at ¶21)[1]

## II.    MATERIAL FACTS

On July 31, 2023, Atlantic submitted its application for tax-exempt bond financing

for the Development to the BCHFA ("VHO Application") (Doc. 37 at ¶ 18) ("Exhibit

A").  The VHO Application stated that there would be 105 total units consisting of 63

---

[1] The proposed Land Use Restriction Agreement for the proposed development is attached as "Exhibit R."

one-bedroom units, 26 two-bedroom units and 12 three-bedroom units (Exhibit A, p. 2). On page 6 of the application, the option to "choose the category that describes the population to be served" was available and VHO selected "family." (Exhibit A, p. 6).

Based on the VHO application, only 20% of the units, or 21 units of the 105 total units, would be available to those earning up to 50% AMI (area medium income) (thirteen (13) one-bedroom units; five (5) two-bedroom units; three (3) 3-bedroom units) (Exhibit A, p. 7). The VHO application specifies that "the project will have the federal minimum affordable set asides at 20% at 50% [of AMI] and VHO opted to select "20% of units at 50% of area median income" (vs. 40% of units at 60% of area median income" (Exhibit A, pp. 2, 7).

Pursuant to the page 7 of VHO Application, the "breakdown of units" was as follows:

| # Of Bedrooms/ Unit | # Of Baths Per Unit | Square Feet Per Unit | # Of Units Per Bedroom type | | % Of Area Median Income | Monthly Gross Rent for Set-Aside Units* | Less Utility Allowance (for HC Developments) | Net Rent for Set-Aside Units | Monthly Market Rent+ |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 720 | 20% Market | 13 50 | 20% Market | 20% $806.25 | $95.79 | $710.46 | $1479 |
| 2 | 2 | 968 | 20% Market | 5 21 | 20% Market | 20% $967.50 | $111.87 | $855.63 | $1699 |
| 3 | 3 | 1,137 | 20% Market | 3 9 | 20% Market | 20% $1,118.17 | $129.33 | $988.84 | $1849 |

The VHO Application also included the following table regarding AMI Set-Aside with 80% of the units at market rate. (Exhibit A, page 73)

On November 14, 2023, a representative of AHP, Marc Gauthier, spoke at the BCBCC meeting. Mr. Gauthier stated he expected the rent for the proposed project to be "somewhere in the low thousands." Chair Pritchett asked, "So, it's really not low income, it's just affordable." Mr. Gauthier responded, "Yeah, it is a, it, it's a, it's first

off, a senior's community... um, and it is mixed income. We're, we're anticipating, um, a range of affordability, um, set aside. So, we'll have some that are closer to market and some that are a little bit lower on the scale" ("Exhibit B")

The consideration of the bond application was tabled and AHP agreed to host a community meeting. On November 30, 2023, AHP hosted a community meeting.  At the meeting, AHP representative, Scott Culp, made a presentation wherein he told the community that the Proposed Development would be restricted to seniors.  Culp showed a PowerPoint presentation which included slides that the Proposed Development would have "50% and 120% income limits" ("Exhibit C").

Prior to the December 5, 2023 BOCC meeting, Culp sent a PowerPoint presentation to the commissioners ("Exhibit D") and told BCBCC that the community was a "senior's affordable housing community building on a commercial parcel utilizing the Live Local legislation." Culp stated, "20 percent of the units will be at 50 percent of the median income and the balance will have a maximum of 120 percent of median income."

Culp was advised on December 13, 2023 by Jonathan Thomas, President of Concord Management, when analyzing the demographics at Venue at Vierra "you will see the data is not in our favor in terms of underrepresented minorities." At Venue at Vierra, 93.3% of the residents reported race and ethnicity and only 7.78% of the residents were Black/African American ("Exhibit E").

The Plaintiffs filed this lawsuit on December 27, 2023.  Culp testified that other than the report of Plaintiffs' hired expert, Dr. Hank Fishkind, Plaintiffs have no evidence of discrimination or that the race of the tenants at the Venue at Vierra would be 35% black (Culp Dep, pp 167, 230-231, 233, 234 "Exhibit M").  Culp was advised on December 13, 2023 by Jonathan Thomas, President of Concord Management, when analyzing the demographics at Venue at Vierra "you will see the data is not in our favor in terms of underrepresented minorities." At Venue at Vierra, 93.3% of the residents reported race and ethnicity and only 7.78% of the residents were Black/African American ("Exhibit E").

Dr. Fishkind was retained as an expert witness in January 2024. On February 14, 2024, Mr. Thomas sent another email to Mr. Culp ("Exhibit E"). These demographic reports appear to have been forward to Dr. Fishkind the same day by Plaintiffs' counsel ("Exhibit F").

On March 18, 2024, Defendant served Interrogatories and Requests for Production to all Plaintiffs, requesting, among other things, all documents relied on expert witness. Per the invoices produced by Plaintiffs, Dr. Fishkind appears to have done a significant amount of work through April 2023. On May 13, 2024, Plaintiffs Responses and Objections to Defendant's initial discovery.  However, Plaintiffs did not include any documents with their responses and served the responses without documents. On May 30, 2024, the documents served with no index and no specificity as to which documents responded to which Requests for Production. ("Exhibit G")

Pursuant to this Court's Order, Plaintiffs disclosed Dr. Fishkind as an expert witness and submitted Dr. Fishkind's Expert Report on September 16, 2024 (Exhibit H)[2]. Plaintiffs did not supplement their Responses to Defendant's Request for Production at that time.

Dr. Fishkind states in his report as follows:

The Project was to be a 105-unit, rental apartment community, with apartments offered at below market rates: (a) 21 units affordable to households earning 30% of the area median income ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.

Dr. Fishkind cites "Plaintiffs' project plan" in footnote 2 as his source for this information. (p. 3) However, Culp testified that there is no "Plaintiffs' project plan" document. (Culp Dep, p 28-29, "Exhibit I")

In "Determining the Relevant Market," Dr. Fishkind's report states as follows:

27.0   The first step in the analysis is to determine the Relevant Market for the Project. The Project was to be a 105-unit, rental apartment community located at 2395 Minton Road (northeast corner of Minton Road and Heritage Oaks Boulevard) in West Melbourne. The Plaintiffs planned to develop apartments offered at below market rates: (a) 21 units affordable to households earning 30% AMI; (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.

28.0   The Plaintiffs have developed, and currently own and manage, four other affordable apartment projects in Brevard County: Wickham Club, Hammock Harbor, Malabar Cove, and Venue at Viera. Figure 1 shows their locations along with the Project. As Figure 1 shows, the Project would have been north of Malabar Cove and south of Wickham Club, Hammock Harbor, and the Venue at Viera.

---

[2] On page 24 of Dr. Fishkind's report "The Plaintiffs have asked me to defer analysis of the damages at this time" and "In the future, I plan to update this report to incorporate the analysis of economic damages and to reflect any additional material evidence provided." However, Dr. Fishkind has not provided any damages opinions or updated his report "to incorporate the analysis of economic damages."

29.0    The Project's location and product offerings would have positioned it to serve the same market as the Plaintiffs' other apartment communities.

30.0    The Plaintiffs survey their residents on a regular basis in the normal course of their business. Among other things, their survey provides information about the racial and ethnic composition of their tenants and where the tenants previously lived. This data shows that 71% of the tenants moved from 16 zip codes in Melbourne, West Melbourne, Rockledge, Palm Bay, Cocoa, Viera, and Titusville.

76.0    Regardless of their ultimate motivation, the Defendant decided not to approve the bond issue dooming the Project. As Table 10 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located. The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households. The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability. Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market. In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households. The data show that the Decision perpetuates racially segregated housing patterns in West Melbourne.

Dr. Fishkind also includes a map of Plaintiffs' other four Brevard developments (pp. 7-8, 22). On page 22 of Dr. Fishkind's report, he references the video record of the December 5, 2023 meeting and provides the cite to the meeting in Footnote 32. On page 29 of Dr. Fishkind's report, he lists "Materials Reviewed or Relied Upon." The list includes: "Demographic Information – Age and Race Ethnicity – Brevard."

On November 20, 2024, the undersigned counsel for the Defendant sent an email to opposing counsel requesting production of the survey relied upon on page 8 of the report and the documents referred to on page 29. (Exhibit J) The response to Defendant's specific request for documents relied on by Dr. Fishkind was:

After a minimal review the produced documents (4,283 pages) we were not able to locate the requested due to the voluminous documents provided. We suggest having your paralegal review the documents provided. If you aren't able to locate what you're looking for, perhaps do an expert Request to our expert individually.

On November 21, 2024, during Culp's deposition, the undersigned again requested copies of the race and ethnic data "survey" relied upon by Dr. Fishkind (Exhibit K, pp, 45-46).

Defendant retained its own expert Sean Malone, PH. D (Dr. Malone). Dr. Malone did not have the "survey" available in order to formulate his opinions and Dr. Malone was without the use of the Dr. Fishkind's complete file. Nonetheless, pursuant to the Court's disclosure deadline, Dr. Malone submitted his Rebuttal Report November 29, 2024 pointing to errors in Fishkind's methodology rendering his ultimate opinions unreliable. ("Exhibit L")

53 days after Defendant served Dr. Malone's expert report, and just over a month before the March 1, 2025 discovery close deadline, Dr. Fishkind responded with his own Expert Rebuttal Report on January 21, 2025 (Exhibit M). On January 27, 2025, Plaintiffs provided Dr. Fishkind's entire file, including the "survey' of the data and demographic information from Plaintiffs' other properties. (Exhibit N)

On February 12, 2025, in response to a Subpoena Duces Tecum to Johnathan Thomas, Plaintiffs provided, for the first time, the emails indicating when Plaintiffs

harvested the data related to the demographics of the other four properties – on December 13, 2023 and February 14, 2024.  (Exhibit O)

Plaintiffs finally provided age, race-ethnicity data of other properties on March 5, 2025, four days after discovery close (Exhibit P). Dr. Malone used to further support his conclusions in his November 2023 report. Dr. Malone provided a supplemental report on March 11, 2025 (Exhibit Q).

## **LEGAL MEMORANDUM SUPPORTING THE REQUEST**

Defendant seeks to exclude the expert testimony of Dr. Fishkind pursuant to 1) Federal Rules of Evidence 402, 403, 702 and 703, as well as *Daubert* and its progeny; and 2) Federal Rules of Civil Procedure 37 for Plaintiffs' failure to comply with FRCP 26. After Dr. Fishkind spent eight months preparing his initial report, which was disclosed on September 17, 2023, he rendered opinions which were not reliable, not helpful and confusing.  Dr. Fishkind used data from Plaintiffs' four other Brevard properties, three of which are not senior restricted communities.  When Defendant's expert opines that it is improper to use properties without the same demographics as the proposed development, Dr. Fishkind takes almost two months to basically create a new report and provides it to Defendant less than a month before discovery close.  Defendant continued to insist on relevant racial data for the other four properties, and that relevant data was not served until March 5, 2025.

In his January 21, 2025 report, Fishkind acknowledges his error in one aspect of his analysis and rejects all of the other criticisms contained in the Malone report. He them proceeds to re-analyze some of the data to support his original conclusion.  It

is unclear from the last Fishkind report which set of analyses and conclusion he proposes to present to the jury. The Defendant will, therefore, address all of the analyses and conclusion. As outlined below, the testimony and opinions Fishkind must be excluded from this case for failure to comply with *Daubert* admissibility standards.

## I.    Dr. Fishkind's Opinions and Testimony Are Not Admissible Under *Daubert* and Rule 702

The District Court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home, Inc.*, 996 F.2d 266, 268 (11th Cir. 1993); *see also U.S. v. Nacchio,* 555 F.3d 1234, 1241 (10th Cir. 2009).

Federal Rule of Evidence 702 requires the District Court serve as gatekeeper to the admission of scientific testimony, specifically "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotations omitted); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). As gatekeepers, courts properly exclude any expert or expert opinion that does not satisfy any of the following: (1) The expert must be qualified to testify competently regarding the matters he intends to address (the "qualification" prong); (2) The methodology used to reach any conclusions must pass the *Daubert* test of reliability (the "reliability" prong); and (3) The testimony assists the trier of fact,

through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue (the "helpfulness" prong). *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–42 (11th Cir. 2003); The offering party bears the burden to lay the proper foundation, by a preponderance of the evidence, for the expert opinion to be admissible. *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Regarding the helpfulness prong, "[e]xpert testimony helps where it concerns matters beyond the ken of the average juror and will allow the jury to understand the evidence or to resolve a factual dispute. . .. Conversely, there will be no need for an expert's opinion where the jury can decide a disputed issue through the application of common sense or simple logic considering the evidence and testimony presented at trial.   Further, like all evidence and testimony, an expert's opinion must be relevant to an issue in the case and must hold probative value that outweighs the concerns listed in Rule 403." *Gales*, 2021 WL 2823269, at *2.

Regarding the reliability prong, such can be evaluated by considering a wide range of factors, including: "(1) whether the expert bases her opinion on sufficient facts or data; (2) whether the expert unjustifiably extrapolates her research to reach an unfounded conclusion; (3) whether the expert considers or accounts for contradictory studies or data; (4) the extent to which the methods used rely on the expert's subjective interpretations; and (5) whether the expert is being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation."

*Gales*, 2021 WL 2823269, at *1. The expert's testimony must always be based on good grounds, and "leaps of faith" unsupported by good science preclude the admission of expert testimony. If the expert's analysis is deemed unreliable at any step of his logic, the expert's entire opinion must be excluded. *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009).

Fishkind's opinions and testimony must be excluded as they fail to satisfy the *Daubert* and Rule 702 standards reliability and helpfulness prongs. Defendant does not challenge Dr. Fishkind's qualifications.

### A. Dr. Fishkind's Opinions Are Not Helpful To A Jury

### 1. <u>Helpfulness Prong - Basis used for the opinion is irrelevant</u>

Throughout his report Dr. Fishkind describes the development "was to be a 105-unit, rental apartment community, with apartments offered at below market rates: (a) 21 units affordable to households earning 30% of the area median income ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI.2 HUD calculates the AMI for all markets each year." He references in footnote 2, as having been derived from "Plaintiff's project plan." It is notable that this document is not attached to his report nor is the document refenced in Exhibit #3 as a document he relied upon in reaching his opinion. That is because no such document exists, as admitted by Culp in the FRCP 30(B)(6) deposition, taken March 24, 2025. Though Dr. Fishkind apparently watched the December 5, 2023 Commissioner meeting, reviewed the Brevard County Housing Finance Authority Meeting Minutes for August 23, 2023 and October 25, 2023, reviewed the BCHFA Agenda for October 15, 2023,

nowhere in Dr. Fishkind's report is there even a mention of the Bond Financing Application submitted by Plaintiffs for consideration on July 31, 2023. Nor does Dr. Fishkind list the Bond Financing Application as a document he relied on to formulate his opinions (see pages 29-31). Although the set-asides of 20% at 50% AMI was what was submitted in the application, presented by Mr. Culp at the November 30, 2023 community meeting through a PowerPoint presentation and discussed extensively at both BOCC meetings, including the December 5, 2023 Dr. Fishkind watched, Dr. Fishkind inexplicably never even mentions the set asides which were presented to and considered by BOCC before it made the decision to deny the bond application. It is noteworthy that the set-aside amounts alleged in Plaintiffs' Complaint and Amended Complaint match what was presented in the bond application and to the Commissioners. Those set-asides also match was in the proposed Land Use Restriction Agreement, attached hereto as Exhibit R.

Dr. Fishkind's description of the project bears little similarity to the project proposed by Plaintiffs and rejected by the Defendant. Dr. Fishkind's selection of the set asides is also inconsistent with the description of the Proposed Project in the Complaint and Amended Complaint. Up until Dr. Fishkind's report was issued in September 2023, the all the evidence stated that the Property would have required that a minimum of 20% of the apartment units be set aside and available only to persons earning less than 50% of area median income with the remaining 80% available to persons earning less than 120% of area median income. However, Dr. Fishkind states, the apartments would have been offered at below market rates: (a) **21 units affordable**

**to households earning 30% of the area median income** ("AMI"); (b) 53 units affordable at 60% AMI; and (c) 31 units affordable at 80% AMI (Fishkind report, page 3, emphasis added). These numbers do not even match Plaintiffs' allegations in the Second Amended Complaint, filed after Dr. Fishkind's report. While Plaintiffs changed their set-aside allegations from the original Complaint, nowhere is it alleged by Plaintiffs in the Second Amended Complaint that the units would be available to households earning 30% AMI. Dr. Fishkind's inclusion of households earning 30% of AMI, and what hypothetical effect the Defendant's decision would have on them, is wholly irrelevant to this case and would not be helpful to the jury. Plaintiffs and Dr. Fishkind appear to be asking this Court, and the jury, to consider facts which were never even presented for consideration for consideration to the BOCC. The set-asides as secretly intended by Plaintiffs or as modified by Plaintiffs after the BOCC vote, is irrelevant to this case. BOCC considered the information in front of it and voted, but Dr. Fishkind and Plaintiffs appear to ask this Court to consider what the set-asides would have been at a future date, depending on how Plaintiffs may have, or may not have, decided to change the set-asides. Such speculation does not pass the *Daubert* standard and, Dr. Fishkind's opinion should therefore be excluded.

### 2. Helpfulness Prong - Unreliable Comparators

Dr. Fishkind September 12, 2024 report also conveniently omitted the fact that the Proposed Project presented by Plaintiffs was restricted to those 55 and older. Plaintiffs' Second Amended Complaint conveniently omits the same fact. Dr. Fishkind relies on the comparison of the Proposed Project to four other projects

completed by the Plaintiff's in Brevard County Florida, Wickham Club, Hammock

Harbor, Malabar Cove and Venue at Viera.  Of those four properties only one, Venue

at Viera, has any age restriction similar to those of the Proposed Development.    It is

also the community Culp repeatedly referred others to as being a similar community.

While the Defendant does not object to the use of Venue at Viera as a comparator, the

use of the other complexes as comparators is not appropriate. Dr. Fishkind should be

comparing "apples to apples" if he is going to rely on the racial composition of

Plaintiffs' other Brevard properties to render opinions about what the racial

composition of the proposed development would have been.

This biased and unjustified selection of comparators is similar to that which lead

to the exclusion of Dr. Fishkind's testimony by United States District Judge James

Moody in *Lincoln Rock v. V.* 2016 U.S. Dist. LEXIS 159874.

> The Initial Report does not discuss factors like the underlying value of
> the real property, the location of the underlying real estate, the services
> offered by these facilities, whether the facilities were profitable and for
> how long, the daily rates charged by these facilities versus the daily rates
> Lincoln Rock would be able to charge, and the length of time the facilities
> were in business. To illustrate the unreliability of Dr. Fishkind's
> methodology, the comparator with the closest number of beds to Lincoln
> Rock's proposed RTF, Skyway, which had 28 beds, sold at a price of
> $10,714.00 per-bed. Yet, Dr. Fishkind's methodology, as corrected in his
> Supplemental Report, is based on a value per-bed of $214,922.00.
> In his Rebuttal Report Fishkind seems to acknowledge this inconsistency, but

rather than re-compute his data based upon the one development, Venue at Viera,

which has age restriction similar to those proposed, he opts to reject all comparators

he so eagerly relied upon in his initial report.  Had he included that information in his

analysis it would have demonstrated the less than 8% of the Venue at Viera occupants

were African American, not the 35% figure that he has consistently use as the basis of his opinion.  His refusal to acknowledge and account for this data is sufficient reason, on its own, for the Court to question the reliability of his ultimate conclusions.

### B. Dr. Fishkind's Opinions Are Not Reliable

In his latest report Fishkind acknowledges his error in one aspect of his analysis and rejects all of the other criticisms contained in the Malone report.  He them proceeds to re-analyze some of the data to support his original conclusion.  It is unclear from the last Fishkind report which set of analyses and conclusion he proposes to present to the jury.  The Defendant will, therefore, address all of the analyses and conclusion. As outlined below, the testimony and opinions Fishkind must be excluded from this case for failure to comply with *Daubert* admissibility standards.

### 1. <u>Dr. Fishkind relies on Irrelevant and Unreliable Data to Formulate His Opinions</u>

Dr. Fishkind states, "Plaintiffs' other four apartment projects in the Relevant Market are rented by members of the Affected Group." (p. 4) Dr. Fishkind states on page 22 as follows:

> As Table 10 demonstrates, the Decision perpetuates segregation in West Melbourne where the Project was to be located. The racial composition of the Plaintiffs' four existing apartment complexes in the Relevant Market is 45% white households and 35% black households. The Plaintiffs planned to rent apartments in the Project similar to their existing projects with a focus on affordability. Therefore, the racial mix for the Project would have been very similar to the Plaintiffs' other projects in the Relevant Market. In stark contrast, black households constitute just 4% of households in West Melbourne where 77% of the households are white, whereas in Brevard County black households account for 9% of households. The data show that the Decision perpetuates racially segregated housing patterns in West Melbourne.

This information in Dr. Fishkind's report is false. As discussed above, Thomas' email dated December 13, 2023 states at Plaintiffs only other senior restricted community, Venue at Viera, 93.3% of the residents reported race and ethnicity and only 7.78% of the residents were Black/African American.  Further, Thomas sent Culp an email on February 14, 2024, with the race and ethnicity of Plaintiffs' other properties. Pursuant to Plaintiffs own data, regarding all other Brevard properties owned by Plaintiffs, 0.93% of the residents reporting were "Black or African American – Hispanic" and 21.15% of residents were "Black or African American – Non-Hispanic". Thomas provided the following testimony regarding race/ethnicity of the properties:

- Venue At Viera had a higher disclosure of those that provided that information. He thought because it was senior and different than the other properties. (34)
- Venue at Viera had a higher percentage of Caucasian non-Hispanic compared to the other Brevard properties and it is an "outlier." (35)
- 93% of the households at Venue at Viera provided race and/or ethnicity. (38)
- Venue at Viera age requirement is 55 plus. (40)
- Of those who reported race at Venue at Viera in December 2023, 15 residents were black or 8.9% - less than 10%. (45, 50)
- Regarding the remaining properties, one property had 35.5% black residents, one property had 52.4% black residents, one property had 35.2% black residents, and one property had 34.1% black residents. (48-50) (Malabar Cove reported as I and II)
- Venue at Viera's black population is "much lower than the others" and the only distinction is that Venue at Viera is senior. (50) (Thomas Deposition, "Exhibit S")

Dr. Fishkind's report may be accurate if he accounted for the age restrictions of the other properties.  While it appears to be true that the non-restricted properties are about 35% black, this statistic is wholly irrelevant to this case. Dr. Fishkind did not limit his data and report to the most comparable property, and the property that Culp repeatedly said was the most similar to the proposed development- the senior age-

restricted Venue at Viera.  If he had, as Thomas told Culp before this current lawsuit was even filed, "you will see the data is not in our favor in terms of underrepresented minorities." Venue at Viera's black tenant population in December 2023, when the bond financing was denied, was only 8.9%. Yet, Dr. Fishkind grouped all Plaintiffs properties together including those that did not have a senior age restriction.  Dr. Fishkind should have based his report on seniors since those were restrictions proposed in the bond financing application.  The affected age group was black seniors.  Plaintiffs have 18 other senior properties in their portfolio.  Instead of harvesting the data from senior properties, which would have been readily available to Plaintiffs, Dr. Fishkind relied on irrelevant data from non-senior properties.

To further emphasis the point that the relevant demographic and dataset is black seniors, and the population Dr. Fishkind should have based his opinions on, the Court can review Culp's Affidavit in a previously filed similar lawsuit. Plaintiffs filed a very similar lawsuit against the *Atlantic Housing Partners, et al. v. City of Winter Springs*, Case No.  6:10-CV-1905-ORL-35DAB,  USDC,  Middle  District  (2011).  In  that  case, Plaintiffs planned to develop an affordable housing development, but the community objected (See Culp Aff. "Exhibit T"). Plaintiffs held a community meeting "to address the concerns of the various residents and groups." In response, Plaintiffs implemented a "senior restriction" and limited the residents to "age 55 or older" (Culp Aff. ¶13-17). Plaintiffs hired Meridian Appraisal Group to conduct a "Disparate Impact Study," prepared by Robert Von.  In the Disparate Impact Study, Mr. Von limited his study to "elderly households." Mr. Von did a full analysis of "elderly White households" and

"elderly "Black households" and concluded, "if the subject property is not built, it will have a disparate impact on the elderly African American/Black households within the Primary Market Area" (See Meridian Report, "Exhibit Q").  It appears that Mr. Von correctly limited his disparate impact study to elderly households in Plaintiffs prior discrimination lawsuit, but Dr. Fishkind did not in the current lawsuit.  Dr. Fishkind's report is unreliable, not helpful and irrelevant and should not be used to support Plaintiffs' claims.

So, Dr. Fishkind alleges that 35% of the tenants at the Proposed Development would be Black residents even though <u>only 7.78% of the residents at Venue at Viera were Black/African American</u>. This conclusion defies logic.  It also defies documents created by Dr. Fishkind himself, wherein Dr. Fishkind's "Costar" report for Venue at Vierra shows the population of black people within 1-mile is only 6% ("Exhibit U").

## 2. <u>As Established by Dr. Malone, Dr. Fishkind's Conclusions Are Unreliable</u>

Dr. Malone's report states numerous reasons why Dr. Fishkind's reports are unreliable.  First, the chi square test is an essential aspect of the comparison of populations.  It's intended as a method to determine population proportion observed in sample data.  In his analysis Fishkind applies it to population estimates not know sample data, thus grossly inflating the population proportionality.  This improper extrapolation of the data is purely subjective on his part and is not based upon adequate, validated research.

Second, Fishkind's regression analysis appear to be unsupported by the data contained in his report. An analysis which is unaccompanied by clarity as to the data upon which it relies in inherently unreliably, in that error rate calculation is impossible and it is incapable of independent verification. In his Rebuttal Report Fishkind fails to address this criticism.

This unwarranted extension of an untested methodology is similar to what Dr. Fishkind attempted to present in *Aldridge v. Forest River Inc.* 2010 Bankr. LEXIS 148. In excluding the testimony of Dr. Fishkind, United States Bankruptcy Judge K. Rodney May held "In forming his opinion, that the rent was comparable, Dr. Fishkind analyzed the Lease in terms of "equivalent recreational units." (5/19/09 Tr. 28:1-7.) While thoughtful and creative, the concept of "equivalent recreational units" was strictly subjective and little more than analytical fiction.

Third, any reliable statistical methodology should return the same result to two individual preforming the analysis, assuming they use the same sets of data and the same formula. Dr. Malone in performing the analysis as described above cannot be replicated Dr. Fishkind results, or support the conclusions he drew.

Fourth, Dr. Fishkind appears to use alternative standards of error calculation during his analysis, when his previously chosen method appears to present an unfavorable result. The failure to consider or account for contradictory results, is one of the factors that may lead the Court to find an opinion unreliable.

Fifth, Fishkind appears to overstate, in a way unsupported by the data, the relative percentages of households used in his calculations. Whether the expert is

being as careful as an expert in the same field would be in conducting professional work outside the context of paid litigation is a significant issue in determining the reliability of the ultimate opinion reached.

For the foregoing reasons, and as outlined in Dr. Malone's Rebuttal Report, Dr. Fishkind's report is unreliable and should be excluded for failing to meet the *Daubert* standards of reliability.

## II.    Dr. Fishkind's Opinions and Testimony Should Be Excluded for Violations of FRCP 26

FRCP 26 require disclosure of Expert Witnesses with specificity as and the inclusion of a written report containing all the facts and data considered by the by the witness in forming the opinion.  The term "considered" is interpreted to include "anything received, reviewed, read, or authored by the expert, before or in connection with the forming of his opinion, if the subject matter relates to the facts or opinions expressed." *Employees v. Eastman Kodak.* 251 F.R.D. 101

(U.S.D.C., W.D. New York. 2008).  This includes any matter examined by the Expert even if it is ultimately rejected, even merely oral communications.  *Synthes v. Walden* 232 F.R.D. 460 (U.S.D.C., E.D. Penn. 2005). In the absence of full disclosure, defendants are precluded from meaningful cross-examination of Experts or from challenging their opinions.  *McCellan v. I-Flow* 710 F.Supp.2d 1092 (U.S.D.C., Oregon 2010) .

## A. Delayed disclosure of Demographic Surveys

The second prong of Dr. Fishkind's factual basis of his opinion is a set of surveys filled out by the residents of Plaintiff's four other properties in Brevard County. Dr. Fishkind refers to those survey repeatedly throughout is initial report. FRCP 26 requires that an expert included within his report a list of documents provided to him for the purposes of rendering an opinion. In Exhibit three of his Report, he lists "Materials Reviewed or Relied upon". Under the sub-heading of "Production" he lists "Demographic Information – Age and Race Ethnicity – Brevard." It is clear from that Plaintiffs had possession of these documents since their creation in December 2023 and February 2023 but delayed until January 27, 2025 to produce them for Defendant's examination. It is noteworthy that Defendant specifically asked for the documents on multiple occasions, including in discovery request, via email and in Culp's deposition. Plaintiffs' discovery requests objected to, or called "premature" Defendants requests for documents. Further, FRCP requires production of the documents at the time of disclosure of expert witnesses. Nonetheless, the documents were not produced until a motion before discovery close and full disclosure did not occur until a days after discovery close. This delay can only be attributed to a deliberate attempt to limit the ability of the Defendant to respond to these so-called surveys, determine their provenance and perhaps prepare competing information. The delay was prejudicial to the defense of this case and Dr. Fishkind should be stricken for the egregious failure to produce significant document relied upon to support Dr. Fishkind's opinions.

23

### B. Dr. Fishkind's "Rebuttal Report" Should be Stricken as Untimely and Outside the Scope of Initial Report

Federal Rule of Civil Procedure 26(a)(2)(D) gives an Expert Witness 30 days to file rebuttal report. "It does not grant a license to supplement a previously filed expert report because a party wants to, but instead imposes an obligation to supplement the report when a party discovers the information it has disclosed is incomplete or incorrect." Specifically, supplemental reports are permitted under Rule 26(e)(1) only in the following situations: (1) upon court order; (2) when the party learns that the earlier information is inaccurate or incomplete; or (3) when answers to discovery requests are inaccurate or incomplete. Keener v. United States, 181 F.R.D. at 640; Coles v. Perry, 217 F.R.D. at.

Fishkind "Rebuttal Report" accomplishes none of the above. Instead, it introduces entirely new data sets, rejection of the apartment survey data in its entirety and replacing it with PUMS data. He also includes information not previously refenced in his report. This "rebuttal report" seems to demonstrate a pattern in Dr. Fishkind's practice. He creates an initial report with errors both mathematical and logical. He then waits for opposing experts to point out his errors, then rebuts their criticism by adding new data and opinions to his original report. In *Lincoln Rock v. City of Tampa* 2016 WL 6818959 (U.S.D.C. M.D. Fla 2016) Dr. Fishkind attempted the same tactic. In that case the Court allowed Dr. Fishkind to correct certain mathematical errors but largely struck his Rebuttal Report as improper new opinions.

The Magistrate Judge granted the City's motion to strike in part. The Magistrate Judge allowed Dr. Fishkind to supplement his Initial Report

only to the extent that (1) he had made an error when calculating the cost-per-bed by including a facility that was not comparable to Lincoln Rock and (2) he was allowed to correct another error, which was the failure to deduct the net proceeds from the sale of the Lincoln Rock property from the damage's calculations. The Magistrate Judge reasoned that: "These corrections did not advance a new theory of damages, but instead corrected Dr. Fishkind's calculation under the method of calculating damages he espoused in his Initial Report." At pg. 3.

## CONCLUSION

Dr. Fishkind 's testimony and opinions are inadmissible under Federal Rule of Evidence 702, unhelpful and unreliable under the *Daubert* factors. Further, Dr. Fishkind's testimony and opinions violated FRCP 26. Accordingly, this Court should exclude Dr. Fishkind's opinions in their entirety. Defendant respectfully requests that this Court enter an Order granting its Motion to Exclude Opinions and Expert Testimony of Dr. Hank Fishkind and precluding Plaintiff's expert, Dr. Hank Fishkind, from testifying at trial.

Dated: April 1, 2025.

Respectfully submitted,

*/s/ Susan G. Gainey*
Susan G. Gainey, Esquire
Florida Bar No.: 1016477
Roper, Townsend, Sutphen, P.A.
255 S. Orange Ave., Suite 750
Orlando, FL  32801
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Attorneys for Defendant,
Brevard County
Primary e-mail:
sgainey@roperpa.com
Secondary e-mail:
mramos@roperpa.com

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to Local Rule 3.01(g) the undersigned counsel hereby certifies that she has conferred with Plaintiffs' counsel, Michael Piccolo, Esquire, via email and telephone call in a good faith effort to agree, narrow or resolve the issues raised in this motion, and that counsel for the parties have not been able to come to a resolution of said issues.

Respectfully submitted,

*/s/ Susan G. Gainey*
Susan G. Gainey, Esquire
Florida Bar No.: 1016477
Roper, Townsend, Sutphen, P.A.
255 S. Orange Ave., Suite 750
Orlando, FL  32801
Telephone: (407) 897-5150
Facsimile: (407) 897-3332
Attorneys for Defendant, Brevard County
Primary e-mail: sgainey@roperpa.com
Secondary email: mramos@roperpa.com