| | |
|---|---|
| From: | Keith, Tammy <tkeith@ngn-tally.com> |
| Sent: | Wednesday, November 29, 2023 9:50 AM |
| To: | angelaabbott@cfl.rr.com |
| Cc: | Mustian, Mark; Fischer, Alex |
| Subject: | RE: Brevard HFA/The Venue at Heritage Oaks |
| Attachments: | LURA.Venue at Heritage.doc; Trust Indenture. Venue at Heritage.3.docx; Financing Agreement.Venue at Heritage.2.docx |

Good morning Angela,

The documents are attached.

Please let me know if I can be of further assistance.

**Tammy L. Keith**
**Legal Assistant to Mark Mustian**

**Nabors Giblin & Nickerson**
ATTORNEYS AT LAW
1500 Mahan Drive, Suite 200
Tallahassee, FL 32308
tkeith@ngnlaw.com
Phone: 850.224.4070
Fax: 850.224.4073

www.ngnlaw.com

---

From: angelaabbott@cfl.rr.com <angelaabbott@cfl.rr.com>
Sent: Wednesday, November 29, 2023 9:46 AM
To: Keith, Tammy <tkeith@ngn-tally.com>
Cc: Mustian, Mark <mmustian@ngn-tally.com>; Fischer, Alex <afischer@ngn-tally.com>
Subject: RE: Brevard HFA/The Venue at Heritage Oaks

Tammy,

Could you please email the latest drafts of the Trust Indenture, Financing Agreement and LURA?

Thanks,
Angela

From: Keith, Tammy <tkeith@ngn-tally.com>
Sent: Monday, November 27, 2023 3:10 PM
To: Fischer, Alex <afischer@ngn-tally.com>; Angela Abbott <angelaabbott@cfl.rr.com>; Cameron Hill <cameron.hill@rbccm.com>; Chandler Luger <chandler.luger@rbccm.com>; Cindy West <cwest@amerinatls.com>; David Leon <David.Leon@nelsonmullins.com>; Denise Rodriguez <denise.rodriguez@rbccm.com>; Elaine Dye

1



&lt;EDye@amerinatls.com&gt;; Helen Feinberg &lt;helen.feinberg@rbccm.com&gt;; Keith, Tammy &lt;tkeith@ngn-tally.com&gt;; Kyle Kuenn &lt;KKuenn@amerinatls.com&gt;; Lori Cardey &lt;lori.cardey@bnymellon.com&gt;; Mandy Lambert &lt;Mandy.Lambert@nelsonmullins.com&gt;; Marianne Edmonds &lt;medmonds@pragadvisors.com&gt;; Mark Fredericks &lt;mfredericks@amerinatls.com&gt;; Molly Clark &lt;mclark@pragadvisors.com&gt;; Monique Rocchild &lt;mrocchild@pragadvisors.com&gt;; Peter Dame &lt;peter.dame@akerman.com&gt;; Samantha D'Angelo &lt;Samantha.DAngelo@nelsonmullins.com&gt;; Shannon Seletos &lt;sseletos@amerinatls.com&gt;; Tim Bramwell &lt;Tim.bramwell@akerman.com&gt;; Tina Smith &lt;tsmith@cantonfin.com&gt;; Tom Louloudes &lt;tlouloudes@amerinatls.com&gt;; Tricia Doody &lt;Tdoody@cantonfin.com&gt;; Veronica Repanti &lt;vrepanti@amerinatls.com&gt;
**Cc:** Mustian, Mark &lt;mmustian@ngn-tally.com&gt;
**Subject:** Brevard HFA/The Venue at Heritage Oaks

All:

Attached for your review is an execution copy of the resolution in connection with the referenced issue, including a blackline against the previous draft.

Thank you

**Tammy L. Keith**
Legal Assistant to Mark Mustian

**Nabors Giblin & Nickerson**
ATTORNEYS AT LAW
1500 Mahan Drive, Suite 200
Tallahassee, FL 32308
tkeith@ngnlaw.com
Phone: 850.224.4070
Fax: 850.224.4073

www.ngnlaw.com

2

THIS INSTRUMENT PREPARED
BY AND RETURN TO:
Mark T. Mustian, Esq.
Nabors, Giblin & Nickerson, P.A.
1500 Mahan Drive, Suite 200
Tallahassee, Florida 32308

NGN Draft No.3 11/__/2023
010.64

ABOVE SPACE RESERVED FOR
RECORDING PURPOSES ONLY

# LAND USE RESTRICTION AGREEMENT

This Land Use Restriction Agreement (the "Agreement") is made and entered into as of December 1, 2023, by and among the BREVARD COUNTY HOUSING FINANCE AUTHORITY, a public body corporate and politic organized and existing under the laws of the State of Florida (the "Issuer") whose mailing address is 4420 South Washington Avenue, Titusville, Florida 32780, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., a national banking association, with a corporate trust office in Jacksonville, Florida (the "Trustee"), pursuant to the Trust Indenture dated as of December 1, 2023 (the "Trust Indenture") securing the Issuer's Multifamily Housing Revenue Bonds, Series 2023 (The Venue at Heritage Oaks Apartments) (the "Bonds"), in the aggregate principal amount of $16,750,000 and the Borrower referenced below.

WHEREAS, pursuant to and in accordance with the Act (hereinafter defined), the Issuer has determined to issue its Bonds and to lend the proceeds thereof (the "Loan") to THE VENUE AT HERITAGE OAKS PARTNERS, LTD., a Florida limited partnership (the "Borrower"), for the purpose of providing funds to finance the acquisition, construction and equipping of a 105-unit multifamily rental housing project in Brevard County, Florida currently known as The Venue at Heritage Oaks Apartments (the "Project"); and

WHEREAS, as a condition of making the Loan referenced herein and in connection with the issuance of the Bonds, the parties hereto have agreed to enter into this Agreement in order to preserve the tax-exempt status of interest on the Bonds;

NOW, THEREFORE, in consideration of the premises and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Issuer, the Trustee and the Borrower hereby agree as follows:

**Section 1.    Definitions and Interpretation.** All initially capitalized, undefined terms used herein shall have the meanings assigned to such terms in the Trust Indenture and the Financing Agreement, respectively. In addition, the following words and phrases shall have the following meanings:

"Act" means Chapter 159, Part IV, Florida Statutes, Chapter 159, Part II, Florida Statutes, the Issuer's resolution adopted December 6, 2023, and other applicable provisions of law.

"Affiliated Party" of any person means a person such that (i) the relationship between such persons would result in a disallowance of losses under Section 267 or 707(b) of the Code, or (ii) such persons are members of the same controlled group of corporations as defined in Section 1563(a) of the Code, except that "more than 50 percent" shall be substituted for "at least 80 percent" each place it appears therein, or (iii) a related person within the meaning of Section 144(a) or 147(a) of the Code.

"Agreement" means this Land Use Restriction Agreement, dated as of December 1, 2023, as the same may be amended, modified, supplemented or restated from time to time.

"Applicable Income Limit" means fifty percent (50%) of area median gross income (within the meaning of Section 142(d) of the Code) for Brevard County, Florida, Standard Metropolitan Statistical Area, as determined by the Secretary of the United States Department of the Treasury in a manner consistent with determinations of lower income families and area median gross income under Section 8 of the Housing Act of 1937, as amended (or if such program is terminated, under such program as in effect immediately before such termination), including adjustments for family size.

"Area Median Gross Income" means the median gross income for the area in which the Project is located as determined under Section 8 of the Housing Act of 1937 (or, if such program is terminated, under such program as in effect immediately before such termination) and as published annually by HUD.

"Bonds" has the meaning provided in the introductory paragraph of this Agreement.

"Borrower" means The Venue at Heritage Oaks Partners, Ltd., a limited partnership, and its successors and assigns.

"Business Day" means any day other than a Saturday, Sunday or a day when banks are authorized to be closed under the laws of the States of Florida or New York or the New York Stock Exchange is closed.

"Certificate of Continuing Program Compliance" means the certificate required to be delivered by the Borrower to the Issuer pursuant to Section 4(f) hereof.

"Code" means the Internal Revenue Code of 1986, as amended, and the Regulations thereunder, or any successor statute, together with corresponding and applicable final, temporary or proposed regulations and revenue rulings issued or amended with respect thereto by the Treasury Department or Internal Revenue Service of the United States. Any reference to a particular provision of the Code shall be deemed to include (a) any successor provision or any successor Internal Revenue Code and (b) the applicable regulations, whether final, temporary or proposed, under such provision or successor provision.

2

"County" means Brevard County, Florida.

"Current Annual Family Income" is determined in accordance with Section 8 of the Housing Act of 1937 (the "Housing Act"), as amended (or, if such program is terminated, under such program as in effect immediately before such termination) and includes the forms of income described in the Income Certification as promulgated by the Issuer from time to time in accordance with the Housing Act.

"Eligible Persons" means persons or families determined by the Issuer to be of low, middle or moderate income and "eligible persons" under the Act applicable to the Project, which determination includes, but is not limited to, an income limit which shall not exceed 150% of the median family (family of four) income for the County; provided that persons 65 years of age or older shall be defined as "Eligible Persons" regardless of their incomes, and provided, further, that as long as the Project receives an ad valorem tax exemption pursuant to Section 196.1978(3)(d)(l), Florida Statutes, as amended, the 150% referenced above shall be 120%.

"Financing Agreement" means that certain Financing Agreement, dated as of even date herewith, entered into among the Borrower, the Trustee and the Trustee Issuer, as amended or supplemented from time to time.

"Income Certification" means the certification required to be obtained from each Lower-Income Tenant by the Borrower pursuant to Section 4(a) hereof.

"Land" means the real property described in Exhibit "A" attached hereto.

"Loan" means the loan in an amount equal to the cumulative amounts drawn under the Bonds made by the Issuer to the Borrower and secured by the Financing Agreement, and the Loan Documents.

"Lower-Income Tenant" means individuals or families whose income does not exceed fifty percent (50%) of the Area Median Gross Income; provided, however, that if all the occupants are students (as defined in Section 152(f) of the Code), no one of whom is entitled to file a joint return under Section 6013 of the Code, the occupants of that Unit shall in no event be deemed to be "Lower-Income Tenants". Notwithstanding the foregoing, a dwelling unit shall not fail to be treated as a dwelling unit that is occupied by Lower-Income Tenants merely because such dwelling unit is occupied (a) by an individual who is (i) a student and receiving assistance under Title IV of the Social Security Act, (ii) a student who was previously under the care and placement responsibility of a foster care program (under Part B or Part E of the Title IV of the Social Security Act), or (iii) a student enrolled in a government supported job training program, or (b) entirely by full-time students if such students are (i) single parents and their children and such parents are not dependents of any person other than the full-time student occupying the unit, or (ii) married and file a joint return. The income of individuals and Area Median Gross Income shall be determined by the Secretary of the Treasury in a manner consistent with determinations of lower income families and Area Median Gross Income under Section 8 (or, if such program is terminated, under such program in effect immediately before such termination). Determinations under the preceding sentence shall include adjustments for family size as prescribed under Section 8, e.g., a family of four generally will qualify

3

if the family has an income of sixty percent (60%) or less of the area median income; a family of three having an income of fifty-four percent (54%) or less generally will qualify; a family of two having an income of forty-eight percent (48%) or less generally will qualify; and a single individual having an income of forty-two percent (42%) or less generally will qualify. Except as provided in Section 4 hereof, in no event shall occupants of a dwelling unit be considered to be of low income if, upon any recertification, such tenant's gross income exceeds 140% of the applicable income limit for a Lower-Income Tenant of the same family size. In such case, such tenant shall cease to qualify as a Lower-Income Tenant. Notwithstanding the foregoing, so long as the next vacant unit of comparable or smaller size is rented to a Lower-Income Tenant, the fact that such tenant's gross income exceeds 140% of the applicable income limit shall not place the Facilities in non-compliance. Said income requirements shall be adjusted for family size in accordance with income limits published, from time to time, by HUD.

"Mortgage" means the First Mortgage, Assignment of Rents and Security Agreement, as the same may be amended, modified, supplemented or rested from time to time, executed by the Borrower and granting a first lien on the Project for the benefit of the Issuer and assigned to the Trustee.

"Permitted Encumbrances" shall have the meaning set forth in the Mortgage.

"Project" means the affordable housing development located on the Land.

"Qualified Project Period" means the period commencing on the first day on which at least ten percent (10%) of the residential units in the Project are first occupied (as certified in writing by the Borrower to the Issuer) (or, if later, the date on which the Bonds are issued) and ending on the latest of the following: (i) the date that is fifteen (15) years after the date on which at least fifty percent (50%) of the residential units in the Project are first occupied (as certified in writing by the Borrower to the Issuer); (ii) the first day on which no tax-exempt private activity bond (as that term is defined in Section 142(d)(2) of the Code) issued with respect to the Project is outstanding; (iii) the date on which any assistance provided with respect to the Project under Section 8 terminates (as certified in writing by the Borrower to the Issuer); provided, that the restrictions set forth above shall continue as long as the Project continues to receive an ad valorem tax exemption pursuant to the provisions of Section 196.1978(3)(d)(1), Florida Statutes, as amended. The Borrower covenants and agrees to provide the Issuer and the Servicer a copy of its ad valorem tax bill each year upon receipt.

"Qualified Tax Counsel" means an attorney, or firm of attorneys, of nationally recognized standing in matters pertaining to the tax-exempt nature of interest on bonds issued by states and their political subdivisions, appointed by the Issuer.

"Regulations" means the regulations promulgated by the United States Department of the Treasury pursuant to the Code, as amended from time to time.

"Rental Housing" shall mean a residential rental project within the meaning of Section 1.103-8(b)(4) of the Treasury Regulations under Section 142(d) of the Code. As such, Rental Housing shall consist of a building or structure or proximate buildings or structures, (a) containing one or more similarly constructed residential units which are to be used on other than a transient basis and any facilities which are functionally related and subordinate to such units, and (b) all of the

4

residential units which are rented or available for rental on a continuous basis to members of the general public in accordance with the requirements of Section 142(d) of the Code. Rental Housing consists of similar residential units together with any functionally related and subordinate facilities within the meaning of Section 142(d) of the Code. A building or structure is a discrete edifice or other man-made construction consisting of an independent (i) foundation, (ii) outer walls, and (iii) roof, and containing one or more similarly constructed residential units. Buildings or structures are proximate if they are all located on a single parcel of land or several parcels of land which are contiguous except for the interposition of a road, street, stream or similar property. Proximate buildings or structures are part of the same project only if owned for federal tax purposes by the same person and if the buildings are financed pursuant to a common plan. In no event shall Rental Housing include a hotel, motel, dormitory, fraternity or sorority house, rooming house, hospital, nursing home, sanitarium, rest home, trailer park or court, health club or recreational facility (other than health and/or recreational facilities that are available only to tenants and their guests without charge for their use and that are customarily found in multifamily rental housing projects), and none of the occupants of such units shall be provided services customarily found in hotels such as room service for food and beverages, maid service, furnishing and laundering of linens or valet service. Furthermore, Rental Housing shall not include any building or structure which contains fewer than five residential units, one residential unit of which is occupied by an owner of the units or a party related to such owner.

"Section 8" means Section 8 of the United States Housing Act of 1937.

"State" means the State of Florida.

"Term of this Agreement" means the term determined pursuant to Section 7 hereof.

Unless the context clearly requires otherwise, as used in this Agreement, words of the masculine, feminine or neuter gender shall be construed to include any other gender when appropriate, and words of the singular number shall be construed to include the plural number, and vice versa, when appropriate. This Agreement and all the terms and provisions hereof shall be construed to effectuate the purposes set forth herein and to sustain the validity hereof.

The titles and headings of the sections of this Agreement have been inserted for convenience of reference only, and are not to be considered a part hereof and shall not in any way modify or restrict any of the terms or provisions hereof or be considered or given any effect in construing this Agreement or any provisions hereof or in ascertaining intent, if any question of intent shall arise.

**Section 2. Residential Rental Property.** The Issuer and the Borrower hereby declare their understanding and intent that, during the term of this Agreement, the Project is to be owned, managed and operated as a "project for residential rental property" as such phrase is utilized in Section 142(d) of the Code and shall be owned, managed and operated as Rental Housing. The Borrower hereby represents, covenants, warrants and agrees that:

(a) (1) The Project is being acquired and constructed for the purpose of providing a "qualified residential rental project" as such phrase is used in Section 142(d) of the Code, (2) the Borrower shall own the entire Project for federal tax purposes, and (3) the Project shall

5

be owned, managed and operated as a multifamily residential rental property comprised of a building or structure or several proximate buildings or structures containing similarly constructed units, together with any functionally related and subordinate facilities and no other facilities, in accordance with Section 142(d) of the Code and Section 1.103-8(b) of the Regulations, and in accordance with such requirements as may be imposed thereby on the Project from time to time.

(b) The Project is comprised of one or more similarly constructed units, each of which contains separate and complete facilities for living, sleeping, eating, cooking and sanitation for an individual or a family, including a living area, a sleeping area, bathing and sanitation facilities and cooking facilities equipped with a refrigerator and sink.

(c) None of the units in the Project will at any time be (1) utilized on a transient basis, (2) used as a hotel, motel, dormitory, fraternity or sorority house, rooming house, nursing home, hospital, sanitarium, rest home, trailer court or park, or (3) rented for lease periods of less than six (6) months.

(d) All of the units in the Project will be rented or available for rent on a continuous basis to members of the general public, and the Borrower will not give preference to any particular class or group in renting the units in the Project, except to the extent that units are required to be leased or rented to Lower-Income Tenants or Eligible Persons, and units may be restricted as required pursuant to any restrictive agreement existing or hereafter recorded against the Project in connection with qualifying low-income housing tax credits under Section 42 of the Code. Lower-Income Tenants will have equal access to and enjoyment of all common facilities of the Project.

(e) The Land consists of a parcel of real property or parcels of real property that are contiguous except for the interposition of a road, street, stream or similar property, and the Project comprises buildings, structures and facilities that are geographically contiguous and functionally related.

(f) The Borrower or a related person, as defined in Section 147(a) of the Code, shall not occupy any of the units in the Project; provided, however, that the Borrower or a related person may occupy a unit in a building or structure that contains five or more units if the Borrower or related person is a resident manager or other necessary employee (e.g., maintenance and security personnel).

(g) None of the proceeds of the Bonds (including investment earnings) will be used to provide a health club facility, skybox or any other private luxury box, an airplane, or store the principal business of which is the sale of alcoholic beverages for consumption off premises or a facility used primarily for gambling.

(h) The Borrower shall not discriminate in violation of fair housing laws on the basis of race, creed, religion, color, sex, marital status, family status, handicapped status or national origin in the lease, use or occupancy of the Project or in connection with the employment or application for employment of persons for the operation and management of the Project.

The requirements of this Section 2 shall terminate on the later of (i) the end of the Qualified Project Period or (ii) the end of the remaining term of the Bonds, as such requirement is interpreted pursuant to the Code, unless otherwise terminated pursuant to Section 7 hereof.

**Section 3.    Lower-Income Tenants and Eligible Persons.** The Borrower hereby represents, warrants and covenants as follows:

(a) There shall be no default hereunder, during the time the Bonds are outstanding, so long as, at all times during the Qualified Project Period, not less than twenty percent (20%) of the completed units in the Project shall be occupied by Lower-Income Tenants, as required by Section 142(d) of the Code.

(b) At all times during which the Bonds are outstanding, those units that are not occupied by Lower-Income Tenants and are available for rental to tenants other than Lower-Income Tenants in accordance with Section 3(a) hereof will be rented to or available for rent by Eligible Persons.

(c) At all times until the later of the end of the Qualified Project Period or the date on which the Bonds are no longer outstanding, all of the units in the Project will be rented as a residential dwelling, on a continuous basis and may not be used or converted to owner-occupied housing or other residential or business use. For purposes of this requirement, a building or structure will not be deemed to be held for rental use if it contains less than five units, any unit of which is occupied by the owner of the units.

(d) For purposes of paragraphs (a) and (b) of this Section 3, a unit occupied by an individual or family who at the commencement of the occupancy of such unit is a Lower-Income Tenant (or Eligible Person) shall be counted as occupied by a Lower-Income Tenant (or Eligible Person) during such individual's or family's tenancy in such unit, even though such individual or family ceases to be a Lower-Income Tenant (or Eligible Person). However, the preceding sentence shall cease to apply to any Lower-Income Tenant whose income under the most recent determination exceeds one hundred forty percent (140%) of the applicable income limit if after such determination but before the next determination, any unit of comparable or smaller size in the Project is occupied by a new resident whose income exceeds the applicable income limit or to any Eligible Person (other than persons 65 years of age or older) whose income under the most recent determination exceeds one hundred fifty percent (150%) of the applicable area median income. In addition, a unit that was occupied by a Lower-Income Tenant (or Eligible Person) shall be counted as occupied by a Lower-Income Tenant (or Eligible Person) until it is reoccupied other than for a temporary period not exceeding 31 days, at which time the unit shall be considered to be occupied by a Lower-Income Tenant (or Eligible Person) only if the individual or family then occupying the unit satisfies the definition of a Lower-Income Tenant (or Eligible Person).

**Section 4.    Reporting Requirements, Payment of Issuer's Annual Compliance Fee and Maintenance.**

(a) During the Qualified Project Period, the Borrower shall obtain from each Lower-Income Tenant, at the time of such Lower Income Tenant's initial occupancy in the Project,

7

an Income Certification dated immediately prior to the initial occupancy of such Lower-Income Tenant in the Project, in the form and containing the information required by applicable rules, rulings, policies, procedures, Regulations or other official statements now or hereafter promulgated, proposed or made by the Department of the Treasury or the Internal Revenue Service with respect to obligations issued under Section 142(d) of the Code.

(b) At all times during which the Bonds are outstanding, the Borrower shall obtain from each Eligible Person residing in the Project, at the time of such person's or family's initial occupancy in the Project, an Income Certification in form and content acceptable to the Issuer.

(c) The Borrower shall file with the Issuer and its compliance agent, on or before January 30 of each year, copies of the Income Certifications specified in Sections 4(a) and (b) hereof obtained by the Borrower during the previous calendar year.

(d) At all times during the Qualified Project Period, the Borrower will obtain and maintain on file from each Lower-Income Tenant residing in the Project the information demonstrating each tenant's income eligibility.

(e) The Borrower shall maintain complete and accurate records pertaining to the incomes of and rentals charged to Lower-Income Tenants and Eligible Persons residing in the Project, and shall permit, upon 5 Business Days' notice to the Borrower, any duly authorized representative of the Issuer or the Trustee to inspect the books and records of the Borrower pertaining to the incomes of and rentals charged to all tenants residing in the Project. All tenant lists, applications, and waiting lists relating to the Project shall at all times be kept separate and identifiable from any other business of the Borrower which is unrelated to the Project, and shall be maintained, as required by the Issuer from time to time, in a reasonable condition for proper audit and subject to examination during business hours by representatives of the Issuer or the Trustee. Failure to keep such lists and applications or to make them available to the Issuer or the Trustee will be a default hereunder.

(f) On or before January 30 of each year, the Borrower shall prepare and submit to the Issuer and its compliance agent rent rolls and to the Issuer a Certificate of Continuing Program Compliance, in the form attached hereto as Exhibit "B", executed by the Borrower stating (i) the percentage of units that were occupied by Lower-Income Tenants and Eligible Persons, respectively, as of the 20th day of the previous month, (ii) that at all times during the previous month at least 20% of the units were occupied by Lower-Income Tenants (as determined in accordance with Section 3 of this Agreement), and (iii) that no default has occurred under this Agreement or, if such a default has occurred, the nature of such default and the steps, if any, the Borrower has taken or proposes to take to correct such default.

(g) The Borrower shall tender an annual report (e.g. IRS Form 8710) to the Secretary of the Treasury required by Section 142(d)(7) of the Code. The Borrower shall simultaneously send copies of such annual report to the Issuer. The Borrower acknowledges that failure to file such annual report may subject the Borrower to penalty (presently, though subject to change, one hundred dollars ($100) per day for every day after the due date that the report is not filed) as provided in Section 6652(j) of the Code.

8

(h) [The Borrower shall notify the Issuer if at any point the Project no longer qualifies as a "qualified low-income housing project" as defined in Section 159.603(6)(a), Florida Statutes, or if the tax credit restrictions with respect to the Project are no longer in effect.]

(i) The Borrower shall immediately notify the Trustee and the Issuer of any change in the management of the Project.

(j) The Borrower will keep the buildings, parking areas, roads and walkways, recreational facilities, landscaping and all other improvements of any kind now or hereafter erected as part of the Project, in good condition and repair (normal wear and tear excepted), will not commit or suffer any waste and will not do or suffer to be done anything which would or could increase the risk of fire or other hazard to the Project or any part thereof. In order to ensure the Borrower's compliance with this covenant, the Issuer and/or its representatives are hereby authorized to enter upon and inspect the Project at any time during normal business hours upon reasonable notice and subject to the rights of tenants. Notwithstanding the foregoing, the Issuer has no affirmative duty to make such inspections.

(k) The Borrower will construct and operate the Project so that it conforms in all material respects with all applicable zoning, planning, building and environmental laws, ordinances and regulations of governmental authorities having jurisdiction over the Project, including, but not limited to, the Americans with Disabilities Act of 1990, as amended.

(l) The Borrower will construct and maintain the Project to provide the amenities described in Exhibit "C" attached hereto.

**Section 5.** **Fair Housing Laws.** The Borrower will comply with all fair housing laws, rules, regulations or orders applicable to the Project. All advertising and promotional material used in connection with the Project shall contain the phrase "Fair Housing Opportunity".

**Section 6.** **Covenants to Run With the Land.** The covenants, reservations and restrictions set forth herein shall be deemed covenants running with the Borrower's interest in the Land and, except as provided in Section 7 hereof, shall pass to and be binding upon the Borrower's assigns and successors interest in the Land or the Project; provided, however, that upon the termination of this Agreement in accordance with the terms hereof said covenants, reservations and restrictions shall automatically and without further action expire. Except as provided in Section 7 hereof, each and every contract, lease or other instrument hereafter executed covering or conveying the Borrower's interest in the Land or the Project or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to such covenants, reservations and restrictions, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instruments. If a portion or portions of the Project are conveyed, all of such covenants, reservations and restrictions shall run to each portion of the Project.

**Section 7.** **Term.** This Agreement shall remain in full force and effect until the later of (i) the expiration of the Qualified Project Period and (ii) the date as of which the Bonds are no longer outstanding; provided, however, that this Agreement shall terminate in the event of involuntary noncompliance with the provisions of this Agreement caused by fire, seizure, requisition, foreclosure

9

or transfer by deed in lieu of foreclosure, change in a federal law or an action of a federal agency that prevents the Issuer from enforcing the provisions hereof, or condemnation or a similar event (as determined by Qualified Tax Counsel), but only if within a reasonable period thereafter (i) the Bonds are retired in full or rendered no longer outstanding by means of foreclosure or a deed in lien of foreclosure or (ii) the proceeds received as a result of such event are used to finance a development that complies with the provisions hereof and any other applicable requirements of the Code and the Regulations. In such event, upon the request of the Borrower, with the consent of the Issuer which consent shall not be unreasonably withheld or delayed and at the expense of the Borrower, the parties hereto shall execute an appropriate document in recordable form to evidence such automatic termination. In the case of foreclosure or transfer of title by deed in lieu of foreclosure or similar event (as determined by Qualified Tax Counsel), such termination will cease to be in effect if, at any time during the remainder of the Qualified Project Period, the Borrower, or a "related person" to any such person within the meaning of Section 147(a) of the Code, obtains an interest in the Project for federal tax purposes. Once the Bonds are no longer outstanding, if this Agreement by its terms will remain in effect, this Agreement shall be deemed automatically amended so that the Trustee shall no longer be a party hereto or have any obligations or duties hereunder.

**Section 8.  Correction of Noncompliance.** The failure of the Borrower to comply with any of the provisions of Section 2 or 3 of this Agreement shall not be deemed a default hereunder unless such failure has not been corrected within a period of ninety (90) days following the date that Borrower learned of such failure or should have learned of such failure by the exercise of reasonable diligence. Not later than twenty (20) Business Days next succeeding the day on which the Trustee or the Issuer learns of such failure, the Trustee or the Issuer shall attempt with reasonable diligence to notify the Borrower of such failure by telephonic communication. In addition, the Trustee or Issuer, as the case may be, shall send to all parties to this Agreement (including the Borrower) written notice of such failure in accordance with Section 18 hereof. The Trustee shall not be deemed to have learned of such failure unless it has received a written notice from the Borrower or the Issuer to the effect that such failure to comply with Section 2 or 3 hereof has occurred. The Borrower's investment limited partner shall have the right, but not the obligation, to cure an event of default under this Agreement and the parties hereto agree to accept such performance as if it were undertaken by the Borrower itself.

**Section 9.  Modification and Termination of Tax Covenants.** To the extent any amendments, modifications or changes to the Regulations or the Code shall, in the written opinion of Qualified Tax Counsel filed with the Issuer, the Borrower and the Trustee, impose requirements upon the ownership, occupancy or operation of the Project different than those imposed by the Regulations or the Code and stated herein, and the Borrower's failure to comply with such different requirements would produce a material and substantial risk that interest on the Bonds will become includable in gross income for federal income tax purposes, then this Agreement shall be amended and modified in accordance with such requirements. The parties hereto agree to execute, deliver and record, if applicable, any and all documents or instruments necessary in the opinion of and in the form approved by Qualified Tax Counsel to effectuate the intent of this Section 9.

**Section 10.  Burden and Benefit.** The Issuer and the Borrower hereby declare their understanding and intent that the burden of the covenants set forth herein touch and concern the Land in that the Borrower's legal interest in the Land and the Project is rendered less valuable