UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:23-CV-02473-CEM-DCI


ATLANTIC HOUSING PARTNERS
L.L.L.P., a Florida limited
liability partnership; CANTON
CONSTRUCTION, LLC, a Florida
limited liability corporation;
CONCORD MANAGEMENT, LTD., a
Florida limited partnership;
THE VENUE AT HERITAGE OAKS
PARTNERS, LTD.,

     Plaintiffs,

V.

BREVARD COUNTY, a political
subdivision of the state of
Florida,

     Defendant.
_____/



VIDEOTAPED DEPOSITION OF WILLIAM SCOTT CULP



November 21, 2024
2:02 p.m. - 5:33 p.m.
Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
215 North Eola Drive
Orlando, Florida




Stenographically Reported By:

Kimberly B. Roat, RPR
Registered Professional Reporter

William Scott Culp
November 21, 2024

---

Page 2

1  APPEARANCES:
2  For the Plaintiffs:
3      Lowndes, Drosdick, Doster, Kantor & Reed, P.A.
       215 North Eola Drive
4      Orlando, Florida 32802-2809
       Ph.: (407)418-6690
5      E-mail: rebecca.rhoden@lowndes-law.com
       BY: REBECCA E. RHODEN, ESQ.
6
7  For the Defendant:
8      Roper, Townsend, Sutphen, P.A.
       255 South Orange Avenue, Suite 750
       Orlando, Florida 32801-3450
9      Ph.: (407)897-5150
       E-mail: sgainey@roperpa.com
10     BY: SUSAN G. GAINEY, ESQ.
11
   Also Present:  George Otalvaro, Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1              INDEX OF PROCEEDINGS
2  DEPOSITION OF WILLIAM SCOTT CULP          PAGE
3  DIRECT EXAMINATION BY MS. GAINEY            5
4
5  CERTIFICATE OF OATH                        179
6  CERTIFICATE OF REPORTER                    180
7  ERRATA SHEET                               181
8  WITNESS REVIEW LETTER                      182
9
10
11           PLAINTIFF'S EXHIBITS
12  MARKED       DESCRIPTION                   PAGE
13               **** None Marked ****
14
15           DEFENDANT'S EXHIBITS
16  MARKED       DESCRIPTION                   PAGE
17  Exhibit A    Sunbiz Documents               13
    Exhibit B    Application of The Venue at     98
18               Heritage Oaks
    Exhibit C    11/14/23 Brevard County        140
19               Commission Meeting Transcription
    Exhibit D    Venue at Heritage Oaks Community 146
20               Meeting Transcription
    Exhibit E    12/05/23 Brevard County        158
21               Commission Meeting Transcription
    Exhibit F    12/5/23 Memorandum             169
22
23
24
25

---

Page 4

1              PROCEEDINGS
2      Deposition taken before Kimberly B. Roat,
3  Registered Professional Reporter and Notary Public in
4  and for the State of Florida at Large in the above
5          -  -  -  -  -
6      VIDEOGRAPHER:  Good afternoon.  We are now on
7  the video record.  The time is 2:02 p.m..  Today
8  is November the 21st, 2024.  The audio and video
9  recording will continue to take place until all
10  parties agree to go off the record.  Please note
11  that the microphones are sensitive and may pick up
12  whispering and private conversations.
13      This is the video recorded proceeding of
14  Scott Culp taken by the counsel for the defendant
15  in the matter of Atlantic Housing Partners L.L.L.P
16  versus Brevard County which is filed in the United
17  States District Court Middle District of Florida
18  Orlando Division.
19      This proceeding is being held at 215 North
20  Eola Drive, Orlando, Florida.  My name is George
21  Otalvaro.  I'm the videographer on behalf of U.S.
22  Legal Support.  I am not related to any party in
23  this action nor am I financially interested in the
24  outcome.  Our court reporter today is Kimberly
25  Roat on behalf of U.S. Legal Support.

---

Page 5

1      Will counsel please state their appearance
2  for the record after which the court reporter will
3  swear in the witness.
4      MS. RHODEN:  Rebecca Rhoden on behalf of
5  plaintiffs.
6      MS. GAINEY:  Susan Gainey on behalf of
7  defendant.
8      COURT REPORTER:  Sir, would you raise your
9  right hand, please.
10      Do you solemnly swear the testimony you shall
11  give to be the truth, the whole truth and nothing
12  but the truth so help you God?
13      MR. CULP:  I do.
14      COURT REPORTER:  Thank you.
15
16  THEREUPON,
17              WILLIAM SCOTT CULP
18  having been first duly sworn, was examined and
19  testified as follows:
20              DIRECT EXAMINATION
21  BY MS. GAINEY:
22      Q.  Please state your name for the record.
23      A.  Scott Culp.
24      Q.  And can you spell it for the court reporter,
25  please.

William Scott Culp
November 21, 2024

Page 6

1    A.  Yeah.  Scott, S-C-O-T-T, the last name Culp,
2  C-U-L-P, as in papa.
3    Q.  Do you have a middle name?
4    A.  No.  I have a first name.  William.  Scott is
5  my middle name.
6    Q.  Okay.
7    A.  So, yes, I do have a middle name.
8    Q.  All right.  So it's William Scott Culp?
9    A.  It is, yes.
10   Q.  But you go by Scott?
11   A.  I do.
12   Q.  All right.  And have you ever given a
13  deposition before?
14   A.  Yes.
15   Q.  I'm sure your attorney went over some ground
16  rules with you, but let me just quickly for the record
17  go over ground rules.  And you may remember some of
18  these from prior depositions.
19       Basically your responses need to be audio so
20  that the court reporter and the videographer can get
21  down everything you're saying.  As we have
22  conversations we tend to shake our head and nod, and
23  so we may not necessarily get that for the record.
24       Do you agree to that?
25   A.  Yes.

Page 7

1    Q.  And I'm going to ask you a series of
2  questions; and if you don't understand any of my
3  questions, please ask me to rephrase or repeat the
4  question.
5    A.  Okay.
6    Q.  And if you answer my question, I'm going to
7  assume you understood what I was asking you.  Is that
8  fair?
9    A.  Okay.
10   Q.  All right.  In what context have you been in
11  depositions before?
12   A.  What context?  Could you clarify?
13   Q.  What cases?  Federal cases, state cases?
14   A.  Fair Housing cases, construction litigation
15  and civil litigation.  No felony or criminal.
16   Q.  That's a good thing.
17       How many depositions would you say you've
18  given?
19   A.  Over a dozen.
20   Q.  How many depositions have you given in
21  discrimination cases, if any?
22   A.  It has to be over half a dozen.  Maybe more.
23   Q.  All right.  And what is your business
24  address?
25   A.  200 East Canton Avenue, Suite 102, Winter

Page 8

1  Park, Florida 32789.
2    Q.  And what county do you live in?
3    A.  I live in Seminole County.
4    Q.  Have you ever testified as an expert witness?
5    A.  I don't remember.
6    Q.  And have you given testimony the prior cases
7  that you have been in the context as -- as you're a
8  named party in a lawsuit?
9        MS. RHODEN:  Object to form.
10   A.  I don't know that I've been a named party.  I
11  know that I've been --
12   Q.  (By Ms. Gainey) And just for clarification I
13  don't mean you personally.  I mean --
14   A.  Oh, okay.
15   Q.  -- one of your companies.
16   A.  Yes.
17   Q.  All right.  How about in a personal capacity
18  have you ever given a deposition?
19   A.  Yes.
20   Q.  And in what context was that?
21   A.  I don't recall.
22   Q.  Was it civil, criminal?
23   A.  Definitely not criminal.  So I guess that
24  would make it civil.  I don't know all the different
25  types of law and depositions.  But not criminal.  I

Page 9

1  can tell you that.
2    Q.  All right.  So is it fair to me -- for me to
3  assume that you've never been convicted of a crime of
4  dishonesty?
5    A.  I have not.
6    Q.  In preparation for your deposition, did you
7  review any documents?
8    A.  Yes.  I looked at I think it was -- I can't
9  remember the actual documents.  There were some
10  documents related to this case, questions and answers,
11  but I don't know the name and title of them.
12   Q.  Interrogatories?
13   A.  It was definitely interrogatories.  I don't
14  know that it was answers or things that we wrote
15  interrogatories on.  I can't remember exactly.
16   Q.  All right.  And those were reviewed in
17  specific preparation for this deposition?
18   A.  Yes.
19   Q.  All right.  So other than interrogatories can
20  you remember anything else you reviewed?
21   A.  No.
22   Q.  Other than your attorneys or representative
23  from your attorneys' law firm did you talk to anyone
24  in preparation for today's deposition?
25   A.  No.

William Scott Culp
November 21, 2024

Page 10

1    Q.  Do you keep a list of cases that you have
2  been involved in or does your office?
3    A.  No.
4    Q.  All right.  You're here in your capacity as
5  representing one of the named defendants -- or, excuse
6  me, named plaintiffs in this lawsuit, correct?
7    A.  No.
8      MS. RHODEN:  Objection.
9    Q.  (By Ms. Gainey) All right.  In what
10  capacity -- you're here in your personal capacity?
11    A.  My understanding is I was deposed as -- in my
12  personal capacity.
13    Q.  Right.  This isn't a 30(b)(6) deposition.
14  You're just here as --
15    A.  I don't know what 30(b)(6) is --
16    Q.  -- Scott the witness, right?
17    A.  -- but I'm here as myself.
18    Q.  I'm sorry.
19      Well, I know you're -- you're a professional
20  and have given -- been involved in law -- lawsuits --
21    A.  Right.
22    Q.  -- so that probably wasn't fair for me to say
23  it like that.
24      But you're just here as a witness.  Not
25  necessarily as a representative for a corporation,

Page 11

1  correct?
2    A.  That's my understanding, yes.
3    Q.  All right.  And what is your profession?
4    A.  I'm a real estate developer.
5    Q.  And how long have you been a real estate
6  developer?
7    A.  Coming up on 40 years.  Wow.  I can't believe
8  I'm that old.
9    Q.  Time flies by, doesn't it.  I guess you're
10  having fun.
11      All right.  And what companies are you an
12  officer of?
13    A.  I am sure that I cannot state them all.  That
14  would be probably over 100.  I can tell you active
15  operationally there is a handful.  Developer, general
16  contractor, property management company, financing
17  company, a few others.  But those are the operating
18  companies that --
19    Q.  So am I understanding you to say that
20  you're -- you have approximately 100 companies that
21  are still active that you are an officer of?
22    A.  Probably more.
23    Q.  Okay.  And you think inactive companies it
24  would be a larger number?
25    A.  Yes.

Page 12

1    Q.  Okay.  Can you estimate how many inactive
2  companies?
3    A.  1 wouldn't want to take a guess, no.
4    Q.  Okay.  The parties in this lawsuit, the
5  plaintiffs, one corporation or LLLP is Atlantic
6  Housing Partners.  Are you an officer in that company?
7    A.  Atlantic Housing Partners is a triple LP,
8  which has a general partner, which I believe I am a --
9  if I remember correctly, a manager of the general
10  partner.  And somewhere down the list in the
11  organizational structure I'm a member and a principal.
12    Q.  All right.  What about Canton Construction,
13  LLC?
14    A.  That would be the same.  Canton Construction
15  is a limited liability corporation, and I believe I'm
16  a manager of that corporation -- as a matter of fact,
17  I know I'm a manager of that corporation and somewhere
18  down the line in the organizational structure an owner
19  and a principal.
20    Q.  How about Concord Management, LTD?
21    A.  If I remember correctly -- that one has
22  changed over time -- I believe I am still a manager of
23  the general partner of that partnership.
24    Q.  And how about The Venue at Heritage Oaks
25  Partners, LTD?

Page 13

1    A.  I don't believe I'm an officer or a principal
2  in that partnership.
3    Q.  All right.  Let me start with Plaintiff's --
4  excuse me, Defendant's Exhibit A.  This might help a
5  little bit.  These are the --
6      MS. GAINEY:  I'm going to -- do you want to
7  mark his copy?
8      THE WITNESS:  Do you need -- do you want this
9  altogether as one exhibit I assume?
10      MS. GAINEY:  Yes.
11      (Deposition Exhibit A was marked.}
12    Q.  (By Ms. Gainey) So I'm going to purport to
13  you these are the Sunbiz printouts and -- as well
14  as -- or articles of incorporation of the -- the
15  plaintiffs that are named in this current lawsuit.
16      As I reviewed this -- I'm want to concentrate
17  on -- the top one is Canton Construction, LLC.  And it
18  looks like the manager of Canton Construction, LLC is
19  you and Paul Missigman.
20    A.  Missigman.
21    Q.  And it looks like that's current as of 2023
22  and 2024.  Is that your understanding?
23    A.  That's my understanding, yes.
24    Q.  All right.  The -- the next page, if you want
25  to flip is Atlantic Housing -- a printout of Atlantic

William Scott Culp
November 21, 2024

Page 14

1  Housing Partners. And it looks like there is various
2  version of Atlantic Housing Partners. Why is that?
3       A.  You would have to go into specifics on each
4  one.  I don't know who Atlantic Housing Solutions is,
5  and I would have to look at each of the other
6  entities.  Some of these are partners of Atlantic
7  Housing Partners triple L.P., some of them are
8  managers, some of them are managers of Atlantic
9  Housing Partners II.  Each one you would have to pull
10  the specifics to determine exactly what the structure
11  is.
12       Q.  So other than Atlantic Housing Solutions, LLC
13  you think that you're involved in some capacity as to
14  the other ones?
15       A.  Yes.
16       MS. RHODEN:  Object to form.
17       Are you asking for all of these because this
18  list includes things other than Atlantic Housing.
19  It includes Atlantic Human Factors, Atlantic
20  Humare Development Corporation, et cetera, et
21  cetera.  So your question is not asking if he's
22  involved with those, correct?
23       MS. GAINEY:  Correct.  He indicated that he
24  didn't organize Atlantic Housing Solutions, LLC.
25       A.  Yeah, the -- the page that you handed me has

Page 15

1  one, two, three, four, five, six, seven entities that
2  start with the words Atlantic Housing.  Six of those I
3  recognize and believe that I probably have some
4  affiliation with.
5       Q.  (By Ms. Gainey) That's what I was asking.
6  Thank you for clarifying.
7       All right.  And then if you flip to the
8  documents regarding Concord Management.  It looks like
9  Concord Management has managers that's Paul and then
10  there is a Jonathan Thomas listed.
11       A.  I see that, yes.
12       Q.  And it doesn't appear that you are an officer
13  or a manager of Concord; is that correct?
14       A.  Of Concord Management Company, Inc., that is
15  correct.
16       Q.  Okay.  The other ones that are listed on the
17  top page they're various versions of Concord
18  Management.  Do you recognize all of them to be
19  companies that you're involved in in some way?
20       A.  I don't know without looking at the detail
21  behind those.  I would -- no.  I would be only making
22  assumptions because I would have to look at each of
23  the individuals to see if the addresses and the
24  parties that are involved in the entity structure are
25  us.

Page 16

1       People often use similar names and -- and
2  without looking at the actual documents I wouldn't
3  know.
4       Q.  Is it fair for me to assume that when we're
5  talking about Concord Marine and some of those others
6  things, that's not an area that you get into or --
7       A.  I don't recognize anything that says Concord
8  Marine as being anything that I'm associated with.
9       Q.  Okay.  And then the last set of documents has
10  to do with The Venue at Heritage Oaks Partners, and
11  that's an LTD, which is the named plaintiff in this
12  lawsuit.  The general partner on that is Southern
13  Affordable Services, Inc.; is that correct?
14       A.  That's correct.
15       Q.  And are you a board member of Southern
16  Affordable Services, Inc.?
17       A.  I am not.
18       Q.  And -- but you are familiar with that entity?
19       A.  Yes.
20       Q.  Okay.  And tell me what your familiarity is.
21       A.  It is the applicant entity for development of
22  the community that was proposed as The Venue at
23  Heritage Oaks.
24       Q.  And it appears to me that a Secretary of
25  State filing was made on April 30th, 2024.  So I

Page 17

1  understand that to mean that the -- the LTD is still
2  active; is that correct?
3       A.  I wouldn't know without some kind of proof.
4       Q.  Okay.  Were you aware that there was a -- you
5  know, a report filing on April 30th, 2024?
6       A.  No.
7       Q.  And it looks like the articles of
8  incorporation -- or, excuse me, the certificate of
9  limited partnership was signed by Jay Brock.  Do you
10  recognize that name?
11       A.  Yes.
12       Q.  And who is Mr. Brock?
13       A.  I don't know his exact title.  I don't know
14  whether he's executive director or president or vice
15  president of Southern Affordable Services.  Might --
16  and it would be the entity that's the general partner
17  for the -- for Southern Affordable Services.
18       Q.  If -- if you flip --
19       A.  Let me see.
20       Q.  It looks like he's the executive vice
21  president or at least he was --
22       A.  Yeah.
23       Q.  -- as of 2023.  Does that sound accurate?
24       A.  That's what it says.  Yep, it sounds
25  accurate.

William Scott Culp
November 21, 2024

Page 18

1    Q.  All right.  If you flip to the page that has
2  the various listings and the names, there is Venue at
3  Heritage Oaks Capital Holdings, LLC, Venue at Heritage
4  Oaks Commercial, LLC, Venue at Heritage Oaks Condo
5  Developer, Venue at Heritage Oaks Partners, LTD.
6  Those four entities are you associated with them in
7  any way?
8    A.  When you say associated with, I'm -- would
9  have to look at each of those to see if I'm a member
10  or officer.  Associated with from the standpoint
11  developer and contractor for The Venue at Heritage
12  Oaks.  There is an association there.  So I'm not --
13  just trying to be clear on what you mean by associated
14  with.
15    Q.  Sure.
16       And obviously we're going to be talking today
17  about The Venue at Heritage Oaks.
18    A.  Uh-huh.
19    Q.  And I -- from reviewing this it looks like
20  there is four different companies that were set up in
21  some manner or another.
22       Do you understand those all to be related to
23  the Brevard County property located at Heritage Oaks?
24    A.  They're all related to the owner that made
25  application for development of the property that's the

Page 19

1  subject of this.
2    Q.  And when you say the owner, who are you
3  referring to?
4    A.  The Venue at Heritage Oaks Partners, LTD,
5  period.
6    Q.  All right.  What about The Venue at Hickory
7  Tree Partners, LTD?  What is that?  Do you know?
8    A.  I don't remember.  It seems like there was
9  another name for some other community at one point
10  that we were talking about Hickory Tree.  I don't
11  remember.
12    Q.  Do you think that when you were originally
13  looking to develop in Brevard County, it was
14  potentially called The Venue at Hickory Tree Partners,
15  LTD?
16       MS. RHODEN:  Object to form.
17    A.  We've looked to develop in Brevard County a
18  lot in different times, different areas.  So I don't
19  know if that particular name was related to this
20  specific property.  It could have been.  But I would
21  need more detail.
22    Q.  (By Ms. Gainey) I understand you've done a
23  lot of transactions, lots of businesses.  You've been
24  around, as you said, for 40 years, so just let me know
25  what you remember.  If there is something you don't,

Page 20

1  just tell me.
2    A.  Yes.  Yes.
3    Q.  Do you hold any licenses or certificates?
4    A.  Yes.  I'm a general contractor.
5    Q.  All right.  And is that for 40 years, or is
6  that a different amount of time?
7    A.  1985.  So not quite.  Give me another six
8  months.
9    Q.  You're close.
10       Do you hold any other licenses or
11  certificates?
12    A.  Driver's license.  Certificates?
13    Q.  You're very thorough.  Thank you.
14    A.  I don't remember any other certificates.  I
15  might have.
16    Q.  How about a real estate license?
17    A.  No.
18    Q.  And can you give me your education history
19  just in a nutshell?
20    A.  Yeah.  I have a bachelor's degree in -- it's
21  from The School of Architecture with a degree in
22  construction management from Auburn.  I think that's
23  right.  It's been a long time ago.
24    Q.  How long have you been associated with
25  Atlantic Housing Partners, L.L.L.P.?

Page 21

1    A.  Since its creation.
2    Q.  And when was that?  Do you remember?
3    A.  I don't remember exactly.
4    Q.  And is it fair to call you a -- a real estate
5  investor for low income housing, or how would you
6  describe yourself?
7    A.  I'm a real estate developer and a general
8  contractor.
9    Q.  And is that primarily focused on low income
10  or affordable housing?
11    A.  It's primarily focused on affordable housing,
12  yes.
13    Q.  And how do you define affordable housing?
14    A.  It's defined under the Florida Statutes, and
15  I only use the statutory definition.
16    Q.  Okay.  Which is?
17    A.  Under 420.004 it's a fairly lengthy
18  definition, but in short summary it's housing that's
19  affordable to households that earn less than
20  120 percent of the area median income in the area
21  which the housing is located and rented for rents that
22  are affordable to those household incomes.
23       But that's a short summary of a longer
24  definition.
25    Q.  I understand that.

William Scott Culp
November 21, 2024

**Page 22**

1  So 120 percent of the AMI is -- is the marker
2  for affordable housing.  Is that --
3      A.  It is the top end marker for affordable
4  housing.  It is not the only marker.
5      Q.  What other markers are there?
6      A.  There is I think five.  There is very low
7  income, extremely low income, low income, moderate and
8  then there is one that doesn't have a label like that,
9  which is 60 percent.  60 percent doesn't actually have
10  a label such as moderate, low, very low or extremely
11  low.
12      Q.  And would -- you -- you're defining that
13  pursuant to Florida Statute that you're pretty
14  familiar with?
15      A.  All except for the 60 percent.  60 percent
16  reference is Federal Internal Revenue Code standards.
17      Q.  Okay.  Is that Section 42?
18      A.  Yes.
19      Q.  And just nutshell it for me.  What -- what is
20  your understanding of Section 42 of the IRS, please?
21      A.  Section 42 governs the -- what used to be
22  called low income housing tax credits.  I believe
23  they're now called housing credits.  And they govern
24  the allocation and use of those housing credits to
25  facilitate the development of affordable housing and

**Page 23**

1  rental of that.
2      Q.  Okay.  So is it fair to say that you still
3  develop under Section 42 of the IRS code as well as
4  Florida Statute?
5      A.  Yes.
6      Q.  Okay.  So you're operating under both of them
7  continuously?
8      A.  I wouldn't say continuously because we do --
9  that's one of those things in Seinfeld, right, we do
10  do.  We develop multifamily communities that aren't
11  under Section 42.
12      Q.  And how long have you been working under
13  Section 42?
14      A.  As long as I've been developing.
15      Q.  Is that the 40 years again?
16      A.  It might be a little short of 40 years.  I
17  think the Section 42 program started in '85, and I
18  think the first low income housing tax credit
19  development was done in '87 and I think the first one
20  I was involved with was probably '95, if I remember
21  correctly.
22      Q.  How many affordable housing sites has
23  Atlantic Housing developed?
24      A.  I don't know the exact number.  I would say
25  over 100.

**Page 24**

1      Q.  Okay.  I saw something that said over 150.
2  Does that sound accurate to you?
3      A.  That -- that would be a reference to the
4  principals.  Atlantic Housing as an entity would not
5  be over 150.
6      Q.  Tell me what you mean when you say in
7  reference to the principals?
8      A.  Well, there is three primary principals of
9  Atlantic Housing, myself and two other partners.  And
10  the three of us, you know, have been involved with
11  development of over 150 affordable housing
12  communities.
13      Q.  And if I'm understanding you correctly,
14  you're saying that they aren't -- they weren't
15  necessarily done under the name Atlantic Housing.
16      A.  That's correct.
17      Q.  Okay.  What other names have you developed
18  affordable housing under?
19      A.  There was a Sandspur Housing years ago.
20      Q.  Can you spell that for the record, please.
21      A.  Sandspur.  S-A-N-D-S-P-U-R.  There was CED,
22  and CED had different names associated with it.  CED
23  Development, CED -- I don't remember all the names.
24  It's been a long time ago.  Before '95 I think.  I
25  can't remember exactly even the years.

**Page 25**

1      Q.  What does CED stand for?
2      A.  It didn't stand for anything.
3      Q.  Was it someone's initials?
4      A.  No.  It wasn't.
5      Q.  Really?
6      A.  Yeah, really.
7      Q.  Just came up with CED?
8      A.  Really just CED.
9      Q.  All right.
10      A.  You can Google it and look it up.  It's just
11  CED.
12      Q.  Are you -- you mentioned the principals of
13  Atlantic Housing.  Can you provide their names,
14  please, for the record?
15      A.  Yeah.  Myself.  You have my name.  Michael
16  Sciarrino, S-C-I-A-R-R-I-N-O, and Paul Missigman,
17  M-I-S-S-I-G-M-A-N.
18      Q.  Which states are you currently operating in?
19      A.  Only in Florida.
20      Q.  Okay.  Did you previously operate in
21  different states?
22      A.  Yes.
23      Q.  Which states?
24      A.  Ten different states.  Florida, Georgia,
25  Texas, Michigan, Illinois, New York, South Carolina,

William Scott Culp
November 21, 2024

**Page 26**

1  Tennessee -- have I said ten yet?  I don't remember
2  after that.
3      Q.  Why are you only operating in Florida now?
4      A.  Because I'm getting old and I like to stay
5  close to home, which is the actual truth.
6      Q.  What about the other principals?  Are they
7  still operating in different states?
8      A.  No.
9      Q.  They're getting old too?
10     A.  They're getting old and want to stay close to
11 home.
12     Q.  All right.
13     A.  Grandkids are more important.
14     Q.  Of course.  I understand.
15         MS. RHODEN:  Let's not tell them you said
16     that though.
17         MS. GAINEY:  It's on the record now.
18         THE WITNESS:  Well, one of my grandkids is my
19     tenure, but --
20     Q.  (By Ms. Gainey) How -- how long would you say
21 approximately have you only been operating in Florida?
22     A.  That's a good question.  I think we've
23 probably only been in Florida for about ten
24 years now.
25     Q.  And that was an executive decision by the

**Page 27**

1  principals to -- to stick to Florida, or was there any
2  other reason?
3      A.  No.
4      Q.  Okay.  And the time you have been in your
5  profession has it always been focused on affordable
6  housing?
7      A.  It's a little bit of an open-ended question.
8  So -- you said the time that I've been involved in my
9  profession.  Like I said, I started in 1985.
10     Q.  Let -- let me be more specific.
11     A.  Okay.
12     Q.  When -- when you started in 1985, what were
13 you doing?
14     A.  It was an affordable housing rental
15 community, but after that was developing some
16 single-family communities, it was developing
17 single-family houses, it was developing some market
18 rate communities.  Came back to affordable housing
19 communities in about 1995.
20     Q.  All right.  And so since 1995 has your focus
21 been exclusively on affordable housing?
22     A.  Not exclusively, but primarily.  I would say
23 in excess of 90 percent.  Maybe in excess of
24 95 percent.
25     Q.  You anticipated my question.

**Page 28**

1  So 90 to 95 percent is affordable housing.
2  Affordable housing is your focus?
3      A.  Has been, yes.
4      Q.  Yes.  And what is the remainder?  Is that
5  single family?
6      A.  No.  It would be -- it would still be
7  multifamily but not necessarily affordable.
8      Q.  Understood.
9         How is the area median income determined for
10 an area -- for a county?
11     A.  I only know that HUD publishes it.  I really
12 don't know how HUD determines it.
13     Q.  And does it change from year to year?
14     A.  Yes.
15     Q.  And who in Atlantic Housing is the person who
16 is most familiar with HUD determining the AMI?
17     A.  Is most familiar.  I don't know that anybody
18 is really most familiar with how HUD does that or --
19     Q.  Let me -- let me simple --
20     A.  Okay.
21     Q.  Let me ask a different question that may be a
22 little bit more simple.
23         Like, how do you find out what the AMI is for
24 a particular county when you're considering
25 developing?

**Page 29**

1      A.  Once a year HUD publishes it.  You can go to
2  huduser.org and every year -- I think it's February,
3  but I'm not exactly sure, but every year HUD updates
4  the area median income for every MSA, Metropolitan
5  Statistical -- Metropolitan Statistical Area in every
6  county in every state in the U.S..
7      Q.  What was it for Brevard County in 2023?
8      A.  I don't recall.
9      Q.  So who looks it up for you, or -- or do you
10 look it up?
11     A.  I do.
12     Q.  Okay.  I didn't know if you had support
13 staff --
14     A.  We do.
15     Q.  -- that normally kept track of that.
16         So how -- what is that process like?  You --
17 you -- basically you're thinking about Brevard, you go
18 look up what the AMI is and go from there?
19     A.  Every development that we attempt to achieve
20 with affordable housing resources needs to consider
21 the area median income for that year.  So every year
22 when that's published we look at all of them.
23     Q.  And when you say we, who are you referring
24 to?
25     A.  Everybody that's involved with the

William Scott Culp
November 21, 2024

Page 30

1  development of affordable housing at Atlantic Housing.
2      Q.  You're talking about staff members?
3      A.  Staff members do at times, principals of
4  course.
5      Q.  And is this an annual meeting that you have
6  as a team or --
7      A.  No.
8      Q.  -- how --
9      A.  No reason to meet annually.  It's published
10  on the Web.  Everybody can look at it.
11      Q.  Is that kind of your starting point when
12  you're determining where you want to develop?
13      A.  I wouldn't say it's a starting point.  I'm
14  liking to be close to home now, so I do look at the
15  counties that are close to home and see if there is a
16  financially feasible way to develop affordable housing
17  in those counties.
18      Q.  And you're talking about close to Seminole
19  County.
20      A.  I say close to the Orlando MSA.
21      Q.  So is it fair for me to say that you
22  generally try to focus your efforts in -- in Central
23  Florida?
24      A.  In the last several years we're focused on
25  the I-4 corridor with primary focus being Central

Page 31

1  Florida because I can drive there at lunchtime.
2      Q.  When you say several years, can you give me a
3  better estimate of how long you've been doing this?
4      A.  Five to ten.
5      Q.  And prior to that you went all over the
6  state?
7      A.  I went all over -- well, say all over the
8  country.  I didn't develop in a lot of states, but,
9  like I said, ten different states.  But --
10      Q.  Are there any government regulations that
11  require your developments to have a minimum number of
12  apartments that are considered affordable housing?
13      A.  Yes.
14      Q.  Okay.  Can you tell me about that.
15      A.  Probably not.  I can describe -- every year
16  there is multiple programs that provide resources that
17  are intended to facilitate economic feasibility and
18  sustainability of affordable housing communities.
19  Each one of those programs, each one of those
20  resources has different parameters and different
21  criteria.
22          They would then -- those resources would have
23  an established what we refer to as a set-aside or
24  numerous different set-asides.  And so each different
25  program on an annual basis will have different

Page 32

1  guidelines and requirements and restrictions.
2      Q.  So I'm just trying to get a -- kind of a
3  general sense of -- of that process and what you and
4  your team go through when you're looking at
5  affordable housing.  And so can -- can you take me
6  through your -- your process for considering
7  affordable housing?
8      A.  We look at areas of strong job growth, of
9  strong population growth and we evaluate cost of
10  development in relation to the rents that can be
11  charged under the different programs to see if there
12  is a program where the rents related to the cost
13  will -- and the resources available will result --
14  result in an economically feasible development.
15      Q.  So do you think about the area before you
16  think about the financing when you're considering
17  developing?
18      A.  Not always.
19      Q.  Okay.  Well, you mentioned strong job growth
20  and strong population growth, so that kind of relayed
21  to me that you're -- you're looking at areas that have
22  both of those things.
23      A.  That's true.  But you said do I look at those
24  areas before.
25      Q.  Uh-huh.

Page 33

1      A.  So it's not always before.
2      Q.  Tell me how I misspoke.  You're -- are you
3  looking at everything all at -- altogether?
4      A.  I am, yeah.  I will look at the programs.
5  And Florida Housing Finance Corporation publishes
6  programs.  I'll look at what their programs are and
7  determine if I think there needs to be further
8  evaluation on what municipalities or MSAs might fit
9  well with those programs and if I believe based upon
10  the numbers, really, if those programs will be
11  financially feasible in those areas.  I don't go to
12  areas where it's not going to be financially feasible.
13      Q.  And are -- are you the guy that kind of gets
14  the ball rolling, or is it the principals that -- that
15  come together and start having conversations about a
16  specific development?
17      A.  Yes to both of those questions.
18      Q.  All right.  Tell me -- tell me what you mean.
19      A.  You said are you the guy --
20      Q.  Yeah.
21      A.  -- and that's a yes.
22      Q.  You're the guy.
23      A.  And the principals -- and the principals get
24  together --
25      Q.  Yes.

Page 34

1  A. -- yes. And we decide, yes.
2  Q. All right.
3  A. We look at, you know, where there is an
4  opportunity and a need.
5  Q. All right. So I guess what I'm asking is
6  do other -- the other principals are they also looking
7  for development potential like you are, or are you
8  generally the person that -- that starts the
9  development?
10  A. Two of us. Michael Sciarrino, who is the
11  majority partner and myself we are primarily focused
12  on where we're going to develop and where we believe
13  it will be feasible. The third principal is primarily
14  focused operationally on the -- on the financing.
15  Q. And that's Paul.
16  A. Correct.
17  Q. Do you have any duties that are really
18  reserved exclusively for you?
19  A. I am -- I wouldn't say -- well, exclusively.
20  No. I think --
21  Q. Or primarily.
22  A. -- Mike -- Mike Sciarrino wouldn't like that
23  since he's the majority owner.
24  Q. Okay. How about primarily.
25  A. Primarily, yes. I'm the general contractor.

Page 35

1  I hold the license. So, yes, from general contracting
2  primarily. From what you would typically consider --
3  because nobody has a real definition for development
4  or real estate development -- I'm primarily
5  responsible for the real estate development.
6      My primarily responsibility is not the
7  management of the portfolio. Paul Missigman would
8  have primary responsibility for overseeing that part
9  of the business. My primary responsibility is not the
10  accounting. Paul Missigman would have oversight of
11  the accounting.
12  Q. All right. So generally when you're talking
13  about GC issues, that's -- that's you. Accounting
14  issues, Paul?
15  A. Correct --
16  Q. All right.
17  A. -- generally.
18  Q. And what about Mike. Is there an area that
19  that he's primarily responsible for?
20  A. Mike is in charge of everything and likes to
21  have his finger on everything.
22  Q. I know the type.
23      Why did you decide to start developing
24  affordable housing?
25  A. I had an owner's representative on a

Page 36

1  condominium that I was the project manager for in
2  Galveston, Texas who asked me if I wanted to return to
3  Florida since that's where I grew up to build an
4  affordable housing community in Orange County. That
5  was my first involvement. And I guess that would
6  answer your question on how I got involved.
7  Q. What company were you working for at that
8  time?
9  A. I think the name was Whitemark. One word.
10  Q. And approximately what year was that?
11  A. 1985.
12  Q. So was it more about returning to Florida for
13  you?
14  A. No. I had left Florida to go to Texas for
15  the work. It was more about liking the idea of what I
16  would be doing.
17  Q. All right. I want to kind of go through
18  the -- the process when you're looking to develop an
19  affordable housing complex. You told me already you
20  look for areas that have specific markers or growths,
21  and then after you kind of focus in on a -- an area
22  that you're interested in or a county that you're
23  interested in. Take me through the process of what
24  happens next.
25  A. I wouldn't say that there is a specific

Page 37

1  process. We generally -- generally try to use our
2  experience and our knowledge to understand and be able
3  to research the demand for one, which is important.
4  You know, there is a lot of data available to look at
5  demand in different locations.
6      We always look at, as I mentioned, program
7  resources. And in Florida it's primarily Florida
8  Housing Finance Corporation. But that's just one of
9  the resources for -- most every affordable housing
10  development has multiple resources, so we try and
11  match the resources and the demand and the growth
12  potential and look at areas where the resources and
13  the demand and the growth potential match up.
14  Q. What databases do you use in order to look at
15  strong growth -- job growth for example?
16  A. We're not typically honing in on any specific
17  data for that. We, you know, have been here for
18  40 years. We try and keep a handle on, you know, what
19  is going on in the areas that we are in. So we're
20  looking at, you know, what the newspaper says about
21  what is coming as far as new jobs and -- and growth.
22  So it's -- it's everything. We don't limit ourselves
23  to any specific dataset.
24  Q. What about as it relates to population
25  growth. Do you focus on a specific dataset?

William Scott Culp
November 21, 2024

Page 38

1    A.  No.  There is a lot of information with
2  regard to population growth, and we try and keep
3  abreast of everything we can.  But it -- in this day
4  and age it's pretty much all available on the Web, so,
5  yeah, look for everything that can help you get a
6  little more knowledge.
7    Q.  Do you have internal data resources available
8  to you?
9    A.  Internal data resources.  I don't know what
10 that means.  I --
11   Q.  Do you --
12   A.  -- do have internal data.
13   Q.  Okay.
14   A.  But it's --
15   Q.  What internal databases do you keep as it
16 relates to affordable housing?
17   A.  All of the financial information on every
18 community that we develop.
19   Q.  Well -- and I'm talking about more generally
20 if you're -- if you're looking at job growth or
21 population growth or what is going on in the area.
22   A.  We don't create datasets that we maintain
23 ourselves.  We only look at third-party resources.
24   Q.  Do you keep internal surveys --
25   A.  No.

Page 39

1    Q.  -- as --
2       So what I'm trying to figure out is do you
3  know how many -- in a specific property do you know
4  how many tenants are minority or how many tenants are
5  white?
6    A.  I don't know them off the top of my head.  In
7  our portfolio we do maintain data.  Some of that data
8  can be collected, some of it can't under Fair Housing
9  Laws.  So we maintain the data that can be collected
10 and maintained with regard to the makeup of the
11 tenants in our communities.
12   Q.  And how do you -- how do you gather that
13 data?  Is that from the applications?
14   A.  The -- I don't know if there is anything
15 other than the applications.  I know there is
16 recertifications on a regular basis, and that -- that
17 may also provide input to the data.
18   Q.  So do you have someone on your team that's
19 collecting that information and entering it into a
20 database?
21   A.  All the applications are entered into a
22 database.
23   Q.  What type of database is it?
24   A.  I don't recall.
25   Q.  And so does that database allow you to pull

Page 40

1  the number of minorities at any given complex?
2    A.  It allows us to pull information with regard
3  to what has been reported.
4    Q.  Tell me what you mean.
5    A.  There is some restrictions on what you can
6  require someone to put down on an application versus
7  what you can, you know, request.  So we can pull the
8  data that's been provided to us by the applicants.
9    Q.  All right.  I'm understanding you to say that
10 if the applicant has checked the box that -- that
11 they're a black person, you're able to pull that at a
12 certain complex?
13   A.  If there is such a box, yes.
14   Q.  All right.  But if -- if they choose not to
15 disclose whether they're black or white, then
16 obviously you don't have access to that information.
17   A.  Correct.
18   Q.  All right.  So other than what they put on
19 their applications do you -- does your company -- and
20 when I'm talking about your company, I'm talking about
21 Atlantic Housing.  Do they do any other surveys or try
22 to determine the -- the racial component of tenants?
23   A.  I'm going to answer your question a little
24 bit more maybe than you -- you would have asked for
25 because Atlantic Housing doesn't do any of that.

Page 41

1    Q.  Okay.
2    A.  Atlantic Housing is a developer.  Concord
3  Management is the management company that leases the
4  apartments.  Concord Management takes in data with
5  regard to what is in the application.  Concord
6  Management -- Management has that data available to
7  them.
8    Q.  All right.  I -- I appreciate the
9  clarification.
10      And let me just say for the record -- and --
11 and I know there is lots of companies involved --
12   A.  Uh-huh.
13   Q.  -- so, you know, let me start using the word
14 plaintiffs because I think you're -- you're associated
15 in some way or the other with all the named
16 plaintiffs.  Is that a fair statement?
17   A.  Yes.
18   Q.  All right.  And so I -- I don't want to get
19 in the position where I ask you about Atlantic Housing
20 and, you know --
21   A.  Yeah.  And I don't want to get in a position
22 where I'm answering a question that you ask
23 specifically about Atlantic Housing and it not be
24 accurate with regard to what you ask.
25   Q.  And I --

William Scott Culp
November 21, 2024

Page 42

1    A.  So I'm going to ask that -- I'm going to
2 answer in the way you ask me.
3    Q.  I -- I certainly understand that.
4    A.  Okay.
5    Q.  But I'm -- I'm trying to make it easier on
6 both of us.
7    A.  That's -- that's fine with me.
8    Q.  All right.
9    A.  Yeah.
10    Q.  And so I've heard you just say that Atlantic
11 Housing doesn't necessarily main -- maintain those
12 databases but -- or surveys but Concord Management
13 does.
14    A.  That's correct.
15    Q.  All right.  Any other of the named plaintiffs
16 that have any type of surveys as to the racial
17 component of tenants at apartment complexes that --
18 that you manage or control?
19    A.  No.
20    Q.  All right.  And tell me when you were talking
21 earlier about the applications, if -- if they so
22 choose to disclose their racial makeup, is it Concord
23 Management that's collecting that?
24    A.  Correct.
25    Q.  And are you aware of any other surveys or

Page 43

1 data collection methods used by any of the plaintiffs
2 in order to determine the racial makeup of tenants in
3 the property -- the properties you own or operate?
4    A.  No.
5    Q.  And would someone at Concord Management then
6 be able to enter some information into a computer and
7 then it -- it pop out racial makeup of the tenants in
8 a particular development?
9    A.  I'm sure they could develop a report that
10 provides any of the data that's within the
11 applications.
12         And I don't mean to be, you know, difficult
13 in my answer to the question.  But sometimes when the
14 question says, you know -- you know, pop out some
15 stuff, I'm not sure, you know, how they pop it out.
16 But, you know, yes, Concord Management can develop
17 reports on information that's in the database with
18 regard to the residents of the communities.
19    Q.  I'm going to tell you why I'm asking.  We'll
20 talk about it a little bit later.
21    A.  Okay.
22    Q.  The plaintiffs have hired an expert in this
23 case.  You're familiar with that?
24    A.  Yes.
25    Q.  All right.  And he indicated in his report

Page 44

1 that he reviewed surveys, as he called them, as to the
2 racial components of the properties that are owned or
3 managed by the plaintiffs.
4    A.  Yes.
5    Q.  All right.  And so that's what I'm trying to
6 figure out.  Like -- because I haven't seen that
7 survey, so I'm trying to figure out what survey Dr.
8 Fishkind, who is the plaintiffs' expert, would have
9 reviewed in preparing his report.
10    A.  Yeah.  And you have to ask Dr. Fishkind that.
11    Q.  All right.  So were you involved in any way
12 in providing Dr. Fishkind any type of surveys to
13 complete his report?
14    A.  I personally was not, no.
15    Q.  All right.  Do you know who was?
16    A.  I don't know who personally prepared -- I
17 know that Concord Management provided him with
18 information, but I don't know who personally in
19 Concord Management did.
20    Q.  Okay.  So who would I talk to at Concord
21 Management that could give me an answer to that
22 question?
23    A.  Well, you can talk to me and I can find out
24 who it is, but I don't know as I'm sitting here who it
25 is that provided Dr. Fishkind with the information.

Page 45

1    Q.  And have you seen any type of surveys in that
2 regard?
3    A.  I don't recall that I actually looked at the
4 surveys.  I know that Dr. Fishkind requested them and
5 they were provided to him, but I don't recall that
6 I've actually seen them.
7    Q.  Do you know who he made that request to?
8    A.  Me.
9    Q.  And who did you ask to provide them?
10    A.  I probably would have talked to Jonathan
11 Thomas, who is the president of the property
12 management company.
13    Q.  So did -- if it had been Jonathan, did he
14 give the reports back to you, or were they sent
15 directly to Dr. Fishkind?
16    A.  I don't remember.
17    Q.  When was that?
18    A.  I don't recall.  Sometimes in the last two
19 years.
20    Q.  So as you sit here today you don't recall
21 actually reviewing the -- the surveys that were
22 provided to Dr. Fishkind?
23    A.  I do not.
24    Q.  Other than potentially Mr. Thomas aware of --
25 are you aware of anyone else who reviewed the -- the

William Scott Culp
November 21, 2024

Page 46

1  surveys other than of course your attorney?
2      A.  I'm not aware of anybody that reviewed them.
3      Q.  Did you provide a copy to your attorney?
4      A.  I don't recall.
5          MS. GAINEY:  We are going to request a copy
6  of those surveys just so you know.  We'll make a
7  formal request for those.
8      Q.  (By Ms. Gainey) Tell me about the process for
9  buy-in tax credits and -- and getting -- you're
10 laughing.  It's a long one.  Just not --
11     A.  I've been doing this for 40 years.  How long
12 are we going to be here?
13     Q.  I understand.  I don't want 40 years of
14 information.  I don't -- I want -- let's say in 2023.
15     A.  The process for buy-in tax credits.
16     Q.  Yeah.  So -- let me ask it a different way.
17     A.  Yeah.
18     Q.  So once you decide -- let's use Brevard
19 County since it's the subject of this lawsuit.  Once
20 you decide that you are going to invest in Brevard
21 County, what is the -- the general steps that it has
22 to go through from inception to completion?
23     A.  And I'll start with -- your preface was once
24 you decide.  So that means we've already decided that
25 the economics, you know, the median income and

Page 47

1  construction costs and the demand was such that it
2  would be financially feasible.
3          Then at that point we determine what programs
4  we would be applying through and under.  And we're
5  talking about Brevard County and specifically this
6  case.  Apply first for the tax-exempt bond allocation,
7  which is through the Brevard Housing Finance
8  Authority, who is a conduit issuer for tax-exempt
9  bonds.  They don't actually fund anything.
10         Those tax-exempt bonds are then purchased by
11 a bond purchaser that provides debt, tax-exempt
12 interest debt, which provides a lower interest rate
13 for the funds that are then loaned to the owner to
14 develop that affordable housing community.
15         That by itself would not make the community
16 feasible because it's just debt.  Just low interest
17 debt.  In order to maintain -- to be able to maintain
18 economic feasibility with the rents that are required
19 to maintain affordability, you also need tax credits.
20         If you're utilizing tax-exempt bonds, you get
21 as of right 4 percent low income housing tax credits,
22 may be called 4 percent housing credits today.  Those
23 are issued through Florida Housing Finance
24 Corporation.  And if you have tax-exempt bonds, those
25 are as of right.  There is not a limit on those, with

Page 48

1  tax-exempt bonds.  It's not a competitive application.
2          There are other resources that look for to
3  try and develop an economically feasible community.
4  The local government has oftentimes available to them
5  SHIP, State Housing Initiative Program funding, impact
6  fee exceptions, discounts, utility fee credits.  There
7  is any number of different sources that may go into
8  developing an affordable housing community.
9          But if you're talking about in specifics
10 the -- the development we were proposing there for
11 Venue at Heritage Oaks it was intended to be a
12 tax-exempt bond community with 4 percent low income
13 housing tax credits.
14     Q.  Did you explore the other options, the
15 financing options that you just mentioned, the SHIP
16 and the impact fee and --
17     A.  We did explore some of those.  Inquired with
18 the County with regard to some of those.  None of
19 those sources were readily available for this
20 development.
21     Q.  All right.  And why not?
22     A.  The local governments make choices on how
23 they allocate their resources.  And I'm not aware that
24 there was a program available at the time we were
25 planning to develop this.

Page 49

1      Q.  All right.  I have seen some references to
2  SHIP.  Tell me more about SHIP.
3      A.  SHIP is a resource that's given to every what
4  they call participating jurisdiction.
5      Q.  Uh-huh.
6      A.  Some cities and counties are not
7  participating jurisdictions.  It's granted through the
8  state through the Housing -- out of the Housing Trust
9  Fund that's allocated annually by the legislature.  So
10 every year the legislature determines how much money
11 is going to go into the SHIP program.
12         The SHIP program has certain statutory
13 restrictions on what it can be used for.  The majority
14 of it is used for single family.  So the majority of
15 SHIP is not used for multifamily rental housing.  And
16 there is a portion of SHIP that can be used for
17 multifamily rental housing, but the local government
18 doesn't have to.  They can use it all for single
19 family.
20     Q.  All right.  And so under the SHIP program the
21 money comes from Florida, the Florida legislature or
22 is it federal funds?
23     A.  The Florida legislature under the SHIP
24 programs.
25     Q.  All right.  What about the other programs?

William Scott Culp
November 21, 2024

Page 50

1  Where is the -- what is the source of the money?
2      A.  The tax-exempt bond program that I mentioned
3  is the source of those funds is from the bond buyer.
4      Q.  Okay.
5      A.  Whether we be the bond buyer, which we are
6  often, or a qualified institutional buyer such as a
7  bank.  And then they buy the bonds.  You know, they
8  purchase those bonds to get the tax-exempt interest on
9  the bonds.
10     Q.  All right.  You mentioned impact fees.  Tell
11 me more about impact fees.
12     A.  Yeah.  Every jurisdiction has impact fees
13 whether it's roads -- a number of different impact
14 fees.  And each jurisdiction can choose what they want
15 to do with their general revenues and with their SHIP
16 money and whether or not they want to support or
17 incentivize affordable housing by paying for some
18 portion of the impact fees.  No jurisdictions have to
19 do it.
20     Q.  Uh-huh.
21     A.  But most of them have programs that
22 incentivize them to provide some form of discount for
23 impact fees for affordable housing.
24     Q.  All right.  So impact fees are what a
25 developer pays for using the roads and -- and the fire

Page 51

1  station and things along those lines and -- is that
2  correct?
3      A.  I guess that could be a description of it.
4  It's what we -- what we pay because we're required to
5  because the local government has done their proper
6  methodology under the state statutes to determine what
7  the impact of the new development is, and, therefore,
8  what the fee structure should be for each different
9  type of use.
10     Q.  And jurisdictions determine on their own
11 whether they want to offer developers some type of
12 discount to the impact fees -- fees in order to
13 incentivize the developer.
14     A.  Mostly on their own.  But there is statutory
15 guidelines with what they can do even in that regard.
16     Q.  All right.  You mentioned -- mentioned
17 exemptions -- exemptions and discounts.  What were you
18 referring to?
19     A.  Some jurisdictions will actually exempt
20 certain fees for affordable housing as opposed to
21 discounting.
22     Q.  And what did Brevard do, if you know?
23     A.  They -- we were not receiving any exemptions
24 or discounts from Brevard County or from the City.
25     Q.  As it relates to impact fees what was Brevard

Page 52

1  offering, if any?
2      A.  Nothing.
3      Q.  As it relates to SHIP was SHIP available for
4  The Venue at Heritage Oaks?
5      A.  No.
6      Q.  And how did you determine that?
7      A.  By asking the County.
8      Q.  Who did you ask?
9      A.  I don't recall.
10     Q.  Are there any other financing sources other
11 than what we have already talked about for affordable
12 housing?
13     A.  Yes.
14     Q.  What other financing sources?
15     A.  There is SAIL, State Apartment Incentive
16 Loan, which is a state-funded program through the
17 legislature on an annual basis.  And highly
18 competitive developers apply for what is essentially
19 low -- low income loans -- low -- low interest loans
20 for the development of affordable housing.  And you
21 apply for them on a competitive basis at the State,
22 and there is typically 20 applications for every one
23 allocation in SAIL dollars.
24     Q.  Did you apply for SAIL for this particular
25 property?

Page 53

1      A.  No.
2      Q.  And why not?
3      A.  We are typically not applying for SAIL
4  because the competitive nature of that program is not
5  realistic to be able to achieve an allocation of those
6  resources on a regular basis.
7      Q.  So am I hearing you correctly to say that
8  you analyzed it, you considered it but determined that
9  the -- it was too competitive to -- to apply?
10     A.  Correct.  There is scoring criteria, and each
11 site, each location, each development has to be
12 evaluated on whether or not it will meet the scoring
13 criteria for that year for that particular funding
14 source, and we determine when we reviewed those
15 whether or not we believe the development would be
16 competitive.
17     Q.  And is this an actual written document --
18     A.  Yes.
19     Q.  -- you do?
20         All right.  And -- and where is that analysis
21 kept?
22     A.  This -- the document is the application from
23 the state, Florida Housing Finance Corporation.
24     Q.  Okay.  I'm a little bit confused.  Did you
25 actually apply?

Page 54

1    A.  No.
2    Q.  Okay.  So was there a written document of
3  the -- the scoring criteria that you completed for
4  Venue at Heritage Oaks?
5    A.  No.
6    Q.  All right.  Is there any written document in
7  order to support that you considered SAIL, the SAIL
8  program?
9    A.  No.
10    Q.  Okay.  I misunderstood you earlier.  I
11  thought you said there was a written -- there was a
12  written document.
13    A.  The written document is the SAIL RFA, request
14  for application at Florida Housing Finance
15  Corporation.  We review those and the scoring criteria
16  within those to determine if there is some reason that
17  we believe we would be competitive in that
18  application.
19    Q.  All right.  So you reviewed the request
20  for application, determined per the scoring criteria
21  that this particular piece of property, Venue at
22  Heritage Oaks, would not be competitive for the
23  program?
24    A.  I don't know that we specifically reviewed it
25  with regard to Venue at Heritage Oaks and whether or

Page 55

1  not it would be competitive.  We didn't make a
2  decision that we would not be competing for that
3  resource for Venue at Heritage Oaks.
4    Q.  And was that based on the scoring criteria?
5    A.  I don't know.
6    Q.  When you say we, who are you referring to?
7    A.  That's most often me, but I don't recall on
8  this particular application if we had anybody else
9  looking at the other resources that might be
10  available.
11    Q.  And when did you make that decision?
12    A.  It would have been at the time we were
13  looking at developing the property.  I can go --
14  without documents I don't know what day we contracted
15  to purchase the land and --
16    Q.  All right.  And do you typically considering
17  all -- consider all your financing options before you
18  enter into the contract to purchase land?
19    A.  Yes.
20    Q.  And for this specific property, Venue at
21  Heritage Oaks, were there any other financing options
22  available to you to develop this property?
23    A.  I'm smiling because there is lots of other
24  financing options.  I can go get a loan from the bank.
25  It's not economically feasible to develop affordable

Page 56

1  housing with some of those financing options.  There
2  is any number of financing options.  We didn't find
3  there were any other options other than the ones we
4  were pursuing that would result in an economically
5  sustainable and financially feasible affordable
6  housing development.
7    Q.  So as it relates to Venue at Heritage Oaks --
8  I'm just trying to figure out if there -- once the
9  bond had been denied did you have other options that
10  you could pursue but -- except for, you know, going to
11  get a loan at a bank?
12    A.  Well, we can always pursue things for
13  continuing years.  Every year there is 9 percent tax
14  credit allocations, there is other SAIL applications,
15  there is -- every year there is opportunities for
16  sources for development.  They don't always line up
17  with the timing of your real estate contracts.
18    Q.  So why didn't you pursue those other options
19  in this case in particular?
20    A.  I would have to look back and see on our
21  land contract, but I don't believe we had time under
22  the land contract.  I don't believe the seller was
23  willing to wait for us for another year or more to
24  pursue other competitive resources.  We had already
25  spent, you know, significant dollars trying to develop

Page 57

1  this.
2    Q.  Was extending the land contract discussed?
3    A.  I don't remember.
4    Q.  When was the land contract entered into?
5    A.  I'd have to look at the land contract.
6    Q.  So are you saying that you did not explore
7  other options regarding financing because you think it
8  had something to do with the expiration of the land
9  contract?
10    A.  That would have been a consideration, yes.
11    Q.  And what other considerations did you have?
12    A.  Other resources that were available to make
13  an economically sustainable financially feasible
14  affordable rental development.
15    Q.  Wow.  That's a lot.
16    A.  It is.  It is.  And we would have to look at
17  a lot of that.
18    Q.  Okay.  And did you in this case?
19    A.  I don't believe in this case that we were
20  able to identify other sources that would have met the
21  time frames and the requirements for both the real
22  estate, particularly the land contract, and where we
23  were focused with our resources at that time.
24    Q.  All right.  I have seen references to the
25  financing expiring on December 31st of 2023.  Are --

William Scott Culp
November 21, 2024

Page 58

1  is that a renewable source?
2      A.  No.
3      Q.  All right.  And so when -- is -- is it use it
4  or lose it?
5      A.  Yes.
6      Q.  All right.  But as of January 1st, 2024 would
7  there be a -- kind of a replenishment of --
8      A.  Yes.
9      Q.  All right.
10     A.  Yeah, I could start over.  I could keep going
11  down this road and spend a lot more money and lose a
12  lot more before we get back to this table --
13     Q.  Uh-huh.
14     A.  -- you know.
15     Q.  Okay.  And you -- you basically chose that --
16  not to start over?
17     A.  I would have to look at all the documentation
18  to determine what made that decision; but, yeah, we
19  were unable to proceed.
20     Q.  Okay.  And what document -- documentation
21  would you have to --
22     A.  I mentioned before that we're going to look
23  at the land contract as one.  You mentioned already
24  the tax-exempt bond allocation that was lost.  We
25  don't know, but you'd probably want to look at the

Page 59

1  bond allocation for Brevard County for the coming
2  year, which I believe there wasn't a source available
3  even though you referred to it being replenished.
4  Oftentimes that replenishment is already reserved, and
5  I believe in Brevard County that's the case for the
6  following year.
7          So there is numerous considerations that
8  would go into is there some other financially feasible
9  model.
10     Q.  Okay.  And do you have any specific memory of
11  exploring those things that -- to determine if you
12  could start over?
13     A.  I would have to look at the documents.
14     Q.  All right.  Did you have any conversations
15  with anybody from Brevard County about the possibility
16  of -- of starting over in 2024?
17     A.  No.
18     Q.  And why are you laughing?
19     A.  Who would I have spoken to in Brevard County
20  who just denied me --
21     Q.  Angela Abbott.
22     A.  -- the tax-exempt bonds?
23     Q.  Angela Abbott.
24     A.  Angela Abbott is with the Housing -- the --
25  counsel for the Housing Finance Authority.

Page 60

1      Q.  Okay.
2      A.  Yeah.  The bond allocation expired that year.
3      Q.  All right.  So why don't you just tell me
4  what your understanding is as to why the bond was
5  denied.
6      A.  I -- I wish I could tell you.  I have -- I
7  don't think there was a good explanation for why the
8  bond was denied.
9      Q.  So as you sit here today you have no idea as
10  to why the bond was denied?
11     A.  No.
12     Q.  And you didn't think to maybe talk to the
13  commissioners or anyone else to see if you can remedy
14  the problem --
15         MS. RHODEN:  Object to form.
16     Q.  -- as to why the bond was denied?
17     A.  How do you remedy the problem?  The bond
18  allocation expired in December.  They denied the --
19  the issuance of those bonds.  I don't know that they
20  had a method to remedy what they did.
21     Q.  (By Ms. Gainey)  All right.  So my
22  understanding that in 2024 there was additional bond
23  financing available.
24     A.  That's your understanding?
25         MS. RHODEN:  Object to the form.

Page 61

1      Q.  (By Ms. Gainey)  Correct.  Yes.  Is --
2      A.  Then you'll have to show that to me.
3      Q.  All right.  That's what I was going to ask
4  you.  Is that your understanding?
5      A.  I would have to look at what happened with
6  the bond allocation in 2024 that Brevard County was
7  eligible to receive.
8      Q.  And at any point have you done that?
9      A.  I don't recall.
10     Q.  Have you considered developing any other
11  properties in Brevard County since December of 2023?
12     A.  No.
13     Q.  And why is that?
14     A.  Because I'm in litigation with Brevard
15  County.
16     Q.  Okay.  As it relates to the financing when
17  you were talking earlier, we talked about the various
18  means of -- of financing or -- or tax exemptions or
19  discounts.  Are there any other that you can think of
20  that we have not already discussed that would be
21  available when you're considering to develop a
22  property?
23     A.  I don't recall everything we discussed.  I
24  think your question was am I aware of any other.  I'm
25  not aware of any other that we haven't discussed that

Page 62

1  would provide an economically feasible affordable
2  housing development.
3      Q.  How do you determine the investors for -- for
4  getting the -- the tax-exempt bonds?
5      A.  The investors for tax-exempt bonds are bond
6  purchasers.
7      Q.  Uh-huh.
8      A.  And bond purchasers are in -- either
9  ourselves, we -- we purchase bonds ourselves or in the
10 market there are banks that are bond purchasers.  We
11 go to, you know, the institutions we know in the
12 market and determine who wants to purchase those
13 bonds.
14     Q.  And do the length of the bonds vary?
15     A.  The term of the bonds?
16     Q.  Yes.
17     A.  The term -- there is a minimum term.  As all
18 of the bonds that we're referring to are private
19 activity bonds that are issued every state by the
20 Federal Government.  And then the Federal -- then the
21 state allocates that private activity bond allocation
22 to the -- to the State Housing Finance Corporation and
23 to the local housing finance authorities.  And so
24 that's how the bond allocation amount gets allocated.
25 And then the purchasers for those bonds are just like

Page 63

1  any other purchaser in the world for any type of
2  tax-exempt bond.
3      Q.  Okay.  And does it require nonprofit status
4  in order to get access to this program?
5      A.  No.
6      Q.  All right.  And so why -- there is a
7  nonprofit that's been identified in the paperwork and
8  also in the complaint called Southern Affordable
9  Services, Inc..
10     A.  Correct.
11     Q.  You're familiar with that?
12     A.  Yes.
13     Q.  Okay.  And we already talked -- I asked you
14 earlier if you were on the board and you're not.
15     A.  Correct.
16     Q.  All right.  And so your -- when you're I
17 guess applying for the bond, is it SAS, Southern
18 Affordable Services, Inc., they're -- they're the
19 ones that actually have to apply for the tax-exempt
20 bond?
21     A.  The application is fairly comprehensive.  You
22 couldn't just apply with a nonprofit general partner,
23 you couldn't just apply with an owner, you couldn't
24 just apply with a bond purchaser, you couldn't just
25 apply with a developer or with a contractor or the

Page 64

1  management company.  All of those are part of the team
2  members that are part of the application.  So whether
3  it's the management company, the general contractor,
4  the developer, the owner, the nonprofit service
5  provider, the bond purchaser, the housing credit
6  syndicator, the housing credit purchaser, all of those
7  are involved in an application to develop an
8  affordable rental community.
9      Q.  And why would there need to be a nonprofit
10 involved?
11     A.  There doesn't have to be a nonprofit.
12 Nonprofits are there for -- they have a mission and a
13 purpose --
14     Q.  Uh-huh.
15     A.  -- as you're aware.
16     Q.  Uh-huh.
17     A.  Southern Affordable Services has a mission
18 and a purpose for providing affordable housing and
19 services to those residents.
20     Q.  All right.  So you're saying that you could
21 apply for and receive tax-exempt bonds without being a
22 nonprofit.
23     A.  Absolutely.
24     Q.  Okay.  And have you ever done that?
25     A.  Yes.

Page 65

1      Q.  All right.  And in what -- in what context?
2      A.  In exactly the same context we're talking
3  about here.
4      Q.  All right.  And so why do you have -- why did
5  you establish -- or why was a nonprofit established to
6  assist in being a general partner?
7          MS. RHODEN:  Object to form.
8      A.  Southern Affordable Services, as I mentioned,
9  is a nonprofit whose mission and purpose is providing
10 affordable housing.  So their purpose and what they do
11 is working on developing affordable housing to provide
12 that, to meet their mission and purpose.  That's why
13 they're involved.
14     Q.  (By Ms. Gainey) And do you know who
15 originally started Southern Affordable Housing?
16     A.  Southern Affordable Services?
17     Q.  I'm sorry.  Excuse me.  SAS, Southern
18 Affordable Services.
19     A.  There are board members, and Jay Brock is I
20 think the vice president.  As far as, you know, how
21 you define who started it, you know, who wrote their
22 articles of incorporation I don't know, so...
23     Q.  Did you know Jay -- did you used to work with
24 Jay Brock?
25     A.  Yes.

William Scott Culp
November 21, 2024

Page 66

1  Q. All right. And where did you --
2  A. Still do work with him.
3  Q. All right. Where did -- what company did you
4  work with him?
5  A. He was at CED. And I'm not sure who he
6  was -- what the technical employer was, you know,
7  after that point. But at some point he worked with
8  others to start Southern Affordable Services.
9  Q. Did Paul work at CED?
10  A. Paul Missigman?
11  Q. Yes.
12  A. Yes.
13  Q. And did the other principal, Mike, did he
14  work at CED?
15  A. Yes.
16  Q. Does CED still exist?
17  A. I don't know if the entity is still active.
18  They're not active in the development or any -- any
19  development for that matter. The entity as a, you
20  know, Sunbiz organization may still be active, but
21  they're not active in any real estate development.
22  Q. I think you said earlier -- let me just
23  confirm -- you -- about 90 to 95 percent of your
24  communities are under the affordable housing umbrella;
25  is that correct?

Page 67

1  A. I would guess, and it would be purely a
2  guess, but probably an educated guess, over
3  95 percent.
4  Q. Do any governments provide payment assistance
5  to your renters?
6  A. Yes.
7  Q. And tell me about that.
8  A. I don't know all the programs. The Federal
9  Government has vouchers for those that qualify,
10  households that qualify, and households that qualify
11  can use those vouchers in the area they live in.
12  Q. And we're talking about Section 8?
13  A. Some of those are Section 8 vouchers. I
14  don't know all the details with regard to all of the
15  rental assistance programs that are available to
16  households.
17  Q. But that's not required to be part of your
18  program, your development?
19  A. No.
20  Q. Do you determine --
21  MS. GAINEY: Or strike that.
22  Q. (By Ms. Gainey) How do you determine who is
23  an eligible renter for your properties? Is it based
24  on income only?
25  A. It's not 100 percent income. There is a

Page 68

1  qualification process as you would with any typical
2  type of, you know, home rental or a lease or a
3  mortgage. You know, criminal background checks,
4  employment verification, income verification. You
5  have to verify in, you know, a nondiscriminatory
6  fashion, you know, those residents that are going to
7  qualify that met your -- the criteria of the funding
8  program. And that will be what I would consider, you
9  know, good residents.
10  Q. Is that Concord Management, LTD that takes
11  it -- that does all that?
12  A. Yes.
13  Q. So once a development is -- is at completion
14  and finished are you still involved in that
15  development or is that -- or not?
16  A. Yes. But to what level. Yes, I'm still
17  involved. I'm still an owner and I'm still involved.
18  Q. As far as the day-to-day operations of the
19  development are you involved in that?
20  A. As far as the day-to-day operations of the
21  management of the occupied community, no.
22  MS. GAINEY: Do you need a break?
23  THE WITNESS: No.
24  MS. GAINEY: At any point you need a break
25  just tell me.

Page 69

1  THE WITNESS: Okay. Thanks.
2  MS. GAINEY: Do you need a break?
3  Let's take a quick break.
4  THE WITNESS: Okay.
5  VIDEOGRAPHER: Going off the video record.
6  The time is 3:17 p.m..
7  (A recess was taken from 3:17 to 3:21.)
8  VIDEOGRAPHER: We are back on the video
9  record. The time is 3:21 p.m..
10  Q. (By Ms. Gainey) How do local housing finance
11  authorities get involved in the process?
12  A. Local housing finance authorities are created
13  under a state statute.
14  Q. Uh-huh.
15  A. The county commissioners appoint the
16  authority members. The authority members then are
17  charged with, you know, their mission and purpose,
18  which is providing -- facilitating the development of
19  affordable housing through the utilization of
20  tax-exempt bond allocation.
21  The allocation is given to the states on a
22  per capita basis. The states then determine how to
23  allocate that among the regions. Brevard -- each
24  county doesn't get its own. Each region gets its own.
25  And the regions can be changed, as they are being

William Scott Culp
November 21, 2024

Page 70

1  changed as of January 1st of 2025.  But each region
2  has an allocation.  Then the Housing Finance Authority
3  takes applications and determines if the applicants
4  meet all the criteria for utilization of those
5  tax-exempt bonds.
6      Q.  Do you pay the local F -- HFA?
7      A.  We pay for all of the expenses of the
8  professionals that are involved in the application
9  process.  And if we develop an affordable housing
10 community, we pay the fees of the Housing Finance
11 Authority, which are charged both up front and
12 annually.
13     Q.  What region is Brevard County in?  Do you
14 know?
15     A.  I don't remember the number.
16     Q.  Does 17 sound --
17     A.  I really don't remember.
18     Q.  You don't remember at all?
19     A.  No.
20     Q.  Okay.
21     A.  I can look at the map.  I know where it is on
22 my computer.
23        It's probably a different number as of
24 January 1st of next year than it is today.
25     Q.  I think you're right about that.

Page 71

1        Okay.  So when you get approval for at least
2  partial financing through -- through the tax credit --
3  I understand at some point it goes through
4  underwriting?
5      A.  Yeah.  You kind of switched gears there.
6      Q.  Okay.
7      A.  You're talking about partial approval of tax
8  credit.  Because where we're starting was the
9  tax-exempt bonds --
10     Q.  Uh-huh.  Uh-huh.
11     A.  -- which was your first question.  Because
12 there is an application for the bonds.  You don't have
13 to utilize tax credits when you use tax-exempt bonds.
14 So you go through the process of an application, what
15 is called an inducement.  There is an inducement
16 resolution --
17     Q.  Uh-huh.
18     A.  -- where the Authority then tells you we've
19 looked at your application, we think this could be
20 feasible, and, therefore, we're going to proceed,
21 which then we'd start with the underwriting.
22        The underwriting at that point is for the
23 tax-exempt bonds, and they also at that point schedule
24 the TEFRA, Tax -- Tax Equity and Financial
25 Responsibility Act public hearings -- I'm sorry.  I

Page 72

1  did that too fast -- and that's part of the required
2  process.
3        The underwriting is -- proceeds then to make
4  a determination that you have a feasible --
5  economically feasible development to utilize the
6  tax-exempt bonds and that you meet all the federal
7  requirements for the tax-exempt bonds.
8        At some point in that process you may or may
9  not choose to also apply for the 4 percent low income
10 housing tax credits, which have additional layers of
11 restrictions and guidelines that will also need to be
12 factored in if you're going to be using those
13 resources along with the tax-exempt bonds.
14     Q.  All right.  And in this case in particular
15 was the underwriter involved?
16     A.  Yes.
17     Q.  So you -- you had reached that stage, if you
18 will?
19     A.  Yes.
20     Q.  All right.  And -- and I've bought houses
21 obviously with underwriters, and there is lots of
22 questions they ask that you have to -- and lots of
23 information that you provide.  Is -- is the situation
24 the same in affordable housing developments?
25     A.  I would say it's similar.

Page 73

1        Every part of a affordable housing
2  development that's financed in part with tax-exempt
3  bonds is reviewed by the underwriter, the ownership
4  structure, the bond purchaser, the guarantors, the
5  general contractor, the management company, the
6  interest rate, the debt service coverage, the demand,
7  the appraisal, the analysis of the construction
8  contract.  All of those things are evaluated by the
9  underwriter and the underwriter's professionals that
10 they hire when they're completing their underwriting.
11     Q.  And what part of the financing is the
12 underwriter financing?
13     A.  The underwriter doesn't finance anything.
14     Q.  Okay.
15     A.  The underwriter is doing a report.
16     Q.  Uh-huh.
17     A.  They're evaluating every component of the
18 development.  Like I said, they evaluate the general
19 contractor.
20     Q.  Uh-huh.
21     A.  Do they have the experience and the resources
22 to successfully build that.  They evaluate the
23 developer.  Do they have the experience and the
24 resources to provide the development services.  They
25 evaluate the owner.  Does the owner have the

William Scott Culp
November 21, 2024

Page 74

1  experience. The management company. They evaluate
2  the bond purchaser. Do they have the resources to
3  purchase the bonds. Do they have the experience --
4  does the management company have the experience for
5  the compliance that's required to meet the
6  requirements of the tax-exempt bond program.
7        So every component of that development
8  transaction is evaluated by the underwriter. That
9  underwriting report is then provided to the Housing
10 Finance Authority.
11    Q.  That was going to be my next question.
12        And so once the report is provided to the
13 Housing Finance Authority is -- is that kind of what
14 I'll call a final step in the process?
15    A.  It's the final step in the evaluation.
16    Q.  Uh-huh.
17    A.  The final step in the process is closing.
18    Q.  Sure.
19    A.  Well, it's not even that. It's delivering
20 the units --
21    Q.  Yeah.
22    A.  -- to be occupied --
23    Q.  And then you've got the building to do.
24    A.  -- and then complying with that for the next
25 50 years --

Page 75

1    Q.  Yeah, right.
2    A.  -- minimum of 30 years, but anyway. So it is
3  a step in the process and it's an important step in
4  the process.
5    Q.  Uh-huh. So is there a mortgage on the
6  property at that point?
7    A.  There is not a mortgage until the bonds
8  close.
9    Q.  All right.
10   A.  When the bonds close, the person who
11 purchased the bonds obviously wants to secure their
12 investment so they get a mortgage. They purchase the
13 bonds from the Housing Finance Authority, the Housing
14 Finance Authority then becomes technically the
15 lender --
16   Q.  Uh-huh.
17   A.  -- because they're using the proceeds that
18 they received from the bond purchaser and they're
19 lending those to the developer to build the affordable
20 housing.
21   Q.  And that's like a private entity, a bank or
22 an investor?
23   A.  Which?
24   Q.  That's -- that's purchasing.
25   A.  Not always a private entity. Oftentimes it's

Page 76

1  a bank.
2    Q.  Okay.
3    A.  It's more typical for it to be a bank because
4  it's typically very much like a first mortgage lender.
5    Q.  All right.
6    A.  Most banks like to buy tax-exempt bonds.
7    Q.  Are there certain entities that you regularly
8  work with?
9    A.  Yes.
10   Q.  Okay. I understand there might be three of
11 them. No. Is there a --
12   A.  You may be thinking of something -- a
13 different question than I am.
14   Q.  I -- I might be. But when you -- who do you
15 typically work with?
16   A.  Are you talking about who I work with in --
17 that are purchasing the bonds?
18   Q.  Yes.
19   A.  Oh, okay.
20       BankUnited often purchases bonds for
21 developments that we are developing, Bank of America,
22 Regions Bank, Synovus. There is -- there is a number.
23 All -- what -- all of what I would call and referred
24 to earlier as qualified institutional buyers.
25   Q.  Okay.

Page 77

1    A.  And there is -- most of the large
2  institutions have a group, a department, I don't know
3  what you would call it, that are their bond purchasers
4  that make a determination on when and where they need
5  to and want to, you know, buy tax-exempt bonds.
6    Q.  When you're considering development of a
7  property, is there a timeline as far as how long the
8  process usually takes from signing the land contract
9  to closing the land contract?
10   A.  There is -- it's really hard to say that
11 there is a timeline for that. It's not unusual for
12 the land contract to be signed 18 months before the
13 closing of the land contract. There is often -- there
14 has been times when land is purchased prior to having
15 an application.
16   Q.  Yeah. But having done this for decades do
17 you have a sense of generally how long the process
18 takes, or does it vary from county to county or
19 project to project?
20   A.  It varies from city to county to resource.
21 And so -- but I would say in general you're somewhere
22 in the neighborhood of three years from the time you
23 first identify a site that you believe will work for
24 the program that you've identified to when you deliver
25 those units for the occupancy.

William Scott Culp
November 21, 2024

Page 78

1    Q.  Is there a general amount of time it takes
2  from the time you sign the land contract until the
3  time you close the land -- land contract?
4    A.  I wouldn't say there is a general rule of
5  thumb there because so many different criteria affect
6  that.  If you're making a really good real estate
7  purchase, you may buy land that I'm not planning to
8  develop for five years.  If you're paying, you know,
9  the retail rate, you're not wanting to close on that
10  land until you close on the bonds; and so the purchase
11  contract may be very close to the time frame when
12  you're submitting the bond application.
13    Q.  For Venue at Heritage Oaks specifically did
14  you have an expectation of how long it would have
15  taken from the time you signed the land contract until
16  closing?
17    A.  I'm sure I did, but I would have to look at
18  the documents to recall exactly what we were planning
19  at that point.
20    Q.  I saw in some of the documents that there is
21  sometimes a requirement to have site control in order
22  to proceed.
23    A.  There is always a requirement to have site
24  control.
25    Q.  All right.  So does signing the land contract

Page 79

1  secure site control for you?
2    A.  Site control is a defined term.  So, again,
3  I've got, you know, pages --
4    Q.  Uh-huh.
5    A.  -- and cases --
6    Q.  Uh-huh.
7    A.  -- on whether there was actually adequate
8  site control or not.  So site control is -- I can't
9  just say signing the land contract is site control.
10  But a valid purchase agreement for a parcel of land
11  that meets all the criteria of the programs is site
12  control and it is required.
13    Q.  Okay.  And did you have site control for --
14    A.  Yeah.
15    Q.  -- Venue at Heritage Oaks?
16    A.  Yes.
17    Q.  At what point did you gain what you call site
18  control?
19    A.  Whatever the document says.  I don't have it
20  in front of me.
21    Q.  What document would you look at?
22    A.  The purchase agreement.
23    Q.  Okay.  We talked a little bit earlier about
24  how -- how you select a particular piece of property
25  to develop.  Do you have any recollection of -- of

Page 80

1  what studies, market value studies, market demand
2  studies, any type of studies you looked at
3  specifically for Venue at Heritage Oaks?
4    A.  No.  We were familiar with the area, so we're
5  pretty familiar without looking at other studies of
6  the market in the area.  We have other communities in
7  the area.  So when the property became available, we
8  were comfortable that the market was there for an
9  affordable rental community.
10    Q.  How were you aware that the property became
11  available?
12    A.  I don't know.  Typically we see it in
13  listings.
14    Q.  Okay.  Do you have as part of your team a
15  realtor that looks for available properties --
16    A.  Yes.
17    Q.  -- that might -- and do you -- who is -- I
18  guess look at the land contract to see who the realtor
19  was in this case.
20    A.  Yeah.  The realtor that we typically work
21  with is Dean Price, and he is on the MLS looking for
22  properties that would be appropriate for what we're
23  trying to develop.
24    Q.  And do you think that's what occurred in the
25  case of Venue at Heritage Oaks?

Page 81

1    A.  I don't recall.
2    Q.  So as you sit here today nothing stands out
3  as to why you wanted this particular property for
4  potential development?
5    A.  I don't remember.
6    Q.  I understand that the state also has rental
7  market study rates available?
8    A.  They do have a rental market study that's
9  updated -- it used to be every three years, but I
10  think it's annually now.
11    Q.  Is that part of your consideration when
12  you're looking at properties?
13    A.  We do review that, and we would take that
14  into consideration.
15    Q.  And what does that tell you?
16    A.  Most of those studies, the ones I think that
17  you and are talking about, the Shimberg Center study
18  tells us what the demand is for affordable housing,
19  what the cost burden is in particular locations.
20    Q.  Do you have any recollection of what the
21  study showed specifically for Brevard County?
22    A.  I don't recall.
23    Q.  And I -- and I assume that the point is, is
24  you're wanting to go into counties and areas where
25  there is a need for affordable housing.

William Scott Culp
November 21, 2024

Page 82

1    A.  Correct.
2    Q.  Let's see.  I also saw some references
3  to -- talking about filling the gap from the tax
4  credits with -- with the rents.
5         You're looking at me so maybe -- I'm sorry.
6  Again, I -- let me fill in the blanks here.
7         So obviously the rents that you're getting
8  off these properties isn't enough to cover the
9  mortgage, correct?
10   A.  Not correct.
11   Q.  Okay.  Tell me why that's not correct.
12   A.  Because the mortgage has to be sized --
13   Q.  Uh-huh.
14   A.  -- so that the rents at the restricted levels
15  required by the program you're developing under can
16  support that mortgage.
17   Q.  All right.  So how do you fill the gap if
18  you're renting -- some of these units that you develop
19  are at below market rate?
20   A.  They all are.
21   Q.  All the units you develop are below market
22  rate?
23   A.  In that community it would be, yes.
24   Q.  And -- Venue at Heritage Oaks?
25   A.  Yes.

Page 83

1    Q.  Tell me -- can you explain what you mean?
2    A.  We've developed market rate communities.
3  Market rate communities are not below market rate.
4    Q.  Uh-huh.
5    A.  You know, Venue at Heritage Oaks was a
6  community that was being developed to be -- for
7  100 percent of the units to be below market rate, to
8  be affordable.
9    Q.  And what was the market rate?
10   A.  I don't recall.
11   Q.  What would I look at?  What document would I
12  look at to determine the market rate?
13   A.  I don't recall if the underwriting report has
14  the market rate -- the variance to market, but I
15  believe it does.
16        The underwriter evaluates that because you
17  have to have a variance to market under the program.
18   Q.  Uh-huh.  All right.  So -- and I'm calling it
19  mortgage.  Is that the correct term?
20   A.  There is a mortgage.
21   Q.  Okay.  So --
22   A.  Yeah.  And the mortgage is -- the bond
23  purchaser, you know, is the -- well, technically the
24  Housing Finance Authority is the lender.  They are
25  lending money that the bank gave them when they

Page 84

1  purchased the bonds from them.
2    Q.  All right.  So as it relates to Venue at
3  Heritage Oaks specifically because all the units were
4  below market rate was the profit sufficient to cover
5  the mortgage?
6         MS. RHODEN:  Object to form.
7    A.  Again --
8    Q.  (By Ms. Gainey) I'm --
9    A.  -- I need one of my little charts because I
10  do this sometimes.
11   Q.  Yes.
12   A.  I wish I had it in front of me.  I would put
13  it up on that screen.
14   Q.  Okay.  Go ahead.
15   A.  Because what do you is the rents are
16  restricted.  Okay.
17   Q.  Yes.
18   A.  So you start with your rents less your
19  expenses.  That's all the money you have, okay, on
20  a -- on a monthly basis.  You size your debt.  You
21  can't take on any more debt than those rents --
22   Q.  Uh-huh.
23   A.  -- will cover plus a cushion.  We call that a
24  debt service coverage.  I'm sure you're very familiar
25  with that.

Page 85

1    Q.  Uh-huh.
2    A.  So the -- the bond amount, that stabilization
3  would be sized such that the restricted rents would be
4  enough less the expenses to cover the payment on those
5  bonds at the rate that the bond purchaser was willing
6  to buy those bonds at.  Okay.  That amount is not
7  enough to construct the job.  The -- the amount that
8  the rents will pay and the -- will result in that --
9  in a -- in a payment for a bond amount.  That bond
10  amount doesn't cover the cost.  All right.  So you
11  have to have something else to cover the cost.
12        The next one is the 4 percent tax credits.
13  Those tax credits fill a portion of the gap.
14  Sometimes they fill all the gap.
15   Q.  Uh-huh.
16   A.  You also have a deferred developer fee.
17  Developers, like ourselves, are -- under all of the
18  programs are restricted to what they can make in a
19  fee.  Typically developers like us who have the
20  resources will defer their fees, meaning we don't get
21  paid unless there is cash flow.  Meaning there is
22  enough income coming from the rents to pay both the
23  debt and the developer fee.
24        Oftentimes that doesn't happen initially.  It
25  doesn't happen for 15 years often.  So that deferred

William Scott Culp
November 21, 2024

Page 86

1  developer fee is another source --
2      Q.  Uh-huh.
3      A.  -- of it.
4          Then there is the 4 percent tax credits we
5  mentioned.  And then oftentimes there is SAIL, SHIP,
6  impact fee discounts, credits.  Something to balance
7  the sources to the uses.
8      Q.  All right.  Can there be any change in the
9  rent even after the -- the property is developed?
10     A.  Every year.
11     Q.  All right.  And tell me about that.
12     A.  HUD publishes the median incomes and the
13  rents by bedroom type and by household, household
14  size, and those are adjusted annually and published --
15  well, published by Florida Housing Finance Corporation
16  from HUD.
17     Q.  And do you consider a potential increase in
18  rent when you're considering the investment?
19     A.  Yeah.  The underwriter has criteria they use,
20  which comes primarily from historic -- historic
21  background.  But Florida Housing Finance Corporation
22  and all the housing finance authorities have criteria
23  for rental increase over -- they do a 15-year pro
24  forma.  They don't look at it for 30.  They look at it
25  for 15 years.  And typically they're looking at a 3

Page 87

1  percent increase annually during that period.
2          They have times when there is no increase.
3  We had an eight-year period where there was no rental
4  increase.  Even though the underwriting report and the
5  closing was done based upon an increase every year
6  you're still subject to what HUD determines each year.
7  So you may not get the increase that the development
8  was underwritten with.
9      Q.  What about for things that are charged extra?
10  Pet rents and things of that nature.
11     A.  Yeah.  There is a --
12     Q.  Is that considered as well?
13     A.  Yes.  Because we call that other income.
14     Q.  Uh-huh.
15     A.  The underwriter also evaluates that along
16  with the appraiser.  They determine that historically
17  the portfolios of this size, of this type, in these
18  geographic areas are able to achieve additional other
19  income.  And typically that is achievable because the
20  residents are not having to leave the community when
21  their income goes up.  They only have to qualify when
22  they move in.  As their income goes up they're allowed
23  to stay.  That's the -- the beauty of the low income
24  housing tax credit program as opposed to public
25  housing.

Page 88

1      Q.  Can you give me examples of what fees are
2  considered other rent?
3      A.  We'll rent washers and dryers.  And those are
4  optional.  You know, you don't have to have a washer
5  and a dryer.  You don't have to rent one.  But we'll
6  rent those.  There are other service fees, and it can
7  be any number of things.  But typically the credit
8  underwriter and the appraiser determines what is
9  standard in the industry and what has been
10  historically feasible and builds that into the pro
11  forma.
12     Q.  Once you have kind of zeroed in on a property
13  you want to consider to develop at what point do you
14  get the local Housing Authority involved?  Is that the
15  application?
16     A.  Yes.
17     Q.  Okay.  So prior to actually submitting the
18  application are there conversations with the Housing
19  Authority generally?
20     A.  Well, I want to be clear.  And I apologize
21  for trying to be a little narrow on your questions.
22  There is Housing Authorities and there is Housing
23  Finance Authorities.  They're two different things.
24     Q.  I'm sorry.  I meant to say Housing Finance
25  Authority.

Page 89

1      A.  Okay.  I just want to make sure because --
2      Q.  Okay.
3      A.  But we are in regular communication with the
4  Housing Finance Authorities.
5      Q.  Uh-huh.
6      A.  We want to be aware of the bond allocations
7  and what may be available so that when we look at a
8  property, we know if we're going to be wasting our
9  time.  If there is not any allocation available, we
10  wouldn't look at that resource.
11     Q.  Do you actually attend Housing Finance
12  Authority meetings when you're considering a property?
13     A.  Yes.
14     Q.  All right.  And at what point do you start
15  attending the meetings?
16     A.  I typically only attend the meeting when we
17  have an item on the agenda.  I will sometimes attend
18  the meeting virtually because some meetings are Zoom
19  or Teams or conference calls.  And then I'll often
20  review minutes and agendas whether I'm attending or
21  not for all of the areas that we are active in.
22     Q.  So as it relates to Brevard County there is a
23  Housing Finance Authority but there is not a Housing
24  Authority; is that correct?
25     A.  I --

Page 90

1    Q.  Or do you know?
2    A.  I don't -- I don't want to assume.
3    Q.  Okay.
4    A.  I know there is a Housing Finance Authority.
5    Q.  And that's who you generally --
6    A.  I would assume there is a Housing Authority
7    as well, but that would be an assumption.
8    Q.  Well, let me ask it this way.
9        You obviously had conversation with the
10   Housing Finance Authority.
11   A.  Correct.
12   Q.  Did you have communications with the Housing
13   Authority in Brevard County?
14   A.  No.
15   Q.  So --
16   A.  We would never have any reason to be
17   communicating with the Housing Authority.
18   Q.  All right.  And that's where I was going.
19       So when -- when you're developing a property,
20   you're not necessarily needing to talk to the Housing
21   Finance Authority.  You need to talk to the Housing --
22   excuse me, the Housing Authority.  You need to talk to
23   the Housing Finance Authority.
24   A.  Yes.
25   Q.  Okay.  What about city officials.  Who -- who

Page 91

1    do you typically communicate with?
2    A.  In most cities we're dealing with land use.
3    Many cities don't have access to the resources to be
4    able to provide much if anything that helps with the
5    affordable housing.  Counties often do.  Most of the
6    smaller cities don't.  The City of Orlando has their
7    own resources.  Some of the larger cities do.
8    They're -- participating jurisdictions have larger
9    resources.  Most of the smaller cities don't have
10   their own resources.
11   Q.  Okay.  And in this case in particular when
12   did you first start a conversation with the HFA
13   regarding Venue at Heritage Oaks?
14   A.  I don't recall.
15   Q.  What about the City?  Do you -- do you --
16   A.  I don't recall.
17   Q.  All right.
18   A.  I -- we would start immediately upon putting
19   the land under contract, but I don't recall exactly
20   when that was.
21   Q.  Do you consider zoning ordinances for the
22   property before you entered into a land contract?
23   A.  Yes.
24   Q.  All right.  And in this case in-particular,
25   what zoning ordinances did you consider?

Page 92

1    A.  The City's.
2    Q.  And what did you determine from those zoning
3    ordinances?
4    A.  That the property was zoned appropriately for
5    development of affordable rental housing.
6    Q.  And you determined that by looking at the
7    City of Melbourne's zoning ordinances?
8    A.  Was it City of Melbourne?
9    Q.  West Melbourne.
10   A.  That's what I thought.  And they're two
11   different cities over there --
12   Q.  Yes, I know.
13   A.  -- so that's -- when you said City of
14   Melbourne, I was thinking I don't think it was City
15   of --
16   Q.  City of West Melbourne.
17   A.  Okay.  Thank you.
18       I really don't remember.  But if you tell me
19   it was City of West Melbourne, I think you're right.
20   Q.  All right.  Well, I know at some point there
21   was -- there has been discussions about Live Local.
22   A.  Yeah.
23   Q.  And tell me what you recall about
24   considerations with respect to Live Local as you were
25   considering this property.

Page 93

1    A.  There was some state legislation a few years
2    ago just before we went under contract on this that
3    allowed for or required local jurisdictions to allow
4    affordable residential development on properties with
5    zoning that allowed commercial and industrial uses.
6    This particular property had met that zoning criteria
7    that was provided for under the state statutes.
8    Q.  And is that you that made that determination
9    or do you get -- seek help from someone else to
10   determine that?
11   A.  Both.  I evaluate it --
12   Q.  Uh-huh.
13   A.  -- and then we also hire legal counsel to
14   review and make sure that I'm not wrong.
15   Q.  For this case in particular who was your
16   legal counsel?
17   A.  On that particular issue --
18   Q.  Yes.
19   A.  -- Robert Bowser.
20   Q.  So Mr. Bowser took a look at Live Local, the
21   zoning ordinances and renders an opinion that -- that
22   the proposed property meets the requirements.
23   A.  That's correct.
24   Q.  Anybody else that was involved in that
25   decision?

William Scott Culp
November 21, 2024

Page 94

1   A.  Other than myself and Robert Bowser I don't
2   believe so.
3   Q.  And I assume that that was done before you go
4   under contract.
5   A.  I don't know that the evaluation by Robert
6   Bowser would be done before we go under contract.
7   Q.  Let me ask it this way.
8   Do you -- do you try to essentially get all
9   your ducks in a row before you enter in the contract
10  to make sure that there is no violation of zoning
11  ordinances or anything along those lines?
12  A.  We typically take the representations of the
13  brokers to get the property under contract.  Most real
14  estate contracts have an inspection period.  During
15  that inspection period we try and determine what the
16  broker tells us -- tells us was valid and if that
17  property really does suit, you know, our intended use.
18  Q.  And for this -- for this property in
19  particular is that who you relied on, the real estate
20  broker?
21  A.  I would have to look at the documents.
22  Q.  But that's generally what you do?
23  A.  Yes.
24  Now, when you say relied on, again, I want to
25  go back to my answer to the question because I -- what

Page 95

1   I said to you was we take the information the broker
2   provides, put the property under contract, then we
3   have an inspection period.  We don't rely on the
4   broker after it's under contract.
5   Q.  Okay.  Have you been in instances with all of
6   your experience that you -- you go under contract and
7   you find out that the property is not zoned -- or --
8   correctly for the area?
9   A.  Yes.
10  Q.  All right.  And what do you then --
11  A.  Not -- I'm not -- I hate to pick at the
12  question, but you said zoned for the area.  Zoned for
13  the intended use.
14  Q.  Thank you.
15  A.  They're all zoned.
16  Q.  Understood.
17  A.  And I -- and I apologize.  I don't want to be
18  answering the wrong question.
19  Q.  Don't apologize.  You're -- you use all this
20  language, and I -- I just misspoke.
21  A.  I'm sorry.  It's what I do every day, so...
22  Q.  We're talking over each other.
23  A.  Talking over each other.
24  Q.  So have you found that after you entered into
25  a land contract that the zoning is not appropriate for

Page 96

1   the intended use?
2   A.  Yes.
3   Q.  And what do you do in those circumstances?
4   A.  Terminate the contract.
5   Q.  All right.  And how many times would you say
6   in your experience has that occurred?
7   A.  I don't recall.
8   Q.  You don't recall?
9   A.  I don't recall.
10  Q.  I just didn't hear you.
11  A.  Sorry.
12  Q.  Was the Milton -- Minton Road and Heritage
13  Oaks Boulevard area the only area that you were
14  considering in Brevard County at the time?
15  A.  At the time, yes.
16  Q.  Okay.  I understand you have done other
17  developments in Brevard County; is that correct?
18  A.  Yes.
19  Q.  How many developments have you done in
20  Brevard County?
21  A.  I don't recall.
22  Q.  Under ten?
23  A.  I think so but I don't remember.
24  Q.  I saw somewhere four maybe.  I think that's
25  in Dr. Fishkind's report.

Page 97

1   A.  Current -- current occupied communities
2   versus -- and, again, we're asking, you know, what
3   your question asked.
4   We have developed more than we currently own
5   in Brevard County.
6   Q.  All right.  So you're talking about you've
7   sold it over the years?
8   A.  Right.
9   Q.  When you were considering the Minton Road and
10  Heritage Oaks Boulevard area, was there a lot of
11  available inventory in the area?
12  A.  A lot of available inventory.
13  Q.  For a project that you were interested in
14  developing.
15  Let me ask it differently.
16  A.  There -- yeah.
17  Q.  Could you have put the -- development at
18  another location that's in a 5 mile -- 5 to 10-mile
19  radius for example?
20  A.  I was not aware of another parcel of land
21  that was available at a price that was feasible.
22  Q.  All right.  Did you ever investigate to see
23  if --
24  A.  We are --
25  Q.  -- there were other options?

Page 98

1    A.  -- we are always looking for other options.
2    Q.  But as you sit here today you -- you don't
3    recall there being other options?
4    A.  Correct.
5    Q.  All right.  Let's -- let's talk about the
6    contract.  Or, excuse me, the application.
7    A.  I was going to say I thought we talked about
8    the contract.
9         MS. GAINEY:  I think it's in some of this.
10   It's probably in this application.
11        (Deposition Exhibit B was marked.)
12        THE WITNESS:  Oh, here.
13        You really are going to make my dogs wine,
14   aren't you?
15        MS. GAINEY:  Drop your case and we can all go
16   home.  I doubt that's an option.
17        THE WITNESS:  My dogs will have to cry a
18   little bit longer.
19        MS. RHODEN:  Just pay us the money and we can
20   all go home.
21        MS. GAINEY:  Our dogs are waiting for us.
22   Q.  (By Ms. Gainey) All right.  I'm going to show
23   you what we'll mark as Defendant's Exhibit B and
24   purport to you that this is the --
25   A.  You said B as in boy?

Page 99

1    Q.  B as in boy.
2         This is the application submitted to the
3    Brevard County Housing Finance Authority for The Venue
4    at Heritage Oaks.  Does that look like a true and
5    accurate copy of that application?
6    A.  It looks like it, and you've represented that
7    it is a true and accurate copy.  I have not reviewed
8    each page to determine that it's a true and accurate
9    copy.
10        MS. GAINEY:  I have an extra one apparently.
11   Q.  (By Ms. Gainey) All right.  I'm not going to
12   go through the whole -- the whole thing, but I have
13   some questions about some specific things that are in
14   here.
15        First of all, it looks like it's dated
16   July 31st, 2023.  Does that meet with your memory as
17   to when the application was submitted?
18   A.  The letter from me is dated July 31st, 2023.
19   I don't have records in front of me of when it was
20   actually submitted, but I would assume that it was
21   around that date.
22   Q.  Well, it looks like it was sent via FedEx.
23   Would you agree?
24   A.  Yes.
25   Q.  All right.  And the second paragraph of the

Page 100

1    first page of the letter that you just referenced it's
2    talking about affordable housing, and it's -- it
3    mentions, quote, minimum 20 percent at 50 percent AMI
4    80 percent unrestricted by the bond covenants.  And
5    you said that's consistent with the legislature's
6    agenda of the Live Local Act; is that right?
7    A.  Yes.
8    Q.  All right.  And so under the Live Local Act
9    you are looking for property that can be at a minimum
10   of 20 percent at 50 percent AMI 80 percent
11   unrestricted.  Is that what you mean when you say
12   that?
13   A.  I don't think so.
14   Q.  Okay.  Tell me how I'm wrong.
15   A.  As a matter of fact I don't think that's what
16   it says.
17   Q.  Okay.
18   A.  I think it -- what it says here is consistent
19   with the legislator's agenda -- legislature's agenda
20   we are proposing a bond program with set-asides
21   minimum 20 of 50, okay, and 80 percent unrestricted.
22   That's minimum.  So we were proposing something that
23   was consistent with the recent legislature's focus.
24   Q.  All right.  So as it relates to this property
25   what are you looking at as far as what percentage is

Page 101

1    going to be what percentage of the AMI?
2    A.  There -- in our ultimate goal for this
3    community we would intend to use income averaging, and
4    income averaging would allow us to have households at
5    different set-asides from as low as 30 percent AMI up
6    to 80 percent.
7    Q.  And when did you decide what the actual
8    numbers would be?
9    A.  The decision to -- would be made during the
10   underwriting process.  I've got at least two programs
11   that are -- we're proceeding under, the tax-exempt
12   bond and the low income housing tax credit program.
13   And during the underwriting for the low income housing
14   tax credit program the decision would be made as to
15   the set-asides.
16   Q.  All right.  So when you submitted this
17   application on or about July 31st, 2023, had the final
18   decision as to the numbers been made as it relates to
19   the AMI?
20   A.  For the tax-exempt bonds the decision had
21   been made to meet the minimum federal criteria.  The
22   final decision about what would ultimately be the
23   restrictions had not been made.
24   Q.  When was that the final decision?
25   A.  I don't think it was because the County

William Scott Culp
November 21, 2024

Page 102

1  arbitrarily denied our tax-exempt bond application.
2      Q.  But when you were proposing the -- the
3  development to the County, what were you telling them
4  as far as what percentage would be --
5      A.  We --
6      Q.  -- below --
7      A.  Sorry.
8      Q.  -- what percentage would -- what the numbers
9  would be as far as the percentages and the AMI?
10     A.  We represented that the community would meet
11 the minimum requirements for the tax-exempt bond
12 program, which was a minimum of 20 percent of the
13 units at or below 50 percent.
14     Q.  But did you tell them what you were
15 specifically looking for?
16     A.  We gave them -- the County had the
17 application --
18     Q.  Uh-huh.
19     A.  -- and the Housing Finance Authority had the
20 underwriting report.  I don't recall whether the
21 Housing Finance Authority provided the underwriting
22 report to the county commission or not.
23     Q.  All right.  On -- back to this letter.  It
24 looks like you had bond-financed developments in
25 Brevard County, Hammock Harbor Apartments in Rockledge

Page 103

1  and Venue at Viera in Viera, Viera.  I think that's --
2      A.  Those are two.
3      Q.  Yeah.  Those both received bond finance or
4  were bond-financed developments, correct?
5      A.  Yes.
6      Q.  The cc on this is CF-Corr with HFA.  Who is
7  that?
8      A.  It's not a person.  It's my network files.
9      Q.  Okay.
10     A.  I make copies and I designate which file.
11 This is the correspondence with the Housing Finance
12 Authority for this.  It would be filed there.
13     Q.  All right.  And so the general contractor on
14 this project was Canton Construction.  We already
15 talked about that's generally you.
16     A.  Correct.
17     Q.  The management company is Concord Management
18 who is an affiliate.
19     A.  Correct.
20     Q.  And then the general partner or owner -- of
21 the owner is the SAS.
22     A.  Correct.
23     Q.  And what role does the general partner or SAS
24 have in the development?
25     A.  They are the general partner of the owner,

Page 104

1  and they provide the role of the owner with regard to
2  the ongoing operation and ownership of the community.
3      Q.  So who is the owner in -- for --
4      A.  The owner is The Venue at Heritage -- I'm
5  looking for the partnership name.  I can't see real
6  well.  I've got it in the application.
7      Q.  Venue at Heritage Oaks Partners.
8      A.  Turn over to page -- Venue at Heritage Oaks
9  Partners.
10     Q.  LTD.
11     A.  That's correct.
12     Q.  All right.  On Page 2 it's talking about the
13 approval by the board of county commissioners.  So --
14 I mean, it speaks for itself.  But you had an
15 understanding when you submitted this application that
16 the board of county commissioners would have to
17 approve the bond, correct?
18     A.  That's correct.
19     Q.  And it also says in there that it could take
20 up to six months for that to happen.
21     A.  That's correct.
22     Q.  And that was your understanding when you
23 submitted the application?
24     A.  Yes.
25     Q.  All right.  And it looks like -- well, it's

Page 105

1  not -- oh, it's Page 7.  Jay Brock signed it.  This is
2  the executive vice president, correct?
3      A.  He signed for the owner, that's correct.
4      Q.  All right.  And, again, the owner is who we
5  just talked about, The Venue at Heritage Oaks
6  Partners, LTD?
7      A.  Yeah, as identified on that page.
8      Q.  Is -- is he the executive vice president of
9  Venue at Heritage Oaks Partners?
10     A.  No.  He's the executive vice president of the
11 general partner.
12     Q.  Okay.  Which is SAS?
13     A.  I would have to look at the organizational
14 structure, which I believe in this one SAS was the
15 general partner.
16     Q.  All right.  And the summary of the proposed
17 development on Page 2.  I don't know why we went back
18 on pages, but --
19     A.  Yeah.  The template and then the -- and then
20 the application.
21     Q.  Yeah.  All right.  So Page 2 it says summary
22 of proposed development at the top.  This was proposed
23 to be a mid-rise development design.  Can you tell me
24 what that means?
25     A.  Let me make sure I'm on the same --

William Scott Culp
November 21, 2024

Page 106

1    Q. At the bottom.
2    A. Oh, I thought you said at the top. I was
3 looking at the top. Yes, mid-rise.
4    Q. Okay. What does mid-rise mean?
5    A. Florida Housing Finance Corporation has
6 designations for the building type. A mid-rise is a
7 four story. I think it might be four and five
8 actually.
9    Q. All right. So you were proposing that this
10 building be a minimum of four stories?
11    A. No. I was proposing it be a maximum.
12    Q. Okay. So it could have been less than four
13 stories?
14    A. It wasn't. We were proposing four stories.
15    Q. All right. Yeah. I don't -- I don't see
16 a -- a low-rise here. So is there --
17    A. Well, garden --
18    Q. All right. That's --
19    A. -- is less than four. I could have chosen to
20 select garden, which have been -- which would not have
21 been four stories.
22    Q. I'll tell you why I'm asking. Because I know
23 at some point there was some discussions about the
24 height of the building. And in your mind was it
25 always going to be four stories?

Page 107

1    A. Yes.
2    Q. All right. It also -- right above that it
3 says set-aside levels. It says for the tax-exempt
4 bonds, the project will have the federal minimum
5 affordable set-asides of 20 percent at 50 percent.
6    A. Correct.
7    Q. So it's 20 percent of the development would
8 be at 50 percent of the AMI.
9    A. Correct.
10    Q. Okay.
11    A. And that was, again, for the tax-exempt
12 bonds.
13    Q. Okay.
14    A. Because there is multiple programs with
15 multiple restrictions.
16    Q. But as -- as it relates to Venue at Heritage
17 Oaks there is really no need to talk about the
18 multiple programs because you had not -- you weren't
19 applying for multiple programs, right?
20    A. Disagree.
21    Q. Okay. Tell me --
22    A. I will explain that every tax-exempt bond
23 development that we do --
24    Q. Uh-huh.
25    A. -- we're also applying after the tax-exempt

Page 108

1 bonds are approved, typically after they're closed,
2 for the 4 percent low income housing tax credits. The
3 4 percent low income housing tax credits have separate
4 set-asides. Also, the Live Local legislation that
5 entitles you to develop residential on commercial use
6 property has a different set of set-asides, which is
7 not the same as the minimum set-asides for the
8 tax-exempt bonds. So each of those has to be met at
9 that stage.
10    Q. All right. And is that a separate
11 application or --
12    A. The Live Local entitlements, their
13 restrictions are a requirement of the legislation.
14 And then a separate application has to be done in
15 order to build, to get your -- have your land use
16 entitlements in accordance with your state statute.
17    Q. And is there a check and balance on that?
18 Is -- is someone checking to make sure that you're in
19 compliance with Live Local from -- from the
20 government, from the state or --
21    A. The local government that is issuing your
22 permits is typically the one that will tell you
23 whether or not you comply with the statutes, both of
24 their ordinance and of the state's.
25    Q. But you're making that determination in

Page 109

1 advance so that you don't get into a position where
2 we're talking about permits and you're -- you're
3 noncompliant?
4    A. Can you restate the question?
5    Q. Sure.
6       You determine compliance with the Live Local
7 statute in advance before you get to the permitting
8 stage so that you're -- you're in compliance. Is that
9 fair?
10    A. We determine that -- what our intended use is
11 consistent with the state and local ordinances
12 regarding our intended use for that specific property.
13    Q. You sound like a lawyer.
14       All right. Page 4. It looks like probably
15 need to talk to Mr. Brock because he -- it's talking
16 about this partnership; and he's on here again, but it
17 also mentions you, that you're a principal Atlantic
18 Housing Develop -- Partners, developer, and Jay is the
19 executive vice president of the general partner of the
20 applicant. He's re -- that's referring to Southern
21 Affordable Services, Inc..
22    A. Correct.
23    Q. And the next thing -- next under E it's
24 asking is the applicant a 501(c)(3) nonprofit
25 organization pursuant to the IRS and you checked no.

William Scott Culp
November 21, 2024

Page 110

1    Is it a foundation?  Do you know?
2        A.  You're missing the question.
3        Q.  Okay.
4        A.  The applicant is The Venue at Heritage Oaks
5    Partners, Limited.  The applicant is not a 501(c)(3).
6        Q.  Is S --
7        A.  The general partner is.
8        Q.  Got it.  You've seen lots more of these
9    applicants then I have, so...
10            Page 6 asked if the development is located in
11   a HUD-designed DDA ZCTA or QCT -- I said that very
12   slow for -- for Madam Court Reporter -- and you
13   indicate yes.
14       A.  Yes.
15       Q.  Why -- why is that significant for this
16   application, if you know?
17       A.  I do know.  It's going to be another long
18   explanation.
19       Q.  In a nutshell.  No, don't give me a long
20   explanation.  Can you -- can you just nutshell it for
21   me?
22       A.  Basis boost.
23       Q.  I'm sorry?
24       A.  Basis Boost.
25       Q.  Okay.

Page 111

1        A.  You want the short form answer.  That's the
2    short form answer.
3        Q.  Okay.  What is the --
4        A.  The long answer is HUD publishes a map every
5    year --
6        Q.  Uh-huh.
7        A.  -- and determines everywhere in the country
8    what is a difficult development area and what is a
9    qualified census tract.  In those difficult
10   development areas and qualified census tracts you get
11   a boost on your eligible basis for your tax credits
12   and, therefore, that would be an area that would be --
13   have more opportunity to be economically feasible
14   because you have greater allocation of tax credits.
15       Q.  So because the answer to the question is yes,
16   does it give you the option to get more tax credits?
17       A.  Yes.
18       Q.  Okay.  A little bit further down it says
19   choose the category that describes the population to
20   be served.  And family is checked but elderly is not
21   checked.  At the time of this application in July --
22   on July 31st, 2023 was this intended to be a senior
23   community?
24       A.  Yes.
25       Q.  All right.  So the -- can you explain why --

Page 112

1        A.  Yes.
2        Q.  -- this was not checked?
3        A.  Elderly has some defined terms.  And elderly
4    and seniors restriction are not the same.  Elderly has
5    defined terms and defined parameters.  Family is
6    defined as a household of one or more persons.  This
7    is under the state definitions.
8            Elderly is not the same as a seniors
9    restriction under the Housing for Older Persons Act.
10   So there are two different parameters with different
11   guidelines and different restrictions and different
12   forms of compliance.  So we can't check elderly
13   because we're not going to comply with all of the
14   elderly definition.  We do comply with family because
15   it's a household of one or more persons.  It is going
16   to be restricted to seniors or was going to be before
17   it was denied in accordance with the Housing for Older
18   Persons Act.
19       Q.  All right.  So --
20           VIDEOGRAPHER:  Counselor, we have 2 minutes
21   left on the media.
22           MS. GAINEY:  We can switch it out.
23           VIDEOGRAPHER:  Now?
24           MS. GAINEY:  Yes.
25           VIDEOGRAPHER:  Going off the video record.

Page 113

1    The time is 4:08 p.m..
2            (A recess was taken from 4:08 to 4:13.)
3            VIDEOGRAPHER:  We are back on the video
4    record the time is 4:13 p.m..
5        Q.  (By Ms. Gainey) All right.  Before we took a
6    quick break we were talking about the different
7    definitions of elderly versus senior restricted.  And
8    I just want to make sure I understand.
9            When you submitted this application, it was
10   intended to be a senior restricted family property.
11       A.  Correct.
12       Q.  All right.  And the reason why elderly wasn't
13   checked in this application is because that would
14   require a different set of documents --
15       A.  Restrictions and --
16       Q.  -- requirements, restrictions?
17       A.  Restrictions and guidelines, yes.
18       Q.  All right.  All right.  If you turn the page
19   and look at 7 under F it's -- it's talking about the
20   breakdown.  And so as I read this it's one, two, three
21   bedroom and the proposal for the number of bedrooms
22   was going to be 20 percent -- well, why don't you
23   explain the column under -- it says 20 percent 13
24   market 50.  What does that mean?
25       A.  If I remember correctly, 20 percent

William Scott Culp
November 21, 2024

Page 114

1 represented the percentage of the units that were
2 going to be at 50 percent AMI.
3      Q.  What does market 50 mean?
4      A.  50 for the bond program would be at market
5 rate.  Not restricted.
6           The bond program only requires the
7 restriction for 20 at 50.  So 20 percent would be
8 restricted at 50 percent of each bedroom type.
9      Q.  All right.  So 20 percent of this property at
10 the time was going to be below market rate.  Is that
11 what that means?
12      A.  20 percent was going to below 50 percent AMI.
13      Q.  AMI.  So then --
14      A.  At --
15      Q.  -- some of the units were going to be at
16 market rate?
17      A.  Under the bond program you have restrictions
18 20 percent at 50 percent.  So that's the restrictions
19 that are being presented.  And so the balance, you
20 refer to those as market, you could refer to them as
21 unrestricted.
22      Q.  So my confusion is that we talked about
23 earlier, and I thought you said earlier that
24 100 percent of the units were going to be below market
25 rate.

Page 115

1      A.  Correct.  And that's under the 4 percent low
2 income housing tax credit program.
3      Q.  Okay.
4      A.  So when you first do the taxes and bonds, you
5 meet the federal requirements for the taxes and bonds.
6 You don't want to meet the requirements of the 4
7 percent credits until you get the credits because the
8 bonds all they do is give you some low interest debt.
9      Q.  All right.
10      A.  They can't support those lower rents.
11      Q.  So are you saying that that's a fluid number?
12 That it -- it changes?
13      A.  Not in the way you're thinking.
14      Q.  Okay.
15      A.  For the bond program --
16      Q.  Uh-huh.
17      A.  -- 20 percent of the units in each bedroom
18 type will be set aside for households earning less
19 than 50 percent of the area median income.  Okay.
20 When you -- when you utilize the taxes and bonds, you
21 are then eligible for the 4 percent low income housing
22 tax credits.  Under the 4 percent low income housing
23 tax credit program you have a different set of
24 restrictions.  Those restrictions will be overlaid
25 with these.  So the 20 at 50 would be included within

Page 116

1 the restrictions for the 4 percent low income housing
2 tax credits.
3      Q.  All right.  And so as of July 31st, 2023 what
4 was the intent as far as what this property would be
5 regarding the percentages and the AMI?
6      A.  That they would be 100 percent affordable
7 under Section 42 eligibility for 4 percent low income
8 housing tax credits which allows for income averaging.
9 And with income averaging you can average your rents
10 from a low of 30 percent up to a high of 80 percent as
11 long as the average in the community is 60 percent.
12 So I can have a percentage at 30 percent, a percentage
13 at 80 percent, a percentage at 60 percent as long as
14 the average is at 60 percent.  So the ultimate intent
15 was to have a Section 42, 4 -- 4 percent low income
16 housing tax credit compliant community.  In order to
17 do that you needed tax-exempt bonds.
18      Q.  I followed you.
19      A.  Okay.
20      Q.  But what I don't follow is at the time of
21 this application did you have a set number as to what
22 the apartments would -- or the requirements for the
23 apartments?
24      A.  We were set that they would be income
25 averaging --

Page 117

1      Q.  Uh-huh.
2      A.  -- at 60 percent.  So we had not set whether
3 it was 10 percent at 30, 10 percent at 80 and
4 80 percent at 60, which it averages to 60, you know.
5 We had not set those percentages.  We knew that it was
6 going to average to 100 percent at 60 percent.
7      Q.  All right.  And then at some point you do
8 finalize those numbers.  But from --
9      A.  You have to when you get your allocation for
10 your 4 percent low income housing tax credits.
11      Q.  And for --
12      A.  It doesn't change the numbers any because
13 you're still averaging to 60 percent.
14      Q.  All right.  And so for this property in
15 particular at the end of the day it was 20 percent --
16      A.  The 20 percent at 50 percent is just to
17 comply with the bond program to get the bonds.
18      Q.  All right.
19      A.  Okay.  At the end of the day you're going to
20 be in -- in big picture thinking 100 percent at
21 60 percent.  You're going to -- it's going to be
22 income averaged to get there because you're going to
23 have some below that and some above that as long as
24 you average to 100 percent at 60 percent.
25           Does that make sense?

William Scott Culp
November 21, 2024

Page 118

```
1      Q.  Yes, it actually does.
2      A.  Okay.  I thought it would.
3      Q.  All right.  Page 8 it's -- it's talking about
4   the financing for the project.  It -- it looks like
5   the proposed bond at that point was $15,750,000,
6   correct?
7      A.  Correct.
8      Q.  And at some point I think it increased?
9      A.  It -- it would have -- it may have during
10  this one increased slightly and then it will decrease
11  later.
12     Q.  All right.
13     A.  Yes.
14     Q.  And then the other -- I guess it's called
15  owner equity of -- of over $8 million.
16     A.  Correct.
17     Q.  What does that owner equity mean?
18     A.  That's the gap between the amount of the
19  bonds and what it takes to build the job.
20     Q.  All right.  And is -- to me when I see owner
21  equity, I think the owner, which is venue --
22     A.  Correct.
23     Q.  -- makes up that $8 million.
24     A.  Correct.
25     Q.  Am I -- am I reading that correctly?
```

Page 119

```
1      A.  That's 100 percent accurate.
2      Q.  All right.  And is -- is that from the -- the
3   resources from the company, or do you seek other
4   investors?
5      A.  Just from the principals of our affiliated
6   companies.
7      Q.  Understood.
8          A little bit further down it's talking about
9   SAIL, HOME, CDBG and SHIP.  And it looks like
10  applicant reserves the right for any gap funding from
11  state, federal and local resources.  Tell me what that
12  means.
13     A.  The application is done to meet the
14  tax-exempt bond requirements.  We're reserving the
15  right to apply for and hopefully receive other types
16  of resources, whether it be SAIL, State Apartment
17  Incentive Loan -- sorry, State Apartment Incentive
18  Loan, HOME -- I don't even remember what the acronym
19  is for HOME, CDBG, which I've never utilized, but
20  that's Community Development Block Grant, and SHIP,
21  which is State Housing Initiative Program, which goes
22  to local governments and they -- most of it has to be
23  used for single family, but there is some small
24  allocations that they can use for multifamily.  We
25  reserve the right to apply for those resources if
```

Page 120

```
1   they're available.
2      Q.  Is there any restriction of only having one
3   source?  I mean --
4      A.  No.
5      Q.  -- those resources could be available to you
6   even if you got the bond --
7      A.  Yes.
8      Q.  -- potentially.
9      A.  Yes.
10     Q.  The next page.  We talked about this a little
11  bit earlier about rental assistance.  And it says is
12  development-based rental assistance anticipated for
13  this development and no was checked.  Is -- that's
14  correct?
15     A.  That's correct.
16     Q.  So at some of your other properties you
17  anticipate rental assistance, but you did not
18  anticipate it at this property; is that fair?
19     A.  It's a lengthier answer as well because when
20  you anticipate rental assistance, there is many
21  communities that have project-based rental
22  assistance --
23     Q.  Uh-huh.
24     A.  -- where it's a HUD program where there is
25  actually rental assistance for that project on an
```

Page 121

```
1   annual basis.  That can be underwritten.  That can
2   affect your bond amount, your debt service coverage,
3   your loan to values.  This one does not include that.
4   There is no project-based rental assistance.  You
5   know, like any other household in the country people
6   can go get a voucher --
7      Q.  Uh-huh.
8      A.  -- from the County or from -- even from where
9   they live in New York and what they call port their
10  voucher down here, move down here, bring their voucher
11  with them.  They can go anywhere.  They can go to a
12  house and use their voucher, they can go to my
13  apartment community and use their voucher.  That's not
14  considered project-based rental assistance.
15         So what they're asking for here is do you
16  have project-based rental assistance.  Okay.  You
17  can't underwrite vouchers because you have no idea who
18  is going to show up at your community.  You don't
19  control those vouchers.
20     Q.  On Page 11 it's asking for elderly
21  developments.  And I think we already probably covered
22  this, but I just want to confirm back to what you
23  said -- said earlier.  This was a senior restricted
24  property, but it wasn't considered an elderly
25  development and, therefore, the reason why you didn't
```

William Scott Culp
November 21, 2024

Page 122

1  attach Exhibit IV-1 or 4-1?
2     A.  Correct.
3     Q.  All right.  On page 14 question C says has
4  the developer or any principal of the developer been
5  associated with any development that has been found in
6  non-compliance with program requirements --
7  requirements; i.e. an incurred 8838 {sic}.  What does
8  that mean?
9     A.  When you have a portfolio of tax rent
10  communities, affordable housing -- affordable housing
11  communities, Florida Housing and Finance Corporation
12  audits those for compliance with all the restrictions
13  and you may at times be in non-compliance.  They issue
14  you an 8823, which is a report that says you're not in
15  compliance, and you have opportunity to come into
16  compliance.
17         Anybody that has any size portfolio will have
18  had non-compliant units.  If they say no, they
19  probably only have one unit.
20     Q.  And it -- it appears by checking yes to this
21  answer that the developer had been issued an 8823.
22     A.  Yes.
23     Q.  Okay.  Do you -- and I -- I think it actually
24  requested for that to be attached, but I didn't see it
25  attached.  Do you have an itemization of your 8823

Page 123

1  non-compliance?
2     A.  I don't know that we have one readily
3  available.
4     Q.  But am I reading that correctly that they are
5  generally asking for, you know, if there is some
6  non-compliance issues, we want it attached and
7  explained.
8     A.  Yes.  And typically with Brevard and with
9  other HFAs you typically only attach those if they
10  haven't been remedied.
11     Q.  All right.
12     A.  Because the question is have you ever, you
13  know.  And so in the history of all your portfolio,
14  you're not going to produce a book of every
15  non-compliance that got remedied.  But they're looking
16  for things that have not been remedied.
17     Q.  All right.  So you think that the reason
18  why -- assuming that, in fact, it wasn't attached and
19  not -- and I'm not just missing it here, that it --
20  the non-compliance issues had been remedied?
21     A.  Yes.
22     Q.  Okay.  I'm going to jump forward several
23  pages back to the exhibits.  And I'm -- it doesn't
24  have a page number on it, but it looks like it's after
25  Exhibit III-1 and then up in the top right it says

Page 124

1  page 1 of 8.
2     A.  I'm there.
3     Q.  It says development cost.
4     A.  Yes.
5     Q.  All right.  Just briefly if you don't mind
6  kind of come up with -- or tell me how you come up
7  with the various development costs?
8     A.  New -- new rental units is the construction
9  cost.
10     Q.  Uh-huh.
11     A.  The fees are those that are allowed under the
12  programs.  The contingencies are those that are
13  required by the programs.  Then you go to Page 2 and
14  all of those are the estimates of all of the
15  professional services that are required in order to
16  get the development permitted and occupied.
17     Q.  And what is the difference between HC
18  eligible costs and HC ineligible costs?
19     A.  Some of your costs are not eligible for tax
20  credits.  If they're optional to the resident, such as
21  washers and dryers --
22     Q.  Uh-huh.
23     A.  -- and things like that, they're not eligible
24  for tax credits.  You can't get tax credits on those
25  and charge your residents for them.  Some of your

Page 125

1  legal fees, as you'll see on the next page, and
2  marketing are not eligible.  And some of your -- I'm
3  trying to see -- yeah.  So there should be another --
4  yeah, I'm going on to the next page.  There is also
5  ineligible financial cost.
6     Q.  And do you have an accountant or a bookkeeper
7  on the staff that -- that manages these costs for you
8  or how -- how -- what is that process?
9     A.  For -- we have accountants and bookkeepers
10  that manage the actual cost.  These are all estimates.
11     Q.  All right.  And where do you get these
12  estimates from?
13     A.  From my own history.
14     Q.  Okay.  And then at some point in the process
15  is it -- is -- is there a cross-check to see if your
16  estimates were in line item with the actual cost?
17     A.  There is two that I can think of.  First the
18  credit underwriter --
19     Q.  Uh-huh.
20     A.  -- that we talked about before.
21     Q.  We did.
22     A.  They review every one of these numbers.  They
23  have professionals, whether it be what they call a
24  PCA, pre-construction analyst and an appraiser.  They
25  look at every one of these numbers and determine

William Scott Culp
November 21, 2024

Page 126

1  whether or not those are reasonable in industry
2  standards when they prepare their final underwriting
3  report. Then when we get to the end of the job, we
4  have to cost certify everything. So every cost, every
5  line item has to be certified to Florida Housing
6  Finance Corporation and audited and determine that it
7  was accurate and eligible for this program.
8      Q. All right. And then on -- when we're talking
9  about the owner's equity of $8,406,565, is that money
10  coming from -- we mentioned this earlier, but is that
11  Atlantic Housing Partners' asset or is it --
12      A. It's coming from the principals of Atlantic
13  Housing.
14      Q. The -- the three principals?
15      A. Yes.
16      Q. All right. And so you're putting in your own
17  assets?
18      A. Yes.
19      Q. All right.
20      A. Now, we may get those back at some point.
21      Q. Well, hopefully.
22         All right. And then up in the top right --
23  I'm on Page 8 of 8 -- the pro forma, cost pro forma.
24  So this says that 20 percent -- 21 of the units was
25  set-aside -- AMI set-aside of 20 percent and market

Page 127

1  rate units 80.
2      A. And that's --
3      Q. What is --
4      A. -- to meet tax-exempt bond criteria.
5      Q. And at the end of the project did this turn
6  out to be the actual numbers or did it change?
7      A. County commission denied our application. We
8  didn't end this project.
9      Q. All right. At -- at the -- when you -- what
10  numbers did you submit to the commission as far as the
11  percentages that we're at?
12      A. The commission was submitted the request for
13  approval of the tax-exempt bond issuance. I don't
14  know whether the commission was reviewing all of the
15  information that the HFA reviewed when they
16  recommended approval.
17      Q. What about when you submitted or when you
18  attended the HFA meeting. What were the -- what were
19  the percentage numbers?
20      A. Again, what was presented to the commission
21  was a request to approve the issuance of the
22  tax-exempt bonds. I don't know whether or not they
23  had the credit underwriting report, I don't know
24  whether they had any more than the memo from the
25  Housing Finance Authority indicating sufficiency of

Page 128

1  all the legal requirements for approval of the -- of
2  the issuance.
3      Q. All right. Going forward to Exhibit IV-2.
4  Again, I think this is probably already answered, but
5  I just want to confirm. It's calling this a
6  non-elderly development and it's a -- for purposes of
7  this exhibit you called it a non -- or it's called a
8  non-elderly development even though it's a senior
9  restricted development.
10     A. Correct.
11     Q. You can see how that can be a little
12 confusing.
13     A. Yeah, it -- it is confusing even for us. But
14 we need to keep the distinction because there are two
15 sets of criteria and guidelines.
16     Q. All right. And then if you go to Exhibit
17 V-1, to me that looks like the -- the contract or at
18 least amendment to the contract of sale.
19     A. The amendment is that the first two pages
20 then you have the contract --
21     Q. Yeah.
22     A. -- behind that.
23     Q. Behind it, right.
24        And so the amendment it has S&A Minton Road
25 Corporation. I assume that's the seller.

Page 129

1      A. That's my understanding.
2      Q. And the buyer is Southern Investment Group,
3  L.L.L.P.?
4      A. Correct.
5      Q. And is -- is -- is that how it's normally set
6  up where Southern Investment Group is -- is one of the
7  companies that does the purchasing of the property?
8      A. Yes.
9      Q. Okay. And Dean Price does -- oh, you
10 mentioned Dean Price earlier. He's associated with
11 Southern Investment Group. He's -- is he --
12     A. Yes.
13     Q. Okay.
14     A. Yes.
15     Q. Is he an accountant or --
16     A. No. He's a lawyer.
17     Q. Lawyer.
18     A. And a -- and a real estate broker.
19     Q. Oh, lawyers.
20        All right. It looks like next page you
21 purchased the property -- property for 2.5 million?
22     A. We contracted to purchase the property for
23 2.5 million.
24     Q. Thank you. You contracted to the purchase
25 the property for 2.5 million. No, I appreciate it.

Page 130

1  It's important to be accurate.
2       When the contract for sale was canceled, were
3  you out any money as far as money you had put in
4  escrow or anything along those lines?
5       A.  I don't recall the accounting.  We've
6  produced that.  But I don't recall the accounting on
7  what nonrefundable deposits were left with the seller
8  and what other cost and expenses we had related to
9  this purchase agreement.
10      Q.  All right.  When you say we will produce
11 that, you mean you produced --
12      A.  We did produce that.
13      Q.  Okay.  And -- and --
14      A.  Well, I was going to say we produced it to
15 our attorney.  I don't know if -- where we are in
16 producing to the other side yet.
17      Q.  All right.  Go to Exhibit V-2.
18      A.  Okay.
19      Q.  And Mr. Bowser, the attorney, it looks like
20 he's penned a letter here that says it's a senior
21 living multifamily dwelling unit and it -- he's giving
22 the opinion here basically that it meets the
23 qualifications of affordable housing --
24      A.  I --
25      Q.  -- dated June --

Page 131

1       A.  That was in the first paragraph.  His second
2  paragraph has to do with the legislation related to
3  affordable housing being developed on properties that
4  were zoned for commercial use.
5       Q.  What is known as Live Local?
6       A.  Correct.
7       Q.  All right.  And was this something that the
8  Housing Finance Authority specifically asked for, or
9  is this just par for the course when you're submitting
10 these applications?
11      A.  In every application -- I'd have to look back
12 at the application itself.  Exhibit V-2 is probably a
13 request for zoning confirmation.  I shouldn't guess,
14 but I would assume that's -- they typically ask for
15 confirmation of zoning.
16      Q.  I think you're right.
17      A.  And they ask --
18      Q.  I think that's what it states here.
19      A.  And in this particular case that would be the
20 confirmation of zoning.
21      Q.  So is -- is your understanding that
22 Mr. Bowser is saying that because this is a Live Local
23 property that it complies with the requirements of
24 Live Local not necessarily the city zoning?
25      A.  I wouldn't say --

Page 132

1       Q.  Live Local property.
2       A.  -- any of that you said.
3       Q.  All right.  Tell me what you would say.
4       A.  I would say that Mr. Bowser is saying that
5  this property with its zoning designation and our
6  intended use complies with the state statutes that are
7  often referred to as Live Local.
8       Q.  Thank you.
9           The next page has a letter dated July 28th,
10 2023.
11      A.  That's my birthday, too.
12      Q.  Happy birthday.  I hope -- I hope you got a
13 good present.
14          And this is from Mark -- and I'm going to
15 butcher his last name, but Gauthier.
16      A.  Gauthier.
17      Q.  Gauthier.  I wasn't even close.
18      A.  He's Canadian, so...
19      Q.  Obviously from Atlantic Housing Partners.
20          And so he's rendering an opinion I guess
21 that, quote, no approval was requested -- well, let me
22 just start over.
23          The engineer reviewed the concept plan for
24 Venue at Heritage Oaks with the City of West Melbourne
25 in June of 2023.  No approval was requested or granted

Page 133

1  at this meeting.  As a development proposed under the
2  Live Local Act, we expect the project to be viewed --
3  reviewed by staff without public input.
4       Do I get an A for reading that slowly --
5       A.  Slow reading.
6       Q.  -- and articulating every word?
7           Tell me what is going on here.  I mean,
8  what --
9       A.  Housing Finance Authority applications --
10      Q.  Uh-huh.
11      A.  -- typically include a request for what he
12 has in the regard line, status of site plan review.
13 He's indicating the status of the site plan review
14 letting the HFA know that this development was
15 reviewed with the City, no approval was requested or
16 granted at that meeting and that it's being proposed
17 under the Live Local Act, and, therefore, there won't
18 be any public input.  Under Live Local it's required
19 to be reviewed administratively, and there is no
20 public hearing or public vote with regard to the land
21 use.
22      Q.  All right.  So as of July 28, 2023 someone
23 from Atlantic Housing Partners had met with the City
24 of West Melbourne?
25      A.  Yes.

William Scott Culp
November 21, 2024

Page 134

1    Q.  All right.  And -- and you weren't expecting
2    as of July 28, 2023 that there would be any type of
3    public input with regard to this project.
4         A.  No.
5         Q.  All right.  There is not a page number on
6    here, but it's the -- where you -- where the
7    application has the other complexes that you -- that
8    SAS Affordable Housing Development completed.
9         A.  Lots of pages.
10        Q.  Yes, sir.
11            At the bottom of the first page it has Venue
12   at Viera Senior Living completed July 2021.  And
13   that's -- was an affordable housing senior complex in
14   Brevard, correct?
15        A.  Correct.
16        Q.  And on the second page it's talking about the
17   financing received, and it looks like that particular
18   project received the allocation of 4 percent housing
19   credit -- housing credits from FHFC, correct?
20        A.  Correct.  Correct.
21        Q.  These other projects that are listed on here
22   is -- they talk about different financing.  For
23   example, Grove Park Apartments a couple pages back.
24   And that --
25        A.  Yes.

Page 135

1         Q.  -- seems to -- actually, all the projects on
2    that page have -- have different financing.
3             As I review these it seems like the -- the
4    program where you use the tax-exempt bonds issued by
5    HFA with the allocation of 4 percent housing credit
6    since -- seems to be what you use a lot.  Is that --
7    is that a fair assessment?
8         A.  That is -- that is a majority of our
9    business, yes.
10        Q.  Okay.  And it's just because it has better
11   terms or --
12        A.  No.  It's because it's not competitive.  The
13   competitive nature of the other resources is not a
14   reliable business model.  And we have the resources,
15   as you saw from the pro forma here, to provide the gap
16   so we can get these communities developed while we're
17   applying for things like 4 percent credits.  If we
18   relied upon 9 percent credits or sale, we would be
19   doing a very small fraction of the development that we
20   currently do.
21        Q.  The owner equity that you would have proposed
22   to put into this project was that fairly consistent
23   with the other owner's equity put in with other
24   projects?
25        A.  At that stage of the development for the

Page 136

1    number of units.  Owner's equity is based upon number
2    of units as is the rents and the bonds and --
3         Q.  All right.  That's all I have on -- on the --
4         A.  Oh, I thought you were going to say that's
5    all you have.
6         MS. RHODEN:  I know.  I was like --
7         THE WITNESS:  I was like whoa.
8         MS. GAINEY:  On that application.
9         Did you see all of these.
10        THE WITNESS:  I was thinking, man, that's --
11        MS. GAINEY:  The good news is --
12        THE WITNESS:  You said it.  It's time to go.
13   Sorry.
14        MS. GAINEY:  No.  As you're being very
15   specific with me, I'm being very --
16        THE WITNESS:  Okay.
17        MR. GAINEY:  On that application.
18        Q.  (By Ms. Gainey) All right.  So once that's
19   submitted to -- to the HFA I understand that
20   the -- HFA meeting was in October.  So we have a
21   period of August and September.  What is going on with
22   the development during that time frame?
23        A.  Typically after the application we're meeting
24   with the local government to go over our design
25   program and developing the site plan and going through

Page 137

1    due diligence for things like environmental issues,
2    soils, civil engineering, architecture.  Things like
3    that.
4         Q.  All right.  And was there anything out of the
5    ordinary with respect to what was happening in August
6    and September as it relates to this project?
7         MS. RHODEN:  Object to form.
8         A.  I don't remember.
9         Q.  (By Ms. Gainey) All right.  It looks like the
10   next thing that occurred was the TEFRA hearing on
11   October 25 -- 25th, 2023.  I'm going to report to
12   you that's when the Housing Finance Authority held
13   their TEFRA hearing.  Were you present at that
14   hearing?
15        A.  I don't recall.
16        Q.  I -- I don't see any indication that you
17   were.  I didn't know if you had any --
18        A.  I typically am.  I typically attend all the
19   TEFRA hearings.  I would be surprised if I wasn't.
20        Q.  Okay.
21        A.  But I think I stated accurately I don't
22   recall.
23        Q.  Okay.  So -- the then the next thing I want
24   to ask you about is the pre-application meeting with
25   the City of West Melbourne.  Did you attend that?

William Scott Culp
November 21, 2024

Page 138

1    A.  No.
2    Q.  Okay.  And who typically attends the
3  pre-application meetings?
4    A.  Mark Gauthier and the civil engineer that he
5  hires.
6    Q.  All right.  And with respect to this
7  development in particular was there anything unusual
8  about the -- pre-application meeting?
9    A.  Not that I recall.
10    Q.  And let me back up.
11        What is the purpose of a pre-application
12  meeting?
13    A.  Every -- I shouldn't say every.  I don't know
14  that for a fact.  It's -- in all of our development
15  all the jurisdictions that we typically develop in
16  they require a pre-application so that you can sit
17  with the staff --
18    Q.  Uh-huh.
19    A.  -- different departments and discuss what
20  you're proposing so they can give you information on
21  what you need to consider before you make an
22  application.  It shortcuts huge mistakes and a lot of
23  wasted time.
24    Q.  Was an application ever submitted to the City
25  of West Melbourne?

Page 139

1    A.  I don't recall.
2    Q.  Are you aware of a Minton Road overlay --
3  overlay zoning?
4    A.  Yes.
5    Q.  All right.  Tell me what you know about that.
6    A.  I don't really know much other than it
7  exists, and I remember we had to consider it.
8    Q.  And do you remember anything -- anything
9  specific about what the zoning said?
10    A.  No.
11    Q.  My understanding is that the zoning said that
12  35 percent of the project had to be nonresidential.
13    A.  I don't believe -- I don't know that to be
14  accurate.
15    Q.  Okay.  So was the intent to have either a
16  doctor's or a dentist office on this project was --
17  was that always the intended use for the area?
18    A.  When you say always --
19    Q.  Let me back up.
20        When you considered -- when you purchased the
21  property and were considering what to put on the
22  property or at least entered into the -- land
23  contract, was the intent always to have an office, a
24  medical or a dental office?
25    A.  Some type of commercial use, yes.

Page 140

1    Q.  All right.  So putting that on the property
2  was not done in order to be consistent with the Minton
3  Road overlay zoning?
4    A.  I don't recall.
5    Q.  The Brevard County commission meeting
6  occurred on November 14th, 2023.  I understand from
7  the minutes that you were not present but Mark
8  attended that.  Is that your recollection?
9    A.  There were two meetings.  I was present at
10  the one and actually spoke at the one where they
11  voted.  And maybe you're referring to a prior county
12  commission meeting.
13        (Deposition Exhibit C was marked.)
14    Q.  (By Ms. Gainey) Let me show you what we've
15  marked as Exhibit C.
16    MS. RHODEN:  Can I have a copy?
17    MS. GAINEY:  Oh, of course.
18    MS. RHODEN:  Thanks.
19    A.  Is this the one where they tabled it?
20    Q.  (By Ms. Gainey) Yes.
21        I'll tell you my understanding is, is that it
22  came up at this November 14th, 2023, and it was tabled
23  to the December 5th, 2023.  You attended the
24  December 5th, 2023 meeting, but you didn't attend this
25  November 14th, 2023 meeting that Mark attended on

Page 141

1  behalf of Atlantic Housing.
2    A.  I don't remember the exact dates, but there
3  were two separate meetings.  One earlier that I did
4  not attend that Mark Gauthier did attend and then the
5  one where the commission denied the issuance of the
6  bonds I was in attendance.
7    Q.  All right.  If you go back a couple of pages,
8  it's -- Mark Gauthier -- it's a memorialization of --
9  of the conversation -- his presentation or his
10  conversation with the commissioners.
11        I'm sorry.  They don't have page numbers so I
12  can't tell you.  It has his name at the top.
13    A.  I see where he introduced himself at the top.
14  That's where you're starting?
15    Q.  Yes.  So about halfway down Chair Pritchett
16  asked, quote, so it's not really -- it's -- excuse me.
17  So it's really not low income.  It's just affordable,
18  close quote.  And Mark responds:  Yeah, it's a -- it's
19  a -- it's first off a senior community.  Is that
20  accurate?
21    A.  That's accurate.
22    Q.  And then he goes on to say it is mixed
23  income.  We're anticipating a range of affordability
24  set-aside.  So we're -- so we'll have some that are
25  closer to market and some that are a little bit lower

William Scott Culp
November 21, 2024

Page 142

1  on the scale.  Is that accurate?
2      A.  Yes, it is.
3      Q.  All right.  And can you explain what Mark was
4  talking about there?  Is that what we were talking
5  about earlier?
6      A.  Yeah.  It's the same thing I was explaining
7  to you about the income averaging.
8      Q.  It looks like there is some discussion about
9  Live Local.  And we don't have to go through that.
10         He appears to say a little bit later -- and
11 I'm on the next page at the bottom.  It says the
12 financing has been approved, and unfortunately we
13 can't do a thing about it.  So I'm sorry.  I wish we
14 could.
15     A.  I'm trying to see where you are.
16     Q.  Yeah.  It's --
17     A.  What is at the top or bottom of the page so I
18 can follow along with you?
19     Q.  In good faith table the financing on this.
20 It should be the second page from where Mark -- it
21 starts here.  It's on the next page.
22     A.  Okay.
23     Q.  And it says somewhere in the middle of
24 that -- are you in the middle of that paragraph?
25     A.  I'm -- I'm right here.

Page 143

1      Q.  At the bottom of it where it says the
2  financing has been approved, and unfortunately we
3  can't do a thing about it.  That seemed to be a
4  discussion from Commissioner Steele?
5      A.  Uh-huh.
6      Q.  Well, no.  It looks like it's --
7      A.  Yeah.
8      Q.  Yeah, Commissioner Steele.  You're right.
9      A.  And so Commissioner Steele was saying the
10 financing has been approved, and he can't do anything
11 about it and he's sorry.  He wished he could.
12     Q.  Yeah.  And so, again, I think that has -- the
13 discussion has to do with Live Local.  So --
14     A.  No.  He referred to financing.  That's not
15 Live Local.  He said the financing has been approved.
16     Q.  Right.
17     A.  And the financing is not Live Local.
18     Q.  Correct.
19     A.  Live Local has nothing to do with the
20 financing.
21     Q.  Right.  That's right.  I'm with you there.
22     A.  That's why -- yeah, because you said it has
23 to do with Live Local.
24     Q.  Yeah.
25     A.  He was saying financing, so...

Page 144

1      Q.  So -- but the Live Local has to do with what
2  requirements that the State is -- is making upon
3  developers in order to select certain areas.  Is it --
4      A.  Live Local is the rights they give owners to
5  utilize land that is zoned for commercial or
6  institutional uses for affordable residential
7  development.
8      Q.  The next page about halfway down Mark is
9  talking about, quote, we would just -- we would just
10 start the application process -- process.  It's not --
11 you know, it's not a two-week process.  You know, to
12 put other funding together would take a little bit of
13 time, but we would start the process immediately.  And
14 he's asked so two months, and Mark says a few months.
15 Is -- is that accurate?
16     A.  It would take some time.  It's not a two-week
17 process.  That's accurate.  We would start the process
18 immediately.  That's accurate.
19     Q.  And as I -- I'm reading this conversation
20 they're talking about if the bond is denied, you know,
21 what other financing would be available.
22     A.  Right.
23     Q.  And Mark is saying, hey, it's not something
24 we can get tomorrow.  It's a process that it takes a
25 couple of months.  Is that how you read this?

Page 145

1      A.  That's the way I read this, yes.
2      Q.  Okay.  Mark later -- the next page he says
3  that we own and operate our communities long-term.
4  That's an accurate statement?
5      A.  Yes.
6      Q.  A little bit further down they're talking
7  about State funding.  The State puts together
8  guidelines.  They -- they leave it to the
9  municipalities to do their architectural reviews and
10 their site plan reviews.  Is that accurate?
11         Almost toward the bottom.
12     A.  Yes.
13     Q.  So what he -- he's talking about is that
14 while -- while the State provides the guidelines it's
15 the municipalities that you generally have to work
16 with in order to get the project approved.
17     A.  For the architectural review and site plan,
18 yes.  He wasn't referring to financing.
19     Q.  Understood.
20         All right.  That's all the questions I have
21 about that.
22     A.  You keep saying that and I'm thinking you're
23 going to --
24     Q.  About that.
25         MS. RHODEN:  That would be my least favorite

William Scott Culp
November 21, 2024

Page 146

1    phrase at this stage.
2        Q.  (By Ms. Gainey)  I want to ask you about the
3    community presentation on November 30th, which I do
4    believe you did.
5        A.  I was -- attended and presented at a
6    community presentation.  Whether it was November 30th
7    or not I can't tell you.
8        Q.  Let me see.  I will purport to you that it
9    was November 30th.
10           Let me show you what we're marking as Exhibit
11    D.
12           (Deposition Exhibit D was marked.)
13        A.  Throw it.
14        Q.  Actually, let me -- I'm sorry.  Excuse me.
15    Let me give you a stapled one.  That way it's easier
16    for you to flip through.
17           MS. RHODEN:  Do you want to take this one?
18           MS. GAINEY:  I've got an extra one.
19        Q.  (By Ms. Gainey)  There.
20           This was produced in response to request for
21    production, and you'll see that it's got plaintiffs
22    and Bate stamp numbers at the bottom right-hand
23    corner.
24           Does this appear to be the presentation that
25    you did at the community meeting?

Page 147

1        A.  Yes.
2        Q.  How many people attended the community
3    meeting?
4        A.  I'm guessing 50 plus.
5        Q.  Did any city or county officials attend?
6        A.  Yes.  And I don't remember the name, but I do
7    remember one -- I believe there was a city official
8    that attended.
9        Q.  Counselman Dittmore?
10        A.  I believe that's correct.
11        Q.  Did anybody from the County attend?
12        A.  I don't recall.
13        Q.  How long did the meeting last?
14        A.  Over an hour.  I can't remember exactly how
15    long.
16        Q.  Were you the only one that presented?
17        A.  I believe so.  I take that back.  There were
18    some questions related to traffic and I had our
19    traffic engineer there and they responded to some of
20    the questions related to traffic.
21        Q.  Who is your traffic engineer?
22        A.  I don't recall the name.
23        Q.  What was the purpose of the community
24    meeting?
25        A.  The county commission had asked us to have --

Page 148

1    hold a community meeting.
2        Q.  And why had they done that?
3        A.  I don't recall.
4        Q.  Could it have been because the area residents
5    had voiced concern about the development?
6        A.  Could it have been?
7        Q.  Yes.
8        A.  It could have been.
9        Q.  All right.  Mark didn't tell you when he
10    attended the meeting what happened at it?
11        A.  I -- I did this presentation.
12        Q.  When Mark attended the -- the prior
13    commissioner meeting on November 14th --
14        A.  Yes.
15        Q.  -- did he tell you what happened?
16        A.  Yes.
17        Q.  And what did he say?
18        A.  I don't recall.
19        Q.  So --
20        A.  You asked me if it could have been.
21        Q.  Yeah.
22        A.  Yes, it could have been.
23        Q.  Okay.  So you're saying you don't know the
24    reason though why you did this community meeting?
25        A.  I don't know why the commission asked us to

Page 149

1    do that.  I don't know that.  That's not something
2    that I would know unless they sent me a letter saying
3    the reason I would like for you to hold this meeting
4    is.
5        Q.  Really?  You're --
6        A.  Really.  I don't know.
7        Q.  Okay.  So you -- you at some point are told
8    that you have been asked to do a community meeting --
9        A.  Yes.
10        Q.  -- but you don't know why?
11        A.  I know that the commission has asked us to
12    have a community meeting with the residents.  It's not
13    unusual.  Oftentimes they would like the residents to
14    have information in an informal setting not in front
15    of the commission in the public hearing.  And that's
16    not unusual for me to go make a presentation to inform
17    the residents.
18        Q.  And what did you intend to inform the
19    residents about?
20        A.  The development program, which is what you're
21    seeing in the presentation here.
22        Q.  All right.  Did Mark tell you -- well, I
23    think you answered this earlier, but let me confirm.
24    Mark didn't tell you anything about any community
25    concerns that were expressed or could have been

William Scott Culp
November 21, 2024

Page 150

1  expressed in the -- the November 14th, 2023 meeting.
2      A.  I didn't say that.
3      Q.  All right.
4      A.  I said I don't recall.  You asked if I spoke
5  to Mark about the meeting and I said yes.  And you
6  asked me what he said.  I said I don't recall.
7      Q.  Do you recall anything about the conversation
8  you and Mark had?
9      A.  No.
10     Q.  All right.  But as you sit here today you
11 know that the commissioners asked for a community
12 meeting and you were setting that up?
13     A.  Correct.
14     Q.  Was the meeting recorded?
15     A.  I don't believe so.
16     Q.  All right.  Just quickly I want to review
17 this.
18         On Page 3 at the bottom right-hand corner
19 it's Bates stamped 02772.  The site plan was for 105
20 senior apartment homes, correct?
21     A.  Correct.
22     Q.  The next page it's talking about the income
23 limits.  And explain this slide to me, please.  It's
24 Bates stamped 02773.
25     A.  These income limits are the income limits

Page 151

1  required by the bond program.  The 50 percent limit is
2  the one in the middle by household size.  Your maximum
3  allowable as it says in the -- top label, maximum
4  allowable household income for the 50 percent AMI
5  set-aside for each size household and then off to the
6  right is the maximum allowable household income for
7  the 120 percent.  And the 120 percent is what
8  qualifies for affordable housing and utilization under
9  the Live Local entitlements for the land use.
10     Q.  All right.  And so at -- this goes back to
11 the application we were talking about earlier that
12 occurred in July.  Now we're in -- and I'm going to
13 purport to you that it was November 30th.  Now that
14 we're at the end of November have -- have these
15 numbers been more finalized?
16     A.  No.
17     Q.  All right.  Tell me what you mean.
18     A.  This is a representation.  We know that the
19 bond program requires 20 percent of the units at
20 50 percent AMI.  That center column is 50 percent AMI
21 for the household sizes.
22     Q.  Uh-huh.
23     A.  We know that the Live Local Act for
24 affordable rental housing on commercial -- on property
25 that's zoned allowing -- allowing for commercial and

Page 152

1  institutional uses requires a certain percentage of
2  the units to be reserved below 120 percent AMI.
3  That's what the right column is.  That hasn't changed.
4      Q.  And had this project been developed and -- on
5  opening day would this have been the requirements for
6  residents as far as income restrictions?
7      A.  Yes.
8      Q.  You hesitated.
9      A.  Yes.  Because we've discussed this further.
10 You would require that 20 percent of the units --
11     Q.  Uh-huh.
12     A.  -- be occupied by households with their
13 household income being less than 50 percent of the AMI
14 as adjusted for family size which is what you see on
15 this table.
16     Q.  Uh-huh.
17     A.  We would also have a restriction recorded on
18 the property required by the State legislation for
19 Live Local that 40 percent of the units would have
20 restrictions requiring that the households have
21 incomes less than the 120 percent AMI as adjusted for
22 household size.  That's what you see there.  We're
23 also going to have the 4 percent low income housing
24 tax credit restrictions which will be consistent with
25 these but will be lower because the requirement here

Page 153

1  is less than.
2      Q.  The next page Bates stamped 02774 tell me
3  what this slide represents.
4      A.  This is the unit mix telling you that we have
5  75 one bedroom, 30 two bedroom and it tells you what
6  the rents would be for the 50 percent AMI set-aside
7  and what the rents would be at a maximum for the
8  120 percent AMI.
9      Q.  So as I read this the property could be
10 renting out a two bedroom for $2,484.
11     A.  No.
12     Q.  All right.  Tell me why no.
13     A.  The -- under the bond program and the Live
14 Local Act the property could be rented 80 percent of
15 it without 4 percent tax credits.  80 percent of it
16 could be rented for what would be considered market
17 rate because the limit is 120 percent, what you see in
18 the 2484.  You also have to reduce that by utility
19 allowance which we're showing at 144.  So your net
20 rent would be 2339.  But you're also limited by market
21 rate rents.  So the market rate rent by -- in that
22 area would be 1699.
23         This is still limitations based upon Live
24 Local Act.  You're still going to have another set of
25 limitations and restrictions based upon the 4 -- 4

William Scott Culp
November 21, 2024

Page 154

1  percent low income housing tax credits.
2      **Q.  So when this property opened had it been**
3  **developed how much would a two bedroom have been for**
4  **someone who was below 120 AMI but above 50 AMI?**
5      A.  When it opened, it would have had the 4
6  percent low income housing tax credit restrictions, so
7  they would have been below these 120 percent rents
8  because the maximum under that program would be
9  80 percent.  So there wouldn't be any units that would
10  be above 80 percent.  They would all be below 120.
11  But under the 4 percent tax credit program they would
12  also be below 80.
13          I don't have the chart in front of me on the
14  income rent restrictions for the 80 percent AMI.
15      **Q.  Okay.  I'm sorry.  I'm not -- I'm not**
16  **necessarily following you and I apologize for that.**
17  **But --**
18      A.  I mean --
19      **Q.  -- why are you presenting this to the --**
20  **this -- the residents if -- if this is not what the**
21  **final numbers I guess would be?**
22      A.  This is what is required for the bond
23  program.
24      **Q.  All right.**
25      A.  So what is going to the commission is

Page 155

1  approval of the bond issue.  Okay.  I don't want to
2  present to the residents things that are inaccurate.
3  The bond issue that's being approved would require
4  these.  Okay.  The 4 percent tax credits are going to
5  require even further restrictions.
6      **Q.  And -- and did you explain in this meeting**
7  **that this -- these were not the final numbers?**
8      A.  I don't recall.
9      **Q.  All right.  Do any of these slides or any of**
10  **the information show, like, what the rent would have**
11  **been had the project proceeded to opening?**
12      A.  I don't believe any of these slides present
13  those numbers, no.
14      **Q.  And you kind of mentioned earlier, but how --**
15  **how would I figure out what the rent would have been**
16  **if -- if it proceeded to close and open?**
17      A.  You would -- you would apply or -- I mean, if
18  you were -- let me ask you.  Are you -- you said how
19  would I.  Are you a tenant wanting to know what the
20  rent would be, or are you just someone from the City
21  wanting to find out what the restrictions are?
22      **Q.  Say I'm a tenant and I want to know what the**
23  **rent is.**
24      A.  A tenant you would go to the property, and we
25  would have to qualify you, determine what income level

Page 156

1  you're at --
2      **Q.  Uh-huh.**
3      A.  -- and which one of the set-asides you
4  qualify for, and then that would determine what your
5  rent is.
6      **Q.  All right.  And is there any way to know that**
7  **in advance?  It's just a matter of --**
8      A.  There is but it's complicated and most
9  tenants aren't able to do that and I wouldn't
10  encourage them to even try.
11      **Q.  What about -- the same question as it relates**
12  **to the City.  If I -- if I were --**
13      A.  Yeah.
14      **Q.  -- someone from the City.**
15      A.  The City could ask their housing department
16  because every housing department has access to Florida
17  Housing Finance Corporation and Florida Housing
18  Finance Corporation publishes the rents and incomes at
19  every AMI level for every jurisdiction.
20      **Q.  Do you appreciate that it may be confusing if**
21  **this is what you're presenting to the citizens for**
22  **them to believe that this is what the final rent**
23  **numbers are going to be?**
24      A.  I'm not presenting something to the residents
25  to guarantee them of rents.  The residents are the

Page 157

1  ones that are -- need to know what the community is
2  going to be developed as.  The affordable housing is
3  being developed under the affordable housing programs
4  that are allowed by the federal and state and local
5  legislation.  I'm not asking the residents to
6  determine whether or not they think the rents are
7  appropriate or affordable or not.
8      **Q.  All right.**
9      A.  I'm -- I'm showing the -- the residents when
10  I come back before the county commission and ask the
11  county for approval of the -- of the tax-exempt bond
12  issuance what are the restrictions.  These are the
13  restrictions that the county commission is approving.
14  They will be restricted to that at a minimum.  Now,
15  they will be restricted further with the 4 -- 4
16  percent low income housing tax credits.  But what --
17  then when the county commission approves it, these are
18  the minimum restrictions.
19      **Q.  Are there maximum restrictions?**
20      A.  The -- with -- with each program, yes.  So
21  when I go to 4 percent low income housing tax credits,
22  I'm going to have lower set-asides.  That's not going
23  to keep me from renting.  I wouldn't because it's
24  economic -- not economically feasible.  But you say
25  maximum restrictions.  I could rent at 10 percent

William Scott Culp
November 21, 2024

Page 158

1 rents, but it's not economically feasible and there is
2 no requirement for that under any of the programs.
3      Q.  So had the project been developed and a --
4 and a renter wants to know, you know, what the rent
5 would be based on their specific income --
6      A.  Uh-huh.
7      Q.  -- is that a computer program that the -- the
8 management team would plug in or how -- how is that
9 figured?
10      A.  They would sit with the prospective resident
11 and show them the set-asides and they would look at
12 where they qualify.  They have to provide their income
13 qualification.  Their income qualification is going to
14 tell them where they fall within the set-asides and
15 what their rent would be.
16      (Deposition Exhibit E was marked.)
17      Q.  I have no more questions on that document.
18      A.  You were quick to respond in that way.
19      Q.  I'm going to show you Defendant's E.  It says
20 that this is the verbatim from the 12/5/23 -- 2023
21 Brevard County commission meeting.  I believe this is
22 the meeting that you attended, correct?
23      A.  It looks that way.  It has my name in a lot
24 of places on it.
25      Q.  Have you ever seen this document before?

Page 159

1      A.  No.
2      Q.  Do you have any independent recollections as
3 to what happened on that meeting?
4      A.  I have an independent recollection that the
5 county commission denied my issuance of the tax-exempt
6 bonds for Venue at Heritage Oaks.
7      Q.  All right.  Do you recall anything that was
8 said in the meeting?
9      A.  Not with specific -- with specificity.  I
10 rely on the transcript for that.
11      Q.  All right.  I certainly can give you a few
12 minutes to look at it if you would like.
13      A.  You can ask questions.  I don't think I need
14 a few minutes.  My dogs don't think I need a few
15 minutes.
16      I don't mean to make it a joke.  It's just
17 fun at this late hour.
18      Q.  Well, again, if you dismiss the lawsuit, we
19 can go home right away.
20      A.  If your client would just write a check, then
21 I'll be happy to go home.
22      Q.  All right.  So it looks like Counselman
23 Dittmore spoke first and then on the second page it
24 looks like you were up.
25      A.  I think Steele had some comments before I was

Page 160

1 up.
2      A.  Yeah, Steele had some comments and then you
3 were the next presenter or person speaking.
4      Toward the -- you're on the second page?
5      A.  Yeah, I am.
6      Q.  Okay.  And toward the bottom of where
7 you're -- the paragraph where it's speak -- you're
8 speaking it says 20 percent of the units will be at
9 50 percent of the median income and the balance will
10 have a maximum of 120 percent of the median income.
11      A.  That is correct.
12      Q.  Is that accurate?
13      A.  That is correct.
14      Q.  But I'm hearing from your testimony that, you
15 know, maybe those were not --
16      MS. GAINEY:  Well, let me strike that.
17      Q.  (By Ms. Gainey) Were those the final numbers
18 as far as allocation and percentages of the AMI?
19      A.  For the bond allocation and the Live Local
20 legislation for the land use entitlements, yes.  For
21 the 4 percent low income housing tax credits they will
22 fall within those parameters, but there will be
23 stricter set-asides.  But they definitely will fall
24 within those parameters.
25      Q.  And am I hearing you to say that you don't

Page 161

1 have the numbers for -- for the -- the second
2 financing.
3      A.  Not in front of me.  I --
4      Q.  Where -- where would those numbers be?
5      A.  Florida Housing Finance Corporation when you
6 go to their Web page go down to the right, it says
7 developers then it says income limits and rent limits.
8 Click on either of those and go by county and by MSA
9 and it will give you all of the household -- income
10 limits by household size and rents by bedroom count
11 for each of the income stratas 10 percent all the way
12 up to 140 percent.
13      Q.  And you're not discussing that in this
14 meeting because for the bond those numbers would --
15 are not relevant; is that --
16      A.  The commission is approving the taxing and
17 bond issuance.  The taxing and bond issuance comes
18 with certain restrictions.  Okay.  And those
19 restrictions would be placed on the property before
20 you have the 4 percent credits.  They're placed on the
21 property when you close on the bonds.  The 4 percent
22 tax credits are later.  You can't do that until you
23 actually place those units in service.
24      Q.  And I heard you to say earlier that --
25      MS. GAINEY:  Well, strike that.

William Scott Culp
November 21, 2024

Page 162

1    Q.  (By Ms. Gainey) Were you -- did you remain
2   and -- and stay at part of the meeting when other
3   community members were speaking?
4    A.  Yes.
5    Q.  What, if anything, do you remember about what
6   the other community members were speaking about?
7    A.  I know that community members were speaking
8   about not wanting the low income housing in their
9   neighborhood.
10    Q.  And did they -- do you have any recollection
11   as to the reasons why?
12    A.  I don't remember the exact language that was
13   used.
14    Q.  There is some reference in -- in your --
15   these conversations that you're proposing to restrict
16   the occupancy of this community for seniors
17   according -- in accordance with Housing for Older
18   Persons Act.
19    A.  That is correct.
20    Q.  And tell me what that means.
21    A.  I don't know if that takes a legal opinion.
22       MS. RHODEN:  Objection.  Yeah.
23    Q.  (By Ms. Gainey) Well, I -- I don't want your
24   legal opinion obviously.
25    A.  Okay.  The Housing for Older --

Page 163

1    Q.  You're obviously very experienced --
2    A.  Yeah.
3    Q.  -- so what does it mean to you?
4    A.  The Housing for Older Persons Act allows you
5   without violating for housing to restrict occupancy of
6   your community to residents with one member of the
7   household age 55 or older, and 20 percent of the units
8   can be exempt from those restrictions.  And you must
9   have no residents under the age of 18 and you must
10   advertise and market it as a seniors community.
11   That's my summary of the Housing for Older Persons
12   Act.  It's a lot longer than that, but --
13    Q.  Understood.
14       So how -- what was the minimum age
15   restriction for someone who signed the lease proposed
16   for Venue at Heritage Oaks?
17    A.  Under the Housing for Older Persons Act,
18   which this was proposed for, you would have to have at
19   least one member of the household 55 or older.  All
20   residents would have to be 18 or older.
21    Q.  And that's what the proposal was for this
22   specific development?
23    A.  I told you that this specific development was
24   to be restricted for seniors in accordance with
25   Housing for Older Persons Act.

Page 164

1    Q.  I'm not trying to set you up.  I'm just
2   trying to figure out --
3    A.  I don't -- I'm not sure you aren't.
4    Q.  Okay.  Tell me what the minimum age was for
5   this development.
6    A.  I told you just now.  I said no one under the
7   age of 18.
8    Q.  All right.  But so -- the person that signed
9   the lease what is the minimum age there?
10    A.  You could have a person signing the lease at
11   18 as long as a member of the household was 55 or
12   older.
13    Q.  That's what I'm after.  Is it 55 or 62
14   because you have another development in Brevard
15   County, and I think from what I've seen the minimum
16   age is 62.
17    A.  Two different criteria.
18    Q.  And how --
19    A.  Housing for Older Persons Act allows you to
20   have a seniors restricted community with a head of
21   household 55 or older.  You don't have to have someone
22   62.  When you have someone 62, you don't have the
23   other provisions that go along with the requirements
24   for a community where the head of household is 55.
25   Two different criteria.  I'm not able to without the

Page 165

1   Federal Register in front of me tell you what the
2   difference is.  But, yes, we have communities that are
3   62 and over.
4    Q.  All right.  And -- and so for this specific
5   complex what I'm hearing you to say is that at least
6   one member of the household had to be at least
7   55 years old.
8    A.  Correct.
9    Q.  And they could have other members that were
10   on -- on the lease, but they were under -- they were
11   between 55 and 18.
12    A.  Correct.
13    Q.  But no one under 18 would be allowed to live
14   at this complex?
15    A.  Correct.
16    Q.  I'm with you.
17    A.  With one exception.
18    Q.  Okay.
19    A.  Under the Housing for Older Persons Act there
20   is a 20 percent exception if you're using the 55 or
21   older and not the 62 and older.  The 20 percent
22   exception was created in my understanding was because
23   they want the ability for things like Veterans with
24   disabilities to be able to rent in a seniors
25   restricted community.

William Scott Culp
November 21, 2024

Page 166

1    Q.  So would this community had it been developed
2    used the 20 percent exception?
3        A.  Yes.
4        Q.  So you're saying that if a Veteran came in
5    that was 45, the management company would have been
6    allowed to rent to that person even though that
7    Veterans wasn't 55?
8        A.  If they already had 80 percent of the units
9    rented to qualified households under the Housing for
10   Older Persons Act, yes.
11       Q.  All right.  It looks like there is a lot of
12   comments from various community members.  I'm hearing
13   you to say that you don't necessarily remember the
14   details of what the complaints are by the community
15   members.  Am I understanding your testimony correctly?
16       A.  Correct.
17       Q.  All right.  And I won't go through all these
18   with you, but it -- it appears that after the
19   community members presented you came back and did --
20   and, again, I'm sorry.  I don't have a page number,
21   but it has Steele at the top and it has Culp.
22       A.  I see that.
23       Q.  So community -- you did the initial
24   presentation, the community members did their
25   presentation and then you came back and -- and maybe

Page 167

1    had some follow-up discussions with the commissioners?
2        A.  I tried to.  But as you can see from the way
3    it was transcribed here I wasn't given much
4    opportunity.
5        Q.  Do you understand that there is a 3-minute
6    limit for speakers at commission meetings?
7        A.  That's typically not my experience for the
8    applicant because the applicant typically has more
9    time to be able to respond and answer questions.  The
10   3 minutes is because there is typically a larger
11   public comment, but the applicant is given more time.
12   But commissions can adopt the rules that they would
13   like to adopt.
14       Q.  How long did you speak for?
15       A.  I don't recall.
16       Q.  And unfortunately it's not in this.  But are
17   you saying or suggesting that you weren't given an
18   opportunity to speak fully?
19       A.  I believe that to be true, yes.
20       Q.  Did someone tell you to stop speaking?
21       A.  I don't recall.
22       Q.  At the top it -- when you're speaking it's
23   talking about -- there is some public comment for the
24   benefit of the public and the board members we heard a
25   lot of concern for traffic.

Page 168

1        A.  I think -- what I see is the comment from
2    Steele says you're going to have to wrap it up.  Thank
3    you very much.  Are you asking me --
4        Q.  No.  I'm -- I'm on the second -- I'm what
5    you're talking about, Culp --
6        A.  Oh, okay.
7        Q.  -- second paragraph.
8            You said we heard a lot of concern for
9    traffic.
10       A.  Yes.
11       Q.  And is that accurate of what you said at the
12   meeting?
13       A.  I believe so.
14       Q.  Does that refresh your recollection any as to
15   what any community -- community member said regarding
16   their concerns?
17       A.  That says to me that I heard a lot of concern
18   for traffic from the community members.
19       Q.  Right.
20           And does that refresh your recollection as to
21   what the community members -- one of the things the
22   community members were complaining about?
23       A.  I don't recall what they said, but I see that
24   I said we heard a lot of concern for traffic.
25       Q.  And so as you sit here today do you have

Page 169

1    any recollection at all of community members
2    complaining about traffic in order to object to the
3    development?
4        A.  I don't remember the specificity of the words
5    used by the community members that were objecting to
6    the item on the agenda.
7        Q.  Was the development always going to be a
8    senior restricted complex?
9        A.  Yes.
10           MS. RHODEN:  Can we take a quick break --
11           MS. GAINEY:  Of course.
12           MS. RHODEN:  -- because I need to run to get
13   my card because I'm about to get locked out of the
14   building.
15           VIDEOGRAPHER:  Going off the video record.
16   The time is 5:17 p.m..
17           (A recess was taken from 5:17 to 5:24.)
18           (Deposition Exhibit F was marked.)
19           VIDEOGRAPHER:  We are back on the video
20   record.  The time is 5:24 p.m..
21       Q.  (By Ms. Gainey) Mr. Culp, I've shown you what
22   we have marked as Exhibit F.  And I'm going to purport
23   to you that that's two documents.  One -- well, I'm
24   going to purport to you that it's part of the consent
25   agenda that was submitted to the Brevard County

William Scott Culp
November 21, 2024

Page 170

1  commissioner meeting for consideration on
2  December 5th, 2023.
3          The first document was -- it appears to be a
4  complaint by a citizen regarding the project.  Is it
5  fair for me to assume that you've never seen that?
6      A.  Correct.
7      Q.  And then the second part of the document it's
8  marked H1 development -- developer submittal up in the
9  right-hand corner.  Does this appear to be the
10  presentation as submitted to the Brevard county
11  commissioners for consideration on the December 5th,
12  2023 meeting?
13      A.  It appears to be.
14      Q.  Just a few brief questions about that.
15          If you go a few pages back, it -- under unit
16  mix and rents.  I think it's about the fourth or fifth
17  page back.
18      A.  Okay.
19      Q.  Tell me what this diagram is.
20      A.  It's the rents based upon the restrictions of
21  the tax-exempt bonds and the Live Local Act by bed --
22  by unit type and by set-aside.
23      Q.  And so you have one, two and three bedrooms,
24  which is what the proposed project would have,
25  correct?

Page 171

1      A.  Correct.
2      Q.  And then the fifth column over it says AMI
3  percentage.  That's the average median income that
4  we've been talking about.
5      A.  Correct.
6      Q.  And tell me what that column means.
7      A.  What that columns means?
8      Q.  Yeah.  What -- what are you trying to convey
9  with that column?
10      A.  Show the restricted rents under the bond
11  program.  The bond program requires 20 percent of the
12  units to be at 50 percent AMI.  And the one-bedroom
13  units you see 14 at 50 percent AMI and 57 at market,
14  meaning unrestricted.  And that is showing what would
15  be a market rent for the ones that are not restricted
16  at the 50 percent AMI.
17      Q.  So as I read this it would be 14 one-bedroom
18  units, 6 two-bedroom units and 1 three-bedroom units
19  that were at the 50 percent AMI?
20      A.  You said 14, 6 and 1?
21      Q.  14, 6 and 1.
22      A.  That's correct.  That's correct.
23      Q.  So if my math is right, that's 21.
24      A.  Correct.
25      Q.  And then the remaining units, which I -- I

Page 172

1  think this is -- proposes, what was it, 105 unit
2  complex?
3      A.  That's correct.  The total is on that page
4  just below the units.
5      Q.  Right.
6          So the remaining units would be at market
7  price.
8      A.  This was showing the credit underwriting
9  report.  This is an excerpt from the credit
10  underwriting report.
11          Credit underwriting report shows what market
12  rents are because a credit underwriter is underwriting
13  for the tax-exempt bond program.  So they would show
14  you what the restricted rents are at the 50 percent
15  and what the market rents are and -- and also what the
16  appraiser's rents are.
17          And since the applicant rents at market are
18  less than the appraiser's to the far right the credit
19  underwriter's rents would be the lower of those --
20  those two.  That's how the development was
21  underwritten for the tax-exempt bond issuance.
22      Q.  So does this slide depict what the actual
23  rents are on opening day had the project proceeded --
24      A.  No.
25      Q.  -- to completion?

Page 173

1      A.  No.
2      Q.  All right.  And was that explained to the
3  commissioners?
4      A.  I don't know.
5      Q.  Or discussed at all as best you recall?
6      A.  I don't believe so.
7      Q.  And, I'm sorry, who created this document?
8      A.  This -- this document I created.  This
9  table --
10      Q.  Oh.
11      A.  -- as it says underneath it, the credit
12  underwriting report prepared for the Brevard County
13  HFA.  It's in the credit underwriting report.  It was
14  approved by the HFA.
15      Q.  And what are you attempting to convey with
16  this slide?
17      A.  What is required by the tax exempt-bond
18  financing that the commission -- that is before the
19  commissioners for approval.
20      Q.  So if -- if this said market, is that not
21  accurate that then the remaining 80 percent of the
22  units would be at market price?
23      A.  They would have to be less than that number.
24  And they will be because the 4 percent tax credits is
25  going to be less than market, less than 120, less than

William Scott Culp
November 21, 2024

Page 174

1  80.
2      Q.  So as we sit here today there is no real
3  reason or reason -- excuse me.
4          As we sit here today there is really no way
5  for us to determine what the actual rents were for the
6  property had it opened.
7      A.  There is a way to determine that.  I don't
8  think you've --
9      Q.  Let's --
10     A.  -- presented the documents.  But I can do
11 that by a computer going to Florida Housing Finance
12 Corporation's Website and telling you what the stratas
13 are.
14     Q.  That's what you -- that's what you were
15 referring to earlier.
16     A.  Correct.
17     Q.  The next page is a traffic analysis.  Is this
18 a traffic analysis that Atlantic Housing Partners
19 commissioned?
20     A.  Yes.
21     Q.  And what is the purpose of this slide?
22     A.  There had been questions from some of the
23 residents about the traffic, and the traffic engineer
24 had provided the traffic study to show that the trip
25 generation did not exceed the levels of service that

Page 175

1  would be acceptable to the City's code.
2      Q.  And what are -- what information are you
3  attempting to convey in this?
4      A.  The traffic that could be on the roadways
5  based upon the approved uses and the traffic that
6  would be based upon the senior housing community with
7  a medical office.
8      Q.  And the -- the next page is the medical
9  office that you're referring to?
10     A.  Well, there is three pages.  The first one is
11 a shopping center, which is an approved use for this
12 property.  The second one, scenario two, is a medical
13 office, which is an approved use for this property.
14 The third one was our proposal, which at the time was
15 108 units when the traffic engineer prepared this,
16 senior adult housing and medical office, and it showed
17 the trip generation for that.  And it was showing the
18 comparison of what the approved uses were already in
19 place for the property and what we were proposing,
20 which is significantly less than the -- the approved
21 uses.
22     Q.  So just in layman's terms, you're -- are you
23 trying to convey to this that even though concerns may
24 have been brought up about traffic that it really was
25 not having a detrimental effect on the area --

Page 176

1      A.  Trying to --
2      Q.  -- had -- had it been developed?
3      A.  Trying to convey that it would actually have
4  a positive effect on the area because the approved
5  uses would have significantly greater traffic
6  generation than our proposed use.
7      Q.  And the photos that are attached to this
8  document are -- are they from one of your different
9  developments or are they concept photos?
10     A.  A number of different developments.  They're
11 kind of smudged in black and white, so it's hard for
12 me to tell you which ones each of these pictures comes
13 from, but...
14         MS. GAINEY:  Okay.  By agreement of counsel I
15 think at this point we're going to take a break.
16 It's getting late in the day, and for the benefit
17 of everyone involved and the dogs that are at home
18 waiting for us --
19         THE WITNESS:  The important ones, yeah.
20         MS. GAINEY:  -- we agreed off the record that
21 we would reconvene at a time as soon as practical
22 meet -- meeting our schedules hopefully in
23 December so that we can be prepared for the
24 scheduled what I think is a January mediation,
25 although I'm not 100 percent sure about that.

Page 177

1  So at this time I have no more questions
2  today.
3         THE WITNESS:  Thank you.
4         VIDEOGRAPHER:  Counsel, would you like to
5  order the video?
6         MS. GAINEY:  I do want the video, yes.
7         COURT REPORTER:  And did you want to order a
8  copy of the transcript?
9         MS. GAINEY:  Yes, I do want the transcript.
10        MS. RHODEN:  Yes, please.
11        VIDEOGRAPHER:  Do you -- do you know what
12 format you would like your video?
13        MS. GAINEY:  What are my options?
14        VIDEOGRAPHER:  Synced, e-mailed, shipped to
15 you.
16        MS. GAINEY:  Oh, you can e-mail.
17        VIDEOGRAPHER:  E-mail it.
18        MS. GAINEY:  I know I looks like old-school
19 with all this paper, but I --
20        VIDEOGRAPHER:  Would you like it synced or
21 just regular?
22        MS. GAINEY:  Just regular.
23        MS. RHODEN:  I don't need a copy.
24        VIDEOGRAPHER:  No.  Okay.  Thank you very
25 much.

William Scott Culp
November 21, 2024

Page 178

1        This will conclude today's videotaped
2 deposition.  The time is 3 -- I'm sorry.
3       5:33 p.m..
4        (The deposition was adjourned at 5:33 p.m..)
5 (Reading and signing of the deposition was not waived
6 by the witness and all parties.)

Page 179

1          CERTIFICATE OF OATH
3
4 STATE OF FLORIDA
5 COUNTY OF ORANGE
6
7      I, Kimberly B. Roat, Registered Professional
8 Reporter, Notary Public, State of Florida, certify
9 that WILLIAM SCOTT CULP personally appeared before me
10 on the 21st day of November 2024 and was duly sworn.
11     Signed this 25th day of November 2024.
16      Kimberly B. Roat, RPR
17      Notary Public, State of FL
       Commission No. HH 314655
18      Expires: 10/26/2026

Page 180

1        CERTIFICATE OF REPORTER
3 STATE OF FLORIDA
4 COUNTY OF ORANGE
6     I, Kimberly B. Roat, Registered Professional
7 Reporter, certify that I was authorized to and did
8 stenographically report the deposition of WILLIAM
9 SCOTT CULP, Pages 1 through 178; that a review of the
10 transcript WAS requested; and that the transcript is a
11 true and complete record of my stenographic notes.
12     I further certify that I am not a relative,
13 employee, attorney, or counsel of any of the parties,
14 nor am I a relative or employee of any of the parties'
15 attorneys or counsel connected with the action, nor am
16 I financially interested in the action.
17     Dated this 25th day of November 2024.
19     Kimberly B. Roat, RPR
20     Registered Professional Reporter

Page 181

1        ERRATA SHEET
2 DO NOT WRITE ON THE TRANSCRIPT-ENTER CHANGES ON THIS PAGE
3 IN RE:  Atlantic Housing Partners L.L.L.P., a Florida
       limited liability partnership; Canton
4      Construction, LLC, a Florida limited liability
       corporation; Concord Management, LTD., a Florida
5      limited liability partnership; The Venue at Heritage Oaks
       Partners, LTD. V. Brevard County, a political
6      subdivision of the state of Florida
7 Witness: WILLIAM SCOTT CULP
  Date:  November 21, 2024
8 U.S. Legal Support Job No. 6731796-001
9 Page No.   Line No.    Change          Reason
23 Under penalties of perjury, I declare that I have read
   the foregoing document and that the facts stated in it
24 are true.
    Date                   WILLIAM SCOTT CULP